Adron W. Beene SB# 129040
Adron G. Beene SB# 298088
Attorney at Law
7960 Soquel Drive, Suite B #296
Aptos, CA 95003
Tel: (408) 392-9233
adron@adronlaw.com

Attorneys for defendants:
PURETHINK LLC, a Delaware limited
liability company, IGOV INC., a Virginia
corporation, and JOHN MARK SUHY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEO4J, INC., a Delaware corporation, and NEO4J SWEDEN AB, a Swedish corporation,<br>Plaintiffs,<br>v.<br><br>PURETHINK LLC, a Delaware limited<br>liability company, IGOV INC., a Virginia corporation, and JOHN MARK SUHY, an individual,<br>Defendants. | CASE NO. 5:18-cv-7182 EJD<br><br>**DECLARATION OF ADRON G. BEENE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON THEIR DCMA CLAIM AND DEFENDANTS' BREACH OF CONTRACT COUNTERCLAIM AND UNCLEAN HANDS DEFENSE**<br><br>Date: July 27, 2023<br>Time: 9:00 a.m.<br>Dept. Courtroom 4, 5th floor<br>Judge: Hon. Edward J. Davila |
| AND RELATED COUNTERCLAIM | **Trial Date November 14, 2023** |

I, Adron G. Beene, declare:

1.      I am an attorney for defendants and counter claimants in this action and am licensed to practice law in the State of California. I have personal knowledge of the facts set forth in this declaration.

2.      Attached hereto as **Exhibit 13** is a true and correct copy of email provided to plaintiff during discovery with bates N4J_010800 marked confidential by Plaintiffs.

3.      Attached hereto as **Exhibit 14** is a true and correct copy of email provided to plaintiff during discovery with bates N4J_004168 marked confidential by Plaintiffs.

4.      Attached hereto as **Exhibit 15** is a true and correct copy of an email with bates N4J_002993 marked confidential by Plaintiffs.

5.      Attached hereto as **Exhibit 17** is a true and correct copy of an email with bates: N4J_003078 marked confidential by Plaintiffs.

6.      Attached hereto as **Exhibit 18** is a true and correct copy of an email with bates: N4J_003302 marked confidential by Plaintiffs.

7.      Attached hereto as **Exhibit 26** is a true and correct copy of a Neo Technology Acknowledgement Form, designated as confidential by Plaintiffs with bates number N4J_001734.

8.      Attached hereto as **Exhibit 27** is a true and correct copy of an email with subject "Neo4j Enterprise Edition License Changes, sent 5/22/18, designated as confidential by Plaintiffs with bates number N4J_019995.

9.      Attached hereto as **Exhibit 28** is a true and correct copy of an amended and restated license agreement, effective august 1, 2010, designated

Beene Declaration In Support of Defendants' Opposition to Plaintiff's Motion for Summary Judgment   CASE NO. 5:18-cv-7182 EJD

2

as highly confidential, attorneys' eyes only by Plaintiffs with bates number NSW_000002.

10.  Attached hereto as **Exhibit 29** is a true and correct copy of a portion of a monthly closed won report, designated as highly confidential, attorneys' eyes only by Plaintiffs with bates number N4J_020132.

11.  Attached hereto as **Exhibit 30** is a true and correct copy of pages from the deposition of Brad Nussbaum, taken 10/16/2020.

12.  Attached hereto as **Exhibit 31** is a true and correct copy of pages from the deposition of John Mark Suhy, taken on 10/22/2020.

13.  Attached hereto as **Exhibit 32** is a true and correct copy of PLAINTIFF NEO4J SWEDEN AB'S RESPONSE TO PURETHINK LLC, IGOV INC. AND JOHN MARK SUHY'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE.

14.  Attached as Exhibit 33 is a true and correct copy of the Expert Report of Bradley M. Kuhn, dated December 22, 2022, and served on plaintiffs that date.


I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on June 1, 2023 in Kenwood, California.

__/s/ Adron G. Beene_____

Adron G. Beene

Beene Declaration In Support of Defendants' Opposition to Plaintiff's Motion for Summary Judgment   CASE NO. 5:18-cv-7182 EJD

3

# EXHIBIT 13

# DOCUMENT PROVISIONALLY FILED UNDER SEAL

# EXHIBIT 14

# DOCUMENT PROVISIONALLY FILED UNDER SEAL

# EXHIBIT 15

# DOCUMENT PROVISIONALLY FILED UNDER SEAL

# EXHIBIT 17

# DOCUMENT PROVISIONALLY FILED UNDER SEAL

# EXHIBIT 18

# DOCUMENT PROVISIONALLY FILED UNDER SEAL

# EXHIBIT 26

# DOCUMENT PROVISIONALLY FILED UNDER SEAL

# EXHIBIT 27

# DOCUMENT PROVISIONALLY FILED UNDER SEAL

# EXHIBIT 28 DOCUMENT PROVISIONALLY FILED UNDER SEAL

# EXHIBIT 29

# DOCUMENT PROVISIONALLY FILED UNDER SEAL

# EXHIBIT 30

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


| | |
|---|---|
| NEO4J, INC., a Delaware corporation, and NEO4J SWEDEN AB, a Swedish corporation, | ) CASE NO.<br>) 5:19-CV-06226-EJD<br>)<br>) |
| Plaintiffs, | )<br>) |
| vs. | )<br>) |
| GRAPH FOUNDATION, INC., an Ohio corporation, GRAPHGRID, INC., an Ohio corporation, and ATOMRAIN INC., a Nevada corporation, | )<br>)<br>)<br>)<br>) |
| Defendants. | ) |


REMOTE VIA ZOOM


30(b)(6) DEPOSITION OF NEO4J INC


BY BRAD NUSSBAUM


_____

9:17 A.M. PDT

FRIDAY, OCTOBER 16, 2020

_____


By:  Denise Myers Byrd, CSR 8340, RPR

1

1    where I'm looking?

2         A.  Yes.

3         Q.  And it lists three individuals.  Do you want to

4    read those to me.

5         A.  The document says the three names are Bradley

6    Nussbaum, Benjamin Nussbaum, John Mark Suhy.

7         Q.  And was John Mark Suhy on the board at that

8    time?

9         A.  No, he was not.

10        Q.  Why is he listed as being on the board as

11   printed out?

12        A.  John Mark was someone that we considered having

13   on the board, I think, along with a few other

14   individuals from the community.

15            Ben and I were the only board members that were

16   ever officially set in.  We had spent a good amount of

17   time trying to figure out how the foundation was going

18   to be governed.  Having never run a nonprofit, we

19   weren't quite sure how we wanted to do that.  I think

20   when the site got created, I think we -- I think we

21   largely looked at the Apache Foundation as a model for

22   how the site was set up.  And when we -- when it got

23   published, it must have went out with John Mark's name

24   maybe because we were considering it at the time, but

25   there were ultimately reasons why we didn't include him

                                                              40

1    way that he conducts publicly that we were just kind of

2    concerned about.

3           Because our goal with the foundation, you know,

4    was to provide a mission, you know, that aligns with what

5    we've said, and I don't think that -- I don't think that

6    John Mark always -- it's not like there's big

7    disagreements.  It's, like, one of those things that's,

8    like -- it's, like, the gray area.  It's not, like, full

9    alignment, but it's not like we disagreed on stuff.  It's

10   just -- it's just when there's administration decisions

11   involved and governance and people in the public sector

12   or public spotlight saying things, we just felt like we

13   needed to have -- yeah, Ben and I would be the ones that

14   that was coming from.

15       Q.  You mentioned there were concerns about how

16   John Mark communicated publicly.  What were those

17   concerns?

18       A.  I think John Mark says a lot of things.  Some

19   of the emails that we don't respond to are probably an

20   example of that.  He definitely says a lot of things.

21   Maybe sometimes it's because of the medication he's on.

22   Some days are good and some days are -- there's a lot,

23   so it's always hard to know with him kind of what -- if

24   he's having a good day or a bad day and what's going out

25   there.  And it's not, like, to say that he's not a good

                                                          42

1    Q.  We can come back to that and you can check on a

2    break or something.

3         Who hosts the website for Graph Foundation?

4    A.  It's hosted by -- I think AWS CloudFront hosts

5    it.

6    Q.  And who's responsible for putting the content

7    on the website?

8    A.  I am.  I have access and Ben has access.

9    Q.  So you made the changes to remove John Mark

10   from the website?

11   A.  I think Ben did.  I think Ben might have -- I

12   think Ben set up some of these initial pages.

13   Q.  Do you guys keep archives of your website?

14   A.  I mean, it's a -- yes, I think so, yeah.

15   Q.  How often do you archive your website?

16   A.  Oh -- oh, you mean like a full backup?

17   Q.  Yes.

18   A.  Well, I mean, it's a WordPress site so I think

19   the database that's hosted it is backed up.  I don't

20   know what frequency, but any pages have versions and are

21   published and stuff so yeah.

22   Q.  So do you have access to prior published

23   versions of the website?

24   A.  I would assume so.  I mean, probably not the

25   full website.  I mean, like, I think through WordPress

44

1   Neo4j Enterprise code base.

2       Q.  And when did Graph Foundation first create

3   ONgDB?

4       A.  I don't know the exact date.  I would assume

5   that it was somewhere or sometime in early November of

6   2018 or around then.  Maybe it was after.  I'm not sure

7   of the exact date.

8       Q.  Could it have been earlier?

9       A.  This exact repository?  I mean, this exact one?

10      Q.  No.  I'm just asking when ONgDB was -- before

11  it was created.

12      A.  I mean, I don't think that this repository that

13  we're looking at here on GitHub -- I mean, obviously it

14  couldn't have been created before we had the Graph

15  Foundation account because that repository lives within

16  the Graph Foundation account.  So that exact repository

17  was created sometime after the Graph Foundation GitHub

18  account was set up, and I don't know the exact date.

19      Q.  Okay.  And who created ONgDB?

20      A.  If you want to be specific to the repository,

21  are you asking who created this repository?

22      Q.  Sure, let's start with that.

23      A.  Okay.  So I created the ONgDB repository on

24  GitHub.

25      Q.  And when you say on GitHub, are you referring

78

COURT REPORTER'S CERTIFICATE


     I, DENISE MYERS BYRD, CA CSR 8340, RPR, the officer

before whom the foregoing proceeding was conducted, do hereby

certify that the witness whose testimony appears in the

foregoing proceeding was duly sworn by me; that the testimony

of said witness was taken down by me in stenotype to the best

of my ability and thereafter transcribed under my supervision;

and that the foregoing pages, inclusive, constitute a true and

accurate transcription of the testimony of the witness.

     Before completion of the deposition, review of the

transcript [X] was [ ] was not requested.  If requested, any

changes made by the deponent (and provided to the reporter)

during the period allowed are appended hereto.

     I further certify that I am neither counsel for,

related to, nor employed by any of the parties to this action,

and further, that I am not a relative or employee of any

attorney or counsel employed by the parties thereof, nor

financially or otherwise interested in the outcome of said

action.  Signed this 9th day of October 2020.




                         Denise Myers Byrd

                         CSR 8340, RPR, CLR 102409-02


                                                      253

# EXHIBIT 31

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA


NEO4J, INC., a Delaware
corporation; and NEO4J SWEDEN
AB, a Swedish corporation,

            Plaintiffs,

                                   CASE NO.
vs.                             5:18-cv-07182-EJD

PURETHINK, LLC, a Delaware
limited liability company;
IGOV, INC., a Virginia
corporation; and JOHN MARK
SUHY, an individual,

            Defendants.
_____/

REMOTE VIDEOTAPED DEPOSITION OF
JOHN MARK SUHY
as representative of IGOV, INC.
pursuant to Federal Rule of Civil Procedure 30(b)(6)

**Confidential Pursuant to Protective Order**


DATE:         October 22, 2020

TIME:         9:12 a.m.

LOCATION:   Via videoconference


REPORTED BY: BENJAMIN GERALD
               California CSR No. 14203
               Washington CSR No. 3468

1

 1          A.   Yes.

 2          Q.   And how was that agreement memorialized?  Was

 3     it in a writing?  Was it in a contract?  Based on your

 4     understanding.

 5          A.   How was it realized it, you said?

 6          Q.   Yeah.  Memorialized.  I'm sorry.  I didn't mean

 7     to...

 8          A.   Can you -- can you explain what "memorialized"

 9     is?  Sorry.

10          Q.   Yeah.  For example, if you have an agreement

11     with someone to -- to sell them your car, and you orally

12     agree to that, then later you say, "We should probably

13     write this down."  Memorializing it is putting it in

14     writing.

15          A.   Okay.  So we do have an exclusivity agreement.

16     We have emails and verbal that confirms.

17          Q.   So you have -- you have a -- you said you have

18     an exclusivity agreement, you have emails, and you have

19     verbal confirmations.  Let me ask you about the

20     exclusivity agreement.

21               What is that?

22          A.   That means that the Neo4j Government Edition,

23     anybody that wants to procure it in the government would

24     have to come through us.

25          Q.   And is that in a -- in a contract signed by

                                                              43

1    iGov and --

2         A.  This was with --

3         Q.  -- Neo4j?

4              I'm sorry.  Correct.  Is that in the contact

5    with PureThink and Neo4j?

6         A.  We provided it.  I'm assuming that's a contract

7    that we provided.

8         Q.  But to your recollection, it is an actual,

9    separate document called an "exclusivity contract"?

10        A.  Yes.

11        Q.  And are you familiar with what is called "the

12   partner agreement"?

13        A.  Yes, I am.

14        Q.  Okay.  Is the exclusivity agreement separate

15   and apart from the partner agreement between PureThink

16   and Neo4j?

17        A.  Yes, it is.

18        Q.  So the relationship with respect to the

19   government exclusivity is memorialized with respect to a

20   separate exclusivity agreement and a partner agreement;

21   is that your understanding?

22        A.  The exclusivity agreement was after the partner

23   agreement.  It was completely different --

24        Q.  Okay.

25        A.  -- than the partner agreement.

                                                          44

1      Q.  Okay.  But there were two separate agreements;
2  that was all I'm getting at.
3      A.  Yes.  Yes.
4      Q.  Okay.  And you formed iGov specifically because
5  of this, from your perspective, the -- the, quote,
6  breaking of that set of agreements with Neo4j?
7      A.  No, that's not the only reason.
8      Q.  Okay.  It was one of the reasons?
9      A.  Yes.
10      Q.  Okay.  And what were the other reasons for the
11  formation of iGov?
12      A.  I wanted to create something that I could build
13  and sell in the future.
14      Q.  And what were you contemplating building and
15  selling?
16      A.  The company.
17      Q.  And what would -- what would be the -- the
18  opportunity that the company was going to exploit so
19  that you could sell it later?
20      A.  Just leveraging my experience in government to
21  build up consulting and revenue, products.
22      Q.  And that would have gone beyond graph database
23  software?
24      A.  Oh, of course.
25      Q.  But graph database software would have been one

45

1         A.  I don't know.  I can get that for you, though.

2         Q.  Okay.  Did -- at any time did PureThink

3    transfer any money to iGov?

4         A.  No.

5         Q.  At any time, did -- did PureThink transfer any

6    assets, such as computer systems, office equipment,

7    anything to iGov?

8         A.  No, no.

9         Q.  So my understanding is that you were the only

10   employee of both PureThink and iGov; is that right?

11        A.  Yes, that's correct.

12        Q.  Okay.  So when you formed iGov, did you get a

13   new computer, or did you just take your PureThink

14   computer with you?

15        A.  I got a new computer.

16        Q.  Okay.  And you left your old computer at --

17   well, your old computer's still with PureThink, then?

18        A.  Yes.  It's still -- I have it, but it's -- yes.

19        Q.  Right.  I understand that you're the company,

20   so I get that.

21        A.  Yeah.  Yeah.  In fact, I think -- I think that

22   old computer is -- I mean, it's not -- it's not worth

23   anything.

24        Q.  Sure.  Did iGov take over any of PureThink's

25   customers?

                                                              52

1      A.   No.   They didn't take over meaning -- taking --

2    how would you describe taking over?

3      Q.   Sure.   And that's a fair question.

4           So for example, my understanding is that

5    PureThink had a business relationship with the Internal

6    Revenue Service.

7      A.   Uh-huh.

8      Q.   And that that relationship is now maintained by

9    iGov; is that right?

10     A.   Relationship, but not the contract.   We still

11   work with -- with the IRS.

12     Q.   So PureThink had a contract with the IRS and

13   iGov had a contract with the IRS; is that right?

14     A.   Separately, yes.

15     Q.   Separate.

16     A.   Yeah.

17     Q.   Two different contracts?

18     A.   Yes.

19     Q.   Was the nature of the services provided by both

20   entities the same, generally?

21     A.   The original contract with PureThink was to

22   build out and support the -- the Government Edition.

23   They scrapped that contract, and the work we're doing

24   now is -- is all over the board.   In fact, there's

25   another company that supports their graphs, and so we do

                                                            53

mostly development of innovative new technologies.

        So no, I would say they're -- they're -- in name, they -- they are, if you go and look at the public records, but what we do is not the same anymore.

        Q.  So initially, PureThink was hired to help build out Neo4j's Government Edition and -- I'm sorry.  Go ahead.  You were about to answer.

        A.  No, no.  I just cleared my throat.

        Q.  Okay.  So is that right, that PureThink was hired to build out the Government Edition?

        A.  No.  PureThink was hired to implement -- to bring in the Government Edition and build out a solution that they needed specifically for IRS.

        Q.  Right.  But that would -- the Government Edition would be part of that solution?

        A.  Yes, it was part of it.

        Q.  And now iGov supports a variety of other services; is included within that list of services support for any graph software implementation?

        A.  So we're in charge of supporting anything we build, and some of the tools we build use graph; some of them don't.

        Q.  And the tools that you build that use graph, what graph solution does that apply to?

        A.  Currently, ONgDB, but we'll -- might be moving

54

JOHN MARK SUHO                                                    October 22, 2020

```
 1                        CERTIFICATE

 2        I, BENJAMIN GERALD, Certified Shorthand Reporter,

 3   Certificate No. 14203, for the State of California do

 4   hereby certify:

 5        That prior to being examined, the witness named in

 6   the foregoing deposition was by me duly sworn to testify

 7   to the truth, the whole truth, and nothing but the truth

 8   in the within-entitled cause;

 9        That said deposition was taken shorthand at the

10   time and place herein named;

11        That the deposition is a true record of the

12   witness's testimony as reported to the best of my

13   ability by me, and was thereafter transcribed to

14   typewriting by computer under my direction;

15        That request [X] was [ ] was not made to read and

16   correct said deposition.

17        I further certify that I am not interested in

18   the outcome of said action, nor am I connected with, nor

19   related to any of the parties in said action, nor to

20   their respective counsel.

21        Witness my hand this 29th day of October, 2020.

22

23                    _____

24                    BENJAMIN GERALD, CSR No. 14203

                      STATE OF CALIFORNIA

25
```

261

# EXHIBIT 32

1   John V. Picone III, Bar No. 187226
    jpicone@hopkinscarley.com
2   Jeffrey M. Ratinoff, Bar No. 197241
    jratinoff@hopkinscarley.com
3   HOPKINS & CARLEY
    A Law Corporation
4   The Letitia Building
    70 South First Street
5   San Jose, CA  95113-2406

6   *mailing address:*
    P.O. Box 1469
7   San Jose, CA 95109-1469
    Telephone:     (408) 286-9800
8   Facsimile:     (408) 998-4790

9   Attorneys for Plaintiffs
    NEO4J, INC. and NEO4J SWEDEN AB
10

11                      UNITED STATES DISTRICT COURT

12                    NORTHERN DISTRICT OF CALIFORNIA

13  NEO4J, INC., a Delaware corporation; and       CASE NO.  5:18-cv-07182-EJD
    NEO4J SWEDEN AB, a Swedish
14  corporation,                                    **PLAINTIFF NEO4J SWEDEN AB'S**
                                                    **RESPONSE TO PURETHINK LLC, IGOV**
15              Plaintiffs,                         **INC. AND JOHN MARK SUHY'S**
                                                    **REQUESTS FOR PRODUCTION OF**
16       v.                                         **DOCUMENTS, SET ONE**

17  PURETHINK LLC, a Delaware limited
    liability company, IGOV INC., a Virginia
18  corporation, and JOHN MARK SUHY, an
    individual,
19
                Defendants.
20

21  AND RELATED COUNTERCLAIMS.

22

23       **PROPOUNDING PARTY:**     Defendants and Counterclaimants PURETHINK LLC,
                                     IGOV INC. and JOHN MARK SUHY
24
         **RESPONDING PARTY:**      Plaintiff and Counter-Defendant NEO4J SWEDEN AB
25
         **DISCOVERY:**             Requests for Production of Documents
26
         **SET NUMBER:**            One (1)
27

28

Hopkins & Carley
Attorneys At Law
San Jose ♦ Palo Alto

842\3442551.5

PLAINTIFF NEO4J SWEDEN AB'S RESPONSE TO PURETHINK LLC, IGOV INC. AND JOHN MARK
SUHY'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE          5:18-cv-07182-EJD

Plaintiff and Counter-Defendant Neo4j Sweden AB (hereinafter "Plaintiff" or "Responding Party") hereby objects and responds to the First Set of Requests for Production ("the Requests") propounded by Defendants and Counterclaimants Purethink LLC, iGov Inc. and John Mark Suhy (hereinafter "Defendants" or "Propounding Parties") in accordance with Rules 26 and 34 of the Federal Rules of Civil Procedure:

## GENERAL OBJECTIONS AND RESPONSES

Plaintiff asserts the following specific objections to each individual Request. These specific objections are separately set out here because they are applicable to the Requests as a whole and because doing so avoids the need to repeat these objections within the individual responses to the Requests.

1.     These responses are made solely for the purpose of the above-entitled action. Plaintiff's responses are based upon a reasonable investigation, performed within the time available, of the reasonably accessible information and documents currently available to Plaintiff. Plaintiff has not completed its investigation of the documents, information, and facts relating to this action, nor has Plaintiff completed its discovery or preparation for trial. In light of its continuing discovery and investigation, Plaintiff reserves the right to amend and/or supplement its responses to the Requests based on any documents, evidence, facts, testimony, or other information discovered, developed, or analyzed at a later date that is not presently known to Neo4j. Notwithstanding the foregoing, Plaintiff assumes no obligation to amend and/or supplement its responses beyond that which is required by the Federal Rules of Civil Procedure.

2.     Plaintiff objects to the Requests to the extent that they call for the production of documents, data, information, or other materials that are protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, or any other privilege, immunity, or defense from disclosure (collectively "Privilege"). To the extent that any documents are withheld on the basis of Privilege, Plaintiff will provide a privilege log consistent with the Federal Rules and the parties' agreement in their Joint Case Management Conference Statement and joint FRCP 26(f) Report, Dkt. No. 31.

/ / /

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

842\3442551.5

- 2 -

PLAINTIFF NEO4J SWEDEN AB'S RESPONSE TO PURETHINK LLC, IGOV INC. AND JOHN MARK SUHY'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE                    5:18-cv-07182-EJD

3.     Plaintiff objects to the Requests to the extent that they call for the production of sensitive, confidential, proprietary, or trade secret information, including but not limited to documents and information that may be subject to confidentiality agreements between Plaintiff and third parties, such as its customers and licensees.  In order to ensure that such information is protected from disclosure to the public and to Defendants, Plaintiff will only produce it (if at all) pursuant to the processes for the discovery of sensitive materials established by the Protective Order entered into this action.

4.     Plaintiff objects to the Requests to the extent that they call for electronically stored information ("ESI") and Defendants have failed to timely provide the parameters for an appropriate load file within a reasonable time before production is required.  Unless Defendants provide such parameters, Neo4j will produce ESI in an electronically searchable (i.e. OCR) format and all Excel spreadsheets shall be produced in native format.

5.     Plaintiff further objects to these requests on the grounds that they are overbroad, unduly burdensome, oppressive, harassing, and not proportional to the needs of the case to the extent that it calls for emails and other ESI that will be very burdensome, time-consuming, and expensive to search for, review, process, and produce.  For example, extracting, searching and producing ESI from Slack is cost-prohibitive, and not reasonably accessible because it cannot be done through normal e-discovery means and would require a significant expenditure of resources by Neo4j in the six figures to access such ESI, which is not proportional to the needs of the case.  Defendants also failed to meet and confer with Neo4j on reasonable and proportionate steps governing requests for and production of emails consistent with this District's Guidelines and Model Order, such as the appropriate number and identity of custodians to be searched, and appropriate search terms that will ensure that potentially responsive ESI is relevant and proportionate to the needs of the case.

6.     Plaintiff objects to the Requests' demand that Plaintiff produce responsive documents and electronic materials by February 28, 2019.  Requiring Neo4j to comply with this deadline would be unduly burdensome, and would impose a hardship on Plaintiff that is not proportional to the needs of this case, especially since Defendants failed to timely meet and

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ◆ PALO ALTO

842\3442551.5                                          - 3 -
PLAINTIFF NEO4J SWEDEN AB'S RESPONSE TO PURETHINK LLC, IGOV INC. AND JOHN MARK
SUHY'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE                5:18-cv-07182-EJD

confer regarding reasonable limitations on the search for responsive emails and similar ESI proportionate to the needs of the case.  Plaintiff will conduct a rolling production as it searches for responsive documents in a manner consistent with the proportional needs of the case.

7.    Plaintiff objects to the General Definitions and Instructions in the Requests as overbroad, unduly burdensome, oppressive, and not proportional to the needs of the case to the extent that they purport to impose any requirements or obligations on Plaintiff beyond those set forth in the Federal Rules of Civil Procedure, and the other rules and laws applicable to this matter.  For example, the Requests demand that Plaintiff produce "entire DOCUMENTS, including attachments, enclosures, cover letters, memoranda, and appendices, with all staples and clips attached and with all associated file folders, dividers, and file labels" and "[w]henever a DOCUMENT or group of DOCUMENTS is removed from a file folder, binder, file drawer, file box, notebook, or other cover or container, a copy of the label or other means of identification of such cover or other container shall be attached to the DOCUMENT."  Requests at 2:13-22.  Likewise, the Requests unreasonably demand that where Neo4j is unable to produce a requested document outside its immediate possession, Plaintiff must state various information about the document, "including but not limited to its date of preparation, date of mailing, author, and type…"  *Id*. at 2:23-27.  In responding to the Requests, Plaintiff does not agree to any requirements or obligations beyond those set forth in the Federal Rules of Civil Procedure.

8.    Plaintiff objects to each individual request in to the extent that it seeks information not relevant to a claim or defense or proportional to the needs of this case.  In providing these responses, Plaintiff does not concede the relevancy or materiality of any individual request, or of the subject to which such individual request refers.  Plaintiff's response to each request is made without waiving any applicable objections on the basis of competency, relevancy, materiality, privilege, work-product protection, or admissibility as evidence.  All such objections are expressly reserved and may be interposed at any time in this action, or in any other subsequent proceeding.

9.    Plaintiff objects to the definition of "YOU" and "YOUR"—and the individual Requests that rely on this definition—as overly broad, unduly burdensome, vague, ambiguous,

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

842\3442551.5

- 4 -

PLAINTIFF NEO4J SWEDEN AB'S RESPONSE TO PURETHINK LLC, IGOV INC. AND JOHN MARK
SUHY'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE          5:18-cv-07182-EJD

1    and not proportional to the needs of the case.  The Requests expand these terms to include "its

2    direct and indirect parents, subsidiaries, attorneys, agents, representatives, successors or assigns,

3    and all other persons acting on behalf of any of them."  This expansion distorts the definitions of

4    "YOU" and "YOUR" beyond the commonly-accepted and reasonable interpretations of these

5    terms, and renders many of the Requests that use these terms vague, ambiguous, overbroad, and

6    unduly burdensome.  Neo4j will respond to these Requests by interpreting the terms "YOU" and

7    "YOUR" as calling for documents within the possession, custody or control of Neo4j Sweden AB

8    as contemplated by the Federal Rules of Civil Procedure.

9        10.   Plaintiff objects to the definition of "DOCUMENT" (and "WRITINGS" and

10   "RECORDINGS")—and the requests and other definitions that rely on this definition—as overly

11   broad, unduly burdensome, vague, ambiguous, and not proportional to the needs of this case.  The

12   Requests attempt to improperly expand these terms beyond Federal Rule of Civil Procedure 34

13   and Federal Rule of Evidence 1001.  Neo4j will respond to these requests by interpreting the term

14   "DOCUMENT" as defined and contemplated by these rules.

15       11.   Plaintiff objects to the definition of "COMMUNICATION" and

16   "COMMUNICATIONS"—and the requests and other definitions that rely on these definitions—

17   as overly broad, unduly burdensome, vague, ambiguous, and not proportional to the needs of this

18   case.  The Requests expand these definitions to beyond the commonly-accepted and reasonable

19   interpretation of these terms, including by defining them to include "any transmission made on

20   any computer network, including the 'Internet.'"  In responding to the Document Requests, Neo4j

21   will interpret "COMMUNICATION" and "COMMUNICATIONS" as those terms are commonly

22   used and understood.

23       12.   Plaintiff objects to the definition of "RELATING TO," "RELATED TO,"

24   "RELATING"—and the requests and other definitions that rely on these definitions—as overly

25   broad, unduly burdensome, vague, ambiguous, and not proportional to the needs of this case.  The

26   definition of these terms are compound and open-ended to where they are overbroad and unduly

27   burdensome to the extent that they pertain to general categories of documents.  *See Cotracom*

28   *Commodity Trading Co. v. Seaboard Corp.*, 189 F.R.D. 655, 665 (D. Kan. 1999) (finding request

Hopkins & Carley
Attorneys At Law
San Jose ♦ Palo Alto

842\3442551.5

- 5 -

PLAINTIFF NEO4J SWEDEN AB'S RESPONSE TO PURETHINK LLC, IGOV INC. AND JOHN MARK
SUHY'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE                    5:18-cv-07182-EJD

facially overly broad due to its use of the omnibus phrase "relating to"); *see also Aikens v. Deluxe Fin. Servs., Inc.*, 217 F.R.D. 533, 538 (D. Kan. 2003) (discovery requests rendered overbroad and unduly burdensome on their face where terms "regarding" and "relating to" do not modify a specific document, but rather very general categories of documents). In responding to the Document Requests, Neo4j will interpret "RELATING TO," "RELATED TO," "RELATING," as those terms are commonly used and understood and apply them within the reasonable scope of discovery and the proportional needs of the case.

13. Plaintiff objects to the definition of "ELECTRONIC DATA"—and the requests and other definitions that rely on these definitions—as overly broad, unduly burdensome, vague, ambiguous, and not proportional to the needs of this case because it calls for ESI that is not readily accessible and will be very burdensome, time-consuming, and expensive to search for, review, process, and produce. This request also is unduly burdensome and imposes a hardship on Plaintiff because Defendants failed to timely meet and confer regarding reasonable limitations on the search for ESI proportionate to the needs of the case.

14. Plaintiff objects to the definition of "COMMUNICATION"—and the requests and other definitions that rely on these definitions—as overly broad, unduly burdensome, vague, ambiguous. This definition distorts the definitions of "communications" beyond the commonly-accepted and reasonable interpretations of these terms, and renders many of the Requests that use these terms vague, ambiguous, overbroad, and unduly burdensome. Plaintiff interpreting this term as commonly used and as contemplated by the Federal Rules of Civil Procedure.

15. Plaintiff objects to the definition of "NEO4J COMMERCIAL SOFTWARE" on the grounds that it is vague, ambiguous and overbroad to the extent it includes not readily identifiable versions and or versions not reasonably calculated to discover facts relevant to any party's claim or defense, and is not proportional to the needs of the case.

16. Plaintiff objects to the definition of "NEO4J SOFTWARE" on the grounds that it is vague, ambiguous and overbroad to the extent it includes not readily identifiable versions and or versions not reasonably calculated to discover facts relevant to any party's claim or defense, and is not proportional to the needs of the case.

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

842\3442551.5
- 6 -
PLAINTIFF NEO4J SWEDEN AB'S RESPONSE TO PURETHINK LLC, IGOV INC. AND JOHN MARK
SUHY'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE                    5:18-cv-07182-EJD

17.     Plaintiff objects to the definitions of "and," "or," "each," "any" and "including,"— and the requests and other definitions that rely on these definitions—as overly broad, unduly burdensome, vague, ambiguous.  This definition distorts the definitions of these terms beyond the commonly-accepted and reasonable interpretations of these terms, and renders many of the Requests that use these terms vague, ambiguous, overbroad, and unduly burdensome.  Plaintiff interpreting these terms as commonly used and as contemplated by the Federal Rules of Civil Procedure.

Without waiving the foregoing General Objections and incorporating said objections into each specific response below, Plaintiff responds to Defendants' Requests as follows:

**RESPONSES TO REQUESTS FOR PRODUCTION OF DOCUMENTS**

**REQUEST FOR PRODUCTION NO. 1:**

All DOCUMENTS related to all trademark agreements sales, assignments, licenses or grants between YOU and Neo4j, Inc. of or related to the NEO4J TRADEMARKS.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

Plaintiff hereby incorporates by reference its General Objections described above. In addition to the foregoing General Objections, Plaintiff objects to this request to the extent that it calls for the disclosure of information protected by the attorney-client privilege, attorney work product doctrine, and other applicable privileges or protections recognized by law or statute.

Plaintiff objects to this request on the grounds that it is, indefinite, vague and ambiguous, overbroad as to time and scope, unduly burdensome, and not proportional to the needs of the case to the extent it requests "All DOCUMENTS related to" the requested subject matter and it requests documents "related to the NEO4J TRADEMARKS."  This renders the request indefinite and open-ended because "relating to" does not modify a specific document, but rather very general categories of documents.  *See Cotracom*, 189 F.R.D. at 665; *see also Aikens*, 217 F.R.D. at 538.  It is also unclear how the broad category of documents without any temporal limitation have any bearing on the claims or defenses asserted in this action since Plaintiff has not asserted any claims for trademark infringement against Defendants, and there are no trademarks asserted from any jurisdiction beyond the United States.  As a result, this request fails to describe the

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

842\3442551.5

- 7 -

PLAINTIFF NEO4J SWEDEN AB'S RESPONSE TO PURETHINK LLC, IGOV INC. AND JOHN MARK
SUHY'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE                    5:18-cv-07182-EJD

1   category of documents sought with reasonable particularity, is not reasonably calculated to

2   discover documents relevant to any party's claim or defense, and is not proportional to the needs

3   of the case. Accordingly, Plaintiff will interpret this request to call for agreements between

4   Plaintiff and Neo4j USA reflecting the sale, assignment and/or licensing of the federally

5   registered trademark, "NEO4J" (U.S. Reg. No. 4,784,280).

6        Plaintiff further objects to this request on the grounds that it is overbroad, unduly

7   burdensome, oppressive and not proportional to the needs of the case to the extent that it calls for

8   emails and other ESI that will be very burdensome, time-consuming, and expensive to search for,

9   review, process, and produce. This request also is unduly burdensome and imposes a hardship on

10  Plaintiff because Defendants failed to timely meet and confer regarding reasonable limitations on

11  the search for ESI proportionate to the needs of the case.

12       Subject to and without waiving the foregoing general and specific objections, and the

13  aforementioned limitations, Plaintiff responds as follows: Plaintiff will produce agreements

14  between Plaintiff and Neo4j USA reflecting the sale, assignment and/or licensing of the federally

15  registered trademark, "NEO4J" (U.S. Reg. No. 4,784,280).

16  **REQUEST FOR PRODUCTION NO. 2:**

17       All DOCUMENTS related to all copyright agreements, source code agreements, sales,

18  assignments, support, development, revenue sharing, licenses or grants between YOU and Neo4J,

19  Inc. of or related to NEO4J SOFTWARE and versions of Neo4J software that is not licensed

20  under the GPL or AGPL.

21  **RESPONSE TO REQUEST FOR PRODUCTION NO. 2:**

22       Plaintiff hereby incorporates by reference its General Objections described above. In

23  addition to the foregoing General Objections, Plaintiff objects to this request to the extent that it

24  calls for the disclosure of information protected by the attorney-client privilege, attorney work

25  product doctrine, and other applicable privileges or protections recognized by law or statute.

26       Plaintiff objects to this request on the grounds that it is compound, unintelligible,

27  indefinite, vague and ambiguous, overbroad as to time and scope, unduly burdensome, and not

28  proportional to the needs of the case to the extent it requests "All DOCUMENTS related to" the

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

842\3442551.5                                                - 8 -

PLAINTIFF NEO4J SWEDEN AB'S RESPONSE TO PURETHINK LLC, IGOV INC. AND JOHN MARK
SUHY'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE                        5:18-cv-07182-EJD

1   requested subject matter and it requests documents "related to NEO4J SOFTWARE and versions

2   of Neo4J software that is not licensed under the GPL or AGPL."  This renders the request

3   contradictory based on the definition of "NEO4J SOFTWARE and indefinite because "relating

4   to" does not modify a specific document, but rather very general categories of documents.  *See*

5   *Cotracom*, 189 F.R.D. at 665; *see also Aikens*, 217 F.R.D. at 538.  It is also unclear how this

6   broad category of documents without any temporal limitation and <u>all</u> versions of NEO4J® native

7   graph database software have any bearing on the claims or defenses asserted in this action.   As a

8   result, this request fails to describe the category of documents sought with reasonable

9   particularity, is not reasonably calculated to discover documents relevant to any party's claim or

10  defense, and is not proportional to the needs of the case.  Accordingly, Plaintiff will interpret this

11  request to call for agreements between Neo4j USA and Plaintiff that govern the licensing and/or

12  assignment of the copyrights to NEO4J® Enterprise Edition and NEO4J® Community Edition.

13      Plaintiff further objects to this request on the grounds that it is overbroad, unduly

14  burdensome, oppressive and not proportional to the needs of the case to the extent that it calls for

15  emails and other ESI that will be very burdensome, time-consuming, and expensive to search for,

16  review, process, and produce.  This request also is unduly burdensome and imposes a hardship on

17  Plaintiff because Defendants failed to timely meet and confer regarding reasonable limitations on

18  the search for ESI proportionate to the needs of the case.

19      Subject to and without waiving the foregoing general and specific objections, to the extent

20  it understands what is being sought by this request and the aforementioned limitations thereto,

21  Plaintiff responds as follows:  Plaintiff will produce the agreements between Neo4j USA and

22  Plaintiff that govern the licensing and/or assignment of the copyrights to NEO4J® Enterprise

23  Edition and NEO4J® Community Edition software responsive to this request.

24  **REQUEST FOR PRODUCTION NO. 3:**

25      All DOCUMENTS related to any copyright assignments, agreements with

26  CONTRIBUTORS, licenses or grants to YOU from any author of NEO4J SOFTWARE that you

27  have licensed under the GPL license.

28  / / /

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

842\3442551.5                                    - 9 -
PLAINTIFF NEO4J SWEDEN AB'S RESPONSE TO PURETHINK LLC, IGOV INC. AND JOHN MARK
SUHY'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE            5:18-cv-07182-EJD

**RESPONSE TO REQUEST FOR PRODUCTION NO. 3:**

Plaintiff hereby incorporates by reference its General Objections described above. In addition to the foregoing General Objections, Plaintiff objects to this request to the extent that it calls for the disclosure of information protected by the attorney-client privilege, attorney work product doctrine, and other applicable privileges or protections recognized by law or statute.

Plaintiff objects to this interrogatory on the grounds that its seeks confidential information protected from disclosure by the United States Constitution, the California Constitution, statutory and common law privacy rights in the United States, the EU's General Data Protection Regulation (GDPR), and such confidential and private information is not relevant to any party's claims or defenses, and not proportional to the needs of the case.

Plaintiff objects to this request on the grounds that it is compound, unintelligible, indefinite, vague and ambiguous, overbroad as to time and scope, unduly burdensome, and not proportional to the needs of the case to the extent it requests "All DOCUMENTS related to" the requested subject matter and it requests documents related to "any author of NEO4J SOFTWARE." This renders the request indefinite and open-ended because "relating to" does not modify a specific document, but rather very general categories of documents. *See Cotracom*, 189 F.R.D. at 665; *see also Aikens*, 217 F.R.D. at 538. It is also unclear how the broad category of documents without any temporal limitation and <u>all</u> versions of NEO4J® native graph database software dating back to 2007 have any bearing on the claims or defenses asserted in this action. As a result, this request fails to describe the category of documents sought with reasonable particularity, is not reasonably calculated to discover documents relevant to any party's claim or defense, and is not proportional to the needs of the case. Accordingly, Plaintiff will interpret this request to call for agreements for the licensing and/or assignment of any copyright in source code authored by persons other than employees and contractors of Plaintiff or Neo4j USA that is being used in version 4.0 of Neo4j® Enterprise Edition.

Plaintiff further objects to this request on the grounds that it is overbroad, unduly burdensome, oppressive and not proportional to the needs of the case to the extent that it calls for emails and other ESI that will be very burdensome, time-consuming, and expensive to search for,

Hopkins & Carley
Attorneys At Law
San Jose ♦ Palo Alto

842\3442551.5

PLAINTIFF NEO4J SWEDEN AB'S RESPONSE TO PURETHINK LLC, IGOV INC. AND JOHN MARK SUHY'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE            5:18-cv-07182-EJD

1  review, process, and produce.  This request also is unduly burdensome and imposes a hardship on

2  Plaintiff because Defendants failed to timely meet and confer regarding reasonable limitations on

3  the search for ESI proportionate to the needs of the case.

4         Subject to and without waiving the foregoing general and specific objections, to the extent

5  it understands what is being sought by this request and the aforementioned limitations thereto,

6  Plaintiff responds as follows:  Plaintiff will produce agreements for the licensing and/or

7  assignment of any copyright in source code authored by persons other than employees and

8  contractors of Plaintiff or Neo4j USA that is being used in version of 4.0 of Neo4j® Enterprise

9  Edition.

10  **REQUEST FOR PRODUCTION NO. 4:**

11         All DOCUMENTS related to any assignments to YOU from any author of or

12  CONTRIBUTOR to NEO4J SOFTWARE.

13  **RESPONSE TO REQUEST FOR PRODUCTION NO. 4:**

14         Plaintiff hereby incorporates by reference its General Objections described above. In

15  addition to the foregoing General Objections, Plaintiff objects to this request to the extent that it

16  calls for the disclosure of information protected by the attorney-client privilege, attorney work

17  product doctrine, and other applicable privileges or protections recognized by law or statute.

18         Plaintiff objects to this interrogatory on the grounds that its seeks confidential information

19  protected from disclosure by the United States Constitution, the California Constitution, statutory

20  and common law privacy rights in the United States, the EU's General Data Protection

21  Regulation (GDPR), and such confidential and private information is not relevant to any party's

22  claims or defenses, and not proportional to the needs of the case.

23         Plaintiff objects to this request on the grounds that it is indefinite, vague and ambiguous,

24  overbroad as to time and scope, unduly burdensome, and not proportional to the needs of the case

25  to the extent it requests "All DOCUMENTS related to" the requested subject matter and it

26  requests documents related to "any author of or CONTRIBUTOR to NEO4J SOFTWARE."  This

27  renders the request indefinite and open-ended because "relating to" does not modify a specific

28  document, but rather very general categories of documents. *See Cotracom*, 189 F.R.D. at 665;

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

842\3442551.5
- 11 -

PLAINTIFF NEO4J SWEDEN AB'S RESPONSE TO PURETHINK LLC, IGOV INC. AND JOHN MARK
SUHY'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE                5:18-cv-07182-EJD

1    *see also Aikens*, 217 F.R.D. at 538.  It is also unclear how the broad category of documents

2    without any temporal limitation and <u>all</u> versions of NEO4J® native graph database software

3    dating back to 2007 have any bearing on the claims or defenses asserted in this action.   As a

4    result, this request fails to describe the category of documents sought with reasonable

5    particularity, is not reasonably calculated to discover documents relevant to any party's claim or

6    defense, and is not proportional to the needs of the case.  Plaintiff further objects to this request as

7    unduly burdensome because it is duplicative of Request No. 3.  Accordingly, Plaintiff will

8    interpret this request to call for agreements reflecting the assignment of a copyright in source

9    code authored by persons other than employees and contractors of Plaintiff or Neo4j USA that is

10   being used in version 4.0 of Neo4j® Enterprise Edition.

11        Plaintiff further objects to this request on the grounds that it is overbroad, unduly

12   burdensome, oppressive and not proportional to the needs of the case to the extent that it calls for

13   emails and other ESI that will be very burdensome, time-consuming, and expensive to search for,

14   review, process, and produce.  This request also is unduly burdensome and imposes a hardship on

15   Plaintiff because Defendants failed to timely meet and confer regarding reasonable limitations on

16   the search for ESI proportionate to the needs of the case.

17        Subject to and without waiving the foregoing general and specific objections, and the

18   aforementioned limitations, Plaintiff responds as follows:  Plaintiff will produce agreements

19   reflecting the assignment of any copyrights in source code authored by persons other than

20   employees and contractors of Plaintiff or Neo4j USA that is being used in version of 4.0 of

21   Neo4j® Enterprise Edition.

22   **REQUEST FOR PRODUCTION NO. 5:**

23        All DOCUMENTS related to any license grants to YOU from any author of or

24   CONTRIBUTOR to NEO4J SOFTWARE.

25   **RESPONSE TO REQUEST FOR PRODUCTION NO. 5:**

26        Plaintiff hereby incorporates by reference its General Objections described above. In

27   addition to the foregoing General Objections, Plaintiff objects to this request to the extent that it

28   / / /

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ◆ PALO ALTO

842\3442551.5                                           - 12 -

PLAINTIFF NEO4J SWEDEN AB'S RESPONSE TO PURETHINK LLC, IGOV INC. AND JOHN MARK
SUHY'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE          5:18-cv-07182-EJD

1    calls for the disclosure of information protected by the attorney-client privilege, attorney work

2    product doctrine, and other applicable privileges or protections recognized by law or statute.

3          Plaintiff objects to this interrogatory on the grounds that its seeks confidential information

4    protected from disclosure by the United States Constitution, the California Constitution, statutory

5    and common law privacy rights in the United States, the EU's General Data Protection

6    Regulation (GDPR), and such confidential and private information is not relevant to any party's

7    claims or defenses, and not proportional to the needs of the case.

8          Plaintiff objects to this request on the grounds that it is compound, unintelligible,

9    indefinite, vague and ambiguous, overbroad as to time and scope, unduly burdensome, and not

10   proportional to the needs of the case to the extent it requests "All DOCUMENTS related to" the

11   requested subject matter and it requests documents related to "any author of or CONTRIBUTOR

12   to NEO4J SOFTWARE."  This renders the request indefinite and open-ended because "relating

13   to" does not modify a specific document, but rather very general categories of documents.  *See*

14   *Cotracom*, 189 F.R.D. at 665; *see also Aikens*, 217 F.R.D. at 538.  It is also unclear how the broad

15   category of documents without any temporal limitation and <u>all</u> versions of NEO4J® native graph

16   database software dating back to 2007 have any bearing on the claims or defenses asserted in this

17   action.   As a result, this request fails to describe the category of documents sought with

18   reasonable particularity, is not reasonably calculated to discover documents relevant to any

19   party's claim or defense, and is not proportional to the needs of the case.  Plaintiff further objects

20   to this request as unduly burdensome because it is duplicative of Request No. 3.  Accordingly,

21   Plaintiff will interpret this request to call for agreements reflecting the licensing grant of a

22   copyright in source code authored by persons other than employees and contractors of Plaintiff or

23   Neo4j USA that is being used in version 4.0 of Neo4j® Enterprise Edition.

24         Plaintiff further objects to this request on the grounds that it is overbroad, unduly

25   burdensome, oppressive and not proportional to the needs of the case to the extent that it calls for

26   emails and other ESI that will be very burdensome, time-consuming, and expensive to search for,

27   review, process, and produce.  This request also is unduly burdensome and imposes a hardship on

28   / / /

Hopkins & Carley
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

842\3442551.5

- 13 -

PLAINTIFF NEO4J SWEDEN AB'S RESPONSE TO PURETHINK LLC, IGOV INC. AND JOHN MARK
SUHY'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE                    5:18-cv-07182-EJD

1  Plaintiff because Defendants failed to timely meet and confer regarding reasonable limitations on

2  the search for ESI proportionate to the needs of the case.

3       Subject to and without waiving the foregoing general and specific objections, and the

4  aforementioned limitations, Plaintiff responds as follows:  Plaintiff will produce agreements

5  reflecting the licensing grant of any copyrights in source code authored by persons other than

6  employees and contractors of Plaintiff or Neo4j USA that is being used in version 4.0 of Neo4j®

7  Enterprise Edition.

8  **REQUEST FOR PRODUCTION NO. 6:**

9       All DOCUMENTS related to any assignments from YOU to any author of or

10  CONTRIBUTOR to NEO4J SOFTWARE.

11  **RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

12       Plaintiff hereby incorporates by reference its General Objections described above. In

13  addition to the foregoing General Objections, Plaintiff objects to this request to the extent that it

14  calls for the disclosure of information protected by the attorney-client privilege, attorney work

15  product doctrine, and other applicable privileges or protections recognized by law or statute.

16       Plaintiff objects to this request on the grounds that it is indefinite, vague and ambiguous,

17  overbroad as to time and scope, unduly burdensome, and not proportional to the needs of the case

18  to the extent it requests "All DOCUMENTS related to" the requested subject matter and it

19  requests documents related to "any author of or CONTRIBUTOR to NEO4J SOFTWARE."  This

20  renders the request indefinite and open-ended because "relating to" does not modify a specific

21  document, but rather very general categories of documents.  *See Cotracom*, 189 F.R.D. at 665;

22  *see also Aikens*, 217 F.R.D. at 538.  It is also unclear how the broad category of documents

23  without any temporal limitation and <u>all</u> versions of NEO4J® native graph database software

24  dating back to 2007 have any bearing on the claims or defenses asserted in this action.   As a

25  result, this request fails to describe the category of documents sought with reasonable

26  particularity, is not reasonably calculated to discover documents relevant to any party's claim or

27  defense, and is not proportional to the needs of the case.  Accordingly, Plaintiff will interpret this

28  request to call for agreements assigning any copyright in source code authored by Plaintiff that is

Hopkins & Carley
Attorneys At Law
San Jose ♦ Palo Alto

842\3442551.5
- 14 -
PLAINTIFF NEO4J SWEDEN AB'S RESPONSE TO PURETHINK LLC, IGOV INC. AND JOHN MARK
SUHY'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE                    5:18-cv-07182-EJD

1    being used in version 4.0 of NEO4J® Enterprise Edition or the current version of NEO4J®

2    Community Edition software to a third party contributor.

3         Plaintiff further objects to this request on the grounds that it is overbroad, unduly

4    burdensome, oppressive and not proportional to the needs of the case to the extent that it calls for

5    emails and other ESI that will be very burdensome, time-consuming, and expensive to search for,

6    review, process, and produce.  This request also is unduly burdensome and imposes a hardship on

7    Plaintiff because Defendants failed to timely meet and confer regarding reasonable limitations on

8    the search for ESI proportionate to the needs of the case.

9         Subject to and without waiving the foregoing general and specific objections, to the extent

10   it understands what is being sought by this request and the aforementioned limitations, Plaintiff

11   responds as follows:  Plaintiff will conduct a reasonable and diligent search for agreements

12   assigning any copyright in source code authored by Plaintiff that is being used in version 4.0 of

13   NEO4J® Enterprise Edition or the current version of NEO4J® Community Edition software to a

14   third party contributor.

15   **REQUEST FOR PRODUCTION NO. 7:**

16        All DOCUMENTS related to any license grants from YOU to any author of or

17   CONTRIBUTOR to NEO4J SOFTWARE.

18   **RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**

19        Plaintiff hereby incorporates by reference its General Objections described above. In

20   addition to the foregoing General Objections, Plaintiff objects to this request to the extent that it

21   calls for the disclosure of information protected by the attorney-client privilege, attorney work

22   product doctrine, and other applicable privileges or protections recognized by law or statute.

23        Plaintiff objects to this request on the grounds that it is indefinite, vague and ambiguous,

24   overbroad as to time and scope, unduly burdensome, and not proportional to the needs of the case

25   to the extent it requests "All DOCUMENTS related to" the requested subject matter and it

26   requests documents related to "any author of or CONTRIBUTOR to NEO4J SOFTWARE."  This

27   renders the request indefinite and open-ended because "relating to" does not modify a specific

28   document, but rather very general categories of documents.  *See Cotracom*, 189 F.R.D. at 665;

Hopkins & Carley
Attorneys At Law
San Jose ♦ Palo Alto

842\3442551.5

- 15 -

PLAINTIFF NEO4J SWEDEN AB'S RESPONSE TO PURETHINK LLC, IGOV INC. AND JOHN MARK
SUHY'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE                    5:18-cv-07182-EJD

1   *see also Aikens*, 217 F.R.D. at 538.  It is also unclear how the broad category of documents

2   without any temporal limitation and <u>all</u> versions of NEO4J® native graph database software

3   dating back to 2007 have any bearing on the claims or defenses asserted in this action.   As a

4   result, this request fails to describe the category of documents sought with reasonable

5   particularity, is not reasonably calculated to discover documents relevant to any party's claim or

6   defense, and is not proportional to the needs of the case.  Accordingly, Plaintiff will interpret this

7   request to call for agreement reflecting a licensing grant of any copyright in source code authored

8   by Plaintiff that is being used in version 4.0 of NEO4J® Enterprise Edition or the current version

9   of NEO4J® Community Edition software to a third party contributor.

10   Plaintiff further objects to this request on the grounds that it is overbroad, unduly

11   burdensome, oppressive and not proportional to the needs of the case to the extent that it calls for

12   emails and other ESI that will be very burdensome, time-consuming, and expensive to search for,

13   review, process, and produce.  This request also is unduly burdensome and imposes a hardship on

14   Plaintiff because Defendants failed to timely meet and confer regarding reasonable limitations on

15   the search for ESI proportionate to the needs of the case.

16   Subject to and without waiving the foregoing general and specific objections, to the extent

17   it understands what is being sought by this request and the aforementioned limitations, Plaintiff

18   responds as follows:  Plaintiff will conduct a reasonable and diligent search for agreements

19   reflecting a licensing grant of any copyright in source code authored by Plaintiff that is being

20   used in version 4.0 of NEO4J® Enterprise Edition or the current version of NEO4J® Community

21   Edition software to a third party contributor.

22   **REQUEST FOR PRODUCTION NO. 8:**

23   All DOCUMENTS related to any consent, license or waiver to alter the NEO4J

24   SOFTWARE AGPL license to add the COMMONS CLAUSE from Free Software Foundation,

25   Inc.

26   **RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**

27   Plaintiff hereby incorporates by reference its General Objections described above. In

28   addition to the foregoing General Objections, Plaintiff objects to this request to the extent that it

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

842\3442551.5                                                - 16 -
PLAINTIFF NEO4J SWEDEN AB'S RESPONSE TO PURETHINK LLC, IGOV INC. AND JOHN MARK
SUHY'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE                    5:18-cv-07182-EJD

1   calls for the disclosure of information protected by the attorney-client privilege, attorney work

2   product doctrine, and other applicable privileges or protections recognized by law or statute.

3   Plaintiff further objects to this request to the extent that it calls for documents outside its

4   possession, custody or control.

5          Plaintiff objects to this request on the grounds that it is indefinite, vague and ambiguous,

6   overbroad as to time and scope, unduly burdensome, and not proportional to the needs of the case

7   to the extent it requests "All DOCUMENTS related to" the requested subject matter.  This

8   renders the request indefinite and open-ended because "relating to" does not modify a specific

9   document, but rather very general categories of documents.  *See Cotracom*, 189 F.R.D. at 665;

10  *see also Aikens*, 217 F.R.D. at 538.  It is also unclear how the broad category of documents

11  without any temporal limitation and <u>all</u> versions of NEO4J® native graph database software

12  dating back to 2007 have any bearing on the claims or defenses asserted in this action.   As a

13  result, this request fails to describe the category of documents sought with reasonable

14  particularity, is not reasonably calculated to discover documents relevant to any party's claim or

15  defense, and is not proportional to the needs of the case.  Accordingly, Plaintiff will interpret this

16  request to call for any consent, license or waiver obtained from the Free Software Foundation,

17  Inc. to include a Commons Clause to the software license for NEO4J® Enterprise Edition version

18  3.4x.

19         Plaintiff further objects to this request on the grounds that it is overbroad, unduly

20  burdensome, oppressive and not proportional to the needs of the case to the extent that it calls for

21  emails and other ESI that will be very burdensome, time-consuming, and expensive to search for,

22  review, process, and produce.  This request also is unduly burdensome and imposes a hardship on

23  Plaintiff because Defendants failed to timely meet and confer regarding reasonable limitations on

24  the search for ESI proportionate to the needs of the case.

25         Subject to and without waiving the foregoing general and specific objections, to the extent

26  it understands what is being sought by this request and the aforementioned limitations, Plaintiff

27  responds as follows:  Plaintiff does not have any responsive documents in its possession, custody

28  or control.

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE • PALO ALTO

842\3442551.5                                    - 17 -

PLAINTIFF NEO4J SWEDEN AB'S RESPONSE TO PURETHINK LLC, IGOV INC. AND JOHN MARK
SUHY'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE              5:18-cv-07182-EJD

1    **REQUEST FOR PRODUCTION NO. 9:**

2           All COMMUNICATIONS to or from CONTRIBUTORS related to the ownership of the

3    copyright to NEO4J SOFTWARE.

4    **RESPONSE TO REQUEST FOR PRODUCTION NO. 9:**

5           Plaintiff hereby incorporates by reference its General Objections described above. In

6    addition to the foregoing General Objections, Plaintiff objects to this request to the extent that it

7    calls for the disclosure of information protected by the attorney-client privilege, attorney work

8    product doctrine, and other applicable privileges or protections recognized by law or statute.

9    Plaintiff further objects to this request on the grounds that it calls for documents outside its

10   possession, custody or control.

11          Plaintiff objects to this interrogatory on the grounds that its seeks confidential information

12   protected from disclosure by the United States Constitution, the California Constitution, statutory

13   and common law privacy rights in the United States, the EU's General Data Protection

14   Regulation (GDPR), and such confidential and private information is not relevant to any party's

15   claims or defenses, and not proportional to the needs of the case.

16          Plaintiff objects to this request on the grounds that it is indefinite, vague and ambiguous,

17   overbroad as to time and scope, unduly burdensome, and not proportional to the needs of the case

18   to the extent it requests "All COMMUNICATIONS to or from CONTRIBUTORS related to" the

19   requested subject matter.  This renders the request indefinite and open-ended because "related to"

20   does not modify a specific document, but rather very general categories of documents.  *See*

21   *Cotracom*, 189 F.R.D. at 665; *see also Aikens*, 217 F.R.D. at 538.  It is also unclear how the broad

22   category of documents without any temporal limitation and <u>all</u> versions of and unspecified

23   copyrights to NEO4J® native graph database software dating back to 2007 have any bearing on

24   the claims or defenses asserted in this action.   As a result, this request fails to describe the

25   category of documents sought with reasonable particularity, is not reasonably calculated to

26   discover documents relevant to any party's claim or defense, and is not proportional to the needs

27   of the case.  Accordingly, Plaintiff will interpret this request to call for agreements assigning

28   and/or licensing a copyright in source code authored by Plaintiff that is being used in version 4.0

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

1    of NEO4J® Enterprise Edition or the current version of NEO4J® Community Edition software to

2    a third party contributor and communications with such third parties about such agreements.

3         Plaintiff further objects to this request on the grounds that it is overbroad, unduly

4    burdensome, oppressive and not proportional to the needs of the case to the extent that it calls for

5    emails and other ESI that will be very burdensome, time-consuming, and expensive to search for,

6    review, process, and produce.  This request also is unduly burdensome and imposes a hardship on

7    Plaintiff because Defendants failed to timely meet and confer regarding reasonable limitations on

8    the search for ESI proportionate to the needs of the case.

9         Subject to and without waiving the foregoing general and specific objections, to the extent

10   it understands what is being sought by this request and the aforementioned limitations, Plaintiff

11   responds as follows:  Plaintiff will produce agreements reflecting the assignment and/or licensing

12   grant of any copyrights in source code authored by persons other than employees and contractors

13   of Plaintiff or Neo4j USA that is being used in version of 4.0 of Neo4j® Enterprise Edition and

14   communications with such third parties about such agreements.

15   **REQUEST FOR PRODUCTION NO. 10:**

16        All COMMUNICATIONS with third parties that discuss or mention the COMMONS

17   CLAUSE YOU added to the NEO4J SOFTWARE APGL license.

18   **RESPONSE TO REQUEST FOR PRODUCTION NO. 10:**

19        Plaintiff hereby incorporates by reference its General Objections described above. In

20   addition to the foregoing General Objections, Plaintiff objects to this request to the extent that it

21   calls for the disclosure of information protected by the attorney-client privilege, attorney work

22   product doctrine, joint defense and common interest privileges, and other applicable privileges or

23   protections recognized by law or statute.  Plaintiff will interpret this request as not calling for the

24   production of communications with its counsel.  Plaintiff further objects to this request on the

25   grounds that it calls for documents outside its possession, custody or control.

26        Plaintiff objects to this request on the grounds that it is indefinite, vague and ambiguous,

27   overbroad as to time and scope, unduly burdensome, and not proportional to the needs of the case

28   to the extent it requests "All COMMUNICATIONS with third parties that discuss or mention" the

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

842\3442551.5

- 19 -

PLAINTIFF NEO4J SWEDEN AB'S RESPONSE TO PURETHINK LLC, IGOV INC. AND JOHN MARK
SUHY'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE                5:18-cv-07182-EJD

1   subject matter of this request without any limitation in time.  This renders the request indefinite

2   and open-ended because "discuss or mention" does not modify a specific document, but rather

3   very general categories of documents.  *See Cotracom*, 189 F.R.D. at 665; *see also Aikens*, 217

4   F.R.D. at 538.  It is also unclear how this broad category of documents without any temporal

5   limitation has any reasonable bearing on the claims or defenses asserted in this action.   As a

6   result, this request fails to describe the category of documents sought with reasonable

7   particularity, is not reasonably calculated to discover documents relevant to any party's claim or

8   defense, and is not proportional to the needs of the case.

9        Plaintiff further objects to this request on the grounds that it is overbroad, unduly

10   burdensome, oppressive and not proportional to the needs of the case to the extent that it calls for

11   emails and other ESI that will be very burdensome, time-consuming, and expensive to search for,

12   review, process, and produce.  This request also is unduly burdensome and imposes a hardship on

13   Plaintiff because Defendants failed to timely meet and confer regarding reasonable limitations on

14   the search for ESI proportionate to the needs of the case.

15        For the above reasons, Plaintiff will not produce documents responsive to this request as

16   currently drafted.  However, Plaintiff is willing to meet and confer to determine whether

17   Defendants can provide a narrower, more reasonably-drawn request and/or explain why such

18   information is relevant to this action and proportional to the needs of this case.

19   **REQUEST FOR PRODUCTION NO. 11:**

20        ALL DOCUMENTS reflecting, evidencing, relating to and/or referring to YOUR

21   COMMUNICATIONS with NEO4J, Inc. or any third parties related to or that mention

22   DEFENDANTS.

23   **RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**

24        Plaintiff hereby incorporates by reference its General Objections described above. In

25   addition to the foregoing General Objections, Plaintiff objects to this request to the extent that it

26   calls for the disclosure of information protected by the attorney-client privilege, attorney work

27   product doctrine, joint defense and common interest privileges, and other applicable privileges or

28   protections recognized by law or statute.  Plaintiff will interpret this request as not calling for the

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

842\344551.5

- 20 -

PLAINTIFF NEO4J SWEDEN AB'S RESPONSE TO PURETHINK LLC, IGOV INC. AND JOHN MARK
SUHY'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE                    5:18-cv-07182-EJD

1    production of communications with its counsel.  Plaintiff further objects to this request on the

2    grounds that it calls for documents outside its possession, custody or control.

3          Plaintiff objects to this request on the grounds that it is compound, unintelligible,

4    indefinite, vague and ambiguous, overbroad as to time and scope, unduly burdensome, and not

5    proportional to the needs of the case to the extent it requests "ALL DOCUMENTS reflecting,

6    evidencing, relating to and/or referring to" the requested subject matter and it requests documents

7    and documents "related to … DEFENDANTS."  This renders the request indefinite and open-

8    ended because "related to" does not modify a specific document, but rather very general

9    categories of documents.  *See Cotracom*, 189 F.R.D. at 665; *see also Aikens*, 217 F.R.D. at 538.

10   It is also unclear how this broad category of documents without any temporal limitation have any

11   bearing on the claims or defenses asserted in this action.   As a result, this request fails to describe

12   the category of documents sought with reasonable particularity, is not reasonably calculated to

13   discover documents relevant to any party's claim or defense, and is not proportional to the needs

14   of the case.

15         Plaintiff further objects to this request on the grounds that it is overbroad, unduly

16   burdensome, oppressive and not proportional to the needs of the case to the extent that it calls for

17   emails and other ESI that will be very burdensome, time-consuming, and expensive to search for,

18   review, process, and produce.  This request also is unduly burdensome and imposes a hardship on

19   Plaintiff because Defendants failed to timely meet and confer regarding reasonable limitations on

20   the search for ESI proportionate to the needs of the case.

21         For the above reasons, Plaintiff will not produce documents responsive to this request as

22   currently drafted.  However, Plaintiff is willing to meet and confer to determine whether

23   Defendants can provide a narrower, more reasonably-drawn request and/or explain why such

24   information is relevant to this action and proportional to the needs of this case.

25   **REQUEST FOR PRODUCTION NO. 12:**

26         Each version of the AGPL license for NEO4J SOFTWARE.

27   / / /

28   / / /

Hopkins & Carley
Attorneys At Law
San Jose ♦ Palo Alto

842\3442551.5

PLAINTIFF NEO4J SWEDEN AB'S RESPONSE TO PURETHINK LLC, IGOV INC. AND JOHN MARK
SUHY'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE                5:18-cv-07182-EJD

**RESPONSE TO REQUEST FOR PRODUCTION NO. 12:**

Plaintiff hereby incorporates by reference its General Objections described above. In addition to the foregoing General Objections, Plaintiff objects to this request to the extent that it calls for the disclosure of information protected by the attorney-client privilege, attorney work product doctrine, and other applicable privileges or protections recognized by law or statute.

Plaintiff objects to this request on the grounds that it is overbroad as to time and scope, unduly burdensome, and not proportional to the needs of the case to the extent it requests "Each version of the AGPL license for NEO4J SOFTWARE."   It is unclear what is meant by "each version of the AGPL license."  Plaintiff also objects to this request on the grounds that it seeks documents that are already in the possession of or equally available to Plaintiff As a result, this request fails to describe the category of documents sought with reasonable particularity, is not reasonably calculated to discover documents relevant to any party's claim or defense, and is not proportional to the needs of the case.

Subject to and without waiving the foregoing general and specific objections, to the extent it understands what is being sought by this request and the aforementioned limitations, Plaintiff responds as follows:  Plaintiff will produce the GNU Affero General Public License version 3.

**REQUEST FOR PRODUCTION NO. 13:**

A copy of each trademark license you have provided to any user of NEO4J SOFTWARE.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 13:**

Plaintiff hereby incorporates by reference its General Objections described above. In addition to the foregoing General Objections, Plaintiff objects to this request to the extent that it calls for the disclosure of information protected by the attorney-client privilege, attorney work product doctrine, joint defense and common interest privileges, and other applicable privileges or protections recognized by law or statute.  Plaintiff further objects to this request on the grounds that it calls for documents outside its possession, custody or control.

Plaintiff objects to this request on the grounds that it is, indefinite, vague and ambiguous, overbroad as to time and scope, unduly burdensome, and not proportional to the needs of the case to the extent it requests "each trademark license you have provided to any user of NEO4J

Hopkins & Carley
Attorneys At Law
San Jose ♦ Palo Alto

842\344251.5

- 22 -

PLAINTIFF NEO4J SWEDEN AB'S RESPONSE TO PURETHINK LLC, IGOV INC. AND JOHN MARK
SUHY'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE                    5:18-cv-07182-EJD

1   SOFTWARE." It is unclear how the requested documents without any temporal limitation have

2   any bearing on the claims or defenses asserted in this action since Plaintiff has not asserted any

3   claims for trademark infringement against Defendants, and there are no trademarks asserted from

4   any jurisdiction beyond the United States.   As a result, this request fails to describe the category

5   of documents sought with reasonable particularity, is not reasonably calculated to discover

6   documents relevant to any party's claim or defense, and is not proportional to the needs of the

7   case.

8          Subject to and without waiving the foregoing general and specific objections, to the extent

9   it understands what is being sought by this request and the aforementioned limitations, Plaintiff

10  responds as follows: Plaintiff will produce representative samples of standard agreements

11  containing trademark licensing provisions, restrictions on the usage of the NEO4J® mark, and/or

12  otherwise provide guidelines as to the permissible and impermissible uses of the NEO4J® mark

13  from January 1, 2014 to the present.

14  **REQUEST FOR PRODUCTION NO. 14:**

15         All COMMUNICATIONS related to YOUR efforts to control, verify quality control, or

16  enforce any trademarks for the "Neo4J" trademark for users of NEO4J SOFTWARE.

17  **RESPONSE TO REQUEST FOR PRODUCTION NO. 14:**

18         Plaintiff hereby incorporates by reference its General Objections described above. In

19  addition to the foregoing General Objections, Plaintiff objects to this request to the extent that it

20  calls for the disclosure of information protected by the attorney-client privilege, attorney work

21  product doctrine, joint defense and common interest privileges, and other applicable privileges or

22  protections recognized by law or statute.  Plaintiff will interpret this request as not calling for the

23  production of communications with its counsel.  Plaintiff further objects to this request on the

24  grounds that it calls for documents outside its possession, custody or control.

25         Plaintiff objects to this request on the grounds that it is, indefinite, vague and ambiguous,

26  overbroad as to time and scope, unduly burdensome, and not proportional to the needs of the case

27  to the extent it requests "All COMMUNICATIONS related to" the subject matter of this request

28  without any limitation in time.  This renders the request indefinite and open-ended because

Hopkins & Carley
Attorneys At Law
San Jose ♦ Palo Alto

842\344251.5                                   - 23 -

PLAINTIFF NEO4J SWEDEN AB'S RESPONSE TO PURETHINK LLC, IGOV INC. AND JOHN MARK
SUHY'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE              5:18-cv-07182-EJD

1  "related to" does not modify a specific document, but rather very general categories of

2  documents.  *See Cotracom*, 189 F.R.D. at 665; *see also Aikens*, 217 F.R.D. at 538.  It is unclear

3  how the requested documents without any temporal limitation have any bearing on the claims or

4  defenses asserted in this action since Plaintiff has not asserted any claims for trademark

5  infringement against Defendants, and there are no trademarks asserted from any jurisdiction

6  beyond the United States.   Likewise, it is also unclear how this broad category of documents

7  without any temporal limitation and <u>all</u> versions of NEO4J® native graph database software have

8  any bearing on the claims or defenses asserted in this action.  As a result, this request fails to

9  describe the category of documents sought with reasonable particularity, is not reasonably

10  calculated to discover documents relevant to any party's claim or defense, and is not proportional

11  to the needs of the case.

12          Plaintiff further objects to this request on the grounds that it is overbroad, unduly

13  burdensome, oppressive and not proportional to the needs of the case to the extent that it calls for

14  emails and other ESI that will be very burdensome, time-consuming, and expensive to search for,

15  review, process, and produce.  This request also is unduly burdensome and imposes a hardship on

16  Plaintiff because Defendants failed to timely meet and confer regarding reasonable limitations on

17  the search for ESI proportionate to the needs of the case.

18          For the above reasons, Plaintiff will not produce documents responsive to this request as

19  currently drafted.  However, Plaintiff is willing to meet and confer to determine whether

20  Defendants can provide a narrower, more reasonably-drawn request and/or explain why such

21  information is relevant to this action and proportional to the needs of this case.

22  **<u>REQUEST FOR PRODUCTION NO. 15:</u>**

23          ALL DOCUMENTS reflecting, evidencing, relating to and/or referring to

24  COMMUNICATIONS with third parties mentioning or attaching the document titled Fair Trade

25  Software Licensing.

26  **<u>RESPONSE TO REQUEST FOR PRODUCTION NO. 15:</u>**

27          Plaintiff hereby incorporates by reference its General Objections described above. In

28  addition to the foregoing General Objections, Plaintiff objects to this request to the extent that it

calls for the disclosure of information protected by the attorney-client privilege, attorney work product doctrine, joint defense and common interest privileges, and other applicable privileges or protections recognized by law or statute.  Plaintiff will interpret this request as not calling for the production of communications with its counsel.  Plaintiff further objects to this request on the grounds that it calls for documents outside its possession, custody or control.

Plaintiff objects to this request on the grounds that it is indefinite, vague and ambiguous, overbroad as to time and scope, unduly burdensome, and not proportional to the needs of the case to the extent it requests "ALL DOCUMENTS reflecting, evidencing, relating to and/or referring to" the subject matter of this request without any limitation in time.  This renders the request indefinite and open-ended because "relating to and/or referring to" does not modify a specific document, but rather very general categories of documents.  *See Cotracom*, 189 F.R.D. at 665; *see also Aikens*, 217 F.R.D. at 538.  It is also unclear how this broad category of documents has any reasonable bearing on the claims or defenses asserted in this action, especially since the reference document was first published in February 2012.   As a result, this request fails to describe the category of documents sought with reasonable particularity, is not reasonably calculated to discover documents relevant to any party's claim or defense, and is not proportional to the needs of the case.

Plaintiff further objects to this request on the grounds that it is overbroad, unduly burdensome, oppressive and not proportional to the needs of the case to the extent that it calls for emails and other ESI that will be very burdensome, time-consuming, and expensive to search for, review, process, and produce.  This request also is unduly burdensome and imposes a hardship on Plaintiff because Defendants failed to timely meet and confer regarding reasonable limitations on the search for ESI proportionate to the needs of the case.

For the above reasons, Plaintiff will not produce documents responsive to this request as currently drafted.  However, Plaintiff is willing to meet and confer to determine whether Defendants can provide a narrower, more reasonably-drawn request and/or explain why such information is relevant to this action and proportional to the needs of this case.

/ / /

Hopkins & Carley
Attorneys At Law
San Jose ♦ Palo Alto

842\3442551.5

- 25 -

PLAINTIFF NEO4J SWEDEN AB'S RESPONSE TO PURETHINK LLC, IGOV INC. AND JOHN MARK SUHY'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE          5:18-cv-07182-EJD

1

**REQUEST FOR PRODUCTION NO. 16:**

2

ALL DOCUMENTS reflecting, evidencing, relating to and/or referring to

3

COMMUNICATIONS about adding the COMMONS CLAUSE to the NEO4J SOFTWARE

4

APGL license.

5

**RESPONSE TO REQUEST FOR PRODUCTION NO. 16:**

6

Plaintiff hereby incorporates by reference its General Objections described above. In

7

addition to the foregoing General Objections, Plaintiff objects to this request on the grounds that

8

it calls for the disclosure of information protected by the attorney-client privilege, attorney work

9

product doctrine, joint defense and common interest privileges, and other applicable privileges or

10

protections recognized by law or statute.  Plaintiff will interpret this request as not calling for the

11

production of communications with its counsel.  Plaintiff further objects to this request on the

12

grounds that it calls for documents outside its possession, custody or control.

13

Plaintiff objects to this request on the grounds that it is indefinite, vague and ambiguous,

14

overbroad as to time and scope, unduly burdensome, and not proportional to the needs of the case

15

to the extent it requests "ALL DOCUMENTS reflecting, evidencing, relating to and/or referring

16

to" the subject matter of this request without any limitation in time.  This renders the request

17

indefinite and open-ended because "relating to and/or referring to" does not modify a specific

18

document, but rather very general categories of documents.  *See Cotracom*, 189 F.R.D. at 665;

19

*see also Aikens*, 217 F.R.D. at 538.  It is also unclear how this broad category of documents

20

without any temporal limitation has any reasonable bearing on the claims or defenses asserted in

21

this action.   As a result, this request fails to describe the category of documents sought with

22

reasonable particularity, is not reasonably calculated to discover documents relevant to any

23

party's claim or defense, and is not proportional to the needs of the case.

24

Plaintiff further objects to this request on the grounds that it is overbroad, unduly

25

burdensome, oppressive and not proportional to the needs of the case to the extent that it calls for

26

emails and other ESI that will be very burdensome, time-consuming, and expensive to search for,

27

review, process, and produce.  This request also is unduly burdensome and imposes a hardship on

28

Plaintiff because Defendants failed to timely meet and confer regarding reasonable limitations on

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ◆ PALO ALTO

842\3442551.5

- 26 -

PLAINTIFF NEO4J SWEDEN AB'S RESPONSE TO PURETHINK LLC, IGOV INC. AND JOHN MARK
SUHY'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE                    5:18-cv-07182-EJD

1   the search for ESI proportionate to the needs of the case.

2          For the above reasons, Plaintiff will not produce documents responsive to this request as

3   currently drafted.  However, Plaintiff is willing to meet and confer to determine whether

4   Defendants can provide a narrower, more reasonably-drawn request and/or explain why such

5   information is relevant to this action and proportional to the needs of this case.

6   **REQUEST FOR PRODUCTION NO. 17:**

7          ALL DOCUMENTS reflecting, evidencing, relating to and/or referring to

8   COMMUNICATIONS with GitHub users of YOUR GitHub public repositories where YOU

9   claim they could not use, display, perform or fork YOUR CONTENT.

10  **RESPONSE TO REQUEST FOR PRODUCTION NO. 17:**

11         Plaintiff hereby incorporates by reference its General Objections described above. In

12  addition to the foregoing General Objections, Plaintiff objects to this request on the grounds that

13  it calls for the disclosure of information protected by the attorney-client privilege, attorney work

14  product doctrine, joint defense and common interest privileges, and other applicable privileges or

15  protections recognized by law or statute.  Plaintiff will interpret this request as not calling for the

16  production of communications with its counsel.  Plaintiff further objects to this request on the

17  grounds that it calls for documents outside its possession, custody or control.

18         Plaintiff objects to this request on the grounds that it is indefinite, vague and ambiguous,

19  overbroad as to time and scope, unduly burdensome, and not proportional to the needs of the case

20  to the extent it requests "ALL DOCUMENTS reflecting, evidencing, relating to and/or referring

21  to" the subject matter of this request without any limitation in time.  This renders the request

22  indefinite and open-ended because "relating to and/or referring to" does not modify a specific

23  document, but rather very general categories of documents.  *See Cotracom*, 189 F.R.D. at 665;

24  *see also Aikens*, 217 F.R.D. at 538.  It is also unclear how this broad category of documents has

25  any reasonable bearing on the claims or defenses asserted in this action.   As a result, this request

26  fails to describe the category of documents sought with reasonable particularity, is not reasonably

27  calculated to discover documents relevant to any party's claim or defense, and is not proportional

28  to the needs of the case.

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

842\3442551.5

PLAINTIFF NEO4J SWEDEN AB'S RESPONSE TO PURETHINK LLC, IGOV INC. AND JOHN MARK
SUHY'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE                    5:18-cv-07182-EJD

1    Plaintiff further objects to this request on the grounds that it is overbroad, unduly

2  burdensome, oppressive and not proportional to the needs of the case to the extent that it calls for

3  emails and other ESI that will be very burdensome, time-consuming, and expensive to search for,

4  review, process, and produce.  This request also is unduly burdensome and imposes a hardship on

5  Plaintiff because Defendants failed to timely meet and confer regarding reasonable limitations on

6  the search for ESI proportionate to the needs of the case.

7    For the above reasons, Plaintiff will not produce documents responsive to this request as

8  currently drafted.  However, Plaintiff is willing to meet and confer to determine whether

9  Defendants can provide a narrower, more reasonably-drawn request and/or explain why such

10  information is relevant to this action and proportional to the needs of this case.

11  **REQUEST FOR PRODUCTION NO. 18:**

12    ALL DOCUMENTS reflecting, evidencing, relating to and/or referring to YOUR

13  COMMUNICATIONS related to the copyright management information for NEO4J

14  SOFTWARE.

15  **RESPONSE TO REQUEST FOR PRODUCTION NO. 18:**

16    Plaintiff hereby incorporates by reference its General Objections described above. In

17  addition to the foregoing General Objections, Plaintiff objects to this request on the grounds that

18  it calls for the disclosure of information protected by the attorney-client privilege, attorney work

19  product doctrine, joint defense and common interest privileges, and other applicable privileges or

20  protections recognized by law or statute.  Plaintiff will interpret this request as not calling for the

21  production of communications with its counsel.  Plaintiff further objects to this request on the

22  grounds that it calls for documents outside its possession, custody or control.

23    Plaintiff objects to this request on the grounds that it is, indefinite, vague and ambiguous,

24  overbroad as to time and scope, unduly burdensome, and not proportional to the needs of the case

25  to the extent it requests "ALL DOCUMENTS reflecting, evidencing, relating to and/or referring

26  to" the subject matter of this request without any limitation in time.  This renders the request

27  indefinite and open-ended because "relating to" and "referring to" does not modify a specific

28  document, but rather very general categories of documents.  *See Cotracom*, 189 F.R.D. at 665;

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ◆ PALO ALTO

842\3442551.5

- 28 -

PLAINTIFF NEO4J SWEDEN AB'S RESPONSE TO PURETHINK LLC, IGOV INC. AND JOHN MARK
SUHY'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE                5:18-cv-07182-EJD

1  *see also Aikens*, 217 F.R.D. at 538.  It is also unclear how this broad category of documents

2  without any temporal limitation and copyright management information for <u>all</u> versions of

3  NEO4J® native graph database software have any bearing on the claims or defenses asserted in

4  this action.  As a result, this request fails to describe the category of documents sought with

5  reasonable particularity, is not reasonably calculated to discover documents relevant to any

6  party's claim or defense, and is not proportional to the needs of the case.

7       Plaintiff further objects to this request on the grounds that it is overbroad, unduly

8  burdensome, oppressive and not proportional to the needs of the case to the extent that it calls for

9  emails and other ESI that will be very burdensome, time-consuming, and expensive to search for,

10  review, process, and produce.  This request also is unduly burdensome and imposes a hardship on

11  Plaintiff because Defendants failed to timely meet and confer regarding reasonable limitations on

12  the search for ESI proportionate to the needs of the case.

13       For the above reasons, Plaintiff will not produce documents responsive to this request as

14  currently drafted.  However, Plaintiff is willing to meet and confer to determine whether

15  Defendants can provide a narrower, more reasonably-drawn request and/or explain why such

16  information is relevant to this action and proportional to the needs of this case.

17  **REQUEST FOR PRODUCTION NO. 19:**

18       All DOCUMENTS YOU identified in YOUR response to the First Set of Interrogatories.

19  **RESPONSE TO REQUEST FOR PRODUCTION NO. 19:**

20       Plaintiff hereby incorporates by reference its General Objections described above. In

21  addition to the foregoing General Objections, Plaintiff objects to this request to the extent that it

22  calls for the disclosure of information protected by the attorney-client privilege, attorney work

23  product doctrine, and other applicable privileges or protections recognized by law or statute.

24  Plaintiff further objects to this request on the grounds that it calls for documents outside its

25  possession, custody or control.

26       Subject to and without waiving the foregoing general and specific objections, to the extent

27  it understands what is being sought by this request and the aforementioned limitations, Plaintiff

28  responds as follows:  Plaintiff will produce non-privileged documents responsive to this request

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ◆ PALO ALTO

842\3442551.5                                                          - 29 -

PLAINTIFF NEO4J SWEDEN AB'S RESPONSE TO PURETHINK LLC, IGOV INC. AND JOHN MARK
SUHY'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE                5:18-cv-07182-EJD

1   that are within its possession, custody or control.

2   **REQUEST FOR PRODUCTION NO. 20:**

3       All DOCUMENTS reviewed to support YOUR damages calculation.

4   **RESPONSE TO REQUEST FOR PRODUCTION NO. 20:**

5       Plaintiff hereby incorporates by reference its General Objections described above.  In

6   addition to the foregoing General Objections, Plaintiff objects to this request on the grounds that

7   it improperly calls for the disclosure of information protected by the attorney-client privilege,

8   attorney work product doctrine (i.e. the mental impressions and opinions of counsel), and other

9   applicable privileges or protections recognized by law or statute.  Plaintiff further objects to this

10  request on the grounds that it prematurely seeks expert discovery.

11      Plaintiff objects to this request on the grounds that it is indefinite, vague and ambiguous,

12  overbroad, unduly burdensome, fails to describe the documents sought with reasonable

13  particularity, and not proportional to the needs of the case to the extent it requests "ALL

14  DOCUMENTS reviewed to support…."  This renders the request indefinite and open-ended.  *See*

15  *Cotracom*, 189 F.R.D. at 665; *see also Aikens*, 217 F.R.D. at 538.  For the above reasons, Plaintiff

16  will not produce documents responsive to this request.

17  **REQUEST FOR PRODUCTION NO. 21:**

18      All DOCUMENTS that support YOUR damages calculation.

19  **RESPONSE TO REQUEST FOR PRODUCTION NO. 21:**

20      Plaintiff hereby incorporates by reference its General Objections described above. In

21  addition to the foregoing General Objections, Plaintiff objects to this request to the extent that it

22  calls for the disclosure of information protected by the attorney-client privilege, attorney work

23  product doctrine (i.e. the mental impressions and opinions of counsel), and other applicable

24  privileges or protections recognized by law or statute.  Plaintiff further objects to this request on

25  the grounds that it calls for documents outside its possession, custody or control.

26      Plaintiff objects to this request on the grounds that it is indefinite, vague and ambiguous,

27  overbroad, unduly burdensome, fails to describe the documents sought with reasonable

28  particularity, and not proportional to the needs of the case to the extent it requests "ALL

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ◆ PALO ALTO

842\344251.5

- 30 -

PLAINTIFF NEO4J SWEDEN AB'S RESPONSE TO PURETHINK LLC, IGOV INC. AND JOHN MARK
SUHY'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE        5:18-cv-07182-EJD

1 DOCUMENTS that support….” This renders the request indefinite and open-ended. *See*

2 *Cotracom*, 189 F.R.D. at 665; *see also Aikens*, 217 F.R.D. at 538.

3  Plaintiff further objects to this request on the grounds that it prematurely seeks expert

4 discovery.  Plaintiff has not completed its investigation of the documents, information, and facts

5 relating to this action, nor has Plaintiff completed its discovery or preparation for trial as

6 discovery has only just commenced.   Plaintiff reserves the right to amend and/or supplement its

7 response to this request based on any documents, evidence or other information discovered,

8 developed, or analyzed at a later date that is not presently known to Plaintiff.

9  Subject to and without waiving the foregoing general and specific objections, to the extent

10 it understands what is being sought by this request and the aforementioned limitations, Plaintiff

11 responds as follows:  Plaintiff will produce non-privileged material documents responsive to this

12 request that are within its possession, custody or control.

13 **REQUEST FOR PRODUCTION NO. 22:**

14  All DOCUMENTS that mention, reference or refer to the document titled Fair Trade

15 Software Licensing.

16 **RESPONSE TO REQUEST FOR PRODUCTION NO. 22:**

17  Plaintiff hereby incorporates by reference its General Objections described above. In

18 addition to the foregoing General Objections, Plaintiff objects to this request to the extent that it

19 calls for the disclosure of information protected by the attorney-client privilege, attorney work

20 product doctrine, joint defense and common interest privileges, and other applicable privileges or

21 protections recognized by law or statute.  Plaintiff will interpret this request as not calling for the

22 production of communications with its counsel.  Plaintiff further objects to this request on the

23 grounds that it calls for documents outside its possession, custody or control.

24  Plaintiff objects to this request on the grounds that it is indefinite, vague and ambiguous,

25 overbroad as to time and scope, unduly burdensome, and not proportional to the needs of the case

26 to the extent it requests “ALL DOCUMENTS that mention, reference or refer to” the subject

27 matter of this request without any limitation in time.  This renders the request indefinite and open-

28 ended because this phrase does not modify a specific document, but rather very general categories

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

842\3442551.5

- 31 -

PLAINTIFF NEO4J SWEDEN AB’S RESPONSE TO PURETHINK LLC, IGOV INC. AND JOHN MARK
SUHY’S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE  5:18-cv-07182-EJD

1   of documents.  *See Cotracom*, 189 F.R.D. at 665; *see also Aikens*, 217 F.R.D. at 538.  It is unclear

2   how this broad category of documents has any reasonable bearing on the claims or defenses

3   asserted in this action, especially since the reference document was first published in February

4   2012.  This request is also duplicative of Request No. 15.  As a result, this request fails to

5   describe the category of documents sought with reasonable particularity, is not reasonably

6   calculated to discover documents relevant to any party's claim or defense, and is not proportional

7   to the needs of the case.

8          Plaintiff further objects to this request on the grounds that it is overbroad, unduly

9   burdensome, oppressive and not proportional to the needs of the case to the extent that it calls for

10  emails and other ESI that will be very burdensome, time-consuming, and expensive to search for,

11  review, process, and produce.  This request also is unduly burdensome and imposes a hardship on

12  Plaintiff because Defendants failed to timely meet and confer regarding reasonable limitations on

13  the search for ESI proportionate to the needs of the case.

14         For the above reasons, Plaintiff will not produce documents responsive to this request as

15  currently drafted.  However, Plaintiff is willing to meet and confer to determine whether

16  Defendants can provide a narrower, more reasonably-drawn request and/or explain why such

17  information is relevant to this action and proportional to the needs of this case.

18  **REQUEST FOR PRODUCTION NO. 23:**

19         All DOCUMENTS related or referring to COMMUNICATIONS with third parties

20  regarding the termination of PureThink LLC Neo4J Solution Partner Agreement.

21  **RESPONSE TO REQUEST FOR PRODUCTION NO. 23:**

22         Plaintiff hereby incorporates by reference its General Objections described above. In

23  addition to the foregoing General Objections, Plaintiff objects to this request to the extent that it

24  calls for the disclosure of information protected by the attorney-client privilege, attorney work

25  product doctrine, joint defense and common interest privileges, and other applicable privileges or

26  protections recognized by law or statute.  Plaintiff will interpret this request as not calling for the

27  production of communications with its counsel.  Plaintiff further objects to this request on the

28  grounds that it calls for documents outside its possession, custody or control.

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

842\3442551.5                                                    - 32 -
PLAINTIFF NEO4J SWEDEN AB'S RESPONSE TO PURETHINK LLC, IGOV INC. AND JOHN MARK
SUHY'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE              5:18-cv-07182-EJD

1   Plaintiff objects to this request on the grounds that it is indefinite, vague and ambiguous,

2   overbroad as to time and scope, unduly burdensome, and not proportional to the needs of the case

3   to the extent it requests "All DOCUMENTS related or referring to" the subject matter of this

4   request without any limitation in time.  This renders the request indefinite and open-ended

5   because "related or referring to" does not modify a specific document, but rather very general

6   categories of documents.  *See Cotracom*, 189 F.R.D. at 665; *see also Aikens*, 217 F.R.D. at 538.

7   It is unclear how this broad category of documents has any reasonable bearing on the claims or

8   defenses asserted in this action when Plaintiff was not a party to the "PureThink LLC Neo4J

9   Solution Partner Agreement."  As a result, this request fails to describe the category of documents

10  sought with reasonable particularity, is not reasonably calculated to discover documents relevant

11  to any party's claim or defense, and is not proportional to the needs of the case.

12   Plaintiff further objects to this request on the grounds that it is overbroad, unduly

13  burdensome, oppressive and not proportional to the needs of the case to the extent that it calls for

14  emails and other ESI that will be very burdensome, time-consuming, and expensive to search for,

15  review, process, and produce.  This request also is unduly burdensome and imposes a hardship on

16  Plaintiff because Defendants failed to timely meet and confer regarding reasonable limitations on

17  the search for ESI proportionate to the needs of the case.

18   Subject to and without waiving the foregoing general and specific objections, to the extent

19  it understands what is being sought by this request and the aforementioned limitations, Plaintiff

20  responds as follows:  Plaintiff does not have any non-privileged documents within its possession,

21  custody or control that are responsive to this request.

22  **REQUEST FOR PRODUCTION NO. 24:**

23   All DOCUMENTS related or referring to COMMUNICATIONS regarding the ONgDB

24  fork of NEO4J SOFTWARE.

25  **RESPONSE TO REQUEST FOR PRODUCTION NO. 24:**

26   Plaintiff hereby incorporates by reference its General Objections described above. In

27  addition to the foregoing General Objections, Plaintiff objects to this request to the extent that it

28  calls for the disclosure of information protected by the attorney-client privilege, attorney work

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE • PALO ALTO

842\3442551.5

- 33 -

PLAINTIFF NEO4J SWEDEN AB'S RESPONSE TO PURETHINK LLC, IGOV INC. AND JOHN MARK
SUHY'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE                5:18-cv-07182-EJD

1   product doctrine, joint defense and common interest privileges, and other applicable privileges or

2   protections recognized by law or statute.  Plaintiff will interpret this request as not calling for the

3   production of communications with its counsel.  Plaintiff further objects to this request on the

4   grounds that it calls for documents outside its possession, custody or control.

5            Plaintiff objects to this request on the grounds that it is, indefinite, vague and ambiguous,

6   overbroad as to time and scope, unduly burdensome, and not proportional to the needs of the case

7   to the extent it requests "All DOCUMENTS related or referring to" the subject matter of this

8   request without any limitation in time.  This renders the request indefinite and open-ended

9   because "related or referring to" does not modify a specific document, but rather very general

10   categories of documents.  *See Cotracom*, 189 F.R.D. at 665; *see also Aikens*, 217 F.R.D. at 538.

11   Plaintiff objects to term "ONgDB fork" as vague and ambiguous as it inaccurately describes the

12   composition of the ONgDB software.  It is also unclear how this broad category of documents

13   without any temporal limitation and reference to unspecified versions of "the ONgDB fork of

14   NEO4J SOFTWARE" is reasonably tethered to claims or defenses asserted in this action.  As a

15   result, this request fails to describe the category of documents sought with reasonable

16   particularity, is not reasonably calculated to discover documents relevant to any party's claim or

17   defense, and is not proportional to the needs of the case.

18            Plaintiff further objects to this request on the grounds that it is overbroad, unduly

19   burdensome, oppressive and not proportional to the needs of the case to the extent that it calls for

20   emails and other ESI that will be very burdensome, time-consuming, and expensive to search for,

21   review, process, and produce.  This request also is unduly burdensome and imposes a hardship on

22   Plaintiff because Defendants failed to timely meet and confer regarding reasonable limitations on

23   the search for ESI proportionate to the needs of the case.

24            For the above reasons, Plaintiff will not produce documents responsive to this request as

25   currently drafted.  However, Plaintiff is willing to meet and confer to determine whether

26   Defendants can provide a narrower, more reasonably-drawn request and/or explain why such

27   information is relevant to this action and proportional to the needs of this case.

28   / / /

Hopkins & Carley
Attorneys At Law
San Jose ♦ Palo Alto

842\3442551.5
- 34 -
PLAINTIFF NEO4J SWEDEN AB'S RESPONSE TO PURETHINK LLC, IGOV INC. AND JOHN MARK
SUHY'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE                         5:18-cv-07182-EJD

1   **REQUEST FOR PRODUCTION NO. 25:**

2       All DOCUMENTS related or referring to COMMUNICATIONS regarding Neo4j

3   Government Edition after June 1st 2017.

4   **RESPONSE TO REQUEST FOR PRODUCTION NO. 25:**

5       Plaintiff hereby incorporates by reference its General Objections described above. In

6   addition to the foregoing General Objections, Plaintiff objects to this request to the extent that it

7   calls for the disclosure of information protected by the attorney-client privilege, attorney work

8   product doctrine, and other applicable privileges or protections recognized by law or statute.

9   Plaintiff will interpret this request as not calling for the production of communications with its

10  counsel.  Plaintiff further objects to this request on the grounds that it calls for documents outside

11  its possession, custody or control.

12      Plaintiff objects to this request on the grounds that it is indefinite, vague and ambiguous,

13  overbroad as to time and scope, unduly burdensome, and not proportional to the needs of the case

14  to the extent it requests "All DOCUMENTS related or referring to" the subject matter of this

15  request without any limitation in time.  This renders the request indefinite and open-ended

16  because "related or referring to" does not modify a specific document, but rather very general

17  categories of documents.  *See Cotracom*, 189 F.R.D. at 665; *see also Aikens*, 217 F.R.D. at 538.

18  It is unclear how this broad category of documents has any reasonable bearing on the claims or

19  defenses asserted in this action when Plaintiff was not a party to the "PureThink LLC Neo4J

20  Solution Partner Agreement" or the alleged agreement between Neo4j USA and PureThink for

21  the so-called "Neo4j Government Edition" software.  As a result, this request fails to describe the

22  category of documents sought with reasonable particularity, is not reasonably calculated to

23  discover documents relevant to any party's claim or defense, and is not proportional to the needs

24  of the case.

25      Plaintiff further objects to this request on the grounds that it is overbroad, unduly

26  burdensome, oppressive and not proportional to the needs of the case to the extent that it calls for

27  emails and other ESI that will be very burdensome, time-consuming, and expensive to search for,

28  review, process, and produce.  This request also is unduly burdensome and imposes a hardship on

Hopkins & Carley
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

842\344551.5

- 35 -

PLAINTIFF NEO4J SWEDEN AB'S RESPONSE TO PURETHINK LLC, IGOV INC. AND JOHN MARK
SUHY'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE          5:18-cv-07182-EJD

1  Plaintiff because Defendants failed to timely meet and confer regarding reasonable limitations on
2  the search for ESI proportionate to the needs of the case.

3      Subject to and without waiving the foregoing general and specific objections, to the extent
4  it understands what is being sought by this request and the aforementioned limitations, Plaintiff
5  responds as follows:  Plaintiff does not have any non-privileged documents within its possession,
6  custody or control that are responsive to this request.

7  **REQUEST FOR PRODUCTION NO. 26:**

8      All Slack and text messages that mention DEFENDANTS, Neo4j Government Edition,
9  and/or the ONgDB fork of NEO4J SOFTWARE.

10 **RESPONSE TO REQUEST FOR PRODUCTION NO. 26:**

11     Plaintiff hereby incorporates by reference its General Objections described above. In
12 addition to the foregoing General Objections, Plaintiff objects to this request to the extent that it
13 calls for the disclosure of information protected by the attorney-client privilege, attorney work
14 product doctrine, and other applicable privileges or protections recognized by law or statute.
15 Plaintiff further objects to this request on the grounds that it calls for documents outside its
16 possession, custody or control.

17     Plaintiff objects to this request on the grounds that it is, indefinite, vague and ambiguous,
18 overbroad as to time and scope, unduly burdensome, and not proportional to the needs of the case
19 to the extent it requests "All Slack and text messages that mention" the subject matter of this
20 request without any limitation in time.  This renders the request indefinite and open-ended
21 because that phrase does not modify a specific document, but rather very general categories of
22 documents.  *See Cotracom*, 189 F.R.D. at 665; *see also Aikens*, 217 F.R.D. at 538.  Plaintiff
23 objects to term "ONgDB fork" as vague and ambiguous as it inaccurately describes the
24 composition of the ONgDB software.  It is also unclear how this broad category of documents
25 without any temporal limitation is reasonably tethered to claims or defenses asserted in this
26 action.  As a result, this request is not reasonably calculated to discover documents relevant to
27 any party's claim or defense, and is not proportional to the needs of the case.

28     Plaintiff further objects to this requests on the grounds that it is overbroad, unduly

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ◆ PALO ALTO

842\3442551.5                                    - 36 -
PLAINTIFF NEO4J SWEDEN AB'S RESPONSE TO PURETHINK LLC, IGOV INC. AND JOHN MARK
SUHY'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE          5:18-cv-07182-EJD

1    burdensome, oppressive, and not proportional to the needs of the case to the extent that it calls for

2    emails and other ESI that will be very burdensome, time-consuming, and expensive to search for,

3    review, process, and produce.  For example, extracting, searching and producing ESI from Slack

4    is cost-prohibitive, and not reasonably accessible because it cannot be done through normal e-

5    discovery means and would require a significant expenditure of resources in excess of six figures

6    to access such ESI, which is not proportional to the needs of the case.  Defendants also failed to

7    meet and confer with Plaintiff on reasonable and proportionate steps governing requests for and

8    production of emails and text messages, such as the appropriate number and identity of custodians

9    to be searched, and appropriate search terms that will ensure that potentially responsive ESI is

10   relevant and proportionate to the needs of the case.  For the above reasons, Plaintiff will not

11   produce documents responsive to this request as currently drafted.

12   Dated:  February 28, 2020                          HOPKINS & CARLEY
                                                        A Law Corporation

13

14

15                                                By: */s/ Jeffrey M. Ratinoff*
                                                        John V. Picone III
16                                                      Jeffrey M. Ratinoff
                                                        Attorneys for Plaintiffs
17                                                      NEO4J, INC. and NEO4J SWEDEN AB

18

19

20

21

22

23

24

25

26

27

28

842\3442551.5

- 37 -

PLAINTIFF NEO4J SWEDEN AB'S RESPONSE TO PURETHINK LLC, IGOV INC. AND JOHN MARK
SUHY'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE                    5:18-cv-07182-EJD

## **PROOF OF SERVICE**

I, Diana L. Hodges, declare:

I am a citizen of the United States and employed in Santa Clara County, California.  I am over the age of eighteen years and not a party to the within-entitled action.  My business address is The Letitia Building, 70 South First Street, San Jose, California  95113-2406.  On the date indicated below, I served a copy of the within document:

> **PLAINTIFF NEO4J SWEDEN AB'S RESPONSE TO PURETHINK LLC, IGOV INC. AND JOHN MARK SUHY'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE**

☒   by transmitting via my electronic service address (dhodges@hopkinscarley.com) the document listed above to the person(s) at the e-mail address(es) set forth below.

> Adron W. Beene
> Adron G. Beene
> 1754 Technology Drive, Suite 228
> San Jose, CA 95110
> *Email: adron@adronlaw.com*
> *adronjr@adronlaw.com*

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on February 28, 2020, at San Jose, California.

_____
Diana L. Hodges

# EXHIBIT 20

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Neo4j, Inc., , a Delaware corporation, | CASE NO. 5:18-cv-07182 |
| Plaintiff, | |
| | |
| v. | |
| | |
| PureThink, LLC, a Delaware limited liability company, | **EXPERT REPORT OF** |
| IGOV, INC., a Virginia corporation, and | **BRADLEY M. KUHN** |
| JOHN MARK SUHY, an individual. | |
| Defendants. | |

EXPERT REPORT OF BRADLEY M. KUHN
22 DECEMBER 2022

## Introduction

1. I am providing this expert report in support of Defendants: PureThink, LLC, IGOV, Inc. and John Mark Suhy.

2. This expert report primarily discusses the issues of the removal of the Commons Clause ("CC") from the "Neo4j Sweden Software License" and Suhy's and/or PureThink, LLC's and/or IGOV, Inc.'s redistribution of the Neo4j software under the AGPLv3 with CC removed.

3. I am appearing as an expert in this case *pro bono publico*. I have asked Defendants' counsel only to cover direct costs of travel expenses to attend depositions and/or the trial (— should I be deposed and/or appear as a witness at trial in this case).

## Qualifications

4. I am currently employed as the Policy Fellow of the Software Freedom Conservancy, Inc. ("SFC"), a 501(c)(3) not-for-profit organization founded in New York. SFC is a nonprofit organization centered around ethical technology. SFC's mission is to ensure the right to repair, improve and reinstall software. SFC promotes and defends these rights through fostering free and open source software (FOSS) projects, driving initiatives that actively make technology more inclusive, and advancing policy strategies that defend FOSS (such as copyleft).

5. My interest in computing began as a child, when I received my first computer as a gift from my parents and began to regularly write new software for it and share that software with my friends, who helped me improve it.

6. As an undergraduate, I studied Computer Science at Loyola College in Maryland (now called the Loyola University Maryland). I received from there in 1995 a summa cum laude Bachelor's Degree in Computer Science, and the James D. Rozics Computer Science Medal, which is an award given to the year's top student in Computer Science at each graduation. I was furthermore elected into Upsilon Pi Epsilon (the National Computer Science Honors Society) and the Phi Beta Kappa honors society, which is the USA's oldest academic honors society for the liberal arts.

7. From 1991 through 2001, I worked consistently on a part-time (while studying) and then a full-time (when not in school) basis as a system administrator and software developer. I administered, configured, programmed, and debugged a variety of Unix and Unix-like operating systems[1] and software for those

---

[1] Unix was a computer operating system developed by AT&T in the early 1970s. Many systems were later developed that operated similarly like Unix, and are typically called "Unix-like" operating systems.

systems. My work experience spans the wide array of possible occupations that are typical for individuals trained in computer science.

8. From 1991-1995, while working as a programmer for the Baltimore Rh Typing Laboratories, Inc. (aka BRT Laboratories), I downloaded, configured, modified, and installed numerous Free and Open Source[2] (FOSS) programs. I became at that time an active participant in Usenet[3], and, at the encouragement of my employer, began sharing code that I improved with others who sought to solve similar tasks, and collaborated with other developers online to improve that code.

9. I have continued my code contributions to FOSS on a semi-regular basis since that time. I have submitted patches — derivative modification of the software, sent back to the original author for later inclusion – to various projects. I have also served as the co-maintainer of FOSS projects at times.

10. In 1992, I began using the Linux-based systems. I downloaded in 1992 the "Soft Landing System", an early GNU/Linux distribution put together by volunteers, and installed it on my personal computer. My professors saw the value in this software, and requested that I install this software throughout the computer lab at my undergraduate institution. I did so, and was later employed by Loyola's computer science department to continue maintaining, modifying and administering these systems until I graduated.

11. In 1997, I began a graduate program in Computer Science at the University of Cincinnati. In early 2001, I graduated from that program, completing a Master's Degree with thesis. My thesis dealt with programming language topics related to the Open Source and Free Software programming language named Perl. This work required me to participate heavily in the Perl community and contribute libraries and modification to the internals of the Perl language implementation. The original inventor and author of Perl, Larry Wall, served on my thesis committee. My thesis was later used by Wall as one of the justifications for the launch of another related Open Source project, called the Parrot Virtual Machine.

12. In 1996, I began volunteering for the Free Software Foundation, Inc. ("FSF"). Initially, Richard M. Stallman, President of the FSF, asked me to serve as a webmaster for the FSF and GNU websites. (GNU is an independent project that is fiscally sponsored by the FSF.)

13. As webmaster, I assisted in creation and editing of the initial "license list" page on the GNU website. This page, a version of which is still available today on the GNU website, explains the details of various software licenses and whether they meet GNU's criteria for Free Software licenses — meaning they give

---

[2]The term "Open Source" did not come into common usage until 1999, so it is somewhat anachronistic to use it referring to events that took place before then. However, I include here as it is a term more familiar to those outside of the field of computer science.

[3]Usenet was a worldwide discussion forum that was widely used by scientists, researchers, and programmers in the 1980s and early 1990s.

users the freedom to copy, share, modify and redistribute the software — and whether the licenses are compatible with the FSF's own licenses. In assisting Dr. Stallman with this type of work, as I have done on a regular basis from the late 1990s through October 2019, I first developed and then improved my expertise interpreting the requirements and details of FOSS licenses.

14.  As time went on in my career, I began to specialize specifically in the specific sub-area of FOSS licenses called "copyleft licensees". Copyleft licenses are FOSS licenses that have specific requirements that assure users' and consumers' right to copy, modify, and redistribute the software — both non-commercially and commercially (i.e., as part of a business endeavor).

15.  In 2000, I was hired to work for the FSF, initially remotely from Cincinnati, and then on-site in Boston upon completion of my Master's thesis in 2001. I was promoted multiple times, and eventually became Executive Director of the FSF, a role which I served in until March 2005.

16.  During my time as an employee of FSF, I assisted in various types of work related to software licensing and compliance with the GNU General Public License ("GPL"), the GNU Lesser General Public License ("LGPL") and other related and similar licenses. It was typical by the time of my departure that I led the resolution of thirty or more GPL violation matters each year, including a number that were made public, such as the OpenTV GPL violation and the original Linksys WRT54G violation.

17.  In 2006, I volunteered to be the President of the SFC. Once the SFC began to receive funding, I became SFC's first employee. I have held multiple roles and positions at SFC.

18.  In 2006 and 2007, I participated in the public process to comment on, evaluate, and make suggestions for the new version of the GPL (version 3). This work included many direct discussions with the GPLv3 drafters themselves.

19.  In March 2010, I was elected to the Board of Directors of the FSF. I held a position on FSF's Board of Directors until October 2019. My CV is attached as Exhibit L and list of publications is provided as Exhibit M. A true and correct copy of my Expert Report in an enforcement action is attached as Exhibit N.

20.  Throughout my long affiliation with the FSF, and also through my daily work at SFC, my primary focus and expertise centers around issues related to "copyleft" licenses such as the GPL and the Affero General Public License ("AGPL").

21.  While Executive Director of the FSF circa 2002, I was involved in many discussions internally at the FSF and with the public about what was then called the "web services loophole" in the GPL. Namely, since the copyleft terms of the traditional GPL triggered only on software *distribution*, and typical deployment on a

website (for server-side software) did not involve distribution to the software's users, no copyleft requirements were triggered.

22. Circa early 2002, based on the Computer Science concept called a "quine", I invented what is now known as the "Affero Clause". This idea was written up by others and used as part of the AGPL, version 1 ("AGPLv1"). The Affero Clause requires that users of software via a web interface must have the opportunity to request and receive the "Corresponding Source" of the software.

23. During the early stages of the public comment process for the GPLv3, I was involved in various discussions regarding whether the Affero Clause would be incorporated into GPLv3 itself, or if it would remain a separate license from the main GPLv3.

24. As part of the public comment process for drafting the GPLv3 (and, ultimately, the AGPLv3), four public, invite-only committees ("A" – "D") were formed for draft discussion. I was invited to participate in "Committee D".

25. After the drafters of GPLv3 decided that the Affero Clause would not be included, and after the GPLv3 was officially published, I worked directly with the drafters to suggest and propose text for AGPLv3 §13 — the only term of AGPLv3 that differs from the GPLv3, and the section which includes the "Affero Clause".

26. During my time as an employee at the FSF from the late 1990s until March 2005, I led and participated in many discussions with the general public about concerns, ideas, and issues related to copyleft licensing. I have continued that work both as a volunteer and employee at other organizations since then.

27. A key issue of study and concern was the issue of "Further Restrictions" that licensors attempted to place outside of the requirements of the GPL.

28. The issue of "Further Restrictions", and what terms copyleft licenses should incorporate to prevent the imposition of "Further Restrictions" became one of the many issues on which I developed expertise.

**History of The "Further Restrictions" Copyleft Licensing Issue**

29.  The FOSS ecosystem depends heavily on the ability of third parties to understand their rights and engage in the unfettered freedom and right to copy, modify and redistribute software, in both non-commercial and commercial contexts.

30.  A key policy tenet of copyleft licensing is assuring that copyleft license texts cannot be used to impose "Further Restrictions" on downstream recipients.

31.  Imposition of Further Restrictions completely undermines the entire purpose of a copyleft license.  Copyleft licenses are drafted carefully to guarantee rights of both individuals and firms that may receive the copyleft-licensed software after it has passed through (and been modified, repurposed, reconfigured and improved by) many different other entities.

32.  The functioning of the FOSS ecosystem relies on individuals and firms to determine that when they receive a copy of FOSS software licensed under a specific FOSS license, that they can feel confident that the rights embodied in that license are unfettered and that there is no ambiguity or confusion about those rights.

33.  Copyleft licenses go even a step further: they are designed and drafted to assure that no one in that entire distribution chain can change the terms of the license.  The terms of the licenses guarantee that everyone who receives the software under that license has the precise same rights and permissions as everyone else.

34.  Starting as early as 1996, and possibly earlier, I became aware in my work as a FOSS activist that there was a problematic practice in copyleft licenses.  At the time, activists tended to call this the "no military use problem", because the issue came up most with regard to software authors who were also anti-war activists.

35.  It was common throughout the late 1990s and into the early 2000s for anti-war activists who were also software authors to license their software under licenses that gave wide permissions, but prohibited any use by the any military (or, sometimes, specifically the USA military).

36.  While many FOSS activists (including myself) were sympathetic to their concerns about FOSS being used in the military industrial complex, we nonetheless felt strongly that the rights and permissions to copy, modify and redistribute should remain unfettered — even for those who applied the software to activities that some of us found abhorrent. Thus, restrictions on military use, or really any specific application of the software, was never included in any widely adopted copyleft license.

37. However, it became quite common between circa 1996–2005 for anti-war activists to license their software under a potentially ambiguous license —- often formulated as "GPL, but military use is prohibited" (or some similar formulation).

38. During my time as an employee of the FSF from 1997–2004, I regularly handled community discussions, requests, and (most importantly) complaints from users who expressed that this Further Restriction of "military use prohibited" was problematic for the copyleft ecosystem for various reasons.

39. While the "military use prohibited" clauses were the most common, during the time frame of 1997–2004, I recall seeing many different formulations of Further Restrictions tacked onto the GPLv2 in various ways. I specifically recall seeing Further Restriction targeted at specific companies, or (quite ironically), I recall at least once seeing "GPL, non-commercial use only" as a license for software.

40. During this period, my standard answer (which as FSF's Executive Director, I made the official response for all such inquiries) was to inform those who complained and/or inquired that software under such a license (— one that referenced the main GPL, version 2 ("GPLv2") text but then added a Further Restriction – ) was software that was ultimately *not FOSS*.

41. Our reasoning for this conclusion was that the license might be construed and/or perceived as somewhat ambiguous. On one hand, the GPLv2 assured even the military's right to copy, modify, and redistributed the software — provided they continued to provide all who received distribution of the software the Corresponding Source. On the other hand, a term had been added to the overarching license that contradicted those terms. Furthermore, the GPLv2 explicitly prohibited the imposition of Further Restrictions, but provided no remedy for what downstream recipients should do in that situation. Users were simply advised to completely avoid software under such a license.

42. Frustrated at the lack of a better solution, everyone that I knew involved in copyleft license policy (including various past and current employees, Directors, and others at the FSF itself) agreed that this issue should be resolved by a provision in future versions of the GPL.

43. The problem continued in the FOSS community after I left the employment of the FSF in March 2005. On or about 2006-08-14, a (now defunct) project named "GPU" was actively covered in the press because the project has had added an Further Restriction prohibiting military use. A true and correct copy of an article written by the (then) journalist Tina Gasperson for linux.com is included in Exhibit A.

### The Public GPLv3 Drafting Process and Relevant Historical Records Online

44. The GPLv3/AGPLv3 drafting process was (primarily) a public process run by the FSF from circa late 2005 through the release of the AGPLv3 on 2007-11-19. The FSF released a comprehensive archive of all public materials related to the drafting process. Then entire archive can be downloaded from:

`https://gplv3.fsf.org/gplv3-archive.tar.gz`

That large archive file is linked from `https://www.fsf.org/licensing/gplv3-archive`. For purposes of this report, I extracted all exhibits and materials regarding the GPLv3/AGPLv3 drafting process from that archive, which I verified on 2022-12-20 was downloadable from FSF's website. I refer to this archive in the remainder of this report as the "GPLv3 Archive".

45. On 2006-01-16, the FSF released the first public discussion draft of the GPLv3. Exhibit B is a true and correct copy of the document the following file found in the GPLv3 archive:

`gplv3.fsf.org/gpl-draft-2006-01-16.txt/download`.

46. On or about 2006-07-26, the FSF released the second public discussion draft of the GPLv3. A true and correct copy of the FSF's published change-tracked markup (from discussion draft 1) — which includes footnotes for rationale of changes. Exhibit C is a true and correct this copy of the following file found in the GPLv3 archive: `gplv3.fsf.org/gpl3-dd1to2-markup-rationale.pdf/download`.

47. On 2006-08-03, the FSF published a supplementary opinion on the "Additional Terms" section of GPLv3 at `https://gplv3.fsf.org/additional-terms-dd2.html` Exhibit D is a true and correct copy of that document, which appears in the GPLv3 Archive:

`gplv3.fsf.org/additional-terms-dd2.pdf/download`

48. On 2007-03-28, the FSF released the third public discussion draft of the GPLv3. A true and correct copy of the FSF's published change-tracked markup (from discussion draft 2) is found in Exhibit F, which is found in the GPLv3 Archive at: `gplv3.fsf.org/gpl3-dd2to3.pdf/download`.

49. On 2007-11-19, the FSF released the Affero GPL version 3 ("AGPLv3"). A true and correct copy of the AGPLv3, as downloaded from `https://www.gnu.org/licenses/agpl-3.0.txt` is in Exhibit H.

50. While the FSF began providing on 2021-11-17 the comprehensive archive file ("GPLv3 Archive") for archival convenience of researchers and licensing practitioners, to my knowledge and recollection, the FSF has *also* continuously made available these aforementioned discussion drafts, license texts, and rationale documents in an easily accessible and browsable format on the website `https://gplv3.fsf.org` — from their publication dates until present day.

### History of AGPLv3§7¶3 and its Prohibition On "Further Restrictions"

51. The first public discussion draft of GPLv3, released on 2006-01-16, presented to the public the first attempt at the "Further Restrictions" clause: "No other additional conditions are permitted in your terms; therefore, no other conditions can be present on any work that uses this License."

52. I recall that there was substantial discussion between publication of the first and second discussion draft — informed by experiences that the FSF, I, and others had advising the community (described above in ¶ 41 and earlier paragraphs) — about developing a method for GPLv3 that would liberate downstream users and redistributors to address the problem themselves.

53. In the second discussion draft of GPLv3, the FSF presented a Further Restriction clause that stated: "Additional requirements are allowed only as stated in subsection 7b. If the Program as you received it purports to impose any other additional requirement, you may remove that requirement" (Exhibit C, page 20).

54. In the contemporaneously published public rationale document for this draft term, the FSF stated: "Here we are particularly concerned about the practice of program authors who purport to license their works under the GPL with an additional requirement that contradicts the terms of the GPL, such as a prohibition on commercial use. Such terms can make the program non-free, and thus contradict the basic purpose of the GNU GPL; but even when the conditions are not fundamentally unethical, adding them in this way invariably makes the rights and obligations of licensees uncertain" (Exhibit C, page 20).

55. In a follow-up opinion a few weeks later, the FSF wrote: "if a user receives GPL'd code that purports to include an additional requirement not in the [GPLv3§]7b list, the user may remove that requirement. Here we were particularly concerned to address the problem of program authors who purport to license their works in a misleading and possibly self-contradictory fashion, using the GPL together with unacceptable added restrictions that would make those works non-free software" (Exhibit D, page 3).

56. In the third public discussion draft of GPLv3, the FSF presented a modified "Further Restrictions Clause" as follows: "If the Program as you received it, or any part of it, purports to be governed by this License, supplemented by a term that is a further restriction, you may remove that term" (Exhibit F, page 15). This clause is carried forward, without further modification, into the fourth discussion draft in 2007-05-31, and to the final official release of GPLv3 on 2007-06-29.

57. As with any public comment process, there were differing views throughout the drafting process on the relative merits of the Further Restrictions Clause. Ultimately, as can be seen in the final draft, the Clause

was *included*. In my opinion, the drafting process bore out the best option for the copyleft community. The FSF clearly agreed, since they included the Clause in the final version of the license.

58. Other participants clearly agreed as well. For example, on 2007-06-01, the day after the release of the fourth discussion draft, User "frx", whom I recall was a regular public commentor throughout the GPLv3 drafting process, submitted comment 3,220 in the GPLv3 process – commenting specifically on the Further Restrictions Clause: "I'm glad to see that this is explicitly stated: every attempt to license a work under the terms of GPLv3 with further restrictions is equivalent to licensing under the plain GPLv3. This is good, since there are unfortunately many people that license works in inconsistent manners (such as GPLv2 + additional restrictions); creating a rule that resolves this kind of inconsistencies for the better is a good thing to do". A record of this comment is available at:

`https://gplv3.fsf.org/comments/rt/readsay.html?filename=gplv3-draft-4&id=3220`

A true and correct copy of that comment can be found in Exhibit E.

59. The AGPLv3 contains the same Further Restrictions Clause — unmodified from the version as it appeared in third public discussion draft of GPLv3.

60. The public who uses the text of the AGPLv3 and GPLv3 have been on notice by the FSF since (at least) 2007-03-28 that this term is an important and essential part of the license. Furthermore, the FSF transparently and publicly communicated the intent and expectations for utilization of the Further Restrictions Clause in their license drafting rationale documents that led up to the final draft of that Clause.

61. I conclude based on these documents, plus my recollection of the GPLv3 and AGPLv3 drafting process in which I participated, and my extensive work with the FSF and SFC in copyleft licensing, that the Further Restrictions Clause was specifically design to allow removal of an additional term when a licensor chose to use the text of the GPLv3 and/or AGPLv3 along with a term that the licensee viewed as a "Further Restriction".

### On Removal and Modification of FOSS Terms By Downstream Users

62. In the world of proprietary software licensing, it is undoubtedly exceedingly rare that a downstream user has permission to modify the terms upon redistribution.

63. In FOSS, this practice is quite common. Such modification of terms occurs both implicitly and explicitly.

64. Implicitly, it is widely understood that certain non-copyleft licenses, such as the widely used MIT license, are "Compatible" with copyleft licenses such as the AGPLv3.

10

65. Individual developers, commercial software firms, and hobbyists routinely include MIT-licensed software in larger AGPLv3'd works. When doing so, they implicitly relicense those MIT-licensed works under the AGPLv3.

66. Authors of MIT-licensed works encourage other developers and firms to incorporate these works not only in AGPLv3'd works, but also in proprietary software works as well. In effect, their license implicitly encourages such incorporation.

67. Copyleft licenses, being more complex, have explicit terms for Compatibility that require downstream users to take explicit actions to combine works under different licensing terms.

68. For example, the Lesser General Public License, v2.1 (LGPLv2.1) in its §3 states: "You may opt to apply the terms of the ordinary GNU General Public License instead of this License to a given copy of the Library. To do this, you must alter all the notices that refer to this License, so that they refer to the ordinary GNU General Public License, version 2, instead of to this License".

69. LGPLv2.1 is just one example where the downstream user is required and encouraged to make changes to the license notices of a copyleft license.

70. As such, changing and modifying license notices based on instructions given in a larger document is customary and normal activity for FOSS developers, and has been so at least since the publication of LGPLv2.1 in February 1999.

### The "Further Restrictions" And Their Removal

71. I have reviewed the document `enterprise/neo4j-enterprise/LICENSE.txt`.

This document appears on `https://github.com/neo4j/neo4j` at 2018-05-20 in

Git revision `47d845925e639297ab2564965ba68105d897e818`.

A true and correct copy of this license, appears as Exhibit G. This is the entirety of AGPLv3 as published by the FSF in Exhibit H, with the addition of the further restrictions outlined in the Commons Clause ("CC"). I understand from this litigation that the Court prefers to refer to this document as the "Neo4j Sweden Software License". For consistency, this report also refers to this document by that name.

72. In my professional opinion, the Neo4j Sweden Software License is structured and presented precisely in the manner that the Further Restrictions Clause anticipated.

73. Specifically, I believe that the AGPLv3 contemplated this precise situation: namely, a licensor licenses under the unmodified text of the AGPLv3, but also includes another term that contradicts, limits, and/or restricts the permissions granted under the AGPLv3.

74. If I had encountered the "Neo4j Sweden Software License" during the normal course of my work as a FOSS activist and FOSS licensing expert, I would have felt removal of the CC portion, upon redistribution of the software, was permitted by the AGPLv3's Further Restrictions Clause.

75. In my opinion, when John Mark Suhy encountered the Neo4j Sweden Software License, his removal of the CC and redistribution of the Covered Work under pure AGPLv3 would be considered customary, permissible, and even widely encouraged in the field of FOSS.

### Neo4j's Own Licensing Choice Permitted Removal of "Commons Clause"

76. In my opinion, the Neo4j Sweden Software License itself gave Suhy, PureThink, LLC, and IGOV, Inc. this permission explicitly. Specifically, even if one firm is the only copyright holder and therefore sole licensor of the work[4], the Neo4j Sweden Software License has the entire the AGPLv3 entirely *intact*, *including* its Further Restrictions Clause.

77. Akin to text of the LGPLv2.1, the Neo4j Sweden Software License states the two following facts:

- "[This software] is subject to the terms of the GNU AFFERO GENERAL PUBLIC LICENSE Version 3, with the Commons Clause as follows:" . . .

- "If the Program as you received it, or any part of it, contains a notice stating that it is governed by this License along with a term that is a further restriction, you may remove that term"

78. In my opinion, given the common FOSS practices of either explicitly or implicitly changing terms upon redistribution within the confines and requirements stated in the license, any reasonable party would determine that the Neo4j Sweden Software License intends — given that it was intentionally drafted to include the Further Restrictions Clause — that the CC can be removed by anyone who engages in redistribution (be it commercial or non-commercial) of the software covered by the Neo4j Sweden Software License.

### Other Licensing Options for Neo4j Software

79. In the FOSS community, the "GNU Affero General Public License" and "GNU General Public License" are well-known brands (owned by the FSF). These are held in high esteem by software developers who care about the political issue of software rights and freedom.

---

[4] ¶ 99 and following discusses the potential outcomes if, in fact, there is *not* a sole licensor of the work

80.  Developers routinely look to confirm that software is licensed under the AGPLv3 or GPLv3 before using or relying on the software.

81.  Based on my personal knowledge and discussions with staff and Board members of the FSF, the FSF is aware of the power of their brand recognition and, as an organization, the FSF cares deeply that developers can rely on the permissions and clauses in all versions of the GPL.

82.  The FSF is a very small non-profit organization with extremely limited resources.  I recall from my experience as a past employee that the FSF simply does not have sufficient resources to police trademark infringement of its registered trademark on "GNU" and its common-law trademark on "GNU Affero General Public License".

83. I believe that the Further Restrictions Clause was, in part, included in the GPLv3 and AGPLv3 to assure that the community could rely on the fact that if the text of the entire AGPLv3 was included in the licensing of some software, that Further Restrictions could not be placed on that software.

84.  The FSF does permit licensors to reuse various portions of their license texts, *provided that* the licensors do not use the brand names of the GNU licenses, and do not include the preamble text.

85.  Specifically, the FSF states in their GPL FAQ: "You can legally use the GPL terms (possibly modified) in another license provided that you call your license by another name and do not include the GPL preamble, and provided you modify the instructions-for-use at the end enough to make it clearly different in wording and not mention GNU". Exhibit I is a true and correct copy the relevant FAQ text as found at:

`https://www.gnu.org/licenses/gpl-faq.en.html#ModifyGPL`.

86.  According to The Internet Archive, similar text has appeared on FSF's GNU website since 2012-01-07. Exhibit J is a true and correct copy of the relevant FAQ text as it was indexed by the Internet Archive at the following link:

`https://web.archive.org/web/20120107170516/https://www.gnu.org/licenses/gpl-faq.en.html#ModifyGPL`

87.  I confirm that in the field of FOSS licensing, FSF's policy is well-known and oft discussed.  Commonly, provisions, terms, and clauses from the GPL routinely are reused in other FOSS (and non-FOSS) licenses, with permission from the FSF via their public statement quoted in ¶ 85.

88.  Given this, it is reasonable and customary for FOSS developers and firms that use FOSS to rely on FOSS licensing information as presented when text from the AGPLv3 is involved.  Specifically, when software users and/or redistributors encounters the full, unmodified text of the AGPLv3 (even with a Further Restriction),

the users and/or redistributors customarily believe in good faith that the choice of licensing in this manner was intentional.

89.  Users and/or redistributors are keenly aware that software providers do have the option to construct their own license using terms similar to the AGPLv3 under a different name and without the preamble. Therefore, if a license that has the full text of the unmodified AGPLv3, users and/or redistributors have a good faith basis to exercise any and all clauses of the AGPLv3 — including the Further Restrictions Clause and its permission to strike and remove additional restriction clauses.

### MongoDB's Modified AGPLv3

90.  MongoDB, Inc.  ("MongoDB") is well-known and has a software offering (itself also called MongoDB) that competes with the Neo4j software in the field of NoSQL database software.

91.  For many, MongoDB licensed their primary software product under the terms of the AGPLv3.

92.  On 2018-10-16, MongoDB announced that the product would be licensed under a new licensed, which they named the Server-Side Public License ("SS Public License").  A true and correct copy of that license appears in Exhibit K, which was printed from:

`https://www.mongodb.com/licensing/server-side-public-license`

93.  The SS Public License is textually nearly identical to the AGPLv3; however, MongoDB clearly followed the requirements of the FSF described in ¶ 85.

94.  While the FOSS community widely rejected the SS Public License, MongoDB was widely considered to be operating under the permissions and rules established by the FSF for reuse of their license text.

95.  It is notable that the release and promotion (widely covered in the technology press) of the SS Public License was nearly contemporaneous with the surreptitious licensing change that created Neo4j Sweden Software License.

96.  In my opinion, it seems highly unlikely that the drafters of the Neo4j Sweden Software License were unaware of MongoDB's approach to their license change.  As such, drafters of the Neo4j Sweden Software License was almost surely aware that they had the options presented under ¶ 85 to produce a fully modified AGPLv3 — sans the preamble and with no mention of FSF's trademark "GNU" — instead of the Neo4j Sweden Software License.

97.  In my opinion, this speaks to clear intentionally in choosing a license that included the Further Restrictions Clause.  In my opinion, after my many years of carefully monitoring use of the AGPLv3 and its

modifications in the industry, the Neo4j Sweden Software License was structured and promoted to give users the **incorrect** impression that the CC could not be removed from those terms — even though the Further Restrictions Clause was present. The Neo4j Sweden Software License also gives the impression to the unwary that the software is still available under the AGPLv3, as it had been before.

98. In essence, my opinion is that the Neo4j Sweden Software License attempted to inappropriately capitalize on the goodwill, power, and notoriety of the "GNU" and "AGPLv3" brands while also frightening commercial redistributors with the addition of the CC. In my opinion, the Neo4j Sweden Software License unfairly confuses users by including the entire text of the AGPLv3 (unmodified). I firmly believe that Neo4j hoped that no one would notice the Further Restrictions Clause remained included, and thereby realize that CC could, in fact, be removed and that commercial activity by downstream redistributors could therefore continue under pure AGPLv3.

### Violation of AGPLv3 If Not Sole Licensor

99. I am very familiar with the business model of "Proprietary Relicensing" — whereby a single firm holds rights to relicense all copyrights contained in a work so that they can simultaneously issue a copyleft license and a proprietary one. I first encountered this business model in the early 1990s when it was employed by a company called MySQL AB (now owned by Oracle), and have often seen it utilized since then by many companies, including MongoDB and with the Neo4j software.

100. Permission to engage in Proprietary Relicensing is completely predicated on universal collection of permissions and rights sufficient to act as sole licensor of the Covered Work under AGPLv3.

101. This process runs counter to the typical method of FOSS contribution, which is often called "inbound=outbound". In the inbound=outbound FOSS contribution method, third-party contributors license their works under the project's primary license (in the case of the Neo4j software, AGPLv3). The upstream project coordinator is then bound by AGPLv3 as a redistributor of these third party works. The upstream project coordinator is often a major (and sometimes even majority) author of the entire work, but typically substantial portions are copyrighted by other contributors and licensed to the upstream project coordinator only under the project's license.

102. To engage in Proprietary Relicensing, a firm must studiously, diligently and carefully avoid the standard inbound=outbound approach to FOSS collaboration. Typically, firms accomplish this task by requiring all contributors to formally and officially assent to a Copyright Assignment Agreement or a Contributor Licensing Agreement that grants (either exclusive or non-exclusive) rights to the firm to issue licenses for the work other than the project's outbound FOSS license.

103. If a firm fails to properly gather such rights from all contributors — going back to the very beginning of the project — then the copyleft license (in this case, the AGPLv3) explicitly prohibits the firm from engaging in Proprietary Relicensing.

104. If rights from every contributor to the Covered Work that constitutes the Neo4j software offerings were not properly gathered and consolidated under the control of a single entity, then distribution of the Neo4j software under any license other than AGPLv3 is, itself, a violation of the AGPLv3. In that case, every license issued that is not strictly AGPLv3 would, in my opinion, constitute a violation of the license.

105. Specifically, if the primary authors of the Neo4j software failed to universally collect relicensing permission for all secondary authors and contributors to the Covered Work, then addition of CC to the Neo4j Sweden Software License is outright prohibited for this additional reason — a reason orthogonal to downstream users' right to remove CC pursuant to AGPLv3's Further Restrictions Clause.

106. Meanwhile, assent from all contributors to issue licenses other than AGPLv3 was properly collected and consolidated into one entity, then that provides further indication that a license other than AGPLv3 could confidently be issued.

107. For example, with such collected and consolidate rights, assents and permissions, the rights holder could instead follow MongoDB's example and issue an entirely new public license for their software — provided they followed the rules and permissions granted to them by the FSF ¶ 85.

## Conclusion

108. Based on all the material that I have reviewed, combined with my detailed knowledge and familiarity with FOSS licensing and how firms typically use FOSS licensing and engage in and with contributors and downstream redistributors, I conclude the following:

109. In my opinion, the Neo4j Sweden Software License intentionally includes the Further Restrictions Clause as a term of that license.

110. In my opinion, there is widespread understanding in the FOSS community of the purpose and function of the Further Restrictions Clause. As such, Suhy acted in a reasonable, customary, good faith, and correct manner when removing CC from the Neo4j Sweden Software License and licensing the software under AGPLv3 to his customers and/or the public.

111. In my opinion, given the extensive publicity of MongoDB's SS Public License, FSF's FAQ, and other widely understood licensing knowledge regarding AGPLv3, those who promulgated the Neo4j Sweden Soft-

ware License were (or should have been) aware that they could construct their own license, picking and choosing their preferred clauses from the AGPLv3 under the rules outlined by the FSF in ¶ 85.

112. In my opinion, it is reasonable, customary, in good faith, and correct for redistributors to believe that the Neo4j Sweden Software License intentionally included the Further Restrictions Clause. The authors of the Neo4j Sweden Software License should have expected that the Further Restrictions Clause would be used to remove CC from the Neo4j Sweden Software License. If they wanted to prevent that behavior, they should have (and could have, provided they had sufficient rights to all contributions to be licensed) removed the Further Restrictions Clause.

113. In my opinion, if a single firm failed to diligently and formally collect explicit, written relicensing permission from all contributors to all code that was licensed under AGPLv3, that distribution of the Neo4j software under the Neo4j Sweden Software License is in violation of AGPLv3 (wholly unrelated to the Further Restrictions Clause). If such rights have not been diligently and carefully collected and consolidated, no entity may engage in Proprietary Relicensing business nor issue the Neo4j Sweden Software License legitimately. In other words, without such consolidation of rights, the only legitimate license of the Neo4j software is AGPLv3.

I declare under penalty of perjury under the laws of the United States of America that all statements and affirmations made herein of my own knowledge are true and correct, and all statements made on information and belief are believed to be true and correct.

Executed on 22 December 2022

By:  _____

# Exhibit A
## Expert Report of Bradley M. Kuhn
## 22 December 2022

"Open source project adds 'no military use' clause to the GPL" by Tina Gasperson, published on

2006-08-14.

Home › News › Open source project adds "no military use" clause to the GPL

News

# Open source project adds "no military use" clause to the GPL

By  -  August 14, 2006

👁 2152

**Author:** Tina Gasperson

GPU is a Gnutella client that creates ad-hoc supercomputers by allowing individual PCs on the network to share CPU resources with each other. That's intriguing enough, but the really interesting thing about GPU is the license its developers have given it. They call it a "no military use" modified version of the GNU General Public License (GPL).

Tiziano Mengotti and Rene Tegel are the lead developers on the GPU project. Mengotti is the driving force behind the license "patch," which says "the program and its derivative work will neither be modified or executed to harm any human being nor through inaction permit any human being to be harmed."

Mengotti says the clause is specifically intended to prevent military use. "We are software developers who dedicate part of our free time to open source development. The fact is that open source is used by the military industry. Open source operating systems can steer warplanes and rockets. [This] patch should make clear to users of the software that this is definitely not allowed by the licenser."

He says some might think an attempt to prevent military use might be "too idealistic" and would not work in practice, but he references the world of ham radio, whose rules specify that the technology is not to be used commercially. "Surprisingly enough, this rule is respected by almost every ham operator."

The developers readily acknowledge that the "patch" contradicts the original intention of the GPL, to provide complete freedom for users of software and source code licensed under it. "This license collides with paragraph six of the Open Source Definition," is how they word it in the license preamble.

users of the software that this is definitely not allowed by the licenser."

He says some might think an attempt to prevent military use might be "too idealistic" and would not work in practice, but he references the world of ham radio, whose rules specify that the technology is not to be used commercially. "Surprisingly enough, this rule is respected by almost every ham operator."

The developers readily acknowledge that the "patch" contradicts the original intention of the GPL, to provide complete freedom for users of software and source code licensed under it. "This license collides with paragraph six of the Open Source Definition," is how they word it in the license preamble.

Richard Stallman, the founder of the Free Software movement and author of the GPL, says that while he doesn't support the philosophy of "open source," neither does he believe software developers or distributors have the right to try to control other people's activities through restricting the software they run. "Nonetheless, I don't think the requirement is entirely vacuous, so we cannot disregard it as legally void."

"As a pacifist, I sympathize with their goals," says Russ Nelson, a founding board member of the Open Source Initiative (OSI). "People who feel strongly about war will sometimes take actions which they realize are ineffectual, but make it clear that they are not willing to take action which directly supports war."

Tegel says he doesn't fully agree with the inclusion of the clause in GPU's license. "I see the point, and my personal opinion supports it, but I am not sure if it fits in a license," he says. "Like our Dutch military: I can say it is bad because it kills people and costs money. But on the other hand, we were taught by both our leftist and rightist teachers to enjoy our freedom due to the alliance freeing us from Nazis, a thing which I appreciate very much."

Both developers do agree about one aspect of their license clause. It is based on the first of science fiction writer Isaac Asimov's Three Law of Robotics, which states, "A robot may not harm a human being, or, through inaction, allow a human being to come to harm." That, they say, is a good thing, "because the guy was right," Tegel says, "and he showed the paradox that almost any technological development has to solve, whether it is software or an atom bomb. We must discuss now what ethical problems we may raise in the future."

**Category:**

- Legal

Previous article                                                                                                          Next article

# Exhibit B

## Expert Report of Bradley M. Kuhn

## 22 December 2022

First discussion draft of the GPLv3, as published by the FSF on 2006-01-16.

```
                    GNU GENERAL PUBLIC LICENSE
                 Discussion Draft 1 of Version 3, 16 Jan 2006
```

THIS IS A DRAFT, NOT A PUBLISHED VERSION OF THE GNU GENERAL PUBLIC LICENSE.

 Copyright (C) 2006 Free Software Foundation, Inc.
    51 Franklin Street, Fifth Floor, Boston, MA 02110-1301 USA
 Everyone is permitted to copy and distribute verbatim copies
 of this license document, but changing it is not allowed.

                            Preamble

  The licenses for most software are designed to take away your
freedom to share and change it.  By contrast, the GNU General Public
License is intended to guarantee your freedom to share and change free
software--to make sure the software is free for all its users.  We,
the Free Software Foundation, use the GNU General Public License for
most of our software; it applies also to any other program whose
authors commit to using it.  (Some Free Software Foundation software
is covered by the GNU Lesser General Public License instead.)  You
can apply it to your programs, too.

  When we speak of free software, we are referring to freedom, not
price.  Our General Public Licenses are designed to make sure that you
have the freedom to distribute copies of free software (and charge for
this service if you wish), that you receive source code or can get it
if you want it, that you can change the software or use pieces of it
in new free programs; and that you know you can do these things.

  To protect your rights, we need to make requirements that forbid
anyone to deny you these rights or to ask you to surrender the rights.
These restrictions translate to certain responsibilities for you if you
distribute copies of the software, or if you modify it.

  For example, if you distribute copies of such a program, whether
gratis or for a fee, you must give the recipients all the rights that
you have.  You must make sure that they, too, receive or can get the
source code.  And you must show them these terms so they know their
rights.

  Developers that use the GNU GPL protect your rights with two steps: (1)
assert copyright on the software, and (2) offer you this License which
gives you legal permission to copy, distribute and/or modify the software.

  For the developers' and author's protection, the GPL clearly explains
that there is no warranty for this free software.  If the software is
modified by someone else and passed on, the GPL ensures that recipients
are told that what they have is not the original, so that any problems
introduced by others will not reflect on the original authors'
reputations.

  Some countries have adopted laws prohibiting software that enables users
to escape from Digital Restrictions Management.  DRM is fundamentally
incompatible with the purpose of the GPL, which is to protect users'
freedom; therefore, the GPL ensures that the software it covers will
neither be subject to, nor subject other works to, digital restrictions
from which escape is forbidden.

  Finally, every program is threatened constantly by software patents.  We
wish to avoid the special danger that redistributors of a free program will
individually obtain patent licenses, in effect making the program
proprietary.  To prevent this, the GPL makes it clear that any patent must
be licensed for everyone's free use or not licensed at all.

The precise terms and conditions for copying, distribution and modification follow.

GNU GENERAL PUBLIC LICENSE
TERMS AND CONDITIONS FOR COPYING, DISTRIBUTION AND MODIFICATION

0.  Definitions.

A "licensed program" means any program or other work distributed under this License.  The "Program" refers to any such program or work, and a "work based on the Program" means either the Program or any derivative work under copyright law: that is to say, a work containing the Program or a portion of it, either modified or unmodified.  Throughout this License, the term "modification" includes, without limitation, translation and extension.  A "covered work" means either the Program or any work based on the Program.  Each licensee is addressed as "you".

To "propagate" a work means doing anything with it that requires permission under applicable copyright law, other than executing it on a computer or making private modifications.  This includes copying, distribution (with or without modification), sublicensing, and in some countries other activities as well.

1. Source Code.

The "source code" for a work means the preferred form of the work for making modifications to it.  "Object code" means any non-source version of a work.

The "Complete Corresponding Source Code" for a work in object code form means all the source code needed to understand, adapt, modify, compile, link, install, and run the work, excluding general-purpose tools used in performing those activities but which are not part of the work.  For example, this includes any scripts used to control those activities, and any shared libraries and dynamically linked subprograms that the work is designed to require, such as by intimate data communication or control flow between those subprograms and other parts of the work, and interface definition files associated with the program source files.

Complete Corresponding Source Code also includes any encryption or authorization codes necessary to install and/or execute the source code of the work, perhaps modified by you, in the recommended or principal context of use, such that its functioning in all circumstances is identical to that of the work, except as altered by your modifications.  It also includes any decryption codes necessary to access or unseal the work's output.  Notwithstanding this, a code need not be included in cases where use of the work normally implies the user already has it.

Complete Corresponding Source Code need not include anything that users can regenerate automatically from other parts of the Complete Corresponding Source Code.

As a special exception, the Complete Corresponding Source Code need not include a particular subunit if (a) the identical subunit is normally included as an adjunct in the distribution of either a major essential component (kernel, window system, and so on) of the operating system on which the executable runs or a compiler used to produce the executable or an object code interpreter used to run it, and (b) the subunit (aside from possible incidental extensions) serves only to enable use of the work with that system component or compiler or interpreter, or to implement a widely used or standard interface, the implementation of which requires no patent license not already

generally available for software under this License.

2. Basic Permissions.

  All rights granted under this License are granted for the term of
copyright on the Program, and are irrevocable provided the stated
conditions are met.  This License explicitly affirms your unlimited
permission to run the Program.  The output from running it is covered by
this License only if the output, given its content, constitutes a work
based on the Program.  This License acknowledges your rights of "fair use"
or other equivalent, as provided by copyright law.

  This License gives unlimited permission to privately modify and run the
Program, provided you do not bring suit for patent infringement against
anyone for making, using or distributing their own works based on the
Program.

  Propagation of covered works is permitted without limitation provided it
does not enable parties other than you to make or receive copies.
Propagation which does enable them to do so is permitted, as
"distribution", under the conditions of sections 4-6 below.

3. Digital Restrictions Management.

  As a free software license, this License intrinsically disfavors
technical attempts to restrict users' freedom to copy, modify, and share
copyrighted works.  Each of its provisions shall be interpreted in light of
this specific declaration of the licensor's intent.  Regardless of any
other provision of this License, no permission is given to distribute
covered works that illegally invade users' privacy, nor for modes of
distribution that deny users that run covered works the full exercise of
the legal rights granted by this License.

  No covered work constitutes part of an effective technological protection
measure: that is to say, distribution of a covered work as part of a system
to generate or access certain data constitutes general permission at least
for development, distribution and use, under this License, of other
software capable of accessing the same data.

4.[1] Verbatim Copying.

 You may copy and distribute verbatim copies of the Program's source
code as you receive it, in any medium, provided that you conspicuously
and appropriately publish on each copy an appropriate copyright
notice; keep intact all license notices and notices of the absence of
any warranty; give all recipients of the Program a copy of this
License along with the Program; and obey any additional terms present
on parts of the Program in accord with section 7.

You may charge a fee for the physical act of transferring a copy, and
you may at your option offer warranty protection for a fee.

5.[2] Distributing Modified Source Versions.

  Having modified a copy of the Program under the conditions of section
2, thus forming a work based on the Program, you may copy and distribute
such modifications or work in the form of source code under the terms of
Section 4 above, provided that you also meet all of these conditions:

    a) The modified work must carry prominent notices stating that you
    changed the work and the date of any change.

    b) You must license the entire modified work, as a whole, under

this License to anyone who comes into possession of a copy.  This
License must apply, unmodified except as permitted by section 7
below, to the whole of the work.  This License gives no permission
to license the work in any other way, but it does not invalidate
such permission if you have separately received it.

c) If the modified work has interactive user interfaces, each must
include a convenient feature that displays an appropriate
copyright notice, and tells the user that there is no warranty for
the program (or that you provide a warranty), that users may
redistribute the modified work under these conditions, and how to
view a copy of this License together with the central list (if any) of
other terms in accord with section 7.  If the interface presents a
list of user commands or options, such as a menu, a command to
display this information must be prominent in the list.
Otherwise, the modified work must display this information at
startup--except in the case that the Program has such
interactive modes and does not display this information at
startup.

These requirements apply to the modified work as a whole.  If
identifiable sections of that work, added by you, are not derived from
the Program, and can be reasonably considered independent and separate
works in themselves, then this License, and its terms, do not apply to
those sections when you distribute them as separate works for use not
in combination with the Program.  But when you distribute the same
sections for use in combination with covered works, no matter in what
form such combination occurs, the whole of the combination must be
licensed under this License, whose permissions for other licensees
extend to the entire whole, and thus to every part of the whole.  Your
sections may carry other terms as part of this combination in limited
ways, described in section 7.

Thus, it is not the intent of this section to claim rights or contest
your rights to work written entirely by you; rather, the intent is to
exercise the right to control the distribution of derivative or
collective works based on the Program.

A compilation of a covered work with other separate and independent
works, which are not by their nature extensions of the covered work,
in or on a volume of a storage or distribution medium, is called an
"aggregate" if the copyright resulting from the compilation is not
used to limit the legal rights of the compilation's users beyond what
the individual works permit.  Mere inclusion of a covered work in an
aggregate does not cause this License to apply to the other parts of
the aggregate.

6.[3] Non-Source Distribution.

   You may copy and distribute a covered work in Object Code form under the
terms of Sections 4 and 5, provided that you also distribute the
machine-readable Complete Corresponding Source Code (herein the
"Corresponding Source") under the terms of this License, in one of these
ways:

a) Distribute the Object Code in a physical product (including a
physical distribution medium), accompanied by the Corresponding Source
distributed on a durable physical medium customarily used for software
interchange; or,

b) Distribute the Object Code in a physical product (including a
physical distribution medium), accompanied by a written offer, valid
for at least three years and valid for as long as you offer spare parts

or customer support for that product model, to give any third party, for a price no more than ten times your cost of physically performing source distribution, a copy of the Corresponding Source for all the software in the product that is covered by this License, on a durable physical medium customarily used for software interchange; or,

c) Privately distribute the Object Code with a copy of the written offer to provide the Corresponding Source.  This alternative is allowed only for occasional noncommercial distribution, and only if you received the Object Code with such an offer, in accord with Subsection b above.  Or,

d) Distribute the Object Code by offering access to copy it from a designated place, and offer equivalent access to copy the Corresponding Source in the same way through the same place. You need not require recipients to copy the Corresponding Source along with the Object Code.

[If the place to copy the Object Code is a network server, the Corresponding Source may be on a different server that supports equivalent copying facilities, provided you have explicitly arranged with the operator of that server to keep the Corresponding Source available for as long as needed to satisfy these requirements, and provided you maintain clear directions next to the Object Code saying where to find the Corresponding Source.]

Distribution of the Corresponding Source in accord with this section must be in a format that is publicly documented, unencumbered by patents, and must require no special password or key for unpacking, reading or copying.

The Corresponding Source may include portions which do not formally state this License as their license, but qualify under section 7 for inclusion in a work under this License.

7. License Compatibility.

  When you release a work based on the Program, you may include your own terms covering added parts for which you have, or can give, appropriate copyright permission, as long as those terms clearly permit all the activities that this License permits, or permit usage or relicensing under this License.  Your terms may be written separately or may be this License plus additional written permission.  If you so license your own added parts, those parts may be used separately under your terms, but the entire work remains under this License.  Those who copy the work, or works based on it, must preserve your terms just as they must preserve this License, as long as any substantial portion of the parts they apply to are present.

  Aside from additional permissions, your terms may add limited kinds of additional requirements on your added parts, as follows:

a) They may require the preservation of certain copyright notices, other legal notices, and/or author attributions, and may require that the origin of the parts they cover not be misrepresented, and/or that altered versions of them be marked in the source code, or marked there in specific reasonable ways, as different from the original version.

b) They may state a disclaimer of warranty and liability in terms different from those used in this License.

c) They may prohibit or limit the use for publicity purposes of specified names of contributors, and they may require that certain specified trademarks be used for publicity purposes only in the ways that are fair use under trademark law except with express permission.

d) They may require that the work contain functioning facilities that allow users to immediately obtain copies of its Complete Corresponding Source Code.

e) They may impose software patent retaliation, which means permission for use of your added parts terminates or may be terminated, wholly or partially, under stated conditions, for users closely related to any party that has filed a software patent lawsuit (i.e., a lawsuit alleging that some software infringes a patent).  The conditions must limit retaliation to a subset of these two cases: 1. Lawsuits that lack the justification of retaliating against other software patent lawsuits that lack such justification.  2. Lawsuits that target part of this work, or other code that was elsewhere released together with the parts you added, the whole being under the terms used here for those parts.

  No other additional conditions are permitted in your terms; therefore, no other conditions can be present on any work that uses this License.  This License does not attempt to enforce your terms, or assert that they are valid or enforceable by you; it simply does not prohibit you from employing them.

  When others modify the work, if they modify your parts of it, they may release such parts of their versions under this License without additional permissions, by including notice to that effect, or by deleting the notice that gives specific permissions in addition to this License.  Then any broader permissions granted by your terms which are not granted by this License will not apply to their modifications, or to the modified versions of your parts resulting from their modifications.  However, the specific requirements of your terms will still apply to whatever was derived from your added parts.

  Unless the work also permits distribution under a previous version of this License, all the other terms included in the work under this section must be listed, together, in a central list in the work.

  8.[4] Termination.

  You may not propagate, modify or sublicense the Program except as expressly provided under this License.  Any attempt otherwise to propagate, modify or sublicense the Program is void, and any copyright holder may terminate your rights under this License at any time after having notified you of the violation by any reasonable means within 60 days of any occurrence.  However, parties who have received copies, or rights, from you under this License will not have their licenses terminated so long as they remain in full compliance.

  9.[5] Not a Contract.

  You are not required to accept this License in order to receive a copy of the Program.  However, nothing else grants you permission to propagate or modify the Program or any covered works.  These actions infringe copyright if you do not accept this License.  Therefore, by modifying or propagating the Program (or any covered work), you indicate your acceptance of this License to do so, and all its terms and conditions.

  10.[6] Automatic Licensing of Downstream Users.

  Each time you redistribute a covered work, the recipient automatically

receives a license from the original licensors, to propagate and modify
that work, subject to this License, including any additional terms
introduced through section 7.  You may not impose any further restrictions
on the recipients' exercise of the rights thus granted or affirmed, except
(when modifying the work) in the limited ways permitted by section 7.  You
are not responsible for enforcing compliance by third parties to this
License.

  11. Licensing of Patents.

  When you distribute a covered work, you grant a patent license to
the recipient, and to anyone that receives any version of the work,
permitting, for any and all versions of the covered work, all
activities allowed or contemplated by this License, such as
installing, running and distributing versions of the work, and using
their output.  This patent license is nonexclusive, royalty-free and
worldwide, and covers all patent claims you control or have the right
to sublicense, at the time you distribute the covered work or in the
future, that would be infringed or violated by the covered work or any
reasonably contemplated use of the covered work.

  If you distribute a covered work knowingly relying on a patent license,
you must act to shield downstream users against the possible patent
infringement claims from which your license protects you.

  12.[7] Liberty or Death for the Program.

  If conditions are imposed on you (whether by court order, agreement or
otherwise) that contradict the conditions of this License, they do not
excuse you from the conditions of this License.  If you cannot distribute
the Program, or other covered work, so as to satisfy simultaneously your
obligations under this License and any other pertinent obligations, then as
a consequence you may not distribute it at all.  For example, if a patent
license would not permit royalty-free redistribution by all those who
receive copies directly or indirectly through you, then the only way you
could satisfy both it and this License would be to refrain entirely from
distribution.

It is not the purpose of this section to induce you to infringe any
patents or other exclusive rights or to contest their legal validity.
The sole purpose of this section is to protect the integrity of the
free software distribution system.  Many people have made generous
contributions to the wide range of software distributed through that
system in reliance on consistent application of that system; it is up
to the author/donor to decide if he or she is willing to distribute
software through any other system and a licensee cannot impose that
choice.

  [13.[8] Geographical Limitations.

  If the distribution and/or use of the Program is restricted in certain
countries either by patents or by copyrighted interfaces, the original
copyright holder who places the Program under this License may add an
explicit geographical distribution limitation excluding those countries,
so that distribution is permitted only in or among countries not thus
excluded.  In such case, this License incorporates the limitation as if
written in the body of this License.]

  14.[9] Revised Versions of this License.

  The Free Software Foundation may publish revised and/or new versions of
the GNU General Public License from time to time.  Such new versions will
be similar in spirit to the present version, but may differ in detail to

address new problems or concerns.

Each version is given a distinguishing version number.  If the Program
specifies that a certain numbered version of this License "or any
later version" applies to it, you have the option of following the
terms and conditions either of that numbered version or of any later
version published by the Free Software Foundation.  If the Program
does not specify a version number of this License, you may choose any
version ever published by the Free Software Foundation.

  15.[10] Requesting Exceptions.

  If you wish to incorporate parts of the Program into other free
programs whose distribution conditions are different, write to the author
to ask for permission.  For software which is copyrighted by the Free
Software Foundation, write to the Free Software Foundation; we sometimes
make exceptions for this.  Our decision will be guided by the two goals
of preserving the free status of all derivatives of our free software and
of promoting the sharing and reuse of software generally.

                              NO WARRANTY

  16.[11] There is no warranty for the Program, to the extent permitted by
applicable law.  Except when otherwise stated in writing the copyright
holders and/or other parties provide the Program "as is" without warranty
of any kind, either expressed or implied, including, but not limited to,
the implied warranties of merchantability and fitness for a particular
purpose.  The entire risk as to the quality and performance of the Program
is with you.  Should the Program prove defective, you assume the cost of
all necessary servicing, repair or correction.

  17.[12] In no event unless required by applicable law or agreed to in writing
will any copyright holder, or any other party who may modify and/or
redistribute the Program as permitted above, be liable to you for damages,
including any general, special, incidental or consequential damages arising
out of the use or inability to use the Program (including but not limited
to loss of data or data being rendered inaccurate or losses sustained by
you or third parties or a failure of the Program to operate with any other
programs), even if such holder or other party has been advised of the
possibility of such damages.

  18. Unless specifically stated, the Program has not been tested for use
in safety critical systems.

                     END OF TERMS AND CONDITIONS

            How to Apply These Terms to Your New Programs

  If you develop a new program, and you want it to be of the greatest
possible use to the public, the best way to achieve this is to make it
free software which everyone can redistribute and change under these terms.

  To do so, attach the following notices to the program.  It is safest
to attach them to the start of each source file to most effectively
convey the exclusion of warranty; and each file should have at least
the "copyright" line and a pointer to where the full notice is found.

    <one line to give the program's name and a brief idea of what it does.>
    Copyright (C) <year>  <name of author>

    This program is free software; you can redistribute it and/or modify
    it under the terms of the GNU General Public License as published by
    the Free Software Foundation; either version 3 of the License, or

```
    (at your option) any later version.

    This program is distributed in the hope that it will be useful,
    but WITHOUT ANY WARRANTY; without even the implied warranty of
    MERCHANTABILITY or FITNESS FOR A PARTICULAR PURPOSE.  See the
    GNU General Public License for more details.

    You should have received a copy of the GNU General Public License
    along with this program; if not, write to the Free Software Foundation,
    Inc., 51 Franklin Street, Fifth Floor, Boston, MA 02110-1301  USA


Also add information on how to contact you by electronic and paper mail.

If the program does terminal interaction, make it output a short
notice like this when it starts in an interactive mode:

    Gnomovision version 69, Copyright (C) year  name of author
    Gnomovision comes with ABSOLUTELY NO WARRANTY; for details type `show w'.
    This is free software, and you are welcome to redistribute it
    under certain conditions; type `show c' for details.

The hypothetical commands `show w' and `show c' should show the appropriate
parts of the General Public License.  Of course, the commands you use may
be called something other than `show w' and `show c'; for a GUI interface,
you would use an "About box" instead.

You should also get your employer (if you work as a programmer) or your
school, if any, to sign a "copyright disclaimer" for the program, if
necessary.  Here is a sample; alter the names:

  Yoyodyne, Inc., hereby disclaims all copyright interest in the program
  `Gnomovision' (which makes passes at compilers) written by James Hacker.

  <signature of Ty Coon>, 1 April 1989
  Ty Coon, President of Vice

For more information on how to apply and follow the GNU GPL, see
http://www.gnu.org/licenses.

The GNU General Public License does not permit incorporating your program
into proprietary programs.  If your program is a subroutine library, you
may consider it more useful to permit linking proprietary applications with
the library.  If this is what you want to do, use the GNU Lesser General
Public License instead of this License.
```

# Exhibit C

## Expert Report of Bradley M. Kuhn

## 22 December 2022

Second discussion draft (and rationale therefor) for the GPLv3, as published by the FSF on or about

2006-07-26.

# GPLv3 Second Discussion Draft Rationale

This document states the rationale for the changes in the second discussion draft of GPLv3. We present the changes themselves in the form of markup, with ~~strikeout~~ indicating text we have removed from the draft and **bold** indicating text we have added. Footnotes state the reasons for specific changes. Several of these reasons refer to opinions we are releasing with the second discussion draft.

We refer to the first and second discussion drafts of GPLv3 as "Draft1" and "Draft2," respectively.

# GNU General Public License

Discussion Draft ~~1~~ **2** of Version 3, ~~16 Jan~~ **27 July** 2006

THIS IS A DRAFT, NOT A PUBLISHED VERSION OF THE
GNU GENERAL PUBLIC LICENSE.

Copyright © 2006 Free Software Foundation, Inc.
51 Franklin Street, Fifth Floor, Boston, MA 02110-1301 USA
Everyone is permitted to copy and distribute verbatim copies of this
license document, but changing it is not allowed.

## Preamble

The licenses for most software are designed to take away your freedom to
share and change it. By contrast, the GNU General Public License is in-
tended to guarantee your freedom to share and change free software—to
make sure the software is free for all its users. We, the Free Software Foun-
dation, use the GNU General Public License for most of our software; it
applies also to any other program whose authors commit to using it. ~~(Some
Free Software Foundation software is covered by the GNU Lesser General
Public License instead.)~~[1] You can apply it to your programs, too.

When we speak of free software, we are referring to freedom, not price.
Our General Public Licenses are designed to make sure that you have the
freedom to distribute copies of free software (and charge for this service if
you wish), that you receive source code or can get it if you want it, that you
can change the software or use pieces of it in new free programs~~;~~, and that
you know you can do these things.

To protect your rights, we need to make requirements that forbid any-
one to deny you these rights or to ask you to surrender the rights. ~~These~~

---

[1]This parenthetical reference to the GNU LGPL is unnecessary and is less relevant
now that we have written the new version of the LGPL as a set of permissive exceptions
to the GNU GPL in accord with section 7.

~~restrictions translate to~~ **Therefore, you have** certain responsibilities ~~for you~~ if you distribute copies of the software, or if you modify it.

For example, if you distribute copies of such a program, whether gratis or for a fee, you must give the recipients all the rights that you have. You must make sure that they, too, receive or can get the source code. And you must show them these terms so they know their rights.

Developers that use the GNU GPL protect your rights with two steps: (1) assert copyright on the software, and (2) offer you this License which gives you legal permission to copy, distribute and/or modify the software.

For the developers' and ~~author's~~ **authors'** protection, the GPL clearly explains that there is no warranty for this free software. ~~If the software is modified by someone else and passed on, the GPL ensures that recipients are told that what they have is not the original, so that any problems introduced by others will not reflect on the original authors' reputations.~~ **For both users' and authors' sake, the GPL requires that modified versions be marked as changed, so that their problems will not be associated erroneously with the original version.**

~~Some countries have adopted laws prohibiting software that enables users to escape from Digital Restrictions Management.~~ **Some computers are designed to deny users access to install or run modified versions of the software inside them.** ~~DRM~~ **This** is fundamentally incompatible with the purpose of the GPL, which is to protect users' freedom; **to change the software.** ~~therefore~~ **Therefore**, the GPL ensures that the software it covers will ~~neither be subject to, nor subject other works to, digital restrictions from which escape is forbidden~~ **not be restricted in this way**.[2]

Finally, every program is threatened constantly by software patents. **States should not allow patents to restrict development and use of software on general-purpose computers, but in places where they do, we** ~~We~~ wish to avoid the special danger that redistributors of a free program will individually obtain patent licenses, in effect making the program proprietary. To prevent this, the GPL ~~makes it clear~~ **assures** that ~~any patent must be licensed for everyone's free use or not licensed at all~~ **patents**

---

[2]DRM becomes nastier when based on Treacherous Computing and other changes in computer hardware which deny users the possibility of running modified or alternate programs. When these measures are applied to GPL-covered software, the freedom to run the program becomes a sham. In the statement on DRM in the Preamble we now emphasize this fact rather than the imposition of laws used to enforce and supplement these technical restrictions.

3

**cannot be used to render the program non-free.**[3]

~~The precise terms and conditions for copying, distribution and modification follow.~~[4]

~~GNU GENERAL PUBLIC LICENSE~~

TERMS AND CONDITIONS ~~FOR COPYING, DISTRIBUTION AND MODIFICATION~~[5]

## 0.   Definitions.

~~A "licensed program" means any program or other work distributed under this License.~~[6] ~~"The Program" refers to any such program or work, and a "work based on the Program" means either the Program or any derivative work under copyright law: that is to say, a work containing the Program or a portion of it, either modified or unmodified.~~[7] **In this License, each licensee is addressed as "you," while "the Program" refers to any work of authorship licensed under this License.** ~~Throughout this License, the term "modification" includes, without limitation, translation and extension.~~ **A "modified" work includes, without limitation, versions in which material has been translated or added.**[8] **A work**

___

[3]The patent licensing practices that section 7 of GPLv2 (corresponding to section 12 of GPLv3) was designed to prevent are one of several ways in which software patents threaten to make free programs non-free and to prevent users from exercising their rights under the GPL. GPLv3 takes a more comprehensive approach to combatting the danger of patents.

[4]This statement is redundant and therefore unnecessary. In addition, while the requirements of the GPL specifically concern copying, distribution, and modification, as these terms are commonly understood by free software users, the GPL speaks of other aspects of users' rights, as for example in affirming the right to run the unmodified Program.

[5]See n. 4.

[6]In Draft1 the term "licensed program" was defined but never used.

[7]Our efforts to internationalize the terminology of GPLv3 were incomplete in Draft1, as can be seen in the definition of "work based on the Program," which continued to use the United States copyright law term of art "derivative work." Some have suggested that the use of "containing" in this definition is not clear. We replace this definition with a generalized definition of "based on" that is neutral with respect to the vocabularies of particular national copyright law systems. See Opinion on Denationalization of Terminology.

[8]We replace the definition of "modification" with a definition of "modified" (work), which we then use as the basis for our new generalized definition of "based on." This in turn provides us with an alternative to the definitions in GPLv2 and Draft1 that incorporated the United States copyright law term "derivative work." See Opinion on Denationalization of Terminology.

We regard the well-established term "extension" (of a program), used in the now-replaced definition of "modification," to be equivalent to adding material to the program.

4

**"based on" another work means any modified version, formation of which requires permission under applicable copyright law.** A "covered work" means either the **unmodified** Program or ~~any~~ **a** work based on the Program.[9] ~~Each licensee is addressed as "you".~~

To "propagate" a work means doing anything with it that requires permission under applicable copyright law, ~~other than~~ **except** executing it on a computer**,** or making ~~private~~ modifications **that you do not share.**[10] ~~This~~ **Propagation** includes copying, distribution (with or without modification), **making available to the public,**[11] ~~sublicensing,~~ and in some countries other activities as well. **To "convey" a work means any kind of propagation that enables other parties to make or receive copies, excluding sublicensing.**[12]

**A party's "essential patent claims" in a work are all patent claims that the party can give permission to practice, whether already acquired or to be acquired, that would be infringed by making, using, or selling the work.**[13]

---

We note that copyright law, and not arbitrary file boundaries, defines the extent of the Program.

[9]See nn. 7–8 and Opinion on Denationalization of Terminology. We have generalized the definition of "based on" beyond "work based on the Program"; note that a "work based on the Program" no longer includes the Program.

[10]We replace the term "private" in the definition of "propagate" with wording that describes behavior. "Private" has many, often conflicting, meanings in legal and common usage.

[11]The copyright laws of many countries other than the United States, as well as certain international copyright treaties, recognize "making available to the public" or "communication to the public" as one of the exclusive rights of copyright holders. See Opinion on Denationalization of Terminology.

[12]See Opinion on Denationalization of Terminology. In Draft1 we defined "propagate" in order to free the license from dependence on national copyright law terms of art. However, Draft1 continued to use the term "distribute," a term that varies in scope in those copyright law systems that recognize it, while applying the conditions for distribution to all kinds of propagation that enable other parties to make or receive copies. This approach proved confusing, and showed the incompleteness of our efforts to internationalize the license. Draft2 now provides a new definition of "convey" and replaces "distribute" with "convey" throughout its terms and conditions, apart from a few idiomatic references to software distribution that are not meant to incorporate the copyright law term of art.

Because we now expressly prohibit sublicensing under section 2 (see n. 34), we have also excluded it from the definition of the new term "convey" (and removed it as an illustrative example of propagation).

[13]As part of our effort to clarify the wording of the express patent license of Draft1, resulting in the covenant not to assert patent claims of Draft2, we provided a new definition of "essential patent claims" to specify, more precisely than we did in Draft1, the set of patent claims that are licensed (or, as we now formulate it, subject to the covenant not to

## 1.   Source Code.

The "source code" for a work means the preferred form of the work for making modifications to it. "Object code" means any non-source version of a work.

**The "System Libraries"[14] of an executable work[15] include every subunit such that (a) the identical subunit is normally included as an adjunct in the distribution of either a major essential component (kernel, window system, and so on) of the specific operating system (if any) on which the object code runs, or a compiler used to produce the object code, or an object code interpreter used to run it, and (b) the subunit (aside from possible incidental extensions) serves only to enable use of the work with that system component or compiler or interpreter, or to implement a widely used or standard interface for which an implementation is available to the public in source code form.[16]**

The "~~Complete~~ Corresponding Source ~~Code~~"[17] for a work in object code form means all the source code needed to ~~understand, adapt, modify,~~

_____

assert). Most notably, we removed the reference to "reasonably contemplated use," which several members of our discussion committees argued was unclear. We also used the verbs that, in most countries, define the basic exclusive powers of patent holders (making, using, and selling the claimed invention). See Opinion on Covenant Not to Assert Patent Claims.

Having factored out and revised the definition of "essential patent claims," we realized that we could also use it to clarify the patent retaliation clause of section 2. See Opinion on Patent Retaliation.

[14]The definition of Corresponding Source ("Complete Corresponding Source Code" in Draft1) is the most complex definition in the license. In our efforts to make the definition clearer and easier to understand, we removed the exception in the final paragraph of section 1 and rewrote it as the definition of the new term "System Libraries," which we then use in the first paragraph of the definition of Corresponding Source.

[15]The definition of System Libraries is inapplicable to non-executable object code works; with this definition, such works have no System Libraries.

[16]In Draft1, a system component that implemented a standard interface qualified for the system library exception if the implementation required "no patent license not already generally available for software under this License." This wording was read by many to mean that the system library exception imposed an affirmative duty to investigate third-party patents, something which we had never intended. Our general concern was to ensure that there would be no obstacle to supporting the implementation in free software; now we have specified this without explicit reference to patents. The revised wording in the definition of System Libraries removes the reference to patents while requiring the interface to have a freely-available reference implementation.

[17]We made the trivial change of shortening "Complete Corresponding Source Code" to "Corresponding Source," an abbreviation we had already used in section 6 of Draft1.

6

~~compile, link~~ **generate**, install, and **(for an executable work)**[18] run the **object code and to modify the** work,[19] ~~excluding~~ **except its System Libraries, and except** general-purpose tools **or generally available free programs which are** used **unmodified** in performing those activities but which are not part of the work. For example, ~~this~~ **Corresponding Source** includes ~~any~~ scripts used to control those activities, **interface definition files associated with the program source files,** and ~~any~~ **the source code for** shared libraries and dynamically linked subprograms that the work is **specifically** designed to require,[20] such as by ~~intimate~~ **complex** data communication[21] or control flow between those subprograms and other parts of the work ~~and interface definition files associated with the program source files.~~

**The** ~~Complete~~ Corresponding Source ~~Code~~ also includes any encryption or authorization ~~codes~~ **keys**[22] necessary to install and/or execute ~~the~~ **modified versions from** source code ~~of the work, perhaps modified by you,~~ in the recommended or principal context of use, such that ~~its functioning in all circumstances is identical to that of the work, except as altered by your modifications~~ **they can implement all the same functionality in the same range of circumstances.**[23] **(For instance, if the work is a DVD player and can play certain DVDs, it must be possible for modified versions to play those DVDs. If the work communicates with an online service, it must be possible for modified versions to communicate with the same online service in the same way such that the service cannot distinguish.)**[24] ~~It also includes any decryption~~

---

[18]For non-software works covered by the GPL, the concept of "running" of object code will generally be meaningless.

[19]In revising this part of the definition of Corresponding Source, we have responded to concerns that some of our wording, which we meant to be expansive, and particularly the verbs "understand" and "adapt," was too vague or open-ended. In defining what source code is included in Corresponding Source, we now focus on source code that is necessary to generate and (if applicable) execute the object code form of the work and to develop, generate and run modified versions.

[20]We clarify that the shared libraries and dynamically linked subprograms that are included in Corresponding Source are those that the work is "specifically" designed to require, making it clearer that they do not include libraries invoked by the work that can be readily substituted by other existing implementations.

[21]We substitute "complex" for "intimate," which some readers found unclear.

[22]We replaced the term "codes" with "keys" to avoid confusion with source code and object code.

[23]We believe that this wording is clearer than the wording it replaces.

[24]The previous version of this paragraph was read more broadly than we had intended. We now provide specific examples to illustrate to readers the kinds of circumstances in

codes necessary to access or unseal the work's output.[25] ~~Notwithstanding this, a code~~ **A key** need not be included in cases where use of the work normally implies the user already has ~~it~~ **the key and can read and copy it, as in privacy applications where users generate their own keys. However, the fact that a key is generated based on the object code of the work or is present in hardware that limits its use does not alter the requirement to include it in the Corresponding Source.**[26]

**The Corresponding Source may include portions which do not formally state this License as their license, but qualify under section 7 for inclusion in a work under this License.**[27]

The ~~Complete~~ Corresponding Source ~~Code~~ need not include anything that users can regenerate automatically from other parts of the ~~Complete~~ Corresponding Source ~~Code~~.

~~As a special exception, the Complete Corresponding Source Code need not include a particular subunit if (a) the identical subunit is normally included as an adjunct in the distribution of either a major essential component (kernel, window system, and so on) of the operating system on which the executable runs or a compiler used to produce the executable or an object code interpreter used to run it, and (b) the subunit (aside from possible incidental extensions) serves only to enable use of the work with that system component or compiler or interpreter, or to implement a widely used or standard interface, the implementation of which requires no patent license~~

---

which users must receive keys along with the source code in order for their ability to modify software to be real rather than nominal. See Opinion on Digital Restrictions Management.

[25]Our reference to decryption codes generated much comment, and was misunderstood by many readers. It was intended to ensure that the program was not limited to production of encrypted data that the user was unable to read. We eventually concluded that this is unnecessary; as long as users are truly in a position to install and run their modified versions of the program, they could if they wish modify the original program to output the data without encrypting it. We have decided, therefore, to remove this sentence from the draft.

[26]The mere fact that use of the work implies that the user *has* the key may not be enough to ensure the user's freedom in using it. The user must also be able to read and copy the key; thus, its presence inside the computer does not satisfy the requirement. In an application in which the user's personal key is used to protect privacy or limit distribution of personal data, the user clearly has the ability to read and copy the key, which therefore is not included in the Corresponding Source. On the other hand, if a key is generated based on the object code, or is present in hardware, but the user cannot manipulate that key, then the key must be provided as part of the Corresponding Source.

[27]This paragraph was previously the final paragraph of section 6; it is more appropriately included in the definition of Corresponding Source.

~~not already generally available for software under this License.~~[28]

## 2. Basic Permissions.

All rights granted under this License are granted for the term of copyright on the Program, and are irrevocable provided the stated conditions are met. This License explicitly affirms your unlimited permission to run the **unmodified**[29] Program. The output from running it is covered by this License only if the output, given its content, constitutes a ~~work based on the Program~~ **covered work**. This License acknowledges your rights of "fair use" or other equivalent, as provided by copyright law.

This License ~~gives unlimited~~[30] ~~permission~~ **permits you** to ~~privately modify~~ **make** and run **privately modified versions of** the Program,[31] **or have others make and run them on your behalf.**[32] ~~provided you do not~~ **However, this permission terminates, as to all such versions, if you** bring suit **against anyone** for patent infringement ~~against anyone~~ **of any of your essential patent claims in any such version,** for making, using**, selling** or ~~distributing~~ **otherwise conveying** ~~their own works~~ **a work** based on the Program **in compliance with this License**.[33]

Propagation of covered works **other than conveying** is permitted without limitation ~~provided it does not enable parties other than you to make or receive copies.~~ **Sublicensing is not allowed; section 10 makes it unnecessary.**[34] ~~Propagation which does enable them to do so~~ **Conveying**

---

[28]As we point out in n. 14, we replaced this paragraph with our new definition of "System Libraries" in the second paragraph of section 1.

[29]We add "unmodified," even though "the Program" is defined as the work as it is received by the licensee, to more clearly distinguish this permission from the permission in the following paragraph, which is subject to patent retaliation.

[30]Strictly speaking, this permission, unlike the permission to run the unmodified Program, is not unlimited, since it may be terminated under the conditions stated in this paragraph.

[31]As we explain further in the Opinion on Patent Retaliation, we have revised this wording for clarity.

[32]Inherent in the right to modify a work is the right to have another party modify it on one's behalf. We mention this explicitly to make clear that one cannot avoid the effects of the patent retaliation clause by contracting out the development of the modified version.

[33]See Opinion on Patent Retaliation. The changes we have made in this paragraph more precisely define the permission as well as the kind of lawsuit that activates termination of the permission. For example, as noted in n. 13, we make use of the new defined term "essential patent claims."

[34]The explicit prohibition of sublicensing ensures that enforcement of the GPL is always by the copyright holder. Usually, sublicensing is regarded as a practical convenience or

is permitted ~~, as "distribution",~~ under the conditions ~~of sections 4-6~~ **stated** below.[35]

## 3. ~~Digital Restrictions Management~~ **No Denying Users' Rights Through Technical Measures.**[36]

~~As a free software license, this License intrinsically disfavors technical attempts to restrict users' freedom to copy, modify, and share copyrighted works. Each of its provisions shall be interpreted in light of this specific declaration of the licensor's intent.~~[37] Regardless of any other provision of this License, no permission is given ~~to distribute covered works that illegally invade users' privacy, nor~~[38] for modes of ~~distribution~~ **conveying** that deny users that run covered works the full exercise of the legal rights granted by this License.

No covered work constitutes part of an effective technological **"protection"** measure **under section 1201 of Title 17 of the United States Code.**~~; that is to say, distribution of a covered work as part of a system to generate or access certain data constitutes general permission at least for development, distribution and use, under this License, of other software capable of accessing the same data.~~ **When you convey a covered work, you waive any legal power to forbid circumvention of technical measures that include use of the covered work, and you disclaim any intention to**

---

[35]necessity for the licensee, to avoid having to negotiate a license with each licensor in a chain of distribution. The GPL solves this problem in another way, through its automatic licensing provision.

[35]To simplify and clarify the text, we make use of the new defined term "conveying." See n. 12 and Opinion on Denationalization of Terminology.

[36]In Draft1 only part of this section concerned Digital Restrictions Management, so the title was misleading. In Draft2 none of the section directly concerns DRM; parts of it are designed to thwart legal means of stopping users from changing free software that comes with DRM, but that is an indirect connection. We have retitled the section to state its direct focus. Our license must do what it can to resist the effects of technical measures to deny users' rights to copy, modify, and share software, and of the laws that prohibit escape from these measures. See Opinion on Digital Restrictions Management.

[37]These sentences were intended to guide judicial interpretation of the license to resolve any ambiguities in favor of protecting users against technical restrictions on their freedom. We deleted this sentence as part of focusing the GPL's requirements on protecting the freedom to modify DRM-ridden software, rather than at the DRM itself.

[38]The clause referring to illegal invasions of users' privacy was intended to provide developers a weapon, based in copyright, to combat spyware and malware, in order to supplement enforcement efforts of public authorities. The considerable public reaction to this provision, however, was overwhelmingly negative, and we therefore have decided to remove it.

**limit operation or modification of the work as a means of enforcing the legal rights of third parties against the work's users.**[39]

## 4.[1]   Verbatim Copying.

You may copy and ~~distribute~~ **convey** verbatim copies of the Program's source code as you receive it, in any medium, provided that you conspicuously and appropriately publish on each copy an appropriate copyright notice; keep intact all license notices and notices of the absence of any warranty; **and** give all recipients**,** ~~of~~ **along with** the Program**,** a copy of this License ~~along with the Program;~~ and ~~obey any additional terms present on parts of the Program in accord with~~ **the central list (if any) required by** section 7. **The recipients of these copies will possess all the rights granted by this License (with any added terms under section 7).**[40]

You may charge ~~a fee~~ **any price or no price** for ~~the physical act of transferring a copy~~ **each copy that you convey**,[41] and you may ~~at your~~

---

[39] We revised the second paragraph of section 3 extensively, breaking it up into two sentences. The first sentence now makes specific reference to the anticircumvention provisions of the U.S. Digital Millennium Copyright Act. The second sentence is more generally directed, but its waiver and disclaimer respond specifically to the features of the anticircumvention provisions of the European Union Copyright Directive and its associated implementing legislation. Although our general approach in drafting GPLv3 has been to remove references to particular regimes of copyright law, and particularly those of the United States, the peculiar features of the different U.S. and European approaches to anticircumvention, and the graveness of the danger these laws pose to free software, demanded a more specialized solution. In particular, the EUCD appears to give implementers of technical restriction measures the power to waive the operation of anticircumvention law. The DMCA is worded differently; we believe its effects are best resisted by way of a declaration that covered works are not part of its "protection" measures. See Opinion on Digital Restrictions Management.

[40] The principal changes in the first paragraph of section 4 concern the possible presence of additional terms on all or part of the Program. We removed wording that was inconsistent with section 7; the job it did is now done in section 7 itself. We also added wording that makes clear that the conveyor must provide the central list of additional terms required by section 7, and that recipients receive full GPL rights, supplemented by any additional terms that were placed on the Program.

[41] The original wording of this clause was meant to make clear that the GPL permits one to charge for the distribution of software. Despite our efforts to explain this in the license and in other documents, there are evidently some who believe that the GPL allows charging for services but not for selling software, or that the GPL requires downloads to be gratis. We referred to charging a "fee"; the term "fee" is generally used in connection with services. Our original wording also referred to "the physical act of transferring." The intention was to distinguish charging for transfers from attempts to impose licensing fees on all third parties. "Physical" might be read, however, as suggesting "distribution in a

11

~~option~~ offer **support or** warranty protection for a fee.[42]

## 5.[2]   ~~Distributing~~ **Conveying** Modified Source Versions.

~~Having modified a copy of the Program under the conditions of section 2, thus forming a work based on the Program, you~~ **You** may copy and ~~distribute~~ **convey** ~~such modifications or~~ **a** work **based on the Program, or the modifications to produce it from the Program,**[43] in the form of source code under the terms of section 4 above, provided that you also meet all of these conditions:

a. The modified work must carry prominent notices stating that you changed the work and the date of any change.

b. You must license the entire ~~modified~~ work, as a whole, under this License to anyone who comes into possession of a copy. This License must apply, unmodified except as permitted by section 7 below, to the whole of the work**, and all its parts, regardless of how they are packaged**.[44] This License gives no permission to license the work in any other way, but it does not invalidate such permission if you have separately received it.

c. If the modified work has interactive user interfaces, each must include a convenient feature that displays an appropriate copyright notice, and tells the user that there is no warranty for the program (or that you provide a warranty), that users may ~~redistribute~~ **convey** the modified work under ~~these conditions~~ **this License**, and how to view a copy of this License together with the central list (if any) of other terms in accord with section 7. **Specifically,** ~~If~~ **if** the interface presents a list of user commands or options, such as a menu, a command to display this information must be prominent in the list~~.; Otherwise~~ **otherwise**,

---

physical medium only." In our revised wording we use "price" in place of "fee," and we remove the term "physical."

[42]There is no harm in explicitly pointing out what ought to be obvious: that those who convey GPL-covered software may offer commercial services for the support of that software.

[43]Conveying a patch that is used to produce a modified version is equivalent to conveying the modified version itself.

[44]We add to subsection 5b a simpler restatement of a point that was previously made in a more cumbersome way in the text following subsection 5c. Distributors may not use artful subdivision of a modified work to evade the GPL's copyleft requirement.

the modified work must display this information at startup~~—except in the case that the Program has such interactive modes and does not display this information at startup~~. **However, if the Program has interactive interfaces that do not comply with this subsection, your modified work need not make them comply.**[45]

~~These requirements apply to the modified work as a whole.~~[46] ~~If~~ **To the extent that** identifiable sections of ~~that~~ **the modified** work, added by you, are not derived from the Program, and can be reasonably considered independent and separate works in themselves, then this License, and its terms, do not apply to those sections when you ~~distribute~~ **convey** them as separate works**, not specifically** for use ~~not~~ in combination with the Program.[47] ~~But when you distribute the same sections for use in combination with covered works, no matter in what form such combination occurs, the whole of the combination must be licensed under this License, whose permissions for other licensees extend to the entire whole, and thus to every part of the whole. Your sections may carry other terms as part of this combination in limited ways, described in section 7.~~[48]

~~Thus, it is not the intent of this section to claim rights or contest your rights to work written entirely by you; rather, the intent is to exercise the right to control the distribution of derivative or collective works based on the Program.~~[49]

A compilation of a covered work with other separate and independent works, which are not by their nature extensions of the covered work, in or on a volume of a storage or distribution medium, is called an "aggregate" if the **compilation and its resulting** copyright ~~resulting from the compilation is~~ **are** not used to limit the **access or** legal rights of the compilation's users beyond what the individual works permit. ~~Mere inclusion~~ **Inclusion** of a covered work in an aggregate does not cause this License to apply to the other parts of the aggregate.

---

[45]Responding to several public comments, we have rewritten the last sentence of subsection 5c to make it clearer. The substance is unchanged.

[46]Subsection 5b makes this sentence redundant.

[47]A separately-conveyed component that is designed only to be used in combination with and as part of a specific GPL-covered work ought to be considered part of that work, and not as a separate work.

[48]The paragraph following subsection 5c was needlessly abstruse, as was made clear to us during the discussion process. We have made it shorter and, we think, clearer, removing wording duplicative of statements made elsewhere (such as in subsection 5b) and limiting use of the term "combination," which troubled many readers.

[49]We have deleted this statement of intent; we consider it unnecessary. It also had the disadvantage of using terminology specific to U.S. copyright law.

## 6.[3]   **Conveying** Non-Source ~~Distribution~~ **Forms.**

You may copy and ~~distribute~~ **convey** a covered work in ~~Object Code~~ **object code** form under the terms of sections 4 and 5, provided that you also ~~distribute~~ **convey** the machine-readable ~~Complete~~ Corresponding Source ~~Code (herein the "Corresponding Source")~~ under the terms of this License, in one of these ways:

a. ~~Distribute~~ **Convey** the ~~Object Code~~ **object code** in a physical product (including a physical distribution medium), accompanied by the Corresponding Source ~~distributed~~ **fixed** on a durable physical medium customarily used for software interchange**.**~~; or,~~

b. ~~Distribute~~ **Convey** the ~~Object Code~~ **object code** in a physical product (including a physical distribution medium), accompanied by a written offer, valid for at least three years and valid for as long as you offer spare parts or customer support for that product model, to give any third party~~, for a price no more than ten times your cost of physically performing source distribution,~~ a copy of the Corresponding Source for all the software in the product that is covered by this License, on a durable physical medium customarily used for software interchange**, for a price no more than your reasonable cost of physically performing this conveying of source.**[50]~~; or,~~

[b1. **Convey the object code in a physical product (including a physical distribution medium), accompanied by a written offer, valid for at least three years and valid for as long as you offer spare parts or customer support for that product model, to provide access to copy the Corresponding Source from a network server at no charge.**][51]

---

[50]Responding to arguments made in several public comments, we have decided to restore the requirement, relaxed in Draft1, that the price of the copy of the Corresponding Source be limited to the reasonable cost of physically performing source distribution.

[51]We present for consideration and discussion this proposed new option for providing Corresponding Source by a written offer to make the Corresponding Source available for download from a network server. In the past, downloading was not a convenient option for most users in most circumstances. This is no longer true in many places where broadband net access is common.

Moreover, there are now services that will download material, store it on a CD or DVD, and mail it to the customer for a reasonable price, comparable to the cost of occasionally preparing and mailing a source disk. (For example, we know of one business that charges U.S. $8.52 to burn and ship a DVD containing between 2GB and 4.7GB of data from

c. ~~Privately distribute~~ **Convey individual copies of** the ~~Object Code~~ **object code** with a copy of the written offer to provide the Corresponding Source. This alternative is allowed only ~~for occasional noncommercial distribution~~ **occasionally and noncommercially**, and only if you received the ~~Object Code~~ **object code** with such an offer, in accord with ~~Subsection b above~~ **subsection 6b or 6b1**.[52] ~~Or,~~

d. ~~Distribute~~ **Convey** the ~~Object Code~~ **object code** by offering access ~~to copy it~~ from a designated place, and offer equivalent access to ~~copy~~ the Corresponding Source in the same way through the same place **at no extra charge**.[53] You need not require recipients to copy the Corresponding Source along with the ~~Object Code~~ **object code**.

[If the place to copy the ~~Object Code~~ **object code** is a network server, the Corresponding Source may be on a different server that supports equivalent copying facilities, provided you have explicitly arranged with the operator of that server to keep the Corresponding Source available for as long as needed to satisfy these requirements, and provided you maintain clear directions next to the ~~Object Code~~ **object code** saying where to find the Corresponding Source.]

e. **Convey the object code using peer-to-peer transmission provided you know that, and inform other peers where, the object code and Corresponding Source of the work are being offered to the general public at no charge under subsection 6d.**[54]

~~Distribution of the~~ **The** Corresponding Source **conveyed** in accord with this section must be in a format that is publicly documented, ~~unencumbered by patents~~, **with an implementation available to the public in source code form**,[55] and must require no special password or key for unpacking,

---

the U.S. to any country outside the U.S.) The availability of such services suggests that option 6b1 will be no worse than option 6b, even for users in countries where access to broadband is uncommon.

[52]We have revised the wording of this option for clarity. The subsection is meant to facilitate personal, noncommercial sharing of copies between individuals.

[53]We now specify what we believe was previously implicit: if binaries are offered for download from a network server, the Corresponding Source made available through the network server in accord with this subsection must be offered at no extra charge.

[54]See Opinion on BitTorrent Propagation.

[55]Our primary objective here was to ensure that the distributor use a generally-recognized mechanism for packaging source code. However, many read the requirement

reading or copying.

~~The Corresponding Source may include portions which do not formally state this License as their license, but qualify under section 7 for inclusion in a work under this License.[56]~~

**A separable portion of the object code, whose source code is excluded from the Corresponding Source as a System Library, need not be included in conveying the object code work.[57]**

## 7. ~~License Compatibility~~ **Additional Terms**.[58]

~~When you release a work based on the Program, you may include your own terms covering added parts for which you have, or can give, appropriate copyright permission, as long as those terms clearly permit all the activities that this License permits, or permit usage or relicensing under this License. Your terms may be written separately or may be this License plus additional written permission. If you so license your own added parts, those parts may be used separately under your terms, but the entire work remains under this License. Those who copy the work, or works based on it, must preserve your terms just as they must preserve this License, as long as any substantial portion of the parts they apply to are present.~~

**You may have received the Program,[59] or parts of it, under terms that supplement the terms of this License. These additional terms may include additional permissions, as provided in subsection 7a, and additional requirements, as provided in subsection 7b. When you convey copies of a covered work, unless the work also permits use under a previous version of this License, it**

---

that the distribution format be "unencumbered by patents" as creating a duty to investigate third-party patents. In Draft2, as with the clause in the system library exception (now the definition of System Libraries) concerning standard implementations, we have removed the reference to patents and instead require the public availability of an implementation in source code form.

[56] We have moved this sentence to the definition of Corresponding Source in section 1.

[57] We made this change, taking advantage of the definition of System Libraries, to make explicit what has been implicit: that the object code distribution of a GPL-covered work does not imply responsibility to distribute any System Library on which the work depends.

[58] As we explain in the Opinion on Additional Terms, we have extensively rewritten section 7. We changed the section title because license compatibility as it is conventionally understood is only one of several aspects of the issue of placement of additional terms on a GPL-covered program.

[59] In Draft1 section 7 did not directly address the possibility of additional terms being placed on the entire Program by the original author. See Opinion on Additional Terms.

must list, in one central place in the source code, the complete set of additional terms governing all or part of the work.[60]

### a. Additional Permissions.

Additional permissions make exceptions from one or more of the requirements of this License.[61]  A license document containing a clause that permits relicensing or conveying under this License shall be treated as a list of additional permissions, provided that the license document makes clear that no requirement in it survives such relicensing or conveying.[62]

Any additional permissions that are applicable to the entire Program are treated as though they were included in this License, as exceptions to its conditions, to the extent that they are valid under applicable law.  If additional permissions apply only to part of the Program, that part may be used separately under those permissions, but the entire Program remains governed by this License without regard to the additional terms.[63]

~~Aside from additional permissions, your terms may add limited kinds of additional requirements on your added parts, as follows:~~

---

[60]This is a restatement of the central list requirement, along with the exception for "version 2 or later" works, that was previously placed at the end of section 7.  It recognizes that additional terms may cover the whole work as well as parts of it.

[61]We offer version 3 of the GNU LGPL as a model for the use of additional permissions as exceptions from requirements of the GPL.

[62]Free software licenses that are nominally permissive and non-copyleft either are assumed to contain an implied relicensing clause or expressly permit distribution "under another license."  Some of these licenses, however, fail to make clear whether all of their requirements are extinguished by the relicensing clause, or whether some of the requirements continue to burden downstream users of code that is nominally distributed under the terms of some other license.

We address this problem in subsection 7a.  A formal license containing a relicensing clause is automatically compatible with GPLv3, as though that formal license contained no additional requirements, but only if that license makes clear that the relicensing clause extinguishes all additional requirements in it.  Otherwise, the relicensing clause is ignored for purposes of analyzing compatibility with GPLv3; each additional requirement must be considered to determine whether it falls within the list of allowed additional requirements given in subsection 7b.

[63]The second sentence of this paragraph restates more clearly what was stated in the first paragraph of Draft1 section 7.  The first sentence of this paragraph is new; it describes the effect of an additional permission that applies to the whole work.

b. **Additional Requirements.**

**Additional requirements are terms that further constrain use, modification or propagation of covered works. This License affects only the procedure for enforcing additional requirements, and does not assert that they can be successfully enforced by the copyright holder.[64]  Only these kinds of additional requirements are allowed by this License:[65]**

0) ~~a) They may~~ **terms that** require ~~the~~ preservation of ~~certain copyright notices, other~~ **specified reasonable** legal notices~~, and/or~~ **or** author attributions~~.~~**; or**

1) ~~and may~~ **terms that** require that the origin of the ~~parts~~ **material** they cover not be misrepresented, ~~and/or~~ **or** that ~~altered~~ **modified** versions of ~~them~~ **that material** be marked ~~in the source code, or marked there~~ in specific reasonable ways~~,~~ as different from the original version~~.~~**; or**

2) ~~b) They may state a disclaimer of~~ warranty ~~and~~ **or** liability **disclaimers** ~~in terms different~~ **that differ** from ~~those used~~ **the disclaimers** in this License~~.~~**; or**

3) ~~c) They may~~ **terms that** prohibit or limit the use for publicity purposes of specified names of ~~contributors~~ **licensors or authors**,[66] ~~and they may~~ **or that** require that certain specified **trade names**, trademarks**, or service marks not** be used for publicity purposes **without express permission, other than** ~~only~~ in ~~the~~ ways that are fair use under **applicable** trademark law~~; except with express permission.~~ **or**

4) ~~d) They may~~ **terms that** require**,** ~~that the work contain functioning facilities that allow~~ **if a modified version of the material they cover is a work intended to interact with users through a computer network, that those** users **be able** to ~~immediately~~ obtain copies of ~~its~~ **the** ~~Complete~~ Corresponding Source ~~Code.~~ **of the**

---

[64]We require enforcement of additional requirements to be by the procedure given in section 8.

[65]We have rewritten the list of allowed additional requirements for clarity, and we have added a catchall requirement category.

[66]"Contributor" is a term defined in several other free software licenses, but not used in our licenses. We replace it here with the equivalent terms of art "licensor" and "author."

work through the same network session;[67] or

5) e) They may impose software patent retaliation, which means **terms that wholly or partially terminate, or allow termination of,** permission for use of your added parts terminates or may be terminated, wholly or partially, under stated conditions, **the material they cover,** for users closely related to any party that has filed **a user who files** a software patent lawsuit (i.e.**that is**, a lawsuit alleging that some software infringes a patent). **not filed in retaliation or defense against the earlier filing of another software patent lawsuit, or in which the allegedly infringing software includes some of the covered material, possibly in combination with other software; or** The conditions must limit retaliation to a subset of these two cases: 1. Lawsuits that lack the justification of retaliating against other software patent lawsuits that lack such justification. 2. Lawsuits that target part of this work, or other code that was elsewhere released together with the parts you added, the whole being under the terms used here for those parts.[68]

6) **terms that are precisely equivalent in type and extent to a requirement expressly stated in this License, or that deny permission for activities that are clearly not permitted, expressly or otherwise, by this License.**[69]

No other additional conditions are permitted in your terms; therefore, no other conditions can be present on any work that uses this License. This License does not attempt to enforce your terms, or assert that they are valid or enforceable by you; it simply does not prohibit you from employing them.

**All other additional requirements, including attorney's fees provisions, choice of law, forum, and venue clauses, arbitration clauses, mandatory contractual acceptance clauses, requirements**

---

[67]We have addressed concerns regarding the phrase "functioning facilities" and the potential applicability of the wording of subsection 7d of Draft1 to modified code not intended for public network use.

[68]The wording of subsection 7e of Draft1, concerning compatible patent retaliation clauses, was particularly difficult for readers to understand. We have entirely rewritten it, without changing any of its substance.

[69]We add this catchall category for other requirements that do not fall neatly into one of the previously listed categories but which, in a sense, are not "additional" because the GPL clearly makes the same requirement, or clearly does not permit what the requirement prohibits. This category might include certain requirements, worded differently from but exactly equivalent to those of the GPL, contained in the terms of other license documents.

regarding changes to the name of the work, and terms that require that conveyed copies be governed by a license other than this License, are prohibited.[70]

### c. Terms Added or Removed By You.

~~When others modify the work, if they modify your parts of it, they may release such parts of their versions under this License without additional permissions, by including notice to that effect, or by deleting the notice that gives specific permissions in addition to this License. Then any broader permissions granted by your terms which are not granted by this License will not apply to their modifications, or to the modified versions of your parts resulting from their modifications. However, the specific requirements of your terms will still apply to whatever was derived from your added parts.~~

When you convey a copy of a covered work, you may at your option remove any additional permissions from that copy, or from any part of it.[71] Some additional permissions require their own removal in certain cases when you modify the work.[72]

Additional requirements are allowed only as stated in subsection 7b. If the Program as you received it purports to impose any other additional requirement, you may remove that requirement.[73]

You may place additional permissions, or additional requirements as allowed by subsection 7b, on material, added by you to a covered work, for which you have or can give appropriate copy-

---

[70]We now provide a non-exhaustive list of examples of other kinds of conditions that are disallowed additional requirements under the GPL. Questions commonly arise about whether certain of these terms, such as attorney's fees provisions and choice of law clauses, are compatible with the GPL. Some such provisions are typically found in license documents drafted from a contract-oriented perspective; to the drafters or users of these licenses it may not be obvious why we consider them to be requirements in the context of a pure copyright license.

[71]We no longer formally require removal of an additional permission to be by one who modifies.

[72]See, for example, subsection 2b of LGPLv3.

[73]Unlike additional permissions, additional requirements that are allowed under subsection 7b may not be removed. The revised section 7 makes clear that this condition does not apply to any other additional requirements, however, which are removable just like additional permissions. Here we are particularly concerned about the practice of program authors who purport to license their works under the GPL with an additional requirement that contradicts the terms of the GPL, such as a prohibition on commercial use. Such terms can make the program non-free, and thus contradict the basic purpose of the GNU GPL; but even when the conditions are not fundamentally unethical, adding them in this way invariably makes the rights and obligations of licensees uncertain.

right permission. **Adding requirements not allowed by subsection 7b is a violation of this License that may lead to termination of your rights under section 8.**

If you add terms to a covered work in accordance with this section, you must place, in the relevant source files, a statement of the additional terms that apply to those files, or a notice indicating where to find the applicable terms.[74]

~~Unless the work also permits distribution under a previous version of this License, all the other terms included in the work under this section must be listed, together, in a central list in the work.~~

## 8.[4]   Termination.

You may not propagate~~, or~~ **or** modify ~~or sublicense~~[75] the Program except as expressly provided under this License. Any attempt otherwise to propagate~~,~~ **or** modify ~~or sublicense~~ the Program is void~~, and any copyright holder may terminate your rights under this License at any time after having notified you of the violation by any reasonable means within 60 days of any occurrence.~~ **If you violate this License, any copyright holder may put you on notice by notifying you of the violation, by any reasonable means, provided 60 days have not elapsed since the last violation. Having put you on notice, the copyright holder may then terminate your license at any time.**[76]   However, parties who have received copies, or rights, from you under this License will not have their licenses terminated so long as they remain in full compliance.

---

[74]The version of section 7 in Draft1 required additional terms to be in writing. The final paragraph of section 7 in Draft2 states in further detail how the written notice of applicable additional terms must be provided.

[75]Because sublicensing is now expressly prohibited under section 2, section 8 need not refer to it.

[76]We have rephrased the non-automatic termination procedure to make it easier to understand.

### 9.[5]   ~~Not a Contract~~ **Acceptance Not Required for Having Copies.**[77]

You are not required to accept this License in order to receive **or run**[78] a copy of the Program. **Ancillary propagation of a covered work occurring solely as a consequence of using peer-to-peer transmission to receive a copy likewise does not require acceptance.**[79] However, nothing else grants you permission to propagate or modify the Program or any covered works. These actions infringe copyright if you do not accept this License. Therefore, by modifying or propagating the Program (or any covered work), you indicate your acceptance of this License to do so, and all its terms and conditions.

### 10.[6]   Automatic Licensing of Downstream Users.

Each time you ~~redistribute~~ **convey** a covered work, the recipient automatically receives a license from the original licensors, to ~~propagate and~~ **run,** modify **and propagate** that work, subject to this License, including any additional terms introduced through section 7. You may not impose any further restrictions on the recipients' exercise of the rights thus granted or affirmed, except ~~(when modifying the work)~~ in the limited ways permitted by section 7. **Therefore, you may not impose a license fee, royalty, or other charge for exercise of rights granted under this License.**[80]

---

[77]We received a number of forceful objections to the title of section 9 of Draft1, principally from lawyers. This surprised us, since our section titles were not intended to have legal significance, and, moreover, the content of section 9 was essentially unchanged from section 5 of GPLv2. We have changed the title of section 9 to one that summarizes the first sentence of the section.

Section 9 means what it says: mere receipt or execution of code neither requires nor signifies contractual acceptance under the GPL. Speaking more broadly, we have intentionally structured our license as a unilateral grant of copyright permissions, the basic operation of which exists outside of any law of contract. Whether and when a contractual relationship is formed between licensor and licensee under local law do not necessarily matter to the working of the license.

[78]The GPL makes no condition on execution of the Program, as section 2 affirms, just as it makes no condition on receipt of the Program.

[79]See Opinion on BitTorrent Propagation.

[80]Draft1 removed the words "at no charge" from what is now subsection 5b, the core copyleft provision, for reasons related to our current changes to the second paragraph of section 4: it had contributed to a misconception that the GPL did not permit charging for distribution of copies. The purpose of the "at no charge" wording was to prevent attempts to collect royalties from third parties. The removal of these words created the danger that

You are not responsible for enforcing compliance by third parties to this License.

**If propagation results from a transaction transferring control of an organization, each party to that transaction who receives a copy of the work also receives a license and a right to possession of the Corresponding Source of the work from the party's predecessor in interest.**[81]

## 11. ~~Licensing of~~ Patents.[82]

~~When you distribute a covered work, you grant a patent license~~[83] ~~to the~~

---

the imposition of licensing fees would no longer be seen as a license violation.

We therefore have added a new explicit prohibition on imposition of licensing fees or royalties in section 10. This section is an appropriate place for such a clause, since it is a specific consequence of the general requirement that no further restrictions be imposed on downstream recipients of GPL-covered code.

[81]The parties in mergers and acquisitions of businesses place a premium on reduction of uncertainty regarding the rights and liabilities being transferred. This is, of course, true of transactions involving businesses with assets that include GPL-covered software. There appears to be particular concern about whether and when such transactions activate the distribution-related requirements of the GPL for software that previously has been used and modified internally. With such concerns in mind, some members of our discussion committees have proposed that we allow assignment of the GPL, while others have suggested complex changes to the definition of propagation or licensee.

For our part, we agree entirely that the GPL should not create obstacles in corporate control transactions, but we do have concerns about the clever structuring of transactions specifically to avoid the consequences of the GPL. As one example, a business that uses certain GPL-covered software internally may seek to sell a division but keep control of a trade secret embodied in its improvements to that software. In such a case, the business might attempt to keep the source code for itself and give only the binary to the buyer. This, we believe, should not be allowed.

In Draft2 we have addressed these issues not by altering definitions of terms or allowing assignment, both of which we believe might have undesirable consequences, but by treating control transactions as a special case to be handled by automatic licensing. Under the new second paragraph of section 10, a party to a control transaction who receives any part or form of a GPL-covered work automatically receives, in addition to all upstream licenses in the chain of propagation, a license and a right to possession of the Corresponding Source from the predecessor in interest.

[82]We removed the reference to "licensing" in the title of this section. Section 11 is no longer concerned solely with granting of and distribution under patent licenses. We have replaced the express patent license grant with a covenant not to assert patent claims, and the new paragraph on reservation of implied rights is not limited to implied patent licenses.

[83]The patent license grant of Draft1 is replaced in Draft2 with a covenant not to assert patent claims. See n. 87 and Opinion on Covenant Not to Assert Patent Claims.

23

~~recipient, and to anyone that receives any version of the work, permitting, for any and all versions of the covered work, all activities allowed or contemplated by this License, such as installing, running and distributing versions of the work, and using their output.~~[84]  ~~This patent license is nonexclusive, royalty-free and worldwide,~~[85]  ~~and covers all patent claims you control or have the right to sublicense, at the time you distribute the covered work or in the future, that would be infringed or violated by the covered work or any reasonably contemplated use of the covered work.~~[86]

**You receive the Program with a covenant from each author and conveyor of the Program, and of any material, conveyed under this License, on which the Program is based, that the covenanting party will not assert (or cause others to assert) any of the party's essential patent claims in the material that the party conveyed, against you, arising from your exercise of rights under this License.  If you convey a covered work, you similarly covenant to all recipients, including recipients of works based on the covered work, not to assert any of your essential patent claims in the covered work.**[87]

If you ~~distribute~~ **convey** a covered work**,** knowingly relying on a **non-sublicensable** patent license **that is not generally available to all,**[88] you must **either (1)** act to shield downstream users against the possible patent infringement claims from which your license protects you**, or (2) ensure that anyone can copy the Corresponding Source of the**

---

[84]In the corresponding wording of the covenant not to assert we refer simply to "your exercise of rights under this License."

[85]These qualifications are unnecessary when the formalism of a patent license is replaced with a covenant, as it is here, or with a warranty.

[86]The last part of the last sentence of the express patent license is replaced, in the covenant not to assert, by the reference to essential patent claims, defined in section 0.

[87]As we explain further in the Opinion on Covenant Not to Assert Patents, we have redrafted the express patent license of Draft1 as a covenant not to assert patent claims. We believe that the new wording, which makes use of the defined terms "essential patent claims" and "based on," is simpler and clearer than the wording of the patent license, and is responsive to the extensive commentary on the express patent license that we received from the public and the discussion committees.

In Draft1, no express patent license was given by the author of the Program. Under the covenant of Draft2, however, the original licensor undertakes to make the same covenant as any other subsequent conveyor. It is primarily for this reason that the covenant is structured in two parts (specifying the rights of the licensee as covenantee, and the obligations of the licensee as covenantor).

[88]If patent licenses are sublicensable or generally available to all, they do not give rise to the problem of shifting risk of patent infringement liability downstream, which this paragraph is intended to target.

24

covered work, free of charge and under the terms of this License, through a publicly-available network server or other readily accessible means.[89]

Nothing in this License shall be construed as excluding or limiting any implied license or other defenses to infringement that may otherwise be available to you under applicable patent law.[90]

## 12.[7]   ~~Liberty or Death for the Program~~ No Surrender of Others' Freedom.[91]

If conditions are imposed on you (whether by court order, agreement or otherwise) that contradict the conditions of this License, they do not excuse you from the conditions of this License. If you cannot ~~distribute~~ **convey** the Program, or other covered work, so as to satisfy simultaneously your obligations under this License and any other pertinent obligations, then as a consequence you may not ~~distribute~~ **convey** it at all. For example, if **you accept** a patent license ~~would not permit~~ **that prohibits** royalty-free ~~redistribution~~ **conveying** by ~~all~~ those who receive copies directly or indirectly through you, then the only way you could satisfy both it and this License would be to refrain entirely from ~~distribution~~ **conveying the Program.**[92]

---

[89]After gathering opinion on the second paragraph of section 11 during the discussion process, we decided to offer a specific form of shielding that would satisfy the objectives of the paragraph. A distributor of a covered work under benefit of a patent license can ensure that the Corresponding Source is made publicly available, free of charge, for all to access and copy, such as by arranging for the Corresponding Source to be available on a public network server. We keep the more general shielding requirement as an option because we do not wish to insist upon public distribution of source code. Distributors complying with this section may prefer to provide other means of shielding their downstream recipients.

[90]Without this provision, it might be argued that any implied patent licenses or other patent infringement defenses otherwise available by operation of law are extinguished by, for example, the express covenant not to assert. We consider it important to preserve these rights and defenses for users to the extent possible. Moreover, the availability of implied licenses or similar rights may be necessary in order for certain kinds of shielding under the second paragraph to be effective.

[91]We have replaced the title of this section with one that more closely reflects its purpose and effect, which is to prevent distribution that operates to give recipients less than the full set of freedoms that the GPL promises them. The previous title was not entirely accurate, in that the program is not necessarily "dead" if an attempt to distribute by one party under a particular set of circumstances activates the section. The program may remain free for other users facing other circumstances.

[92]The example given here is reworded slightly to make it clearer that it is acceptance of the patent license (a self-imposition of conditions) that activates the section, and that the

~~It is not the purpose of this section to induce you to infringe any patents or other exclusive rights or to contest their legal validity. The sole purpose of this section is to protect the integrity of the free software distribution system. Many people have made generous contributions to the wide range of software distributed through that system in reliance on consistent application of that system; it is up to the author/donor to decide if he or she is willing to distribute software through any other system and a licensee cannot impose that choice.~~[93]

## [13.[8]   Geographical Limitations.

If the ~~distribution~~ **conveying** and/or use of the Program is restricted in certain countries either by patents or by copyrighted interfaces, the original copyright holder who places the Program under this License may add an explicit geographical ~~distribution~~ limitation **on conveying,** excluding those countries, so that ~~distribution~~ **conveying** is permitted only in or among countries not thus excluded.  In such case, this License incorporates the limitation as if written in the body of this License.]

## 14.[9]   Revised Versions of this License.

The Free Software Foundation may publish revised and/or new versions of the GNU General Public License from time to time.  Such new versions will be similar in spirit to the present version, but may differ in detail to address new problems or concerns.

Each version is given a distinguishing version number.  If the Program specifies that a certain numbered version of this License "or any later version" applies to it, you have the option of following the terms and conditions either of that numbered version or of any later version published by the Free Software Foundation.  If the Program does not specify a version number of this License, you may choose any version ever published by the Free Software Foundation.

---

effective terms of the patent license must actually prohibit exercise of GPL freedoms by downstream recipients. A distributor who accepts a patent license that does not activate this section may nonetheless be required to comply with the second paragraph of section 11.

[93]This paragraph provides a statement of purpose but does not contain a substantive term or condition. Our experience with GPLv2 convinces us that it is no longer necessary, if indeed it ever was.

## [15.[10]   Requesting Exceptions.[94]

If you wish to incorporate parts of the Program into other free programs ~~whose distribution conditions are different~~ **under other licenses**, write to the author to ask for permission. For software which is copyrighted by the Free Software Foundation, write to the Free Software Foundation; we sometimes make exceptions for this. Our decision will be guided by the two goals of preserving the free status of all derivatives of our free software and of promoting the sharing and reuse of software generally.]

## NO WARRANTY

## 16.[11]   **Disclaimer of Warranty.**[95]

There is no warranty for the Program, to the extent permitted by applicable law. Except when otherwise stated in writing the copyright holders and/or other parties provide the Program "as is" without warranty of any kind, either expressed or implied, including, but not limited to, the implied warranties of merchantability and fitness for a particular purpose. The entire risk as to the quality and performance of the Program is with you. Should the Program prove defective, you assume the cost of all necessary servicing, repair or correction.

## 17.[12]   **Limitation of Liability.**[96]

In no event unless required by applicable law or agreed to in writing will any copyright holder, or any other party who may modify and/or ~~redistribute~~ **convey** the Program as permitted above, be liable to you for damages, including any general, special, incidental or consequential damages arising out of the use or inability to use the Program (including but not limited to loss of data or data being rendered inaccurate or losses sustained by you or third parties or a failure of the Program to operate with any other programs),

---

[94]We have bracketed section 15 for possible removal from the final version of GPLv3. Though this section has value in teaching users that authors may grant permissive exceptions to the strong copyleft of the GPL, we now provide a framework for such exceptions within the license, in section 7. Section 15 is, in a sense, a provision that exists outside the terms of the GPL (it is neither a permission nor a requirement). It may be more appropriate to transfer it to a FAQ or other educational document.

[95]We added a descriptive title for this section.

[96]We added a descriptive title for this section.

even if such holder or other party has been advised of the possibility of such damages.

~~18.~~[97]

~~Unless specifically stated, the Program has not been tested for use in safety critical systems.~~

END OF TERMS AND CONDITIONS[98]

---

[97]We added the new disclaimer of section 18 assuming that it would be welcomed by developers and distributors of safety-critical free software. The reaction to section 18 from this constituency has instead generally been negative. Companies involved in distributing safety-critical applications have recommended that we remove the disclaimer, pointing out that it may be preferable to rely on the general warranty and liability disclaimers of sections 16 and 17 in the usual case and to add a special disclaimer under section 7 when appropriate. In light of these comments, we have decided to remove section 18 from the GPLv3 draft.

[98]We have removed from this draft the appended section on "How to Apply These Terms to Your New Programs." For brevity, the license document can instead refer to a web page containing these instructions as a separate document.

# Exhibit D
## Expert Report of Bradley M. Kuhn
## 22 December 2022

"Additional Terms Opinion" as published by the FSF on 2008-08-03.

# Opinion on Additional Terms

## Introduction

The wording of section 7 in Draft 1 proved difficult for many readers to understand. In Draft 2 section 7 has been entirely rewritten and bears a new title that more accurately reflects its scope. The new section 7 is longer than the first version, but it is no less concise; it now explicitly addresses certain issues regarding the presence and validity of additional terms that were not covered in the first version. It is meant to be clear, comprehensible, and comprehensive. Because most of the comments we received on section 7 were, in effect, questions about its meaning and interpretation, we use this opinion to explain how section 7 provides a framework for the analysis and treatment of additional terms under the GPL.

The GPL is a statement of permissions, some of which have conditions. Additional terms, terms that supplement those of the GPL, may come to be placed on, or removed from, GPL-covered code in certain common ways. We consider those added terms "additional permissions" if they grant exceptions from the conditions of the GPL, and "additional requirements" if they add conditions to the basic permissions of the GPL. The treatment of additional permissions and additional requirements under GPLv3 is necessarily asymmetrical, because they do not raise the same ethical and interpretive issues; in particular, additional requirements, if allowed without careful limitation, could transform a GPL'd program into a non-free one. With these principles in the background, section 7 answers the following questions: (1) How do the presence of additional terms on all or part of a GPL'd program affect users' rights? (2) When and how may a licensee add terms to code being distributed under the GPL? (3) When may a licensee remove additional terms?

## Additional Permissions

Additional permissions present the easier case. We have licensed some of our own software under GPLv2 with permissive exceptions that allow combination with non-free code, and that allow removal of those permissions by downstream recipients; similarly, LGPLv2.1 is in essence a permissive variant of GPLv2, and it permits relicensing under the GPL. We have generalized these practices in section 7. A licensee may remove any additional permission from a covered work, whether it was placed by the original author or by an upstream distributor. A licensee may also add any kind of additional permission to any part of a work for which the licensee has, or

1

can give, appropriate copyright permission. For example, if the licensee has written that part, the licensee is the copyright holder for that part and can therefore give additional permissions that are applicable to it. Alternatively, the part may have been written by someone else and licensed, with the additional permissions, to that licensee. Any additional permissions on that part are, in turn, removable by downstream recipients. As subsection 7a explains, the effect of an additional permission depends on whether the permission applies to the whole work or a part.

We have drafted version 3 of the GNU LGPL, which we have released with Draft 2 of GPLv3, as a simple list of additional permissions supplementing the terms of GPLv3. Section 7 has thus provided the basis for recasting a formally complex license as an elegant set of added terms, without changing any of the fundamental features of the existing LGPL. We offer this draft of LGPLv3 as as a model for developers wishing to license their works under the GPL with permissive exceptions. The removability of additional permissions under section 7 does not alter any existing behavior of the LGPL; the LGPL has always allowed relicensing under the ordinary GPL.

### Additional Requirements and License Compatibility

We broadened the title of section 7 because license compatibility, as it is conventionally understood, is only one of several facets of the placement of additional terms on GPL'd code. The license compatibility issue arises for three reasons. First, the GPL is a strong copyleft license, requiring modified versions to be distributed under the GPL. Second, the GPL states that no further restrictions may be placed on the rights of recipients. Third, all other free software licenses in common use contain certain requirements, many of which are not conditions made by the GPL. Thus, when GPL'd code is modified by combination with code covered by another formal license that specifies other requirements, and that modified code is then distributed to others, the freedom of recipients may be burdened by additional requirements in violation of the GPL. It can be seen that additional permissions in other licenses do not raise any problems of license compatibility.

Section 7 relaxes the prohibition on further restrictions slightly by enumerating, in subsection 7b, a limited list of categories of additional requirements that may be placed on code without violating GPLv3. The list includes the items that were listed in Draft 1, though rewritten for clarity. It also includes a new catchall category for terms that might not obviously fall within one of the other categories but which are precisely equivalent

2

to GPLv3 conditions, or which deny permission for activities clearly not permitted by GPLv3. We have carefully considered but rejected proposals to expand this list further. We have also rejected suggestions, made by some discussion committee members, that the Affero clause requirement (7d in Draft 1 and 7b4 in Draft 2) be removed, though we have revised it in response to certain comments. We are unwavering in our view that the Affero requirement is a legitimate one, and we are committed to achieving compatibility of the Affero GPL with GPLv3.

A GPL licensee may place an additional requirement on code for which the licensee has or can give appropriate copyright permission, but only if that requirement falls within the list given in subsection 7b. Placement of any other kind of additional requirement continues to be a violation of the license. Additional requirements that are in the 7b list may not be removed, but if a user receives GPL'd code that purports to include an additional requirement not in the 7b list, the user may remove that requirement. Here we were particularly concerned to address the problem of program authors who purport to license their works in a misleading and possibly self-contradictory fashion, using the GPL together with unacceptable added restrictions that would make those works non-free software.

Section 7 points out that GPLv3 itself makes no assertion that an additional requirement is enforceable by the copyright holder. However, section 7 makes clear that enforcement of such requirements is expected to be by the termination procedure given in section 8 of GPLv3.

## Conclusion

Some have questioned whether section 7 is needed, and some have suggested that it creates complexity that did not previously exist. We point out to those readers that there is already GPLv2-licensed code that carries additional terms. One of the objectives of section 7 is to rationalize existing practices of program authors and modifiers by setting clear guidelines regarding the removal and addition of such terms. With its carefully limited list of allowed additional requirements, section 7 accomplishes additional objectives, permitting the expansion of the base of code available for GPL developers, while also encouraging useful experimentation with requirements we do not include in the GPL itself.

# Exhibit E
## Expert Report of Bradley M. Kuhn
## 22 December 2022

Comment number 3,320 on in the GPLv3 Process by user "frx".

read GPLv3 comments 32
Case 3:18-cv-07182-EJD    Document 186-2    Filed 06/01/23    Page 133 of 248



gplv3.fsf.org/comments/rt/readsay.html?filename=gplv3-draft-4&id=3220    Incognito (3)

Showing comment 3220 [rss] [see on license] search                    you could login



| Home | Comments | Wiki | Press | Support |

Log in    Register

# DISABLES ADDITIONAL ACTIONS FOR DRAFTERS

## Comment 3220: Good: further restrictions are void

**Regarding the text:** *"If the Program as you received it, or any part of it, purports to be governed by this License, supplemented by a term that is a further restriction, you may remove that term"*
**In section:** gpl3.licensecompat.p8.s2
**Submitted by:** frx on 2007-06-02 at 12:01 EDT
0 agree:
**noted by** frx on 2007-06-02 at 12:01 EDT:

> I'm glad to see that this is explicitly stated: every attempt to license a work under the terms of GPLv3 with further restrictions is equivalent to licensing under the plain GPLv3. This is good, since there are unfortunately many people that license works in inconsistent manners (such as GPLv2 + additional restrictions); creating a rule that resolves this kind of inconsistencies for the better is a good thing to do.

# Exhibit F

## Expert Report of Bradley M. Kuhn

## 22 December 2022

The third discussion draft of the GPLv3, as published by the FSF on 2007-03-28.

# GPLv3 Third Discussion Draft Markup of Changes from Second Discussion Draft

## Free Software Foundation

Copyright © 2007 Free Software Foundation, Inc., 51 Franklin Street, Fifth Floor, Boston, MA 02110-1301, USA

Verbatim copying and distribution of this entire article are permitted worldwide, without royalty, in any medium, provided this notice is preserved.

2

# GNU General Public License

Discussion Draft ~~2~~ **3** of Version 3, ~~27 July~~ **28 March** ~~2006~~ **2007**

THIS IS A DRAFT, NOT A PUBLISHED VERSION OF THE
GNU GENERAL PUBLIC LICENSE.

Copyright © ~~2006~~ **2007** Free Software Foundation, Inc. (**http://fsf.org**)
51 Franklin Street, Fifth Floor, Boston, MA 02110-1301 USA
Everyone is permitted to copy and distribute verbatim copies of this
license document, but changing it is not allowed.

## Preamble

**The GNU General Public License is a free, copyleft license for software and other kinds of works.**

The licenses for most software **and other practical works** are designed to take away your freedom to share and change ~~it~~ **the works**. By contrast, the GNU General Public License is intended to guarantee your freedom to share and change free software—to make sure the software is free for all its users. We, the Free Software Foundation, use the GNU General Public License for most of our software; it applies also to any other program whose authors commit to using it. You can apply it to your programs, too.

When we speak of free software, we are referring to freedom, not price. Our General Public Licenses are designed to make sure that you have the freedom to distribute copies of free software (and charge for this service if you wish), that you receive source code or can get it if you want it, that you can change the software or use pieces of it in new free programs, and that you know you can do these things.

To protect your rights, we need to make requirements that forbid anyone to deny you these rights or to ask you to surrender the rights. Therefore, you have certain responsibilities if you distribute copies of the software, or if you modify it.

For example, if you distribute copies of such a program, whether gratis or for a fee, you must ~~give~~ **pass on to** the recipients ~~all~~ the **same** ~~rights~~ **freedoms** that you ~~have~~ **received**. You must make sure that they, too, receive or can get the source code. And you must show them these terms so they know their rights.

Developers that use the GNU GPL protect your rights with two steps: (1) assert copyright on the software, and (2) offer you this License which gives you legal permission to copy, distribute and/or modify the software.

For the developers' and authors' protection, the GPL clearly explains that there is no warranty for this free software. For both users' and authors' sake, the GPL requires that modified versions be marked as changed, so that their problems will not be associated erroneously with the ~~original version~~ **previous versions**.

Some ~~computers~~ **devices** are designed to deny users access to install or run modified versions of the software inside them**, although the manufacturer can do so**. This is fundamentally incompatible with the purpose of the GPL, which is to protect users' freedom to change the software **where changes are possible. The systematic pattern of such abuse occurs in the area of products for individuals to use, which is precisely where it is most unacceptable.** Therefore, ~~the GPL ensures that the software it covers will not be restricted in this way~~ **we have designed this version of the GPL to prohibit the practice for those products. If such problems arise substantially in other domains, we stand ready to extend this provision to those domains in future versions of the GPL, as needed to protect the freedom of users.**

Finally, every program is threatened constantly by software patents. States should not allow patents to restrict development and use of software on general-purpose computers, but in places where they do, we wish to avoid the special danger that ~~redistributors of~~ **patents applied to** a free program ~~will individually obtain patent licenses, in effect making the program~~ **could make it effectively** proprietary. To prevent this, the GPL assures that patents cannot be used to render the program non-free.

**The precise terms and conditions for copying, distribution and modification follow.**

TERMS AND CONDITIONS

## 0.   Definitions.

**"This License" refers to version 3 of the GNU General Public License.**

**"Copyright" also means copyright-like laws that apply to other kinds of works, such as semiconductor masks.**

~~In this License, each licensee is addressed as "you," while "the~~ **"The** Program" refers to any **copyrightable** work ~~of authorship~~ licensed under this License. **Each licensee is addressed as "you." "Licensees" and "recipients" may be individuals or organizations.**

~~A "modified" work includes, without limitation, versions in which material has been translated or added. A work "based on"~~another work means~~ any modified version, formation of which requires permission under applicable copyright law.~~ **To "modify" a work means to copy from or adapt all or part of the work in a fashion requiring copyright permission, other than the making of a verbatim copy. The resulting work is called a "modified version" of the earlier work or a work "based on" the earlier work.** A "covered work" means either the unmodified Program or a work based on the Program.

**A "contributor" is a party who licenses under this License a work on which the Program is based. Such a work is called the party's "contribution."**

To "propagate" a work means ~~doing~~ **to do (or cause others to do)** anything with it that requires permission under applicable copyright law, except executing it on a computer~~,~~ or making modifications that you do not share. Propagation includes copying, distribution (with or without modification), making available to the public, and in some countries other activities as well. To "convey" a work means any kind of propagation that enables other parties to make or receive copies, excluding sublicensing. **Mere interaction with a user through a computer network, with no transfer of a copy, is not conveying.**

A party's "essential patent claims" in a work are all patent claims ~~that the party can give permission to practice~~ **owned or controlled by the party**, whether already acquired or ~~to be~~ **hereafter** acquired, that would be infringed by **some manner, permitted by this License, of** making, using, or selling the work**, but do not include claims that would be infringed only as a consequence of further modification of the work**. **For purposes of this definition, "control" includes the right to grant sublicenses in a manner consistent with the requirements of this License.**

## 1.   Source Code.

The "source code" for a work means the preferred form of the work for making modifications to it.  "Object code" means any non-source ~~version~~ **form** of a work.

A "**Standard Interface**" **means an interface that either is an official standard defined by a recognized standards body, or, in the case of interfaces specified for a particular programming language, one that is widely used among developers working in that language.**

The "System Libraries" of an executable work include ~~every subunit such~~ **anything, other than the work as a whole,** that (a) ~~the identical subunit~~ is normally included ~~as an adjunct~~ in the distribution of ~~either~~ a ~~major essential component (kernel, window system, and so on) of the specific operating system (if any) on which the object code runs, or a compiler used to produce the object code, or an object code interpreter used to run it~~ **Major Component**, **but which is not part of that Major Component,** and (b) ~~the subunit (aside from possible incidental extensions)~~ serves only to enable use of the work with that ~~system component or compiler or interpreter~~ **Major Component**, or to implement a ~~widely used or standard interface~~ **Standard Interface** for which an implementation is available to the public in source code form.  **A "Major Component", in this context, means a major essential component (kernel, window system, and so on) of the specific operating system (if any) on which the executable work runs, or a compiler used to produce the work, or an object code interpreter used to run it.**

The "Corresponding Source" for a work in object code form means all the source code needed to generate, install, and (for an executable work) run the object code and to modify the work, ~~except its~~ **including scripts to control those activities.  However, it does not include the work's** System Libraries, ~~and except~~ **or** general-purpose tools or generally available free programs which are used unmodified in performing those activities but which are not part of the work.  For example, Corresponding Source includes ~~scripts used to control those activities,~~ interface definition files associated with ~~the program~~ source files **for the work**, and the source code for shared libraries and dynamically linked subprograms that the work is specifically designed to require, such as by ~~complex~~ **intimate** data communication or control flow between those subprograms and other parts of the work.

~~The Corresponding Source also includes any encryption or authorization keys necessary to install and/or execute modified versions from source code~~

~~in the recommended or principal context of use, such that they can implement all the same functionality in the same range of circumstances. (For instance, if the work is a DVD player and can play certain DVDs, it must be possible for modified versions to play those DVDs. If the work communicates with an online service, it must be possible for modified versions to communicate with the same online service in the same way such that the service cannot distinguish.) A key need not be included in cases where use of the work normally implies the user already has the key and can read and copy it, as in privacy applications where users generate their own keys. However, the fact that a key is generated based on the object code of the work or is present in hardware that limits its use does not alter the requirement to include it in the Corresponding Source.~~

~~The Corresponding Source may include portions which do not formally state this License as their license, but qualify under section 7 for inclusion in a work under this License.~~

The Corresponding Source need not include anything that users can regenerate automatically from other parts of the Corresponding Source.

**The Corresponding Source for a work in source code form is that same work.**

## 2.   Basic Permissions.

All rights granted under this License are granted for the term of copyright on the Program, and are irrevocable provided the stated conditions are met. This License explicitly affirms your unlimited permission to run the unmodified Program. The output from running ~~it~~ **a covered work** is covered by this License only if the output, given its content, constitutes a covered work. This License acknowledges your rights of ~~"~~fair use~~"~~ or other equivalent, as provided by copyright law.

~~This License permits you to make and run privately modified versions of the Program, or have others make and run them on your behalf. However, this permission terminates, as to all such versions, if you bring suit against anyone for patent infringement of any of your essential patent claims in any such version, for making, using, selling or otherwise conveying a work based on the Program in compliance with this License.~~

Propagation of covered works ~~other than conveying~~ **that you do not convey, and making modified versions of the Program that you do not convey,** ~~is~~ **are** permitted without ~~limitation~~ **conditions, so long as your license otherwise remains in force. Conveying is permitted**

**under the conditions stated below.** Sublicensing is not allowed; section 10 makes it unnecessary. ~~Conveying is permitted under the conditions stated below.~~

## 3.   No Denying Users' Rights through Technical Measures.

~~Regardless of any other provision of this License, no permission is given for modes of conveying that deny users that run covered works the full exercise of the legal rights granted by this License.~~

No covered work ~~constitutes~~ **shall be deemed** part of an effective technological ~~"protection"~~ measure under ~~section 1201 of Title 17 of the United States Code~~ **any applicable law fulfilling obligations under article 11 of the WIPO copyright treaty adopted on 20 December 1996, or similar laws prohibiting or restricting circumvention of such measures**.

When you convey a covered work, you waive any legal power to forbid circumvention of technical measures ~~that include use of~~ **to the extent such circumvention is effected by exercising rights under this License with respect to** the covered work, and you disclaim any intention to limit operation or modification of the work as a means of enforcing, **against the work's users, your or third parties'** the legal rights ~~of third parties against the work's users~~ **to forbid circumvention of technical measures**.

## 4.~~[1]~~   **Conveying** Verbatim ~~Copying~~ **Copies**.

You may ~~copy and~~ convey verbatim copies of the Program's source code as you receive it, in any medium, provided that you conspicuously and appropriately publish on each copy an appropriate copyright notice; keep intact all ~~license~~ notices **stating that this License and any non-permissive terms added in accord with section 7 apply to the code;** ~~and~~ **keep intact all** notices of the absence of any warranty; and give all recipients~~,~~ ~~along with the Program,~~ a copy of this License **along with the Program** ~~and the central list (if any) required by section 7. The recipients of these copies will possess all the rights granted by this License (with any added terms under section 7).~~

You may charge any price or no price for each copy that you convey, and you may offer support or warranty protection for a fee.

8

## 5.[2]   Conveying Modified Source Versions.

You may copy and convey a work based on the Program, or the modifications to produce it from the Program, in the form of source code under the terms of section 4 above, provided that you also meet all of these conditions:

a) The modified work must carry prominent notices stating that you changed the work **modified it,** and the date of any change **giving a relevant date**.

b) **The work must carry prominent notices stating that it is released under this License and any conditions added under section 7. This requirement modifies the requirement in section 4 to "keep intact all notices".**

b **c)** You must license the entire work, as a whole, under this License to anyone who comes into possession of a copy. This License must **will therefore** apply, unmodified except as permitted by section 7 below, to the whole of the work, and all its parts, regardless of how they are packaged. This License gives no permission to license the work in any other way, but it does not invalidate such permission if you have separately received it.

e **d**) If the modified work has interactive user interfaces, each must include a convenient feature that displays an appropriate copyright notice, and tells the user that there is no warranty for the program **work** (or that **unless** you provide a warranty), that users **licensees** may convey the modified work under this License, and how to view a copy of this License together with the central list (if any) of other terms in accord with section 7. Specifically, if the interface presents a list of user commands or options, such as a menu, a command to display this information must be prominent in the list; otherwise, the modified work must display this information at startup. However, if the Program has interactive interfaces that do not comply with this subsection, your modified work need not make them comply.

To the extent that identifiable sections of the modified work, added by you, are not derived from the Program, and can be reasonably considered independent and separate works in themselves, then this License, and its terms, do not apply to those sections when you convey them as separate works, not specifically for use in combination with the Program.

A compilation of a covered work with other separate and independent works, which are not by their nature extensions of the covered work, in or on a volume of a storage or distribution medium, is called an "aggregate" if the compilation and its resulting copyright are not used to limit the access or legal rights of the compilation's users beyond what the individual works permit. Inclusion of a covered work in an aggregate does not cause this License to apply to the other parts of the aggregate.

## 6.[3]   Conveying Non-Source Forms.

You may ~~copy and~~ convey a covered work in object code form under the terms of sections 4 and 5, provided that you also convey the machine-readable Corresponding Source under the terms of this License, in one of these ways:

a) Convey the object code in**, or embodied in,** a physical product (including a physical distribution medium), accompanied by the Corresponding Source fixed on a durable physical medium customarily used for software interchange.

b) Convey the object code in**, or embodied in,** a physical product (including a physical distribution medium), accompanied by a written offer, valid for at least three years and valid for as long as you offer spare parts or customer support for that product model, **either (1)** to give ~~any third party~~ **anyone who possesses the object code** a copy of the Corresponding Source for all the software in the product that is covered by this License, on a durable physical medium customarily used for software interchange, for a price no more than your reasonable cost of physically performing this conveying of source~~.~~**, or (2)**

[~~b1)~~  ~~Convey the object code in a physical product (including a physical distribution medium), accompanied by a written offer, valid for at least three years and valid for as long as you offer spare parts or customer support for that product model,~~ to provide access to copy the Corresponding Source from a network server at no charge.]

c) Convey individual copies of the object code with a copy of the written offer to provide the Corresponding Source. This alternative is allowed only occasionally and noncommercially, and only if you received the object code with such an offer, in accord with subsection 6b ~~or 6b1~~.

d) Convey the object code by offering access from a designated place **(gratis or for a charge)**, and offer equivalent access to the Corresponding Source in the same way through the same place at no ~~extra~~ **further** charge. You need not require recipients to copy the Corresponding Source along with the object code.

[If the place to copy the object code is a network server, the Corresponding Source may be on a different server **(operated by you or a third party)** that supports equivalent copying facilities, ~~provided you have explicitly arranged with the operator of that server to keep the Corresponding Source available for as long as needed to satisfy these requirements, and~~ provided you maintain clear directions next to the object code saying where to find the Corresponding Source.] **Regardless of what server hosts the Corresponding Source, you remain obligated to ensure that it is available for as long as needed to satisfy these requirements.**

e) Convey the object code using peer-to-peer transmission**,** provided you ~~know that, and~~ inform other peers where~~,~~ the object code and Corresponding Source of the work are being offered to the general public at no charge under subsection 6d.

~~The Corresponding Source conveyed in accord with this section must be in a format that is publicly documented, with an implementation available to the public in source code form, and must require no special password or key for unpacking, reading or copying.~~

A separable portion of the object code, whose source code is excluded from the Corresponding Source as a System Library, need not be included in conveying the object code work.

**A "User Product" is either (1) a "consumer product", which means any tangible personal property which is normally used for personal, family, or household purposes, or (2) anything designed or sold for incorporation into a dwelling. [In cases of doubt concerning whether an item is a "consumer product", the interpretation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*, shall provide the basis for interpretation, regardless of the choice of law determination for this License as a whole.]**

**"Installation Information" for a User Product means any methods, procedures, authorization keys, or other information required to install and execute modified versions of a covered work in that User Product from a modified version of its Corresponding Source.**

11

The information must suffice to ensure that the continued functioning of the modified object code is in no case prevented or interfered with solely because modification has been made.

If you convey an object code work under this section in, or with, or specifically for use in, a User Product, and the conveying occurs as part of a transaction in which the right of possession and use of the User Product is transferred to the recipient in perpetuity or for a fixed term (regardless of how the transaction is characterized), the Corresponding Source conveyed under this section must be accompanied by the Installation Information. But this requirement does not apply if neither you nor any third party retains the ability to install modified object code on the User Product (for example, the work has been installed in ROM).

The requirement to provide Installation Information does not include a requirement to continue to provide support service, warranty, or updates for a work that has been modified or installed by the recipient. Network access may be denied when the modification itself materially and adversely affects the operation of the network or violates the rules and protocols for communication across the network.

Corresponding Source conveyed, and Installation Information provided, in accord with this section must be in a format that is publicly documented, with an implementation available to the public in source code form, and must require no special password or key for unpacking, reading or copying.

## 7.  Additional Terms.

~~You may have received the Program, or parts of it, under terms that supplement the terms of this License. These additional terms may include additional permissions, as provided in subsection 7a, and additional requirements, as provided in subsection 7b. When you convey copies of a covered work, unless the work also permits use under a previous version of this License, it must list, in one central place in the source code, the complete set of additional terms governing all or part of the work.~~

a. ~~Additional Permissions.~~

"Additional permissions" **are terms that supplement the terms of this License by** ~~make~~ **making** exceptions from one or more of ~~the requirements~~

12

of this License ~~its conditions~~. ~~A license document containing a clause that permits relicensing or conveying under this License shall be treated as a list of additional permissions, provided that the license document makes clear that no requirement in it survives such relicensing or conveying.~~

~~Any additional~~ **Additional** permissions that are applicable to the entire Program shall be treated as though they were included in this License, ~~as exceptions to its conditions,~~ to the extent that they are valid under applicable law. If additional permissions apply only to part of the Program, that part may be used separately under those permissions, but the entire Program remains governed by this License without regard to the additional ~~terms~~ **permissions**.

    b. ~~Additional Requirements.~~

~~Additional requirements are terms that further constrain use, modification or propagation of covered works. This License affects only the procedure for enforcing additional requirements, and does not assert that they can be successfully enforced by the copyright holder. Only these kinds of additional requirements are allowed by this License:~~

    ~~0) terms that require preservation of specified reasonable legal notices or author attributions; or~~

    ~~1) terms that require that the origin of the material they cover not be misrepresented, or that modified versions of that material be marked in specific reasonable ways as different from the original version; or~~

    ~~2) warranty or liability disclaimers that differ from the disclaimers in this License; or~~

    ~~3) terms that prohibit or limit the use for publicity purposes of specified names of licensors or authors, or that require that certain specified trade names, trademarks, or service marks not be used for publicity purposes without express permission, other than in ways that are fair use under applicable trademark law; or~~

    ~~4) terms that require, if a modified version of the material they cover is a work intended to interact with users through a computer network, that those users be able to obtain copies of the Corresponding Source of the work through the same network session; or~~

5) terms that wholly or partially terminate, or allow termination of, permission for use of the material they cover, for a user who files a software patent lawsuit (that is, a lawsuit alleging that some software infringes a patent) not filed in retaliation or defense against the earlier filing of another software patent lawsuit, or in which the allegedly infringing software includes some of the covered material, possibly in combination with other software; or

6) terms that are precisely equivalent in type and extent to a requirement expressly stated in this License, or that deny permission for activities that are clearly not permitted, expressly or otherwise, by this License.

All other additional requirements, including attorney's fees provisions, choice of law, forum, and venue clauses, arbitration clauses, mandatory contractual acceptance clauses, requirements regarding changes to the name of the work, and terms that require that conveyed copies be governed by a license other than this License, are prohibited.

c. Terms Added or Removed by You.

When you convey a copy of a covered work, you may at your option remove any additional permissions from that copy, or from any part of it. (Some additional **Additional** permissions **may be written to** require their own removal in certain cases when you modify the work.) **You may place additional permissions on material, added by you to a covered work, for which you have or can give appropriate copyright permission.**

   Notwithstanding any other provision of this License, you may **supplement the terms of this License with terms effective under, or drafted for compatibility with, local law:**

   a. **disclaiming warranty or limiting liability differently from the terms of section 15 of this License; or**

   b. **requiring preservation of specified reasonable legal notices or author attributions in source or object code forms of material added by you to a covered work; or**

   c. **prohibiting misrepresentation of the origin of material added by you to a covered work, or requiring that modified versions of such material be marked in reasonable ways as different from the original version; or**

14

    d. **limiting the use for publicity purposes of specified names of licensors or authors, or of specified trade names, trademarks, or service marks, to the extent otherwise permitted by law.**

~~Additional requirements are allowed only as stated in subsection 7b.~~ **All other non-permissive additional terms are considered "further restrictions" within the meaning of section 10.** If the Program as you received it**, or any part of it,** purports to ~~impose any other additional requirement~~ **be governed by this License, supplemented by a term that is a further restriction**, you may remove that ~~requirement~~ **term**. **If a license document contains a further restriction but permits relicensing or conveying under this License, you may add to a covered work material governed by the terms of that license document, provided that the further restriction does not survive such relicensing or conveying.**

~~You may place additional permissions, or additional requirements as allowed by subsection 7b, on material, added by you to a covered work, for which you have or can give appropriate copyright permission. Adding requirements not allowed by subsection 7b is a violation of this License that may lead to termination of your rights under section 8.~~

If you add terms to a covered work in accord~~ance~~ with this section, you must place, in the relevant source files, a statement of the additional terms that apply to those files, or a notice indicating where to find the applicable terms.

## 8.[4]   Termination.

You may not propagate or modify ~~the Program~~ **a covered work** except as expressly provided under this License. Any attempt otherwise to propagate or modify ~~the Program~~ **it** is void. If you violate this License, any copyright holder may put you on notice by notifying you of the violation, by any reasonable means, provided 60 days have not elapsed since the ~~last~~ **most recent** violation. Having put you on notice, the copyright holder may**,** ~~then terminate your license~~ at any time, **terminate the rights (including any patent rights) that the copyright holder has granted to you under this License**.

**However, if this is your first violation of this License with respect to a given copyright holder, and you cure the violation within 30 days following your receipt of the notice, then your license is automatically reinstated.**

~~However,~~ **In the event that your rights are terminated under this section,** parties who have received copies, or rights, from you under this License will not have their licenses terminated so long as they remain in full compliance.

## 9.[5]  Acceptance Not Required for Having Copies.

You are not required to accept this License in order to receive or run a copy of the Program. Ancillary propagation of a covered work occurring solely as a consequence of using peer-to-peer transmission to receive a copy likewise does not require acceptance. However, nothing ~~else~~ **other than this License** grants you permission to propagate or modify ~~the Program or~~ any covered ~~works~~ **work**. These actions infringe copyright if you do not accept this License. Therefore, by modifying or propagating ~~the Program (or any~~ **a** covered work~~)~~, you indicate your acceptance of this License to do so~~, and all its terms and conditions~~.

## 10.[6]  Automatic Licensing of Downstream ~~Users~~ **Recipients**.

Each time you convey a covered work, the recipient automatically receives a license from the original licensors, to run, modify and propagate that work, subject to this License~~, including any additional terms introduced through section 7. You may not impose any further restrictions on the recipients' exercise of the rights thus granted or affirmed, except in the limited ways permitted by section 7. Therefore, you may not impose a license fee, royalty, or other charge for exercise of rights granted under this License~~. You are not responsible for enforcing compliance by third parties ~~to~~ **with** this License.

**An "entity transaction" is a transaction transferring control of an organization, or substantially all assets of one, or subdividing an organization, or merging organizations.** If propagation **of a covered work** results from ~~a transaction transferring control of an organization~~ **an entity transaction**, each party to that transaction who receives a copy of the work also receives ~~a license~~ **whatever licenses to the work the party's predecessor in interest had or could give under the previous paragraph, plus** ~~and~~ a right to possession of the Corresponding Source of the work from the ~~party's~~ predecessor in interest.

**You may not impose any further restrictions on the exercise of the rights granted or affirmed under this License. For example,**

16

you may not impose a license fee, royalty, or other charge for exercise of rights granted under this License, and you may not initiate litigation (including a cross-claim or counterclaim in a lawsuit) alleging that any patent claim is infringed by making, using, selling, offering for sale, or importing the Program (or the contribution of any contributor).

## 11.  Patents.

~~You receive the Program with a covenant from each author and conveyor of the Program, and of any material, conveyed under this License, on which the Program is based, that the covenanting party will not assert (or cause others to assert) any of the party's essential patent claims in the material that the party conveyed, against you, arising from your exercise of rights under this License. If you convey a covered work, you similarly covenant to all recipients, including recipients of works based on the covered work, not to assert any of your essential patent claims in the covered work.~~

**Each contributor grants you a non-exclusive, worldwide, royalty-free patent license under the contributor's essential patent claims in its contribution, to make, use, sell, offer for sale, import and otherwise run, modify and propagate the contribution.**

**For purposes of the following three paragraphs, a "patent license" means a patent license, a covenant not to bring suit for patent infringement, or any other express agreement or commitment, however denominated, not to enforce a patent.**

If you convey a covered work, knowingly relying on a ~~non-sublicensable~~ patent license ~~that is not generally available to all~~, **and the Corresponding Source of the work is not available for anyone to copy, free of charge and under the terms of this License, through a publicly available network server or other readily accessible means, then** you must either ~~(1) act to shield downstream users against the possible patent infringement claims from which your license protects you, or (2) ensure that anyone can copy the Corresponding Source of the covered work, free of charge and under the terms of this License, through a publicly available network server or other readily accessible means~~ **(1) cause the Corresponding Source to be so available, or (2) disclaim the patent license for this particular work, or (3) arrange, in a manner consistent with the requirements of this License, to extend the patent license to downstream recipients. "Knowingly relying" means you**

17

have actual knowledge that, but for the patent license, your conveying the covered work in a country, or your recipient's use of the covered work in a country, would infringe one or more identifiable patents in that country that you have reason to believe are valid.

If, pursuant to or in connection with a single transaction or arrangement, you convey, or propagate by procuring conveyance of, a covered work, and grant a patent license providing freedom to use, propagate, modify or convey a specific copy of the covered work to any of the parties receiving the covered work, then the patent license you grant is automatically extended to all recipients of the covered work and works based on it.

You may not convey a covered work if you are a party to an arrangement with a third party that is in the business of distributing software, under which you make payment to the third party based on the extent of your activity of conveying the work, and under which the third party grants, to any of the parties who would receive the covered work from you, a patent license (a) in connection with copies of the covered work conveyed by you, and/or copies made from those, or (b) primarily for and in connection with specific products or compilations that contain the covered work, which license does not cover, prohibits the exercise of, or is conditioned on the non-exercise of any of the rights that are specifically granted to recipients of the covered work under this License[, unless you entered into that arrangement, or that patent license was granted, prior to March 28, 2007].

Nothing in this License shall be construed as excluding or limiting any implied license or other defenses to infringement that may otherwise be available to you under applicable patent law.

## 12.[7]   No Surrender of Others' Freedom.

If conditions are imposed on you (whether by court order, agreement or otherwise) that contradict the conditions of this License, they do not excuse you from the conditions of this License. If you cannot convey the Program, or other covered work, so as to satisfy simultaneously your obligations under this License and any other pertinent obligations, then as a consequence you may not convey it at all. For example, if you ~~accept a patent license that prohibits royalty-free conveying by those who receive copies directly or indirectly through you~~ **agree to terms that obligate you to collect a**

**royalty for further conveying from those to whom you convey the Program**, ~~then~~ the only way you could satisfy both ~~it~~ **those terms** and this License would be to refrain entirely from conveying the Program.

## 13.   Use with the Affero General Public License.

**Notwithstanding any other provision of this License, you have permission to link any covered work with a work licensed under version 2 of the Affero General Public License, and to convey the resulting combination.  The terms of this License will continue to apply to your covered work but will not apply to the work with which it is linked, which will remain governed by the Affero General Public License.**

### [~~13.~~[8]   ~~Geographical Limitations.~~

~~If the conveying and/or use of the Program is restricted in certain countries either by patents or by copyrighted interfaces, the original copyright holder who places the Program under this License may add an explicit geographical limitation on conveying, excluding those countries, so that conveying is permitted only in or among countries not thus excluded. In such case, this License incorporates the limitation as if written in the body of this License.]~~

## 14.[9]   Revised Versions of this License.

The Free Software Foundation may publish revised and/or new versions of the GNU General Public License from time to time. Such new versions will be similar in spirit to the present version, but may differ in detail to address new problems or concerns.

Each version is given a distinguishing version number.  If the Program specifies that a certain numbered version of ~~this~~ **the GNU General Public** License "or any later version" applies to it, you have the option of following the terms and conditions either of that numbered version or of any later version published by the Free Software Foundation.  If the Program does not specify a version number of ~~this~~ **the GNU General Public** License, you may choose any version ever published by the Free Software Foundation.

**If the Program specifies that a proxy can decide whether future versions of the GNU General Public License shall apply, that**

proxy's public statement of acceptance of any version is permanent authorization for you to choose that version for the Program.

### 15.[10]   Requesting Exceptions.

If you wish to incorporate parts of the Program into other free programs under other licenses, write to the author to ask for permission. For software which is copyrighted by the Free Software Foundation, write to the Free Software Foundation; we sometimes make exceptions for this. Our decision will be guided by the two goals of preserving the free status of all derivatives of our free software and of promoting the sharing and reuse of software generally.]

NO WARRANTY

### 16 15.[11, 12]   Disclaimer of Warranty **and Limitation of Liability**.

There is no warranty for the Program, to the extent permitted by applicable law. Except when otherwise stated in writing the copyright holders and/or other parties provide the Program "as is" without warranty of any kind, either expressed or implied, including, but not limited to, the implied warranties of merchantability and fitness for a particular purpose. The entire risk as to the quality and performance of the Program is with you. Should the Program prove defective, you assume the cost of all necessary servicing, repair or correction.

**THERE IS NO WARRANTY FOR THE PROGRAM, TO THE EXTENT PERMITTED BY APPLICABLE LAW. EXCEPT WHEN OTHERWISE STATED IN WRITING THE COPYRIGHT HOLDERS AND/OR OTHER PARTIES PROVIDE THE PROGRAM "AS IS" WITHOUT WARRANTY OF ANY KIND, EITHER EXPRESSED OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. THE ENTIRE RISK AS TO THE QUALITY AND PERFORMANCE OF THE PROGRAM IS WITH YOU. SHOULD THE PROGRAM PROVE DEFECTIVE, YOU ASSUME THE COST OF ALL NECESSARY SERVICING, REPAIR OR CORRECTION.**

## 17.[12]   ~~Limitation of Liability.~~

~~In no event unless required by applicable law or agreed to in writing will any copyright holder, or any other party who may modify and/or convey the Program as permitted above, be liable to you for damages, including any general, special, incidental or consequential damages arising out of the use or inability to use the Program (including but not limited to loss of data or data being rendered inaccurate or losses sustained by you or third parties or a failure of the Program to operate with any other programs), even if such holder or other party has been advised of the possibility of such damages.~~

**IN NO EVENT UNLESS REQUIRED BY APPLICABLE LAW OR AGREED TO IN WRITING WILL ANY COPYRIGHT HOLDER, OR ANY OTHER PARTY WHO MODIFIES AND/OR CONVEYS THE PROGRAM AS PERMITTED ABOVE, BE LIABLE TO YOU FOR DAMAGES, INCLUDING ANY GENERAL, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF THE USE OR INABILITY TO USE THE PROGRAM (INCLUDING BUT NOT LIMITED TO LOSS OF DATA OR DATA BEING RENDERED INACCURATE OR LOSSES SUSTAINED BY YOU OR THIRD PARTIES OR A FAILURE OF THE PROGRAM TO OPERATE WITH ANY OTHER PROGRAMS), EVEN IF SUCH HOLDER OR OTHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.**

**If the disclaimer of warranty and limitation of liability provided above cannot be given local legal effect according to their terms, reviewing courts shall apply local law that most closely approximates an absolute waiver of all civil liability in connection with the Program, unless a warranty or assumption of liability accompanies a copy of the Program in return for a fee.**

END OF TERMS AND CONDITIONS

# Exhibit G

## Expert Report of Bradley M. Kuhn
## 22 December 2022

The Neo4j Sweden Software License

```
NOTICE
This package contains software licensed under different
licenses, please refer to the NOTICE.txt file for further
information and LICENSES.txt for full license texts.

Neo4j Enterprise object code can be licensed independently from
the source under separate commercial terms. Email inquiries can be
directed to: licensing@neo4j.com. More information is also
available at:https://neo4j.com/licensing/

The software ("Software") is developed and owned by Neo4j Sweden AB
(referred to in this notice as âM-^@M-^\Neo4jâM-^@M-^]) and is subject to the te
rms
of the GNU AFFERO GENERAL PUBLIC LICENSE Version 3, with the Commons Clause as f
ollows:



                   GNU AFFERO GENERAL PUBLIC LICENSE
                    Version 3, 19 November 2007

 Copyright (C) 2007 Free Software Foundation, Inc. <http://fsf.org/>
 Everyone is permitted to copy and distribute verbatim copies
 of this license document, but changing it is not allowed.

                          Preamble

  The GNU Affero General Public License is a free, copyleft license
for software and other kinds of works, specifically designed to ensure
cooperation with the community in the case of network server software.

  The licenses for most software and other practical works are
designed to take away your freedom to share and change the works.  By
contrast, our General Public Licenses are intended to guarantee your
freedom to share and change all versions of a program--to make sure it
remains free software for all its users.

  When we speak of free software, we are referring to freedom, not
price.  Our General Public Licenses are designed to make sure that you
have the freedom to distribute copies of free software (and charge for
them if you wish), that you receive source code or can get it if you
want it, that you can change the software or use pieces of it in new
free programs, and that you know you can do these things.

  Developers that use our General Public Licenses protect your rights
with two steps: (1) assert copyright on the software, and (2) offer
you this License which gives you legal permission to copy, distribute
and/or modify the software.

  A secondary benefit of defending all users' freedom is that
improvements made in alternate versions of the program, if they
receive widespread use, become available for other developers to
incorporate.  Many developers of free software are heartened and
encouraged by the resulting cooperation.  However, in the case of
software used on network servers, this result may fail to come about.
The GNU General Public License permits making a modified version and
letting the public access it on a server without ever releasing its
source code to the public.

  The GNU Affero General Public License is designed specifically to
ensure that, in such cases, the modified source code becomes available
to the community.  It requires the operator of a network server to
provide the source code of the modified version running there to the
```

users of that server.  Therefore, public use of a modified version, on
a publicly accessible server, gives the public access to the source
code of the modified version.

  An older license, called the Affero General Public License and
published by Affero, was designed to accomplish similar goals.  This is
a different license, not a version of the Affero GPL, but Affero has
released a new version of the Affero GPL which permits relicensing under
this license.

  The precise terms and conditions for copying, distribution and
modification follow.

                        TERMS AND CONDITIONS

  0. Definitions.

  "This License" refers to version 3 of the GNU Affero General Public
License.

  "Copyright" also means copyright-like laws that apply to other kinds
of works, such as semiconductor masks.

  "The Program" refers to any copyrightable work licensed under this
License.  Each licensee is addressed as "you".  "Licensees" and
"recipients" may be individuals or organizations.

  To "modify" a work means to copy from or adapt all or part of the work
in a fashion requiring copyright permission, other than the making of an
exact copy.  The resulting work is called a "modified version" of the
earlier work or a work "based on" the earlier work.

  A "covered work" means either the unmodified Program or a work based
on the Program.

  To "propagate" a work means to do anything with it that, without
permission, would make you directly or secondarily liable for
infringement under applicable copyright law, except executing it on a
computer or modifying a private copy.  Propagation includes copying,
distribution (with or without modification), making available to the
public, and in some countries other activities as well.

  To "convey" a work means any kind of propagation that enables other
parties to make or receive copies.  Mere interaction with a user through
a computer network, with no transfer of a copy, is not conveying.

  An interactive user interface displays "Appropriate Legal Notices"
to the extent that it includes a convenient and prominently visible
feature that (1) displays an appropriate copyright notice, and (2)
tells the user that there is no warranty for the work (except to the
extent that warranties are provided), that licensees may convey the
work under this License, and how to view a copy of this License.  If
the interface presents a list of user commands or options, such as a
menu, a prominent item in the list meets this criterion.

  1. Source Code.

  The "source code" for a work means the preferred form of the work
for making modifications to it.  "Object code" means any non-source
form of a work.

  A "Standard Interface" means an interface that either is an official
standard defined by a recognized standards body, or, in the case of

interfaces specified for a particular programming language, one that is widely used among developers working in that language.

The "System Libraries" of an executable work include anything, other than the work as a whole, that (a) is included in the normal form of packaging a Major Component, but which is not part of that Major Component, and (b) serves only to enable use of the work with that Major Component, or to implement a Standard Interface for which an implementation is available to the public in source code form.  A "Major Component", in this context, means a major essential component (kernel, window system, and so on) of the specific operating system (if any) on which the executable work runs, or a compiler used to produce the work, or an object code interpreter used to run it.

The "Corresponding Source" for a work in object code form means all the source code needed to generate, install, and (for an executable work) run the object code and to modify the work, including scripts to control those activities.  However, it does not include the work's System Libraries, or general-purpose tools or generally available free programs which are used unmodified in performing those activities but which are not part of the work.  For example, Corresponding Source includes interface definition files associated with source files for the work, and the source code for shared libraries and dynamically linked subprograms that the work is specifically designed to require, such as by intimate data communication or control flow between those subprograms and other parts of the work.

The Corresponding Source need not include anything that users can regenerate automatically from other parts of the Corresponding Source.

The Corresponding Source for a work in source code form is that same work.

2. Basic Permissions.

All rights granted under this License are granted for the term of copyright on the Program, and are irrevocable provided the stated conditions are met.  This License explicitly affirms your unlimited permission to run the unmodified Program.  The output from running a covered work is covered by this License only if the output, given its content, constitutes a covered work.  This License acknowledges your rights of fair use or other equivalent, as provided by copyright law.

You may make, run and propagate covered works that you do not convey, without conditions so long as your license otherwise remains in force.  You may convey covered works to others for the sole purpose of having them make modifications exclusively for you, or provide you with facilities for running those works, provided that you comply with the terms of this License in conveying all material for which you do not control copyright.  Those thus making or running the covered works for you must do so exclusively on your behalf, under your direction and control, on terms that prohibit them from making any copies of your copyrighted material outside their relationship with you.

Conveying under any other circumstances is permitted solely under the conditions stated below.  Sublicensing is not allowed; section 10 makes it unnecessary.

3. Protecting Users' Legal Rights From Anti-Circumvention Law.

No covered work shall be deemed part of an effective technological measure under any applicable law fulfilling obligations under article

11 of the WIPO copyright treaty adopted on 20 December 1996, or
similar laws prohibiting or restricting circumvention of such
measures.

  When you convey a covered work, you waive any legal power to forbid
circumvention of technological measures to the extent such circumvention
is effected by exercising rights under this License with respect to
the covered work, and you disclaim any intention to limit operation or
modification of the work as a means of enforcing, against the work's
users, your or third parties' legal rights to forbid circumvention of
technological measures.

  4. Conveying Verbatim Copies.

  You may convey verbatim copies of the Program's source code as you
receive it, in any medium, provided that you conspicuously and
appropriately publish on each copy an appropriate copyright notice;
keep intact all notices stating that this License and any
non-permissive terms added in accord with section 7 apply to the code;
keep intact all notices of the absence of any warranty; and give all
recipients a copy of this License along with the Program.

  You may charge any price or no price for each copy that you convey,
and you may offer support or warranty protection for a fee.

  5. Conveying Modified Source Versions.

  You may convey a work based on the Program, or the modifications to
produce it from the Program, in the form of source code under the
terms of section 4, provided that you also meet all of these conditions:

    a) The work must carry prominent notices stating that you modified
    it, and giving a relevant date.

    b) The work must carry prominent notices stating that it is
    released under this License and any conditions added under section
    7.  This requirement modifies the requirement in section 4 to
    "keep intact all notices".

    c) You must license the entire work, as a whole, under this
    License to anyone who comes into possession of a copy.  This
    License will therefore apply, along with any applicable section 7
    additional terms, to the whole of the work, and all its parts,
    regardless of how they are packaged.  This License gives no
    permission to license the work in any other way, but it does not
    invalidate such permission if you have separately received it.

    d) If the work has interactive user interfaces, each must display
    Appropriate Legal Notices; however, if the Program has interactive
    interfaces that do not display Appropriate Legal Notices, your
    work need not make them do so.

  A compilation of a covered work with other separate and independent
works, which are not by their nature extensions of the covered work,
and which are not combined with it such as to form a larger program,
in or on a volume of a storage or distribution medium, is called an
"aggregate" if the compilation and its resulting copyright are not
used to limit the access or legal rights of the compilation's users
beyond what the individual works permit.  Inclusion of a covered work
in an aggregate does not cause this License to apply to the other
parts of the aggregate.

  6. Conveying Non-Source Forms.

You may convey a covered work in object code form under the terms of sections 4 and 5, provided that you also convey the machine-readable Corresponding Source under the terms of this License, in one of these ways:

a) Convey the object code in, or embodied in, a physical product (including a physical distribution medium), accompanied by the Corresponding Source fixed on a durable physical medium customarily used for software interchange.

b) Convey the object code in, or embodied in, a physical product (including a physical distribution medium), accompanied by a written offer, valid for at least three years and valid for as long as you offer spare parts or customer support for that product model, to give anyone who possesses the object code either (1) a copy of the Corresponding Source for all the software in the product that is covered by this License, on a durable physical medium customarily used for software interchange, for a price no more than your reasonable cost of physically performing this conveying of source, or (2) access to copy the Corresponding Source from a network server at no charge.

c) Convey individual copies of the object code with a copy of the written offer to provide the Corresponding Source.  This alternative is allowed only occasionally and noncommercially, and only if you received the object code with such an offer, in accord with subsection 6b.

d) Convey the object code by offering access from a designated place (gratis or for a charge), and offer equivalent access to the Corresponding Source in the same way through the same place at no further charge.  You need not require recipients to copy the Corresponding Source along with the object code.  If the place to copy the object code is a network server, the Corresponding Source may be on a different server (operated by you or a third party) that supports equivalent copying facilities, provided you maintain clear directions next to the object code saying where to find the Corresponding Source.  Regardless of what server hosts the Corresponding Source, you remain obligated to ensure that it is available for as long as needed to satisfy these requirements.

e) Convey the object code using peer-to-peer transmission, provided you inform other peers where the object code and Corresponding Source of the work are being offered to the general public at no charge under subsection 6d.

A separable portion of the object code, whose source code is excluded from the Corresponding Source as a System Library, need not be included in conveying the object code work.

A "User Product" is either (1) a "consumer product", which means any tangible personal property which is normally used for personal, family, or household purposes, or (2) anything designed or sold for incorporation into a dwelling.  In determining whether a product is a consumer product, doubtful cases shall be resolved in favor of coverage.  For a particular product received by a particular user, "normally used" refers to a typical or common use of that class of product, regardless of the status of the particular user or of the way in which the particular user actually uses, or expects or is expected to use, the product.  A product is a consumer product regardless of whether the product has substantial commercial, industrial or non-consumer uses, unless such uses represent the only significant mode of use of the product.

"Installation Information" for a User Product means any methods,
procedures, authorization keys, or other information required to install
and execute modified versions of a covered work in that User Product from
a modified version of its Corresponding Source.  The information must
suffice to ensure that the continued functioning of the modified object
code is in no case prevented or interfered with solely because
modification has been made.

If you convey an object code work under this section in, or with, or
specifically for use in, a User Product, and the conveying occurs as
part of a transaction in which the right of possession and use of the
User Product is transferred to the recipient in perpetuity or for a
fixed term (regardless of how the transaction is characterized), the
Corresponding Source conveyed under this section must be accompanied
by the Installation Information.  But this requirement does not apply
if neither you nor any third party retains the ability to install
modified object code on the User Product (for example, the work has
been installed in ROM).

The requirement to provide Installation Information does not include a
requirement to continue to provide support service, warranty, or updates
for a work that has been modified or installed by the recipient, or for
the User Product in which it has been modified or installed.  Access to a
network may be denied when the modification itself materially and
adversely affects the operation of the network or violates the rules and
protocols for communication across the network.

Corresponding Source conveyed, and Installation Information provided,
in accord with this section must be in a format that is publicly
documented (and with an implementation available to the public in
source code form), and must require no special password or key for
unpacking, reading or copying.

7. Additional Terms.

"Additional permissions" are terms that supplement the terms of this
License by making exceptions from one or more of its conditions.
Additional permissions that are applicable to the entire Program shall
be treated as though they were included in this License, to the extent
that they are valid under applicable law.  If additional permissions
apply only to part of the Program, that part may be used separately
under those permissions, but the entire Program remains governed by
this License without regard to the additional permissions.

When you convey a copy of a covered work, you may at your option
remove any additional permissions from that copy, or from any part of
it.  (Additional permissions may be written to require their own
removal in certain cases when you modify the work.)  You may place
additional permissions on material, added by you to a covered work,
for which you have or can give appropriate copyright permission.

Notwithstanding any other provision of this License, for material you
add to a covered work, you may (if authorized by the copyright holders of
that material) supplement the terms of this License with terms:

    a) Disclaiming warranty or limiting liability differently from the
    terms of sections 15 and 16 of this License; or

    b) Requiring preservation of specified reasonable legal notices or
    author attributions in that material or in the Appropriate Legal
    Notices displayed by works containing it; or

   c) Prohibiting misrepresentation of the origin of that material, or
requiring that modified versions of such material be marked in
reasonable ways as different from the original version; or

   d) Limiting the use for publicity purposes of names of licensors or
authors of the material; or

   e) Declining to grant rights under trademark law for use of some
trade names, trademarks, or service marks; or

   f) Requiring indemnification of licensors and authors of that
material by anyone who conveys the material (or modified versions of
it) with contractual assumptions of liability to the recipient, for
any liability that these contractual assumptions directly impose on
those licensors and authors.

  All other non-permissive additional terms are considered "further
restrictions" within the meaning of section 10.  If the Program as you
received it, or any part of it, contains a notice stating that it is
governed by this License along with a term that is a further restriction,
you may remove that term.  If a license document contains a further
restriction but permits relicensing or conveying under this License, you
may add to a covered work material governed by the terms of that license
document, provided that the further restriction does not survive such
relicensing or conveying.

  If you add terms to a covered work in accord with this section, you
must place, in the relevant source files, a statement of the
additional terms that apply to those files, or a notice indicating
where to find the applicable terms.

  Additional terms, permissive or non-permissive, may be stated in the
form of a separately written license, or stated as exceptions;
the above requirements apply either way.

  8. Termination.

  You may not propagate or modify a covered work except as expressly
provided under this License.  Any attempt otherwise to propagate or
modify it is void, and will automatically terminate your rights under
this License (including any patent licenses granted under the third
paragraph of section 11).

  However, if you cease all violation of this License, then your
license from a particular copyright holder is reinstated (a)
provisionally, unless and until the copyright holder explicitly and
finally terminates your license, and (b) permanently, if the copyright
holder fails to notify you of the violation by some reasonable means
prior to 60 days after the cessation.

  Moreover, your license from a particular copyright holder is
reinstated permanently if the copyright holder notifies you of the
violation by some reasonable means, this is the first time you have
received notice of violation of this License (for any work) from that
copyright holder, and you cure the violation prior to 30 days after
your receipt of the notice.

  Termination of your rights under this section does not terminate the
licenses of parties who have received copies or rights from you under
this License.  If your rights have been terminated and not permanently
reinstated, you do not qualify to receive new licenses for the same
material under section 10.

  9. Acceptance Not Required for Having Copies.

  You are not required to accept this License in order to receive or
run a copy of the Program.  Ancillary propagation of a covered work
occurring solely as a consequence of using peer-to-peer transmission
to receive a copy likewise does not require acceptance.  However,
nothing other than this License grants you permission to propagate or
modify any covered work.  These actions infringe copyright if you do
not accept this License.  Therefore, by modifying or propagating a
covered work, you indicate your acceptance of this License to do so.

  10. Automatic Licensing of Downstream Recipients.

  Each time you convey a covered work, the recipient automatically
receives a license from the original licensors, to run, modify and
propagate that work, subject to this License.  You are not responsible
for enforcing compliance by third parties with this License.

  An "entity transaction" is a transaction transferring control of an
organization, or substantially all assets of one, or subdividing an
organization, or merging organizations.  If propagation of a covered
work results from an entity transaction, each party to that
transaction who receives a copy of the work also receives whatever
licenses to the work the party's predecessor in interest had or could
give under the previous paragraph, plus a right to possession of the
Corresponding Source of the work from the predecessor in interest, if
the predecessor has it or can get it with reasonable efforts.

  You may not impose any further restrictions on the exercise of the
rights granted or affirmed under this License.  For example, you may
not impose a license fee, royalty, or other charge for exercise of
rights granted under this License, and you may not initiate litigation
(including a cross-claim or counterclaim in a lawsuit) alleging that
any patent claim is infringed by making, using, selling, offering for
sale, or importing the Program or any portion of it.

  11. Patents.

  A "contributor" is a copyright holder who authorizes use under this
License of the Program or a work on which the Program is based.  The
work thus licensed is called the contributor's "contributor version".

  A contributor's "essential patent claims" are all patent claims
owned or controlled by the contributor, whether already acquired or
hereafter acquired, that would be infringed by some manner, permitted
by this License, of making, using, or selling its contributor version,
but do not include claims that would be infringed only as a
consequence of further modification of the contributor version.  For
purposes of this definition, "control" includes the right to grant
patent sublicenses in a manner consistent with the requirements of
this License.

  Each contributor grants you a non-exclusive, worldwide, royalty-free
patent license under the contributor's essential patent claims, to
make, use, sell, offer for sale, import and otherwise run, modify and
propagate the contents of its contributor version.

  In the following three paragraphs, a "patent license" is any express
agreement or commitment, however denominated, not to enforce a patent
(such as an express permission to practice a patent or covenant not to
sue for patent infringement).  To "grant" such a patent license to a
party means to make such an agreement or commitment not to enforce a
patent against the party.

If you convey a covered work, knowingly relying on a patent license,
and the Corresponding Source of the work is not available for anyone
to copy, free of charge and under the terms of this License, through a
publicly available network server or other readily accessible means,
then you must either (1) cause the Corresponding Source to be so
available, or (2) arrange to deprive yourself of the benefit of the
patent license for this particular work, or (3) arrange, in a manner
consistent with the requirements of this License, to extend the patent
license to downstream recipients.  "Knowingly relying" means you have
actual knowledge that, but for the patent license, your conveying the
covered work in a country, or your recipient's use of the covered work
in a country, would infringe one or more identifiable patents in that
country that you have reason to believe are valid.

  If, pursuant to or in connection with a single transaction or
arrangement, you convey, or propagate by procuring conveyance of, a
covered work, and grant a patent license to some of the parties
receiving the covered work authorizing them to use, propagate, modify
or convey a specific copy of the covered work, then the patent license
you grant is automatically extended to all recipients of the covered
work and works based on it.

  A patent license is "discriminatory" if it does not include within
the scope of its coverage, prohibits the exercise of, or is
conditioned on the non-exercise of one or more of the rights that are
specifically granted under this License.  You may not convey a covered
work if you are a party to an arrangement with a third party that is
in the business of distributing software, under which you make payment
to the third party based on the extent of your activity of conveying
the work, and under which the third party grants, to any of the
parties who would receive the covered work from you, a discriminatory
patent license (a) in connection with copies of the covered work
conveyed by you (or copies made from those copies), or (b) primarily
for and in connection with specific products or compilations that
contain the covered work, unless you entered into that arrangement,
or that patent license was granted, prior to 28 March 2007.

  Nothing in this License shall be construed as excluding or limiting
any implied license or other defenses to infringement that may
otherwise be available to you under applicable patent law.

  12. No Surrender of Others' Freedom.

  If conditions are imposed on you (whether by court order, agreement or
otherwise) that contradict the conditions of this License, they do not
excuse you from the conditions of this License.  If you cannot convey a
covered work so as to satisfy simultaneously your obligations under this
License and any other pertinent obligations, then as a consequence you may
not convey it at all.  For example, if you agree to terms that obligate you
to collect a royalty for further conveying from those to whom you convey
the Program, the only way you could satisfy both those terms and this
License would be to refrain entirely from conveying the Program.

  13. Remote Network Interaction; Use with the GNU General Public License.

  Notwithstanding any other provision of this License, if you modify the
Program, your modified version must prominently offer all users
interacting with it remotely through a computer network (if your version
supports such interaction) an opportunity to receive the Corresponding
Source of your version by providing access to the Corresponding Source
from a network server at no charge, through some standard or customary
means of facilitating copying of software.  This Corresponding Source

shall include the Corresponding Source for any work covered by version 3
of the GNU General Public License that is incorporated pursuant to the
following paragraph.

  Notwithstanding any other provision of this License, you have permission
to link or combine any covered work with a work licensed under version 3
of the GNU General Public License into a single combined work, and to
convey the resulting work.  The terms of this License will continue to
apply to the part which is the covered work, but the work with which it is
combined will remain governed by version 3 of the GNU General Public
License.

  14. Revised Versions of this License.

  The Free Software Foundation may publish revised and/or new versions of
the GNU Affero General Public License from time to time.  Such new
versions will be similar in spirit to the present version, but may differ
in detail to address new problems or concerns.

  Each version is given a distinguishing version number.  If the
Program specifies that a certain numbered version of the GNU Affero
General Public License "or any later version" applies to it, you have
the option of following the terms and conditions either of that
numbered version or of any later version published by the Free
Software Foundation.  If the Program does not specify a version number
of the GNU Affero General Public License, you may choose any version
ever published by the Free Software Foundation.

  If the Program specifies that a proxy can decide which future
versions of the GNU Affero General Public License can be used, that
proxy's public statement of acceptance of a version permanently
authorizes you to choose that version for the Program.

  Later license versions may give you additional or different
permissions.  However, no additional obligations are imposed on any
author or copyright holder as a result of your choosing to follow a
later version.

  15. Disclaimer of Warranty.

  THERE IS NO WARRANTY FOR THE PROGRAM, TO THE EXTENT PERMITTED BY
APPLICABLE LAW.  EXCEPT WHEN OTHERWISE STATED IN WRITING THE COPYRIGHT
HOLDERS AND/OR OTHER PARTIES PROVIDE THE PROGRAM "AS IS" WITHOUT WARRANTY
OF ANY KIND, EITHER EXPRESSED OR IMPLIED, INCLUDING, BUT NOT LIMITED TO,
THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR
PURPOSE.  THE ENTIRE RISK AS TO THE QUALITY AND PERFORMANCE OF THE PROGRAM
IS WITH YOU.  SHOULD THE PROGRAM PROVE DEFECTIVE, YOU ASSUME THE COST OF
ALL NECESSARY SERVICING, REPAIR OR CORRECTION.

  16. Limitation of Liability.

  IN NO EVENT UNLESS REQUIRED BY APPLICABLE LAW OR AGREED TO IN WRITING
WILL ANY COPYRIGHT HOLDER, OR ANY OTHER PARTY WHO MODIFIES AND/OR CONVEYS
THE PROGRAM AS PERMITTED ABOVE, BE LIABLE TO YOU FOR DAMAGES, INCLUDING ANY
GENERAL, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF THE
USE OR INABILITY TO USE THE PROGRAM (INCLUDING BUT NOT LIMITED TO LOSS OF
DATA OR DATA BEING RENDERED INACCURATE OR LOSSES SUSTAINED BY YOU OR THIRD
PARTIES OR A FAILURE OF THE PROGRAM TO OPERATE WITH ANY OTHER PROGRAMS),
EVEN IF SUCH HOLDER OR OTHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF
SUCH DAMAGES.

  17. Interpretation of Sections 15 and 16.

If the disclaimer of warranty and limitation of liability provided
above cannot be given local legal effect according to their terms,
reviewing courts shall apply local law that most closely approximates
an absolute waiver of all civil liability in connection with the
Program, unless a warranty or assumption of liability accompanies a
copy of the Program in return for a fee.

END OF TERMS AND CONDITIONS

How to Apply These Terms to Your New Programs

If you develop a new program, and you want it to be of the greatest
possible use to the public, the best way to achieve this is to make it
free software which everyone can redistribute and change under these terms.

To do so, attach the following notices to the program.  It is safest
to attach them to the start of each source file to most effectively
state the exclusion of warranty; and each file should have at least
the "copyright" line and a pointer to where the full notice is found.

    <one line to give the program's name and a brief idea of what it does.>
    Copyright (C) <year>  <name of author>

    This program is free software: you can redistribute it and/or modify
    it under the terms of the GNU Affero General Public License as
    published by the Free Software Foundation, either version 3 of the
    License, or (at your option) any later version.

    This program is distributed in the hope that it will be useful,
    but WITHOUT ANY WARRANTY; without even the implied warranty of
    MERCHANTABILITY or FITNESS FOR A PARTICULAR PURPOSE.  See the
    GNU Affero General Public License for more details.

    You should have received a copy of the GNU Affero General Public License
    along with this program.  If not, see <http://www.gnu.org/licenses/>.

Also add information on how to contact you by electronic and paper mail.

If your software can interact with users remotely through a computer
network, you should also make sure that it provides a way for users to
get its source.  For example, if your program is a web application, its
interface could display a "Source" link that leads users to an archive
of the code.  There are many ways you could offer source, and different
solutions will be better for different programs; see section 13 for the
specific requirements.

You should also get your employer (if you work as a programmer) or school,
if any, to sign a "copyright disclaimer" for the program, if necessary.
For more information on this, and how to apply and follow the GNU AGPL, see
<http://www.gnu.org/licenses/>.


"Commons Clause" License Condition

The Software is provided to you by the Licensor under the License, as
defined below, subject to the following condition. Without limiting
other conditions in the License, the grant of rights under the License
will not include, and the License does not grant to you, the right to
Sell the Software.  For purposes of the foregoing, "Sell" means
practicing any or all of the rights granted to you under the License
to provide to third parties, for a fee or other consideration,
a product or service that consists, entirely or substantially,
of the Software or the functionality of the Software. Any license

notice or attribution required by the License must also include
this Commons Cause License Condition notice.

# Exhibit H

## Expert Report of Bradley M. Kuhn

## 22 December 2022

The Affero General Public License, version 3.

GNU AFFERO GENERAL PUBLIC LICENSE
Version 3, 19 November 2007

Copyright (C) 2007 Free Software Foundation, Inc. <https://fsf.org/>
Everyone is permitted to copy and distribute verbatim copies
of this license document, but changing it is not allowed.

Preamble

The GNU Affero General Public License is a free, copyleft license for
software and other kinds of works, specifically designed to ensure
cooperation with the community in the case of network server software.

The licenses for most software and other practical works are designed
to take away your freedom to share and change the works.  By contrast,
our General Public Licenses are intended to guarantee your freedom to
share and change all versions of a program--to make sure it remains free
software for all its users.

When we speak of free software, we are referring to freedom, not
price.  Our General Public Licenses are designed to make sure that you
have the freedom to distribute copies of free software (and charge for
them if you wish), that you receive source code or can get it if you
want it, that you can change the software or use pieces of it in new
free programs, and that you know you can do these things.

Developers that use our General Public Licenses protect your rights
with two steps: (1) assert copyright on the software, and (2) offer
you this License which gives you legal permission to copy, distribute
and/or modify the software.

A secondary benefit of defending all users' freedom is that
improvements made in alternate versions of the program, if they
receive widespread use, become available for other developers to
incorporate.  Many developers of free software are heartened and
encouraged by the resulting cooperation.  However, in the case of
software used on network servers, this result may fail to come about.
The GNU General Public License permits making a modified version and
letting the public access it on a server without ever releasing its
source code to the public.

The GNU Affero General Public License is designed specifically to
ensure that, in such cases, the modified source code becomes available
to the community.  It requires the operator of a network server to
provide the source code of the modified version running there to the
users of that server.  Therefore, public use of a modified version, on
a publicly accessible server, gives the public access to the source
code of the modified version.

An older license, called the Affero General Public License and
published by Affero, was designed to accomplish similar goals.  This is
a different license, not a version of the Affero GPL, but Affero has
released a new version of the Affero GPL which permits relicensing under
this license.

The precise terms and conditions for copying, distribution and
modification follow.

TERMS AND CONDITIONS

0. Definitions.

"This License" refers to version 3 of the GNU Affero General Public License.

"Copyright" also means copyright-like laws that apply to other kinds of works, such as semiconductor masks.

"The Program" refers to any copyrightable work licensed under this License.  Each licensee is addressed as "you".  "Licensees" and "recipients" may be individuals or organizations.

To "modify" a work means to copy from or adapt all or part of the work in a fashion requiring copyright permission, other than the making of an exact copy.  The resulting work is called a "modified version" of the earlier work or a work "based on" the earlier work.

A "covered work" means either the unmodified Program or a work based on the Program.

To "propagate" a work means to do anything with it that, without permission, would make you directly or secondarily liable for infringement under applicable copyright law, except executing it on a computer or modifying a private copy.  Propagation includes copying, distribution (with or without modification), making available to the public, and in some countries other activities as well.

To "convey" a work means any kind of propagation that enables other parties to make or receive copies.  Mere interaction with a user through a computer network, with no transfer of a copy, is not conveying.

An interactive user interface displays "Appropriate Legal Notices" to the extent that it includes a convenient and prominently visible feature that (1) displays an appropriate copyright notice, and (2) tells the user that there is no warranty for the work (except to the extent that warranties are provided), that licensees may convey the work under this License, and how to view a copy of this License.  If the interface presents a list of user commands or options, such as a menu, a prominent item in the list meets this criterion.

1. Source Code.

The "source code" for a work means the preferred form of the work for making modifications to it.  "Object code" means any non-source form of a work.

A "Standard Interface" means an interface that either is an official standard defined by a recognized standards body, or, in the case of interfaces specified for a particular programming language, one that is widely used among developers working in that language.

The "System Libraries" of an executable work include anything, other than the work as a whole, that (a) is included in the normal form of packaging a Major Component, but which is not part of that Major Component, and (b) serves only to enable use of the work with that Major Component, or to implement a Standard Interface for which an implementation is available to the public in source code form.  A "Major Component", in this context, means a major essential component (kernel, window system, and so on) of the specific operating system (if any) on which the executable work runs, or a compiler used to produce the work, or an object code interpreter used to run it.

The "Corresponding Source" for a work in object code form means all the source code needed to generate, install, and (for an executable work) run the object code and to modify the work, including scripts to control those activities.  However, it does not include the work's System Libraries, or general-purpose tools or generally available free

programs which are used unmodified in performing those activities but
which are not part of the work.  For example, Corresponding Source
includes interface definition files associated with source files for
the work, and the source code for shared libraries and dynamically
linked subprograms that the work is specifically designed to require,
such as by intimate data communication or control flow between those
subprograms and other parts of the work.

  The Corresponding Source need not include anything that users
can regenerate automatically from other parts of the Corresponding
Source.

  The Corresponding Source for a work in source code form is that
same work.

  2. Basic Permissions.

  All rights granted under this License are granted for the term of
copyright on the Program, and are irrevocable provided the stated
conditions are met.  This License explicitly affirms your unlimited
permission to run the unmodified Program.  The output from running a
covered work is covered by this License only if the output, given its
content, constitutes a covered work.  This License acknowledges your
rights of fair use or other equivalent, as provided by copyright law.

  You may make, run and propagate covered works that you do not
convey, without conditions so long as your license otherwise remains
in force.  You may convey covered works to others for the sole purpose
of having them make modifications exclusively for you, or provide you
with facilities for running those works, provided that you comply with
the terms of this License in conveying all material for which you do
not control copyright.  Those thus making or running the covered works
for you must do so exclusively on your behalf, under your direction
and control, on terms that prohibit them from making any copies of
your copyrighted material outside their relationship with you.

  Conveying under any other circumstances is permitted solely under
the conditions stated below.  Sublicensing is not allowed; section 10
makes it unnecessary.

  3. Protecting Users' Legal Rights From Anti-Circumvention Law.

  No covered work shall be deemed part of an effective technological
measure under any applicable law fulfilling obligations under article
11 of the WIPO copyright treaty adopted on 20 December 1996, or
similar laws prohibiting or restricting circumvention of such
measures.

  When you convey a covered work, you waive any legal power to forbid
circumvention of technological measures to the extent such circumvention
is effected by exercising rights under this License with respect to
the covered work, and you disclaim any intention to limit operation or
modification of the work as a means of enforcing, against the work's
users, your or third parties' legal rights to forbid circumvention of
technological measures.

  4. Conveying Verbatim Copies.

  You may convey verbatim copies of the Program's source code as you
receive it, in any medium, provided that you conspicuously and
appropriately publish on each copy an appropriate copyright notice;
keep intact all notices stating that this License and any
non-permissive terms added in accord with section 7 apply to the code;

keep intact all notices of the absence of any warranty; and give all
recipients a copy of this License along with the Program.

   You may charge any price or no price for each copy that you convey,
and you may offer support or warranty protection for a fee.

   5. Conveying Modified Source Versions.

   You may convey a work based on the Program, or the modifications to
produce it from the Program, in the form of source code under the
terms of section 4, provided that you also meet all of these conditions:

      a) The work must carry prominent notices stating that you modified
      it, and giving a relevant date.

      b) The work must carry prominent notices stating that it is
      released under this License and any conditions added under section
      7.  This requirement modifies the requirement in section 4 to
      "keep intact all notices".

      c) You must license the entire work, as a whole, under this
      License to anyone who comes into possession of a copy.  This
      License will therefore apply, along with any applicable section 7
      additional terms, to the whole of the work, and all its parts,
      regardless of how they are packaged.  This License gives no
      permission to license the work in any other way, but it does not
      invalidate such permission if you have separately received it.

      d) If the work has interactive user interfaces, each must display
      Appropriate Legal Notices; however, if the Program has interactive
      interfaces that do not display Appropriate Legal Notices, your
      work need not make them do so.

   A compilation of a covered work with other separate and independent
works, which are not by their nature extensions of the covered work,
and which are not combined with it such as to form a larger program,
in or on a volume of a storage or distribution medium, is called an
"aggregate" if the compilation and its resulting copyright are not
used to limit the access or legal rights of the compilation's users
beyond what the individual works permit.  Inclusion of a covered work
in an aggregate does not cause this License to apply to the other
parts of the aggregate.

   6. Conveying Non-Source Forms.

   You may convey a covered work in object code form under the terms
of sections 4 and 5, provided that you also convey the
machine-readable Corresponding Source under the terms of this License,
in one of these ways:

      a) Convey the object code in, or embodied in, a physical product
      (including a physical distribution medium), accompanied by the
      Corresponding Source fixed on a durable physical medium
      customarily used for software interchange.

      b) Convey the object code in, or embodied in, a physical product
      (including a physical distribution medium), accompanied by a
      written offer, valid for at least three years and valid for as
      long as you offer spare parts or customer support for that product
      model, to give anyone who possesses the object code either (1) a
      copy of the Corresponding Source for all the software in the
      product that is covered by this License, on a durable physical
      medium customarily used for software interchange, for a price no

more than your reasonable cost of physically performing this
conveying of source, or (2) access to copy the
Corresponding Source from a network server at no charge.

c) Convey individual copies of the object code with a copy of the
written offer to provide the Corresponding Source.  This
alternative is allowed only occasionally and noncommercially, and
only if you received the object code with such an offer, in accord
with subsection 6b.

d) Convey the object code by offering access from a designated
place (gratis or for a charge), and offer equivalent access to the
Corresponding Source in the same way through the same place at no
further charge.  You need not require recipients to copy the
Corresponding Source along with the object code.  If the place to
copy the object code is a network server, the Corresponding Source
may be on a different server (operated by you or a third party)
that supports equivalent copying facilities, provided you maintain
clear directions next to the object code saying where to find the
Corresponding Source.  Regardless of what server hosts the
Corresponding Source, you remain obligated to ensure that it is
available for as long as needed to satisfy these requirements.

e) Convey the object code using peer-to-peer transmission, provided
you inform other peers where the object code and Corresponding
Source of the work are being offered to the general public at no
charge under subsection 6d.

  A separable portion of the object code, whose source code is excluded
from the Corresponding Source as a System Library, need not be
included in conveying the object code work.

  A "User Product" is either (1) a "consumer product", which means any
tangible personal property which is normally used for personal, family,
or household purposes, or (2) anything designed or sold for incorporation
into a dwelling.  In determining whether a product is a consumer product,
doubtful cases shall be resolved in favor of coverage.  For a particular
product received by a particular user, "normally used" refers to a
typical or common use of that class of product, regardless of the status
of the particular user or of the way in which the particular user
actually uses, or expects or is expected to use, the product.  A product
is a consumer product regardless of whether the product has substantial
commercial, industrial or non-consumer uses, unless such uses represent
the only significant mode of use of the product.

  "Installation Information" for a User Product means any methods,
procedures, authorization keys, or other information required to install
and execute modified versions of a covered work in that User Product from
a modified version of its Corresponding Source.  The information must
suffice to ensure that the continued functioning of the modified object
code is in no case prevented or interfered with solely because
modification has been made.

  If you convey an object code work under this section in, or with, or
specifically for use in, a User Product, and the conveying occurs as
part of a transaction in which the right of possession and use of the
User Product is transferred to the recipient in perpetuity or for a
fixed term (regardless of how the transaction is characterized), the
Corresponding Source conveyed under this section must be accompanied
by the Installation Information.  But this requirement does not apply
if neither you nor any third party retains the ability to install
modified object code on the User Product (for example, the work has
been installed in ROM).

The requirement to provide Installation Information does not include a requirement to continue to provide support service, warranty, or updates for a work that has been modified or installed by the recipient, or for the User Product in which it has been modified or installed.  Access to a network may be denied when the modification itself materially and adversely affects the operation of the network or violates the rules and protocols for communication across the network.

Corresponding Source conveyed, and Installation Information provided, in accord with this section must be in a format that is publicly documented (and with an implementation available to the public in source code form), and must require no special password or key for unpacking, reading or copying.

7. Additional Terms.

"Additional permissions" are terms that supplement the terms of this License by making exceptions from one or more of its conditions. Additional permissions that are applicable to the entire Program shall be treated as though they were included in this License, to the extent that they are valid under applicable law.  If additional permissions apply only to part of the Program, that part may be used separately under those permissions, but the entire Program remains governed by this License without regard to the additional permissions.

When you convey a copy of a covered work, you may at your option remove any additional permissions from that copy, or from any part of it.  (Additional permissions may be written to require their own removal in certain cases when you modify the work.)  You may place additional permissions on material, added by you to a covered work, for which you have or can give appropriate copyright permission.

Notwithstanding any other provision of this License, for material you add to a covered work, you may (if authorized by the copyright holders of that material) supplement the terms of this License with terms:

    a) Disclaiming warranty or limiting liability differently from the terms of sections 15 and 16 of this License; or

    b) Requiring preservation of specified reasonable legal notices or author attributions in that material or in the Appropriate Legal Notices displayed by works containing it; or

    c) Prohibiting misrepresentation of the origin of that material, or requiring that modified versions of such material be marked in reasonable ways as different from the original version; or

    d) Limiting the use for publicity purposes of names of licensors or authors of the material; or

    e) Declining to grant rights under trademark law for use of some trade names, trademarks, or service marks; or

    f) Requiring indemnification of licensors and authors of that material by anyone who conveys the material (or modified versions of it) with contractual assumptions of liability to the recipient, for any liability that these contractual assumptions directly impose on those licensors and authors.

All other non-permissive additional terms are considered "further restrictions" within the meaning of section 10.  If the Program as you received it, or any part of it, contains a notice stating that it is

governed by this License along with a term that is a further
restriction, you may remove that term.  If a license document contains
a further restriction but permits relicensing or conveying under this
License, you may add to a covered work material governed by the terms
of that license document, provided that the further restriction does
not survive such relicensing or conveying.

  If you add terms to a covered work in accord with this section, you
must place, in the relevant source files, a statement of the
additional terms that apply to those files, or a notice indicating
where to find the applicable terms.

  Additional terms, permissive or non-permissive, may be stated in the
form of a separately written license, or stated as exceptions;
the above requirements apply either way.

  8. Termination.

  You may not propagate or modify a covered work except as expressly
provided under this License.  Any attempt otherwise to propagate or
modify it is void, and will automatically terminate your rights under
this License (including any patent licenses granted under the third
paragraph of section 11).

  However, if you cease all violation of this License, then your
license from a particular copyright holder is reinstated (a)
provisionally, unless and until the copyright holder explicitly and
finally terminates your license, and (b) permanently, if the copyright
holder fails to notify you of the violation by some reasonable means
prior to 60 days after the cessation.

  Moreover, your license from a particular copyright holder is
reinstated permanently if the copyright holder notifies you of the
violation by some reasonable means, this is the first time you have
received notice of violation of this License (for any work) from that
copyright holder, and you cure the violation prior to 30 days after
your receipt of the notice.

  Termination of your rights under this section does not terminate the
licenses of parties who have received copies or rights from you under
this License.  If your rights have been terminated and not permanently
reinstated, you do not qualify to receive new licenses for the same
material under section 10.

  9. Acceptance Not Required for Having Copies.

  You are not required to accept this License in order to receive or
run a copy of the Program.  Ancillary propagation of a covered work
occurring solely as a consequence of using peer-to-peer transmission
to receive a copy likewise does not require acceptance.  However,
nothing other than this License grants you permission to propagate or
modify any covered work.  These actions infringe copyright if you do
not accept this License.  Therefore, by modifying or propagating a
covered work, you indicate your acceptance of this License to do so.

  10. Automatic Licensing of Downstream Recipients.

  Each time you convey a covered work, the recipient automatically
receives a license from the original licensors, to run, modify and
propagate that work, subject to this License.  You are not responsible
for enforcing compliance by third parties with this License.

  An "entity transaction" is a transaction transferring control of an

organization, or substantially all assets of one, or subdividing an organization, or merging organizations.  If propagation of a covered work results from an entity transaction, each party to that transaction who receives a copy of the work also receives whatever licenses to the work the party's predecessor in interest had or could give under the previous paragraph, plus a right to possession of the Corresponding Source of the work from the predecessor in interest, if the predecessor has it or can get it with reasonable efforts.

You may not impose any further restrictions on the exercise of the rights granted or affirmed under this License.  For example, you may not impose a license fee, royalty, or other charge for exercise of rights granted under this License, and you may not initiate litigation (including a cross-claim or counterclaim in a lawsuit) alleging that any patent claim is infringed by making, using, selling, offering for sale, or importing the Program or any portion of it.

11. Patents.

A "contributor" is a copyright holder who authorizes use under this License of the Program or a work on which the Program is based.  The work thus licensed is called the contributor's "contributor version".

A contributor's "essential patent claims" are all patent claims owned or controlled by the contributor, whether already acquired or hereafter acquired, that would be infringed by some manner, permitted by this License, of making, using, or selling its contributor version, but do not include claims that would be infringed only as a consequence of further modification of the contributor version.  For purposes of this definition, "control" includes the right to grant patent sublicenses in a manner consistent with the requirements of this License.

Each contributor grants you a non-exclusive, worldwide, royalty-free patent license under the contributor's essential patent claims, to make, use, sell, offer for sale, import and otherwise run, modify and propagate the contents of its contributor version.

In the following three paragraphs, a "patent license" is any express agreement or commitment, however denominated, not to enforce a patent (such as an express permission to practice a patent or covenant not to sue for patent infringement).  To "grant" such a patent license to a party means to make such an agreement or commitment not to enforce a patent against the party.

If you convey a covered work, knowingly relying on a patent license, and the Corresponding Source of the work is not available for anyone to copy, free of charge and under the terms of this License, through a publicly available network server or other readily accessible means, then you must either (1) cause the Corresponding Source to be so available, or (2) arrange to deprive yourself of the benefit of the patent license for this particular work, or (3) arrange, in a manner consistent with the requirements of this License, to extend the patent license to downstream recipients.  "Knowingly relying" means you have actual knowledge that, but for the patent license, your conveying the covered work in a country, or your recipient's use of the covered work in a country, would infringe one or more identifiable patents in that country that you have reason to believe are valid.

If, pursuant to or in connection with a single transaction or arrangement, you convey, or propagate by procuring conveyance of, a covered work, and grant a patent license to some of the parties receiving the covered work authorizing them to use, propagate, modify

or convey a specific copy of the covered work, then the patent license
you grant is automatically extended to all recipients of the covered
work and works based on it.

  A patent license is "discriminatory" if it does not include within
the scope of its coverage, prohibits the exercise of, or is
conditioned on the non-exercise of one or more of the rights that are
specifically granted under this License.  You may not convey a covered
work if you are a party to an arrangement with a third party that is
in the business of distributing software, under which you make payment
to the third party based on the extent of your activity of conveying
the work, and under which the third party grants, to any of the
parties who would receive the covered work from you, a discriminatory
patent license (a) in connection with copies of the covered work
conveyed by you (or copies made from those copies), or (b) primarily
for and in connection with specific products or compilations that
contain the covered work, unless you entered into that arrangement,
or that patent license was granted, prior to 28 March 2007.

  Nothing in this License shall be construed as excluding or limiting
any implied license or other defenses to infringement that may
otherwise be available to you under applicable patent law.

  12. No Surrender of Others' Freedom.

  If conditions are imposed on you (whether by court order, agreement or
otherwise) that contradict the conditions of this License, they do not
excuse you from the conditions of this License.  If you cannot convey a
covered work so as to satisfy simultaneously your obligations under this
License and any other pertinent obligations, then as a consequence you may
not convey it at all.  For example, if you agree to terms that obligate you
to collect a royalty for further conveying from those to whom you convey
the Program, the only way you could satisfy both those terms and this
License would be to refrain entirely from conveying the Program.

  13. Remote Network Interaction; Use with the GNU General Public License.

  Notwithstanding any other provision of this License, if you modify the
Program, your modified version must prominently offer all users
interacting with it remotely through a computer network (if your version
supports such interaction) an opportunity to receive the Corresponding
Source of your version by providing access to the Corresponding Source
from a network server at no charge, through some standard or customary
means of facilitating copying of software.  This Corresponding Source
shall include the Corresponding Source for any work covered by version 3
of the GNU General Public License that is incorporated pursuant to the
following paragraph.

  Notwithstanding any other provision of this License, you have
permission to link or combine any covered work with a work licensed
under version 3 of the GNU General Public License into a single
combined work, and to convey the resulting work.  The terms of this
License will continue to apply to the part which is the covered work,
but the work with which it is combined will remain governed by version
3 of the GNU General Public License.

  14. Revised Versions of this License.

  The Free Software Foundation may publish revised and/or new versions of
the GNU Affero General Public License from time to time.  Such new versions
will be similar in spirit to the present version, but may differ in detail to
address new problems or concerns.

Each version is given a distinguishing version number.  If the
Program specifies that a certain numbered version of the GNU Affero General
Public License "or any later version" applies to it, you have the
option of following the terms and conditions either of that numbered
version or of any later version published by the Free Software
Foundation.  If the Program does not specify a version number of the
GNU Affero General Public License, you may choose any version ever published
by the Free Software Foundation.

If the Program specifies that a proxy can decide which future
versions of the GNU Affero General Public License can be used, that proxy's
public statement of acceptance of a version permanently authorizes you
to choose that version for the Program.

Later license versions may give you additional or different
permissions.  However, no additional obligations are imposed on any
author or copyright holder as a result of your choosing to follow a
later version.

15. Disclaimer of Warranty.

THERE IS NO WARRANTY FOR THE PROGRAM, TO THE EXTENT PERMITTED BY
APPLICABLE LAW.  EXCEPT WHEN OTHERWISE STATED IN WRITING THE COPYRIGHT
HOLDERS AND/OR OTHER PARTIES PROVIDE THE PROGRAM "AS IS" WITHOUT WARRANTY
OF ANY KIND, EITHER EXPRESSED OR IMPLIED, INCLUDING, BUT NOT LIMITED TO,
THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR
PURPOSE.  THE ENTIRE RISK AS TO THE QUALITY AND PERFORMANCE OF THE PROGRAM
IS WITH YOU.  SHOULD THE PROGRAM PROVE DEFECTIVE, YOU ASSUME THE COST OF
ALL NECESSARY SERVICING, REPAIR OR CORRECTION.

16. Limitation of Liability.

IN NO EVENT UNLESS REQUIRED BY APPLICABLE LAW OR AGREED TO IN WRITING
WILL ANY COPYRIGHT HOLDER, OR ANY OTHER PARTY WHO MODIFIES AND/OR CONVEYS
THE PROGRAM AS PERMITTED ABOVE, BE LIABLE TO YOU FOR DAMAGES, INCLUDING ANY
GENERAL, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF THE
USE OR INABILITY TO USE THE PROGRAM (INCLUDING BUT NOT LIMITED TO LOSS OF
DATA OR DATA BEING RENDERED INACCURATE OR LOSSES SUSTAINED BY YOU OR THIRD
PARTIES OR A FAILURE OF THE PROGRAM TO OPERATE WITH ANY OTHER PROGRAMS),
EVEN IF SUCH HOLDER OR OTHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF
SUCH DAMAGES.

17. Interpretation of Sections 15 and 16.

If the disclaimer of warranty and limitation of liability provided
above cannot be given local legal effect according to their terms,
reviewing courts shall apply local law that most closely approximates
an absolute waiver of all civil liability in connection with the
Program, unless a warranty or assumption of liability accompanies a
copy of the Program in return for a fee.

                    END OF TERMS AND CONDITIONS

              How to Apply These Terms to Your New Programs

If you develop a new program, and you want it to be of the greatest
possible use to the public, the best way to achieve this is to make it
free software which everyone can redistribute and change under these terms.

To do so, attach the following notices to the program.  It is safest
to attach them to the start of each source file to most effectively
state the exclusion of warranty; and each file should have at least
the "copyright" line and a pointer to where the full notice is found.

```
    <one line to give the program's name and a brief idea of what it does.>
    Copyright (C) <year>  <name of author>

    This program is free software: you can redistribute it and/or modify
    it under the terms of the GNU Affero General Public License as published by
    the Free Software Foundation, either version 3 of the License, or
    (at your option) any later version.

    This program is distributed in the hope that it will be useful,
    but WITHOUT ANY WARRANTY; without even the implied warranty of
    MERCHANTABILITY or FITNESS FOR A PARTICULAR PURPOSE.  See the
    GNU Affero General Public License for more details.

    You should have received a copy of the GNU Affero General Public License
    along with this program.  If not, see <https://www.gnu.org/licenses/>.

Also add information on how to contact you by electronic and paper mail.

  If your software can interact with users remotely through a computer
network, you should also make sure that it provides a way for users to
get its source.  For example, if your program is a web application, its
interface could display a "Source" link that leads users to an archive
of the code.  There are many ways you could offer source, and different
solutions will be better for different programs; see section 13 for the
specific requirements.

  You should also get your employer (if you work as a programmer) or school,
if any, to sign a "copyright disclaimer" for the program, if necessary.
For more information on this, and how to apply and follow the GNU AGPL, see
<https://www.gnu.org/licenses/>.
```

# Exhibit I

## Expert Report of Bradley M. Kuhn

## 22 December 2022

Relevant portion of the GNU FAQ regarding modification of FSF's licenses, as it appeared on the GNU

website on 2022-12-21.

**Can I modify the GPL and make a modified license?** (#ModifyGPL)

It is possible to make modified versions of the GPL, but it tends to have practical consequences.

You can legally use the GPL terms (possibly modified) in another license provided that you call your license by another name and do not include the GPL preamble, and provided you modify the instructions-for-use at the end enough to make it clearly different in wording and not mention GNU (though the actual procedure you describe may be similar).

If you want to use our preamble in a modified license, please write to <licensing@gnu.org> for permission. For this purpose we would want to check the actual license requirements to see if we approve of them.

Although we will not raise legal objections to your making a modified license in this way, we hope you will think twice and not do it. Such a modified license is almost certainly incompatible with the GNU GPL, and that incompatibility blocks useful combinations of modules. The mere proliferation of different free software licenses is a burden in and of itself.

Rather than modifying the GPL, please use the exception mechanism offered by GPL version 3.

**If I use a piece of software that has been obtained under the GNU GPL, am I allowed to modify**

# Exhibit J

## Expert Report of Bradley M. Kuhn
## 22 December 2022

Internet Archive the relevant portion of the GNU FAQ regarding modification of FSF's licenses, as captured from the GNU website on 2012-01-07.



policy. Please contact <licensing@gnu.org> if you want more information.

## Can I modify the GPL and make a modified license? (#ModifyGPL)

You can use the GPL terms (possibly modified) in another license provided that you call your license by another name and do not include the GPL preamble, and provided you modify the instructions-for-use at the end enough to make it clearly different in wording and not mention GNU (though the actual procedure you describe may be similar).

If you want to use our preamble in a modified license, please write to <licensing@gnu.org> for permission. For this purpose we would want to check the actual license requirements to see if we approve of them.

Although we will not raise legal objections to your making a modified license in this way, we hope you will think twice and not do it. Such a modified license is almost certainly incompatible with the GNU GPL, and that incompatibility blocks useful combinations of modules. The mere proliferation of different free software licenses is a burden in and of itself.

# Exhibit K

## Expert Report of Bradley M. Kuhn

## 22 December 2022

The Server Side Public License as published by MongoDB, Inc. on 2018-10-16.

{Blog} MongoDB named as a leader in the Forrester Wave™: Translytical Data Platforms, Q4 2022 — learn more

 

# Server Side Public License (SSPL)

- Frequently Asked Questions about the Server Side Public License (SSPL)
- Comparison of GNU Affero General Public License v3 to SSPL

---

## Server Side Public License

VERSION 1, OCTOBER 16, 2018

Copyright © 2018 MongoDB, Inc.

Everyone is permitted to copy and distribute verbatim copies of this license document, but changing it is not allowed.

## TERMS AND CONDITIONS

## 0. Definitions.

"This License" refers to Server Side Public License.

"Copyright" also means copyright-like laws that apply to other kinds of works, such as semiconductor masks.

"The Program" refers to any copyrightable work licensed under this License. Each licensee is addressed as "you". "Licensees" and "recipients" may be individuals or organizations.

To "modify" a work means to copy from or adapt all or part of the work in a fashion requiring copyright permission, other than the making of an exact copy. The resulting work is called a "modified version" of the earlier work or a work "based on" the earlier work.

A "covered work" means either the unmodified Program or a work based on the Program.

To "propagate" a work means to do anything with it that, without permission, would make you directly or secondarily liable for infringement under applicable copyright law, except executing it on a computer or modifying a private copy. Propagation includes copying, distribution (with or without modification), making available to the public, and in some countries other activities as well.

To "convey" a work means any kind of propagation that enables other parties to make or receive copies. Mere interaction with a user through a computer network, with no transfer of a copy, is not conveying.

An interactive user interface displays "Appropriate Legal Notices" to the extent that it includes a convenient and prominently visible feature that (1) displays an appropriate copyright notice, and (2) tells the user that there is no warranty for the work (except to the extent that warranties are provided), that licensees may convey the work under this License, and how to view a copy of this License. If the interface presents a list of user commands or options, such as a menu, a prominent item in the list meets this criterion.

# 1. Source Code.

The "source code" for a work means the preferred form of the work for making modifications to it. "Object code" means any non-source form of a work.

A "Standard Interface" means an interface that either is an official standard defined by a recognized standards body, or, in the case of interfaces specified for a particular programming language, one that is widely used among developers working in that language.

The "System Libraries" of an executable work include anything, other than the work as a whole, that (a) is included in the normal form of packaging a Major Component, but which is not part of that Major Component, and (b) serves only to enable use of the work with that Major Component, or to implement a Standard Interface for which an implementation is available to the public in source code form. A "Major Component", in this context, means a major essential component (kernel, window system, and so on) of the specific operating system (if any) on which the executable work runs, or a compiler used to produce the work, or an object code interpreter used to run it.

The "Corresponding Source" for a work in object code form means all the source code needed to generate, install, and (for an executable work) run the object code and to modify the work, including scripts to control those activities. However, it does not include the work's System Libraries, or general-purpose tools or generally available free programs which are used unmodified in performing those activities but which are not part of the work. For example, Corresponding Source includes interface definition files associated with source files for the work, and the source code for shared libraries and dynamically linked subprograms that the work is specifically designed to require, such as by intimate data communication or control flow between those subprograms and other parts of the work.

The Corresponding Source need not include anything that users can regenerate automatically from other parts of the Corresponding Source.

The Corresponding Source for a work in source code form is that same work.

# 2. Basic Permissions.

All rights granted under this License are granted for the term of copyright on the Program, and are irrevocable provided the stated conditions are met. This License explicitly affirms your unlimited permission to run the unmodified Program, subject to section 13. The output from running a covered work is covered by this License only if the output, given its content, constitutes a covered work. This License acknowledges your rights of fair use or other equivalent, as provided by copyright law.

Subject to section 13, you may make, run and propagate covered works that you do not convey, without conditions so long as your license otherwise remains in force. You may convey covered works to others for the sole purpose of having them make modifications exclusively for you, or provide you with facilities for running those works, provided that you comply with the terms of this License in conveying all material for which you do not control copyright. Those thus making or running the covered works for you must do so exclusively on your behalf, under your direction and control, on terms that prohibit them from making any copies of your copyrighted material outside their relationship with you.

Conveying under any other circumstances is permitted solely under the conditions stated below. Sublicensing is not allowed; section 10 makes it unnecessary.

## 3. Protecting Users' Legal Rights From Anti-Circumvention Law.

No covered work shall be deemed part of an effective technological measure under any applicable law fulfilling obligations under article 11 of the WIPO copyright treaty adopted on 20 December 1996, or similar laws prohibiting or restricting circumvention of such measures.

When you convey a covered work, you waive any legal power to forbid circumvention of technological measures to the extent such circumvention is effected by exercising rights under this License with respect to the covered work, and you disclaim any intention to limit operation or modification of the work as a means of enforcing, against the work's users, your or third parties' legal rights to forbid circumvention of technological measures.

## 4. Conveying Verbatim Copies.

You may convey verbatim copies of the Program's source code as you receive it, in any medium, provided that you conspicuously and appropriately publish on each copy an appropriate copyright notice; keep intact all notices stating that this License and any non-permissive terms added in accord with section 7 apply to the code; keep intact all notices of the absence of any warranty; and give all recipients a copy of this License along with the Program.

You may charge any price or no price for each copy that you convey, and you may offer support or warranty protection for a fee.

## 5. Conveying Modified Source Versions.

You may convey a work based on the Program, or the modifications to produce it from the Program, in the form of source code under the terms of section 4, provided that you also meet all of these conditions:

- a) The work must carry prominent notices stating that you modified it, and giving a relevant date.
- b) The work must carry prominent notices stating that it is released under this License and any conditions added under section 7. This requirement modifies the requirement in section 4 to "keep intact all notices".
- c) You must license the entire work, as a whole, under this License to anyone who comes into possession of a copy. This License will therefore apply, along with any applicable section 7 additional terms, to the whole of the work, and all its parts, regardless of how they are packaged. This License gives no permission to license the work in any other way, but it does not invalidate such permission if you have separately received it.

- d) If the work has interactive user interfaces, each must display Appropriate Legal Notices; however, if the Program has interactive interfaces that do not display Appropriate Legal Notices, your work need not make them do so.

A compilation of a covered work with other separate and independent works, which are not by their nature extensions of the covered work, and which are not combined with it such as to form a larger program, in or on a volume of a storage or distribution medium, is called an "aggregate" if the compilation and its resulting copyright are not used to limit the access or legal rights of the compilation's users beyond what the individual works permit. Inclusion of a covered work in an aggregate does not cause this License to apply to the other parts of the aggregate.

## 6. Conveying Non-Source Forms.

You may convey a covered work in object code form under the terms of sections 4 and 5, provided that you also convey the machine-readable Corresponding Source under the terms of this License, in one of these ways:

- a) Convey the object code in, or embodied in, a physical product (including a physical distribution medium), accompanied by the Corresponding Source fixed on a durable physical medium customarily used for software interchange.
- b) Convey the object code in, or embodied in, a physical product (including a physical distribution medium), accompanied by a written offer, valid for at least three years and valid for as long as you offer spare parts or customer support for that product model, to give anyone who possesses the object code either (1) a copy of the Corresponding Source for all the software in the product that is covered by this License, on a durable physical medium customarily used for software interchange, for a price no more than your reasonable cost of physically performing this conveying of source, or (2) access to copy the Corresponding Source from a network server at no charge.
- c) Convey individual copies of the object code with a copy of the written offer to provide the Corresponding Source. This alternative is allowed only occasionally and noncommercially, and only if you received the object code with such an offer, in accord with subsection 6b.
- d) Convey the object code by offering access from a designated place (gratis or for a charge), and offer equivalent access to the Corresponding Source in the same way through the same place at no further charge. You need not require recipients to copy the Corresponding Source along with the object code. If the place to copy the object code is a network server, the Corresponding Source may be on a different server (operated by you or a third party) that supports equivalent copying facilities, provided you maintain clear directions next to the object code saying where to find the Corresponding Source. Regardless of what server hosts the Corresponding Source, you remain obligated to ensure that it is available for as long as needed to satisfy these requirements.
- e) Convey the object code using peer-to-peer transmission, provided you inform other peers where the object code and Corresponding Source of the work are being offered to the general public at no charge under subsection 6d.

A separable portion of the object code, whose source code is excluded from the Corresponding Source as a System Library, need not be included in conveying the object code work.

A "User Product" is either (1) a "consumer product", which means any tangible personal property which is normally used for personal, family, or household purposes, or (2) anything designed or sold for incorporation into a dwelling. In determining whether a product is a consumer product, doubtful cases shall be resolved in favor of coverage. For a particular product received by a particular user, "normally used" refers to a typical or common use of that class of product, regardless of the status of the particular user or of the way in which the particular user actually uses, or expects or is expected to use, the product. A product is a consumer product regardless of whether the product has substantial commercial, industrial or non-consumer uses, unless such uses represent the only significant mode of use of the product.

"Installation Information" for a User Product means any methods, procedures, authorization keys, or other information required to install and execute modified versions of a covered work in that User Product from a modified version of its Corresponding Source. The information must suffice to ensure that the continued functioning of the modified object code is in no case prevented or interfered with solely because modification has been made.

If you convey an object code work under this section in, or with, or specifically for use in, a User Product, and the conveying occurs as part of a transaction in which the right of possession and use of the User Product is transferred to the recipient in perpetuity or for a fixed term (regardless of how the transaction is characterized), the Corresponding Source conveyed under this section must be accompanied by the Installation Information. But this requirement does not apply if neither you nor any third party retains the ability to install modified object code on the User Product (for example, the work has been installed in ROM).

The requirement to provide Installation Information does not include a requirement to continue to provide support service, warranty, or updates for a work that has been modified or installed by the recipient, or for the User Product in which it has been modified or installed. Access to a network may be denied when the modification itself materially and adversely affects the operation of the network or violates the rules and protocols for communication across the network.

Corresponding Source conveyed, and Installation Information provided, in accord with this section must be in a format that is publicly documented (and with an implementation available to the public in source code form), and must require no special password or key for unpacking, reading or copying.

## 7. Additional Terms.

"Additional permissions" are terms that supplement the terms of this License by making exceptions from one or more of its conditions. Additional permissions that are applicable to the entire Program shall be treated as though they were included in this License, to the extent that they are valid under applicable law. If additional permissions apply only to part of the Program, that part may be used separately under those permissions, but the entire Program remains governed by this License without regard to the additional permissions.

When you convey a copy of a covered work, you may at your option remove any additional permissions from that copy, or from any part of it. (Additional permissions may be written to require their own removal in certain cases when you modify the work.) You may place additional permissions on material, added by you to a covered work, for which you have or can give appropriate copyright permission.

Notwithstanding any other provision of this License, for material you add to a covered work, you may (if authorized by the copyright holders of that material) supplement the terms of this License with terms:

- a) Disclaiming warranty or limiting liability differently from the terms of sections 15 and 16 of this License; or
- b) Requiring preservation of specified reasonable legal notices or author attributions in that material or in the Appropriate Legal Notices displayed by works containing it; or
- c) Prohibiting misrepresentation of the origin of that material, or requiring that modified versions of such material be marked in reasonable ways as different from the original version; or
- d) Limiting the use for publicity purposes of names of licensors or authors of the material; or
- e) Declining to grant rights under trademark law for use of some trade names, trademarks, or service marks; or
- f) Requiring indemnification of licensors and authors of that material by anyone who conveys the material (or modified versions of it) with contractual assumptions of liability to the recipient, for any liability that these contractual assumptions directly impose on those licensors and authors.

All other non-permissive additional terms are considered "further restrictions" within the meaning of section 10. If the Program as you received it, or any part of it, contains a notice stating that it is governed by this License along with a term that is a further restriction, you may remove that term. If a license document contains a further restriction but permits relicensing or conveying under this License, you may add to a covered work material governed by the terms of that license document, provided that the further restriction does not survive such relicensing or conveying.

If you add terms to a covered work in accord with this section, you must place, in the relevant source files, a statement of the additional terms that apply to those files, or a notice indicating where to find the applicable terms.

Additional terms, permissive or non-permissive, may be stated in the form of a separately written license, or stated as exceptions; the above requirements apply either way.

## 8. Termination.

You may not propagate or modify a covered work except as expressly provided under this License. Any attempt otherwise to propagate or modify it is void, and will automatically terminate your rights under this License (including any patent licenses granted under the third paragraph of section 11).

However, if you cease all violation of this License, then your license from a particular copyright holder is reinstated (a) provisionally, unless and until the copyright holder explicitly and finally terminates your license, and (b) permanently, if the copyright holder fails to notify you of the violation by some reasonable means prior to 60 days after the cessation.

Moreover, your license from a particular copyright holder is reinstated permanently if the copyright holder notifies you of the violation by some reasonable means, this is the first time you have received notice of violation of this License (for any work) from that copyright holder, and you cure the violation prior to 30 days after your receipt of the notice.

Termination of your rights under this section does not terminate the licenses of parties who have received copies or rights from you under this License. If your rights have been terminated and not permanently reinstated, you do not qualify to receive new licenses for the same material under section 10.

## 9. Acceptance Not Required for Having Copies.

You are not required to accept this License in order to receive or run a copy of the Program. Ancillary propagation of a covered work occurring solely as a consequence of using peer-to-peer transmission to receive a copy likewise does not require acceptance. However, nothing other than this License grants you permission to propagate or modify any covered work. These actions infringe copyright if you do not accept this License. Therefore, by modifying or propagating a covered work, you indicate your acceptance of this License to do so.

## 10. Automatic Licensing of Downstream Recipients.

Each time you convey a covered work, the recipient automatically receives a license from the original licensors, to run, modify and propagate that work, subject to this License. You are not responsible for enforcing compliance by third parties with this License.

An "entity transaction" is a transaction transferring control of an organization, or substantially all assets of one, or subdividing an organization, or merging organizations. If propagation of a covered work results from an entity transaction, each party to that transaction who receives a copy of the work also receives whatever licenses to the work the party's predecessor in interest had or could give under the previous paragraph, plus a right to possession of the Corresponding Source of the work from the predecessor in interest, if the predecessor has it or can get it with reasonable efforts.

You may not impose any further restrictions on the exercise of the rights granted or affirmed under this License. For example, you may not impose a license fee, royalty, or other charge for exercise of rights granted under this License, and you may not initiate litigation (including a cross-claim or counterclaim in a lawsuit) alleging that any patent claim is infringed by making, using, selling, offering for sale, or importing the Program or any portion of it.

## 11. Patents.

A "contributor" is a copyright holder who authorizes use under this License of the Program or a work on which the Program is based. The work thus licensed is called the contributor's "contributor version".

A contributor's "essential patent claims" are all patent claims owned or controlled by the contributor, whether already acquired or hereafter acquired, that would be infringed by some manner, permitted by this License, of making, using, or selling its contributor version, but do not include claims that would be infringed only as a consequence of further modification of the contributor version. For purposes of this definition, "control" includes the right to grant patent sublicenses in a manner consistent with the requirements of this License.

Each contributor grants you a non-exclusive, worldwide, royalty-free patent license under the contributor's essential patent claims, to make, use, sell, offer for sale, import and otherwise run, modify and propagate the contents of its contributor version.

In the following three paragraphs, a "patent license" is any express agreement or commitment, however denominated, not to enforce a patent (such as an express permission to practice a patent or covenant not to sue for patent infringement). To "grant" such a patent license to a party means to make such an agreement or commitment not to enforce a patent against the party.

If you convey a covered work, knowingly relying on a patent license, and the Corresponding Source of the work is not available for anyone to copy, free of charge and under the terms of this License, through a publicly available network server or other readily accessible means, then you must either (1) cause the Corresponding Source to be so available, or (2) arrange to deprive yourself of the benefit of the patent license for this particular work, or (3) arrange, in a manner

consistent with the requirements of this License, to extend the patent license to downstream recipients. "Knowingly relying" means you have actual knowledge that, but for the patent license, your conveying the covered work in a country, or your recipient's use of the covered work in a country, would infringe one or more identifiable patents in that country that you have reason to believe are valid.

If, pursuant to or in connection with a single transaction or arrangement, you convey, or propagate by procuring conveyance of, a covered work, and grant a patent license to some of the parties receiving the covered work authorizing them to use, propagate, modify or convey a specific copy of the covered work, then the patent license you grant is automatically extended to all recipients of the covered work and works based on it.

A patent license is "discriminatory" if it does not include within the scope of its coverage, prohibits the exercise of, or is conditioned on the non-exercise of one or more of the rights that are specifically granted under this License. You may not convey a covered work if you are a party to an arrangement with a third party that is in the business of distributing software, under which you make payment to the third party based on the extent of your activity of conveying the work, and under which the third party grants, to any of the parties who would receive the covered work from you, a discriminatory patent license (a) in connection with copies of the covered work conveyed by you (or copies made from those copies), or (b) primarily for and in connection with specific products or compilations that contain the covered work, unless you entered into that arrangement, or that patent license was granted, prior to 28 March 2007.

Nothing in this License shall be construed as excluding or limiting any implied license or other defenses to infringement that may otherwise be available to you under applicable patent law.

## 12. No Surrender of Others' Freedom.

If conditions are imposed on you (whether by court order, agreement or otherwise) that contradict the conditions of this License, they do not excuse you from the conditions of this License. If you cannot use, propagate or convey a covered work so as to satisfy simultaneously your obligations under this License and any other pertinent obligations, then as a consequence you may not use, propagate or convey it at all. For example, if you agree to terms that obligate you to collect a royalty for further conveying from those to whom you convey the Program, the only way you could satisfy both those terms and this License would be to refrain entirely from conveying the Program.

## 13. Offering the Program as a Service.

If you make the functionality of the Program or a modified version available to third parties as a service, you must make the Service Source Code available via network download to everyone at no charge, under the terms of this License. Making the functionality of the Program or modified version available to third parties as a service includes, without limitation, enabling third parties to interact with the functionality of the Program or modified version remotely through a computer network, offering a service the value of which entirely or primarily derives from the value of the Program or modified version, or offering a service that accomplishes for users the primary purpose of the Program or modified version.

"Service Source Code" means the Corresponding Source for the Program or the modified version, and the Corresponding Source for all programs that you use to make the Program or modified version available as a service, including, without limitation, management software, user interfaces, application program interfaces, automation software, monitoring software, backup software, storage software and hosting software, all such that a user could run an instance of the service using the Service Source Code you make available.

## 14. Revised Versions of this License.

MongoDB, Inc. may publish revised and/or new versions of the Server Side Public License from time to time. Such new versions will be similar in spirit to the present version, but may differ in detail to address new problems or concerns.

Each version is given a distinguishing version number. If the Program specifies that a certain numbered version of the Server Side Public License "or any later version" applies to it, you have the option of following the terms and conditions either of that numbered version or of any later version published by MongoDB, Inc. If the Program does not specify a version number of the Server Side Public License, you may choose any version ever published by MongoDB, Inc.

If the Program specifies that a proxy can decide which future versions of the Server Side Public License can be used, that proxy's public statement of acceptance of a version permanently authorizes you to choose that version for the Program.

Later license versions may give you additional or different permissions. However, no additional obligations are imposed on any author or copyright holder as a result of your choosing to follow a later version.

## 15. Disclaimer of Warranty.

THERE IS NO WARRANTY FOR THE PROGRAM, TO THE EXTENT PERMITTED BY APPLICABLE LAW. EXCEPT WHEN OTHERWISE STATED IN WRITING THE COPYRIGHT HOLDERS AND/OR OTHER PARTIES PROVIDE THE PROGRAM "AS IS" WITHOUT WARRANTY OF ANY KIND, EITHER EXPRESSED OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. THE ENTIRE RISK AS TO THE QUALITY AND PERFORMANCE OF THE PROGRAM IS WITH YOU. SHOULD THE PROGRAM PROVE DEFECTIVE, YOU ASSUME THE COST OF ALL NECESSARY SERVICING, REPAIR OR CORRECTION.

## 16. Limitation of Liability.

IN NO EVENT UNLESS REQUIRED BY APPLICABLE LAW OR AGREED TO IN WRITING WILL ANY COPYRIGHT HOLDER, OR ANY OTHER PARTY WHO MODIFIES AND/OR CONVEYS THE PROGRAM AS PERMITTED ABOVE, BE LIABLE TO YOU FOR DAMAGES, INCLUDING ANY GENERAL, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF THE USE OR INABILITY TO USE THE PROGRAM (INCLUDING BUT NOT LIMITED TO LOSS OF DATA OR DATA BEING RENDERED INACCURATE OR LOSSES SUSTAINED BY YOU OR THIRD PARTIES OR A FAILURE OF THE PROGRAM TO OPERATE WITH ANY OTHER PROGRAMS), EVEN IF SUCH HOLDER OR OTHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

## 17. Interpretation of Sections 15 and 16.

If the disclaimer of warranty and limitation of liability provided above cannot be given local legal effect according to their terms, reviewing courts shall apply local law that most closely approximates an absolute waiver of all civil liability in connection with the Program, unless a warranty or assumption of liability accompanies a copy of the Program in return for a fee.

END OF TERMS AND CONDITIONS

# Exhibit L

## Expert Report of Bradley M. Kuhn
## 22 December 2022

Curriculum Vitae of Bradley M. Kuhn

*Curriculum Vitae of*
**BRADLEY M. KUHN**
bkuhn@ebb.org • `http://www.ebb.org/bkuhn`

## Experience:

3/2006 – present    *Software Freedom Conservancy* (Multiple positions.)       USA-based telecommute

3/2014 – present    POLICY FELLOW, HACKER-IN-RESIDENCE, AND
                    MEMBER OF THE BOARD OF DIRECTORS.

Mentors staff in all aspects of Free and Open Source Software (FOSS) politics, advocacy, services, coordination, and logistics. Participates in cross-organizational initiatives regarding license compliance. Annually co-coordinates the "Legal and Policy" track at the annual Free and Open Source Developers' Meeting (FOSDEM) — the largest FOSS conference in the world with more than 5,000 attendees annually.

Analyzes and plans strategic initiatives related to all aspects of FOSS advocacy, with a key focus on FOSS licensing policy. Leads and coordinates litigation in *Software Freedom Conservancy v. Vizio* — the first third-party beneficiary litigation seeking specific performance of source code disclosure under a copyleft license, the General Public License (GPL).

3/2006 – 3/2014    FOUNDING PRESIDENT.

Co-founded this 501(c)(3) non-profit charitable organization. Worked relentlessly as a volunteer for five years, and eventually became its first paid employee (in 2011). Created, planned, managed, and build out all organizational activities, in the primary focus areas of fiscal sponsorship for Free and Open Source Software (FOSS) projects, and license compliance, enforcement, and litigation regarding copyleft license (including the GPLv2, GPLv3, and AGPLv3).

Negotiated and built advocacy coalitions with key individuals in leadership positions of major FOSS projects and FOSS organizations. Coordinated cross-organizational resources to receive volunteer labor and pro-bono legal assistance for the organization.

Deposed as organization's 30(b)(6) witness, and wrote the expert report in the *Software Freedom Conseravncy, et al. v. Best Buy, et al* lawsuit (commonly referred to as the *Busybox case*) in the Southern District of New York.

Strategically planned and executed on fundraising strategy that built the organization from a purely volunteer organization to a staffed organization of four (by 2014). Keenly aware of the dangers of Founders' Syndrome in non-profit charities, recruited and hired a highly qualified Executive Director, Karen Sandler, and gladly stepped down from role of chief executive to assure sustainability and growth for the organization.

**Experience** (continued)**:**

1/2000 – 3/2005   *Free Software Foundation*  (Multiple positions.)                    Boston, MA

3/2002 – 3/2005   EXECUTIVE DIRECTOR.

Handled all day-to-day senior management tasks for a staff of nine employees. Scheduled and directed all projects and departments, which included: archival research, book publishing, legal consulting, fund-raising, software development, and system administration. Mentored staff through turbulent organizational changes.

Formalized existing GPL compliance activity into its own department. Worked closely with the general counsel and staff to design and implement successful strategies for the new department. Led existing staff to increase violation case closure from a few per year to approximately thirty per year.

Carried out diplomacy throughout the technology industry to generate goodwill and secure contributions of software copyrights and funding. Leveraged strong technological background to negotiate decisively with executives and lawyers at both for-profit companies and non-profit organizations.

Directed, guided and assisted staff to design and implement an associate membership program, which included an online self-service system for donors. Convinced the board of directors to adopt this as the organization's primary fundraising effort. Led the implementation of the program, which yielded record-breaking fund-raising returns, despite a widely documented economic downturn for non-profits during the period.

1/2001 – 3/2002   VICE PRESIDENT.

Reorganized management and departmental structure of the Foundation. Handled and resolved employee performance situations. Hired staff as necessary. Coordinated closely with board of directors to build consensus for organizational changes.

Represented the Foundation in the press, including interviews with The New York Times, The Boston Globe, and throughout the technology press. Revamped the press image of the Foundation, including launching a successful ongoing response to direct press attacks by Microsoft in May 2001.

1/2000 – 12/2001   ASSISTANT TO THE PRESIDENT.

Coordinated with Foundation's president to handle communication with the press and volunteer community. Personally handled much of the Foundation's external email communication and routed necessary communication to the president and other staff.

Answered FOSS licensing questions and investigated violations of the GPL. Researched and prepared reports on licensing situations for the president and general counsel.

**Experience** (continued)**:**

7/1998, 3/1999     TECHNICAL TRAINER.
*Synapsis Solutions, Inc.*     Berkeley, CA

Designed and wrote course materials for a four-day course entitled "Introduction to Perl for Programmers". Taught the course twice on site at Synapsis' client, Autodesk.

8/1998 – 6/1999     TEACHER.
*Walnut Hills High School*
*Cincinnati Public School System*     Cincinnati, OH

Designed, prepared, and taught an Advanced Placement Computer Science course in C++ to junior and senior high school students.

9/1997 – 7/1998     SYSTEM ADMINISTRATOR.
*Center for Geographic Information Systems*
*University of Cincinnati*     Cincinnati, OH

Served as the head system administrator for a network of machines that included SGI Irix, Sun Solaris and Intel-based Windows NT systems. Developed and implemented a computer usage policy. Designed and implemented department-wide file sharing, user account, email and web server systems.

7/1996 – 8/1997     NETWORK AND SYSTEM ADMINISTRATOR.
Work contracted to:
*Westinghouse Wireless Solutions Company*     Linthicum, MD

Performed all administration tasks for a LAN of Sun workstations running Solaris 2.4 and 2.5.1, including: implementation of security measures and backup procedures, installation and integration of new hardware and software, extensive script writing in Perl and Korn shell to assist users, interacting with software and hardware vendors for ordering, pricing and service calls, and assisting users with the use of a Unix environment to perform software development tasks. Handled all user support requests for a department of fifty users. Served as the technical lead on the site's system administration team.

Performed all administration duties for machines running Red Hat GNU/Linux. These machines served as the DNS server, the mail server, and the Usenet news server for the entire site and subdomain. Configured Sendmail to suit mail services at the site.

**Experience** (continued)**:**

6/1991 – 7/1996    SOFTWARE DEVELOPER.    (Multiple clients.)

3/1996 – 7/1996    Work contracted to:
*Lucent Technologies*                                                Cockeysville, MD

Participated in a short term contract to reengineer a legacy software system. Evaluated configuration management and CASE tools. Worked on a development team using Booch OOA/OOD methodology and C++ with the Standard Template Library.

12/1995 – 3/1996    Work contracted to:
*dakota imaging, inc.*                                                Columbia, MD

Assisted in establishing a policy for maintaining software development under the Atria ClearCase environment. Designed and implemented a set of programs and Imakefiles that worked in concert with the ClearCase environment to implement that policy. Wrote Perl programs to generate reports for an OCR data retrieval system. Developed client/server imaging software in C.

6/1991 – 9/1995    Work contracted to:
*The Baltimore RH Typing Laboratory*                                Baltimore, MD

Assisted with system administration tasks for an AT&T 3B2/600 running Unix System V Release 3.2.3. Configured and installed numerous Free Software tools.

Designed, implemented, maintained and augmented a large suite of software in Perl, Tcl, Bourne Shell, C, SQL, and Informix-4GL. This software provided end-user applications, middleware, data warehousing, and account management functions for the entire blood laboratory.

Designed and implemented an interface between the Tcl language and Informix database products using Informix-ESQL/C. Augmented Tcl to better to suit the needs of the client.

Designed and implemented a system that produced statistical calculations using genetic blood typing results retrieved from an SQL database. Maintained and augmented that system for two years.

**Education:**

| | | |
|---|---|---|
| 9/1997 – 1/2001 | THE UNIVERSITY OF CINCINNATI | Cincinnati, OH |

M.S. in Computer Science, January 2001.
GPA: 3.93
Advisor: John Franco, PhD.
Thesis Title: *Considerations on Porting Perl to the Java Virtual Machine*

| | | |
|---|---|---|
| 9/1995 – 12/1995 | THE UNIVERSITY OF DELAWARE | Newark, DE |

Studied for one semester as a funded graduate student in the Computer and Information Sciences graduate program.
GPA: 4.00

| | | |
|---|---|---|
| 9/1991 – 5/1995 | LOYOLA UNIVERSITY MARYLAND | Baltimore, MD |

(formerly named LOYOLA COLLEGE IN MARYLAND)
B.S. (summa cum laude) in Computer Science, May 1995
Major GPA: 3.98  Overall GPA: 3.83

Graduated first in Computer Science class of 1995. Maryland Distinguished Scholar, Loyola Presidential Scholar, Maryland House of Delegates Scholar. Dean's List throughout attendance. Academic Achievement Award in Computer Science received each year of attendance. Upsilon Pi Epsilon (Computer Science Honors Society) member. Phi Beta Kappa member.

Administrated a local network of Computer Science department machines running Slackware GNU/Linux. Configured and installed Free Software. Set up and maintained campus-wide Usenet news server.

Conducted research on compiler optimizations for C++. Programmed extensively in Perl.

Received the Hauber Summer Research Fellowship in 1993 and 1994. Conducted research on embeddable command languages. Programmed extensively in Tcl/Tk.

**Other Interests:** Ethics, Social Activism, Poker.

# Exhibit M

## Expert Report of Bradley M. Kuhn
## 22 December 2022

List of Publications

**Publications**

I'm the co-author of a book that was published online and is routinely updated, the last extensive rewrite was in 2018:

"Copyleft and the GNU General Public License: A Comprehensive Tutorial and Guide" published at https://copyleft.org/guide/

"Trademark Was Made to Prevent Attack of the "Clones" Problem in App Stores", an article published on July 11, 2022.

https://sfconservancy.org/blog/2022/jul/11/app-store-clones-trademark-approach/

"An Erroneous Preliminary Injunction Granted in Neo4j v. PureThink", an article published on March 30, 2022 .

https://sfconservancy.org/blog/2022/mar/30/neo4j-v-purethink-open-source-affero-gpl/

"Copyleft Won't Solve All Problems, Just Some of Them: Toward a Broad Ethical Software Licensing Coalition" on March 17, 2022.

https://sfconservancy.org/blog/2022/mar/17/copyleft-ethical-source-putin-ukraine/

"If Software is My Copilot, Who Programmed My Software?", an article published on February 3, 2022. This article was chosen by the Free Software Foundation as a featured article on its series related to the GitHub CoPilot licensing issue.

https://sfconservancy.org/blog/2022/feb/03/github-copilot-copyleft-gpl/

https://www.fsf.org/licensing/copilot/if-software-is-my-copilot-who-programmed-my-software

"'Tivoization' and Your Right to Install Under Copyleft"
published on on July 23, 2021.

https://sfconservancy.org/blog/2021/jul/23/tivoization-and-the-gpl-right-to-install/

I coauthored (with my colleagues at SFC) three DMCA exemption requests, submitted to the USA Copyright Office in September 2020.  Details are here:

https://sfconservancy.org/blog/2020/sep/16/dmca-exemptions-2020/

Toward Copyleft Equality for All"
published on January 6, 2020
https://sfconservancy.org/blog/2019/sep/20/sotm2019-karen/

**Key Talk:**

"Understanding The Complexity of Copyleft Defense" a Keynote in March 2017 at the Free and Open Source Software Developers' Meeting (FOSDEM), a conference attended by 5000+ people.

https://fosdem.org/2017/schedule/event/copyleft_defense/

# Exhibit N

## Expert Report of Bradley M. Kuhn

## 22 December 2022

Expert Report of Bradley M. Kuhn in 09-CV-10155

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

SOFTWARE FREEDOM CONSERVANCY, INC.,

and ERIK ANDERSEN,

Plaintiffs,


    -against-


BEST BUY CO., INC., SAMSUNG ELECTRONICS

AMERICA, INC., WESTINGHOUSE DIGITAL

ELECTRONICS, LLC, JVC AMERICAS

CORPORATION, WESTERN DIGITAL

TECHNOLOGIES, INC., ROBERT BOSCH LLC,

PHOEBE MICRO, INC., HUMAX USA INC.,

COMTREND CORPORATION, DOBBS-STANFORD

CORPORATION, VERSA TECHNOLOGY INC.,

ZYXEL COMMUNICATIONS INC., ASTAK INC.,

and GCI TECHNOLOGIES CORPORATION,

Defendants.

**ECF CASE**

Civil Action No. 09-CV-10155 (SAS)

# Expert Report of Bradley M. Kuhn
# 11 May 2011

1

## Introduction

1. As the Court is aware from my previous declarations in this matter, I am the President and Executive Director of Plaintiff Software Freedom Conservancy, Inc.

2. As part of my work at the Conservancy in this litigation, I have reviewed in detail the original software releases by Best Buy Co., Inc. ("Best Buy") that led to our filing of this litigation, as well as materials provided by Best Buy. I have also reviewed the "Expert Report of Jake Richter" provided to my attorneys.

3. I have been reviewing on an ongoing basis all technical material, including but not limited to source code (both BusyBox's own releases and Best Buy's candidate source releases provided during this litigation), as well as the binary firmware distributions by Best Buy. I have come to certain conclusions as to the technical facts about Best Buy's distributions and how they relate to Erik Andersen's and other BusyBox copyrights holders' work. My opinions and the bases therefore are set forth in this Report.

4. I continue to perform ongoing review of new information that comes to light in this case, and therefore this Report represents my conclusions as of this date. Also, as is always true with technical matters, different methodology can always be employed to provide other views of data. Therefore, my work in this regard remains ongoing, and I understand that additional work of this nature will be exchanged between us and the Defendants as trial approaches. In particular, I have been informed that I will be given the opportunity to analyze additional claims and opinions submitted by Mr. Richter and respond to those at a later date. I therefore reserve the right to modify, supplement, or otherwise alter this report and the opinions contained herein if I find it appropriate to do so in light of any additional information.

**Qualifications**

5.  I am currently Executive Director and President of the Software Freedom Conservancy, Inc., a 501(c)(3) not-for-profit organization in New York. Conservancy's purpose is to provide fiscal sponsorship and various other non-profit organizational services to volunteer-based, community-oriented Open Source and Free Software projects.

6.  My role at Conservancy includes a variety of duties, as I am its only full-time employee and therefore handle most of the operations of Conservancy, which include both technical and administrative matters.

7.  My interest in computing began as a child, when I received my first computer as a gift from my parents and began to regularly write new software for it and share that software with my friends, who helped me improve it.

8.  As an undergraduate, I studied Computer Science at Loyola College in Maryland (now called the Loyola University Maryland). I received from there in 1995 a summa cum laude Bachelor's Degree in Computer Science, and the James D. Rozics Computer Science Medal, which is an award given to the year's top student in Computer Science at each graduation. I was furthermore elected into Upsilon Pi Epsilon (the National Computer Science Honors Society) and the Phi Beta Kappa honors society, which the USA's oldest academic honors society for the liberal arts.

9.  From 1991 through 2001, I worked consistently on a part-time (while studying) and then a full-time (when not in school) basis as a system administrator and software developer. I administered, configured, programmed, and debugged a variety of Unix and Unix-like operating systems[1] and software for those systems. My work experience spans the wide array of possible occupations that are typical for individuals trained in computer science.

---

[1] Unix was a computer operating system developed by AT&T in the early 1970s. Many systems were later developed that operated similarly like Unix, and are typically called "Unix-like" operating systems.

10. From 1991-1995, while working as a programmer for the Baltimore Rh Typing Laboratories, Inc. (aka BRT Laboratories), I downloaded, configured, modified, and installed numerous Open Source[2] and Free Software programs. I became at that time an active participant in Usenet[3], and, at the encouragement of my employer, began sharing code that I improved with others who sought to solve similar tasks, and collaborated with other developers online to improve that code.

11. I have continued my code contributions to Open Source and Free Software on a semi-regular basis since that time. I have submitted patches to various projects, including rsync and BusyBox itself. I have also served as the co-maintainer of Open Source and Free Software projects at times.

12. In 1992, I began using the GNU/Linux system, which is sometimes confusingly referred to as just "Linux". The GNU project had begun the work of creating a Unix-like operating system in 1984. In 1991, Linus Torvalds began creating a specific operating system component, called a kernel, that was later named "Linux". Putting together the incomplete parts of GNU with Linux made a complete operating system usable on PC computers.

13. I downloaded in 1992 the "Soft Landing System", an early GNU/Linux distribution put together by volunteers, and installed it on my personal computer. My professors saw the value in this software, and requested that I install this software throughout the computer lab at my undergraduate institution. I did so, and was later employed by Loyola's computer science department to continue maintaining, modifying and administering these systems until I graduated.

14. In 1997, I began a graduate program in Computer Science at the University of Cincinnati. In early 2001, I graduated from that program, completing a Master's Degree with thesis. My

---

[2]The term "Open Source" did not come into common usage until 1999, so it is somewhat anachronistic to use it referring to events that took place before then. However, I include here as it is a term more familiar to those outside of the field of computer science.

[3]Usenet was a worldwide discussion forum that was widely used by scientists, researchers, and programmers in the 1980s and early 1990s.

thesis topic dealt with programming language topics related to the Open Source and Free Software programming language named Perl. This work required me to participate heavily in the Perl community and contribute libraries and modification to the internals of the Perl language implementation. The original inventor and author of Perl, Larry Wall, served on my thesis committee. My thesis was later used by Wall as one of the justifications for the launch of another related Open Source project, called the Parrot Virtual Machine.

15. In 1996, I began volunteering for the Free Software Foundation, Inc. ("FSF"). Initially, Richard M. Stallman, President of the FSF, asked me to serve as a webmaster for the FSF website.

16. As webmaster, I assisted in creation and editing of the initial "license list" page on the FSF website. This page, a version of which is still available today on FSF's website, explains the details of various software licenses and whether they meet the FSF's criteria for Free Software licenses — meaning they give users the freedom to copy, share, modify and redistribute the software — and whether the licenses are compatible with the FSF's own licenses. In assisting Dr. Stallman with this type of work, as I have done on a regular basis from the late 1990s through the present day, I have developed expertise in the interpreting the requirements and details of software copyright licenses, and how they interact with the technical details of putting together and distributing software packages.

17. In 2000, I was hired to work for the FSF, initially remotely from Cincinnati, and then on-site in Boston upon completion of my Master's thesis in 2001. I was promoted multiple times, and eventually became Executive Director of the FSF, a role which I served in until March 2005.

18. During my time as an employee of FSF, I assisted in various types of work related to software licensing and compliance with the GNU General Public License ("GPL"), the GNU Lesser General Public License ("LGPL") and other related and similar licenses. It was typical by the time of my departure that I led the resolution of thirty or more GPL violation

matters each year, including a number that were made public, such as the OpenTV GPL violation and the original Linksys WRT54G violation.

19. In March 2005, I took a job working for the Software Freedom Law Center ("SFLC"), the law firm representing the Plaintiffs in this action. As part of my duties at the SFLC, I assisted with and performed GPL enforcement actions. I researched, confirmed, enforced, or otherwise assisted with hundreds of GPL violation and compliance matters while an employee at SFLC.

20. In 2006, I volunteered to be the President of the Software Freedom Conservancy, Inc. ("Conservancy"), a separate and independent organization that SFLC helped form to serve as a fiscal sponsor and non-profit home for Open Source and Free Software projects. The BusyBox project, led by Erik Andersen, was among the earliest members of the Conservancy.

21. In 2006 and 2007, I participated in the public process to comment on, evaluate, and make suggestions for the new version of the GPL (version 3). This work included many direct discussions with the GPLv3 drafters themselves.

22. My employment with SFLC ended in September 2010, and I have since then focused my full-time attention on Conservancy, which includes GPL enforcement on behalf of our member projects. I am currently tracking more than 300 GPL violations, which I work as diligently as possible (given the limited time available to a resource-strapped non-profit) to resolve in a collaborative way with the parties in question.

23. In March 2010, I was elected to the Board of Directors of the Free Software Foundation and my service there is ongoing.

**Technical Terminology and Technical Concepts**

24. This litigation deals with computer software. Software is digital information stored on a computer's storage device, such as a hard disk, flash drive or other non-volatile memory, which is loaded in to volatile memory as needed to operate the computer.

25. Volatile memory, such as RAM, is erased every time a computer is turned off. Non-volatile memory, like hard disks and flash drives, retains its contents even when the computer is turned off.

26. Companies and non-profit organizations typically provide software in a variety of different ways to the general public. Computers often come with software already installed on it. In addition, consumers can download and install new software to receive updates.

27. A programmer creates software in a form called "source code" (sometimes called just "source"). Source code is written in a textual format that humans (trained in computer science) can read and comprehend. Source code is the instructions that the programmer gives the computer to do some specific job, or (more often) a large group of different types of jobs that work in tandem to perform some useful task at the user's request.

28. Before a computer can execute the programmer's instructions, the source code must be translated or interpreted into the native language of the computer. That language is binary, which consists of a series of 1's and 0's sequenced such that they cause the computer to perform useful operations.

29. A programmer often uses a helper program, called a "compiler", to translate and modify the programmer's source code into the binary data that the computer expects. This translation process is called "compilation".

30. There are often intermediate forms of binary data that are produced at various stages of the compilation process. For example, "object code" is an intermediate binary form that is produced by the penultimate stage of compilation. The final stage of compilation is called "linking", which typically takes "object code" and puts it all together into a final binary program. The final binary program is sometimes also called the "executable".

31. Thus, a given program can be modified to appear in many forms — source, object, or binary code. Typically, the program starts as source code, and then is modified by the

compiler (as instructed by the programmer) to produce object and binary code as needed.

32. Once a programmer has used the compiler to modify and translate the source code into a binary program, for it to be useful to the user, the binary program must be installed onto the computer. The process of installation varies depending on the details of the type of computer involved. However, typically, installing a binary at the very least involves taking a copy of the binary program and placing it to a specific place on the computer or target device. Often, installation requires careful placement of the binary in a place where other programs that rely on it can find the new version.

33. An "operating system" is the base software that every computer needs to run. An operating system is usually separated into various parts. Typically, these parts include (a) the software that regulates and organizes the hardware for other software (often called the "kernel"), (b) various low-level programs that are required for all computers, such as the basic file operations (such as copy, move, rename), and (c) core library programs that all applications on the system need to operate properly on that particular operating system.

34. Software for use in an embedded computer (such as the Blu-ray DVD players at issue in this case) is commonly referred to as "firmware". For modern systems, a firmware file typically comprises the entire set of programs to be stored on the computer, including all parts of the operating system and any applications, usually organized into a format that allows for easy installation onto the computer.

**Source Code Repositories and Revision Control Systems**

35. It is generally considered best practice for programmers to store their work in a source code repository managed by a revision control system. A code repository is usually a designated place (which, for Open Source and Free Software projects, is usually publicly available on the Internet), where all versions, revisions, and improvements to source code are published.

8

36. Revision control systems, sometimes called version control systems, keep detailed records of each change made by each developer who contributes to the code repository. When a developer submits new code or modifications ("commits") to the code repository, a log entry describing the commit is stored in the revision control system.

37. Commits vary in size. A commit might represent a small change to a single file, or might contain substantial modifications to several files.

38. In the revision control system's logs, each commit is associated with the name (or user-name) of the developer, the exact date and time the commit took place, the actual textual changes to the software made by the commit and a free-form commit message (sometimes called a "commit log message") written by the developer.

39. Developers typically use commit messages to explain succinctly the changes to the software made by the commit. They also routinely include thank-yous or credits to developers that assisted them in producing the code committed. Sometimes, developers commit on behalf of another developer, noting in the commit message that the commit is on behalf of another developer. (This latter process is discussed in detail in ¶ 47 and following paragraphs.)

40. The changes stored in each commit are usually viewed in a format that shows the differences between an affected file before and after the commit, i.e. a "diff" format. The typical diff format is called "unified diff format", and can be generated with a utility, which is also called "diff". This format shows (a) a short context of where the change occurred, (b) the lines that were added by the commit (preceded with a "+"), and (c) the lines that were removed by the commit (preceded by a "−"). This format is also sometimes called a "patch" format, because the "patch" program can be used to read and apply these diffs.

41. The "patch" program was originally written in the mid 1980s by Larry Wall, who later passed its maintainership to the GNU project. The patch program can take a diff and "apply"

the changes represented in that diff to a codebase. For example, suppose a developer has made some changes to BusyBox. The developer can use the diff utility to generate a patch which would show the differences between the original version of BusyBox and the derivative version that the developer has just created. Someone else can then use the patch program to apply that "patch" to their version of BusyBox, thus incorporating the new changes.

42. Because of the convenience for collaborative development provided by the diff/patch workflow described in ¶ 41, by the late 1980s, "sharing patches" became the standard way that Open Source and Free Software developers share, discuss, debate, and apply improvements to software. That workflow (sometimes with minor tweaks) is still the standard today in nearly all Open Source and Free Software projects, including BusyBox.

**Open Source and Free Software Community Processes**

43. Open Source and Free Software is almost always developed in full public view — in public code repositories, via public mailing lists, etc. — typically by developers posting patches to mailing lists and discussing their merits.

44. The "maintainer" (who can be a single individual or a group) of an Open Source and Free Software project decides which patches are ultimately accepted and become part of official releases. The maintainer's editorial, stylistic, and decision-making authority is generally considered the final say by other developers, although the best maintainers listen carefully to any arguments and disagreements among developers and seek any technical compromises that are best for the project.

45. Project maintainers typically do a substantial amount of development themselves, particularly when a project is young or is going through a major code rewrite, reoganization and/or transition. BusyBox underwent such a transition in 2001 and 2002, while Andersen was maintainer of the project.

46. Maintainers often grant some experienced developers with a history of writing good patches direct "commit access" to the project. In concrete terms, this usually means that such developers have permission to commit code directly to the revision control system, under their own name, without prior approval from the maintainer.

47. Participating developers without commit access typically post their patches to the project's public mailing list (or, occasionally, email such patches directly to the maintainer). The maintainer reviews the patch, often giving public or private feedback to the developer about any problems or better approaches that could be used to improve the patch.

48. Ultimately, the maintainer, sometimes after a few revisions based on feedback from the maintainer to the other developer, either rejects or accepts the patch. If the patch is rejected, the patch is usually not committed to the revision control system at all. If accepted, the maintainer applies the patch to the maintainer's private copy of the codebase.

49. From there, the maintainer will test and verify that the patch functions correctly. The maintainer will quite often make final changes to the patch to integrate it well into the software. For example, some very new changes may have been made by the maintainer since the other developer wrote the patch, and the maintainer's subsequent changes might in turn affect certain details and require adaptation of the patch before integration. Such integration work is sometimes quite substantial.

50. Once all integration and editing by the maintainer is complete, the maintainer will commit the patch and the maintainer's modifications as a single commit. The maintainer will note in the commit log the name and/or email address of the developer who offered the patch.

**History of Revision Control Systems**

51. The first Open Source and Free Software revision control system was plainly called "Revision Control System", usually abbreviated to "RCS". RCS could keep track of revisions

11

on single files, and it required that all developers have access to a single machine where the source files were stored.  Only one developer could work on any particular file at a time. Each commit was specific to an individual file.

52. In 1990, the first version of the "Concurrent Versioning System" (usually abbreviated to "CVS") was released.  CVS used the RCS file format internally to store its data, but implemented a layer above that allowed each developer to keep a private copy of all files in the repository.  After making changes privately, developers could then commit entire units of work that spanned many files across many directories.

53. Beginning in 2000, CVS was gradually superceded by the revision control system Subversion ("SVN"), which provided similar functionality to CVS but was generally more capable and better designed.  As developers begin transitioning from CVS to SVN, various importing utilities were created to convert the revision history stored in CVS into an SVN repository. As SVN eclipsed CVS, these tools were widely used by developers to transition their CVS repositories to SVN.

54. While SVN is still in wide use today, it too is being gradually superceded by a new generation of revision control systems.  The most popular of those systems is Git.  As previously occurred with the CVS to SVN transition, by the time Git was ready for use, SVN was in widespread use.  Consequently, there are many conversion utilities available that can convert an SVN repository into a Git repository.

55. These repository conversion technologies were widely used by the entire Open Source and Free Software community as we transitioned from CVS to SVN, and then later from SVN to Git. I am not aware of any reports of these conversion utilities causing any data loss as they convert repositories from one format to another.  Information sufficient to identify the committer, the date of the commit, and the patch that was committed is invariably preserved in the conversion.

56. There are minor differences between the way this data is stored in each revision system. For example, CVS and SVN rely on username to identify the committer. Git, by contrast, stores the full name and email address of the committer. Therefore, the Git conversion utility prompts the user to enter a full name and email address for each username represented in the SVN repository. Even if the person entering this information made a mistake, it is a straightforward process to understand what has occurred. The information available in the Git repository is usually sufficient information to uniquely identify the developer responsible for the commit. The other conversions done during SVN to Git repository are automatically done by software.

## BusyBox Project's Use of Revision Control Systems

57. Andersen stated (see Andersen Dep. 234:24-235:9, Oct. 29, 2010) that in 1999, he set up a CVS repository for the BusyBox project. Andersen further stated that in the early 2000s, he converted the CVS repository to an SVN repository. (Id. at 235:15-22).

58. On 29 April 2009, the current BusyBox maintainer, Denys Vlasenko, converted the SVN repository to Git. The historical SVN repository has since remained available for public review at `svn://busybox.net/trunk/busybox`, although new code is not committed here but to the Git repository.

59. I am not aware of any reason to believe that the information in today's BusyBox Git repository does not preserve all commit information from both the original CVS repository and the SVN repository.

60. Over the last three years, I have routinely reviewed various parts of the archive of the BusyBox repository using the modern Git interface. In these years of review, I have noticed no substantial discrepancy that caused me to question the veracity and certainty of archival details. I have noticed only one minor discrepancy. Namely, when performing the user-controlled part of the SVN to Git conversion described in ¶ 56, Mr. Vlasenko apparently misspelled Mr. Andersen's first name, using a "c" in place of a "k".

61. Other than this trivial discrepancy, all data imported from the SVN repository appears to be properly imported into the modern Git repository. In my three years of regular study of the BusyBox Git repository, I have seen no evidence whatsoever that any substantive discrepancies, misattributions, or otherwise corrupted or incorrect data has been caused by the various conversions between revision control systems. It is therefore my opinion that the information in the current repository is accurate and reliable.

**Unix, GNU, Linux, and BusyBox**

62. Unix is an operating system that was initially developed by AT&T and then licensed to many other companies and universities.

63. Dr. Stallman founded the GNU project in 1984 with a philosophical goal: he wanted to create operating system software that everyone could use, improve, modify, share and redistribute, both non-commercially and commercially. The requirement that he placed on this software, the details of which are embodied in the text of the copyright license, the GPL, was that those who distributed the software further make sure that everyone else had equal rights to also modify, improve and redistribute the software.

64. The GNU project sought to create an operating system that worked just like Unix, but was written from scratch by programmers, so that it could be licensed under the GPL (or, the LGPL, as appropriate).

65. During the intervening years, the way Unix works was standardized by the Institute of Electrical and Electronics Engineers (IEEE). This standard made it possible for those who, like GNU, wished to rewrite Unix from scratch could test and verify it against a standard. That standard is called POSIX.

66. A POSIX-compliant operating system typically has three fundamental components: (a) a kernel, which is the component that talks directly to the hardware and manages peripherals; (b) a "C library", which is provides a standard interface for everything else on the system

14

to communicate requests to the kernel; and (c) a set of programs that provide a POSIX-compliant environment. The latter is sometimes called the "userspace tools", meaning that they share a memory space with user applications rather than the kernel, which runs in a separate memory space.

67. Linux is a kernel that is licensed freely under the terms of GPL. Initially, Linux only functioned in tandem with the components from the GNU operating system. Most references to the term "Linux" typically refer to the use of three components together: the kernel named Linux, the GNU C Library, and the GNU userspace tools.

68. BusyBox is full-fledged replacement for the GNU userspace tools designed in a radically different way. Namely, BusyBox includes all the POSIX-required GNU userspace tools in one single binary program. BusyBox provides easy configurations for programmers to choose which parts of the userspace they actually want or need to have on their operating system. BusyBox is written to be as small as possible (i.e., to occupy as little volatile and non-volatile memory as possible). BusyBox is also designed to run quickly, and thus, to be as fast an implementation of the userspace tools as possible.

69. Since BusyBox is so highly configurable and adaptable, and is such a small and fast implementation, many who want smaller installations of a POSIX-compliant operating system use BusyBox along with the Linux kernel (and a C library of their choice) to construct a tailored Unix-like operating system for specific purposes. I often call such systems "BusyBox/Linux" systems to distinguish them from the "GNU/Linux" systems and avoid the confusion of calling the three very different components described above by just the name "Linux".

70. The particular size advantage to BusyBox/Linux is that the manufacturer can chose how much of the POSIX-compliant environment they need for their given plans. Application programs can expect whatever parts of POSIX to be present, and BusyBox can be configured to *only* provide those that are necessary.

15

71. Thus, the authors of BusyBox offer the software as a complete implementation of a POSIX userspace, but allow the downstream user to adapt that work to be precisely the subset of POSIX they need. This adaption process is done affirmatively by the programmer who wishes to use BusyBox.

72. Before BusyBox can be compiled, it must be configured using BusyBox's "`make config`" system. This system prompts the programmer to specify which features of BusyBox and which parts of POSIX the programmer wishes to use. The output of this process is a file called BusyBox's `.config` (pronounced "dot config").

73. Once the programmer creates a `.config` file, that file is used as a script to control the compilation (along with other such scripts) for BusyBox and together they create the adapted BusyBox binary that contains only those features the programmer requested.

74. This configurable size and fine-grained control of included features is widely considered the most innovative and creative idea expressed in the BusyBox codebase. This configurability was implemented by the careful and painstaking placement of special directives throughout the source code. This allows for quick and easy production of the exact Busy-Box features the programmer desires.

**Embedded Computing And Upgrades**

75. Years ago, making specialized, small electronic devices required building specialized computers. Such specialized computers were built specifically to solve a particular task, and the same components were often not reusable for other types of products. As general purpose computers got smaller, it became possible to "embed" a general purpose computer in an electronic device. Such computers are called "embedded computers". Embedded computers are virtually no different from desktops and laptops, although embedded computers typically have slower CPUs and less memory and storage.

76. Embedded computers are now commonplace. Today, general purpose computing chipsets are very cheap. Therefore, the same types of general purpose computer components found in desktops and laptops are now also in DVD players, televisions, digital media players, phones, and many other small electronic devices.

77. If a device uses a general purpose computer rather than a specialized computer, the features of the device can often be implemented in software running on the general purpose computer, rather than by designing special hardware. This allows the software to stay much the same across different devices of the same type (e.g., all DVD players), and allows for new features to be easily implemented, and bug and problem fixes to occur in software rather than by changing hardware components.

78. Furthermore, general purpose computing devices are generally "field upgradable". That means that the device does not need to be sent to a repair shop or back to the manufacturer to perform upgrades or fixes. Typically, the consumers can themselves perform the upgrade by placing the "firmware" on a USB drive or CD and putting that media into the device. If the device is Internet-connected, such upgrades and fixes can even be performed automatically across the Internet. Such field upgrades are extremely common and easy to do; most manufacturers have a one page tutorial to explain to their customers how to do so. In short, manufacturers routinely tell their users how to replace the binary programs on their devices at home.

79. BusyBox/Linux has become a very common choice of operating system for embedded computers. While embedded computers are indeed general purpose computers, and could therefore run a wide variety of different operating systems, manufacturers often choose Busy-Box/Linux because the non-volatile storage space on such devices is limited.

80. While a particular device's operating system may be configured by its manufacturer for a specific task, that does not change the nature of computer inside the device: it could do virtually any operations that are typically done by other types of computers. Configuring

a BusyBox/Linux computer to behave as a DVD player is akin to configuring a desktop computer for use as an Automated Teller Machine or a web-browsing kiosk (both of which are very common). Such computers are general purpose computers that are "pared down" to perform some specified, narrow set of tasks, but the device could always be repurposed later to perform wholly different, or slightly different and improved tasks, should the owner of the device wish to do so.

**The GPL**

81. During my years of work with Dr. Stallman, the GPL's original author, he has communicated to me his intentions regarding the meaning of the GPL.

82. A central purpose of the GPL is to ensure that users could engage in the activities of modifying, sharing and redistributing their software. The text of the GPL was written to express these rights in a way that would allow any user of the software to take advantage of them.

83. The GPL is a copyright license designed to use the copyright controls granted to authors by the copyright statue to ensure that all the subsequent users of the software can engage in all activities mentioned above, and to end copyright permissions for any entity or individual that fails to ensure those rights for all subsequent users (by terminating the license of violators through GPLv2 §4).

84. Dr. Stallman wrote the GPL to be as forward-looking as possible. Obviously, no one can see the future, but his goal was to anticipate all possible uses, deployments, distributions and modifications of the software and ensure that no matter what happened, each person who received a copy of the software would have the ability to modify, improve, share, and distribute that software to the maximum extent.

85. The specific version of the GPL at issue in this particular litigation is version 2 ("GPLv2"), as that is the version of the license under which BusyBox is distributed.

86. GPLv2 §3 describes the requirements regarding distribution of binary and object code versions of software licensed under GPL. All three possible options require that the distributor in some way make arrangements for the recipient of binary or object code to receive the source code for the software as well.

87. GPLv2 §3 further details what the license means when it refers to source code, particularly when the distributed form of the software is in binary. In particular, the GPLv2 §3 requires inclusion of "the scripts used to control compilation and installation of the executable".

88. GPL requires that these scripts be included as part of the source code so that the user can take full advantage of the ability to modify the software. Without these scripts, the user might be able to modify the source code of one of the programs, but would still be unable to compile it, install it onto their device, and make use of their new changes and ideas on the device.

**Compilation and Installation Scripts**

89. Compilation and installation scripts can take many forms. The form of these scripts varies from one programming language or system to another, and over time as industry practice develops and new technology emerges. GPL does not specify which forms these scripts should take, because the requirement is intended to encompass all methodologies in use and anticipate those that might come into existence later.

90. The required "script" might simply be a human-language list of actions to take to compile and install the software. More commonly, however, a script is itself a program which defines the sequence of steps necessary to compile and install some software.

91. Since instructing a computer to compile and install a very large set of software, such an operating system, can be complex, programmers often write such programs to assist in this task. These programs could themselves be written in any programming language, but are

frequently written in specialized programming languages for the purpose of compilation and installation, such as Makefiles or autoconf.

92. Some programs, such as BusyBox, have their own custom-made configure system that helps the programmer generate the compilation script. Specifically, BusyBox has a .config file that is generated when the programmer chooses what parts of the POSIX-like system to utilize in the operating system. This file is an essential piece of information for building BusyBox.

93. In addition to scripts for compiling each individual part of the software, there are often "overarching" scripts that guide the entire build process. For example, in building an operating system comprised of uClibc (a commonly used C library), Linux, and BusyBox, in addition to scripts to build each of the individual components, another script will typically be used to define the specific order of compilation, or perform some rote configuration tasks before attempting to compile the individual programs.

94. Once a programmer has used whatever scripts to compile the software, the software must be installed on the device. Installation is usually very straightforward on a desktop or laptop computer, so much so that a skilled user can often guess where the program should be installed. On embedded computers, the task is much more specialized and detailed scripts are essential.

95. Specifically, on embedded computers, the software for the operating system, along with any applications, are typically collected in a precise way into a single file image. For example, my initial analysis of Best Buy's Blu-ray Disc player firmwares indicates that they seem to collect all the userspace software (including BusyBox) and the C library into what is called a "squashfs" filesystem — a compressed collection of files organized in a particular way. They then give the binary copy of Linux a special name, add a few files whose format is unknown to me, and place all of these pieces into an "ISO image" (i.e. a storage format for an archive of files).

20

96. While it's possible to examine a binary firmware and discover these basic facts about it, it is exceedingly difficult to construct a duplicate from a modified version of the software without detailed scripts explaining how to do it. Dr. Stallman designed GPL to ensure there would not be such guesswork for users who wished to install new versions of the software, and if such guesswork is required, the distributor has not provided adequate "scripts used to control ... installation of the executable".

**Examination of Automated NS-WBRDVD Firmware Distribution by Best Buy**

97. Most of Best Buy's Insignia Blu-ray disc players can be connected to the Internet. Best Buy has configured these devices to upgrade the firmware on the embedded computer inside the Blu-ray disc player when the device is connected. I have confirmed with the help of my technical staff that this distribution is ongoing, as of 5 May 2011.

98. Using an NS-WBRDVD purchased on the open market and Best Buy's USB-key method of firmware installation, an NS-WBRDVD was downgraded to an older firmware version, specifically:

`20091022_NS_WBRDVD_BBY_52_6902_22.iso`

which has a sha1sum[4] of `20a2bc323a0495b1cd7507c750ac80fd3204f0b4`.

99. After the older firmware was installed on the NS-WBRDVD, the device was rebooted, and the on-screen option was selected to permit Internet upgrade. Before selecting the upgrade option, network packet capture software was started on the same local network with the NS-WBRDVD. The network packet capture software allows for determining what URLs the NS-WBRDVD is automatically downloading when the upgrade option is selected.

100. The packet capture revealed that the NS-WBRDVD made an HTTP GET request to 170.65.129.162 (insigniaproducts.com) for the URL:

---

[4]A sha1sum is a "hash" of a file. In Computer Science, hash algorithms can compute a specific signature, or footprint, for a file. Secure hash algorithms, like SHA-1, can be used to uniquely identify a file. Even changing a single bit (i.e., changing a "1" to a "0") in a file will cause the file to have a different sha1sum.

```
http://insigniaproducts.com/cms/software-updates/NS-WBRDVD/
20101222_NSWBRDVD_BBY_B052_109_34.iso
```

and downloaded that entire file, which has sha1sum of:

```
b902e3a476ba6f8627befc67935f6f9e3702ccf2
```

, and is thus the exact same file discussed and analyzed in detail in ¶ 105 and following. (The entire network packet capture file is quite large and is therefore not attached as an exhibit. This data is on file with Conservancy's counsel.)

101. After NS-WBRDVD download the entire file from that URL, it performed an upgrade automatically to that version of the firmware. Note that URL is exactly the same URL provided at:

```
http://insigniaproducts.com/products/dvd-players-recorders/NS-WBRDVD.html
```

in the Support/Downloads tab.

**Examination of BusyBox distributed by Best Buy**

102. In my Declaration executed on 26 January 2011, I identified that Best Buy distributes BusyBox 1.2.1 in the firmwares for its Insignia Blu-ray disc player products, using a standard and common method for identifying BusyBox. I believe that method to conclusively identify the version of BusyBox used in a firmware, and Best Buy has not disputed the that it distributes BusyBox 1.2.1 in the firmwares for its Insignia Blu-ray disc player products.

103. However, herein I will describe another technique to demonstrate that the firmware images distributed by Best Buy for their Insignia Blu-ray disc players contain a binary copy of BusyBox 1.2.1. I describe in full detail the technical work that was done and how it confirms the presence of BusyBox.

104. The BusyBox source code for version 1.2.1 of BusyBox is available publicly from the BusyBox website at the URL:

`http://www.busybox.net/downloads/busybox-1.2.1.tar.bz2`

The file has a sha1sum of `487ef51209e253d3aa981dc0b0645063a804f4c7`.

105. The current firmware for Best Buy's NS-WBRDVD product is available via the URL, `http://www.insigniaproducts.com/cms/`

`software-updates/NS-WBRDVD/20101222_NSWBRDVD_BBY_B052_109_34.iso`. This file has a sha1sum of `b902e3a476ba6f8627befc67935f6f9e3702ccf2`. This is a file that a Best Buy's customers are instructed to copy onto a CD to upgrade the software on their NS-WBRDVD DVD player.

106. Best Buy provided Conservancy with a candidate source release for this firmware on 5 November 2010. This candidate release was in a file called:

`BusyBox 2010-11-05 Release.zip`

This file has a sha1sum of `4badcfa8d0e8d631e7e72b5c03e69aa2490d03e5`. This candidate includes some source code for BusyBox.

107. Comparing the sources provided in the candidate source release to the official BusyBox 1.2.1 source code, some small differences can be found. The differences are shown in Exhibit A in patch format. The patch shows that there are a total of ten lines of code changed in the sources.

108. This patch can be applied to the BusyBox 1.2.1 sources as they are received from the BusyBox developers. In other words, the ten lines of changes can be made to the 1.2.1 sources.

109. Upon doing so, the newly modified BusyBox source code can be built to produce a binary program. That binary program can then be disassembled, using the command `mips-linux-objdump -d busybox`. This command takes a binary program as input, in this case the program called `busybox`, and outputs the low-level computer instructions contained in that binary, which are expressed in what is called an assembler language.

110. The same command can similarly be run on the binary program named `busybox` contained in the NS-WBRDVD firmware available from Best Buy's website.

111. When comparing the output of the two commands, it can bee seen that the binaries contain the identical set of computer instructions at the assembler level.

112. Any reasonable programmer, in my view, would conclude upon seeing that output that the two binaries are essentially identical programs.

113. Based on this analysis, it is my conclusion that Best Buy included a binary program, which was derived by compiling sources that were substantially similar to the BusyBox 1.2.1 sources (after first applying the patch that appears in Exhibit A).

114. Furthermore, it is my conclusion that BusyBox 1.2.1 source code itself was modified before it was distributed by Best Buy in the NS-WBRDVD firmware. Those modifications can be seen in patch form in Exhibit A.

**Examination of Andersen's Contributions to BusyBox 0.60.3 and 1.2.1**

115. In my declaration executed on 21 March 2011, I identified various findings regarding the number of lines of C code that Andersen contributed to BusyBox at various dates and times and for various versions of BusyBox. Due to length constraints imposed by the Court for that declaration, I was not able to fully include the entire technical details of how the analysis was performed.

116. In reviewing the details of that declaration for this report, I noticed that I made a minor transposition error when calculating the extent of the similarity between versions

24

of BusyBox. Specifically, the second version number of BusyBox being examined in that declaration was "1.1.2", rather than "1.2.1," which is the version distributed by Best Buy. Therefore, all findings represented there pertained to a different version of BusyBox than that found in Best Buy's Insignia Blu-ray disc players.

117. To correct this error for this report, I have performed anew the entire analysis discussed in my declaration against different versions of BusyBox. I have also included all supporting materials that would allow anyone sufficiently skilled with Git, Perl, and POSIX utilities to independently verify this analysis.

118. However, since BusyBox 1.2.1 was released only a few months after BusyBox 1.1.2, the results of this corrected analysis vary only minimally from my original report. Therefore, my conclusions regarding the extent of Andersen's contribution to BusyBox based on various different criteria have not changed. Namely, Mr. Andersen has a large number contributions to both 0.60.3 and 1.2.1, and a significant portion of both his own 0.60.3 code and the code of other 0.60.3 contributors have survived into 1.2.1.

119. My analysis centers around the use of a facility provided by Git (using version 1.5.6.5) called `git blame`. "Blame" features are commonly found in many revision control systems, and existed at least as far back as CVS. Blame is used to search the repository archives to determine, for each line of text (in this case, C code) that appears in the repository, who was the last person to commit a change, improvement, or to move that line around within the repository.

120. More specifically, my analysis centers around running the following command for each file in the repository:

```
git blame -l -M -C -C -C -w -f -n
```

This `git blame` command generates a report listing the last person to edit each line of code. Some commits involve one developer simply copying or moving code (written by

someone else) from one place to another, and therefore do not contain any new code from the commiter; the options exclude these such cases.

121. To gather the initial data for this process, I wrote the program whose source code is provided in Exhibit B. That program produces a large file containing output of the `git blame` command above for all of the files with names ending in `.c` and `.h`[5] in BusyBox 0.60.3 and BusyBox 1.2.1. The output from this data-gathering program is tens of megabytes, so it is not included as an exhibit. It is on file with Conservancy's counsel.

122. To determine the number of lines that Andersen was the last to edit in 0.60.3 made between September 2001 and April 2002 (the exact range date range being 7 September 2001 04:00:00 UTC to 27 April 2002 06:06:12 UTC), I wrote the program found in Exhibit C, giving it as input the 0.60.3 blame data gathered in ¶ 121. This process showed that Andersen added or was the last person to edit at least 8,897 lines of code between those dates. The program in Exhibit C works by fetching the 0.60.3 sources from Git, running the `git blame` command described ¶ 120, and output only those output lines where Erik Andersen is listed as the author, and the change was made between the dates September 7, 2001 at 04:00:00 UTC and April 27, 2002 at 06:06:12 UTC.

123. As discussed above in ¶ 47, maintainers sometimes commit patches on behalf of other developers, after examining, editing and adapting those patches as needed. Andersen did this for developers who did not have commit access to the BusyBox revision control system. When he did, Andersen noted in the commit log who authored the patch. Since Andersen noted these facts in the commit log entry (a free form text field), these commits must be identified via human review. To that end, I ran the following command to generate a report of all of Andersen's commits:

```
git log --author="Andersen" \
```

---

[5]Typically, when using the C programming language, the programmer stores all C programming code in files that end in either `.c` or `.h`.

```
--since="2001-09-07 04:00:00" --until="2002-04-27 06:06:12"
```

I examined each commit message and compiled a list of commits that Andersen did not credit to another developer in the corresponding log entry. The list of commit identifiers in this time period that Andersen did not attribute in any way to another developer are listed in Exhibit D.

124. Despite the conservative approach taken here, it is quite likely that Andersen contributed important material to these patches written by others. As he stated (see Andersen Dep. 249:9-250:16, Oct. 29, 2010), Andersen operated like a typical project maintainer — he often edited the patches for content, form, and optimization before committing them. Furthermore, as maintainer, Andersen maintained complete editorial control over the code repository, and therefore decided which submitted patches were appropriate and which should not be included. He also decided how and where to incorporate patches.

125. Using the list of commits built in ¶ 123 and the program in Exhibit E, giving it as input the 0.60.3 blame data gathered in ¶ 121, I determined that Andersen added or was the last person to edit 5,794 lines between the aforementioned dates, even when excluding those situations where Andersen noted in the log that he was contributing a patch written (in part or in whole) by another developer. The program in Exhibit E is very similar to the program in Exhibit C, however, it outputs only those `git blame` lines that meet the previous criteria and can be found in the list of Andersen's commits found in Exhibit D.

126. Using the program in Exhibit C, giving it as input the 1.2.1 blame data gathered in ¶ 121, I determined that of the 8,897 lines of code Andersen added or was the last to edit in BusyBox version 0.60.3, 5,377 lines remain unchanged in BusyBox version 1.2.1. Specifically, since the program in Exhibit C finds only those lines of source code which Andersen committed between the dates September 7, 2001 at 04:00:00 UTC and April 27, 2002 at 06:06:12 UTC. By running that program with the 1.2.1 blame data as input, we see which lines meeting that criteria remain in the 1.2.1 codebase.

127. Using the list of commits built in ¶ 123 and the program in Exhibit E, giving it as input the 1.2.1 blame data gathered in ¶ 121, I determined that of the 5,794 lines of code that were found in a ¶ 125 Andersen added or was the last to edit (excluding those commits written, in whole or in part, by another developer), 3,590 of those lines remained in BusyBox 1.2.1. Specifically, since the program in Exhibit E finds only those lines of source code which Andersen committed between the dates September 7, 2001 at 04:00:00 UTC and April 27, 2002 at 06:06:12 UTC where I have identified that Andersen did not attribute any of the work to another developer, by running that program with the 1.2.1 blame data as input, we see which lines meeting those criteria remain in the 1.2.1 codebase.

128. Using the program in Exhibit F, giving it as input the 1.2.1 blame data gathered in ¶ 121, I determined that 53,821 lines of code that originally appeared in BusyBox 0.60.3 still appear in BusyBox 1.2.1. Specifically, taking the 1.2.1 blame data as input, the program in Exhibit F prints out all `git blame` lines that indicate the line has not been edited and/or changed in the code repository since April 27, 2002 06:06:12, the release date of 0.60.3.

129. Given the findings in ¶ 128 and that BusyBox 1.2.1 only contains approximately 185,848 lines of C code, which can be determined with the command:

```
wc `find . -name "*.[ch]" -print`
```

I conclude that at least 28% of the C code sources of BusyBox 1.2.1 is identical to the C code sources of BusyBox 0.60.3. That estimation is extremely conservative, since it considers only lines of code that have survived identically as they stood in 0.60.3 and completely ignores lines that have were changed in 1.2.1 but would, upon inspection by a human, prove to be clearly derivative of similar code in 0.60.3. It is thus my opinion that BusyBox 1.2.1 is heavily derived from BusyBox 0.60.3.

130. Using the program in Exhibit G, giving it as input the 1.2.1 blame data gathered in ¶ 121, I determined that Andersen added or was the last person to edit at least 29,644

lines of source code in the repository between the dates of September 7, 2001 04:00:00 UTC and April 10, 2006 20:37:29 UTC. This indicates that Andersen added or was the last person to edit 29,644 of those 185,848 lines of source code in BusyBox 1.2.1, which is 15% of the total C source code in BusyBox 1.2.1.

I declare under penalty of perjury under the laws of the United States of America that all statements and affirmations made herein of my own knowledge are true and correct, and all statements made on information and belief are believed to be true and correct.

Executed on 11 May 2011

By:

29

# Exhibit A
## Expert Report of Bradley M. Kuhn
## 11 May 2011

Printed by Bradley M. Kuhn

| May 11, 11 15:58 | **busybox–1–2–1_to_bestbuy–ccs–candidate.patch** | Page 1/1 |

```
diff -ruN busybox-1.2.1-downloaded-pristine/Makefile busybox-1.2.1-bestbuy-prist
ine/Makefile
--- busybox-1.2.1-downloaded-pristine/Makefile   2006-07-28 18:53:44.000000000 -0
400
+++ busybox-1.2.1-bestbuy-pristine/Makefile      2011-04-28 01:34:58.000000000 -0
400
@@ -4,6 +4,8 @@
#
# Licensed under GPLv2, see the file LICENSE in this tarball for details.
#
# Modified by Broadcom (BRCM)  2006-08-29T22:12:57-04
#

# You shouldn't have to edit anything in this file for configuration
# purposes, try "make help" or read http://busybox.net/FAQ.html.
@@ -346,6 +348,8 @@
busybox.links: $(top_srcdir)/applets/busybox.mkll include/bb_config.h $(top_srcd
ir)/include/applets.h
        $(Q)-$(SHELL) $^ >$@

romfs: install

install: $(top_srcdir)/applets/install.sh busybox busybox.links
        $(Q)DO_INSTALL_LIBS="$(strip $(LIBBUSYBOX_SONAME) $(DO_INSTALL_LIBS))" \
            $(SHELL) $< $(PREFIX) $(INSTALL_OPTS)
diff -ruN busybox-1.2.1-downloaded-pristine/networking/tftp.c busybox-1.2.1-best
buy-pristine/networking/tftp.c
--- busybox-1.2.1-downloaded-pristine/networking/tftp.c 2006-06-30 18:42:02.0000
00000 -0400
+++ busybox-1.2.1-bestbuy-pristine/networking/tftp.c    2011-04-28 01:34:59.0000
00000 -0400
@@ -19,6 +19,9 @@
 * Licensed under GPLv2 or later, see file LICENSE in this tarball for details.
 * ---------------------------------------------------------------------- */

 /*
  * modified by Broadcom (BRCM)  2007-07-25T16:11:00-04
  */
#include <stdio.h>
#include <stdlib.h>
#include <string.h>
@@ -547,7 +550,8 @@
        if (localfile == NULL || strcmp(localfile, "-") == 0) {
                fd = (cmd == tftp_cmd_get) ? STDOUT_FILENO : STDIN_FILENO;
        } else {
                fd = open(localfile, flags, 0644); /* fail below */
                /* BRCM: make localfile executable */
                fd = open(localfile, flags, 0755); /* fail below */
        }
        if (fd < 0) {
                bb_perror_msg_and_die("local file");
```

Thursday May 12, 2011                                                        1/1

# Exhibit B

## Expert Report of Bradley M. Kuhn

## 11 May 2011

Printed by Bradley M. Kuhn

| May 11, 11 19:26 | **build–blame–output–for–a–version.plx** | Page 1/1 |
|---|---|---|

```perl
#!/usr/bin/perl

use warnings;
use strict;

use File::Find;

my $VERBOSE = 1;
if (@ARGV != 2) {
  print STDERR "usage: $0 <WORKING_DIRECTORY> <TAG>\n";
  exit 1;
}

my($WORKING_DIRECTORY, $TAG) = @ARGV;

chdir $WORKING_DIRECTORY or die "unable to chdir to $WORKING_DIRECTORY: $!";

system("git clone git://busybox.net/busybox.git busybox_with_tag_$TAG 1>&2");
die "error cloning git repository in $WORKING_DIRECTORY: $!" if ($? != 0);

chdir("busybox_with_tag_$TAG") or die "unable to enter busybox_with_tag_$TAG: $!";

system("git checkout $TAG 1>&2");
die "error checking out $TAG in $WORKING_DIRECTORY: $!" if ($? != 0);

my @files;
my $buildList = sub {
  my $val = $_;
  chomp $val;
  push(@files, $val) if -f $val and $val =~ /\.[ch]\s*$/;
};
find({ wanted => $buildList, no_chdir => 1},  ".");

foreach my $file (sort {$a cmp $b } @files) {
  print STDERR "Processing $file ..." if $VERBOSE > 0;
  open(BLAME, "-|", "git blame -l -M -C -C -C -w -f -n -- $file") or die "unable to run blame on fil
e $file: $!";
  while (my $line = <BLAME>) { print "$file: $line"; }
  print STDERR "\n" if $VERBOSE > 0;
}
#
# Local variables:
# compile-command: "perl -c build-blame.plx"
# End:
```

# Exhibit C
## Expert Report of Bradley M. Kuhn
## 11 May 2011

Printed by Bradley M. Kuhn

| May 11, 11 22:21 | **commits−between−relevant−0−60−3−dates.plx** | Page 1/1 |

```perl
#!/usr/bin/perl

use warnings;
use strict;


use Date::Manip;

Date_Init("TZ=UTC");

my $startDate = ParseDate("September 7, 2001 04:00:00");
my $endDate   = ParseDate("April 27, 2002 06:06:12");

while (my $line = <>) {
    die "invalid line: $line in blame output" unless ($line =~
     /^\s*(\S+)\s*:\s*\S+\s+\S+\s+\d+\s+\((.+)\s+(\d{4,4}\-\d{2,2}\-\d{2,2}\s+\d{2,
2}:\d{2,2}:\d{2,2})\s+([\+\-\d]+)/);
    my($file, $name, $date, $tz) = ($1, $2, $3, $4);
    my $parsedDate = ParseDate($date);
    die "Unable to parse date information in $date found in git blame"
        if (not defined $parsedDate);

    die "time input not in UTC from blame in $line" if ($tz ne "−0000" and $tz ne "+0000");

    if ($parsedDate gt $startDate and $parsedDate lt $endDate and
        $name =~ /^\s*Eri[ck]+\s+Andersen/) {
      print $line;
    }
}
#
# Local variables:
# compile-command: "perl -c commits-between-dates.plx"
# End:
```

# Exhibit D

## Expert Report of Bradley M. Kuhn

## 11 May 2011

Printed by Bradley M. Kuhn

| May 05, 11 2:26 | **andersen–solo–commits–in–date–range.ids** | Page 1/2 |
| --- | --- | --- |

```
b1591d1f8b9444c770771c9482d708dd5e497829
416340642df18d92600998566ccb1bec25b10d4b
1c31501b1bacd5d3a2a156dfd6833fe174fff9d1
467a18b1d94dbcdc9f750e52d09f6579037fbff5
c57e42b8f0aaeb44952284ade29717a36ee43e49
c3657428d3207d35cda634adbe23f75457f7912b
f4c208937c997f9b65e77b9304a527b03349d219
d63dee4019a62d1c5bb31755d9866ef921aff76b
f8f6e624bb5b0cbe418356e02a8a61b445c5bd66
43626d7671cf1b4c7adac777d421ad784a400422
d81891a2e6d52a35b3b633f95716d7a3a88f60c9
55805bcba49abf296435be5282eca69c6bd4bb72
6f8b7ea452656faf0183e378cb9fd457ffd9b8d6
d75ac02a4ffb6c843794d8f7d745ee083bdb0516
a66a43e8ef1e55c2415aa7084365cce3fb8f931a
db7d5fca5f6a98a68a16bbea7cd71593791c43dc
3e6908b5865d8e3ab3a986cd5a5ad86c4cea7ff5
19732c6226e9f2f89b9294e3c23af2bfbb084cec
c8459a5a8f692faead7f26a6905b056805767bab
ef38b392627b31abf6b99273311d2a155023e73a
50e4d660ace54d8da2cb09d537138447a92c68bd
6d13964714c36ef6ea8d698b64fd7caea77969f9
79a466f1285509853b2fa37351219d58506c58c4
38ddbed4c1144370169611bd94d3b0662961dfbb
744a194f53b0e524814a4e40e05d621e6c4222a0
94f19a838518293810a0fc0c4dca926ca8caff57
282671bf76bd7e3644b730673ca748947913b911
dba4e6f0468ee3ec9cd3825404e85eeba3795c24
45784febaf5e5f635bedb831b9609655ce33b525
9c6b5fcb0a624423dc3fb4de808f4ea3118a4ad3
fedce06b7fa53989df8a7994dcd2b24ed5ccf51a
c265b17550dc90237c7dc03da7b58ceea8c74bbf
8e392922b09dff10cd7e1e5a83c578000bf34fe5
c94e89d81f9a5cbbbb9c1cbdcb52e3379173a5a7
038cbc74429f8c3c74a505314bc3eca5b44c342c
72f9a4277fe5ad7c6c6b9a9810d469cc7fcc3c71
4acf8f848161cb321130cbc014113a91b061a1db
0ee0a8d5396c9da17ba47991715da3ff8ea484f1
463304edfd2f727522420022676ebbac31d31a00
06656f363de87846086f03c5e12541a66637858e
b24d65659f193cd7497dfdae4d8aa1bc91dbf343
11fdb8a4c79752157a8263fbcf583916d5ec0347
8acbf1d3079e9ed6d15c39bd57135b13ecb4076f
74400ccfd08e8ff72b9147951dd437dd3bb7abb1
a0f0ae5a7acd71c3c56df5183e38c189c3151c98
8eaa7b36985e6be193ed0ad1e4cbc493aa8d3cbc
f3f9062ecfb6893ca55094861c0a5e9f5ddba607
0298be88aece2a10b04c71db34fb154bdbbc45c9
c36642195cb97c1a632b85d4f473058f1409aaed
81ee96fe62916e9bd571cf3456d87cb1bba4c210
f435a918fab2a315981c185a3135b97388b572c4
5f6873621d58e879d06b9a1ef7ea28b6d84c4b43
d35c5df08c7ca8ad506a418555538a9270411c42
b159146fa6bbc779c5d9f01e3058cd0a9a6f2e8f
b5474c48b158f4a7d60f4b4faa40129c7eda6e9f
89de1e7930a752e0a444d30172ca508f58f02365
5a406510466943f9c70b88bd1a9398147e02e470
b0cc0a6ca879781c3899731c70eb3261252c7fe3
c7a3fb96d0936bbbedc428eafd3701edd219f70a
```

Printed by Bradley M. Kuhn

```
27eff033d20198f04ecf44af93988b89363650e4
2480e3a30a063fb400a0912ddf513dff03ebc641
9260fc5552a3ee52eb95823aa6689d52a1ffd33c
bdfd0d78bc44e73d693510e70087857785b3b521
3cd2760ba1b235f3ead9feaaa1d3c41def3fb3bc
1a10eec17846b864a89834239a0533040cb504e7
371ca19f5346d626f0c75c8d53aa5e3fb2e85c43
fd35de564ea822e7fec620eaf402783946dfbf63
eaecbf33f70c0eed2f9a60b392e5782e03a9be2f
1552ff7efb760214eb4e5afc97f200136a935643
63ae66198d3f2d51d077a8fbcdaf1e5fe80a210f
20d739adf7fb1542015537dbdb969689118ceb02
```

# Exhibit E
## Expert Report of Bradley M. Kuhn
## 11 May 2011

Printed by Bradley M. Kuhn

| May 11, 11 19:09 | **commits−between−relevant−0−60−3−dates_with−include−only−list.plx** | Page 1/1 |

```perl
#!/usr/bin/perl

use warnings;
use strict;


use Date::Manip;

if (@ARGV != 1) {
  print STDERR "usage: $0 <COMMIT_EXCLUDE_LIST>";
}
Date_Init("TZ=UTC");

my %includeOnlyCommits;

open(COMMIT_LIST, "<", $ARGV[0]) or die "unable to open file $ARGV[0] for reading: $!";

while (my $line = <COMMIT_LIST>) {
  chomp $line;
  die "invalidly formatted commit id in $ARGV[0]: $line"
    unless ($line =~ /^[a-zA-Z\d]+$/);
  my $commit = "\L$line\E";
  $includeOnlyCommits{$commit}  = $line;
}

Date_Init("TZ=UTC");

my $startDate = ParseDate("September 7, 2001 04:00:00");
my $endDate   = ParseDate("April 27, 2002 06:06:12");

while (my $line = <STDIN>) {

  die "invalid line: $line in blame output" unless ($line =~
  /^\s*(\S+)\s*:\s*(\S+)\s+\S+\s+\d+\s+\((.+)\s+(\d{4,4}\-\d{2,2}\-\d{2,2}\s+\d{
2,2}:\d{2,2}:\d{2,2})\s+([\-\+\-\d]+)/);
  my($file, $commit, $name, $date, $tz) = ($1, $2, $3, $4, $5);

  $commit =~ s/^\^//;
  $commit = "\L$commit\E";
  die "invalid commit id in $line" unless $commit =~ /^[\da-z]+$/;

  my $parsedDate = ParseDate($date);
  die "Unable to parse date information in $date found in git blame"
    if (not defined $parsedDate);

  die "time input not in UTC from blame in $line" if ($tz ne "-0000" and $tz ne "+0000");

  if ($parsedDate ge $startDate and $parsedDate le $endDate and
      $name =~ /^\s*Eri[ck]+\s+Andersen/ and
      (defined $includeOnlyCommits{$commit}) ) {
    print $line;
  }
}
#
# Local variables:
# compile-command: "perl -c commits-between-dates-with-exclude-list.plx"
# End:
```

# Exhibit F

## Expert Report of Bradley M. Kuhn
## 11 May 2011

Case 5:18-cv-07182-EJD   Document 188-2   Filed 06/01/23   Page 245 of 248

```perl
#!/usr/bin/perl

use warnings;
use strict;


use Date::Manip;

Date_Init("TZ=UTC");

my $endDate   = ParseDate("April 27, 2002 06:06:12");

while (my $line = <>) {
   die "invalid line: $line in blame output" unless ($line =~
   /^\s*(\S+)\s*:\s*\S+\s+\S+\s+\d+\s+\((.+)\s+(\d{4,4}\-\d{2,2}\-\d{2,2}\s+\d{2,
2}:\d{2,2}:\d{2,2})\s+([\+\-\d]+)/);
   my($file, $name, $date, $tz) = ($1, $2, $3, $4);
   my $parsedDate = ParseDate($date);
   die "Unable to parse date information in $date found in git blame"
      if (not defined $parsedDate);

   die "time input not in UTC from blame in $line" if ($tz ne "-0000" and $tz ne "+0000");

   if ($parsedDate lt $endDate) {
      print $line;
   }
}
#
# Local variables:
# compile-command: "perl -c commits-between-dates.plx"
# End:
```

# Exhibit G

## Expert Report of Bradley M. Kuhn

## 11 May 2011

Printed by Bradley M. Kuhn

| May 11, 11 19:21 | **commits−between−relevant−1−2−1−dates.plx** | Page 1/1 |

```perl
#!/usr/bin/perl

use warnings;
use strict;


use Date::Manip;

Date_Init("TZ=UTC");

my $startDate = ParseDate("September 7, 2001 04:00:00");
my $endDate   = ParseDate("April 10, 2006 20:37:29");

while (my $line = <>) {
   die "invalid line: $line in blame output" unless ($line =~
   /^\s*(\S+)\s*:\s*\S+\s+\S+\s+\d+\s+\((.+)\s+(\d{4,4}\-\d{2,2}\-\d{2,2}\s+\d{2,
2}:\d{2,2}:\d{2,2})\s+([\+\-\d]+)/);
   my($file, $name, $date, $tz) = ($1, $2, $3, $4);
   my $parsedDate = ParseDate($date);
   die "Unable to parse date information in $date found in git blame"
      if (not defined $parsedDate);

   die "time input not in UTC from blame in $line" if ($tz ne "-0000" and $tz ne "+0000");

   if ($parsedDate gt $startDate and $parsedDate lt $endDate and
       $name =~ /^\s*Eri[ck]+\s+Andersen/) {
      print $line;
   }
}
#
# Local variables:
# compile-command: "perl -c commits-between-reelvant-1-2-1-dates.plx"
# End:
```

Re:     *NEO4J, INC. v. PURETHINK LLC et al.* UNITED STATES DISTRICT COURT,
NORTHERN DISTRICT OF CALIFORNIA, Case No. 5:18-cv-7182 EJD

PROOF OF SERVICE

I am a citizen of the United States. My business address is 7960 Soquel Drive, Ste B #296
Aptos, CA 95003. I am over the age of eighteen years and not a party to the within action.
On the date stated below, I served the attached:

**1.   Expert Report of Bradley M. Kuhn**

On the parties listed below at the addresses listed:

**to NEO4J, INC., a Delaware corporation, NEO4J SWEDEN AB, attorneys of record:**

Jeffrey M. Ratinoff
jratinoff@hopkinscarley.com
John V. Picone III
jpicone@hopkinscarley.com
Arthur E. Rothrock
arothrock@hopkinscarley.com
Hopkins & Carley, a Law Corporation
70 South First Street
San Jose, CA 95113
Telephone: (408) 286-9800
Facsimile (408) 998-4790

__ (By Mailing) I caused a true copy of each document identified above to be placed in a sealed
envelope with first class postage affixed. Each such envelope was deposited for collection and
mailing that same day in the ordinary course of business in the United States Mail at San Jose,
California.
___(By Personal Service) I caused a true copy of each documents identified above to be delivered by
hand to the offices of each addressee above.
___(By Overnight Delivery) I caused a true copy of each documents identified above to be sealed in
an envelope to be delivered to an overnight carrier with delivery fees provided for, addressed of each
addressee above.
_X__ (By Electronic Service) by transmitting via my electronic service address
(adronjr@adronlaw.com) the document(s) listed above to the persons at the e-mail addresses set
forth above.

        I declare under penalty of perjury under the laws of the State of California that the above is
true and correct.

Dated: 12-22-22                                    _____

                                                   Adron G. Beene