John V. Picone III, Bar No. 187226
jpicone@hopkinscarley.com
Jeffrey M. Ratinoff, Bar No. 197241
jratinoff@hopkinscarley.com
Arthur E. Rothrock, Bar No. 312704
arothrock@hopkinscarley.com
HOPKINS & CARLEY
A Law Corporation
The Letitia Building
70 South First Street
San Jose, CA  95113-2406

*mailing address:*
P.O. Box 1469
San Jose, CA 95109-1469
Telephone:    (408) 286-9800
Facsimile:    (408) 998-4790

Attorneys for Plaintiffs and Counter-Defendants
NEO4J, INC. and NEO4J SWEDEN AB

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEO4J, INC., a Delaware corporation, NEO4J SWEDEN, AB,<br><br>Plaintiffs,<br><br>v.<br><br>PURETHINK LLC, a Delaware limited liability company, IGOV INC., a Virginia corporation, and JOHN MARK SUHY, an individual,<br><br>Defendants.<br><br>AND RELATED COUNTERCLAIMS. | CASE NO.  5:18-cv-07182-EJD<br><br>**PLAINTIFFS' DEPOSITION DESIGNATIONS FOR USE AT TRIAL** |

4893-6450-2146.1

Pursuant to the Court's April 6, 2023 Order for Modification of Case Schedule After Trial Setting Conference, Plaintiffs Neo4j, Inc. and Neo4j Sweden AB  hereby file the following deposition transcript excerpts and testimony (highlighted in green) they intend to introduce at trial:

| Exhibit No. | Deposition Transcript |
|---|---|
| 1. | Remote Videotaped Deposition of John Mark Suhy, Individually and as a Representative of iGov, Inc. and PureThink LLC Pursuant to Federal Rule of Civil Procedure 30(b)(6) and by Stipulation (Dkt. No. 155), Vol. 1[1] |
| 2. | Remote Videotaped Deposition of John Mark Suhy, Individually and as a Representative of iGov, Inc. and PureThink LLC Pursuant to Federal Rule of Civil Procedure 30(b)(6) and by Stipulation (Dkt. No. 155), Vol. 2 |
| 3. | Remote Videotaped Deposition of Ashwani Mayur as a Representative of eGovernment Solutions Pursuant to Federal Rules of Civil Procedure 45 and 30(b)(6) |
| 4. | Videotaped Deposition of Jim Weyant as a Representative of CACI International, Inc. Pursuant to Federal Rules of Civil Procedure 45 and 30(b)(6)[2] |
| 5. | Remote Videotaped Deposition of Internal Revenue Service Through its Designee Michael C. Dunn Pursuant to Federal Rules of Civil Procedure 45 and 30(b)(6) |
| 6. | Videotaped Deposition of Michael Stavrianos as a Representative of ASR Analytics, LLC Pursuant to Federal Rules of Civil Procedure 45 and 30(b)(6) |
| 7. | Video-Recorded Deposition of Turin Pollard as a Representative of Greystones Consulting Group, LLC Pursuant to Federal Rules of Civil Procedure 45 and 30(b)(6)[3] |

Dated:  September 28, 2023

HOPKINS & CARLEY
A Law Corporation


By: /s/ Jeffrey M. Ratinoff
John V. Picone III
Jeffrey M. Ratinoff
Arthur E. Rothrock
Attorneys for Plaintiffs and
Counter-Defendants
NEO4J, INC. and NEO4J SWEDEN AB

---

[1] Counsel for Defendants confirmed that these excerpts need not be filed under seal.

[2] Counsel for CACI confirmed that these excerpts need not be filed under seal.

[3] Counsel for Greystones confirmed that these excerpts need not be filed under seal.

**EXHIBIT 1**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA


NEO4J, INC., a Delaware
corporation; and NEO4J SWEDEN
AB, a Swedish corporation,

        Plaintiffs,

                               CASE NO.
vs.                            5:18-cv-07182-EJD

PURETHINK, LLC, a Delaware
limited liability company;
IGOV, INC., a Virginia
corporation; and JOHN MARK
SUHY, an individual,

        Defendants.
_____/

REMOTE VIDEOTAPED DEPOSITION OF
JOHN MARK SUHY
as representative of IGOV, INC.
pursuant to Federal Rule of Civil Procedure 30(b)(6)

**Confidential Pursuant to Protective Order**


DATE:        October 22, 2020

TIME:        9:12 a.m.

LOCATION:   Via videoconference


REPORTED BY:  BENJAMIN GERALD
              California CSR No. 14203
              Washington CSR No. 3468

1    John Mark Suhy individually.

2         THE VIDEOGRAPHER:  The court reporter will now

3    administer the oath, and then we can again.

4                      --o0o--

5                   JOHN MARK SUHY,

6    being duly sworn by the Certified Shorthand Reporter to

7    tell the truth, the whole truth, and nothing but the

8    truth, testified as follows:

9                      --o0o--

10                   EXAMINATION

11   BY MR. PICONE:

12        Q.  Good morning, Mr. Suhy.  Can you state your

13   full name, please.

14        A.  John Mark Suhy, Jr.

15        Q.  Where do you live?

16        A.  I live in Alexandria, Virginia.

17        Q.  What's your address?

18        A.  8814 Danewood Drive, Alexandria, Virginia

19   22308.

20        Q.  Have you ever had your deposition taken before?

21        A.  Yes.

22        Q.  In what context?

23        A.  I was in a car accident years ago, and I had to

24   be deposed for it.

25        Q.  And that's the only time?

                                                            13

1    A.  I don't remember any other times.

2    Q.  Okay.  I'm going to go over just a couple of

3    the basics of a deposition.  You've been doing very well

4    so far in allowing me to finish my question before you

5    answer, and I will likewise do my best to let you finish

6    your answer before I pose another question.

7         You've also been doing very well with respect

8    to answering audibly.  We have to answer audibly.  We

9    can't shake our heads or use non-verbal communication

10   because Mr. Gerald can't record that.

11        You know the oath you took today means that

12   your testimony is given under penalty of perjury.

13        Do you understand that?

14   A.  Yes.

15   Q.  Okay.  And once the deposition is completed,

16   the transcript will be put in a booklet form, and it

17   will be sent to you, and you will be allowed it make any

18   changes or corrections to your testimony, but you should

19   be aware that, if you do make changes or corrections, I

20   will be able to comment on those changes or corrections.

21        Do you understand that?

22   A.  Yes.

23   Q.  All right.  This is -- I think is the most

24   important one:  If at any time you don't understand a

25   question that I pose, just simply ask me to clarify it,

14

 1    and I'll do my best to make it more clear.  But if you

 2    don't ask me, I'm going to assume that you understood

 3    the question and that you answered it fully and

 4    truthfully.

 5          Do you agree to ask me to clarify if you have

 6    any questions about the content of my question?

 7          A.  Yes.

 8          Q.  Okay.  I typically take a break about every

 9    hour, but if you need a break before that period, just

10    let me know, and the only I think ask you with respect

11    to breaks is that if a question is pending when you

12    request a break, I just ask you to answer the question

13    before we go off the record.

14          Also, you know, we're going to have breaks, and

15    we're going to have lunch breaks, and the witness (sic)

16    is not going to re-swear you in.  You remain under oath

17    the entire deposition regardless of whether we take a

18    break or we extend to another day.

19          Do you understand that?

20          A.  Yes.

21          Q.  Okay.  Is there any reason that you can't give

22    your best and most truthful testimony today?

23          A.  No.

24          Q.  Okay.  And you understand today that you're

25    testifying on behalf of iGov?

                                                          15

1    Q.  Okay.  What was your first job after college?

2    A.  I believe it was with a company called Core

3  Express.

4    Q.  And what did you do there?

5    A.  I did software development.

6    Q.  Okay.  How long did you work there?

7    A.  About one to two years.

8    Q.  Where did you go next?

9    A.  I believe I started PureThink after that.

10   Q.  And so what was -- what was the approximate

11 time you started PureThink, the date?  I just need a

12 year.

13   A.  2012 -- or I'm sorry, not '12.  2002, I

14 believe.

15   Q.  So you graduated from George Mason around 2000?

16   A.  That sounds right, yes.

17   Q.  Okay.

18       MR. PICONE:  Mr. Ratinoff, can you drop Tab 109

19 into the chat box, please?

20       And Mr. Gerald, this will be Exhibit 2.

21       (Exhibit 2 was marked for identification.)

22 BY MR. PICONE:

23   Q.  And it is identified by production numbers

24 N4J 00156 through 158.

25       Mr. Suhy, do you see that document that's been

21

1  marked as Exhibit 2?

2       A.  Yes, I do.

3       Q.  Okay.  What is it?

4       A.  It's the Commonwealth of Virginia State

5  Corporation Commission document for the articles

6  submitted on behalf of iGov, Inc.

7       Q.  Okay.  And that document is dated, I believe,

8  June 23, 2017.

9           Does that comport with your memory regarding

10 when iGov was founded?

11      A.  Yes, that sounds right.

12      Q.  Okay.  And at the time of its founding, what

13 role did you play in iGov?

14      A.  Well, I created the company, and am a director

15 and CTO, I believe.  But I was -- it was -- I created

16 the company.

17      Q.  I see.  So you were the founder and -- and CTO

18 at the time of its founding in 2017?

19      A.  Yes.

20      Q.  Did you have any employees at the time of its

21 founding, other than you?

22      A.  No.

23      Q.  Okay.  So you -- did you have any contractors

24 or any other people contributing to the work of iGov at

25 the time of its founding?

                                                        22

```
1        A.  I'm trying to think if we had help from
2   contracting.
3            Nothing major, but I don't know offhand.  We
4   might have had someone that helped us with
5   administration tasks and whatnot, but I don't remember
6   if they actually were just helping us, or if we had paid
7   them.
8        Q.  So you may have had a volunteer helping with
9   admin, but you can't recall one way or the other whether
10  or not they received any compensation for that help?
11       A.  Yeah, if they received anything, it would have
12  been a small amount, like a few hundred dollars.
13       Q.  Okay.
14       A.  It wouldn't have been a W-2, or anything like
15  that.
16       Q.  Understood.  Since its founding in 2017, has --
17  has iGov had any employees, other than you?
18       A.  No employees.
19       Q.  Okay.  Have you hired any contractors or
20  contributors to help iGov's operations since its
21  founding in 2017?
22       A.  Contractors meaning people or businesses?
23       Q.  Primarily people.  Let's leave it -- to start
24  with that.
25       A.  No.
```

23

1     Q.  Okay.  How about businesses or entities?  Have

2  you contracted with them to help iGov in its operations?

3     A.  Yes.

4     Q.  And can you give me a list, or is that too

5  much?

6     A.  I can.  One moment.  Let me write this down.

7     Q.  Let me help you with that.  To that extent

8  that, you know, if you hired, you know, financial people

9  or accountants to help with your accounting, things like

10  that, I don't necessarily need those.  I was thinking

11  more with operational people who -- who helped with

12  iGov's core mission.

13     A.  We've only hired -- or not hired, but

14  subcontracted work for development to assist me in

15  software development --

16     Q.  Okay.

17     A.  -- but no one to help with the operations.

18     Q.  Okay.  So who -- who's helped you with the

19  software development?

20     A.  AtomRain.

21     Q.  And when did you engage AtomRain to help you

22  with soft -- software development?

23     A.  I don't know the date off -- offhand, but it

24  was -- I don't know the date, but I can find it.

25     Q.  Is it -- is it -- can you give me an

24

1    approximate year?  I don't need the day and time, I'm

2    just wondering how long they helped you.

3         A.  At least 2018, I believe.  But I don't know for

4    sure unless I actually go and look at the -- the

5    documents I have.

6         Q.  Okay.  And did you pay them to help you?

7         A.  Yes.

8         Q.  Okay.  And how much did you pay them,

9    approximately?

10        A.  Between 50,000 to -- or a hundred thousand.

11   I'm not sure exactly, but those -- I can get all those

12   documents for you.

13        Q.  Okay.  And what was the -- the nature of the

14   software development work that AtomRain provided to

15   iGov?

16        A.  Development of back-end software and

17   user-interface software applications.

18        Q.  Was this back-end software and UI work, was

19   that related to any particular software product that

20   iGov was developing?

21        A.  It was for a tool that we had to design for a

22   client, and it was based on -- or part of the tool was

23   called GraphStack, which is -- I guess you could call it

24   a -- I don't know if you'd call it a product.  It's

25   consulting, a bunch of toolings that allow you to build

25

1    software applications.

2         Q.  Were those software applications in the graph

3    database space?

4         A.  One small piece of the application was a graph

5    database.

6         Q.  And generally, what were the other pieces of

7    the -- of the -- of the tooling?

8         A.  There was an API which was in charge of

9    communicating data back and forth to a user interface,

10   and on the back end, it used elastic search, PostgreSQL,

11   ONgDB -- I'm trying to think of -- Hazelcast, Spring

12   Boot, and Java.  There's quite a bit of technologies

13   behind what we're building that make up the -- the

14   custom product --

15        Q.  And--

16        A.  -- for delivery.

17        Q.  -- was -- was ONgDB, was that the graph

18   database that you had earlier referenced?

19        A.  Yes.

20        Q.  Okay.  Was there a specific version of ONgDB

21   that was included in the GraphStack tooling application?

22        A.  It wasn't included in the GraphStack, but we --

23   we set it up for the end user, and whatever the newest

24   version -- we always -- we always kept it up to date

25   with the newest version of ONgDB.

26

1           MR. PICONE:  Mr. Starr, what you can do is, the

2     protective order gives you the opportunity to, I

3     believe, designate the transcript either in whole or in

4     part under any of the various designations, confidential

5     attorney's eyes only, and we can agree to have the

6     entirety of the deposition be treated as confidential

7     from the outset and marked confidential, or whatever

8     designation you think is appropriate, and then revisit

9     the issue with respect to separate parts of it after the

10    transcript's been received.  I'm really -- whatever you

11    think it appropriate, I'm fine with.

12          MR. STARR:  Okay.  Okay.  What I would prefer

13    to do is, we'll -- when we review the transcript, let's

14    treat it as attorney-eyes only until such time when we

15    review the transcript.  I'm not out to hold anything

16    back, but we can then categorize whatever we think is

17    confidential or attorney-eyes only at that point.

18          MR. PICONE:  That's fine.

19          MR. STARR:  Thank you.

20    BY MR. PICONE:

21       Q.  Go ahead, Mr. Suhy.  Who was the -- who was

22    the -- the identity of the client for this particular

23    project?

24       A.  The Internal Revenue Service.

25       Q.  And just so we're clear, when we talk about

                                                         28

1    ONgDB, what is that?

2         A.   ONgDB is a fork of Neo4j.

3         Q.   And at what version of Neo4j did ONgDB fork?

4         A.   I believe it start -- well, it's a continuous

5    fork.  It's still pulling in code from Neo4j, and I

6    believe that started at 3.4.  You can find out the

7    actual -- or which versions are up and public by going

8    to the graphfoundation.org.

9         Q.   So it's your recollection that the fork started

10   with version 3.4 of Neo4j?

11        A.   I believe that's when the fork started, yes.

12        Q.   Okay.  And you mentioned that it's a continuous

13   fork.  So as of -- as of today, you're still pulling in

14   Neo4j code into ONgDB?

15        A.   Well, I'm not, but it is being -- it is being

16   pulled in.

17        Q.   By the Graph Foundation?

18        A.   Yes.

19        Q.   Okay.  And are you aware of where Graph

20   Foundation is getting that code that they are

21   incorporating into ONgDB?

22        A.   Yes.

23        Q.   And where is that?

24        A.   It's on github.com.

25        Q.   And what repository is the code that is being

                                                              29

1        Q.   Okay.

2        A.   Yeah, I don't think so.

3        Q.   So when you first started iGov in 2017, its

4   initial address was 1902 Campus Commons Drive,

5   Suite 101, Reston, Virginia?

6        A.   Yes.

7        Q.   Okay.  And was that also PureThink's address as

8   well at some -- at any time?

9        A.   Yes.  It was an address I used for mailing,

10  basically.

11       Q.   Okay.  Did you have office space there?

12       A.   It was a shared office.  I could go in and use

13  meeting rooms, but I didn't have any dedicated office

14  space just for us.

15       Q.   And did you have telephone service through that

16  shared office space?

17       A.   All of the telephone service we had was VoIP,

18  so it could come to us anywhere virtually.

19       Q.   I see.  So you had a phone number for that

20  office space, but the -- that phone number would connect

21  to any -- any device that you designated?

22       A.   Yes.

23       Q.   Okay.  And the phone number that you had for

24  this office space was the same for both PureThink and

25  for iGov?

                                                        37

 1          A.  I don't believe so.  We had -- PureThink had

 2   its own number, and then iGov -- iGov got another phone

 3   number.  Now, our support number that we had, that's

 4   from -- what's the name of it -- of Zendesk, that's the

 5   only one where we -- we had the -- we only had one

 6   number, and so any time a ticket could come in, it could

 7   forward to an email address.

 8          Q.  I see.

 9          A.  But that was only -- that was only a support

10   number that was -- and I think we -- we fixed that so we

11   have separate numbers now.

12          Q.  That was the (855) 971-7771 phone number that

13   was, at the time, the same support number for PureThink

14   and iGov?

15          A.  I believe so.  I don't remember if that's the

16   exact number, but it sounds right.

17          Q.  Okay.

18          MR. PICONE:  Mr. Ratinoff, can you drop Tab 110

19   into the chat function?

20          And Mr. Gerald, this will be, I believe,

21   Exhibit Number 3.

22          (Exhibit 3 was marked for identification.)

23          THE WITNESS:  I see it.

24   BY MR. PICONE:

25          Q.  Okay.

                                                          38

1            MR. PICONE:  And Mr. Starr, I'm going to assume

2    that you -- you have the exhibit referenced, unless --

3    unless you say otherwise, okay?

4            MR. STARR:  (Nonverbal response.)

5    BY MR. PICONE:

6        Q.  Do you recognize this document that's been

7    marked as Exhibit 3?

8        A.  Yes, I do.

9        Q.  Okay.  And what is it?

10       A.  It looks to be a screenshot of the iGov

11   website.

12       Q.  And did you create the iGov website?

13       A.  Yes, I did.  I used a template.

14       Q.  Okay.  Were there any contributors to the iGov

15   website?

16       A.  No, just me.

17       Q.  And were you responsible for any changes to the

18   iGov website after you created it?

19       A.  Yes, I was.

20       Q.  Okay.  Were there any other persons responsible

21   for any changes to the iGov website after it was

22   created?

23       A.  No.

24       Q.  Was this website created around the same time

25   as the founding in June of 2017?

                                                        39

1        A.   I believe so, but I'm not sure.

2        Q.   Okay.

3        A.   But it should have been.

4        Q.   Okay.   And if you see, I believe it's in the

5   third page, it has phone numbers there.   It says General

6   Contact.

7        A.   Yes.

8        Q.   Okay.   And it has an email address of

9   info@igovsol.com?

10        A.   Yes.

11        Q.   Okay.   And below that, it says "Customer

12   Support," and that's the (855) 979-7771 Zendesk number?

13        A.   Yes.

14        Q.   And that number, you believe, was shared by

15   PureThink as well?

16        A.   It wasn't shared; it was reused.

17        Q.   What does that mean?

18        A.   It means Zendesk charges a lot of money now,

19   and I had that number available.   Since PureThink didn't

20   have any more customers because of what Neo did, I had

21   to reuse that number from Zendesk, or else I would have

22   had to upgrade to the bigger plan.   It would have cost

23   more.

24        Q.   Okay.   So before you used the general contact

25   email address of info@igovsol.com, you used to use the

                                                        40

1   have restrictions upon its activities?

2       A.  Yes, it did not sign a partnership agreement or

3   have any agreements with Neo.

4       Q.  Okay.

5       A.  That's correct.

6       Q.  Just give me one second, Mr. Suhy.

7       A.  Take your time.  Let me see what time it is on

8   the clock.

9       Q.  It's 10:10 Pacific.

10      A.  Thank you.

11          MR. PICONE:  Mr. Ratinoff, can you drop Tab 113

12  into the chat function, please?

13          (Exhibit 4 was marked for identification.)

14          THE WITNESS:  I see it.

15  BY MR. PICONE:

16      Q.  And what is that document?

17          MR. PICONE:  I'm sorry.  Mr. Gerald, can we

18  mark this as Exhibit 4, please.

19  BY MR. PICONE:

20      Q.  And then Mr. Suhy, what is that document that's

21  marked as Exhibit 4?

22      A.  This appears to be a website -- oops.  Sorry.

23  I just moved away from it.

24          This appears to be the website snapshot,

25  screenshot.

47

1      Q.   From?

2      A.   It looks like PureThink.

3      Q.   Okay.   And were you responsible for creating

4   PureThink's website?

5      A.   Yes, I was.

6      Q.   Okay.   And was anyone else responsible for the

7   content of PureThink's website?

8      A.   No.

9      Q.   Is -- is PureThink's website still up and

10  visible to the public?

11     A.   It's supposed to be.

12     Q.   So to your knowledge then, if I navigated to

13  the URL --

14     A.   There should be a website there.

15     Q.   Okay.   And why is that website still active?

16     A.   Well, because I plan on growing PureThink as

17  well, once I recover.

18     Q.   And did you use the same template to create

19  PureThink's website that you used to create the iGov

20  website?

21     A.   Yes.

22     Q.   Okay.   And so you incorporated a lot of the

23  content from PureThink's website into the iGov website?

24     A.   The template is a UI template that you pay for,

25  and the -- the content, usually I go in and rewrite it,

48

1   but it's possible I copied and pasted certain things,

2   like NAICS codes, or potentially -- I'm trying to think

3   what else it could have been.

4        Q.  How about the statement regarding why iGov was

5   founded?  Because that, to me, looked pretty similar.

6        A.  I'm sure that it is the same.  I'm sure

7   something was changed, because iGov wouldn't have said

8   "PureThink."

9        Q.  Right.  No, I get that.  You changed the name,

10  obviously.

11       And are you familiar with an entity called

12  eGovernment Solutions?

13       A.  Yes, I am.

14       Q.  And what is eGovernment Solutions?

15       A.  It's a software consulting company.

16       Q.  And are you part of eGovernment Solutions?

17       A.  I don't have any ownership.  I act as their

18  facility clearance officer -- or a facility security

19  officer, and acting CTO until they can find someone.

20       Q.  Does eGovernment Solutions pay you for those

21  contributions?

22       A.  Yes, I get paid a small amount.

23       Q.  Okay.  Who owns eGovernment Solutions?

24       A.  Two people own it:  Nikhil Budhiraja and

25  Ashwani Mayur.

49

1     A.  I don't know.  I can get that for you, though.

2     Q.  Okay.  Did -- at any time did PureThink

3 transfer any money to iGov?

4     A.  No.

5     Q.  At any time, did -- did PureThink transfer any

6 assets, such as computer systems, office equipment,

7 anything to iGov?

8     A.  No, no.

9     Q.  So my understanding is that you were the only

10 employee of both PureThink and iGov; is that right?

11     A.  Yes, that's correct.

12     Q.  Okay.  So when you formed iGov, did you get a

13 new computer, or did you just take your PureThink

14 computer with you?

15     A.  I got a new computer.

16     Q.  Okay.  And you left your old computer at --

17 well, your old computer's still with PureThink, then?

18     A.  Yes.  It's still -- I have it, but it's -- yes.

19     Q.  Right.  I understand that you're the company,

20 so I get that.

21     A.  Yeah.  Yeah.  In fact, I think -- I think that

22 old computer is -- I mean, it's not -- it's not worth

23 anything.

24     Q.  Sure.  Did iGov take over any of PureThink's

25 customers?

52

1        A.  No.  They didn't take over meaning -- taking --
2   how would you describe taking over?
3        Q.  Sure.  And that's a fair question.
4            So for example, my understanding is that
5   PureThink had a business relationship with the Internal
6   Revenue Service.
7        A.  Uh-huh.
8        Q.  And that that relationship is now maintained by
9   iGov; is that right?
10       A.  Relationship, but not the contract.  We still
11  work with -- with the IRS.
12       Q.  So PureThink had a contract with the IRS and
13  iGov had a contract with the IRS; is that right?
14       A.  Separately, yes.
15       Q.  Separate.
16       A.  Yeah.
17       Q.  Two different contracts?
18       A.  Yes.
19       Q.  Was the nature of the services provided by both
20  entities the same, generally?
21       A.  The original contract with PureThink was to
22  build out and support the -- the Government Edition.
23  They scrapped that contract, and the work we're doing
24  now is -- is all over the board.  In fact, there's
25  another company that supports their graphs, and so we do

                                                          53

1   mostly development of innovative new technologies.

2           So no, I would say they're -- they're -- in

3   name, they -- they are, if you go and look at the public

4   records, but what we do is not the same anymore.

5       Q.   So initially, PureThink was hired to help build

6   out Neo4j's Government Edition and -- I'm sorry.  Go

7   ahead.  You were about to answer.

8       A.   No, no.  I just cleared my throat.

9       Q.   Okay.  So is that right, that PureThink was

10  hired to build out the Government Edition?

11      A.   No.  PureThink was hired to implement -- to

12  bring in the Government Edition and build out a solution

13  that they needed specifically for IRS.

14      Q.   Right.  But that would -- the Government

15  Edition would be part of that solution?

16      A.   Yes, it was part of it.

17      Q.   And now iGov supports a variety of other

18  services; is included within that list of services

19  support for any graph software implementation?

20      A.   So we're in charge of supporting anything we

21  build, and some of the tools we build use graph; some of

22  them don't.

23      Q.   And the tools that you build that use graph,

24  what graph solution does that apply to?

25      A.   Currently, ONgDB, but we'll -- might be moving

54

1    to another open-source technology.

2        Q.  Is that possible move to another open-source

3    technology related in any way to -- to Graph Foundation

4    or iGov's own solution?

5        A.  No, we found -- we found --

6            MR. STARR:  Excuse me a sec, John.  I'm not

7    sure I understand the question.  I'm sorry.

8            MR. PICONE:  Right.  Mr. Suhy testified that --

9    that they were possibly moving to another open-source

10   graph technology, and I just wanted to know if that was

11   related to the Graph Foundation or AtomRain or iGov.

12           THE WITNESS:  So, no.  This is another

13   open-source solution that's on GitHub.  It's part of the

14   community.

15   BY MR. PICONE:

16       Q.  Is it related to Neo4j in any way?

17       A.  No.

18       Q.  What about other PureThink customers, such as

19   DHS, the Air Force, Northrop Grumman, Accenture; did any

20   of those customers come to iGov after it was formed?

21       A.  I don't remember Northrop Grumman ever being

22   with PureThink, but no.  We -- we only -- iGov is only

23   working around IRS.

24       Q.  Okay.  So iGov currently has no other clients,

25   other than the IRS?

                                                              55

1    break.

2              THE VIDEOGRAPHER:  The time is 11:42 a.m., and

3    we're off the record.

4              (Off the record from 11:42 a.m. to 12:04 p.m.)

5              THE VIDEOGRAPHER:  The time is 12:04 p.m.;

6    we're on the record.

7              MR. PICONE:  Mr. Ratinoff, can you put up

8    Tab 4?  This will be Exhibit 10.

9              (Exhibit 10 was marked for identification.)

10             MR. PICONE:  And for the record, this has been

11   previously marked as Exhibit 4 to the Graph Foundation

12   30(b)(6) deposition.

13   BY MR. PICONE:

14        Q.  Mr. Suhy, do you see what's been marked as

15   Exhibit 10?

16        A.  Yes, I have it open.

17        Q.  And -- and what is it?

18        A.  It's an email from me to Ben and Brad Nussbaum.

19        Q.  All right.  You sent this on May 21, 2018?

20        A.  Yes.

21        Q.  Okay.  I notice that your -- that your

22   PureThink email address is used here; is that also an

23   artifact of the collective inbox that you have on your

24   phone?

25        A.  Yes, most likely this was sent by the -- my

                                                          92

1    phone.

2       Q.  Okay.  So your phone would have the PureThink

3    signature block, automated signature block?

4       A.  Yes.  It should have it.

5       Q.  Who's Steve Baker?

6       A.  Steve Baker is someone who used to work at

7    Neo4j.

8       Q.  Okay.  Was he doing another fork of Neo4j

9    Enterprise?

10       A.  No --

11       Q.  What was --

12       A.  -- not that I know of.  I don't know what he

13    works on.

14       Q.  In your message, you say, "Assume that Steve

15    Baker and team are doing another fork in parallel."

16          What are you referring to?

17       A.  I don't know, because I -- I talked to Steve

18    afterwards, and he's not -- he's doing something

19    completely different.

20       Q.  So you were just speculating that he was going

21    to do a Neo4j fork in your message to the Nussbaums?

22       A.  Let me -- I haven't read through this all yet,

23    so let me read it first.

24          Okay.  I've read through it.

25       Q.  Okay.

                                                          93

1      Q.  Does -- so you're using Neo4j in your URL as of

2   October 2nd, 2019, right?

3      A.  I know we used it in the URL name, the same as

4   the email address, but I don't know if this date is

5   accurate.  Just because it says that, doesn't mean -- I

6   mean, it's quite -- quite easy to make it so it says

7   anything there, any URL, but it looks like it.  I

8   don't -- I mean, we used Neo4j, the GitHub project name,

9   we used that for the email and the site at some point.

10  I just don't know if it's on -- that date is correct.

11     Q.  Okay.  Assuming this document hasn't been

12  altered or corrupted in any way, you have no reason to

13  suspect that this is not accurate, because you did, in

14  fact, use the Neo4j name in the email address and the

15  URL for the website?

16     A.  Yes, just the date would be the question.  But

17  the document looks, from doing a quick glance over, it

18  looks like it would be from our site.

19     Q.  Okay.

20          MR. PICONE:  Tab 127, please.  This will be

21  Exhibit 14.

22          (Exhibit 14 was marked for identification.)

23          THE WITNESS:  I've got it.

24  BY MR. PICONE:

25     Q.  Okay.  And what is this document?

                                                         116

1          A.  This looks like a printout of the iGov website,
2     or one of the pages.
3          Q.  And it's dated July 27, 2020; do you see that?
4          A.  Okay.  I see that.
5          Q.  Okay.  And do you see the use of the
6     neo4j@igovsol.com email address in the "Request
7     Procurement Document Package" tab?
8          A.  Yes, I do.
9          Q.  And do you see the same Neo4j inclusion in the
10    URL down in the lower left-hand corner of the first
11    page?
12         A.  Yes, I do.
13         Q.  So if the date on this document is accurate,
14    that would mean that, as of July 27, 2020, that iGov was
15    still using the Neo4j name in its URL and its email
16    address.
17         A.  Yes.  If the date was accurate, and the content
18    was accurate, then of course.
19         Q.  Okay.
20         A.  But I'm saying that I don't know that that's
21    true.  Why not -- well, the Internet Archive would be
22    the easy way to -- because I trust and accept anything
23    from the archive.  It's a separate organization and
24    they're -- they're -- how would you say it?  They're
25    unbiased.  At least I believe --

117

1      Q.  They don't have an interest?

2      A.  Yeah.  They don't -- they don't have an

3  interest.

4      Q.  Right.  So I'm just saying, assuming the date

5  is accurate, then that would confirm that iGov was still

6  using Neo4j --

7      A.  Yes.

8      Q.  -- on its website?

9          Okay.

10     A.  Assuming that, yes.

11         MR. PICONE:  Tab 132, please.

12         This will be Exhibit 15, please.

13         (Exhibit 15 was marked for identification.)

14  BY MR. PICONE:

15     Q.  And do you see what's been marked as Exhibit 15

16  on your screen, Mr. Suhy?

17     A.  Yes, I do.

18     Q.  And again, assuming this -- the date is

19  accurate of October 18, 2020, it shows that the email

20  address for the "Request Procurement Document Package"

21  has been changed to info@igovsol.com.

22         Do you see that?

23     A.  Yes, I see that.

24     Q.  And were you the person that changed that email

25  address on iGov's website?

JOHN MARK SUHY                                                    October 22, 2020

 1   documents and website has been removed.

 2          Do you see that?

 3      A.  I'm just looking.

 4          Yes, I see that they're no longer there.

 5      Q.  So sometime between October 2, 2019, and

 6   July 15, 2020, you removed the links to Neo4j's website

 7   and documents; is that fair?

 8      A.  Yes, assuming those dates are correct.

 9      Q.  Right.

10      A.  That's what these show.

11      Q.  Okay.

12          MR. PICONE:  Tab 170, please.

13          (Exhibit 19 was marked for identification.)

14   BY MR. PICONE:

15      Q.  Do you see what's been marked -- I'm sorry,

16   Exhibit 19?

17      A.  Is Tab 170 an email?

18      Q.  Yes, it's an email from you to -- it looks like

19   a Lee Smales or Smalls.

20          Do you see that?

21      A.  I see that.

22      Q.  And that's dated August 22, 2018.

23          Do you see that?

24      A.  Yes, I do.

25      Q.  Okay.  Who is Mr. or Ms. Smales?

                                                              142

1          A.   I would have to read this first, because I have

2     no idea offhand.

3               Okay.  So I have no idea.  It might have been

4     just somebody that I reached out to.  I reach out to a

5     lot of people.

6          Q.   Okay.  And so there, you tell Lee Smales that,

7     "You may want to reference the Neo4j Enterprise

8     open-source distribution which has the name 'ONgDB

9     Enterprise.'"

10              Do you see that?

11         A.   Yes, I do.

12         Q.   Okay.  And you say, "US Treasury and other

13    agencies use this."

14              When you say "US Treasury," are you referring

15    to the IRS?

16         A.   Yes.  I believe others within Treasury are

17    using it, as well.

18         Q.   And what other agencies within Treasury are

19    using ONgDB?

20         A.   I don't know.  I just know that they're -- I've

21    heard conversations from other teams that mentioned that

22    they were going to be using it, as well.  Just in phone

23    conversations.  I'm not positive though.  You'd have to

24    ask them.

25         Q.   So that statement's not entirely accurate then,

1  because you don't really know of other agencies within

2  Treasury use --

3       A.  The US -- no, it's accurate.  "US Treasury and

4  other agencies."

5       Q.  Okay.  I'm just wondering:  Who's the other

6  agency, aside from US Treasury?

7       A.  Well, we know that DHS was -- was starting to

8  work with it.  Who else?  We know that there was other

9  agencies that weren't US government that were using it,

10  other companies.  I'm trying to think of who they were.

11  I don't recall offhand, but I believe they're all in the

12  documents we sent.

13       Q.  All right.  So the ones you can remember right

14  now are IRS and DHS?

15       A.  It's US Treasury.

16       Q.  US Treasury.

17       A.  Yes.

18       Q.  And --

19       A.  IRS is just a -- is a component.  And I believe

20  DHS was.

21       Q.  Okay.  So --

22       A.  They were evaluating it.  Evaluating it.  When

23  I say "using," it could be evaluating it, downloaded it,

24  using it for development, I don't know.  All we know

25  is -- is when people are reach out to us or mention

                                                         144

1    something on a phone call.

2        Q.   Okay.  You say -- this looks like you were

3    responding to an official request for proposal or some

4    type of other governmental procurement mechanism.

5    Because you cite to the actual line in the email that

6    says other "FOSS products," and you say "Neo4j," and you

7    highlight "Neo4j."

8        Do you see that?

9        A.   Yes, I do.

10       Q.   And you -- your suggested change is

11   Neo4j/ONgDB, right?

12       A.   That's what I put, yes.

13       Q.   Okay.  And you weren't concerned that this

14   would cause any confusion for the Air Force, and I'm

15   referencing the "USAF" in the fbo.gov hyperlink below

16   that.

17       You weren't concerned that using Neo4j/ONgDB

18   would cause any confusion at the Air Force?

19       A.   Well, what I'm saying is that you can't just

20   say Neo4j; you have to say Neo4j, ONgDB is a fork of it,

21   and since it's a fork of it, that means that has to be

22   considered as well as an order.  So -- now, the

23   confusion, I believe, might have been caused by your

24   sales teams -- or not yours, but Neo's sales teams.

25       But this is very clear.  Whenever I write

                                                      145

1    group, the team, but that's it.  Nothing -- I'm not a

2    director, I'm not any treasurer, or anything like that.

3         Q.  Has iGov ever been a targeted sponsor of Graph

4    Foundation?

5         A.  I believe that I asked if we could be one

6    because I was volunteering, and I believe they had added

7    us, but I don't remember.  But we didn't -- we didn't

8    pay anything.

9         Q.  So you didn't give them any money, make any

10   donations?

11        A.  No, no.  Just my time as a committer and

12   helping the community.

13            MR. PICONE:  Tab 5, please.

14            And this will be exhibit --

15            THE VIDEOGRAPHER:  20.

16            MR. PICONE:  20.  Thank you, Mr. Sayler.

17            (Exhibit 20 was marked for identification.)

18   BY MR. PICONE:

19        Q.  Mr. Suhy, do you see Exhibit 20 on your screen?

20        A.  Yes, I do.

21        Q.  And what is this?

22        A.  It looks like an email from me to Ben Nussbaum.

23        Q.  Right.  It's entitled "Neo4j Procurement,"

24   right?

25        A.  Yes, it is.

                                                        152

1    Q.  All right.  And this -- you sent this message

2    to Mr. Nussbaum at 7 -- July 25, 2018?

3    A.  Yes.

4    Q.  And you used your PureThink email address, and

5    that, again, was the artifact of the collective mailbox

6    that you had on your phone; is that right?

7    A.  Yes, most likely.  I use my phone for almost

8    everything.

9    Q.  Okay.  You say the "Air Force wants Neo4j

10   Enterprise."  And you say, "They do not realize that

11   Neo4j Enterprise is dual licensed and therefore unique

12   for procurement."

13        What do you mean by that?

14   A.  Let me read the whole message, and I'll be able

15   to bring in context.

16   Q.  Sure.

17   A.  Okay.  I've read it.  Can you ask the question

18   again?

19   Q.  Sure.  You said that, "Air Force wants Neo4j

20   Enterprise.  They do not realize that enterprise is dual

21   license and therefore unique for procurement."

22        What do you mean by that?

23   A.  What I mean is -- I believe what I meant is

24   this -- since -- my understanding of the federal

25   procurement laws around brand-name justification breaks

153

1   down in the situation where you have a dual-licensed

2   product like Neo4j, and the reason why is that the US

3   government has open-source initiatives, and they care

4   about past performance and many other -- many other

5   pieces or -- you know, or qualities from their vendors.

6   But if they knew and were told by Neo4j, "Hey, there is

7   an open source version that you can have someone else

8   support," they may not have procured it and actually

9   said Neo4j Enterprise, they might have said Neo4j

10  software -- you know, based software or forks.

11         And so it's a unique -- it's a unique area

12  where, if you came -- especially depending on when this

13  was written, a compiled version of Neo4j that was done

14  by us or an agency or anybody would have the same exact

15  features as the ones they could download from you.  And

16  that is very -- that's a slippery slope, because that

17  means that anybody who compiles competes against you.

18         So that's why it's unique.  And we haven't

19  seen -- or at least I tried to research to see if there

20  was any other times that this has happened, and I was

21  not able to find any.

22       Q.  So in July of 2018, Neo4j was -- was licensed

23  under the AGPLv3, but it had a Commons Clause addition

24  to it, right?

25       A.  I don't remember when that was added.

154

1    Q.  But at some time they did add that Commons

2    Clause to the license that was available for Neo4j?

3    A.  Yes.

4    Q.  Okay.  And that -- and that addition restricted

5    the use of the open-source version to non-commercial

6    activities; is that your understanding?

7    A.  Well, it didn't restrict anything because it

8    was invalid.

9    Q.  Right.  But the actual language of the -- of

10   the Commons Clause said that it was for -- that the

11   license was for non-commercial purposes; is that right?

12   A.  I don't believe so.  You would have to show it

13   to me.  But I believe it -- I believe it was talking

14   about selling or something.  I don't remember.  I don't

15   remember it saying non-commercial.

16   Q.  Okay.  But it did restrict your ability to sell

17   the software; is that what you remember?

18   A.  I believe it had something.  You know, I'd be

19   more comfortable reading it with you, so --

20   Q.  Sure.  I can --

21   A.  I believe it was --

22       (Unintelligible Cross-talk.)

23       THE WITNESS:  I remember it was something about

24   limiting commercial, but I don't remember what it was

25   exactly.  It was sales or consulting or something.

155

1    That's -- that's what I remember.

2    BY MR. PICONE:

3        Q.  And so were you aware that AtomRain was a --

4    was a partner of Neo4j in 2018?

5        A.  I knew they were a partner; I did not know when

6    they stopped becoming a partner.

7        Q.  And so were you suggesting that -- that iGov

8    and Graph Foundation bid this contract, or something

9    else?

10       A.  I don't know actually, even from reading it.

11   It might have been -- it could have been that we just

12   work together.  I don't know, because it doesn't say

13   specifically.  I don't think -- I don't think that --

14   well, I don't want to say any -- any guesses.

15           I don't remember what it was, but I'm sure that

16   other emails have the context in it.

17       Q.  Okay.

18       A.  I don't remember what -- but somebody was going

19   to go after it.  That -- that's the gist of the email.

20   I just don't know.

21           See, a lot of times, I'll just reference, just

22   to be friendly, I'll go and reference it and say,

23   "Here's something that, you know, can help out."  This

24   one looks like I wanted to do some sort of work with

25   them, but I don't remember the details of it.  But I

156

1    Q.  Okay.

2         MR. PICONE:  Tab 137, please.

3         And this is Exhibit 22.

4         (Exhibit 22 was marked for identification.)

5    BY MR. PICONE:

6    Q.  Let me know when you --

7    A.  I see it.

8    Q.  Okay.

9    A.  I see it.

10   Q.  And what is that that you're looking at, as

11   Exhibit 22?

12   A.  This is an email from Donald Robertson at

13   fsf.org to jmsuhy at PureThink.

14   Q.  Okay.  And his response to you is on the 22nd

15   of May 2018, right?

16   A.  Yes.

17   Q.  Because on Saturday May 19th, you wrote to him,

18   "I'm not sure whom to bring this up, but Neo4j recently

19   added restrictive licensing conditions to their AGPL

20   license."

21        Do you see that?

22   A.  I see that.

23   Q.  And you wrote that?

24   A.  Yes, I believe I did this.  Yup.

25   Q.  Okay.  And you copied the Commons Clause

169

1    license condition that was added to Neo4j's license?

2         A.   Yes.  It looks like at the bottom of the

3    initial email.

4         Q.   Okay.  And that was -- you got that off of the

5    GitHub Neo4j 3.5 Enterprise license.txt file?

6         A.   I don't remember where we got it, because I do

7    remember that Neo tried to backdate the Commons Clause

8    and then removed it, so it could have been in any files

9    that were -- there's more than one license.txt file.

10   They put that same license.txt file in multiple

11   directories, but it's all supposed to be just the AGPL

12   license.

13        Q.   But you have an URL there.

14        A.   I probably would have taken it from there so

15   they could have seen it.

16        Q.   Okay.  So you see that the Commons Clause

17   condition says that the licensee does not have the right

18   to sell the software.

19             Do you see that?

20        A.   I see it says selling -- yes.  Yup.  I see

21   that.

22        Q.   And then they define "sell" as what they mean

23   by selling; do you see that there?

24        A.   "Licenses not grant to you the right to sell

25   the software.  For purposes of foregoing, 'sell'

                                                            170

1    means" -- yup.  I see it.

2         Q.  Okay.  So you can't provide the software you

3    obtained via this license, at least under the Commons

4    Clause, for money, right?  That's what they use as the

5    definition of "sell"?

6         A.  I don't know what you meant for it.  "Sell"

7    could be selling it as a product.  I don't know if it

8    means hosting it for someone.  It's not clear at all.

9         Q.  Yeah.  You see the Commons Clause says, "'Sell'

10   means practicing any or all of the rights granted to you

11   under the license to provide to third parties, for a fee

12   or other consideration, a product or service that

13   consists entirely or substantially of the software or

14   the functionality of the software."

15        Do you see that?

16        A.  I see it, but it doesn't make sense to me

17   because the AGPL specifically counters that.

18        Q.  Right.  I'm not talking about the AGPL; I'm

19   talking about this particular clause, right, that you --

20   that you sent to Mr. Robertson and the actual text.

21        A.  Yeah, that's what is says.  I would have copied

22   it exactly.  I wouldn't have changed it.

23        Q.  Okay.  So did you -- you obtained Neo4j 3.4 and

24   used that, at least in part, to create 3.4 of ONgDB,

25   right?

                                                      171

1          A.  I believe so.  I don't know the exact start

2     date -- or, you know, the start version number when I

3     started that.

4          Q.  So if you obtained the 3.4 open-source Neo4j

5     source code, and it included this Commons Clause, did

6     you -- did you remove that clause from the license.txt

7     file as part of your work in creating ONgDB 3.4?

8          A.  What I did is, I read the AGPL license, and it

9     said it needs to be verbatim, and it needs to -- it

10    can't have further restrictions, and so I copied over

11    the default license onto that, over that specific one,

12    so ONgDB would be in compliance with the AGPL license.

13    I didn't -- and I believe that in the actual commit tag,

14    when I -- when I did that overwrite, I specifically said

15    this is the reason, so we can be in compliance.

16         Q.  So just so I get this right, you copied the

17    text from the AGPL Version 3 over to from the Free

18    Software Foundation's website, and then copied that over

19    the Commons Clause, so essentially removing it from the

20    Neo4j license?

21         A.  That was the effect of it.  I copied the actual

22    file, the license.txt, but yes, that's -- in the end,

23    it's the same.  It removed it by copying it, yeah.

24         Q.  All right.  So you've bought a car before,

25    right?

                                                          172

1    Q.  Mr. Suhy, it's a simple question, and if your

2    testimony is you don't understand, then that's your

3    testimony.  But I want it clear on the record that you

4    don't understand that concept.

5    A.  The way you're saying it --

6    Q.  The question --

7    A.  -- I don't know the answer, because I don't

8    know contract law, but I'm assuming that when you

9    have -- I'm hoping that that's the case.

10        MR. STARR:  Let's not assume, Mr. Suhy.  If you

11   don't know the answer, you don't know the answer.

12   Please don't guess.  That's not helping anybody.

13        THE WITNESS:  Okay.

14   BY MR. PICONE:

15   Q.  So then one more time, just so it's clear for

16   the record.

17        If you have an agreement with another party,

18   and you are not allowed to unilaterally change the terms

19   and conditions of the agreement after the fact because

20   you don't like the terms and conditions that you agreed

21   to.

22        You don't understand that?

23   A.  No, I understand that.

24   Q.  Okay.

25   A.  So what's the question?

178

1       Q.  The question is, do you have the right to

2   unilaterally change the terms and conditions after the

3   fact because you don't like them?

4       A.  Only if that agreement allowed is to is the

5   answer.

6       Q.  If the agreement does not allow you to do it,

7   then the answer is --

8       A.  No, you can't --

9           (Unintelligible Cross-talk.)

10          THE REPORTER:  Guys, we're really stepping all

11  over each other, and it's making it damn near impossible

12  for me to get anything down here.  So if we could keep

13  to one at --

14          MR. STARR:  You know, I'm going to object to

15  the question as confusing.

16          (Unintelligible Cross-talk.)

17          THE REPORTER:  Guys --

18          MR. PICONE:  One more time.

19  BY MR. PICONE:

20      Q.  If you were a party to an agreement, and the

21  agreement does not allow you to unilaterally change the

22  terms and condition after the fact because you don't

23  like them, you have no right to do that, do you?

24      A.  Agreement.  Give me one second.

25          MR. STARR:  Again, I'm going to object to the

                                                        179

1    witness not to answer:  One is it to protect a

2    privilege, and one is the stop the deposition and seek a

3    protective order.

4          So I encourage you to withdraw that objection,

5    and we can get an answer to this question.

6          MR. STARR:  I will instruct him to answer the

7    question if he can, if he understands it.  And if not,

8    he should explain that he doesn't understand it, and we

9    move on.  We're not going to have him badgered and go

10   back and forth on this.

11         MR. PICONE:  If he doesn't understand, if

12   that's his testimony, he doesn't understand, that's

13   fine.  If he can answer the question, then he can answer

14   the question, but I want a clear answer.  Either he

15   doesn't understand or yes or no.  And we're going to do

16   this all night until we get an answer to that.

17   BY MR. PICONE:

18      Q.  So again, Mr. Suhy, if you were --

19         MR. STARR:  I don't think we're going to be

20   here all night.  I'm going to have to take objection to

21   that statement.  There is going to be a point where

22   we're going to end this deposition before all night.

23   BY MR. PICONE:

24      Q.  One more time, Mr. Suhy.

25         If you are party to an agreement with another

                                                        181

1    party and you agree on the terms and conditions, you

2    cannot, by yourself, decide to alter the terms and

3    conditions of that agreement, can you?

4         A.  I believe that's true.  You used the word

5    "unilaterally" before, which I didn't understand.

6              So yes, when you have a contract, both people

7    would have to be agreeing on the contract to make a

8    change.  Unless there's some law that I don't know

9    about, states, like you were saying.

10        Q.  Okay.  That's all I was asking.

11             I'm going to back to Exhibit 22.

12        A.  Which one is that?  Because I only see tab --

13        Q.  That's Tab 137.

14        A.  Got it.  Okay.

15        Q.  So I'm not clear as to where Mr. Robertson

16   responds to you.  Is that below your signature line that

17   says, "Thank you for your time.  Both AGPL and GPL

18   prevent further restrictions."

19             Is that his -- his response to you?

20        A.  I don't know if I wrote that or if he wrote

21   that.  Commons Clause.

22        Q.  It looks like he wrote it, because it's

23   directly underneath your signature block.

24        A.  Yeah.  It looks -- that's what I would think,

25   too.  Yeah.  It says -- down on the third page, it says,

182

1    "Sincerely," Donald Robertson.

2        Q.   Okay.  So he tells you that "the GPL and AGPL

3    prevent the addition further restrictions," and then he

4    cites some portion of the AGPL.

5            Do you see that quoted language there?

6        A.   Yes, I do.

7        Q.   And then it says, "Only the copyright holder

8    has the power to enforce the terms of the license."

9            Do you see that?

10       A.   "Copyright holder."

11           Yes, I see that.

12       Q.   So in the situation where you're downloading

13   Neo4j source code from GitHub, who's the copyright

14   holder of that source code?

15       A.   Whoever wrote it and maintained the copyright.

16   I would assume that Neo4j owns all of the copyright, but

17   I'm not sure of that.

18       Q.   I think that would be a good assumption.  I

19   think you're right.

20       A.   Uh-huh.

21       Q.   So he's telling you that only Neo4j has the

22   power to enforce the terms of the license, right?

23       A.   It looks like he's saying contact Neo4j and

24   tell them someone's added these restrictions and they'll

25   deal with it, is how I read it.  Meaning it wasn't an

183

1   understanding of the question.

2       Q.  Right.  So you -- what did you interpret

3   that --

4       A.  Now --

5       Q.  -- to mean?

6       A.  -- now I'm saying that.  When I first read

7   it -- when I first read it, I wasn't sure if he was

8   talking about the copyright holder, Neo4j Sweden or

9   Neo4j, but as I read it now, in this instance, it feels

10  like he didn't understand it.  But I'm not sure.

11      Q.  Okay.

12      A.  The way -- the way that the first read it is

13  that the copyright holder, basically at the very top,

14  "All other non-permissive additional terms are

15  considered 'further restrictions,'" that's what --

16  that's the one thing I wanted to make sure about, that

17  and the verbatim.

18      Q.  Right.

19      A.  So the second line, I don't know exactly, but

20  the first line answered -- you know, he confirmed what I

21  wanted to know.  The second line, I don't know now

22  exactly now what it is, what he was saying.

23      Q.  Right.

24      A.  I understand --

25      Q.  Right.

184

1       A.  I don't know what that means.

2       Q.  It entitles you to take out the Commons Clause?

3       A.  Entitles me -- I don't understand.  I just know

4   that the rules say do this, and that's what I followed.

5   So I don't know if the term "entitle" or "titleized" or

6   whatever it was, "deputized" -- I don't understand that,

7   but I do know that what I read means if we don't want to

8   be in trouble, if we keep it the way it is, we'll be in

9   trouble by them.  So we have to follow these rules in

10  order not to be in trouble by the Free Software

11  Foundation.

12      Q.  Right.  But the agreement, when you download

13  Neo4j's software that includes the Commons Clause,

14  you're taking a license to that software.  The Free

15  Software Foundation's not a party to that agreement,

16  right?

17      A.  Well, you have all the terms of the AGPL that

18  specifically say you can remove stuff.  So I think that

19  that license, that's why they put it in there, so if

20  somebody does do something like what Neo4j did, you can

21  fix it easily, and they tell you what to do.

22      Q.  So -- but only the copyright holder has the

23  power to enforce the license, right?  According to

24  Mister --

25      A.  Yes.  That's what he says.  Yes.

                                                        187

1     Q.  Right.  And you're generally in agreement with

2  that, right?

3     A.  Yeah, I believe so.  I couldn't go sue someone

4  that -- because they're using Neo4j.  I don't have the

5  copyright.  That's my understanding.

6     Q.  Right.  And so when you download the Neo4j

7  software from GitHub and you take it pursuant to the

8  licenses and the license.txt file, if it includes the

9  Commons Clause, that doesn't automatically bring the

10  Free Software Foundation into that license agreement;

11  it's between the copyright holder, Neo4j, and whomever

12  is downloading the software, right?

13         The Free Software Foundation is not involved in

14  that transaction; that's what I'm driving at.

15     A.  No, they're not.

16     Q.  Okay.

17     A.  But there are terms in AGPL that they left in.

18  Had Neo4j removed certain terms in AGPL and kept the

19  commons, maybe it would have been different.  But you

20  know, you're reading something that says one thing, and

21  then underneath it says it's the opposite, and then the

22  third thing that says remove it if it's there.  I'm sure

23  that's probably why they said it needs to be verbatim,

24  but I don't know.

25         MR. PICONE:  I'm going to move to strike that.

188

 1              Tab 138, please, and this will be Exhibit 23.

 2              (Exhibit 23 was marked for identification.)

 3   BY MR. PICONE:

 4       Q.  Do you have what's been marked as Exhibit 23,

 5   Mr. Suhy?

 6       A.  Yes, I do.

 7       Q.  Okay.  And what is that?

 8       A.  That's an email from me to licensing@fsf.org.

 9       Q.  And so this is about a month after you received

10   your initial response in Exhibit 22 from Mr. Robertson,

11   and you're following up?

12       A.  It looks that way, yes.

13       Q.  All right.  And so why did you follow-up?  I

14   thought you said that -- that his initial response in

15   Exhibit 22 provided enough information for you to

16   believe that you could remove the Commons Clause.

17       A.  I don't know why I followed up, but during that

18   time, I'd been doing lots of research, and I might have

19   had more questions to ask him.  I'm reading through it

20   right now.

21       Q.  Okay.

22       A.  Let me see.

23       Q.  I'll let you read through it.

24       A.  Okay.

25       Q.  Right.  So it seems like you're adding --

                                                         189

1    trying to give him more context about what you're trying

2    to do, because you're going to create an open force --

3    excuse me, open-source Neo4j graph database; is that

4    right?

5         A.  That's what it looks like -- that's what it

6    looks like it's saying, yes.

7         Q.  Okay.  And you're focused in on the Enterprise

8    Edition, which is under AGPLv3, right?

9         A.  Yes, that's the only one that's under that.

10         Q.  Right.  And your concern was that -- that Neo4j

11    was the copyright holder of that software; is that

12    right?

13         A.  I don't know if I had that concern; I believe I

14    just wanted to get more clarification so I could use

15    that, but I don't -- I don't remember the context of why

16    I responded.

17         Q.  Yeah.  That's --

18         A.  I think I was expecting him to say, "Oh, this

19    is absolutely right," and then I would have that beyond

20    all the other research that showed that I should do

21    that.  That would be the final piece, but I don't even

22    remember if he responded back to this or not.  You would

23    have it, if so.

24         Q.  You do recall though that you believed that

25    Neo4j was the copyright holder of the software, right?

190

1       I didn't mean to insert "concern" in there.

2   Sorry.

3       A.  Yeah.

4       Q.  And then you provide him a summary of the

5   modifications that Neo4j added.  Specifically, it sounds

6   like that you call out the Commons Clause license

7   condition; is that right?

8       A.  Yup.  That's what it says.

9       Q.  Okay.  And so you have some follow-up

10  questions.  And you have two specific follow-up

11  questions, and the first question is, "As the copyright

12  holder, is Neo4j, Inc. allowed to add the specific

13  additional terms mentioned above to the license.txt file

14  and enforce these new additions?"  And the second

15  question, you ask, "In our fork, are we allowed to

16  remove the additional terms and comments they have added

17  to the license.txt files that go beyond the standard

18  AGLv3 licence content," because, "Neo4j is telling us we

19  can't change those files."

20          One question:  Who at Neo4j told you you

21  couldn't change those files?

22      A.  I don't remember anybody saying we couldn't

23  change those.

24      Q.  If you --

25      A.  Go ahead.

191

1      Q.   If you look below the number 2 in the message

2   on the second page, it says, "Neo4j, Inc. is telling us

3   that we cannot change these license.txt files."

4      A.   I have no idea.  It might have been sometime in

5   the lawsuits.  I don't know.  At some point, somebody

6   said that, or I inferred it by the fact that you sent

7   new terms that said that we illegally removed them or

8   whatnot in one of the amended complaints.  But I don't

9   know exactly what I was talking about.

10      Q.   Okay.  So you don't remember anybody

11   specifically at Neo4j saying you can't do that?

12      A.   I mean, it's possible it was in the forum under

13   GitHub.  I don't know.  I don't remember.

14      Q.   Okay.  Did you talk to any lawyers at this time

15   in 2018 about this issue?

16      A.   I don't think so.  I don't remember, but I

17   don't think so.

18           MR. PICONE:  All right.  Tab 57, please.  And

19   this will be Exhibit 24.

20           (Exhibit 24 was marked for identification.)

21           THE WITNESS:  I see it.

22   BY MR. PICONE:

23      Q.   Okay.  What is that?

24      A.   This is an email from licensing-comment@fsf.org

25   to me.

                                                          192

Q.  Do you remember receiving this message?

A.  I do now from seeing it, yes.

Q.  So this is a couple months later that -- that Mr. Robertson responds to you, right?  This is in August of 2018?

A.  I don't remember what the original -- can you tell me what the original -- the first email -- or the email this is responding to?

Q.  I think the first response was -- your first question was in May 2019.  Mr. Robertson responded shortly thereafter in June.  Let me see.

A.  Oh, I see it.  The date -- I'm assuming that a month -- you know, he responded back at some point.

Q.  Yeah.

A.  I didn't remember if it was a month.

Yes?  So -- sorry.  So what was the question.

Q.  Sure.  So it looks like Mr. Robertson says to you, "I apologize for the delay in responding."

Do you see that -- that appears to be his text?  Do you agree with that?

A.  Yes, I do.

Q.  And he also wants to tell you that he can't provide you with legal advice, right?

A.  Yes, I see that.

Q.  He wants to provide useful information, but he

193

1   license specifically counteracts the Commons Clause.  So

2   it would still be the free AGPL license.  By adding it

3   in, it falls of as soon as you add it, because the terms

4   below it basically say get rid of it.  You know, get rid

5   of it.

6       Q.  So you interpret Mr. Robertson's sentence that

7   says, "If a work was previously available under a free

8   license and later that license is changed, users can

9   always use that earlier version under the terms of the

10  free license."

11          So you interpret that to mean that you are

12  entitled to remove any additions to the AGPL?

13      A.  No, because I'm not clear if, when he says "the

14  earlier version" is for the license or the software.  So

15  I don't think this -- this was very useful information

16  to me.

17      Q.  Okay.  And then he -- he says, "Also, as noted

18  before," and he re-quotes the section of the AGPL and

19  GPL about further restrictions.

20          Do you see that?

21      A.  Yes, I do.

22      Q.  And then he closes with saying, "I can't give

23  you legal advice on how that would work for your

24  particular situation, but I hope that this information

25  proves useful to you."

                                                        195

1        A.  Yes, I see that.

2        Q.  Okay.  So what did you -- what did you globally

3   interpret Mr. Robertson's message to you regarding your

4   specific questions that you had provided in your

5   subsequent question to him?

6        A.  Well, I believe that he's saying you can remove

7   the additional restriction terms, and that's why he kept

8   quoting it over and over again.  If you received it

9   containing notice saying it's governed by this license,

10  meaning AGPL, along with the term that says further

11  restriction, you remove that term.

12          I mean, that seems pretty clear to me.  Remove

13  the terms that's are restriction.  And this doesn't even

14  talk about the -- about the verbatim, which I don't -- I

15  guess we just lost track of that.

16       Q.  Right.  But so that's how you interpreted his

17  message to you, this entitled you or gave you the right

18  to take out the Commons Clause?

19       A.  It's not only his message; it just supported

20  the concept that I should remove it in order to be in

21  compliance with AGPL.

22       Q.  Did you take Mr. Robertson's advice and consult

23  a lawyer about this issue?

24       A.  No, I did not, I don't believe.  I've consulted

25  many people.  I don't know if they were lawyers.  More

                                                        196

1    of the community.

2         Q.  Yeah.  I'd like to follow-up on that.

3         So you said -- you said this -- this

4    correspondence, series of messages between you and

5    Mr. Robertson, was one of the pieces of information that

6    gave you the right to remove the Commons Clause from the

7    Neo4j license.

8         What other information did you rely on to make

9    that determination?

10        A.  I relied on the terms in the AGPL that

11   specifically say remove it and verbatim.

12        Q.  So your own analysis of the terms of the AGPL,

13   is that -- is that another piece in addition to this

14   correspondence with Mr. Robertson?

15        A.  I believe so.  Because no one -- I'm the one

16   that made the decision based on the license itself and

17   along with his emails, so...

18        Q.  Is there anything else, other than the emails

19   and your analysis of the AGPL?

20        A.  Well, obviously, research, and I would have

21   gone through cases, and there's not many.  I did look

22   at -- I did look at Elastic and analyzed kind of what

23   they did, and they specifically, I believe, changed to

24   Apache so they wouldn't run into this issue.  So there

25   was quite a bit of research I did before doing this.  It

197

1  wasn't just off the cuff.

2       Q.  So you said research, cases, and Elastic.

3  That's what I wrote down.

4       A.  Uh-huh.

5       Q.  So when you say "research," what are you

6  talking about?  Just generalized Internet research?

7       A.  Yes.  Researching any types of court cases I

8  could find.  Researching others that have tried this,

9  and unfortunately, the ones that did it successfully had

10 to switch licenses, and I believe that there was a

11 discussion about the terms actually being the reason.

12 You'll have to go look it up, but if you look up --

13 you'll know what to do.

14          But I believe there was actually a discussion

15 from one of the articles that talked about why it

16 doesn't work with AGPL and it kind of --

17      Q.  Did you say the --

18      A.  -- that was --

19      Q.  I'm sorry.  I didn't mean to interrupt.

20          Did you save any of this research?

21      A.  I don't know.  I need to go look, but I'm not

22 sure.

23      Q.  When you said you looked at Elastic, which is

24 that a reference to?

25      A.  Elastic is a company that has -- well, it had

198

 1    an open-source search database, and it adopted -- I

 2    think it adopted the Commons Clause.  I can't remember

 3    if it was Redis or Elastic.  I'm sorry.  It might have

 4    been Redis.  It's either Redis or Elastic.

 5         Q.  It's a company --

 6         A.  Yeah, it's a company.  It's one of those.  It

 7    might not have been Elastic.  It might have been Redis,

 8    but one of those companies I believe had a similar

 9    situation with the Commons, and they ended up having to

10    switch away from AGPL first in order to apply it.

11    That's my recollection.

12         Q.  Okay.  And you said you looked at cases; do you

13    remember any specific cases you looked at?

14         A.  I don't remember the specifics.  I just went in

15    and was searching for AGPL terms and seeing if there's

16    any cases or -- I don't know what you call it --

17    precedent that talked about AGPL.  I remember there was

18    quite a few, but nothing -- nothing specific, I don't

19    think, that talked about Commons.  I'm assuming we'll be

20    the first ones setting precedent on this, if that's the

21    right term.

22         Q.  So other than the correspondence with

23    Mr. Robertson, your own analysis of the AGPL, some

24    generalized research that you really can't remember the

25    boundaries of and you may not have saved, and reference

                                                          199

1    to a specific example of a company that's either Elastic

2    or Redis, is -- is that the body of information that you

3    relied on to make the decision that you could remove the

4    Commons Clause from the Neo4j software?

5        A.   No, that's the decision to put the default

6    verbatim AGPL inside the license.  I replaced it.  I

7    didn't change anything else on any source code files or

8    anything.

9        Q.   Right.  But you basically replaced the Neo4j

10   AGPL with Commons with just a copy of AGPL, having the

11   effect of removing the Commons Clause, right?

12       A.   Exactly.  And when I do a commit on a -- so you

13   can make changes, but they have to be accepted by the

14   repository owner, meaning the Graph Foundation.  So just

15   because you change something, it still needs to be

16   accepted and brought into it, so...

17       Q.   Right.  And so --

18       A.   I don't know if they've done any research is

19   what I mean.  I don't know if they did research before

20   accepting the commits on that.  You'd have to ask them.

21       Q.   Right.  And I'm asking just -- I'm just trying

22   to understand the body of information that you relied

23   upon to make your decision to replace the AGPL plus

24   Commons with just the AGPL having the effect of removing

25   the Commons Clause.

                                                          200

1              And right now I have a list of information:  I

2    have correspondence with Mr. Robertson, I have your own

3    analysis of the AGPL, the language of the license, I

4    have some generalized research and investigation into

5    cases, but you can't remember the names of the cases nor

6    the scope of the research, and you have a reference to

7    two specific examples you believe were Elastic or Redis.

8              Is there any other information --

9         A.  One of those.  One of those would be.  I don't

10   know if it's both of them.

11        Q.  Right.  It would be one of those.

12        A.  It would be one example.  Yup.

13        Q.  Is that the entire body of information that you

14   relied upon to make the decision to change the

15   licenses -- license.txt files?

16        A.  I would say -- I would say yes.  Yup.

17        Q.  Okay.

18             MR. PICONE:  Tab 52, please.

19             (Exhibit 25 was marked for identification.)

20   BY MR. PICONE:

21        Q.  Do you have that, Mr. Suhy?

22        A.  I'm looking at it right now.

23        Q.  Do you want to take a moment to look at it?

24   It's several pages.  It looks like some type of

25   open-forum discussion.

                                                         201

1    4:15 Pacific, please?

2            THE VIDEOGRAPHER:  The time is 4:03 p.m.; we're

3    off the record.

4            (Off the record from 4:03 p.m. to 4:22 p.m.)

5            THE VIDEOGRAPHER:  The time is 4:22 p.m.; we're

6    on the record.

7            MR. PICONE:  Tab 45, please.  And this is

8    Exhibit 26.

9            (Exhibit 26 was marked for identification.)

10           THE WITNESS:  I've got that open.

11   BY MR. PICONE:

12       Q.  And what is that document that's been marked

13   Exhibit 26?

14       A.  This is an email from Ben Nussbaum to me.

15       Q.  And what is the -- what is the message he's

16   sending you?  What is he trying to communicate?  That's

17   the better question.

18       A.  I need to see what that link is to get the

19   context.  Someone -- oh --

20       Q.  Let's see.

21       A.  -- I can click on that link.  Is that allowed?

22       Q.  I don't know if that will -- if that link's

23   alive.  Let me see.

24           Why don't we -- why don't you put up Tab 44,

25   and I'll represent to you that that is where the link

                                                        207

1    will take you.

2         A.   Okay.   And it was live, just so you know.

3         Q.   It was?

4         A.   Yes.

5         Q.   Did it take you to Tab 44?

6         A.   It didn't look the same, but it took me to it.

7    Like, it -- it loaded and it talked about the desktop,

8    and it looks like the content's the same.

9         Q.   Okay.   Yeah.

10        MR. PICONE:   And again, we can tab exhibit --

11   excuse me -- Tab 44 as Exhibit 27.

12        (Exhibit 27 was marked for identification.)

13   BY MR. PICONE:

14        Q.   And Exhibit 27, do you see someone named

15   Stephanie in November of 2018 is asking about the Neo4j

16   Desktop and whether that applies to ONgDB Server?

17        A.   Yes, I see that.

18        Q.   First of all, what is Neo4j Desktop?

19        A.   Neo4j Desktop is a -- it's a client-side

20   application that let's you quickly spin up and kind of

21   use -- let's beginners use Neo4j easily from their

22   desktop.   It's like -- I don't know, a utility tool.

23        Q.   Right.

24        A.   It has lots of plug-ins and whatnot.

25        Q.   So going back to Exhibit 26 there.   You said,

208

1    "I thought you would like this.  Someone having issues

2    using ONgDB with Neo4j Desktop."

3            Why did you think Mr. Nussbaum would be

4    interested in that?

5        A.  I don't remember the exact reason, but it would

6    be interesting that people are starting to adopt ONgDB.

7        Q.  Why was Stephanie trying to use Neo4j Desktop

8    with ONgDB?

9        A.  Oh, I have no idea.

10        Q.  And Ben Nussbaum writes back to you, says,

11   "That's unfortunate, but LOL."  Is that "laugh out

12   loud"?

13        A.  I believe so, yes.

14        Q.  "That they posted it to a Neo4j site."

15            Why was that funny?

16        A.  Well, it's interesting that there's -- most

17   people that would adopt ONgDB are well-versed and

18   already know Neo, but it's -- I wouldn't say "funny" is

19   the word.  It's interesting that normal people now are

20   trying to use -- not normal people -- people that aren't

21   technically inclined are starting to try to use tools

22   that it won't work with, like Neo4j Desktop with it.  I

23   don't know why it would be funny, but it's definitely

24   interesting.  That means there's a community of people

25   who, you know, who are starting to learn about this, and

                                                      209

1    Enterprise?

2        A.  For the Enterprise source code we had?  Yes,

3    and we used all those tests, as well.

4        Q.  So you didn't know about any changes after they

5    closed Enterprise to the clustering tests?

6        A.  No.

7            MR. PICONE:  Tab 48, please.

8            (Exhibit 30 was marked for identification.)

9    BY MR. PICONE:

10       Q.  Do you see that, Mr. Suhy?

11       A.  Yes, I do.

12           MR. PICONE:  And just for the record, this was

13   also marked as Exhibit 31 to the Graph Foundation

14   30(b)(6).

15   BY MR. PICONE:

16       Q.  And what is this message?

17       A.  This is an email from Ben Nussbaum to myself,

18   and Brad Nussbaum was copied.

19       Q.  And are you responding to a message from -- it

20   appears to be a gentleman or a person named Shahak,

21   S-H-A-H-A-K; N-A-G-I-E-L, Nagiel.

22       A.  Let me read through this.

23       Q.  That's at the bottom of the string, Mr. Suhy,

24   that I'm reading from.

25       A.  Yes.  It's a response from -- yes.

                                                        218

1    Q.  So you're responding to Mr. Nagiel -- I'm

2    assuming it's a man -- but Shahak Nagiel saying, "Check

3    out this issue," and you sent him a link to Graph

4    Foundation ONgDB issues link, right?

5    A.  I don't -- I'm going to have to read the entire

6    email thread, so give me a second.  Unless you want

7    to -- let's see.

8         Well, I see -- I see that I responded to an

9    issue.  So yes, I see that.

10   Q.  Yeah.  And -- and then you refer him to the

11   link, and then he says, "Thanks, John.  That helps, but

12   this basically means that all the Enterprise changes

13   moving forward (big fixes and new features alike) are

14   completely forked off from Neo4jer proper, right?  Any

15   concerns about the long-term

16   consistency/parity/maintainability?"

17   A.  Which page is that?  I'm just trying to scroll

18   down.

19   Q.  Sure.  So if you look at the numbers in

20   the -- in the --

21   A.  Like in the Bates stamp?

22   Q.  Yeah, the Bates stamp numbers.  It's .001 and

23   the top of 002.

24   A.  Okay.  Give me one second.  "If you're

25   using" -- "this basically means" -- yes, I see that.

219

 1        Q.  So you're saying that Graph Foundation will be

 2   managing Enterprise features moving forward.  So that

 3   means the Graph Foundation, while it's not going to have

 4   insight into the change, "big fixes and new features

 5   alike," since you're completely forked off from Neo4j --

 6   let me break that question into smaller questions.

 7             So you're telling Mr. Nagiel that the Graph

 8   Foundation will be managing Enterprise features moving

 9   forward; that means independently, right?  You're not

10   going to have any insight into what Neo4j's doing, since

11   it's closed now?

12        A.  Well, just because they're closed doesn't mean

13   we don't have insight.  As I said before, they do a lot

14   of the features, the infrastructure to support the new

15   Enterprise feature in Community.

16        Q.  Right.  But you didn't tell Mr. Nagiel that

17   right here in this message; you just said to him that

18   Graph Foundation will be managing Enterprise features,

19   and that if you have any concerns or don't see us

20   keeping up, just go back to Neo4j.

21             Right?  That's what you told him?

22        A.  Are you paraphrasing it --

23        Q.  Yeah.

24        A.  -- or is that just something I'm looking at?

25        Q.  No, I'm paraphrasing it.

                                                              220

1        A.   Okay.  Yes.

2        Q.   Right.  So that's what you were trying to tell

3   him, is that if you don't see us keeping up, just go to

4   Neo4j?  And I'm paraphrasing.

5        A.   Yes.

6        Q.   Okay.  And then he asks another question about

7   the Community portion of the code base being merged from

8   Neo4j, repo for every release, and you didn't respond to

9   him, did you; you instead forwarded the message to

10  Mr. Nussbaum?

11       A.   It looks like I did not, but I'm trying to find

12  that specific -- if you have a question -- he

13  responded -- I don't see myself responding to him.

14  Well, I see something down at the bottom.  I can't tell.

15  I can't tell in this thread if I responded to him or not

16  after that.  Let's see.

17            Yeah, I can't tell from this.  If you want to

18  guide me where to look --

19       Q.   Sure.  I'll help you out a little bit.

20            If you can bring up 48.1, and this will be --

21            THE VIDEOGRAPHER:  The videographer would like

22  to say that you did not identify the -- the Tab 48 as

23  Exhibit 30 yet.

24            MR. PICONE:  Oh.  So Tab 48 will be Exhibit 30.

25  Thank you, Mr. Sayler.  And 48.1 will be Exhibit 31.

                                                        221

```
 1              (Exhibit 31 was marked for identification.)
 2     BY MR. PICONE:
 3         Q.   Can you see Tab 48.1?
 4         A.   .0001?
 5         Q.   No, it's just Tab 48.1.  It should be up on --
 6     it should be up on your screen.
 7         A.   I'm looking at Tab 48, but I don't see the .01.
 8     I'm sorry.
 9              Are you talking about inside -- the -- I'm
10     looking inside Tab 48 for a page?
11         Q.   No, I'm talking about a separate tab.  It's
12     Tab 48.1.
13         A.   Oh, you sent another one in the -- I see.
14     Sorry.
15         Q.   Sorry about that.
16         A.   I've got that open now.
17         Q.   And this appears to be an email thread between
18     Mr. Nussbaum, Mr. Nagiel, you, and -- and Ms. Griffith?
19         A.   Yes.
20         Q.   And this appears to be a continuation of the
21     thread we just looked at in Exhibit 30; would you agree
22     to that?
23         A.   Let me go back to it and see if it does.  I
24     recognize the same names, so I think -- yes.  Shahak --
25     I believe it is, yeah.
```

222

1      Q.  And so then Mr. Nussbaum accepts your

2   invitation to continue the discussion, and he responds

3   to Shahak saying that they're going to move ONgDB in a

4   fully open-source manner.

5            So I wanted to ask you about what you

6   understood Mr. Nussbaum to mean when he said, "ONgDB 3.5

7   restores the Neo4j Enterprise source code that was

8   removed by Neo4j and continues development forward from

9   there."

10            How did that happen?

11      A.  That is the fork of ONgDB brought in the

12   commits for the 3.5 enterprise code, and made them part

13   of the commit history.  Moving forward, there wouldn't

14   be any more commits that would update or override it, so

15   it would be moving forward from that point.

16      Q.  So it would be a completely separate fork from

17   Neo4j Enterprise after version 3.5?

18      A.  Well, it would be a fork like any other fork,

19   except we would be -- we -- there's no pulling in

20   Enterprise, because they don't post commits anymore.

21   They didn't remove the Enterprise code, they just

22   stopped posting commits to it, meaning when we pull in

23   all the changes from Neo4j Core, there's no commits for

24   Enterprise for that or do stuff for the code.  It's what

25   that means, I believe.

223

1      Q.  And so when you say "commits," would that be a

2   synonym for updates, changes, modifications, fixes?

3   Could that be among the things that are in the commits?

4      A.  Yes, those are among the things that are in

5   commits.

6      Q.  So after 3.5, ONgDB would no longer include any

7   of the Neo4j 3.4 commits to the Enterprise code?

8      A.  Yes, they would not -- they would not have any

9   commits to the Enterprise code.

10     Q.  Okay.  Did NextCentury ever become a customer

11  and begin using ONgDB?  Do you know?

12     A.  I'm not sure.

13     Q.  Do you know what version of ONgDB currently is

14  in use at the IRS, if it is?

15     A.  I believe it would be 3.5.something.  Not the

16  newest, but it's not the oldest.  I don't know offhand

17  what version it is exactly, but it would be

18  3.5.something.  Between -- I think the current release

19  is at, like, 20?  So it would be in between there.

20     Q.  So 3.5.1 and 3.5.20, somewhere in between

21  there?

22     A.  Yes.  I believe they might be using older

23  versions, as well.  I don't know all the uses.

24         MR. PICONE:  Tab 135, please.  And this will be

25  Exhibit 32.

                                                        224

1    their name?

2         A.  Oh, I'm sure they did.  I just don't remember.

3         Q.  Okay.  Are you aware of the customer base

4    that -- that uses ONgDB, other than the IRS?

5         A.  I'm only aware that there's 10,000 or more

6    downloads, but not the whole customer base, or whatever

7    you would call it.  The user base.  I don't think

8    they're customers.  It's free, so it would be users.

9              MR. PICONE:  Tab 143, please.

10             (Exhibit 33 was marked for identification.)

11             THE WITNESS:  I've got that open.

12   BY MR. PICONE:

13        Q.  And what is that document?

14        A.  That looks like the iGov, Inc. profit and loss

15   report for 2018.

16        Q.  So this is the first full year for iGov in its

17   operation, right?

18        A.  Yes, I believe.  Yup.

19        Q.  Okay.  So where did the revenue come from, the

20   income, the $285,792.49?  There's no detail there.

21        A.  Consulting.

22        Q.  For -- for whom?

23        A.  I'd have to get the list, but it was mainly

24   around IRS.  And I believe some consulting for being

25   FSO, but I don't have the details.  I can get them.

227

DECLARATION OF DEPONENT

I, JOHN MARK SUHY, declare under penalty of perjury that
I have reviewed the foregoing transcript; that I have
made any corrections, additions, or deletions in my
testimony that I deemed necessary; and that the
foregoing is a true and correct transcription of my
testimony in this matter.


Dated this _____ day of _____, 20__,
at _____, _____.
        [City]                    [State]


        _____

        JOHN MARK SUHY


                    --o0o--

                                                        260

CERTIFICATE

I, BENJAMIN GERALD, Certified Shorthand Reporter,
Certificate No. 14203, for the State of California do
hereby certify:

That prior to being examined, the witness named in
the foregoing deposition was by me duly sworn to testify
to the truth, the whole truth, and nothing but the truth
in the within-entitled cause;

That said deposition was taken shorthand at the
time and place herein named;

That the deposition is a true record of the
witness's testimony as reported to the best of my
ability by me, and was thereafter transcribed to
typewriting by computer under my direction;

That request [X] was [ ] was not made to read and
correct said deposition.

I further certify that I am not interested in
the outcome of said action, nor am I connected with, nor
related to any of the parties in said action, nor to
their respective counsel.

Witness my hand this 29th day of October, 2020.


BENJAMIN GERALD

CSR No. 14203

261

**EXHIBIT 2**

UNITED STATES DISTRICT COURT
NORTHER DISTRICT OF CALIFORNIA


NEO4J, INC., a Delaware
corporation; and NEO4J
SWEDEN AB, a Swedish
corporation,                          CASE NO.
                                      5:18-cv-07182-EJD

            Plaintiffs,
vs.
PureThink, LLC, a Delaware
limited liability company;
IGOV, INC., a Virginia
corporation; and JOHN MARK
SUHY, an individual,
            Defendants.
_____/


 REMOTE VIDEOTAPED DEPOSITION OF JOHN MARK SUHY, JR.
   INDIVIDUALLY AND AS PERSON MOST KNOWLEDGEABLE
       PURSUANT TO FED. R. CIV. P. 30(b)(1)
          FOR IGOV INC. AND PURETHINK LLC


DATE:          November 29, 2022

TIME:          8:06 a.m. PST

LOCATION:      Via Zoom Videoconference

REPORTED       KAREN L. BUCHANAN
BY:            CSR No. 10772
               CLR No. 031106-04


1

1    AB.  Although he's not on the line right now, my

2    other counsel at Hopkins & Carley, John Picone, will

3    also be attending at some point today.

4          MR. BEENE:  Adron Beene, Jr., for

5    Defendants John Mark Suhy, PureThink LLC and iGov

6    Inc.  Mr. Suhy is in attendance today as the

7    deponent.

8          JOHN MARK SUHY, JR.,

9    being duly sworn by the Certified Shorthand Reporter

10   to tell the truth, the whole truth, and nothing but

11   the truth, testified as follows:

12          EXAMINATION BY MR. RATINOFF:

13   Q.  Good morning, Mr. Suhy.  How are you?

14   A.  Good morning.  I'm good.  How about you?

15   Q.  I'm well, thank you.  You have been deposed

16   in this case before, correct?

17   A.  Yes.

18   Q.  And do you remember at the beginning of the

19   depo we talked about some ground rules about how the

20   deposition is going to proceed?

21   A.  Yes.

22   Q.  Okay.  I just want to go through them real

23   quick, since you have been deposed before.

24          We're going to proceed in a

25   question-and-answer format.  It's important that you

8

```
 1    allow me to finish my question and then pause so if
 2    your counsel has any objections he can assert those,
 3    and then you can go ahead and answer unless you're
 4    instructed not to answer a particular question.  Do
 5    you understand this?
 6         A.  Yes.
 7         Q.  And then your testimony is going to be
 8    reported in booklet form.  You'll have a chance to
 9    review that testimony once the transcript is issued,
10    and you can make any corrections that you believe
11    need to be made.  Do you understand?
12         A.  Yes.
13         Q.  And if you do make corrections, I'll be
14    able to use those corrections and ask you about them
15    at trial if we use your deposition testimony at
16    trial.  Do you understand this?
17         A.  Yes, I do.
18         Q.  And we're going to go ahead and we're going
19    to be deposing you both in your personal capacity --
20    do you understand what that means?
21         A.  Not exactly.
22         Q.  Okay.  That means what you personally know,
23    your personal knowledge.  Do you understand what I
24    mean by that?
25         A.  Yes.
```

                                                            9

1    Q.  And you're also going to be testifying on

2    behalf of PureThink LLC as a corporate

3    representative, and you're going to be testifying as

4    a corporate representative of iGov Inc.  Do you

5    understand this as well?

6    A.  Yes.

7    Q.  And do you understand that your testimony

8    about those corporations, companies and corporation

9    will be not just about what you personally know but

10   what the company itself knows, meaning from its

11   documents and other employees?  Do you understand

12   this?

13   A.  Yes.

14   Q.  And is there any reason today you don't

15   believe you can testify to the best of your ability?

16   A.  No.  I should point out that I have

17   attention deficit, so if I start to lose focus or

18   I'm having issues, I'll let you know.

19   Q.  Please do.  If I don't hear from you, I'll

20   assume that you're able to understand my questions

21   and able to answer them to your best ability.  Is

22   that fair?

23   A.  Yes.

24   Q.  And if any time you need to take a break,

25   please let me know.  If there is a question pending,

10

1    work for you?

2          A.   Yes, whatever the Court Reporters, whatever

3    we have to do for lunch, I'll do it at the same

4    time.

5          Q.   Great.   Thanks.   And you understand you've

6    taken an oath today under the penalty of perjury?

7          A.   Yes.

8          Q.   And do you understand that's as if the same

9    as you were testifying in front of a judge or jury?

10         A.   Yes.

11         Q.   Okay.   Let's go ahead and proceed.

12              Could you please state your full name for

13   the record.

14         A.   John Mark Suhy, Jr.

15         Q.   And are you represented by counsel today?

16         A.   Yes, I am.

17         Q.   And who is your counsel?

18         A.   Adron Beene.

19              MR. RATINOFF:   I'm going to go ahead, and

20   this has been premarked.   We left off I believe at

21   Exhibit 191, so it will be marked as Exhibit 192.

22              (Plaintiffs' Exhibit 192 was marked for

23   identification.)

24              MR. RATINOFF:   And you'll see the exhibits

25   in the chat.   It may take you a minute to open it

                                                          12

1          MR. RATINOFF:  Let me go ahead and put this

2    next exhibit in the chat.  This will be marked as

3    Exhibit 195.

4          (Plaintiffs' Exhibit 195 was marked for

5    identification.)

6          MR. BEENE:  Objection.  It hasn't been

7    marked.

8          MR. RATINOFF:  Sorry?

9          MR. BEENE:  There is no marking on it as an

10   exhibit.

11         MR. RATINOFF:  Yeah.  I'm going to mark it.

12         MR. BEENE:  When?

13         MR. RATINOFF:  Now.  I'm marking for

14   identification the document that I just dropped in

15   the chat.  I've been doing this for like six depos

16   that you've been at.  I don't know why you're

17   mentioning that, but okay.

18   BY MR. RATINOFF:

19       Q.  Do you see the document that's been dropped

20   in the chat, Bates number at the top is 00012000?

21       A.  Yes, I have that open.

22       Q.  That's a Bates number that your counsel put

23   on this document and produced in this litigation.

24   Is that fair?

25       A.  If you say so.

                                                    48

1    Q.  Do you have any reason to believe this

2  wasn't produced by the litigation?

3    A.  It seems like it would have been responsive

4  for some -- one of the requests.

5    Q.  Do you understand what this document that's

6  been marked as Exhibit 195 is?

7    A.  I'm looking right now.  I believe this is a

8  requisition of Neo4j Enterprise.

9    Q.  This is a subscription, commercial

10  subscription that PureThink sold to the Maryland

11  Procurement Office under the Partner Agreement?

12    A.  Yes, it is.

13    Q.  That's your signature on the first page in

14  the lower left-hand corner?

15    A.  Yes, that's my signature.

16    Q.  And then you'll see on the next page, there

17  is an item No. 1, "Neo4j Enterprise plus software.

18  Instances Purchased:  3 Productions, 3 test, 3

19  Development.  License Term:  1 year."  Do you see

20  that?

21    A.  Yes, I do.

22    Q.  Is that reflective of the sale of a

23  commercial subscription of Neo4j Enterprise under

24  the Partner Agreement?

25    A.  I believe so, yes.

49

1    Q.   And then the price of that one-year

2    subscription was 229,000?

3    A.   Yes.

4    Q.   And under the Partner Agreement, PureThink

5    was entitled to 25-percent commission on that, that

6    sale?

7    A.   Yes.

8    Q.   And you didn't tell the Maryland

9    Procurement Office that Neo4j could be used under

10   the AGPL without a commercial subscription before

11   signing this, correct?

12   A.   Before signing this, no.

13   Q.   And did the Maryland Procurement Office

14   renew this subscription?

15   A.   No, they did not.

16   Q.   Do you know why they didn't?

17   A.   I'm not positive.

18   Q.   What do you mean, you're not positive?

19   A.   I'm not positive right now what the reason

20   was, but I believe part of it was -- I'm trying to

21   remember when we spoke with them.  Part of it was

22   that they could use the Community Edition.

23       Another part of it, I believe, was about

24   scalability, and how it scales could not meet their

25   needs.

50

1            But there was -- there was a discussion.

2    You can ask for a debrief.  I just don't remember

3    the details of what it was exactly right now.

4        Q.  And going back to Sandia, did they renew

5    their subscription to Neo4j after the three-year

6    Discovery bundle expired?

7        A.  No, they did not.

8        Q.  Do you know why they didn't?

9        A.  I don't recall offhand.  I don't recall

10   that.

11       Q.  I believe the FBI was another entity that

12   you mentioned that PureThink sold a commercial

13   subscription of Neo4j under the Partner Agreement.

14       A.  Yes.

15           MR. RATINOFF:  I'm going to go ahead and

16   mark this exhibit that I've dropped in the chat.  I

17   believe this should be 196.

18           (Plaintiffs' Exhibit 196 was marked for

19   identification.)

20           MR. BEENE:  Objection.  This exhibit was

21   not marked.

22           THE WITNESS:  Okay.  It's open.

23   BY MR. RATINOFF:

24       Q.  This document is entitled Order for

25   Supplies or Services.  It's Bates number is 12503 at

                                                        51

1    the top.  Do you see that?

2         A.  Yes, I do.

3         Q.  This is produced by PureThink in this

4    litigation.  Do you have any reason to believe that

5    it wasn't?

6         A.  No.

7         Q.  And do you have an understanding of what

8    this document is?

9         A.  I'm looking over it.  It's an Order For

10   Supplies or Services, so for a Neo4j Commercial --

11   like their contract subscription.

12        Q.  And is this the commercial subscription

13   that you were earlier referring to that was sold to

14   the FBI under the Partner Agreement?

15        A.  Yes.

16             MR. RATINOFF:  I'd just like to remark this

17   exhibit as Exhibit 196, if Counsel doesn't have any

18   objections.

19             MR. BEENE:  I'd like to see a exhibit

20   stamp.

21             MR. RATINOFF:  The exhibit stamp gets put

22   on after the deposition.  Come on.  Really?

23             MR. BEENE:  Generally, it happens during

24   the deposition.

25             MR. RATINOFF:  No.  That's not how it works

                                                    52

1    in video depos.  We've been doing this for months.

2    Come on.

3    BY MR. RATINOFF:

4        Q.   Looking down at it, it says details --

5    actually strike that.

6             Under item No. 1, it says "Neo Graph

7    database software."  Do you see that?

8        A.   Yes.

9        Q.   And was that Neo4j Enterprise commercial

10   subscription that was sold to the FBI, is that

11   reflected there?

12       A.   Yes, the Government Edition, but yes, it

13   was a commercial subscription through the Partner

14   Agreement.

15       Q.   And the Enterprise meaning a one-year

16   subscription was for 222,000?

17            (Reporter interruption.)

18            THE WITNESS:  Yes, I see that.

19   BY MR. RATINOFF:

20       Q.   And that's the amount for a one-year

21   commercial subscription to either the Government

22   Edition or Neo4j Enterprise Edition that was sold to

23   the FBI, correct?

24       A.   Yes.  It seems discounted.  I believe it

25   was higher.  But yes, that's for --

53

1      Q.  And so since this is under the Partner

2  Agreement, PureThink would have been entitled to a

3  25-percent commission, correct?

4      A.  Correct.

5      Q.  I assume that PureThink was paid that

6  commission; is that correct?

7      A.  Yes.

8      Q.  And it was also paid the commission under

9  the MPO order form, as well?

10     A.  The NPO (sic)?  I'm not sure what that is.

11     Q.  Maryland Procurement Office.

12     A.  Yes.

13     Q.  Does the Maryland Procurement Office, is

14  that another name for the National Security Agency?

15     A.  I don't know if that office is another name

16  for it or if it's an office that helps.  I'm not

17  sure how they're related.

18     Q.  Do you have an understanding that the

19  Maryland Procurement Office is affiliated with the

20  National Security Agency?

21     A.  I believe so, yes.

22     Q.  Is it okay if we just refer to the Maryland

23  Procurement Office as MPO?  Is that fair?

24     A.  Yes.

25     Q.  So, so far, we've got the MPO, the FBI, and

                                                        54

1    Q.  Do you recall when that happened?

2    A.  I believe -- I'm not positive of the

3    months.

4    Q.  Did that happen while the Partner Agreement

5    was in effect?

6    A.  We were working on it when it was in

7    effect.  But I don't know when -- what the date was

8    that that the situation with Jason Zagalsky

9    occurred.

10   MR. RATINOFF:  I'd like to go ahead and

11   drop the next document in the chat, which will be

12   marked as Exhibit, I believe, 197.

13   (Plaintiffs' Exhibit 197 was marked for

14   identification.)

15   THE WITNESS:  But there is no exhibit, so

16   is this tab 501?

17   MR. RATINOFF:  Sure.  That's right.

18   THE WITNESS:  It's open.

19   BY MR. RATINOFF:

20   Q.  Okay.  And what's been identified as

21   Exhibit 197 or will be identified as Exhibit 197 is

22   a Profit and Loss Statement, January through

23   December 2014, for PureThink LLC.  And you'll see

24   there is an iGov Bates number at the bottom.  Do you

25   see that?

56

1      A.  Yes, I do.

2      Q.  Do you recognize what will be marked as

3  Exhibit 197?

4      A.  It looks like a Profit and Loss report for

5  PureThink.

6      Q.  Any reason --

7      A.  2014.

8      Q.  Any reason to believe this isn't a correct

9  copy of Purethink's Profit and Loss Statement for

10  2014?

11     A.  I don't believe so.  It looks -- it looks

12  like something I would have created.

13     Q.  Okay.  So you created this document?

14     A.  I believe so.

15     Q.  It wasn't created by an accountant for

16  PureThink?

17     A.  I don't know if it was.  It would have been

18  created by the software that was used for

19  accounting, and I did a lot of the accounting.

20     Q.  For PureThink?

21     A.  I'm not sure -- I'm not sure who created

22  this.  I looks like something I would have.  It

23  looks like a standard report generated by accounting

24  software.

25     Q.  And says under "Ordinary Income/Expense,

57

1     Sale - Software, 229,000."  Do you see that?

2          A.  Yes.

3          Q.  Do you understand for 2014 what that number

4     is referring to as far as income?

5          A.  It would have been -- since PureThink was

6     only focused -- once we partnered with Neo4j, it

7     would have been Neo4j Commercial license revenue

8     or -- I'm assuming that's what it was.

9          Q.  And then aside from that, there is a

10    consulting income.  What's a consulting income for?

11         A.  I don't remember offhand.

12         Q.  But that would be separate from the

13    software license sale?

14         A.  It looks to be, yes.

15         Q.  And then you look at under Expenses, there

16    is a software reseller license cost for 171,750.  Do

17    you see that?

18         A.  Yes, I do.

19         Q.  And what is that expense in reference to?

20         A.  I'm assuming that that's the money that

21    goes to Neo4j as -- under the Partner Agreement.

22    25 percent of the total stays with us.

23         Q.  Okay.  So the licensee would be -- would

24    pay PureThink the full amount for the commercial

25    license, and then PureThink would remit 75 percent

58

1  of that to Neo4j under the Partner Agreement?  Is

2  that fair?

3       A.  Yes.  In this scenario, yes.

4       MR. RATINOFF:  Now, we were looking at the

5  MPO order form.  24 -- I'm sorry.  Strike that.

6  Okay.  And then let me move on to Exhibit -- what

7  will be marked as Exhibit 198.

8       (Plaintiffs' Exhibit 198 was marked for

9  identification.)

10      MR. RATINOFF:  I'll put this in the chat

11  for you.

12      MR. BEENE:  Okay.  It's open.

13 BY MR. RATINOFF:

14      Q.  Yes.  This is another document.  It's Bates

15 numbered iGov, got an iGov Bates number.  It's

16 entitled "PureThink LLC Profit and Loss, January

17 through December 2015."  Do you recognize this

18 document?

19      A.  Yes.

20      Q.  What is it?

21      A.  It's a Profit and Loss report for 2015 for

22 PureThink.

23      Q.  Okay.  And then looking at the -- under

24 Income, it says "Sales - Software, $320,987.50."  Do

25 you see that?

59

```
 1          A.   Yes.
 2          Q.   And that income would be for commercial
 3    software licenses for Neo4j Enterprise or Government
 4    Edition that PureThink sold under the Partner
 5    Agreement?
 6          A.   I believe so.   That was the only thing we
 7    were focusing on.
 8          Q.   And looking under the expense, it says
 9    "Software reseller license cost."   Do you see that
10    it's for $242,715.52?
11          A.   Yes, I see that.
12          Q.   And that would be for the 75 percent that
13    would be owed to Neo4j under the Partner Agreement?
14          A.   I assume that's what that's for.
15          Q.   No reason to believe it isn't?
16          A.   Not off the top of my head, no.
17          Q.   And I believe the FBI and Sandia contracts
18    were for -- from the year 2015, so the sales would
19    be for those licenses?
20          A.   That sounds right.
21          Q.   Any reason to believe it isn't?
22          A.   I would have to go in and look at my
23    documents to verify it, but it sounds -- sounds like
24    that's the reason for these numbers.
25          Q.   PureThink wasn't doing anything else at the
```

60

1    time, though?

2         A.   Nothing major, no.

3         Q.   It wasn't selling any -- it wasn't selling

4    any other software other than the Neo4j Government

5    Edition?

6         A.   I don't believe so.  I think we were just

7    focused on the Government Edition at this time

8    period, yeah.

9              MR. RATINOFF:   Okay.  We can go ahead and

10   mark the next exhibit.  It's -- it will be marked as

11   Exhibit 199.

12             (Plaintiffs' Exhibit 199 was marked for

13   identification.)

14   BY MR. RATINOFF:

15        Q.   It should be tab 503 in the chat.

16        A.   Okay.  It's open.

17        Q.   Okay.  What we've marked as Exhibit 199 is

18   a document entitled "PureThink LLC Profit and Loss,

19   January through December 2016."

20        A.   Yes, I see that.

21        Q.   And it's got a Bates number at the bottom,

22   IGOV 1569057.001 on the first page?

23        A.   Yes, I see that.

24        Q.   And do you recognize this document?

25        A.   Yes.  It looks like the same as the other

61

 1  documents but for 2016.

 2      Q.  So Purethink's Profit and Loss Statement

 3  for that year, 2016?

 4      A.  Yes.  I'm just looking at it to see.  It

 5  looks like it's marked for -- "Sales - Software" is

 6  probably the wrong category for it.

 7      Q.  Category for what?

 8      A.  Category for whatever that is.  This would

 9  have been -- I'm looking at the expense.  Since

10  there was no expenses, this might have been for IRS,

11  which was the consulting project.  I'm not positive,

12  but it looks -- if it was, it definitely is

13  miscategorized.

14      Q.  So PureThink didn't sell software in 2016?

15      A.  I have to go look and see, because I know

16  that when we started IRS, that was a consulting

17  project.  So I don't -- I think that was in 2016.

18  I'm not sure, but that's what it looks like this

19  might be representing.

20      Q.  This document was prepared by PureThink,

21  correct?

22      A.  Yeah.  I believe I would have done this,

23  yeah.

24      Q.  And as you note, there is no software

25  license fee that was under Expenses that we saw in

62

1    the prior Profit and Loss Statements, correct?

2         A.   Yes.   That's why I think this is for IRS,

3    which wasn't a software license sale.   That's why I

4    believe that that's what this represents.

5         Q.   But there is only a mark for -- I'm sorry,

6    the only income here is showing sales for software

7    and not consulting, correct?

8              MR. BEENE:   Objection to form.

9    BY MR. RATINOFF:

10        Q.   You can answer the question.

11        A.   Well, now, this is -- this definitely is

12   for consulting.

13        Q.   But it's listed as sales and software in

14   this document, correct?

15        A.   It says "Sales - Software"; that's correct.

16        Q.   Now, I'd like to show you the 2017

17   Profit and Loss Statement, but one wasn't produced.

18   Did PureThink prepare a Profit and Loss Statement

19   for 2017?

20        A.   We should have, because that's what I used

21   for taxes, so . . . .

22        Q.   So PureThink was still in business in 2017?

23        A.   Yes.   PureThink is still in business now.

24        Q.   So it should -- it filed its tax return in

25   2017?

                                                          63

1   previously talked about that PureThink entered into

2   contracts with under the Partner Agreement, correct?

3        A.  No, that's not correct.

4        Q.  No?  Why is that not correct?

5        A.  IRS was entered into a new agreement for

6   consulting.

7        Q.  But you entered into a contract with the

8   IRS?

9        A.  Yes.

10        Q.  Let me get that and make sure we're on the

11   same page here.  Just give me a second.

12        Okay.  Let me go ahead and put in this next

13   exhibit that was previously marked as Exhibit 159.

14   That should make your counsel happy.

15        A.  Yes.  It's open.

16        Q.  Okay.  Do you recognize what was -- what is

17   marked as Exhibit 159?

18        A.  Yes, I do.

19        Q.  What is it?

20        A.  It's an Order For Supplies or Services.

21        Q.  Is this the contract that you were

22   referring to that PureThink entered into with the

23   IRS?

24        A.  Yes.

25        Q.  You're saying it was for consulting

74

1    services and not for software?

2         A.   It is for consulting services, yep.

3         Q.   And it says "Implementation" under item

4    No. 1, "Implementation of the Government Edition

5    Neo4j project"?

6         A.   Yes.

7         Q.   And so under this contract, PureThink

8    provided Neo4j -- I'm sorry, provided the IRS with

9    Neo4j Government Edition under the AGPL?

10        A.   Yes.  Since they wouldn't have had a

11   commercial, this would have fallen under the AGPL.

12        Q.   And this is -- this document, Order For

13   Supplies or Services, is dated September 23rd, 2016,

14   correct?

15        A.   Yes, that's correct.

16        Q.   And at that time, the Partner Agreement was

17   in effect between Neo4j and PureThink, correct?

18        A.   Yes, it was.

19        Q.   And did you get approval from Neo4j before

20   entering into this Order For Supplies and Services?

21        A.   Yes.

22        Q.   Who gave that approval?

23        A.   I believe Lars Nordwall, John Broad.

24        Q.   Sorry, did you say John or Sean?

25        A.   John Broad.  And I believe they went and

75

1    Q.  And you were at the IRS deposition of Mike

2    Dunn, correct?

3    A.  Yes, I was.

4    Q.  And you heard him testify that the reason

5    why they canceled this award was because it was

6    improperly designated as sole source; isn't that

7    correct?

8    A.  I don't remember hearing that.  And it

9    definitely could have been sole sourced because of

10   all the facts around it, so -- I'm also aware Mike

11   Dunn is not a procurement person.

12        MR. RATINOFF:  Okay.  Let's go ahead and

13   mark this next document.  It will be tab 491, and it

14   will get marked as Exhibit 209.

15            (Plaintiffs' Exhibit 209 was marked for

16   identification.)

17            THE WITNESS:  It's downloading slowly.

18   BY MR. RATINOFF:

19      Q.  Yeah.  It's a large document.

20      A.  Yes, it's open.

21      Q.  Okay.  Do you recognize what will be marked

22   as Exhibit 209?

23      A.  Yes.

24      Q.  And what is it?

25      A.  Looks like a pre-award protest.

143

 1        Q.   And is this the protest that you were just

 2   referring to?

 3        A.   Yes, I was.

 4        Q.   Do you see it says, "By this protest

 5   (defined below)," first page, 3 out or 13, first

 6   page of the protest, it says, "By this protest

 7   (defined below) Neo also objects to the Agency's

 8   sole source justification and the Agency's intended

 9   award."  Do you see that?

10        A.   On page 3?

11        Q.   It's page 1 of the actual protest.  It

12   would be page 3 of the document that's been marked

13   as Exhibit 209.

14        A.   Yes.

15        Q.   And in your experience in government

16   contracting, are interested parties permitted to

17   protest awards?

18        A.   Yes.

19        Q.   And that's provided by regulation or

20   statute, to your knowledge?

21        A.   I believe it's in the FAR, Federal

22   Acquisition Regulations.

23             (Reporter interruption.)

24             THE WITNESS:  I believe that's defined in

25   the FAR, the Federal Acquisition Regulations.  I

                                                      144

1    believe that's a FAR.

2    BY MR. RATINOFF:

3        Q.  And by FAR, you're talking about a

4    government regulation; is that correct?  Federal --

5        A.  Procurement rules, laws.

6        Q.  And you also see here, it says, ". . . this

7    pre-award protest challenging the intended award by

8    the Department of Treasury . . . ."  Do you see

9    that?

10       A.  Yes, I do.

11       Q.  So that means that IRS was intending to

12   award but had not officially awarded it yet to iGov;

13   is that correct?

14       A.  They were going to make the award, and

15   there was a time set aside for protest.  So it

16   was -- it was going to be made.

17       Q.  Okay.  So this was -- this protest, to your

18   knowledge, was filed within that protest period?

19       A.  I'm not sure.

20       Q.  In your experience, it wouldn't be

21   considered if it wasn't filed within that period,

22   right?

23       A.  This is an agency-level protest.  There's

24   different types of protests.

25       Q.  But I'm talking about in your experience,

145

1  agency-level protests.

2       A.  I don't have much experience with

3  agency-level protests.

4       Q.  Have you ever done an agency-level protest

5  before?

6       A.  I'm not sure if the protests I've done

7  before were agency but -- I believe they were

8  agency.  But I'm not sure what the rules are.  I

9  believe each agency has different rules.  And you

10  were asking if this was done in the time period.  I

11  don't know, is the answer.

12      Q.  And you attained this -- a copy of this

13  protest by FOIA request?

14      A.  I believe so.

15          (Reporter interruption.)

16          MR. RATINOFF:  A FOIA, Capital F-O-I-A.

17  It's an acronym.

18          THE WITNESS:  I believe so.  Freedom of

19  Information -- Freedom of Information something.

20  BY MR. RATINOFF:

21      Q.  Act.

22      A.  Act.

23      Q.  Is that correct?

24      A.  Sounds right.

25      Q.  And then have you ever protested -- filed a

                                                    146

1    an agency-level protest with the IRS?

2         A.   IRS?  I don't remember.  I'm not sure.

3              MR. RATINOFF:  Let me go ahead and mark the

4    next exhibit.  This will be tab 492 in the chat.

5    Exhibit 210, it will be marked as.

6              (Plaintiffs' Exhibit 210 was marked for

7    identification.)

8              THE WITNESS:  And it looks like we have.

9    BY MR. RATINOFF:

10        Q.   Do you recognize this document that's

11   been -- or will be marked as Exhibit 210?

12        A.   I'm just looking at what this is for.  Yes,

13   I recognize this.

14        Q.   What is it?

15        A.   It's a protest for AlphaSix Corporation.

16   It's selling Neo4j software, and this is a protest

17   stating that there is other alternatives, I believe.

18   But it's a protest to that award.

19        Q.   And looking at the very bottom of this

20   document, the Bates number IGOV00002851648.012, is

21   that your signature?

22        A.   Yes, it is.

23        Q.   And that -- it says FAR 33.103(d)(4).  Do

24   you see that?

25        A.   Yes.

147

1    Q.  Is that the same provision that Neo4j filed
2  its protest?
3    A.  I have no idea.  I'm not a lawyer.
4    Q.  But you prepared this document and cited it
5  to that statute, correct?
6    A.  Yes.  But I don't remember what that
7  statute was.  I don't remember that.  I would have
8  done due diligence and made sure it was correct, but
9  as for what that means, I have no idea what that
10 statute is.
11   Q.  Okay.  Why don't you go ahead and look back
12 at the last exhibit we were just looking at.
13   A.  Which tab would that be?
14   Q.  Tab 491.
15   A.  Okay.  I'm there.
16   Q.  And if you look on page 2 of the protest.
17   A.  Page 2, the actual page 2?
18   Q.  Yeah.
19   A.  Okay.
20   Q.  And it says, "Neo requests an independent
21 review of this potest at a level above the
22 Contracting Officer, pursuant to FAR 33.103(d)(4)."
23 Do you see that?
24   A.  Yes.
25   Q.  Same statute or rule that you've cited in

148

 1    your protest, right?

 2         A.   Seems to be, yeah.

 3         Q.   So you filed a protest under the same

 4    provision as Neo4j?

 5         A.   I don't know what that means.

 6         Q.   Well, it's the same statute, right?

 7         A.   Yeah, but I'm not a lawyer.  The way you

 8    stated it, I don't know if that's what we did or

 9    not.

10         Q.   You signed the document, right, what's been

11    marked as Exhibit 210, tab 492?

12         A.   Yes.

13         Q.   So everything in this e-mail that you said

14    you would have done -- I'm sorry, in this protest,

15    you would have done due diligence before signing,

16    correct?

17         A.   Yes, I would have.

18         Q.   And what was the result of this protest?

19         A.   The result was they did not award -- oh, is

20    this our 491?  So is that the protest from Neo4j or

21    for iGov?

22         Q.   No.  I'm talking about your protest, the

23    one that you filed that's dated July 8th, 2020.

24         A.   Oh, I'm not sure.  I don't remember.

25         Q.   You don't know if the contract was canceled

                                                        149

```
 1              THE VIDEOGRAPHER:  Off the record?
 2              MR. RATINOFF:  Sure.  Let's go off the
 3      record.
 4              THE VIDEOGRAPHER:  We are now off the
 5      record at 12:29.
 6              (Break taken from 12:29 to 12:31 p.m.)
 7              THE VIDEOGRAPHER:  We are now on the record
 8      at 12:31.
 9      BY MR. RATINOFF:
10         Q.  Okay.  I'm going to turn back to
11      Exhibit 202, which was marked as -- originally as
12      tab 485.  It's the amended interrogatory responses.
13      And if you could turn your attention to page 11.
14         A.  One moment.  I'm at page 11.
15         Q.  Okay.  And you'll see interrogatory No. 2,
16      it says:
17              "Identify all facts and documents
18              supporting your contention in
19              Paragraph 15 of your Counterclaim that
20              PureThink" -- sorry, "PureThink spent
21              an equivalent of 650,000 to design,
22              develop, and build a new Neo4j
23              Government Package software based on
24              Mr. Nordwall's representations that
25              PureThink would have continuing
```

170

1          exclusivity with the government sales

2          and support contracts."

3          Do you see that?

4     A.   Yes, I do.

5     Q.   And you understand that's referring to the

6  exclusivity agreement we just talked about in the

7  counterclaims?

8     A.   Yes.

9     Q.   And you'll see -- I'm sorry, in response

10  2.2, it says, "PureThink spent an equivalent of

11  $650,000 to" -- sorry, "spent an equivalent of

12  $650,000."  What do you mean by "equivalent"?

13     A.   So we didn't spend money.  We dedicated

14  full time to building out this framework that would

15  surround Neo4j Enterprise and make it into what was

16  called the Neo4j for Government Edition.  So it was

17  a suite of software, addressed FISMA, modules,

18  documentation, business plan.  It was our full

19  focus.

20          And I needed to make sure that before we

21  focused 100 percent, dropped everything else and

22  focused on this that we were on the same line, that

23  we understood each other, that hey, we're building

24  this Government Edition, it's going to take off,

25  because it allows us to do sole sourcing.  And that

171

1    is my main focus, and that's -- all my time is being

2    invested into that.

3        Q.   And also, according to this interrogatory

4    response:

5             "Development of the Neo4j Government

6             Edition software business development

7             and marketing activities continued up

8             until about June 2017."

9        A.   Okay.

10       Q.   So you're saying that the $650,000 included

11   work from May of 2015 to June of 2017.  Is that the

12   time period for that amount?

13       A.   That sounds right.

14       Q.   And the work that you're saying that that

15   $650,000 is based on is for the development of the

16   Neo4j Government Edition software, business

17   development and marketing activities, correct?

18       A.   Yes.  It's -- we could have been doing

19   consulting and made that money, but instead it was

20   focused on this.  So it was an investment on my side

21   and the company's side, PureThink.

22       Q.   Weren't you required to market and develop

23   business under the Partner Agreement?

24       A.   Not -- not like this.  This is -- this is a

25   new agreement, and it was for us to run -- it's for

172

1    issue that it wasn't going to work with the

2    government because of the FAR rules and that we had

3    to come up with a different approach to get Neo4j

4    into the government.  And that's where this

5    agreement came.

6           And that's why it took so much dedication

7    to it.  No other teams or companies would go and

8    dedicate this much effort into something that was

9    not guaranteed to bring revenue.  I mean this is an

10   investment, and I don't think the Partner Agreement

11   says you have to drop all your business and only

12   focus on this, and we did for this, and we did it

13   because of the exclusivity agreement.

14   BY MR. RATINOFF:

15       Q.  Looking at the financial statements that we

16   did for PureThink in 2014, you testified, I believe,

17   that revenue generated in 2014 was based on only

18   sales of Neo4j Enterprise Edition, correct?

19       A.  Yes, in which we only got the

20   revenue 25,000 -- we made 25,000 or 25 percent of

21   whatever that total sale was, which was not a lot.

22       Q.  But between 2014 and 2015, April, PureThink

23   was solely focused on developing business under the

24   Partner Agreement, correct?

25       A.  I believe so.  Yes.  That was our -- that

174

1    was our focus.

2          Q.   And in looking at the next page in the

3    interrogatory responses, 2.3, it says:

4               "The hourly rate Neo4j charged for

5               resources that were at or below the

6               expertise level of John Mark Suhy was

7               $300 an hour for a subject matter

8               expert."

9          A.   Yes.

10         Q.   "These rates are used to justify many of

11   the costs."

12         A.   Yes.

13         Q.   Did you take $300 and multiply that by a

14   certain number of hours to come up with $650,000?

15   In other words, if I divide $650,000 by 300 and got

16   approximately 2166 hours, that's what you're saying

17   is the time you spent on Neo4j Government Edition?

18         A.   I believe that's part of it.  Remember that

19   when we're doing business development and marketing

20   and whatnot, that time is not something that's

21   covered under those hourly rates.  The $300 an hour

22   rate is something that Neo4j charges and what we

23   could have done consulting for instead of doing

24   this.

25         Q.   Do you understand that Neo4j charged $300

175

1    an hour to its customers, but that's not what its

2    actual employees who do the consulting make?

3         A.   Well, I don't know any of that.

4         Q.   Isn't it normal in business that if a

5    company charges consulting rates, it's not paying

6    its employee the same amount that it's charging the

7    client?

8              MR. BEENE:   Objection to form.

9              THE WITNESS:   I'm one person, and this is

10   PureThink.   So everything would come back to me

11   anyway in some way or another.

12   BY MR. RATINOFF:

13        Q.   But you don't charge your clients $300 an

14   hour for consulting, do you?

15        A.   It depends on what we're doing, and it

16   depends on if they can afford us.   Sometimes we will

17   give them much less rates just because we feel that

18   it's worthwhile being involved with them so we can,

19   you know, identify their opportunities.   So there is

20   always a balance.

21        Q.   But you don't know whether Neo4j charges

22   its clients $300 an hour and then in turn pays its

23   employees $300 for work per hour, correct?

24        A.   I have no idea about how Neo4j operates.

25        Q.   So then are you saying that you have a way

                                                        176

1   of tracking the 2166 hours plus that you spent

2   between May of 2015 and 2017?

3       A.  Yeah.  I basically was working full time

4   and more than eight hours a day just to get

5   everything done.  And that's how we came up with the

6   dates, the times, the amounts, everything.

7       Q.  Do you have time sheets to evidence that

8   time spent?

9       A.  Hmm -- not time sheets, but I'm sure that

10  you get repos and commits, and all the documents and

11  whatnot would kind of show that.  Writing a 15-page

12  marketing document on how we're going to approach

13  government and whatnot takes days to do.

14      Q.  But you didn't actually keep any official

15  records to track that time, did you?

16      A.  I don't believe we would have needed to,

17  because it was full time, fully dedicated.

18      Q.  Do you have --

19      A.  We're not charging -- you know, usually you

20  track -- you track hours when you're charging

21  someone and billing the rates.  This was an

22  investment on our end, so there would have been no

23  need to do that.  So our goal was to be 100-percent

24  focused on this.

25      Q.  So the $650,000 is essentially just an

177

1    A.  Yes.  I see it.

2    Q.  And so you're using Neo4j's $300 an hour to

3  calculate the $650,000; is that correct?

4    A.  I believe some of it, yes.

5    Q.  Okay.  So the 650,000 isn't necessarily all

6  at $300 an hour.  It could vary based on whether it

7  be technical work versus marketing and business

8  development.  Is that fair?

9    A.  It could be different amounts, but we had

10  to drop everything.  And, you know, we could have

11  only focused on being subject matter experts, but

12  instead we had to go and focus on building the

13  marketing plans, doing everything.  And so it's --

14  $300 an hour is what we -- what we missed out on

15  because we focused on this.

16    Q.  Did you ever tell Neo4j that your hourly

17  rate for this type of work would be $300 an hour?

18    A.  I have no idea.  I don't remember those

19  discussions.  Because we would have been going

20  directly to clients, not having them pay us.

21    MR. RATINOFF:  We'll have marked the next

22  exhibit.  Have it marked as Exhibit 212.

23    (Plaintiffs' Exhibit 212 was marked for

24  identification.)

25  BY MR. RATINOFF:

181

1    related to their GSA for staffing.

2           You know, the goal is to get business out

3    of this, and that's why sometimes you do stuff for

4    free.  And I do a lot of stuff for zero dollars.

5    You know, if it leads to us making money, then

6    that's the whole purpose of the investment is we

7    aren't doing it for the current -- the now.  We're

8    doing it for the future.

9        Q.  All right.  I want to go ahead and move on

10   to -- we talked about the protest and then the

11   cancellation of the -- or the pre-award protest.

12   And you believe that the -- sorry.  Let me start

13   over.

14          So it's PureThink's contention that it lost

15   out on continuing with the Government Edition?

16       A.  Well, it did, because they, Neo4j, canceled

17   the Government Edition and told our clients that

18   they couldn't work with us.

19       Q.  Did you give back all the work that you did

20   to Neo4j, all the working documents and the business

21   development and all the work that you did?  Did you

22   just say here you go, it's yours?

23       A.  I don't believe so.  I don't think that

24   would be theirs.

25       Q.  So you kept all that work?

                                                    186

1    the different modules that we had created.  I have

2    no idea if they took our work and integrated it.

3            Because I do remember that -- what is his

4    name, the lead, the head of the software

5    development, I'm forgetting right now, for Neo4j

6    said that there is a lot of the features they wanted

7    to integrate into Neo4j Enterprise that we had done

8    with this.  I don't know if they took our work or if

9    they just created it from the beginning.

10            MR. RATINOFF:  And then on this next

11   exhibit, it's going to be marked for identification

12   as Exhibit 214, tab 504, will be in your chat.

13            (Plaintiffs' Exhibit 214 was marked for

14   identification.)

15            THE WITNESS:  I'm looking at this.

16   BY MR. RATINOFF:

17       Q.  And this is an e-mail.  The last e-mail in

18   exchange is dated October 4th, 2017.  It's from

19   Michael Dunn to John Mark Suhy at egovsol.com.  And

20   the Bates on the first page is -- ends with

21   3249.001.  Do you see that?

22       A.  Yes, I do.

23       Q.  Is this an e-mail exchange you had with

24   Mr. Dunn?

25       A.  Yes, it looks to be.

188

1    Q.  And why did you send this e-mail to

2  Mr. Dunn?  At the beginning here, it says, "Hello

3  Michael.  Here is some information for market

4  research regarding eGovernment Solutions, Inc."

5    A.  It sounds like I was giving him information

6  for market research.

7    Q.  Why were you giving him market research

8  information about eGovernment Solutions?

9    A.  Usually the government will reach out

10  saying they're doing market research and ask you for

11  information.  And that's what it looks like they

12  did, and that was the response.

13    Q.  And at this time, were you part owner of

14  eGovernment Solutions?

15    A.  October 2017?  I might have been.  I don't

16  remember when I sold my shares.  But I might have

17  been.

18    Q.  But you were working under the eGovernment

19  Solutions name at this point, correct?

20       MR. BEENE:  Objection to form.

21       THE WITNESS:  I was answering from

22  eGovernment Solutions, so it seems to be that's what

23  this e-mail is from.

24  BY MR. RATINOFF:

25    Q.  And then it says, if you go down towards

189

1    the bottom of the first page:

2              "The current CKGE environment will

3         require any potential vendor to

4         provide 2 critical components:  1) the

5         Government Package/Suite for Neo4j and

6         2) professional services for continued

7         development."

8    And it continues:

9              "Other vendors may be able to offer

10        the professional services, but only

11        iGov Inc. can fulfill the Government

12        Package/Suite for Neo4j requirement."

13        What are you referring to as the Government

14   Package/Suite for Neo4j requirement?

15        A.   I believe we're talking about the bisma and

16   all the auditing that needs to be put in place, and

17   that knowledge we gained by working with IRS at the

18   beginning.  We knew how to apply that, so we could

19   reapply everything.

20             I don't think any other vender -- and I

21   think it would be obvious that other vendors that

22   would come in would not have that knowledge that

23   would be able to help them wrap up and get moving.

24   So it was basically because of me and my knowledge.

25        Q.   And that's the knowledge that you gained

190

1    working as PureThink under the PureThink/IRS

2    contract we talked about earlier, correct?

3            MR. BEENE:  Objection to form.

4            THE WITNESS:  It's knowledge, but not

5    necessarily software.

6    BY MR. RATINOFF:

7        Q.  And it says, "The same team members," and

8    this is on the second page, halfway down:

9                "The same team members from the past

10               contract would be able to stay on

11               under eGovernment Solutions Inc.  All

12               of the development environment, tools,

13               et cetera would also be maintained

14               meaning there would be no ramp-up

15               time."

16       A.  I see that.

17       Q.  When you say the same team members, are you

18   talking about PureThink on the past contract that we

19   previously discussed between the IRS and PureThink?

20       A.  No.  I believe I'm talking about myself

21   only.

22       Q.  Okay.  But you're talking about the work

23   that you performed for the IRS under PureThink and

24   the contract we discussed earlier, correct?

25       A.  Yes.  I believe I would be showing them

191

1   that, hey, I have all this experience that I bring

2   to the table with this company.

3       Q.  And it says "All of the development

4   environment tools, et cetera will also be maintained

5   meaning there would be no ramp-up time."  Are you

6   referring to the work that you previously did with

7   the IRS under PureThink?

8       A.  Yes.  The software that they actually

9   owned, they have a lot of work product.

10      Q.  And that was what you developed for the

11  IRS, correct?

12      A.  Some of it was.  Some of it was done by

13  other teams, and we helped them integrate it.

14      Q.  Then at the bottom, it says:

15          "I am a minority partner in

16          eGovernment Solutions, and a majority

17          partner (only partner) in iGov Inc.

18          IGov Inc. holds the rights and sells

19          and supports the Neo4j Government

20          Package/Suite."

21          Do you see that?

22      A.  Yes.

23      Q.  And are you at this time now clearly still

24  an owner or part owner of eGovernment Solutions at

25  this time?

192

1    A.  Yes.  If I said that, then I was still an

2    owner.

3    Q.  And it says, "iGov holds the rights and

4    sells and supports the Neo4j Government

5    Package/Suite."

6    A.  Yes, that's a solution that's an offering.

7    It's not a product.  The Neo4j Government Edition

8    was the product.  The Neo4j Government Package/Suite

9    is a suite of services and support focused on FISMA,

10   addressing other needs that U.S. governments need.

11          And it's important because if you're using

12   Neo4j Community, whatever version you're using, you

13   need to follow these security guidelines and

14   whatnot.  And that's what -- that's the expertise

15   that I bring to the table now, because I gained all

16   that knowledge, you know, what requirements are

17   needed for IRS, what their 508 compliance

18   requirements are and whatnot.

19   Q.  And you gained that knowledge through the

20   prior work that you did under PureThink with the

21   PureThink/IRS contract that we talked about,

22   correct?

23          MR. BEENE:  Objection to form.

24          THE WITNESS:  That as well as I've have

25   other contracts with IRS years before, subcontracts.

193

1   besides the number at this time?

2       A.  Not for this.  They would have stated it in

3   the description.

4       Q.  All right.  Let's take a look at

5   Exhibit 105 --

6       A.  Okay.

7       Q.  -- previously marked.

8       A.  Okay.  I'm looking at it.

9       Q.  Okay.  And do you see the effective date of

10  this Amendment of Solicitation/Modification of

11  Contract is May 24, 2019?

12      A.  Yes, I see that.

13      Q.  Do you understand what this document is?

14      A.  I understand it's an Amendment of

15  Solicitation/Modification of Contract.

16      Q.  Do you know what contract this is referring

17  to?

18      A.  It says 2032H8-18-P-00168.

19      Q.  Do you understand what the actual contract

20  is that's being amended?

21      A.  I believe it's the award that eGovernment

22  Solutions won and that this is for -- this is to

23  exercise option year 1.

24      Q.  And that's for an additional $200,000 for

25  the year from May 24, 2019, to May 23rd, 2020?

                                                    205

1    A.   Yep.  That's the next -- the first option
2  year, they said we're going.
3    Q.   And to your knowledge; the IRS paid
4  eGovernment Solutions 300,000 for the first year?
5    A.   Well, they should have.  I believe they
6  did.
7    Q.   To your knowledge, did eGovernment
8  Solutions get $200,000 in conjunction with this
9  option year exercise, 200,000?
10   A.   Yes, they should have.  I don't think IRS
11 has ever missed a payment.
12   Q.   Yeah, that would be pretty bad for the
13 agency that collects taxes to miss payments, right?
14 You don't have to answer that.
15   A.   Oh, sorry.
16   Q.   That was a rhetorical question.  Sorry.
17 Just trying to lighten up the mood a little bit.
18   All right.  Let me mark the next exhibit,
19 or actually, it's been premarked.  So take a look at
20 what was previously marked as Exhibit 106.  Do you
21 recognize what's been previously marked as
22 Exhibit 106?
23   A.   Amendment of solicitation of the contract.
24 Yes, I see this.
25   Q.   What do you understand this document to be?

206

1    A.  This is a modification to add funding to

2  option year 1.

3    Q.  Of the eGovernment Solutions contract that

4  we've been talking about?

5    A.  Yes.

6    Q.  And is that your signature at the bottom of

7  the first page?

8    A.  Yes.

9    Q.  And what was the purpose of the increase of

10  funding for option year 1?

11    A.  I believe this is for us to build a user

12  interface in the micro service for something called

13  the LB&I, Large Business -- Large -- International,

14  I guess, component or division for IRS.

15    Q.  Looking at the next page, you'll see, "The

16  modification will require the contractor to perform

17  the following."

18    A.  Mm-hmm.

19    Q.  Are those bullet points there, one, two,

20  three, four, five bullet points your understanding

21  of what the additional work required?

22    A.  Yes.  And the way they wrote that, they're

23  not technical, so it's not 100-percent correct.  But

24  yes, I know what they're talking about.

25    Q.  And it says, "Integrate corporate graph

1     A.  The environment, the CKGE environment is a

2  platform and services, and we don't manage the data

3  sources.  The data sources would be by the team,

4  meaning I would have to ask them what they were

5  using.

6     Q.  So the platform would be built on top of

7  the various data sources which would include ONgDB

8  at this time, correct?

9     A.  If there was a data source with ONgDB, we

10  can connect to it and we could display and let you

11  explore it.  Same with any other graph database

12  software.

13     Q.  Okay.  Let me go ahead and mark the next

14  exhibit.  It's actually already marked.  This will

15  be in your chat here marked as Exhibit 107.

16        By the way, before we get there, was it

17  your understanding that the IRS paid eGovernment

18  Solutions the additional 216,000 for the option year

19  increase?

20     A.  Yes.  All those should have been paid.  I

21  don't remember them ever not paying something.

22        I've got the new EX. 107 open.

23     Q.  This was previously marked at Mr. Mayur's

24  deposition.  Do you recognize this document?

25     A.  Yep.  This is another Amendment of

211

1    Solicitation/Modification of Contract.

2        Q.   And it was for the same eGovernment

3    Solutions contract that we've been talking about

4    that was initially awarded in May of 2018?

5        A.   Let me check.   Well, that depends on if

6    it's the same contract from legal speak between

7    00151 and 168.   But this is the same work.

8        Q.   There is no other contract that the IRS

9    awarded eGovernment Solutions, right, just one?

10       A.   Well, there was the contract that ended in

11   00151.

12       Q.   But it was for the same work, correct?

13       A.   Yes, but you said contract.   And this

14   specifically says contract number is 00168.   The

15   first one was not 00168.   So to me, it looks like

16   they're separate contracts.

17       Q.   But we looked at the exhibit that changed

18   the number, right?

19       A.   Yes, we did.

20       Q.   So it's fair to say it's the same contract

21   based on the change that the IRS made, correct?

22       A.   I wouldn't -- I wouldn't categorize it as

23   that, because they seem to have two different

24   contract numbers.   You would keep the IDs the same

25   if they were the same contracts.   But I'm not a

212

1      Q.  What's a Smart ID?

2      A.  I have no idea.

3      Q.  All right.  Going back to Exhibit 107, do

4  you understand this to be the exercise of option

5  year 2 for the eGovernment Solutions contract?

6      A.  Yes.  That's what it says.

7      Q.  And that's your understanding of what this

8  is?

9      A.  Yes.

10     Q.  And that was for $200,000?

11     A.  Yes.

12     Q.  And that money, to your knowledge, was paid

13  to eGovernment Solutions?

14     A.  Yes.

15     Q.  And then let me take a look at -- okay.

16  Let me drop in Exhibit 108.  Do you recognize what's

17  previously marked as Exhibit 108?

18     A.  Yes.

19     Q.  And is this the exercise of option year 3

20  for eGovernment Solutions under the IRS contract?

21     A.  That looks to be the case, yes.

22     Q.  And it's for $200,000?

23     A.  Yes.

24     Q.  And to your knowledge, that $200,000 was

25  paid to eGovernment Solutions?

214

1          A.   Yes.

2          Q.   And then Exhibit 109, previously marked.  I

3     just dropped that into the chat.  It's also titled

4     Amendment of Solicitation/Modification of Contract.

5     It's dated May 24, 2022.

6          A.   Yes.

7          Q.   Do you recognize this document?

8          A.   Yes.

9          Q.   Is this the exercise of option year 4 for

10    the eGovernment Solutions IRS contract we've been

11    talking about?

12         A.   That's what it says, yes.

13              (Zoom audio and/or video frozen.)

14    BY MR. RATINOFF:

15         Q.   I just said it wouldn't be anything else.

16         A.    That's what it says.  It says the purpose

17    of this modification is to exercise option year 4.

18         Q.   To your knowledge, was that $200,000

19    identified here paid to eGovernment Solutions?

20         A.   Yes.

21         Q.   And was this -- is this the last option

22    year on the contract between eGovernment Solutions

23    and iGov -- I'm sorry, the IRS and eGovernment

24    Solutions?

25         A.   Let me look at -- I believe so.  Yes.

215

1    iGov right now, it's a lot of trouble to fix that

2    damage that's been done.  I believe that IRS

3    associates risk with iGov because of this pestering

4    and intimidation from Neo4j and specifically

5    focusing on me and my company.  So I just don't

6    think it's worth focusing on anymore right now.

7         Q.  All right.

8         A.  iGov.

9         Q.  And eGovernment Solutions isn't going to

10   competitively bid?

11        A.  I have no idea what they're going to do.

12        Q.  You're no longer affiliated with

13   eGovernment Solutions?

14        A.  No.  I'm affiliated.  I help them still on

15   their FSO, and I help -- well, I used to help with

16   the bisdev.  I'm still the subcontractor to finish

17   this contract.  But if they go after it next year,

18   it's not going to be with me.  But they can make

19   their choices however they want to go.

20        Q.  I'm going to drop into the chat what was

21   previously marked as Exhibit 100.  Do you recognize

22   Exhibit 100?

23        A.  I'm still opening it or downloading it.

24        Q.  Yeah.  It's a large one.

25        A.  Yes.

                                                        217

1      Q.   And what do you understand Exhibit 100 to

2   be?

3      A.   This is me giving back my shares to eGov

4   and them buying me out.

5      Q.   And what were the terms of the buyout?

6      A.   They would be in the contract.  I would

7   have to go read it all for you.  If you let me do

8   that, I can read it all and tell you.

9      Q.   Let's focus on a couple of sections here.

10     A.   Okay.

11     Q.   You'll see at paragraph 5 --

12     A.   Paragraph 5.

13     Q.   -- it says, "Re:  Treasury contract

14  2032H8-18-P-0015 (aka CKGE Knowledge Environment

15  contract) dated 5/24/2018."  Is that referring to

16  the eGovernment Solutions contract with the IRS we

17  have been discussing?

18     A.   Yeah, referring -- yes, 00151, that

19  contract.

20     Q.   And then in addition to that at paragraph

21  3.1 above, there is a $20,000 payment, correct?

22     A.   Can you say that again?  I'm sorry.

23     Q.   So section 3 is Terms of Payment.

24     A.   Oh, I see.

25     Q.   And it says you were paid $20,000 for your

1    shares, as well; is that correct?

2          A.   Yes, that's correct.

3          Q.   And then under 5.1, it says:

4               "eGovernment Solutions Inc. hereby

5               hires John Mark Suhy as an independent

6               Contractor for all options that are

7               exercised on the CKGE contract.  His

8               compensation is $200,000 per year paid

9               when eGovernment Solutions gets paid."

10              So at this time, the IRS had already made

11   the $300,000 initial base contract payment to

12   eGovernment Solutions, correct?

13         A.   I believe so.

14         Q.   If you look at the date of this agreement,

15   it was signed, it looks like, or at least effective

16   date is December 31st, 2018.  Do you see that down

17   in section 7.1?

18         A.   Okay.  I see that.

19         Q.   Okay.  So your interest in iGov -- or I'm

20   sorry, your interest in eGovernment Solutions was

21   sold based on this agreement on December 31st, 2018,

22   correct?

23         A.   Yes.  That looks correct.

24         Q.   And by sections 5.1 through 5.3, was it

25   your understanding that you were still entitled to

219

1    each $200,000 payment that was made in conjunction

2    with each option year on the eGovernment Solutions

3    contract?

4         A.  Only if I actually did the work.  Because

5    they have to -- they have to legally meet those

6    requirements.  So if I didn't do anything, if I

7    didn't accept them using us or using me, they would

8    have had to go and find someone to do this.

9         Q.  But you actually did the work for each

10   option years 1 through 4, correct?

11        A.  Yes, I did.

12        Q.  And under this agreement, you were entitled

13   to the $200,000 that was paid by the IRS for each

14   option year of the contract, correct?

15        A.  Well, my salary was $200,000.  It covered

16   this and other services.  But I allowed them to not

17   pay me the salary.  For some reason, this or some

18   other projects had fallen through.  But that

19   was our -- that was the agreed amount.  It says

20   right there.

21        Q.  The payments were ultimately made to iGov

22   and not you personally, correct?

23        A.  They came to iGov, and I worked through

24   iGov.

25        Q.  But there is no reference to iGov in this

                                                     220

1    agreement, correct?

2         A.   I'd have to search and see.  Give me

3    moment.

4         Q.   Well, it says in 5.1, it says:

5              "EGovernment Solutions Inc. hereby

6              hires John Mark Suhy as an independent

7              contractor for all option years that

8              are exercised on the CKGE contract.

9              This compensation will be $200,000 per

10             year when eGovernment Solutions gets

11             paid."

12             There is no reference to iGov in that

13   section, correct?

14        A.   Yes.  We must have had another agreement,

15   which most likely doesn't have a signature, just

16   like everything else.  But it's still a contract,

17   it's still an agreement.  Because it --

18        Q.   So there is another agreement you entered

19   into with eGovernment Solutions that assigned the

20   payments under this agreement from you to iGov?

21        A.   Just a verbal agreement that I would like

22   them to hire iGov.

23        Q.   Why did you do that?

24        A.   I don't remember the exact reasons.  But

25   it's -- I always like to do things as an entity that

221

1    you can focus on and build up.  So most likely it

2    was because I wanted to build up iGov and sell it at

3    some point.

4         Q.  And then I want to --

5         A.  I don't remember exactly what the reasons

6    were, but we did discuss it, you know, and we agreed

7    that yes, we'll do that, then.

8         Q.  Okay.  And you mentioned that Mr. Mayur

9    didn't sign this.  But you understood this agreement

10   was executed between all of the parties involved,

11   the shareholders?

12        A.  I'm not sure what you mean.

13        Q.  Well, you said that you understood this

14   agreement to be executed.  That's right?

15        A.  Yes.  Well, we got paid, so . . . .

16        Q.  Okay.  Let me go ahead and mark the next

17   exhibit.  Actually, it's already been marked.  This

18   was previously marked as Exhibit 110.

19        A.  Okay.  I'm looking at that.

20        Q.  Do you recognize the documents that are

21   comprised of Exhibit 110?

22        A.  Yes.  They look to be invoices.

23        Q.  These are invoices for payment -- or I'm

24   sorry, what are these invoices for?

25        A.  The first one says "CDW Graphic

222

1   Environment," which again is a mis- -- it's not

2   called CDW Graphic Environment.  It's just initiated

3   that was what was on the award.  So the IRS has made

4   a few mistakes in describing things.

5        Q.  But you understand this is an invoice, at

6   least the one that ends in 68, the first one,

7   invoice No. 817 is for the initial 300,000 due under

8   the eGovernment Solutions/IRS contract that we've

9   just been discussing?

10       A.  Yeah.  That looks to be the case.

11       Q.  And then did you generate this document?

12       A.  I believe I did.

13       Q.  And submitted it to the IRS?

14       A.  I believe I did, yeah, on behalf of

15   eGovernment Solutions.

16       Q.  Looking at the next page, invoice 827, and

17   is this an invoice for the eGov Solutions/IRS

18   contract option year 1?

19       A.  Yes, it looks to be.

20       Q.  And this is for the $200,000 on that option

21   year?

22       A.  Yes.

23       Q.  You generated this document, invoice 827?

24       A.  I believe I did for eGovernment Solutions.

25       Q.  And it was submitted to the IRS under the

223

1   eGovernment Solutions/IRS contract?

2        A.  Yes.

3        Q.  And the IRS paid the $200,000?

4        A.  Yes.  I believe they paid everything.

5        Q.  And invoice 901, next page, is this the

6   invoice for option year 3 -- I'm sorry, strike that.

7             This is invoice 901 for option year 1

8   modification.  Is that what we were previously

9   discussing as being a modification to add additional

10  work to the eGovernment Solutions/IRS contract?

11       A.  I'm not sure if that references this, this

12  additional work.

13       Q.  Well, it says under line the item, "CDW

14  Graphic Environment Continued Option Year 1

15  Modification.  Item code:  101B."  Do you see that?

16       A.  I see that.

17       Q.  And for 216,000?

18       A.  I see that.

19       Q.  Isn't that the amount of what the option

20  year 1 increase was for?

21       A.  I don't remember if this was what -- were

22  all the option years 200,000?

23       Q.  Okay.  Why don't we go ahead and just take

24  a quick look at -- let's see.  It was Exhibit 105.

25  Why don't you go just take a quick look at

224

1   Exhibit 105 and see if that helps.

2       A.  Okay.  Let me get this open.  Bear with me.

3   All right.

4       Q.  Looking at Exhibit 105, do you now

5   understand this invoice is reflecting the

6   modification to option year 1 for the eGovernment

7   Solutions/IRS contract?

8       A.  I see that.  But the prices don't line up.

9       Q.  How so?

10      A.  Well, that invoice says 216,000, and

11  Ex. 105 says 200,000.

12      Q.  If you actually go down, let's see -- so

13  why would you invoice for 216,000?

14      A.  I have no idea if it's a mistake or

15  something else.

16      Q.  You know what, I apologize.  I meant to

17  show you Exhibit 106.  That's my fault.  A lot of

18  exhibits.  So please take a look at Exhibit 106, and

19  let me know if that helps you.

20      A.  This looks like it was just the increase,

21  the option year, by 216,000, yes.

22      Q.  So then going back to Exhibit 110, the

23  invoice we were looking at, which was invoice 901,

24  this is the invoice 901 for that option year

25  modification, correct?

225

```
 1        A.   Yes, it looks to be.   The numbers line up.

 2        Q.   And 216,000, same number?

 3        A.   Yes.

 4        Q.   This money was paid to eGovernment

 5   Solutions?

 6        A.   Yes.

 7        Q.   And going on to Exhibit -- I'm sorry, the

 8   same exhibit, 110, invoice 955.   This is an

 9   invoice -- are you there?

10        A.   Yes.

11        Q.   This is the invoice that you generated to

12   send to the IRS for option year 2 under the

13   eGovernment Solutions/IRS contract?

14        A.   Yes, I believe so.   Yeah.

15        Q.   To your knowledge, the IRS paid the 200,000

16   to eGovernment Solutions?

17        A.   Yes.

18        Q.   Looking at invoice 960.

19        A.   I'm looking at it.

20        Q.   Do you recognize invoice 960 as being an

21   invoice you generated for option year 3 under the

22   eGovernment Solutions/IRS contract?

23        A.   That looks right.

24        Q.   And this is for $200,000?

25        A.   Yes.
```

226

1      Q.  And the IRS paid that $200,000 for option

2  year 3 to eGovernment Solutions?

3      A.  Yes.

4      Q.  And finally looking at invoice 912.

5      A.  I'm looking at it.

6      Q.  And is this the invoice you generated to

7  send to the IRS for option year 4 under the

8  eGovernment Solutions/IRS contract?

9      A.  It looks correct.  But we don't actually

10  send anything to IRS.  This is just an option to

11  upload.  I don't believe you even need to have

12  invoices, because IRS has its own system for

13  payments.  So I don't believe this was sent

14  anywhere.  I believe it was just uploaded as a

15  reference, so when we look in their antiquated

16  system for showing procurements, we could remember

17  what it was for.

18      Q.  So this is uploaded to the IRS, these

19  invoices?

20      A.  Yes.  I believe they were on the website.

21  It could have been another government agency that

22  runs it for all -- for different agencies, but I

23  think it's just for IRS, the website.

24      Q.  And going to the last page of this exhibit,

25  it ends with a Bates number 74, did you generate

227

1    you've got your numbers right, but our numbers are

2    right.  Everything that we made comes in.  We

3    generate reports and pay the taxes.  You can do that

4    without 1099s.  You could make a mistake, though, so

5    1099s are good to help you verify.

6              MR. RATINOFF:  Okay.  Let me mark -- it's

7    already been premarked in a previous deposition as

8    Exhibit 111.

9              THE WITNESS:  I've got that open.

10   BY MR. RATINOFF:

11        Q.  Okay.  Do you recognize this document?

12        A.  Yeah.  That looks like a 1099.

13        Q.  Issued by eGovernment Solutions?

14        A.  EGovernment Solutions to iGov Inc.

15        Q.  And that's for 2018?

16        A.  Yes.

17        Q.  And then the 285,700 would be for the money

18   received that year from eGovernment Solutions?

19        A.  That would have been paying me for my

20   services, consulting, SFO duties and whatnot.

21        Q.  During that year, you performed services

22   for the IRS under the eGovernment Solutions/IRS

23   contract, correct?

24        A.  That's correct.

25        Q.  And that work would have been reflected in

231

1    this 1099?

2         A.  Yes, that would have been part of it.

3         Q.  And the other part is what?

4         A.  FSO services and business development.

5         Q.  You don't have any time sheets, though, to

6    reflect the division of that labor though, do you?

7         A.  There is no need.  This is -- we agreed on

8    fixed prices.  Usually that's the easiest way to do

9    things.  And that's how IRS pays, as well.

10        Q.  So the IRS paid $300,000 in 2018 under the

11   eGovernment Solutions contract, correct?

12        A.  Yes.

13        Q.  And you were paid by eGovernment Solutions

14   285,700, correct?

15        A.  Yes.

16        Q.  And the difference between the 285-plus

17   thousand was that -- and the 300,000, was that

18   expenses that you mentioned that were paid out?

19        A.  I believe so.  It could have been that we

20   had other help.  Whenever I need help on something,

21   it costs money.  So it could have been that, as

22   well.  I'm not positive.

23        Q.  And then I'll mark Exhibit 112, or it's

24   been marked already.  Just let me know when you've

25   had a chance to look at it.

232

1    A.   Yes, I'm looking at that right now.

2    Q.   And do you understand what Exhibit 112 is?

3    A.   Yes.   This is a 1099 Misc.

4    Q.   This is issued to iGov by eGovernment

5    Solutions?

6    A.   Yes.

7    Q.   And this is for work that you performed

8    under the eGovernment Solutions/iGov -- I'm sorry,

9    eGovernment Solutions/IRS contract?

10   A.   This is for work done, consulting done on

11   that, FSO services and business development

12   services.

13   Q.   So the IRS, I think that year prior to the

14   amendment, paid $200,000 to eGovernment Solutions,

15   correct?

16   A.   Let me look and see for 2019 what was paid.

17   Option year 1 was 200,000.   Option year 1

18   modification, though, was 216,000.

19   Q.   So the total for 2019 was 416,000 that was

20   paid by the IRS to eGovernment Solutions?

21   A.   I'm not positive, but it looks like -- let

22   me see.   From looking at these invoices, it looks

23   like there was a 200,000 for invoice 827, and then

24   there was invoice 901, which was 216,000.

25   Q.   Those are both --

233

1        A.   That's 2020, so never mind.

2        Q.   As far as Exhibit 112 goes, you have no

3   reason to believe this wasn't sent to iGov by

4   eGovernment Solutions?

5        A.   I don't think it was mailed.   These are

6   generated by your tax software.   And it's possible

7   that they e-mailed it to us or provided it by e-mail

8   or didn't provide it at all.   I don't remember.

9        Q.   You have no reason to believe this is an

10  incorrect amount?

11       A.   No, no.   It looks right.

12       Q.   Let me mark Exhibit -- I'm sorry, this one

13  has already been previously marked as Exhibit 113.

14       A.   Okay.   I'm looking at that.

15       Q.   Do you have an understanding of what

16  Exhibit 113 is?

17       A.   Yes.   It's a 1099-NEC for 2020.   I have no

18  idea what that means.

19       Q.   Okay.   To your knowledge, were you paid

20  193,000 by eGovernment Solutions in 2020?

21       A.   I have no reason to think why that wasn't

22  true, but I would have to look at our accounting to

23  see the numbers.   For all of these, I would have to

24  just verify it to say for sure yes.   But it looks

25  like.

                                                        234

1          Q.  So this is something that might be
2     reflected in iGov's financial statements?
3          A.  Yes.
4          Q.  But you have no reason to believe this is
5     incorrect 1099 for 2020?
6          A.  It's not a 1099 Misc.  It's a 1099-NEC,
7     which I have no idea what that means.
8          Q.  But it's still a 1099-NEC, correct?
9          A.  Yes.
10         Q.  It's not for employment income?
11         A.  I don't know what -- I'm not familiar with
12    what they all mean.  I just have a vague
13    understanding.
14         Q.  To your knowledge, you were paid 193,000 by
15    eGovernment Solutions for work as an independent
16    contractor?
17         A.  They paid that to iGov Inc. for services.
18    I don't know what the term "independent contractor"
19    means.  iGov Inc. is a company.  It's a corporation.
20         Q.  As working as a contractor for eGovernment
21    Solutions on the IRS/eGovernment Solutions contract,
22    correct?
23         A.  That's one of the things that iGov does for
24    them, yes.
25         Q.  Can iGov as an entity act as an FSO?

                                                        235

1    just pick whichever one you want, whatever is

2    available in Exhibit 110, just -- we can start at

3    the top.  That's fine.

4         A.  Okay.  I'm looking at it.

5         Q.  And there's -- actually, scratch that.  Let

6    me move on.

7              So then going and looking at -- I see

8    where -- sorry.  I got sidetracked there.

9              Okay.  So then I don't think I showed you

10   Exhibit 114 yet, so let me do that.  This was

11   previously marked as Exhibit 114.

12        A.  It's not opening.  Maybe I've got to close

13   all my other exhibits.  I have to close everything,

14   because it's no longer opening.

15        Q.  That's fine.  I don't think we're going to

16   be going back to anything as of now.

17        A.  I've got that open.

18        Q.  Okay.  So previously marked Exhibit 114, do

19   you recognize what this document is?

20        A.  Yes.  It says it's a 1099-NEC.

21        Q.  And this is issued by eGovernment Solutions

22   to iGov?

23        A.  Yes, that's correct.

24        Q.  And the amount of employee compensation

25   being 197,000?

                                                        237

1      A.   That sounds right.

2      Q.   And that's for work done under the

3  eGovernment Solutions/IRS contract?

4      A.   And FSO services and then business

5  development services.

6      Q.   But again, you don't have any time sheets

7  to reflect the breakdown of that work versus what

8  was done for the IRS?

9      A.   No.   We -- we put everything together.

10 IRS, they can only subcontract a certain amount of

11 it, and so I could calculate how much that would

12 have been.

13     Q.   You testified that the IRS, for instance in

14 2021, made a $200,000 payment to eGovernment

15 Solutions.

16     A.   Yes.

17     Q.   And it makes that payment pursuant to the

18 renewal, correct?

19     A.   When they exercise an option year, yes.

20     Q.   And they do that as a lump-sum payment,

21 correct?

22     A.   Yes.

23     Q.   And then you perform the work after that

24 for that option year after that payment is made,

25 correct?

238

1          A.   Yes.

2          Q.   Do you submit any time sheets to the IRS to

3    reflect how much of that $200,000 worth of work you

4    do?

5          A.   It's fixed price.   They don't require that.

6    That's one of the benefits of a fixed price is they

7    miss -- they don't have to deal with the risk.   Time

8    and materials could easily make it 500, $600,000.

9          Q.   So you could have worked five hours or

10   5,000 hours that year, and you would still be paid

11   the $200,000 for 2021 by the IRS?

12         A.   Exactly.   And that's why -- that's why the

13   agreement between eGovernment and iGov was the same,

14   because if we were doing time and materials, it

15   could have made it so that eGovernment Solutions

16   could have owed a lot of money that they just didn't

17   have.   If it was time and materials, though, it

18   would have been -- it would have passed through, and

19   iGov would have done time and materials, as well.

20         Q.   But that didn't happen?

21         A.   This is not a time and materials contract.

22         Q.   Okay.   Now, I don't have a 1099 for 2022,

23   because I think we can agree those don't come out

24   until after the close of the calendar year, correct?

25         A.   I believe so.

                                                        239

1    know if it's based on it.

2           MR. RATINOFF:  All right.  Let me mark the

3    next exhibit, Exhibit 505.  I'm sorry.  This is tab

4    505.  It will be marked as Exhibit 217.

5           (Plaintiffs' Exhibit 217 was marked for

6    identification.)

7           THE WITNESS:  Yes.  I'm looking at that

8    now.

9    BY MR. RATINOFF:

10      Q.  Okay.  I'll represent to you this is

11   produced by eGovernment Solutions.  It starts at

12   Bates number 151.  Do you understand what what's

13   been marked as 217 is?

14      A.  Tab 505, it's a Wells Fargo transaction

15   history.

16      Q.  And do you recognize the account number for

17   this transaction history?

18      A.  I don't remember account numbers, but there

19   is only one Wells Fargo account that I had access

20   to.

21      Q.  Is this the account that -- is this the

22   account you had access to at eGovernment Solutions?

23      A.  Yes.  I believe I may have had access to

24   this just when I was a partner, and it just stayed

25   there.  But I'm not positive when this was created.

243

1          Q.  Do you have signing authority on this

2     account?

3          A.  I should have it, but I'm not positive.

4          Q.  You sign checks on this account?

5          A.  Yes, I've signed checks.  I've always

6     signed checks after verifying that I have the

7     permission to do so.  So if there is a check that

8     needs to be submitted, I would always call and get

9     permission.

10         Q.  Permission from who?

11         A.  Ashwani, usually.

12         Q.  Ashwani Mayur?

13         A.  Yes.

14         Q.  And to your knowledge, were all the

15    payments made by the IRS deposited in this account?

16         A.  I believe so.

17         Q.  And you mentioned there was expenses paid

18    on behalf of eGovernment Solutions.  Would those

19    also be paid from this account?

20         A.  I'm not positive.

21         Q.  So for instance, let's go to the next page,

22    152, there is a -- there is an IRS Treas

23    miscellaneous payment for 216,000 dated January 9th,

24    2020.  Do you see that?

25         A.  Yes, I see that.

244

1    Q.  That's the 216,000 for that amendment to

2    option year 1?

3    A.  Yep, this seems right.

4        Q.  And below that, you'll see there is GoDaddy

5    payments?

6        A.  Yes, I had that.

7        Q.  Are those GoDaddy payments made on behalf

8    of eGovernment Solutions or iGov?

9        A.  Everything here would be just for

10   eGovernment Solutions.

11       Q.  And I want you to take a look at page 152.

12       A.  That's what I was just looking at.

13   Q.  And you'll see on January 15, 2020, a

14   payment was made to AtomRain for $101,400.  Do you

15   see that?

16   A.  Yes, I see that.

17   Q.  Was that payment made to AtomRain on behalf

18   of iGov?

19   A.  This would have been -- iGov wouldn't have

20   used eGovernment Solutions' bank accounts.  They're

21   completely different entities.  EGovernment

22   Solutions would have paid AtomRain directly.

23   Q.  Did iGov subcontract out work under the

24   eGovernment Solutions/IRS contract to AtomRain?

25   A.  It looks like from this that eGovernment

245

1   Solutions subcontracted out to AtomRain.

2       Q.  Are you aware of any subcontractor

3   agreement between eGovernment Solutions and

4   AtomRain?

5       A.  I'm not sure.  I don't remember.

6       Q.  Did you recommend that eGovernment

7   Solutions hire AtomRain to do additional work on the

8   eGovernment Solutions/IRS contract?

9       A.  Yes.  That would have come from me.

10      Q.  So essentially, you hired them?

11      A.  I didn't hire them.  I would have gone

12  to -- I treat companies as entities, and I try to

13  keep everything separate from anything else.  And I

14  would have gone to them and said these are the

15  experts.  We should subcontract them, because I

16  don't have enough time to do a lot of the work they

17  want.  And then they would have said okay, and then

18  we would have an agreement.  Or they might have got

19  an agreement with AtomRain.  I don't remember.

20      Q.  So you're not aware of there being an

21  actual agreement with AtomRain between eGovernment

22  Solutions and AtomRain?

23      A.  I'm not sure if it was a handshake deal or

24  a written agreement.  I wasn't an owner at this

25  point, so I don't remember if they would have had

                                                      246

1    lawyers come in and verify everything.  But they do

2    take -- when I make a recommendation, if I say look,

3    we need to do this, they usually listen.  But they

4    don't have to.

5         Q.  Okay.  I'm going to go ahead and put what

6    was previously marked as an Exhibit 115.

7         A.  After this, I'm going to have to use the

8    bathroom again.  Sorry.

9         Q.  Sure.  No problem.

10        A.  I'm looking at it now.

11            (Reporter interruption.)

12   BY MR. RATINOFF:

13        Q.  It's 115.  And this is also a Wells Fargo

14   business checking printout from eGovernment

15   Solutions production.  It's eGov Production 81 is

16   the first Bates number.

17        A.  Yes, I'm looking at it.

18        Q.  At the bottom of the first page, it says

19   Account Number.

20        A.  I do not see that.  The first page, bottom

21   right?

22        Q.  Yeah.  There is a little line, vertical

23   line, and it says Account Number, and under it, it

24   says eGovernment Solutions.

25        A.  I see that.

                                                    247

1     Q.  And your understanding is that these bank

2     statements are from the same account that we were

3     just discussing?

4     A.  Yes, because I believe there is only one

5     Wells Fargo account.  But I'm not positive.  I know

6     it added other bank accounts, as well.  I believe it

7     is.  The easy way is to check this account number

8     and the previous one you looked at to see if they

9     match.

10    Q.  Why don't you go ahead and do that just so

11    we're clear.  Tab 505 and Exhibit 115.  Tab 505 has

12    now been marked as Exhibit 217.

13    A.  I'm looking right now.  505.  Yep.  They're

14    the same number, account number.

15    Q.  And that's the same account that you had

16    signing authority on?

17    A.  I don't know if I had signing authority,

18    but yes, the same account.

19    Q.  But you had access to it?

20    A.  Yeah, I had access to it.

21    Q.  And then let's go ahead and look at page

22    134, eGov Production 134.  It's going to be -- it's

23    going to be page 54 of 56 of the PDF.

24    A.  Are we talking about EX 155?

25    Q.  Yeah.  EX 155, if you go to 54 out of 56.

248

1      A.  All right.  115 on there?  Okay.  Well,

2  this says account balance calculation sheet.  Is

3  that --

4      Q.  No.  It's going to be -- it's going to be

5  54 out of 56 with the Bates numbers eGov Production

6  134 at the very bottom.

7      A.  I'm confused.  What is the name of the file

8  I should be looking at?

9      Q.  EX 155.

10     A.  Combined statements.  Okay.  So I'm going

11  down to -- you said down to the bottom?

12     Q.  Page 54 out of 56 in the PDF.  The Bates

13  number at the bottom should be eGov Production 134.

14     A.  I'm there.

15     Q.  You'll see there is a payment made by IRS

16  Treas on June 13th, 2022?

17     A.  Yes, I see that.

18     Q.  200,000?

19     A.  I see that.

20     Q.  And that's the payment for option year 4?

21     A.  Based on the date, I believe so.

22     Q.  So going down to the next page, 135.

23     A.  Okay.

24     Q.  $200,000 from IRS Treas dated June 15,

25  2021.  Do you see that?

249

1        A.  I see that.

2        Q.  That's for option year 3 under the

3   IRS/eGovernment Solutions contract?

4        A.  Okay.

5        Q.  Yes?

6        A.  Okay.  Are you asking me a question?

7        Q.  Yeah.

8        A.  It seems like it would be, yes.

9        Q.  Same amount that was due under option year

10  3?

11       A.  I have to go back and keep looking at it,

12  but it sounds right.  Everything was 200,000, so

13  yes.

14       Q.  Everything but the first year of 300,000?

15       A.  Yes.

16       Q.  And obviously 216,000 for the option year 1

17  increase, correct?

18       A.  Yes.

19       Q.  Okay.  We can take a break now.  Thanks for

20  your patience.  We can come back -- if everyone is

21  okay, we can do -- I guess it's 5:30 your time, so

22  5:35?

23          THE VIDEOGRAPHER:  Okay.  We're off the

24  record at 2:28.

25          (Break taken from 2:28 to 2:36 p.m.)

                                                      250

 1             THE VIDEOGRAPHER:  We are now on the record

 2    at 2:36.

 3    BY MR. RATINOFF:

 4        Q.  Mr. Suhy, I just want to put the next

 5    exhibit into the chat.  It will be tab 507.  This

 6    is --

 7        A.  It's downloading.

 8             MR. RATINOFF:  Let me know when you're

 9    ready.

10             While you're doing that, this will be

11    marked as exhibit -- where are we at?  218.

12             (Plaintiffs' Exhibit 218 was marked for

13    identification.)

14             THE WITNESS:  Yes.  I've got it open.

15    BY MR. RATINOFF:

16        Q.  Okay.  And these were checks, printouts of

17    checks that were provided by eGovernment Solutions.

18    You'll see there is a Bates number, EGOVS ending in

19    the Bates number 150.  Do you see that?

20        A.  Yes.

21        Q.  If you look at the top, you'll see there is

22    an account number 5581518783.

23        A.  I don't see that account number.

24        Q.  It's at the very top.  You can also see it

25    on the chat.  You'll see there is an account number

                                                    251

1   on the chat as well as the 5581518783.

2       A.   I see it, yes.

3       Q.   That's the same account number that we've

4   been talking about in the bank statements, the

5   Wells Fargo account?

6       A.   Yes.

7       Q.   And is this your signature on this check?

8       A.   Yes.

9       Q.   And this is for at least part payment for

10  the work that you did for eGovernment Solutions on

11  the IRS contract?

12      A.   I believe so.  I would have had to call up

13  and get permission from Ashwani for each of these.

14  So I would have to see how it linked up, but I

15  believe that's what it's for.

16      Q.   Let's go down to the next check.  This one

17  is on Bates number 151.

18      A.   Yes.

19      Q.   And it's dated January 24, 2020.  Do you

20  see that?

21      A.   Yes.

22      Q.   It's for 5,000?

23      A.   Yes, I see that.

24      Q.   And then is that your signature?

25      A.   Yes, it is.

252

1    Q.   And it says, "Pay to the order of Irving
2  Starr, Esquire."   Who is that?
3    A.   That's a legal, for lawyers.   So I have an
4  agreement with eGovernment Solutions that they can
5  help pay for some of the legal fees directly and put
6  it into escrow for me to use.   And we have an
7  agreement that there will be no -- I forgot the name
8  of it, no -- what's it called when you work with
9  someone?   You can have a conflict of interest.   So
10 this is -- this is something that I'd asked them for
11 permission for and they gave me.   And then they gave
12 me permission to sign it.
13        The reason why is I'm the only one that
14 happened to have checks.   So once they get checks,
15 they're able to do everything on their own.   But I
16 was the only one that had checks from the account
17 creation.
18    Q.   You say legal fees.   Whose legal fees are
19 you referring to that this is payment for?
20    A.   Well, this is just -- this is going into a
21 trust.   So this would be for -- I believe this
22 was -- I don't remember if this was for the lawsuit
23 or for something else.
24    Q.   So this is a lawyer or a law firm that iGov
25 retained, Irving Starr?   That's your counsel in this

253

1    case, correct?

2        A.  Yes.

3        Q.  So Irving Starr, they were retained by

4    iGov, not eGovernment Solutions, correct?

5        A.  Retained by, I guess you would say, myself.

6        Q.  Right.  Irving Starr, you're not writing a

7    check for services provided to eGovernment

8    Solutions, correct?

9        A.  No.  This is where I had asked them if they

10   could put a deposit into a legal trust for me to use

11   for other -- you know, by helping out with this, it

12   would let me focus on, you know, helping them with

13   business development and whatnot.

14       Q.  So were they helping pay for your legal

15   fees in this case?

16       A.  Hmm -- I don't know if I consider it

17   helping pay for the legal fees.  I just asked them

18   to put that amount in the trust, and it was

19   something that I didn't bill them for.  So I don't

20   think they actually -- they would have subtracted

21   this out of what we would have billed.

22       Q.  You said you had an agreement with

23   eGovernment Solutions to pay for services provided

24   by Irving Starr?

25       A.  Yes.  Well, yes, to put money into the

                                                    254

1          MR. BEENE:  If you want to do that right

2     now, that's fine.

3          MR. RATINOFF:  Yeah, it will kind of close

4     off this line of questioning.

5     BY MR. RATINOFF:

6          Q.  What I put in the chat as Exhibit 145 is a

7     spreadsheet produced by ASR reflecting the payments

8     made between June 28, 2019, July 27, 2022, the total

9     amount being $246,082.55.  Your counsel and I talked

10    about this being a fair and accurate representation

11    of what ASR paid you under the Master Subcontract

12    Agreement.  Is that acceptable?

13         A.  I believe so.  I'd like to verify it if

14    we're going to stipulate to something.  I can -- I

15    can -- unless you have another --

16         MR. RATINOFF:  I'm asking your counsel.

17    I'm just making a record of our stipulation.

18         MR. BEENE:  Let's go off record for one

19    second.

20         MR. RATINOFF:  Okay.

21         THE VIDEOGRAPHER:  Okay.  We are off the

22    record at 3:38.

23         (Break taken from 3:38 to 3:40 p.m.)

24         THE VIDEOGRAPHER:  We are now on the record

25    at 3:40.

                                                    296

1          MR. BEENE:  Okay.  So defendants stipulate

2  that Exhibit 145 accurately reflects the payments

3  from ASR to iGov.

4          MR. RATINOFF:  Under the Master Subcontract

5  Agreement and Task Orders?

6          THE WITNESS:  I believe that's what they're

7  for.

8          MR. RATINOFF:  Do you need to go back off

9  the record?

10         MR. BEENE:  No.

11         THE WITNESS:  I don't know which ones --

12  which subcontractor tasks they're for.  But those

13  are all -- those all pertain to iGov.

14         MR. RATINOFF:  I appreciate that.  I just

15  wanted to confirm with your counsel that it's okay

16  to proceed with that addition.

17         Mr. Beene?

18         MR. BEENE:  We'll have to go off the

19  record.

20         MR. RATINOFF:  Okay.  Just to be clear, all

21  I'm asking is that if they weren't payments made by

22  ASR, it would have had to be pursuant through a

23  contract.  So I'm assuming there is no other

24  contract.  The Master Subcontract and the other

25  contract we looked at, the subcontract for Tylor

297

1   Data, and then the Task Orders.  That's all I'm
2   asking.
3            MR. BEENE:  And my client just went on the
4   record saying there is a lack of clarity on that, so
5   I have to talk to him about that clarity.
6            MR. RATINOFF:  Okay.  Gotcha.  Let's just
7   take a full five-minute break to give everyone a
8   chance to stretch their legs.
9            THE VIDEOGRAPHER:  Okay.  We're off the
10  record at 3:42.
11           (Break taken from 3:42 to 3:48 p.m.)
12           THE VIDEOGRAPHER:  We're now on the record
13  at 3:48.
14           MR. RATINOFF:  Just to be clear on the
15  record, we discussed the specific exhibits
16  representing the various subcontracts that iGov is
17  working on with ASR's Exhibits 134, 135, as amended
18  by 136.
19           MR. BEENE:  And Defendants stipulate that
20  the payments reflected in Exhibit 145 from ASR to
21  iGov are those payments applicable to the contracts
22  represented by Exhibits 135, 136 and 134.
23           MR. RATINOFF:  Agreed.  All right.  That
24  was probably easier than doing it via written
25  stipulation.  It would have taken us a week.

298

1    very specific question about what you wrote in this

2    e-mail.  So I'm going to strike your response, and

3    I'm going to ask you the question one more time.

4    And I want you to --

5         A.  That answer is to the previous question.

6         Q.  I know it's late, but I'm going to ask for

7    more time because you're wasting my time.

8              MR. BEENE:  Let's go off the record.

9              THE WITNESS:  I think you're wasting my

10   time.

11             MR. BEENE:  Let's go off the record.

12             THE WITNESS:  Okay.

13             THE VIDEOGRAPHER:  Jeffrey, do you want to

14   go off the record?

15             MR. RATINOFF:  Yeah, that's fine.

16             THE VIDEOGRAPHER:  We are now off the

17   record at 5:23.

18             (Break taken from 5:23 to 5:31 p.m.)

19             THE VIDEOGRAPHER:  We are now on the record

20   at 5:31.

21   BY MR. RATINOFF:

22        Q.  Mr. Suhy, before we broke you mentioned

23   that at that time ONgDB was based on the identical

24   code to Neo4j Enterprise, correct?

25        A.  It was based on the full code base of

                                                      363

1   Neo4j, which includes Community and Enterprise as

2   submodules, I guess you'd call them.

3       Q.  And at that time, was it your understanding

4   that Neo4j was suiteing (phonetic) the copyrights to

5   the source code for Neo4j Enterprise?

6       A.  Yes.  To the source code, yes.

7       Q.  And that was the same source code that was

8   used in ONgDB 3.4.x?

9       A.  Yes.

10      Q.  Thank you.  All right.  I'm going to give

11  you the next exhibit here.  This was previously

12  marked as Exhibit 170.

13      A.  All right.  I have it open.

14      Q.  You'll see this e-mail was produced by

15  iGov.  There is a Bates number ending in 3216 on the

16  first page, .001.  Do you see that?

17      A.  Yes, I see that.

18      Q.  And you'll see it was produced from your

19  egovsol.com account.  Do you see that?

20      A.  Yes.

21      Q.  And do you understand it's an e-mail to be

22  a continuation of the conversation and e-mail that

23  you were having with Mr. Dunn about switching to

24  ONgDB 3.4.x?

25      A.  I'm not sure if this is a continuation or

                                                    364

1    something new.  Let's see the subject line.  Could

2    you give me one moment?

3         Q.  Sure.

4         A.  I'm -- well, the subjects are the same, so

5    I would say this would be a continuation.

6              MR. BEENE:  Don't guess, please.  Make sure

7    you read the whole document.

8              THE WITNESS:  Let me read the whole doc and

9    see.  Okay.  I've read it.

10   BY MR. RATINOFF:

11        Q.  Is it fair to say this is a continuation of

12   your e-mail exchange with Mr. Dunn on recommending

13   going with ONgDB 3.4.x over Neo4j?

14        A.  Well, this is a continuation of the e-mail.

15   I'm not sure if you categorized it correctly.

16        Q.  Okay.  But this is the e-mail where you

17   recommended to Mr. Dunn on August 13th of 2018 at

18   11:58 a.m., "I think we should use ONgDB 3.4.x for

19   the launch," correct?

20        A.  Yes, I said that.

21        Q.  And then eventually Mr. Dunn in the last

22   e-mail in the top here says, "John Mark, go ahead

23   and integrate the ONgDB into the CKGE framework

24   we'll deploy."  Do you see that?

25        A.  I see that.

                                                          365

1    Q.  After that, did you provide a version of

2    ONgDB to the IRS to use in the CKGE framework?

3    A.  I believe he -- he didn't say it correctly.

4    You don't -- you don't deploy it to the framework.

5    You just have your own data sources, and the

6    framework has tools that can connect to it.

7    Q.  So then did you start using ONgDB at the

8    IRS in relationship to the CKGE framework or

9    environment, whatever you like to call it?

10   A.  I didn't.  The teams did, the teams that

11   manage graphs, I'm sure.  Because this says let's go

12   ahead and do it.

13   Q.  Where did ONgDB software come from for the

14   IRS?  Was it downloaded from the iGov website?

15   A.  The Graph Foundation.

16   Q.  And at that time, was the IRS using an

17   internal gitlab repository to maintain its graph

18   database software it was using?

19   A.  I don't remember at that time if they had

20   it.

21   Q.  At some point did the IRS begin using an

22   internal gitlab repository to maintain versions of

23   ONgDB?

24   A.  No, not to maintain versions, but I think

25   it was to be able to run their own code scans.  So

366

1    any time they had software, they had source course

2    available.  They wanted it to be in there so they

3    can run code scan tools.

4         Q.  What are code scan tools?

5         A.  They're tools that can do static secure

6    code.  So it can do static code scanning.  It can

7    identify specific types of vulnerabilities that you

8    can recognize by looking at actual source code.

9         Q.  So they --

10        A.  Tools for that.

11        Q.  So before using that version of ONgDB, it

12   would be loaded into the gitlab, and the IRS would

13   scan it to make sure it didn't have any security

14   vulnerabilities?

15        A.  Sorry, repeat that again.

16        Q.  Yeah.  So for instance, if there was a new

17   version of ONgDB to be used, it would be uploaded to

18   the gitlab in the IRS, and they would run scans on

19   it to make sure it was secure and didn't have any

20   security vulnerabilities?  Is that what you're

21   saying?

22        A.  That's one thing they would do, yes.  But

23   it wasn't mandatory to do it.  It was more that,

24   hey, they have a tool that will scan all the repos,

25   let's make sure everything is there in case there

367

1    was something that wasn't reported to us in gitlab.

2        Q.  Did you ever upload any version of ONgDB to

3    the IRS's gitlab repository?

4        A.  I believe I'm the one that did it, but I

5    don't remember.  I'm the one that's responsible for

6    making sure that any of the software that's being

7    used can all be found in a certain area, in a

8    certain location.  So I think I would have done

9    that.

10       Q.  Is that something you continued to do

11   throughout the eGovernment Solutions contract?

12       A.  No.  I think it was something that I

13   started to help with, and then since it's unpaid,

14   just no time to keep doing it.

15       Q.  To this day, you have access to that gitlab

16   repository that the IRS maintains?

17       A.  I believe so.  I should have it.  I haven't

18   checked it for a while, so . . . .

19       Q.  And do you know whether the IRS switched

20   over to ONgDB for its YK1 platform?

21       A.  I'm not positive.

22       Q.  Take a look at what's been previously

23   marked as Exhibit 174.  Oh, I'm sorry.  I think I

24   put the wrong e-mail in.  Let me back up here.

25   Yeah.  Why don't you hold off on that one.  Let me

368

1  put it --

2       A.  Let me close these down so I can open up

3  new ones.

4           MR. RATINOFF:  While you're doing that, let

5  me put in tab 456.  This will be marked as, I

6  believe, Exhibit 234.

7           (Plaintiffs' Exhibit 234 was marked for

8  identification.)

9           THE WITNESS:  Okay.

10  BY MR. RATINOFF:

11      Q.  Do you have an internal IRS e-mail address?

12      A.  Yes, I do.

13      Q.  And you use that address for work that you

14  do for the IRS under the various contracts that

15  you're working under?

16      A.  Yes.

17      Q.  And do you know who Rahul Tikekar is?

18      A.  Yes.

19      Q.  And who is he?

20      A.  He is an IRS employee.

21      Q.  And is he responsible for the YK1 platform?

22      A.  I'm not sure who's responsible for it, but

23  he's involved in it.

24      Q.  And you'll see in this e-mail dated

25  September 21, 2018, you write:

369

1          "I uploaded the ONgDB 3.4.5 instance

2          with the same configuration settings,

3          plugins, et cetera, into my directory

4          on the server you gave me access to,

5          and everything works just fine."

6     A.   Yes, I see that.

7     Q.   Does this refresh your recollection about

8  the YK1 platform beginning to use ONgDB 3.4.5 in

9  September of 2018?

10     A.   No.  Because I'm not sure if they ended up

11  using it.  That's what I'm not -- unsure of.  They

12  could have been using Neo4j Community.  You're going

13  to have to ask.

14     Q.   So you defer to the IRS on that?

15     A.   Yes.  I have no idea what they ended up

16  using.

17          But as I said, I help out as much as I can

18  and wanted to make anything we had available.

19  They're obviously talking about something that

20  they're having an issue with on the server, and I'm

21  talking about what I uploaded.

22     Q.   I don't have a question pending, sir, thank

23  you.  You've already answered my question.

24          All right.  Let's go back to Exhibit 174,

25  which I uploaded in the chat.

370

```
 1          A.   Okay.

 2          Q.   And do you know who Patrick Martin is?

 3          A.   Yes.  Let me review this, please.  Okay.

 4     I've read through it.

 5          Q.   Do you understand what this e-mail is?

 6          A.   Yes, I've got a sense for it.

 7          Q.   Any reason to believe this wasn't an e-mail

 8     exchange between yourself and Patrick Martin?

 9          A.   No.

10          Q.   This was produced by the IRS with Bates

11     number 1738, beginning Bates number.  Do you have an

12     understanding what Patrick Martin was asking you

13     about, "Within this CKGE is ONgDB" -- "Within this

14     CKGE is ONgDB installed on all the database servers

15     or the AS servers or both?"

16          A.   Yes, I see that.

17          Q.   What's he referring to?

18          A.   Well, everyone references anything with

19     Neo4j as ONgDB, first of all, which is not correct

20     all the time.  And he's asking if it's installed on

21     database servers or application AS servers or

22     application servers.

23          Q.   And then you respond to him, "The GDB

24     servers host a single ONgDB node (instance)."  Do

25     you see that?
```

371

1        A.  Yes.  So that would be correct, then, if I

2   said that.

3        Q.  So each, when you say each server, you're

4   talking about servers running one instance of ONgDB

5   software?

6        A.  Yes.  The "each server" was a virtual

7   server.  It might have been the same exact hardware,

8   but they're split out into virtual servers.

9        Q.  And those are running ONgDB software?

10       A.  That's what it says.  I don't know if it's

11  Community or Enterprise.  But yes, that's what it

12  says.  So that would have been -- whatever that date

13  is, then I would say that based on this, they were

14  using ONgDB.  The version, and if it was Community

15  or Enterprise, I don't know.

16       Q.  And then you'll see, it says, "I actually

17  have a mapping document in the CKGE docs — I'll send

18  you the direct link to that on gitlab."  Do you see

19  that?

20       A.  Yes, I do.

21       Q.  Did you keep a mapping document with the

22  IRS so they could track which servers were running

23  ONgDB?

24       A.  I didn't keep that, but there was one that

25  somebody had managed, and that's what I was

                                                         372

1    one.

2         Q.  I'm asking in September of 2019, were there

3    two instances of ONgDB running on separate servers

4    within the CKGE environment?

5         A.  I don't remember at that time.

6         Q.  So you'd defer to the IRS on that?

7         A.  Yes.

8         Q.  I'm going to go ahead and put the next

9    exhibit in.  I know we're running short on time.

10        A.  I've got it open.

11        Q.  This was previously marked as Exhibit 181.

12        A.  Got it.  Let me read through this all.

13   Okay.

14        Q.  Okay.  Do you have any reason to believe

15   that wasn't an e-mail that you exchanged, that you

16   participated in?

17        A.  No.

18        Q.  Okay.  And just for the record, this is

19   produced by the IRS, the last Bates number on the

20   first page of 473.

21            And you'll see if you go down to the e-mail

22   from yourself to an Aaron Katch and a Hai Huynh,

23   hopefully I pronounced that correct, and the subject

24   is "Re: Re:  Graph for local install."  Do you see

25   that?

                                                    378

1      A.   Yes, I do.

2      Q.   And you'll see you're referring to the

3  latest ONgDB for Windows, and there is a URL there,

4  a cdwgit.web.irs.gov.  Do you see that?

5      A.   Yes, I do.

6      Q.   And the reference is graphstack-dist, and

7  at the end it says ONgDB.

8      A.   Yes, I see that.

9      Q.   What is that URL referring to?

10      A.   I believe that's a shared folder for

11  different technologies that are available to them.

12  ONgDB would have been one.  They would have had

13  forward slash, like, Elastic, forward slash

14  Keycloak.

15      Q.   But in this case, it's referring to ONgDB?

16      A.   Yes, this one is referring to ONgDB.

17      Q.   And then you'll see below it says Direct

18  link to 3.5.11.

19      A.   Yes.

20      Q.   Okay.  And you'll see a URL there that ends

21  with ongdb-enterprise-3.5.11-windows.zip.

22      A.   Yes.

23      MR. BEENE:  Can we get a time check?

24      THE VIDEOGRAPHER:  Hold on.

25      MR. RATINOFF:  We're off the record.

                                                      379

1          THE VIDEOGRAPHER:  All right.  We are now

2     off the record at 5:53.

3               (Break taken from 5:53 to 5:56 p.m.)

4          THE VIDEOGRAPHER:  We are now on the record

5     at 5:56.

6          MR. BEENE:  Defendants are agreeing to

7     extend the deposition by an additional 10 minutes

8     for a total of eight hours and 40 minutes.

9          MR. RATINOFF:  And I appreciate that

10    courtesy, Counsel.

11    BY MR. RATINOFF:

12         Q.  Okay.  So turning back to Exhibit 181, we

13    were looking at that URL that says Direct Link to

14    3.5.11.  That's referring to ONgDB Enterprise

15    version 3.5.11, correct?

16         A.  Yes, Windows version.

17         Q.  And that's something that you put up on the

18    gitlab for the IRS's use?

19         A.  Yes.  It would have been brought in by

20    Graph Foundation, and then I would have put it up

21    there as the shared folder, help everyone figure out

22    where everything is.

23         Q.  Okay.  Thank you.  And moving on to my next

24    exhibit, this is previously marked as Exhibit 151.

25    And I'll represent to you this is an e-mail that was

                                                    380

DECLARATION OF DEPONENT

   I, JOHN MARK SUHY, JR., declare under penalty of
perjury that I have reviewed the foregoing
transcript; that I have made any corrections,
additions, or deletions in my testimony that I
deemed necessary; and that the foregoing is a true
and correct transcription of my testimony in this
matter.


   Dated this _____ day of _____, 2022,
at _____, _____.
    [City]                    [State]


                 _____

                 JOHN MARK SUHY, JR.

409

1                     REPORTER'S CERTIFICATE
            The undersigned Certified Shorthand
2    Reporter licensed in the State of California does
     hereby certify:
3            I am authorized to administer oaths or
     affirmations pursuant to Code of Civil Procedure,
4    Section 2093(b), and prior to being examined, the
     witness was duly administered an oath by me.
5            I am not a relative or employee or attorney
     or counsel of any of the parties, nor am I a
6    relative or employee of such attorney or counsel,
     nor am I financially interested in the outcome of
7    this action.
             I am the deposition officer who
8    stenographically recorded the testimony in the
     foregoing deposition, and the foregoing transcript
9    is a true record of the testimony given by the
     witness.
10           Before completion of the deposition, review
     of the transcript [x] was [^ ] was not requested.
11   If requested, any changes made by the deponent (and
     provided to the reporter) during the period allowed
12   are appended hereto.
             In witness whereof, I have subscribed my
13   name this 5th day of December, 2022.

14

15

16

17

18                  
                    _____
19                  KAREN L. BUCHANAN
20
21                  CSR No. 10772
22
                    CLR No. 031106-04
23

24

25
                                                        410

**EXHIBIT 3**

UNITED STATES DISTRICT COURT
NORTHER DISTRICT OF CALIFORNIA


NEO4J, INC., a Delaware
corporation; and NEO4J
SWEDEN AB, a Swedish
corporation,                         CASE NO.
                                     5:18-cv-07182-EJD

          Plaintiffs,
vs.
PURETHINK, LLC, a Delaware
limited liability company;
IGOV INC., a Virginia
corporation; and JOHN MARK
SUHY, an individual,
          Defendants.
_____/


     REMOTE VIDEOTAPED DEPOSITION OF ASHWANI MAYUR
AS PERSON MOST KNOWLEDGEABLE FOR EGOVERNMENT SOLUTIONS


 DATE:         October 25, 2022

 TIME:         8:03 a.m.

 LOCATION:     Via Zoom Videoconference

 REPORTED      KAREN L. BUCHANAN
 BY:           CSR No. 10772
               CLR No. 031106-04


1

1          (Reporter interruption.)

2          MR. GOLDSTEIN:  The deponent, eGov

3     Solutions.

4          THE VIDEOGRAPHER:  Thank you.  Will the

5     Court Reporter please swear in the witness at this

6     time.

7                    ASHWANI MAYUR,

8     being duly sworn by the Certified Shorthand Reporter

9     to tell the truth, the whole truth, and nothing but

10    the truth, testified as follows:

11         THE WITNESS:  Yes, I do.

12         THE VIDEOGRAPHER:  Thank you.  Please

13    proceed.

14              EXAMINATION BY MR. RATINOFF:

15       Q.  Okay.  Mr. Mayur, would you please state

16    your full name for the record.

17       A.  Ashwani Mayur.

18       Q.  And are you here today on behalf of

19    eGovernment Solutions?

20       A.  That is correct.

21       Q.  And are you represented by counsel today?

22       A.  Yes.

23       Q.  And who is your counsel?

24       A.  Mr. Jeffrey Goldstein.

25       Q.  Have you ever been deposed before?

7

1      A.  I do.

2      Q.  Okay.  And the other thing that's very

3  important is that your answers be audible, meaning

4  that you -- if it's a yes-or-no question, that you

5  answer "yes" or "no."  You don't shake your head or

6  nod your head, because even though this is being

7  videotaped, the court reporter doesn't transcribe

8  body language.  Does that make sense?

9      A.  Yes, I do.

10      Q.  And now you were just given an oath.  That

11  oath that you took is the same as if you were

12  testifying live in court before a judge or a jury.

13          Do you understand?

14      A.  I understand.

15      Q.  And that the oath is under the penalty of

16  perjury.  Do you understand what that means?

17      A.  I don't, but I have no reason to lie.

18      Q.  Okay.  Penalty of perjury is there is laws

19  in the books that say you can't lie under oath, and

20  if you do, you could be punished criminally.  Do you

21  understand that?

22      A.  I understand.

23      Q.  And I'm sure you're here today to give your

24  full and best and most truthful testimony, correct?

25      A.  That is correct.

9

1    been marked as Exhibit 95.  Do you recognize this

2    document?

3           A.  Yes, I do.

4           Q.  And what is it?

5           A.  This is the subpoena document which I

6    received from your end.

7           Q.  And you understand this is why you're here

8    to testify today?

9           A.  Yes.

10          Q.  And you understand you're testifying on

11   behalf of eGovernment Solutions?

12          A.  That is correct.

13          Q.  And you understand that you're not just

14   testifying about what you personally know but what

15   anyone who is associated, i.e., employees of

16   eGovernment Solutions, might know?

17          A.  That is correct.

18          Q.  I'll have you go ahead and go to page 2 of

19   attachment A.  Just let me know when you're there.

20          A.  Yes.

21          Q.  You'll see starting at page 2 scrolling

22   through the document to page 5, there is a list of

23   14 deposition topics of examination.  Do you see

24   that?

25          A.  Yes.

                                                        13

1    Mr. Goldstein?

2         A.  In the morning.  It was a call.

3         Q.  Understood.

4              (Reporter interruption.)

5    BY MR. RATINOFF:

6         Q.  And were any -- was there anyone else on

7    these telephone calls with your attorney?

8         A.  No.

9         Q.  And did you talk to anyone else in

10   preparation for this deposition?

11        A.  I did talk to my CPA firm.

12        Q.  Your accountant?

13        A.  Yes.

14        Q.  And do you know who John Mark Suhy is?

15        A.  Yes.

16        Q.  And did you talk to John Mark Suhy prior to

17   this deposition after receiving this subpoena?

18        A.  Yes, I did.  When I received the subpoena,

19   I wanted to find out what it is.

20        Q.  Okay.  What did you talk to Mr. Suhy about?

21        A.  Because he is the one who is running the

22   project, so I just wanted to figure out what exactly

23   it is.  And after talking to him, I decided I would

24   like to go to Jeff, my attorney.  And once I spoke

25   to Jeff, since then I did not connect with John Mark

                                                        15

1      Q.  Have you reviewed these topics before?

2      A.  Yes, I did.

3      Q.  And do you know you're going to be

4  testifying on each of those topics?

5      A.  That is correct.

6      Q.  Is there anything in these 14 topics that

7  you don't believe you're able to provide testimony

8  on?

9      A.  No.  I believe I will be able to provide

10  testimony based on my best knowledge.

11      Q.  On all of these topics, all 14?

12      A.  I'm sorry, repeat that.

13      Q.  You're prepared to testify on all 14

14  topics?

15      A.  Yes.

16      Q.  And then prior to the deposition today, did

17  you meet with your counsel to prepare?

18      A.  Yes.  We had a couple of calls.

19      Q.  And approximately how long were those

20  calls?

21      A.  All together, maybe three, four hours.

22      Q.  And when you said your counsel, you mean

23  Mr. Goldstein?

24      A.  That is correct.

25      Q.  When is the last time you met with

14

```
1    Suhy.
2        Q.  And I'm sure your attorney will jump in,
3    but I don't want you to tell me what you spoke with
4    your lawyer.  Okay.  So then when was that
5    conversation that you had with Mr. Suhy?
6        A.  It should be three, four weeks back, I
7    guess, the last conversation.  Once we had the
8    document, then you and I went back and forth about
9    the date.  That was the last time I spoke to him.
10       Q.  Did you ask Mr. Suhy about any documents?
11       A.  No.
12       Q.  You mentioned a project.  What project were
13   you referring to?
14       A.  Department of Treasury IRS project.
15           (Reporter interruption.)
16           THE WITNESS:  The Department of Treasury
17   IRS project.
18           MR. RATINOFF:  I'm going to go ahead and
19   drop the next document into the chat.  Mark this as
20   Exhibit 96.
21           (Plaintiffs' Exhibit 96 was marked for
22   identification.)
23   BY MR. RATINOFF:
24       Q.  Just let me know when you've had a chance
25   to download it and open it and take a look.
```

16

1  copy files?

2      A.  The only hard copies we have is the company

3  legal documents, anything along that line.  But in

4  regards to this particular project, because I

5  believe this is what is being told to me, that this

6  is a clear project, and John Mark Suhy was

7  responsible from very beginning talking to the

8  client, collecting anything.  We have a location in

9  Alexandria where we have documents, but any of those

10  documents were maintained by John Mark Suhy.  I

11  never saw any document ever as of today.

12      Q.  And when you say any documents, you're

13  referring to documents related to the IRS project?

14      A.  Correct.  Any physical document.

15      Q.  And did you have access to electronic

16  documents in the Google cloud that you mentioned in

17  relation to the IRS project?

18      A.  No, I did not.

19      Q.  So eGov Solution does not have access to

20  any documents related to the IRS project?

21      A.  Any of the documents, even if it came to

22  the eGovernment Solution e-mail, that would be with

23  John Mark Suhy's e-mail.

24      Q.  Did you ask Mr. Suhy to look for any

25  documents when you received Exhibit 96?

20

1    A.  So my partner reached out to him, and we

2    took the access, and then we searched all of those.

3    Q.  Oh, so you needed to ask Mr. Suhy for

4    permission to access to his e-mail account?

5    A.  Because the two-way authentication, he is

6    still working on that project, so we had to ask him

7    so that we can -- we did not want to stop his

8    access.

9    Q.  Okay.  So you asked Mr. Suhy to give you

10   access to his egovsol.com account?

11   A.  That is correct.

12   Q.  And you had no way of getting access

13   without asking him to get the two-factor

14   authentication done, if I understand correctly?

15   A.  I'm not familiar if I can research that.

16   My partner did that.

17   Q.  But you were unable to get access to his

18   eGov Solutions account without his -- I'm sorry, let

19   me start over.

20        So you were unable to get access to that

21   e-mail account without going through Mr. Suhy?

22   A.  I -- I believe so.  I mean as I mentioned,

23   my partner, he did it.  And there is a code from

24   Mr. John Mark Suhy.  He gave us the code.  He gave

25   the code to my partner, and then he searched the

21

1    isn't the Articles of Incorporation for eGovernment

2    Solutions?

3         A.  I'm sorry.  Repeat that again.

4         Q.  You don't have any reason to believe this

5    isn't the Articles of Incorporation for --

6         A.  No, no, no.  I never saw this document,

7    because when the company was registered, Nikhil and

8    I, we were not partners in the company.

9         Q.  Okay.  So who founded eGovernment

10   Solutions?

11        A.  John Mark Suhy and Benjamin Siegler.

12        Q.  If you go to page 7 out of 8.  There is no

13   numbering, so I'm just using the PDF page.  You'll

14   see it says Articles of Incorporation Virginia Stock

15   Corporation.  Do you see that?

16        A.  Uh-huh.  Yes, I do.

17        Q.  And you'll see "The initial directors are:

18   John Mark Suhy."

19        A.  That is correct.

20        Q.  So he was the original director of

21   eGovernment Solutions in 2009 when it was founded?

22        A.  That is -- I believe that is correct.

23   That's per the document.

24            MR. RATINOFF:  And then I'm going to go

25   ahead and put the next document in the chat.

                                                    24

1          Q.   Okay.  And what time was that?

2          A.   I believe it should be 2013 or 2014.

3          Q.   So it was definitely -- but it was after?

4     I'm looking back at Exhibit 99, and Mr. Siegler is

5     listed as of January 29, 2014, so the buyout would

6     have been in 2014?

7          A.   That sounds about right.

8          Q.   And then was there a point in time where

9     Mr. Suhy was bought out of his shares of eGovernment

10    Solutions?

11         A.   That is correct.  That is December 31st,

12    2018.

13         Q.   And what was the reason for buying Mr. Suhy

14    out of his shares of eGovernment Solutions?

15         A.   Well, for many, many years nothing happened

16    in the company.  And Mr. Suhy's interest had always

17    been in projects.  And as I mentioned, my partner,

18    Nikhil, my present partner, Nikhil and I, we have a

19    background which is related to staffing.  And we

20    wanted to do something in the federal space.  We

21    wanted to identify some projects where we can

22    realize the company to do staffing, technology

23    staffing, to partner with the larger contracting

24    companies which are based out of this area.  So that

25    is the time Mr. Suhy decided to sell his shares to

                                                          30

1    us.

2         Q.   And was there a purchase price discussed?

3         A.   Yes.

4         Q.   And do you recall what that purchase price

5    was?

6         A.   I believe it was $20,000.

7         Q.   And then how did -- how did the remaining

8    shareholders and Mr. Suhy come to that number?

9         A.   So at that time, I think the IRS project

10   was also won in the eGovernment Solution, which

11   everything was done by Mr. Suhy.  And when we

12   decided that, hey, we would like to buy the share

13   and the agreement was this project belongs to you,

14   we have no idea what it is, and you can continue to

15   use it.  If we get the money from IRS, we will pay

16   it to you without keeping anything out of that.

17   That was the agreement with him.  And we decided

18   that 20,000 is a fair share.

19        Q.   And was there a written agreement that

20   reflected the purchase of Mr. Suhy's shares?

21        A.   Yes.

22        MR. RATINOFF:  All right.  Please go ahead

23   and take a look at the chat.  I dropped another

24   document in there.  This will be Exhibit 100.

25        (Plaintiffs' Exhibit 100 was marked for

31

1    identification.)

2              THE WITNESS:  It's downloading.  One

3    second.

4    BY MR. RATINOFF:

5         Q.  The title of this document is Stock

6    Purchase Agreement, so let me know when you've had a

7    chance to open it and take a look at it.

8         A.  Yes.  Now I have.

9         Q.  And do you recognize what has been marked

10   as Exhibit 100?

11        A.  The buy-sell agreement?

12        Q.  Yeah.  The title is Stock Purchase

13   Agreement.  That's Exhibit 100.

14        A.  Yes.

15        Q.  And do you recognize this document?

16        A.  Yes.

17        Q.  What is it?

18        A.  This is a Stock Purchase Agreement which --

19   where we agreed to buy Mr. Suhy's stock from the

20   company, shares from the company.

21        Q.  And then you mentioned the purchase price

22   of 20,000.  If you look at section 2.1 --

23        A.  Yes.

24        Q.  -- that's reflected there in that section,

25   the purchase price.

32

1          A.   That is correct.

2          Q.   And I'm looking at -- I don't know if it's

3     a section or paragraph, I'll call it section,

4     section 4, it says "John Mark Suhy will continue to

5     act as Facility Security Officer or assistant

6     Facility Security Officer for eGovernment Solutions,

7     Inc."  Do you see that?

8          A.   Yes.

9          Q.   What's a Facility Security Officer?

10         A.   So my understanding is if you're doing any

11    project for the federal government and you need

12    certain clearance for that, there are secret, top

13    secret, different kind of clearances.

14              This project required a secret level

15    clearance, I believe.  John Mark was the only one at

16    that time who had the clearance in the company.  So

17    you have to identify some individual who can work as

18    a security officer.  What does that means is it

19    doesn't matter who the owner is, if I'm not cleared,

20    I'm not supposed to look at any of the documents

21    coming for that project.

22         Q.   So it was necessary for him to remain the

23    Facility Security Officer to keep servicing IRS

24    under the contract you mentioned?

25         A.   That is correct.  That is my impression.

33

1       Q.  Okay.  And if we look at the next page,

2   there is a paragraph 5.

3       A.  Mm-hmm.

4       Q.  It says Treasury Contract 2032H, as in

5   hotel, 8-18-P, as in papa, dash 00151.  Do you see

6   that?

7       A.  Yes.

8       Q.  Is that the project that you had mentioned

9   earlier?

10      A.  That is correct.

11      Q.  I think the numbers are kind of a mouthful.

12  So is it okay -- it says aka CKGE Knowledge

13  Environment contract right next to that number I

14  just read off.  Do you see that?

15      A.  That is correct.

16      Q.  Can we just call it the "CKGE contract" for

17  short?  Do you understand if we use that word,

18  that's that contract?

19          MR. BEENE:  Objection to form.

20  BY MR. RATINOFF:

21      Q.  Can we call the Treasury Contract

22  2032H8-18-P-00151 the "CKGE contract" for short?

23      A.  Is that a question for me?

24      Q.  Yes.

25      A.  Yes, you can.

34

1     Q.  You'll understand what I'm talking about?

2     A.  Yes.  The project from the -- the contract

3  from the IRS.

4     Q.  Now, you mentioned Mr. Suhy would keep

5  working on the contracts.  Looking at paragraph 511

6  or section 5.1, it says:

7          "EGovernment Solutions, Inc., hereby

8          hires John Mark Suhy as an independent

9          contractor for all option years that

10         are exercised on the CKGE contract."

11         Do you see that?

12    A.  Yes, I do.

13    Q.  And it says, "His compensation will be

14  200,000 per year paid when eGovernment Solutions

15  gets paid"?

16    A.  That is correct.

17    Q.  When it says eGovernment Solutions gets

18  paid, that means paid by the IRS under the CKGE

19  contract?

20    A.  That is correct.

21    Q.  And again, the reason I think you testified

22  earlier that the money would be paid to Mr. Suhy is

23  he was the only one in eGovernment Solutions that

24  was able to fulfill that contract?

25    A.  That is correct.

35

1      Q.  And looking at paragraph 5.2 or section

2   5.2, "eGovernment Solutions will give John Mark Suhy

3   the authority to drive the direction of the project,

4   (Section 5)," I assume that's referring to the CKGE

5   contract; is that correct?

6      A.  That's correct.

7      Q.  And from that point up until this contract

8   and the Stock Purchase Agreement, did Mr. Suhy have

9   full authority on the CKGE contract?

10     A.  Yes.

11     Q.  And the purpose of this agreement was to

12  allow him to continue to have full authority under

13  that contract as an independent contractor?

14     A.  That is correct.

15     Q.  Now, looking at paragraph 5.3, it mentions

16  option years.  And then there is a list of years 1,

17  2, 3 and 4.  What does that mean as far as option

18  years?

19     A.  So my impression is when this project was

20  won, John Mark Suhy did mention that there would be

21  an extension on this project.  There would be

22  multiple years.  And I believe it goes to five

23  years.

24         So we wanted to be fair, if anything coming

25  out of the project, any money -- because he is the

36

1   one who won that, he was the one who is working on

2   it, so anything that comes from IRS, we felt

3   obligated, we wanted to give to him.  Now, if the

4   money would come, we will pay him.  If the money

5   would not come, I will assume that service is not

6   provided to IRS, so there is no more money coming.

7        Q.  But as far as if the IRS did pay the full

8   amount that was due in the contract, that money

9   would be in turn paid to Mr. Suhy?

10       A.  That is correct.

11       Q.  And so eGovernment Solutions didn't take a

12  commission or anything off of any payments from the

13  IRS?

14       A.  No.

15       Q.  And in looking at paragraph 6, it says:

16           "Profit on any future contracts with

17           the Department of Treasury the CACI

18           Army contract (prime award, teaming,

19           or subcontracts) shall be subject to a

20           1/3 commission on Net Profit to John

21           Mark Suhy."

22           Do you see that paragraph or section?

23       A.  Yes.

24       Q.  Was the Department of Treasury future --

25   sorry.  Were there any other Department of Treasury

37

1      Q.   Okay.  So it was a staffing contract?

2      A.   That is correct.

3      Q.   It wasn't a contract for the installation

4  of any type of software?

5      A.   I'm not aware of that.

6      Q.   Okay.

7      A.   It is a 250 million -- I don't want to give

8  any amount.  It's a large contract with the Army, so

9  I'm sure they would have hundreds of technologies

10 there.

11     Q.   Okay.  And what was Mr. Suhy's role with

12 that contract?

13     A.   So in the beginning, because we are a small

14 business, we wanted to convey to CACI that we would

15 be able to fulfill some of those positions in some

16 specific technology.  And he is the one who brought

17 in that contract.

18     Q.   Okay.  And then for some reason, there

19 seems to be two copies of the agreement in this

20 document.  So I'm going to scroll down to what's the

21 signature page.  And you'll see there are some

22 signatures on the left column.  Do you see that?

23     A.   Yes.

24     Q.   And is that Mr. Suhy's signature, to your

25 knowledge?

                                                     39

1      A.  I believe that is his signature.

2      Q.  Is that Mr. Budhiraja's signature?

3      A.  Yes.

4      Q.  I notice there is two spots for your

5  signature.  Do you see that?

6      A.  That is correct.  I think I may have missed

7  it.

8      Q.  Did you end up signing this document, this

9  Stock Purchase Agreement?

10      A.  Yes.

11      Q.  Just -- I'll represent that we received a

12  copy of this from you, also from Mr. Suhy, and

13  neither had your signature on it.  Do you have a

14  copy of it with your signature?

15      A.  I can sign one, I'm sure.

16      Q.  But it was understood this contract was

17  fully executed?

18      A.  Yes.

19      Q.  And Mr. Suhy transferred his shares in the

20  company to the remaining shareholders?

21      A.  That is correct.

22      Q.  And how were those shares distributed

23  between the remaining shareholders?

24      A.  I think there is some more documents here.

25  I think Nikhil and I are equal partners on that now.

                                                      40

 1          Q.  And if you keep scrolling down here, it's

 2     page 12 out of 14, and in the PDF, it's Stock Ledger

 3     eGovernment Solutions.

 4          A.  Yes.

 5          Q.  And that shows, if you look at it, that

 6     12/26/2018, Mr. Suhy's one-third share was

 7     distributed it looks like here -- I'm trying to --

 8     well, strike that.

 9              Is this Stock Ledger, was this accurate as

10     far as up to the time of the sale?

11          A.  That is correct.

12          Q.  And again, it looks like there is two

13     signatures here, but yours is missing.  Do you see

14     that?

15          A.  Yeah, I see that.

16          Q.  Do you have a signed copy of the Stock

17     Ledger with your signature?

18          A.  I can check.  If not, I can sign it, I'm

19     sure.

20          Q.  But this -- to your knowledge, this is an

21     accurate Stock Ledger as of 2018?

22          A.  Yes.

23          Q.  And then going back to CKGE contract, at

24     the time that the Stock Purchase Agreement was

25     signed, was there anyone else working on that

                                                           41

1    contract on behalf of eGovernment Solutions?

2         A.  I believe there may be another company

3    which was working, but John Mark Suhy would know all

4    about that.

5         Q.  As of 2018, you think there may have been

6    another company working on that contract on

7    eGovernment Solutions' behalf?

8         A.  So recently I was looking at the document,

9    and one of the e-mails from John Mark Suhy mentioned

10   there is a company who was supporting him in the

11   beginning.

12        Q.  Do you recall the name of that company?

13        A.  I think it's called AtomRain.

14        Q.  Is the CKGE contract still active?

15        A.  I have to check that.  I mean we have to

16   check that with John Mark Suhy.  The only thing I

17   remember is we received the last money.  The moment

18   the money comes, John Mark Suhy takes the money out.

19   So I would not know anything about the project.

20        Q.  And other than being the FSO, Facilities

21   Security Officer -- we'll just call it FSO, if

22   that's okay.

23        A.  I'm okay with that.

24        Q.  Did Mr. Suhy retain any other position at

25   eGovernment Solutions after he sold his shares?

                                                    42

1          A.  So in regard to this particular project, he

2     is the one who is conducting it.

3          Q.  But did he have any -- was he retaining any

4     other positions at eGovernment Solutions as an

5     officer, like treasurer, vice president after?

6          A.  No.

7          Q.  So the only position he held was FSO after

8     the Stock Purchase Agreement was signed?

9          A.  Please repeat that again.

10         Q.  So after the Stock Purchase Agreement was

11    signed, the only position he held at eGovernment

12    Solutions was FSO?

13         A.  That is correct.

14         Q.  Did he ever stay on as the chief technology

15    officer for eGovernment Solutions?

16         A.  I believe he must have used that term.  But

17    is there an official letter for that?  No, there is

18    not.

19              (Reporter interruption.)

20              THE WITNESS:  So as I said, he is an FSO,

21    but he might have used the term chief technology

22    officer.  But there is no project, nothing going on

23    other than this particular project.  So for this

24    particular project, he can call himself anything.

25    BY MR. RATINOFF:

                                                           43

1    currently working on?

2        A.  So we have three individuals working

3    with -- as a subcontract with a different

4    department.

5        Q.  And do any of those contracts involve

6    Mr. Suhy?

7        A.  No.  They were building staffing projects.

8        Q.  Do any of those contracts involve Neo4J

9    software?

10       A.  No.

11           (Reporter interruption.)

12           MR. RATINOFF:  Neo4J software.

13           THE REPORTER:  Thank you.

14           MR. RATINOFF:  Okay.  I'm going to go ahead

15   and mark the next exhibit as I put it in the chat as

16   Exhibit 102.

17           (Plaintiffs' Exhibit 102 was marked for

18   identification.)

19   BY MR. RATINOFF:

20       Q.  This is a document that was produced by

21   eGovernment Solutions.  And it starts with a Bates

22   number of EGOVS with the number 1.  Are you in

23   there?

24       A.  Which page should I look?

25       Q.  Just the first page will be fine, thanks.

47

1    I mean take a look at the whole document too.

2         A.  This is IRS Price Quotation Sheet?

3         Q.  Correct.  Do you remember this document?

4         A.  I did see this document, first time in the

5    last two weeks.

6         Q.  Okay.  But it was produced by eGovernment

7    Solutions?

8         A.  It is produced by John Mark Suhy on behalf

9    of eGovernment Solutions.

10        Q.  So you got -- you asked Mr. Suhy for

11   documents related to the CKGE contract, correct?

12        A.  I believe my attorney asked for them.

13        Q.  And this is the -- one of the documents you

14   received?

15        A.  That is correct.

16        Q.  And to your knowledge, does this quotation

17   relate to the IRS project we've been talking about?

18        A.  I believe so.

19        Q.  And was this a quote prior to that contract

20   being issued that was submitted by eGovernment

21   Solutions?

22        A.  I mean as I mentioned, I just see this

23   document a few weeks back, so I guess that is

24   correct.

25        Q.  Going and looking at what's marked as Bates

48

1    numbers number 11, do you want to go to that?

2         A.  I'm on that page.

3         Q.  Okay.  It says "Offeror name:  EGovernment

4    Solutions, Inc."

5         A.  Yes.

6         Q.  Do you see that?

7         A.  Yes.

8         Q.  So is it fair to say this document was

9    submitted to the IRS on behalf of eGovernment

10   Solutions?

11        A.  That is correct.

12        Q.  Looking at the next page, Bates No. 12.

13        A.  Mm-hmm.

14        Q.  Sorry, you'll have to use an audible "yes"

15   or "no."

16        A.  Yes.  Sorry.

17        Q.  No problem.  I know it's hard.  Sometimes

18   we slip into normal conversation.

19             Looking at the signature name here, it says

20   "Insert print name:  John Mark Suhy," and there is

21   an April 3rd, 2018, is the date.  Do you see that?

22        A.  I do see that.

23        Q.  Is that Mr. Suhy's signature?

24        A.  I believe that's his signature.

25        Q.  Mr. Suhy was signing this quote on behalf

                                                          49

1    eGovernment Solutions, correct?

2         A.  That is correct.

3         Q.  And to eGovernment Solutions' knowledge,

4    this was submitted to the IRS?

5         A.  Yes.

6         Q.  But no one else in the company had any

7    input into this quote, just Mr. Suhy?

8         A.  That is correct.

9         Q.  And we were talking about it a little

10   earlier.  To eGovernment -- sorry, eGovernment

11   Solution's knowledge, this quote was accepted by the

12   IRS?

13        A.  That's correct.

14        MR. RATINOFF:  And now I'm going to go

15   ahead and put the next exhibit into the chat.  I

16   believe this would be Exhibit 103.

17        (Plaintiffs' Exhibit 103 was marked for

18   identification.)

19   BY MR. RATINOFF:

20        Q.  Let me know when you've had a chance to --

21        A.  I'm looking at it right now.

22        Q.  Let me know when you're done.

23        A.  Yes.

24        Q.  Okay.  Looking at what's been marked as

25   Exhibit 103, it says "Order for Supplies or

50

1    Services." And you'll see there is a box 3, and it's

2    got the order No. 20232H8-18-P-00151.  Do you see

3    that?

4         A.  Yes, I do.

5         Q.  And is that the same contract number that

6    was referenced in the Stock Purchase Agreement?

7         A.  That is correct.

8         Q.  And then what's your understanding of what

9    this order for supplies or services is?

10        A.  This is a project which was won by John

11   Mark Suhy on behalf of eGovernment Solutions for

12   IRS.

13        Q.  And that is what we've been calling the

14   CKGE --

15        A.  That is correct.

16        Q.  -- contract?

17        A.  Yes.

18        Q.  And this is the same contract that is in

19   the Stock Purchase Agreement?

20        A.  That is correct.

21        Q.  And looking at the next page, you'll see

22   there is a list of Line Item Table.

23        A.  Yes.

24        Q.  If you look at the item number 1, it's CDW

25   Graphic Environment Continued development and

51

1    operations, et cetera.  Do you see that?

2        A.  Yes, I do.

3        Q.  And the base is listed as the year or the

4    dates, 5/24/18 to 5/23 -- and it looks like there's

5    a typo, 2029.

6        A.  I see that.

7        Q.  Is it your understanding this line item 1

8    with the price of 300,000 was the first year of the

9    IRS contract for the Stock Purchase Agreement?

10       A.  That's correct.

11       Q.  And I believe you mentioned there was some

12   option years listed in the Stock Purchase Agreement;

13   is that correct?

14       A.  That's correct.

15       Q.  And looking at items 1001, 2001, 3001 and

16   4001, is that the option years that were referring

17   to in the contract?

18       A.  That is correct.

19       Q.  And when I say contract, I mean the Stock

20   Purchase Agreement.  Sorry.

21       A.  Yes.

22       Q.  And the price or the value of each one of

23   those option years is $200,000, correct?

24       A.  That is correct.

25       Q.  And as you testified before with the Stock

52

Purchase Agreement, the idea was that if each one of these option years is exercised for $200,000, that money would be ultimately paid to Mr. Suhy?

A.  That is correct.

Q.  And as of the time of the -- you'll see the date on this is at the very bottom.  It's signed on May 31st, 2018.

A.  Which page?

Q.  I'm sorry.  I jumped ahead there.  Strike that question.  Let me go back.  Sorry.  On the first page.

A.  Same document?

Q.  Yeah.  Same document.  First page, you'll see it was signed on May -- it's very small under the 22 box, it's a signature that says digitally signed dated 2018.05.24.  Do you understand to be May 24, 2018?

A.  Yes.  I see that.

Q.  And is that your understanding of when the contract was awarded?

A.  I believe that may be the correct date.

Q.  And was there a $300,000 payment made to eGovernment Solutions by the IRS after this contract was awarded?

A.  Yes.

1      Q.  And was the entire $300,000 then paid to

2  Mr. Suhy?

3      A.  That is correct.

4      Q.  We've been going for about an hour.  Are

5  you doing okay, or do you need to take a break?

6      A.  I'm doing fine.

7      Q.  We'll go a few more questions and take a

8  break, because I know there's other folks on this

9  that probably do want to take a break.

10      MR. RATINOFF:  Okay.  The next document is

11  going to be marked as Exhibit 104.

12      (Plaintiffs' Exhibit 104 was marked for

13  identification.)

14  BY MR. RATINOFF:

15      Q.  I'm going to drop this in the chat.  You'll

16  see this document is entitled Amendment

17  Solicitation/Modification of Contract.

18      A.  I see that.

19      Q.  And I'll represent to you this is provided

20  to us by your counsel.

21      A.  What?  I didn't get that.

22      Q.  This document, you'll see there is a Bates

23  number on the bottom.  This is produced by your

24  counsel.  Do you understand that?

25      A.  Yes.

54

1        Q.  And do you recognize what's been marked as

2    Exhibit 104?

3        A.  I'm sorry.  I'm looking at some specific

4    number?

5        Q.  Yeah.  Look at -- I'll help you out here.

6    If you take a look at Box 10A, it says Modification

7    for Contract Order Number.

8        A.  Yes, that is correct.

9        Q.  And then looking down actually at Box 14, I

10   think it's a little bit more descriptive.  It says,

11   "The purpose of this modification is to correct OF

12   347 block 3 order number Smart ID from

13   2032H8-18-P-00151 to 2032H8-18-P-00168."

14        Do you see that?

15       A.  Yes, I do.

16       Q.  And do you understand that this amendment

17   was changing the contract number for the CKGE

18   contract?

19       A.  Based on the document, it looks like that

20   is the case.  But I never saw this document before.

21   When I say before, it means before the subpoena.

22       Q.  And did you obtain this document from

23   Mr. Suhy?

24       A.  My counsel did.

25       Q.  And you see the name and address of the

                                                        55

1    contractor says eGovernment Solutions?

2         A.  That is correct.

3         Q.  So to your knowledge, this was an amendment

4    to the original CKGE contract we've been talking

5    about?

6         A.  Based on the document, that sounds right.

7    That sounds right.

8         Q.  But you don't have any reason to believe

9    it's not correct?

10        A.  No, I don't.

11        Q.  And based on what this document states, you

12   understand that the contract number -- just the

13   contract number has been changed by this amendment,

14   correct?

15        A.  Yes.

16        MR. RATINOFF:  The next document I'm going

17   to mark is Exhibit 105.

18        (Plaintiffs' Exhibit 105 was marked for

19   identification.)

20   BY MR. RATINOFF:

21        Q.  I just dropped that in the chat.  And this

22   document is entitled Amendment of

23   Solicitation/Modification of Contract, and it starts

24   with the Bates number EGOVS000030.  Do you see that?

25        A.  Yes, I do see that.

56

1        Q.  And I'll represent to you this is produced
2   by your counsel.
3        A.  That is correct.
4        Q.  And what is your understanding of this
5   document?
6        A.  It looks like the initial price has
7   increased from 300,000 to 500,000.
8        Q.  Okay.  And that's by 200,000 essentially?
9        A.  That is correct.
10       Q.  And it says on the second page, it sounds
11  like you might already be there, it says, "Option to
12  extend services."  Do you see that?
13       A.  Yes.
14       Q.  Is it your understanding that this is the
15  option 1 year in the CKGE contract that we've been
16  talking about?
17       A.  I believe so.
18       Q.  You can see, "The purpose for this
19  modification," box 14, "is to exercise option year 1
20  in the amount of $200,000 with the period of
21  performance is 5/24/19 to 5/23/2020."  Do you see
22  that?
23       A.  Yes.  Looking at this document, that sounds
24  right.
25       Q.  And looking back -- just so we're on the

57

1    same page, looking back at Exhibit 100, I don't know

2    if you have that handy, it would be tab 366 in the

3    chat if you needed to go back and look at that.  I'm

4    sorry.  365.  Do you have that open?

5        A.  I do have it open.

6        Q.  Okay.  So just so we're clear -- I'm sorry.

7    I'm off by one.  It is 366.  I'm looking at -- I'm

8    looking at the Stock Purchase Agreement,

9    Exhibit 100, and you'll see there is an option

10   year 1, 5/24/2019 to 5/23/2020.  Do you see that?

11   It's in section 5.3.

12       A.  I do see that.

13       Q.  So is it fair to say that what we've been

14   looking at as an amendment is the option year 1

15   that's referenced in the Stock Purchase Agreement?

16       A.  I'm afraid I didn't understand the

17   question.

18       Q.  So I'm just asking whether it's your

19   understanding that Exhibit 105 which says option

20   year 1 for $200,000 is the same option year that's

21   referred to in section 5.3 in the Stock Purchase

22   Agreement.

23       A.  That is correct.

24       Q.  Turning back to Exhibit 105, the amendment,

25   it references $200,000.  Was that money, 200,000,

58

1    paid by the IRS to eGov Solutions?

2         A.   Yes.

3         Q.   And to your knowledge, was that $200,000,

4    was that paid to Mr. Suhy?

5         A.   Yes.   We paid it to him.

6         MR. RATINOFF:   Okay.   I think I want to

7    take just a quick five-minute break, because I know

8    the Court Reporter and videographer probably

9    appreciate that, if you don't mind.   So let's take a

10   five-minute break.   It's 9:14 my time, so come back

11   at 9:20 Pacific.   Does that work for everyone?

12        THE WITNESS:   Yeah, that works for me.

13        THE VIDEOGRAPHER:   Thank you.   We're now

14   going off the video record.   The time is 9:14 a.m.

15        (Break taken from 9:14 to 9:22 a.m.)

16        THE VIDEOGRAPHER:   We are now back on the

17   video record.   The time is 9:22 a.m.

18        MR. RATINOFF:   All right.   I'm going to go

19   ahead and put another document in the chat.   This is

20   going to be marked as Exhibit 106.

21        (Plaintiffs' Exhibit 106 was marked for

22   identification.)

23   BY MR. RATINOFF:

24        Q.   And the title of this document is also a

25   Amendment of Solicitation/Modification of Contract,

59

1   and it's got an Amendment Modification No. 10.  Do

2   you see that, Box 2, with an effective date of

3   September 26th, 2019?  And this bears the Bates

4   number EGOVS000034.  That's the beginning Bates

5   number.  Do you see that document that's been marked

6   as Exhibit 106?

7        A.  I do see the document.

8        Q.  And do you have an understanding what this

9   document is?

10        A.  That is correct.

11        Q.  Okay.  Let me point you to contract order

12   No. 2032H8-18-P-00168.

13        A.  Yes.

14        Q.  Do you see that number?  And you recall

15   that we talked about an amendment to the -- to a

16   contract that was Exhibit 103, so you understand --

17   strike that.

18            Do you understand that this is a further

19   amendment of the CKGE contract we've been talking

20   about?

21        A.  Yes, I do understand.

22        Q.  And if you look at under box 14, it says:

23            "The purpose for this modification

24            is to increase the funding for option

25            year 1 by $216,000 and revise the

60

1              Statement of Work.  The total

2              obligated on the order is changed from

3              500,000 by 216,000 to [a total of]

4              716,000."

5              Do you see that?

6       A.  Yes, I do see that.

7       Q.  For the record, I added "total" in there.

8    That's not actually in the document.

9              So do you understand that this document

10   increased the option year 1 from 200,000 to 416,000?

11       A.  Yes.

12       Q.  And looking at the date signed box, 15B,

13   and the date is 09/26/2019, do you understand that

14   to be Mr. Suhy's signature?

15       A.  That is correct.

16       Q.  And do you know why the IRS increased the

17   contract option year 1 by 216,000?

18       A.  No, I don't remember that.

19       Q.  And was there an additional payment for

20   option year 1 made to eGov Solutions by the IRS for

21   216,000?

22       A.  Yes.

23       Q.  And after eGovernment Solutions received

24   that 216,000, where did that money go?

25       A.  That money was paid to John Mark Suhy.

                                                    61

1          Q.   So for option year 1, Mr. Suhy was paid by
2     eGovernment Solutions a total of 416,000?
3          A.   That is correct.
4          Q.   And at this point in time, was eGovernment
5     Solutions paying anyone else to work on the CKGE
6     contract?
7          A.   So in the last couple of weeks, I went back
8     and I checked all of our payments which were
9     outgoing, because this account was -- all of the
10    money coming in from IRS, John Mark Suhy was allowed
11    to use this account to pay to himself for iGov.  And
12    I recently noticed in 2019, all of the money went to
13    iGovsol.
14         Q.   So the bank account that this payment went
15    to, Mr. Suhy had access to; is that correct?
16         A.   Yes.
17         Q.   But this is an eGovernment Solutions
18    account?
19         A.   That is correct.
20         Q.   What is -- the eGovernment Solutions
21    account that the payments were made, did anyone else
22    have access to that account?
23         A.   I did.
24         Q.   So just you and Mr. Suhy?
25         A.   Yes.

62

1          Q.  And Mr. Suhy was allowed to make whatever

2     payments out of that account was needed; is that

3     correct?

4          A.  Because all of the money coming from the

5     IRS project was his money, so we had him access to

6     that account.

7          Q.  So that account was specifically set up

8     just for the IRS project?

9          A.  That is the only project the company had at

10    that time, and that account had no other income

11    other than the IRS project.  So we let him operate

12    that account.

13          MR. RATINOFF:  Okay.  I'm going to go ahead

14    and put the next document in the chat.  This will be

15    marked as Exhibit 107.

16          (Plaintiffs' Exhibit 107 was marked for

17    identification.)

18          THE WITNESS:  I see that.

19    BY MR. RATINOFF:

20          Q.  This is also entitled Amendment of

21    Solicitation/Modification Contract, in box 2,

22    Amendment 14.  Box 3, Effective Date of May 24,

23    2020.  Bates number at the bottom of the first page

24    is EGOVSOL -- I'm sorry, EGOVS, and the last two

25    digits are 42.  Do you see that?

63

1          A.  Yes.

2          Q.  And I'll represent to you this was produced

3     by your counsel in response to the subpoena.

4          A.  That is correct.

5          Q.  And do you have an understanding of what

6     this document is?

7          A.  I believe this is an extension for another

8     year and a payment amount for that.

9          Q.  And looking at box 14, it says:

10              "The purpose of this modification is

11              to exercise CLIN 2001A option year 2

12              for a period of performance of

13              5/24/2020 through 5/23/2021."

14          And then it further states that it's fully

15     funded in the amount of 200,000; is that correct?

16          A.  That's correct.

17          Q.  And is it your understanding that this was

18     the contract extension for option year 2 that was

19     referenced in the Stock Purchase Agreement which was

20     Exhibit 100?

21          A.  That is correct.

22          Q.  And you'll see box 14, the last sentence

23     says, "The purchase order funding is hereby

24     increased from 716,000 by 200,000 to 916,000."  Do

25     you see that?

                                                          64

1          A.   Correct.

2          Q.   So was that 200,000 that's contemplated by

3     this document, was that paid by the IRS to

4     eGovernment Solutions?

5          A.   That is correct.

6          Q.   If you look at the next page, you'll see

7     there is a Line Item Table referencing that $200,000

8     payment.   Do you see that?

9          A.   Page No. 4?

10         Q.   Yeah.   2 of 4, the next page.   You'll see

11    there is a box that says Line Item Table.

12         A.   Yes, I do.

13         Q.   And it references a unit price of 200,000?

14         A.   Yes.

15         Q.   And that amount was -- that was paid after

16    it was paid by the IRS to eGovernment Solutions, was

17    that then paid to Mr. Suhy?

18         A.   That is correct.   And this is for the year

19    2020.

20         Q.   Correct.   The second year option.

21         A.   Yes.

22         Q.   And it looks like the total paid out thus

23    far on the IRS CKGE contract was 916,000.   Is that

24    correct, as of this time?

25         A.   That is correct.

65

1    Q.  And then each time a payment was paid from
2    eGovernment Solutions to Mr. Suhy in relation to the
3    CKGE contract, how were those payments made?
4    A.  John Mark Suhy wrote the checks or he went
5    to the bank branch and he -- I guess he cashed it
6    via a draft or something like this.  Because when I
7    went back, I did see some of the check numbers are
8    different than the others.  So my assumption is he
9    went there and he put in some form and got the
10   money.
11   Q.  And did -- how did -- how did eGovernment
12   Solutions book the payments?
13   A.  So end of the year when we go back and we
14   saw what are the money taken out, we would put that
15   in the books.
16   Q.  It would be booked as -- I'm sorry, let me
17   ask the question.  How were the payments treated to
18   Mr. Suhy by eGovernment Solutions?
19   MR. GOLDSTEIN:  Just for the record, object
20   just on the scope issue.  I'm not sure how far
21   you're going to go into this, but I don't think
22   that's within the scope of any of the particular
23   subject areas of the notice.  But the witness can
24   answer the question, but I don't want to get too far
25   afield.

66

1    BY MR. RATINOFF:

2        Q.   Okay.  You can answer the question.  I

3    probably don't remember what it was, so I'll just

4    reask it, and I'm sure Counsel will just make the

5    same objection quickly.  Actually, let's go ahead

6    and move on.  I'll come back to that.

7            MR. RATINOFF:  I think I'm going to mark

8    the next exhibit as Exhibit 108.

9            (Plaintiffs' Exhibit 108 was marked for

10   identification.)

11   BY MR. RATINOFF:

12       Q.   I'm sorry.  I just put the wrong document

13   in there.  Just bear with me a second.  You'll see

14   it's tab 378.  It should be the last document in the

15   chat.  I'm going to mark that as Exhibit 108.

16           THE WITNESS:  Is it 378 or 379?

17   BY MR. RATINOFF:

18       Q.   378.  Got too many windows open.  It's the

19   blessing of having two screens or two monitors.  You

20   can see it all, but you can put more up.

21           Okay.  So what's been marked as Exhibit 108

22   has the beginning Bates number of 58, and then it

23   would be Amendment 16 for box 2.  Do you see that?

24       A.   Yes.

25       Q.   The effective date is 5/24/21.  Do you see

67

 1     that?

 2          A.   Yes.

 3          Q.   And this was produced by your counsel on

 4     behalf of eGovernment Solutions.  Is that your

 5     understanding?

 6          A.   That is correct.

 7          Q.   And do you understand what this document

 8     is?

 9          A.   Yes.

10          Q.   And what is that?

11          A.   That's another option year, the contract

12     for another 200,000.

13          Q.   And when you say the contract, you're

14     talking about the CKGE contract that's referenced in

15     the Stock Purchase Agreement?

16          A.   That is correct.

17          Q.   And looking at box 14, it says:

18               "The purpose of this modification is

19          to exercise CLIN 3001 option year 3

20          for a period of performance of

21          5/24/2021 through 5/23/2022."

22          And it says it's "fully funded in the

23     amount of $200,000."  Do you see that?

24          A.   Yes.

25          Q.   So for the option year 3 of the CKGE

                                                          68

1    contract, the IRS paid eGovernment Solutions

2    200,000?

3         A.  That is correct.

4         Q.  And then again that money for the Stock

5    Purchase Agreement was then paid to Mr. Suhy?

6         A.  That is correct.

7         Q.  And at this point through option year 3

8    with all the modifications, the total amount paid to

9    eGovernment Solutions was 1,116,000; is that

10   correct?

11        A.  That is correct.

12        MR. RATINOFF:  Okay.  I already dropped it

13   into the chat, so that's going to be tab 379.  So

14   just go back one, the PDF.  I'm going to mark that

15   as Exhibit 109.

16        (Plaintiffs' Exhibit 109 was marked for

17   identification.)

18   BY MR. RATINOFF:

19        Q.  Let me know if you've got it open.

20        A.  Yes, I see that document.

21        Q.  And this one is -- in box 2, it shows

22   amendment 17.  Do you see that?

23        A.  Yes.

24        Q.  And the effective date is 5/24/2022.

25        A.  That's correct.

69

1          Q.  And I'll represent to you this was produced
2     by your counsel on behalf of eGovernment Solutions.
3     Is that your understanding?
4          A.  Yes.
5          Q.  And then do you know what this document is?
6          A.  This is another option year where another
7     200,000 was awarded for the same project.
8          Q.  And looking at box 14, it says option year
9     4.  Is that the same option year 4 that was
10    referenced in the Stock Purchase Agreement?
11         A.  That is correct.
12         Q.  And the $200,000 that's referenced in here
13    on page 2 of 3, was that paid by the IRS to
14    eGovernment Solutions?
15         A.  That is correct.
16         Q.  And through option year 4 with all the
17    amendments we've looked at, the total then paid to
18    eGovernment Solutions was 1,316,000?
19         A.  That is correct.
20         Q.  And are you aware -- I think there was only
21    four option years in the original Stock Purchase
22    Agreement, correct?
23         A.  That is correct.
24         Q.  Are you aware if there has been any
25    renewals or additional option years that have been

                                                              70

1       awarded for the CKGE contract?

2            A.   I wouldn't know that.

3            Q.   Who would know that?

4            A.   John Mark Suhy.

5            Q.   Since the Stock Purchase Agreement doesn't

6       contemplate any additional option years, how would

7       any additional option years be handled by

8       eGovernment Solutions?

9            A.   I would ask John Mark Suhy to use another

10      entity and not use eGovernment Solutions, because

11      the promise was to complete this project, because it

12      was awarded to eGovernment Solutions.

13           Q.   So at this point in time, then, you would

14      consider eGovernment Solutions' relationship

15      finished with John Mark Suhy?

16           A.   In regard to this project, yes.

17           MR. RATINOFF:   Okay.   I'm going to go ahead

18      and mark the next exhibit as Exhibit 110.

19           (Plaintiffs' Exhibit 110 was marked for

20      identification.)

21      BY MR. RATINOFF:

22           Q.   And this is a series of invoices that were

23      produced by eGovernment Solutions and the beginning

24      Bates number is 68.

25           A.   I see this.

71

1    Q.  And do you have an understanding of what
2    this document -- or I should restart that.
3         Do you understand what this file system of
4    combined documents or docs is?
5    A.  Yes.
6    Q.  And what's your understanding?
7    A.  These are the invoices produced by
8    eGovernment Solutions to the IRS, and my counsel
9    received these from John Mark Suhy.
10   Q.  Okay.  So they state eGovernment Solutions
11   on them, but they were actually generated by
12   Mr. Suhy?
13   A.  That is correct.
14   Q.  And it's your understanding that these were
15   submitted on behalf of eGovernment Solutions to the
16   IRS for payment under the CKGE contract?
17   A.  That is correct.
18   Q.  So looking at invoice 817, and it says
19   "Contact Name:  John Mark Suhy," invoice date is
20   June 15, 2018.  Do you see that?
21   A.  Yes.
22   Q.  And this was for the $300,000 initial
23   payment that we talked about in the first year of
24   the CKGE contract, correct?
25   A.  That is correct.

72

1    Q.  And then looking at the next invoice, 827,

2  was this invoice also created by Mr. Suhy and issued

3  to the IRS on behalf of eGovernment Solutions?

4    A.  Yes.

5    Q.  And Mr. Suhy was authorized to issue this

6  invoice on behalf of eGovernment Solutions?

7    A.  Yes.

8    Q.  And do you have an understanding of what

9  this invoice is for?

10   A.  That is the continuation of the same

11  project, option year 1.

12   Q.  Looking at invoice -- the next one, 901,

13  with a date of January 4, 2020, you'll see that the

14  invoice is in the amount of $216,000.

15   A.  I do see that.

16   Q.  Okay.  And what's your understanding of

17  this invoice?

18   A.  That is the continuation of the same

19  project.  I believe there was some modification.

20   Q.  Okay.  This is the $216,000 modification

21  that we were previously talking about with respect

22  to option year 1?

23   A.  Correct.

24   Q.  And Mr. Suhy was authorized by eGovernment

25  Solutions to issue this invoice to the IRS?

73

1      A.  Yes.

2      Q.  And looking at invoice 955, do you see

3  that?

4      A.  I do see that.

5      Q.  Okay.  And this is dated May 27th, 2020.

6      A.  Correct.

7      Q.  And do you have an understanding what this

8  invoice is?

9      A.  This is the continuation of the same

10  project.

11      Q.  The CKGE contract?

12      A.  Contract, yes.

13      Q.  And you'll see it says option year 2.

14      A.  Yes, I do see that.

15      Q.  For 200,000?

16      A.  Yes.

17      Q.  And is this the invoice that was issued for

18  the renewal for option year 2 to the IRS?

19      A.  That is correct.

20      Q.  And Mr. Suhy was authorized to issue this

21  invoice to the IRS on behalf of eGovernment

22  Solutions?

23      A.  That is correct.

24      Q.  Going to the next invoice, 960, do you see

25  that?

74

```
 1        A.  Yes, I see that.
 2        Q.  And the date on this invoice is June 3rd,
 3   2021?
 4        A.  Yes.
 5        Q.  Looking at line item 5, it says "Option
 6   Year 3," and continues with the date, and "CDW
 7   Graphic Environment . . . Continued development and
 8   operations."  Do you see that?
 9        A.  I do see that.
10        Q.  What's your understanding of this invoice?
11        A.  It's a continuation of the same project,
12   option year 3.
13        Q.  And that's the same option year 3 that we
14   looked at in the amendment and also talked about
15   with the Stock Purchase Agreement?
16        A.  That is correct.
17        Q.  And was Mr. Suhy responsible for issuing
18   this invoice to the IRS on behalf of eGovernment
19   Solutions?
20        A.  Yes.
21        Q.  And looking at invoice 912, the next
22   invoice.  Do you see that?
23        A.  I do see that.
24        Q.  The date on that is May 31st, 2020.
25        A.  That is correct.
```

75

1          Q.  And do you have an understanding of what

2     this invoice is?

3          A.  This is option year 4, continuation of the

4     same project.

5          Q.  This is the line item says "Option year 4,

6     200,000."  This is the 200,000 option year 4 that

7     was referenced in the Stock Purchase Agreement?

8          A.  Yes.

9          Q.  And also with that memo we just looked at,

10    105, Exhibit 105?

11         A.  That is correct.

12         Q.  And to your and eGovernment Solutions'

13    knowledge, those invoices we just went through were

14    all issued to the IRS by Mr. Suhy?

15         A.  That is correct.

16         Q.  Looking at the last page of this document,

17    it says "Related Documents - PO."  Do you see that?

18         A.  I do see that.

19         Q.  And what is this summary that's titled

20    Related Documents?

21         A.  Honestly, I didn't see that back at this

22    time.  Looking at it, it looks like it may be

23    something we received from the IRS by John Mark

24    Suhy.

25         Q.  So this wasn't generated by eGovernment

                                                        76

1    Solutions?

2         A.   No.

3         Q.   It was either generated by John Mark or the

4    IRS?

5         A.   That is correct.

6         Q.   And you'll see that -- you'll see there is

7    an invoice number column, the first in the Invoice

8    and Credit Memos section.  Do you see that?

9         A.   Yes.

10        Q.   You'll see starting at the bottom, invoice

11   817, 300,000, that's marked paid?

12        A.   That is correct.

13        Q.   That was, in fact, paid to eGovernment

14   Solutions by the IRS?

15        A.   That is correct.

16        Q.   And looking at invoice 827 for 200,000 --

17             (Reporter interruption.)

18   BY MR. RATINOFF:

19        Q.   I'm sorry.  Let me start over.

20             In looking at the next invoice, No. 827,

21   the line for that, it has a $200,000 number there.

22   Do you see that?

23        A.   Is that for me?

24        Q.   Is it your understanding that the IRS

25   paid --

77

1          A.  Yes.

2          Q.  -- that?  And the same with the line item

3     or invoice 901 for 216,000, the IRS paid?

4          A.  Yes.

5          Q.  And the same for invoice 955, $200,000 was

6     paid, as well?

7          A.  That is correct.

8          Q.  And then for invoice 960, it's listed as

9     $200,000 being paid, as well; is that correct?

10          A.  Yes.

11          Q.  And finally for invoice 912, that $200,000

12     was recently paid, correct?

13          A.  That is correct.

14          Q.  If you look at the next ones that are

15     rejected in the invoice history, do you have any

16     understanding why there is two $300,000 invoices for

17     the same number that were rejected?

18          A.  I'm not aware of that.  I don't understand

19     exactly why that is in there.

20          Q.  Do you believe either Mr. Suhy or the IRS

21     would have an understanding?

22          A.  That is correct.

23          Q.  It wasn't clear to me.  Did this document

24     come from Mr. Suhy, or did you ask Mr. Suhy for

25     invoices and payments and you received this

                                                        78

1    document, the related document?

2         A.   My counsel received this document from John

3    Mark Suhy.

4         Q.   Why did your counsel have to ask John Mark

5    Suhy for these invoices?  Do you know why?

6         A.   I believe we wanted to make sure that

7    whatever money we had received or that we have

8    invoiced were there.

9         Q.   So it's up to Mr. Suhy to account for all

10   the invoices issued to the IRS and payments received

11   by the IRS are accounted for for the CKGE contract?

12        A.   That is correct.

13        Q.   And then how did eGov Solutions account for

14   the payments that were made to Mr. Suhy for tax

15   purposes?

16             MR. GOLDSTEIN:  I'm just going to object.

17   I think that's outside the scope of the deposition

18   subpoena, Jeff, internal accounting within the

19   company.

20             MR. RATINOFF:  Well, it relates --

21             MR. GOLDSTEIN:  Might be a different topic

22   area.

23             MR. RATINOFF:  It relates to payments that

24   were made to Mr. Suhy.  So I think it's fairly

25   within the scope.  I can look --

                                                         79

1      MR. GOLDSTEIN:  I think the company is --

2   without testifying for Mr. Mayur or the company, the

3   documents and information are already there about

4   the payments that have come in and the payments

5   having gone out.  But you know what, unless there

6   is -- I can tell you he hasn't gone back and looked

7   at the company tax returns.

8      MR. RATINOFF:  I guess the agreement is

9   that the Stock Purchase Agreement states that he was

10  treated as an independent contractor.  So I guess

11  I'll just ask that question.

12  BY MR. RATINOFF:

13     Q.  Was Mr. Suhy with the CKGE contract, was he

14  treated as an independent contractor throughout?

15     A.  Yes.

16     Q.  Is it your understanding that independent

17  contractors are paid as and issued a 1099 every

18  year; is that correct?

19     A.  I can check with my accountant, and I can

20  confirm that.

21     Q.  Did eGovernment Solutions issue payments to

22  Mr. Suhy for payments made under the CKGE contract?

23     A.  I believe we did.

24         MR. RATINOFF:  Sorry.  I'm just trying to

25  figure out what exhibit I'm at.  Exhibit 111.  So

                                                          80

```
 1      let me go ahead and mark this next document as
 2      Exhibit 111.
 3              (Plaintiffs' Exhibit 111 was marked for
 4      identification.)
 5      BY MR. RATINOFF:
 6          Q.  Go ahead and take a look at Exhibit 111.
 7          A.  I have that in front of me.
 8          Q.  Do you understand what Exhibit 111 is?
 9          A.  It's a 1099 prepared for iGov Inc. for
10      2018.
11          Q.  What's iGov Inc.?
12          A.  That is a company owned by John Mark Suhy.
13          Q.  And at some point, was there a decision
14      or -- sorry, at some point was there an agreement
15      made between eGovernment Solutions and Mr. Suhy that
16      the payments for the CKGE contract would go to iGov
17      Inc. instead of Mr. Suhy?
18          A.  There is no formal agreement, but yes,
19      anything coming from that particular project was
20      supposed to be paid to him.  And he said pay it to
21      iGov Sol -- iGov Inc., so we paid it to iGov Inc.
22          Q.  So all the payments in the Stock Purchase
23      Agreement that we've been talking about were
24      actually paid to iGov Inc. rather than to Mr. Suhy
25      personally, correct?
```

81

1     A.  I think nothing was paid to Mr. Suhy

2  personally.

3     Q.  So all of the payments that were received

4  by the IRS and then were in turn paid to Mr. Suhy

5  were actually paid to his entity iGov Inc., correct?

6        MR. GOLDSTEIN:  Object to the form of the

7  question of the question.  I think you got a little

8  confused on that in the middle, Jeff.

9  BY MR. RATINOFF:

10    Q.  Okay.  So once the IRS paid eGovernment

11 Solutions under the CKGE contract, the payments that

12 were contemplated by the Stock Purchase Agreement

13 were actually made to iGov Inc. instead of Mr. Suhy.

14 Is that how it worked?

15    A.  That's a question for me or for Jeff?

16    Q.  It's for you.

17    A.  Oh, yes.  It was paid to iGov Inc.

18    Q.  So looking at what we just marked as

19 Exhibit 111, it's a 2018 1099.  It's -- the amount

20 is 285,700.  Do you see that?

21    A.  Yes.

22    Q.  And previously we talked about there being

23 a $300,000 payment being made by the IRS; is that

24 correct?

25    A.  Yes.

82

Q.  So it's fair to say that there is a slight discrepancy in the amount of money that was paid by the IRS and that was in turn paid to Mr. Suhy; is that correct?

A.  I did mention earlier that AtomRain was also paid in year 1.

Q.  Okay.  So they were paid -- in year 1 of the CKGE project, AtomRain was paid 10,000?

A.  That is correct.

Q.  So doing the math, that would increase the total amount, if you take this 1099 into consideration, it would be 295,000; is that correct?

A.  Yes.

Q.  And 700, obviously.  That leaves -- I know it's only a small amount, but what happened to the rest of that 300,000?

A.  I think that maybe the payment which goes for the accountant or QuickBooks or a couple of payments around that.  And there may be still money sitting in that account.  So any payment which is in regards to this particular project, as I mentioned, it was -- there may be a few thousand here and there, as we mentioned on there.

Q.  So that 4300 difference, if we take into account what was paid on the 1099 and what was paid

83

1     to AtomRain would have been used for other expenses,

2     or it could be still in the account.  Is that your

3     testimony?

4          A.  I'm sorry.  Could you repeat the question?

5          Q.  So I just did the quick math.  There is

6     about a $4,300 difference in the $300,000 that was

7     paid by the IRS versus what was paid out to

8     iGov Inc. and AtomRain.  So you're saying that the

9     4300 would either still be in the bank account or

10    used to pay for other expenses?

11         A.  I can check with my accountant and confirm

12    exactly what happened to those $4,300.

13         Q.  And I assume that eGovernment Solutions

14    issued a 1099 also to AtomRain.

15         A.  I have to check that with my accountant.

16         MR. RATINOFF:  I'm going to go ahead and

17    drop in the next exhibit.  This will be Exhibit 112.

18              (Plaintiffs' Exhibit 112 was marked for

19    identification.)

20              THE WITNESS:  I have that open in front of

21    me.

22    BY MR. RATINOFF:

23         Q.  Okay.  This is a document that was produced

24    by your counsel yesterday.  It's got the beginning

25    Bates number 141.  Do you have an understanding of

84

1   what 112 is?

2        A.   Yes.

3        Q.   And what is that?

4        A.   This is a 1099 generated for iGov Inc. for

5   2019 for $199,850.

6        Q.   So the IRS had paid eGovernment Solutions

7   $200,000 for that year, correct?

8        A.   Yes.

9        Q.   So the difference would be likely due to

10  other expenses that were paid out before paying iGov

11  Inc.?

12       A.   I believe there was a difference of $150.

13       Q.   And this 1099 was issued to Mr. Suhy on

14  behalf of iGov -- sorry.  Strike that.

15            So this 1099 was issued to iGov Inc. as

16  option year 2 under the Stock Purchase Agreement?

17       A.   That is correct.

18       Q.   I'm sorry.  Let me strike that question.  I

19  think this might be option year 1, so let me back

20  up.  I went to law school, I didn't go to accounting

21  school, so you have to bear with me.  Lawyers

22  usually go -- or people go to law school because

23  they don't like math.  I'm sure Jeff would agree

24  with that.

25            All right.  So let me start over so the

85

1    record is a little more clear.  So Exhibit 112 is a

2    2019 1099, and this was issued to iGov Inc., as part

3    of the option year 1 payment by the IRS as

4    contemplated by the Stock Purchase Agreement; is

5    that correct?

6         A.   That is correct.

7         Q.   I believe we talked about for option year 1

8    there was an additional $216,000 payment from the

9    IRS in option year 1.

10        A.   That is correct.

11        Q.   And I note that this 1099 that was issued

12   to iGov Inc. is only for 199,850.  Where did the

13   other 216,000 go?

14        A.   That money was received in 2020, not in

15   2019.  Because we are an S corp, we go with the

16   calendar year, financial year.  So we have not

17   received that money in 2019.  That money was

18   still --

19            (Reporter interruption.)

20            THE WITNESS:  That money -- that money was

21   received on January 9th, 2020, because the financial

22   year for the government is different than the

23   financial year for eGovernment Solutions.

24   BY MR. RATINOFF:

25        Q.   I understand.  So even though the invoice

86

1    was issued in December of 2019, the payment wasn't

2    actually received from the IRS until 2020.

3         A.  That's correct.

4         Q.  So that money should then be reflected in

5    the following year's iGov -- I'm sorry.  EGov, iGov.

6         So the 216,000 that was received as an

7    increase in option year 1 would have actually been

8    reflected in the 2020 1099 issued to iGov Inc.,

9    correct?

10        MR. GOLDSTEIN:  Objection to form.

11        You can go ahead and answer.

12   BY MR. RATINOFF:

13        Q.  If you know.

14        A.  I'm sorry, Jeff.

15        MR. GOLDSTEIN:  I said objection to the

16   form.  You can go ahead and answer.

17   BY MR. RATINOFF:

18        Q.  I'll just reask the question.  So the

19   260,000 -- I'm sorry, $216,000 payment for option

20   year 1 increase was received in January of 2020,

21   correct?

22        A.  That is correct.

23        Q.  So that payment, to the extent it was paid

24   out to Mr. Suhy, would be then reflected in a 1099

25   for 2020, correct?

87

1          MR. GOLDSTEIN:  Object to the form the of

2     the question.

3          But you can go ahead and answer.  Ash, you

4     can go ahead and answer.

5          THE WITNESS:  So the part portion of that

6     was paid to iGov.

7     BY MR. RATINOFF:

8          Q.  I'm sorry, what was the other portion --

9     who was the other portion paid to?

10         A.  I believe one of the portions was paid to

11    AtomRain.

12         Q.  And do you recall the amount?

13         A.  $101,400.

14         Q.  To AtomRain?

15         A.  Yes.

16         Q.  And then doing the quick math -- so let me

17    just make I've got all the numbers lined up here.

18    So the IRS paid a total of 416,000 for option

19    year 1, correct?

20         A.  Yes.

21         Q.  And -- but the actual second payment for

22    216,000 was paid in 2020, correct?

23         A.  Yes.

24         Q.  And then of that 216,000, approximately

25    100,000 was paid to AtomRain in 2020; is that

                                                              88

 1    correct?

 2         A.  Yes.

 3         Q.  And then where did the other 100 --

 4    approximately 116,000 from that payment received in

 5    January of 2020 go?

 6         A.  There was a payment paid to Irving Starr.

 7         Q.  I'm sorry, can you repeat that?

 8         A.  The payment were made to -- there are some

 9    checks cut by John Mark to Irving Starr, I-R-V-I-N-G

10    S-T-A-R (sic).

11         Q.  What is that or who is that?

12         A.  I have the check with John Mark Suhy on

13    that.

14         Q.  I'm sorry, can you just spell that one more

15    time?

16         A.  E-R-V-I-N-G (sic).

17         Q.  E-R-I-N-G?

18         A.  E-R-V-I-N-G.

19         Q.  Irving.  Okay.  What was the last name?

20         A.  Starr, S-T-A-R (sic).

21         Q.  Irving Starr.  Is that a person, to your

22    knowledge?

23         A.  I was always under the impression that was

24    a company name.

25         Q.  A company name.  Okay.

                                                            89

1          A.   That's my impression.

2          Q.   Do you understand what that company is?

3          A.   No.  I have to check with John Mark Suhy on

4     that.

5          Q.   Would there have been a 1099 issued to

6     Irving Starr for that --

7          A.   I would have to check with my accountant on

8     that.

9          Q.   So is it fair to say that none of the

10    $216,000 that was paid by the IRS in option year 1

11    in the amendment went to Mr. Suhy?

12         A.   All these checks, AtomRain and Irving

13    Starr, were incurred by Mr. Suhy.

14         Q.   So eGovernment Solutions didn't ask any

15    questions about why the money was being paid to them

16    instead of Mr. Suhy?

17         A.   No, we did not.

18         Q.   But it was eGovernment Solutions'

19    understanding that those payments were made to

20    AtomRain and Irving Starr for work done on the CKGE

21    contract, correct?

22         A.   That is the impression we have.

23         Q.   You had no other reason to believe that the

24    payments were for something else?

25         A.   No.

90

1      Q.  Okay.  The next exhibit would be

2  Exhibit 114 (sic).  Let me know when you've had a

3  chance to take a look at that.

4      A.  I've had a look.

5      Q.  I'll represent to you this was produced by

6  your counsel yesterday.  It's got the Bates number

7  ending in 142.  Do you have an understanding of what

8  Exhibit 114 is?

9      A.  This is a 1099 for year 2020 to iGov, Inc.,

10  $193,000.

11      Q.  I apologize.  You know what, I have

12  mismarked this.

13        MR. RATINOFF:  Karen, should this be

14  Exhibit 113?

15        THE REPORTER:  Hold on a moment, please.

16      Yes.

17        MR. RATINOFF:  Okay.  Let me start over

18  again, since I mismarked that.  What's been dropped

19  in the tab 383 with the Bates number EGOVS000142 was

20  produced by your counsel yesterday, and it's been

21  marked as Exhibit 113.

22        (Plaintiffs' Exhibit 113 was marked for

23  identification.)

24  BY MR. RATINOFF:

25      Q.  Do you understand what Exhibit 113 is?

91

1          A.  Yes.

2          Q.  What do you understand Exhibit 113 to be?

3          A.  So this is a 1099 for year 2020 to iGov

4     Inc.

5          Q.  And this is reflecting the payment of

6     option year -- I believe it would be 2, is that

7     correct, to Mr. Suhy under the Stock Purchase

8     Agreement?

9          A.  Correct.

10         Q.  And again, this payment was made to

11    iGov Inc. or on behalf of iGov Inc. for Mr. Suhy's

12    benefit?

13         A.  Yes.

14         Q.  And again, it looks like the amount is

15    193,000, and the payment made by the IRS was

16    200,000.

17         A.  That is correct.

18         Q.  And so do you know what happened to the

19    other 7,000?

20         A.  I think it's still lying in the account.

21         Q.  But that would be money that would be owed

22    to Mr. Suhy if he wished to withdraw it?

23         A.  Correct.

24         Q.  And to your knowledge, this 1099 was issued

25    to Mr. -- or, sorry, to iGov Inc.?

                                                        92

1       A.   Yes.

2       Q.   And I will ask the same question for the

3   prior one, Exhibit 112.   That was also issued to

4   iGov Inc.?

5       A.   That is correct.

6           MR. RATINOFF:   Moving on to what should be

7   Exhibit 114, I'm going to drop this in the chat.

8           (Plaintiffs' Exhibit 114 was marked for

9   identification.)

10          THE WITNESS:   I have that in front of me.

11  BY MR. RATINOFF:

12      Q.   Okay.   I just put in the chat a document

13  that was produced yesterday by your counsel.   Ending

14  Bates number is 143, or the Bates number on the only

15  page is 143.

16          Do you understand what Exhibit 114 is?

17      A.   That is a 1099 for the year 2021, generated

18  for iGov Inc. for the amount of 197,000.

19      Q.   Was this reflecting option year 3 under the

20  CKGE contract referenced in the Stock Purchase

21  Agreement?

22      A.   No.   That should be the option year 4.   No,

23  no, that's correct.   Option year 3.

24      Q.   Yeah, option year 4 would be 2022, correct?

25      A.   That is correct.

93

1          Q.  Okay.  So option year 3 is 2021?

2          A.  Yes.

3          Q.  So then we talked about earlier $200,000

4    was paid to eGovernment Solutions for option year 3,

5    correct?

6          A.  That is correct.

7          Q.  And then of that 200,000, 197,000 was paid

8    to iGov Inc., correct?

9          A.  That is correct.

10          Q.  Okay.  And then what happened to the

11    $3,000?  That's sitting in the account?

12          A.  That is correct.

13          Q.  Is that money -- it essentially belongs to

14    Mr. Suhy if he wants to withdraw it?

15          A.  That is correct.

16          Q.  Obviously we're not through 2022 yet, but

17    would a 1099 issued to iGov Inc. reflect any payment

18    to Mr. Suhy made under the Stock Purchase Agreement

19    that was received money received from the IRS?

20          A.  That is correct.

21          Q.  And has Mr. Suhy withdrawn any amount for

22    option year 4?

23          A.  Yes.

24          Q.  Do you know off the top of your head what

25    that amount is?

                                                        94

A.  189,000.

Q.  And of that 189,000 -- I'm sorry, the difference between 189,000 and the $200,000 payment received from the IRS, is that money sitting in the account still?

A.  Yes.

MR. RATINOFF:  I'm going to go ahead and mark the next exhibit as 115.

(Plaintiffs' Exhibit 115 was marked for identification.)

BY MR. RATINOFF:

Q.  Let me know when you've had a chance to take a look at what's been marked as Exhibit 115.

A.  I have that in front of me.

Q.  And I'll represent to you this is produced by your counsel.  I believe it was last week.  It starts with Bates number 81, and it goes all the way through to Bates number 136.  The full Bates number is EGov Production 136, the last page.

Do you understand what's contained in this exhibit?

A.  These are the statements from the bank, from the eGovernment Solutions bank.

Q.  Okay.  And this is the account that Mr. Suhy has access to?

95

1      A.  That is correct.

2      Q.  And this is the account that was used to

3  receive all of the payments from the IRS for the

4  CKGE contract?

5      A.  That is correct.

6      Q.  It's also the account that all the payments

7  to iGov Inc. were made from?

8      A.  That's correct.

9      Q.  And it's also the account that payments

10  were made to AtomRain?

11      A.  Yes.

12      Q.  As well as Irving Starr?

13      A.  That is correct.

14      Q.  I notice there is a bunch of black boxes

15  where those things are blocked out.  We call it

16  redacted.  Did you apply those redactions to this

17  document?

18      A.  I believe my counsel must have done that.

19      Q.  Okay.  Do you have any idea what's behind

20  the redactions?

21      A.  I would have go back and check on the

22  statement, because there are so many of those.

23      Q.  Okay.  Do you know why these redactions

24  were made?

25      A.  I believe they may not be relevant.

96

1     MR. GOLDSTEIN:  It sounds familiar, but I

2  don't recall at the moment seeing it.  But it's

3  certainly possible I've seen that already.

4     MR. RATINOFF:  All right.  I'll send it

5  over your way when we get off line here, just so you

6  have it at the top of your inbox.

7  BY MR. RATINOFF:

8     Q.  All right.  So let's go ahead and return

9  back to the document.  And I'm looking at page 82,

10  which is -- this is the July 2018 bank statement.

11  The Bates number at the bottom of the page I'm

12  referring is 82.  You'll see there is a July 26th

13  date.  It's a deposit of 300,000.  Do you see that?

14     A.  Yes.

15     Q.  Is that the -- does that reflect the

16  $300,000 payment that was received for the base year

17  for the IRS CKGE contract?

18     A.  I believe so.

19     Q.  Then going to page 86, you'll see there is

20  two payments made in -- this is an August 2018

21  statement.  There's two payments, one August 1st for

22  10,000, and one on August 3rd for 139,000.  Do you

23  see that?

24     A.  Yes.

25     Q.  And to your knowledge, were those payments

99

1    that were made to iGov Inc.?

2         A.  To my knowledge, 10,000 is for AtomRain,

3    and the 139,000 is for iGov.

4         Q.  And then in October of 2018, it's the Bates

5    number 90, there is $146,700 payment.  Do you see

6    that?

7         A.  Yes, I do see that.

8         Q.  Is that the remaining amount received from

9    the IRS that was paid to Mr. Suhy?

10        A.  That is correct.  To iGov.

11        Q.  I was just going to say reflected in the

12   iGov 1099.

13        A.  That is correct.

14           (Reporter interruption.)

15   BY MR. RATINOFF:

16        Q.  So I just wanted to make sure I got the

17   math correct.  So there was a $139,000 payment made

18   to iGov Inc. in 2018, and then an additional

19   146,700, and that total, it would be 285,700.  And I

20   believe that's the amount of the 1099 to iGov Inc.;

21   is that correct?

22        A.  That is correct.

23        Q.  And the other 10,000 was paid to AtomRain?

24        A.  Yes.

25        Q.  And then moving on to what's going to be

100

1    Bates number 94, it's the July -- I'm sorry, the

2    June 30th, 2019, statement.

3         A.  I do see that.

4         Q.  And you'll see on June 5th, there was a

5    $200,000 payment, looks like it was made by the IRS;

6    is that correct?

7         A.  That is correct.

8         Q.  And that was for the first of two payments

9    for option year 1?

10        A.  Yes.

11        Q.  And then there is two checks, one for

12   $74,850, and one for 125,000, both paid on

13   June 25th, 2019.  Do you see that?

14        A.  That is correct.  I see that.

15        Q.  And were both those payments made to iGov

16   Inc.?

17        A.  That is correct.

18        Q.  Doing the math, I believe that adds up to

19   199,850; is that correct?

20        A.  That is correct.

21        Q.  And then that was the same number that was

22   reflected in the 1099 to iGov in 2019?

23        A.  That is correct.

24        Q.  Then moving on to the January 31st, 2020,

25   statement that's -- I'm sorry.  Looking at page or

101

1    Bates number 99.  Let me know when you're there.

2         A.  I'm there.

3         Q.  And you'll see there is a January 9th

4    payment of 216,000 that looks like from the IRS.  Do

5    you see that?

6         A.  I do see that.

7         Q.  Is that the earlier payment that we were

8    talking about that was invoiced in December of 2019

9    but paid in 2020?

10        A.  That is correct.

11        Q.  And then moving down to January 2015 -- I'm

12   sorry, January 15, 2020, there is looks like a wire

13   transfer to AtomRain for $101,400.  Do you see that?

14        A.  I do see that.

15        Q.  Is that the payment you had mentioned --

16        A.  Excuse me.

17        Q.  Bless you.

18        A.  Thank you.

19        Q.  Let me ask that again.  So is that the

20   payment that you previously mentioned was made to

21   AtomRain?

22        A.  That is correct.

23        Q.  And then there is another $5,000 withdrawal

24   or check dated January 31st, 2020.  Do you see that?

25        A.  I do see that.

                                                      102

1      Q.   And do you know what that $5,000 payment

2   was for?

3      A.   That is to Irving Starr.

4      Q.   And then scrolling down to the next month's

5   statement, this would be February 2020, looking on

6   the page with the Bates number 103.

7      A.   I do see that.

8      Q.   And there's a payment or check cashed on

9   February 5th, 2020, for $25,835.   Do you see that?

10      A.   I do see that.

11      Q.   Do you know who that check was issued to?

12      A.   Irving Starr.

13      Q.   Is Irving Starr a law firm?

14      A.   Um -- I'm not quite familiar, because I

15   never saw this name.   I mean I started looking at

16   all the payments in the last few days.   That's the

17   first time I heard this name.   But my assumption is

18   that was related to his particular project.   John

19   Mark must have used Irving Starr.

20      Q.   You're not sure what Irving Starr was used

21   for for the project?

22      A.   No, I'm not aware of that.

23      Q.   Okay.   Moving on to what's Bates page

24   no. 106, this would be the April 2020 statement.

25      A.   I do see that.

1     Q.   There's a $20,000 cash or deposited check

2     dated 4/20/2020.  Do you see that?

3     A.   I do see that.

4     Q.   Who was that $20,000 paid to?

5     A.   Again, Irving Starr.

6     Q.   So there is a -- I'm looking at page 109,

7     which is the May 2020 statement.  Looks like it's

8     all redacted, but it looks like there were several

9     withdrawals or debits.  Without providing the

10    amounts, I guess, do you know what those were about?

11    A.   I wouldn't know that.  I would have to go

12    back and check the statement.

13    Q.   Okay.  And moving on to -- actually, before

14    I get there, let me just make sure I've got all

15    these numbers lined up.  So we've got a -- for 2020,

16    so we've got a payment from -- I'm sorry, a payment

17    to AtomRain for 100 -- actually, let me back up for

18    a second.  Let's try again.  We'll come back to

19    that.  Let's get through the rest of these

20    statements, and we'll come back.

21         Looking at Bates number page 113, this

22    would be the June 2020 statement, you'll see there

23    is a June 17, 2020, payment.  Looks to be from the

24    IRS for $200,000.  Do you see that?

25    A.   I do see that.

104

1        Q.   And is that the payment for option year 2?

2        A.   That is correct.

3        Q.   That's option year 2 under the CKGE

4    contract, correct?

5        A.   That is correct.

6        Q.   And also listed as option 2 in the Stock

7    Purchase Agreement?

8        A.   That is correct.

9        Q.   And then we go on to the August 2020 bank

10   statement.  I'm looking at page 117, Bates number

11   117.

12       A.   I do see that.

13       Q.   And there's a payment made on August 10th,

14   2020, for 25,000.  Do you see that?

15       A.   I do see that.

16       Q.   Who was that payment made to?

17       A.   Irving Starr.

18       Q.   And then there was another payment made on

19   8/24 for 125,000.  Do you see that?

20       A.   Yes.

21       Q.   Was that a payment made to iGov Inc.?

22       A.   That is correct.

23       Q.   And that was payment in part for option

24   year 2 in the Stock Purchase Agreement?

25       A.   That is correct.

105

1       Q.   And then in October 2020, I'm looking at

2   the statement on Bates number 122, there is a

3   payment that looks like it was made on October 28th,

4   2020, for 30,000.   Do you know who that payment was

5   made to?

6       A.   Irving Starr.

7       Q.   And then there was the payment made on

8   December 28th, would be on Bates number 127, it's

9   the December 2020 payment.

10      A.   I do see that.

11      Q.   You see that?   Okay.   Who was that $68,000

12   payment made to?

13      A.   iGov.

14      Q.   So if we put that $125,000 payment that we

15   talked about earlier and the 68,000 that was paid

16   here, that comes out to 193,000; is that correct?

17      A.   That's correct.

18      Q.   And that's -- I believe that was the same

19   amount that was on the 2020 1099 that eGovernment

20   Solutions issued to iGov Inc., correct?

21      A.   Yes.

22      Q.   Then for the rest of 2020, I just want to

23   make sure I got my numbers, we've got a total of

24   101,400 for AtomRain.

25      A.   That is --

106

1    Q.  That was -- that was a payment made in
2  January of 2020, correct?
3    A.  Yes.
4    Q.  And we've got a series of payments made to
5  Irving Starr in the amount of 500 -- I'm sorry,
6  5,000.  I don't want to do this.  I'm going to go
7  ahead and share my screen here just to make sure
8  we're on the same page, because I don't want to put
9  you on the spot for the math, because I'm sure your
10  counsel is going to object.
11        MR. GOLDSTEIN:  Can I just say it seems to
12  me this is all interesting for us, but this all
13  seems like something that the parties in the lawsuit
14  could actually figure out and stipulate to, how much
15  money went to the iGov entity or to other entities
16  or persons within the John Mark community.
17        MR. RATINOFF:  That's fair.  I mean if
18  you're stipulating that you agree that John Mark has
19  the ability to have access to bank statements from
20  this account, that's fine.  We're deposing him next
21  month.
22        MR. GOLDSTEIN:  I think that's true, and I
23  think the numbers are what the numbers are.  And it
24  seems like between counsel involved in the actual
25  underlying case, they could come up with a number.

107

1          MR. GOLDSTEIN:  I think that's clear.

2          MR. RATINOFF:  He can obtain information

3    from it.  And -- but again, it's also subject to the

4    subpoenas, so the lawyers can work it out at the end

5    of the day and not take any more of the witness'

6    time.

7    BY MR. RATINOFF:

8          Q.  So then moving on to -- let me get back.

9    Too many open PDFs.  We're looking back now to the

10   bank statements, Exhibit 115.  Going to move on to

11   the following year, so we're now in 2021.  There's

12   a -- looks like we don't have a page showing a

13   deposit, or maybe I'm be misreading this, from the

14   IRS.  So let me just start with the December 2021

15   statement which would be -- I'm looking at Bates

16   number 130.  There's $197,000 payment, and that's

17   dated 12/22/2021.  Do you see that?

18         A.  I do see that.

19         Q.  And was that the payment made from

20   eGovernment Solutions to iGov for option year 3?

21         A.  Yes.

22         Q.  And option year 3 that's reflected in the

23   Stock Purchase Agreement?

24         A.  That's correct.

25         Q.  And also option year 3 is reflected in the

109

1    IRS amendments, contract amendment?

2         A.   Yeah.   That is correct.

3         Q.   And moving on, I think there is sort of a

4    different format here.   So to do this, it's reverse

5    chronological order.   So I'm going to scroll all the

6    way down to the very end here, page 136, Bates

7    number 136.   I'm just going to scroll from the

8    bottom to -- looks like -- okay, there we go.   On

9    Bates number 135, there's a payment of June -- dated

10   June 15, 2021, for 200,000.   Do you see that?

11        A.   Yes, I do see that.

12        Q.   And that's the option year 3 payment from

13   the IRS; is that correct?

14        A.   That is correct.

15        Q.   And moving up to the Bates number 134 we

16   just talked about, I believe it was the $197,000

17   payment to iGov after the IRS made that option

18   year 3 payment, correct?

19        A.   That is correct.

20        Q.   And then moving on to 2022, so this would

21   be the same page at the top, there's a June 13,

22   2022, payment of $200,000.   Do you see that?

23        A.   I do see that.

24        Q.   And was that payment from the IRS?

25        A.   That is correct.

1    Q.  And that was the option year 4 payment

2  under the Stock Purchase Agreement?

3    A.  That is correct.

4    Q.  And also the option year 4 under the IRS

5  contract amendment?

6    A.  Yes.

7    Q.  And then there is $189,000 payment that was

8  made on June 27th, 2022.  Do you see that?

9    A.  I do see that.

10   Q.  And was that payment made to iGov?

11   A.  That is correct.

12   Q.  That was the payment that was contemplated

13 to Mr. Suhy or being made to Mr. Suhy under option

14 year 4 under the Stock Purchase Agreement?

15   A.  That is correct.

16   Q.  You see there is a little check with a

17 magnifying glass?  Do you see that?

18   A.  Yes.

19   Q.  No. 103?

20   A.  Yes.

21   Q.  Is that something you would be able to

22 click on and see an image of the check, who it was

23 actually made out to and cashed by?

24   A.  That has been made to iGov.

25   Q.  Okay.  But if you were to click on that,

1           MR. RATINOFF:  Yeah.  That works fine.

2           THE WITNESS:  I'm okay with that.

3           THE VIDEOGRAPHER:  All right.  Thank you.

4  We're now going off the video record.  The time is

5  10:41 a.m.

6           (Break taken from 10:41 to 11:06 a.m.)

7           THE VIDEOGRAPHER:  We are now back on the

8  video record.  The time is 11:06 a.m.

9           MR. RATINOFF:  Okay.  I think when we left

10  off, we were just going through the last of that

11  bank statement which was Exhibit 115.  And I think

12  you had mentioned there was a payee of that account

13  that was Irving Starr, and I don't think we got the

14  spelling quite correct.

15           So I'm just going to put something in the

16  chat.  I'm going to mark this as Exhibit 116.

17           (Plaintiffs' Exhibit 116 was marked for

18  identification.)

19  BY MR. RATINOFF:

20     Q.  And I went ahead and went on the LinkedIn

21  and found it.  And Irving Starr, there is a

22  Mr. Starr, as listed here in his profile.  And if

23  you look at this, it says attorney at Irving Starr,

24  Esq., PC.  Is that Irving Starr, starting with an I,

25  I-R-V-I-N-G, second word Starr with two Rs, is that

114

1    who the payee you were referring to was when you

2    mentioned Irving Starr?

3         A.  The spellings are matching, I believe.  So

4    I believe that is the right person or entity.

5         Q.  Okay.  But from the spelling standpoint,

6    for the Court Reporter, when you previously

7    mentioned Irving Starr, it was spelled I-R-V-I-N-G,

8    second word S-T-A-R-R, on those checks that you were

9    talking about that we discussed payments made out of

10   the account, correct?

11        A.  That is correct.  I-R-V-I-N-G, S-T-A-R-R.

12        Q.  Did those checks also -- and again, I guess

13   we'll actually get them, but just for the deposition

14   record, do those checks also have the "ESQ" or "PC"

15   on them?

16        A.  They do.

17        Q.  So the checks were made out to Irving Starr

18   E-S-Q, period, comma, P, period, C comma -- period,

19   correct?

20        A.  These are handwritten checks by John Mark,

21   but that sounds right.

22        Q.  And again, you don't know what Irving Starr

23   was being paid for out of that eGovernment Solutions

24   account?

25        A.  No, I don't.  My assumption would be for

                                                      115

1   the project somewhere.  But that's an assumption.
2   Bu I wouldn't know that.
3        Q.  And eGovernment Solutions has never
4   retained an attorney named Richard Starr?
5        A.  No.
6        Q.  And it's never retained a law firm -- I'm
7   sorry.  eGovernment Solutions has never retained a
8   law firm called Irving Starr, Esquire, PC?
9        A.  No.
10       Q.  Would it be an unusual for a lawyer to be
11  paid to do the work on a contract with the IRS?
12           MR. GOLDSTEIN:  Objection to the form of
13  the question.
14           You can go ahead and answer.
15  BY MR. RATINOFF:
16       Q.  In your experience.  Let me start over.
17           In your experience, is it common for an
18  attorney to be paid for work performed on a
19  government contract for software?
20           MR. GOLDSTEIN:  Objection to the form of
21  the question.
22           You can go ahead and answer.
23           THE WITNESS:  I don't have any answer to
24  that.  But as I mentioned, I presume everything done
25  is for the project.

116

1    BY MR. RATINOFF:

2        Q.   So from eGovernment Solutions' perspective,

3    the money that it paid out from the IRS payments was

4    made in conjunction with the CKGE contract, correct?

5        A.   That is correct.

6        Q.   All right.  We mentioned AtomRain.  I'm

7    sorry.  You had mentioned AtomRain.  Do you know

8    what AtomRain is?

9        A.   This is a company -- honestly, I don't

10   know.  The only thing I know is it's a company that

11   John Mark used to do some kind of work on this

12   project, because he needed some help.

13       Q.   And do you know anyone who is affiliated

14   with AtomRain?

15       A.   Nothing on top of my head.  I don't

16   remember talking to anybody or connecting with

17   anyone.

18       Q.   Do you recognize the name Brad Nessbaum?

19       A.   There is one e-mail in my account.  I have

20   to go back and check.  But I never connected with

21   the person.

22       Q.   You recognize the name Nessbaum or

23   Nessbaum?

24       A.   The last name I recollect.

25       Q.   Do you have any understanding of anyone

                                                          117

1    named Nessbaum who's affiliated with AtomRain?

2         A.   Recently when I went through all of the

3    documents that we shared with you, there was one

4    e-mail which popped up.  That's the only thing I

5    know.

6         Q.   So eGovernment Solutions has never employed

7    anyone named Brad Nessbaum?

8         A.   No.

9         Q.   eGovernment Solutions, has it ever employed

10   anyone named Ben Nessbaum?

11        A.   No, unless John Mark employed anyone on

12   behalf of eGov.

13        Q.   But eGovernment Solutions doesn't have any

14   record of anyone being on payroll with the last name

15   of Nessbaum?

16        A.   No.

17        Q.   Has eGovernment Solutions ever issued a

18   1099 to either a Brad or Ben Nessbaum?

19        A.   Not that I'm aware of.

20        Q.   But earlier you said that there may have

21   been a 1099 issued to AtomRain, correct?

22        A.   No.  I mentioned there is a payment which

23   went to AtomRain.  I can check with my accountant if

24   a 1099 is issued or not.

25        Q.   Do you know if any payments were made to

                                                              118

1    AtomRain by eGovernment Solutions after February of
2    2021?
3         A.  After February 2021, I don't believe so.  I
4    think there are only two payments, which I already
5    mentioned.  One was 10,000; one was $101,400.
6             (Reporter interruption.)
7             THE WITNESS:  The other one was $101,400.
8    But none of them -- that was in 2020, and the first
9    one was in 2018.  There was no payment that went to
10   anybody other than iGov in 2021 and 2018.
11   BY MR. RATINOFF:
12        Q.  So did Mr. Suhy have authority -- I'm
13   sorry.  Strike that.
14             Did Mr. Suhy have permission from
15   eGovernment Solutions to retain additional
16   contractors to work on the CKGE project as needed?
17        A.  Yes.
18        MR. RATINOFF:  I'm going to go ahead and
19   put the next exhibit in the chat.  And this should
20   be Exhibit 117.
21             (Plaintiffs' Exhibit 117 was marked for
22   identification.)
23             THE WITNESS:  I see that.
24   BY MR. RATINOFF:
25        Q.  Okay.  And this exhibit, 117, is an e-mail

119

1          A.  I don't think so.

2          Q.  And moving to a different area, we talked a

3    little bit about iGov Inc. in the context of those

4    1099s.  What's your understanding of what iGov Inc.

5    is?

6          A.  My understanding is iGov Inc. is an entity

7    owned by John Mark Suhy.

8          Q.  And do you understand what iGov Inc. does?

9          A.  Different projects.  That's all I know

10   right now.

11         Q.  But the only project that eGovernment

12   Solutions has a relationship on with iGov Inc. is

13   the CKGE contract?

14         A.  That is correct.  That's the only project.

15         Q.  And does iGov Inc. lease any office space

16   from eGovernment Solutions?

17         A.  Yes.  It is the same office.

18         Q.  What do you mean by "the same office"?

19         A.  I mean it's a one-room office.  eGovernment

20   Solutions has its own company.  So iGov shares that

21   office with us.

22         Q.  What is a HUBZone company?

23             (Reporter interruption.)

24   BY MR. RATINOFF:

25         Q.  What is a HUBZone company?

                                                      124

1     Q.  We would have to ask Mr. Suhy that?

2     A.  Yes.  See, this whole project was literally

3  a black box for us.  Because it is a clear project,

4  I'm not supposed to know anything.  So we never

5  asked.

6     Q.  What was the benefit for eGovernment

7  Solutions to allow John Mark Suhy to keep the

8  contract under eGovernment Solutions' name?

9          MR. BEENE:  Objection to form.

10  BY MR. RATINOFF:

11     Q.  Why did -- strike that.

12          Why did eGovernment Solutions allow

13  Mr. Suhy to continue working under the eGovernment

14  name?

15     A.  I guess he won the project through

16  eGovernment Solutions, and we wanted to honor it.

17  And it would have taken him forever to take the

18  project on his company.  So we didn't see any harm,

19  so we left it on that.

20     Q.  Did eGovernment Solutions get any

21  nonmonetary benefits out of the CKGE contract?

22     A.  No.  We had -- we had or we have no

23  intention of taking.  It is his money, so . . . .

24     Q.  So essentially, it was just eGovernment

25  Solutions acted as a conduit for Mr. Suhy?

                                                    137

1       A.   So he won the project while he was partner,

2   and then he was moving away.   So that was his

3   project.   So we let him take the project as his.

4       Q.   And he had complete control over this CKGE

5   contract?

6       A.   That is correct.

7       Q.   And any decisions he made under that

8   contract, eGovernment Solutions was okay with him

9   making those decisions?

10          MR. GOLDSTEIN:   Objection to the form of

11   the question.

12          You can go ahead and answer.

13          THE WITNESS:   I have -- I don't understand

14   the question.

15   BY MR. RATINOFF:

16       Q.   So Mr. Suhy had autonomy to make decisions

17   in relation to the CKGE contract?

18       A.   I believe, because he is the one who knew

19   about the project, so he is the one who can make any

20   decision on that.

21       Q.   But from eGovernment Solutions'

22   perspective, he had complete autonomy to make those

23   decisions?

24       A.   Um --

25       Q.   In other words, eGovernment Solutions

138

1    didn't have any say in any sort of aspect to how the

2    CKGE contract was performed?

3        A.   That is correct.

4             MR. RATINOFF:  Okay.  I don't have any

5    further questions.  Obviously, as stated on the

6    record, this is a few documents we think should be

7    produced.  I'll make these bank statements to be a

8    little more intelligible on that.

9             MR. BEENE:  I just have a few questions.

10   This is counsel for defense.

11             EXAMINATION BY MR. BEENE:

12       Q.  The first one is did Mr. Nikhil Budhiraja

13   control the authentication policy for e-mail

14   accounts at eGov Solutions?

15             MR. RATINOFF:  Objection.  Form.

16             THE WITNESS:  I'm not sure what does that

17   mean.

18             MR. RATINOFF:  Hold on.  We're having an

19   earthquake here.

20             THE REPORTER:  Yeah, we sure are.  It's a

21   decent one.

22             MR. RATINOFF:  Let's go off the record.

23   Let's go off the record, please.

24             THE VIDEOGRAPHER:  We are now going off the

25   video record.  The time is 11:42 a.m.

139

DECLARATION OF DEPONENT


    I, ASHWANI MAYUR, declare under penalty of
perjury that I have reviewed the foregoing
transcript; that I have made any corrections,
additions, or deletions in my testimony that I
deemed necessary; and that the foregoing is a true
and correct transcription of my testimony in this
matter.



    Dated this _____ day of _____, 2022,
at _____, _____.
        [City]                      [State]


                    _____

                    ASHWANI MAYUR

143

```
 1                    REPORTER'S CERTIFICATE

 2          The undersigned Certified Shorthand Reporter

 3   licensed in the State of California does hereby certify:

 4          I am authorized to administer oaths or

 5   affirmations pursuant to Code of Civil Procedure,

 6   Section 2093(b), and prior to being examined, the

 7   witness was duly administered an oath by me.

 8          I am not a relative or employee or attorney or

 9   counsel of any of the parties, nor am I a relative or

10   employee of such attorney or counsel, nor am I

11   financially interested in the outcome of this action.

12          I am the deposition officer who

13   stenographically recorded the testimony in the foregoing

14   deposition, and the foregoing transcript is a true

15   record of the testimony given by the witness.

16          Before completion of the deposition, review of

17   the transcript [ ] was [x] was not requested.  If

18   requested, any changes made by the deponent (and

19   provided to the reporter) during the period allowed are

20   appended hereto.

21          In witness whereof, I have subscribed my

22   name this 28th day of October, 2022.

23

24

25          Karen L. Buchanan, CSR 10772
```

144

**EXHIBIT 4**

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA


NEO4J, INC., et al.,

           Plaintiff,

vs.                       CASE NO.
                           5:18-cv-07182-EJD

PURETHINK LLC, et al.,

           Defendants.

_____/


VIDEOTAPED DEPOSITION OF
JIM WEYANT
as representative of CACI INTERNATIONAL, INC.
pursuant to Federal Rule of Civil Procedure 30(b)(6)


**CONFIDENTIAL PORTIONS**


DATE:         September 16, 2022

TIME:         8:16 a.m. Pacific Time

LOCATION:    via videoconference


REPORTED BY:  BENJAMIN GERALD
              California CSR No. 14203
              Washington CSR No. 3468
              Texas CSR No. 11912

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA


NEO4J, INC., et al.,

            Plaintiff,

vs.                                    CASE NO.
                                       5:18-cv-07182-EJD

PURETHINK LLC, et al.,

            Defendants.
_____/


VIDEOTAPED DEPOSITION OF
JIM WEYANT
as representative of CACI INTERNATIONAL, INC.
pursuant to Federal Rule of Civil Procedure 30(b)(6)


**ATTORNEYS' EYES ONLY PORTIONS**


DATE:          September 16, 2022

TIME:          8:16 a.m. Pacific Time

LOCATION:      via videoconference


REPORTED BY:   BENJAMIN GERALD
               California CSR No. 14203
               Washington CSR No. 3468
               Texas CSR No. 11912

1

--oOo--

JIM WEYANT,

as representative of CACI INTERNATIONAL, INC. pursuant

the Federal Rule of Civil Procedure 30(b)(6), being duly

sworn by the Certified Shorthand Reporter to tell the

truth, the whole truth, and nothing but the truth,

testified as follows:

--oOo--

EXAMINATION

BY MR. RATINOFF:

Q.  Good morning.  Could you please state your full

name for the record.

A.  Good morning.  My name is James Franklin

Weyant, II.

Q.  Mr. Weyant, thank you for joining us today.  I

appreciate your time.  I know it's Friday and we have a

time difference, so our lunches are going to be at a

different point.

Have you been deposed before?

A.  I have not.

Q.  Okay.  So I'm going to go through some kind of

ground rules just to get you familiar with the process.

I'm sure you've done some preparation, so some of this

may not come as a surprise.

I know we're several hours apart.  Your

10

1    lunchtime's coming up sooner, so if you want a break --

2    we need to take maybe a five-minute break every hour,

3    but if you want to take your lunch before our lunchtime,

4    please let me know.  We can do a little bit longer of a

5    break.  So I believe it's already 11:15 where you're at

6    or 11:20, so I'll be cognizant of that.

7           We're going to proceed in an

8    question-and-answer format.  I'm going to ask questions.

9    It's important to allow me to finish my questions and

10   give your attorney a time to respond if there's an

11   objection to that question, so maybe just a

12   couple-second pause.  That way, we don't speak over each

13   other, and the court reporter can properly transcribe

14   the deposition.

15          It's going to be put into what's called a

16   transcript, so it will be a written conversation of

17   question and answer of us.  You'll have a chance to

18   review that transcript before you sign off on it, and be

19   able to note any changes or corrections, and to the

20   extent you're making any changes or corrections, we're

21   going to be able to comment on that in court if the

22   transcript is used in court.

23          Do you understand that?

24   A.  I understand.

25   Q.  Okay.  And you understand you've been sworn

                                                              11

1  under the penalty of perjury to provide truthful

2  testimony?

3       A.  I understand.

4       Q.  Okay.  And it's -- just so you know, this is

5  the equivalent of testifying in front of a court live in

6  front of a jury, and this deposition and the videotape

7  of the deposition can be presented in front of a jury at

8  trial.

9            Do you understand?

10      A.  I understand.

11      Q.  And is there any reason why you can't provide

12 your full and truthful testimony today?

13      A.  No reason.

14      Q.  All right.  Let me go ahead and ask you -- I'm

15 going to -- if you have your chat open, I'm going to

16 start dropping documents which we're going to call

17 exhibits, and these are going to be part of the record,

18 so as soon as you get this in chat, please go ahead and

19 open it.

20           MR. RATINOFF:  I'd like to mark this first

21 exhibit, which is a resume for Jim Weyant.

22           (Exhibit 40 was marked for identification.)

23 BY MR. RATINOFF:

24      Q.  Did I pronounce that correctly?  Is it

25 "Way-ant" or "Why-ant"?

                                                        12

1      A.   "Why-ant," please.

2      Q.   "Why-ant."

3           This is a resume of Jim Weyant.  This would be

4  Exhibit 40.

5           Mr. Weyant, do you recognize this document?

6      A.   Looks like a LinkedIn resume, yes.

7      Q.   Okay.  And is this LinkedIn resume up to date

8  to your knowledge?

9      A.   Yes.

10      Q.   And what is your educational background,

11  starting with college?

12      A.   Starting from college, in 1992, I graduated the

13  United States Naval Academy.  I spent six years on

14  initial active duty and then went to the private sector

15  while staying in the Reserves.  Held positions in the

16  corporate arena with two different companies prior to

17  9/11, then went back on active duty from 2003 to 2006 in

18  two different roles for the Navy.  Went back in the

19  Reserves, then rejoined the corporate world, and in

20  2000 -- from 2006 to 2011 with a small company, and then

21  joined Next Century in 2011, and I've been there since.

22  We were acquired by CACI in October 2019.

23      Q.   Okay.  Thank you.

24           So starting with Next Century, what was your

25  Next Century?

13

1     A.  Next Century was a mid-size software

2  development company headquartered in the Annapolis

3  Junction area, initially in Columbia and --

4  (unintelligible.)

5          THE REPORTER:  I'm sorry, sir.  You dropped off

6  at the end, and I did not get your complete answer.

7  Please repeat.

8          THE WITNESS:  The final part of that answer was

9  that Next Century was headquartered initially in

10  Columbia, and then we went to Annapolis Junction, where

11  we are today.

12  BY MR. RATINOFF:

13     Q.  Okay.  And -- and how long were you with Next

14  Century for?

15     A.  I joined in December of 2011, and Next Century

16  was acquired by CACI in October of 2019.

17     Q.  So in October 2019, is that correct, it was

18  acquired by CACI?

19     A.  Correct.

20     Q.  And what was your role in Next Century prior to

21  the acquisition?

22     A.  Prior to the acquisition, I was a program

23  manager and vice president.

24     Q.  And -- and what type of programs did you

25  manage?

                                                          14

1      A.   We managed software development programs for

2   government customers.

3      Q.   And when you -- or when Next Century was

4   acquired by CACI, did you continue in the same role?

5      A.   Yes, with the exception that we relinquished

6   the titles of -- of -- you know -- (unintelligible.)

7           THE REPORTER:  I'm sorry.  "Relinquished the

8   titles of" -- you're dropping off a little at points in

9   your answer, sir, so if you could keep your voice up,

10  I'd appreciate it.

11          THE WITNESS:  Okay.

12          Yes, the same role, with the exception of the

13  title of vice president.

14  BY MR. RATINOFF:

15     Q.   Understood.  And was that acquisition a

16  complete assimilation of Next Century?

17     A.   Yes.

18     Q.   So --

19     A.   We were a wholly-owned subsidiary, but...

20     Q.   Sorry.  I misspoke.

21          So Next Century remained a wholly-owned

22  subsidiary?

23     A.   Yes.

24     Q.   Okay.  And does it still remain as a

25  wholly-owned subsidiary of CACI?

15

1          A.  Yes.

2          Q.  And at the time of the acquisition, were the

3     employees that were employed by Next Century -- would --

4     do they stay on with Next Century or become employees of

5     CACI?

6          A.  Employees became employees of CACI.

7          Q.  Okay.  Thank you.

8              I'm going to put the next document in the chat

9     for you to open up.

10             MR. RATINOFF:  This is a subpoena to testify at

11     a deposition in a civil action to CACI

12     International, Inc.  I'd like to mark this as

13     Exhibit 41.

14             (Exhibit 41 was marked for identification.)

15     BY MR. RATINOFF:

16         Q.  And let me know, sir, when you've had a chance

17     to see the document or download it.

18         A.  I downloaded it, and I can see it.

19         Q.  Okay.  And just take a quick look, and if you

20     go to what's called Attachment A, and it would be

21     page -- starting at Page 3 of Attachment A and just let

22     me know when you're there.

23         A.  I'm there.

24         Q.  Okay.  And have you seen this document before?

25         A.  I have.

                                                          16

1    Q.  Okay.  And when did you see this document?

2    A.  Oh, approximately one month ago.

3    Q.  And are you familiar with the topics of

4  examination that are listed 1 through 14?

5    A.  I am.

6    Q.  And do you understand that you're here to

7  testify today, not just in your personal capacity, but

8  as a representative of Next Century and CACI?

9    A.  I understand.

10   Q.  And that your testimony on these topics is not

11  just your personal knowledge, but what would be the

12  knowledge of Next Century and CACI?

13   A.  Yes, I understand.

14   Q.  And are you prepared to testify on all 14 of

15  these topics today?

16   A.  I am.

17   Q.  And did you, prior to this deposition, spend

18  any time preparing?

19   A.  Yes, I did.

20   Q.  And what did you do to prepare for this

21  deposition?

22   A.  I reviewed the topics of examination, I met

23  with Gregg, I was asked to review emails, which I did,

24  and -- and we also had a meeting with one of the

25  developers.

                                                    17

1    Q.  Okay.  Thank you.  I appreciate that.  It's a

2    Herculean effort, and again, I appreciate your time.

3    All right.  Let's go ahead and start with Next Century's

4    work.

5           We talked about you being a program manager at

6    Next Century; what type of programs did you manage?

7        A.  We -- I managed software development programs

8    for government customers.

9        Q.  And who were those government customers?

10       A.  National Security Agency.

11       Q.  (Unintelligible.)

12           Apologies.  Even the sign on my door didn't

13   stop someone.

14           MR. RATINOFF:  Can we have the question read

15   back and -- so we'll have a cleaner record?

16           (The following record was read:

17           Question:  And who were those government

18           customers?)

19           THE WITNESS:  National Security Agency.

20   BY MR. RATINOFF:

21       Q.  Okay.  Is it okay if we call National Security

22   Agency "the NSA" for short?

23       A.  Yes.

24       Q.  Okay.  We understand what that means.

25           Is the National Security Agency sometimes

19

1   referred to as "the Maryland Procurement Office"?

2       A.  Yes.

3       Q.  Okay.  And sometimes also referred to as "the

4   MPO"?

5       A.  Yes.

6       Q.  So if we use "MPO" or "NSA," we understand

7   we're talking about the same government agency, correct?

8       A.  Yes.

9       Q.  Okay.  I'll try to use one, but I may slip, and

10  I'm sure you'll probably do the same, but as long as we

11  understand what we're talking about, then that's --

12  that's okay.

13          And what type of work did Next Century -- well,

14  let me start with, when did Next Century start working

15  with the NSA?

16      A.  Approximately 2005.

17      Q.  And so that's prior to your time there?

18      A.  Correct.

19      Q.  Okay.  Was Next Century working with the NSA in

20  2018?

21      A.  Yes.

22      Q.  And what type of work was Next Century doing

23  for the NSA in 2018?

24      A.  We were doing analytical software -- custom

25  analytical software development for this -- for the NSA.

20

1    Q.  Okay.  And when did that contract actually
2  begin?
3    A.  Contract -- there were multiple contracts that
4  we managed and were involved in.
5    Q.  Did any of those contracts involve the use of
6  graph database software?
7    A.  Yes.
8    Q.  Okay.  And how many of those contracts involved
9  graph database software?
10    A.  So --
11    Q.  Circa 2018.  Sorry.
12    A.  Okay.  To my knowledge, one that I was involved
13  was one -- one contract where we were a subcontractor,
14  to clarify.
15    Q.  Okay.  So you were a subcontractor on -- on a
16  project for the NSA in 2018.
17        Who was the prime contractor?
18    A.  The prime contractor was Praxis Engineering.
19    Q.  Could you spell that for the record, please?
20    A.  Sure:  Papa, Romeo, Alpha, X-ray, India,
21  Sierra.
22    Q.  And when did that contract begin?
23    A.  August of 2018.
24    Q.  And what was Next Century tasked with under
25  that subcontract?

21

 1          A.   We were tasked with an analysis of alternatives

 2     of various technologies that the NSA wanted to consider

 3     for implementation.

 4          Q.   And what technologies were under consideration

 5     with that project?

 6          A.   There were multiple threads.  And I assume you

 7     want to focus on the graph database portion of it?

 8          Q.   Yes, please.

 9               And so what -- so there was a project in 2018

10     that involved consideration of various graph database

11     software systems?

12          A.   Correct.

13          Q.   Did the contract call for a specific graph

14     database software program to be used?

15          A.   No.

16          Q.   And why not?

17               MR. NIVALA:  Could we define the contract at

18     this time?

19               MR. RATINOFF:  Sure.  Okay.

20     BY MR. RATINOFF:

21          Q.   Did the contract have a name that Next Century

22     was involved in in 2018 with the NSA?

23          A.   Next Century was a subcontractor to Praxis on a

24     contract called Blue Rocket, Task Order 39.

25          Q.   So "Blue Rocket" was the code name for that

                                                               22

1          (The following was deemed attorneys' eyes

2          only.)

3          MR. RATINOFF:  Did we have a question pending,

4   or not?

5          (The following record was read:

6          Question:  So Blue Rocket was the code name for

7          that particular contract or project?

8          Answer:  Yes.)

9   BY MR. RATINOFF:

10      Q.  Okay.  So we were talking about Project Blue

11  Rocket; is that correct?

12      A.  Yes.

13      Q.  And what was Project Blue Rocket?

14      A.  Blue Rocket was the name of the contract; Task

15  Order 39 is the name of the project.

16      Q.  Okay.  So Password 39 was the specific project

17  that Next Century was contracted for?

18      A.  Correct.

19      Q.  And what was Password 39?

20      A.  Task -- Task Order 39.

21      Q.  Oh, "task order."  I apologize.  Okay.

22          What was Task Order 39?

23      A.  Task Order 39 was an analysis of alternatives

24  for new technologies that the NSA customer wanted to

25  consider for research and prototyping effort.

28

THE REPORTER:  Sorry.  "Prototyping..."

THE WITNESS:  Effort.

BY MR. RATINOFF:

Q.  And what technology would be considered for Task 39 (sic)?

A.  So the task order had multiple threads of -- of effort, five main lanes.  Specific to graph technologies that we were talking about before the break, that was one of the lanes of effort.

Q.  Okay.  And did Task Order 39 specify a particular graph database technology?

A.  No.

Q.  And was it the assignment to Next Century to determine what graph database software would work for Task Order 39?

A.  Next Century was tasked to conduct an analysis of alternatives of graph database technologies to see if they were viable for implementation at the NSA.

Q.  And was this -- sorry.  Strike that.

What graph database technologies did Next Century consider for Task Order 39?

A.  Several, including -- so there was -- Neo4j was one, Oracle was a second one, DataStax and JanusGraph were others that were the primary thrust.  There were several others that I don't have the names of that --

29

1    that were also under initial consideration.

2         Q.  And when were these all under consideration

3    when -- under -- let me strike that.

4         A.  In August 2018, when we were working the task

5    order.

6         Q.  And what was the -- what was the total amount

7    of the contract at Task Order 39?

8         A.  The dollar amount?

9         Q.  Yes.

10        A.  I don't have that off the top of my head.

11        Q.  Was it -- was it a six-figure award?

12        A.  Yes.

13        Q.  Was it a seven-figure award?

14        A.  Not Task Order 39, no.

15        Q.  Was it, to your best recollection, a

16   mid-six-figure award?

17        A.  Approximately.

18        Q.  And what was the term of that Task Order 39 as

19   far as was it -- was it a year?  Six months?

20        A.  Yeah, so the period of performance, the

21   timeline was August of 2018 through February of 2019.

22        Q.  And what was the scope of the -- of the

23   contract for August of 2018 to February of 2019?

24        A.  Scope of the contract, or scope of the task

25   order?

                                                        30

1        Q.   Scope of the task order.

2        A.   The scope of the task order was to conduct an

3    analysis of alternatives of multiple technologies,

4    including graph database technologies, for consideration

5    by the NSA to implement into their analytical software.

6        Q.   And then what did Next Century do as an

7    evaluation to rate graph database software that you

8    identified?

9        A.   Our team conducted research and evaluation of

10   multiple graph database technologies.

11       Q.   And that included Neo4j?

12       A.   Yes.

13       Q.   Okay.  And how did that analysis start as far

14   as narrowing down the graph database software programs

15   you were considering?

16       A.   The analysis started with the teams reviewing

17   other implementations of graph database technologies at

18   the NSA and in other -- other applications to assess the

19   performance, the security, lessons learned, and costs of

20   the wide range of initial technologies under

21   consideration.

22       Q.   Had Next Century used Neo4j before?

23       A.   I am aware of one other project that had at

24   least considered Neo4j.

25       Q.   And this is prior to August of 2018?

                                                          31

```
 1    highlights for purposes of marking as an exhibit.  Okay.
 2            And looking at this email, there's a Bates
 3    number at the bottom, it says "CACI" and then four
 4    zeros, and then "5431" on that first page.
 5            Do you see that?
 6        A.  I do.
 7        Q.  And do you understand this email was produced
 8    by CACI in response to Neo4j's subpoena?
 9        A.  I understand.
10        Q.  And do you know who Michael Smolyak is?
11        A.  I do.
12        Q.  Did I pronounce his name correctly?
13        A.  Smolyak.
14        Q.  Smolyak.  Okay.
15            Who's Michael Smolyak?
16        A.  Michael Smolyak's an engineer that works for
17    Next Century/CACI.
18        Q.  And do you know who Jason Zagalsky is?
19        A.  I do.
20        Q.  And who is he?
21        A.  He was the federal sales rep for Neo4j.
22        Q.  Okay.  And going to bottom -- going to bottom
23    of -- which would be the start of the email chain, and
24    it would be Bates numbered at the bottom 5432, and then
25    moving up to 5431, you'll see there's an email dated
```

33

 1    research also being used for the Task Order 39 project?

 2        A.  Those two projects were independent of each

 3    other and did not support one another.

 4        Q.  Okay.  Was Michael -- was Michael Smolyak, was

 5    he working on both of those projects?

 6        A.  Yes.

 7            MR. RATINOFF:  All right.  I'm going to drop

 8    the next exhibit here.  This would be, I believe,

 9    Exhibit 43.

10            (Exhibit 43 was marked for identification.)

11    BY MR. RATINOFF:

12        Q.  This document as the Bates number at the

13    beginning, you'll see it as 5178.  This document, I'll

14    represent to you, is produced by CACI in response to the

15    subpoena.

16            Do you have any reason to believe this isn't a

17    true and correct copy of what was produced?

18        A.  I have no reason to believe it's not that.

19        Q.  I'm sorry.  You broke up there.  Could you just

20    repeat your answer?

21        A.  I have no reason to believe this is not a

22    correct document.

23        Q.  Okay.  Who's -- who's Diane Griffith?

24        A.  Diane Griffith is another engineer that was

25    employed by Next Century and then CACI after the

                                                        35

1    acquisition.

2         Q.   Okay.  And was she working on Task Order 39 as

3    of October 2018?

4         A.   Yes.

5         Q.   And then who's Seth Cooper?

6         A.   Seth Cooper was a technical writer employed by

7    Next Century.

8         Q.   Okay.  And was Seth Cooper also working on Task

9    Order 39 at this time?

10        A.   Yes.

11        Q.   And then who's Shahak -- is Nagiel?  Is that

12   correct?

13        A.   Nagiel, correct.

14        Q.   Nagiel.  Who's Shahak Nagiel?

15        A.   He's also an engineer who's employed by Next

16   Century.

17        Q.   And was he, at this time, working on Task

18   Order 39?

19        A.   Yes.

20        Q.   And I'll ask the same for Sean Graff; who's

21   that?

22        A.   Same answer:  Engineer employed by Next

23   Century.

24        Q.   Also working on the Task Order 39?

25        A.   Yes.

36

1    Q.  And then Rebecca Butterfield, was she also an

2    employee of Next Century?

3    A.  Yes.

4    Q.  Was she also working on Task Order 39?

5    A.  Yeah.

6    Q.  And did Task Order 39 provide a budget for

7    paying for a license for whatever graph database

8    software Next Century selected?

9    A.  No.

10   Q.  Was that something that Next Century was -- if

11   it had to pay for a license, would have to do at its own

12   cost?

13   A.  Yes.

14   Q.  So cost was a consideration as far as which

15   database software Next Century would -- would choose?

16   A.  Can I ask Gregg a question?

17   Q.  Well, unless it's something that's going to be

18   attorney-client privilege information, I think you need

19   to answer the question.  Unless you don't understand the

20   question.  I can re-ask it.

21   A.  Okay.  Yeah.  Repeat the question, please.

22   MR. RATINOFF:  Can you read the question back,

23   please?

24   (The following record was read:

25   Question:  So cost was a consideration as far

37

1          as which database software Next Century would

2          choose?)

3          MR. NIVALA:  Well, let me interpose an

4    objection at this point.  I think that the question

5    assumes facts that aren't -- aren't in evidence.  It

6    assumes that --

7          MR. RATINOFF:  Okay.  Hold on, Gregg.

8          MR. NIVALA:  -- costs --

9          MR. RATINOFF:  Gregg?

10          MR. NIVALA:  -- database --

11          MR. RATINOFF:  Gregg, I know -- I know this has

12    been a friendly deposition, but I just want to remind

13    you that you can only object as to form.  You can't do

14    speaking objections.

15          MR. NIVALA:  Got it.

16          MR. RATINOFF:  So, you know, you can you can

17    instruct the witness not to answer if it's privileged,

18    but if you have an objection to the question itself, I

19    think you're limited to doing it to form per the rules.

20    Most courts these days subscribe to that.

21          So let me -- let me ask a different question

22    and come back to that one.  I'll just note the witness

23    didn't answer it.

24    BY MR. RATINOFF:

25          Q.  So my prior question to that was the budget

                                                              38

1  under Task Order 39.

2      If Next Century were to choose a graph database

3  software for that project, who would bear the cost of a

4  license for that software?

5      A.  The budget was supplied by the government.  The

6  cost of research would be borne by the contractor,

7  unless there was decisions and discussions with

8  government to modify the contract to provide the budget

9  for licensing.

10      Q.  So as -- as written, Task Order 39 would have

11  required Next Century to pay for a license as part of

12  its scope of work under Task Order 39?

13      A.  At the time of award, it was unknown by either

14  the government or the prime or Next Century which

15  database would be a viable option, and again, for

16  research and evaluation of multiple databases, there

17  were multiple factors evaluated between performance,

18  security, lessons learned, and cost.

19      Q.  Sorry.  There was a plane flying overhead.  I

20  wanted to mute my mic.  Unfortunately, we're pretty

21  close to the flight path for San Jose International

22  here, and so I may just mute my mic here once in a

23  while.

24      Anyway, so -- so cost of a license for

25  whichever graph database software was being considered

39

1   was a factor in the decision-making process, correct?

2      A.  Yes.

3      Q.  Okay.  So turning to what I believe was marked

4   as Exhibit 43, which is an October 1st email -- 2018

5   email from Diane Griffith.

6           She says, "I did not talk to Neo4j.  I used GSA

7   pricing I was able to find published already for intro

8   into (sic) their pricing.  Neo4j" -- (unintelligible.)

9           THE REPORTER:  I'm sorry.  You're slurring it a

10  little bit.  Can you please start over?

11          MR. RATINOFF:  Okay.  Sure.  No problem.

12  BY MR. RATINOFF:

13     Q.  Do you see at the beginning of the email where

14  it says, "I do not" -- I'm sorry -- "I did not talk to

15  Neo4j.  I used GSA pricing I was able to find published

16  already for their intro pricing (sic)."

17          Do you see that sentence?

18     A.  I do.

19     Q.  And so was Ms. Griffith -- was she researching

20  pricing in relation to Neo4j for Task Order 39?

21     A.  Yes.

22     Q.  And was that a task she was assigned to perform

23  by Next Century?

24     A.  Yes.

25     Q.  And was she instructed to go to iGov Solutions?

40

1    You can see it -- she says -- let me strike that

2    question.

3           Do you see where she says, "Where I found the

4    GSA pricing link was off of a blog entry by iGov

5    Solutions"?  Do you see that sentence?

6        A.  I do.

7        Q.  And was this something that Next Century

8    directed her to look at?

9        A.  No.

10       Q.  She found it, and it is part of her job in

11   evaluating Neo4j?

12       A.  Yes.

13       Q.  And was it helpful to have that GSA pricing for

14   Next Century's evaluation of Neo4j for --

15       A.  Yes.

16       Q.  -- Task Order 39?

17       A.  Yes.

18       Q.  And did she circulate the price list among the

19   folks working on Task Order 39 at Next Century?

20       A.  I don't know.

21       Q.  But the recipients on this email, just for the

22   record, were also working on Task Order 39?

23       A.  Yes.

24       Q.  And then I'm just going to have you click on

25   this first link where it says "blog.igovsol.com," and

41

1    then it's a string.

2           Do you see that?

3       A.  Right.

4       Q.  I'm going to go ahead and share -- actually,

5    what's the best way to share screen here?  Should I

6    have --

7           THE REPORTER:  May we go off the record for one

8    moment?

9           MR. RATINOFF:  Sure.

10          THE VIDEOGRAPHER:  All right.  We are not going

11   off the video record.  The time is 9:10 a.m.

12          (Off the record from 9:10 a.m. to 9:12 a.m.)

13          THE VIDEOGRAPHER:  We are now back on the video

14   record.  The time is 9:12 a.m.

15   BY MR. RATINOFF:

16      Q.  Okay.  You should be able to see, I believe,

17   a -- the -- do you see an email we're looking at?  It

18   should be Tab 302.  We've marked that as Exhibit 43.

19          Do you see that?

20      A.  I do.

21      Q.  Okay.  So I'm just going to go ahead and click

22   on -- and you can do the same so you can confirm for

23   yourself.  I'm going to go ahead and click on this first

24   link there that's "https://blog.igovsol.com," et cetera.

25          Go ahead and click on that.  I'm going to share

42

1    that screen now.  Let me know if you end up at the same

2    thing.

3         A.  Yup.

4         Q.  Do you see it says "Neo4j Enterprise commercial

5    Prices" at the top of the website?  Do you see that?

6         A.  I see that.

7         Q.  Okay.  And you scroll down, and you'll see,

8    towards the middle of the scroll, you'll see "Neo4j

9    Enterprise Bundle."

10             Do you see that?

11        A.  I see it.

12        Q.  Okay.  If you keep scrolling, you'll see that

13   there's "Neo4j Enterprise Base Bundle:  189,188."

14        A.  I do.

15        Q.  Okay.  And you'll see at the bottom there's

16   pricing based on core packs.

17        A.  I see it.

18        Q.  And also business model pricing.

19             So it's -- it's fair to say this website

20   provided Next Century with some basic pricing

21   information on Neo4j Enterprise software bundles; is

22   that correct?

23        A.  If Diane read it, yes.

24        Q.  Okay.  Just going back -- just going back to

25   the email we were looking at, Exhibit 43, she says, "I

43

1    was able to find published already" -- I'm sorry.

2        "I used GSA pricing I was able to find

3    published already for intros to their pricing.  Neo4j

4    prices by instances and cores, but has bundles."

5        Is it fair to say that Next Century did look at

6    this pricing -- the pricing of Neo4j Enterprise,

7    correct?

8        A.  I would say that's fair.

9        Q.  All right.  And did the NSA provide any

10   guidance on -- on pricing for the graph database

11   software or the -- strike that.

12        Were you provided any instructions from the NSA

13   on pricing considerations for the graph database

14   software that was being considered?

15        A.  The NSA asked us to provide an analysis of

16   alternatives that considered cost as one of the many

17   factors, and we were tasked to provide -- not provide --

18   to consider cost as one of the factors.

19        Q.  Okay.  And then -- and then performance was

20   another important factor?

21        A.  Yes.

22        Q.  And security was also another important factor?

23        A.  Yes.

24        MR. RATINOFF:  Okay.  I'm going to take the

25   next document here and mark this as Exhibit 43 -- I'm

44

1    sorry -- Exhibit 44.

2         (Exhibit 44 was marked for identification.)

3    BY MR. RATINOFF:

4    Q.  And let me know when you've got the it's Bates

5    number -- the starting Bates number would be CACI0000 --

6    I think I got all of them -- 4994.

7    A.  I have it up.

8    Q.  Okay.  And I think we've already discussed

9    Diane Griffith and Shahak.

10        Peter Loats and Jim Mantheiy, were they also

11   Next Century employees at that time?

12   A.  Yes.

13   Q.  So in October 2018, what -- what had Next

14   Century done at that point in evaluating various graph

15   database software programs it was considering for the

16   NSA?

17   A.  At that point, we had done initial research on

18   a wide range of graph database technologies and had a

19   requirement to deliver to the customer an initial --

20   initial evaluation, which they then reviewed.

21   Q.  Okay.  So at that point -- and when I say "at

22   that point," as of the middle October of 2018, had Next

23   Century provided any feedback to the NSA on whether it

24   had narrowed down its -- its decision on which graph

25   database program it would go with?

45

1      A.  So let's -- let's -- let's be clear.  Let me

2  first -- we had not -- at that point, we would have just

3  provided the initial evaluation of the wide range of --

4  of databases, the initial list.

5      Q.  Okay.  So then we were talking about important

6  features.  I'll just go ahead and point you to what's

7  been marked as Exhibit 44, an email; subject, "Neo4j

8  licensing."

9          Do you have that in front of you?

10     A.  I do.

11     Q.  It says at the top of this email, "Up front,

12  some reasons why we may need the Neo4j distro that has

13  the (sic) license giving access to the Neo4j Enterprise

14  features," and in parentheses, "so Neo4j commercial

15  license or the enterprise free bundle from

16  iGov/GraphStack," close parens, comma, "can be found

17  here, but the (sic) reasons that apply include" -- and

18  then there's a list of features there.

19          Do you see that?

20     A.  Yes, I do.

21     Q.  Okay.  And when we were talking about important

22  features listed here, first casual -- sorry -- causal

23  clustering; was that an important feature that Next

24  Century was looking for in the software it was

25  considering?

46

1      A.  Yes.

2      Q.  Okay.  Do you know what HA availability is?

3      A.  I understand the concept, yes.

4      Q.  Okay.  Let me ask -- let me ask a quick side

5  question.

6          Did -- at that time, did Next Century

7  understand that Neo4j offered multiple programs -- or

8  sorry.  Strike that.

9          Did -- at that time, in October 2018, did Next

10  Century understand that Neo4j offered a Community

11  Edition?

12      A.  I would say yes.

13      Q.  Okay.  And then it also understood that Neo4j

14  also offered an Enterprise Edition?

15      A.  Yes.

16      Q.  And did Next Century understand, in October of

17  2018, that the Enterprise Edition offered by Neo4j

18  required a paid commercial license?

19      A.  I would say yes.

20      Q.  And -- and then there was -- was it Next

21  Century's understanding that there were certain features

22  that were included in the Enterprise Edition of Neo4j

23  that weren't offered in the Community Edition?

24      A.  Yes.

25      Q.  And did Next Century believe those -- those

47

1    enterprise-only features were needed for the NSA project

2    it was working on?

3        A.  In October 2018, we would not have known that.

4        Q.  From the NSA's perspective, you mean?

5        A.  No, I mean from the evaluation of alternatives,

6    at that point in the evaluation, we would not have known

7    what the agency needed in terms of capabilities.

8        Q.  Okay.  But from Next Century's perspective, was

9    casual (sic) clustering important?

10       A.  Yes.

11       Q.  And then was intracluster encryption to secure

12   traffic between nodes and data centers, was that also an

13   important feature that Next Century wanted in its

14   software that it was going to go chose?

15       A.  Next Century wasn't choosing any software; we

16   were evaluating softwares (sic) for government to

17   decide.

18       Q.  Apologies.  Another plane flying by.

19           Okay.  But was intracluster encryption, was

20   that a feature that Next Century viewed as being

21   important?

22       A.  Yes.

23       Q.  And then what is "unlock number of cores

24   allowed"?  What does that mean?

25       A.  That means an additional capability to expand

48

1   on the ability of the software to scale.

2       Q.  And then was it Next Century's understanding

3   that these bullet points within the email --

4   (unintelligible.)

5           THE REPORTER:  I'm so sorry, Counsel.  You

6   broke up.  Can you please repeat?  Apologies.

7           MR. RATINOFF:  Excuse me.  Sure.

8   BY MR. RATINOFF:

9       Q.  Just looking at this list of six bullet points,

10  was it Next Century's understanding that these six

11  bullet points were referencing enterprise-only features

12  in the Neo4j software?

13          MR. BEENE:  I'm going to object to the

14  identification of those as enterprise-only.

15          What enterprise are we talking about?

16          MR. RATINOFF:  Counsel, you can object to form.

17  There's no speaking objections.  Thank you.

18  BY MR. RATINOFF:

19      Q.  Do you understand what Neo4j Enterprise is?

20      A.  Yes.

21      Q.  Okay.  And what's your understanding of Neo4j

22  Enterprise as -- as offered by Neo4j, Inc. or Sweden?

23      A.  The original software with additional features

24  in the Community Edition.

25      Q.  And it's your understanding that those features

                                                    49

1   are only in Enterprise, and can only be obtained by a

2   paid commercial subscription from Neo4j?  Strike that

3   question.  I don't know.  I think I've already kind of

4   covered that, so let's go back to the email.

5           Do you see there's a reference in that first

6   paragraph to -- to "the enterprise free bundle from

7   iGov/GraphStack"?  Do you see that?

8       A.  I do.

9       Q.  And what's that referring to?

10      A.  Reading the email, it looks like it's referring

11  to a bundled solution available from iGov.

12      Q.  And what was -- as of October 2018, what was

13  Next Century's understanding of what iGov was offering

14  as an enterprise free bundle?

15      A.  An alternative to the Neo4j Enterprise

16  solution.

17      Q.  And how was it an alternative?

18      A.  Similar features, less cost.

19      Q.  And when you say "less cost," there was no cost

20  for a license to iGov's offering of Neo4j Enterprise,

21  correct?

22      A.  Not to my knowledge.

23      Q.  So looking down at the quoted -- after these

24  bullet points it says, quote, "Right now the only

25  difference between the paid Neo4j Enterprise

50

1    (commercial) binary and Neo4j Enterprise (open source)

2    binary (we complied from source) is that intracluster

3    encryption is still offered" -- I'm sorry -- "is still

4    off by default in the AGPLv3 version."

5           Do you see that?

6      A.  I do.

7      Q.  Okay.  So was it Next Century's understanding

8    from iGov that it was offering essentially an equivalent

9    version of Neo4j Enterprise under the AGPL?

10     A.  Yes.

11     Q.  And that the features offered in iGov's Neo4j

12   Enterprise was the same as the Neo4j Enterprise software

13   that was offered by Neo4j at the enterprise level?

14     A.  Yes.

15     Q.  Okay.  And did -- at this point, had Next

16   Century reached out to -- when I say "at this point," as

17   of October 2018, did Next Century reach out to iGov or

18   Mr. Suhy regarding their alternate offering of Neo4j

19   Enterprise?

20     A.  I don't know the answer to that question.

21     Q.  Okay.  Let me see if I can help you refresh

22   your recollection.

23          MR. RATINOFF:  I've dropped in what has been --

24   it starts with the Bates number CACI00004966.

25          (Exhibit 45 was marked for identification.)

51

```
1              (The confidential testimony resumed.)

2              THE VIDEOGRAPHER:  We are now back on the video

3    record.  The time is 9:39 a.m.

4              Please proceed, Counsel.

5              MR. RATINOFF:  Thank you.

6    BY MR. RATINOFF:

7         Q.  Okay.  So before we broke, I put up an email

8    that was dated October 22, 2018, it was from a

9    Mr. John Mark Suhy to Shahak -- sorry --

10        A.  Nagiel.

11        Q.  Nagiel.  Thank you -- and Diane Griffith.

12             Do you have that in front of you?

13        A.  I do.

14        Q.  Okay.  And do you understand this email was

15   produced by CACI in response to the subpoena?

16        A.  Yes.

17        Q.  And do you know who John Mark Suhy is?

18        A.  I do.

19        Q.  Okay.  Who is he?  At least to the company's

20   knowledge at the time, in 2018.

21        A.  He was a leader in the iGov Foundation.

22        Q.  Okay.  What was your understanding of what iGov

23   is or was?

24        A.  My limited understanding is a foundation

25   dedicated to open-source technologies.
```

54

1      Q.   Okay.  And was there a specific -- well, let

2  me -- let me back up for a second.

3           Do you understand what Graph Foundation is?

4      A.   I do.

5      Q.   Okay.  And what is your understanding of

6  graph -- the Graph Foundation?

7      A.   Again, a foundation designed to advance

8  open-source graph technology.

9      Q.   And did you understand that Mr. Suhy was

10  involved in both iGov and the Graph Foundation?

11     A.   Yes.

12     Q.   Okay.  And why did Next Century reach out to

13  Mr. Suhy?  And let me point you to -- if you look at the

14  bottom of this email -- strike that question.

15          If you go to the last page of this email,

16  CACI -- it ends with 4967.

17     A.   I see it.

18     Q.   And you'll see it says, "Hi John, I'm trying to

19  better understand the licensing nuances of Neo4j

20  Enterprise Edition, and came across some posts you made

21  on StackOverflow."

22          Do you see that?

23     A.   Yes.

24     Q.   Why did Next Century reach out to Mr. Suhy in

25  regards to the licensing nuances of Neo4j Enterprise

55

1  Edition?

2      A.  Within part of our research effort, as part of

3  the task order requirements on Task Order 39.

4      Q.  And why -- why did Next Century in particular

5  reach out to Mr. Suhy?

6      A.  Because of the posts that were on the site.

7      Q.  Okay.  And what was it about these posts that

8  Next Century was interested in finding more about from

9  Mr. Suhy?

10      A.  Our government customer was interested in

11  open-source technologies.

12      Q.  And because open source is generally -- it

13  doesn't require to pay license?

14      A.  Correct.

15      Q.  And was it your understanding that Mr. Suhy was

16  involved with a particular graph database program called

17  ONgDB?

18      A.  Yes.

19      Q.  Okay.  And what was your -- or Next Century's

20  understanding of what ONgDB was in October of 2018?

21      A.  An open-source version of Neo4j capability.

22      Q.  Okay.  And we did talk -- (unintelligible.)

23      THE REPORTER:  Sorry.  Broke up a bit, Counsel.

24  Please repeat.

25      MR. RATINOFF:  Hold on.  A plane's flying over.

56

BY MR. RATINOFF:

    Q.  Just so we -- earlier, I think before break,
talked about Neo4j offering different levels of its
software.

       So which -- which -- sorry.  Strike that.

       MR. RATINOFF:  What was the original question?
I'm sorry.  Before I cut that one off.

       (The following record was read:

       Question:  Okay.  And what was your -- or Next
       Century's understanding of what ONgDB was in
       October of 2018?

       Answer:  An open-source version of Neo4j
       capability.

       Question:  Okay.  And we did talk --)

       THE REPORTER:  And that's where it broke up.

       MR. RATINOFF:  Okay.  Got it.

BY MR. RATINOFF:

    Q.  So you mentioned Neo4j.  We spoke about there's
different versions of Neo4j.

       Which -- which version of Neo4j did you
understand ONgDB to be equal to?

    A.  At the time, it would contain features both
from the Community Edition and at least some of the
Enterprise Edition.

    Q.  And when we refer to "the Enterprise Edition,"

57

1  you mean Neo4j Enterprise Edition?

2      A.  Correct.

3      Q.  And as far as -- I think as you mentioned, you

4  mean the paid-for, enterprise-only level of features

5  with respect to Neo4j Enterprise?

6      A.  To my knowledge.

7      Q.  And was it Next Century's understanding in

8  October of 2018 that a paid license wasn't required

9  for -- I'm sorry -- for ONgDB?

10      A.  Correct.

11      Q.  And turning back to the email we were just

12  talking about, I'm going to scroll back up to the top

13  email, which would be the response to the one we just

14  spoke about where Mr. Suhy says, "We actually package

15  these feature's source code back into the open source

16  distributions, turning features such as causal

17  clustering encryption back on."

18          Do you see that?

19      A.  Yes.

20      Q.  Okay.  Was causal clustering encryption, to

21  Next Century's understanding, an enterprise-level

22  feature?

23      A.  Yes.

24      Q.  And that was a feature that was important to

25  its evaluation of graph database software for the Task

58

Order 39?

    A.  Yes.

    Q.  It says, in the email, "Not to mention the US
Treasury has now adopted ONgDB enterprise, which is the
same code base."

        Was it Next Century's understanding that,
from -- at least from Mr. Suhy, that ONgDB and Neo4j
Enterprise were -- shared the same code base?

    A.  Yes.

    Q.  And what license did Next Century understand
that ONgDB was distributed under?

    A.  The -- (unintelligible.)

        THE REPORTER:  I'm sorry.  One more time?

        THE WITNESS:  GPLv3 license.

BY MR. RATINOFF:

    Q.  AGPL Version 3; is that correct?

    A.  Yes.

        MR. RATINOFF:  Okay.  I'm going to mark the
next exhibit as 46, I believe.  Oops.  I just dropped a
highlighted one.  Let me try that again.  I have too
many windows open, even with two screens.

        (Exhibit 46 was marked for identification.)

        MR. RATINOFF:  All right.  So the most recent
one that I dropped should be the one marked as the
exhibit.

59

BY MR. RATINOFF:

Q.  Okay.  And you see -- I'm going to go ahead and just point to -- this is the last four digits, the Bates numbers, 4931, it was produced by CACI in response to the subpoena.

Do you have any reason to believe this wasn't a true and correct copy of the email that was produced?

A.  No reason to believe otherwise.

Q.  Now, if you scroll down to the bottom of this email, which would be the start of the email thread, 4933 being the page, and you'll see this is referencing the prior email we were talking about, I believe.

And scrolling up to the October 22, 2018, 10:10 p.m. email, do you see that?

A.  I do.

Q.  Okay.  At this point, do you know what version of Neo4j Next Century was considering?

A.  No.

Q.  And didn't -- was Next Century looking at ONgDB version 3.4 at this time?

A.  I would say yes, looking at the email.

Q.  So the equivalent version of Neo4j Next Century would be looking at would have been Neo4j 3.4, correct?

A.  I don't know the answer to that question.

Q.  As -- as of October 2018, was Next Century

60

1    considering both Neo4j Enterprise and ONgDB as a

2    potential graph database program to be using for Task

3    Order 39?

4         A.  Neo4j (sic) was evaluating Neo4j, ONgDB, and

5    other graph database technologies as part of our Task

6    Order 39.

7         Q.  And both Neo4j Enterprise and ONgDB were being

8    considered as of October 2018?

9         A.  They were both being evaluated as of

10   October 2018.

11        Q.  Okay.  And then moving up to this email that's

12   dated Friday October 26, 2018, in Exhibit 46, I believe,

13   it says, "Hi John.  Can you comment on the iGov-packaged

14   enterprise distribution specifically with respect to

15   multi-data centers," and then there's a block quote

16   below that says, "Have you verified this works without

17   a" -- "the commercial license?"

18            Do you see that?

19        A.  Yes.

20        Q.  Was multi-data centers a feature that was

21   important in the evaluation of -- of Neo4j and ONgDB?

22        A.  It was.

23        Q.  And was it your -- Next Century's understanding

24   that multi-data centers was an enterprise-only feature

25   in Neo4j?

61

1      A.   Yes.

2      Q.   And was it your understanding that ONgDB also

3   offered multi-data centers as a feature?

4      A.   Yes.

5      Q.   And was this based in part on the next email

6   where Mr. Suhy confirmed, "Yes, the open source

7   enterprise distribution we package has this feature.

8   (ONgDB does as well)"?

9      A.   Yes.

10      Q.   And that was consistent with Next Century's

11   understanding at the time?

12      A.   Yes.

13           MR. RATINOFF:  Okay.  I'm going to mark the

14   next exhibit as, I believe, 47.

15           (Exhibit 47 was marked for identification.)

16           MR. RATINOFF:  I'm assuming by Ben's silence I

17   am correct.

18           THE REPORTER:  You are correct, Counsel.

19           MR. RATINOFF:  All right.  So this email starts

20   with the Bates number CACI 3832.

21   BY MR. RATINOFF:

22      Q.   Do you have that in front of you?

23      A.   Yes.

24      Q.   Okay.  And it starts with the Bates -- sorry.

25           And so this email that was produced in response

                                                          62

 1    to the subpoena issued to CACI.

 2            Do you have any reason to believe this isn't a

 3    correct copy of that email that was produced?

 4        A.  No reason to believe otherwise.

 5        Q.  Okay.  Now, if you -- I'll point you to page

 6    marked 3834, which should be the third page in this

 7    document.

 8            I just want to confirm that this is the email

 9    that we were just previously talking about, and this is

10    a continuation of that thread; is that a fair

11    representation?

12        A.  Yes.

13        Q.  And then we'll scroll up now back to what would

14    be the first page of this email, or the last couple

15    emails in the thread at 3832.  You'll see Mr. Nagiel

16    says, "Hi John, happy new year.  Any idea when the 3.5.0

17    release of the ONgDB is expected?"

18            Do you see that?

19        A.  I do.

20        Q.  And was Next Century inquiring into ONgDB

21    3.5 -- I'm sorry.  Strike that.

22            Why was Next Century inquiring into the release

23    of ONgDB -- ONgDB 3.5.0?

24        A.  As a continuation of the requirement assigned

25    to us under Task Order 39 for the evaluation of graph

                                                          63

1   databases.

2       Q.  So as of January 2019, had Next Century been

3   using ONgDB to the exclusion of Neo4j Enterprise?

4       A.  I don't know that it was to the exclusion of

5   Neo4j.

6       Q.  But at that time, Next Century hadn't obtained

7   an commercial license for a copy of -- or an

8   installation of Neo4j Enterprise, correct?

9       A.  Correct.

10      Q.  Okay.  And was Next Century inquiring about

11  ONgDB 3.5 because Neo4j had also recently released

12  Neo4j 3.5?

13      A.  I don't know the answer to that question.

14      Q.  Was it important for Next Century's evaluation

15  to be using the same versions of Neo4j Enterprise and

16  ONgDB?

17      A.  Yes.

18      Q.  That was for parity reasons?

19      A.  Yes.

20      Q.  And when I say "parity," I mean

21  enterprise-level features.

22      A.  Yes.

23      Q.  So it was important that ONgDB continue to --

24  to have parity in enterprise features with Neo4j

25  Enterprise for the evaluation process?

64

1      A.   Yes.

2      Q.   And did Next Century, in early 2019, obtain a

3  version of ONgDB that was 3.5.1 as referenced in this

4  top email?

5      A.   I can't tell that from the email.

6      Q.   Did Next Century upgrade its -- whatever

7  version of ONgDB it was using in January of 2019 to

8  ONgDB 3.5, and it could have been any sub-version of

9  that?

10     A.   Yeah, I can't tell that from that email, but we

11  would strive for parity.

12     Q.   You have no reason to believe that, if ONgDB

13  3.5.1 was released, that Next Century would move to that

14  version if it was equal to the current version of Neo4j

15  Enterprise?

16     A.   Yes, we would have -- we would have leveraged

17  the most current version available.

18          MR. RATINOFF:  And let me go ahead and mark the

19  next email, which I'm going to drop here.

20          (Exhibit 48 was marked for identification.)

21  BY MR. RATINOFF:

22     Q.   Just let me know when you're able to open it.

23     A.   I see it.

24     Q.   Okay.  Now, this has been marked with a Bates

25  number of -- last four digits are 3635, and I'll

65

1    represent to you this was produced by CACI in response

2    to the subpoena issued by Neo4j.

3              Do you have any reason to believe this isn't a

4    true and correct copy of that email?

5        A.   I have no reason to believe otherwise.

6        Q.   Let's scroll down to the -- the last page or

7    second to last page of this email, 3636.

8              Do you see there's an email from a David Fauth

9    to -- addressed to you?

10       A.   Yup, I see it.

11       Q.   Okay.  Do you know who David Fauth is?

12       A.   I do.

13       Q.   Who is he?

14       A.   He was an employee of Neo4j.

15       Q.   And do you know Mr. Fauth personally?

16       A.   I do.

17       Q.   And how do you know Mr. Fauth?

18       A.   We worked together from 2006 to 2011 at a

19   previous company.

20       Q.   Okay.  And did -- would you say you have a

21   personal friendship with him?

22       A.   Yes.

23       Q.   And there's an email from Mr. Fauth asking, "Do

24   you have any insight into the PoC using Neo4j?  Is it

25   near the end and is there a decision pending?"

66

1    Do you see that?

2    A.  I do.

3    Q.  And what is your understanding of what

4  Mr. Fauth was referring to?

5    A.  He would have been referring to the evaluation

6  efforts under the Blue Rocket Task Order 39.

7    Q.  Okay.  And this is -- I think you mentioned

8  that, at least as of initially starting, Task Order 39

9  was set to conclude in February of 2019, correct?

10    A.  Correct.

11    Q.  Okay.  And was there an extension provided by

12  the NSA at that time to continue with that project in

13  February?

14    A.  Yes.

15    Q.  And did Next Century receive additional funding

16  in conjunction with that extension?

17    A.  Yes.

18    Q.  And did that additional funding include or did

19  it budget for a paid license for graph database software

20  to be used?

21    A.  No.

22    Q.  As of February 1st, he -- had Next Century

23  narrowed down the candidates of graph database software

24  in its evaluation?

25    A.  The department narrowed down the choices.

67

1    Q.  Did you find there was any performance

2  differences at that time between Neo4j Enterprise and

3  ONgDB in your evaluation?

4    A.  To my knowledge, not significant differences.

5        THE REPORTER:  You know, I'm getting it, sir,

6  and I'll speak up -- I'm not shy -- but if you could

7  lean in a little bit, it would -- it would help.  Your

8  microphone is dropping it a bit at the end.  Thank you.

9        THE WITNESS:  Okay.

10 BY MR. RATINOFF:

11   Q.  Okay.  So going up to the top email, and it

12 looks like Mr. Fauth is no longer a recipient of this

13 email.

14       Do you see that?

15   A.  I do.

16   Q.  And it look like it's from Mr. Nagiel to you.

17   A.  Yes.

18   Q.  And he says, "What I haven't told him yet (but

19 will likely need to do" -- "but would (sic) likely need

20 to soon) is that we're pursuing an open-source

21 alternative (the same Neo4j source code but built and

22 licensed separately) which bundles all the same features

23 as the Neo4j Enterprise version but without cost (sic)."

24       Do you see that sentence?

25   A.  I do.

69

```
1        Q.  And was it your understanding that he was
2    referring to ONgDB?
3        A.  Yes.
4        Q.  And does that help clarify whether, at that
5    time, Next Century was looking at ONgDB over Neo4j
6    Enterprise?
7        A.  Yes.
8        Q.  So as of February 2019, at least internally,
9    Next Century had decided to choose ONgDB over Neo4j
10   Enterprise?
11       A.  Next Century did not make any decisions on any
12   of these technologies.  We provided government the
13   decision -- government the information to make the
14   decision.
15       Q.  And what information did Next Century provide
16   at this time to the government as far as the -- Neo4j
17   versus ONgDB?
18       A.  We evaluated security, performance, lessons
19   learned, and cost.
20       Q.  And did Next Century, at that time, provide a
21   recommendation to the government as far as which
22   software it would recommend --
23           MR. NIVALA:  I think at this point that I'd
24   like to ask that we go back on AEO designation.
25           MR. RATINOFF:  Okay.  Adron, is that okay if
```

70

1    Q.  And -- I'm sorry.  I didn't mean to cut you

2    off.

3    A.  -- and would have gotten feedback in February

4    as well.

5    Q.  And what was the feedback that was received in

6    February 2019 from the NSA?

7    A.  We would have -- I don't know.  I don't know

8    specifically when or exactly what they would have given

9    us regarding graph database technology evaluation at

10   that time.

11   Q.  And that -- you don't personally know, but Next

12   Century would have some record of that?

13   A.  I'm -- in writing, at that point, no.  It would

14   have been verbal feedback from meetings.

15   Q.  Okay.  And is there a reason why -- referring

16   back to the email we were looking at, I believe -- is it

17   Exhibit 47?

18         THE REPORTER:  The last was 48.

19         MR. RATINOFF:  48.  I'm sorry.

20   BY MR. RATINOFF:

21   Q.  Looking back at Exhibit 48, where Mr. Nagiel

22   said, "We haven't told him yet (sic)," is he referring

23   to Neo4j?

24   A.  Yes.

25   Q.  So he's telling you that he hasn't told Neo4j

                                                         73

1    that they're pursuing ONgDB over Neo4j Enterprise; is

2    that correct?

3        A.   Correct.

4        MR. RATINOFF:  Okay.  I'm going to show another

5    email.  It's got -- it's to Neo4j folks, so technically

6    it's not internal, and I'm sure Mr. Beene would prefer

7    his client to be involved.  I have to say -- but maybe

8    it's a good time for you to take your lunch break.  I

9    know it's after 1:00 o'clock your time, and we can come

10   back on the record as -- as confidential, if that's okay

11   with Gregg.

12       MR. NIVALA:  Yeah, that's okay with me.

13       MR. RATINOFF:  Okay.  So do we want to -- how

14   long of a lunch do you want to take?  I mean, the

15   shorter lunch is, the quicker you'll be done.

16       MR. NIVALA:  20 minutes?

17       MR. RATINOFF:  You want to just say we'll be

18   back 1:30 East Coast time?

19       MR. NIVALA:  Yeah, that's good for me.

20       Is that good for you, Jim?

21       THE WITNESS:  Sounds good.

22       MR. RATINOFF:  Thank you.

23       THE VIDEOGRAPHER:  Thank you.  We are now going

24   off the video record.  The time is 10:09 a.m.

25       ///

74

```
1              (The confidential testimony resumed.)

2                      AFTERNOON SESSION

3              (All Parties having been duly noted for the

4         record, proceedings resumed at 10:33 a.m.)

5                        --o0o--

6              THE VIDEOGRAPHER:  We are now back on the video

7      record.  The time is 10:33 a.m.

8      BY MR. RATINOFF:

9         Q.  Okay.  Are we ready to continue?

10        A.  (Nonverbal response.)

11             MR. RATINOFF:  All right.  The witness has

12     given a thumbs up.  Okay.  I'm going to go ahead and

13     mark the next email as 49.

14             (Exhibit 49 was marked for identification.)

15     BY MR. RATINOFF:

16        Q.  And the beginning Bates number on this document

17     is CACI00003597.

18             And Mr. Weyant, let me know when you have a

19     chance to look at this email chain.

20        A.  Okay.  I have it up.

21        Q.  Okay.  And I'll represent to you this was

22     produced by CACI in response to the subpoena issued by

23     Neo4j.

24             Do you have any concerns regarding whether it's

25     a true and correct copy of what was produced?
```

76

1       A.   No concerns.

2       Q.   And if you want to scroll down to what would be

3  the bottom page marked 3598, the last four digits of the

4  Bates number, it would actually be the second page of

5  this email.  Let me know when you're there.

6       A.   3598?

7       Q.   Yeah, it should be the second page --

8       A.   Yup.

9       Q.   -- of the --

10      A.   Got it.

11      Q.   Okay.  You'll see there's a Monday, January 14,

12  2109, email from Jason Zagalsky.

13      A.   I see it.

14      Q.   Okay.  And he says, "I understand that your

15  current funding expires in February and you are

16  currently putting together a proposal for funding to

17  continue the project."

18           That was back in January, so we were talking

19  about February, so just to confirm that the project was

20  continued and additional funding was granted, correct,

21  as of February 2019?

22      A.   That's correct.

23      Q.   And at that -- at that time, when the renewal

24  was up, there was no recommendation to provide a

25  subscription -- or to purchase a subscription for Neo4j

77

1    Enterprise, correct?

2         A.  That is correct.

3         Q.  Okay.  Scrolling up to -- it's the email

4    actually starts on the first page, but then it continues

5    to the top of the second page, so it's the bottom of

6    3597, it's an email from Jason Zagalsky to --

7         A.  Got it.

8         Q.  Okay.  And that's dated February 5th, 2019, and

9    the next page, it says, "When we spoke briefly last" --

10   sorry -- "When we spoke briefly last month, you had

11   indicated you were using the free open-source version of

12   Neo4j and planned to continue."

13            And is that in reference to ONgDB?

14        A.  Yes.

15        Q.  And then you see a reference to "Gary" in

16   various places in this email.

17            Do you understand that's gary.mann@neo4j.com?

18        A.  I understand.

19        Q.  Okay.  And do you know who Gary Mann is?

20        A.  To my knowledge, he's a tech rep for Neo4j.

21        Q.  Okay.  And was Next Century working with Gary

22   at that time?

23        A.  Yes.

24        Q.  And what was Gary doing for Next Century?

25        A.  Providing technical assistance to engineers who

78

1    were working on the task order.

2        Q.  Okay.  And was he providing support in

3    conjunction with Next Century's use of ONgDB?

4        A.  I don't know.

5        Q.  But he'd be providing support with respect to

6    Neo4j software, correct?

7        A.  Correct.

8        Q.  Okay.  And since Next Century viewed Neo4j and

9    ONgDB as being equivalent, that support would be helpful

10   for both Neo4j and ONgDB, correct?

11       A.  Yes.

12       Q.  And it says here in the second paragraph -- the

13   first -- yeah, it's the second paragraph on the second

14   page, it says, "Indeed, Gary has been helping you and

15   your team with security clustering questions, and thus

16   it is clear you are using Neo4J EE."

17           Do you see that?

18       A.  I do see that.

19       Q.  And did you understand that "Neo4J EE" refers

20   to Neo4j Enterprise?

21       A.  I understand.

22       Q.  And is it okay if I refer to "Neo4J EE" as

23   the -- as a shorthand --

24       A.  Yes.

25       Q.  -- for Neo4J Enterprise?

79

 1          A.  Yes.

 2          Q.  Okay.  And then there's a reference to

 3   "security and clustering."

 4              And would you agree with the statement that

 5   those were enterprise features with Neo4J EE?

 6          A.  Yes.

 7          Q.  And those are also features in ONgDB at that

 8   time?

 9          A.  Yes.

10          Q.  Okay.  And then moving up to the -- to the --

11   what would be the last email on the first page of the

12   chain from Mr. Nagiel to Mr. Zagalsky.

13              "Hi Jason, thanks for the message, and thanks

14   again to Gary for his assistance in addressing our

15   questions.  Neo4j's strengths helped us" -- sorry.  Let

16   me start over -- "Neo4j's strengths helped convince us

17   and the customer that it is the right graph product for

18   their requirements."

19              Do you see that sentence?

20          A.  I do.

21          Q.  Okay.  So is it fair to say, at this time,

22   February 5th, 2019, that Next Century and the NSA had

23   determined that ONgDB was the preferred graph database

24   software for the Task Order 39?

25          A.  Can you repeat the question again?

                                                           80

1    Q.   As of -- as of February 5th, 2019, is it fair

2    to say that Next Century had determined that ONgDB was

3    the best software for the Task Order 39 requirements?

4    A.   Next Century did not make that determination.

5    We gave the customer the evaluation results, and they

6    made the determination.

7    Q.   And they determined that ONgDB was the

8    preferred software for the project?

9    A.   Yes.

10   Q.   It says, "Neo4j's strengths helped us" --

11   "helped convince us and the customer that it was the

12   right graph product for their requirements."

13        So is it fair to say that Next Century also

14   agreed that ONgDB was the preferred graph database

15   software for the project?

16   A.   Yes, based on the customer requirements.

17   Q.   And the only difference between ONgDB and Neo4j

18   at that point was the paid license required for Neo4j

19   Enterprise from Next Century's perspective?

20   A.   Yes, to our knowledge.

21   Q.   And then it says in the next paragraph,

22   "Indeed, we have (almost) reached the end of this task

23   order, and have been demonstrating our integration with

24   a small Neo4j development cluster.  We have found that

25   the open-sourced (non-commercial) builds from the Neo4j

81

1   source code provides the clustering and security

2   requirements needed in our environment."

3           Do you see that?

4       A.  Yes, I do.

5       Q.  Okay.  And is that sentence actually referring

6   to ONgDB and not Neo4j Enterprise?

7       A.  Correct.

8       Q.  And was there any internal discussions at that

9   time regarding the -- the license governing ONgDB

10  internal to Next Century?

11      A.  Not to my knowledge.

12      Q.  Was there any discussions between Next Century

13  and either the Graph Foundation or -- sorry.  Strike

14  that.

15          What -- did Next Century have discussions with

16  Graph Foundation regarding the -- the licensing of ONgDB

17  in February of 2019?

18      A.  There were discussions.  I do not know if they

19  were in February 2019.

20      Q.  Okay.  And what was the subject of those

21  discussions?

22      A.  It was referenced back to the foundation's work

23  with the Department of Treasury, specifically IRS,

24  regarding their -- their evaluation of the license.

25      Q.  And that's -- to be clear, that's the license

82

1    to ONgDB?

2        A.  Yes.

3        Q.  And was there any particular issues with the

4    licensing with ONgDB that Next Century was concerned

5    about?

6        A.  Not to my knowledge.

7        Q.  Your personal knowledge, correct?

8        A.  Correct.

9        Q.  But that's not to say that Next Century wasn't

10   aware of potential issues with the licensing of ONgDB?

11       A.  Next Century, based on the information

12   available in the evaluation that it researched, felt

13   comfortable making recommendations and evaluation

14   comments to the customer that the open-source version

15   would meet their requirements.

16       Q.  When you say "the open-source version," you're

17   referring to ONgDB as an open-source version of Neo4j

18   Enterprise?

19       A.  Yes.

20       Q.  All right.

21           MR. RATINOFF:  I think we're up to Exhibit 50.

22   I'm going to drop this into the chat here for your

23   reference.

24           (Exhibit 50 was marked for identification.)

25           ///

83

BY MR. RATINOFF:

Q. And let me know when you've had a chance to open it and take a quick look.

A. Okay.

Q. Okay. So I'll represent to you this is an email thread that was produced by CACI in response to the subpoena should by Neo4j. It begins with a Bates number ending with 3512.

Do you have any reason to believe this isn't a true and correct copy of what was produced by CACI?

A. No reason to believe otherwise.

Q. Okay. And taking a look at the top here, top email, where Mr. Nagiel says, "Thanks your for your perspective. I did run across this GitHub thread (which John was involved in) that seemed to discuss the issue. However, there does not seem to be a resolution there (certainly not from the Neo4j perspective, which defends their use of both the AGPL and the Commons Clause)."

Do you see that sentence there?

A. I do.

Q. Does that refresh your recollection as far as any internal discussions at Next Century concerning the AGPL and the licensing of ONgDB?

A. That was discussions between Shahak and -- and Mr. Nussbaum.

84

 1      Q.  Sure.  I understand, but you're testifying --

 2   you understand that you're testifying today as far as

 3   Next Century's general knowledge, not just your personal

 4   knowledge?

 5      A.  Sure.  I think the way I heard the question was

 6   an internal discussion, and this one does involve

 7   someone external to the company, is my interpretation.

 8      Q.  Oh, I'm sorry.  I didn't realize -- maybe my

 9   question wasn't as sharp as it could have been, so let

10   me -- let me ask you a different question.

11          Were you involved in discussions in Next

12   Century regarding -- and you'll see the reference to the

13   Commons Clause -- with respect to the license for ONgDB?

14      A.  Next Century did have discussions on the

15   Commons Clause and AGPL.

16      Q.  Okay.  And what was the gist of those

17   discussions?

18      A.  The gist of those discussions was that there

19   were not issues with recommend -- recommending to the

20   customer ONgDB.

21      Q.  Why did --

22      A.  (Unintelligible.)

23      Q.  Sorry.

24          THE REPORTER:  Sorry.  I didn't catch the end

25   of that.  Stepped over it.  Please repeat.

                                                          85

1          THE WITNESS:  The open-source version.

2          THE REPORTER:  Thank you.

3   BY MR. RATINOFF:

4      Q.  Why did Next Century reach out to the Graph

5   Foundation regarding the AGPL and the Commons Clause?

6      A.  Next Century engineers were doing everything

7   they could to be thorough in the evaluation,

8   recommendations, and inputs to the government and were

9   doing a lot of research, and I'm sure that they, in the

10  Internet research that was done, found the iGov

11  resources out there for ONgDB.

12     Q.  Okay.  And scrolling down to what would be the

13  bottom of the -- towards the bottom of the first page,

14  3512, you'll see an email from Mr. Nagiel to -- looks to

15  be to Brad.

16          And do you know who Brad -- Brad is?

17     A.  Yes, I do.

18     Q.  Okay.  Who -- who is your understanding of who

19  Brad is?  I'm sorry.

20          What's your understanding of who Brad is?

21     A.  Brad is a leader within the Graph Foundation

22  organization.

23     Q.  Okay.  And to be clear, that's Brad Nussbaum?

24     A.  Correct.

25     Q.  You'll see it says, "The (sic) Neo4j sales guys

86

1    actually contacted us recently specifically about the

2    Commons Clause modifier to the AGPLv3 license, pointing

3    out that we may be in violation of it (if we were using

4    open-source builds of their software -- including, by

5    extension, ONgDB)."

6            Do you see that?

7        A.   I do.

8        Q.   So were you -- was Next Century contacted by

9    Neo4j concerning their use of ONgDB under the AGPL?

10       A.   Yes.

11       Q.   Was it pointed out to Next Century that the

12   Commons Clause had certain restrictions in the use of

13   Neo4j Enterprise software?

14       A.   On behalf of Next Century, in reviewing this

15   thread, I would say yes.

16       Q.   Okay.  Was Next Century made aware that -- that

17   the Commons Clause had been removed from the license

18   that was governing the Neo4j software that was being

19   marketed as ONgDB?

20       A.   I don't know the answer to that question.

21       Q.   Did the license to ONgDB have the Commons

22   Clause in it to Next Century's knowledge?

23       A.   Not to my knowledge.

24       Q.   And was it Next Century's understanding that

25   either the Graph Foundation or iGov had removed the

87

1    Commons Clause from the license governing the Neo4j

2    source code used in ONgDB?

3         A.  I believe yes.

4         MR. RATINOFF:  Okay.  I'd like to drop the next

5    exhibit into the chat for your reference.

6         (Exhibit 51 was marked for identification.)

7    BY MR. RATINOFF:

8         Q.  This is Tab 310, so Bates number ending in

9    3524.  I believe this is Exhibit 51.

10        A.  I've got it up.

11        Q.  Okay.  And I'll represent to you this is

12   produced by CACI in response to the subpoena issued by

13   Neo4j.

14             Do you have any concerns regarding its

15   authenticity, that it's not a true and correct copy of

16   what was produced?

17        A.  No concerns.

18        Q.  And does this help frame the issue as far as

19   what the discussions internally were with -- with the

20   licensing of ONgDB?

21        A.  Yes.

22        Q.  And you'll see a Todd Hughes; was he an

23   employee of Next Century?

24        A.  Yes, he was.

25        Q.  And he was working on the Task Order 39?

                                                              88

1     A.  No, he was not.

2     Q.  Okay.  Who was Todd Hughes, or what was

3  Todd Hughes's role at that time?

4     A.  He was Next Century's chief technology officer.

5     Q.  And why was he emailing you and others?

6     A.  In his role as our CTO, he had broad oversight

7  over company -- the company's technical aspects of -- of

8  various projects.  He did not -- he did not charge to

9  that task order.

10     Q.  Was he brought in -- or sorry.  Strike that.

11         Was he involved in any discussions due to the

12  potential concerns over the licensing of ONgDB under the

13  AGPL?

14     A.  He was brought in to provide oversight and

15  guidance in the -- in the way ahead.

16     Q.  Because there was some internal concern

17  regarding the -- how ONgDB was licensed without the

18  Commons Clause?

19     A.  He was brought in to help the team provide

20  recommendations and inputs in the evaluation to the

21  government; that would have included awareness of

22  licensing challenges that engineers may not have thought

23  about in their day-to-day work.

24         MR. RATINOFF:  Okay.  I'm going to drop in the

25  next exhibit.  That would be Exhibit 52.

                                                    89

1          (Exhibit 52 was marked for identification.)

2     BY MR. RATINOFF:

3          Q.   And this is an email that was produced by CACI

4     with the Bates number starting with -- or ending with

5     the four digits 3476.

6               Do you have any reason to believe this is --

7     this is not a true and correct copy of what was produced

8     by CACI in response to Neo4j's subpoena?

9          A.   No concerns.

10         Q.   And when you look at the -- basically the

11    contents of this message, it says, "Please ensure that,

12    from this point forward, we are only using

13    binaries/containers released by ONgDB, not" -- with an

14    underline emphasis -- "by Neo4j.  This applies to all

15    lanes, all servers (shared and local), and both networks

16    (high and low).  I suggest deleting all Neo4j

17    binaries/containers to help with this."

18              Do you see that?

19         A.   I do.

20         Q.   Why was -- why was this email sent to -- it

21    looks like a whole host of Next Century folks, including

22    yourself?  I'm sorry.  I misspoke.  It doesn't look like

23    you're on this email.  Let me strike that.  You might be

24    the only person not on this email.

25         A.   Yeah.

90

1    Q.  Why did -- why did Next Century want to remove

2    all instances of Neo4j per this email?

3        A.  We would have gotten guidance from the

4    government that they wanted to move ahead with ONgDB.

5        Q.  And there was a concern internally about

6    co-mingling Neo4j and ONgDB?

7        A.  If the government gave us direction to pursue

8    ONgDB, yes, we would have wanted to make sure that

9    project and the code associated with that task order

10   were co-mingled appropriately -- not co-mingled.

11       Q.  And did the government indicate it preferred

12   ONgDB, due to its being open source, over Neo4j?

13       A.  Yes.

14       Q.  And to your knowledge, would all instances of

15   Neo4j Enterprise have been deleted from -- from all lane

16   servers and networks at Next Century at that point?

17       A.  Yes, to my knowledge on this project.

18           MR. RATINOFF:  Okay.  I would like to drop the

19   next exhibit into the chat for your reference.

20           (Exhibit 53 was marked for identification.)

21           MR. RATINOFF:  I believe we're at Exhibit 43.

22           THE REPORTER:  53.

23           MR. RATINOFF:  I'm sorry.  53.  Thank you.

24           So I'd like to mark this next email starting

25   with the Bates number 34 -- or, sorry, Bates number 3446

91

1  as Exhibit 53.

2  BY MR. RATINOFF:

3      Q.  Let me know when you've got it.

4      A.  Okay.

5      Q.  Okay.  And I'll represent to you this is

6  produced by CACI in response to the subpoena issued by

7  Neo4j.

8          Do you have any concerns regarding it being a

9  true and correct copy of what was produced?

10     A.  No concerns.

11     Q.  And if you go down to the last email -- or what

12  would be the first, I guess, in this thread, it would be

13  on Page 3448 --

14     A.  Yup.

15     Q.  -- you'll see that Zagalsky says, "Hi Todd,

16  following up on our discussion at your office a few

17  weeks ago.  Shall we schedule a phone call to discuss

18  next steps this week?"

19          So even though, per Task Order 39, ONgDB had

20  been selected as the graph database software to be used,

21  was Next Century still discussing the potential of using

22  Neo4j Enterprise with Neo4j?

23     A.  Yes, and let's clarify:  At this point, in

24  March of 2019, we're now into what's known as Blue

25  Rocket Task Order 50.

92

1          (The following was deemed attorneys' eyes

2          only.)

3          MR. RATINOFF:  Okay.  It looks to me that

4     Mr. Suhy is no longer on the call or the video, so let's

5     go ahead and continue as AEO.

6     BY MR. RATINOFF:

7          Q.  What was Task Order 50?

8          A.  Task Order 50 was a project underneath the Blue

9     Rocket contract which was an extension of the first

10     analysis of alternatives and evaluations of various

11     technologies, to include graph database technologies

12     along with other, unrelated work.

13          Q.  So at this point, was the -- the goal of Task

14     Order 50 to -- to determine whether the, at this point,

15     software that was selected, ONgDB, would be adequate for

16     the underlying purpose of the -- of the Blue Rocket?

17          A.  At this point, there was -- there were still

18     evaluations going on.  ONgDB was the preferred

19     technology, but in any project like this, there was

20     ongoing evaluation that was not ruling out Neo4j, either

21     Community or Enterprise Edition, for -- for further

22     evaluation depending on the additional prototyping that

23     was going on under the Task Order 50 requirements.

24          Q.  As of the time of Task Order 50, had a

25     development environment been created that was running

94

```
1   instances of ONgDB?
2        A.  Yes.
3        Q.  Would you be able to, at a high level, describe
4   the -- the structure of the development environment?
5        A.  At a very high level, in a non-technical
6   manner, the development environment provides the
7   engineers and their government counterparts a playground
8   of sorts to continue testing with actual data on the
9   other -- on -- on secure networks in a -- in an
10  evaluation and testing mode, and it would have included
11  ONgDB as part of a larger architecture.
12       Q.  What was the system architecture that was being
13  used to run ONgDB at that time in terms of servers,
14  instances of software?
15       A.  I'm afraid I can't get into that.
16       Q.  Okay.  Is that due to being classified
17  information?
18       A.  Yes.
19           MR. RATINOFF:  All right.  Let me go ahead and
20  turn back to what I think was marked as Exhibit 53; is
21  that correct?  Got a thumbs up.  All right.
22  BY MR. RATINOFF:
23       Q.  So before we started talking about Task
24  Order 50 -- by the way, just before we move on, was Task
25  Order 50 what you referred to as being the renewal,
```

95

1    before we took our break, of the Task Order 39, or the

2    continuation?

3         A.  Continuation, yes.  Same -- yes.

4         Q.  So when we talked about the funding earlier,

5    the funding was actually under Task Order 50 after the

6    Task Order 39 concluded?

7         A.  Right, there was separate funding allocated for

8    Task Order 50.

9         Q.  So as of March 2019, you were operating under

10   the requirements of Task Order 50, correct?

11        A.  Correct.

12        Q.  And then turning to this email that I put up,

13   you're copied on personally, and it says, "The concern

14   here, of course, is that if we are" -- "we say we're

15   using ONgDB but they sense that we're active on

16   Neo4j-related discussions, then that could provide them

17   with potential legal ammunition that we're really still

18   using Neo4j," question mark.

19        Was there still concern within Next Century at

20   this time regarding using ONgDB versus Neo4j?

21        A.  Could you repeat the question one more time?

22        Q.  Sure.

23        MR. RATINOFF:  Would you mind reading it back?

24        (The following record was read:

25        Question:  And then turning to this email I put

                                                            96

1  up, you're copied on personally, and it says,

2  "The concern here, of course, is that if we

3  are" -- "we say we're using ONgDB but they

4  sense that we're active on Neo4j-related

5  discussions, then that could provide them with

6  potential legal ammunition that we're really

7  still using Neo4j," question mark.

8  Was there still concern within Next Century at

9  this time regarding using ONgDB versus Neo4j?)

10  THE WITNESS:  My opinion on this answer is that

11  we were trying to take the high road and be transparent

12  that, while the government had made the decision to move

13  with ONgDB, that we were not -- we did not want to be in

14  a position where the government thought we -- or excuse

15  me -- where Neo4j thought that we were lying to them

16  rather than concern over what -- what -- what the actual

17  software in place was.

18  BY MR. RATINOFF:

19  Q.  And was there concerns that Next Century might

20  be in some sort of legal hot water, so to speak, if it

21  continued to use ONgDB as opposed to Neo4j Enterprise

22  Edition?

23  A.  I think I'm being asked to speculate on

24  Shahak's person opinion there, and if we can

25  differentiate between his comment and what Next

97

1    Century's perspective was, I can answer that.

2        Q.  Sure.  I asked you what Next Century's concerns

3    were, if any.

4        A.  Next Century's concerns at this point were to

5    make sure that we were providing information to our

6    customers that is complete and accurate to our

7    knowledge, and evaluating software, whether it's a

8    commercial enterprise solution -- excuse me -- community

9    enterprise solution or the -- or the licensed version,

10   or the alternative, ONgDB, that the licensing thing

11   that -- we're a software company, not a law firm -- that

12   we were providing information to the customer that would

13   be above reproach and not able to be questioned.

14       Q.  Okay.  Thank you.

15           MR. RATINOFF:  So I'm going to drop in the next

16   document, and I've got a few questions and documents

17   that, you know, we're just going to get into Neo4j AEO

18   material, so I would -- I'm sure Adron is concerned

19   about these emails being confidential, so I'll represent

20   I'm going to do some AEO questioning, and then after

21   that, it would be up to Gregg whether to go back to

22   confidential.

23           (Exhibit 54 was marked for identification.)

24   BY MR. RATINOFF:

25       Q.  Okay.  I've just dropped another document into

98

 1   the chat.  If you wouldn't mind opening it and letting

 2   me know when you've had a chance to review.  It starts

 3   with the ending Bates number 3301.

 4       A.  Okay.  I have it up.

 5       Q.  I'll represent to you this was produced by CACI

 6   in response to the subpoena issued by Neo4j.

 7           Any -- do you have any concerns regarding it

 8   being a true and correct copy of that email produced?

 9       A.  No concerns.

10       Q.  And if you take a look at the email, if you go

11   down to what's been marked as CACI00003302 --

12       A.  Yes.

13       Q.  -- starting at the -- it says, "Jason we don't

14   have a firm grasp on what the (eventual) production

15   posture will be, but we are" -- "but for now we are

16   building a staging environment with."

17           Do you see that?

18       A.  I do.

19       Q.  To Next Century's knowledge, is this an

20   accurate description of the development environment that

21   it was using for ONgDB at this time?

22       A.  Yes.

23       Q.  So when it says, "One 'RKS' cluster with three

24   nodes, each node having approximately 96 gigabytes of

25   RAM and seven cores."

99

1    Do you see that?

2    A.  I do.

3    Q.  And the next line it says, "One 'KE'

4  cluster" -- (unintelligible.)

5    THE REPORTER:  Sorry, Counsel.  You broke up.

6  Please repeat.

7  BY MR. RATINOFF:

8    Q.  And would you agree, when it says, '"KE'

9  cluster with likely similar specs as above," it's

10  referring to the -- the RKS cluster?

11    A.  Yes.

12    Q.  And at this time, had Next Century asked Neo4j

13  for a quote on Neo4j Enterprise?

14    A.  Yes, I know we asked for a quote on behalf of

15  the government to deliver to them, and it does appear

16  it's about this time, yes.

17    Q.  Why -- why did Next Century ask Neo4j for a

18  quote at this time, March of 2019?

19    A.  The government would have asked us to.

20    Q.  That's despite already deciding to use ONgDB?

21    A.  It had not made a final decision.  They were

22  still in evaluation and prototyping and researching.

23    Q.  Okay.  And then going back to the very top of

24  this document, so it would be the last email in the

25  chain -- I'm sorry.  It's the preceding email where

100

Mr. Nagiel says, "Regarding the architecture:  No, the customer is interested in a multi-master configuration."

A.  Where -- what page are you on again?

Q.  It's on the first page.  It's the -- it would be the email that's Monday, March -- I'm sorry -- April 1st, 2019, at 5:20 p.m.

A.  I got it.  Okay.

Q.  What's a multi-master configuration?

A.  That is database structure and overall architecture that -- I'm trying to use my words carefully -- facilitates multiple -- multiple hosts, if you would.

Q.  And was that something that Next Century was able to do because it was using the enterprise-level version of Neo4j vis-à-vis ONgDB?

A.  That configuration is -- is part of a larger customer architecture well beyond just the database -- specific databases, graph or otherwise.

Q.  But it -- the graph program that Next Century was working with would need to be able to be compatible with that configuration?

A.  The requirements in Task Order 50 had us moving towards a state in the customer's mission architecture that would have necessitated that the graph portion of the solution could integrate with other types of

101

1    databases.

2          And I'm trying to be clear here, but it's --

3    we're getting into things that -- that the customer

4    would be uncomfortable with disclosing.

5       Q.   Yeah, I understand you're -- you're careful

6    because of the classified nature, so I understand.  Let

7    me see if I can ask it a different way.

8          Was ONgDB found to be compatible with the

9    greater architecture that you were working with then at

10   that time?

11      A.   At that time, the initial results for ONgDB

12   were favorable, but the testing at that point was

13   incomplete, and evaluation at that point was incomplete.

14      Q.   And was it because of the specific

15   enterprise-level features in ONgDB that allowed you to

16   integrate it into that larger system?

17      A.   They were helpful, yes.

18          MR. RATINOFF:  Okay.  The next exhibit, I

19   believe we're at 55.

20          (Exhibit 55 was marked for identification.)

21          MR. RATINOFF:  I'll just note for the record

22   this document has been designated as AEO at Neo4j's

23   request, because it contains highly confidential

24   commercial and sensitive information.

25          THE WITNESS:  I have it up.

102

BY MR. RATINOFF:

Q.  Okay.  And I'll represent to you this was produced by CACI in response to the subpoena issued by Neo4j.

Do you have any reason to believe this isn't a true and correct copy of the email and the attachment referenced?

A.  No concerns.

Q.  Okay.  And we -- we were just talking about the proposal that Neo4J was preparing.

Is this the proposal that was referenced in the prior email that was provided to Next Century from -- by Neo4j?

A.  Yes, it is.

Q.  And then going to the actual proposal itself, which would be the attachment to the email, it says, "KMS Project."  I know we're getting into some sensitive areas, so, you know, don't -- I don't want you to violate any obligations you have under classified designation.

But can you explain, at least at a high level, what the KMS Project is?

A.  The MPO KMS Project is equivalent to Blue Rocket Task Order 50.

Q.  So it's just another name for it?

103

1    A.  Yeah, and the subset of that task order that

2    had requirements for graph in addition to other work, as

3    I believe we discussed before.

4    Q.  Okay.  And would you agree this proposal

5    pertains to a commercial license or subscription to

6    Neo4j Enterprise?

7    A.  Yes.

8    Q.  And looking at the -- the requirements, does

9    this roughly match what was previously discussed between

10   Mister -- I'm sorry -- Zagalsky and Nagiel, Mr. Nagiel?

11   A.  Yes.

12   Q.  And was this proposal also passed on to the --

13   to your government clients after receiving it from

14   Mr. Zagalsky?

15   A.  Yes, it was.

16   Q.  And this is what was requested by the NSA?

17   A.  Yes, it was.

18   Q.  Did Next Century provide any comments or

19   opinions on the -- I'm sorry.  Strike that.  I don't

20   think you'll want to get into that for classified

21   reasons, so I won't put you in that bad position.

22       And there's a reference to Matt; who's -- who's

23   Matt?

24   A.  Matt is the primary government technical

25   director that the team interfaced with, an NSA civilian

104

1    employee.

2         Q.  Okay.  Can you provide his last name, or is

3    that something that's not --

4              MR. NIVALA:  I'm going to object to that.

5              MR. RATINOFF:  And that's based on being

6    classified?

7              MR. NIVALA:  Typically, NSA employees deal only

8    in their first names in our experience, and I think you

9    can -- I'm just going to object and direct the witness

10   not to answer.

11             MR. RATINOFF:  Okay.

12   BY MR. RATINOFF:

13        Q.  So when we say "Matt," we'll understand that

14   that is your -- the -- your interface at the NSA on --

15   on -- at this point, order 50 -- sorry -- Task Order 50?

16        A.  Correct.

17        Q.  And was Matt as the individual at the NSA that

18   Next Century interfaced with for Task Order 39?

19        A.  Did you say Task Order 39?

20        Q.  Yes.

21        A.  Matt was one of several government technical

22   engineers that we interfaced with.  He was the primary

23   for this portion of the work.

24        Q.  And there's also a reference to any feedback

25   from him -- (unintelligible.)

                                                    105

1        THE REPORTER:  Sorry.  Broke up, Counsel.  One

2   more time.

3   BY MR. RATINOFF:

4        Q.  Okay.  There's a reference to, "Have you

5   received any feedback from him following the meeting?"

6   Actually, strike that.

7        It says, "Thanks again for setting up the

8   meeting with Matt this week."

9        Did Next Century set up a meeting with Neo4j

10  and -- and NSA, or this Matt at the NSA and yourselves?

11       A.  Yes, we did.

12       Q.  And was the discussion regarding the proposal?

13       A.  In part, yes.

14       MR. RATINOFF:  All right.  I'm going to mark

15  the next exhibit as Exhibit...

16       THE REPORTER:  That would be 56.

17       (Exhibit 56 was marked for identification.)

18       MR. RATINOFF:  56.

19  BY MR. RATINOFF:

20       Q.  Let me know when you've had a chance to review

21  Exhibit 56.

22       A.  Got it.

23       Q.  And I'll represent to you this email was

24  produced in response to the subpoena issued by Neo4j,

25  CACI Bates number ending with 3132.

106

1    A.  No concerns.

2    Q.  No concerns with this being a true and correct

3 copy?

4    A.  No concerns.

5    Q.  Okay.  And then here this is an April 29, 2019,

6 and Mr. Nagiel says, "I imported (high side) your

7 proposal and shared with Matt.  Unfortunately --

8 although not surprisingly -- he has not...responded."

9         So is it fair to say that actually that meeting

10 didn't discuss the proposal since it seems to be

11 referring to forwarding it on without comment from Matt?

12    A.  We had a low-side meeting with Matt, Jason,

13 Shahak, and another Neo4j VP, I believe, which

14 discussed, in part, the proposal among other technical

15 topics, and Neo4j capabilities, and then subsequent to

16 that, the proposal was submitted to Matt via email on

17 the other net.

18    Q.  And at this point, was Neo4j Enterprise still

19 being viewed as an alternative or potential alternative

20 to ONgDB?

21    A.  Being viewed as?

22    Q.  As an alternative, yes.

23    A.  Yes.

24    Q.  And the big difference being, at this point,

25 price?

107

1    A.  Yes.

2    Q.  And again, there was no allocation in the

3 budget at that point for Task Order 50 for a commercial

4 subscription to Neo4j?  Strike that.  Let me ask it a

5 different way.

6         Was the -- earlier, you testified that Task

7 Order 50 didn't budget in a -- a subscription to graph

8 database software, correct?

9    A.  Correct.

10   Q.  And that's still -- is that subject to change

11 depending on the ultimate selection of software?

12   A.  That would be between the prime proxies in the

13 government if they chose to make a mod to the contract

14 to fund a commercial license.

15   Q.  So that was still a possibility depending on

16 other considerations in performance and, you know, with

17 the software?

18   A.  Multiple factors, including performance in

19 software, yes.

20   Q.  And it says in this email as well, "We continue

21 to use ONgDB for our development purposes based on the

22 customer's direction."

23         So as of April 29, 2019, you were instructed by

24 the NSA to use ONgDB for the requirements of Task

25 Order 50?

108

1    A.  Yes.

2         MR. RATINOFF:  Okay.  I think at this point I

3    don't have anymore specific AEO questions related to

4    Neo4j pricing.  I'll leave it up to Gregg if he's okay

5    with continuing as confidential.

6         MR. NIVALA:  Yeah, sorry.  I was -- for some

7    reason I wouldn't unmute there.

8         Yeah, I have no objection to continuing as

9    confidential.

10        MR. RATINOFF:  Okay.

11        THE REPORTER:  You know, Counsel, we've been

12   going for about an hour anyway.  This might be a good

13   time for five for me, if that's okay.

14        MR. RATINOFF:  Sure.  No problem.  So would we

15   just come back at -- let's see.  It's 11:27 my time.

16   Why don't we just say 11:35.

17        THE VIDEOGRAPHER:  Sounds good.

18        MR. NIVALA:  Sounds good.

19        THE VIDEOGRAPHER:  Okay.  We are now going off

20   the video record.  The time is 11:27 a.m.

21        (A short recess was taken.)

22        (End of attorneys' eyes only portion of

23        testimony.)

24                    --o0o--

25

109

```
 1                (The confidential testimony resumed.)

 2                THE VIDEOGRAPHER:  We are now back on the video

 3     record.  The time is 11:36 a.m.

 4                MR. RATINOFF:  Okay.  I'd like to put a new

 5     exhibit up on the chat here for you to take a look at.

 6                (Exhibit 57 was marked for identification.)

 7     BY MR. RATINOFF:

 8        Q.  This is bearing the beginning Bates number

 9     CACI00002845.

10            Do you have that up in front of you now?

11        A.  I do.

12        Q.  And have you had a chance to take a quick look

13     at it?

14        A.  (Nonverbal response.)

15        Q.  Any reason to believe this wasn't a true and

16     correct copy of what was produced by CACI in response to

17     Neo4J's subpoena?

18        A.  No concerns.

19        Q.  Okay.  Just looking at the date here of

20     July 21, 2019, you'll see Mr. Nagiel says, "Last I spoke

21     with Matt about the subject, he was not interested in

22     pursuing the EE option at this time."

23            Do you see that?

24        A.  I do.

25        Q.  Is that referring -- "the EE option" is
```

                                                              110

 1  Neo4J EE?

 2      A.  Correct.

 3      Q.  With respect to the proposal that was

 4  previously submitted by Neo4j?

 5      A.  Correct.

 6      Q.  So as of April 21, 2019, your instructions from

 7  the NSA were continue to use ONgDB as the graph database

 8  software in Task Order 50?

 9      A.  You said April 21st or July 21st?

10      Q.  Sorry.  July 21, 2019.

11      A.  Correct.  At that time, yes, they were

12  directing us to continue our evaluations on ONgDB.

13      Q.  And did Matt tell you exactly why he wasn't

14  interested in pursuing the EE option?

15      A.  There were meetings where they continued the

16  evaluation in the development environment, and ONgDB was

17  continuing to provide performance that they felt was

18  acceptable.

19      Q.  And that included the enterprise-level

20  features:  Clustering, and security, and the other --

21      A.  Yes.

22      Q.  The big differentiator between Neo4j still at

23  this point was price?

24      A.  Yes.

25          MR. RATINOFF:  And then the next exhibit I am

                                                      111

1    going to put up, Exhibit 58.

2            (Exhibit 58 was marked for identification.)

3    BY MR. RATINOFF:

4        Q.   This is an email produced by CACI, and it is

5    the beginning Bates number CACI00006260.

6        A.   Got it.

7        Q.   And I'll represent to you this is produced by

8    CACI in response to Neo4j's subpoena.

9            Do you have any reason to believe this isn't a

10   true and correct copy of an email produced by CACI?

11       A.   No concerns.

12       Q.   And going down to the beginning of this email

13   thread, it's addressed to Brad Nussbaum.

14           Do you see that?  It says, "Hello Brad."

15       A.   Yes, I see it.

16       Q.   Okay.  And there's a -- a reference in the

17   second paragraph, "I am currently leading the Graph

18   Database team responsible for deploying an ONgDB-based

19   solution into production."

20           Is this referring to the same deployment or

21   development of ONgDB that we were discussing with

22   respect to Task Order 50?

23       A.   At this point, we were operating under another

24   prime contractor.

25       Q.   Okay.  I'm going to ask more questions about

112

1          (The following was deemed attorneys' eyes

2          only.)

3          MR. RATINOFF:  Okay.

4          THE REPORTER:  Okay.  Can you hold on one

5     second everybody?

6          Thank you.  Please continue.

7          MR. BEENE:  This is Adron confirming that this

8     has been designated AEO, and that Mr. Suhy has left the

9     deposition.

10    BY MR. RATINOFF:

11         Q.  So as of January 2020, had Task Order 50

12    concluded?

13         A.  Yes, it had.

14         Q.  All right.  When did Task Order 50 conclude?

15         A.  October of 2019.

16         Q.  Okay.  And then with --

17         A.  Correction.  September of 2019.

18         Q.  What was the -- or sorry.  Strike that.

19         Why did Task Order 50 conclude in

20    September 2019?

21         A.  The government made the decision to move the

22    work from one contract to another, which was not unusual

23    for them at the time.

24         Q.  When you say the "contract," you're talking

25    about the prime contract?

114

1    A.  Correct.

2    Q.  So Next Century's role at this point was still

3  the same?

4    A.  No.

5    Q.  What was different about its role as of

6  September 2019?

7    A.  So in -- at the end of September 2019, Task

8  Order 50 concluded under Praxis on the Blue Rocket

9  contract.  In October, the government switched prime

10  contractors to a contract called Road Rally;

11  specifically, Road Rally Route 66 was the cover term for

12  the contract.  At the time, a place -- a company called

13  WaveStrike was the prime contractor to the government,

14  and Next Century was a subcontractor to WaveStrike.

15    Q.  And was Next Century's continuing role to -- to

16  work on development of the graph database software

17  portion of the -- of the KMS Project?

18    A.  The KMS Project per se concluded with Task

19  Order 50.  Under WaveStrike, Next Century had a

20  diminished role, much more diminished role, and had

21  much-limited interaction with government personnel in

22  the overall direction of the project, and -- and the

23  technical capabilities that were being delivered.

24    Q.  But Next Century was still working on

25  delivering a graph database solution with ONgDB at that

115

1  time?

2      A.  Next Century was still involved, yes, and

3  Michael Smolyak was our -- was our main representative.

4      Q.  And was there a new contract -- subcontract

5  granted to Next Century at that time?

6      A.  Next Century was under subcontract to

7  WaveStrike on the Road Rally Route 66 contract.

8      Q.  Sorry.  What was of the last?  You dropped off

9  there?

10      A.  Yeah.  Sorry.  Road Rally Route 66.

11      Q.  And did Next Century receiving funding under

12  Road Rally Route 66?

13      A.  Yes, and at that time, Next Century was also

14  acquired by CACI, so technically, CACI received the

15  funding.

16      Q.  So this is -- so right at the transition

17  from -- from the Task Order 50 to Route 66, there's also

18  the change in ownership with Next Century?

19      A.  Correct.  That all happened in October of 2019.

20      Q.  So from the -- from the project standpoint,

21  CACI was now the subcontractor of the Road Rally

22  Route 66 project?

23      A.  Correct, with Next Century as a wholly-owned

24  subsidiary.

25      Q.  So then as of January of 2020, Next Century was

116

1    operating under the -- the Road Rally Route 66 project?

2        A.  Yes.

3        Q.  And that included the, quote, "deploying an

4    ONgDB-based solution into production"?

5        A.  Yes.

6        Q.  And when you say deploying into production,

7    does that mean moving from the development phase to a

8    more robust platform with a -- for the NSA?

9        A.  Yes, where the solution folded into a much

10   larger architecture.

11       Q.  Is that -- when it goes into production, is

12   that more of a now usable system for the client versus

13   when it's in a development phase?

14       A.  Yes.

15       Q.  And did the requirements as far as the number

16   of servers and the instances of the software being

17   installed, cores, et cetera, did that also change?

18       A.  Yes.

19       Q.  And normally when -- just in -- the company's

20   experience, when you go from development to production,

21   it's usually a much larger deployment of the software;

22   is that correct?

23       A.  In some cases, yes.

24       Q.  In this case, was there an increase in the

25   number of servers and instances of ONgDB?

117

1    A.  Yes.

2    Q.  And can you say how many machines were running

3  or had ONgDB installed in the production environment?

4        MR. NIVALA:  I'm going to object -- object to

5  that and direct the witness not to answer.

6  BY MR. RATINOFF:

7    Q.  Can you -- is it fair to say that the number of

8  machines that had ONgDB installed increased from the

9  development phase?

10   A.  Yes.

11   Q.  And that would have been beyond the number of

12  machines that Neo4j had original proposed?

13   A.  I can't speak to that one.

14   Q.  Due to being it classified information?

15   A.  Yes.

16   Q.  But it would be a number greater than what was

17  proposed by Neo4j?

18   A.  I can't speak to that one.

19   Q.  Can you say how many CPU cores were increased

20  in the production environment?

21        MR. NIVALA:  I'm going to object that -- object

22  to that and direct the -- the witness not to answer.

23        MR. RATINOFF:  Based on?

24        MR. NIVALA:  Classified nature of the answer.

25        ///

118

1    Q.  And then in the last email, which would be the

2    top, it says -- and this is from you -- "Let's carefully

3    review the SGOAT proposal language because simply

4    stating 'KMS decided on Neo4j' could be perceived as

5    misleading."

6         Why did you feel that was misleading?

7    A.  Because in our proposal, we want to make sure

8    that everything is above reproach and accurate.

9    Q.  And then what was inaccurate about saying KMS

10   decided on Neo4j?

11   A.  KMS did not decide on Neo4j.

12   Q.  It decided on ONgDB?

13   A.  Correct.

14        MR. RATINOFF:  Okay.  The next exhibit would be

15   Exhibit 60.

16        (Exhibit 60 was marked for identification.)

17   BY MR. RATINOFF:

18   Q.  This is an email with the Bates number ending

19   in 5838.  It was produced in response to the subpoena

20   issued to CACI by Neo4j.

21        Do you have any reason to believe this isn't a

22   true and correct copy of that -- an email that was

23   produced by CACI?

24   A.  No, I don't.

25   Q.  Just starting at top, there's a domain,

                                                          125

Novetta.com.

Who's Novetta.com?

A.  So WaveStrike was purchased by a company called Novetta somewhere in the -- that same time frame.

Q.  Okay.  So they're -- so Novetta basically was working as the prime at this time, October of 2020, with Route 66?

A.  Yes, they -- yes, you have that right.

Q.  And you'll see here, Michael Smolyak writes, "I was deploying the Graph database (ONgDB) to the production environment."

So at this time, in October of 10 -- sorry -- October 27, 2020, had ONgDB been moved to production with the NSA?

A.  Yes, it had.

Q.  Okay.  And CACI, at this point, had -- or was assisting with moving ONgDB from the development environment to the production environment?

A.  Correct.

Q.  And when did the -- when did CACI complete its contract to move ONgDB to production and Route 66 of Road Rally?

A.  CACI was a sub on Road Rally and still is today.  The task order expired in September of 2020 and renewed through the coming fiscal year 2021.  I hope

126

1    that answered your question.

2         Q.  So what month in 2021 was it renewed?

3         A.  I'm sorry?

4         Q.  You said -- you said the Road Rally subcontract

5    was renewed in 2021.

6         A.  Correct.

7         Q.  When in 2021?

8         A.  On the government fiscal year.

9         Q.  So September -- I'm sorry, beginning of October

10   of 2021?

11        A.  Correct.

12        Q.  And how long was that contract for?

13        A.  It runs on a government fiscal-year basis --

14        Q.  So --

15        A.  -- so a 12-month period that would have ended

16   in September of this year.

17        Q.  So this month, it would -- that contract ran

18   out?

19        A.  Correct.

20        Q.  And would that still -- would that contract

21   still involve working with ONgDB in an production

22   environment?

23        A.  Yes, in part.

24        Q.  And has that contract been renewed for the next

25   fiscal year, 2023?

                                                        127

DECLARATION OF DEPONENT

I, JIM WEYANT, declare under penalty of perjury that I
have reviewed the foregoing transcript; that I have made
any corrections, additions, or deletions in my testimony
that I deemed necessary; and that the foregoing is a
true and correct transcription of my testimony in this
matter.


Dated this _____ day of _____, 20__,
at _____, _____.
    [City]          [State]

       _____

       JIM WEYANT


      --o0o--

138

JIM WEYANT, 30(b)(6) - AEO                        September 16, 2022

CERTIFICATE

I, BENJAMIN GERALD, Certified Shorthand Reporter,

Certificate No. 14203, for the State of California do

hereby certify:

That prior to being examined, the witness named in

the foregoing deposition was by me duly sworn to testify

to the truth, the whole truth, and nothing but the truth

in the within-entitled cause;

That said deposition was taken shorthand at the

time and place herein named;

That the deposition is a true record of the

witness's testimony as reported to the best of my

ability by me, and was thereafter transcribed to

typewriting by computer under my direction;

That request [X] was [ ] was not made to read and

correct said deposition.

I further certify that I am not interested in

the outcome of said action, nor am I connected with, nor

related to any of the parties in said action, nor to

their respective counsel.

Witness my hand this 29th day of September, 2022.

BENJAMIN GERALD

CSR No. 14203

139

CERTIFICATE

I, BENJAMIN GERALD, Certified Shorthand Reporter,

Certificate No. 14203, for the State of California do

hereby certify:

That prior to being examined, the witness named in

the foregoing deposition was by me duly sworn to testify

to the truth, the whole truth, and nothing but the truth

in the within-entitled cause;

That said deposition was taken shorthand at the

time and place herein named;

That the deposition is a true record of the

witness's testimony as reported to the best of my

ability by me, and was thereafter transcribed to

typewriting by computer under my direction;

That request [X] was [ ] was not made to read and

correct said deposition.

I further certify that I am not interested in

the outcome of said action, nor am I connected with, nor

related to any of the parties in said action, nor to

their respective counsel.

Witness my hand this 29th day of September, 2022.


BENJAMIN GERALD

CSR No. 14203

139

**EXHIBIT 5**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA


NEO4J, INC., a Delaware          )   CASE NO.
corporation; and NEO4J SWEDEN    )   5:18-cv-07182-EJD
AB, a Swedish corporation,       )
                                 )
          Plaintiffs,            )
                                 )
vs.                              )
                                 )
PURETHINK, LLC, a Delaware       )
limited liability company;       )
IGOV, INC., a Virginia           )
corporation; and JOHN MARK       )
SUHY, an individual,             )
                                 )
          Defendants.            )
                                 )


***EXHIBITS ONLY DESIGNATED CONFIDENTIAL***

REMOTE VIDEOTAPED DEPOSITION OF INTERNAL REVENUE

SERVICE THROUGH ITS DESIGNEE MICHAEL C. DUNN

PAGES 1 - 293

_____

8:10 A.M.

Thursday, November 17, 2022
_____


REPORTED BY:     Shelley M. Sailor, CSR No. 10254


1

1          THE VIDEOGRAPHER:  Yes.

2          MR. TEPPER:  Okay.  This is Jonathan

3    Tepper, Department of Treasury, Internal Revenue

4    Service Chief Counsel's Office, Public Contracts and

5    Technology Law Branch.

6          MR. BREWSTER:  Good morning.  This is

7    Albert Brewster, Department of Treasury, IRS Office

8    of Chief Counsel, Small Business and Self-Employed

9    Division area counsel.

10         THE VIDEOGRAPHER:  Thank you so much.  Will

11   the court reporter please swear the witness at this

12   time.

13              MICHAEL C. DUNN,

14   called as a witness by the Plaintiffs and who,

15   having been by me duly sworn, was thereupon examined

16   and testified as hereinafter set forth.

17              EXAMINATION BY MR. RATINOFF

18   Q.  Good morning.

19   A.  Good morning.

20   Q.  Are you represented by counsel today?

21   A.  I am.

22   Q.  And that would be Mr. Tepper?

23   A.  Yeah.

24   Q.  And Mr. Brewster?

25   A.  Yeah.

9

1    Q.  Okay.  And have you ever been deposed

2    before?

3    A.  I haven't.

4    Q.  Okay.  So let me go through a few kind of

5    ground rules just to get you familiar with the

6    process.  You may have already had some

7    conversations with your counsel about it, but I just

8    want to make sure we're on the same page.

9        So you just took an oath under the penalty

10   of perjury.  Do you understand that your testimony

11   has the same force and effect as if you were

12   testifying in front of the judge and jury?

13   A.  Yes.

14   Q.  Okay.  We're going to proceed in a

15   question-and-answer format.  I'm going to ask the

16   questions, and you'll provide answers.  If a

17   question isn't clear or you don't understand it,

18   please let me know, and I can rephrase it.  If you

19   don't say anything and go ahead and answer, I'm just

20   going to assume you understood the question.  Is

21   that fair?

22   A.  Sure.

23   Q.  And it's also not sufficient that you nod

24   your head or shake your head in response to a

25   question.  Even though it's on video, the court

10

1   ask you a couple of quick questions.  Your full name

2   is Michael Dunn.  Is that correct?

3        A.  Yeah.  Michael Christopher Dunn.

4        Q.  And where are you currently located?

5        A.  Melbourne, Florida.

6        Q.  And is that your residence?

7        A.  Yes.

8        Q.  Is that your permanent residence in

9   Florida?

10       A.  It is.

11       Q.  And you're currently employed with the IRS?

12       A.  I am.

13  BY MR. RATINOFF:

14       Q.  Do you have what's marked as Exhibit 157

15  open?

16       A.  I do.

17       Q.  And have you -- do you recognize this

18  document that's been marked as Exhibit 157?

19       A.  Yes.  I -- yeah.  I believe this is the one

20  that Jonathan sent me.

21       Q.  Okay.  The Subpoena to Testify in a

22  Deposition in a Civil Action?

23       A.  Yes.

24       Q.  And you understand you're here today to

25  testify on behalf of the IRS in response to this

14

1    subpoena?

2         A.   I do.   I am.

3         Q.   Let's go ahead and go down to Attachment A,

4    and you'll see on page 3 there's a heading that

5    says, "Topics of Examination."   Just let me know

6    when you're there.

7         A.   I'm there.

8         Q.   And are you familiar with these topics of

9    examination?   There's 12 of them.

10        A.   I looked -- yes.   I was able to look over

11   them.   Yes.

12        Q.   And you understand that you're here today

13   to provide testimony on these topics on behalf of

14   the IRS?

15        A.   I am.

16        Q.   And do you have authorization from the IRS

17   to provide testimony on all 12 topics?

18        A.   As far as I know.   Yes.

19        Q.   And as far as the topics go, do you

20   understand that you're not just providing your

21   personal knowledge -- I'm sorry.   Strike that.

22             Do you understand that today you're being

23   asked not just testimony based on your personal

24   knowledge but that on which the IRS understands and

25   knows?

                                                          15

1    Q.  So in August of 2001 you started with the

2    IRS?

3    A.  I did.  Yes.

4    Q.  What was your first position at the IRS?

5    A.  Program evaluation risk analyst.

6    Q.  And what did that job entitle -- or entail?

7    A.  A range of things dealing, as you can

8    imagine, with program evaluation, you're studying

9    outcomes, treatments, processes, et cetera, based on

10   objectives.  Risk analysis came into play with

11   dealing with analysis, different types of

12   qualitative and quantitative analyses.  We also did

13   surveys, data analysis, et cetera.

14   Q.  And how long were you in that position at

15   the IRS?

16   A.  Until what, 2017, I think.  2016, 2017 I

17   officially moved into my current unit and took over

18   there.  Or started there.

19   Q.  What's your current unit?

20   A.  Within the Research, Applied Analytics and

21   Statistics unit.  It is the Data Management

22   Division.

23   Q.  I've seen an acronym R-A-A-S, RAAS.  Is

24   that --

25   A.  Yeah.  That's the parent organization.  DMD

21

1   would be the initialism for Data Management

2   Division.

3       Q.  So the Data Management Division is within

4   the RAAS?

5       A.  Correct.  Yes.

6       Q.  And what does the Data Management Division

7   do?

8       A.  Two primary functions in my view based on

9   the mission.  One is providing a centralized data

10  source for research and analytics in the IRS.  So

11  that is dealing with the provisioning of data for

12  use.  The second is providing the infrastructure to

13  do the analytics.  So storage and compute in a

14  simple sense.

15      Q.  Essentially maintain taxpayer information,

16  and then providing a tool to provide analysis of

17  that information?

18      A.  Or tools, yes, in the environment to work

19  with them.  Yes.

20      Q.  Now, what does the RAAS, the larger entity,

21  do?

22      A.  It -- there are several different facets.

23  One is the -- one of the functions is the director

24  of RAAS serves as the chief data analytics officer

25  for the IRS.  The units within there have different

22

1   areas of work.  The Statistics of Income Division is

2   led by the chief statistical officer for the

3   Treasury, and they are responsible for the official

4   statistics that go out to the external public, if

5   you will.  There are other units that deal with

6   modeling, different forms of analysis that are done

7   either under the request of RAAS or in partnership

8   with other units across the IRS.  And that could

9   take a variety of forms.  I can try to get into

10  those if you want to.

11      Q.  I think that high level is probably good

12  enough since we're mostly talking about the DMD.  Is

13  that --

14      A.  DMD, yes.  Data Management Division.

15      Q.  Not the DMV but DMD.

16      A.  Not the DMV.  DMD.  Yes, sir.

17      Q.  You mentioned that the DMD provides

18  analytical tools.  Is that throughout the IRS beyond

19  the RAAS?

20      A.  Yes.  So there are users from outside of

21  RAAS who use those resources.

22      Q.  So in other words, the resources provided

23  by DMD are made available throughout the entire IRS?

24      A.  Yes.  They can be.  Yes.

25      Q.  And approximately how many employees are

23

1    within the DMD?

2         A.  I want to say 75 or 80 offhand.

3         Q.  And what's your official title within the

4    DMD?

5         A.  Technical advisor.

6         Q.  And what's the -- just the GS equivalent?

7         A.  GS-15.

8         Q.  And did you come in as a GS-15, or that's

9    just the current level you're at?

10        A.  When I came in to the IRS or to the DMD?

11        Q.  To the DMD.

12        A.  Yeah.  I think I officially came in as a

13   15.  Yeah.  Yeah.  Yeah.

14        Q.  GS-15 is basically a high-level manager

15   level under the GS scale?

16        A.  Technically not a manager position.  It's

17   almost like, you know, do whatever work is needed

18   where there's no set -- there's not necessarily a

19   set program area that you're over with employees or

20   anything like that.

21        Q.  What are your general job responsibilities

22   as I believe program manager, is that --

23        A.  Versus a program manager?

24        Q.  Yeah.

25        A.  So a program manager in DMD is typically

                                                      24

1    dealing with a particular program of work or -- or

2    area of responsibility.  So my particular areas of

3    responsibility have been doing activities under

4    what's called the business systems planner roles and

5    responsibilities, BSP, and that involves liaisoning

6    with our IT unit, helping with supporting, you know,

7    processes with them, handling some other sort of

8    security, and sort of work request processing with

9    IT.  And then of late I work on some strategic

10   planning initiatives.  I have some responsibilities

11   over CKGE sort of day to day and some planning

12   activities.  I support some security and privacy

13   work.  Let's see.  And other duties as assigned as

14   they call it.

15        Q.  You keep referring to the acronym CKGE.

16   Just so we're on the same page, what does CKGE stand

17   for?

18        A.  CDW Knowledge Graph Environment.

19        Q.  And then CDW stands for Compliance Data

20   Warehouse?

21        A.  Yes.  That's correct.

22        Q.  And Compliance Data Warehouse is where all

23   of the data you mentioned that RAAS is responsible

24   for is stored?

25        A.  Not all of it.  Because when you use the

25

1    word CDW, it can refer to the Sybase database.  So

2    that's usually the -- call that almost 80 or 90

3    percent of the data that DMD manages.  There is a

4    separate amount of data that's over in another

5    infrastructure that we manage.  You could loosely

6    call it all CDW but typically -- and this is not --

7    it is not even done -- let me say this:

8         The term CDW is not even used by people in

9    the IRS consistently.  Some people refer to the

10   whole thing that I'm talking about DMD as CDW, some

11   people are referring to just the database.  So I try

12   to use just the database.  And then DMD being sort

13   of the, you know, additional resources

14   infrastructure.  Does that make sense?

15        Q.  Sure.  And when you say CDW in the context

16   of the CKGE, you're talking about just the database.

17   Correct?

18        A.  Yeah.  What it's supposed to be implying is

19   the data is coming out from CDW and being used in

20   that environment.  So that's why it was labeled that

21   way.

22        Q.  And the CKGE is one of the analytical tools

23   used to analyze the data drawn from the CDW?

24        A.  Yes.

25        Q.  All right.  We'll probably get into a

26

```
 1    conversations with counsel.
 2         A.  Okay.
 3         Q.  You can tell me if you were asked -- I just
 4    want to know if you've been asked to gather any
 5    other documents --
 6         A.  No.  No.  If that's the question, I wasn't
 7    gathering any documents, no, of late.
 8         Q.  So the only documents that you were asked
 9    to look at or provide were contract documents?
10         A.  Yeah.  Well, I wasn't asked to provide
11    contract documents as much as just kind of going
12    over what might be contracts that are relevant.
13         Q.  Okay.  You weren't asked to provide any
14    technical documents on the -- what you call the
15    infrastructure of the CKGE?
16         A.  No.  But I tried to gather some
17    information.
18         Q.  All right.  Let me go ahead and go on,
19    then, since you have not seen that subpoena.  We
20    have multiple subpoenas.  We try to keep the
21    documents and the testimony separate.  So let's kind
22    of go ahead and start with -- I think you testified
23    you started in the DMD around 2016, 2017?
24         A.  Yeah.  I was part-time down there sort of,
25    but I was working still in RAAS.  So I worked with
```

29

1    DMD folks over the years.

2         Q.  You were in within RAAS --

3         A.  Yeah.  Yeah.  Yes.  Yeah.  So I've been in

4    RAAS in its technical form since 2001.  So I've

5    always been in RAAS.  But I moved from one division

6    down to DMD at that time.

7         Q.  Understood.  Okay.  And through your work

8    at RAAS -- again, I'm not clear when you gained this

9    knowledge.  During your work with RAAS, did you

10   become familiar with Neo4j software?

11        A.  Yes.

12        Q.  And when did you first become aware of

13   Neo4j software?

14        A.  Probably 2015, 2014.  We were working on a

15   project with Elder Research, and they used or

16   brought in the Neo4j Community Edition for us to

17   do -- or the project was to do some graph analytics

18   work, graph data -- put stuff in graph database.  It

19   was their idea to store some stuff so that we could

20   do some analytics.

21        Q.  So your understanding of Neo4j software is

22   it's a graph database analytics software?

23        A.  Yes.

24        Q.  And what does this mean -- strike that.

25             What do you understand a graph database

                                                         30

1    analytics software to do?

2        A.  So a graph database is storing the data in

3    graph form.  And then, you know, the database might

4    have, you know, Neo4j, the graph databases usually

5    have some type of query function or using some

6    language.  And then, you know, analytics could be

7    used through that query language.  Inherently they

8    may have some other algorithms in there.  It just

9    depends.  So that's what I would think of offhand as

10   a graph database.

11       Q.  Okay.  When you say -- so a graph database,

12   is that something that is independent of whatever

13   analytics software you're using?

14       A.  It can be.

15       Q.  In the case of Neo4j, is the graph database

16   in a common form such as Cypher?

17       A.  Say that one more time.

18       Q.  Do you know what Cypher is?

19       A.  Yes.

20       Q.  What's your understanding of Cypher?

21       A.  The Cypher query language.  It's a type of

22   query language used to interface with the data in

23   Neo4j or, you know -- yeah.

24       Q.  Cypher is used to extrapolate data from the

25   database, the graph database?

31

```
1    interact with the data and pull that data out, and
2    they can be used in a couple of different forms.
3    The two primary forms that we've been using it in
4    over the years is just visualization of the results
5    through a UI.  And then as I said, there are a small
6    group of people that will use other tools to
7    interact with the database, graph database, and then
8    pull that data out and then work with it.
9         Q.  Thank you for clarifying that.
10        A.  Okay.
11        Q.  Now, you said you first became familiar
12   with Neo4j software.  When did you actually first
13   become familiar with the company Neo4j?  I know that
14   there's the software and then there's the company
15   that provides the software.  So --
16        A.  You know, in all honesty, I think it may
17   have been around the same time.  I don't remember --
18   I don't remember anything more particular than
19   around that time.  Using some other stuff.  So I
20   would say then -- the best of my knowledge is around
21   then.
22        Q.  Around then meaning 2015, 2016?
23        A.  2014, whenever the Elder Research project
24   kind of kicked off.
25        Q.  And I know I mentioned the name earlier,
```

34

1  John Mark Suhy.  Do you know who John Mark Suhy is?

2      A.  I do.  Yes.

3      Q.  And when did you first meet John Mark Suhy?

4      A.  I -- I -- I think it was -- let's see.

5  Maybe '16, the fall of '16.  It was at a Neo4j --

6  I'm pretty sure of this.  In my mind, it was at a

7  Neo4j event in D.C. and the -- one of the Neo4j,

8  I'll call them sales manager for lack of a better

9  word, introduced us because we had -- I believe we

10 had called or emailed Neo4j to just find out about,

11 you know, what options Neo4j had, and then they

12 connected us with John Mark Suhy.

13     Q.  What do you mean, what options are you

14 talking about?  Different versions of Neo4j

15 software?

16     A.  Yeah.  I think we had just reached out

17 about, if I remember right -- I can't remember if it

18 was email.  I'm pretty sure it was email, but it was

19 basically just finding out about what the other

20 options like, you know, the commercial one or such.

21 Just generally finding out about that.  And then I

22 think we got invited to the event.  The sales

23 manager introduced us to John Mark Suhy, PureThink

24 as I think it was called the Government Edition or

25 something like that.

35

1    Q.  So a different version of Neo4j when you

2    mean Government Edition?

3    A.  Yeah.  I believe, if I remember right, it

4    was sort of they said he was the partner of Neo4j

5    for the government, and I think it was called the

6    Government Edition, if I remember right.

7    Q.  But it was Enterprise-level software?

8    A.  Yeah.  Because I think we -- yeah.  I think

9    it was -- yeah.  It was not the Community Edition.

10   It was -- I mean, I wouldn't recognize it as the

11   Community Edition.  But it was -- yeah.  It was --

12   it was sort of through -- well, it was through

13   PureThink that was doing the, I guess the product in

14   my mind.

15   Q.  Okay.  And why was the IRS looking -- I

16   assume at the time it was -- based on your

17   testimony, it was using Community Edition.  Why was

18   it looking to, for a better word, upgrade to

19   Enterprise Edition?

20   A.  So pretty much for two things in my mind,

21   was the user interface and the FISMA security

22   capabilities for sort of accounts management.

23   Q.  What's FISMA?

24   A.  Federal information -- oh, shoot.  Federal

25   Information Security and something Act.  It's

36

1    name in the chat.

2         Q.   Federal Information Security Modernization

3    Act.  Does that sound correct?

4         A.   That sounds correct.  Let's go with it.

5         Q.   All right.  I'll take your word for it.

6    And did the IRS enter into -- strike that.

7              Did the IRS purchase a license to what you

8    call the Neo4j Government Edition?

9         A.   Yeah.  I believe we had a contract with

10   PureThink that was prototyping, piloting out,

11   testing how it worked, et cetera.  So that was

12   through PureThink.

13        Q.   Okay.  And did that include an actual

14   license, a commercial license for Neo4j's software?

15        A.   I don't remember ever -- I mean, I don't

16   remember us ever, like, being delivered anything.

17   It was through whatever John Mark Suhy -- yeah, I

18   don't remember -- I don't remember anything like,

19   you know, some kind of data rights or something

20   being sent over to us.

21        Q.   Was there any discussion about how many

22   cores the contract would include?

23        A.   I can't remember.  I remember only -- the

24   only -- what I remember about cores and such was

25   when we were talking with the Neo4j folks and we

                                                          39

1   were talking about the licensing of Enterprise

2   itself and how the cores and such -- you know, how

3   many cores and sizing you get for the price.  I

4   remember that conversation.

5        Q.   Let me go ahead and mark the next exhibit.

6   I believe we're at 159.

7             (Exhibit 159 is introduced.)

8             THE WITNESS:  Okay.

9   BY MR. RATINOFF:

10       Q.   Do you have what's been marked as Exhibit

11  159 open?

12       A.   I do.

13       Q.   It says dated 9/23/2016.  Then there's the

14  contract number TIRNO-16-P-00202.

15       A.   Yes.

16       Q.   Do you recognize what's been marked as

17  Exhibit 159?

18       A.   I'm familiar with it.  I can't remember it

19  specifically from that time, but it looks like our

20  contract with PureThink and how it would be set up.

21  Yeah.  Vivian Daniels has the core.  Yeah.

22       Q.   Okay.  Who is Vivian Daniels?

23       A.   She was the contracting officer

24  representative.  Hang on.  I can't see.  So she's

25  IRS contracting officer representative.

40

1    Q.  Then do you see under Schedule 17 it

2  says -- and then under item 0001 it says,

3  "Implementation of Government Edition Neo4j

4  project"?

5    A.  What page?

6    Q.  On the first page.

7    A.  Oh.  Just up there.  Yeah.

8    Q.  Does that help --

9    A.  Yeah.  Implementation of the Government

10  Edition Neo4j project.  Yeah.

11    Q.  And you'll see there's a unit price of

12  $229,000?

13    A.  Uh-huh.

14    Q.  Yes?

15    A.  Yes.  I do.

16    Q.  And was that payment for -- made for the

17  Government Edition for Neo4j?

18    A.  Yes.  To PureThink.

19    Q.  And was it your understanding that this

20  contract included a license to use the Neo4j

21  Government Edition?

22    A.  Yeah.  I would think so.  Whatever the

23  agreement was with PureThink and Neo4j.  But we got,

24  you know, we were able to use the Government

25  Edition, which would include the Neo4j database that

41

 1   came with it during this period of performance.

 2         Q.   When you mean the Neo4j database, are you

 3   referring to Neo4j Enterprise database software?

 4         A.   Yeah.  I would if that's what came with --

 5   and which I'm assuming came with the Government

 6   Edition.  So yeah.

 7         Q.   So the Government Edition didn't come with

 8   Community Edition, then.

 9         A.   No.  I'm -- I'm certain of that.  Yeah.  So

10   it must have been the Enterprise Edition if those

11   were the two flavors.

12         Q.   And then you see -- if you go to the next

13   page under "Statement of Work."

14         A.   Yes.

15         Q.   Do you see "Introduction/Overview," it says

16   this contract will provide -- and then I guess

17   that's a typo-- provide facilitate the deployment,

18   for testing and feasibility of the Neo4j Edition NGE

19   via a one-year use of Neo4j Government Edition?

20         A.   Yes.

21         Q.   Which both the software use and

22   professional services?

23         A.   That's correct.

24         Q.   So you understand, then, that it was a

25   one-year license, then, for Neo4j Enterprise?

                                                           42

1      A.   That's correct.

2      Q.   And to your knowledge, did Mr. Suhy -- I

3  guess -- let me backtrack a little bit.

4           You mentioned PureThink.   What's PureThink?

5      A.   PureThink was, my mind, John Mark Suhy's

6  company that was in partnership with Neo4j, Inc.

7      Q.   And are you aware of any other -- or were

8  you aware of anyone else affiliated with PureThink

9  at that time in 2016?

10     A.   No.

11     Q.   So essentially PureThink was John Mark Suhy

12  in your mind?

13     A.   Yeah.   That's fine.   I agree.

14     Q.   And then this is signed by Genevieve

15  Colvin.   Who is Genevieve Colvin?

16     A.   She would probably -- she would have been

17  the contracting officer representative.   Wait a

18  minute.   Sorry.   Sorry.

19           She would have been the contracting

20  officer.   So she would sign it as via procurement.

21     Q.   And as far as -- and you mentioned the

22  CKGE.   Did the CKGE exist at the time of this

23  contract in September --

24     A.   It did not.   No.   It did not.

25     Q.   So was this contract a precursor so to

43

1  speak for the CKGE?

2      A.  Yeah.  I think so.  Yeah.  Yeah.  I'm good

3  with that.  Yes.

4      Q.  So what was the purpose of this contract

5  beyond obviously just using the Neo4j Government

6  Edition?

7      A.  Primarily I would say three things.  One is

8  the ability to work with user interface and be able

9  to customize that to the desires of the

10 stakeholders.  That was primarily, probably the

11 primary interest.  The second would be the ability

12 to take two -- the Community Editions that we had

13 were in two separate instances, and the interest was

14 to combine them into one.  So essentially be able to

15 just put them in one so that one user interface

16 could work with them.  And third would be the

17 security, logging, infrastructure, that kind of

18 stuff.  So that's how I would kind of put the three

19 priorities out there.

20     Q.  And was this being done within the DMD at

21 this point?

22     A.  It would have been -- yes.  In the

23 infrastructure.  Yes.

24     Q.  Okay.  And then what was -- it sounds like

25 from at least the contract it's the development and

                                                    44

1    testing of the Government Edition.  What was the

2    next step envisioned after this year contract was

3    up?

4         A.  Yeah.  If -- I think the next step would

5    have been if all of that was going well and people

6    and stakeholders and decision-makers were happy, I

7    think the idea would be we would have moved off of

8    what we had into that new, you know, call it

9    environment, if you will.  Or at least a stack of

10   those components.

11        Q.  And that actual stack of those components,

12   was Mr. Suhy able to implement them successfully for

13   the IRS under the contract?

14        A.  I mean, we were still -- it was still being

15   worked on, but we were, I think, making headway.

16   Yes.

17        Q.  And when you say headway, was this moving

18   towards what is now the CKGE?

19        A.  Yeah.  It would have -- it would have been

20   sort of essentially the taking what we had and

21   putting it into a new form.  And that sort of became

22   sort of the, you know, the beginning of the first

23   project if you will.

24        Q.  And then I want to turn your attention back

25   to Exhibit 159.  If you go down to page 4, it says

45

1    "Government" -- there's a heading "Government

2    Furnished Property."

3         A.   Yep.  I see it now.  Yes.

4         Q.   It says at least one Linux OS server with

5    at least 16 cores and 1 terabyte of RAM --

6         A.   Yeah.

7         Q.   -- and available hard drive space as

8    needed.

9         A.   Yes.

10        Q.   And was that at that time the basic

11   hardware requirement for this project?

12        A.   Yeah.  I don't know if it was the

13   requirement as much as what we had available and we

14   thought would be sufficient.  And maybe with some

15   buffer.

16        Q.   During the course of this year contract,

17   was this ended up being sufficient specification for

18   the hardware?

19        A.   Yeah.  If I remember right, you know, the

20   testing and everything showed that -- I mean, it was

21   probably even maybe a little bit more in terms of

22   what would have been cores than would have been

23   necessary given how the user interface would

24   function with the graph database.  But that being

25   said, you know, I don't know -- that's sort of an

46

1    estimate, but I would say that to me is a decent

2    enough size to say it was working within that, that

3    set of infrastructure.

4          (Exhibit 160 is introduced.)

5    BY MR. RATINOFF:

6          Q.  I'm going to go ahead and mark the next

7    exhibit.  This should be Exhibit 160.  Just let me

8    know when you've had a chance to download it and

9    take a quick look.

10         A.  I'm open.  Yes.

11         Q.  Just marked Exhibit 160.  It's an email

12   from yourself to Mr. Suhy dated March 29, 2017.  And

13   that's the top email.  You'll see there's a prior

14   email from Mr. Suhy addressed to you.

15         A.  Okay.

16         Q.  Is that an email exchange between you and

17   Mr. Suhy?

18         A.  Yes.  I saw it.  Yes.

19         Q.  Yes, this is an email -- I'm sorry.

20             Yes, this is an email exchange between

21   you --

22         A.  Oh.  Yes.  Sorry.  Yes, it is an email

23   exchange.

24         Q.  Just for your reference, you'll see there's

25   a number at the bottom that says IGOV00 and there's

47

1    a whole bunch of numbers there.

2         A.  Okay.

3         Q.  I may refer to numbers like that as Bates

4    number, and this Bates number represents that this

5    email was actually pursued by Mr. Suhy or one of

6    Mr. Suhy's entities.  Do you understand?

7         A.  I do.  Yes.

8         Q.  And you'll also see some what we'll call

9    Bates numbers that will have an IRS prefix, and

10   those will mean that those are actually produced by

11   the IRS.

12        A.  Yes.  That's good.  Yes.

13        Q.  Just so we know where these are coming

14   from.

15        A.  Okay.  I gotcha.

16        Q.  And then if you look -- if you look in this

17   third paragraph here, it says, In terms of the

18   working-side:  Jason and John did stop by yesterday;

19   I told them we have been really happy with how

20   things are going and working with you and things are

21   going well for continued interest and arrangement

22   for this capability.  Who are you referring to as

23   Jason and John?

24        A.  I believe they're the Neo4j -- is it Jason

25   Zelenski or Zakowski?

                                                      48

1        Q.  Zagalsky?

2        A.  Okay.  And then John Broad.  Brode --

3   Broad?

4        Q.  Yeah.  There is a John Broad in here, too.

5        A.  Okay.  Then that would have been them.

6        Q.  Okay.  And do you recall why they had

7   stopped by?

8        A.  Yeah.  They said that they were -- to

9   summarize, they were having disputes with John Mark

10  over signing some -- either it was signing or they

11  said that they were having issues with John Mark and

12  there was disputes going on.  And they wanted to

13  kind of talk about, you know, just purchasing of the

14  Enterprise Edition.

15       Q.  And you'll see -- I'm sorry.  I didn't mean

16  to cut you off.

17       A.  No.  Sorry.  Go ahead.  I said that's what

18  I remember.

19       Q.  And the next sentence says, My main point

20  of emphasis I want to express is that we (IRS) want

21  to go into production with this environment within

22  this contract period, and we're assuming we have

23  proper licensing and paid for 12-core production

24  Enterprise-license services; as part of that is the

25  unlimited, quote, "DEV" environment use.

                                                          49

```
 1         A.  That's right.
 2         Q.  Is that sentence something that you had
 3    told Jason and John?
 4         A.  Yeah.  I think.  My feeling of the
 5    conversation with Jason and John is what would it
 6    cost for a 12-core license.  And how would that -- I
 7    think if I remember right, there was some -- there
 8    was a presentation of three nodes of four, and I
 9    think I was talking to them about being able to have
10    that as one node of 12.  So along those lines, I
11    think we were talking about sort of what's the
12    pricing of that, if that was feasible or not.
13         Q.  And then you say, we're assuming we have a
14    proper licensing and paid for 12-core production
15    Enterprise license.  Is that what you understood at
16    the time that you had under the contract that we
17    just talked about in Exhibit 159?
18         A.  I think so.  Yes.
19         Q.  And when you say that you want to go into
20    production you were assuming -- or it was the IRS's
21    desire to have the same level of cores for
22    production license?
23         A.  Yeah.  Basically for us to be able to have
24    that -- we wanted, you know, at least 12 cores.
25    Yes.
```

50

1    a break, too.

2         Q.  Yeah.  I know the videographer and court

3    reporter would also appreciate that.  So let me go

4    ahead and put one more exhibit in the chat here.

5    We'll mark it, ask a few questions, and then we can

6    take a quick break for everyone.

7         A.  Okay.  I see it.  916?  916?

8         Q.  916, no.  It should be -- oh, yeah.  The

9    end of the Bates number.  Gotcha.  I was looking at

10   tab 444, but yes.  That is correct.  So this is

11   going to be -- we'll just call it Exhibit 161, then.

12        A.  Okay.  I opened it up.  Yes.

13            (Exhibit 161 is introduced.)

14   BY MR. RATINOFF:

15        Q.  You'll see this is an email, and this

16   represents Neo4j --

17        A.  Yes.

18        Q.  -- Zagalsky --

19        A.  Yes.

20        Q.  -- yourself and --

21            (Reporter interruption.)

22   BY MR. RATINOFF:

23        Q.  We've got to kind of give each other a

24   chance.  You know, we've kind of been going fast and

25   furious here, so I'll slow down just a little bit.

                                                      55

1    Sorry about that.  Let me start over again.

2          I just marked what's Exhibit 161.  It's an

3    email from Jason Zagalsky of Neo4j to yourself,

4    Ms. Daniels, who I think we talked about, as well as

5    John Broad.  And the subject is "Termination of

6    Neo4j Solution Partner PureThink LLC."  And it's

7    dated July 11, 2017.  Does this -- do you recognize

8    this email?

9          A.  I -- yeah.  I do.

10         Q.  And what does -- what did it mean to you?

11         A.  So I believe that was Jason just

12   officially, you know, letting us know that they had

13   terminated the partnership and sort of giving us

14   notice of that situation.

15         Q.  And then it says in the third paragraph

16   regarding the IRS's purchase of a Neo4j subscription

17   Neo still has not received a purchase order from

18   PureThink.  Do you have an understanding of what

19   that is in reference to?

20         A.  I think.  I think this goes back to there

21   was a dispute between -- this is what I think part

22   of the dispute may be, but this is, again, tell me

23   if I'm speculating but --

24         Q.  I don't want you to speculate.  So if

25   you're speculating then --

56

1    A.   Well -- I -- I think -- my belief is that

2    this was regarding part of the dispute that John

3    Mark had not paid for or sent money to Neo4j based

4    on, you know, what was contracted to PureThink.  So

5    if I could summarize it like that.

6    Q.   Are you referring to payment for the

7    license for the Neo4j Government Edition?

8    A.   Yeah.  I think so.  Yes.

9    Q.   And if you look to the next -- I guess it's

10   the paragraph that says, "Regarding the consulting

11   services."  Do you see that paragraph?

12   A.   Yes.

13   Q.   And it says while the IRS has stated its

14   intention to proceed with the AGPL-licensed

15   Enterprise Edition, please understand that Neo's

16   agreements with its partners, including PureThink,

17   prohibit them from providing any consulting services

18   on these products during the term of their agreement

19   for a period of 36 months following termination.  Do

20   you see that?

21   A.   Right.

22   Q.   And what was your understanding of what

23   those restrictions were?

24   A.   This was about PureThink not being able to

25   operate and do work with anything to do with Neo4j.

57

1    Q.  And what did the IRS do when it received

2    this letter?

3    A.  I -- so when I got the letter, I told the

4    director of DMD about the situation, and then --

5    well, Vivian got the letter, too, so I think -- I

6    believe -- I'm going to -- I believe that the

7    director of DMD, you know, was not -- wanted to have

8    either procurement or an official statement that

9    PureThink could not do the work.  Meaning our

10   contract was with PureThink, and so we would have to

11   have, you know, something official through the

12   procurement channels that says that they can't

13   finish their work.

14   Q.  And when you say finish their work, you

15   mean under the contract --

16   A.  Under this period of performance, this

17   contract.  Yes.

18   Q.  And going back to I think it was

19   Exhibit 159, that contract expired or was set to

20   expire about when?

21   A.  September.  September of that year.

22   Q.  So a year contract.  So September to

23   September -- September 2016 to September 2017.

24   A.  Yeah.

25   Q.  Okay.  And then -- but Mr. Suhy did

58

1    actually continue to perform under that contract.

2    Correct?

3         A.  Yes.

4         Q.  So the IRS never officially took the

5    position that he couldn't continue to work on that

6    contract?

7         A.  Not that I know of or was told of or

8    anything.  No.

9         Q.  And so PureThink was -- finished out its

10   obligations under that contract?

11        A.  Yes.

12        Q.  And why did the IRS not -- why did the IRS

13   decide to continue to work with Mr. Suhy and

14   PureThink?

15        A.  From my understanding and direction, it was

16   that the, you know, officially the procurement has

17   to be the channel in which the work stoppage is

18   formally, you know, announced or take action of.  So

19   even though it was sent to them, I mean, we -- we

20   let them know, but my director's stance was that we

21   had to have, you know, procurement say that the, you

22   know, the work could not continue and stop it.

23        Q.  And they never said one way or the other?

24        A.  No.  Never heard.  No.

25             MR. RATINOFF:  All right.  This is a good

                                                          59

1     that up.

2          Q.   Okay.  Were we actually on the record?

3              THE REPORTER:  Yes.

4              THE WITNESS:  I think so.  Yeah, I waited

5     until that to bring it up.  But that was it.  But I

6     just remembered that so I wanted to bring it up.

7              (Off the record.)

8              THE WITNESS:  Do you need me to repeat it?

9     BY MR. RATINOFF:

10         Q.   No.  No.  I think we got it.

11             So going back to the July, August time

12    period, was the IRS looking to continue working with

13    Mr. Suhy after the expiration of the contract with

14    PureThink?

15         A.   Yeah.  I think we were.  And we felt

16    like -- again, sort of the -- one of the primary

17    things that was of interest was dealing with the

18    user interface.  And there seemed to be, from what I

19    remember of all the stakeholders, you know, that

20    that was moving along nicely with being able to

21    customize it, et cetera.  So there was interest to

22    continue working with those elements of what I'll

23    call at that time was, for lack of a better term,

24    the Government Edition.  Those stack elements.

25         Q.   And at this point did the CKGE, at least in

                                                          61

1    concept, exist at that time?

2        A.   Primarily, you know, in that formative

3    stage, there is that set of technology and what was

4    happening.  Yes.  And I think -- I don't know if

5    people were using the term "CKGE" at that time.  I

6    believe people were still -- we may have been using

7    something along those lines, but the idea of using

8    that -- you know, the UI and all of that as sort of

9    a new basis was there amongst the project members.

10   Does that make sense?

11       Q.   Yeah.  I think it does.  Was there a new

12   contract -- I'm not best at government contracting,

13   but was there a new RFQ put out at that point for

14   the next phase?

15       A.   Well, yeah.  So what -- so -- understood

16   that what was happening with PureThink and all of

17   that was -- whatever was happening was not tenable.

18   And so the original intent was through, I think it

19   was -- I think it was eGov or iGov, a company that

20   John Mark had -- a small business company that John

21   Mark had that was separate through his professional

22   services was at the beginning sort of what we were

23   going to request for professional services to

24   continue primarily, again, working on the UI, the

25   security features, et cetera.  And -- and I don't --

62

1   at that time, the decision by our director was to

2   use that money that we had for those professional

3   services instead of getting an Enterprise Edition

4   where we wouldn't have -- we would only have the

5   database -- those database elements and not the UI

6   and the rest of it.  And that was primarily the main

7   interest at that time.  And so that's what we were

8   going out with a contract.  Originally it was sole

9   source.  It was a sole source that went through

10  procurement, and I believe Neo4j contested that.

11  And then we ended up going through, again, sort of,

12  I believe it's 8A or one of the small business was

13  what procurement likes to go first through one of

14  John -- out for open bid for those professional

15  services dealing with -- dealing with technology to

16  do CKGE.

17       Q.  Okay.  So I know there's some similar

18  company names that you mentioned, but in the IRS's

19  mind, all of those companies were essentially John

20  Mark Suhy, that's who you were --

21       A.  He was --

22          (Reporter interruption.)

23  BY MR. RATINOFF:

24       Q.  I've got to finish my question.  Let me

25  start over.  We'll clear up the record.

63

1          So from the IRS's perspective, the company
2    names were sort of less important as to continuing
3    to work with John Mark Suhy.  That's what was
4    important to the IRS at that point?
5          A.  That was our primary interest starting off,
6    and then -- so I would say yes.  It was his skill
7    set was -- was something that we were interested in
8    leveraging.
9          Q.  So any disputes he had through PureThink
10   with Neo4j was irrelevant to continue working with
11   them?
12         A.  I don't -- I don't want to say relevant.
13   If we put forward the solicitation, and he is able
14   to bid on it, so I guess there is some relevancy on
15   whether he was able to work with -- I guess in this
16   case with Neo4j itself and whatever that would be.
17   But I think that was secondary to with his skills of
18   using the security.  Those elements of the
19   Government Edition that were not Neo4j itself.
20   Those capabilities were the primary interest and his
21   skill set in doing that.
22         Q.  And you mentioned iGov.  That's iGov, Inc.?
23         A.  Yes.  I believe it's Inc.  Yeah.  IGov.
24         Q.  Let me go ahead and mark this next exhibit.
25              (Exhibit 162 is introduced.)

64

BY MR. RATINOFF:

    Q.   This should be tab 445, which I'll mark as
Exhibit 162.  You'll see this is an email exchange,
looks like it's between several folks at the IRS
including yourself if you take a look at the whole
document.  The last email is from Mr. Suhy to
yourself and then Chris Hess, Lisa Rosenmerkel,
Renee Goss, Genevieve Colvin, Vivian Daniels, and
then a couple of -- I guess another Mr. Suhy and
Jeff Butler.  Are those all -- other than Mr. Suhy,
those are all IRS employees?

    A.   Yes.

    Q.   And do you know what this email exchange is
about?

    A.   Let me -- I'm looking at it now.  Okay.
Okay.  I've read it.  Okay.

    Q.   And do you have any reason to believe this
isn't a true and correct copy of an email exchange
between Mr. Suhy and various stakeholders at the
IRS?

    A.   No.  No issues.

    Q.   And you'll see in the email where it reads
July 12th -- sorry.  Yes.  July 12th at 11:31 a.m.
It's at the bottom of 544 dash 001?

    A.   Right.

65

1      Q.   Mr. Suhy says, "Our lawyer just pointed out

2   that since iGov has no limitations on supporting or

3   provides services for Neo4j Enterprise open source

4   licenses, we can just have iGov, Inc. assume over

5   all the objections of the current contract now

6   instead of waiting for the next procurement."

7           Then it continues to the next page.

8           "Nothing would change, we would have the

9   same team, locations and would keep working as we

10   always have.  IGov owns the new Government Package

11   for Neo4j as well."

12           Do you see that?

13      A.   Yes.

14      Q.   And did the IRS do its own determination

15   whether it was okay to work with iGov as opposed to

16   PureThink based on the notice that Neo4j sent?

17      A.   I did not do anything other than rely on

18   procurement folks to do -- so as far as I know, we

19   just -- as I said sort of up there at the beginning,

20   you know, I'll let procurement talk about regarding

21   the statement of work arrangements, et cetera.  So I

22   didn't do anything -- I don't remember doing

23   anything else.

24      Q.   And what did procurement decide at that

25   point working with iGov?

                                                          66

1    A.   I -- I don't remember hearing anything from

2    them.

3    Q.   Who would make the decision, then, to work

4    with iGov at that point?  Would that be procurement?

5    A.   Yeah.  If you're talking about under the

6    same contract vehicle, procurement would have to do

7    all that.  We have -- I have no say in that.

8    Q.   And then who is Chris Hess?

9    A.   Chris Hess is a manager in RAAS.

10   Q.   Is that in one of your reports?

11   A.   No.  No.  Not my reports.  No.  He's a

12   programmer manager in RAAS, a colleague in another

13   division who was working with this project.

14   Q.   And Lisa Rosenmerkel, who is Lisa

15   Rosenmerkel?

16   A.   She was associate director of DMD.

17   Q.   So at the time, she was someone you would

18   report to?

19   A.   Yes.  I did.

20   Q.   Is she still with the IRS?

21   A.   She is not.

22   Q.   When did she leave?

23   A.   Just recently.  Well, formally just

24   recently.  Before that she had been gone for at

25   least a year or two at main Treasury, and before

67

1    that she had been gone a year or two on different

2    details within the IRS.  So I think she probably

3    left, I'm just going to say '19.  2019.

4        Q.  Renee Goss, what does Renee Goss do?

5        A.  She was a contracting officer

6    representative here in RAAS.

7        Q.  Would she be within procurement, what you

8    call procurement?

9        A.  Yes.

10        Q.  So she would have been one of the persons

11    to make the decision as far as whether it was okay

12    to continue working with PureThink or start working

13    with iGov?

14        A.  I think that's fair.  Yes.

15        Q.  And we talked about Vivian Daniels.  Was

16    she also in procurement?

17        A.  She was in procurement.  Yes.

18        Q.  Was she also decision-maker with respect to

19    procurement?

20        A.  Yes.  She was -- I believe Vivian was the

21    contracting officer or contract specialist there in

22    procurement, and Genevieve Colvin I believe was the

23    contracting officer in procurement.

24        Q.  Gotcha.  And then Jeff Butler, was he also

25    in procurement?

68

1          A.   No.   He was the director of DMD.

2          Q.   So he would be the person that Lisa

3    would -- reported to?

4          A.   Correct.

5          Q.   So the hierarchy would have been Jeff,

6    Lisa, and then yourself more or less?

7          A.   Yes.   Yes.   That's fine.   Yeah.

8          Q.   And then I guess looking at your email on

9    July 12, 2017, I would like to know from my

10   perspective that I appreciate your communication and

11   involvement helping clarify and work on options.

12   I'll let procurement talk to anything regarding the

13   nature of the SOW arrangements and needs.

14          That's what you're referring to as

15   different procurement?

16          A.   Yes.

17          Q.   Mr. Suhy confirms there would be no work

18   stoppage under the 2016 contract?

19          A.   That's how I interpreted it.   Yes.

20          Q.   And then you mentioned there is a new

21   contract, which you said it was sole sourced to

22   iGov.   Is that correct?

23          A.   No.   It was not -- Neo4j disputed that and

24   so it was not executed.   And then we started a new

25   procurement process for new competition.   It went

                                                          69

 1    out as -- I call it, you know -- I don't want to use

 2    the -- it went out as a bid.

 3        Q.  Okay.  So just to back up, there was a sole

 4    source RFQ put out in what, July, August of 2017?

 5        A.  Yeah.  That seems about right.

 6        Q.  And that was -- that was the sole source to

 7    iGov.  Correct?

 8        A.  Correct.  That was using iGov, the sole

 9    source to them for the professional services.

10        Q.  Okay.  And then this -- but professional

11    services using Neo4j Enterprise software?

12        A.  Not necessarily.  No.

13        Q.  At that time the Government Edition that

14    the IRS was using included Neo4j Enterprise.

15    Correct?

16        A.  But we weren't -- we weren't using the

17    Government Edition.  It was still in, call it

18    development.  So as long as you're okay with that,

19    then yeah.  It wasn't the regular use by other

20    people.  It was just being developed, worked on,

21    et cetera.

22        Q.  But the version at Neo4j that was being

23    used in development was Neo4j Enterprise.

24        A.  Yes.  As far as I know in that edition.

25    Yes.

70

1      Q.  All right.  And then I'm going to go ahead

2  and drop another document into the chat here.  So be

3  Exhibit 163.  It's a lengthy document.  And I just

4  wanted to see if this refreshes your recollection.

5          (Exhibit 163 is introduced.)

6  BY MR. RATINOFF:

7      Q.  It's not letting me drag it into the chat.

8  Hold on just a second.  Let me give it one more

9  time.  Here we go.

10     A.  I see it.

11     Q.  I believe this will be Exhibit 163.  You'll

12 see it's an email from Ms. Daniels to Mr. Suhy dated

13 2017?

14     A.  Yeah.  Yes.  I do.  I see it.

15     Q.  And it's -- the subject's SF18

16 TIRNO-17-Q-00209.  Is that -- is that the sole

17 source contract we were just talking about that's

18 referenced in the subject of this email?

19     A.  I would think so.  Yeah.

20     Q.  If you scroll down, I'm looking at -- its

21 quite a ways down.  It would be actually 9 out of 12

22 in the PDF itself.  The Bates number at the bottom

23 is 1570513.001.  Do you see that?

24     A.  What page is it?

25     Q.  9 out of 12 in the PDF.

                                                   71

1      A.   Okay.   I'm there.

2      Q.   The title is "Statement of Work/Performance

3  Work."

4      A.   Yep.

5      Q.   And then it says in

6  "Introduction/Overview," "The contract will

7  facilitate the continued development and O&M support

8  needs of DMD's CDW Knowledge Graph Environment

9  (CKGE)."   Do you see that?

10     A.   Yes.   I do.

11     Q.   Does that help refresh your recollection as

12  to where the CKGE was at at that time?

13     A.   Yeah.   It would -- that environment that

14  was being -- that had been started under PureThink.

15     Q.   Okay.   Then going down to the last

16  paragraph, "The CKGE framework."   Do you see that?

17     A.   Right.

18     Q.   So "The CKGE framework includes Neo4j's

19  Enterprise Edition open source version, Elastic

20  Search capabilities, and micros-service components

21  useful for supporting graph-related research."   Do

22  you see that?

23     A.   Yes.   Yes.

24     Q.   So at that time the IRS was using Neo4j

25  Enterprise under an open source license?

72

    A.  I don't know if it -- in my mind, it would
have been whatever the edition was that was part of
the Government Edition that had been started by
PureThink.

    Q.  You mentioned that this contract was
awarded to iGov.  Is that correct?

    A.  No.  This was -- this was not.

    Q.  Okay.  What I mean is it was awarded but
then protested by Neo4j.

    A.  Yes.  So this -- if this was a statement of
work, which I'm assuming it is, it would have gone
out to iGov, and that's what was protested.  So yes.

    Q.  Okay.  So it was never awarded.  It was
just the statement of work was protested.

    A.  I actually think the -- I think it was
going to be awarded, and I thought that's what was
protested.  Saying that other people could work on,
if I remember right -- I believe I do in my mind.
That other people -- Neo4j said something to the
effect of other people could be work -- could have
the technical skills to work with Neo4j.  That's
what was the point of dispute.

    Q.  And IRS sided with Neo4j on that?

    A.  Yes.  That is true.  There is other people
that can work on Neo4j.  So we just did an award

                                                      73

1    contract.

2        Q.  But then the work was eventually awarded to

3    Mr. Suhy via a different contract vehicle?

4        A.  Yes.  It was a new procurement order that

5    had started -- or was executed for sort of open

6    competition.  I believe it was AA companies or small

7    business companies originally, but it was open

8    competition, and it was awarded to eGov for

9    professional services to work, you know, to further

10   the development of CKGE.

11       Q.  Okay.  When you say eGov, you mean

12   eGovernment Solutions?

13       A.  Yes.  That's fine.  That's correct.

14       Q.  I will probably refer to it as eGovernment

15   Solutions just because it's so -- you say eGov and

16   iGov is so similar, if that's okay.

17       A.  Fair enough.

18       Q.  I think the court reporter would appreciate

19   that.

20       A.  Fair enough.  Yeah.  EGovernment.  That's

21   fine.

22       Q.  Let me go ahead and drop in the next

23   exhibit.  This has previously been marked as

24   Exhibit 103.

25           (Previously marked Exhibit 103 is

74

1    referenced.)

2           THE WITNESS:  Jonathan just put something

3    into the chat.

4           MR. RATINOFF:  Yeah.  I appreciate it,

5    Jonathan, but we can't have him testifying on your

6    behalf, though.  I don't think the IRS wants the

7    lawyers to be up on the stand and have the privilege

8    waived.

9           MR. TEPPER:  We do not.  I just wanted to

10   provide clarification if needed.

11   BY MR. RATINOFF:

12      Q.  All right.  Thank you.  I didn't think that

13   was your intent.

14           I just put in what was previously marked as

15   Exhibit 103.  The title of the document is Order for

16   Supplies or Services.  The date of the order is

17   05/24/2018, Order No. 2032H8-18-P-00151 with the

18   issuing office being Vivian Daniels at the IRS

19   procurement office.  Do you see that?

20      A.  Okay.  Sorry.  Let me -- I had so many tabs

21   of exhibits.  Let me -- let me just go back and make

22   sure I'm looking at -- okay.  I think I got it.

23   Okay.  I see -- did you say it was a procurement

24   order dated 05/24/18?  Is that the one you're

25   talking about?

                                                    75

1      Q.  Yes.

2      A.  Okay.  I got it open.

3      Q.  Okay.  Now, this Order for Supplies or

4  Services, is this the contract that you mentioned

5  was awarded to eGovernment Solutions?

6      A.  That's correct.  Yes.

7      Q.  And then the actual name of the contractor

8  being Mr. Suhy?

9      A.  Correct.

10     Q.  And this was to continue the work that

11  Mr. Suhy had been doing for the CKG under the prior

12  contract?

13     A.  Yes.  Yes.  Continuing on with that type of

14  work.

15     Q.  Did Mr. Suhy in between July, August 2017

16  from the time this contract was awarded, was he

17  continuing to work with the IRS?

18     A.  No.  After the period of performance for

19  PureThink, he was not.

20     Q.  But then he started up with the same work

21  again in May of 2018?

22         MR. BEENE:  Objection to form.

23         THE WITNESS:  He -- I'm not sure what --

24  let me -- I'm not sure what the object to form is --

25  ///

76

BY MR. RATINOFF:

Q.  Don't worry about it.

A.  -- but --

Q.  We're going to argue later on if we're going to use your testimony.  So let me ask the question again so the record is clear.

The Order for Supplies or Services we're looking at, once this was awarded to eGovernment Solutions, Mr. Suhy continued the work that he was doing on the CKGE with Neo4j?

MR. BEENE:  Same objection.

THE WITNESS:  He continued to work.  I believe at that time we were not using -- we had not started to use Neo4j.  I believe we had -- they brought up ONgDB.  And so we worked -- so eventually -- and it was not immediate, given some background clearances and other stuff that had to be reactivated and all that.  But around that point in time, I believe ONgDB was discussed with us along with GraphGrid as sort of the larger set of technical capabilities.  So I don't -- I cannot say with certainty that that version of Enterprise Edition that was prior was used when the work started up again.

///

BY MR. RATINOFF:

1      Q.   Okay.   That wasn't quite what I was

asking --

      A.   Okay.

      Q.   Let me ask a different question.   So when

the Order for Supplies or Services was awarded to

Mr. Suhy at eGovernment Solutions, Mr. Suhy began

working again with the development of the CKGE

platform.   Correct?

      A.   Yes.   Correct.   Sorry if I overcomplicated

it.

      Q.   And at that time, the IRS was still using

some form of Neo4j Enterprise software?

      A.   Yeah.   We were still using the prior graph

database and UIs that we had before.   We were still

continuing to let users work with that.

      Q.   And then you were -- okay.   And then at

that point the CKGE was still in development phase?

      A.   Correct.   Yes.

      Q.   So there was only -- when you said

development phase, what does that mean in terms of

versus production?

      A.   So it was not for regular use.   So I

contrast that with sort of those two, you know,

those two things I was talking about that we started

78

1    off with.  We were allowing users to use that

2    regularly.  The disc work that John Mark Suhy was

3    picking back up on was just him working with the

4    project team members on requirements of feedback on

5    how things were progressing with the UI, changes,

6    working on understanding how to bring in the two

7    separate graph database data that was separate into

8    one and starting to work on some of the security

9    audit features.  So that -- he was working on that

10   with the project team, some testers were testing it

11   eventually later on.  So it was very -- there was,

12   you know, nobody was regularly using it as a tester

13   or anything like that.  Does that make sense?  I

14   don't know if I'm explaining it.

15        Q.  Sure.  Sure.  When you say the user

16   interface, you're talking about the user interface

17   that's integrated with the Neo4j graph database.

18        A.  No.  No.  This is a separate user interface

19   that came with the Government Edition that sort of

20   sits above the graph database, in fact above a

21   middle tier that's sort of like a micro services

22   layer.  So the UI sits above that.  That's the user

23   interface that we started work on under PureThink

24   and was the main interest to get that user interface

25   to what the stakeholders and project team wanted so

79

1    that user -- we could eventually have users work

2    with it.  So not the one that's integrated in -- not

3    the browser UI that essentially comes with Neo4j.

4    This is a separate -- I'll call it application.

5         Q.  But ultimately the application would allow

6    the user to interface with Neo4j through those

7    layers that you discussed.

8         A.  Yes.  Correct.

9         Q.  And you had mentioned -- I know you talked

10   about ONgDB.  We'll get there.  But prior to the

11   time the IRS started using ONgDB, was there -- did

12   it become aware of any licensing changes that Neo4j

13   made to its Enterprise Edition?  So this would be,

14   you know, around the same time that Mr. Suhy and the

15   IRS entered into the purchase order that we looked

16   at as Exhibit 103.

17        A.  I -- I don't know separately, but I think

18   through at least conversations at that point there

19   was -- it was presented or told to us about the

20   Enterprise Editions.  There were some additional or

21   I guess I would call it additional licensing

22   requirements for the Enterprise Edition.  But I -- I

23   don't -- I don't know -- I don't feel like we

24   were -- we did anything separately 'cause we weren't

25   really doing -- I mean we weren't -- whatever was

                                                      80

1    with PureThink, that product, when the period of

2    performance ended, was just sitting there.

3         Q.  Okay.  So then in May of -- they've got --

4    in May of 2018, the IRS was using some form of Neo4j

5    Enterprise in the CKGE.  Correct?

6         A.  When -- so we were not using that CKGE

7    stack once the PureThink -- pure performance ended.

8    It was just sitting there.  We were using what we

9    had already before PureThink.

10        Q.  Okay.  But was that Neo4j Enterprise or

11   Community Edition?

12        A.  It was originally the Community Edition.  I

13   think, if I remember right, in the fall -- let me

14   remember.  Yeah.  I think in the fall we made -- the

15   direction was to just get off of -- if the -- if the

16   Neo4j edition that was with PureThink had been, you

17   know, stood up, instantiated, to remove that.  So

18   whatever was with the PureThink edition, I remember

19   that going through and people just making sure that

20   we didn't have the PureThink one in use anywhere.

21        Q.  Okay.  Let me go ahead and mark the next

22   exhibit.  This will be Exhibit 164.

23             (Exhibit 164 is introduced.)

24             THE WITNESS:  Okay.

25   ///

                                                         81

```
 1    BY MR. RATINOFF:
 2         Q.  This is a document that was produced by
 3    Neo4j.  It's an email from Mr. Zagalsky to yourself
 4    and copying Vivian Daniels and Renee Gross.  I'm
 5    sorry, Goss.
 6         A.  Yes.
 7         Q.  It's dated May 22nd, 2018.  Do you have
 8    that in front of you?
 9         A.  Yes.  I do.
10         Q.  Do you recall receiving this email?
11         A.  I don't recall receiving it offhand, but I
12    don't have any reason to not believe I didn't get
13    it.
14         Q.  That's your email address?
15         A.  So that's my email and I'm good.
16         Q.  Now, the first paragraph, it says, "It has
17    come to our attention that you intend to place a
18    HUBZone set-aside sole source order with eGoverment
19    Solutions, Inc. as described in Solicitation
20    5000007221."
21         A.  Yes.
22         Q.  And "to procure consulting services for the
23    CKGE project, including consulting services around
24    the open source version of Neo4j Enterprise
25    Edition."  Do you see that?
```

82

1        A.   Yes.

2        Q.   Is that an accurate description of what we

3   just looked at, Exhibit 103 was?

4        A.   Yes.   That makes sense.   Yes.

5        Q.   So then the actual contract with

6   eGovernment Solutions we looked at, that was

7   actually a sole source contract.  Correct?

8        A.   No.   No.   It was -- as far as I know,

9   procurement did it as an open competition.

10       Q.   Were you aware of any other competitors

11  that bid on the --

12       A.   I don't think anybody -- I -- I don't think

13  anybody else bid.  I remember doing the market

14  research, and I remember other entities that I put

15  on market research.  So as far as I know, this was

16  not a sole source.

17       Q.   But that's a question procurement would

18  have the answer to for sure?

19       A.   I guess so.  Yeah.  Because, I mean, nobody

20  else bid on it from what I remember.  But I -- I

21  don't -- I -- I don't believe it was a sole source.

22  I don't ever remember doing anything sole source

23  after that dispute of the one we had just talked

24  about.  So the eGovernment Solutions was procured

25  through a HUBZone, and I believe it was, you know,

                                                        83

1    CKGE, which is that stack that came out of the

2    Government Edition development work.

3        Q.   Okay.   So just so we're clear, when

4    eGovernment Solutions got the award, it was to

5    essentially start work on the CKGE that had been

6    left off with PureThink.   Is that correct?

7        A.   That's correct.   Yes.   Those components.

8    Yes.   But didn't necessarily mean that it was -- I

9    don't remember at the time particularly what we were

10   going to do with the Neo4j.   I don't know if we

11   were -- I think there was even discussion, I

12   believe -- now I'm speculating.   Never mind.

13       Q.   Okay.   Yeah.   We don't want you to do that.

14       So in May of 2018 when Mr. Suhy was brought

15   back, was part of his statement of work was for him

16   to continue working on integrating the UI in Neo4j

17   into what was going to be the CKGE?

18       A.   Yeah.   It's just I don't know -- I can't

19   remember what exactly was going to be the subject of

20   Neo4j, though.   And by that I mean what version or

21   anything we were going to use.   It was -- again,

22   sort of the primary focus was on the user interface

23   and some of the security stuff, and I don't even

24   know if it -- what version of Neo4j it was even

25   discussed as what to use or not to use at that

85

1      point.  It was really just getting his professional

2      services back so that we could primarily start

3      working on the UI at the beginning.  That was the

4      primary, the important thing and some of the

5      security stuff.

6            Q.  Okay.  And then you'll see that there's a

7      reference to -- looking -- going back to

8      Exhibit 164.  So if you look at the page where it

9      says -- let's see where we're at.  You'll see a

10     reference to the Commons Clause.  You see that?

11           A.  Yes.

12           Q.  There's a --

13           A.  Wait.  I'm sorry.  What was the attachment?

14     I had to delete a bunch just so I could --

15           Q.  Oh.  Sure.  No problem.  So looking at --

16     in the chat it would have been tab 449, which I've

17     marked as Exhibit 164.  That's not going to show,

18     but that's what I'm going to refer to as 164.  If

19     you look at page 2 of 3, there's a -- it's -- the

20     Bates number at the bottom is 19999.  Do you see

21     that?

22           A.  Now, I'm still -- I'm sorry.  I'm trying

23     to --

24           Q.  I can share my screen if --

25           A.  If you could do that, because I'm trying to

                                                              86

1  interest in that, it didn't matter what else we had,

2  really, because there was hardly any other -- you

3  know, we had users and interested users, but it was

4  about the user interface, people wanted changes to

5  that, there were issues with doing accounts

6  management, and how the old UI is, so we wanted

7  something improved.  So those were the primary areas

8  of work that were the most important.  And I don't

9  ever necessarily remember us talking specifically

10 about Enterprise Edition this or Enterprise Edition

11 that.

12         I will say I don't think anybody -- and I

13 feel this from the directors and anybody, there

14 was -- there was openness.  It was just not really,

15 you know, for whatever product.  It wasn't really

16 particular to any particular product.  It was just

17 the primary interest was working on the user

18 interfaces and those priorities that I mentioned.

19     Q.  So the user interface was important for --

20 to get people to be able to use graph database

21 software such as Neo4j.  Correct?

22     A.  Yeah.  Any -- to -- yes.  I think that's

23 perfectly good statement.

24     Q.  But in other words, the user interface

25 wasn't useful other than to interface with group

                                                      93

1    it's probably 2019, 2020.  I'm still in 2018.

2              So for 2018's purpose, or at that time

3    the -- let me actually, maybe this will help.

4    Actually, let me ask you about this email real

5    quick, and then we can move to that.

6              You'll see this is an email from Mr. Suhy

7    to yourself --

8         A.  Okay.

9         Q.  -- dated May 22nd, 2018.

10        A.  Okay.  Yes.  I see it.

11             (Exhibit 165 is introduced.)

12   BY MR. RATINOFF:

13        Q.  We'll mark it Exhibit 165.  This email was

14   produced by Mr. Suhy or one of his entities.  Do you

15   have any reason to believe this isn't an email that

16   was sent to you by Mr. Suhy?

17        A.  I don't think -- no.  I don't.

18        Q.  No reason to believe this isn't a true and

19   correct copy of an email?

20        A.  No.  I don't.  No issues.

21        Q.  Do you understand why Mr. Suhy was sending

22   you this email from your perspective?

23        A.  I have to --

24        Q.  Go ahead and take a minute.

25        A.  Okay.  I've read it.  Yeah.  So he's -- if

                                                      96

 1   I'm reading this right, he's describing sort of

 2   using what's called the Neo4j Enterprise open source

 3   version and what that means as it relates to AGPL

 4   and then the Free Software Foundation's guidance on

 5   the matter, et cetera.

 6        Q.   And did you have an understanding between

 7   what we were just looking at as Exhibit 164 and 165

 8   that there was two different versions of Neo4j 3.4

 9   Enterprise Edition?

10        A.   There were two different versions?  I

11   don't --

12        Q.   Let me ask it a different way.

13             Did you understand that there was two

14   different licensing models for Neo4j 3.4 Enterprise

15   Edition?

16        A.   I can't say that I did.  No.

17        Q.   Did the IRS have any -- or did the IRS look

18   into anything related to whether Neo4j could add the

19   Commons Clause to its Enterprise Edition software

20   under the AGPL?

21        A.   I -- I don't believe it was done.  No.

22        Q.   So did the IRS ever contact the Free

23   Software Foundation to see if Neo4j was wronging

24   Mr. Suhy in adding the Commons Clause to the AGPL?

25        A.   I never did and I don't know any -- I don't

                                                          97

1    remember anybody else contacting them or anything.

2    No.

3         Q.  Did the IRS take anything that Mr. Suhy

4    represented as far as Neo4j adding the Commons

5    Clause, that being improper?  Just assumed that

6    Mr. Suhy was correct?

7         A.  I -- I don't -- I don't feel like anybody

8    assumed -- the way I would express it is I don't

9    feel like anybody assumed necessarily one way or the

10   other.

11        Q.  You mean -- you say assume.  You mean the

12   IRS --

13        A.  Yeah.  Yeah.  Reading his -- reading his

14   email or that kind of stuff, you know, taking a

15   particular side at that point or anything.

16        Q.  So as of that time in May 2018, the IRS

17   didn't have an opinion on or position on whether

18   Neo4j adding the Commons Clause to the AGPL version

19   3.4 was improper or not?

20        A.  I don't think so.  No.  I don't feel that

21   way.

22        Q.  Hold on just a second.  I'll put the next

23   exhibit in.  This maybe will help clarify what

24   version the IRS was using at that point.

25        A.  Okay.  Email dated 6/14/2018?

                                                    98

1    Q.  Yeah.

2    A.  Okay.  Yep.

3    Q.  Okay.  And then you'll see this is produced

4    by iGov, and it's an email that's dated June 14,

5    2018.  It's from yourself -- at least the last email

6    is from yourself to Mr. Suhy.  And you'll see below

7    there's an ongoing exchange between yourself and

8    Mr. Suhy.

9    A.  Yeah.  Switching to community?

10   Q.  Yeah.  Let's go ahead and go all the way

11   down to the bottom.

12   A.  Okay.

13   Q.  First, do you have any reason to believe

14   this email exchange, that this is a true and correct

15   copy of the email exchange you had with Mr. Suhy?

16   A.  I don't have any issues.

17   Q.  Okay.  So then looking at the first email

18   in the chain, which would be at the bottom --

19   A.  Yes.

20   Q.  -- June 14th, 2018.

21   A.  Okay.

22   Q.  It's from you.  It says, we got a few

23   questions regarding this option switch our CKG

24   instance from having 3.2 Enterprise to 331 Community

25   Edition.

99

1    A.  Okay.

2    Q.  Does that help refresh your recollection as

3  to what the IRS was using in the CKGE as far as

4  Neo4j software goes as of June of 2018?

5    A.  Sure.  If that is that was it, yeah.  Then

6  that's it.

7    Q.  So as of June 2018, CKGE was using 3.2

8  Enterprise Edition of Neo4j?

9    A.  Yeah.  It would have had that.  Yeah.  Yep.

10  That will work.

11    Q.  Then why were you asking Mr. Suhy about

12  switching from 32 Enterprise to 3.3.1 Community

13  Edition?

14    A.  Kind of -- I would think back to sort of

15  what I was talking which was given the amount of

16  users, the demand requirements, just it wasn't

17  necessary to have any of the Enterprise features.

18  And so, you know, I think we may have been, you

19  know, just wondering just to use the Community

20  Edition instead of whatever was happening with the

21  Enterprise Edition or moving forward.

22      So that's my general view is the

23  requirements of Neo4j from our standpoint I don't

24  believe required any of those Enterprise features

25  about the clustering or any of that.  So I would

100

1   have been asking him sort of, well, what would it

2   take to just switch out from one -- you know, to the

3   Community Edition.  Like technically level of

4   effort, what would it have been.

5        Q.  And then you'll see Mr. Suhy responds.  I

6   think he quotes the Commons Clause again, which we

7   saw in the prior exhibit.

8        A.  Okay.

9        Q.  By the way, I don't think I actually marked

10  this exhibit.  I believe this would be Exhibit 166.

11        (Exhibit 166 is introduced.)

12  BY MR. RATINOFF:

13        Q.  Turning back to Exhibit 166, you'll see

14  there's an email response to your questions for

15  Mr. Suhy.  And if you go to the bottom of, it's

16  231.001, so it's really the first page.

17        A.  Okay.  I think I see it.  Yes.

18        Q.  And Mr. Suhy says, "I don't think you

19  should consider moving to Community."

20        A.  Yeah.

21        Q.  And if you see it, he references, "You will

22  be much safer adopting the open fork we manage than

23  moving to Neo4j's Community Edition."

24             What did you understand that to mean?

25        A.  That there was this open fork version that

1    was, I guess, available or out there for potential

2    use.

3         Q.  Why would the IRS move to a open fork Neo4j

4    Enterprise versus just using Neo4j Community Edition

5    if it didn't need new features?

6         A.  I don't know.  I think that was what John

7    Mark Suhy's, you know, reply to me was.  Again, I

8    was thinking of just using the Community Edition.  I

9    think he was suggesting not just using the open

10   fork, which would have been, I guess, an open source

11   version with the, you know, those Enterprise

12   features or whatever Enterprise features were

13   available as part of that fork.  So I think that's

14   him, you know, arguing back to, you know, his advice

15   is to go this way versus Community Edition.

16        Q.  But you went ahead and took his advice as

17   far as sticking with Enterprise Edition?

18        A.  I don't -- I'm not sure at this time what

19   the decision was.  What I remember was it was around

20   the topic of ONgDB.  And that's why I remember most,

21   you know, and GraphGrid and stuff.  But -- I mean,

22   yeah, so I don't know -- I don't know what we

23   were -- if we were using -- I don't think we did

24   the -- I'm trying to remember when some of the

25   events about ONgDB and what was happening with that,

102

1    what time that was, and I can't remember that.

2         Q.  Yeah.  We'll get there.  I'm just trying to

3    go in a linear fashion.

4         A.  I know.  I'm sorry.

5         Q.  That's okay.

6         A.  I'm trying to fit things together.  But

7    what I see there is whatever was happening was that

8    discussion.  And again, I was -- I was looking at it

9    from the point of Community Edition just being

10   sufficient.  And I think he was arguing that this

11   open source fork one was available and would have

12   these, you know, would have these additional

13   features.

14        Q.  Then as far as, as far as the Enterprise

15   Edition went, did you have an understanding at that

16   time that a commercial subscription to Neo4j

17   Enterprise would come with support?

18        A.  Yes.  Yes.  I believe there was some

19   professional services -- yeah.  As far as I know,

20   yes, in my mind.  There was some degree of

21   professional services, or I call professional

22   services that comes with the licensing.

23        Q.  So if you buy a commercial license, it's

24   not just -- for Neo4j Enterprise, it was not just

25   about additional features.  It's also about -- it

                                              103

1    also includes support services.  Correct?

2         A.  Yes.

3         Q.  So there's more of a benefit than just the

4    features themselves to the purchasing a commercial

5    subscription to Neo4j Enterprise, then.  Correct?

6    In other words, if you're not using the features,

7    you're still getting additional benefits.

8         A.  From like the professional services help,

9    those kinds of stuff, yes.  So I think you can

10   get -- those are -- those are additional features --

11   those are additional benefits to it than just the

12   features.  Yes.

13        Q.  And then moving on to the bottom of this,

14   you'll see -- I think you might have referenced this

15   before, but it says, "I.e., GraphStack (renamed from

16   Neo4j Government Edition) is a competing platform

17   alternative to Neo4j Enterprise commercial

18   packages - with exact feature set because of the

19   open source nature of Neo4j."

20             What was your understanding of what

21   Mr. Suhy was referring to, this GraphStack?

22        A.  Sorry.  I'm just looking over it.  Okay.

23   So the GraphStack at that point was, I would assume,

24   involving that version of Neo4j.  And I don't know

25   at that time how -- I really don't know how I would

104

BY MR. RATINOFF:

    Q.  Okay.  At that time in June of 2018, had the IRS adopted GraphStack for the CKGE --

    A.  I -- I don't think so because -- and I may be getting ahead of you.  So tell me if I stop.  But the -- there was a process that happened with GraphGrid and discussions about GraphGrid, and then we moved forward with submitting GraphGrid, which included GraphStack elements and ONgDB.  I feel like it was later in the summer or sometime, but I feel like it took -- it was not -- I don't feel like everything happened at that time period.  I feel like we're still back to like -- there's still time ahead before we settle ultimately -- as you probably know, you know, we settled on getting GraphGrid and all of that bundle.  So that's sort of where I'm at.

    Q.  Okay.  And then during that time did you have any -- did the IRS have any conversations with Neo4j about possibly adopting, at least as part of that project, Neo4j Enterprise under a commercial license?

    A.  I don't -- no.  I don't -- I don't think at that time -- I don't remember much -- I didn't and I don't remember other people talking to Neo4j at all during that time.  No.

1    Q.   Okay.   Let me go ahead and mark the next

2   exhibit.   That will be Exhibit 167.

3           (Exhibit 167 is introduced.)

4           THE WITNESS:   Is the end of it 061?

5   BY MR. RATINOFF:

6    Q.   Yeah.   The first page would be 061

7   through -- it's quite a long email --

8    A.   Okay.

9    Q.   -- 067.

10   A.   Okay.

11   Q.   What I just marked as Exhibit 167 is an

12  email chain between -- it looks like it's between --

13  well, there's multiple emails in it, but the last

14  email is between Lisa Rosenmerkel and Jason Zagalsky

15  of Neo4j.   Do you see that?

16   A.   Yep.   Okay.   Yep.   I do.

17   Q.   And then if we scroll down to 063, there's

18  an email from Lisa that says, "Jason - Thanks for

19  reaching out.   As I am sure you will understand

20  given the state of the IRS budget, our resources are

21  extraordinarily limited in all avenues.   Those

22  restricted resources prevent us from moving beyond

23  Neo4j v. 3.2 at this time."   Do you see that?

24   A.   What page?   I'm sorry.   It's cutting off

25  the -- all I see is like N4J_020061, and I don't see

109

1   anything else.

2        Q.   Yeah.  If you scroll down, it would be page

3   3 of 7 of the PDF.

4        A.   Okay.  Cool.  Okay.  I'm there.

5        Q.   Then you'll see there's a prior email --

6   actually just start from beginning here.  If you go

7   to the bottom, you'll see -- we previously looked at

8   that email from Jason that he sent to you on

9   May 22nd, 2018.  You see that at the very bottom?

10       A.   Yes.

11       Q.   Starting page 064.

12       A.   Okay.

13       Q.   Then we'll move up here.  You'll see that

14  Jason follows up with you requesting confirmation.

15  You see that?

16       A.   Yes.  I do.  I do.  I do.  Yeah.  The time

17  is Tuesday, May 22nd.

18       Q.   Yeah, 6:59 p.m.

19       A.   Okay.  I'm there.

20       Q.   And then in response to that email from

21  Jason to you, Lisa says, Thanks for reaching out.

22  As I'm sure you'll understand given the state of the

23  IRS budget, et cetera.  Do you see that?

24       A.   Yes.  I do.

25       Q.   There's a reference to Neo4j 3.2.

110

1          A.   Okay.

2          Q.   So back to May 2018, it looks like the IRS,

3    whatever it was working with at the time in the

4    graph environment, it was using Neo4j Enterprise 32.

5    Does that sound fair?

6          A.   I think that's -- that's perfectly fair.

7          Q.   And then at this point you'll see that Lisa

8    says, if your team would be up for providing a demo

9    of the products you recommend we consider when

10   resources become available, we will gladly set that

11   up.  Do you see that?

12         A.   Yep.

13         Q.   And if you keep going up, you'll see that

14   Lisa -- it is the email from Lisa to Jason dated

15   May 25th, 2018 at 10:40 -- I'm sorry, 10:04 a.m.  Do

16   you see that?

17         A.   Wait.  The 25th at 10:04.  Yes.  I'm there

18   on page 2.

19         Q.   It says, "Hi Jason - I think both meetings

20   sound good."  And "I would at the very least like to

21   loop in Chris Hess and Jeff Butler."

22         A.   Okay.

23         Q.   And moving up you'll see -- I'm just trying

24   to refresh your recollection to see if this is now

25   bringing back in your memory if you had an actual

                                                      111

```
 1        Q.  All right.  Do you recall having a meeting
 2   with Jason within the next couple months after May,
 3   so say July 2018?
 4        A.  No.
 5        Q.  Let me go ahead and drop this next exhibit.
 6   It will be Exhibit 168.
 7            (Exhibit 168 is introduced.)
 8            THE WITNESS:  Okay.  File 130?
 9   BY MR. RATINOFF:
10        Q.  Yeah.
11        A.  Okay.
12        Q.  I'm sorry.  You said file 130?
13        A.  Yes.  I'm looking at file --
14        Q.  Oh.  Bates number ending in 130.  Correct.
15   Let me just get it clear for the record so we're
16   talking about the same thing.
17            So I just marked as Exhibit 168 an email
18   that ends in a chain dated July 27th, 2018.  Bates
19   number at the bottom of the first page is 20130.
20   This is an email produced by Neo4j.  And you'll go
21   ahead and look now -- let's go down to the bottom of
22   this email chain, so this is going to be starting
23   page 133 or Bates number ending in 133.  And you'll
24   see --
25        A.  Okay.  Very bottom.  Right.
```

1    Q.  Sure.  And it starts off actually on 132.

2    It's an original appointment from Michael Dunn sent

3    on May 24th, 2018, and you'll see there's a list of

4    recipients including yourself, Lisa, Jeff Butler,

5    there is a JC Garnish, Brian Raub, Jason --

6    A.  Yep.

7    Q.  -- and Chris Hess and then Matthew Scoffic.

8    A.  Yep.  Matt Scoffic.  Yes.

9    Q.  Subject:  Discussion of Neo4j options.

10   A.  Yep.  Yes.

11   Q.  Do you have a recollection now of setting

12   up a meeting with Neo4j in July of 2018 to talk

13   about Neo4j products and seeing a demo of the newer

14   Neo4j Enterprise software?

15   A.  I still don't.  No.  Was I there?

16   Q.  I don't know.

17   A.  I said --

18   Q.  I assume that, you know, is it a safe

19   assumption that you were the one who organized the

20   meeting if you're the sender of the appointment?

21   A.  I'm -- on that email, it looks like I

22   sent -- on that, yeah, on that email looks like I

23   sent it out to everybody, and then I said Lisa is

24   going to pick everybody up at the guard's desk.  So

25   I -- I don't think I was there.

114

1    Q.  Okay.  Going up to Lisa's next email, it
2  says, "Hi Jason - I spoke with Mike about your
3  concerns regarding the amount of storage included in
4  the quote information.  Mike estimates we are
5  currently using about 300 gigabytes."  Do you see
6  that?
7    A.  Yes.  I see that line.
8    Q.  Do you have an understanding what she's
9  referring to your estimate?  I'm assuming Mike is
10  you.  Is that correct?
11    A.  Yeah.  Must have been me.  I can't think of
12  anybody else.
13    Q.  300 gigabytes, is that in reference to
14  memory?
15    A.  Probably, because if that was the size of
16  the graph -- the data together, I think we were
17  estimating like how much would be in memory or how
18  much storage it would be.  So that -- that seems to
19  fit with sort of the size of the data we were
20  talking about.
21    Q.  Okay.  By the way, I just noticed this
22  document wasn't designated as confidential, so I
23  just want to make sure -- maybe we can substitute
24  during the break or get it stamped, but I wanted to
25  let everyone know that this document should be

115

1    designated by Neo4j as confidential.  I'm really

2    sure why it's not actually stamped on the document.

3    It should be treated as such under the protective

4    order.

5            Then you'll see Jason responds to Lisa,

6    "For large memory configs, we build in blocks of 24

7    cores/256 gigabytes RAM.  So even if you don't need

8    more than 12 cores, with 512 gigabytes of memory

9    (gives you some headroom on the 300 gigabytes you

10   have), you will be licensed for up to 48 cores, if

11   you want to cut your servers back from 1 terabyte of

12   RAM to 512 gigabytes of RAM."

13           (Reporter interruption.)

14   BY MR RATINOFF:

15       Q.  So looking at the email where Lisa says we

16   build -- sorry -- where Jason says we build in

17   blocks of 24 cores, then there's a reference to 300

18   gigabytes, do you have a better understanding of

19   what the 300 gigabytes was in reference to as far as

20   the server memory versus storage memory?

21       A.  Yeah.  Let me just read it -- I think I

22   agree.  Yeah.  So when I told Lisa 300 gigabytes, it

23   was -- it was -- when I would have thought that I

24   would have replied to her was how big of, you know,

25   RAM or storage, and since to bring the graph into

116

1    memory, if you brought the whole graph in, we are

2    essentially saying, well, we have about 300

3    gigabytes of data, so that's what would be brought

4    in.  I figure she's passing that on to Jason and

5    kind of talking about those parameters.  And then

6    Jason is replying sort of, okay, taking that

7    information, here's how we would price that out

8    and -- and sort of here's what the pricing would be.

9        Q.  Okay.  From what Jason's written here, is

10   that a pretty comprehensive estimate of what the

11   CKGE needs were at that time?

12       A.  Yeah.  Because this is the way that I'm

13   reading it is we were talking about the size, 300

14   gigabytes.  And then where he says even if you don't

15   need more than 12 cores.  So I'm assuming we were

16   still talking about like 12 cores.  Or somebody was

17   telling him about 12 cores that brought it up.  I

18   mean, I remember -- like I said, going back in time,

19   I was using 12 cores.  So I'm sure it was discussed

20   then, and he's replying yeah, even if not 12 cores,

21   here's the options.

22       Q.  Okay.  And then so as of -- I know we

23   talked about cores in 2017, but in July of 2018, was

24   the IRS still using only 12 cores for the CKGE

25   platform?

117

1    wanted to, I don't -- I don't know if we would be

2    using 12 cores.  My belief is we wouldn't.  Maybe

3    four.  Maybe -- maybe eight.  I don't know.  Because

4    we are talking about dozens of people an hour maybe

5    logging in and running a query or two.  So it wasn't

6    that many concurrently, if that makes sense.

7         Q.  Okay.  But that's as of approximately

8    July --

9         A.  Yeah.  As of that time.  Yes.

10        Q.  But things changed as CKGE became more

11   widespread adopted amongst the folks --

12        A.  Yeah.  Over the years.  Yeah.

13        Q.  That would require additional cores and

14   memory and such when the number of users increased?

15        A.  Yes.  I think it could.  Yes.

16        Q.  Okay.  I know we've been going for awhile.

17   Probably a good time -- I'm going to switch topics,

18   so maybe take a break right now.  And actually, if

19   you don't mind, before we do that, just a real quick

20   question.

21            At the very end of the email Lisa says --

22   and this would be the top email.  Lisa says to

23   Jason, "Thank you for providing the pricing.  It

24   will be an important component for planning

25   purposes."

                                                          120

1         Do you have an understanding of why pricing

2    was important to the IRS for planning purposes at

3    that time?

4         A.   Well, if -- if there was availability of

5    money ahead, if we had the money ahead, would -- you

6    know, and we felt like we, you know, needed some

7    additional capabilities, my -- my -- I'm

8    interpreting her as we have this in case something

9    changes ahead for us, and that way we know sort of

10   the cost and what you get with it, et cetera.

11        Q.   So in other words, there's an understanding

12   that the paid commercial license with Neo4j wouldn't

13   necessarily increase whatever amount was budgeted

14   for the CKGE if the IRS were to go forward with a

15   paid subscription?

16        A.   I'm sorry.  Can you say it one more time,

17   please?

18        Q.   Sure.  So another way of looking at it is a

19   commercial subscription to Neo4j Enterprise would

20   necessarily increase whatever budget was needed for

21   continuing to develop the CKGE platform.  Correct?

22        A.   Yeah.  We would have to have additional

23   money.

24        Q.   At that time did the IRS -- or did your

25   particular division see if any additional money was

                                                        121

1   available for commercial subscription for Neo4j

2   Enterprise?

3       A.  So I feel like that was -- where she was

4   talking about I have spoken at length with Jeff, so

5   my -- you know, they would have been talking about

6   what monies were available, what were already

7   obligated.  So I'm assuming that that was part of

8   that conversation.

9       Q.  But you weren't part of that conversation.

10      A.  I don't -- she was saying she spoke -- she

11  had her own conversations with Jeff.  I mean, I -- I

12  was part of conversations about, you know, as we

13  were discussing there, how much sizing and

14  et cetera, usage.  I feel like -- I don't know if --

15  I don't remember being there with Lisa -- I remember

16  being there in a number of conversations about sort

17  of using the money and how much money we had and

18  talking to Jeff, but I don't know if that was that

19  exact conversation.

20      Q.  Okay.  So you aren't privy to any

21  conversation where it was decided that an additional

22  156,000 per year for Neo4j Enterprise subscription

23  would have been a problem as far as obtaining funds?

24      A.  I was in a conversation with Jeff and

25  others that were providing sort of the pros and cons

                                                    122

1  of different, you know, options or what -- what

2  could be done.  So I was in at least one meeting

3  with Jeff and others as we were discussing it.  And

4  I don't know if that was -- let me see if I -- it

5  must have been somewhere around there because this

6  was what, June?

7      Q.  July.

8      A.  July 27th.

9      Q.  2018.

10     A.  Yeah.  So I would have been -- I would have

11 been involved at least a conversation.  And I know I

12 was involved with one conversation where we were

13 talking about just the options, and Jeff was sort of

14 listening to different people's view.  And then I

15 think Jeff -- Jeff would have decided at that point,

16 you know, we didn't have -- we didn't have the, you

17 know -- I think it was in the context of, you know,

18 what about the options of any open source and how to

19 use that money.  And I think Jeff determined that at

20 that point not to spend on the Enterprise Edition.

21 And -- and either look at other options.

22     Q.  Other options being just continuing to use

23 open source Neo4j for free?

24     A.  Yeah.  One of those -- I don't think -- I

25 don't think there was any -- I don't think at that

123

1   time we were talking about any other graph databases

2   and stuff.  So I feel like it was just what to do

3   with that, and he was thinking about how to spend

4   the different money.

5            MR. RATINOFF:  Okay.  All right.  I think

6   this is a good time to take a break.  It's 11:42.  I

7   know it's sort of lunchtime or past lunchtime.  Do

8   you want to take a little bit longer break right

9   now?  I still have quite a bit of ground to cover,

10  so I want to make sure you're doing okay on your

11  end.

12           THE WITNESS:  I'm okay.  I'm just -- I'm

13  just hoping to answer your questions as fast as I

14  can so I can get back to work.

15           MR. RATINOFF:  Understood.  So I know we're

16  kind of at lunchtime on the West Coast, too.  It's

17  11:43.  Does everyone want to just take a half an

18  hour break?  Is that fair?

19           MR. TEPPER:  Before we make a determination

20  about a half-hour break or anything, I'm going to

21  ask, you know, Michael what time does -- you know,

22  because it's 2:42 where we are.  What time do you

23  typically finish up your day?

24           THE WITNESS:  Well, it would be -- you

25  know, I guess I can normally clock off at 3:30.  But

                                                    124

```
 1                    AFTERNOON SESSION
 2           THE VIDEOGRAPHER:  We are now back on the
 3   video record.  The time is 12:16 p.m.
 4   BY MR. RATINOFF:
 5       Q.  Let's go ahead and pick up where we left
 6   off.  I believe we were in the summer of 2018.
 7   Definitely in summer of 2018 the IRS had gone
 8   forward with working with Mr. Suhy via eGovernment
 9   Solutions.  Correct?
10       A.  Correct.  I think at the time we're at the
11   award has been made, and he's, you know, being
12   on-boarded and starting to talk about sort of ideas
13   and stuff.
14       Q.  Okay.  And then the ideas as far as where
15   the CKGE environment was going as far as --
16       A.  Yeah.  Yes, sir.  What the interests were,
17   you know those kinds of things, what the project
18   team was interested in, plans, that kind of stuff.
19       Q.  And so was he being asked or he was taking
20   input from the IRS to come up with some sort of
21   architecture for what the CKGE environment would
22   look like?
23       A.  Yes.
24       Q.  All right.  Let me -- as far as the CKGE
25   environment, it was still decided to use some form
```

126

1    of Neo4j graph database software.  Is that the graph

2    database for the CKGE?

3        A.  Yes.  Sorry.  Yes.  Because, again, I'm

4    trying to remember when GraphGrid and all that came

5    into context, which was either around this time or,

6    you know, shortly -- shortly thereafter where we

7    started getting into ONgDB.  But whatever we had at

8    that time would have been sitting there.  But I

9    believe John Mark would have been cleared, because

10   he would have still had his clearance.  So we would

11   have been sort of -- sort of talking about, you

12   know, plans, future requirements, all of that, and

13   would have been, you know, talking about whatever --

14   whatever graph that database, whatever version it

15   was that we had.

16       Q.  Okay.  So let me pinpoint that time for

17   you.  Here's what I'm dropping in the chat.

18       A.  Okay.

19       Q.  It should be tab 454, which I'm going to

20   mark as Exhibit 169.  You'll see it's an email

21   exchange between yourself and Mr. Suhy.

22       A.  Okay.

23           (Exhibit 169 is introduced.)

24   BY MR. RATINOFF:

25       Q.  With the last email dated August 13th,

1    2018.  You see that?

2         A.  Okay.  I got it up.  Yes.

3         Q.  Do you have any reason to believe this

4    isn't a true and correct copy of an email exchange

5    between yourself and Mr. Suhy?

6         A.  I have no issues.  Yes.

7         Q.  And just for the record, this was an email

8    that was produced by iGov, Inc.?

9         A.  Okay.  Yes.

10        Q.  You'll see at the very bottom of the email

11   exchange -- at the very beginning I guess, so that

12   would be on 217.0002.

13        A.  Okay.  I'm there.

14        Q.  You ask John Mark would it be easier to go

15   ahead and use ONgDB now in CKGE or wait and deploy

16   CKGE with Neo4j 3.3.2 we have, and then later

17   transition to ONgDB.  Why were you asking him that?

18        A.  I mean I -- go ahead and use ...  Maybe

19   just level of effort and complexity.  Sort of

20   proposing cons of each.  Because my assumption would

21   be by this time the topic of ONgDB is there and the

22   decision was made, I'm assuming at this time, that

23   we were -- we would go with ONgDB.  If not, it was

24   just talking about sort of the pros and cons of it.

25        Q.  And what was your understanding of what

                                                          128

1   ONgDB was at that point?

2       A.  At that point, my understanding was ONgDB

3   was an open source available graph database that

4   was -- that used the GitHub core source code

5   compiled and then additional plug-ins were added to

6   it and made available through The Graph Foundation's

7   website.  Or through there.  Sorry.

8       Q.  Okay.  Let's break that down.  So as far as

9   when you say ONgDB core source code, are you

10  referring to Neo4j Community Edition?

11      A.  I didn't -- it was not the binaries.  It

12  was my understanding from -- and this was from John

13  Mark Suhy.  I believe at that time because we were

14  talking about GraphGrid, and it was part of the

15  GraphGrid bundle.  Ben Nussbaum may have been on the

16  line, too, but it was a description that there

17  was -- it was not the binaries.  It was the source

18  code itself that came from a GitHub repository that

19  Neo4j had.  And that source code was taken and

20  compiled into binaries and added the plug-in to make

21  the ONgDB version that was made available.  Does

22  that make sense?

23      Q.  Sure.  So it was your understanding that

24  ONgDB was based on Neo4j source code.  Correct?

25      A.  Yes.  Git -- sorry.  Go ahead.

129

1    Q.  So the Neo4j source code, Neo4j would own

2    the copyright to that.  Correct?

3    A.  Yes.  I would assume it would be available

4    based on whatever Neo4j allowed it to be used from.

5    Q.  When you are talking about the plug-ins,

6    are you referring to Enterprise-level features that

7    are enabled by plug-ins?

8    A.  Yeah.  I think so.  That makes sense.

9    Q.  Okay.  So your understanding was then ONgDB

10   was essentially the feature equivalent of Neo4j

11   Enterprise at that time?

12   A.  I don't know if I could say it was one for

13   one.  I just understood that there were the

14   Enterprise -- there were Enterprise features that

15   were added to the core -- the Neo4j core source

16   code, compiled, and then added to it to make the

17   ONgDB in that those were, or I guess somehow could

18   be connected to Enterprise version.  I feel like

19   that that term was used or at least the types of,

20   you know, with the -- I guess clustering and all

21   that stuff.  So I'd say yes, I think.  I would think

22   it had similar features.

23   Q.  Okay.  Features meaning Enterprise-level

24   features?

25   A.  Yeah.

130

1    Q.  Then as far as -- going back to the Neo4j

2    Community Edition, I had asked you whether you

3    understood there was a limitation of cores, and

4    maybe I wasn't as artful about it.  But did you

5    understand Neo4j Community Edition only allowed up

6    to the use of, from a performance standpoint, four

7    cores?

8    A.  I can't remember that, but I don't see any

9    reason that I would have known that at some prior

10   point in time.  So I would say yes, probably at that

11   point I would have known or been aware of it.  Yes.

12   Q.  Did you have any understanding of whether

13   there was any limitations on the number of cores you

14   could use with ONgDB?

15   A.  No.  I -- I did not -- I don't remember

16   ever hearing about limitations of cores.

17   Q.  But you understood that as far as

18   purchasing a Neo4j Enterprise subscription, the

19   pricing would be based on the number of cores at

20   least in part.  Correct?

21   A.  Yeah, I think so based on what we went over

22   today and stuff, yeah, it would be, there is a core

23   element to the Enterprise pricing.  Yes.

24   Q.  In addition to obviously the add-ons, like

25   the support and whatnot.

                                              131

1     A.  Yes.

2     Q.  All right.  So turning back to this email,

3  Mr. Suhy recommends to go with ONgDB version 3.4.x.

4  Was that the current version of ONgDB at that time

5  that you were aware of?

6     A.  Yes.  What -- yeah.

7     Q.  And what license -- and what licenses did

8  you understand that ONgDB was offered under?

9     A.  I -- I don't know if it was -- I can't

10  remember exactly what the ONgDB -- if The Graph

11  Foundation had a particular licensing, I can't

12  remember what that would be.  But I understood it to

13  be, you know, open source in that the -- the

14  requirements it was stated that, you know, we would

15  meet our requirements and we could use it.

16     Q.  For free.

17     A.  Yes.  For free.  It was -- it was

18  downloadable from The Graph Foundation website.  You

19  could use it for free.

20     Q.  Was the -- to your knowledge, was it

21  licensed under the AGPL version 3?  ONgDB, that is?

22     A.  It probably was.  I can't remember exactly,

23  but I don't -- that probably makes sense.

24     Q.  And if you remember before the break we

25  were talking about couple of emails, one sent by

132

1    Jason and one sent by Mr. Suhy.  There was reference

2    to Commons Clause.  Do you recall those emails?

3         A.  Yes.

4         Q.  And were you aware of whether at that time

5    that The Graph Foundation or Mr. Suhy had removed

6    the Commons Clause from the license that was

7    governing ONgDB 3.4?

8         A.  Yeah, because I don't -- yes.  Because I

9    don't remember it being discussed.  So it would have

10   been removed or whatever, was taken from the source

11   code off of GitLab, whatever that was releasable by.

12   That's how I understood was carried forward from

13   that.

14        Q.  I didn't get -- I didn't quite follow that.

15   I apologize.  To clarify, so you understood -- so

16   you understood that the license that ONgDB was under

17   was the AGPL version 3 but with the Commons Clause

18   removed by Mr. Suhy?

19        A.  Yeah.  I don't -- I don't remember if he

20   removed it.  I don't remember it being discussed.  I

21   just remember the description of taking the core

22   source code from GitLab, compiling it, and then, as

23   we discussed, adding the additional capabilities

24   that would be the ONgDB release.  So I can't

25   remember the Commons Clause being part of the

133

```
 1    discussion.  I can't remember if he said that he
 2    took it out or what, but I can't say that.  Yeah.  I
 3    just can't say that.  In my mind, I'm tracing it
 4    from the GitLab source code, whatever that licensing
 5    was, and then released by ONgDB under their
 6    licensing.
 7         Q.  Okay.  So you understood that ONgDB was
 8    released under a license issued from The Graph
 9    Foundation?
10         A.  Yeah.  Well, yes.  In this sense, that for
11    a member of the ONgDB or Graph Foundation website,
12    they were saying they were releasing it under
13    this -- this licensing agreement.  The Graph
14    Foundation itself.
15         Q.  So you understood The Graph Foundation was
16    the licensor for the ONgDB?
17         A.  Yes.  That was -- that was -- yes.  I think
18    so.  Yeah.
19         Q.  And it wasn't -- Neo4j was not the
20    licensee -- sorry.  Strike that.
21            So in other words, Neo4j was not the
22    licensor for ONgDB.
23         A.  Say that one more time, please.
24         Q.  So Neo4j, in your mind, was not the
25    licensor of ONgDB.  Meaning Neo4j -- Neo4j wasn't --
```

134

1    wasn't -- wasn't the -- wasn't the entity that was

2    licensing ONgDB.

3        A.  Right.  The Graph Foundation was.

4        Q.  I see.  Okay.  And where did you -- how did

5    you come to that conclusion?

6        A.  Well -- well, I mean, we had -- I remember

7    having conversations with John Mark Suhy walking

8    through, talking about the Graph Foundation, the

9    licensing, the entity itself and so -- you know, it

10   was sort of -- I was -- I guess I was looking at it

11   as -- as what the Graph Foundation was doing.

12       Q.  But to your knowledge, the actual software

13   functionally, ONgDB, was Neo4j Enterprise?

14       A.  My understanding it was not the Enterprise.

15   It was the core source code from GitLab, Neo4j's

16   GitLab, whatever that licensing was of that core

17   source code brought over, and then the additional

18   elements, whatever elements ONgDB, The Graph

19   Foundation added onto that.  That's how I understood

20   from my point of view who was -- who was

21   distributing and licensing it and the follow-through

22   from whatever the licensing was of the Neo4j core

23   that was off of GitLab.  That's how I understood it.

24       Q.  Okay.  And as far as the -- you said the

25   core, then there was the additional features that

135

1   Graph Foundation enabled.  Was it your understanding

2   that they were creating Enterprise features that are

3   equivalent to what was in Neo4j Enterprise

4   independently?

5       A.  Yeah.  I would -- I think -- yeah.  I mean,

6   I understood that they were adding in things that

7   the Neo4j, Inc. Enterprise Edition had as Enterprise

8   features.  They were in ONgDB.  That was being added

9   to the core that was compiled.

10      Q.  Okay.  So then the source code for the

11  Enterprise features didn't, in your mind, come from

12  Neo4j?

13      A.  No.  I don't think.  I mean, I -- I -- no.

14  I can't offhand think that, oh, they downloaded them

15  somehow or what have you from Neo4j itself.

16      Q.  Did the IRS ever do any independent

17  investigation to determine whether ONgDB was

18  entirely based on Neo4j's source code?

19      A.  I don't believe so.  I think the conver --

20  not on the source code.  It was a walk-through,

21  again, with sort of John Mark Suhy, I think Ben

22  Nussbaum was there at least for one, describing sort

23  of what The Graph Foundation was, what they were

24  doing, the process to what was distributed.  And the

25  only thing I remember is adding in plug-ins and code

136

1    to the core, and that became sort of the ONgDB.  So

2    that was -- that was the group, you know, having

3    John Mark walk through that process, and then

4    understanding The Graph Foundation was established

5    as an entity and, you know, making the product

6    available, you know, as open source.  I can't hear

7    you.

8         Q.  I apologize.  I had a bus going by.  I'm

9    right on the street.  So I tried to mute that while

10   you were testifying.

11            So what are your conversations with

12   Mr. Suhy about The Graph Foundation?  What did he

13   tell you about The Graph Foundation?

14        A.  Well, I believe he would have walked

15   through sort of the entity itself.  You know, the

16   elements of sort of it being, you know, what they

17   were trying to do, the formal setup of it, and then

18   what the -- you know, what the ONgDB product, I'll

19   call it product, was and how it was made and under

20   what reasoning and basis.  That's about what I

21   remember just going through that.  Not just myself

22   but, you know, there were others who listened in and

23   sort of wanted to know about it and its setup.

24        Q.  And was it your understanding that Mr. Suhy

25   was one of founders of Graph Foundation?

137

1      A.   Yeah.   That's how I would -- I would --

2   yeah.

3      Q.   Now, as far as The Graph Foundation, when I

4   asked about your understanding, did he tell you it

5   was an open source organization, or how did he

6   describe The Graph Foundation?

7      A.   An open source foundation -- I mean, I feel

8   like -- I mean, it was a foundation that was

9   crowd-sourcing the ONgDB development and making it

10  available for, you know, as open source use for

11  people.

12     Q.   Did he tell you that it was formed

13  partially in response to Neo4j Enterprise Edition

14  license?

15     A.   I don't know if he would have -- I can't

16  remember if he said it specifically, but I guess --

17  I mean, it -- you know, I'm -- I understood it

18  was -- it was their interest to make -- you know, do

19  an open source product.  And so I would guess I --

20  it makes sense that I guess they were -- it was

21  contention with Neo4j.

22     Q.   Okay.   And so looking back at this email on

23  August 13th, 2018, looks like you write, "Thanks

24  John Mark.  Making sure Lisa is looped in on this,

25  and ask her if we're okay to go ahead and just use

138

1   ONgDB from now on in the CKGE environment."

2         Do you see that?

3      A.  Yes.

4      Q.  Why were you referring to Lisa on the

5   decision to go forward on ONgDB?

6      A.  Because that -- that type of decision

7   needs, you know, either her or Jeff to make that

8   decision.  I can't make that call.

9      Q.  And did they make the decision to go

10  forward with ONgDB?

11     A.  Probably.  I mean at the -- I can't

12  remember that we didn't.  Does the email tell us?

13     Q.  I might have one for you.  We'll get there.

14  You can't remember offhand.

15     A.  Sorry.  Sorry.  Not to get ahead.  But I

16  would think that -- I don't -- in my mind, it has to

17  be around that time frame.  So that we would have

18  switched over to ONgDB.  Because I feel like it was

19  during the summer where we had these conversations

20  about ONgDB and then ultimately GraphGrid and that

21  kind of stuff.

22     Q.  So then going back to this email, you'll

23  see Mr. Suhy responds to your email addressing, it

24  looks like to Lisa Rosenmerkel, and you'll see he

25  says about two-thirds of the way down, "ONgDB open

139

1   source licenses come directly from The Graph

2   Foundation as well, not from Neo4j, Inc., which is a

3   huge benefit based on their past behavior."  Do you

4   see that?

5        A.  Yeah.  It's -- yeah.  Right.  So that's --

6   I mean that -- I guess in my mind that's where I'm

7   thinking, well, what is, what is The Graph

8   Foundation, you know, making this product available,

9   what is the data rights or whatever you call it, the

10  licensing, The Graph Foundation is.

11       Q.  So you took the representation that ONgDB

12  open source licenses were coming from Graph

13  Foundation and not Neo4j?

14       A.  Yeah.  I think ONgDB coming from Graph

15  Foundation.

16       Q.  You mean the licenses themselves, not just

17  the software?

18       A.  Yeah, because I -- if I remember, yes.  I

19  mean, I would -- I would -- I think I would have

20  assumed that.  Yes.

21       Q.  Again, so you took this at face value, that

22  ONgDB open source licenses come directly from Graph

23  Foundation and not from Neo4j, Inc.

24       A.  Well, I don't -- I don't know if it was at

25  face value, and this is why I say that is, you know,

140

1    in hearing I guess -- having to walk through the

2    development of the ONgDB, seeing the -- being told

3    this is where the Neo4j source code is coming from,

4    not GitLab.  So it was walking through that.  That

5    was -- at least I don't remember anybody having --

6    you know, that was sort of what I remember everybody

7    sort of basing a decision on with that.

8         Q.  You say basing a decision on.  You mean

9    going with ONgDB in CKGE?

10        A.  Yes.

11        Q.  Again, I want to be really precise in my

12   question.  I'm not asking about the source code or

13   GitLab or GitHub.  From the IRS's perspective, you

14   understood from Mr. Suhy that ONgDB's open source

15   licenses were coming from Graph Foundation and not

16   from Neo4j, Inc.

17        A.  Yes.

18        Q.  As far as it says the upgrade would be a

19   low risk move in our opinion, now that upgrade

20   meaning what you had asked originally was Neo4j

21   Enterprise 3.3 to ONgDB 3.4?

22        A.  Yeah, because I'm asking can we just go

23   ahead and -- yeah.  I can't think of what else it

24   would be about where he says that.

25        Q.  And as far as at that time, I think there's

                                                        141

1    a reference to deployment of the CKGE.  Was that the

2    point in time where CKGE sort of moved out of its

3    development phase into a more production

4    environment?

5         A.  No.  Unfortunately not.  We did -- I -- in

6    my opinion, we did not get to bringing in regular

7    users until the spring of 2019 at this time.

8              (Simultaneous speaking.)

9              THE WITNESS:  Yeah.  It was -- it was done

10   in phases, so not everybody was brought on until

11   let's say the end of the summer of 2019.  But in my

12   opinion, we started people for regular use in the

13   spring.  So as you said, about six months or so

14   later.  So I think that makes sense.

15             (Exhibit 170 is introduced.)

16   BY MR. RATINOFF:

17        Q.  Let me go ahead and put the next exhibit in

18   the chat here.  So be Exhibit 170.

19             What I have put in there is an email also

20   produced by iGov in this litigation.

21        A.  Okay.

22        Q.  You'll see it's an email from --

23   starting -- or ending from yourself to Mr. Suhy

24   amongst others, cc's, dated August 14th, 2018.  And

25   it you'll look, you'll see at the bottom it's sort

                                                    142

1   of a continuation of the original thread.

2       A.  Yeah.  Yes.

3       Q.  You would agree with that?

4       A.  Yes.

5       Q.  And do you have any reason to believe this

6   email isn't true and correct copy of an exchange

7   between you and Mr. Suhy among others?

8       A.  I don't.

9       Q.  Then looking at the top here it says, "John

10  Mark, go ahead and integrate the ONgDB into the CKGE

11  framework we'll deploy"?

12      A.  That's right.  Yes.

13      Q.  So safe to say that you got approval from

14  Jeff and Lisa to tell John Mark to go ahead and

15  integrate ONgDB?

16      A.  I do.  Yes.

17      Q.  And then at that point that's essentially

18  when CKGE started using ONgDB was in about August

19  2018?

20      A.  Yes.  I would agree with that.

21      Q.  See, I told you I would be able to help get

22  your memory squared away.

23      A.  Look, I'm completely perplexed at how bad

24  my memory is.

25      Q.  No.  You know, the lawyers in the case

                                                    143

```
 1   BY MR. RATINOFF:
 2        Q.   Next exhibit I am going to drop in here
 3   will be Exhibit 171.
 4        A.   Did you just put it in?
 5        Q.   I did.   Should be tab 455.2.   It's got the
 6   same title, transition risk question from our CKGE
 7   Neo4j 3.3.2 to ONgDB.   Do you see that?
 8        A.   Correct.   Yes.   I see it.
 9        Q.   And you'll see it's, like I said, a
10   continuation.   You would agree this is the same
11   email conversation you're having with Mr. Suhy?
12        A.   Yes.
13        Q.   All right.   So Exhibit 171, if you go ahead
14   and look down at the email where it says, "can you
15   also" -- and this is the August 14th email just in
16   the later chain.   August 14th, 2018 at 12:52.   You
17   see where it says after John Mark, go ahead and
18   integrate the ONgDB into the CKGE framework we'll
19   deploy.   Can you also loop in Rahul on the topic so
20   he's aware of the options and ideas for YK1
21   transition.
22        A.   Right.
23        Q.   I think you mentioned Rahul before.   Is
24   that correct?   And can you spell his last name?   Are
25   you able to do that now?
```

145

1    A.  Yeah.  T-i-k-e-k-a-r.  And I forgot to put

2  all these names into the chat during the break, so I

3  apologize.

4    Q.  We can always take care of that later.

5    Okay.  What was Rahul's role in reference

6  to YK1?

7    A.  So Rahul works on the YK1 project.  So this

8  was referencing letting him know that, you know, go

9  ahead about being -- you know, going ahead and, you

10  know, using ONgDB and seeing if he wanted to start

11  looking at it.

12    Q.  And to your knowledge, following the next

13  email, Mr. Suhy responds directed to Rahul, "We can

14  talk more when I come over there, or feel free to

15  give me a call anytime."

16    A.  Right.  Yes.

17    Q.  Is it your understanding that Mr. Suhy and

18  Mr. Rahul talked about using the ONgDB in the YK1

19  platform?

20    A.  Yes.  I'm confident -- yeah.  I believe

21  they did.  Yes.  I'm confident.

22    Q.  And as a result of that conversation, did

23  YK1 similarly adopt ONgDB at 3.4?

24    A.  Not at -- not at that time.  I think Rahul

25  and them started to look at it.  And the reason I

146

1    say that is YK1 need -- it did not -- they didn't

2    have -- there was no existing -- they weren't using

3    existing graph database.  They were using Oracle and

4    some stuff.  So I think there would have had to have

5    been some evaluation and such.  And that's what

6    Rahul was talking about is are you interested in

7    looking at this.

8        Q.  At that time, was the YK1 using a

9    combination of Oracle and some form of Neo4j

10   software?

11       A.  Yeah.  I can't remember -- there was a time

12   when there was a project that worked on YK1.  There

13   were two data scientists who worked with YK1 to

14   create a graph database that YK1 started to use.  I

15   don't remember if it was this early or whether it

16   was sometime starting in 2019, because the people on

17   this email are not those people that worked on that

18   project.  So I can't say -- I cannot say what Rahul

19   did with it at that time.

20       Q.  But eventually the YK1 did switch over to

21   ONgDB?

22       A.  It did.  Yes.

23       Q.  And as far as -- what was the purpose of

24   the YK1?  Actually, before I get there, is it more

25   appropriate to call the CKGE and the YK1 a platform

147

1    or environment?  What's the preferred term?

2        A.  So people -- CKGE is more of an

3    environment.  So it has, you know, different

4    activities going on with different technology

5    stacks.  They call YK1 an application.  So if you're

6    okay with that, I'll call YK1 an application and

7    CKGE an environment.

8        Q.  Okay.  Then what was the purpose of YK1?

9        A.  Jonathan will have to make sure that I

10   don't say anything sensitive but unclassified.

11           It is for looking at entity -- taxpayer

12   entity relationships through the tax forms for

13   enforcement research purposes.  Is that good enough?

14       Q.  Sure.  Using graphs to establish

15   relationships between data?

16       A.  Yeah.  So it's still a graph -- it's still

17   trying to work with graph data or present graph data

18   to end users.

19       Q.  So similar idea of using at some point at

20   least ONgDB to -- to be the graph database and then

21   having a user interface to be able to work with that

22   data and visualize it?

23       A.  Yes.  YK1, though, was -- had been around

24   for many years.  So they already had their own user

25   interface database, et cetera.  So they already had

148

1    sort of a -- sort of a baseline technology to

2    work -- to do what they needed to do.  But they were

3    presenting data in a graph form.

4        Q.  Okay.  And as far as at this point, or

5    going into the fall of 2018, the CKGE environment,

6    was it running on multiple servers?

7        A.  I think it -- it -- I think yes in the

8    sense that there was starting to stand up sort of

9    copies of the stack.  So while CKGE is an

10   environment, there's a stack of technology that,

11   let's say we call prod and a stack of the same

12   technology that we call beta.  So I believe it

13   started with one server.  At some point we probably

14   were using multiple servers for like a backup or,

15   you know, standing up that GraphStack in such a way

16   it creates like a beta or stage kind of environment,

17   too.

18              (Exhibit 172 is introduced.)

19   BY MR. RATINOFF:

20       Q.  Okay.  Let me go ahead and put the next

21   exhibit into the chat.  It's should be tab 457,

22   which I'll mark as Exhibit 172.

23       A.  Okay.  I have it open.

24       Q.  And then you'll see this is an email now

25   with production IRS-PROD then ending Bates number of

149

1    129 the first page.  You see that?

2         A.  Wait.  I'm sorry.

3         Q.  What are you looking at?  I marked as

4    Exhibit 172, it's an email.  There is some sort

5    of -- I can't really interpret what the from is, but

6    it's sent to you, Patrick Martin, Guoqing Weng, and

7    the title is "Neo4j-Enterprise on Athena/Minerva."

8    Do you see that?

9         A.  Yes.

10        Q.  And I'm representing this was produced by

11   the IRS in response to the first subpoena that was

12   issued in this case.  You understand this was a

13   document that was produced by the IRS?

14        A.  Yes.

15        Q.  Any reason to believe it's not a true and

16   correct copy of an email that was produced by the

17   IRS?

18        A.  I have no issue.

19        Q.  So going to the very beginning of the email

20   exchange, this would be the bottom email on 131?

21        A.  Right.

22        Q.  October 23rd, 2018.  You'll see there's a

23   question -- or an email from Patrick Martin that

24   says, "Hey Gene and Link, We need to remove all the

25   Neo4j-Enterprise installs from our servers.  I saw

                                                    150

1    we have Neo4j-Enterprise installed on both Athena

2    and Minerva" --

3         A.   Minerva.

4         Q.   -- "and wanted to make sure they weren't in

5    use anymore before removing them."

6         A.   Okay.  Yes.

7         Q.   And what are they referring to here as far

8    as Athena and Minerva?

9         A.   Two servers.

10        Q.   Are those the two servers that you

11   mentioned?  There was a production server and a beta

12   server for running graphs?

13        A.   Well, yeah.  I was trying to illustrate it

14   as two stacks, but yes.  Think of two stacks and I

15   don't know -- I believe those were the servers that

16   we were using, Minerva and Athena.

17        Q.   As of October 2018?

18        A.   Yes.

19        Q.   Who is Patrick Martin, by the way?

20        A.   Patrick Martin is an IRS employee who

21   worked in DMD.

22        Q.   He's no longer with the IRS?

23        A.   No.  He is with the IRS, just not in DMD at

24   the moment.  He provided like system administration

25   duties.

                                                        151

1       Q.  Like IT basically?

2       A.  Yeah.  I mean, working on the server

3   itself, you know, operating system installs, those

4   kinds of things.  So he had that kind of function.

5       Q.  All right.  Then do you know why the IRS

6   was wanting to move Neo4j Enterprise from those

7   servers?

8       A.  Probably just -- it looks like we weren't

9   using them and just get rid of them.  They were

10  probably left on there.

11      Q.  That's because the IRS had moved to ONgDB?

12      A.  Yeah.  We would have been using that.  So

13  the way I'm interpreting this is that they are

14  talking about cleaning up.  Where it says, like I

15  think it's an old project, I say remove it.  So this

16  was probably me saying yeah, I don't know why it's

17  there, what it's being used for.  And yes, at this

18  time I'm still assuming we were using ONgDB.

19          (Exhibit 173 is introduced.)

20  BY MR. RATINOFF:

21      Q.  And then I'm going to go ahead and put the

22  next exhibit in the chat.  This will be marked as

23  Exhibit 173.  And what I've put -- marked as

24  Exhibit 173 is an email exchange between Mr. Suhy

25  and Mr. Martin with you copied.  First email.

                                                    152

1    Starting on December 6, 2018 through December 11th,

2    2018 with the title "CKGE memory usage."

3         A.  Yes.  I see it.

4         Q.  Any reason to believe this wasn't a true

5    and correct copy of this email exchange that was

6    produced by the IRS?

7         A.  No.  I don't.

8         Q.  Okay.  Starting at the beginning of this

9    email exchange, it says, "Hey John Mark, Between the

10   environment and the future growth of adding YK1,

11   what memory usage are you estimating for production

12   servers?  We had talked about dedicating all DL 380s

13   instead of the current half VM/half DL380 we have

14   now.  Would four DL380s with 256GB or 512GB be

15   sufficient?"

16            Starting with what's a DL380?

17        A.  It's a type of server.  It's a HP.  DL380

18   just represents the type of server.

19        Q.  At that time in December of 2018 for the

20   CKGE, was it running on at least one DL380?

21        A.  See, I don't know if it was 380.  I can't

22   remember what Minerva and Athena were.  I thought

23   those were 580s.  So -- that's my -- that's my view.

24   Both of those I believe were 580s.  So my

25   interpretation of this is -- and I know Patrick was

153

1   working on sort of requirements, sizing, and I think

2   he's talking back and forth about with, you know,

3   with four DL380s would this information be

4   sufficient.  You know, instead of the half or VM.

5   So I think they're talking about adding servers to

6   the environment and then how they would be used.

7        Q.  So in other words, because CKGE was going

8   into production, there was going to be a need to add

9   additional servers for the number of users?

10       A.  Yes.  And also I saw the word "Kafka" in

11  there.  I was just trying to go back and -- yeah.

12  It said, I can tell you regarding SS drives.  This

13  is John Mark.  It will be important event around the

14  ETL-related stack components (Kafka, et cetera)."

15  So how -- so the GraphStack, as I mentioned -- we

16  were talking about that earlier.  So the GraphStack

17  is made up of a number of components.  He was

18  talking about Kafka there.  There's Keycloak,

19  Prometheus -- there's a number of software

20  components that make up that bundle.  And so

21  Elasticsearch being another component.  So all --

22  all of those have to be taken into account from a

23  sizing standpoint, so not just the graph database

24  itself.  Does that make sense?

25       Q.  Sure.  So because there was other RAAS on

154

1    the environment, there needed to be a sufficient

2    service to run not just the graph database but also

3    the other components of the environment.

4         A.  Yes.  That's how I see it and would have

5    seen it at that time, and they sort of back and

6    forth on that.

7         Q.  And Mr. Suhy had input on hardware

8    requirements as part of his work?

9         A.  He did.  He did.  Yes.

10        Q.  And then you go off to the -- it would be

11   the first page.  It's the email where Patrick Martin

12   says, "Let's start with CKGE.  Would you expect four

13   DL380, 32-core, 256 gigabyte RAM to be enough or

14   would four DL380, 32-core, 512 RAM be more

15   appropriate."  And then he talks about could there

16   be a mix -- or a mix if needed of Prod1 and 2 need

17   to be 512 and Prod3 /Dev/Test could be 256.  Do you

18   see that?

19        A.  Yes.  I do.  At 9:04 a.m.

20        Q.  Correct.

21        A.  Correct.

22        Q.  He's referring to four DL380s, so that

23   means four DL380 servers?

24        A.  Correct.

25        Q.  And that would be each one of those having

                                                          155

1    32 cores and 256 gigabytes of RAM?

2         A.  Yes.  That's right.

3         Q.  The same would be the alternative of four

4    DL380s with 32 cores each and then 512 RAM --

5         A.  Correct.  Yeah.  I think it asks about

6    either/or.

7         Q.  Sure.  Was it determined at that time that

8    there would be a need for four servers to run the

9    CKGE environment?

10        A.  Yeah.  I believe it was both production and

11   all of that that that entailed, and then something I

12   saw that I just wanted to -- yeah, where Prod1 and

13   2.  So sort of being able to work in both of those

14   stacks.  And then there's a Prod3/Dev/Test.  So,

15   which I'm interpreting as a separate server.  So

16   three, three servers.

17        Q.  Okay.  So there would be three servers and

18   each consisting -- well, Prod1 and 2 and 3, were

19   those three different servers, or are those three

20   different clusters?

21        A.  Yeah, I don't know if -- if Prod1 and 2

22   would be on the same server or not or whether they

23   would be on separate servers.

24        Q.  But there is a -- sorry.  Strike that.

25            So at that time the design, architectural

156

1    design for the CKGE environment was to have three

2    production servers?  Would that be the accurate way

3    to describe it?

4         A.  Yeah.  I mean, I can't think of -- and what

5    I remember is and how this is being discussed is

6    Prod1, Prod2 being two stacks.  And the way that I

7    remember it being set up is we had copies of the

8    database, and so Prod1 and 2, 1 may have been --

9    let's say 1 was the primary.  That's the way people

10   were normally going to use it.  Prod2 may have had a

11   stack, and it was in case Prod1, you know, something

12   happened to it as backup.

13        Q.  Okay.  So would that be like a hot backup

14   for Prod1 theoretically?

15        A.  Is it a hot backup.  I don't -- I

16   believe -- I don't know.  I don't know if I would

17   call it a hot backup.  But I -- I think it -- I

18   think you could through the user interface, if

19   something happened to Prod1, it would -- it would

20   switch to Prod2.  So in that sense, you know, it's a

21   hot backup.  And in that way.  So I believe the

22   configuration was set up like that.  Yes.

23        Q.  All right.  So that each Prod launch the

24   stack and Prod1 and Prod2 each would be running a

25   separate instance of ONgDB?

157

1    A.  At that time we were -- only one of them
2  was actively used.  We started later on using
3  another instance of ONgDB which would allow users
4  that were connecting directly to the graph database
5  using R and Python.  And so in this case I think it
6  was just some redundancy.
7    Q.  But in order to have redundancy between
8  Prod1 and 2, each one would be running ONgDB?
9    A.  Each one.  Yes.  I'm sorry if I
10  misunderstood.  Yes.  Each one of them had an
11  instance of ONgDB.  Yes.
12    Q.  How would -- at this point, how did
13  Prod3/Dev/Test fit into that architecture?
14    A.  Since it's Prod/Dev/Test, this would be,
15  you know, being able to use it as some kind of just
16  testing on changes0, on what would -- you would be
17  sort of doing changes and other kinds of activities
18  that were not static that the end users would be
19  working with.
20    Q.  Okay.  And since there was a question about
21  using four servers, would then there be one server,
22  one DL380 for Prod1, one DL380 for Prod2, then the
23  other two would be used to support the
24  Prod3/Dev/Test?  Is that accurate?
25    A.  Yeah.  And it looks like in the last

158

1   sentence where "Take into consideration future
2   planning and some growth such as YK1," it's sort of
3   having four servers be good enough.  You know, right
4   now and looking ahead.
5       Q.  Okay.  So I guess my question is would the
6   other two servers be used to support Prod3 Dev and
7   Test, or it would just be -- the fourth one would
8   just be a spare?
9       A.  Yeah.  It was either a spare or it was
10  anticipating a YK1.  I know with the Elasticsearch,
11  the Elasticsearch that we use is set up in its own
12  little cluster.  So could have been using that
13  server for that and then just, as we said, spare.
14  You know, just some extra capacity.
15      Q.  So when you say Elasticsearch, you're
16  talking about Elasticsearch, I think earlier you
17  testified about small incidence of ONgDB, that would
18  be sort of a separate instance.  Is that what you're
19  referring to with Elasticsearch?
20      A.  No.  Sorry.  The Elasticsearch is a
21  software product that takes in data, indexes it, and
22  makes it available to search.  And so it's part of
23  the GraphStack that John Mark was bringing, you
24  know, it was part of the bundle.  And so that's a
25  separate software component.

159

1    Q.  But it's interconnected with ONgDB as far

2    as getting the data?

3        A.  No.  It's -- the pipeline -- there is --

4    there is some relationship, but you can load the

5    data separately and operate it separately.  So

6    how -- so the use of the Elasticsearch was in the

7    UI.  So that when the end user was going to be

8    searching for entities, they would first see the

9    results in the UI through the Elasticsearch

10   retrieval.  And then if they were interested, that

11   node, that node -- that entity was being stored in

12   ONgDB.  And if they were interested, you click a

13   button, and then it would open up another tab of the

14   UI, query the ONgDB, and pull the, you know,

15   predetermined graph results up for visualization.

16       Q.  Okay.  So that -- would that -- that would

17   be a separate server from Prod1, Prod2, and

18   Prod3/Dev and Test?

19       A.  Unless they were -- unless they're -- I

20   can't say that because they could be accounting for

21   that in this -- in this estimation.

22       Q.  Okay.

23       A.  They could be saying for all of this, you

24   know, how many servers would be useful.

25       Q.  And then going back to the Prod3 Dev and

160

1   Test, that would be running another instance of

2   ONgDB?

3       A.  Yes.  I would think yes.

4       Q.  And to your knowledge, was this, at least

5   in December of 2018 or shortly thereafter, was

6   this -- were these servers adopted in this

7   structure, Prod1, Prod2, and Prod3?

8       A.  I would think so.  Yeah.  If they were --

9   if Patrick and John Mark were working on it, I

10  would -- they would be working towards getting that

11  set up.  So I don't see any reason not to believe

12  around this time.

13      Q.  Okay.  And then do you know as of now what

14  the initial server requirements or specs were for

15  CKGE?  Let's just say beginning of 2019.

16      A.  Not offhand.  I mean, this would give me

17  my -- probably the best view here.  I don't have any

18  other ideas offhand of anything different than this.

19      Q.  So at minimum, then, the design for CKGE

20  would have been having the four DL380s, at least 32

21  cores, and 256 gigs each?

22      A.  Yeah.  I think that's fair.

23      Q.  All right.  Let me go ahead and drop in the

24  next exhibit.

25          (Exhibit 174 is introduced.)

161

1    BY MR. RATINOFF:

2        Q.  So this is another email exchange produced

3    by the IRS.  You'll see the first page ending with

4    1738, and it's a email exchange between Mr. Suhy and

5    Mr. Martin.  A short one.  You'll see at the bottom

6    Patrick is asking John Mark within the CKGE is ONgDB

7    installed on all the DB servers or AS servers or

8    both.  Do you have an understanding what he means

9    between DB servers versus AS servers?

10       A.  Not --

11       Q.  Maybe the next email of Mr. Suhy's response

12   will help.

13       A.  Okay.  I see what you're going up -- okay.

14   Applications servers.  Okay.  So the GDB servers

15   versus the application servers.  The ES servers --

16   what is ES.

17       Q.  So it says ES --

18       A.  Oh.  Elasticsearch.  Okay.  Elasticsearch.

19   Yes.  Sorry.

20       Q.  So from this email exchange, is it fair to

21   say, then, that there were separate servers running

22   ONgDB from what you referred to as the Elasticsearch

23   and then the other applications in the stack?  Is

24   that accurate?

25       A.  Yeah.  I think so.  Yes.

162

1    Q.  So there was dedicated -- multiple

2    dedicated graph database servers running ONgDB.  Is

3    that correct?

4    A.  Yes.  That's how I'm -- how I'm reading it.

5    Q.  Then you'll see that Mr. Suhy at the top of

6    that email on March 11th, 2019 at 10:35 a.m. says,

7    "I actually have a mapping document in the CKGE

8    docs.  I'll send you the direct link to that on

9    GitLab."

10   A.  Yes.  I see it.

11   Q.  Is there -- is there like a document

12   repository with CKGE documents that's kept by your

13   group?

14   A.  There is a GitLab project repository.  So

15   yes, there are that contain, you know, the code and

16   information, those kinds of things.  So that's

17   what's -- when it says GitLab, it's talking about

18   the GitLab project server that he was putting this

19   file and information on.

20   Q.  Okay.  So then there's an actual GitLab in

21   terms of GitLab repository that the CKGE environment

22   is kept on as far as you said source code and then

23   related documents to the --

24   A.  Yes.  Yes.

25   Q.  And by the reference here mapping document,

163

1   what do you understand the mapping document to be?

2   The server architecture mapping document.

3        A.   Yeah.   It -- yeah.   I -- I believe the

4   mapping document is saying what server or where on

5   the server the different -- these different files.

6   So that AS server hosts these job apps.   So he's

7   essentially saying 1 through 6 there, you know, is

8   found on -- it would be on this server, you know.

9   And showing that mapping.

10       Q.   Okay.   And would that mapping document also

11  show the number of GDB --

12            (Reporter interruption.)

13  BY MR. RATINOFF:

14       Q.   Let me ask it again.

15            And then would the mapping document also

16  show the number of GDB servers each host a single

17  ONgDB node?

18       A.   Yeah.   I would think that it would.

19       Q.   And is that mapping document something that

20  would be easily available to you if you wanted to go

21  and look in to see what the current server structure

22  is for the CKG environment?

23       A.   Well, I don't know what kept up on that --

24  I mean, if -- if the mapping document is kept up to

25  date and we knew the file name or whatever it is,

164

1    then you could go find it.  But I don't -- I don't

2    know in my own mind and I don't have permission to,

3    you know, do a lot of things, I could not just

4    naturally go into the GitLab project and find it.

5    So you would -- one would need to know the name or

6    location, et cetera.  Because the GitLab project has

7    any number of sub-project folders.  Does that make

8    sense?

9         Q.  Sure.  Mr. Suhy as an individual you would

10   probably ask to see that document, hey, I need to

11   see a mapping document of the servers for CKGE, you

12   would ask Mr. Suhy?

13        A.  Yes.

14        Q.  Is there anyone else at the IRS that you

15   would ask to locate that document?

16        A.  I could, you know -- there could be --

17   yeah.  I think other people to look for that mapping

18   document.  I don't know how easy it would be for

19   them necessarily, but I think that they -- there are

20   at least one if not two people that would know how

21   to, you know, understand how to try to look.

22        Q.  Aside from Mr. Suhy.

23        A.  Yes.  Correct.

24        Q.  Who are those two people?

25        A.  Puru Komaravolu and Alexis Spande.  Both

                                                    165

1   IRS employees.

2       Q.  And Puru I think you mentioned you had

3   spoken --

4       A.  Yeah.

5       Q.  -- to him earlier about bad things about

6   CKGE.  Was the server mapping one of the things you

7   talked to him about?

8       A.  No.  I did not talk to him about that.  I

9   talked to him about basically, you know, were the

10  graph database installed in a docking container or

11  are they on bare metal.  You know, we were talking

12  about sizing, that kind of stuff.  So I didn't talk

13  to him about a mapping document.

14      Q.  But as of this email March of 2019 that

15  we're looking at, how many -- how many graph

16  database servers -- let me actually start over.

17          So GDB stands for graph database?

18      A.  Yes.  Correct.

19      Q.  So at that time in March of 2019, how many

20  graph database servers were running ONgDB in CKGE?

21      A.  I would think at least three.  We may have

22  had -- I believe at that time there was another

23  project team that wanted to test out some ideas for

24  a project, and I believe they were using it.  So my

25  estimation would be four.

166

1    Q.  Okay.  So in 2019 there was four separate

2  servers running ONgDB?

3    A.  Not separate servers but instances of

4  ONgDB.

5    Q.  Okay.  And did that change in 2020?

6    A.  Yes.  Okay.  So around the summer of 2019,

7  there was another project that stood up dealing with

8  what I'll call a corp graph, corporate graph.  And

9  so they were starting with I believe it was 20 --

10  yeah, sometime around there would have been another

11  corporate graph.  They may have started a little bit

12  earlier than that, but somewhere around there the

13  corporate graph project stood up, and they were

14  their own project.

15    Q.  Okay.  So in the beginning of 2019 there

16  was four instances of ONgDB running within the CKGE

17  environment, and then you're saying there was a

18  fifth instance that was set up for the corporate

19  graph environment?

20    A.  Yeah.  It must have been sometime around

21  there, because the -- because the corporate graph

22  project started I believe in the fall of 2018.  And

23  eventually at some point in there, they would have

24  been, you know, starting to test out graph ideas and

25  using their own graph instance.

167

1    Q.  And then did that change -- I know you said
2    that was the middle of 20 -- I'm sorry, 2019, so
3    moving on to 2020, was the setup the same with the
4    four instances running ONgDB for the CKGE, and then
5    the fifth for a corporate graph, did that change in
6    2020, or was it still the same?
7    A.  There -- there should have been at least --
8    I believe at that time YK1 and excise graph were
9    switched over and using ONgDB at some point at that
10   time.  So that would have been what, two more.
11   Q.  And the YK1 would have been a separate
12   server?
13   A.  Yes.  That would have been its own
14   instance.  Yes.
15   Q.  And then what was -- what was the other
16   one, I'm sorry, you mentioned?
17   A.  Excise graph.  E-x-c-i-s-e.
18   Q.  What is excise graph?
19   A.  It's a separate graph that a particular
20   unit uses to look at excise tax relationships.
21   Q.  And is that running its own instance of
22   ONgDB?
23   A.  Yes.
24   Q.  So let me just make sure I got my math
25   correct.  This is as of 2020, there was four

168

1  instances running on the CKGE environment.  There

2  was a fifth instance for corporate graph.  And then

3  there was a sixth would have been for YK1, and then

4  a seventh for excise?

5       A.  So four for -- and when I'm -- this may be

6  help.  The first ones that we talked about, let's

7  call those the main graph.

8       Q.  Okay.  That's production 1, 2, and 3?

9       A.  Yes.  And, you know, the development stuff.

10  So that includes main graph.  So then -- so then

11  there was another project.  Analytics project.

12  We'll call them -- just call it a fraud project.

13  And then the excise graph.  The YK1 at some point

14  was started during that time, was developing the YK1

15  graph.  And then at the same time the corporate

16  graph was being worked on.  Development.

17       Q.  Okay.  So we've got the main graph, the

18  excise graph, the YK1 graph, and then the corporate

19  graph.

20       A.  Yes.  And so the regular use or what we

21  could call production was excise, the main graph,

22  and at some point at that time YK1 would have been

23  in production, meaning regularly used.  The

24  corporate graph and the other ones were just test --

25  they were still just testing out stuff.

169

1    Q.  Okay.  As far as main graph goes, when you

2    say main graph, that's main graph in the CKGE

3    environment.

4    A.  Yeah, and the reason I was doing that is in

5    fact a corporate graph is part of CKGE as an

6    environment as if you drew a little line.  So I just

7    wanted to help trying to -- try using the same

8    terms, and I didn't want to confound stuff.  So

9    that's why it's just easier.  People call it the

10   main graph.

11   Q.  Okay.  How many instances of ONgDB was the

12   main graph running in 2019?

13   A.  I would say three.

14   Q.  Then was that the same in 2021?  I'm sorry,

15   2020, the main graph was running three instances of

16   ONgDB?

17   A.  Yeah, I don't think -- yes.  Because at

18   that time we were using one for the investigators,

19   one of the analyst graph, and then there would have

20   been like a backup or something.  So those would

21   have been sort of the production.

22   Q.  Okay.  And in addition to production, there

23   may have been some testing or development use --

24   A.  Yes.

25   Q.  -- on a separate server?

170

1          A.   Yes.   Yeah.

2          Q.   So potentially four -- four instances of

3    ONgDB in relation to main graph.   Three being

4    production, one being some sort of testing --

5          A.   At least one if not maybe two.

6          Q.   And then moving to 2020 -- that was for

7    2020.   So for 2021, did things change as far as the

8    number of instances for main graph, excise, YK1, and

9    corporate graph?

10         A.   Yeah, I don't -- I don't remember any

11   changes.   I was trying to think is there any -- I

12   believe, not in production.   I think there may have

13   been some other projects using ONgDB to do some

14   testing or ideas like that, but production was

15   staying in my mind around three.   And then there

16   was -- let's see, 2020, '21, so around that time we

17   started another graph project called COVID graph.

18         Q.   I'm sorry, that was 2021?

19         A.   Yeah.   It would have been after the Cares

20   Act.   So that would have been when COVID first hit.

21   So when was that.   Let's say the summer of 2020.   So

22   that would have been like 2020 starting and then

23   doing, you know, starting to test things out,

24   et cetera, going into '21.

25         Q.   And these are all running ONgDB.

171

1    A.  Yes.

2    Q.  Okay.  So then -- so for 2021, just to make

3  sure I've got everything down, we've got main graph

4  running three production instances of ONgDB plus one

5  or two additional development/testing environments

6  on ONgDB.  You've got one instance of ONgDB for the

7  excise graph, one instance of ONgDB for YK1, and one

8  instance for corporate graph, plus an additional

9  instance of ONgDB for the COVID.

10   A.  Yes.  And then --

11   Q.  That's for 2021.  So then --

12   A.  Well, I'm trying to use what I understood

13  now from what we have up, you know, existing that I

14  was told and working back in time.  So around 2021

15  we had policy net, which uses ONgDB.  That was a

16  development project that's sort of happening.  Just

17  call it policy net.  And then, let's see, I'm trying

18  to remember when some of these projects -- because I

19  don't work with all these projects, so I'm trying to

20  like, in my own mind, remember when things started.

21  As I said, I -- you know, I just don't work on all

22  these projects.  I don't really know what they're

23  doing.  At least in '21 there was another instance

24  of what is called the individual graph that started

25  to be a project.  And then -- now, these two I think

172

1    were this year.  So that's what I have -- that's
2    what I have working backwards from what I see or was
3    told now.
4         Q.  Did you take notes on everything that we've
5    been talking about?
6         A.  Have I taken notes while we're talking?
7         Q.  Yeah.  Are you doing this all from what you
8    were told or do you actually have some notes
9    reflecting --
10        A.  No.  I actually have some notes I try to
11   write down when talking with the team here.
12        Q.  Okay.  Jonathan, I just wanted to make sure
13   I could get a copy of those notes.  Obviously
14   there's a lot of complicated data, and since he's
15   taking the notes during the deposition, I would ask
16   that those be produced.
17        A.  Can I send you -- well, they're on
18   handwritten.  I don't have a scanner.  Can I take a
19   picture of them and send them to you?
20        Q.  Yeah.  If you could do that on a break so
21   we can --
22            MR. TEPPER:  No.  We actually will not.
23   We'll have to discuss whether we disclose those or
24   not.
25   ///

173

BY MR. RATINOFF:

    Q.  Well, I think they're fair game, and we can

about that off the record.

    A.  Look, this was just my notes as I was -- it

was being described to me over our telephone

conversation.

    Q.  Okay.  Who were you talking to?

    A.  Puru Komaravolu.

    Q.  All right.  So then let's see here.  Okay.

So then I might have to go back and start from the

beginning just to make sure we've got everything

accurate.

    Is it easier for you to work backwards, or

would it be easier to start -- I just want to go

through it one more time just so we're clear.

    A.  Yeah.  Let me start what -- when I asked

sort of how many instances we had now, and you can

see what you have.  So --

    Q.  Start with 2022, and we're going to work

backwards?

    A.  Sure.  Okay.  So --

    Q.  Just to be clear for the record, this is

instances of ONgDB.

    A.  Correct.

    Q.  Okay.

174

1    A.   So main graph, there are two instances

2  right now of main graph.   There is one instance of

3  COVID.   Those are in production.   There are -- for

4  YK1, there are two instances in production, two

5  instances dev/test.   Tell me when you're ready.

6    Q.   Go ahead.   This is for 2022 instances of

7  ONgDB.   We've got main graph, COVID, and YK1 so far.

8    A.   And then one instance of excise graph.

9    Q.   That's in production?

10    A.   Yes.   And then the ones in -- considered

11  development are individual graph, CPEO, ghost

12  preparer, corporate, and policy net.

13    Q.   And then so for CPEO, ghost, corporate, and

14  policy, those are all in dev -- ONgDB dev

15  environment?

16    A.   Yes.   And similar with individual graph.

17    Q.   Got it.   As of 2022, are you aware of what

18  version ONgDB each one of these instances is?

19    A.   Yes.   The code is -- has Neo4j 3.5.2.6.

20    Q.   Okay.   So let's go through -- for all of

21  these instances we've just gone through it's 3.5.6?

22    A.   Yes.

23    Q.   Okay.   So for main graph two instances of

24  ONgDB 3.5.6?

25    A.   Correct.

175

1          (Reporter asks for clarification.)

2          MR. RATINOFF:  It's 3.5.6.

3          THE WITNESS:  It's 2.6.  Sorry.  It's

4   3.5.2.6.

5          (Discussion off the stenographic record.)

6          THE WITNESS:  Wait.  Here.  Let me type it

7   in.  3.5.2.6.

8   BY MR. RATINOFF:

9       Q.  So for each one of the instances of ONgDB

10   we've gone over for 2022, each one of these

11   instances as running ONgDB version 3.5.2.6?

12       A.  Yes.  But it's not ONgDB because everything

13   is compiled inside the IRS.  I believe John Mark

14   didn't want to call it ONgDB because it's not being

15   received by The Graph Foundation.  Or compiled by

16   The Graph Foundation.  So it's not being called

17   ONgDB.  It's just graph database.

18       Q.  Okay.  Is it possible that the version is

19   actually 3.5.26?

20       A.  It could be.  I could have mistaken it.  I

21   was writing it down over the phone.

22       Q.  Okay.  I have a document we'll get to.  I

23   think we can clarify that.  Okay.  So then going

24   back, that takes care of 2022.  So going to 2021,

25   let's go ahead and do that.

                                                    176

1      A.  So everything would have existed except for

2  I believe the CPEO and graph preparer were not

3  started then.

4      Q.  And did main graph in 2021 have two or

5  three instances in production?

6      A.  Yeah.  I don't think it had any more, any

7  less than two.  I don't remember that.

8      Q.  All right.  So then main graph had two

9  instances.  COVID would have had one instance.

10      A.  Yeah.  And COVID would have only gone to

11  production in September, October 2021.

12      Q.  It would have still been using ONgDB.  It

13  just would have been in dev and test?

14      A.  Yeah.  It would have been in that phase.

15  Yes.

16      Q.  For YK1, was it running two instances in

17  2021 in production?

18      A.  I don't know.  I just asked what was now.

19      Q.  Okay.  It would have been at least one

20  instance?

21      A.  Yeah.  I would have assumed there has to be

22  at least one instance since they were using -- in

23  2021 they were using a graph database.

24      Q.  And then for excise in 2021, it would have

25  been one instance in production?

177

1      A.   Correct.

2      Q.   And then for individual graph, was it still

3  one instance in dev?

4      A.   As far as I know.  Yes.

5      Q.   And then the CPBO was that -- that was in

6  dev in 2021?

7      A.   As far as I know.  Yes.  Wait.  Did you say

8  CPEO?

9      Q.   CPBO.

10     A.   CPEO.  Charlie, Peter, echo, omega.

11     Q.   Got it.

12     A.   I don't think -- as far as I remember, they

13 hadn't started at that time.  You know, as I said,

14 I'm not -- I don't -- I don't manage or directly

15 involved with these projects, so I'm giving you sort

16 of my take on it and what I understand.

17     Q.   That's taken from Puru who you talked to?

18     A.   Yes.  As of right now.  Yes.

19     Q.   And then on the corporate, was corporate in

20 2021?

21     A.   Correct.

22     Q.   That was one instance of ONgDB?

23     A.   Correct.

24     Q.   And then policy, was that in existence in

25 2021?

178

1      A.  Yes.

2      Q.  And that was also dev?

3      A.  Yes.

4      Q.  And then for all of these instances in 2021

5  that we just talked about, what version of ONgDB

6  were they running?

7      A.  I don't know.

8      Q.  It was something either that was -- it was

9  a 3.5 instance of ONgDB?

10     A.  I don't know.  I really -- I don't.  I only

11 know of as of right now because of just asking.  So

12 I don't -- I don't know -- I would -- I don't know.

13     Q.  Okay.  How would you be able to find out

14 what the historical version of ONgDB was?  Could

15 GitLab provide that information?

16     A.  I don't know if it would.  I mean, the best

17 person would be John Mark Suhy.

18     Q.  Because he was primarily responsible for

19 keeping ONgDB in the GitLab?

20     A.  Yeah.  He was the primary person with, you

21 know, working with the software, coming in that

22 represented sort of that bundle coming from

23 GraphGrid.

24     Q.  Okay.  Now, we talked about Athena and

25 Minerva as servers.  Were those legacy servers, not

179

1    to drop in here -- thank you.  I know that I know is

2    very complicated.

3            THE REPORTER:  Before you go, could we take

4    a short break?

5            MR. RATINOFF:  Sure.

6            THE VIDEOGRAPHER:  We are now going off the

7    video record.  The time is 1:47 p.m.

8            (Recess taken.)

9            THE VIDEOGRAPHER:  We are now back on the

10   video record.  The time is 1:55 p.m.

11           (Exhibit 175 is introduced.)

12           MR. RATINOFF:  Before we took a break, I

13   just dropped what will be the next exhibit in the

14   chat.  Forgive me.  I need to go back.  Look to see

15   where we're at exhibit-wise.  I believe we're at

16   174.

17           THE REPORTER:  175.

18   BY MR. RATINOFF:

19       Q.  175.

20       A.  Does the end of the PDF say 1321?

21       Q.  Yes.

22       A.  Okay.  I opened it up.

23       Q.  Okay.  This is a short one.  You'll see

24   what's been marked as Exhibit 175 is a calender

25   appointment sent by yourself to a host of

                                                          181

1    recipients, including Mr. Suhy amongst others,

2    dated -- or the calendar appointment is for

3    September 17th, 2019.  And it talks about in the

4    title, although it says "cancelled," it says,

5    "disc" -- I assume short for discussion -- "BETA,

6    STAGE, production domains and satellites."  Is that

7    correct?

8         A.  Right.  Yeah, discussion of.  Yes.

9         Q.  We were talking about -- I think you said

10   there was some change later on, but as of 2019 I

11   believe you said there was -- and you'll look in the

12   three domains, one being production at the bottom,

13   multiple servers.  So 2019 there was three

14   production servers, I believe you said.

15        A.  Yes.  Yeah.  Yeah.

16        Q.  Sorry.  Go ahead.

17        A.  I was just going to say yeah, this is --

18   this is me talking about it in domains.  So taking

19   the servers and trying to start -- my thought is

20   organizing things moving ahead so that you have like

21   this beta, this staging.  So the staging is about

22   ready -- everything would be -- whatever is being

23   updated to production would be, you know, reviewed

24   on staging and then, you know, if everything is good

25   there, then it can be passed on to production and

182

1    whatever is done.  And then data being what's called

2    a staging server is like, as it says, trial and

3    error.  So this is me talking about these ideas.

4         Q.  Okay.  But basically you earlier testified

5    that main graph had three production instances.  So

6    you'll see here there's a bullet point says,

7    "Production (multiple servers) main broken out into

8    three store instances."

9             So that's consistent what your earlier

10   testimony was?

11        A.  Yeah.  It's the three in that form.  Or at

12   least I'm calling it domains to try break everything

13   up into sort of some, in my mind, logical fashion or

14   suggesting that.  So yeah, there were -- there

15   were -- this is saying three graph store instances,

16   then we have three.  That would have been main graph

17   that we're talking about there.

18        Q.  Three instances of ONgDB.

19        A.  Yes.  Yes.  They would have each had their

20   own instance -- or three instances of ONgDB.

21        Q.  Now, on staging there's a Athena in

22   parenthesis.  I think we go talked about that

23   earlier whether, you know, it was used in a

24   particular role.  Is that consistent with your

25   understanding, that Athena was being used as a

183

1    staging server at that time?

2         A.  Yes.  At least part of it was for this

3    staging -- some stacker in instance of GraphStack so

4    that everything that's being updated, the UI, you

5    know, the Elasticsearch, the data that's stored in

6    the ONgDB, all of that passes through that.  And the

7    idea was it's sort of a checkpoint.

8         Q.  And that would be running one instance of

9    ONgDB?

10        A.  Yeah.  I can't think why it would be more.

11   So it would be one.  What I don't know is at this

12   time whether this is my aspiration.  I feel like I'm

13   talking about moving forward and trying to put

14   things into this structure.

15        Q.  But at the time there was these three

16   instances in main graph production.

17        A.  Yes.  I believe so.  Yeah.  Three instances

18   of ONgDB in production.

19        Q.  Okay.  Then as far as the stacks on those

20   servers go, let me see if I can refresh your

21   recollection on that.  I'm dropping in the next

22   exhibit.

23             (Exhibit 176 is introduced.)

24             THE WITNESS:  I've got it open.

25   ///

                                                       184

1    which I think we talked about being a -- at least at

2    one point a dev -- becoming a dev server.  You'll

3    see this is going back to that same September 2019

4    time period we were talking about earlier.  I just

5    dropped in a new exhibit tab 462.

6            (Exhibit 178 is introduced.)

7            THE WITNESS:  I see it.  I'm on it.

8    BY MR. RATINOFF:

9        Q.  That will be marked as Exhibit 178.  Let me

10   know when you've had a chance to take a look at this

11   email.  I think you'll see the title of this is

12   "Athena CKGE-v2 resync" -- or, I'm sorry, "rsync."

13       A.  Right.

14       Q.  It's dated, the last email, September 17th,

15   2019.  This is produced by the IRS with the Bates

16   number ending in 2201.

17       A.  That's correct.

18       Q.  Do you believe this is a true and correct

19   copy of an email produced by the IRS?

20       A.  No issue.

21       Q.  And you'll see that you're at least copied

22   on this email exchange?

23       A.  Yep.  I do.  Yes.

24       Q.  And then you'll see there's a reference in

25   the very first email, which would be on

                                                         193

1    September 17th at 2:58 p.m. at the bottom, "Hey John

2    Mark, do you happen to have a newer version of ONgDB

3    available?  We are using 3.5.3 for everything, but

4    it looks like there was a bug fix in 3.5.6 that

5    could help address some issues we're having."

6         A.  Yes.  I see that.

7         Q.  Okay.  I'm just trying to make sure I've

8    got the version number correct.  So I think you said

9    you thought that the 2022 ONgDB was 3.5.2.6.  Do you

10   think because -- at least in September of 2019, is

11   it fair to say that there is a later version being

12   run in 2022?

13        A.  The way that I am interpreting this is my

14   understanding was ONgDB had its own numbering

15   scheme, and so they're referring to the ONgDB

16   version.  I don't know -- I don't know how that

17   relates to anything Neo4j so --

18        Q.  Understood.  I think we had some confusion

19   whether -- when you talked about what version of

20   ONgDB all the servers were running in 2022, you said

21   you thought it was 3.5.2.6 --

22        A.  Sorry.  I missed -- I didn't mean to imply

23   that.  It was the -- what I said with 3.5 and if

24   it's 2.6, that's the Neo4j version that's found

25   within the code.  It's not the ONgDB version.  It's

                                                    194

1    what -- does that make sense?

2        Q.  So you're saying that -- okay.  So you're

3    saying that for in 2022 that the version of ONgDB

4    that was being run on the servers showed up as being

5    Neo4j source code version 3.5.2.6?  Is that fair?

6        A.  Yes.  Yes.  As long as -- my understanding

7    is we're not supposed to use ONgDB term now.  We're

8    using graph database.  But your main point there is

9    what I understand when I talked with Puru, and he

10   looked at the code base of the graph database, and

11   it's referred to as Neo4j 3.5, and if it's 2.6,

12   that's what it would be.  Does that make sense?

13       Q.  Yeah.  I think so.  And you said the

14   different name.  So from the IRS's perspective, the

15   program is the same, it's just the names have

16   changed from ONgDB to GDB.  Is that correct?

17       A.  Yeah.  The way that I understand it from

18   John Mark is that we have all the source code that

19   makes up this graph database, and because it's

20   compiled inside the IRS, because we wanted a copy of

21   the source code from the distribution, his statement

22   was you can't call it GraphStack GDB nor ONgDB

23   because ONgDB is compiled by The Graph Foundation,

24   released by them.  So I'm trying to use the names

25   that -- as I understand how to call them.

                                                        195

1    Q.  Okay.

2    A.  Does that make sense?

3    Q.  Sure.  So then actually what software is

4  being run on the servers in 2022 is what would be

5  called internally GDB 3.5.2.6.

6    A.  Yeah, but I don't think we call them by

7  that versioning.  We just have the GDB version.  I

8  don't even know myself what GDB version we would

9  have.  I think John -- there was still discussion

10  what to call it because it's compiled internally.

11  But it's -- the Neo4j source code says Neo4j 3.5.2.6

12  is what I understand from Puru.

13    Q.  Did he say whether that was Neo4j

14  Enterprise source code?

15    A.  He couldn't tell.

16    Q.  As far as you know, it was a derivative of

17  what was previously called ONgDB?

18    A.  Or at least the process is the same.  I

19  don't -- I don't know how -- how it aligns back to,

20  because I understood in March or April of this year

21  when John Mark Suhy mentioned that what we have is

22  not ONgDB anymore because the ONgDB version is

23  version 1 that's available through The Graph

24  Foundation, and we were using some version, at that

25  time I thought he said GraphStack, but it's compiled

196

1    through I thought the GraphStack.  But now because

2    we have the source code that -- brought in and he's

3    compiling it, we're just calling it GDB.

4        Q.  Okay.  So then in other words, the IRS

5    didn't roll back ONgDB 1.0.  They kept using

6    whatever source code it had on hand at that time in

7    March or April that Mr. Suhy kept on updating.

8        A.  Yes.  We did not -- all I remember from

9    March and April was John Mark said that whatever,

10   you know, whatever happened with the legal issues,

11   that's when I found out that something happened, was

12   in March or April of this year.  And we weren't

13   using ONgDB.  He was bringing in a GraphStack, and

14   so we couldn't call it ONgDB.  That's what I

15   understood.

16       Q.  Okay.  So other than the name, though, were

17   you aware of any changes to --

18       A.  I wasn't -- yeah.  I wasn't -- oh.  Sorry.

19       Q.  I was going to say so there wasn't a

20   switch-over to official Neo4j Enterprise 3.5.2.6 at

21   that time.

22       A.  No.  No.  We didn't switch to Enterprise or

23   anything at that time.  I just understood that the

24   version that we were using in March or April was --

25   I called it GraphStack GDB or something, and then

197

1    later this past summer mentioned that with the code

2    being, as I said, brought in and compiled there, it

3    just needed to be another name.  That's how I was

4    interpreting it.

5        Q.  So where did that Neo4j source code that is

6    now maintained internally come from?

7        A.  John Mark Suhy.

8        Q.  And to your knowledge, what license is that

9    source code under?  Is it under the AGPL?

10       A.  As far as I know.  Yeah.  I haven't been

11   informed of any other requirements.

12       Q.  And it's not under the AGPL clause

13   comments?

14       A.  I'm not -- as far as I know, no.  I have

15   not been told that or brought up or anything.  No.

16       Q.  Okay.  I'm going to go ahead and mark the

17   next exhibit.  Sorry.  I'm trying to do this as

18   quickly as possible.

19            (Exhibit 179 is introduced.)

20            THE WITNESS:  Okay.  I have it up.

21   BY MR. RATINOFF:

22       Q.  This will be Exhibit 179, and this is an

23   email that was also produced by the IRS.  And you'll

24   see it is -- there's a scrambled from, but you see

25   it's to yourself and LuLu.  I can't remember if you

198

1          A.  Yes.  Yes.  That's correct.

2          Q.  Or what's now called GDB?

3          A.  Yes.

4          Q.  You'll be happy to know I'm going to skip

5     over a few exhibits.  Now, we talked a little bit

6     about YK1.  Was there an initiative -- or is there

7     an initiative to merge YK1 into CKGE?

8          A.  Yeah.  There have been for a couple of

9     years.  And the original integration is -- has been

10    sort of back-end stuff, accounts management or

11    logging.  Those have been thrown around as ideas.

12    At the current time even it's -- nothing's happened.

13    It's sort of operated as its own entity.  There's --

14    I don't think they've integrated anything.  But by

15    integration, as I said, that's starting off to be

16    sort of back-end stuff, accounts management,

17    bringing in the YK1 UI and seeing if it could be

18    part of the app.  That's where the home page is

19    where people go to when they first log in to the CKG

20    UI.  Those kinds of things.

21         Q.  As of now, as you said, I guess starting in

22    I think, according to my notes, starting in 2019 at

23    least, the YK1 was running ONgDB independently on

24    its own server and still is to this day.  Correct?

25         A.  Correct.  It's still is on its own sort of

204

1    environment.  And as far as I know, they're running

2    it on its own server or -- whatever they have it

3    installed on in YK1, those two prod and two dev

4    tests.

5        Q.  And has Mr. Suhy been involved in

6    supporting the ONgDB installations in the YK1

7    servers?

8        A.  Probably early on.  I would think yes.  The

9    way that it happened was there was a particular task

10   order to have some contractors help develop that YK1

11   database.  They were doing the work.  John Mark Suhy

12   may have consulted with them, helped them as part of

13   his eGov services.  But there was a -- there was a

14   separate group that stood up the first version, and

15   there's been separate people actually just updating

16   the data since then.

17       Q.  Okay.  As far as the YK1's version of

18   ONgDB, do they obtain that, the updates on the

19   software from the same source of CKG from the GitLab

20   that you mentioned?

21       A.  They would -- yeah, you would get it from

22   the same source here internally when it's brought

23   in.

24       Q.  So which would be brought in by Mr. Suhy,

25   then.

205

1    A.  Yes.  He's still the primary one.  Yes.

2    Q.  So he still has the primary responsibility

3  for maintaining the -- what was ONgDB and is now

4  GDB?

5    A.  Yes.  Or -- yes.

6    Q.  What contract is that under?

7    A.  It's still eGov.

8    Q.  The one we talked about earlier today?

9    A.  That's correct.  Yes.

10    Q.  Okay.  We've been going for I don't know

11  how long.  Want to take a quick five-minute break?

12  I think Shelley's saying yes.

13    A.  Okay.

14    Q.  I'm going to switch topics here, and I'm

15  actually getting closer to end here, which is good

16  news.  So I think it would be a good time to take a

17  break.  Also I noticed it's getting dark there on

18  the East Coast.  It's a little dark on the video.

19  So I don't know if you have another light you can

20  put on when we come back.

21    A.  Yeah.  Let me see what I can do.  I see

22  what you're saying.  Okay.  Yeah.  Let me see if I

23  can work on something.

24    MR. RATINOFF:  It's 2:37 now.  Let's come

25  back at 5:45.  Little longer than five minutes.

1           THE WITNESS:  Okay.

2           THE VIDEOGRAPHER:  We are now going off the

3    video record.  The time is 2:37 p.m.

4           (A recess was taken.)

5           THE VIDEOGRAPHER:  We are now back on the

6    video record.  The time is 2:56 p.m.

7           (Previously marked Exhibit 149 is

8    referenced.)

9    BY MR. RATINOFF:

10       Q.  I just want to keep moving along here.  I

11   know it's late on your end.  I'm going to drop the

12   next document in the chat.  This is previously

13   marked as Exhibit 149.  It's an email produced by

14   the IRS.  The last email being I believe dated on

15   September 28th, 2019.  The subject is "ONgDB

16   deepwalk and new graph analytics library,

17   et cetera."  You'll see there's a Bates number 1292.

18   So I'll represent to you this is produced by the

19   IRS.  And do you believe this is a true and correct

20   copy produced by the IRS other than the exhibit

21   sticker on there?

22       A.  Yep.  No issue.

23       Q.  Okay.  Then taking a look at the email that

24   you sent in the beginning here, you'll see that it's

25   sent a whole host of folks.  It says, "Hi, The team

                                                      207

1    has updated some stuff for ONgDB."  And then you'll

2    see that there is a third bullet point that says,

3    "ONgDB 3.5.9 is now the master."

4         A.  Yes.  I do.

5         Q.  And then there's that URL.  Obviously it's

6    inactive, but it's among the words in there.  It's

7    cdwgit.web.irs.gove/ongdb/distributions/tree/master.

8         A.  Correct.  Yes.  I see that.

9         Q.  Is that referring to whatever that at the

10   time was the most current version of ONgDB that the

11   IRS was using?

12        A.  Yes.  It would have been.

13        Q.  And that main root of that URL is pointing

14   to the internal GitLab that the IRS maintains?

15        A.  That's correct.

16        Q.  And is that where Mr. Suhy would maintain

17   the most recent version at the time of ONgDB on

18   behalf of CKGE?

19        A.  Yes.  I would -- yeah.  I would think so.

20        Q.  So when you're referring to the master, you

21   mean that's just the most recent version of ONgDB

22   that at that time everyone should be using in the

23   CKGE environment?

24        A.  Yes.  I would think so.  Yeah.  I don't

25   know why the term "master."  Maybe because that's

208

1    the, that's the -- on the end of the Git URL it has

2    master, so that's probably why I use master.  I

3    don't know why else I would have used it.

4        Q.  And up until the time that the name was

5    changed to GDB, Mr. Suhy maintained the source code

6    for ONgDB on behalf of the IRS?

7        A.  Yes.  What I don't know is if these were

8    the ONgDB downloaded binaries at the time and not

9    the full source code.  So either way, my view, that

10   would have contained the ONgDB file that people

11   would use.

12       Q.  So, for instance, if they wanted to run

13   their own instance on a laptop, that's where they

14   would go to find the latest version of --

15       A.  Yes.  Yes.

16       Q.  And it was important for them to be running

17   whatever version that the actual CKGE environment

18   was running independently on their laptops for

19   compatibility?

20       A.  Yeah.  I know that there were -- I believe

21   some people had for probably I guess development

22   purposes or what, if it was down to a laptop, I

23   don't know how many people actually had it on their

24   laptops.  But this would have also been, I would

25   think, where if you were replacing or updating one

209

1    of the servers, you would get that.  So it's

2    essentially putting to -- you know, pointing

3    everybody to where the master is or the most current

4    version.

5          Q.  Okay.  Then I'm going to go ahead and put

6    the next exhibit in here.

7                (Exhibit 181 is introduced.)

8                THE WITNESS:  Okay.  I see it.

9                MR. RATINOFF:  This will be tab 474.  I

10   believe we are at Exhibit 150 --

11               (Reporter clarifies number.)

12   BY MR. RATINOFF:

13         Q.  181.  So I've just dropped in will be

14   marked as Exhibit 181.  It's an email exchange that

15   was produced by the IRS with the email -- sorry --

16   the Bates number of 473 at the end there on the

17   first page.  Subject is "Graph for local install,"

18   sent on 11/12/2019 to Mr. Suhy.  The last email

19   there.  Do you see that?

20         A.  I do.

21         Q.  Any reason to believe that this is not a

22   true and correct copy of an email produced by the

23   IRS?

24         A.  Yep.  No issues.

25         Q.  Then looking at Mr. Suhy's email on the

                                                        210

1  bottom of the first page, Bates number 473, "Here is

2  how to run it on your local laptop.  Download the

3  latest ONgDB for Windows."  It looks like a similar

4  URL to the last exhibit we were looking at.

5  Correct?

6       A.  Correct.  Yes.

7       Q.  And then there's an actual direct link to

8  3.5.11?

9       A.  Correct.

10      Q.  And that would be whatever the latest

11 version that was made available by Mr. Suhy to RAAS

12 as of November 2019.  Is that accurate?

13      A.  Correct.

14      Q.  So to best of your knowledge, at least as

15 of towards the end of 2019, the latest version of

16 ONgDB that was running on the CKGE environment would

17 have been version 3.5.11?

18      A.  That makes sense to me.

19      Q.  No reason to believe otherwise?

20      A.  No reason to believe otherwise.  Yes.

21      Q.  And going from November of 2019 -- I think

22 we talked about this a little bit earlier.

23 Unfortunately, I don't have any documents that were

24 produced by the IRS after early 2020, so I don't

25 know if you in your conversations with your

211

1      So at least in 2020, the version would have

2  been at least what version was being used at the end

3  of 2020, which was 3.5.11?

4      A.  That makes sense.  Yes.  I agree with that.

5      Q.  Okay.  So -- but it's possible in 2020 that

6  ONgDB was operated from 3.5.11 to a more recent

7  subversion, but you just don't know as you sit here

8  today what that version --

9      A.  That's correct.  That's correct.  I don't.

10      Q.  And same thing for 2021, all the servers

11  that we were talking about, including CKGE, YK1,

12  et cetera, earlier, those would be running at least

13  a version 3.5.11, if not something later of ONgDB?

14      A.  Well, I believe sometime around -- did you

15  say '21?

16      Q.  Yes.  2021.

17      A.  Sorry.

18      Q.  So in 2021, all of the servers -- strike

19  that.

20      All of the instances of ONgDB that were

21  being run at the IRS, including CKGE, as of 2021

22  would have been at least using ONgDB version 3.5.11.

23      A.  Yes.  I believe so.  Yes.

24      Q.  Including CKGE?

25      A.  Correct.  Yes.

213

1    Q.  Okay.  And then for 2020 -- okay.  That was

2    2021.  I think you were going to 2022.  We talked

3    about this earlier.  So you said sometime between

4    March and -- well, strike that.

5         So sometime between 2020 and 2022, there

6    was an upgrade to -- sorry.  Let me start over

7    again.  I'm trying to figure out how to best

8    articulate this.

9         You previously testified that there was a

10   change in name of the version of graph database

11   software being used on the CKGE amongst other

12   instances of ONgDB.  Correct?

13   A.  Correct.

14   Q.  So as of -- and I believe you said it was

15   somewhere in March or April of 2022?

16   A.  Correct.  Yes.

17   Q.  Okay.  So up until that March/April 2022,

18   all of the servers running instances of ONgDB that

19   we were talking about were running what was called

20   ONgDB.  Actually, that's a bad question.  Strike

21   that.

22        So up until March/April of 2022, all of the

23   instances of ONgDB that you had identified in 2021

24   were still running ONgDB in 2022.  Correct?

25   A.  I believe so.  I don't know -- I don't know

214

1    when the ONgDB was switched over to something that

2    wasn't labeled ONgDB except for in March and April.

3    So does that make sense?

4         Q.   So you don't exactly when that switch in

5    nomenclature was made, but at least prior to let's

6    say March of 2022, CKGE, for instance, was running

7    some version of ONgDB?

8         A.   I was at least referring to it as ONgDB.

9    So that's when John Mark Suhy told us that, as I

10   said, it wasn't ONgDB.  So I was referring to it,

11   other people were referring to it as ONgDB up until

12   March and April until that -- John Mark Suhy

13   contacted us and said that.

14        Q.   Did he explain why the name had to be

15   different?

16        A.   Yeah, I believe -- well, I don't know quite

17   what I remember except for just the name change.  If

18   he said anything.  I do -- I -- I believe there was

19   a discussion about there was a settlement or

20   something the previous year based on the legal case,

21   which I didn't even know was over.  But that what we

22   had now was not the ONgDB version that The Graph

23   Foundation was releasing.  It was, as I said, I

24   think we called it GraphStack GDB.  And I forgot the

25   number or what version it was.

215

1    Q.   So as far as the -- when Mr. Suhy asked you

2    to stop calling it ONgDB, did he say there was going

3    to be any functional changes in the operation of the

4    software?

5    A.   Nope.  He did not.

6    Q.   It was just a name change as far as you

7    knew?

8    A.   As far as I -- yes.  Correct.

9    Q.   So it wasn't like he brought in an entirely

10   new set of binaries to install on the CKGE

11   instances?

12   A.   I don't know that.  Yeah.  I don't know

13   because we didn't get into sort of the binaries and

14   if they were different.  I was just -- I was

15   understanding that as things get upgraded or bug

16   fixes or whatever, different versions are made

17   available.  But I just don't know when -- you know,

18   I don't know that, myself, anything about the

19   underlying binaries.  I would defer to John Mark

20   Suhy on that.

21   Q.   Okay.  There's no one else at the IRS who

22   would be better to talk to than Mr. Suhy?

23   A.   I don't know -- I don't know about how

24   detailed the specifics would be.  There could be

25   some people who might know, but I can't -- I don't

216

1   know for certain.

2       Q.  So Mr. Suhy is the only person that comes

3   to mind with certainty who would be able to answer

4   that question?

5       A.  Yeah.  Towards certainty.  Yes.

6       Q.  And would the IRS have any issue with

7   Mr. Suhy providing that information?

8       A.  Let me ask Jonathan and them on that

9   question, because I don't think I could say yes or

10  no on that.

11      Q.  Okay.  I'll have that conversation with

12  him --

13      A.  Okay.  Yeah.

14      Q.  -- with Mr. Beene and Mr. Tepper.

15      A.  That's above my pay grade.

16      Q.  Yeah.  I wasn't trying to put you on the

17  spot.

18      A.  I understand.

19      Q.  I just need to know who to talk to.  All

20  right.  Let me go ahead and let me ask you -- let me

21  switch gears.

22          Are you familiar with a project called the

23  Knowledge API or the KGAPI project?

24      A.  I am familiar with it.  Yes.

25      Q.  And what is that project?

                                                      217

1        A.  It's a project that is doing pattern

2   matching on graph data that allow users not having

3   to know Cypher and not starting with an

4   anchor-based, you know, entity to find the number of

5   sub-graphs or networks that match that pattern.

6        Q.  Okay.  And was that a project that -- or a

7   prime contract that was awarded to Tyler Data

8   Services?

9        A.  As far as I know, yes.  It wasn't -- these

10  are not projects I'm directly involved with, so I'm

11  giving you what I know.  But yes, that was Tyler

12  Data Services.

13       Q.  And are you aware of Mr. Suhy also being a

14  contractor in relation to that project?

15       A.  Yes.  I am.

16       Q.  And was the KPG -- I'm sorry.

17            The KGAPI project, was that something that

18  worked with ONgDB?

19       A.  It did.  It used GDB stored data.  Yes.  It

20  queried -- - I believe it queries one of the main

21  graphs.

22       Q.  When you say main graphs, you mean as far

23  as main graph in production?

24       A.  Yes.  As far as I know it uses one of the

25  main graphs in production.  I could -- as far as I

218

1    were -- you know, who could be using this.  So I

2    would have been telling Ovi that okay, GraphGrid was

3    approved.  If you're interested, you at least are on

4    the change -- or the approval form to be able to use

5    it if you wanted to.

6         Q.  And then are you familiar with the term "IT

7    whitelist"?

8         A.  Yes.

9         Q.  What's an IT whitelist?

10        A.  That would be the websites or those kinds

11   of external, you know, external to the IRS sites

12   that people can download from.  So the whitelist

13   essentially is Cyber opening up or, you know, you

14   have the permission to download from there.

15        Q.  Sort of there's been a determination it's

16   legitimate software, not some sort of spyware or

17   something like that?

18        A.  Yeah.  So in this case, I believe the

19   sequence in some way was, you know, this is

20   approved, and I would assume a whitelist or a IRS

21   whitelist is to get the -- wherever you would

22   download from whitelisted so you could get, in this

23   case, we'll say GraphGrid's, the software that

24   you're going to work with.

25        Q.  But you weren't -- you weren't contracted

                                                        223

1    that.  So John Mark Suhy, I believe around that time

2    or maybe slightly before, had joined Graystone's,

3    and Graystone's grid started -- they wanted to have

4    conversations about -- I guess the GraphStack

5    components were being absorbed by Graystone, for --

6    for lack of a better word, their own product.  And

7    so we were going, you know, it was around -- I think

8    it was involving sort of those discussions, and I

9    was showing him what -- I believe this is the 2020

10   list.  That -- I'm trying to see if there's any

11   other dating.

12          Yeah.  So this would have been the 2020

13   list.  So I was showing him what GraphStack

14   components were listed in there and what we had on

15   record.  And also underscoring that, you know,

16   GraphStack was approved in the IRS as a bundled

17   component of GraphGrid.  So I was -- I think we

18   had -- it was a phone conversation or something, and

19   I said, well, I'm sending you what we have.  So

20   that's probably why there's no context or anything.

21   It's just me forwarding whatever I had.

22          Q.  Gotcha.  You mentioned Graystone's.  What's

23   Graystone's?

24          A.  I believe Graystone's is a company -- well,

25   obviously they are a company.  They are a company

227

1    and John Mark Suhy has joined them, I don't know, I

2    think sometime this summer.

3         Q.   And does Graystone's have any independent

4    contracts within RAAS?

5         A.   No.  They have no contracts.

6         Q.   And you mentioned there was a Graystone's

7    product that they were absorbing.  Is it called Gray

8    Raven?  Does that sound familiar?

9         A.   No.  I don't know if Gray Raven is -- I --

10   they were -- I thought the name they were thinking

11   about or discussing was GrayStack, but maybe it is

12   Gray Raven.  I don't know.

13        Q.   And what did he tell you about the

14   circumstances of why he joined Graystone's?

15             MR. BEENE:  Objection to relevancy.  Object

16   to the form.

17   BY MR. RATINOFF:

18        Q.   You can answer.

19        A.   Okay.  So I can answer?

20        Q.   Yes.  He assert his objections for the

21   record and then you can answer.

22        A.   Okay.  I gotcha.  Why did he join?  As far

23   as I know -- remember, it was just -- I don't

24   know -- I can't -- I don't know if I have a specific

25   idea about why.  I know he had talked about joining

228

1    a company.  They thought that they, you know, were

2    sort of, call them kindred spirits, and I don't know

3    if there was any -- I don't remember anything else

4    as a reason.

5         Q.  Did he say anything to you about no longer

6    doing work for the IRS because he was going over to

7    Graystone's?

8         A.  No.  He didn't.

9         Q.  Did he assure you that he was going to

10   continue fulfilling his obligations under the

11   current eGovernment Solutions contract?

12        A.  Yes.

13        Q.  Did he indicate whether GrayStone's is

14   going to take over eGovernment Solutions' contract?

15        A.  No.  And I remember, you know, referring

16   them to a contracting officer.  I mean, I don't -- I

17   can't do anything with that.  So if, you know, if

18   eGov was absorbed into Graystone's, they need to

19   deal with that with the contracting officer.  I

20   believe I've told them that.

21        Q.  Okay.  So he did say that he needed to have

22   them take over his contract and --

23        A.  Oh.  I'm sorry.  No.  I don't mean to imply

24   that.  No.  I don't remember the contract -- as far

25   as I know, you know, we still have the contract --

229

1    Q.  But not GraphGrid.

2    A.  Yeah, no.  This is -- we haven't had any

3  discussions about this in quite awhile.

4    Q.  So we were talking about the Nussbaums.

5  Are you -- so you're familiar with Brad and Ben

6  Nussbaum.  Correct?

7    A.  I am.  Yes.

8    Q.  That was in part due to The Graph

9  Foundation conversations you had with Mr. Suhy we

10  talked earlier today?

11    A.  That was the very beginnings.  Yes.

12    Q.  And are your aware of another entity called

13  AtomRain?

14    A.  I am.

15    Q.  And what's your understanding of what

16  AtomRain is?

17    A.  I believe AtomRain is just a separate

18  company to GraphGrid.

19    Q.  Okay.  And that's a company that Ben and

20  Brad Nussbaum are also involved with?

21    A.  Yes.

22    Q.  And what's your understanding of their role

23  at AtomRain?  "They" being the Nussbaums.

24    A.  As far as I understand, the principals of

25  it.  CTO, CEO, those kinds of things.

235

1          Q.   Has the IRS specifically -- RAAS entered

2    into any sort of contracts or purchase orders with

3    AtomRain?

4          A.   I -- yes.   They have.

5          Q.   And is there more than one?

6          A.   I don't know if there are -- I don't know

7    how many there are in what way.   I don't have any

8    direct oversight on that.

9          Q.   Okay.   Are they -- are they currently -- is

10   AtomRain currently a contractor at the IRS?

11         A.   As far as I know.   Yes.

12         Q.   And is AtomRain working on any projects

13   relating to the CKGE?

14         A.   As far as I know, yes.

15         Q.   And what projects are those?

16         A.   I believe they're working on the corp

17   graph, and I believe that they're working on the --

18   I believe it's the ghost preparer.   But again, I

19   don't manage those -- I don't do any -- so -- but I

20   believe those are at least two.   They're also, as

21   far as I know, still listed as sort of people on the

22   eGov contract.   But, you know, that's handled

23   through eGov.   So their names would be on that,

24   still on that contract, I believe.

25         Q.   And are you aware of any AtomRain employees

                                                          236

1   working as subcontractors with ASR Analytics?

2        A.   Yeah.  I believe those are -- that's what I

3   was referring to as their projects.  I believe that

4   they're working -- I believe that ghost preparer is

5   a partnership with ASR.

6        Q.   And is the court graph, is that an

7   ONgDB-based database?

8        A.   It is.

9        Q.   How long has that court graph been around?

10       A.   That's the corporate graph we talked

11   about --

12       Q.   Oh.  Corporate.  I thought you said court

13   graph.

14       A.   Oh, sorry.  Corporate graph.  Yeah, sorry.

15       Q.   Gotcha.  Okay.  So corporate graph.  So we

16   talked about that already as existing for a few

17   years and running at least one instance of ONgDB.

18       A.   Yes.

19       Q.   And also you mentioned ghost preparer as

20   being also something that was running ONgDB in the

21   dev environment?

22       A.   Yes.  That's correct.

23       Q.   And at this point is -- corporate graph is

24   running GDB now?

25       A.   Yes.  It is.  Correct.

237

1      Q.   And then same with the ghost preparer, is
2  also running GDB?
3      A.   Yes.
4      Q.   And, let's see, I think there's something
5  that Mr. Tepper just provided during this
6  deposition.  Let me see if I've got the right one.
7  These contract numbers are all kind of the same.
8  Let me find the right one here.  Here we go.
9          I'm going to go ahead and drop this next
10 document into the chat.
11         (Exhibit 185 is introduced.)
12         THE WITNESS:  Okay.  I see it.
13 BY MR. RATINOFF:
14     Q.   It's a long one.  I'm going to point you to
15 some specific places, but go ahead and take a look
16 to familiarize yourself.  While you're doing that, I
17 believe -- go back.  I'll just ask Shelley.  What
18 exhibit are we at?  184?
19         THE REPORTER:  We are at 185.
20 BY MR. RATINOFF:
21     Q.   185.  I'm always one behind.  Exhibit 185.
22     A.   Okay.
23     Q.   Do you recognize what's been marked as
24 Exhibit 185?
25     A.   Yeah.  It looks like a procurement order.

238

1    I don't think I've ever seen it before.

2        Q.  Does the contract number look like an IRS

3    contract number?

4        A.  It does.  Yes.

5        Q.  And then you'll see it was awarded to ASR

6    Analytics?

7        A.  Okay.  Yes.  I do.

8        Q.  You mentioned they're a contractor

9    currently working in RAAS?

10       A.  They are.  Yes.

11       Q.  Are they also -- are they specifically

12   working on the CKGE?

13       A.  They do.  Yes.

14       Q.  You'll see if we go down to I think it

15   would be page 6 out of 67 in the PDF, because

16   there's no page number.  The heading says,

17   "Performance Work Statement"?

18       A.  Yes.  I see it.

19       Q.  Okay.  Just move down here.  You see

20   there's a scope of engagement?

21       A.  Yes.

22       Q.  That's on page 7 of 67.  It says, "This

23   engagement involves contractor support for Corporate

24   Graph Database Modules.  Specifically, the

25   contractor shall provide analytical support to RAAS'

239

1    Data Exploration and Testing Division."

2           Is this the corporate graph database

3    contract you were just referring to?

4           A.   Yes.   It is.

5           Q.   And then going to page 17.

6           A.   Okay.   I'm there.

7           Q.   Yeah.   17 of actually -- I'm sorry.   Page

8    28 out of 67.   Apologies.

9           A.   Okay.   I'm there.

10          Q.   Okay.   The heading is "Knowledge, Skills

11   and Capabilities Required."

12          A.   Yes.

13          Q.   You see a list of names here, one of them

14   being Amanda Bouman?

15          A.   Yes.

16          Q.   Is she -- to your knowledge, is Amanda

17   Bouman an AtomRain employee?

18          A.   Yes.   As far as I know.   Yes.

19          Q.   And then Elizabeth Trenholme, is she also

20   an AtomRain employee?

21          A.   Yes.   As far as I know.   Yes.

22          Q.   And Mr. Nussbaum, Benjamin Nussbaum is also

23   an AtomRain employee?

24          A.   Correct.   Yes.

25          Q.   And those are -- all three of those are

240

1  currently working as subcontractors under this

2  contract?

3       A.  Yes.  Yes.  If the option years -- as far

4  as I know, they would be if the option years are

5  continuing.  Again, I don't do anything really with

6  this contract.  So as long as the option years are

7  still current -- I believe Amanda Bouman is working

8  on the corporate graph, so I believe it's still

9  active as far as I know.

10      Q.  You'll see underneath the names that we

11  just looked at there's a -- "The government desires

12  a balanced team of key and non-key personnel

13  proposed by the contractor."

14          And then it continues on to the next

15  paragraph.  "Experience with IRS data file

16  structures and formats; IRS business processes and

17  systems architecture; ETL/T processes; SAP IQ or

18  column data stores; Bash; Open Native Graph Database

19  (ONgDB)" as being one of those file structures and

20  formats.  Is this accurate?

21      A.  Yes.  As far as I know.  Yeah.

22      Q.  So the individuals listed above would need

23  to be able to work with ONgDB within the CKGE

24  environment?

25      A.  That's how I would interpret it.  Yes.  Or

241

1    at least one of them.
2         Q.  Or in this case the corporate graph
3    environment which --
4         A.  Yes.  This is for the corporate graph
5    project.  Right?  So this would be using these
6    capabilities or working with this for that project.
7         Q.  And then up until approximately I guess
8    March of 2022, that corporate graph database was
9    running ONgDB.  Correct?
10        A.  As far as I know.  Yes.
11        Q.  And then it switched over, in name at
12   least, to GDB sometime between March and April of
13   2022?
14        A.  As far as I know.  Yes.
15        Q.  No reason to believe not --
16        A.  No.  Not that I'm aware of.  No.  I don't
17   know the specifics, though.  But that's as
18   reasonable to me as anything else.
19        Q.  And you mentioned you were aware of -- I
20   think you testified you were aware of some
21   litigation that you didn't know if it was resolved
22   or not.  Do you recall mentioning that?
23        A.  Yes.  I do.  Yes.  Back to the March and
24   April time frame?
25        Q.  Yeah.

                                                        242

1      A.   Yes.

2      Q.   And what litigation were you referring to?

3      A.   I believe this dispute that you all are

4   involved in.

5      Q.   Were you ever aware of any dispute between

6   Neo4j and AtomRain and Graph Foundation?

7      A.   I -- yes.   I guess in the sense that I --

8   well, yeah, I guess so with the Graph Foundation.

9   Yeah.   I think.   At the very beginning many years

10  ago, I thought it was all involved.

11     Q.   Did you have any understanding from the

12  Nussbaums whether that dispute had been resolved?

13     A.   I believe in March and April it came across

14  that it got resolved and -- and -- with The Graph

15  Foundation.

16     Q.   Okay.   And that's one of the reasons that

17  precipitated the name change?

18     A.   Yeah.   It seemed like it.   Yes.

19     Q.   Just to be clear, that was March, April

20  2022?

21     A.   That's correct.

22     Q.   Did anyone from AtomRain or Graph

23  Foundation or GraphGrid inform you that an

24  injunction had been entered against them in 2021?

25     A.   No.

243

1   And I was -- I asked some questions that I was

2   gathering for my director and everybody to just

3   understand about sort of what the legal -- what the

4   rights of The Graph Foundation were.  Because as I

5   understand it, The Graph Foundation, as far as I

6   know, still had or available for download ONgDB

7   version 1, which had some statement about that this

8   product was something from July or something like

9   that of last year.  And so I was -- I just asked the

10  questions about -- with the idea that ONgDB

11  version 2 was going to soon be sent out.  I was

12  asking about sort of, you know, the basis of that,

13  how did it match up with the settlement.  And Ben

14  Nussbaum, you know, replied with sort of saying that

15  no, it would adhere to the policies.  I don't think

16  he could get specific because of a NDA.  So that's

17  where it ended.

18       Q.  NDA with who?

19       A.  I don't know.  He just said an NDA.  I

20  don't remember with anybody specifically.  But I

21  just remember that as being sort of stated.

22       Q.  Now, you mentioned ONgDB 1.0.  What was

23  your understanding of what ONgDB 1.0 was or is?

24       A.  It is -- the way I -- the way I understand

25  it is it has a certain -- it's using a certain Neo4j

251

1   code base that is -- from the description meets the
2   terms of the settlement, and so it got re-labeled as
3   version 1.
4        Q.   Do you have any understanding as to whether
5   the ONgDB version 1, the rollback of the source code
6   is older, an older version than what the IRS is
7   currently using?
8        A.   I can't remember what -- I believe on their
9   website they have the version number that's there.
10   But I can't remember what number it is compared to
11   what I just said the Neo4j code that I just
12   mentioned earlier.
13        Q.   Okay.  Other than the actual number, is it
14   your understanding that ONgDB 1.0 was using older
15   Neo4j source code than what the IRS is currently
16   using?
17        A.   I would -- I think so based on my
18   recollection.  I believe so.
19        Q.   And what was -- what was the explanation
20   for what ONgDB 2.0 would be?
21        A.   I believe that it's using -- well, I can't
22   remember anything specifically, but ONgDB version 2
23   would use some Community Edition or something like
24   that that would have the plug-ins added to it, or at
25   least -- well, no.  No.  I think maybe the Community

252

1    Edition with whatever else they're going to add to

2    it, which I don't really know because haven't heard

3    about it any further.  Maybe that's what it is.

4    Sorry.  I'm trying to remember things.  The

5    Community Edition would be the part of ONgDB

6    version 2, and there would be, I think, some

7    additional features added to it.  But as I said, I

8    don't know what those are.  And I think we had a --

9    awhile ago asked for whatever it was, the release

10   notes, and I can't even remember if that was -- if

11   anything was sent back.

12        Q.  Does the IRS -- sorry.  Strike that.

13            What is the current plan with the CKGE as

14   far as continuing with GDB?

15        A.  I think that the -- we're looking at the

16   other options.  Reached out to Neo4j to look at the

17   Enterprise Edition.  Part of it is going to be

18   dependent upon other parties in the IRS and sort

19   of -- there's a separate unit in IT that is looking

20   to build out a platform.  And so it could be -- it

21   could somehow be evolved into that through some

22   project life cycle process, whatever.  And I don't

23   know, it depends -- I don't know.  That's so

24   generalized, I don't even know if I could get more

25   specific than that.

253

1    Q.  And then as far as the current level of
2   performance with, for instance, the CKGE production
3   or main graph, I guess is what you used, are you
4   using any, to your knowledge, Enterprise-level
5   features?
6    A.  The only feature that I know that would be
7   listed in the Enterprise when looking at Community
8   versus Enterprise is there's a node ID that the
9   Enterprise automatically does.  And so that would --
10   that would be the feature that would be the
11   different -- or that feature would be, of the
12   Enterprise features, the one that, you know, we
13   would want to use or we would have to do a
14   work-around if we had the Community Edition.
15    Q.  So currently the main graph isn't operating
16   any clusters?
17    A.  No.  We still -- the -- the instances are
18   sort of stand-alone and, you know, they're not
19   really clustered for workload distribution.  It's
20   sort of, you know, a UI goes here, analyst graph,
21   people go here.
22    Q.  Are you using horizontal scaling in any of
23   the graphs databases with main graph?
24    A.  What do you mean by horizontal scaling,
25   just so I make sure I know.

254

1    so it's just installed on the server.  So it's using

2    whatever is needed amongst the size.  So there was

3    no way that they could say, oh, it's using four

4    cores, six cores, or what have you.

5         Q.  Based on the emails that we looked at

6    earlier, there was at least 12 cores being used from

7    the start.  Correct?  Sorry.  Let me rephrase that.

8         A.  Yeah.  Go ahead.

9         Q.  The capability of 12 cores was something

10   that was originally contemplated?

11        A.  Yes.  Sp -- sorry.  I interrupted you.

12        Q.  Let me -- I know you want to get out of

13   here --

14        A.  No.  No.  Shelley's going to kill me if I

15   keep interrupting.

16        Q.  So then the number of cores that originally

17   the IRS is looking at was 12, and that was in the

18   development phase.  Was there a greater need once

19   CKGE went into production for more than 12 cores?

20        A.  I -- I don't know because, again, it's sort

21   of -- the way that it's installed on the bare metal,

22   it's just using the cores.  And I asked, there was

23   the answer from Puru Komaravolu in this instance was

24   he's not able to tell how many are used typically or

25   anything.  So it was left with just an answer --

257

1   basically, well, if we wanted the Enterprise

2   Edition, sort of what would be the bare minimum.

3   Bare minimum to be able to put what we wanted into

4   production, what would be the bare minimum, and he

5   said 2 by 16.  So two nodes each with 16 cores.

6       Q.  Okay.  When you say two nodes, you mean two

7   graph instances or two instances --

8       A.  Yeah.  We would -- again, not -- I don't

9   think anybody's interested in the clustering, so it

10  would be sort of two, two separate instances, each

11  with 16 cores is sort of the bare minimum.

12      Q.  Then when we talked about that email

13  earlier -- I think it was a December 12 -- I'm

14  sorry, December 11th email where I think Mr. Martin

15  was asking about the DL38 server capabilities, you

16  were looking at servers with 32 cores.  Correct?

17      A.  Yeah.  Those -- those servers may just come

18  with those cores.

19      Q.  And you just may not -- strike that.

20      In other words, probably at least in

21  guesstimation would only be half of those 16,

22  correct, that would be used?

23      A.  You could.  It's hard to tell back then.

24  But, you know, given right now with the size, I

25  would say it could be less, because the graph has

258

 1    grown over those years back, you know, 2019, 2018,
 2    2020.  You know, it's just the size of the graph.
 3            Now, back to your point earlier was well
 4    the number of users has grown.  So right now we have
 5    about -- I think about 6,000 logins a month.  And
 6    they're all using a set Cypher query define.
 7    They're not doing their own Cypher writing.  So it's
 8    a set -- oh, shoot.  I'm sorry.  I'm late for a
 9    church meeting, but I'll handle them.
10        Q.  I'm sorry.  I apologize for that.
11        A.  That's okay.  What was I gonna say.  Oh,
12    user.  So back then we had a few hundred, probably
13    maybe less than a handful of people per hour.  My
14    working rule of thumb has been probably about maybe
15    200 an hour now logins.  You know, if you take the
16    6,000 logins per month.  So that's not necessarily
17    you need people or anything.  So it's just a rough
18    order.  But, you know, if Puru -- if the discussion
19    was sort of let's go with two 16-core instances,
20    then that's, you know, sort of the best that I can
21    understand right now.  And that would include the
22    main -- I believe the idea would be to include the
23    main graph, YK1, you know, all in that sort of
24    setup.
25        Q.  So then just current needs, you're saying

259

1    there are 6,000, approximately 6,000 logins based on

2    that 200 per day, and so you're saying current need

3    would be two instances of 16 cores?

4         A.   Not -- sorry.  Not 200 a day.  Probably

5    around 200 an hour.

6         Q.   200 per hour.  Sorry.  Thank you for

7    correcting me.  So just to be clear, when you say

8    Puru said two instances at 16-core, he was referring

9    to the current need?

10        A.   Yes.  The current need.

11        Q.   And were you able to get any more

12   information along those lines with respect to any

13   other graph instances, such as corporate graph or

14   COVID?

15        A.   Um, I believe if -- so COVID, while it's in

16   production, that data is eventually just going to

17   bleed into the main graph.  It's very limited use

18   and it's use is dwindling.  You know, I'm not sure

19   that that's really a key factor.  So the main graph

20   really is.  And then the corporate graph and

21   individual graphs may present more -- more demand

22   for increasing.  I just don't know what that would

23   be.  Because part of it is where these projects end

24   up with what they're doing.  It may just drop.  Or

25   it may be stand-alone or the data may just be added,

260

1   for example, into the main graph as just additional

2   data elements, and the same users just work with it.

3   So it's -- it's hard to know.

4        Q.  Okay.  As far as the, for instance,

5   corporate graph, it would require at least the same

6   minimum one instance, 16 cores.  Is that fair?

7        A.  I don't know.  I really don't know.

8   Because I don't even know -- I'm not even sure what

9   the size of the graph or anything.  I'm just not

10  part of that project.  So I don't know right now

11  what -- how to answer that based on like, you know,

12  your question.

13       Q.  Okay.  So the only ones you can really

14  provide more specifics are the main graph and YK1?

15       A.  Yes.  Yeah.  Those are the two primary ones

16  that I think would be in that sort of, you know,

17  minimum is the way that it was presented to me.

18       Q.  Okay.  So two instances at 16 cores each.

19  What about the memory, did you get information on

20  what minimum memory RAM would be on that?

21       A.  256.

22       Q.  256.  And would YK1 at least as of now need

23  its own instance?

24       A.  My understanding would be it would sort of

25  be brought into the same instance and just as a

261

 1    different schema.

 2           Q.  But as of now, it's still separate.

 3           A.  That's correct.  As of now, everything is

 4    still separate.

 5           Q.  And are you aware that Enterprise Edition

 6    has a faster Cypher ability?

 7           A.  Not -- I don't -- no.  I don't know if I

 8    know it that way.  I mean I -- no.  I understand

 9    from discussions with people that the Community

10    Edition shows faster queries.  But I don't know

11    anything specific about the Enterprise Edition.

12           Q.  You have no understanding that Cypher

13    queries with Enterprise can run 50 to 100 percent

14    faster than --

15           A.  I do not.  It wasn't -- sorry.  Go ahead.

16           Q.  I was going to say if that were the case,

17    then Enterprise Edition would be advantageous, being

18    faster than the Community Edition for the work that

19    the IRS is doing.  Correct?

20           A.  It could if that, if it -- I mean, the

21    question would be is, is the Community Edition speed

22    fast enough.  And, you know, we're -- our users are,

23    you know, just query results, reading the data,

24    looking at it through the UI for the most part, and

25    I don't know -- and they're using a set -- a

                                                        262

1    predefined Cypher query.  I think what you're saying
2    could make sense, but I don't know.  Because it --
3    you know, I don't know if it would matter.  I don't
4    know if end user would know.
5        Q.  Okay.  But if you're an end user and you're
6    able to run your queries faster, you can be more
7    productive.  Isn't that a fair?
8        A.  Yeah.  I would say if it would be faster to
9    return the results and they can work with it faster,
10   I would hope that it speeds up whatever they're
11   doing.
12           MR. RATINOFF:  I am just about done.  I
13   know you've been very patient.  I really appreciate
14   that.  It's already 7:15 there, so I do appreciate
15   your time.  I think at this point I have no further
16   questions.  Although, I do have a few outstanding
17   issues I need to talk to Mr. Tepper about, some
18   documents that we didn't receive in response to
19   subpoena as well as a couple questions I wasn't able
20   to get answers to.  But I think at this point
21   Mr. Beene's going to want to ask you a couple
22   questions.  I assume everyone would like to take a
23   quick break before that happens?
24           MR. BEENE:  That's fine.
25           MR. RATINOFF:  Can I get a time check where

263

1    A.  I believe that would be part of their

2  duties and what they would -- they could do.  Yes.

3    Q.  And for the individual graph, do you know

4  what entity is providing that type of service?

5    A.  Whoever is on the contract for the

6  individual graph.

7    Q.  Is that -- that's not John Mark Suhy.

8  Correct?

9         MR. RATINOFF:  Objection to form.

10        THE WITNESS:  As far as I know, John Mark

11  Suhy's not on that contract or being paid as far as

12  I know.

13  BY MR. BEENE:

14    Q.  Do you know who the entity with the role of

15  maintaining the corporate graph is?

16    A.  I believe the one person that I interacted

17  with is Amanda Bouman.  I believe she was doing the

18  work.  Now, as of late when -- when the corporate

19  graph first stood up, I believe -- I believe she was

20  there.  But John Mark Suhy was working on it

21  whenever that started.  But of late, at least, I

22  don't know, past year, two years, I believe whenever

23  ASR -- I guess if ASR Analytics took over in 2020,

24  it's been since then.

25    Q.  And when you meant -- for reference to John

                                                    274

1     Mark Suhy in the beginning, you mean in 2016 as part

2     that 2016 order.  Is that correct?

3          A.  No.  It would be the eGovernment.  I

4     believe the project team modified the eGovernment

5     task order for that first year so that they could

6     start looking at the corporate graph project.

7     That's when the corporate graph project started.

8     And so that was under eGovernment Solutions until

9     the end of that year and I believe would have been

10    what, 2020, I believe that's when the project team

11    started the new contract.

12         Q.  And the COVID graph, do you know what

13    entity has the responsibility for maintaining that

14    graph database?

15         A.  Nobody now.  It just sits there.  But it

16    was brilliant.  They had the contract.

17         Q.  Which entity maintains the ghost preparer

18    database?

19         A.  I believe that's the project team.  I

20    believe that's the ASR Analytics.  I believe that's

21    who has the project.  I don't know.  Again, these

22    are projects that I don't directly deal with, so

23    some of my understanding could be wrong.  But I

24    believe that ASR Analytics has that.

25         Q.  And then YK1 graph, do you know who

1    maintains the YK1 graph?

2         A.   I believe it's ASR Ana -- well, I

3    believe -- I believe a it's ASR Analytics person

4    who's working with the contractor that has the YK1

5    contract AtImpact.   That's the vendor name,

6    AtImpact.

7         Q.   Do you know who is responsible for

8    maintaining the software under the GraphGrid

9    whitelist?

10        MR. RATINOFF:   Objection to form.

11        THE WITNESS:   Who is maintaining it?   I

12   mean, I've always worked through John Mark Suhy, who

13   is always working under those software components

14   that we were using.

15   BY MR. BEENE:

16        Q.   Does KG allow you to work with Spark or

17   other databases?

18        A.   I believe it still does.   Yes.

19        Q.   Okay.   I would like to mark for

20   identification as Exhibit 188.   This is a IRS price

21   quotation sheet.

22             (Exhibit 188 is introduced.)

23             THE WITNESS:   Okay.   I see it.

24   BY MR. BEENE:

25        Q.   Does this document reflect the scope that

                                                          276

```
1                    DECLARATION OF WITNESS

2

3          I, MICHAEL C. DUNN, hereby declare I am the

4   deponent in the within matter; that I have read the

5   foregoing deposition and know the contents thereof,

6   and I declare that the same is true of my knowledge

7   except as to the matters which are therein stated

8   upon my information or belief, and as to those

9   matters, I believe it to be true.

10         I declare under the penalties of perjury of

11  the State of California that the foregoing is true

12  and correct.

13

14         Executed this _____ day of

15  _____, 20_____, at

16  _____, _____.

17  (City)                              (State)

18

19

20

21                    MICHAEL C. DUNN

22

23

24

25

                                                    292
```

```
1                    REPORTER'S CERTIFICATE
2             I, SHELLEY M. SAILOR, duly authorized to
3     administer oaths pursuant to Section 2093(b) of the
4     California Code of Civil Procedure, do hereby
5     certify that the witness, MICHAEL C. DUNN, in the
6     foregoing deposition was by me duly sworn to testify
7     the truth in the within-entitled cause; that
8     deposition was taken at the time and place therein
9     named; that testimony was reported by me and
10    thereafter transcribed under my direction; that the
11    foregoing is a complete and accurate record of said
12    testimony; and that the witness was given an
13    opportunity to read and correct said deposition and
14    to subscribe the same.  Should the signature of the
15    witness not be affixed, the witness shall not have
16    availed himself of the opportunity to sign or the
17    signature has been waived.  I further certify that I
18    am not of counsel nor attorney for any of the
19    parties in the foregoing deposition and caption
20    named nor in any way interested in the outcome of
21    the cause named in said caption.
22            Reading and Signing was REQUESTED.
23    DATED:  November 27, 2022
24
25            _____
              SHELLEY M. SAILOR, CSR 10254
                                              293
```

**EXHIBIT 6**

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA


NEO4J, INC., et al.,

              Plaintiffs,

vs.                            CASE NO.
                            5:18-cv-07182-EJD

PURETHINK, LLC, et al.,

              Defendants.
_____/


VIDEOTAPED DEPOSITION OF
MICHAEL STAVRIANOS
as representative of ASR ANALYTICS, LLC


DATE:         November 7, 2022

TIME:         10:28 a.m. Eastern Time

LOCATION:    via videoconference


REPORTED BY:  BENJAMIN GERALD
               California CSR No. 14203
               Washington CSR No. 3468
               Texas CSR No. 11912

1

1   Defendants John Mark Suhy, iGov, Inc., and

2   PureThink LLC, and Defendant John Mark Suhy is in

3   attendance.

4          MS. EMBRY:  This is Rebecca Embry of Landman,

5   Crosi, Ballaine & Ford for non-party deponent

6   Michael Stavrianos, and attending is general counsel,

7   Vanessa Champion, by phone.

8                      --o0o--

9                 MICHAEL STAVRIANOS,

10       as representative of ASR ANALYTICS, LLC,

11  being duly sworn by the Certified Shorthand Reporter to

12  tell the truth, the whole truth, and nothing but the

13  truth, testified as follows:

14                      --o0o--

15                   EXAMINATION

16  BY MR. RATINOFF:

17       Q.  Good morning, Mr. Stavrianos.  How are you?

18       A.  I'm good.  How are you?

19       Q.  As you know, I'm representing the plaintiffs in

20  this lawsuit you've been asked to provide testimony in,

21  and I do appreciate you giving us your time today.  I'll

22  try to make this as quick and painless as possible,

23  but -- and I'm definitely aware of the time differences,

24  so I know it's 10:30 there.  Our lunch time is going to

25  be a little bit different, but I want to be respectful

                                                          12

1    of yours, so if you want to break around 12:30-ish your

2    time for a short lunch, I'm happy to do that, or if you

3    need an hour, whatever, just let me know.

4         Otherwise, I'm just going to take breaks every

5    hour, maybe 5-10 minutes depending on how we're doing,

6    and if there's any time you need a break, as long as

7    there's not a question pending that needs to be

8    answered, I'm happy to take a break whenever you want,

9    so just ask.

10        A.  Okay.

11        Q.  And have you ever been deposed before?

12        A.  I have not.

13        Q.  Well, let's go through a few -- I'm sure your

14   counsel's has already done this, but I need to make sure

15   we're on the same page.

16        You're taking a deposition, and you've been

17   sworn in under oath, under penalty of perjury.  This is

18   just as if you were testifying live in court.

19        Do you understand this?

20        A.  Yes.

21        Q.  And your testimony's going to be transcribed

22   into booklet form.  It will show my question and your

23   answers, and at the end of deposition, within about 5-10

24   days, you'll receive a transcript, and you'll have an

25   opportunity to read that transcript and make any

                                                    13

```
 1   record.  The time is 10:49 a.m.

 2   BY MR. RATINOFF:

 3       Q.  Okay.  So you should have before you

 4   Exhibit 120, which is a subpoena to testify at

 5   deposition.

 6           Do you have that in front of you now?

 7       A.  I do.

 8       Q.  And do you recognize Exhibit 120?

 9       A.  Let me just finish reviewing it.  One moment.

10           Okay.  Yes, I recognize this document.

11       Q.  Okay.  And what is it?

12       A.  It's a subpoena.

13       Q.  And do you understand this subpoena was served

14   on ASR Analytics, LLC?

15       A.  Yes.

16       Q.  And do you understand today that you're going

17   to be providing testimony on the topics of examination

18   which start on Page 3 of Attachment A?

19       A.  Yes.

20       Q.  And are you familiar with Topics 1 through 14?

21       A.  I have read them, yes.

22       Q.  And do you understand that you're going to be

23   providing testimony today on each one of these topics?

24       A.  Yes.

25       Q.  And are you prepared today to provide testimony
```

25

1    on each one of these 14 topics?

2         A.   Yes, I think so.

3         Q.   And do you understand that your testimony on

4    these topics doesn't necessarily include what you know

5    personally, but it's what is known to the company,

6    ASR Analytics?  Do you understand this?

7              MS. EMBRY:  Objection to form.

8              THE WITNESS:  Yes.

9    BY MR. RATINOFF:

10        Q.   Did you understand my question?

11        A.   I think so.

12        Q.   Okay.  Well, I want to make sure you do, so

13   what -- what did you understand my question to be?

14        A.   That I am speaking not only regarding my own

15   recollection, but those of the company, ASR Analytics.

16        Q.   Thank you.

17             Just -- just to be clear, too, if there is an

18   objection to form, and you don't say, "I don't

19   understand the question," I'm going to assume that you

20   do understand the question, and I'm just going to go

21   ahead and wait for your answer; is that okay?

22        A.   Yes.

23             MR. RATINOFF:  And then I'd like to go ahead

24   and drop another document in the chat.  This is going to

25   be marked as Exhibit 121.

                                                        26

1   for documents that were asked for by this document

2   subpoena?

3       A.  No, I don't believe so.  By and large, that

4   effort was led by our counsel.

5       Q.  Did ASR Analytics provide access to email

6   accounts to its counsel?

7       A.  I'm not aware of any steps that were taken to

8   provide additional access to ASR email addresses.

9       Q.  How did ASR Analytics search for documents that

10  were responsive to this subpoena?

11      A.  I don't know.

12      Q.  Was there anyone at ASR Analytics involved in

13  the search for documents in response to this subpoena?

14      A.  What do you mean by "involved in"?

15      Q.  Meaning did anyone at ASR Analytics assist in

16  the search for documents that were produced in response

17  to this subpoena?

18          MS. EMBRY:  And just for clarification, when

19  you say "ASR," are you referring to GCOM as well?

20  BY MR. RATINOFF:

21      Q.  Yeah, I think that's -- well, let me ask you

22  this:  ASR Analytics, is that currently an independent

23  company?

24      A.  ASR Analytics was acquired by GCOM at the end

25  of 2021.

29

1    Q.  When you say "acquired," what do you mean by

2  "acquired"?

3    A.  Purchased.

4    Q.  So a hundred percent ownership was purchased by

5  GCOM?

6    A.  That's correct.

7    Q.  Is GCOM a company name, or is that an acronym?

8    A.  It is a company name.  I believe the full name

9  is GCOM Software, Inc., but I could be wrong about that.

10    Q.  Does ASR Analytics, LLC still exist as an

11  independent company?

12    A.  My understanding is that it does continue to

13  exist as a legal entity.

14    Q.  So it continues to exist as a limited liability

15  company?

16    A.  I don't know.

17    Q.  And what's your current role at Analytica --

18  I'm sorry -- ASR Analytics?

19       MS. EMBRY:  Objection to form.

20       THE WITNESS:  So again, ASR Analytics is now

21  apart of GCOM.  I can answer the question, but just

22  recognize that that is a --

23  BY MR. RATINOFF:

24    Q.  Understood.  So just to be clear,

25  ASR Analytics, LLC still exists as an independent legal

30

1    entity, correct?

2        A.   Correct.

3        Q.   And who's in charge of ASR Analytics, LLC

4    internally?

5        A.   I would say ASR Analytics is controlled -- is

6    operated by a group of partners.

7        Q.   And are you one of those partners?

8        A.   Yes.

9        Q.   And how many other partners are there?

10       A.   Ten others.

11       Q.   What's your current title at ASR Analytics?

12       A.   My -- my title -- yeah.  Up until the time of

13   the acquisition, and for all intents and purposes

14   continuing, is founding principle.

15       Q.   Okay.  So when you received the subpoena --

16   "you" being ASR Analytics -- was GCOM the one to search

17   for and collect documents in response to the subpoena?

18       A.   Yes.

19       Q.   And who at GCOM is responsible for that

20   document collection?

21       A.   I believe it was coordinated by

22   Vanessa Champion.

23       Q.   And were employees or -- of ASR Analytics asked

24   to provide access to their emails in conjunction with

25   searching for documents in response to this subpoena?

                                                            31

1    of the founding principals of ASR Analytics?

2        A.   That's right.

3        Q.   And why did you found ASR Analytics?

4            MS. EMBRY:   Objection to form.

5            THE WITNESS:   Because two colleagues and I

6    wanted to try something new.

7    BY MR. RATINOFF:

8        Q.   So these are colleagues at IBM that you -- you

9    formed or founded ASR Analytics with?

10       A.   Correct.

11       Q.   And were there just three original founders of

12   ASR Analytics including yourself?

13       A.   Yes.

14       Q.   And who are the two other founders?

15       A.   Peter Arena, and Stephen -- with a P-H, he'll

16   want you to know -- Rhody.

17       Q.   And how do you spell -- are they still founding

18   principals of ASR Analytics?

19       A.   Peter --

20           MS. EMBRY:   Objection to form.

21           THE WITNESS:   Peter Arena is still with the

22   company; Stephen Rhody is not.

23   BY MR. RATINOFF:

24       Q.   And what does ASR Analytics do?

25       A.   We provide analytic consulting services to

39

1   government clients.

2       Q.   And the IRS is one of those clients currently?

3       A.   Yes.

4       Q.   And what other clients does ASR Analytics have

5   besides the IRS?

6       A.   Many others.  Mostly either state departments

7   of revenue or colleges and universities.

8       Q.   So it's not just federal agencies, but also

9   state agencies, correct?

10      A.   Correct.

11      Q.   And so is it fair to say that ASR Analytics

12  specializes in tax matters?  Is that fair?

13          MS. EMBRY:  Objection to form.

14          THE WITNESS:  What do you mean by "tax

15  matters"?

16  BY MR. RATINOFF:

17      Q.   Well, you said that ASR Analytics works with

18  the IRS and then state revenue agencies.

19          I'm assuming those are the state equivalents of

20  the IRS; is that correct?

21      A.   That's correct.

22      Q.   So how do you describe ASR Analytics' work with

23  those tax agencies?

24      A.   Yeah, I would say the majority of ASR's work

25  involves tax analytics.

40

1        A.  I'm almost certain it was between 2006 and

2    2007.

3        Q.  Okay.  So the IRS has been a long-time client

4    of ASR Analytics?

5        A.  Correct.

6        Q.  Is it fair to say ASR Analytics has a very

7    lengthy relationship with the IRS?

8            MS. EMBRY:  Objection to form.

9            THE WITNESS:  Relative to our history as a

10   company, we have a long relationship with them.

11           MR. RATINOFF:  And I'm going to go ahead and

12   mark the next exhibit as 124.

13           (Exhibit 124 was marked for identification.)

14   BY MR. RATINOFF:

15       Q.  And this is a -- I'll represent to you a press

16   release that was downloaded off of ASR Analytics'

17   website with a date of December 6, 2018, entitled,

18   "Using Data Science to Improve Tax Compliance

19   Administration, ASR Awarded BPA Contract Under

20   161 Million IRS DAIS Vehicle."

21           Do you recognize this press release?

22       A.  Let me just scan through it real quick.

23           Yes, I -- I recognize this.

24       Q.  And do you have any reason to believe this

25   isn't a true and correct copy of a press release issued

                                                        45

1    by ASR Analytics on December 6, 2018?

2         A.   No.

3         Q.   And do you have an understanding of what

4    contract is being referred to in this press release?

5         A.   Yes.

6         Q.   Okay.  And what is your understanding?

7         A.   It's referring to the Data Analytics and

8    Innovation Services Blanket Purchase Agreement from the

9    IRS.

10        Q.   Is that what "DAIS" stands for?

11        A.   Correct.

12        Q.   And what is -- what is a DAIS?

13        A.   It is a blanket purchase agreement,

14   multiple-award contract vehicle issued by a research

15   organization at the IRS.

16        Q.   And that's the Office of Research Applied

17   Analytics and Statistics?

18        A.   That's correct.

19        Q.   And that's generally referred to as the

20   R-A-A-S?

21        A.   Or RAAS, depending on who you're talking to.

22        Q.   That was my next question.  You got ahead of

23   me.

24             So generally, instead of the long form of

25   Research Applied Analytics and Statistics is either

46

referred to as R-A-A-S or RAAS by those working around

the RAAS?

        A.  Correct.  Usually RAAS.

        Q.  Usually RAAS.  Okay.  So we'll be on the same

page if we say "RAAS."  Got it.

             Okay.  Now, what's the -- what is the

blanket -- and you'll have to excuse my ignorance.  I

know government contracting is a very -- it's a little

bit of an art, little bit of a science.  It's very

different from commercial contracts.

             But what's -- what's a blanket purchase

agreement?

        A.  So speaking as not a procurement expert, my

understanding of a blanket purchase agreement is a

contract that the government establishes with one or

more contractors that then enables them to compete and

award individual task orders within the BPA, or blanket

purchase agreement.

        Q.  So the blanket purchase agreement operates as

sort of a preferred vendor award at the onset; is that

fair?

        A.  That's fair.

        Q.  And then once multiple vendors are awarded --

are awarded under the BPA, they can then -- then they

still have to compete for actual specific contracts

47

1    A.  I'm sorry.  I didn't catch the question.

2    Q.  Oh, okay.  I'll ask it again.

3        So it was an accurate statement at the time

4    that -- in 2018, that there had been an approximately

5    15-year partnership with the IRS' RAAS organization,

6    between the RAAS organization and ASR Analytics?

7    A.  Yeah.  That's probably a bit on the

8    overestimate side given that ASR had only existed for

9    14 years at that time.

10    Q.  Well, that might feed back to your prior --

11    prior work at IBM then?

12    A.  Perhaps, or -- yeah.

13    Q.  Or it's just a PR --

14    A.  Yeah.  We rounded up to the nearest five.

15    Q.  Understood.  And then there's five bullet

16    points listed here.

17        Were these particular areas where a task order

18    could be issued that ASR Analytics would be able to bid

19    on?

20        MS. EMBRY:  Objection to form.

21        THE WITNESS:  I am not certain, but I believe

22    these were areas of scope defined in the BPA contract.

23    BY MR. RATINOFF:

24    Q.  And did ASR Analytics view itself of being

25    capable of providing services in relation to these five

49

1    areas of focus?

2         A.  Yes.

3         Q.  And what is authentication, identity theft, and

4    fraud protection under the BPA?

5         A.  You want me to sort of describe what those

6    things are?

7         Q.  Yes, please.

8         A.  All right.  So identity theft is when an

9    individual submits a tax return professing to be someone

10   else in an attempt to steal their refund, and the IRS

11   uses various methods to prevent that, to detect returns

12   that are submitted by identity thieves.

13            Fraud protection is just a general term that

14   would encompass identity theft, but also other types of

15   fraud in an attempt to not pay the appropriate tax

16   liability.

17            And authentication is the process of a taxpayer

18   confirming their identity to the IRS.

19        Q.  And was ASR Analytics awarded any task orders

20   that fell within the authentication, identity theft, and

21   fraud protection area after receiving the BPA?

22        A.  Yes.

23        Q.  And approximately when was that task order

24   awarded?

25        A.  There wasn't a single task order awarded that

50

1    related to this set of items.

2        Q.   When you say "set of items," are you talking

3    about all five bullet points, or just authentication,

4    identity theft, and fraud protection?

5        A.   I was just referring to authentication,

6    identity theft, and fraud protection.

7        Q.   So when you say not specific -- I'm sorry.

8        Your testimony was there wasn't -- you didn't

9    receive a task order that was necessarily specific to --

10   to these items; is that correct?

11       A.   That's right.  I can't sort of say a task order

12   for authentication, identity theft, and fraud protection

13   was awarded on any specific date.

14       Q.   But just a task order that touched upon those

15   areas was awarded after the BPA?

16       A.   Correct.

17       Q.   And did that -- do you recall what the name of

18   that task order was that you're referring to?

19       A.   I think there was a contract -- a task order

20   award for what was labeled "identity theft innovation"

21   that was awarded -- let me think -- I believe it would

22   have been mid-2019.  I'm -- I'm pretty sure.

23       Q.   And did that identity theft innovation task

24   order involve the use of graph database software?

25       A.   I believe there was a task that -- that

51

1    included a variety of analytic methods, including graph.

2         Q.  So one of the analytic methods that you can use

3    for authentication, identity theft, and fraud protection

4    is graph database software?

5              MS. EMBRY:  Objection to form.

6              THE WITNESS:  Can you be more specific about

7    how you are applying graph there, or...

8    BY MR. RATINOFF:

9         Q.  Well, can you use graph database software to

10   enhance the IRS' ability to detect identity theft, for

11   instance?

12        A.  Yes, I believe you could.

13        Q.  And is that something ASR Analytics actually

14   did for the IRS?

15        A.  We have used graph methods to attempt to detect

16   identity theft.

17        Q.  For ŧhe IRS?

18        A.  For the IRS.

19        Q.  And graph methods requires using graph database

20   software; is that correct?

21        A.  I think that's fair, yes.

22        Q.  Okay.  Are you familiar with Neo4j graph

23   database software?

24        A.  I have heard the name, yes.

25        Q.  Has ASR Analytics ever used Neo4j graph

52

1  database software in any projects it's done for the IRS?

2      A.  I don't know.

3      Q.  You don't know personally, or ASR Analytics

4  doesn't know?

5      A.  I don't know personally.

6      Q.  But you can't answer on behalf of ASR Analytics

7  with certainty?

8      A.  I guess I would say I cannot answer -- can you

9  define what you mean by "Neo4j software" more clearly?

10      Q.  Well, what's your understanding of Neo4j

11  software, what it does?

12      A.  I know that there are different Neo4j products.

13  For example, I heard of Community Edition.  I heard of

14  Enterprise Edition.  I personally don't know if, at any

15  point in the however many, 16-17 years of work we've

16  done with the IRS, we have ever used any component of

17  Neo4j software.

18      Q.  And more specifically, under the 2018 BPA, has

19  ASR Analytics ever used Neo4j software in any iteration

20  with its work with the IRS?

21      A.  Not that I know of.

22      Q.  Previously, we talked about ONgDB, which is

23  also a graph database software, correct?

24      A.  Correct.

25      Q.  And has ASR Analytics used ONgDB in any

53

1    capacity under the 2018 BPA with the IRS?

2        A.   Yes, my understanding is we have.

3        Q.   And in preparing the -- I guess it would be an

4    RFQ; is that correct, for the BPA?  Let me back up.

5             To get the BPA, ASR Analytics had to prepare an

6    RFQ, correct?

7        A.   No.

8        Q.   No?  Okay.

9             How -- how do -- how do you -- how do you bid

10   for the BPA contract?

11       A.   We write a proposal in response to an RFQ.

12       Q.   And so when you write a proposal for an RFQ, in

13   particular with this 2018 BPA, were there subcontractors

14   that were contemplated in drafting the proposal for the

15   2018 BPA?

16            MS. EMBRY:  Objection to form.

17            THE WITNESS:  There were subcontractors that

18   were contemplated, period, for response to the BPA.

19   BY MR. RATINOFF:

20       Q.   And did you -- I'm sorry.  Strike that.

21            Was iGov one of those subcontractors that was

22   contemplated in the 2018 DAIS BPA?

23       A.   Yes.

24       Q.   And were there any other subcontractors besides

25   iGov that were contemplated within the scope of that

                                                        54

1    proposal?

2         A.   Yes.

3         Q.   And who were they?

4         A.   My recollection is that there were a handful of

5    subcontractors, including iGov, Tylor Data, Analytica,

6    Eastport Analytics, and AtomRain, and I think that's

7    all.

8              MS. EMBRY:  Hey, Jeffery?  We've been going

9    over an hour.  I just want to check in with Mike and

10   with everyone else, and we can see if anyone's in need

11   of a break.

12             Mike, how are you doing?  Do you want to take a

13   break, or how are you doing?

14             MR. RATINOFF:  I'm happy --

15             THE WITNESS:  I'm okay for now.

16             MR. RATINOFF:  Why don't we -- I just have a

17   couple more questions, and then I think we can take a

18   break before I get to my next exhibit, if that's okay.

19             MS. EMBRY:  Yes.

20             MR. RATINOFF:  All right.

21   BY MR. RATINOFF:

22        Q.   So tailer data:  Who's tailer data?

23        A.   Tylor Data.

24        Q.   Sorry.  Tylor Data?

25        A.   T-Y-L-O-R.

                                                              55

1     Q.  T-Y-L-O-R.  Got it.

2     A.  They are a small business.

3     Q.  And what was their role -- or what was their

4  contemplated role in the proposal for the BPA?

5     A.  I don't recall a narrowly-defined role that

6  they would play.

7     Q.  Did they bring an expertise to the table?

8     A.  Yes.

9     Q.  And what was that expertise?

10    A.  Primarily in advanced analytic methods for

11 community detection.

12    Q.  And did that involve working with the graph

13 database software?

14    A.  What do you mean by "the graph database

15 software"?

16    Q.  With graph database software.  Not anything

17 specific.

18    A.  Oh, yes.

19    Q.  And then AtomRain, what was their expertise

20 that they brought to the table in the proposal?

21    A.  They were viewed as having especially

22 technology expertise surrounding graph analytics.

23    Q.  And when you say "graph analytics," you mean

24 using graph database software?

25    A.  Among other things.

56

1    Q.  What were the other things that they brought to

2    the table?

3    A.  Understanding how to manage the technology

4    infrastructure to support graph analytics.

5    Q.  And do you know who owns AtomRain?

6    A.  I don't know the details of their ownership.

7    Q.  Are you familiar with Brad -- a person named

8    Brad Nussbaum?

9    A.  Sorry, say the first name again?

10   Q.  Brad Nussbaum.

11   A.  Yes.

12   Q.  And is Brad Nussbaum affiliated with AtomRain?

13   A.  Yes.  To my knowledge, yes.

14   Q.  And what do you understand of Brad Nussbaum's

15   role at AtomRain?

16   A.  I believe that he is one of the co-owners of

17   AtomRain, but I'm not certain.

18   Q.  And are you familiar with a Ben Nussbaum?

19   A.  Yes.

20   Q.  And who's Ben Nussbaum?

21   A.  I believe he's another owner of AtomRain.

22   Q.  And then you also mentioned iGov as being one

23   of the contemplated subcontractors, correct?

24   A.  Correct.

25   Q.  And that's Mister -- Mr. Suhy's company?

57

1          A.   Correct.   That's my understanding.

2          Q.   Did Mr. Suhy assist in preparing the proposal

3   for the DAIS BPA?

4          A.   Can you define what you mean by "assist"?

5          Q.   Assist in drafting the proposal.

6               MS. EMBRY:   Objection to form.

7               THE WITNESS:   In a very limited capacity.

8   BY MR. RATINOFF:

9          Q.   And what capacity was that?

10         A.   As I recall, he provided input, usually short

11   text descriptions of work that he had performed or

12   capabilities that his firm had.

13         Q.   When you say "work that he performed," are you

14   talking about work that he had already performed for the

15   IRS?

16         A.   Not exclusively.

17         Q.   Why did ASR Analytics involve iGov in its

18   proposal for the DAIS BPA?

19               MR. BEENE:   Objection to form.

20               MS. EMBRY:   Join.

21               THE WITNESS:   What was that, Becky?

22               MS. EMBRY:   I join.   Objection to form.

23   BY MR. RATINOFF:

24         Q.   You can still answer the question.

25         A.   Sorry.   Could you repeat the question?

                                                        58

1          MR. RATINOFF:  Yeah.  Can you read the question

2    back, please?  Maybe it is a bad one.

3               (The following record was read:

4               Question:  Why did ASR Analytics involve iGov

5               in its proposal for the DAIS BPA?)

6    BY MR. RATINOFF:

7          Q.  Just to be clear for the record, when I say

8    DAIS, I'm saying -- that's the acronym D-A-I-S.

9               We all understand that?

10         A.  Yes, I understand.

11         Q.  Okay.  Let me re-ask -- let me just re-ask the

12   question, clean up the record.

13              Why did -- why did ASR Analytics select iGov to

14   participate in the proposal for the DAIS BPA?

15         A.  I suppose we felt it would strengthen the

16   capabilities of our team.

17         Q.  How so?

18         A.  It would add relevant expertise to our

19   offering.

20         Q.  What expertise are you referring to?

21         A.  Generally, graph database and graph analysis

22   expertise.

23         Q.  Did iGov have a pre-existing relationship with

24   the IRS that -- that ASR Analytics felt would also be

25   helpful?

59

1      A.  I believe so.  I -- I believe that -- yeah, I

2   believe so.

3      Q.  And what was your understanding of iGov's

4   relationship with the IRS at that time?

5      A.  I'm not certain about the timeline, but my

6   recollection is that they had a contract in place with a

7   division of the IRS supporting graph software.

8      Q.  When you say "they," you mean iGov?

9      A.  Correct.

10          MR. RATINOFF:  All right.  I think this is a

11   good time to take a break.

12          Do you need 5-10 minutes?

13          MS. EMBRY:  How -- how about ten minutes?

14          MR. RATINOFF:  Sure.

15          MS. EMBRY:  That okay?  So we'll be back at --

16   do you want to just say we'll come back at 12:00 our

17   time?

18          MR. RATINOFF:  Yeah, that's fine.

19          THE VIDEOGRAPHER:  Thank you.  We are now going

20   off the video record.  The time is 11:48 a.m.

21          (Off the record from 11:48 a.m. to 12:02 p.m.)

22          THE VIDEOGRAPHER:  We are now back on the video

23   record.  The time is 12:02 p.m.

24   BY MR. RATINOFF:

25      Q.  All right.  I wanted to go ahead and mark the

60

BY MR. RATINOFF:

     Q.  Okay.  I've marked what is Exhibit 127.  It's
an email chain produced by ASR about with the beginning
Bates number ASR 00558, which the last email being from
Mr. Suhy to yourself, February 9, 2018.

          MS. EMBRY:  I think that's a different exhibit
than what we're looking at.

          MR. RATINOFF:  Oh, I apologize.  Let me --
you're right.  I've got too many windows open.  Let me
start over again.  Strike that.

          Okay.  What's been marked as Exhibit 127 is an
email produced by ASR with the beginning Bates number
ASR 01734, and that's an email from Mr. Suhy to yourself
dated January 17, 2018.

          THE WITNESS:  I'm with you.

BY MR. RATINOFF:

     Q.  Okay.  And you'll see Mr. Suhy's referring
to -- in the second email below -- or the second to last
in the chain, January 11, 2018, at 8:30 p.m., you wrote,
"Hi John Mark, I had a good discussion with Chris Hess
today, and he liked the concept of coordinating ASR's
Spark work with iGov's Neo and other open-source work,
but he said that Mike Dunn had already initiated the
process of issuing a new solicitation in place of the
one that was targeted to iGov last year, so you should

67

1    be seeing an RFP in the next couple of weeks."

2            Do you see that?

3        A.  Yes.

4        Q.  All right.  And who is Chris Hess?

5        A.  Chris Hess is a manager in the RAAS

6    organization, an IRS employee.

7        Q.  And then who's Mike Dunn?

8        A.  Mike Dunn is also a manager within RAAS,

9    another IRS employee.

10       Q.  And here it says, "I had a good discussion,"

11   with Mr. Hess regarding "iGov's Neo and other

12   open-source work."

13           So it sounds like you talked about Neo4j with

14   Mr. Hess; is that fair?

15           MS. EMBRY:  Objection to form.

16           THE WITNESS:  I would say no.

17   BY MR. RATINOFF:

18       Q.  Okay.  And then what are you referring to as

19   "iGov's Neo" in this email?

20       A.  I'm referring to the work that iGov was doing

21   with RAAS at the time.

22       Q.  And what was your understanding of that work?

23       A.  That it involved developing and managing graph

24   database and analysis software.

25       Q.  And that software being Neo4j?

1        A.   No, not necessarily.

2        Q.   Why did you refer to "Neo" in this email?

3        A.   Because he was trying to use descriptive

4    language to refer to a set of technology that I was not

5    familiar with.

6        Q.   What's "ASR's Spark work" that you're referring

7    to in this email?

8        A.   This is work that ASR was doing in

9    collaboration with Tylor Data under a separate contract

10   which involved using Spark software to do graph database

11   analysis.

12       Q.   And how does Spark software work with graph

13   database analysis?

14            MS. EMBRY:   Objection to form.

15            THE WITNESS:   I would say Spark -- I guess I

16   don't know the technical details of how it conducts

17   graph analysis.

18   BY MR. RATINOFF:

19       Q.   Is Spark a graph database software?

20       A.   I don't believe that's its primary function.

21       Q.   What's Spark's primary function?

22       A.   I -- yeah, that's probably beyond my technical

23   knowledge.

24       Q.   Okay.  Well, what were you able to convey to

25   Chris Hess about ASR's Spark work with iGov's Neo and

69

1   open-source work?

2       A.  The work that we were doing in Spark was about

3   identifying patterns within graph data.

4       Q.  So the graph database software would generate

5   graph data, and then Spark would be used to analyze that

6   data; is that correct?

7       A.  I'm not certain how the graph data was

8   generated.

9       Q.  But Spark would be using graph database data to

10  conduct its analysis?

11      A.  That's my understanding.

12      Q.  All right.  I'd like to go ahead and now look

13  at the email in front of you that I had previously

14  mentioned.

15          (Exhibit 128 was marked for identification.)

16          THE WITNESS:  Okay.  Got it open.  Let me take

17  a look.

18  BY MR. RATINOFF:

19      Q.  And you'll see this is a continuation of the

20  same email chain that we were just speaking about.

21          MR. RATINOFF:  And just for the record, this

22  has been marked as Exhibit 127 (sic) that has a

23  beginning Bates number of ASR 01737.  It's an email

24  ending from Mr. Suhy to the witness, dated January 18,

25  2018.

70

1    AtomRain, not GraphGrid, correct?

2        A.   That's right.

3        Q.   Did ASR work with Mr. Suhy on any other

4    proposals besides the DAIS BPA?

5        A.   I believe he had some involvement in task

6    orders that followed the BPA; in other words, in

7    proposals for task orders that were issued under the

8    BPA.

9        Q.   And when you say "the BPA," you're talking

10   about the DAIS BPA?

11       A.   Correct.

12            MR. RATINOFF:  Okay.  I'd like to mark the next

13   exhibit as Exhibit 129.

14            (Exhibit 129 was marked for identification.)

15            THE WITNESS:  Okay.  Let me read through this

16   one.

17            Okay.

18   BY MR. RATINOFF:

19       Q.   All right.  So what's been marked as

20   Exhibit 129 is an email with the beginning Bates number

21   ASR 00568.  The end of the chain is an email from

22   Mr. Suhy to yourself dated May 2nd, 2018.

23            Do you recognize this email?

24       A.   Yes.

25       Q.   And what's your understanding of what this

                                                        73

1    is adopting."

2         Do you have an understanding of what he's

3    referring to?

4         A.  A general understanding.

5         Q.  And what's that?

6         A.  It's really just based on what he's written on

7    the page.  It helps me to understand what it is that the

8    Graph Foundation is doing.

9         Q.  Did Mr. Suhy ask ASR Analytics to sponsor the

10   Graph Foundation?

11        A.  He did bring the topic up with me at one point.

12        Q.  Okay.  And what was the -- what was the context

13   that that was brought up in?

14        A.  I don't remember exactly.

15        Q.  Did he ask ASR Analytics to sponsor the Graph

16   Foundation?

17             MR. BEENE:  Objection to form.

18             THE WITNESS:  I don't think so.

19   BY MR. RATINOFF:

20        Q.  But he just offered to add ASR Analytics to the

21   sponsor page of Graph Foundation; is that correct?

22        A.  That's correct.

23        Q.  And does this email help refresh your

24   recollection as far as what Graph Foundation's primary

25   mission was as far as -- I think you described it as

                                                          86

1    open graph database software?

2        A.  I guess reading this sentence tells me his

3    understanding of what the organization was doing.

4        Q.  Yeah, I'm asking for your understanding of what

5    the organization was doing.

6            Does this help refresh your recollection?

7        A.  I suppose it does.

8        Q.  Okay.  And how so?

9        A.  I -- only in that, when I read this sentence,

10   it tells me that the Graph Foundation, quote, maintains

11   the Open Neo4j distributions.

12       Q.  And do you have an understanding of what those

13   Open Neo4j -- sorry.

14           Do you have an understanding of what those Open

15   Neo4j distributions were maintained by the Graph

16   Foundation?

17       A.  Not in any substantive sense.

18       Q.  How about non-substantive?  Do you have an

19   understanding?

20       A.  I assume it's referring to maintaining software

21   that can be distributed.

22       Q.  Okay.  But do you understand that software to

23   be related to Neo4j software?

24       A.  What do you mean by "related"?

25       Q.  Well, it says Open Neo4j distributions.

87

1          You understand that Neo4j, the company, offers

2   Neo4j -- I think you said Community Edition and

3   Enterprise Edition -- graph database software, correct?

4          MS. EMBRY:  Objection to form.

5          Go ahead.

6          THE WITNESS:  Correct.

7   BY MR. RATINOFF:

8      Q.  And so do you have an understanding of Graph

9   Foundation being involved with some form of Neo4j

10  software?

11     A.  In a general sense.

12     Q.  And what is that general sense?

13     A.  That they were involved in creating and

14  maintaining an open-source alternative to Neo4j.

15     Q.  And that alternative would be ONgDB?

16     A.  Yes.

17     Q.  And so it was your understanding that ONgDB was

18  some sort of open-source Neo4j, or version of

19  open-source Neo4j?

20         MR. BEENE:  Objection to form.

21         THE WITNESS:  My understanding is that it was

22  an open-source software -- that it was open-source

23  software that originated from an open-source version of

24  Neo4j.

25         ///

88

BY MR. RATINOFF:

    Q.  And you're referring to ONgDB as being the --
what --

    A.  Yeah.

    Q.  -- based on -- okay.  Hold on.  Let me make
sure I get the question out.

        So your understanding is that ONgDB was based
on a form of open-source Neo4j; is that correct?

    A.  Correct.

    Q.  Did anyone at the Graph Foundation ever explain
how it was based on an open-source version of Neo4j?

        MS. EMBRY:  I'm sorry.  I didn't hear the whole
question.  Did you hear it, Mike?

        THE WITNESS:  Could you repeat it?

        MR. RATINOFF:  Sure.  Ben, could you read that
one back if you got it?

        (The following record was read:

        Question:  Did anyone at the Graph Foundation

        ever explain how it was based on an open-source

        version of Neo4j?)

        THE WITNESS:  No.

BY MR. RATINOFF:

    Q.  And then to your knowledge, was ASR added to
the Graph Foundation's website as a sponsor?

    A.  I don't recall.

                                                      89

 1          THE WITNESS:  I wouldn't have had a strong

 2   objection to it.  I wouldn't have cared much one way or

 3   the other.

 4   BY MR. RATINOFF:

 5       Q.  It just wasn't that important to ASR?

 6       A.  No.

 7          MR. RATINOFF:  Okay.  I'd like to go ahead and

 8   put the next exhibit in the chat.

 9          (Exhibit 133 was marked for identification.)

10          THE WITNESS:  Okay.  Let me take a look at

11   this.

12   BY MR. RATINOFF:

13       Q.  And while you're doing that, I'll just state

14   for the record that this was an email that was produced

15   by ASR in response to the subpoena.  It's got the

16   beginning Bates number ASR 00719.  It's an email from

17   Mr. Suhy to the witness dated March 29, 2019.

18          Just let me know when you've had a chance to

19   review the email.

20       A.  Okay.  Got it.

21       Q.  Okay.

22          MR. RATINOFF:  And Ben, this would be

23   Exhibit 133, correct?

24          THE REPORTER:  That is correct, Counsel.

25          ///

                                                          91

BY MR. RATINOFF:

Q.  Okay.  Do you recognize this document?

A.  I do.

Q.  And what is it?

A.  It's an email exchange between me and John Mark Suhy regarding, I guess, two different topics.

Q.  Okay.  So let's start with the first topic.

What's -- what's the first topic that comes to your mind?

A.  The first is requesting his resume for -- for what appears to be an RFQ.

Q.  You're talking about where it says "cyber RFQ"?

A.  Uh-huh.

Q.  Sorry, the court reporter --

A.  Sorry.

Q.  Yeah, it needs to be "yes" or "no," or words. Nodding the head, shaking the head, uh-huhs, uh-huhs, they don't really work with the transcript.

A.  Yes.

Q.  Okay.  And do you understand what the cyber RFQ is?

A.  I think I know what it is referring to.

Q.  Is it referring to a task order under the DAIS BPA?

A.  I believe so.

92

 1      Q.  Is that something that was ultimately awarded

 2  to ASR as a -- as a task order?

 3      A.  If it is the task order I'm thinking of, it

 4  was.

 5      Q.  What task order was that?

 6      A.  That is the identity theft innovation task

 7  order that I referred to earlier.

 8      Q.  And that's a task order -- that's referring to

 9  the identity theft task order, something that Mr. Suhy

10  assisted ASR in obtaining?

11          MS. EMBRY:  Objection to form.

12          THE WITNESS:  What do you mean by "assisted"?

13  BY MR. RATINOFF:

14      Q.  Did Mr. Suhy participate in -- in responding to

15  the task order that was issued by the IRS that you

16  called the ID theft task order?

17      A.  Aside from providing a resume, I don't recall.

18      Q.  By providing a resume though, would it have

19  been to be included in the proposal in response to the

20  task order?

21      A.  It -- it is possible that it was included in

22  the response.

23      Q.  And then there's a reference to the KG-API

24  engagement structure in the subject.

25          Do you understand what that's referring to?

                                                        93

1       A.  Yes.

2       Q.  And what is the KG-API engagement structure?

3       A.  That is -- the KG-API engagement is the

4  contract between the IRS and Tylor Data that I

5  referenced earlier.

6       Q.  So that's not a contract that was under the

7  DAIS BPA?

8       A.  That's right.  It was not.

9       Q.  So Tylor Data was the prime contractor on the

10  KG-API engagement?

11       A.  Correct.

12       Q.  And was -- and AS -- I'm sorry.  Strike that.

13           And ASR was a subcontractor under -- under

14  tailer?

15       A.  Under Tylor Data.

16       Q.  Sorry.  Tylor.

17       A.  Yes.

18       Q.  And was Mr. Suhy also a subcontractor under

19  that particular engagement?

20       A.  Yes.

21       Q.  When I mean (sic) Mr. Suhy, I mean through

22  iGov; is that correct?

23       A.  Yes, I believe so.

24       Q.  And why was Mr. Suhy involved in the KG-API

25  contract?

94

1          MS. EMBRY:  Objection to form.

2    BY MR. RATINOFF:

3          Q.  Do you have an understanding of what Mr. Suhy

4    was involved in the KG-API contract?

5          A.  I believe it was because the owner of Tylor

6    Data felt his involvement would -- would be beneficial

7    to the project.

8          Q.  And what was your understanding of the benefits

9    he would be providing to the contract?

10         A.  This is the project that was referenced earlier

11   that involved Spark software, and I believe John Mark

12   Suhy's involvement would enable the use -- non-technical

13   term -- enable the coordination of that Spark software

14   with the RAAS IT environment.

15         Q.  And when you -- more specifically with the

16   Spark software interface with the CKGE environment?

17         A.  I'm not certain.

18         Q.  We talked about it a little bit earlier, I

19   believe, but the Spark software would interface with

20   graph database software, right?

21         A.  Yes, I believe so.

22         Q.  And then at the time, as of March 2019, that

23   graph database software being used by RAAS was ONgDB?

24         A.  Yes.

25         Q.  So Mr. Suhy's role would be to assist in -- I

                                                          95

MICHAEL DAVID SUHY, Jr.                                     November 7, 2022

think you used the word "interfacing" the Spark software
with ONgDB?

    A.  Yes.

       MR. BEENE:  Objection to form.

BY MR. RATINOFF:

    Q.  Sorry.  I want to make sure your answer's
clear.

    A.  Yes.

    Q.  And you understood my question?

    A.  Yes.

    Q.  And then -- was Mr. Suhy then -- would he act
as a subcontractor directly to -- to Tylor, or -- sorry.
Strike that.

       Was Mr. Suhy acting -- sorry.  Let me start
over.  Got two thoughts.  Trying not to ask a compound
question.  Anyway.

       Was Mr. Suhy being asked to act as a
subcontractor to ASR under -- under the prime contract?

    A.  Yes.

    Q.  And was it your understanding that, at the
time, Mr. Suhy's normal hourly rate was $150 an hour for
consulting on graph database software?

    A.  Only in that that's stated in this email.

    Q.  Did you have an understanding at that time of
what Mr. Suhy's general hourly rate was for any work

96

1    that he performed in conjunction with ASR?

2         A.  I don't believe I did.

3         Q.  Does 150 an hour sound about right?

4              MS. EMBRY:  Objection to form.

5              THE WITNESS:  What do you mean by "about

6    right"?

7    BY MR. RATINOFF:

8         Q.  Does it sound about normal for someone with his

9    qualifications?

10             MS. EMBRY:  Objection to form.  I'm sorry.

11             MR. RATINOFF:  Yeah, can I -- let me just

12   finish, Counsel.

13             MS. EMBRY:  Yeah.

14             MR. RATINOFF:  Let me ask again.

15   BY MR. RATINOFF:

16        Q.  In ASR's experience with using consultants with

17   graph database software, was approximately $150 an hour

18   a fair rate for someone with Mr. Suhy's skill set?

19             MS. EMBRY:  Objection to form.

20             THE WITNESS:  I would say it's approximately

21   right.

22   BY MR. RATINOFF:

23        Q.  And then going down and looking at the bottom

24   of Mr. Suhy's resume -- it's the Bates number -- that's

25   the number in the bottom right-hand corner, it's

97

ASR 00721.

    Do you see that?

    A.  Yes.

    Q.  And Mr. Suhy represents under Other Relevant
Experience and Focus, "Developed the platform which
IRS's CKGE platform is built on top of."

    Do you see that?

    A.  I do.

    Q.  And do you have an understanding of what
platform Mr. Suhy's referring to?

    A.  In general?

    Q.  Yes.

    A.  Yeah, I think he's referring to the ONgDB
platform.

    Q.  So "the ONgDB platform" meaning -- or sorry.
Strike that.

    So your understanding is the ONgDB platform is
what the CKGE platform is built on top of?

    A.  I don't know the technical architecture of the
solution, but my understanding is that CKGE uses ONgDB
technology.

    Q.  And what is the CKGE platform?

    A.  In layman's terms, it is a -- an environment
for building and managing graph data and analysis tools.

    Q.  And does ASR Analytics work with the IRS on the

98

1    CKGE platform?

2          MS. EMBRY:  Objection to form.

3          THE WITNESS:  What do you mean by work on the

4    platform?

5    BY MR. RATINOFF:

6      Q.  Does -- does ASR Analytics provide any

7    consulting in relation to the IRS' CKGE platform?

8          MS. EMBRY:  Objection to form.

9          Go ahead.

10         THE WITNESS:  We provide consulting to analyze

11   data within the CKGE environment.

12   BY MR. RATINOFF:

13     Q.  So you just referred to it as a CKGE -- CKGE

14   environment; is that the same as CKGE platform?  Just

15   another way of describing it?

16     A.  Yeah.  Yes.  The two terms are synonymous in my

17   mind.

18     Q.  So there's not a CKGE platform, and it's

19   separate from a CKGE environment?

20     A.  No difference in my mind.

21     Q.  And then going up on the resume here, back up

22   to the Summary of Qualifications, so it would be the

23   first page of the resume on ASR 00720, do you have an

24   understanding of what he's referring to as the,

25   "Designer and maintainer of GraphStack"?

99

 1      A.  I generally understand that GraphStack is the
 2   technology platform that John Mark maintains and uses.
 3      Q.  Okay.  And do you have an understanding of
 4   whether GraphStack incorporates ONgDB?
 5      A.  I don't know exactly.
 6      Q.  And do you have an idea -- or sorry.  Strike
 7   that.
 8          Are you familiar with the website
 9   graphstack.io?
10      A.  I am not.
11      Q.  And it says right above there, "ONgDB," and
12   then parentheses, "Neo4j enterprise open source fork."
13          Does that help you recall what ONgDB is in
14   relation to Neo4j?
15          MS. EMBRY:  Objection to form.
16          THE WITNESS:  It is consistent with my general
17   understanding that I stated earlier that ONgDB
18   originated from an earlier open-source version of Neo4j.
19   BY MR. RATINOFF:
20      Q.  And that understanding's based on
21   representations that were made to you by Mr. Suhy?
22          MR. BEENE:  Objection to form.
23          THE WITNESS:  I don't recall the exact origin
24   of that understanding, but I would say it was based on
25   conversations I had with various individuals.

100

1    that I think relates to what we're talking about, and

2    then I think it might be a good place to take a break.

3    Thank you for bringing that up.  I think everyone

4    else -- well, actually, Ben might be on the East Coast,

5    but I think everyone else is on the West Coast.  Maybe

6    someone on the most part of the team here, the

7    videographer, and -- all right.

8            Let me go ahead and drop this next one in the

9    chat.  This is -- I believe we're up to Exhibit 134.

10           (Exhibit 134 was marked for identification.)

11           THE WITNESS:  This is the -- labeled

12   "Subcontract Agreement"?

13   BY MR. RATINOFF:

14       Q.  Yes, this is a subcontract agreement between

15   what appears to be Tylor Data Services and --

16       A.  Okay.  Let me -- just got it open.  Let me read

17   through this.

18       Q.  Let me go ahead and get everything on the

19   record here.

20           So this is what's been marked as Exhibit 134.

21   It was produced by ASR with the beginning Bates number

22   ASR 01764, and this is a document entitled, "Subcontract

23   Agreement."

24       A.  Okay.  I've scanned through this.

25       Q.  Okay.  Do you recognize this document?

                                                              102

1    A.  Yes.

2    Q.  Okay.  What is it?

3    A.  It's a subcontract agreement between ASR and

4  iGov.

5    Q.  Okay.  And is this the subcontract agreement

6  that related to the prime contract that Tylor Data

7  Services was awarded with respect to the KG-API project?

8    A.  Yes.

9    Q.  And this is the subcontract that ASR entered

10  with Mr. Suhy to assist with that project that you

11  previously testified about?

12    A.  Correct.

13    Q.  And this related to providing consulting in

14  relation to ONgDB interfacing with Spark?

15    A.  That's right.

16    Q.  And just -- just to be clear, there -- there

17  was a separate subcontract then between Tylor Data

18  Services and ASR, which this fell under then; is that

19  fair?

20    A.  That's correct.

21    Q.  But for -- for purposes of billing, Mr. Suhy

22  would submit bills to ASR rather than Tylor for the work

23  performed on the KG-API project?

24    A.  That's right.

25    Q.  And is this contract still -- subcontract still

103

1    in effect today as you sit here?

2         A.   I believe it is, yes.

3         Q.   And just going to the last page, that's just to

4    confirm that the bottom is your signature under "ASR"?

5         A.   It is.

6         Q.   And that's Mr. Suhy's signature under "iGov" to

7    your knowledge?

8         A.   To my knowledge, yes.

9         Q.   And what's the -- what's the term of this

10   subcontract, meaning, like, when does it terminate?

11        A.   Let me look back here.

12             So this contract, the prime contract with Tylor

13   Data Services, I believe expired on September 30, 2021.

14        Q.   So this prime contract has expired?

15        A.   This prime contract has expired.

16        Q.   Has it been renewed?

17        A.   No.

18        Q.   So the KG-API contract -- or project expired;

19   that would mean the subcontract then would no longer be

20   in effect?

21        A.   I suppose that's right.  This subcontract is no

22   longer in effect.

23        Q.   And I'm sorry; when was the date that it

24   expired?

25        A.   I believe September 30, 2021.

104

1    Q.  And just to be clear, it says under Services to

2  Be Performed By Contractor, "Subcontractor will provide

3  the consulting services of John Mark Suhy in support of

4  ASR's first tier contract," and, "Consulting services

5  will include technical guidance and development (sic)

6  support related to the Compliance Data Warehouse

7  Knowledge Graph Environment (CKGE)."

8         Is that the type of work that Mr. Suhy did

9  perform prior to the expiration or termination of the

10  prime contract?

11    A.  Just to clarify the record, I think you said,

12  "and development support," but the contract reads, "and

13  deployment support."

14    Q.  Oh, I apologize.  Thank you.

15    A.  That's okay.

16         But yes, that's an accurate description of the

17  type of work that he did under this subcontract.

18    Q.  And the reason why is he brought knowledge of

19  the CKGE's use of ONgDB?

20         MR. BEENE:  Objection to form.

21         MS. EMBRY:  Objection to form.

22  BY MR. RATINOFF:

23    Q.  One of the -- one of the things -- one of the

24  reasons why Mr. Suhy was brought on as a subcontractor

25  was because of his knowledge and experience with the use

105

1    of ONgDB in the CKGE environment?

2           MR. BEENE:  Objection to form.

3           THE WITNESS:  It was due to his knowledge of

4    the CKGE environment, yes.

5    BY MR. RATINOFF:

6       Q.  Which used ONgDB?

7       A.  To my understanding, yes.

8           MR. RATINOFF:  All right.  I think it's a good

9    time to break.  I know -- I'm sure you're probably

10   hungrier than we are on the West Coast, but we can take

11   a little lunch break too.

12          How long do you need?  I'm happy to go short or

13   long, whatever's preferential to you.

14          MS. EMBRY:  Mike, what do you prefer?

15          THE WITNESS:  I don't need a lot of time.  I

16   mean, what's -- what's normal in these?

17          MR. RATINOFF:  The shorter the break, the

18   sooner we get done.

19          MS. EMBRY:  Yeah.  That's kind of --

20          MR. RATINOFF:  So it's really up to you.  If

21   you need a full hour to recharge, or half an hour,

22   that's -- as long as that's okay with everyone else, I'm

23   fine with a half an hour.

24          MS. EMBRY:  Is 30 minutes enough, Mike?

25          THE WITNESS:  Sure, 30 minutes is fine.

106

```
 1                    AFTERNOON SESSION

 2          (All Parties having been duly noted for the

 3          record, proceedings resumed at 2:04 p.m.)

 4                    --o0o--

 5          THE VIDEOGRAPHER:  We are now back on the video

 6   record.  The time is 2:04 p.m.

 7   BY MR. RATINOFF:

 8       Q.  All right.  Ready to get going again?

 9       A.  Ready to go.

10       Q.  All right.  Let's go ahead and drop another

11   document in the chat.  I believe this will be

12   Exhibit 135.

13          (Exhibit 135 was marked for identification.)

14   BY MR. RATINOFF:

15       Q.  Got the thumbs up from Ben.

16          And what I've put in the chat here is a

17   document marked "Master Subcontractor Agreement" -- or

18   sorry -- titled.

19          Let me know when you've had a chance to review

20   the document?

21       A.  Okay.  Got it pulled up.  Give me a minute or

22   two to look through here.

23       Q.  I'm just going to ask you some few basic

24   questions, so just let me know when you've had a chance

25   to familiarize yourself with the document.
```

108

1    A.  Okay.  Just give me a minute or two.  I'm going

2  through the PWS's, but there are attachments on this

3  one, I think.

4         Got a lot of government contracts.  They're

5  definitely long.

6         Okay.  I think I got it.

7    Q.  All right.  Do you recognize what's been marked

8  as Exhibit 135?

9    A.  Yes.

10   Q.  And what is it?

11   A.  It is a master subcontract agreement between

12  ASR and iGov related to the DAIS BPA.

13   Q.  And that's the -- the 2018 press release that

14  we talked about earlier?  That's the contract being

15  referenced here?

16   A.  Yes.

17   Q.  And the contract number's 2032H5-19-A-00011?

18   A.  Correct.

19   Q.  And that's the prime contract number, meaning

20  the actual BPA that was awarded to ASR?

21   A.  Yes.

22   Q.  And then I -- you'll see there's a dated as of

23  November 7, 2018, as being the effective date?

24   A.  Yes.

25   Q.  And is that the same date that the BPA award

109

1   was given to ASR?

2       A.  I believe it was, yes.

3       Q.  And what was the reason for entering into this

4   agreement with iGov?

5       A.  ASR established a master subcontractor

6   agreement with each subcontractor that we teamed with on

7   the DAIS BPA following BPA contract award so that we

8   would be able to engage them as needed on task order

9   contracts.

10      Q.  Okay.  And then going to the next page, Page 2,

11  there's a signature.  It appears to be of a

12  Jeremy Howard on behalf of ASR Analytics.

13      A.  Yes.

14      Q.  And who's Jeremy Howard?

15      A.  He is one of my partners at ASR.

16      Q.  And then under "iGov," there's a signature

17  block for Mr. Suhy?

18      A.  Yes.

19      Q.  And that's your understanding, to be his

20  signature?

21      A.  Yes, to my understanding.

22      Q.  Okay.  And so this document is, to your

23  knowledge, a true and correct copy of the master

24  subcontract agreement for ASR Analytics in relation to

25  iGov for the DAIS BPA?

110

November 7, 2022

1      A.  Yes, it is.

2      Q.  And you'll note it's dated June 30, 2019, for

3  Mr. Suhy's signature, and then October 7, 2019, for

4  Mr. Howard's, but the effective date is November 7,

5  2018.

6           What's the reason for there being such a delay

7  in executing the agreement?

8      A.  I don't know.

9      Q.  Was Mr. Suhy, on behalf of iGov, providing any

10  subcontracting services prior to June of 2019?

11           MS. EMBRY:  Objection to form.

12           THE WITNESS:  Could you repeat the question?

13  BY MR. RATINOFF:

14      Q.  Yeah.  Actually, I wasn't finished.

15           MS. EMBRY:  Oh.

16           MR. RATINOFF:  Counsel, if you wouldn't mind,

17  let me finish my question.

18  BY MR. RATINOFF:

19      Q.  So let me start over again.

20           Had Mr. Suhy performed any subcontracting work

21  prior to June 30th, 2019, on any task orders that were

22  issued in relation to the -- the BPA DAIS contract?

23      A.  Not to my knowledge.

24      Q.  So this agreement was a prerequisite before he

25  could actually provide any subcontracting services in

                                                    111

 1    relation to the -- the -- it actually looks like it's

 2    called the RAAS Data Analytics Innovation Support

 3    Contract?

 4        A.   A prerequisite in the sense that, as normal

 5    course of business, we would put this sort of master

 6    subcontract in place before engaging anyone on a task

 7    order level.

 8        Q.   Okay.  And so then what would happen after this

 9    agreement was entered?  Task -- individual task orders

10    would be issued to the subcontract under this agreement?

11        A.   That's usually the process, yes.

12        Q.   And then scrolling down to Page 3, at the

13    bottom there's a heading, "TO Team Lead Business Rules."

14             What's -- what does -- what does "TO Team Lead

15    Business Rules" mean?

16        A.   So we had several and have several team members

17    that support ASR under the DAIS contract, and when we

18    originally created the team and -- and even when we

19    established these master subcontract agreements, we

20    wanted to define some areas of responsibility, or you

21    could call them "swim lanes," for the various members of

22    our team so that there would be some ground rules for

23    who would have either a lead role or a role at all on

24    task orders that involved different domain areas.

25        Q.   Okay.  And so then Mr. Suhy's recognized --

                                                          112

1    described here as a subcontractor.  Core capabilities

2    would have been his expertise in the development and

3    management of technology infrastructure supporting the

4    CDW Knowledge Graph Environment -- CKGE for short -- and

5    custom development of graph/network analysis algorithms

6    supporting analytical efforts.

7          Is that a fair representation of what he was

8    expected to provide expertise in?

9       A.  Yes.

10      Q.  And that's what we talked about earlier, as far

11   as having knowledge of developing the CKGE environment

12   and the use of ONgDB?

13          MR. BEENE:  Objection to form.

14          MS. EMBRY:  Same objection.

15   BY MR. RATINOFF:

16      Q.  Did I inaccurately state your prior testimony?

17      A.  No, that's an accurate description.

18      Q.  And then it says -- oh, before I get there,

19   just so the record's clear then, Mr. Suhy's

20   subcontractor core capabilities was based on his

21   experience with the CKGE environment, correct?

22      A.  Yes.

23      Q.  And part of that expertise was his knowledge of

24   the CKGE environment's use of ONgDB software; is that

25   correct?

113

1    A.  So also for the record, I don't have a clear

2  understanding from a technical standpoint of the

3  distinction between, quote, the CKGE environment, and,

4  quote, ONgDB, but I think of the two of them as closely

5  related and perhaps part of the same thing.

6        So given that, I would agree.  We thought of

7  John Mark Suhy's expertise as including CKGE and the

8  ONgDB software.

9    Q.  And then it says, "This expertise is

10  complemented by two additional prospective teaming

11  partners (i.e., AtomRain and Tylor Data Services) that

12  have closely related areas of expertise."

13        You had mentioned that there was lanes, so were

14  AtomRain and Tylor bringing additional lanes of

15  expertise to this project apart from Mr. Suhy?

16    A.  I don't know that they were bringing entirely

17  distinct skill sets, which is, I guess, why they are

18  described as complementary in this -- in this phrase.

19    Q.  Okay.  So then as far as AtomRain goes, you

20  mentioned they were also a contemplated subcontractor in

21  the DAIS BPA bid, correct?

22    A.  Correct.

23    Q.  Did they also enter into a separate master

24  subcontractor agreement similar to this one?

25    A.  To my knowledge, yes, they did.

114

November 7, 2022

1    Q.  And the same with Tylor Data Services?

2    A.  Yes, I believe so.

3    Q.  And was -- or sorry.

4        Is this agreement still in effect with iGov?

5    A.  Yes, it is.

6    Q.  And is it set to terminate at a particular

7    time?

8    A.  I guess this may be a -- an amendment to that

9    comment a moment ago.

10       I don't recall whether this contract exists

11   between ASR Analytics and iGov today, or if it was

12   novated or modified to be between ASR and Greystones.

13   Q.  Okay.  What's -- what's Greystones?

14   A.  Greystones is, to my understanding, a firm that

15   acquired some portion or all of the businesses that

16   John Mark Suhy operated.

17   Q.  Okay.  So when you say "acquired," you mean

18   Greystones acquired iGov?

19   A.  I believe so.  I'm -- I -- yeah, I believe so.

20   Q.  And do you know approximately when that took

21   place?

22   A.  Approximately in 2022 at some point.

23   Q.  And you believe there may have been a

24   modification -- or I think you used the word

25   "novation" -- to this contract to reflect Greystones'

                                                    115

November 7, 2022

1  acquisition of iGov?

2          MR. BEENE:  Objection to form.

3          THE WITNESS:  I don't recall if that has

4  happened, but I do recall that some of the contracts

5  with John Mark Suhy were in the process of being

6  modified or novated.

7  BY MR. RATINOFF:

8      Q.  With the idea that Mr. Suhy would continue

9  performing his -- his core capabilities, but under the

10  Greystones banner versus iGov; is that fair?

11     A.  Yes, that's fair.

12     Q.  So -- so this contract in some way, shape, or

13  form is still in effect, whether it's iGov being the

14  subcontractor or Greystones; is that correct?

15     A.  That's correct.  That's why I indicated earlier

16  that it, in effect, is still active.

17     Q.  Okay.  And then what other entities were you

18  referring to as being acquired by Greystones?

19     A.  I don't know.  As you've noted earlier, there

20  are multiple business entities that were part -- that

21  were in some way connected to John Mark Suhy, and I

22  don't know the distinction between them or their

23  relationship to Greystones.

24     Q.  If there is any amendments to this agreement or

25  novations reflecting the substitution, I guess to put it

116

1          MR. RATINOFF:  This is -- will be marked as

2   Exhibit 36 -- I'm sorry -- 136.

3   BY MR. RATINOFF:

4      Q.  That's what happens when you try to type and

5   speak at the same time.

6          So yeah.  Exhibit 136, this would be a document

7   entitled -- oh, are you going to be able to open it?

8      A.  Let me make sure I have the right one here.

9      Q.  Yeah.  It should say -- you know what?  I

10  apologize.  I did drop the wrong document in there, so

11  let me -- let me start over again.

12     A.  Okay.

13     Q.  This'll be -- it'll be Tab 417 in the chat.

14     A.  Okay.

15         Okay.  I've got it open here.  Let me look

16  through this.

17     Q.  And the title of this document should be,

18  "Modification 001 to Master Subcontract Agreement."

19     A.  Uh-huh.  Yes.

20     Q.  And that's got a beginning Bates number of

21  ASR 01898, which is produced by ASR.

22         Do you recognize this document that's been

23  marked as Exhibit 136?

24     A.  Let me take a look through it.

25     Q.  Okay.

                                                      119

1    A.  Okay.

2    Q.  Okay.  Do you recognize what's been marked as

3  Exhibit 136?

4    A.  Yes.

5    Q.  And what is it?

6    A.  It is a modification to the master subcontract

7  agreement that we looked at in a previous document.

8    Q.  And what was the purpose for this modification?

9    A.  It looks like this was put in place in

10  anticipation of a task order RFQ that -- that was going

11  to be released under the DAIS BPA.

12    Q.  Okay.  And to your knowledge, was that task

13  order awarded to ASR?

14    A.  If I'm correctly interpreting the name of this

15  opportunity, then yes, this was ultimately awarded to

16  ASR.

17    Q.  And what was the name of the opportunity that

18  came to mind?

19    A.  That came to mind?  It is referred to in this

20  document as "Employment Tax Innovation Lab Support For

21  the Data Management Division and Data Exploration and

22  Testing Organization."

23    My understanding is that this ultimately was

24  released and awarded under the name "Emerging Compliance

25  Issues."

120

1    Q.  Okay.  I believe you mentioned that earlier

2    before our -- our break, Emerging Compliance Issues,

3    correct?

4        A.  That's the name.  I don't recall if I mentioned

5    it before the break.

6        Q.  Gotcha.  And what is that -- or what does that

7    task order involve?

8        A.  As this paragraph accurately states, it

9    involves support for two different organizations within

10   RAAS:  One with the acronym DMD, and one with the

11   acronym DET, and the work covers a fair amount of ground

12   divided between these two organizations.  There's

13   probably, if I remember correctly, a dozen or more

14   separate work streams.

15   Q.  Okay.  And where does Mr. Suhy's expertise fit

16   into that task order?

17       MR. BEENE:  Objection to form.

18   BY MR. RATINOFF:

19       Q.  Where does Mr. Suhy's expertise fit into the

20   Emerging Compliance Issues task order?

21       A.  So or the DET side of the project, a portion of

22   that work involves analysis of graph databases, and his

23   expertise would fall into that work stream.

24       Q.  Okay.  And did that -- those graph databases

25   that you mentioned for the DET, did that involve the use

121

1  of ONgDB?

2      A.  I, again, am not entirely clear on the

3  technical definition of "ONgDB," but I believe it would

4  be fair to say yes.

5      Q.  So the data -- the graph databases -- the

6  analysis of graph databases would be -- in other words,

7  that's analyzing graphs that are generated with ONgDB?

8      A.  Analyzing graphs that were generated using a

9  variety of tools, including ONgDB.

10      Q.  And would the same be true for -- for the work

11  on the side of the Data Management Division?  I think

12  you called it "DMD."

13      A.  DMD?  No, that portion of the project is

14  primarily focused on data ingest and bringing new data

15  sources into the CDW data warehouse.

16      Q.  And then how does -- how does this CDW --

17  that's the acronym, I believe.

18      A.  Uh-huh.

19      Q.  How does that interface with the CKGE to your

20  knowledge?

21      A.  There's probably a variety of ways that you

22  could say there's relationships there, but mainly I

23  would say data from CDW is used to construct graph

24  databases in CKGE.

25      Q.  So the data in -- that's stored in the CDW is

122

1   drawn -- or -- I'm trying to use the laymen terms, so

2   you know, if you need to correct me, that's fine.

3          So the CKGE draws raw data from the CDW; is

4   that a fair description?

5       A.  That's fair, yes.

6       Q.  And then within the CKGE, the data is put into

7   graphs using ONgDB?

8       A.  It is put into graphs using various tools,

9   including ONgDB.

10      Q.  But the actual construction of the graphs is

11  done by ONgDB, as opposed to visualization of the graphs

12  which might be done by a different tool?

13      A.  I would say that's correct, although I would

14  say other tools have also been used to develop graph

15  databases.

16      Q.  And what other tools are those?

17      A.  Our programming language has been used to

18  develop graph databases, Python has been used.  I --

19  there are other projects that use Oracle and SQL and

20  Cytoscape, but I'm into the sure how those are used in

21  relation to graph databases.

22      Q.  But in terms of the CKGE, it's primarily ONgDB

23  that's the main graphing tool?

24      A.  I think that's correct.

25          MR. RATINOFF:  All right.  Let me go ahead and

123

1    mark the next document as exhibits exhibit let's see

2    where we're at here -- 137.

3              (Exhibit 137 was marked for identification.)

4    BY MR. RATINOFF:

5        Q.   Now, this is a 45-page document, so for the

6    time being, if you could just familiarize yourself

7    generally with it, and then I'll point you to some

8    specific portions of it that I would like to talk about.

9              MS. EMBRY:   Yeah, but Mike, if you need to look

10   at it, you should take that opportunity.

11   BY MR. RATINOFF:

12       Q.   Oh, absolutely, yeah.   That's fine.

13       A.   Okay.

14            Okay.

15       Q.   Okay.   Do you recognize what's been marked as

16   Exhibit 137?

17       A.   Yes.

18       Q.   Okay.   What is it?

19       A.   This appears to be a technical proposal that

20   ASR submitted in response to a task order under the DAIS

21   BPA.

22       Q.   And then going to page -- it would be, I guess,

23   the second page in PDF, so this is the letter addressed

24   to Mr. Rodney Walters, and then below you'll see the --

25   the signature.

                                                        124

1          Do you recognize that signature at the end of

2    the letter?

3        A.   Yes.

4        Q.   Is that your signature?

5        A.   It is.

6        Q.   So you submitted this -- this response to an

7    RFP on behalf of ASR?

8        A.   Yes.

9        Q.   You were familiar with the contents of this

10   document at the time you signed it?

11       A.   Yes.

12       Q.   You weren't kidding when you said government

13   contracts are long.

14          All right.  Let me go ahead -- go ahead and

15   turn your attention to page -- let's see.  Where are we

16   at?  And actually, let's stick with the letter.

17          And it says, "We have deep expertise" -- and

18   this is the second paragraph, for the record.

19          "We have deep expertise with the integration

20   and delivery of Compliance Data Warehouse (CDW) data,

21   and we helped RAAS to develop the CDW Knowledge Graph

22   Environment (CKGE) environment.  As part of our

23   Knowledge Graph-Application Programming Interface

24   (KG-API) work with Data Management Division (DMD) and

25   Data Exploration and Testing (DET) division."

125

1        So just to be clear, this is the KG-API project

2   that ASR was working with Tylor Data; is that correct?

3        A.  That's correct.

4        Q.  And then the prior reference to the CKGE

5   environment, is that actually referring to the work that

6   Mr. Suhy did for the IRS?

7        A.  Yes.

8        Q.  So this proposal was envisioning using

9   Mr. Suhy's expertise and experience along with Tylor

10  Data's to get the -- get the work?

11       A.  Among many other capabilities.

12       Q.  Their capabilities, or ASR's?

13       A.  Both.

14       Q.  So both ASR and iGov?

15       A.  And Tylor Data.

16       Q.  And Tylor Data.

17       A.  And others.

18       Q.  Who were the others?

19       A.  Who --

20       Q.  AtomRain -- was AtomRain one of the

21  subcontractors envisioned supporting this proposal?

22       A.  I believe so, but let me look at the document.

23           Yes, they were.

24       Q.  Okay.  And then moving to -- and I know there's

25  different page numbers here, so I'm going to use the PDF

126

1    page numbers, so this would be 11 out of 45 --

2         A.   Uh-huh.   Yes.

3         Q.   -- and this would be, I guess Page 2 of 1 of

4    the documents.

5              And it says, "Team ASR includes experts in

6    graph analytics (Deb Tylor, Rudra Chakraborty)" -- I'm

7    not sure if I'm pronouncing that correctly.

8              MR. RATINOFF:   That's -- for the spelling is

9    C-H-A-K-R-A-B-O-R-T-Y.

10             THE WITNESS:   Uh-huh.

11   BY MR. RATINOFF:

12        Q.   So those two individuals, are they with

13   Tylor -- Tylor Data?

14        A.   Deb Tylor is with Tylor Data data;

15   Rudra Chakraborty is with ASR.

16        Q.   And then, "graph application development,

17   (Ben Nussbaum, Amanda Bouman)," B-O-U-M-A-N.

18             Those are both AtomRain employees?

19        A.   Yes.

20        Q.   And what is meant by "graph application

21   development"?

22        A.   You mean how we intended it as used in this

23   proposal?

24        Q.   Yes.

25        A.   I can't be certain what we were thinking at the

                                                      127

1    time, but I imagine we meant building tools to analyze

2    graph data.

3        Q.  And that graph data being generated by ONgDB

4    among other graph database programs?

5        A.  Correct.

6        Q.  And next it says, "system administration

7    (Judith Nyamia)," N-Y-A-M-I-A.

8        A.  Uh-huh.  Yes.

9        Q.  John Mark Suhy.

10           Who's Judith Nyamia, or Nyamia?

11       A.  She is an employee of Analytica.

12       Q.  And then, of course, John Mark Suhy is here on

13   behalf of iGov?

14       A.  Yes.

15       Q.  Now Greystones?

16       A.  Yes.

17       Q.  And the rest of the names in here, are they all

18   ASR employees?

19       A.  In this paragraph?

20       Q.  Yes.

21       A.  Rebecca Myhre is.  Veronica Krejci is an

22   Analytica employee.

23       Q.  What role did Analytica have within this

24   proposal?

25       A.  Primarily support around administration in the

                                                          128

1    DMD portion of the project.

2        Q.  And then as far as the system administration in

3    reference to John Mark Suhy, what was that role

4    envisioned to be?

5        A.  I'm not certain.  I imagine we were trying to

6    demonstrate complete coverage of various domain areas

7    and mapped the names as best fit.

8        Q.  And then moving on to page -- it would be 17

9    out of 45, also Page 8 within the document, it appears

10   to be.

11       A.  Okay.

12       Q.  And then it says -- this is way down at the

13   bottom.  It's the last bullet point.  It says, "Team ASR

14   developed the KG-API, a suite of tools coupled with a

15   web-based user interface that enables users to search

16   graph databases for user-specific (sic) patterns and

17   then view the resulting patterns in CKGE Graph

18   Explorer."

19           So the KG-API suite of tools, is that basically

20   what would be referred to as a "graph visualizer," or is

21   that not an accurate description?

22       A.  I don't think that's accurate.  Yeah, that's

23   not how I would think of KG-API's primary functionality.

24       Q.  Okay.  What is meant by, as is stated in the

25   document, being "coupled with a web-based user interface

129

1     that enables users to search graph databases"?

2         A.  It's referring to a user interface of the

3     KG-API application that allows users to specify a graph

4     pattern so that it can be searched for in a graph

5     database.

6         Q.  Okay.  And how -- and would that graph database

7     be generated by a graph database tool like ONgDB?

8         A.  Yes, like ONgDB.

9         Q.  Which was what -- what was used in the CKGE

10    Graph Explorer?

11        A.  You're saying ONgDB is what was used in the

12    CKGE Graph Explorer?

13        Q.  Yeah.

14        A.  It was used to generate those graph databases,

15    you're saying?

16        Q.  Right, that would be visible in the CKGE Graph

17    Explorer.

18        A.  I believe that's correct.

19        Q.  And then it says -- in the same paragraph it

20    says, "ASR is now working with RAAS to develop a true

21    API in the Spark environment which, will enable the IRS

22    to rapidly build custom pipelines for graph data

23    creation and analysis using the Neo4j Spark Connector,

24    Apache Hive, and Metabase."

25            What does that mean?

                                                        130

1     Q.  And then going to Page 39 out of 45, you'll see

2  it's -- A-10 is the page number, but the title's, "A6,

3  Elizabeth Trenholme."  That's T-R-E-N-H-O-L-M-E.

4     Do you see that?

5     A.  Yes.

6     Q.  And who's Elizabeth Trenholme?

7     A.  She is an employee of AtomRain.

8     Q.  And why was she included in this proposal?

9     A.  I believe because she had experience using

10  graph tools in the IRS RAAS environment.

11     Q.  And one of those tools being ONgDB?

12     A.  Yes.

13     Q.  And again, this is your signature at the bottom

14  of this resume?

15     A.  It is.

16     Q.  Certificating that, to your knowledge, this was

17  an accurate representation of Ms. Trenholme's

18  experience?

19     A.  Yes.

20     Q.  And then just quickly scrolling back to

21  Ms. Bouman's resume, I know there's -- this could be

22  marketing words, but the first bullet point back to

23  that, it says, "Ms. Bouman understands and follows CKGE

24  ecosystem templates, patterns, and best practices for

25  ETL between CDW and ONgDB within the CKGE environment."

138

 1            I know we were earlier speaking about using

 2    different words for the relationship between CDW and the

 3    CKGE environment, but is this a pretty accurate

 4    description of how -- how the CKGE ecosystem works?

 5            MS. EMBRY:  Jeff, where were you reading from?

 6            MR. RATINOFF:  It's in the first bullet point

 7    in Ms. Bouman's resume, A-8.

 8            THE WITNESS:  And is there -- you're asking --

 9    sorry.

10    BY MR. RATINOFF:

11       Q.  Yeah, let me re-ask it.  I think that was a

12    pretty vague question.

13            So as far as the relationship between CDW and

14    ONgDB in the CKGE environment, is this a fair

15    representation of how they interact?

16       A.  I think so, yes.

17       Q.  And what does "ETL" stand for?

18       A.  Extract, transform, and load.

19       Q.  And what does that mean in the context of the

20    interface between CDW and ONgDB within the CKGE

21    environment?

22       A.  I think it is stating that, in the CKGE

23    environment, data is extracted and transformed and

24    then -- from CDW and then loaded into graph databases

25    within the CKGE environment.

139

1    Q.  So the CDW does all the work; for instance, all

2    the tax payer information that may be used in creating a

3    graph; is that fair?

4    A.  Yeah, the CDW contains lots of information, but

5    inclusive of tax pair information.

6    Q.  And I think it's -- is it fair to say that CDW

7    is -- contains pentabytes (sic) of data, an order of

8    magnitude?

9    A.  I think it's petabytes, but yes.

10   Q.  Petabytes.  Got it.  Okay.  I know it was a

11   very large order of magnitude, so...

12   A.  It's a lot.

13   Q.  It is a lot.

14        MR. RATINOFF:  All right.  Let me go ahead and

15   mark the next exhibit.  This is going to be in your chat

16   here in a minute.  This will be marked as Exhibit 138.

17        (Exhibit 138 was marked for identification.)

18   BY MR. RATINOFF:

19   Q.  Oh, and before we even get there, this proposal

20   that we were just talking about, that was the Emerging

21   Compliance Issues, I think is how you described it?

22   A.  Yes.

23   Q.  And that was actually award to ASR, correct?

24   A.  Correct.

25   Q.  Okay.  Let me know when you've had a chance to

140

1    look at what's been marked as Exhibit 138.

2        A.  Okay.  And this is the one that starts with

3    "Subcontractor Task Order Number 0001"?

4        Q.  Correct.

5        A.  Okay.  Let me take a look.

6            Okay.

7        Q.  So do you recognize what's been marked as

8    Exhibit 138?

9        A.  Yes.

10       Q.  Okay.  This is Bates number ASR 01752, produced

11   by ASR in response to subpoena.

12           What is your understanding of this document?

13       A.  This is a subcontract between ASR and iGov at

14   the task-order level under DAIS, specifically for the

15   Emerging Compliance Issues task order.

16       Q.  So this relates to what was ultimately awarded

17   in response to what we were just looking at,

18   Exhibit 137?

19       A.  That's correct.

20       Q.  And it's contemplated that both, I assume, that

21   the task order awarded to ASR, and in turn, the

22   subcontract awarded to -- or the task order awarded to

23   iGov could go as far as 2025?

24       A.  That's correct.

25       Q.  And this is for the base year of that -- that

141

1    task order?

2        A.  That's correct.

3        Q.  And then looking at paragraph -- I think it's

4    on the next page, actually.  Excuse me.  It's in the

5    second to last paragraph that is in that box.  It starts

6    with, "In addition to."

7        A.  Uh-huh.  Yes.

8        Q.  You'll see that, "The recent adoption of graph

9    database technology by the IRS has rapidly led to the

10   new" -- sorry -- "to new insights and is now being used

11   by over 3,000 employees" -- excuse me -- "in

12   Examination, Collection, Criminal Investigation, and

13   even cybersecurity functions."

14           Do you have an understanding of that's being --

15   what that's referring to?

16       A.  Yes, generally.  This language is, I believe,

17   taken directly from the IRS' request for quotations.

18       Q.  And is this referring to the CKGE environment?

19       A.  I believe it's referring to the CKGE

20   environment inclusive of tools that have been developed

21   to analyze that data.

22       Q.  I'm sorry; you said "inclusive"?

23       A.  "Inclusive of."

24       Q.  Gotcha.  And one of those tools being ONgDB?

25       A.  I suppose so, yes.

142

Q.  And then in the beginning of that box, I think it looks like it might parrot the language of what we looked at in that prior modification, the "DMD manages a large-scale data, analytics, and computing environment. The scope involves analytical support to RAAS' Data Exploration and testing division," et cetera.

So actually, this task order relates to that modification one to the subcontractor master agreement?

A.  Yes, that's right.

Q.  All right.  I think I'm able to connect all the government contracting dots.  It's a little complicated. Took me a couple of tries going through the document.

A.  Well done.

Q.  Thank you.  Pat myself on the back.

And as far as the award goes on Page 2, is the -- is that, the $29,538, is that basically the max amount that can be paid under this task order?

A.  That is the maximum amount that could be paid to -- from ASR to John Mark Suhy's firm under this task order barring any modification.

Q.  And to your knowledge, was the full amount paid to Mr. Suhy?

A.  I don't know.

Q.  And then I'm going to go ahead and put the next exhibit in the chat.

143

1          Oh, actually, I'm sorry.  Before I do, I just

2     wanted to confirm at the bottom of Page 3, is that your

3     signature on under "ASR Analytics"?

4          A.  It is.

5          Q.  And is this Mr. Suhy's signature to your

6     knowledge?

7          A.  It does appear to be, yes.

8          Q.  And to your knowledge, was this task order

9     fulfilled by Mr. Suhy?

10          A.  Well, this task order is still active, but this

11     base year, to my knowledge, yes, was fulfilled.

12          Q.  And so he fully performed whatever was called

13     for within the base year under this task order?

14          A.  Yes.  To my recollection, yes.

15          Q.  Okay.  So moving on to what's been dropped in

16     the chat.  This will be Exhibit 139.

17          (Exhibit 139 was marked for identification.)

18          THE WITNESS:  Okay.  Let me take a look.

19     BY MR. RATINOFF:

20          Q.  Sure.

21          A.  This starts with "Subcontractor Task Order

22     Number 0002"?

23          Q.  Correct.

24          A.  Okay.

25          Q.  And just while you're doing that, I will state

144

1    for the record, this is a document with the beginning

2    Bates number 01758.  As noted, "Subcontractor Task Order

3    Number 0002" is the title of the document, which I've

4    marked as Exhibit 139.

5        A.   Okay.

6        Q.   And do you recognize what's been marked as

7    Exhibit 139?

8        A.   Yes.

9        Q.   What do you understand this document to be?

10       A.   This appears to be a subcontract agreement

11   between ASR and iGov at the task-order level under the

12   DAIS BPA, specifically for the Corporate Graph Database

13   task order.

14       Q.   And when you say "the Corporate Graph Database

15   task order," is that a different task order than the one

16   the IRS awarded ASR?

17       A.   It is, yes.

18       Q.   And when was that awarded to ASR?

19       A.   I believe it was awarded in September of 2020.

20       Q.   And it's described under "Purpose of Task

21   Order/Description of Work."

22            "This engagement involves Subcontractor support

23   to ASR for Corporate Graph Database modules.

24   Specifically, the Subcontractor will support ASR to

25   provide analytical support of (sic) the IRS Office of

145

1  Research, Applied Analytics and Statistics" -- I'll just

2  say "RAAS" for short -- "Data Exploration...Testing

3  Division," et cetera.

4         Is that -- is that a fair representation of

5  what this task required Mr. Suhy to provide services on?

6      A.  Yes.

7      Q.  And at a high level, what -- what was this

8  task -- sorry -- what was the Corporate Graph Database

9  modules being referred to here?

10     A.  I'm not sure what the term "modules" is used to

11 mean, but the Corporate Graph Database project, as I

12 understand it, is developing user-interface driven tools

13 to visualize and analyze corporate organizational

14 structures.

15     Q.  And then when you say using graphs, you mean

16 graphs generated by programs such as ONgDB?

17     A.  I don't know how the graphs for this project

18 are generated, but I would assume that's correct.

19     Q.  Okay.  Maybe this will help clarify things.

20 Moving on to the next page.  The same box, but

21 continuing on.

22         By the way, I notice it says, "The recent

23 adoption of the graph database technology by the IRS has

24 rapidly led to new insights and is now used by over

25 4,000 employees."  I think the other one said 3,000.

146

1    Is it 3,500?  I mean, do you have -- was that

2  something that ASR wrote?

3    A.  No, these -- as I mentioned, these narratives

4  in the Description of Work section are typically things

5  we take directly from the government's RFQ, so more

6  likely than not, two different authors in the government

7  either wrote them at different times or had different

8  numbers.

9    Q.  Understood.  And I think you testified this was

10  under a different task order than the emerging

11  compliance issue, so that -- that makes sense.  Right

12  hand not talking to the left.

13    Okay.  It says -- further on, it says, "RAAS

14  graph data models are accessible by employees through a

15  web-based user interface (UI) that provides

16  authentication, query, visualization, datasheet views,

17  and other functionality.  Many of these services are

18  messaged through GraphGrid, a microservices-based

19  application programming interface that includes ONgDB."

20    Do you see that?

21    A.  Yes.

22    Q.  Would that more articulately describe the

23  relationship of ONgDB with GraphGrid and then in terms

24  of CKGE that we've been trying to nail down today?

25    A.  I believe so.  I -- I did not write this, but I

147

November 7, 2022

 1    don't have any reason to question that it's an accurate

 2    description, and it does provide a more precise

 3    explanation of what GraphGrid is.

 4         Q.   And from this document, do you have a better

 5    understanding in your own words what GraphGrid does?

 6         A.   I believe so, yeah.

 7         Q.   And what -- what is that understanding now?

 8         A.   I would say it is that GraphGrid is an API that

 9    allows developers to interact with different

10    microservices, including ONgDB.

11         Q.   What are microservices?

12         A.   Again, you're pushing at the boundary of my

13    technical understanding, but I understand it to be

14    discrete, functional components within a technology

15    architecture.

16         Q.   In this case, being components of GraphGrid?

17         A.   That's my understanding.

18         Q.   And one of those components being ONgDB?

19         A.   That's my understanding, yes.

20         Q.   And then moving on, this is -- so this would

21    be, again, a DAIS award under that task order, support

22    for Corporate Graph Database?

23         A.   Correct.

24         Q.   And then the amount here is, at least for the

25    base here is 25 -- $25,993.44?

148

```
 1        A.   Correct.
 2        Q.   And that's -- that would be the maximum amount
 3   that would be awarded for this particular contract
 4   period to iGov?
 5        A.   Correct.
 6        Q.   And that's based on Mr. Suhy's stated hourly
 7   rate of $147.69?
 8        A.   Correct, along with an estimated level of
 9   effort.
10        Q.   "Effort" meaning the 176 hours?
11        A.   Correct.
12        Q.   And did Mr. Suhy perform all the tasks required
13   under this task order for that base contract period of
14   September 2020 to September 2021?
15        A.   As far as I know, he provided all of the
16   support that was requested.
17        Q.   And then at the bottom, this is your signature
18   on the left under "ASR Analytics"?
19        A.   It is, yes.
20        Q.   And this is Mr. Suhy's signature under "iGov"?
21        A.   Yes, to my knowledge.
22        Q.   No reason to believe it's not?
23        A.   No reason to believe it's not.
24        MR. RATINOFF:  All right.  I know we've going
25   for a little over an hour, so I want to make sure I give
```

149

1    Let's do that.

2              THE VIDEOGRAPHER:  Thank you.  We are now going

3    off the video record.  The time is 3:19 p.m.

4              (Off the record from 3:19 p.m. to 3:32 p.m.)

5              THE VIDEOGRAPHER:  We are now back on the video

6    record.  The time is 3:32 p.m.

7    BY MR. RATINOFF:

8         Q.  All right.  Let's go ahead and continue.  I'm

9    going to drop a new exhibit in the chat.  This will be

10   marked as Exhibit 140.  It was produced by ASR,

11   beginning Bates number ASR 01755, and it's titled,

12   "Subcontractor Task Order Number 0001 – Modification

13   01."

14             (Exhibit 140 was marked for identification.)

15   BY MR. RATINOFF:

16        Q.  Please let me know when you've had a chance to

17   review.

18        A.  Sorry.  I was on mute.  I will.  I'm looking at

19   it now.

20             Okay.

21        Q.  And do you recognize what's been marked as

22   Exhibit 140?

23        A.  Yes.

24        Q.  Okay.  What do you understand Exhibit 140 to

25   be?

                                                          151

1          A.  This is a modification to our subcontract, to

2      the subcontract between ASR and iGov for work on the

3      Emerging Compliance Issues project.

4          Q.  So this is essentially amending the original

5      task order by exercising option year one?

6          A.  Correct.

7          Q.  Option year one being from September 2021 to

8      September 2022?

9          A.  Correct.

10         Q.  And this Emerging Compliance Issues is again

11     the same task order that we've been talking about that

12     ASR was awarded by the IRS?

13         A.  It's one of the ones we've been discussing,

14     yes.

15         Q.  And we're working under the -- the DAIS BPA,

16     correct?

17         A.  Correct.

18         Q.  And then going down to the second page, you'll

19     see the hourly rate.  It looks like it was changed from

20     147.69 to 150.94; is that correct?

21         A.  Correct.

22         Q.  And that's just reflecting inflation, I guess

23     would be the best explanation?

24         A.  Yeah.  Government contracts often have a small

25     escalation rate built in.

152

1    Q.  And then modification amount -- so then the
2  award amount underneath there is the original -- I think
3  the task order we talked about, the 29,000-plus, and
4  then the modification now is -- would be an additional
5  $35,470.90; is that accurate?
6    A.  That's correct.
7    Q.  And that reflects the increase of hours from
8  200 to 235 for this period?
9    A.  Correct.  Sorry.
10    Q.  And then it lacks like this expired not too
11  long ago, in September -- or ended in September 2021.
12       Did Mr. Suhy, during that one year period,
13  perform all the tasks he was required to do under this
14  task order?
15    A.  He did.  My understanding is he performed all
16  of the tasks he was asked to perform.  I don't know if
17  that exhausted all of the hours that were part of the --
18  that were within the ceiling.
19    Q.  And that would be under timekeeping and
20  invoicing, he would have to submit invoices to reflect
21  the amount of hours he spent on this particular project?
22    A.  That's correct.
23    Q.  And I know there's a reference to timesheets
24  here.  It says, "directly from the hours reported on the
25  approved timesheets."

153

1    Were there timesheets created by Mr. Suhy

2  separate from the invoices he submitted?

3    A.  Yes, I believe there were.

4    Q.  And how were those submitted?  Were they

5  electronically submitted by Mr. Suhy?

6    A.  Yes, electronically submitted.

7    Q.  Is that through a portal that ASR provided for

8  him to log his time in?

9    A.  Yes, that's correct.

10   Q.  And then he would still be required to provide

11  an invoice reflecting that time performed under the task

12  order?

13   A.  That's correct.

14   Q.  And then ASR would just match the time entries

15  to -- to the invoice to make sure that everything was

16  accurate?

17   A.  Correct.

18   Q.  And then again at the bottom, is that your

19  signature under "ASR Analytics"?

20   A.  It is, yes.

21   Q.  And to your knowledge, Mr. Suhy signed this

22  under "iGov"?

23   A.  I have no reason to believe that's not his

24  signature.

25   Q.  And I notice there's an option here, two, which

154

1    would be -- and this is back on Page 1 -- for

2    September 30, 2022, to September 29, 2023.

3            To your knowledge, has that option year two

4    been exercised under this task order?

5        A.  I believe it has.

6        Q.  And would it -- there been a similar sub --

7    sub -- sorry -- Subcontractor Task Order Number 001

8    in -- and presumably it would be modification two?

9        A.  Yes, that would be my understanding.

10       Q.  And it would have been exercised around the

11   expiration of this -- this modification?

12       A.  Around that date, assuming we're on top of

13   things as we should be.

14       Q.  Understood.  But to your knowledge, Mr. Suhy's

15   continuing to work under this general task order for

16   Emerging Compliance Issues at the IRS on behalf of ASR?

17       A.  Yes.

18       Q.  And would you be able to produce the -- the

19   additional modification to this task order?

20       A.  I think Becky's on mute.

21       Q.  Well, I'll --

22           MS. EMBRY:  Objection just to the extent that,

23   you know, any -- any requests you have, you know, submit

24   to us in writing, and we will take them under

25   advisement.

                                                     155

1    what is -- oh.  Sorry.  My Acrobat is acting up.

2            This would be a document produced by ASR with

3    the beginning Bates number zero -- ASR 01761, titled,

4    "Subcontractor Task Order Number 0002 - Modification

5    01," and again, this is marked as Exhibit 141.

6            Please take a look at it, and let me know when

7    you're ready.

8        A.   I'm looking at it now.

9            Okay I'm familiar with this document.

10       Q.   And what is your understanding of what this

11   document is?

12       A.   This is a modification to a subcontract between

13   ASR and iGov for the Corporate Graph Database task

14   order.

15       Q.   And that's the one we were previously

16   discussing in reference to the original task order for

17   the base year?

18       A.   Yes.

19       Q.   And then this would be the -- the box on the

20   first page, option year one, from September 28, 2021, to

21   September 27, 2022?

22       A.   Correct.

23       Q.   And then looking down here again, similar bump

24   in hourly rate for Mr. Suhy?

25       A.   Correct.

157

1      Q.   But with a lower expectation on hours?

2      A.   Correct.

3      Q.   At least from the base year on this particular

4  task order?

5      A.   Correct.

6      Q.   And the contemplated maximum amount for this

7  task order modification period would be $21,131.60?

8      A.   Correct.

9      Q.   And to your knowledge, did -- did Mr. Suhy

10  fulfill all his obligations under this task order

11  modification one?

12      A.   As with the last one, my understanding is he

13  provided all the support that he was asked to provide,

14  and again, I don't know if that matched the

15  originally-estimated hours.

16      Q.   And then looking at it, there's an option year

17  number two from September 28, 2022, to September 27,

18  2023.

19           To your knowledge, has that option year two

20  been exercised?

21      A.   To my knowledge, it has.  I know that this

22  option was exercised by the IRS, and to the earlier

23  discussion, it may be that the documents were in the

24  process -- the subcontracts were in the process of

25  execution at the time earlier requests were made.

158

     1        Q.  Okay.  But to your knowledge, as of now, this

     2   similar modification has been executed between ASR and

     3   Mr. Suhy?

     4        A.  That's my understanding.

     5        MR. RATINOFF:  Okay.  So counsel, I'd just ask

     6   that your most recent option year task order be produced

     7   as well.  That was also called for by the subpoena.

     8        MS. EMBRY:  The document subpoena predates that

     9   date, just for the record.

    10        MR. RATINOFF:  Yeah, but you have a continuing

    11   obligation, I believe, under the federal rules, but we

    12   can talk about it offline.

    13   BY MR. RATINOFF:

    14        Q.  And then looking at signature on Page 3, under

    15   "ASR Analytics," that's your signature, correct?

    16        A.  That's correct.

    17        Q.  And then the signature under "iGov," Mr. Suhy,

    18   it would be his signature to your knowledge?

    19        A.  Yes.

    20        Q.  And you talked about Greystones earlier.

    21        For these particular tasks, the Emerging

    22   Compliance Issues and the support for corporate

    23   database, would those be the type of tasks that there

    24   would be some sort of transfer, at least in name, to

    25   Greystones from iGov?

                                                          159

1    MR. BEENE:  Objection to form.

2    THE WITNESS:  They are in that class of task

3  that I had in mind.

4  BY MR. RATINOFF:

5    Q.  So in other words, Mr. Suhy would be continuing

6  to perform those tasks as required, but it may not be on

7  behalf of iGov, correct?

8    A.  Correct.

9    Q.  And instead, it would be on behalf of the

10  subcontractor, Greystones?

11    MR. BEENE:  Objection to form.

12    THE WITNESS:  I don't know the exact

13  organizational contractual structure that would be in

14  place on their side.

15  BY MR. RATINOFF:

16    Q.  But from ASR's perspective, the important fact

17  is that Mr. Suhy will be continuing to perform the tasks

18  required under these task orders; is that correct?

19    MR. BEENE:  Objection to form.

20    MR. RATINOFF:  Counsel, just let me finish my

21  question.

22  BY MR. RATINOFF:

23    Q.  So let me ask that again.

24    So under support for Corporate Graph Database,

25  which is a task that continues to be performed for the

160

1    IRS by Mr. Suhy, correct?

2        A.  Correct.

3            MR. BEENE:  Objection to form.

4    BY MR. RATINOFF:

5        Q.  You can answer.

6        A.  Correct.

7        Q.  And from ASR's perspective, it's -- the

8    important performance issue is that Mr. Suhy continues

9    to perform the tasks under these particular task orders;

10   isn't that also correct?

11       A.  I --

12           MS. EMBRY:  Objection to form.

13           Go ahead.

14           THE WITNESS:  The important part is that we

15   continue to provide this capability to our client, and

16   Mr. Suhy is one individual who can provide that support.

17   BY MR. RATINOFF:

18       Q.  So it's important to have some continuity for

19   ASR as far as the actual personnel performing the tasks

20   under these task orders?

21       A.  Yes.

22       Q.  And for the -- the task order for support for

23   corporate database that was awarded from the IRS to ASR,

24   is AtomRain also performing task orders under that?

25       A.  Sorry.  Give me one moment.  I'm having a

161

1    little bit of a technology issue here.  The Zoom window

2    disappeared on me.  Give me one moment.

3           Okay.  I'm back.  I did hear the question, and

4    yes, AtomRain is also providing support through this

5    task order.

6       Q.  And when we say "this task order," we're

7    talking about support for Corporate Graph Database?

8       A.  Correct.

9       Q.  And is AtomRain also currently providing

10   support for the Emerging Compliance Issues task order?

11      A.  They are, yes.

12      Q.  And are both those task orders, does that

13   relate to their provision of services in relation to --

14   sorry.  Strike that.

15          For the support to -- for graph -- Corporate

16   Graph Database, does that involve AtomRain providing

17   support in relation to the CKGE environment?

18      A.  When you say "support in relation to

19   the...environment," can you describe that further?

20      Q.  Sure.  Let me ask you this:  What -- what type

21   of support is AtomRain providing for the task order

22   support for Corporate Graph Database on behalf of ASR?

23      A.  They are largely building an application that

24   allows business users to view and analyze organizational

25   structures for businesses.

162

Q.   Okay.   And are those organizational structures
analyzed in the form of graphs?

A.   Yes, I believe so.

Q.   And those graphs would be generated by graph
database software such as ONgDB?

A.   That's my understanding.

Q.   And then for the emerging corporate -- I'm
sorry, Emerging Compliance Issues, you mentioned
AtomRain is currently tasked with providing support for
ASR on that task order with the IRS, correct?

A.   Correct.

Q.   And what type of support are they providing
under Emerging Compliance Issues?

A.   They are primarily developing user interface
features in Graph Explorer.

Q.   And then the Graph Explorer, I think it was
referenced in the -- in the proposal; is that correct,
that we looked at earlier?

A.   I believe it was, yes.

Q.   And that Graph Explorer provides a
visualization of graphs generated by programs such as
ONgDB; is that also correct?

A.   That's correct.

Q.   And who are the individuals at AtomRain that
are providing support under the Emerging Compliance

163

BY MR. RATINOFF:

Q.  This will be Exhibit 142.

A.  Okay.  I've got it open.  Let me take a look.

Okay.  I've got it.

Q.  Okay.  This was produced by ASR with the Bates number ASR 01901.  It's indicated as being an invoice number 212 from iGov to ASR Analytics.  It looks like the date on it is June 6th, 2019.

Do you have an understanding of what this invoice is?

A.  I think I do, yes.

Q.  And what -- what is that?

A.  It appears to be an invoice from iGov for services performed in relation to what we've been calling the KG-API project.

Q.  And that's the project that tailer data services was the prime contractor on?

A.  That's right, Tylor Data Services.

Q.  And that's the -- I think we looked at it earlier.  I don't have the exhibit number on hand, but it's the subcontract between ASR and Mr. Suhy related to the KPGAI -- did I get that right?  Too many acronyms.

A.  That's right, that relates to the KG-API contract.

Q.  KG-API, thank you.

166

1          And so just to be clear, he would submit

2    invoices like this for when he performed services under

3    that particular subcontract to ASR?

4        A.   That's correct.

5        Q.   And then ASR would in turn bill Tylor Data

6    Services?

7        A.   That's correct.

8        Q.   And then after Tylor Data Services would pay

9    ASR, then Mr. Suhy would be paid?

10       A.   That's generally correct.  I don't know if it

11   always followed that sequence.

12       Q.   And then these type of invoices would be

13   verified against timesheets Mr. Suhy would submit to

14   ASR?

15       A.   Yes.

16       Q.   All right.  I'm going to go ahead and put the

17   next exhibit here.

18          (Exhibit 143 was marked for identification.)

19          THE WITNESS:  Okay.  I've got it open.

20   BY MR. RATINOFF:

21       Q.   All right.  This will be Exhibit 143.  It's

22   produced by ASR with the Bates number ASR 01915, invoice

23   number 267 is the title.

24       A.   Okay.  Got it.  Yeah.  I've looked at it.

25       Q.   Do you recognize this document?

167

1    A.  Yes.

2    Q.  Okay.  What's your understanding of what

3    Exhibit 143 is?

4    A.  I'll -- I'll clarify when I say I recognize the

5    document:  I don't know that I've actually seen this one

6    before, but I -- I can tell exactly what it is.

7    Q.  Okay.  So is this a -- is this an exemplar of a

8    typical invoice that iGov would submit under its various

9    subcontracts with -- with ASR?

10    A.  Yes.

11    Q.  And this is -- payment to Mr. Suhy would be

12    based on these invoices?

13    A.  Correct.

14    Q.  And in this case, you'll see down in the "Part

15    Number/Description," it says, "IRS: DAIS BPA," and

16    that's meaning the general BPA contract we talked about

17    earlier, correct?

18    A.  Correct.

19    Q.  And then there's some references in the

20    parentheses after that.  One is "IDT Innovation."

21    What's IDT Innovation?

22    A.  That's one of the task order contracts awarded

23    under the DAIS BPA to ASR.

24    Q.  Okay.  And what -- what is the IDT Innovation

25    task order?

168

1    A.   So that's the one that we talked about first

2    that involves a variety of tasks around identity theft

3    detection using a variety of methods, including, as we

4    discussed, graph analysis.

5    Q.   And "graph analysis" meaning graphs generated

6    by ONgDB?

7    A.   Among other tools, yes.

8    Q.   And I know we looked at some task orders for

9    Emerging Compliance Issues and Corporate Graph.

10   Was there also task orders issued to Mr. Suhy

11   under IDT Innovation?

12   A.   I don't recall specifically, but I would assume

13   that there were.

14   Q.   And would those have been on similar terms as

15   far as hourly rate and number of hours as the other task

16   orders we've looked at?

17   A.   Yes.

18   Q.   And then it says -- the next one is Knowledge

19   Graph.

20   Do you have an understanding what that is

21   referring to?

22   A.   I'm not sure, actually.  I have a guess.

23   Q.   Okay.  Well, I don't want you to guess, but you

24   have a reasonable basis to surmise what that is, maybe

25   we can do this a different way.

169

1              There's a reference to Corporate Graph.  I

2    believe -- is that consistent with what we were just

3    talking about the task orders, number two?

4         A.  Yes.

5         Q.  And then Emerging Compliance Issues is -- that

6    would be the task order one?

7         A.  Correct.

8         Q.  Okay.  So process of elimination, it looks like

9    we've got three different task orders:  You've got the

10   IDT Innovation, Corporate Graph, and then Emerging

11   Compliance Issues.

12             So does that help bracket what other task order

13   Knowledge Graph might be referring to?

14        A.  My assumption is that it is referring to the

15   Knowledge Graph API project, but that is not a DAIS BPA

16   task order, which is what confuses me about the label on

17   the invoice.

18        Q.  Okay.  We can back to that Knowledge Graph API.

19             Was it acceptable for Mr. Suhy to just bill

20   generally for all the different tasks as one entry and

21   total number of hours?

22             MR. BEENE:  Objection to form.

23             THE WITNESS:  I would not have objected to it

24   provided the rest of the invoice was accurate.

25             ///

                                                          170

BY MR. RATINOFF:

Q.  How did -- how did ASR differentiate between allocating hours between the various different task orders that Mr. Suhy was working on?

A.  Sorry.  Could you repeat the question?

Q.  Sure.  Did -- was -- was it necessary for ASR to -- I'm sorry.  Let me -- let me try again.

Did -- so you said it was okay for Mr. Suhy to generally invoice ASR for the various tasks he was supposed to be doing, correct?

A.  Correct.

Q.  How did ASR allocate the total amount of hours and the equivalent of dollars to the various task orders?

A.  So this would have been handled by our accounting staff, but I'm fairly certain they would have looked to the timesheets to determine the breakout of hours across projects.

Q.  Okay.  So then Mr. Suhy would have to actually specify the hours per task order within the time-entry system?

A.  That's right.

Q.  What is the time-entry system that -- that ASR uses?

A.  We use a system called Mavenlink, all one word.

171

1    Q.  And does Maven have the capability to produce

2 reports on the number of hours billed on a particular

3 task by a contractor?

4    A.  Yes, it does.

5    Q.  Were you ever asked in response to the subpoena

6 to generate a report on -- on the hours spent by

7 Mr. Suhy on his various task orders?

8    A.  We did produce a report showing payments to

9 Mr. Suhy and the corresponding hours.  I don't believe

10 it broke out the detail by task order.

11        MR. RATINOFF:  Okay.  Let me go ahead and mark

12 the next exhibit.  It's coming in the chat here

13 momentarily.  This would be exhibit -- I believe we're

14 at --

15        THE REPORTER:  That would be 144.

16        MR. RATINOFF:  144.  Thank you.

17        (Exhibit 144 was marked for identification.)

18 BY MR. RATINOFF:

19    Q.  This is a document produced by about ASR with

20 the Bates number ASR 01956, invoice number 303 from

21 iGov.

22    A.  Okay.  Got it, and I've looked at it.

23    Q.  Okay.  Do you understand what Exhibit 144 is?

24    A.  Yes.

25    Q.  And what's your understanding?

172

1          A.   It appears to be another invoice for work

2    performed by John Mark Suhy under a set of task order

3    contracts.

4          Q.   Okay.  And then looking at the "Part

5    Number/Description," we see "IDT."

6               Is that short for IDT Innovation, that task we

7    were just talking about?

8          A.   That's my assumption, yes.

9          Q.   And then "KG" being short for Knowledge Graph?

10         A.   Yes.

11         Q.   And "CG" for Corporate Graph?

12         A.   Yes.

13         Q.   And "ECI," Emerging Compliance Issues?

14         A.   Yes.

15         Q.   And those were the four tasks that, at least as

16   of July of 2020, that Mr. Suhy was still working under?

17         A.   Yes.

18         Q.   And has he continued to work on -- on all four

19   of those task orders on behalf of ASR as you sit here

20   today?

21         A.   Yes.  My hesitation is I don't know if he's

22   actively providing support under IDT Innovation, though

23   he may be in a very low level of effort.

24         Q.   Understood.  And then you had mentioned that a

25   spreadsheet was generated reflecting all the payments

173

1    made by Mr. Suhy and the hours; is that correct?

2        A.  Yes.

3            MR. RATINOFF:  Okay.  Let me go ahead and put

4    the next document in the chat, and this would be

5    Exhibit 145.

6            (Exhibit 145 was marked for identification.)

7            THE WITNESS:  Got it.  I have looked at it.

8    BY MR. RATINOFF:

9        Q.  Okay.  Was this the spreadsheet you were

10   referring to that was generated as far as all the

11   payments made to Mr. Suhy under the iGov task orders?

12       A.  Yes.

13       Q.  And it shows that the last entry on here was on

14   July 27, 2022; is that correct?

15       A.  Correct.  That's correct.

16       Q.  Have any payments been made to iGov since that

17   time under any of these four task orders we've just been

18   talking about?

19       A.  My understanding is they have not, because this

20   was generated within the last couple weeks, and there

21   were no other payments as of that point.

22       Q.  But Mr. Suhy is continuing to work under those

23   task orders with the expectation to receive payment for

24   the work?

25       A.  I believe so, yes.

174

1     Q.   And is it simply because he hasn't submitted

2  any new invoices to ASR that there's no further payments

3  other than what's reflected on this document?

4     A.   That would be my understanding.

5     Q.   To your knowledge, have any invoices since July

6  of 2020 been submitted by Greystones to ASR?

7     A.   To my understanding, they -- there have not

8  been any.

9     Q.   Has Mr. Suhy entered time into the timekeeping

10  system since July of 2022?

11     A.   I don't know the answer to that.

12     Q.   But as you sit here today, the -- the payments

13  made between June 6th, 20 -- sorry -- June 28, 2019, and

14  July 27, 2022, have been made to Mr. Suhy in response to

15  the invoice submitted to ASR, correct?

16     A.   Correct.

17     Q.   Okay.  Let me -- you've mentioned -- let me

18  make sure I've got the acronym correct.  Or actually, I

19  think it was just API.

20          You said there was a Knowledge Graph API

21  contract that was not under the DAIS BPA; is that

22  correct?

23     A.   That's correct.

24     Q.   What is the Knowledge Graph API project?

25     A.   That's the prime contract with Tylor Data,

175

November 7, 2022

1    between Tylor Data and the IRS.

2        Q.  Is it different from the one we were previously

3    talking about?

4        A.  No.

5        Q.  Okay.  I believe you said that that contract

6    had expired recently; is that correct?

7        A.  The contract that we were looking at documents

8    for did expire.

9        Q.  But has there been a new contract with the IRS

10   and Tylor Data --

11       A.  Yes.

12       Q.  -- or tailer data?  Sorry.

13       A.  You had it.  Tylor Data, yes.

14       Q.  Tylor Data.  Thank you.  I think the spelling

15   keeps throwing me off.  I'm used to the E-R.  Okay.

16           And ASR is now -- actually, when was that new

17   contract awarded to Tylor Data Services -- or software?

18       A.  I believe it immediately followed the

19   expiration of the preceding contract, so that would be

20   September of 2021.

21       Q.  And did ASR -- was ASR engaged as a

22   subcontractor on that one, the new award, as well?

23       A.  Yes, though in a somewhat lesser capacity than

24   the original contract.

25       Q.  And in turn, Mr. Suhy was brought in as a

176

1    subcontractor on behalf of ASR with that new contract?

2        A.   That's correct.

3            MR. RATINOFF:  All right.  Let me go ahead

4    and -- I'm going to change topics.  I don't know if you

5    want to take a quick five-minute break.  Have we been

6    going for about an hour?

7            THE WITNESS:  About 45 minutes.

8            MR. RATINOFF:  Okay.  I can continue.  I just

9    was going to change topics, so I thought maybe this

10   would be a good time to take a quick five-minute break,

11   but I'm happy to go on, whatever everyone else wants to

12   do.

13           THE WITNESS:  I see Carrie nodding vigorously.

14   I'm happy to take a break.

15           THE VIDEOGRAPHER:  No, I'm good.  I'm fine, to

16   be honest.

17           THE WITNESS:  Okay.  I'm fine.

18           MR. RATINOFF:  Okay.  Let's go on a little bit

19   longer then.  I'm trying to get you out of here as

20   quickly as possible.  We're getting there.

21           THE WITNESS:  Okay.

22   BY MR. RATINOFF:

23       Q.  All right.  Let me see.  Let me drop the next

24   document in the chat.  I'm having all kinds of trouble

25   with Acrobat.  It's saying it's all out of memory.  I

177

1    apologize for the silence.

2           (Exhibit 146 was marked for identification.)

3           THE WITNESS:  Okay.  I've got it.  I'm looking

4    through it now.  Apologies if there's a little bit of

5    background noise here.

6    BY MR. RATINOFF:

7        Q.  This will be marked as Exhibit 146, I believe.

8        A.  Okay.

9        Q.  So I've marked as Exhibit 146 an email from

10   Mr. Suhy to a host of people, including yourself, and

11   then there's also -- it looks like another -- a few

12   other ASR folks here:  Aaron Taylor, Logan Montrone, and

13   then Lauren Szczerbinski.

14           Did I get it?

15       A.  Close.

16       Q.  Close?

17       A.  Szczerbinski.

18       Q.  Szczerbinski?

19       A.  Szczerbinski.

20       Q.  Szczerbinski.  Got it.  Okay.

21           And were those all individuals that were

22   working on task orders issued by the IRS?

23       A.  Yes.

24       Q.  And in this particular instance, do you have an

25   understanding of what this email's referring to as far

                                                      178

1    as what task order was being worked on as of January 4,

2    2019?

3        A.  Yes.

4        Q.  And what is that understanding?

5        A.  This appears to relate to work on the KG-API

6    task order.

7        Q.  And then with respect to the KG-PI -- KG-API

8    task order, this shows that ONgDB was used in some

9    capacity by ASR in conjunction with that task order,

10   correct?

11       A.  Yes, it does appear that Tylor Data and ASR

12   were using ONgDB for tasks under KG-API.

13       Q.  And in this particular instance, it appears

14   that they were using ONgDB version 3.4.11; is that

15   accurate?

16       A.  I see the hyperlink to a file that includes

17   those numbers, but I -- I don't know enough about

18   versioning to know -- well, I was not personally

19   involved in this technical work, so I can't be certain

20   what it -- what version it is.

21       Q.  Do you have an understanding of why Mr. Suhy

22   was offering or directing ASR to download ONgDB to

23   replicate the configurement -- or sorry -- configuration

24   at IRS complete with APOC and graph algorithms library

25   setup?

179

```
1          THE VIDEOGRAPHER:  We are now going off the

2    video record.  The time is 4:32 p.m.

3          (Off the record from 4:32 p.m. to 4:41 p.m.)

4          THE VIDEOGRAPHER:  We are now back on the video

5    record.  The time is 4:41 p.m.

6          MR. RATINOFF:  Okay.  Let me go ahead and put

7    the next exhibit in the chat.

8          (Exhibit 150 was marked for identification.)

9    BY MR. RATINOFF:

10        Q.  This will be Exhibit 150.

11        A.  Okay.

12        Q.  Another email produced by the IRS, with ASR

13   individuals, including the witness being a recipient,

14   dated 12/6/2019, and ends with the Bates number 334 on

15   the first page.

16        A.  Okay.  I'll take a look through it.

17             Okay.

18        Q.  Okay.  Do you recognize this email?

19        A.  Yes, I recognize it.

20        Q.  No reason to believe you didn't receive it at

21   your IRS email address?

22        A.  No.

23        Q.  Do you understand what's being referred to as

24   the -- in the subject as being "milestones - O&M"?

25        A.  I think so.
```

189

1      Q.  And for clarification, there's a reference to

2  the O&M project in the first paragraph.

3      A.  Right.

4      Q.  What's the O&M project?

5      A.  I -- I was assuming that this -- that the O&M

6  project is talking about operations and maintenance of

7  the KG-API application, but I -- I don't remember

8  hearing that term used frequently, so I'm reading

9  between the lines a bit.

10      Q.  Okay.  And under Item Number 1, "Data transfer

11  methods between ONgDB and HDFS/Spark," do you see that?

12      A.  Yes.

13      Q.  Is that -- is that a task that relates to the

14  KG-API project?

15      A.  It is an activity that was contemplated, and I

16  think is being performed under the KG-API project.

17      Q.  So that was a goal of the KG -- KG-API project,

18  to allow data transfer between ONgDB and HDFS, and

19  Spark?

20      A.  Yes, I think that's accurate.

21      Q.  What's the HDFS stand for?

22      A.  I believe it's for Hadoop Data File Server.

23      Q.  And on number four it's listed as either a

24  milestone or task of integration into CKGE.

25          And do you understand what that's referring to?

190

```
 1    the next exhibit.  This will be Exhibit 155.

 2              (Exhibit 155 was marked for identification.)

 3              THE WITNESS:  Okay.  Let me take a look.

 4    BY MR. RATINOFF:

 5         Q.   While you're doing that, this is an email -- or

 6    email chain that was produced by ASR in response to the

 7    subpoena with beginning Bates number ASR 00910, the last

 8    email being an email from Mr. Suhy dated July 8, 2022,

 9    to the witness, as well as a Jake Brooks,

10    Jeremy Wiedemeier.  Both have GCOM email addresses.

11         A.   Okay.  One more minute here.

12         Q.   Sure, no problem.

13         A.   Okay.  Got it.

14         Q.   All right.  Who is Jake Brooks?

15         A.   Jake Brooks is an ASR employee who manages the

16    Emerging Compliance Issues task order.

17         Q.   And then who's Jeremy Wiedemeier?  Is that how

18    you pronounce it?

19         A.   Yes.

20         Q.   I got one right.

21         A.   Jeremy Wiedemeier is an ASR employee who

22    supports a variety of task orders at the IRS.

23         Q.   And then I notice that you're all using

24    gcomsoft.com email addresses as of July 2022.

25              Do you see that?
```

204

A.   Yes.

Q.   Is that generally how you email now, is with GCOM Soft versus Analytica -- I'm sorry -- ASR email addresses?

A.   It is, yes.

Q.   Part of the acquisition, just merging onto the same email system?

A.   Yeah, that's right.

Q.   And then moving on down to -- let's go down to the bottom here, which would be the first email from Mr. Suhy to yourself, July 8, 2022.

And he says, "Whenever I go on vacation, I always have someone to back me up.  That has been Amanda from AtomRain in the past, but I think we need to switch to have someone at ASR be on the team.  With the re-compete coming up, I suspect it might be important. I suspect AtomRain may try to compete with Analytica as a team member."

Do you see that?

A.   Yes.

Q.   Do you have an understanding of why Mr. Suhy was asking for a replacement backup for Amanda?

A.   I think so.  I only know what I read in this email.

Q.   Sure.  And if he emailed you asking you for a

205

1  person, did he ever explain why he didn't want to have

2  Amanda at AtomRain anymore be his back up?

3      A.  I don't recall any explanation beyond what is

4  explained here about AtomRain potentially being a

5  competitor going forward.

6      Q.  As of July 2022, was AtomRain still a

7  subcontractor for ASR under the BPA DAIS award?

8      A.  Yes.

9      Q.  How would they be a competitor then if they

10  were still subcontracting?

11      A.  I am interpreting this to mean that for future

12  RFQs from the IRS that were not issued under the DAIS

13  BPA, for example, that AtomRain might be a competitor to

14  John Mark Suhy.

15      Q.  Oh, I see.  So a competitor to John Mark Suhy,

16  not ASR?

17      A.  That's my understanding.  I'm maybe

18  interpreting.

19      Q.  Did you have an understanding of how AtomRain

20  would be a competitor to Mr. Suhy as of July 2022?

21      A.  Again, my interpretation is that it would

22  relate to future RFQs that, I guess, other firms would

23  be eligible to bid on.

24      Q.  And you'll see at the bottom of the page,

25  Mr. Suhy says, "I don't work as closely as I used to

206

1   with AtomRain now that I've joined Greystones" -- and

2   then it continues -- "so it only makes sense to make

3   that change anyway."

4        Does this help refresh your recollection as to

5   when you may have found out that Mr. Suhy had sold his

6   company to Greystones?

7        A.  It certainly refreshes my memory that it would

8   have been no later than July 8, 2022.

9        Q.  As opposed to August, which we talked about

10  earlier?

11       A.  Right, I think before I said no later than

12  August.

13       Q.  Has AtomRain ever informed you that they were

14  also sued by Neo4j?

15       A.  I don't recall that phrasing being used, but I

16  do recall hearing that there were legal issues between

17  AtomRain and Neo4j.

18       Q.  Did anyone at AtomRain ever tell you how those

19  issues were resolved?

20       A.  Yes, in very general terms.

21       Q.  And what were those terms that were conveyed to

22  you?

23       A.  That some agreement was reached as to what

24  technology could be used permissibly within AtomRain's

25  products.

207

1    that they are currently performing.

2    BY MR. RATINOFF:

3        Q.   To your knowledge as you sit here today, do you

4    know what version of ONgDB the IRS is using with the

5    CKGE environment?

6        A.   I do not.

7        Q.   Is there someone at ASR who would know that

8    answer?

9        A.   I don't know for certain.

10       Q.   Is there someone at ASR -- I think you

11   mentioned were managing the various projects, one being

12   the Knowledge Graph environment, I think; is that

13   correct?

14       A.   A different one, but yes.

15       Q.   Okay.  So on the Corporate Graph sub-task -- or

16   sorry -- task, is AtomRain performing work under that

17   task order?

18       A.   Yes.

19       Q.   And that involves the IRS' use of ONgDB?

20       A.   Yes.

21       Q.   And then with the Emerging Compliance Issues,

22   does that also involve -- sorry.  Strike that.

23           Does the Emerging Compliance Issues -- I

24   believe you testified that AtomRain's performing work

25   under that task order as well, correct?

211

 1       A.   Correct.

 2       Q.   And that also does relate to the IRS' use of

 3  ONgDB?

 4       A.   Yes, as we've discussed before in this -- to

 5  the extent that ONgDB is used to create graph data that

 6  is used on those projects.

 7       Q.   And do you have individuals at ASR that are

 8  managing each of those task orders and the subcontracts

 9  under those task orders, correct?

10       A.   I'm sorry.  Yes.

11       Q.   And those would probably be the persons to ask

12  what version of ONgDB is being used -- being used at the

13  IRS as of now?

14       MS. EMBRY:  Objection to form.

15  BY MR. RATINOFF:

16       Q.   In relation to those task orders.

17       A.   They would be the ones most likely to know the

18  version of ONgDB that is being used in relation to those

19  task orders.

20       MR. RATINOFF:  Okay.  All right.  I have no

21  further questions at this time pending -- I'm sure

22  Mr. Beene will have some questions, and I may ask a

23  couple follow-up.

24       ///

25       ///

212

DECLARATION OF DEPONENT

I, MICHAEL STAVRIANOS, declare under penalty of perjury that I have reviewed the foregoing transcript; that I have made any corrections, additions, or deletions in my testimony that I deemed necessary; and that the foregoing is a true and correct transcription of my testimony in this matter.

Dated this _____ day of _____, 20__, at _____, _____.
                [City]                    [State]

_____
MICHAEL STAVRIANOS

--o0o--

222

1                        CERTIFICATE

2          I, BENJAMIN GERALD, Certified Shorthand Reporter,

3     Certificate No. 14203, for the State of California do

4     hereby certify:

5          That prior to being examined, the witness named in

6     the foregoing deposition was by me duly sworn to testify

7     to the truth, the whole truth, and nothing but the truth

8     in the within-entitled cause;

9          That said deposition was taken shorthand at the

10    time and place herein named;

11         That the deposition is a true record of the

12    witness's testimony as reported to the best of my

13    ability by me, and was thereafter transcribed to

14    typewriting by computer under my direction;

15         That request [X] was [ ] was not made to read and

16    correct said deposition.

17         I further certify that I am not interested in

18    the outcome of said action, nor am I connected with, nor

19    related to any of the parties in said action, nor to

20    their respective counsel.

21         Witness my hand this 14th day of November, 2022.

22

23

24        BENJAMIN GERALD

25        California CSR No. 14203

223

**EXHIBIT 7**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NEO4J, INC., et al.

            Plaintiffs,

-vs-                    Case No. 5:18-cv-07182-EJD

PURETHINK LLC, et al.

            Defendants.

_____/

VIDEO-RECORDED

DEPOSITION OF TURIN POLLARD

30(b)(6) WITNESS

FOR GREYSTONES CONSULTING GROUP

Date:             December 1, 2022

Time:            3:01 p.m.

Location:       Zoom Videoconference

Stenographically   Cambria L. Denlinger

Reported By:      CSR #14009

1    counsel for defendants Purethink, iGov, Inc., and John

2    Mark Suhy.  Mr. Suhy is in attendance today.

3            MR. RHODES:  My name is Lewis Rhodes.  I'm the

4    counsel for Greystones, and Turin Pollard is our

5    employee who is providing corporate testimony.  Our CEO

6    Sheila Duffy is attending via the same link with

7    Mr. Suhy.

8                        TURIN POLLARD,

9    being first duly sworn by the Certified Shorthand

10   Reporter to tell the truth, the whole truth, and nothing

11   but the truth, testified as follows:

12                        EXAMINATION

13   BY MR. RATINOFF:

14       Q.  Good afternoon, Mr. Pollard.  How are you?

15       A.  Good.  How are you?

16       Q.  Doing well; thank you.  Have you ever been

17   deposed before?

18       A.  No.

19       Q.  Okay.  Well, I'm sure you've already talked

20   about this with your counsel, but I just want to make

21   sure we're on the same page so I'm just going to go

22   through a few basic ground rules for the deposition.

23           You understand you just took an oath under the

24   penalty of perjury?

25       A.  Yes.

                                                          7

1      Q.  And you understand that your -- this oath that
2  you've taken is the same as if you were providing
3  testimony live in a court?
4      A.  Yes.
5      Q.  We're going to proceed in a question-and-answer
6  format.  It's important that you allow me to finish my
7  question, and then maybe leave a couple seconds before
8  you answer because one of the other attorneys may just
9  object.  And they're just going to say "objection form,"
10 or they may say "objection privilege."  Depending on
11 what the objection is, if it's form, you can go ahead
12 and answer; that's just for the record for the attorneys
13 to argue about later on.  Do you understand?
14     A.  Yes.
15     Q.  So unless you're instructed not to answer, I'll
16 expect an answer to my question.  Is that fair?
17     A.  Okay.
18     Q.  Also, the court reporter is taking your
19 deposition testimony in booklet form, so it's going to
20 be in what's called a transcript.  Even though you're
21 speaking live, it's going to be on paper.  So it's very
22 important if I'm asking a question and you say yeah, nay
23 and you shake your head or nod your head, it's not going
24 to be recorded properly.  So it's important that you say
25 "yes" or "no" or provide a full answer.  Do you

                                                        8

1   time please let me know, or if there's any time during

2   the deposition you need to take a break, as long as

3   there's not a question pending -- which I would ask for

4   an answer for first -- I'm happy to take a break.  Is

5   that fair?

6        A.  Yes.

7        Q.  And then once I'm done questioning you,

8   Mr. Beene may have some questions for you as well, and

9   then I may have a couple follow-ups.  Just want to let

10  you know that's how this is going to proceed.  Does that

11  sound fair to you?

12       A.  Yes.

13       Q.  Is there any reason today why you would be

14  unable to testify truthfully and to the best of your

15  ability?

16       A.  No.

17       Q.  Are you on any kind of medication, or is there

18  any reason why you wouldn't be able to provide your

19  truthful and best testimony today?

20       A.  No.

21       Q.  Okay.  Can you please again state your full

22  name for the record?

23       A.  Turin Pollard.

24       Q.  And are you an employee of Greystones?

25       A.  Yes.

10

TURIN POLLARD, 30(b)(6)                          December 1, 2022

1    Q.  What is your current role at Greystones?

2    A.  Vice president of business development.

3    Q.  And how long have you been at Greystones?

4    A.  Almost a year.

5    Q.  And just for the record, the full name of your

6  employer is Greystones Consulting Group, LLC; is that

7  correct?

8    A.  I believe that's correct, yes.

9    Q.  Okay.  Is it okay if we just refer to your

10  employer as Greystones for short if we're talking about

11  the same thing?  Is that fair?

12   A.  Yes.

13   Q.  And about when did you start at Greystones?

14   A.  Mid December of 2021.

15   Q.  Where were you employed before Greystones?

16   A.  Delphinus Engineering.

17   Q.  What does Delphinus Engineering do?

18   A.  They're an engineering firm providing services

19  to the United States Navy.

20   Q.  What was your job at Delphinus?

21   A.  Director of business development -- I'm sorry.

22  Business development manager was the correct title.

23   Q.  How long were you employed there?

24   A.  Just over two years.

25   Q.  Where were you employed prior to that time at

11

TURIN POLLARD, 30(b)(6)                    December 1, 2022

1       Q.  Correct.  And are you familiar with this

2   document?

3       A.  Yes.

4       Q.  And what is your understanding of this

5   document?

6       A.  As the title says, this is a subpoena to

7   provide the deposition that we're currently doing.

8       Q.  And you understand today you're testifying, not

9   on behalf of just yourself and your personal knowledge,

10  but also testifying on behalf of Greystones' collective

11  knowledge?

12      A.  Yes.

13      Q.  And do you understand that there's a --

14  starting on page 3 of Attachment A, there's certain

15  topics of examination?  Why don't you go ahead and let

16  me know when you're at page 3 of Attachment A.

17      A.  Yeah, I'm there.

18      Q.  Okay.  And you'll see that starting on page 3

19  there's a topic of examination number 1 and it goes

20  through topic of examination 11.  Do you see that?

21      A.  Yes.

22      Q.  And have you read through these topics before?

23      A.  Yes.

24      Q.  When did you first review these topics?

25      A.  Shortly after this document was served to

                                                    18

1    Q.  Did you speak with anyone, other than your
2   counsel, in preparing to testify on topics of
3   examination 1 through 11?
4    A.  Yes.
5    Q.  Who did you speak with?
6    A.  Sheila Duffy and John Mark Suhy.
7    Q.  Did you speak to them together at the same
8   time?
9    A.  Yes.
10   Q.  Did you ever speak to either separately about
11  the topics of examination?
12   A.  No.
13   Q.  And when did you speak with Ms. Duffy and
14  Mr. Suhy?
15   A.  We met this morning.
16   Q.  And this is the only time you met with Mr. Suhy
17  and Ms. Duffy in preparation for this deposition today?
18   A.  We have met previously in the run-up to the
19  original November 14th date.
20   Q.  Okay.  And that was just one time?
21   A.  I believe so, yes.
22   Q.  Let's start with the earlier meeting.  When did
23  that take place?
24   A.  Early November.
25   Q.  Was there anyone else present in that meeting

21

1    besides Ms. Duffy and Mr. Suhy and yourself?

2         A.  I believe Mr. Rhodes was also in that meeting.

3         Q.  Are you certain?

4         A.  No.

5         Q.  What did you talk about during that meeting?

6         A.  The responsive documents that we provided to

7    you.

8         Q.  So you just discussed the documents that were

9    produced in response to another subpoena?

10        A.  In response to this subpoena.

11        Q.  Approximately how long did you meet with

12   Ms. Duffy and Mr. Suhy in this first meeting?

13        A.  Approximately an hour.

14        Q.  And let's go ahead and talk about this meeting

15   today, this morning.  Approximately how long did you

16   meet with -- did you meet with anyone else -- sorry.

17   Let me start over.

18             Was anyone else present in the meeting today

19   besides yourself, Ms. Duffy and Mr. Suhy?

20        A.  Mr. Rhodes was also in that meeting.

21        Q.  And approximately how long did you meet for?

22        A.  Again, approximately an hour.

23        Q.  I believe you said you started at Greystones in

24   2021?

25        A.  That's correct.

                                                        22

1      Q.   What was the month?

2      A.   December.

3      Q.   You'll notice in many of these topics, it asks

4  for information from January 1, 2018, to the present.

5  Do you see that?

6      A.   Yes.

7      Q.   And you weren't at the company between

8  January 1, 2018, and approximately early December of

9  2021; correct?

10      A.   Correct.

11      Q.   Did you do any inquiries into what the company

12  was doing with respect to any of these topics during

13  that time period?

14      A.   In what context?

15      Q.   For instance, let's look at Topic Number 1:

16           Details about each installation of

17       deployment, development, implementation, and use

18       of ONgDB, GraphStack GDB, and/or the Greystones

19       Analytics Platform from January 1, 2018 to the

20       present...

21           Then it continues.  Did you inquire with

22  anyone at Greystones about the Greystones Analytics

23  Platform as it was used between January 1, 2018, through

24  the time that you started employment at Greystones?

25      A.   In what context?

                                                        23

1   the use of something called GreyRAVEN?

2       A.  Yes.

3       Q.  Is another name for GreyRAVEN Greystones

4   Analytics Platform?

5       A.  No.

6       Q.  So GreyRAVEN has never been called at any time

7   Greystones Analytic Platform?

8       A.  Only by people who are making mistakes about

9   what words they use.

10      Q.  So if someone refers to Greystones Analytics

11  Platform, they could actually be meaning GreyRAVEN?

12      A.  Only if they're misspeaking.

13      Q.  And did the -- any of the Air Force contracts

14  call for the use of Greystones Analytic Platform as you

15  understand it?

16      A.  No.

17      Q.  Did the Air Force contracts that you're

18  referring to relate to the use of GreyRAVEN?

19      A.  Yes.

20      Q.  And do you know what ONgDB is?

21      A.  Open native graph database.

22      Q.  And what is open native graph database?

23      A.  That is a graph database software application.

24      Q.  And did the GreyRAVEN product at least use in

25  part ONgDB?

                                                              32

TURIN POLLARD, 30(b)(6)                          December 1, 2022

1    graph software.  I have never seen the code for it or

2    any system documentation, so I -- I don't know.

3        Q.  So you don't know whether GraphStack GDB is

4    based on Neo4j source code?

5        A.  That's correct.

6        Q.  Do you understand that ONgDB is based on the

7    Neo4j source code?  And, again, this is you as the

8    company, not just you personally.

9        A.  My understanding is that ONgDB was based on an

10   open source implementation or an open source Neo4j.

11       Q.  And you understand what the basis for that open

12   source licensing was for the Neo4j source code for

13   ONgDB?

14       A.  Yes.

15       Q.  And what's that understanding?

16       A.  My understanding is that that was under the

17   AGPL.

18       Q.  What does the AGPL stand for?

19       A.  I forget what the A stands for.  G is I believe

20   general purpose license or GNU public license.  I would

21   have to go look at the definition of that acronym to be

22   certain.

23       Q.  Okay.  If I represent it stands for the GNU

24   AFFERO general public license, Version 3.  Does that

25   sound correct in your estimation?

                                                          41

1    marketing Neo4j software?

2         A.   No.

3         Q.   Has Greystones ever had an interest in

4    marketing ONgDB software?

5         A.   No.

6         Q.   I'm going to go ahead and give you the next

7    email.

8              (Whereupon, Exhibit 240 was marked for

9              identification.)

10   BY MR. RATINOFF:

11        Q.   This will be marked as Exhibit 240.  It's a

12   September 14, 2018 email with the from

13   sduffy@greystonesgroup.com to a John Mark Suhy

14   jmsuhy@purethink.com.  Do you see that?

15        A.   Yes.

16        Q.   Again, that's Ms. Duffy's email address?

17        A.   Yes.

18        Q.   And do you understand that to be from one of

19   Mr. Suhy's email addresses?

20        A.   There is an email here from one of Mr. Suhy's

21   email addresses, yes.

22        Q.   That's purethink.com?

23        A.   Yes.

24        Q.   Do you know what purethink.com is?  Just the

25   company -- let me ask that again.

61

 1          Do you know of a company name "Purethink"?

 2     A.   As one of Mr. Suhy's companies, yes.

 3     Q.   And you have any reason to believe this wasn't

 4  an email sent by Ms. Duffy?

 5     A.   No.

 6     Q.   When you'll look below, there's a prior email

 7  to the one at the top.  It says it's from Mr. Suhy, same

 8  email address, to Benjamin Nussbaum at ben@atomrain.com.

 9     A.   Yes.

10     Q.   Do you understand that's Mr. Nussbaum's

11  AtomRain email address?

12     A.   Yes.

13     Q.   And then you'll see the initial email says:

14  Notes from meeting.  Who uses Neo4j?

15     A.   Yes.

16     Q.   Why was Greystones meeting with Mr. Suhy and

17  Mr. Nussbaum talking about who uses Neo4j?

18     A.   I'm not sure.

19     Q.   Ms. Duffy would know this, though?

20     A.   Probably.

21     Q.   She sent the email; correct?

22     A.   Apparently.

23     Q.   And appears that she was at a meeting that

24  occurred sometime in September of 2018 with Mr. Nussbaum

25  and Mr. Suhy; correct?

                                                        62

TURIN POLLARD, 30(b)(6)                    December 1, 2022

1    A.  Apparently.

2    Q.  Did you ask Ms. Duffy, in preparation for this

3  deposition, whether she had met with Mr. Suhy or

4  Mr. Nussbaum to talk about Neo4j?

5    A.  Specifically, no.  Ms. Duffy met with both of

6  those individuals to discuss the market for data

7  analytics on many occasions.

8    Q.  So this might have been one of those occasions?

9    A.  Yes.

10    Q.  And when you say "data analytics," you're

11  talking about use of graph database software, for

12  example?

13    A.  That would be one example.

14    Q.  And why was Greystones particularly interested

15  in these government customers or federal clients that

16  bought Neo4j or from Purethink?  It looks like Ms. Duffy

17  is asking which one of these is Purethink still involved

18  in.  Do you see that?  It's in the original email from

19  Mr. Suhy to Mr. Nussbaum and Ms. Duffy.

20    A.  Are you referring to the capitalized:  Is this

21  either a Purethink or AtomRain customer?

22    Q.  I was looking at the one above, but yeah,

23  that's fair.  That's fine.  You understand that to be

24  Ms. Duffy responding to those questions in the line

25  below as she referred to in her email?

63

1    to big data analytics.

2         Q.  Did you look in that failed bids folder in

3    responding to the document request we looked at earlier

4    in the second subpoena?

5         A.  Personally, no.

6         Q.  Did anyone that you're aware of?

7         A.  I don't know.

8         Q.  And for the IRS, how many contracts or

9    opportunities that were bid on were you referring to?

10        A.  I am aware of one bid that went in this week.

11   There may have been previous -- there may have been bids

12   submitted previous to my employment that didn't result

13   in an award so I'm not sure if those even exist.

14        Q.  What bid are you referring to that was

15   submitted this week?

16        A.  We submitted a response to a sources sought or

17   request for information on GSA.

18        Q.  What do you mean by sources sought on GSA?

19        A.  The General Services Administration conducts

20   requests for information or sources sought requests on

21   behalf of federal customers.

22        Q.  What was the scope of this sources sought

23   opportunity you're referring to?

24        A.  The application of the Greystones Analytic

25   Platform to support lead case analysis -- lead case

                                                      66

1    analysts.

2         Q.   At the IRS?

3         A.   At the IRS.

4         Q.   What's a lead case analysis?

5         A.   I'm sorry.  It should be lead case analyst.

6    That's a job title, and it appears to be exactly what it

7    says.

8         Q.   Is that -- are you familiar with the acronym

9    RAAS, R-A-A-S, at the IRS?

10        A.   Yes.

11        Q.   What's your understanding of that acronym?

12        A.   RAAS is an organization within IRS.

13        Q.   Do you know what RAAS stands for?

14        A.   Research analysis services.  I forget what the

15   second A is.

16        Q.   Analytics.  Does that sound right?

17        A.   That sounds right.

18        Q.   But we're talking about an organization within

19   the IRS when we say RAAS?

20        A.   Correct.

21        Q.   Was this opportunity in relation to work that

22   RAAS was doing -- or is doing?

23        A.   Not to the best of my knowledge.

24        Q.   What department within the -- what group within

25   the IRS was putting out a request for information?

67

1    A.   I believe that was part of the investigative

2  services.

3    Q.   Investigative services, is that a group or a

4  division within the IRS?

5    A.   Apparently.

6    Q.   That's who was asking for -- asking for quotes

7  or -- RFIs, request for information; correct?

8    A.   RFI is a request for information; yes.

9    Q.   That was a precursor to an RFQ, request for

10  quote?

11    A.   Possibly.

12    Q.   Or it could be, essentially, seen as a bid?

13    A.   There is an explicit disclaimer on it that it

14  is not a request for bid.

15    Q.   Sort of exploring what might be out there for

16  them to put out a solicitation for?

17    A.   Yes.

18    Q.   Was Mr. Suhy involved in preparing that

19  submission?

20    A.   Yes.

21    Q.   Why was he involved?

22    A.   In his current employment as Chief Technical

23  Officer at Greystones Group.

24    Q.   His title is Chief Technical Officer, CTO?

25    A.   Yes.

68

1    proposals we were interested in responding to.

2        Q.  Meaning they didn't ask for something that

3    Greystones was capable of providing?

4        A.  Correct.

5        Q.  And are you familiar with a company called ASR

6    Analytics?

7        A.  Yes.

8        Q.  Who is or what is ASR Analytics?

9        A.  The ASR Analytics is a G-Com subsidiary company

10   with work at the Department of Treasury and other

11   federal civilian customers.

12       Q.  Is Greystones' normal specialty working with

13   entities within the Department of Defense?

14       A.  Greystones' specialty is across the entire

15   federal government.

16       Q.  But historically most of its contracts have

17   been within the DOD?

18       A.  Correct.

19       Q.  It hasn't had any separate contracts with any

20   other civilian agencies?

21       A.  Not recently.

22       Q.  And does Greystones currently have a

23   relationship with ASR Analytics?

24       A.  Yes.

25       Q.  And what is that relationship?

160

1          A.  We are a subcontractor for supporting IRS.

2          Q.  And how did that subcontract come about?

3          A.  After we hired Mr. Suhy -- after we hired

4    Mr. Suhy, we were issued a subcontract with several

5    delivery orders on it under one of their contracts with

6    the IRS.

7          Q.  One of their blanket purchase awards?

8          A.  I believe it's through a BPA, yes.

9          Q.  Okay.  BPA, blanket purchase award.  We can use

10   "BPA," and you know what we're talking about?

11         A.  Yes.

12         Q.  Okay.  Shortens things up a bit.  So was this

13   BPA -- sorry.  Was the subcontract that Greystones

14   was -- or took over, was that -- that was from Mr. Suhy?

15         A.  Can you restate -- rephrase that?

16         Q.  Sure.  So there's a master -- so you have a

17   blanket purchase order, right, and then --

18         A.  ASR has a blanket purchase award.

19         Q.  Right.  And then within that there's various

20   contracts that it's awarded; correct?

21         A.  If we can use contracts and task orders

22   interchangeably, then yes.

23         Q.  I'll be more precise.  They'll be issued a task

24   order, and then -- and it's under that blanket purchase

25   award, and then ASR may subcontract the task order out;

                                                         161

1    correct?

2         A.   Correct.

3         Q.   And at the time Mr. Suhy was hired by

4    Greystones, he was -- through iGov, was under a

5    subcontract, a master subcontract with ASR; correct?

6             MR. RHODES:  Object to the form.

7             THE WITNESS:  IGov -- as I understand it, iGov

8    has a subcontract with ASR.

9    BY MR. RATINOFF:

10        Q.   Still has a subcontract with ASR?

11        A.   To the best of my knowledge.

12        Q.   So when you hired Mr. Suhy, he had a

13   subcontract with ASR.  At that same time did Greystones

14   have a subcontract with ASR?

15        A.   At the time of Mr. Suhy's hire, no.

16        Q.   So Greystones was able to get a subcontract

17   with ASR because of Mr. Suhy?

18        A.   Because we were employing him, yes.

19        Q.   So, essentially, the subcontract that ASR gave

20   Greystones was the same subcontract that iGov had at

21   that time?

22             MR. RHODES:  Object to the form.

23             THE WITNESS:  No.

24   BY MR. RATINOFF:

25        Q.   Different scope of work?

162

1        A.  I can't speak to iGov's scope of work.

2        Q.  I'll mark the next exhibit.  This will be

3    Exhibit 249.

4            (Whereupon, Exhibit 249 was marked for

5            identification.)

6            MR. RHODES:  Turin, do you need to take a short

7    break?  You look like you're getting a little bit

8    gassed.

9            MR. RATINOFF:  I'm happy to take a break.

10           THE WITNESS:  Yeah, let's go ahead and take 10

11   minutes.

12   BY MR. RATINOFF:

13       Q.  It's 7:44 your time so five to?

14       A.  Sure five of 8:00.

15           THE VIDEOGRAPHER:  We're going to go off the

16   video record.  The time is 7:45 p.m. Eastern time.

17   Going off the record.

18           (Whereupon a recess was taken.)

19           THE VIDEOGRAPHER:  This is the start of Media

20   Label Number 3, and we're going back on the video

21   record.  The time is 8:00 p.m. Eastern time.

22   BY MR. RATINOFF:

23       Q.  Okay.  Before we broke, I put a document in the

24   chat, Tab 539, which will be marked Exhibit 249.

25           Let me know when you've had a chance to look at

                                                      163

1   that.

2        A.   Tab 539, Master Subcontract Agreement ASR

3   Analytics.

4        Q.   Greystones Consulting Group.

5        A.   Yes.

6        Q.   Okay.  Is this one of the contracts that you

7   reviewed for production in response to the subpoena and

8   in preparation for your deposition?

9        A.   Yes.

10       Q.   And I think you just testified before we broke

11  about Greystones getting a subcontract with ASR

12  Analytics; correct?

13       A.   Correct.

14       Q.   Is this the subcontract that you were referring

15  to?

16       A.   Yes.

17       Q.   Okay.  You'll see under prime contract number,

18  one of them is GS-10F-0062R.  That would be referring to

19  the contract, the master -- the prime contract awarded

20  to ASR; correct?

21       A.   Typically, yes.

22       Q.   And you'll see that in the first whereas on the

23  same page it says:

24            Prime contract is entered into a contractual

25            agreement awarded November 7, 2018, with the

164

1         U.S. Department of Treasury, Internal Revenue

2         Service (IRS), Office of Research Applied

3         Analytics and Statistics.

4              The client, RAAS or government contract

5    number, and you'll see it's the same contract number.

6         A.  Yes.

7         Q.  Okay.  And then I guess we have the official --

8    or at least on this document, RAAS being Research

9    Applied Analytics and Statistics; that's your

10   understanding of RAAS?

11        A.  Yes.

12        Q.  And then looking at the next page, 657, you'll

13   see the signature of looks like a Docusign by Ms. Duffy.

14   Is that her Docusign signature under Greystones

15   Consulting Group?

16        A.  To the best of my knowledge.

17        Q.  And to the best of your knowledge, this is an

18   authorized individual from ASR Analytics who signed this

19   contract?

20        A.  Yes.

21        Q.  And has -- this contract itself isn't for a

22   specific task; correct?

23        A.  As I understand it, this -- this is a

24   subcontract, and then task orders are placed underneath

25   it.

                                                    165

TURIN POLLARD, 30(b)(6)                              December 1, 2022

1      Q.  To your knowledge, this master subcontract

2   wasn't signed by -- from iGov?

3      A.  Correct.

4      Q.  So in Greystones' view, it's a new master

5   subcontract between Greystones and ASR; correct?

6      A.  Correct.

7      Q.  And when Mr. Suhy came on as a W2 employee, was

8   he asked to do all of his work for ASR under this master

9   subcontract?

10     A.  Yes.

11     Q.  So he was essentially asked to stop work for

12  iGov under the subcontract iGov had with ASR?

13     A.  Correct.

14     Q.  Was Mr. Suhy compensated for that?

15         MR. RHODES:  Objection to form.

16  BY MR. RATINOFF:

17     Q.  Did ASR pay iGov to cease working on its master

18  subcontract with ASR?

19     A.  Not to the best of my knowledge.

20     Q.  What were the terms of Mr. Suhy's employment

21  coming on board?

22         Mr. Beene:  Objection to form.

23         THE WITNESS:  He has a standard employment

24  agreement like the rest of Greystones' W2 employees.

25  BY MR. RATINOFF:

                                                          166

1      Q.  Was Mr. Suhy asked to stop performing work for

2  iGov?

3          MR. RHODES:  Object to form.

4  BY MR. RATINOFF:

5      Q.  As a condition of his employment?

6      A.  As part of our employment agreement, we're not

7  allowed to work for -- we're not allowed to have other

8  employers.

9      Q.  And that would apply to Mr. Suhy?

10     A.  Correct.

11     Q.  And are you aware of Mr. Suhy having another

12 contract with the IRS through an entity called

13 E-Government Solutions?

14     A.  I'm aware that he had one, yes.

15     Q.  What do you mean by "had"?

16     A.  IGov and Mr. Suhy, as an employee of iGov, had

17 a contract through E-Gov that was fully funded, and it

18 was paid up front.

19     Q.  Do you understand the term of that contract

20 that goes into 2023?

21     A.  Yes.

22     Q.  And is Mr. Suhy allowed to continue performing

23 under that contract via iGov under his condition of

24 employment at Greystones?

25         MR. RHODES:  Form.

167

 1          MR. BEENE:  Objection to form.

 2          THE WITNESS:  Mr. Suhy is still supporting IRS

 3  RAAS.

 4  BY MR. RATINOFF:

 5      Q.  Through the contracts he has via E-Government

 6  Solutions?

 7      A.  Through the contract with ASR.

 8      Q.  So is Mr. Suhy no longer permitted to provide

 9  services under the contract between E-Government

10  Solutions and the IRS of which ARS is a contractor?

11          MR. RHODES:  Objection to form.

12          THE WITNESS:  Since that contract was already

13  fully funded, he is still allowed to provide services,

14  but he is not paid for any work.

15  BY MR. RATINOFF:

16      Q.  When you say "paid for any work," you mean paid

17  by Greystones?

18      A.  Correct, because he was already paid by iGov.

19      Q.  But he still has obligations until that

20  contract terminates to perform work under it; correct?

21      A.  Correct.

22      Q.  Is there a provision in his employment

23  agreement that addresses that?

24      A.  I'm not sure if it's in the employment

25  agreement or an addendum to.

                                                        168

1          MR. BEENE:  Same objection.

2    BY MR. RATINOFF:

3       Q.  Has Greystones purchased any intellectual

4    property from Purethink?

5          MR. BEENE:  Objection to form.

6          THE WITNESS:  No.

7    BY MR. RATINOFF:

8       Q.  Has Greystones purchased any intellectual

9    property from Mr. Suhy?

10         MR. BEENE:  Objection to form.

11         THE WITNESS:  Yes.

12   BY MR. RATINOFF:

13      Q.  What is that intellectual property that

14   Greystones has purchased?

15         MR. RHODES:  I'm going to object on this as

16   being outside of the scope of the corporate designation.

17   This has nothing to do with anything related to any

18   ONgDB or Neo4j or otherwise.

19         Mr. Suhy's worked on other projects completely

20   unrelated, and if he sold personal IP that he brought to

21   Greystones, it's off the reservation as far as what's on

22   the subpoena for cooperate -- your topic list.

23         MR. RATINOFF:  I disagree.  Mr. Suhy has an

24   intellectual property that is called GraphStack, which

25   he may characterize as being beyond Neo4j, but it was

                                                    170

1   developed with Neo4j --

2          MR. RHODES:  If you want to ask your question

3   specifically related to GraphStack, if it's anyhow tied

4   to that, but any other generic IP is outside of the

5   scope of the topics.

6          MR. RATINOFF:  Well, also Mr. Suhy is subject

7   to a summary judgement order finding liability for

8   trademark infringement.  If he's transferred any

9   personal property during the course of this litigation,

10  especially after that was entered, it would be a

11  fraudulent transfer potentially, so I'm entitled to that

12  discovery.

13         So I'm going to the ask the question, and if

14  you instruct the witness not to answer, I may bring that

15  up to the court.  So I'll ask the witness about his

16  personal knowledge if that's what you're saying, but he

17  still has to answer the question.

18         I'm going to ask the question again, and you

19  can instruct him, and I'll ask if he's going to take

20  your instruction.

21  BY MR. RATINOFF:

22      Q.  What was the IP that Greystones purchased from

23  Mr. Suhy?

24         MR. BEENE:  Objection to form.

25         MR. RHODES:  You can answer, Turin.

                                                        171

1          THE WITNESS:  Okay.  The IP that we bought from

2   Mr. Suhy was the -- was components of the Greystones

3   Analytic Platform.

4   BY MR. RATINOFF:

5          Q.  What components were those?

6          A.  That would be the gatekeeper and software

7   fabric and several modules of analytic tools and log

8   management and analysis tools.

9          Q.  Was it your understanding that was part of

10  something called GraphStack?

11         A.  No.

12         Q.  Was that, to your knowledge, anything having to

13  do with something called Government Packages for Neo4j?

14         A.  No.

15         Q.  Did that intellectual property include any sort

16  of PISMA compliance modules or software?

17         A.  I'm not sure.

18         Q.  How much did Greystones pay for that

19  intellectual property?

20         MR. RHODES:  Objection to form.

21         MR. BEENE:  Objection to form.

22         THE WITNESS:  Approximately $1.3 million.

23  BY MR. RATINOFF:

24         Q.  Was that intellectual property developed by

25  Mr. Suhy working for Greystones as an independent

                                                        172

1   contractor?

2          MR. BEENE:  Objection to form.

3          THE WITNESS:  No.

4   BY MR. RATINOFF:

5      Q.  That was something he developed independently

6   from Greystones?

7          MR. RHODES:  Form.

8          THE WITNESS:  Yes.

9   BY MR. RATINOFF:

10     Q.  And does that include any patents?

11     A.  Not to the best of my knowledge.

12     Q.  Just source code?

13     A.  And associated documentation.

14     Q.  Material subject to copyrights?

15     A.  Broadly.

16     Q.  Were there any particular copyrights that were

17  purchased as part of that deal?

18     A.  I don't know.

19     Q.  Is there a written agreement, a purchase

20  agreement for that intellectual property?

21     A.  Yes.

22     Q.  At the time that Greystones purchased that

23  intellectual property, did it have an understanding that

24  Mr. Suhy had a summary judgment entered against him

25  personally?

                                                    173

TURIN POLLARD, 30(b)(6)                     December 1, 2022

1    Q.  And did Mr. Nussbaum ever inform Greystones

2 that it needed to stop using any particular version of

3 ONgDB?

4    A.  I don't know.

5    Q.  Are you familiar with a licensing provision

6 called the "commons clause"?

7    A.  Broadly.

8    Q.  What's your understanding of the commons

9 clause?

10   A.  If I'm remembering my open source licensing

11 correctly, the commons clause is part of the AGPL and

12 says that if you use this -- if you use software covered

13 under it, you can't remove that license from your

14 product.

15   Q.  Okay.  Where did you get that understanding

16 from?

17   A.  That is my personal recollection from previous

18 research into open source software.

19   Q.  Is that something you had a conversation with

20 Mr. Suhy about?

21   A.  Mr. Suhy has talked about the commons clause.

22   Q.  What did he tell you about the commons clause?

23   A.  That it was the point of this litigation, and

24 whether or not the open source versions of Neo4j had

25 been handled correctly.

                                                       179

1      Q.  Did he tell you that the court determined that

2  the removal of the commons clause by anyone but Neo4j

3  would be improper?

4      A.  Yes.

5      Q.  When did he tell you that?

6      A.  I believe the first time we discussed that

7  would be in the first half of this calendar year.

8      Q.  Was it after there was an appellate court

9  decision in relation to this case?

10     A.  I'm not sure.

11     Q.  Mr. Suhy ever talk about -- strike that.

12         Let me switch gears here.  Okay.  You mentioned

13  there was some task orders under the ASR subcontract

14  that was entered into; correct?

15     A.  Correct.

16     Q.  And I'll go ahead and put in what is Tab 540.

17         (Whereupon, Exhibit 250 was marked for

18         identification.)

19  BY MR. RATINOFF:

20     Q.  I'll represent to you this is a document

21  produced by ASR.  It's got the beginning Bates number

22  ASR 02025, and ends with 02027.

23     A.  02025.  02027 yep.

24     Q.  I think this is going to be Exhibit 249.

25         THE REPORTER:  I think it's 250.

                                                        180

1          MR. RATINOFF:  Sorry.  I'll have this marked

2    Exhibit 250 titled subcontractor task order number

3    0001_MOD01.  Do you recognize this document?

4          A.  This appears to be a modification to a task

5    order under the ASR BPA contract.

6          Q.  And in particular, the master subcontract we

7    just looked at as Exhibit 249?

8          A.  I believe so, yes.

9          Q.  No reason to believe anything other than what

10   this is?

11         A.  Correct.

12         Q.  And you'll see it says:

13             The subcontract agreement places and

14             terminates subcontract agreement

15             ASR_RAAS_DAIS-IGOV-001_TO-001 with iGov, Inc.,

16             which is hereby reassigned to Greystones

17             Consulting Group, LLC.

18             Do you see that?

19         A.  Yep.

20         Q.  And then at the bottom you'll see there's a

21   couple of signatures on page 3, 2027 Bates number?

22         A.  Yep.

23         Q.  The name Turin Pollard, and then there's a

24   signature there.  Do you see that?

25         A.  That's correct.

                                                        181

1      Q.   Is that your signature?

2      A.   That is.

3      Q.   And next to that is a representative of ASR;

4   correct?

5      A.   Correct.

6      Q.   To your knowledge, this is a correct copy of

7   the agreement you signed with ASR, specifically this

8   task order?

9      A.   Without comparing it to our files, I would have

10  to agree, yes.

11     Q.   Okay.  I'll represent to you it's the same as

12  what you produced, except for as redacted.  I'm happy to

13  provide that to you, but this is much more useable.  If

14  you have any doubts about the authenticity of this

15  agreement, I'm happy to show you that document.

16          So if you can say for certain this is a

17  contract you signed on behalf of Greystones and ASR,

18  that's fine, but if not, let me know.

19     A.   That appears to be.

20     Q.   No reason to doubt it's not?

21          And so do you understand this was a task order

22  that was originally contracted by with iGov; correct?

23          MR. RHODES:  Objection to form.

24          THE WITNESS:  Correct.

25  BY MR. RATINOFF:

                                                    182

1      Q.  This is a task order that Greystones took over

2  as part of his hiring of Mr. Suhy; correct?

3          MR. RHODES:  Objection to form.

4          THE WITNESS:  This is a task order issued to

5  Greystones, yes.

6  BY MR. RATINOFF:

7      Q.  Which was previously issued to iGov?

8          MR. RHODES:  Objection to form.

9          THE WITNESS:  Since we have a separate master

10  subcontract agreement, this is a separate task order.

11  BY MR. RATINOFF:

12      Q.  Okay.  But I'm asking about not the

13  subcontract.  I'm asking about this task order.  This is

14  a task order that says it replaces and terminates

15  subcontract agreement with iGov and is reassigned to

16  Greystones Consulting Group.  Is that inaccurate?

17      A.  I agree the document says that.

18      Q.  And you signed it?

19      A.  Correct.

20      Q.  And you read it before you signed it?

21      A.  Correct.

22      Q.  Made sure everything was correct before you

23  signed it?

24      A.  Our contracts and legal reviewed it for

25  compliance before I signed it.

183

1    Q.  They told you it was okay to sign it?

2    A.  Correct.

3    Q.  All right.  Looking at the purpose of task

4  order description of work, you'll see on the bottom of

5  the first page it says:  Emerging compliance issues.

6        And there's a very long description, but

7  looking at just the title, do you have an understanding

8  of what emerging compliance issues relates to at the

9  IRS?

10   A.  Compliance with tax law, specifically tax

11 filings.

12   Q.  And is that a task that AtomRain is also

13 currently working on to your knowledge?

14   A.  I'm not sure.

15   Q.  Who would know the answer to that?

16   A.  AtomRain and ASR since it would be their

17 contractual relationship.

18        MR. RHODES:  Objection; form.

19 BY MR. RATINOFF:

20   Q.  But if you were required to work with AtomRain

21 under this task order, the person performing the work

22 under the task order would probably know the answer to

23 that question; right?

24        MR. RHODES:  Objection to form.

25        THE WITNESS:  Yes.

                                                      184

BY MR. RATINOFF:

   Q.  And is the person performing the work under
this task order Mr. Suhy?

   A.  Yes.

   Q.  And you'll see he's listed there as being -- on
the page 2 -- as the only authorized personnel to
perform work under this contract; correct?

   A.  Where are you looking?

   Q.  Second page.

   A.  Authorized personnel in all categories.  Yes,
he is authorized to work on this contract.

   Q.  Going back to the first page, it says, option
year two exercised.  It's from September 30, 2019, to
September 29, 2023.

   A.  Correct.

   Q.  And then there's two other option years on
here.

   A.  Correct.

   Q.  Through 2025?

   A.  Yes.

   Q.  And is it Greystones' understanding that
assuming that these option years are exercised, Mr. Suhy
would continue to be the only authorized personnel on
the contract?

      MR. RHODES:  Objection to form.

185

1    BY MR. RATINOFF:

2        Q.  You can answer the question.

3        A.  How we will staff this in the future has not

4    been determined.

5        Q.  But as of this current option year, it will be

6    Mr. Suhy as provided in here?

7        A.  Yes.

8        Q.  And then Greystones will receive payment for

9    the work that Mr. Suhy does under this task order?

10       A.  Correct.

11       Q.  Let me go ahead and mark the next exhibit,

12   Tab 541.

13            (Whereupon, Exhibit 251 was marked for

14            identification.)

15   BY MR. RATINOFF:

16       Q.  Have you seen this document before?

17       A.  I believe so.

18       Q.  Okay.  It's document subcontractor task order

19   number 0002_MOD01.  I'll have it marked as Exhibit 251.

20            I'll represent to you it was produced by ASR,

21   and it was produced by your counsel with redactions.  So

22   I'm using the one without redactions, if that's okay.

23       A.  I'll defer to counsel.

24       Q.  Well, let's just look at your signature at the

25   bottom or what should be your signature.

                                                        186

1        A.   This appears to be signed by me.

2        Q.   And then Mr. Stavrianos on behalf of ASR

3   Analytics?

4        A.   Correct.

5        Q.   And you had your contract folks, legal, review

6   this before you signed it?

7        A.   Correct.

8        Q.   You reviewed it yourself as well?

9        A.   Yes.

10       Q.   Then you signed it after you got approval from

11  who you needed approval from?

12       A.   Yes.

13       Q.   And then you'll see the purpose of task order

14  description of work:  Support for corporate graph

15  database.  Do you see that?

16       A.   Yes.

17       Q.   And if you go to the second page at the bottom

18  of the paragraph, last -- second to last sentence it

19  says:

20            RAAS graph data models are accessible by

21        employees through a web-based user interface

22        that provides authentication, query,

23        visualization, data sheet views, and other

24        functionality.  Many of these services are

25        messaged through GraphGrid, a micro services

187

1       application programming interface that includes

2       ONgDB.

3       A.   That's what it says.

4       Q.   Doesn't say "based," based on ONgDB.  It says

5   it includes ONgDB.

6       A.   Right.  That's what it says.

7            MR. RHODES:  Objection to form.

8   BY MR. RATINOFF:

9       Q.   And you read this when you signed it?

10      A.   Yes.

11      Q.   Do you understand that the scope of this task

12  order requires work in relation to ONgDB at the IRS?

13      A.   Can you repeat that please?

14           MR. RATINOFF:  Can you read the question back

15  please?

16           (Record read.)

17           THE WITNESS:  I'm not sure if this task

18  actually involves using ONgDB.

19      Q.   But as far as you know, the description in this

20  task is accurate?

21      A.   The description in this task is an accurate

22  reflection of the task order issued by RAAS to ASR and

23  flowed down to us at the time of task order award.

24      Q.   Okay.  So this is the IRS's description of what

25  the work would be under this task order?

188

1      A.  As of the award of the base year.  As of

2    solicitation of the base year, which would be prior to

3    the award by some amount.

4      Q.  But it would be approximately right on or about

5    September 2020?

6      A.  It would be some amount before.  I don't know

7    how quickly they can get these out.

8      Q.  Okay.  But you weren't involved in the original

9    issuance of the task order; correct?

10     A.  Correct.

11     Q.  So we'd have to ask ASR that question?

12     A.  Correct.

13     Q.  And then as far as authorized personnel on this

14   task order, the only person authorized to do work is

15   Mr. Suhy on behalf of Greystones; correct?

16     A.  Correct.

17     Q.  Then whatever work Mr. Suhy does, payment will

18   be made to Greystones?

19     A.  Correct.

20     Q.  I've got just two more exhibits that I just

21   need to get you to tell me what they were because your

22   counsel heavily redacted them.  And then I propose we'll

23   take a short break, and I'll take a look at the

24   PowerPoint, and I guess there was some sort of code

25   comparison done at some point and I'll ask you about

189

REPORTER'S CERTIFICATE

I, Cambria Denlinger, California Certified
Shorthand Reporter No. 14009, certify;
That the foregoing proceedings were taken before me at
the time and place therein set forth, at which time the
witness declared under penalty of perjury; that the
testimony of the witness and all objections made at the
time of the examination were recorded stenographically
by me and were thereafter transcribed under my direction
and supervision; that the foregoing is a full, true and
correct transcript of my shorthand notes so taken and of
the testimony so given;
That before completion of the deposition, review of the
transcript ( X ) was ( ) was not requested; ( ) that
the witness has failed or refused to approve the
transcript.
I further certify that I am not financially interested
in the action, and I am not a relative or employee of
any attorney of the parties, nor of any of the parties.
I declare under penalty of perjury under the laws of
California that the foregoing is true and correct.
Dated this 5th of December, 2022

CAMBRIA L. DENLINGER
CSR NO. 14009

221