John V. Picone III, Bar No. 187226
jpicone@hopkinscarley.com
Jeffrey M. Ratinoff, Bar No. 197241
jratinoff@hopkinscarley.com
Arthur E. Rothrock, Bar No. 312704
arothrock@hopkinscarley.com
HOPKINS & CARLEY
A Law Corporation
The Letitia Building
70 South First Street
San Jose, CA  95113-2406

*mailing address:*
P.O. Box 1469
San Jose, CA 95109-1469
Telephone:     (408) 286-9800
Facsimile:     (408) 998-4790

Attorneys for Plaintiffs and Counter-Defendants
NEO4J, INC. and NEO4J SWEDEN AB

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEO4J, INC., a Delaware corporation, NEO4J SWEDEN, AB,<br><br>            Plaintiffs,<br><br>    v.<br><br>PURETHINK LLC, a Delaware limited liability company, IGOV INC., a Virginia corporation, and JOHN MARK SUHY, an individual,<br><br>            Defendants.<br><br>AND RELATED COUNTERCLAIMS. | CASE NO.  5:18-cv-07182-EJD<br><br>**PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

I.      **FINDINGS OF FACT**

The Court makes the following findings of fact based on the Court's May 18, 2021 Order (Dkt. No. 118), Defendants' Responsive Statement of Undisputed Facts submitted in opposition to Plaintiffs' first Motion for Summary Judgment (Dkt. No. 100, Ex. A), Defendants' Responsive Statement of Undisputed Facts submitted in opposition to Plaintiffs' second Motion for Summary Judgment (Dkt. No. 188), the parties' stipulation of undisputed facts (Dkt. No. 206) and the evidence presented at trial in the above-entitled action, which commenced on November 14, 2023:

1.      Neo4j USA is the parent corporation of Neo4j Sweden, which in turn is a wholly owned subsidiary of Neo4j USA.  Dkt. No. 118 at 2:15-16; Dkt. No. 206, UDF No. 1.

2.      Neo4j Sweden owns all of the copyrights related to the Neo4j graph database platform, including the source code, and has licensed those copyrights to Neo4j USA. Dkt. No. 118 at 2:16-18; Dkt. 100, Ex. A at UDF No. 80.

3.      In conjunction with its business, Neo4j USA filed for and obtained several federally registered trademarks, including U.S. Trademark Registration No. 4,784,280 for the word mark "NEO4J" (the "Neo4j Mark"). Dkt. No. 118 at 2:18-21; Dkt. No. 206, UDF No. 2.

4.      Neo4j USA owns the rights to the Neo4j Mark in the United States and is the proper registrant.  Dkt. No. 118 at 2:18-26.

5.      Neo4j USA did not make any misrepresentations to the USPTO concerning its ownership of the Neo4j Mark or date of first use.  Dkt. No. 118 at 12:2-17, 13:18-18:1.

6.      The Neo4j® Mark is inherently distinctive and Plaintiffs have used it in commerce since 2007, and as a result has gained strong brand recognition via various awards and recognition in the graph database software market.

7.      Prior to May 2018, Plaintiffs offered a free and open source version of the Neo4j® graph database platform, Neo4j® Community Edition ("Neo4j® CE"), under the GNU General Public License version 3 ("GPL") license. Dkt. No. 118 at 3:1-4; Dkt. No. 206, UDF No. 5.

8.      Neo4j® CE is limited in its feature set and does not come with technical or administrative support. Dkt. No. 118 at 3:4-5; Dkt. No. 206, UDF No. 5.

9.      Plaintiffs also offered a more advanced commercial version, which included

additional features and support services, known as the Neo4j Enterprise Edition (hereafter referred to as "Neo4j® EE"). Dkt. No. 118 at 3:5-7.

10.     Prior to May 2018, Plaintiffs offered Neo4j® EE under both a paid-for commercial license and for free under the GNU Affero General Public License, version 3 (hereafter referred to as the "AGPL"). Dkt. No. 118 at 3:5-9; Dkt. No. 206, UDF No. 6.

11.     On May 17, 2018, Neo4j Sweden released Neo4j® EE v3.4 and replaced the AGPL with a stricter license, which included the terms from the AGPL and additional commercial restrictions provided by the Commons Clause (hereafter referred to as the "Neo4j Sweden Software License"). Dkt. No. 118 at 3:9-12; Dkt. No. 206, UDF No. 7.

12.     The new terms added by Neo4j Sweden to the Neo4j Sweden Software License prohibited the non-paying public from engaging in commercial resale and support services. Dkt. No. 118 at 3:12-13; *accord* Dkt. No. 206, UDF No. 8 (quoting same); *see also* Dkt. No. 118 at 5:26-6:1 ("The Commons Clause prohibited resale and commercial support services.").

13.     The NOTICE provision in the Neo4j Sweden Software License states that Neo4j® EE is developed and owned by Neo4j Sweden… and is subject to the terms of the [AGPL], with the Commons Clause as follows…." Dkt. No. 118 at 6:21-26; Dkt. No. 206, UDF No. 9.  It also provides additional information, such as the title of the work, terms and conditions for use of the work, and other identifying information about Neo4j Sweden and how to obtain a commercial license for the use of Neo4j® EE.  *Id.*

14.     The GPL, AGPL and Neo4j Sweden Software Licenses are copyright licenses and not trademark licenses. Dkt. No. 188, UDF No. 60; Dkt. No. 206, UDF No. 14.

15.     Neo4j® EE v3.4 included advanced scalability, availability, security, and operational features that were not previously available.  Dkt. No. 118 at 3:1-15; Dkt. No. 206, UDF No. 10.

16.     In November 2018, Plaintiffs officially released of Neo4j® EE v3.5 solely under a commercial license. Dkt. No. 118 at 3:18-19; Dkt. No. 206, UDF No. 11.

17.     Prior to the official release of Neo4j® EE v3.5, Plaintiffs published several beta versions via their GitHub repository subject to the Neo4j Sweden Software License.  Dkt. No. 118

at 6:18-21; Dkt. No. 206, UDF No. 12.    Thereafter, Neo4j Sweden only made the source code for Neo4j® CE publicly available under the GPL via GitHub.  *Id.*

18.     Neo4j® EE v3.5 contained at least 182 source code files and 247 Java classes that were released for the first time under the Neo4j Sweden Software License either in (a) Neo4j® EE version 3.4 and were incorporated into Neo4j® EE version 3.5; or (b) Neo4j® EE version 3.5.0-RC1, and were therefore never previously licensed under the AGPL.  Dkt. No. 206, UDF No. 13; Dkt. No. 118 at 6:18-21.

19.     John Mark Suhy founded PureThink in 2002, which is a software and information technology consulting company specializing in supporting agencies within the U.S. Government that use Neo4j® graph database software.  Dkt. No. 118 at 3:17-19; Dkt. No. 206, UDF No. 14.

20.     PureThink is a single person limited liability company filing as an s-corporation for tax purposes.  Dkt. No. 188, UDF No. 87; Dkt. No. 206, UDF Nos. 15-16.

21.     Since at least September 1, 2014, Suhy has been the sole employee, member and manager of PureThink.  Dkt. No. 206, UDF No. 16.

22.     On September 30, 2014, PureThink and Neo4j USA entered into the Neo Technologies Solution Partner Agreement ("Partner Agreement" or "SPA") where PureThink agreed sell commercial licenses for Neo4j® EE and provide support to end-users that purchased those licenses. Dkt. No. 206, UDF No. 17; *see also* Dkt No. 118 at 3:17-4:3.

23.     Under Section 4.1 of the SPA, PureThink was granted a non-exclusive, non-transferable limited license to, *inter alia*, use the Neo4j® Mark solely to market and resell commercial licenses to Neo4j® EE and related support services in exchange for shared revenue for the licenses that it resold.  Dkt. No. 118 at 3:17-23; Dkt. No. 100, UDF No. 3.

24.     Under Section 7.3 of the SPA, all rights and licenses granted under the SPA to Neo4j® Software and the Neo4j® Mark would terminate upon the expiration or termination, and upon such an event, PureThink agreed to "cease using any trademarks, service marks and other designations of Plaintiffs."  Dkt. No. 118 at 3:26-4:3; Dkt. No. 100, UDF No. 6.

25.     Section 4.3.1 of the SPA prohibited PureThink from developing "for internal use, any Neo Technology Community Edition Products for commercial or production use" during the

term of the SPA.

26.     Section 4.3.2 of the SPA provided that both during the term of the SPA and up until thirty six (36) months after the termination or expiration thereof, PureThink could "not develop, market, distribute or offer any service related to any Neo Technology Community Edition Products, derivative works of such products, or any Partner software code made to work with Neo Technology Community Edition Products (including, without limitation, hosting services, training, technical support, configuration and customization services, etc.)."

27.     Section 11 of the SPA defined "Neo Technology Community Edition Product" as any open source version of a Neo Technology software product.

28.     Under Section 10 of the SPA, PureThink agreed that all contractual restrictions would apply to any successor-in-interest, assign, and acquirer of substantially all of its assets.  Dkt. No. 100, UDF No. 9.

29.     In the hope of increasing sales, Suhy came up with the idea of rebranding Neo4j® EE as Neo4j® Government Edition ("Gov't Edition"), which was a package designed to streamline government procurements.  Dkt No. 118 at 4:4-5.

30.     Suhy knew that if PureThink could create the appearance that it was the sole reseller of the Gov't Edition, it could bypass protracted mandatory competitive bidding processes and take advantage of a faster sole-source procurement track.

31.     To do so, Suhy asked Neo4j USA to sign letters stating that PureThink was the exclusive reseller of the Gov't Edition.

32.     Suhy repeatedly assured Neo4j USA that it would own the intellectual property making up the Gov't Edition.  Dkt. No. 188, UDF Nos. 66, 69.

33.     Suhy repeatedly assured Neo4j USA that Neo4j could unilaterally cancel the arrangement and reassign the exclusive rights to another reseller at any time and for any reason.

34.     On April 10, 2015, Suhy sent proposed language for external and internal versions of the sole-source justification letters to Neo4j USA with the internal version stating, "Neo Technologies has the right to cancel this exclusivity agreement at any time and for any reason." Dkt. No. 188, UDF No. 70.

35.     The internal version of the April 11, 2015 sole-source letter signed by Lars Nordwall on behalf of Neo4j USA stated, "Neo Technology has the right to cancel this exclusivity agreement at any time and for any reason."  Dkt. No. 188, UDF Nos. 70-71.

36.     The external version of the April 11, 2015 sole-source letter signed by both Neo4j USA and PureThink did not contain terms requiring Neo4j USA to obtain PureThink's consent prior to discontinuing the Gov't Edition or terminating it as the exclusive reseller of the Gov't Edition.

37.     The external version of the April 11, 2015 sole-source letter signed by the parties did not contain terms requiring Neo4j USA to compensate PureThink for development work on the Gov't Edition.

38.     The Gov't Edition consisted of Neo4j® EE and certain FISMA security plug-ins. Dkt. No. 206, UDF No. 18.

39.     Neo4j USA owned the intellectual property making up the Gov't Edition.  Dkt. No. 188, UDF Nos. 66, 69.

40.     Neo4j USA never agreed that it required PureThink's consent prior to discontinuing the Gov't Edition or terminating it as the exclusive reseller of that software.

41.     Neo4j USA never agreed that it was required to "buy out" or compensate PureThink for its work on the Gov't Edition upon discontinuing the Gov't Edition or terminating it as the exclusive reseller of that software.

42.     PureThink did not maintain any time sheets documenting any time that Suhy might have spent working on the Gov't Edition.

43.     PureThink's financial statements do not reflect any expenses or overhead for any work relating to the Gov't Edition.  Dkt. No. 188, UDF No. 87.

44.     PureThink had limited success in convincing government agencies to pay for licenses to Gov't Edition and support services from PureThink.

45.     By September 2016, the only promising lead PureThink had was the IRS, which indicated that it would require a prototype before purchasing a full subscription.  Dkt. No. 118 at 4:7-8.

46.     To secure the IRS's business, Suhy told the IRS that it could use the open source version of Neo4j® EE and pay PureThink for consulting services instead of buying a commercial subscription for Neo4j® EE. Dkt. No. 118 at 4:7-12.

47.     On September 23, 2016, the IRS's Office of Research, Applied Analytics and Statistics ("RAAS") awarded PureThink a one-year contract for the "Implementation of the Government Neo4j project" for $229,000. Dkt. No. 206, UDF No. 21.

48.     In early 2017, Suhy revealed to Neo4j USA that PureThink had compiled its own modified version of the Neo4j® EE software under the AGPL, which the IRS had already installed and PureThink was supporting.

49.     On May 30, 2017, Neo4j USA sent PureThink notice that Suhy's use, distribution, and marketing of Neo4j® open source products and his marketing of consulting services focused on those products constituted a material breach of the SPA.  Dkt. 118 at 4:13-15; Dkt. No. 206, UDF No. 22.

50.     This notice triggered a 30-day cure period, during which Suhy formed iGov on June 23, 2017 to support open source Neo4j® software without being bound by restrictions in the SPA on June 23, 2017.  Dkt. No. 118 at 4:15-18; Dkt. No. 206, UDF No. 23.

51.     On June 19, 2017, Neo4j USA sent an email to PureThink notifying it that Neo4j USA was discontinuing the Gov't Edition and that PureThink was "no longer authorized to market, resell, demonstrate or provide training on the Neo4j Government Edition."  Dkt. No. 188, UDF No. 75.

52.     Suhy acknowledged receipt of the June 19, 2017 email and represented that "[w]e are removing references from the website."  Dkt. No. 188, UDF No. 76.

53.     Suhy has been the sole employee, officer and director of iGov since he formed the corporation. Dkt. No. 188, UDF No. 18; Dkt. No. 206, UDF No. 24.

54.     On July 11, 2017, Neo4j USA terminated the Partner Agreement thereby requiring PureThink to "cease using [Neo4j's] trademarks, service marks, and other designations…and remove from PureThink's website(s) marketing materials, [Neo4j's] trademarks and tradenames, including, without limitation, Neo4j" as required by Agreement.  Dkt. No. 118 at 4:19-42; Dkt. No.

206, UDF No. 25.

55.     On July 11, 2017, Neo4j USA notified the IRS that it had terminated its partnership with PureThink, and advised the IRS that PureThink was contractually restricted from providing support services for open source versions of Neo4j® software for 36 months.  Dkt. No. 188, UDF No. 53.

56.     Despite Neo4j USA's warnings, the IRS continued to use Neo4j® EE for free under the AGPL and allowed Suhy to perform under PureThink's support contract. Dkt. No. 188, UDF No. 54.

57.     After the termination of the SPA, Suhy and iGov continued marketing the Gov't Edition to government agencies. Dkt. No. 118 at 4:24-5:7; Dkt. No. 206, UDF No. 26.

58.     The same day that Neo4j USA terminated the SPA, Suhy began targeting the same federal agencies that PureThink previously solicited under the SPA by offering iGov's "Government Packages for Neo4j."   Dkt. No. 118 at 4:24-5:12.

59.     iGov effectively operated as PureThink's successor-in-interest.

60.     On July 12, 2017, Suhy told the IRS that "[s]ince iGov Inc [sic] has no limitations on supporting or providing services for Neo4j Enterprise open source licenses, we can just have iGov Inc. assume over all [PureThink's] obligations of the current contract now instead of waiting for the next procurement. Nothing would change, we would have the same team, locations and would keep working as we always have."

61.     On August 3, 2017, Suhy told another potential customer that "US Treasury has decided to make the move to our new company iGov Inc [sic] and the new Government Packages for Neo4j Enterprise."

62.     Defendants used the Neo4j® Mark without Neo4j USA's authorization to direct customers to iGov's website, www.igovsol.com, to obtain "Government Package for Neo4j" and "Government Development Package with Neo4j Enterprise." Dkt. No. 118 at 5:7-12; Dkt. No. 206, UDF No. 26.

63.     Defendants made clear on iGov and PureThink's websites that the "Government Package for Neo4j" was from the same "principle" behind PureThink and Gov't Edition.  Dkt. No.

118 at 4:24-5:12; Dkt. No. 188, UDF No. 80; Dkt. No. 206, UDF No. 28.

64.     Defendants stated on iGov and PureThink's websites that "iGov Inc's [sic] new Government Package for Neo4j can be added to any Neo4j instance making it a 'Government Edition.'" Dkt. No. 118 at 4:25-5:7; Dkt. No. 206, UDF No. 28.

65.     Suhy kept the FISMA framework and security plug-ins for the Gov't Edition and other work product that he claimed to have developed for Neo4j USA.

66.     Suhy used the same FISMA framework and security plug-ins for the Gov't Edition and other work product for iGov's "Government Package for Neo4j."

67.     Suhy assured potential customers that iGov's package included the same FISMA framework and security plug-ins as the Gov't Edition, but with Neo4j® EE under the AGPL for free instead of a paid commercial license.

68.     Defendants' iGov website, www.igovsol.com, contained numerous infringing uses of the Neo4j Mark, including (1) using "https://igovsol.com/neo4j.html" as a URL to promote "Government Development Packages for Neo4j"; (2) displaying "Request Procurement Document Package" link with "mailto:neo4j@igovsol.com" embedded that creates an email addressed thereto upon activation; (3) encouraging consumers to obtain more information by sending an email to "neo4j@igovsol.com;" and (4) using "Government Packages for Neo4j" and "Neo4j Enterprise" to describe iGov's modified version of Neo4j® EE software.  Dkt. No. 118 at 5:13-20, 20:3-21:3.

69.     Suhy formed iGov to compete with Neo4j USA in offering support and consulting services for Neo4j® EE and later ONgDB.

70.     After forming iGov, Suhy specifically targeted the IRS to transition to iGov's Government Package for Neo4j.

71.     In late July 2017, the IRS invited iGov to submit a quote for a sole-source contract for the development and support of its CDW Knowledge Graph Environment ("CKGE"), which used an open source version of Neo4j® EE software as a main component.

72.     As of July 2017, IRS was using an open source version of Neo4j® EE in the CKGE. Dkt. No. 188, UDF No. 55 (Defendants confirmed that "[t]he CKGE framework includes a Neo4j's Enterprise Edition open-source version").

73. The IRS did so because it was immaterial to the IRS whether iGov or PureThink would be the contracting entity so long as Suhy was the individual providing them.

74. On September 5, 2017, the IRS announced its intent to award a sole-source contract to iGov based on Suhy's quote. Dkt. No. 188, UDF No. 57.

75. Neo4j USA filed an official agency-level protest pursuant to the applicable Federal Acquisition Regulations with the IRS on the grounds that it was improper to award the contract to iGov on a sole source basis. Dkt. No. 188, UDF No. 58 (response does not dispute stated facts).

76. The IRS agreed with Neo4j USA that it had improperly awarded the contract to iGov on a sole source basis and canceled it for that reason.

77. The IRS re-issued the contract for the development of the CKGE framework, which required the use and support of Neo4j® EE software, for open bidding.

78. Suhy told the IRS that iGov would be providing the "Government Package for Neo4j" for the CKGE platform and he would be performing the development work through iGov. Dkt. No. 188, UDF No. 26.

79. Suhy submitted a bid for the new contract via another entity that he had an ownership interest in at the time, eGovernment Solutions, Inc. ("eGov Sol" or "eGov Solutions"). Dkt. No. 188, UDF No. 25.

80. Under the proposal for the new contract signed by Suhy, the scope of work required iGov to perform "all operations and maintenances duties for all components of the CKGE framework…." iGov would also be "responsible for ensuring any open source products within the CKGE conform to their license-terms" and iGov would "need to work with the following components: React, Angularjs, Neo4j…."

81. On May 22, 2018, Neo4j USA informed the IRS, including those in RAAS, that Neo4j Sweden added Commons Clause to Neo4j® EE 3.4, and the resulting need to obtain a commercial subscription if they intended to use that software in the CKGE platform.

82. On May 22, 2018, Suhy sent an email to the IRS claiming Neo4j Sweden could not add the Commons Clause to the license governing Neo4j® EE v3.4.

83. On May 24, 2018, the RAAS division of the IRS awarded eGov Solutions the new

1    contract, Order No. 2032H8-18-P-00151, as amended Order No. 2032H8-18-P-00168, to further

2    develop and support the CKGE in May 2018 ("CKGE Contract"). Dkt. No. 188, UDF No. 25.

3         84.    Following the release of Neo4j® EE v3.4, Suhy worked with Brad and Ben

4    Nussbaum to form Graph Foundation, Inc. ("GFI") in June 2018.  Dkt. No. 118 at 6:2-7.

5         85.    On July 25, 2018, a month after forming GFI, Suhy sent an email to the Nussbaums

6    stating, "We work together as one company. We all are the founders of the Graph Foundation."

7    Dkt. No. 118 at 6:2-7.

8         86.    Suhy created ONgDB v3.4 by replacing the Neo4j Sweden Software License with

9    verbatim copies of the AGPL thereby removing the Commons Clause and certain legal notices

10   identifying Neo4j Sweden as the copyright holder and licensor.  Dkt. No. 118 at 6:2-11, 6:24-25;

11   Dkt. No. 206, UDF No. 32.

12        87.    Prior to replacing the Neo4j Sweden Software License with the AGPL, Suhy sought

13   guidance from the Free Software Foundation ("FSF"), which told him "[t]he copyright holder on a

14   work is the one with the power to enforce the terms of the license" and "[i]f a work was previously

15   available under a free license, and later that license is changed, users can always use that earlier

16   version under the terms of the free license." The FSF also warned that "we cannot provide you with

17   legal advice" and that he should "talk with legal counsel." Dkt. No. 206, UDF No. 33.

18        88.    Prior to replacing the Neo4j Sweden Software License with the AGPL, Suhy ignored

19   the FSF's admonitions and did not seek independent legal advice from an attorney.  Dkt. No. 206,

20   UDF No. 34.

21        89.    Prior to replacing the Neo4j Sweden Software License with the AGPL, Suhy knew

22   that Neo4j Sweden owned the copyright for Neo4j® EE and that Neo4j Sweden controlled the

23   licensing thereof.  Dkt. No. 100, UDF No. 80.

24        90.    Prior to replacing the Neo4j Sweden Software License with the AGPL, Suhy knew

25   that he could not replace the Neo4j Sweden Software License with the AGPL without first obtaining

26   Neo4j Sweden's authorization as the copyright holder.    Dkt. No. 188, UDF No. 15

27   ("UNDISPUTED that Mr. Suhy knew that Neo4j Sweden owned the copyright for Neo4j EE");

28   Dkt. No. 206, UDF No. 33-34.

91.     Suhy understood that the Common Clause imposed commercial restrictions on the use of Neo4j® EE and prohibited the non-paying public from engaging in commercial resale and support services.

92.     Suhy removed the Commons Clause to induce and mislead end-users to use ONgDB in commercial applications for free, and then use the cost savings to pay Defendants to provide support services to those users.

93.     Suhy "donated" ONgDB v3.4 to GFI, which then made publicly available for download via GFI's website, https://graphfoundation.org/projects/ongdb/, and GFI's GitHub source code repository for ONgDB, https://github.com/graphfoundation/ongdb.

94.     In January 2019, Defendants and GFI released ONgDB v3.5.1, which contained at least 182 source code files that had only been previously released under the Neo4j Sweden Software License in a publicly available beta version of Neo4j® EE 3.5.  Dkt. No. 118 at 6:18-21; Dkt. No. 188, UDF No. 13; Dkt. No. 206, UDF No. 36.

95.     To create ONgDB v.3.5.1, Suhy replaced the more restrictive Neo4j Sweden Software License with a verbatim copy of the AGPL in 28 LICENSE.txt files governing those 182 source code files.  Dkt. No. 118 at 6:21-26; Dkt. No. 206, UDF No. 37.  Doing so stripped out valid legal notices identifying Neo4j Sweden as the copyright holder and licensor; and removed the commercial restrictions imposed by the Commons Clause in 28 LICENSE.txt files. *Id.*

96.     ONgDB v3.5.x combines the last public beta version of the source code, Neo4j® EE 3.5.0-RC1, and source code from Neo4j® Community Edition held together by "glue code" authored by Suhy and other contributors.  Dkt. No. 118 at 7:7-10.

97.     ONgDB 3.5.x does not include every closed enterprise feature in equivalent Neo4j® EE 3.5.x.  Dkt. No. 118 at 26:2-11, 27:6-28:16.

98.     Neo4j Sweden never gave Suhy permission to remove Commons Clause or the legal notices identifying Neo4j Sweden as the copyright holder and licensor in ONgDB v3.4 and ONgDB v3.5 by replacing the Neo4j Sweden Software License with a verbatim copy of the AGPL.  Dkt. No. 188, UDF No. 16.

99.     Defendants' removal of the commercial restrictions imposed by the Commons

1  Clause allowed Defendants to commercially use and support ONgDB v3.4 and ONgDB v3.5.  Dkt.

2  No. 118 at 6:21-26.

3       100.    Defendants actively encourage actual and potential users of commercially licensed

4  Neo4j® EE to adopt ONgDB and obtain support services from iGov instead of Plaintiffs.  Dkt. No.

5  118 at 7:18-24, 20:15-24, 28:26-29:11.

6       101.    Defendants made the following (and similar) statements via their websites: (a)

7  "ONgDB distributions are licensed under AGPLv3 as a free and open drop-in replacements of

8  Neo4j Enterprise commercial licensed distributions with the same version number"; (b) "ONgDB

9  distributions are licensed under AGPLv3 as a free and open source alternative to currently available

10 proprietary native graph offerings such as Neo4j Enterprise Edition"; (c) "download ONgDB

11 Enterprise as a drop in replacement for an existing commercial licensed distribution of the same

12 version number."; and (d) "ONgDB Enterprise is a drop in replacement for Neo4j Enterprise

13 commercial packages downloaded from Neo4j.com".  Dkt. No. 118 at 7:18-24, 24:1-6, 27:6-28:16.

14      102.    Defendant's statements were false because they knew that Neo4j Sweden owned the

15 copyright for Neo4j® EE and never gave permission to remove Commons Clause and offer it under

16 the AGPL for free as "ONgDB."   Dkt. No. 118 at 24:27-26:19; Dkt. No. 100, UDF No. 80; Dkt.

17 No. 188, UDF No. 15 ("UNDISPUTED that Mr. Suhy knew that Neo4j Sweden owned the

18 copyright for Neo4j EE").

19      103.    Defendant's statements are false because ONgDB v3.5.1 and later versions were not

20 100% identical to equivalent version numbers of Neo4j® EE. Dkt. No. 118 at 26:12-24, 27:6-28:16.

21      104.    Defendants made the false statements on their websites that ONgDB is a "free and

22 open" and a drop-in replacement/equivalent of Neo4j® EE under the AGPL to convince customers

23 to adopt ONgDB over Neo4j® EE, and pay them for related consulting and support services. Dkt.

24 No. 118 at 6:24-26, 28:4-24.

25      105.    Defendants' false statements entered interstate commerce through the internet via

26 their websites and Twitter, as well as emails sent to consumers.  Dkt. No. 118 at 23:6-14.

27      106.    Defendants'   iGov   webpage,   https://igovsol.com/downloads.html,   provided

28 hyperlinks for potential users of Neo4j® EE to download copies of ONgDB v3.4.x and ONgDB

v3.5.x. Dkt. No. 206, UDF No. 44; Dkt. No. 188, UDF Nos. 22-23; Dkt. No. 118 at 27:12-28:1.

107.    Defendants' iGov website also provided hyperlinks to Plaintiffs' build instructions, support documentation and change logs containing the Neo4j Mark rather than creating and hosting their own with the ONgDB name.  Dkt. No. 118 at 21:25-22:5, 27:12-28:2;

108.    iGov and Suhy operated another website, www.graphstack.io to further promote ONgDB over Neo4j® EE.  Dkt. No. 188, UDF No. 38.

109.    Defendants' Graphstack website provided hyperlinks to provided potential users of Neo4j® EE hyperlinks to directly download copies of ONgDB v3.5.x and ONgDB v3.6.x. Dkt. No. 206, UDF No. 45; Dkt. No. 188, UDF No. 22.

110.    Defendants' Graphstack website also provided hyperlinks to Plaintiffs' build instructions, support documentation and change logs containing the Neo4j Mark rather than creating and hosting their own with the ONgDB name.  Dkt. No. 100, UDF No. 23.

111.    Defendants used "Neo4j Enterprise" and ONgDB" interchangeably to promote ONgDB on their iGov and Graphstack websites. Dkt. No. 118 at 21:25-22:21.

112.    Defendants advertised via the iGov and Graphstack websites and through direct communications with potential users that ONgDB was licensed under AGPL as a free and open drop-in replacement for Neo4j Enterprise commercial licensed distributions with the same version number.  Dkt. No. 118 at 6:18-7:5, 7:18-24, 24:1-28:16; Dkt. No. 100, UDF No. 23; Dkt. No. 188. UDF Nos. 20-22.

113.    Defendants used the Neo4j Mark in the URL https://igovsol.com/neo4j.html to promote ONgDB and in the email address neo4j@igovsol.com as means for consumers to inquire about ONgDB.  Dkt. No. 118 at 6:11-15, 20:3-21:2; Dkt. No. 206, UDF No. 40.

114.    After the release ONgDB v3.4 in July 2018, Defendants continued to use the Neo4j Mark by using "https://igovsol.com/neo4j.html" as a URL address to promote ONgDB until it deactivated that page after July 27, 2020. While iGov replaced this URL with "https://igovsol.com/graph.html," the contents of the page remained the same.  Dkt. No. 118 at 6:11-17; Dkt. No. 206, UDF No. 35.

115.    After the release ONgDB in July 2018, iGov used a "Download Neo4j Enterprise"

Hopkins & Carley
Attorneys At Law
San Jose • Palo Alto

4878-9639-7699.2

- 14 -

PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

CASE NO. 5:18-CV-07182-EJD

hyperlink on its "downloads" page to redirect consumers to download links for ONgDB until July 27, 2020. Dkt. No. 118 at 6:11-17; Dkt. No. 188, UDF No. 23; Dkt. No. 206, UDF No. 35.

116.   Suhy emailed hyperlinks to potential users of Neo4j® EE to view and download ONgDB from iGov's website from his jmsuhy@purethink.com and jmsuhy@igovsol.com accounts. Dkt. No. 188, UDF No. 20-21.

117.   Suhy emailed hyperlinks to potential users of Neo4j® EE to view and download ONgDB from GFI's website and GitHub repository from his jmsuhy@purethink.com and jmsuhy@igovsol.com accounts. Dkt. No. 188, UDF No. 20-21.

118.   Consumers chose ONgDB over Neo4j® EE based on Defendants' misrepresentations about ONgDB being "free and open" drop-in replacement/equivalent under the AGPL, including Next Century and the Maryland Procurement Office (a/k/a the National Security Agency, the NSA and the MPO), and the IRS.  Dkt. No. 118 at 28:18-24, 29:19-30:6.

119.   By December 2020, just under two years after the release of ONgDB v3.5.1, ONgDB software had been downloaded over 14,000 times, signaling its widespread success. Dkt. No. 118 at 8:13-15; Dkt. No. 206, UDF No. 46.

120.   Defendants misled consumers to believe they were downloading an exact copy of the same version of commercial-only releases of Neo4j® EE, which in actuality they were receiving an inferior ONgDB product that was not a true "drop in" replacement.  Dkt. No. 118 at 8:15-9:1, 28:18-24, 29:19-30:6.

121.   Consumers encountered compatibility issues, technical problems or glitches with ONgDB and sought assistance from Plaintiffs. Dkt. No. 118 at 8:15-23, 28:18-24.

122.   Consumers expressed uncertainty about the propriety of Defendants' modification to the Neo4j Sweden Software License, and whether and when a commercial license from Neo4j USA is necessary to use, modify or redistribute the software in a commercial setting. Dkt. No. 118 at 8:24-9:1.

123.   Defendants' false statements that ONgDB is a drop-in replacement/equivalent to paid-for, commercial licensed Neo4j® EE was material to potential consumers' purchasing decision because Defendants were offering it for free under the AGPL, and unbeknownst to

1  consumers, in violation of the Neo4j Sweden Software License and Neo4j Sweden's copyright.

2  Dkt. No. 118 at 28:26-29:11.

3      124.    In July 2018, Jason Zagalsky, a sales representative from Neo4j USA, met with

4  employees of the IRS, and then provided a quote of $156,000 for one-year subscription and a

5  $397,800 for a 3-year subscription for a Neo4j® EE v3.4 based on then-current requirements of

6  CKGE.  Dkt. No. 188, UDF No. 31.

7      125.    As of August 2018, the IRS understood that Neo4j® CE had a performance

8  limitation to only 4 cores, while Neo4j® EE had enterprise-only features, came with professional

9  services and subscriptions, and was priced based on number of cores. Dkt. No. 188, UDF No. 32

10  (no contrary evidence cited).

11     126.    Under the CKGE Contract, Suhy provided input in the architecture design and

12  hardware requirements needed to run ONgDB installations on multiple servers within the CKGE.

13     127.    In August 2018, Suhy recommended that the IRS integrate ONgDB v3.4 rather than

14  Neo4j® EE v3.4 in the CKGE framework, and also stated "ONgDB open source licenses come

15  directly from the Graph Foundation as well, not from Neo4j Inc."

16     128.    Based on Suhy's recommendation, Mike Dunn at the IRS instructed him to "[g]o

17  ahead and integrate the ONgDB into the CKGE framework we'll deploy" on August 14, 2018.

18     129.    Suhy then uploaded ONgDB v3.4 to the IRS's internal Gitlab repository.

19     130.    Defendants then used the IRS's adoption of ONgDB to encourage other government

20  agencies and contractors to do the same for free, and use the savings pay them for support services.

21  Dkt. No. 188, UDF No. 46.

22     131.    The IRS decided to not allocate $156,000 for a license to use Neo4j® EE in the

23  CKGE platform because ONgDB was a free and open, unrestricted alternative.

24     132.    Under the CKGE contract, Suhy and iGov were responsible for supporting,

25  maintaining and updating ONgDB in an internal Gitlab repository for the RAAS at the IRS.

26     133.    Under the CKGE contract, Suhy and iGov helped the IRS upgrade the CKGE

27  platform to ONgDB v3.5 in April 2019 and integrated subsequent subversions through at least April

28  2022.  Dkt. No. 188, UDF No. 35 (no contrary evidence cited).

134.   After April 2022, the IRS started calling ONgDB v3.5 just "GDB" due to the injunction entered against GFI and its rollback of ONgDB source code.

135.   GDB was merely a name change because it was still based on Neo4j® EE v3.5 source code that was improperly licensed under the AGPL without the Commons Clause, which Suhy continued to be responsible for maintaining on the IRS's internal Gitlab repository.

136.   The IRS used at least one Neo4j® enterprise-only feature, node ID, via ONgDB in CKGE.

137.   The IRS understood that Neo4j® EE can run Cypher queries significantly faster than Neo4j® CE, which is advantageous in terms of productivity.

138.   The initial hardware available to run Neo4j® EE in the IRS's pre-CKGE platform were for one server with at least 16 cores and 1 terabyte of RAM under the September 23, 2016 contract award to PureThink.

139.   As of December 2018, the CKGE (a/k/a "main graph") was running, or was expected to be running, on at least two production servers and one development / test server utilizing ONgDB.  Each machine was comprised of a DL380 with 32 cores and 256GB of RAM at minimum.

140.   As of March 2019, the IRS was running ONgDB on three production servers, and one development server in the CKGE, totaling four instances of ONgDB.

141.   In 2020, the IRS continued to run ONgDB on at least three production servers in the CKGE with four total instances of ONgDB.

142.   In 2021, the IRS continued to run ONgDB on at least three production servers in the CKGE with four total instances of ONgDB.

143.   In 2022, the IRS continued to run ONgDB on at least two production servers in the CKGE with at least three total instances of ONgDB.

144.   Each machine in the CKGE running ONgDB was comprised of a DL380 with 32 cores and 256GB of RAM.

145.   As of November 2022, the IRS would only want the bare-minimum Neo4j® EE package for two nodes, each with 16 cores and 256GB RAM for the CKGE.

146.   On August 14, 2018, Mike Dunn asked Suhy to inform the YK1 team of the switch to ONgDB v3.4.x into the CKGE framework "we'll deploy."

147.   By December 2018, the IRS's YK1 began using one instance of ONgDB.

148.   The minimum server specifications for YK1 at the IRS was a DL380 with 12 cores and 256GB of RAM.

149.   In 2019, one instance of ONgDB was running on its own server in YK1 at the IRS.

150.   In 2020, one instance of ONgDB was in production and running on its own server in YK1 at the IRS.

151.   In 2021, one instance of ONgDB was in production and running on its own server in YK1 at the IRS.

152.   In 2022, two instance of ONgDB in production and two instances of ONgDB in development/test in YK1 at the IRS.

153.   Starting in 2019 and continuing through 2022, the IRS ran a separate instance of ONgDB in development in a project called "Corporate Graph."

154.   The minimum server specifications for Corporate Graph are DL380 with 12 cores and 256GB of RAM.

155.   Starting in 2020 and continuing through 2022, the IRS ran one instance of ONgDB in production in a project called "Excise Graph."

156.   The minimum server specifications for Excise Graph are DL380 with 12 cores and 256GB of RAM.

157.   Starting in summer of 2020 and continuing through September/October 2021, the IRS ran one separate instance of ONgDB in development for its COVID Graph project.

158.   Starting in September/October 2021 and continuing through October 2022, the IRS ran one separate instance of ONgDB in production for its COVID Graph project.

159.   The minimum server specifications for COVID Graph are DL380 with 12 cores and 256GB of RAM.

160.   Starting in 2021 and continuing through 2022, the IRS ran one separate instance of ONgDB in development for a project called "Policy Net."

161.    The minimum server specifications for Policy Net are DL380 with 12 cores and 256GB of RAM.

162.    Starting in 2021 and continuing through 2022, the IRS ran one separate instance of ONgDB in development called "Individual Graph."

163.    The minimum server specifications for Individual Graph are DL380 with 12 cores and 256GB of RAM.

164.    In 2022, the IRS ran one separate instance of ONgDB in development in a project called "CPEO Graph."

165.    The minimum server specifications for CPEO Graph are DL380 with 12 cores and 256GB of RAM.

166.    In 2022, the IRS ran one separate instance of ONgDB in development called "Ghost Preparer."

167.    The minimum server specifications for Ghost Preparer graph are DL380 with 12 cores and 256GB of RAM.

168.    Neo4j USA has sold commercial subscriptions of Neo4j® EE to divisions at the IRS other than RAAS.

169.    Between September 2019 and September 2022, Neo4j licensed products and services to the IRS for a total price of approximately $1,380,000.   These licensed products include a new subscription to Neo4j's Enterprise Bundle in 2019 (as well as renewal subscriptions in 2020, 2021, and 2022) for a project referred to as IRS/AlphaSix Corp – CSIRC via CompSec, and totaling more than $1,206,000.

170.    The initial year subscription identified three machines with 24 cores and 256GB of RAM at a sales price of $262,800.    The applicable list price in September 2019 for this configuration would have amounted to $331,000, suggesting a discount off list of approximately 20.6% was provided to the IRS for this project licensing during the first year.

171.    The project licensing was renewed by the IRS each subsequent year through September 2023 at increasing sales prices and without any referenced increase in number of machines, cores, or otherwise.

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

172.    The IRS uses at least one Neo4j® EE feature, node ID, via ONgDB in CKGE and understands that a commercial subscription for Neo4j® EE also comes with professional services. The IRS "would have to do a work-around" of that enterprise-only feature if it had to revert to Neo4j Community Edition.  However, the IRS agreed that if Neo4j® EE can run Cypher queries significantly faster than Neo4j® CE, it could be advantageous to the IRS in terms of productivity.

173.    Based this, and the fact that Neo4j has sold commercial subscriptions of Neo4j® EE to divisions at the IRS other than RAAS, it is reasonable to conclude that the RAAS at the IRS would have purchased a paid commercial subscription for Neo4j® EE if using ONgDB for free was not an option.

174.    As a result of the IRS using ONgDB in the CKGE instead of Neo4j® EE under a paid commercial license, Neo4j USA lost $1,471,800 in licensing revenue.

175.    As a result of the IRS using ONgDB in YK1 instead of Neo4j® EE under a paid commercial license, Neo4j USA lost $537,200 in licensing revenue.

176.    As a result of the IRS using ONgDB in Corporate Graph instead of Neo4j® EE under a paid commercial license, Neo4j USA lost $217,600 in licensing revenue.

177.    As a result of the IRS using ONgDB in Excise Graph instead of Neo4j® EE under a paid commercial license, Neo4j USA lost $188,700 in licensing revenue.

178.    As a result of the IRS using ONgDB in COVID Graph instead of Neo4j® EE under a paid commercial license, Neo4j USA lost $188,700 in licensing revenue.

179.    As a result of the IRS using ONgDB in Policy Net instead of Neo4j® EE under a paid commercial license, Neo4j USA lost $125,800 in licensing revenue.

180.    As a result of the IRS using ONgDB in Individual Graph instead of Neo4j® EE under a paid commercial license, Neo4j USA lost $125,800 in licensing revenue.

181.    As a result of the IRS using ONgDB in CPEO Graph instead of Neo4j® EE under a paid commercial license, Neo4j USA lost $62,900) in licensing revenue.

182.    As a result of the IRS using ONgDB in Ghost Preparer Graph instead of Neo4j® EE under a paid commercial license, Neo4j USA lost $62,900 in licensing revenue.

183.    Neo4j USA's total loss of revenue in conjunction with the IRS using ONgDB for

1   free instead of paying for commercial licenses for Neo4j® EE is at least $2,981,000.

2       184.   After accounting for saved expenses, the lost profits suffered by Neo4j USA in
3   conjunction with the IRS using ONgDB for free instead of paying for commercial subscriptions for
4   Neo4j® EE is $2,744,572.

5       185.   After the IRS awarded the CKGE Contract to eGov Solutions, it made an initial
6   $300,000 payment to eGov Solutions in July 2018.  At that time, the money received from the IRS
7   on the CKGE Contract was to be paid in its entirety to Mr. Suhy, at his sole discretion.

8       186.   Suhy sold his ownership interest in eGov Solutions to its remaining shareholders on
9   December 31, 2018 pursuant to a Stock Purchase Agreement entered into with the other two
10  shareholders of eGov Solutions.

11      187.   Consistent with Section 5 of the Stock Purchase Agreement, Suhy had the
12  responsibility and authority with respect to the CKGE Contract to "to drive the direction of the
13  project" and "the authority to enter into agreements on behalf of [eGov Sol] relating to this project
14  as long as the agreements are in line with government contracting laws and hubzone regulations."

15      188.   Under Section 5.1 of the Stock Purchase Agreement, Suhy was entitled to $200,000
16  for each option year on the CKGE contract that was exercised by the IRS. Dkt. No. 188, UDF No.
17  29 (Defendants quoting from Section 5.1).

18      189.   eGov Solutions continued to view the CKGE Contract with the IRS as belonging to
19  Suhy to which he had sole control over the performance under the contract and payments received.

20      190.   eGov Solutions maintained a Wells Fargo bank account for all the payments
21  received from the IRS ("the Wells Fargo Account"), which Suhy had access to and was authorized
22  to disburse the payments made by the IRS as he saw fit.  Dkt. No. 188, UDF No. 30.

23      191.   eGov Solutions did not take any commission from payments made by the IRS and
24  according to Mr. Mayur the "moment the money comes, John Mark Suhy takes the money out"
25  using an account under his control.

26      192.   At some point, Suhy asked eGov Sol to make the payments received from the IRS
27  to iGov rather than personally to him as required by the Stock Purchase Agreement.

28      193.   eGov Solutions considered all the payments made by the IRS under the CKGE

1    Contract into the Wells Fargo Account to belong Suhy and later iGov.

2            194.    The IRS paid a total of $1,316,000 to eGov Solutions under the CKGE Contract,

3    which was deposited into the Wells Fargo Account. Dkt. No. 188, UDF No. 28.

4            195.    This total amount was based on the following contractual increases/renewals: (a)

5    $300,000 for 2018 Base Contract Award; (b) $200,000 for 2019 Option Year 1 exercised; (c)

6    $216,000 for 2019 Modification Option Year 1; (d) $200,000 for 2020 Option Year 2 exercised;

7    (e) $200,000 for 2021 Option Year 3 exercised; and $200,000 for 2022 Option Year 4 exercised.

8            196.    The financial statements produced by eGov Solutions and iGov indicate that eGov

9    Solutions paid a total of $1,064,550 to iGov for the work it performed under the CKGE Contract.

10   See Dkt. No. 188, UDF No. 28.

11           197.    The $251,450 discrepancy between the amounts paid by the IRS to eGov Sol and

12   the amounts paid by eGov Sol to iGov and Suhy are partially explained by Suhy paying $111,400

13   to AtomRain via the eGov Solutions Wells Fargo account for work performed by AtomRain at the

14   IRS under the CKGE Contract.

15           198.    The $251,450 discrepancy between the amounts paid by the IRS to eGov Sol and

16   the amounts paid by eGov Sol to iGov and Suhy are also partially explained by a total of $105,835

17   in payments made from the eGov Solutions Wells Fargo account by Suhy to one of his counsel of

18   record in this action, the Irving Starr law firm.

19           199.    The Profit & Loss statements produced by iGov do not reflect any cost of goods sold

20   (i.e., any expenses that would have been incurred in generating the revenues reported by the

21   company). Thus, iGov realized $1,316,000 in total revenue supporting ONgDB distributions at the

22   IRS under the CKGE Contract.

23           200.    The MPO tasked Next Century to analyze available graph database technologies,

24   including Neo4j® EE. Dkt. No. 188, UDF No. 49.

25           201.    Next Century and the MPO required the enterprise-only features, such as causal

26   clustering and multi-data centers, offered by both Neo4j® EE and ONgDB.

27           202.    In June 2018, Next Century sought information from Neo4j USA regarding certain

28   Neo4j® EE features, including causal clustering.  In response, Neo4j USA confirmed required

1   those features required a commercial subscription for Neo4j® EE, and the pricing for it was based

2   on number of servers in the cluster, cores per server, and RAM per server.

3       203.   In October 2018, Next Century obtained additional information about the pricing of

4   Neo4j® EE software bundles offered by Neo4j USA, and that iGov offered the same software for

5   free under the AGPL bundled with iGov's consulting services.

6       204.   In October 2018, Next Century exchanged emails with Suhy regarding

7   representations made on iGov's website that ONgDB v3.4 was an open source version of Neo4j®

8   EE that provided the same enterprise-only features for free.

9       205.   Suhy also told Next Century that the MPO could use ONgDB v3.4 under the AGPL

10   without restrictions or paying Plaintiffs for a commercial license, as advertised on the iGov's

11   website.

12       206.   As a result of Next Century's communications with Suhy, Next Century

13   downloaded ONgDB v3.4 and began evaluating against Neo4j® EE v3.4.

14       207.   In another series of emails with Next Century ending on January 4, 2019, Suhy

15   confirmed that ONgDB v3.5 would have feature parity with the enterprise features of Neo4j® EE

16   v3.5, and would also be available without restrictions on the number of clusters, instances and cores

17   and without paying Neo4j USA for a commercial license.  This led Next Century to upgrade from

18   ONgDB v3.4 to ONgDB v3.5.

19       208.   By February 2019, the MPO had chosen to use ONgDB v3.5 over Neo4j® EE v3.5

20   for continued development work for the MPO.

21       209.   On February 5, 2019, Next Century informed Neo4j USA of this decision, stating,

22   "[w]e have found that open-sourced (non-commercial) builds from the Neo4j source code provide

23   the clustering and security requirements needed in our environment."

24       210.   In March 2019, Next Century gave Neo4j USA the required specifications for its

25   ongoing project with the MPO and ask for Neo4j USA for a quote for use in a production

26   environment.

27       211.   On April 19, 2019, Jason Zagalsky of Neo4j USA sent a 3-year Neo4j Enterprise

28   Edition Enterprise Bundle for $2,266,950 based on those requirements. Dkt. No. 118 at 29:21-23.

This included a commercial license and technical support for (a) 12 Production Machines (up to 12 cores and 256GB of RAM per Machine); and (b) 12 Test Machines (up to 12 cores and 256GB of RAM per Machine). Neo4j USA also provided a 15% multi-year discount.

212.    On April 29, 2019, Next Century confirmed that it shared Neo4j USA's proposal with the MPO, and was instructed by the MPO to continue using ONgDB.   The reason for the MPO continuing to use ONgDB over Neo4j® EE was price.

213.    On July 21, 2019, Next Century informed Neo4j USA that the MPO was not interested in the Neo4j® EE proposal.  Again, the deciding factor between ONgDB and Neo4j® EE was price.

214.    Next Century continued to use ONgDB v3.5, which was placed into a production environment for the NSA in or about October 2020.

215.    Neo4j USA has a past history of entering into licensing arrangements with the MPO, including one transaction in November 2019 wherein the MPO obtained a license for Neo4j® EE v3.5 discovery bundle for another project, which included one production machine with 12 cores and 256GB of RAM (as well as one test machine) at a price of $59,250.

216.    The list price of this discovery bundle in November 2019 was $64,000, indicting a discount of 7% was provided to the MPO.   This license was renewed in November 2020, but utilizing the higher list price in effect at the time of $68,820 while the applicable list price was $74,000 (again resulting in a 7% discount).

217.    It is reasonable to conclude that Next Century and the MPO would have purchased a paid commercial subscription of Neo4j® EE if using ONgDB for free was not an option as the enterprise-only features were required by the MPO.  This is demonstrated by Neo4j's prior sales of commercial subscriptions of Neo4j® EE for other projects at the MPO.

218.    After accounting for saved expenses, the lost profits suffered by Neo4j USA in conjunction with Next Century and the MPO using ONgDB for free instead of paying for a commercial subscription for Neo4j® EE is $2,113,218.  *See* Dkt. No. 118 at 29:19-30:6.

219.    ASR Analytics LLC ("ASR") engaged Suhy via iGov as a subcontractor to provide support, consulting and development services for the CKGE and other implementations of ONgDB

at the IRS between 2019 and 2022.

220.    The subcontracts and task orders provided by ASR to iGov included: (1) Knowledge Graph API (KG-API) for CKGE; (2) Support for Corporate Graph Database; (3) Emerging Compliance Issues; and (4) IDT Innovation.

221.    The consulting work that iGov and Suhy performed under the KG-API subcontract with another subcontractor working with ASR, Tylor Data, which related to ONgDB interfacing with another graph software tool.

222.    KG-API contract expired in September 2021. Immediately thereafter, ASR entered into a similar contract with Tylor Data and ASR, which Suhy continued to work on as a subcontractor.

223.    The work that iGov and Suhy performed under Corporate Graph Database (Subcontractor Task Order Number 0002) involved supporting GraphGrid, a micro services-based application programming interface (API) that includes ONgDB, at the IRS.

224.    The work that iGov and Suhy performed relating to Emerging Compliance Issues involved the analysis of graph data, including graphs generated using ONgDB.

225.    IDT Innovation was a task order issued by ASR to iGov relating to identity theft, which involved the use of a graph database, which was ONgDB.

226.    ASR Analytics paid iGov a total of $246,082.55 for work performed under these subcontracts and task orders at the IRS, which all involved the use and support of ONgDB.

## II.     CONCLUSIONS OF LAW

### A.   Neo4j USA's First Cause of Action for Trademark Infringement, 15 U.S.C. § 1114 and Third Cause of Action for Unfair Competition, 15 U.S.C. § 1125(a), Asserted Against All Defendants

For the reasons set forth below and in the Court's May 18, 2021 order granting partial summary judgment in favor of Neo4j USA on its First Cause of Action for Trademark Infringement, 15 U.S.C. § 1114, and Third Cause of Action for Unfair Competition, 15 U.S.C. § 1125(a), the Court finds Neo4j USA is entitled to entry of judgment in its favor against Defendants:

1.    To prevail on its claim under 15 U.S.C. § 1114, Neo4j USA must prove (1) an

ownership interest in a protectable mark; and (2) that Defendants' use of the mark is likely to cause consumer confusion. *Network Automation, Inc. v. Advanced Sys. Concepts, Inc*., 638 F.3d 1137, 1144 (9th Cir. 2011). "The core element of trademark infringement is the likelihood of confusion, i.e., whether the similarity of the marks is likely to confuse customers about the source of the products." *E. & J. Gallo Winery v. Gallo Cattle Co*., 967 F.2d 1280, 1290 (9th Cir. 1992).

2.      "To establish standing to sue for trademark infringement under the Lanham Act, a plaintiff must show that he or she is either (1) the owner of a federal mark registration, (2) the owner of an unregistered mark, or (3) a nonowner with a cognizable interest in the allegedly infringed trademark." *Halicki Films, LLC v. Sanderson Sales & Mktg.*, 547 F.3d 1213, 1225 (9th Cir. 2008) (citing 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition §§ 27:20–21, 32:3, 32:12 (4th ed. 2008) (noting that standing to sue for trademark infringement under the Lanham Act extends to owners of registered and unregistered marks, and nonowners with a protectable interest in the mark)). Trademark claims under 15 U.S.C. § 1114(1) may be brought by the registrant of the trademark, and the registrant's "legal representatives, predecessors, successors, and assigns." 15 U.S.C. § 1127.  Neo4j USA is the registrant of the Neo4j Mark, and therefore has standing to pursue its trademark claim under the Lanham Act.

3.      Even if Neo4j USA was not the owner of the mark, Neo4j USA would be a "nonowner with a cognizable interest in the allegedly infringing trademark." *See Halicki Films, LLC*, 547 F.3d at 1225.  As the registrant of the Neo4j Mark and parent company of Neo4j Sweden, Neo4j USA undoubtedly has a cognizable interest in the mark. *See Hem & Thread, Inc. v. Wholesalefashionsquare.com*, No. 2:19-CV-283-CBM-AFM, 2019 WL 3017669, at *2 (C.D. Cal. Mar. 27, 2019) (finding standing to bring claim under 15 U.S.C. § 1125 where plaintiff was not the owner or registrant but had "express authority and permission" to use the mark in commerce and therefore had a cognizable interest in the trademark).

4.      "Registration of a mark is prima facie evidence of the validity of the mark, the registrant's ownership of the mark, and the registrant's exclusive right to use the mark in connection with the goods specified in the registration." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014) (citing 15 U.S.C. § 1115(a)); *see also Align Tech., Inc. v. Strauss Diamond*

1   *Instruments, Inc.*, No. 18-CV-06663-TSH, 2019 WL 1586776, at *4 (N.D. Cal. Apr. 12, 2019)

2   (same).

3       5.      The parties do not dispute that Neo4j USA is the registrant of the mark. Dkt. No.

4   118 at 14:3.  Thus, there is no dispute that Neo4j USA benefits from a presumption of ownership

5   and a presumption that the mark is valid. *Pom Wonderful LLC*, 775 F.3d at 1124.

6       6.      Under section 1 of the Lanham Act, only the owner of a mark is entitled to apply for

7   registration. 15 U.S.C. § 1051 ("The owner of a trademark . . . may request registration of its

8   trademark on the principal register hereby established by paying the prescribed fee and filing in the

9   Patent and Trademark Office an application and a verified statement").

10      7.      Neo4j USA wholly owns and controls Neo4j Sweden and did so at the time of the

11  registration. Neo4j USA is also the only party who exercises control over the mark in the United

12  States.  Thus, Neo4j USA was at the time of registration and continues to be the owner of the Neo4j

13  Mark in the United States.  *Neo4j, Inc. v. PureThink, LLC*, No. 5:18-CV-07182-EJD, 2021 WL

14  2483778, at *10 (N.D. Cal. May 18, 2021), *aff'd*, No. 21-16029, 2022 WL 501120 (9th Cir. Feb.

15  18, 2022), *amended on denial of reh'g*, No. 21-16029, 2022 WL 781037 (9th Cir. Mar. 14, 2022).

16      8.      Typically, Plaintiffs would need to establish that Defendants' use of the mark is

17  likely to confuse consumers, under the eight-factor analysis in *Sleekcraft*. *See Fortune Dynamic,*

18  *Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1030 (9th Cir. 2010); *AMF Inc.*

19  *v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979)). When an accused infringer raises a

20  nominative fair use defense, however the fair-use analysis replaces the likelihood-of-consumer

21  confusion analysis set forth in *Sleekcraft*. *See Playboy Enterprises, Inc. v. Welles*, 279 F.3d 796,

22  801 (9th Cir. 2002).

23      9.      A trademark defendant may raise a nominative fair use defense if "the use of the

24  trademark does not attempt to capitalize on consumer confusion or to appropriate the cachet of one

25  product for a different one." *New Kids on the Block v. News Am. Pub., Inc.*, 971 F.2d 302, 308–09

26  (9th Cir. 1992).

27      10.     To establish a nominative fair use defense, a defendant must prove the following

28  three elements: "First, the [plaintiff's] product or service in question must be one not readily

1    identifiable without use of the trademark; second, only so much of the mark or marks may be used

2    as is reasonably necessary to identify the [plaintiff's] product or service; and third, the user must

3    do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the

4    trademark holder." *Id.* (citing *New Kids on the Block*, 971 F.2d at 308). "This test 'evaluates the

5    likelihood of confusion in nominative use cases.'" *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610

6    F.3d 1171, 1176 (9th Cir. 2010) (quoting *Horphag Rsch. Ltd. v. Garcia*, 475 F.3d 1029, 1041 (9th

7    Cir. 2007). Plaintiffs need only negate one of these elements to defeat Defendants' reliance on the

8    nominative fair defense. *See Playboy Enterprises, Inc. v. Netscape Commc'ns Corp.*, 354 F.3d

9    1020, 1030 (9th Cir. 2004) (because defendants use of plaintiff's mark ran afoul of the first prong

10   for nominative use, no need to consider the other two); *see also Horphag Research Ltd. v. Garcia*,

11   475 F.3d 1029, 1041 (9th Cir. 2007) (defendant's use must meet all three fair use prongs).

12          11.     Defendants have not engaged in nominative fair use because they used the Neo4j

13   Mark to refer to Defendants' own products, rather than Plaintiffs' products. *Neo4j, Inc. v.*

14   *PureThink, LLC*, 2021 WL 2483778, at *11.  PureThink and iGov initially marketed a product

15   called "Neo4j Enterprise," and a "Government Package for Neo4j," before rebranding Neo4j

16   Enterprise as ONgDB. While Defendants claim that these products consisted of genuine open

17   source Neo4j® EE software, neither product was in fact a Neo4j USA product. Rather, "Neo4j

18   Enterprise" consisted of the last public Neo4j® EE code (beta version of Neo4j® EE 3.5), the Neo4j

19   CE code, and "glue code" authored by Mr. Suhy and other contributors. Moreover, Defendants

20   assured potential customers both on iGov's website and in direct email communications that "Neo4j

21   Enterprise" was the "same official Neo4j Github Repositories as Neo4j Inc [sic] uses for their paid

22   commercial licensed builds" except distributed under an open source license.

23          12.     Thus, Defendants were not using "Neo4j" to refer to Plaintiffs' products, they were

24   using it to create the misleading perception that Defendants' products *were* Plaintiffs' products.

25   *Neo4j, Inc. v. PureThink, LLC*, 2021 WL 2483778, at *10 (citing *Adobe Sys. Inc. v. A & S Elecs.,*

26   *Inc.*, 153 F. Supp. 3d 1136, 1143 (N.D. Cal. 2015) (not fair use because defendant's use of Adobe's

27   marks was not intended to describe Adobe's product, but rather to make it appear that the software

28   was sanctioned by Adobe for sale and distribution).

13.    Any reasonable consumer reading about "Neo4j Enterprise" would conclude that they are getting official Neo4j® EE, or in the case of the "Government Package for Neo4j," consumers would conclude they are getting Neo4j® EE in a specialized government package. Thus, because Defendants used "Neo4j Enterprise" and "Government Package for Neo4j" to refer to their own products, they do not benefit from a nominative fair use defense as to those uses. *Neo4j, Inc. v. PureThink, LLC*, 2021 WL 2483778, at *11 (citing *Align Technology, Inc.*, 2019 WL 1586776, at *5 ("[i]n nominative fair use, the defendant uses the trademarked term not to describe its product but to describe the plaintiff's [product]")).

14.    The same is true of Defendants' use of the Neo4j Mark in the URL https://igovsol.com/neo4j.html to promote "Neo4j Enterprise," and later to promote ONgDB. Similarly, Defendants used neo4j@igovsol.com as means for consumers to inquire about ONgDB. *Neo4j, Inc. v. PureThink, LLC*, 2021 WL 2483778, at *11. Nothing about the use of the Neo4j Mark in the URL or email can be reasonably interpreted to refer to Plaintiffs' products. Indeed, the URL brings users to a page marketing Defendants' products, and the email address is offered to answer questions about Defendants' products. *Id.* at 12. Thus, Defendants' use of the Neo4j Mark in their URLs or email addresses are not protected by the nominative fair use defense. *Id.* (citing *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1064–65 (9th Cir. 1999) ("[u]sing another trademark in one's metatags is much like posting a sign with another's trademark in front of one's store"); *Experience Hendrix, L.L.C. v. Hendrixlicensing.com, Ltd.*, No. C09-285Z, 2010 WL 2104239, at *6 (W.D. Wash. May 19, 2010) (use of plaintiff's HENDRIX mark in defendants' URL addresses and business names did not describe plaintiffs' products but rather defendants' products); *State St. Glob. Advisors Tr. Co. v. Visbal*, 431 F. Supp. 3d 322, 342 (S.D.N.Y. 2020) (holding that use of a trademark in a URL is not fair use)).

15.    Although Defendants have the right to comparatively advertise their products and refer to Plaintiffs' products in the process, they still cannot use the Neo4j Mark more than necessary and cannot falsely suggest endorsement by Neo4j USA. *Neo4j, Inc. v. PureThink, LLC*, 2021 WL 2483778, at *12 (*citing Toyota Motor Sales, U.S.A., Inc.*, 610 F.3d at 1176).

16.    Defendants' use goes beyond what is necessary to identify ONgDB as a fork of

Neo4j by (1) extensively using of "Neo4j' and "Neo4j Enterprise" on iGov and PureThink websites without proper trademark notices; (2) using embedded "Neo4j" links to Neo4j USA's website and GitHub repository on their websites; (3) hyperlinking to Plaintiffs' build instructions, support documentation and change logs containing the Neo4j Mark rather than creating and hosting their own with the ONgDB name; and (4) using of "Neo4j Enterprise" and "ONgDB" interchangeably to promote ONgDB on their websites. *Neo4j, Inc. v. PureThink, LLC*, 2021 WL 2483778, at *12. The Court finds that these embedded links to Plaintiffs' sites and links to Plaintiffs' documentation, along with the repeated references to "Neo4j," including in the title of the products themselves, create the misleading perception that Defendants and Plaintiffs are affiliated. *Id.* Thus, Defendants' use of the Neo4j Mark falsely suggests endorsement by Neo4j USA, and therefore, is not nominative fair use. *Id.*

17.     In light of the foregoing, the Court finds that Plaintiffs have thus satisfied their burden of proving each essential element of their trademark infringement claim against Defendants. *Neo4j, Inc. v. PureThink, LLC*, 2021 WL 2483778, at *12-13.

**B.   Neo4j USA's Second Cause of Action for False Designation of Origin and False Advertising, 15 U.S.C. § 1125(a), against Defendants**

For the reasons set forth below and in the Court's May 18, 2021 order granting partial summary judgment in favor of Neo4j USA on its Neo4j USA's Second Cause of Action for False Designation of Origin and False Advertising, 15 U.S.C. § 1125(a), against all Defendants (Dkt. No. 90 at ¶¶ 112-119), and Neo4j USA's Fourth Cause of Action for Unfair Competition, Cal. Bus. Prof. Code §§ 17200 et seq., against Defendants (Dkt. No. 90 at ¶¶ 127-133), the Court finds Neo4j USA is entitled to entry of judgment in its favor against Defendants:

**False Advertising Under the Lanham Act and UCL**

1.     The elements of a Lanham Act false advertising claim are: "(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or

1    is likely to be injured as a result of the false statement, either by direct diversion of sales from itself

2    to defendant or by a lessening of the goodwill associated with its products." *Align Technology,*

3    *Inc*., 2019 WL 1586776, at *13 (*citing Southland Sod Farms v. Stover Seed Co*., 108 F.3d 1134,

4    1139 (9th Cir. 1997)).

5            2.      Defendants do not dispute that statements made via their websites, email, and social

6    media qualify as commercial advertisements under element one.  *Neo4j, Inc. v. PureThink, LLC*,

7    2021 WL 2483778, at *13.  Likewise, they do not dispute that statements made through these

8    channels were placed into interstate commerce, as required under element four. *Id. (citing*

9    *Healthport Corp. v. Tanita Corp. of Am*., 563 F. Supp. 2d 1169, 1178 (D. Or. 2008), aff'd, 324 F.

10   App'x 921 (Fed. Cir. 2009) (holding that statements made on website were advertisements placed

11   into interstate commerce); *SuccessFactors, Inc. v. Softscape, Inc.*, 544 F. Supp. 2d 975, 982 (N.D.

12   Cal. 2008) (likelihood of success on interstate commerce element met where defendant had

13   disseminated the misleading statement via email and on its website)).

14          3.      Proof establishing these Lanham Act claims will also establish Neo4j USA's UCL

15   claim. "State common law claims of unfair competition and actions pursuant to California Business

16   and Professions Code § 17200 are 'substantially congruent' to claims made under the Lanham Act."

17   Cleary v. News Corp., 30 F.3d 1255, 1262–63 (9th Cir. 1994); *Acad. of Acad. of Motion Picture*

18   *Arts & Scis. v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1457 (9th Cir. 1991) (same).

19          4.      "To demonstrate falsity within the meaning of the Lanham Act, a plaintiff may show

20   that the statement was literally false, either on its face or by necessary implication, or that the

21   statement was literally true but likely to mislead or confuse consumers." *Southland Sod Farms*, 108

22   F.3d at 1139.

23          5.      Defendants have made numerous misrepresentations in their advertisement and

24   promotion of ONgDB.  *Neo4j, Inc. v. PureThink, LLC*, 2021 WL 2483778, at *13.  These

25   statements generally fall into two groups: (1) statements that ONgDB and Neo4j Enterprise are

26   "free and open source" versions of or alternatives to commercially licensed Neo4j® EE; and (2)

27   statements that ONgDB is a "drop-in replacement for an existing commercial licensed distribution

28   of the same version number" of Neo4j® EE. *Id.*

6.      The first group of statements that ONgDB is "free and open source" are false because the Neo4j Sweden Software License did not permit Defendants to remove the commercial restrictions imposed by the Commons Clause. *Neo4j, Inc. v. PureThink, LLC*, 2021 WL 2483778, at *14.

7.      Defendants argue that there is a reasonable interpretation of Section 7 and 10 of the Neo4j Sweden Software License that permits licensees, like Defendants and GFI, to remove the Commons Clause and redistribute the software under the standardized AGPL license. The Court disagrees. *Neo4j, Inc. v. PureThink, LLC*, 2021 WL 2483778, at *14.  Neither of the two provisions in the form AGPLv3 that Defendants rely upon grant licensees the right to remove the information at issue. *Id.* (*citing Neo4j, Inc. v. Graph Found., Inc.,* No. 5:19-CV-06226-EJD, 2020 WL 6700480, at *4 (N.D. Cal. Nov. 13, 2020).

8.      Section 10 of the AGPLv3, which is incorporated into the Neo4j Sweden Software License, states: "You may not impose any further restrictions on the exercise of rights granted or affirmed under this License."  *Neo4j, Inc. v. PureThink, LLC*, 2021 WL 2483778, at *14.  (*citing Neo4j, Inc. v. Graph Found., Inc.*, 2020 WL 6700480, at *4).

9.      Section 7 states: "[i]f the Program as you received it, or any part of it, contains a notice stating that it is governed by this License along with a term that is a further restriction, you may remove that term."  *Neo4j, Inc. v. PureThink, LLC*, 2021 WL 2483778, at *14.  (*citing Neo4j, Inc. v. Graph Found., Inc.*, 2020 WL 6700480, at *4).

10.      Section 0 of the AGPLv3 defines "you" as the licensee, not the licensor. *Neo4j, Inc. v. PureThink, LLC*, 2021 WL 2483778, at *14.  (*citing Neo4j, Inc. v. Graph Found., Inc.*, 2020 WL 6700480, at *4).

11.      Thus, read correctly, Sections 7 and 10 prohibit a licensee from imposing further restrictions, but do not prohibit a licensor from doing so.  *Neo4j, Inc. v. PureThink, LLC*, 2021 WL 2483778, at *14; *aff'd*, No. 21-16029, 2022 WL 501120 (9th Cir. Feb. 18, 2022), *amended on denial of reh'g*, No. 21-16029, 2022 WL 781037 (9th Cir. Mar. 14, 2022) ("The representation that ONgDB is a "free and open-source" version of Neo4j® EE was literally false, because Section 7 of the Sweden Software License only permits a downstream licensee to remove "further

1    restrictions" added by an upstream licensee to the original work.").

2          12.    It would be contrary to principles of contract and copyright law to interpret these

3    provisions as limiting Neo4j Sweden's exclusive right to license its copyrighted software under

4    terms of its choosing. *See Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1159 (9th Cir. 2011)

5    ("copyright owners may choose to simply exclude others from their work" or "use their limited

6    monopoly to leverage the right to use their work on the acceptance of specific conditions").

7          13.    Even "[c]opyright holders who engage in open source licensing have the right to

8    control the modification and distribution of copyrighted material." *Jacobsen v. Katzer*, 535 F.3d

9    1373, 1381 (Fed. Cir. 2008). The Court, therefore, rejects the notion that the terms drawn from the

10   AGPLv3, on which the Neo4j Sweden Software License is based, somehow limit the rights of

11   Neo4j Sweden to include the Commons Clause or any other additional restriction in its own

12   copyright license.  *Neo4j, Inc. v. PureThink, LLC*, 2021 WL 2483778, at *14.  (*citing Neo4j, Inc.*

13   *v. Graph Found., Inc.*, 2020 WL 6700480, at *4).

14         14.    Consequently, the Court finds that Plaintiffs have established that Defendants'

15   statements regarding ONgDB as "free and open source" versions of Neo4j® EE are false and

16   misleading.  *Neo4j, Inc. v. PureThink, LLC*, 2021 WL 2483778, at *14 (N.D. Cal. May 18, 2021),

17   *aff'd*, No. 21-16029, 2022 WL 501120 (9th Cir. Feb. 18, 2022), *amended on denial of reh'g*, No.

18   21-16029, 2022 WL 781037 (9th Cir. Mar. 14, 2022) (affirming that "[t]he representation that

19   ONgDB is a 'free and open-source' version of Neo4j® EE was literally false, because Section 7 of

20   the Sweden Software License only permits a downstream licensee to remove "further restrictions"

21   added by an upstream licensee to the original work').

22         15.    Defendants also falsely advertised via their websites and through direct

23   communications with potential users that ONgDB was licensed under AGPL as a "drop-in

24   replacement" for Neo4j Enterprise commercial licensed distributions with the same version

25   number.  *Neo4j, Inc. v. PureThink, LLC*, 2021 WL 2483778, at *15, *aff'd*, No. 21-16029, 2022 WL

26   501120 (9th Cir. Feb. 18, 2022), *amended on denial of reh'g*, No. 21-16029, 2022 WL 781037 (9th

27   Cir. Mar. 14, 2022) (affirming that "advertisements of ONgDB as a "drop-in replacement" for

28   Neo4j® EE were also false. And, even if the "drop-in replacement" representations were not

1    literally false, substantial evidence showed that consumers were confused by Defendants' use of

2    the term.").

3         16.    In particular, because Neo4j® EE v3.5 and later versions were all closed source,

4    Defendants' representations that the equivalent versions of ONgDB were "drop-in replacements"

5    could not be verified and were therefore false or misleading. *Neo4j, Inc. v. PureThink, LLC*, 2021

6    WL 2483778, at *15.

7         17.    With respect to Defendants' "drop-in replacement" statements about earlier

8    versions, Plaintiffs argue that Defendants' interpretation of what "drop-in replacement" implies is

9    irrelevant. For the purpose of this false advertising claim, Plaintiffs can prove either that the

10   statement was "literally false" or that the statement was "likely to mislead or confuse consumers."

11   *See Southland Sod Farms*, 108 F.3d at 1139. Although the phrase "drop-in replacement" on its own

12   may not necessarily indicate that the software systems were identical, in context, that is precisely

13   what Defendants' statements implied.  *Neo4j, Inc. v. PureThink, LLC*, 2021 WL 2483778, at *15.

14        18.    The Court finds that the use of "drop-in replacement" clearly implies that ONgDB

15   "has all the enterprise features" and is essentially the same software as Neo4j® EE.  *Neo4j, Inc. v.*

16   *PureThink, LLC*, 2021 WL 2483778, at *16.  No reasonable consumer would understand these

17   statements to indicate mere compatibility with Neo4j® EE. *Id.* Thus, the Court concludes that the

18   "drop-in replacement" claims are false or likely to mislead consumers for the purposes of Plaintiffs'

19   false advertising claim.  *Id.*

20        19.    For the same reasons that Defendants' statements regarding ONgDB as "free and

21   open source" and as a "drop-in replacement" for Neo4j are likely to mislead consumers, they also

22   have a tendency to deceive.  *Neo4j, Inc. v. PureThink, LLC*, 2021 WL 2483778, at *16.  Moreover,

23   Plaintiffs offer evidence that consumers who chose ONgDB and encountered technical issues

24   reached out to Neo4j USA for help, indicating that those consumers thought they were operating

25   genuine Neo4j® EE. *Id.* Thus, the Court finds sufficient evidence that Defendants' misstatements

26   caused actual deception or had a tendency to deceive.  *Id.*

27        20.    "A finding of consumer deception does not amount to a Lanham Act violation unless

28   the deception 'is material, in that it is likely to influence the purchasing decision.' " *R & A Synergy*

1   *LLC v. Spanx, Inc.*, No. 2:17-CV-09147-SVW-AS, 2019 WL 4390564, at *12 (C.D. Cal. May 1,

2   2019) (quoting *Southland Sod Farms*, 108 F.3d at 1139).

3          21.    It is undisputed that Defendants made the statements at issue to convince customers

4   to adopt ONgDB over Neo4j® EE. *Neo4j, Inc. v. PureThink, LLC*, 2021 WL 2483778, at *16.

5   Because Defendants misrepresented ONgDB as a free version of Neo4j® EE licensed under the

6   AGPL, there is no doubt that this price differential (free versus paid) was likely to influence

7   customers purchasing decisions. *See Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1106–1107 (9th Cir.

8   2013), *as amended on denial of reh'g and reh'g en banc* (July 8, 2013) (recognizing under the UCL

9   that price is material to purchasing decisions). Thus, the Court finds that Defendants' statements

10  suggesting that customers could obtain a "free and open source drop in replacement" for Neo4j®

11  EE were material.  *Neo4j, Inc. v. PureThink, LLC*, 2021 WL 2483778, at *16.

12         22.    "Under the Lanham Act, the plaintiff must "plead (and ultimately prove) an injury

13  to a commercial interest in sales or business reputation proximately caused by the defendant's

14  misrepresentations." *Clorox Co. v. Reckitt Benckiser Grp. PLC*, 398 F. Supp. 3d 623, 644 (N.D.

15  Cal. 2019). "Lost sales for the plaintiff because of the defendant's false advertising is the

16  'paradigmatic direct injury from false advertising.' " *Id.* (*quoting Lexmark Int'l, Inc. v. Static

17  Control Components, Inc.*, 572 U.S. 118 (2014)).

18         23.    The Court finds that Defendants' false statements diverted sales from Neo4j USA.

19  Neo4j USA lost multi-year deals when Next Century via the Maryland Procurement Office and the

20  IRS adopted ONgDB.  *Neo4j, Inc. v. PureThink, LLC*, 2021 WL 2483778, at *16.

21         24.    Defendants claim that Plaintiffs have failed to establish that customers like Next

22  Century would have purchased a Neo4j subscription but for Defendants' offering ONgDB as a "free

23  and open source drop-in replacement." The Court does not find this argument persuasive.

24  Commercial injury is generally presumed "in false comparative advertising cases, where it's

25  reasonable to presume that every dollar defendant makes has come directly out of plaintiff's

26  pocket." *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 831 (9th Cir. 2011); *see also*

27  *Lexmark Intern., Inc.*, 134 S. Ct. at 1393 ("diversion of sales to a direct competitor may be the

28  paradigmatic direct injury from false advertising"). Defendants provide no evidence to dispute

1  Plaintiffs' evidence that customers chose ONgDB based on Defendants misrepresentations at the

2  commercial detriment to Plaintiffs. *Neo4j, Inc. v. PureThink, LLC*, 2021 WL 2483778, at *16.

3      25.     The Court finds that Neo4j USA has established each element of its claims for false

4  advertising under the Lanham Act. *Neo4j, Inc. v. PureThink, LLC*, 2021 WL 2483778, at *17.

5      26.     Neo4j USA is entitled to entry of judgment against Defendants on its Second Cause

6  of Action for false advertising under 15 U.S.C. § 1125(a).  Because the Court finds that judgment

7  is appropriate as to the Lanham Act claims, the Court also enters judgment in favor of Neo4j USA

8  as to its related UCL claim. *See Cleary*, 30 F.3d at 1262–63.  Because the Court enters judgment

9  in favor of Neo4j USA as to the Lanham Act claims, the Court also enters judgment in favor of

10 Neo4j on its related Fourth Cause of Action for Unfair Competition, Cal. Bus. Prof. Code §§ 17200

11 et seq. *See Cleary*, 30 F.3d at 1262–63.

12                              **False Designation of Origin**

13     27.     Similar to the a false advertising claim, a false designation of origin claim under

14 Section 1125(a)(1)(A) requires that Plaintiffs show: (1) the defendants used a false designation of

15 origin; (2) the use occurred in interstate commerce; (3) that such false designation is likely to cause

16 confusion, mistake or deception as to the origin, sponsorship, or approval of defendants' goods or

17 services by another person; and (4) that plaintiff has been or is likely to be damaged. *Hokto Kinoko

18 Co. v. Concord Farms, Inc*., 810 F. Supp. 2d 1013, 1039 (C.D. Cal. 2011), *aff'd*, 738 F.3d 1085

19 (9th Cir. 2013) (citing 15 U.S.C. § 1125(a)).

20     28.     Defendants' holding out of ONgDB as free and open source Neo4j® EE constitutes

21 a false designation of origin under the first element. *Neo4j, Inc. v. PureThink, LLC*, 2021 WL

22 2483778, at *17.  As discussed above, Defendants' claim that ONgDB is free and open source

23 Neo4j is false because it relies on an interpretation of the Neo4j Sweden Software License that this

24 Court has rejected. *See id.*

25     29.     There is no dispute that Defendants used the Neo4j Mark to falsely imply origin in

26 interstate commerce (element 2). Plaintiffs have also established that they have been or are likely

27 to be damaged (element 4).  *Neo4j, Inc. v. PureThink, LLC*, 2021 WL 2483778, at *17.

28     30.     As to the likelihood of confusion, "[t]he Ninth Circuit has held that the *Sleekcraft*

1  test is appropriate to determine likelihood of confusion regarding a claim for false designation of

2  origin. *Cisco Sys., Inc. v. Shenzhen Usource Tech. Co.*, No. 5:20-CV-04773-EJD, 2020 WL

3  5199434, at *7 (N.D. Cal. Aug. 17, 2020) (citing *Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d

4  1531, 1536 (9th Cir. 1989)).

5       31.    The *Sleekcraft* factors include: "(1) [T]he similarity of the marks; (2) the strength of

6  the plaintiff's mark; (3) the proximity or relatedness of the goods or services; (4) the defendant's

7  intent in selecting the mark; (5) evidence of actual confusion; (6) the marketing channels used; (7)

8  the likelihood of expansion into other markets; and (8) the degree of care likely to be exercised by

9  purchasers of the defendant's product. *Align Technology, Inc.*, 2019 WL 1586776, at *8 (citing

10  *Fortune Dynamic, Inc.*, 618 F.3d at 1030).

11       32.    For reasons similar to why the Court rejected Defendants' nominative fair use

12  defense, the Court also finds that the *Sleekcraft* factors weigh in favor of finding a likelihood of

13  confusion to establish the third element of Plaintiffs' false designation of origin claim. *Neo4j, Inc.*

14  *v. PureThink, LLC*, 2021 WL 2483778, at *18.

15       33.    Specifically, it is undisputed that the Defendants used the Neo4j Mark (factor 1),

16  which Plaintiffs' have used in commerce since 2007 and which enjoys strong brand recognition in

17  the graph database software market (factor 2). *Neo4j, Inc. v. PureThink, LLC*, 2021 WL 2483778,

18  at *18.  There is also no dispute as to the relatedness of the products, given that Defendants hold

19  out ONgDB as a free and open source drop-in replacement for Neo4j® EE (factor 3). *Id.* Although

20  Defendants may assert that their intent was to describe their own products, the evidence also makes

21  clear that Defendants intended to convince consumers to buy Defendants' products instead of

22  Neo4j® EE commercial licenses; in other words, Defendants used the Neo4j Mark to unfairly

23  compete with Plaintiffs (factor 4). *Id.* As noted above, Plaintiffs have introduced evidence of actual

24  customer confusion (factor 5). *Id.* The evidence also shows that both Plaintiffs and Defendants were

25  attempting to gain the business of various government entities, and even bid for the same contracts.

26  *Id.* This particularly weighs in Plaintiffs' favor because, as Defendants recognize, government

27  entities prefer cost-effective and open source products where possible (factor 6-8).  *Id.*

28       34.    Accordingly, the Court finds that Plaintiffs have established each element of their

1    false designation of origin claim. The Court, therefore, enters judgment in favor of Neo4j USA on

2    its false designation of origin claim asserted pursuant to 15 U.S.C § 1125(a).

3    **C.**   **Plaintiffs' Eighth Cause of Action for Unauthorized Distribution of Altered**

4    **Copyright Management Information, 17 U.S.C. § 1202(b), against All Defendants**

5        1.      For the reasons set forth below, the Court finds Plaintiffs are entitled to entry of

6    judgment on their Eighth Cause of Action for Unauthorized Distribution of Altered Copyright

7    Management Information, 17 U.S.C. § 1202(b) against Defendants.  *See* Dkt. No. 90, ¶¶ 166-173.

8        2.      A defendant is liable under the DMCA for knowingly removing copyright

9    management information ("CMI"), or for distributing works with the knowledge that CMI was

10   removed, even if the defendant itself did not remove the CMI. 17 U.S.C. § 1202(b)(1), (3).

11       3.      To prevail on a claim for the removal or alteration of CMI, a plaintiff must establish

12   that a defendant: (1) without the authority of the copyright owner or the law; (2); intentionally

13   removed or altered CMI; and (3) knowing or having reasonable grounds to know that the removal

14   will induce, enable, facilitate, or conceal copyright infringement. 17 U.S.C. § 1202(b)(1).

15       4.      To prevail on a claim for the distribution of CMI or material from which CMI has

16   been removed, require a showing that (1) the defendant distributing that material knew that CMI

17   "has been removed or altered without authority of the copyright owner or the law;" and (2) the

18   defendant knew or had reason to know that distributing works without CMI would "induce, enable,

19   facilitate or conceal an infringement." 17 U.S.C. § 1202(b)(3); *see also Mango v. BuzzFeed, Inc*.,

20   970 F.3d 167, 171 (2nd Cir. 2020).

21       5.      Both §1202(b)(1) and §1202(b)(3) require that the original copyrighted work

22   contained CMI, which includes, *inter alia*, the title or identifying information of the work, author

23   or copyright owner, the terms and identifying numbers or symbols referring to such information.

24   17 U.S.C. § 1202(c) (1)-(3), (7).  CMI also includes the "[t]erms and conditions for use of the

25   work."  17 U.S.C. § 1202(c)(6).

26       6.      Neo4j Sweden owns the copyrights for Neo4j® EE v3.4 and v3.5 and licensed them

27   subject to the Neo4j Sweden Software License.  This license constitutes Neo4j Sweden's CMI

28   because the NOTICE provision at the top clearly states that Neo4j® EE is developed and owned

by Neo4j Sweden… and is subject to the terms of the [AGPL], **with the Commons Clause as follows**….” It also contains the terms and conditions for the use of that software, including instructions on where to obtain a commercial license in the NOTICE provision and the commercial restrictions imposed by the “‘Commons Clause’ License Condition” at the bottom.

7. To establish a violation of Section 1202(b)(1), Plaintiffs must show Defendants intentionally removed Neo4j Sweden’s CMI without Neo4j Sweden’s authorization. *See* 17 U.S.C. § 1202(b)(1).

8. To prove a violation of Section 1202(b)(3), Plaintiffs must show that Defendants had actual knowledge that CMI “has been removed or altered” without Neo4j Sweden’s authorization. *See* 17 U.S.C. § 1202(b)(3); *see also Harrington v. Pinterest, Inc*., No. 5:20-CV-05290-EJD, 2022 WL 4348460, at *3 (N.D. Cal. Sept. 19, 2022).

9. The evidence establishes that Suhy intentionally removed Neo4j Sweden’s CMI in Neo4j® EE v3.4 by replacing the Neo4j Sweden Software License with a verbatim copy of AGPL in the LICENSE.txt files governing ONgDB v3.4.

10. The evidence establishes that Suhy intentionally removed Neo4j Sweden’s CMI in Neo4j® EE v3.5 when he replaced the Neo4j Sweden Software License with the AGPL in 28 LICENSE.txt files governing 182 source code files that had only been released under the Neo4j Sweden Software License.

11. Suhy intentionally removed Neo4j Sweden’s CMI in both instances without first obtaining Neo4j Sweden’s authorization as the copyright owner and license.

12. Defendants suggest they did not violate the DMCA because separate NOTICE.txt files in ONgDB still identified Neo4j Sweden as the copyright holder and referenced the Commons Clause. This does not insulate them from liability because §1202(b) prohibits **any removal _or alteration_** of the title of the work, terms and conditions for use of the copyrighted work and other conspicuous displays identifying the owner of these copyrighted works. *See ICONICS, Inc. v. Massaro*, 192 F. Supp. 3d 254 (D. Mass. 2016) (copyright headers of individual source code files constituted CMI because they conveyed information about copyright owner, and certain terms of use for the file, and were conveyed along with source code files precisely to keep identifying

1   information together with the code); *Neo4j, Inc. v. Graph Found., Inc*., 2020 WL 6700480, at *5

2   ("moving the CMI into separate NOTICE.txt files constitutes altering the CMI, and conveying the

3   Neo4j Sweden Software License without the Commons Clause constitutes removing CMI").

4        13.     Defendants also insist that they were justified in removing the Commons Clause

5   because the FSF owns the copyright to the AGPL.  However, this Court previously ***rejected*** "'the

6   notion that the terms drawn from the AGPLv3, on which the Neo4j Sweden Software License is

7   based, somehow limit the rights of Neo4j Sweden to include the Commons Clause or any other

8   additional restriction in its own copyright license.'"  Dkt. No. 118 at 24:16-25:12, *quoting Neo4j,*

9   *Inc*., 2020 WL 6700480, at *4 ("Defendants argue that Plaintiffs were not permitted to alter the

10  form license agreement under the terms of the [FSF's] copyright over the form AGPLv3. But

11  whether Plaintiffs acted in accordance with the copyright covering the AGPLv3 is not at issue

12  before this Court, as Defendants are not entitled to enforce the FSF's copyright.").

13       14.     Defendants are therefore not absolved from liability under §1202(b) because Suhy

14  thought he was preventing the infringement of the FSF's copyright or was seeking to avoid being

15  a contributor infringer of that copyright.

16       15.     PureThink and iGov are liable for Suhy's removal of the CMI, and had actual

17  knowledge of the removal thereof because Suhy was the sole officer, director and employee of

18  those entities when he engaged in that misconduct.  Suhy's removal of Neo4j Sweden's CMI was

19  for the pecuniary benefit of all Defendants as evidenced by their extensive promotion of ONgDB

20  as a "free and open" version of Neo4j® EE and offering paid support services that would have

21  otherwise been prohibited by the Commons Clause.

22       16.     Consequently, Suhy's intentional removal of Neo4j Sweden's CMI and his

23  knowledge thereof is imputed on his entities and vice-versa for purposes of §1202(b)(1) and

24  §1202(b)(3).  *See Carson v. Verismart Software*, 2012 WL 1038713, at *4 (N.D. Cal. Mar. 27,

25  2012) ("corporate officers, shareholders, and employees may be held personally liable for the

26  corporation's copyright infringements when they are a 'moving, active conscious force behind the

27  corporation's infringement'") (internal citation omitted); *The Comm. for Idaho's High Desert, Inc.*

28  *v. Yost*, 92 F.3d 814, 823 (9th Cir. 1996) ("a corporate officer or director is… personally liable for

1   all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as

2   an agent of the corporation and not on his own behalf") (internal citation omitted).

3          17.     Defendants distributed and caused Neo4j Sweden's copyrighted source code

4   without the Neo4j Sweden Software License to be distributed in violation of §1202(b) by making

5   ONgDB available via GFI's GitHub repository.

6          18.     Defendants distributed and caused Neo4j Sweden's copyrighted source code

7   without the Neo4j Sweden Software License to be distributed in violation of §1202(b) by providing

8   hyperlinks to potential users of Neo4j® EE to download ONgDB via email and through iGov's

9   websites.

10         19.     Defendants distributed and caused Neo4j Sweden's copyrighted source code

11  without the Neo4j Sweden Software License to be distributed in violation of §1202(b) by providing

12  hyperlinks to potential users of Neo4j® EE to download ONgDB via GFI's website and GFI's

13  GitHub repository.

14         20.     Defendants distributed and caused Neo4j Sweden's copyrighted source code

15  without the Neo4j Sweden Software License to be distributed in violation of §1202(b) by

16  facilitating the IRS' adoption of ONgDB, as well as continuing to upload, maintain and distribute

17  infringing ONgDB and rebranded "GDB" at the IRS.

18         21.     Suhy and iGov's Graphstack website also contained download hyperlinks to GFI's

19  website for this improperly compiled and licensed software.  They continued make several versions

20  of ONgDB available on this website even after GFI entered into a stipulated injunction on February

21  16, 2021, which prohibited the further distribution of those same versions.

22         22.     To establish knowing or having reasonable grounds to know that conduct will

23  "induce, enable, facilitate or conceal" infringement under §1202(b), Plaintiffs "need not show that

24  any specific infringement has already occurred." *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 674 (9th

25  Cir. 2018).   Rather, they can "provide evidence from which one can infer that future infringement

26  is likely, albeit not certain, to occur as a result of the removal or alteration of CMI." *Id.*   Such

27  evidence may include "a past 'pattern of conduct' or 'modus operandi' that the defendant was

28  aware or had reasonable grounds to be aware of the probable future impact of its actions."

1    23.    Defendants engaged in a pattern of conduct where they had reasonable grounds to

2    know that the removal of Neo4j Sweden's CMI from Neo4j® EE would result in infringement of

3    its copyright.   Suhy did so under the false premise that Sections 7 and 10 of the Neo4j Sweden

4    Software License permitted licensees to remove "further restrictions," *i.e.* the Commons Clause,

5    imposed by Neo4j Sweden as the copyright holder and original licensor.  *Neo4j, Inc. v. PureThink,*

6    *LLC*, 2021 WL 2483778, at *14.  This contradicted what Sections 7 and 10 of that license actually

7    states—that only a downstream licensee may remove unauthorized restrictions when placed by an

8    upstream licensee who redistributes the copyrightable program, not those placed by the copyright

9    owner offering the terms to the licensees.  *Id*.

10    24.    The fact that Defendants "misinterpreted" the provisions of the Neo4j Sweden

11    Software License does not negate the knowledge element under §1202(b).  *Neo4j, Inc. v. Graph*

12    *Found., Inc*., 2020 WL 6700480, at *4 (rejecting the argument that it is not possible for a

13    "contractually permitted action" to have been "taken with knowledge that it would aid

14    infringement" under the DMCA).

15    25.    Defendants argue that the law of the case doctrine does not bar them from re-

16    litigating whether the "further restrictions" provision in Sections 7 and 10 of the Neo4j Sweden

17    License permitted them to remove the Commons Clause.  Since Defendants filed an interlocutory

18    appeal, the resulting affirmation of that ruling is now incontestable as the law of the case.  *See*

19    *Herrington v. County of Sonoma*, 12 F.3d 901, 904 (9th Cir. 1993) ("[t]he law of the case doctrine

20    states that the decision of an appellate court on a legal issue must be followed in all subsequent

21    proceedings in the same case") (internal quotations omitted); *Aquino v. Cnty. of Monterey Sheriff's*

22    *Dep't*, No. 5:14-CV-03387-EJD, 2018 WL 3845718, at *1 (N.D. Cal. Aug. 12, 2018) (citing same

23    in recognizing that Ninth Circuit's decision on an interlocutory appeal of the summary judgment

24    order "was now law of the case").

25    26.    Defendants actually knew or had reason to know that they could not replace the

26    Neo4j Sweden Software License with the AGPL without Neo4j Sweden's authorization.  Suhy

27    knew that Neo4j Sweden owned the copyright for Neo4j® EE, that Neo4j Sweden controlled the

28    licensing thereof.  Defendants also failed to seek competent legal advice, and relied on Suhy's own

1    unqualified analysis of the provisions of the AGPL and "internet research" that was admittedly

2    inconclusive.  *Id*.  Defendants thus chose to remain willfully and recklessly blind of Neo4j

3    Sweden's rights as the copyright holder and licensor when Suhy removed ***all*** of Neo4j Sweden's

4    CMI by replacing the Neo4j Sweden Software License with a verbatim copy of the AGPL.

5         27.    Defendants actually knew or had reason to know their removal of the Commons

6    Clause would result in end-users infringing Neo4j Sweden's right to limit the use of Neo4j® EE to

7    paid subscribers.  *See Jacobsen*, 535 F.3d at 1381; *accord MDY Indus., LLC v. Blizzard Ent., Inc*.,

8    629 F.3d 928, 939 (9th Cir. 2010).

9         28.    Suhy understood that Neo4j Sweden owned the copyright for Neo4j® EE and that

10   Neo4j Sweden controlled the licensing thereof.  He also understood that the Common Clause

11   imposed commercial restrictions on the use and commercial support of Neo4j® EE.  Nevertheless,

12   he copied source code from Neo4j® EE licensed under the Neo4j Sweden Software License and

13   stripped out the CMI for that source code, including the commercial restrictions imposed by the

14   Commons Clause.

15        29.    Defendants then distributed that source code as ONgDB without Neo4j Sweden's

16   CMI with the specific intent of providing an open-source, restriction-free version of the software

17   in violation of the Neo4j Sweden Software License.  Defendants intentionally did so to profit off

18   providing paid support services – in direct contradiction to the commercial restrictions in the

19   missing Commons Clause – based off the savings users would gain by not paying Plaintiffs for a

20   commercial license for Neo4j® EE.  Consequently, Defendants knew future infringement of Neo4j

21   Sweden's copyrights in Neo4j® EE was likely occur because of their removal and alteration of

22   Neo4j Sweden's CMI. *See Stevens*, 899 F.3d at 674.

23        30.    While Plaintiffs are not required to show Defendants' removal of Neo4j Sweden's

24   CMI resulted in actual copyright infringement in order to prevail, there is clear evidence of this

25   occurring.  For example, Suhy's concealment of the infringing nature of ONgDB and misleading

26   the IRS to believe that GFI licensed the software rather than Neo4j Sweden exemplifies their actual

27   knowledge that the removal of Neo4j Sweden's CMI would result in copyright infringement.  This

28   deception caused the IRS to adopt ONgDB over Neo4j® EE in August 2018 and  to pay Suhy and

1    iGov over $1.3 million via the CKGE Contract to support that software in violation of the Neo4j

2    Sweden License that they had replaced with the AGPL.

3         31.    Defendants then leveraged the IRS's adoption of ONgDB to encourage other

4    government agencies and contractors to do the same.   This included facilitating infringement at

5    the MPO after it had tasked Next Century to analyze available graph database technologies,

6    including Neo4j® EE.

7         32.    After the release of ONgDB v3.4, Next Century reconfirmed with Suhy the MPO

8    could use ONgDB under the AGPL without restrictions or paying Plaintiffs for a commercial

9    license as advertised on the iGov's website.

10        33.    After the release of ONgDB v3.5, Next Century again asked Suhy whether it had

11   the same closed enterprise features as Neo4j® EE v3.5, and could use it without restrictions or

12   paying Neo4j for a commercial license.  Suhy reconfirmed the same.

13        34.    Defendants' removal of Neo4j Sweden's CMI and false statements about the same

14   caused Neo4j USA to lose a $2.2 million multi-year deal when the MPO chose ONgDB over paying

15   for a subscription to Neo4j® EE.  *See Neo4j, Inc. v. PureThink, LLC*, 2021 WL 2483778, at *16.

16        35.    Finally, Defendants built their entire business around inducing others to use ONgDB

17   and pay Defendants for support services that they clearly understood violated the now-removed

18   Commons Clause.  This constitutes copyright infringement.  *See Jacobsen*, 535 F.3d at 1382 (the

19   use and distribution of software in violation of an open source license constitutes copyright

20   infringement); *see also Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd*., 545 U.S. 913, 930

21   (2005) ("[o]ne infringes contributorily by intentionally inducing or encouraging direct

22   infringement," which includes providing a service "with the object of promoting its use to infringe

23   copyright") *accord Columbia Pictures Indus., Inc. v. Fung,* 710 F.3d 1020, 1037-38 (9th Cir. 2013)

24   (liability for copyright infringement on an inducement theory is where the product or service was

25   used to infringe the plaintiff's copyrights).

26        36.    In sum, Defendants knew that their removal of Neo4j Sweden's CMI would

27   facilitate the infringement of Neo4j Sweden's copyrights in Neo4j® EE in a commercial setting.

28   *See Mango*, 970 F.3d at 172-73 (upholding district court's finding that defendant violated the

DMCA by distributing the photo knowing that the photographer's CMI had been removed and knowing that distributing it with a false credit would conceal that defendant did not have authority to use the photo).

37.    In light of the foregoing, the Court finds Plaintiffs are entitled to entry of judgment on their DMCA claim against Defendants.

**D.    Plaintiffs Are Entitled to Recover their Actual Damages and the Disgorgement Defendants' Profits Obtained via their Violations of the Lanham Act and DMCA**

1.    Upon establishing a violation of the Lanham Act, "the plaintiff shall be entitled … to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a).

2.    Under the Lanham Act, actual damages sustained by a plaintiff can include commercial injury, such as lost sales. *See Clorox Co.*, 398 F. Supp. 3d at 644 ("Lost sales for the plaintiff because of the defendant's false advertising is the 'paradigmatic direct injury from false advertising.'") (internal citations omitted). Commercial injury is presumed "when defendant and plaintiff are direct competitors and defendant's misrepresentation has a tendency to mislead consumers." *TrafficSchool.com*, 653 F.3d at 826; *see also Lexmark*, 572 U.S. at 138 ("diversion of sales to a direct competitor may be the paradigmatic direct injury from false advertising").

3.    A plaintiff may recover an infringing defendant's profits under the Lanham Act in two scenarios: (1) as a measure of the plaintiff's own damages; or (2) on a theory of disgorgement of the defendant's unjustly obtained profits. *See Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993), *abrogated on other grounds by SunEarth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179 (9th Cir. 2016); *see also Quia Corp. v. Mattel, Inc*., No. C 10-1902 JF HRL, 2011 WL 2749576, at *7 (N.D. Cal. July 14, 2011).    In either scenario, a plaintiff need only prove "defendant's gross profits from the infringing activity with reasonable certainty." *Quia Corp*., 2011 WL 2749576, at *8.  The defendant then "must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a).

4.    Under the DMCA, Plaintiffs may also recover "the actual damages suffered … as a result of the violation, ***and*** any profits of the violator that are attributable to the violation and are

1    not taken into account in computing the actual damages." 17 U.S.C. § 1203(c)(2) (emphasis added).

2        5.    Actual damages may consist of lost licensing fees and renewal fees, as well as lost

3    profits.  *See Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 707-708 (9th Cir. 2004)

4    (affirming an actual damages award based on the copyright holder's actual price quote to the

5    infringer).  A plaintiff may also recover hypothetical-license damages as actual damages. *Id.*  The

6    Court has the discretion to award prejudgment interest.  *Id.* at 718.

7        6.    With respect to disgorgement, plaintiff must only prove defendants' gross revenue

8    in establishing defendant's ill-gotten profits. *See Netdragon Websoft, Inc. v. Toft*, 2012 WL

9    13008123, at *3 (C.D. Cal. Apr. 24, 2012).  Defendant must then prove its deductible expenses and

10   the elements of profit attributable to factors other than the wrongful conduct.  *Id.*  If defendant fails

11   to present such poof, "the gross [revenue] figure stands as the defendant's profits."  *Enter. Tech.*

12   *Holdings, Inc. v. Noveon Sys.*, Inc., No. 05-CV-2236 W (CAB), 2008 WL 11338356, at *15 (S.D.

13   Cal. July 29, 2008) (internal quotes and citation omitted).

14       7.    As detailed above, Defendants' use of the Neo4j Mark in relation to their promotion

15   of "Neo4j Enterprise", "Neo4j for Government" and similar uses, as well as their promotion of

16   ONgDB constituted trademark infringement in violation of Sections 1114(1) and 1125(a) of the

17   Lanham Act.  Likewise, statements made by Defendant in promoting ONgDB and their support

18   services of users of that software constituted false advertising and false designation of origin in

19   violation of Section 1125(a) of the Lanham Act and the UCL.

20       8.    Plaintiffs' DMCA claim is based, in part, on Defendants' unauthorized removal and

21   alteration of the Commons Clause, which prohibited the non-paying public from engaging in

22   commercial resale and certain commercial support services, and Neo4j Sweden's other CMI from

23   the software license governing the source code for Neo4j® EE v3.4 and Neo4j® EE v3.5.

24       9.    Defendants then redistributed that source code containing the DMCA violations as

25   rebranded ONgDB v3.4 and ONgDB v3.5 software to commercial users and offered paid support

26   services to those users, or otherwise caused that source code containing the DMCA violations to be

27   redistributed via their iGov and Graphstack websites, and GFI's website and GitHub repository.

28       10.   Defendants' aforementioned violations of the Lanham Act and DMCA caused

Neo4j USA to lose **$2,113,218** in licensing revenue after Next Century and the Maryland Procurement Office (MPO) adopted ONgDB for free rather than pay for commercial subscription for Neo4j® EE.

11.     Defendants' aforementioned violations of the Lanham Act and DMCA also caused Neo4j USA to lose **$2,744,572** in licensing revenue due to the IRS's widespread adoption and use of ONgDB in a number of servers and projects under the improper license in lieu of purchasing commercial licenses for Neo4j® EE from Neo4j USA.

12.     Plaintiffs are entitled to disgorge from Defendants the **$1,316,000** iGov and Suhy earned from providing support services under a 5-year contract to build and support the IRS' CKGE platform. The scope of work under this contract, required iGov and Suhy to perform all operations and maintenances duties for all components of the CKGE framework, which included the installation and use of graph database software.

13.     During the course of performance, the IRS obtained Suhy's input on whether to implement unrestricted and improper licensed ONgDB for free instead of paying for a commercial license Neo4j® EE as the graph database software in the CKGE framework.  Thereafter, Suhy and iGov were responsible for supporting, maintaining and updating ONgDB on an internal repository at the IRS, which violated the commercial restrictions of the now-removed Commons Clause.

14.     eGov Solutions considered the CKGE Contract to belong to Suhy, which he had sole responsibility and control over the $1,316,000 received from the IRS.  While Plaintiffs need only show Defendants' gross profits, iGov's financial statements indicate there were no associated cost of goods sold incurred by Defendants.

15.     Plaintiffs are entitled to disgorge from Defendants the **$246,082.55** received by Suhy and iGov under the latter's subcontracts with ASR.  The work under these subcontracts and related task order required Suhy and iGov to provide support, consulting and development services for the CKGE and other installations of ONgDB at the IRS between 2019 and 2022.

16.     Had Suhy not removed the Commons Clause and misinformed the IRS of the infringing nature of ONgDB, the IRS would have needed to obtain the commercial license from Plaintiffs in order to utilize the enhanced features and performance provided by Neo4j® EE.

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

17.     The paid support work performed by Mr. Suhy and iGov under the CKGE Contract and the ASR subcontracts relating to Neo4j® EE software would have otherwise violated the commercial restrictions imposed by the Commons Clause that Defendants removed without Neo4j Sweden's authorization.

**E.    Plaintiffs Are Entitled to Recover their Attorneys' Fees and Costs under the Lanham Act and DMCA**

1.     In exceptional Lanham Act cases, the Court may award reasonable attorneys' fees to the prevailing party.  District courts analyzing a request for fees under the Lanham Act should examine the "totality of the circumstances" to determine if the case was exceptional.  *See SunEarth, Inc*., 839 F.3d at 1181.  District courts may exercise equitable discretion and consider nonexclusive factors including, "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence" based on the preponderance of the evidence. *Id*. (*quoting Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 fn 6, (2014)).

2.     A case may be exceptional where the infringement was willful. *See Jason Scott Collection, Inc. v. Trendily Furniture, LLC*, 68 F.4th 1203, 1223 fn 13 (9th Cir. 2023) ("[b]ecause the *SunEarth* test is less stringent than the previous 'willful infringement' standard, it stands to reason that this case of willful infringement would satisfy the *SunEarth* test"); *Sophia & Chloe, Inc. v. Brighton Collectibles, Inc.*, 2019 WL 1429588, at *7 (S.D. Cal. Mar. 29, 2019) (recognizing that inequitable conduct or willful infringement still may make a case exceptional under *SunEarth*). Willful infringement occurs where a defendant engages in deliberate, false, misleading, or fraudulent conduct.  *Lindy Pen*, 982 F.2d at 1406.  The Ninth Circuit has also stated willful infringement as "attempting to gain the value of an established name of another." *Id*.

3.     The DMCA allows for an award of "reasonable attorney's fee to the prevailing party." 17 U.S.C. § 1203(b)(5).  In deciding whether the award of attorney's fees is appropriate in cases brought under the Copyright Act, courts consider factors including "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and

1   deterrence." *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 fn 19 (1994); *see also Unicom Systems,*

2   *Inc. v. Farmers Group, Inc.*, 405 F. App'x 152, 155 (9th Cir. 2010) (approving of use of the *Fogerty*

3   factors in determining whether to award fees under Section 1203(b)(5)).

4       4.      Courts will award a plaintiff its attorneys' fees where defendant's violations of the

5   DMCA were willful.  *See, e.g., Sony Computer Entm't Am., Inc. v. Divineo, Inc.*, 457 F. Supp. 2d

6   957, 967 (N.D. Cal. 2006); *Dish Network, L.L.C. v. SatFTA*, No. 5:08-CV-01561 JF PSG, 2011

7   WL 856268, at *7 (N.D. Cal. Mar. 9, 2011).

8       5.      The Court finds this case to be exceptional under the Lanham Act warranting an

9   award of Plaintiffs' attorneys' fees. As detailed above, Defendants did not use "Neo4j" to refer to

10  Plaintiffs' products.  Instead, they used it to create the misleading perception that Defendants'

11  products *were* Plaintiffs' products." *Neo4j, Inc. v. PureThink, LLC*, 2021 WL 2483778, at *11-13.

12  The evidence makes clear that Defendants intended to convince consumers to buy Defendants'

13  products instead of Neo4j® EE commercial licenses; in other words, Defendants used the Neo4j

14  Mark to unfairly compete with Plaintiffs.  *Id.*

15      6.      This constitutes willful infringement because Defendants clearly sought to gain the

16  value of the established name of Neo4j.  *Lindy Pen*, 982 F.2d at 1406.

17      7.      Defendants also knowingly engaged in false advertising through the intentional

18  removal of the commercial restrictions by replacing the Neo4j Sweden Software License with the

19  AGPL.  *Neo4j, Inc. v. PureThink, LLC*, 2021 WL 2483778, at *13-17. Defendants' false statements

20  actually deceived consumers. *Id.*

21      8.      Defendants' removal of the Commons Clause in order to commercially use and

22  support ONgDB also establishes their intentional violation of the DMCA. Suhy did so without

23  Neo4j Sweden's authorization under the false premise that Section 7 of the Neo4j Sweden Software

24  License permitted licensees to remove "further restrictions," i.e. the Commons Clause, imposed by

25  Neo4j Sweden as the copyright holder and original licensor.

26      9.      Defendants also continued to facilitate the use of ONgDB containing DMCA

27  violations and to support the commercial use of ONgDB at the IRS *after* the Ninth Circuit affirmed

28  this Court's determination that Defendants could not remove the Commons Clause from the Neo4j

1    Sweden Software License after the Ninth Circuit.

2        10.    Finally, Defendants have litigated this case in an unreasonable manner.  Defendants

3    have repeatedly sought to reassert legal arguments, claims and defenses that the Court previously

4    dismissed with prejudice or otherwise determined to be meritless.

5        11.    For example, Defendants argued in opposition to Plaintiffs' summary judgment

6    motion that Neo4j USA's "misrepresentations of time of use, ownership of trademark and failure

7    to correct those misrepresentations is unclean hands under the PTO's standards."  Dkt. No. 188 at

8    7:9-17, 19:16-19.  These were the same facts underpinning their twice-stricken cancellation/fraud

9    on the PTO defense.  Dkt. Nos. 70, 110.  In doing so, the Court warned Defendants and their counsel

10   that "Defendants **are not permitted** to reassert any affirmative defense or counterclaim in this action

11   based on the cancellation or abandonment theories asserted in the stricken defenses."  Dkt. No. 110

12   at 6:1-4 (emphasis added).

13       12.    Defendants improperly sought to re-litigate the issue of whether Neo4j USA

14   misrepresented that it was the owner of the trademark rights to the Neo4j® Mark to the PTO.  This

15   issue was conclusively resolved after the Court granted summary judgment in favor of Neo4j USA

16   during Phase 1 and the Ninth Circuit's affirmation thereof.  *Neo4j, Inc. v. PureThink, LLC*, 2021

17   WL 2483778, at *6-10.  Relying on the same intercompany license between Neo4j Sweden and

18   Neo4j USA, Defendants asserted the same facts and arguments in opposition to Plaintiffs' second

19   summary judgment motion and attempted to do so at trial in support of their unclean hands defense.

20       13.    Defendants have sought to reargue that the "further restrictions" provision in

21   Sections 7 and 10 of the Neo4j Sweden License permitted them to remove the Commons Clause,

22   mischaracterized this Court's May 18, 2021 as an interlocutory order that is subject to

23   reconsideration.  *See, e.g.,* Dkt. No. 188 at 10:6-16:24.  Defendants also sought to use an alleged

24   expert witness to re-litigate this Court's interpretation of Sections 7 and 10 of the Neo4j Sweden

25   Software License after the Ninth Circuit affirmed that interpretation.  Thus, requiring Plaintiffs to

26   file a *Daubert* Motion seeking to preclude that expert from improperly testifying about the meaning

27   of those provisions and his inadmissible interpretation of the same. *See* Dkt. No. 181, 186 189.

28       14.    In doing so, Defendants inexcusably refused to acknowledge that their unsuccessful

1    appeal of this Court's ruling on that issue barred them from rearguing these trademark ownership

2    and contractual interpretation issues as the law of the case.  *See Herrington*, 12 F.3d at 904; *Aquino*,

3    2018 WL 3845718, at *1.

4         15.    Defendants' attempt to re-litigate the interpretation of the Neo4j Sweden Software

5    License also violates their prior stipulation (and the resulting order).  On September 2, 2021, the

6    parties stipulated to narrowing the scope of their claims to streamline Phase 2, and the Court

7    adopted that stipulation as an order.  *See* Dkt. Nos. 133, 144.  Defendants therein agreed that should

8    the Ninth Circuit affirm that ruling, they would no longer pursue and would take all necessary steps

9    to dismiss their Seventh Cause of Action for Declaratory Relief, which sought a determination as

10   to whether Neo4j Sweden AB's inclusion of Common Clause in the Neo4j Sweden Software

11   License violated its terms and Suhy's right to remove it as a "further restriction." *Id.* at 3:1-9.

12        16.    After the Ninth Circuit affirmed this Court's interpretation of the Neo4j Sweden

13   Software License (Dkt. No. 140, 141), Defendants stipulated to dismiss their Seventh Cause of

14   Action for Declaratory Relief (Dkt. No. 72, ¶¶ 62-69), and Fifth, Sixth and Thirteenth Affirmative

15   Defenses (Dkt. No. 91 at 19:9-20:9, 22:22-24:5).  Dkt. No. 144 at 1:23-28.  In doing so, Defendants

16   ***expressly admitted their positions were "no longer legally viable."***  Dkt. No. 144 at 1:23-28

17   (emphasis added).

18        17.    Defendants were thus estopped from rearguing the interpretation of the relevant

19   provisions of the Neo4j Sweden Software License and the AGPL based on their prior stipulations

20   and judicial admissions made therein.  *See United States v. Real Property Located at 22 Santa*

21   *Barbara Drive*, 264 F.3d 860, 873 (9th Cir. 2001) (stipulation meets the fully litigated requirement

22   where it is clear that the parties intended the stipulation to adjudicate once and for all the issue or

23   claim); *see also American Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988)

24   (recognizing "under federal law, stipulations and admissions in the pleadings are generally binding

25   on the parties and the Court").

26        18.    Defendants' failure to comply with the Court's prior orders, ignoring their prior

27   stipulations, and "persistent desire to re-litigate issues already decided" makes this an exceptional

28   case thereby entitling Plaintiffs to recover their attorneys' fees.  *See San Diego Comic Convention*,

1   807 F. App'x at 676.

2       19.     The Court also has the discretion to award prejudgment interest, and willful

3   violations of the Lanham Act are reasons for doing so.   *See Fitness Anywhere LLC v. WOSS*

4   *Enterprises LLC*, No. 14-CV-01725-BLF, 2018 WL 6069511, at *7 (N.D. Cal. Nov. 20, 2018)

5   (court awarded pre-judgment interest based on the 52-week T-Bill rate, compounded annually due

6   to the willful and deliberate nature of defendant's infringement of plaintiff's mark).   For same

7   reasons making this case exception, the Court shall award Plaintiffs prejudgment interest.   *See*

8   *Fitness Anywhere*, 2018 WL 6069511, at *7.

9       20.     The Court grants Plaintiffs leave to file a motion for attorneys' fees and costs, as

10  well as provide final prejudgment interest calculations.

11      **F.    The Court Finds that Counsel for Defendants are Joint and Severally**

12          **Responsible for a Portion of Plaintiffs' Attorneys' Fees and Costs**

13      1.      In cases where attorneys' fees are awarded, the Court may make the non-prevailing

14  party's attorneys jointly and severally liable for the payment thereof pursuant to 28 U.S.C. § 1927.

15  *See Int'l Intell. Mgmt. Corp. v. Lee Yunn Enterprises*, Inc. (U.S.A.), No. CV 08-7587 R JWJX, 2009

16  WL 9137315, at *3–4 (C.D. Cal. Dec. 14, 2009).

17      2.      Under Section 1927, the Court has the inherent authority to order the attorney for

18  the non-prevailing party to compensate a prevailing party if the attorney "so multiplies the

19  proceedings in any case unreasonably and vexatiously...." 28 U.S.C. § 1927. In such a case, the

20  Court may order the non-prevailing attorney to "satisfy personally the excess costs, expenses and

21  attorneys' fees reasonably incurred because of such conduct."  Section 1927 is not limited to patent

22  law, and the regional circuit law controls the analysis of whether to impose Section 1927 sanctions

23  against a party in a patent infringement case. *See, e.g., Phonometrics, Inc. v. Westin Hotel Co.*, 350

24  F.3d 1242, 1246 (Fed. Cir. 2003).

25      3.      In the Ninth Circuit, a court may award fees under Section 1927 on a showing of

26  subjective bad faith, which may be met where counsel "'knowingly or recklessly raises a frivolous

27  argument, or argues a meritorious claim for the purpose of harassing an opponent.'" *B.K.B. v. Maui*

28  *Police Department*, 276 F.3d 1091, 1107 (9th Cir. 2002) (*quoting In re Keegan Mgmt. Co., Sec.*

*Lit.*, 78 F.3d 431, 436 (9th Cir. 1996)). Thus, sanctions are available when counsel either knowingly or recklessly asserts a frivolous claim or defense. *Id.* Section 1927 permits a prevailing party to recover "the excess costs, expenses and attorneys' fees reasonably incurred" caused by opposing counsel's misconduct. *Int'l Intell. Mgmt. Corp.*, 2009 WL 9137315, at *3–4.

4.      In its March 3, 2021 Order Granting Plaintiff's Motion to Strike, the Court declined to sanction Defendants' counsel for having no good faith basis to reassert the same two previously stricken affirmative defenses.  Dkt. No. 110.  However, the Court warned counsel that it "expect[ed] that Defendants will only advance claims and defenses that are supported by law and evidence and will generally adhere to the proper standard of practice in Federal Court." *Id. at* 7:1-12.

5.      The Court finds that Defendants' counsel has knowingly and recklessly re-litigated settled issues in complete disregard of the Court's orders granting Plaintiffs' dispositive motions, their prior stipulations, and the preclusive effect of their appeal of the Court's summary judgment order, *See* 28 U.S.C. § 1927; *see also*, *B.K.B.,* 276 F.3d at 1107; *Int'l Intell. Mgmt. Corp.*, 2009 WL 9137315, at *3–4.   In particular, counsel for Defendants acted in bad faith when they ignored the application of the law of the case doctrine and the case law cited by Plaintiffs making it clear that their interlocutory appeal foreclosed the re-litigation of this issue. *See* Dkt. No. 181 at 7:15-12:8 (citing *Herrington*, 12 F.3d at 904 and *Aquino*, 2018 WL 3845718, at *1).  This was not first time that Defendants ignored the law of the case doctrine.  Dkt. No. 110 at 5:16-27, 6:22-7:6.

6.      Counsel for Defendants' wanton disregard of this Court's orders and controlling Ninth Circuit authority has unnecessarily increased the costs of this litigation and will continue to do so.  Accordingly, Defendants and their counsel should be joint and severally responsible for payment of Plaintiffs' attorneys' fees incurred in conjunction with the following:

        a.      Plaintiffs' Motion to Strike (Dkt. Nos. 93-96);

        b.      Plaintiffs' Motion to Strike the Report and Exclude the Testimony of Defendants' Expert Witness Bradley M. Kuhn (Dkt. Nos. 181, 186, 189);

        c.      Plaintiff's Motion for Summary Judgment (Dkt. Nos. 183, 188, 191);

        d.      Plaintiffs' pretrial filings and preparation for trial; and

        e.      All trial and post-trial proceedings.

7.     Plaintiffs' forthcoming motion for attorneys' fees and costs shall provide the specific amounts of fees and costs incurred with the foregoing.

**G.   Plaintiffs are Entitled to Injunctive Relief under the Lanham Act and DMCA**

1.     The Lanham Act vests the Court with the "power to grant injunctions according to principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right" of the trademark owner. 15 U.S.C. § 1116(a); *see Century 21 Real Estate LLC v. Ed/Var Inc.*, 2014 WL 3378278, at *6 (N.D. Cal. July 10, 2014). Generally, where "a plaintiff demonstrates a likelihood of confusion, it is generally presumed that the plaintiff will suffer irreparable injury if injunctive relief is not granted." *Sun Microsystems, Inc. v. Microsoft Corp.*, 999 F. Supp. 1301, 1311 (N.D. Cal. 1998).

2.     Since the Court previously found that Defendants' violations of the Lanham Act were likely to cause confusion and did cause actual confusion, it will make the preliminary injunction entered on May 18, 2021 permanent.  Dkt. No. 118 at 8:13-9:1, 19:2-22:10, 31:20-32:10, 33:3-10 (citing *Sun Microsystems*, 999 F. Supp. at 1311).

3.     The DMCA provides that the Court "may grant temporary and permanent injunctions on such terms as it deems reasonable to prevent or restrain a violation" of Section 1202(b).  17 U.S.C. § 1203(b)(1); *see also Apple Inc. v. Psystar Corp.,* 673 F. Supp. 2d 943, 948 (N.D. Cal. 2009), *aff'd*, 658 F.3d 1150 (9th Cir. 2011).

4.     To obtain injunctive relief, a plaintiff must show that: (1) it has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction. *See eBay Inc. v. MercExchange*, L.L.C., 547 U.S. 388, 391 (2006); *accord Apple Inc.,* 673 F. Supp. 2d at 948 (citing same).

5.     The Court finds that if it does not enjoin Defendants, Plaintiffs will suffer irreparable injury from the ongoing damage resulting from the proliferation of improperly licensed ONgDB and its derivatives such as GraphStack and GDB.  *See Apple*, 673 F. Supp. 2d at 948 (recognizing that monetary damages would not prevent defendant from continuing to infringe plaintiff's

1    copyrights and violate the DMCA in the future, and will not prevent third-parties from infringing

2    plaintiff's copyrights); accord *Michael Grecco Prods., Inc. v. WrapMarket, LLC*, 2017 WL

3    10434020, at *4 (C.D. Cal. Nov. 8, 2017) (irreparable injury exists where infringement harms the

4    competitive position and market share of the copyrighted work).

5         6.    As detailed above, there is compelling evidence that Plaintiffs have suffered a loss

6    to control over licensing of the commercial licensing of Neo4j® EE as result of Defendants'

7    unauthorized "relicensing" of that software under the AGPL and falsely calling ONgDB a free and

8    unrestricted drop-in replacement for official Neo4j® EE.

9         7.    It is also clear that Defendants will continue to do so, as evidenced by the IRS'

10   continued use of GDB and Suhy's maintenance thereof, unless enjoined by the Court.

11        8.    Further, the balance of hardships favors Neo4j USA because an injunction would

12   serve the narrow purpose of preventing or restraining further infringement of Neo4j Sweden's

13   copyrights and violations of the DMCA; and Defendants cannot "claim any legitimate hardships as

14   a result of being enjoined from committing unlawful activities." *Apple*, 673 F. Supp. 2d at 950.

15        9.    Finally, a permanent injunction "would serve no purpose other than to vindicate the

16   legitimate rights of [Neo4j Sweden] in its copyrights." *Apple*, 673 F. Supp. 2d at 950. "Such

17   equitable relief would not harm the interests of the public; rather, consistent with the policies

18   underlying copyright protection, an injunction preventing [Defendants] from continuing to commit

19   infringing and illegal, if not criminal, acts under the Copyright Act and DMCA would ensure that

20   the public will continue to benefit from the creative fruits of [Neo4j Sweden's] labor. *Id.* The public

21   interest is further served by preventing Defendants from inducing unsuspecting customers to use

22   improperly licensed software in violation of Neo4j Sweden's copyright.

23        10.   The Court will thus enter a permanent injunction pursuant to 17 U.S.C. § 1203(b)(1).

24   **H.   The Court Finds in Favor of Neo4j USA on PureThink's Fourth Cause of Action**

25        **for Breach of Exclusivity Contract**

26        1.    PureThink asserts its Fourth Cause of Action for Breach of Exclusivity Contract to

27   Government against Neo4j USA.  Dkt. No. 177 at ¶¶ 53-57.  The essential elements of a breach of

28   contract claim are: (1) the existence of an enforceable contract, (2) plaintiff's performance or excuse

1  for nonperformance, (3) defendant's breach, and (4) resulting damages to the plaintiff. *Oasis W.*
2  *Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011); *accord Hickcox-Huffman v. US Airways,*
3  *Inc.*, 855 F.3d 1057, 1062 (9th Cir. 2017).

4      2.      Defendants contend that Neo4j USA entered into an agreement with PureThink on
5  April 11, 2015 separate from the SPA where it agreed that PureThink would be the exclusive
6  reseller of the Gov't Edition to government agencies and have continuing exclusivity to support
7  users of that version of Neo4j® Software.  Dkt. No. 177, ¶¶ 15-16, 54 and Ex. C.

8      3.      Prior to April 11, 2015, Suhy told Neo4j USA that the "exclusivity agreement"
9  would consist of two letters.  The first would be an internal letter that Suhy could give to agencies
10 on official Neo4j letterhead, stating PureThink was the exclusive reseller.  The second would be an
11 internal version that confirmed that Neo4j USA had the right to cancel the exclusivity agreement
12 at any time and for any reason.

13     4.      Consistent with Suhy's representations, Neo4j USA created and signed both letters
14 on April 11, 2015, with the internal letter providing that "Neo Technology has the right to cancel
15 this exclusivity agreement at any time and for any reason."  Suhy confirmed receipt without
16 objection and assured Neo4j USA that he would sign them.

17     5.      Under California law, contract formation "requires that the parties' reach mutual
18 assent or consent on definite or complete terms." *Netbula, LLC v. Bindview Dev. Corp.*, 516 F.
19 Supp. 2d 1137, 1155 (N.D. Cal. 2007) (citing *Merced County Sheriff's Employees' Ass'n v. Merced*
20 *County*, 188 Cal. App. 3d 662, 670 (1987)).  "A contract is void and unenforceable if it is so
21 uncertain and indefinite that the intention of the parties in material particulars cannot be
22 ascertained." *Id.*

23     6.      Despite having the burden of proof to establish the existence of an enforceable
24 contract, PureThink failed to offer competent evidence establishing that ***both*** parties understood
25 that the April 11, 2015 letters constituted a separate agreement from the SPA rather than simply a
26 tool to seek sole-source procurements.  *See* Cal. Civ. Code § 1636 ("A contract must be so
27 interpreted as to give effect to the mutual intention of the parties as it existed at the time of
28 contracting"); Cal. Civ. Code § 1639 ("When a contract is reduced to writing, the intention of the

1    parties is to be ascertained from the writing alone, if possible.").

2        7.      In this regard, extrinsic evidence is admissible to determine whether contracting

3    parties achieved mutual assent for purposes of formation.  *See* Cal. Civ. Proc. Code § 1856(f)-(g);

4    *accord Banner Entm't, Inc. v. Sup. Court,* 62 Cal. App. 4th 348, 358 (1998) ("[e]vidence as to the

5    parties' understanding and intent … is admissible to ascertain when or whether a binding agreement

6    was ever reached") (citing same).

7        8.      The Court finds that Suhy's written representations made before the parties signed

8    April 11, 2015 letters confirm that there was no contract apart from the SPA.[1]  *See Netbula, LLC*,

9    516 F. Supp. 2d 1137, 1155 (N.D. Cal. 2007) ("[m]utual assent is determined from the reasonable

10   meaning of the words and acts of the parties, and not from their unexpressed intentions or

11   understandings"); *RHUB Commc'ns, Inc. v. Karon,* No. 16-CV-06669-BLF, 2019 WL 8267743, at

12   *4 (N.D. Cal. Nov. 22, 2019) ("failure to reach a meeting of the minds on all material points

13   prevents the formation of a contract even though the parties have orally agreed upon some of the

14   terms, or have taken some action related to the contract") (internal citation omitted).

15       9.      Even assuming arguendo a separate exclusivity agreement came into existence,

16   PureThink cannot establish any alleged breach thereof because the lack of a party's signature does

17   not make a contract unenforceable.  *Performance Plastering v. Richmond Am. Homes of California,*

18   *Inc*., 153 Cal. App. 4th 659, 668 (2007).   To the extent there was such an agreement, the parties

19   understood at the time Neo4j USA signed the two letters and Suhy confirmed he would do the

20   same, Neo4j USA had the right to discontinue the Gov't Edition and terminate PureThink as the

21   exclusive reseller thereof without cause and without further compensating PureThink.

22       10.     Consequently,  Neo4j  USA  could  not  have  breached  the  alleged  exclusivity

23   _____

24   [1] For this same reason, PureThink's waiver defense fails as a matter of law. It also fails because it

25   has never identified any specific contractual right waived by Neo4j USA under the SPA Partner

     Agreement or any evidence of its intentional relinquishment thereof. *Old Republic Ins. Co. v. FSR*

26   *Brokerage, Inc*., 80 Cal. App. 4th 666, 678 (2000) ( waiver is the intentional relinquishment of a

27   known right after full knowledge of the facts); *accord MicroTechnologies, LLC v. Autonomy, Inc*.,

28   No. 15-CV-02220-JCS, 2017 WL 1848470, at *19 (N.D. Cal. May 8, 2017) (citing same).

agreement when it notified PureThink that it was discontinuing the Gov't Edition on June 19, 2017. *See Curley v. Wells Fargo & Co.*, 120 F. Supp. 3d 992, 1002 (N.D. Cal. 2015), *aff'd*, 692 F. App'x 900 (9th Cir. 2017) (granting summary judgment in favor of defendant where plaintiff could not establish that a breach occurred).

11.     Defendants also claim the parties entered into a subsequent oral modification to the April 11, 2015 letters that purportedly required the discontinuation of the Gov't Edition to be "unanimous" and for Neo4j USA to compensate PureThink.

12.     "Mutual consent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions of understandings." *Bustamante v. Intuit, Inc*., 141 Cal. App. 4th 199, 208 (2006).  "Where a contract is so uncertain and indefinite that the intention of the parties in material particulars cannot be ascertained, the contract is void and unenforceable." *Id.* at 209 (internal quotes and citation omitted).

13.     PureThink fails to offer competent evidence establishing **when** Neo4j USA consented to such an oral agreement or modification, **who** consented on behalf of Neo4j USA, **how** much compensation would be, and **what** additional consideration PureThink offered.  Thus, no such oral agreement or modification can legally exist.  *See Hohs v. Allstate Ins. Co*., No. C 08-02177 JW, 2010 WL 11706760, at *5-6 (N.D. Cal. Feb. 10, 2010) (plaintiff failed to provide evidence of when the oral contract was entered into and defendant's consent to the terms thereof); *Kahn Creative Partners, Inc. v. Nth Degree, Inc.*, No. CV 10-932-JST FFMX, 2011 WL 1195680, at *3-5 (C.D. Cal. Mar. 29, 2011) (same); *see also Stanford Hosp. & Clinics v. Multinat'l Underwriters, Inc*., 2008 WL 5221071, at *7 (N.D. Cal. Dec. 12, 2008) (finding no mutual consent to oral agreement because plaintiff only offered evidence of its own state of mind); *Davidson v. ConocoPhillips Co*., 2009 WL 2136535, at *3 (N.D. Cal. July 10, 2009) (plaintiffs failed to show the oral modification to a written contract was supported by new consideration).

14.     Defendants rely on a June 20, 2017 email sent by Suhy in response to Neo4j USA's cancelation of the Gov't Edition and a month after providing notice of PureThink's breach of the SPA to argue that Neo4j USA did not have the unilateral right to terminate the Gov't Edition.

15.     This is not admissible to establish any alleged modification because Suhy sent it in anticipation of litigation and in direct contradiction to the representations he made to Neo4j USA prior to the dispute arising.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (an assertion that is "blatantly contradicted by the record, so that no reasonable jury could believe it" will not create a genuine issue of material fact at summary judgment); *Warner Constr. Corp. v. City of Los Angeles*, 2 Cal. 3d 285, 296–97 (1970) (refusing to admit "negotiations" after the date on which "the parties had reached a stage of clear disagreement on the crucial question"); *accord Wolsey, Ltd. v. Foodmaker, Inc.*, 144 F.3d 1205, 1210 (9th Cir. 1998) (recognizing that the principle of "practical construction" only applies to acts before any dispute has arisen) (citing same).

16.     In conjunction with terminating the Gov't Edition on June 19, 2015, Neo4j USA informed PureThink that it was "no longer authorized to market, resell, demonstrate or provide training on the Neo4j Government Edition."  Suhy acknowledged this and agreed to remove all references from PureThink's website.  Yet, Defendants continued to exploit the intellectual property associated with the Gov't Edition—despite previously admitting they had no right to do so.  Consequently, if any alleged oral modification occurred, PureThink cannot establish that it performed all of its contractual obligations or that its performance was otherwise excused because it never stopped using the Gov't Edition.

17.     PureThink seeks $750,000 in damages based on the alleged "full time" effort Suhy put into developing the add-ons to Neo4j® EE to create the Gov't Edition.  However, PureThink does not offer competent evidence that would allow this Court to determine the actual time spent and the value of that time.  *See Food Safety Net Servs. v. Eco Safe Sys. USA, Inc*., 209 Cal. App. 4th 1118, 1132 (2012) (contract "damages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery"); *see also Shannon v. Crowley*, 538 F. Supp. 476, 484 (N.D. Cal. 1981) (granting motion in limine to exclude damages evidence as not having sufficient evidentiary support and being too speculative);

18.     PureThink also cannot recover such amounts on a theory of unjust enrichment or quantum meruit because it failed to plead a counterclaim separate from their breach of contract claim as a means to recover such amounts. *See Day v. Advanced Micro Devices, Inc*., No. 22-CV-

1   04305-VC, 2023 WL 2347421, at *1 (N.D. Cal. Mar. 2, 2023) (holding that "an unjust enrichment

2   claim must be pleaded in the alternative, and plaintiffs must allege why legal remedies are

3   inadequate"); *accord Johnson v. Trumpet Behav. Health, LLC*, No. 3:21-CV-03221-WHO, 2022

4   WL 74163, at *3 (N.D. Cal. Jan. 7, 2022).

5       19.    Even if PureThink could assert such equitable claims, the measure of recovery in

6   the form of restitution "is the reasonable value of the services rendered, provided they were of direct

7   benefit to the defendant." *Palmer v. Gregg*, 65 Cal. 2d 657, 660 (1967).

8       20.    PureThink failed to produce competent evidence demonstrating that Neo4j USA

9   *directly* benefited from Suhy's work on the Gov't Edition.  To the contrary, Defendants kept the

10  FISMA framework plug-ins that Suhy developed and continued to use in them in iGov's

11  "Government Packages for Neo4j." PureThink also retained the entire $229,000 it received from

12  the IRS to develop and implement the Gov't Edition at the IRS, and iGov received and addition

13  $1,316,000 from the IRS to continue that work and later replace Neo4j® EE with ONgDB. For this

14  same reason, it is improbable that Suhy worked full time on the Gov't Edition during this time.

15      21.    PureThink also failed to establish the market value of Suhy's services and the

16  plugins he claimed to have developed, which is the price that "a willing buyer would pay to a

17  willing seller, neither being under compulsion to buy or sell, and both having full knowledge of all

18  pertinent facts." *Alameda Cnty. Flood Control & Water Conservation Dist. v. Dep't of Water Res.*,

19  213 Cal. App. 4th 1163, 1174–1175, fn. 9 (2013) (internal quotes and citations omitted).

20      22.    PureThink's attempt to recover $1.3 million in damages for its alleged loss of an

21  additional IRS contract is also untenable.  Neo4j USA had an absolute First Amendment right to

22  protest IRS' award of the CKGE Contract to PureThink under the *Noerr–Pennington* doctrine.  *See

23  Octane Fitness*, 572 U.S. at 555–56 (under the *Noerr–Pennington* doctrine "defendants are immune

24  from antitrust liability for engaging in conduct … aimed at influencing decision making by the

25  government"); *Empress LLC v. City & Cty. of San Francisco*, 419 F.3d 1052, 1056 (9th Cir. 2005)

26  (recognizing that the *Noerr-Pennington* doctrine shields individuals and entities from liability for

27  petitioning any part of the government for redress, even if the outcome of the petitioning results in

28  harm to a competitor).  By agreeing to dismiss their IIPEA claim with prejudice in the face of a

1     motion to dismiss, Defendants conceded that Neo4j USA had a constitutional right to protest that

2     award. *See* Dkt. Nos. 171, 172 and 176.

3           23.      Finally, Defendants seek damages for all of Neo4j USA's sales to the US

4     government that occurred after the termination of alleged exclusivity contract. However,

5     Defendants did not produce any evidence establishing that but for that termination, PureThink

6     would have sold the Gov't Edition to each one of the agencies in that spreadsheet. Without any

7     evidence establishing the required causal connection, it is pure speculation that PureThink would

8     have made any of those sales. *See Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc*., 773 F.2d

9     1506, 1509-10 (9th Cir. 1985) (plaintiff must provide evidence such that trier of fact is "not left to

10    'speculation or guesswork' in determining the amount of damages to award"); *see also Codding v.*

11    *Pearson Educ., Inc*., No. 18-CV-00817-LB, 2019 WL 5864579, at *12 (N.D. Cal. Nov. 8, 2019),

12    *aff'd*, 842 F. App'x 70 (9th Cir. 2021) (recognizing that causation of damages in contract cases

13    requires that the damages be proximately caused by the defendant's breach, and that their causal

14    occurrence be at least reasonably certain, and the test for causation in a breach of contract action is

15    whether the breach was a substantial factor in causing the damages).

16           24.      In addition, "when a plaintiff claims lost profits associated with new customers,

17    'damages may be established with reasonable certainty with the aid of expert testimony, economic

18    and financial data, market surveys and analyses, business records of similar enterprises, and the

19    like.'" *Urica, Inc. v. Pharmaplast S.A.E.*, No. CV1102476MMMRZX, 2013 WL 12123230, at *11

20    (C.D. Cal. May 6, 2013) (quoting *Universe v. In2Labs*, 95 Cal. App. 4th 870, 884 (2002)).

21    However, PureThink did not proffered any economic analyses, market surveys, or expert analysis.

22    Nor did it produce necessary examples of profits of comparable businesses, or the profits of

23    companies operating under similar exclusive dealing arrangements. Thus, their alleged lost sales

24    damages are purely speculative and thus not recoverable. *See Shannon v. Crowley*, 538 F. Supp. at

25    483–84; *see also Food Safety Net Servs.,* 209 Cal. App. 4th at 1132 (recognizing "lost profits based

26    on a future contract cannot be recovered when the contract is uncertain or speculative").

27           25.      In light of the foregoing, the Court finds in favor of Neo4j USA on PureThink's

28    Fourth Cause of Action for Breach of Exclusivity Contract to Government, and that PureThink

1    takes nothing as the non-prevailing party.

2    **I.    The Court Finds in Favor of Neo4j USA on Defendants' Unclean Hands Defense**

3        1.    Defendants assert their Fourth Affirmative Defense of Unclean Hands against Neo4j

4    USA's Lanham Act and UCL claims.  *See* Dkt. No. 91 at 16:20-19:7; Dkt. No. 169 at 10:4-8; *see*

5    *also* Dkt. No. 91 at 16:20-24.  For the reasons set forth below, the Court finds that Defendants

6    cannot prevail on this defense.

7        2.    Defendants contend that Neo4j USA engaged in "unlawful" licensing practices by

8    "attempting to improperly use a dual licensing practice having a commercial version controlled by

9    plaintiff and an open source software licensed under [the GPL]."  Dkt. No. 91 at 16:21-24, 17:16-

10   19.  They also cite to Neo4j USA and PureThink's dispute over whether the IRS needed to purchase

11   a commercial license for Neo4j® EE rather than use that software under the AGPL as evidence

12   thereof, and alleged false statement made by Neo4j USA to the IRS between January and July 2017.

13   *Id.*, 16:23-17:16.  In addition, Defendants assert that Neo4j USA's "misrepresentations of time of

14   use, ownership of trademark and failure to correct those misrepresentations is unclean hands under

15   the PTO's standards."  Dkt. No. 188 at 19:16-19; *see also id.* at 7:9-17.

16       3.    To prevail on an unclean defense, a trademark defendant must prove by clear and

17   convincing evidence that (1) plaintiff's conduct is inequitable; and (2) the conduct relates to the

18   subject matter of the trademark claims.  *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d

19   837, 847 (9th Cir. 1987); *accord Vineyard House, LLC v. Constellation Brands U.S. Operations,*

20   *Inc.*, 515 F. Supp. 3d 1061, 1078 (N.D. Cal. 2021) (citing same).

21       4.    With respect to the first requirement, "only a showing of wrongfulness, willfulness,

22   bad faith, or gross negligence, proved by clear and convincing evidence, will establish sufficient

23   culpability for invocation of the doctrine of unclean hands."  *Pinkette Clothing, Inc. v. Cosm.*

24   *Warriors Ltd.*, 894 F.3d 1015, 1029 (9th Cir. 2018) (internal citation and quotes omitted); *see also*

25   *GoTo.com, Inc. v. Walt Disney Co*., 202 F.3d 1199, 1210 (9th Cir. 2000) (a party's hands need not

26   be "clean as snow" to avoid the unclean hands doctrine).  In particular, "[t]o show that a trademark

27   plaintiff's conduct is inequitable, defendant must show that plaintiff used the trademark to deceive

28   consumers." *Japan Telecom, Inc. v. Japan Telecom Am. Inc*., 287 F.3d 866, 870 (9th Cir. 2002).

5.      Defendants have not established by clear and convincing evidence that Neo4j USA engaged in fraud in obtaining the Neo4j Mark or that it used the mark to deceive consumers. *See Wells Fargo & Co. v. Stagecoach Properties, Inc.*, 685 F.2d 302, 308 (9th Cir. 1982) (bad intent is the essence of the defense of unclean hands); *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 841 (9th Cir. 2002) (application of unclean hands to Lanham Act claims requires evidence of fraudulent intent).

6.      As previously held by this Court in dismissing Defendants' cancelation counterclaim and affirmative defense, Defendants' allegations that Neo4j USA's alleged misstatement of the date of first use in obtaining the registration for the Neo4j Mark did not support cancellation of that registration as a matter of law. Dkt. No. 70 (*citing Pony Exp. Courier Corp. of Am. v. Pony Exp. Delivery Serv.*, 872 F.2d 317, 319 (9th Cir. 1989); *Teeter-Totter, LLC v. Palm Bay Int'l, Inc.*, 344 F. Supp. 3d 1100, 1109 (N.D. Cal. 2018)).

7.      The Court finds that Defendants' reassertion of these same facts is in direct violation of the Court's warning that "Defendants are not permitted to reassert any affirmative defense or counterclaim in this action based on the cancellation or abandonment theories asserted in the stricken defenses."  Dkt. No. 110 at 5:16-6:4 (emphasis added).  As noted above, this type of misconduct makes this an exceptional case.

8.      The Court further finds that Defendants' assertion that Plaintiffs were required to disclose the existence of the intercompany license between Neo4j USA and Neo4j Sweden to the PTO is without merit. There can be no alleged misrepresentation to correct or intent to deceive because this Court held in granting summary judgment on Neo4j USA's Lanham Act claims that Neo4j USA was the owner of the Neo4j Mark and the registration for that mark was valid.  *Neo4j, Inc. v. PureThink, LLC*, 2021 WL 2483778, at *6-10.

9.      As conclusively determined by this Court, Neo4j Sweden did not "violate" the AGPL by adding the Commons Clause to create the Neo4j Sweden Software License.  *See Neo4j, Inc. v. PureThink, LLC*, 2021 WL 2483778, at *14; *see also Neo4j, Inc. v. Graph Found., Inc.*, No. 5:19-CV-06226-EJD, 2020 WL 6700480, at *4 (N.D. Cal. Nov. 13, 2020).   Thus, Defendants cannot show any inequitable conduct related thereto. *See Pinkette Clothing, Inc.*, 894 F.3d at 1029.

10.     Neo4j USA also did not act with unclean hands when Neo4j USA filed an official protest of the IRS's intended award of a sole-source contract to iGov to develop and support the CKGE.  The IRS agreed with Neo4j USA that it had improperly awarded the contract to iGov on a sole source basis and canceled it for that reason.

11.     More importantly, as conceded by Defendants in dismissing their counterclaim with Intentional Interference with Prospective Economic Advantage counterclaim, Neo4j USA had a constitutionally protected right under the *Noerr–Pennington* doctrine to protest that award.  *See* Dkt. Nos. 171, 172 and 176; *see also Octane Fitness,* 572 U.S. at 555–56 (under the *Noerr– Pennington* doctrine "defendants are immune from antitrust liability for engaging in conduct … aimed at influencing decision making by the government"); *Empress LLC v. City & Cty. of San Francisco*, 419 F.3d 1052, 1056 (9th Cir. 2005) (recognizing that the *Noerr-Pennington* doctrine shields individuals and entities from liability for petitioning any part of the government for redress, even if the outcome of the petitioning results in harm to a competitor).

12.     With respect to the second requirement, Defendants must show that that plaintiff's "misdeeds ... have an immediate and necessary relation to the equity that [plaintiff] seeks in respect of the matter in litigation."  *S. Cal. Darts Ass'n v. Zaffina,* 762 F.3d 921, 932 (9th Cir. 2014) (*quoting Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933)).

13.     Neo4j Sweden owns the copyright to Neo4j® EE and was licensor of that software under the GPL and AGPL, and not Neo4j USA.  As previously recognized by this Court, the GPL, AGPL and the Neo4j Sweden Software License "are copyright licenses, not trademark licenses" Dkt. No. 85 at 7:27-8:7; UDF No. 59; *see also* Dkt. No. 118 at 2:16-18.  Defendants cannot conflate **Neo4j Sweden's** alleged improper licensing practices with respect to Neo4j® EE with **Neo4j USA's** use of the Neo4j Mark to sell that software.  Consequently, Neo4j Sweden's copyright-based licensing practices do not bear the requisite "immediate and necessary" relationship to Neo4j USA's Lanham Act and UCL claims. *See S. Cal. Darts Ass'n*, 762 F.3d at 932; *Tveter v. AB Turn– O–Matic*, 633 F.2d 831, 839 (9th Cir. 1980).

14.     Defendants fail to show by clear and convincing evidence that Neo4j USA's alleged conduct resulted in any consumer deception.  *See Perfumebay.com, Inc. v. eBay, Inc.*, 506 F.3d

1165, 1178 (9th Cir. 2007) (holding that for unclean hands, the record must "affirmatively demonstrate" consumer deception); *see also Republic Molding Corp. v. B.W. Photo Utils*., 319 F.2d 347, 349–50 (9th Cir. 1963) (the "extent of actual harm caused by the conduct in question" is "highly relevant" to whether the plaintiff's conduct was inequitable); *Allmerica Fin. Life Ins. & Annuity Co. v. Dalessio*, No. C-96-0385 VRW, 2006 WL 408538, at *7 (N.D. Cal. Feb. 20, 2006) (recognizing that "courts do not apply the doctrine of unclean hands where the defendant has suffered no harm as a result of the plaintiff's actions"). To the contrary, the IRS ignored Neo4j USA's statements about needing to obtain a paid commercial license from Neo4j USA, and instead continued to use Neo4j® EE (and later ONgDB) for free under the AGPL.

15. The Court further finds that Defendants' unclean hands defense does not bear the necessary temporal relationship to the crux of Neo4j USA's Lanham Act claims. Neo4j Sweden release Neo4j® EE v3.4 (the first version subject to the more restrictive Neo4j Sweden Software License) **in May 2018**. As a result, Neo4j Sweden ceased its dual licensing model under the GPL and AGPL at that time. Defendants released ONgDB **in July 2018**, and thereafter engaged in the misconduct that the Court found violated the Lanham Act and UCL. *See* Dkt. No. 118 at 18:2-32:14; *see also* UDF Nos. 10-11, 64.

16. Conversely, Neo4j USA's alleged false statements that the IRS needing to obtain a paid license for Neo4j® EE were made **before October 2017**. *See* Dkt. No. 118 at 3:17-4:22; Dkt. No. 171 at ¶¶ 20-21. For this additional reason, Defendants' unclean hands defense fails as a matter of law. *See Seller Agency Council, Inc. v. Kennedy Ctr. for Real Est. Educ., Inc*., 621 F.3d 981, 987 (9th Cir. 2010) (recognizing that conduct which came to an end prior to the events which are in issue cannot constitute an unclean hands defense); *see also* 6 McCarthy on Trademarks and Unfair Competition § 31:55 (5th ed.) ("[d]efendant cannot dredge up inequitable conduct of plaintiff which had been discontinued for some time prior to suit") (citing same).

17. Finally, Defendants fail to show that they suffered harm caused by Neo4j USA's alleged unclean hands. *See Allmerica Fin. Life Ins. & Annuity Co. v. Dalessio*, No. C-96-0385 VRW, 2006 WL 408538, at *7 (N.D. Cal. Feb. 20, 2006) (recognizing that "courts do not apply the doctrine of unclean hands where the defendant has suffered no harm as a result of the plaintiff's

1     actions").

2         18.     In light of the foregoing, the Court finds that Defendants cannot prevail on their

3   Fourth Affirmative Defense of Unclean Hands against Neo4j USA's Lanham Act and UCL claims,

4   and finds in favor of Neo4j USA.

5

6   Dated:   October 2, 2023                   HOPKINS & CARLEY
                                             A Law Corporation

7

8                                       By: */s/ Jeffrey M. Ratinoff*

9                                           John V. Picone III
                                          Jeffrey M. Ratinoff

10                                           Arthur E. Rothrock
                                          Attorneys for Plaintiffs and

11                                           Counter-Defendants
                                          NEO4J, INC. and NEO4J SWEDEN AB

12

13

14   Dated:   _____

15                                           Honorable Edward J. Davila

16

17

18

19

20

21

22

23

24

25

26

27

28

4878-9639-7699.2                              - 66 -

PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW          CASE NO. 5:18-CV-07182-EJD