1    John V. Picone III, Bar No. 187226
     jpicone@hopkinscarley.com
2    Jeffrey M. Ratinoff, Bar No. 197241
     jratinoff@hopkinscarley.com
3    Arthur E. Rothrock, Bar No. 312704
     arothrock@hopkinscarley.com
4    HOPKINS & CARLEY
     A Law Corporation
5    The Letitia Building
     70 South First Street
6    San Jose, CA  95113-2406

7    *mailing address:*
     P.O. Box 1469
8    San Jose, CA 95109-1469
     Telephone:    (408) 286-9800
9    Facsimile:    (408) 998-4790

10   Attorneys for Plaintiffs
     NEO4J, INC. and NEO4J SWEDEN AB
11
     Adron W. Beene, Bar No. 129040
12   adron@adronlaw.com
     Adron G. Beene SB# 298088
13   adronjr@adronlaw.com
     Attorney at Law
14   7960 Soquel Drive Suite #296
     Aptos, CA 95003
15   Tel: (408) 392-9233

16   Attorneys for Defendants and
     Counterclaimants PURETHINK LLC,
17   IGOV INC., and JOHN MARK SUHY

18                  UNITED STATES DISTRICT COURT

19                 NORTHERN DISTRICT OF CALIFORNIA

20   NEO4J, INC., a Delaware corporation, and      CASE NO.  5:18-cv-07182-EJD
     NEO4J SWEDEN AB, a Swedish
21   corporation,                                   **AMENDED JOINT FINAL PRETRIAL
                                                    CONFERENCE STATEMENT**
22                         Plaintiffs,

23            v.

24   PURETHINK LLC, a Delaware limited
     liability company, IGOV INC., a Virginia
25   corporation, and JOHN MARK SUHY, an
     individual,
26
                           Defendants.
27
     AND RELATED COUNTERCLAIMS.
28

4859-1719-5914.3

Plaintiffs and Counter-Defendants Neo4j, Inc. and Neo4j Sweden AB (collectively "Plaintiffs" or "Neo4j") and Defendants and Counterclaimants PureThink LLC and iGov, Inc., and Defendant John Mark Suhy (collectively "Defendants"), by and through their undersigned attorneys, and in accordance with this Court's Standing Order for Civil Cases and the Court's October 25, 2023 Order Granting Plaintiffs' Motion for Summary Judgment, respectfully submit this Amended Joint Final Pretrial Conference Statement.

## I.      SUBSTANCE OF THE ACTION

Neo4j, Inc. ("Neo4j USA") is a Delaware corporation with its principal place of business in San Mateo, California, specializing in graph database management systems. Neo4j USA's platform helps organizations make sense of their data by revealing how people, processes and digital systems are interrelated.  Neo4j USA is the parent corporation of Neo4j Sweden AB ("Neo4j Sweden"), which in turn is a wholly owned subsidiary of Neo4j USA. Neo4j Sweden owns the copyrights related to the Neo4j graph database platform, including the source code, and has licensed those copyrights to Neo4j USA.  Defendants dispute Neo4j Sweden's complete ownership of underlying the source code in response to Plaintiffs' DMCA claim.

In conjunction with its business, Neo4j USA filed for and obtained several federally registered trademarks, including U.S. Trademark Registration No. 4,784,280 for the word mark "NEO4J" covering the goods and services in International Classes, 009, 035, 041, 042 and 045 (the "Neo4j Mark").  Defendants contend that Neo4j USA made certain misrepresentations to the USPTO in obtaining that registration in the context of their unclean hands defense.

John Mark Suhy is the individual that founded PureThink LLC ("PureThink"), which was a software and information technology consulting company specializing in supporting agencies within the U.S. Government that use Neo4j graph database software.  Mr. Suhy also founded iGov Inc. ("iGov"), which similarly specializes in providing support and development services to agencies within the U.S. Government using Neo4j graph database software licensed under the AGPL, ONgDB, and other graph database software as part of a larger platform.

On November 28, 2018, Neo4j USA filed suit against PureThink, iGov and Mr. Suhy (collectively "Defendants") for violations of the Lanham Act and California's Unfair Competition

1   Law, Cal. Bus. Prof. Code §§ 17200 et seq.  These claims were primarily based on Defendants'

2   infringement of the Neo4j Mark and the false advertising in relation thereto. Neo4j USA also

3   asserted a claim for breach of a reseller partner agreement that PureThink had entered into with

4   Neo4j USA in September 2014 (the "Partner Agreement") and was terminated by Neo4j USA in

5   July 2017 for breach. *See* Dkt. No. 1.

6        Neo4j USA filed its First Amended Complaint ("FAC") on October 23, 2019. *See* Dkt. Nos.

7   35, 37. The FAC provided, *inter alia*, additional and more recent examples of Defendants'

8   continuing violations of the Lanham Act. The FAC also added Neo4j Sweden as a plaintiff, which

9   in turn asserted claims against Defendants for violations of the DMCA.  Plaintiffs have since filed

10  their Third Amended Complaint, which is their current operative pleading. Dkt. No. 90.   On

11  October 19, 2020, Defendants filed their operative answer thereto.  Dkt. No. 91.

12       On February 9, 2019, Defendants filed their original counterclaim.   Dkt. No. 22.

13  Defendants, *inter alia*, asserted causes of actions for: (1) intentional interference with prospective

14  economic advantage; (2) intentional interference with contract; (3) breach of contract; and (4)

15  declaratory relief on whether certain post-termination restrictions in the Partner Agreement violated

16  Cal. Bus. & Prof. Code §16000 and the AGPL. Defendants filed their First Amended Counterclaims

17  on December 9, 2019 adding additional declaratory relief claims raising several legal issues.  On

18  March 17, 2023, Defendants filed their Fourth Amended Counterclaim, which is their operative

19  pleading.  Dkt. No. 177.  Plaintiffs filed their answer thereto on March 24, 2023.  Dkt. No. 178.

20       On May 31, 2021, the Court bifurcating the case into two phases. Dkt. Nos. 66, 68. Phase 1

21  was to adjudicate Plaintiffs' claims pursuant to the Lanham Act and California's unfair competition

22  law, Cal. Bus. & Prof. Code § 17200 et seq. ("UCL") and Defendants' counterclaims and related

23  defenses (excluding their unclean hands defense).  *See* Dkt. No. 68, ¶ 3. The Court found in favor

24  of Plaintiffs on several claims and defenses via a motion for judgment on the pleadings and motions

25  to dismiss and to strike (Dkt. Nos. 70, 85, 110), and ultimately on a motion for partial summary

26  judgment that was granted in favor of Neo4j USA on issues pertaining to Defendants liability under

27  the Lanham Act and UCL claims and issued a Preliminary Injunction against Defendants

28  prohibiting more unlawful conduct (Dkt. No. 118). Defendants have asserted an unclean hands

defense in response to Neo4j USA's Lanham Act and UCL claims, the viability of which is subject to Plaintiffs' pending second motion for summary judgment which defendants have opposed based on evidence of unclean hands.

Defendants appealed the Court's May 18, 2021 order. *See* Dkt. No. 121. The Ninth Circuit heard the appeal on an expedited basis pursuant to its rules on appeals of preliminary injunctions and affirmed the Court's ruling. Dkt. No. 141.

After the conclusion of Phase 2, Plaintiffs filed a second motion for summary judgment on the issue of Defendants' liability under the DMCA claim, as well as for summary judgment on Defendants' Fourth Cause of Action for Breach of Exclusivity Agreement and their unclean hands affirmative defense. Dkt. No. 183.  After the motion was fully briefed by parties, the Court took it under submission after hearing oral argument by parties on July 27, 2023.  Dkt. No. 192.

On October 13, 2023, Defendants withdrew their unclean hands defense to be dismissed upon final judgment.  Dtk. No. 215.

On October 25, 2023, the Court issued its Order Granting Plaintiffs' Motion for Partial Summary Judgment. Dtk. No. 216. In doing so, the Court found Defendants liable for violating Section 1202(b) of the DMCA.  *Id.*  The Court also granted summary judgment in favor of Neo4j USA on Defendants' Fourth Cause of Action for Breach of Exclusivity Agreement. *Id.*  The Court's second summary judgment order also resolved Defendants' Eighth Cause of Action for Declaratory Relief, Commons Clause in AGPL does not Apply to Professional Services against Neo4j Sweden in favor of Neo4j Sweden.  *See id.* at 15:25-28, 18:20-20:8-24:6; *see also* Dkt. No. 118 at 3:11-13, 5:26-6:1, 6:21-26.

The parties have also entered into a series of stipulations wherein they agreed to dismiss certain claims, counterclaims and defenses to streamline this action.  *See* Dkt. Nos. 133, 144, 176. As a result of these stipulations and the Court's rulings on the aforementioned dispositive motions, the following claims, counterclaims and defenses remain to be decided.

/ / /

/ / /

/ / /

*Plaintiffs' Remaining Claims Asserted in their Third Amended Complaint (TAC)[1]*

1.      Neo4j USA's First Cause of Action for Trademark Infringement, 15 U.S.C. § 1114, against Defendants.  Dkt. No. 90 at ¶¶ 99-111.  With the Court already holding that Defendants infringed the Neo4j Mark (Dkt. No. 118), the only issues that remain to be tried with this claim are the (a) amount of actual damages caused by the infringement that Neo4j USA may recover; (b) the amount of Defendants' ill-gotten profits from their acts of infringement subject to disgorgement; (c) whether Defendants' infringement of the Neo4j Mark constitutes an exceptional case where Neo4j USA is entitled to its attorneys' fees, and if so the amount of fees that it may recover; and (d) whether the preliminary injunction previously issued should be made permanent.  *See* 15 U.S.C. §§ 1116, 1117.

2.      Neo4j USA's Second Cause of Action for False Designation of Origin and False Advertising, 15 U.S.C. § 1125(a), against Defendants.  Dkt. No. 90 at ¶¶ 112-119.  With the Court already finding that Defendants engaged in false advertising and false designation of origin (Dkt. No. 118), the only issues that remain to be tried with this claim are (a) the amount of actual damages caused by the false advertising and false designation of origin that Plaintiffs are entitled to recover; (b) the amount of Defendants' profits generated from their violations of the Lanham Act that are subject to disgorgement; (c) whether this constitutes an exceptional case entitling Neo4j USA to its attorney's fees, and if so the amount of attorneys' fees that it may recover; and (d) whether the preliminary injunction previously issued should be made permanent.  *See* 15 U.S.C. §§ 1116, 1117.

3.      Neo4j USA's Third Cause of Action for Unfair Competition, 15 U.S.C. § 1125(a) against Defendants.  Dkt. No. 90 at ¶¶ 120-126.   With the Court already finding that Defendants engaged in unfair competition under the Lanham Act (Dkt. No. 118), the only issues that remain to be tried with this claim are (a) the amount of actual damages caused by unfair competition that Plaintiffs may recover; (b) the amount of Defendants' profits generated from their violations of the Lanham Act that are subject to disgorgement; (c) whether this constitutes an exceptional case

---

[1] Defendants do not adopt and dispute some of Plaintiffs' contentions regarding its claims.

entitling Neo4j USA to its attorney's fees, and if so the amount of fees that it may recover; and (d) whether the preliminary injunction previously issued should be made permanent. *See* 15 U.S.C. §§ 1116, 1117.

4.      Neo4j USA's Fourth Cause of Action for Unfair Competition, Cal. Bus. Prof. Code §§ 17200 et seq., against Defendants.  Dkt. No. 90 at ¶¶ 127-133.  With the Court already finding that Defendants engaged in unfair competition in violation of California's Unfair Competition Law (Dkt. No. 118), the only issues that remain to be tried with this claim are the (a) the amount of Defendants' profits generated from their acts of unfair competition are subject to disgorgement; and (b) whether the preliminary injunction previously issued should be made permanent.

5.      Plaintiffs' Eighth Cause of Action for Unauthorized Distribution of Altered Copyright Management Information, 17 U.S.C. § 1202(b), against Defendants.  Dkt. No. 90 at ¶¶ 166-173.  With the Court already finding that Defendants violated 17 U.S.C. § 1202(b)(1) and 17 U.S.C.  § 1202(b)(3) (Dkt. No. 216), the only issues that remain to be tried with this claim are the (a) the amount of actual damages that Plaintiffs are entitled to recover; (b) the amount of Defendants' profits generated from their violations that are subject to disgorgement; (c) whether the Court should award Plaintiffs their attorneys' fees; and (d) whether the preliminary injunction previously issued should be made permanent. *See* 17 U.S.C. §1203.

## II.      RELIEF SOUGHT

Without the parties waiving any of their respective remaining claims or defenses, or conceding any legal or factual issues, the parties are seeking the following relief:

### A.      Plaintiffs' Statement of Relief Sought

#### 1.      Remedies Available under the Lanham Act

Upon establishing a violation of the Lanham Act, "the plaintiff shall be entitled … to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."  15 U.S.C. § 1117(a).  Actual damages sustained by a plaintiff can include commercial injury, such as lost sales. *See Clorox Co. v. Reckitt Benckiser Grp. PLC*, 398 F. Supp. 3d 623, 644 (N.D. Cal. 2019) ("Lost sales for the plaintiff because of the defendant's false advertising is the 'paradigmatic direct injury from false advertising.'") (*quoting Lexmark Int'l, Inc. v. Static Control*

1    *Components, Inc*., 572 U.S. 118 (2014)). The Ninth Circuit has held that commercial injury is

2    generally presumed "when defendant and plaintiff are direct competitors and defendant's

3    misrepresentation has a tendency to mislead consumers." *TrafficSchool.com, Inc. v. Edriver, Inc.*,

4    653 F.3d 820, 831 (9th Cir. 2011) (emphasis in original), 653 F.3d at 826; *see also Lexmark*, 134

5    S.Ct. at 1393 ("diversion of sales to a direct competitor may be the paradigmatic direct injury from

6    false advertising").

7         The defendant need not be a competitor, however, for plaintiff to recover damages for false

8    advertising under the Lanham Act.  In *Lexmark Int'l, Inc. v. Static Control Components, Inc*., 572

9    U.S. 118 (2014), the Supreme Court expressly rejected "a categorical test permitting only direct

10   competitors to sue for false advertising," holding instead that an "application of the zone-of-

11   interests test and the proximate-cause requirement supplies the relevant limits on who may sue"

12   under § 1125(a). *Id*. at 134.[2]  Rather, the alleged false advertisement must merely constitute (1)

13   commercial speech; (2) for the purpose of influencing consumers to buy defendant's goods or

14   services; and (3) disseminated sufficiently to the relevant purchasing public to constitute

15   "advertising" or "promotion" within that industry.  *Lona's Lil Eats, LLC v. DoorDash, Inc*., No.

16   20-CV-06703-TSH, 2021 WL 151978, at *6 (N.D. Cal. Jan. 18, 2021) (citing *Lexmark*, 572 U.S.

17   at 137).  In other words, plaintiff need only prove that it lost sales and incurred damages as a result

18   of defendant's false advertising. *Lexmark*, 572 U.S. at 137.

19        A plaintiff may recover an infringing defendant's profits in two scenarios: (1) as a measure

20   of the plaintiff's own damages; or (2) on a theory of disgorgement of the defendant's unjustly

21   obtained profits.  *See Lindy Pen Co. v. Bic Pen Corp*., 982 F.2d 1400, 1407 (9th Cir. 1993),

22

23   ────────────────

24   [2]Defendants cite to non-binding, out of circuit authority predating *Lexmark* to argue that because
     the parties are not direct competitors, Neo4j USA cannot establish Defendants caused its damages

25   under the Lanham Act.  This is yet another example of Defendants and their counsel taking a
     frivolous legal position that is contrary to controlling authority and ignoring the prior rulings of this

26   Court. In particular, this Court previously determined that Defendants were direct competitors of
     Neo4j USA. *See* Dkt. No. 118 at 29:12-30:10. The Court also found that Defendants' falsely

27   advertising ONgDB as a "free and open source drop-in replacement" for Neo4j® EE caused Neo4j
     USA to lose a $2.2 million multi-year deal when Next Century and the Maryland Procurement

28   Office adopted ONgDB rather than pay for a commercial license to Neo4j® EE. *Id.* at 29:12-30:10.

1    *abrogated on other grounds by SunEarth, Inc. v. Sun Earth Solar Power Co*., 839 F.3d 1179 (9th

2    Cir. 2016); *see also Quia Corp. v. Mattel, Inc*., No. C 10-1902 JF HRL, 2011 WL 2749576, at *7

3    (N.D. Cal. July 14, 2011).   In either scenario, a plaintiff need only prove "defendant's gross profits

4    from the infringing activity with reasonable certainty." *Quia Corp*., 2011 WL 2749576, at *8.  The

5    defendant then "must prove all elements of cost or deduction claimed."  15 U.S.C. § 1117(a).

6          In exceptional Lanham Act cases, the Court may award reasonable attorneys' fees to the

7    prevailing party.  District courts analyzing a request for fees under the Lanham Act should examine

8    the "totality of the circumstances" to determine if the case was exceptional.  *See SunEarth, Inc*.,

9    839 F.3d at 1181.  District courts may exercise equitable discretion and consider nonexclusive

10   factors including, "frivolousness, motivation, objective unreasonableness (both in the factual and

11   legal components of the case) and the need in particular circumstances to advance considerations

12   of compensation and deterrence" based on the preponderance of the evidence. *Id*. (*quoting Octane*

13   *Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 fn 6, (2014)).

14         A case may be exceptional where the infringement was willful. *See Jason Scott Collection,*

15   *Inc. v. Trendily Furniture, LLC*, 68 F.4th 1203, 1223 fn 13 (9th Cir. 2023) ("[b]ecause the *SunEarth*

16   test is less stringent than the previous 'willful infringement' standard, it stands to reason that this

17   case of willful infringement would satisfy the *SunEarth* test"); *Sophia & Chloe, Inc. v. Brighton*

18   *Collectibles, Inc*., 2019 WL 1429588, at *7 (S.D. Cal. Mar. 29, 2019) (recognizing that inequitable

19   conduct or willful infringement still may make a case exceptional under *SunEarth*).   Willful

20   infringement occurs where a defendant engages in deliberate, false, misleading, or fraudulent

21   conduct.  *Lindy Pen*, 982 F.2d at 1406.  The Ninth Circuit has also stated willful infringement as

22   "attempting to gain the value of an established name of another." *Id*.

23         The Court also has the discretion to award prejudgment interest, and willful violations of

24   the Lanham Act are reasons for doing so.  *See Fitness Anywhere LLC v. WOSS Enterprises LLC*,

25   No. 14-CV-01725-BLF, 2018 WL 6069511, at *7 (N.D. Cal. Nov. 20, 2018) (court awarded pre-

26   judgment interest based on the 52-week T-Bill rate, compounded annually due to the willful and

27   deliberate nature of defendant's infringement of plaintiff's mark).

28         In cases where attorneys' fees are awarded, the Court may make the non-prevailing party's

1  attorneys jointly and severally liable for the payment thereof pursuant to 28 U.S.C. § 1927.  *See*

2  *Int'l Intell. Mgmt. Corp. v. Lee Yunn Enterprises*, Inc. (U.S.A.), No. CV 08-7587 R JWJX, 2009

3  WL 9137315, at *3–4 (C.D. Cal. Dec. 14, 2009).  Under Section 1927, the Court has the inherent

4  authority to order the attorney for the non-prevailing party to compensate a prevailing party if the

5  attorney "so multiplies the proceedings in any case unreasonably and vexatiously...." 28 U.S.C. §

6  1927. In such a case, the Court may order the non-prevailing attorney to "satisfy personally the

7  excess costs, expenses and attorneys' fees reasonably incurred because of such conduct."  Section

8  1927 is not limited to patent law, so the Federal Circuit has held that regional circuit law controls

9  the analysis of whether to impose Section 1927 sanctions against a party in a patent infringement

10  case. *See, e.g., Phonometrics, Inc. v. Westin Hotel Co.*, 350 F.3d 1242, 1246 (Fed.Cir.2003).

11          In the Ninth Circuit, fees may be awarded under Section 1927 on a showing of subjective

12  bad faith, which may be met where counsel "'knowingly or recklessly raises a frivolous argument,

13  or argues a meritorious claim for the purpose of harassing an opponent.'" *B.K.B. v. Maui Police*

14  *Department*, 276 F.3d 1091, 1107 (9th Cir. 2002) (*quoting In re Keegan Mgmt. Co., Sec. Lit*., 78

15  F.3d 431, 436 (9th Cir. 1996)). Thus, sanctions are available when counsel either knowingly or

16  recklessly asserts a frivolous claim or defense. *Id*.  Section 1927 permits a prevailing party to

17  recover "the excess costs, expenses and attorneys' fees reasonably incurred" as a result of the

18  opposing counsel's misconduct. *Int'l Intell. Mgmt. Corp.*, 2009 WL 9137315, at *3–4.

19          Finally, the Lanham Act vests the Court with the "power to grant injunctions according to

20  principles of equity and upon such terms as the court may deem reasonable, to prevent the violation

21  of any right" of the trademark owner. 15 U.S.C. § 1116(a); *see Century 21 Real Estate LLC v.*

22  *Ed/Var Inc.*, 2014 WL 3378278, at *6 (N.D. Cal. July 10, 2014). Generally, where "a plaintiff

23  demonstrates a likelihood of confusion, it is generally presumed that the plaintiff will suffer

24  irreparable injury if injunctive relief is not granted."  *Sun Microsystems, Inc. v. Microsoft Corp*.,

25  999 F.Supp. 1301, 1311 (N.D. Cal. 1998).

26          **2.      Remedies Available under the DMCA**

27          Under the DMCA, Plaintiffs may recover "the actual damages suffered … as a result of the

28  violation, *and* any profits of the violator that are attributable to the violation and are not taken into

account in computing the actual damages."  17 U.S.C. § 1203(c)(2) (emphasis added).  Actual damages may consist of lost licensing fees and renewal fees, as well as lost profits.  *See Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 707-708 (9th Cir. 2004) (affirming an actual damages award based on the copyright holder's actual price quote to the infringer).  A plaintiff may also recover hypothetical-license damages as actual damages.  *Id.*  The Court has the discretion to award prejudgment interest.  *Id.* at 718.  With respect to disgorgement, plaintiff must only prove defendants' gross revenue in establishing defendant's ill-gotten profits.  *See Netdragon Websoft, Inc. v. Toft*, 2012 WL 13008123, at *3 (C.D. Cal. Apr. 24, 2012). Defendant must then prove its deductible expenses and the elements of profit attributable to factors other than the wrongful conduct.  *Id.* If defendant fails to present such poof, "the gross [revenue] figure stands as the defendant's profits."  *Enter. Tech. Holdings, Inc. v. Noveon Sys.*, Inc., No. 05-CV-2236 W (CAB), 2008 WL 11338356, at *15 (S.D. Cal. July 29, 2008) (internal quotes and citation omitted).

The DMCA allows for an award of "reasonable attorney's fee to the prevailing party." 17 U.S.C. § 1203(b)(5).  In deciding whether the award of attorneys' fees is appropriate in cases brought under the Copyright Act, courts consider factors including "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19 (1994); *see also Unicom Systems, Inc. v. Farmers Group, Inc.*, 405 F. App'x 152, 155 (9th Cir. 2010) (approving of use of the *Fogerty* factors in determining whether to award fees under Section 1203(b)(5)). Courts will award a plaintiff its attorneys' fees where defendant's violations of the DMCA were willful.  *See, e.g., Sony Computer Entm't Am., Inc. v. Divineo, Inc.*, 457 F. Supp. 2d 957, 967 (N.D. Cal. 2006); *Dish Network, L.L.C. v. SatFTA*, No. 5:08-CV-01561 JF PSG, 2011 WL 856268, at *7 (N.D. Cal. Mar. 9, 2011).

Finally, the DMCA provides that the Court "may grant temporary and permanent injunctions on such terms as it deems reasonable to prevent or restrain a violation" of Section 1202(b).  17 U.S.C. § 1203(b)(1); *see also Apple Inc. v. Psystar Corp.,* 673 F. Supp. 2d 943, 948 (N.D. Cal. 2009), *aff'd*, 658 F.3d 1150 (9th Cir. 2011).  To obtain injunctive relief, a plaintiff must show that: (1) it has suffered an irreparable injury; (2) remedies available at law, such as monetary

damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction. *See eBay Inc. v. MercExchange*, L.L.C., 547 U.S. 388, 391 (2006); *accord Apple Inc.,* 673 F. Supp. 2d at 948 (citing same).

### 3.    Remedies Sought by Plaintiffs Under the Lanham Act and DMCA

#### a.    Plaintiffs' Lost Profits

In its May 18, 2021 Order, the Court held that Defendants' use of the Neo4j Mark in relation to their promotion of "Neo4j Enterprise", "Neo4j for Government" and similar uses, as well as their promotion of ONgDB, which was based on the source code for certain versions of Neo4j Enterprise Edition ("Neo4j® EE"), constituted trademark infringement in violation of Sections 1114(1) and 1125(a) of the Lanham Act.  Dkt No. 118 at 13:2-22:21.  Likewise, the Court held that statements made by Defendant in promoting ONgDB and their support services of users of that software constituted false advertising and false designation of origin in violation of Section 1125(a) of the Lanham Act and California's Unfair Competition Law (UCL).  *Id.* at 22:22-32:14.  As found by the Court, Defendants' false statements generally fell into two groups: (1) that ONgDB was "free and open source" versions of or alternatives to commercially licensed Neo4j® EE; and (2) that ONgDB was a "drop-in replacement for an existing commercial licensed distribution of the same version number" of Neo4j® EE.  *Id.* at 23:20-28:19.

In its October 25, 2023 Order, the Court found that Defendants violated Section 1202(b)(1) & (3) of the DMCA when they (a) removed the Commons Clause, which prohibited the non-paying public from engaging in commercial resale and certain commercial support services, without Neo4j Sweden's authorization; and (b) removed and/or alter Neo4j Sweden's other CMI from the license governing the source code for Neo4j® EE v3.4 and Neo4j® EE v3.5. Dkt. No. 216 at 16:23-24:6. Defendants then redistributed that source code containing the DMCA violations as rebranded ONgDB v3.4 and ONgDB v3.5 software to commercial users and offered paid support services to those users or otherwise caused that source code to be redistributed containing the DMCA violations.  *Id.*  This is the same misconduct that the Court found to constitute false advertising under the Lanham Act.  *See* Dkt. No. 118 at 24:7-25:19.

1   During expert discovery, Plaintiffs disclosed Steven Boyles, a forensic and certified public
2   accountant, as an expert witness who will testify at trial that Plaintiffs' actual damages comprise of
3   lost licensing revenue caused by Defendants' violations of the Lanham Act and DMCA in an
4   amount totaling at least **$4,857,790**.  This includes $2,113,218 in lost revenue after Next Century
5   and the Maryland Procurement Office (MPO) adopted ONgDB for free rather than pay for a two-
6   year commercial subscription for Neo4j® EE, which the Court previously recognized as a lost sale
7   caused by Defendants in granting summary judgment on Neo4j USA's false advertising claims.
8   *See* Dkt. No. 118 at 29:13-30:19.

9   Documents supporting this component of Plaintiffs' damages will primarily include: (a)
10  internal email communications between stakeholders at Next Century; (b) emails between
11  employees of Next Century and Neo4j USA; (c) emails between Suhy and stakeholders at Next
12  Century; (d) emails between Suhy and stakeholders at Graph Foundation, Inc. ("GFI"); (e) emails
13  between stakeholders at GFI and Next Century; (f) Neo4j USA's $2.2 million proposed
14  subscription bundle; and (g) certain internal Neo4j USA pricing and financial information.
15  Plaintiffs will also expect to present testimony from Jason Zagalsky of Neo4j USA and Jim Weyant
16  of Next Century (subsequently acquired by CACI).

17  Plaintiffs' lost revenue also consists of $2,744,572 attributed to the IRS's adoption and use
18  of ONgDB in a number of servers and projects under the improper license in lieu of purchasing a
19  commercial license for Neo4j® EE.  Documents supporting this damages claim will primarily
20  include: (a) internal email communications between stakeholders at the IRS; (b) emails between
21  employees of IRS and Neo4j USA; (c) emails between Suhy and stakeholders at the IRS; and (d)
22  internal Neo4j USA financial and pricing information.  Plaintiffs also expect to offer testimony
23  from Jason Zagalsky of Neo4j USA, Michael Dunn of the IRS and Mr. Suhy as an adverse witness
24  in establishing these lost profits.

### b.    Disgorgement of Defendants' Profits

26  Mr. Boyles will testify at trial that Defendants generated **$1,562,082** in ill-gotten profits
27  from their violations of the Lanham Act and DMCA.  The evidence will show this consists of
28  $1,316,000 iGov and Suhy received from providing support services under a 5-year contract to

1   build and support the IRS' CKGE analytics platform ("CKGE Contract") between the IRS and

2   eGovernment Solutions ("eGov Sol"), another entity in which Suhy had an ownership interest at

3   the time the IRS awarded the contract.

4        The evidence will show that the scope of work under this contract, required iGov and Suhy

5   to perform all operations and maintenances duties for all components of the CKGE framework,

6   which included the installation and use of graph database software.   During the course of

7   performance, the IRS obtained Suhy's input on whether to implement unrestricted and improper

8   licensed ONgDB for free instead of paying for a commercial license Neo4j® EE as the graph

9   database software in the CKGE framework.   Thereafter, Suhy and iGov were responsible for

10  supporting, maintaining and updating ONgDB on an internal repository at the IRS, which violated

11  the commercial restrictions of the now-removed Commons Clause.

12       The evidence also will show that eGov Sol considered the CKGE Contract to belong to

13  Suhy, which he had sole responsibility for fulfilling and control over the $1,316,000 received from

14  the IRS.   While Plaintiffs need only show Defendants' gross profits, Mr. Boyles is expected to

15  testify that the financial statement produced by iGov do not reflect any cost of goods sold.   Thus,

16  Defendants cannot show they are entitled to any deductions from their gross profits.

17       Documents supporting the disgorgement of the gross profits received by Defendants in

18  supporting improperly licensed ONgDB at the IRS will primarily include: (a) CKGE Contract

19  documents; (b) internal email communications between stakeholders at the IRS; (c) emails between

20  Suhy and stakeholders at the IRS; (d) emails between Suhy and stakeholders at eGov Solutions; (e)

21  a stock sale agreement between Suhy and other shareholders of eGov Solutions; (f) iGov's financial

22  documents; and (f) eGov Solutions' banking and financial documents.   Plaintiffs also expect to

23  offer testimony from Michael Dunn of the IRS, Ashwani Mayur of eGov Solutions, and Mr. Suhy

24  as an adverse witness.

25       The evidence will show that Defendants ill-gotten profits also consists of $246,082.55

26  received by Suhy and iGov under certain subcontracts with ASR Analytics, LLC ("ASR").   The

27  evidence will also show that the work under these subcontracts and related task order required Suhy

28  and iGov to provide support, consulting and development services for the CKGE and other

1   installations of ONgDB at the IRS between 2019 and 2022.  Had Suhy not removed the Commons

2   Clause and misinformed the IRS of the infringing nature of the ONgDB product, it would have

3   needed to obtain the commercial license from Plaintiffs. The paid support work performed by Mr.

4   Suhy and iGov under the ASR subcontracts relating to Neo4j® EE software would have otherwise

5   violated the commercial restrictions imposed by the Commons Clause that Defendants removed

6   without Neo4j Sweden's authorization.

7        Documents supporting the disgorgement of the gross profits received by Defendants in

8   supporting improperly licensed ONgDB at the IRS versions will primarily include: (a) ASR

9   subcontracts and task orders; (b) internal email communications between stakeholders at ASR; (c)

10  emails between Suhy and stakeholders at the IRS; (d) emails between Suhy and stakeholders at

11  ASR; (e) emails between Suhy and other contractors and subcontracts working at the IRS; and (f)

12  iGov's financial documents.  Plaintiffs also expect to offer testimony from Michael Dunn of the

13  IRS, Michael Stavrianos of ASR Analytics, LLC, and Mr. Suhy as an adverse witness.

14                      **c.    Plaintiffs' Attorneys' Fees**

15       Plaintiffs have incurred over $2,974,296 in attorneys' fees thus far in prosecuting their

16  Lanham Act and DMCA claims.  Plaintiffs assert this is an exceptional case under the Lanham Act

17  warranting an award of those attorneys' fees. The Court already found that "Defendants were not

18  using 'Neo4j' to refer to Plaintiffs' products, they were using it to create the misleading perception

19  that Defendants' products *were* Plaintiffs' products." Dkt. No. 118 at 20:3-4 (emphasis in original);

20  *see also id.* at 32:12-5 ("the evidence also makes clear that Defendants intended to convince

21  consumers to buy Defendants' products instead of Neo4j® EE commercial licenses; in other words,

22  Defendants used the Neo4j Mark to unfairly compete with Plaintiffs").  This constitutes willful

23  infringement because Defendants clearly sought to gain the value of the established name of Neo4j.

24  *Lindy Pen*, 982 F.2d at 1406. The Court also determined that Defendants intentionally engaged in

25  false advertising through the intentional removal of the commercial restrictions by replacing the

26  Neo4j Sweden Software License with the AGPL.  *Id.* at 23:20-28:16.  This included a finding that

27  Defendants' false statements actually deceived consumers. *Id.* at 28:17-24.

28       The Court's prior findings that Defendants removed the Commons Clause in order to

1   commercially use and support ONgDB also establishes their intentional violation of the DMCA.

2   Dkt. No. 118 at 6:2-7:6, 24:7-25:19.  Suhy did so without Neo4j Sweden's authorization under the

3   false premise that Section 7 of the Neo4j Sweden Software License permitted licensees to remove

4   "further restrictions," i.e. the Commons Clause, imposed by Neo4j Sweden as the copyright holder

5   and original licensor.  *See Neo4j, Inc.*, 2020 WL 6700480, at *4 (rejecting argument that it is not

6   possible for a "contractually permitted action" to have been "taken with knowledge that it would

7   aid infringement" under the DMCA).

8       Finally, Defendants have litigated this case in an unreasonable manner.  Defendants have

9   repeatedly sought to reassert legal arguments, claims and defenses that the Court previously

10  dismissed with prejudice or otherwise determined to be meritless.  For example, Defendants argued

11  in opposition to Plaintiffs' summary judgment motion that Neo4j USA's "misrepresentations of

12  time of use, ownership of trademark and failure to correct those misrepresentations is unclean hands

13  under the PTO's standards."  Dkt. No. 188 at 7:9-17, 19:16-19.  These were the same facts

14  underpinning their twice-stricken cancellation/fraud on the PTO defense, which the Court warned

15  that "Defendants are not permitted to reassert any affirmative defense or counterclaim in this action

16  based on the cancellation or abandonment theories asserted in the stricken defenses." Dkt. No. 110.

17      The issue of whether Neo4j USA misrepresented that it was the owner of the trademark

18  rights to the Neo4j® Mark to the PTO was also conclusively resolved when the Court granted

19  summary judgment in favor of Neo4j USA during Phase 1.  In doing so, the Court provided a

20  detailed legal and factual analysis to reach the conclusion that Neo4j USA was the owner of the

21  Neo4j Mark at the time of registration.  Dkt. No. 118 at 11:16-12:26, 13:18-18:1 *aff'd* Dkt. Nos.

22  140-141. Relying on the same intercompany license between Neo4j Sweden and Neo4j USA,

23  Defendants sought to assert the same facts and arguments in support of their unclean hands defense.

24  *See* Dkt. No. 100 at 7:13-8:2, 12:13-14:9.

25      Perhaps the most egregious example is Defendants' attempt to use an alleged expert witness

26  to re-litigate this Court's interpretation of Sections 7 and 10 of the Neo4j Sweden Software License

27  after the Ninth Circuit affirmed that interpretation.  *See, e.g.*, Dkt. No. 183.  Defendants' attempt to

28  re-litigate this issue also violates their prior stipulation (and the resulting order) dismissing one of

their counterclaims and three affirmative defenses – all of which required determining whether Neo4j Sweden AB's inclusion of Common Clause in the Neo4j Sweden Software License violated these same provisions and whether Suhy was entitled to remove it as a "further restriction." *See* Dkt. Nos. 133, 144.  In doing so, Defendants *expressly admitted their positions were* "*no longer legally viable*." Dkt. No. 144 at 1:23-28 (emphasis added).

Defendants' failure to comply with the Court's prior orders, reneging on their prior stipulation, and "persistent desire to re-litigate issues already decided" makes this an exceptional case thereby entitling Plaintiffs to recover their attorneys' fees. *See San Diego Comic Convention*, 807 F. App'x at 676. Since Defendants' counsel has knowingly and recklessly re-litigated these issues in complete disregard of the Court's orders granting Plaintiffs' dispositive motions, their prior stipulations, and the preclusive effect of their appeal of the Court's summary judgment order, Defendants and their counsel should be joint and severally responsible for payment of Plaintiffs' attorneys' fees incurred from March 22, 2022 when the Ninth Circuit affirmed this Court's May 18, 2021 order through trial.[3]  *See* 28 U.S.C. § 1927; *see also*, *B.K.B.,* 276 F.3d at 1107; *Int'l Intell. Mgmt. Corp*., 2009 WL 9137315, at *3–4.   For these same reasons, the Court should award Plaintiffs prejudgment interest, which they will establish such amounts via expert testimony.   *See Fitness Anywhere*, 2018 WL 6069511, at *7.

### d.      Permanent Injunctive Relief

Plaintiffs are requesting that the Court make the preliminary injunction it issued on May 18,

---

[3] Plaintiffs object to Defendants' assertion that they are attempting to chill Defendants' unclean hands defense by seeking its attorneys' fees pursuant to 28 U.S.C. § 1927.  Plaintiffs are doing so because Defendants and their counsel willfully disregarded the Court's express directive that they may not reassert the same facts that supported their already-dismissed cancelation counterclaim and affirmative defense in support of any other affirmative defense. *See* Dkt. No. 110 at 3:14-6:4.  Defendants and their counsel also continue ignore that the Ninth Circuit's affirmation of the Court's May 18, 2021 Order has foreclosed the re-litigation of the legal and factual issues therein.  Their wanton disregard of this Court's orders and controlling Ninth Circuit authority has unnecessarily increased the costs of this litigation and will continue to do so.

1 | 2021 in granting summary judgment on Neo4j USA's Lanham Act and UCL claims. *See* Dkt. No.

2 | 118 at 32:15-36:6.  Since the Court previously found that Defendants' violations of the Lanham

3 | Act were likely to cause confusion and did cause actual confusion, it should make the preliminary

4 | injunction entered on May 18, 2021 permanent. Dkt. No. 118 at 8:13-9:1, 19:2-22:10, 31:20-32:10,

5 | 33:3-10 (citing *Sun Microsystems*, 999 F.Supp. at 1311). With respect to their DMCA claim,

6 | Plaintiffs are seeking to make the preliminary injunction entered by the Court pursuant to 17 U.S.C.

7 | § 1203(b)(1) on October 26, 2023 a permanent injunction. Dkt. No. 216 at 24:7-25:24, 31:13-35:23.

8 | ### B.   Defendants' Statement of Relief Requested

9 | With respect to Plaintiffs' damage claims, the Lanham Act claims seek damages arising out

10 | of iGov comparative advertisement comparing two software products: Neo4j USA's commercial

11 | version of Neo4j software and Neo4j Sweden's AGPL version of Neo4j software. ONgDB is a

12 | version of the Neo4j AGPL software.  The court found the following statements were false: (1) that

13 | "ONgDB were "free and open source" versions of or alternatives to commercially licensed Neo4j®

14 | EE; and (2) that ONgDB was a "drop-in replacement for an existing commercial licensed

15 | distribution of the same version number" of Neo4j® EE. Dkt 118 at 23:20-28:19. Lanham Act

16 | damages must proximately flow directly from iGov's advertising. *LexMark Intern., Inc. v. Static*

17 | *Control Components, Inc.* 572 U.S. 118 (2014).

18 | Defendants in this case do not license any software. So do not compete is software licensing.

19 | The advertisement only addressed licensing. As Neo4j must directly tie the damages to the

20 | advertisement, no damages arise out of the "free and open source" or "drop in engine" statements.

21 | The falsity of the "free and open source" statement was derived from the construction it meant not

22 | subject to the commons clause. That clause restricts licensees of the Neo4j Sweden AGPL version

23 | from selling the software. iGov only provides services to the US government. iGov has no

24 | commercial licenses or service agreements. The IRS version of Neo4j software includes the

25 | commons clause so there is no improper licensing. The IRS decided to use the AGPL version before

26 | the advertising. The US government does not sell software or services derived from the software.

27 | The commons clause does not apply to the US Government. The "drop in replacement" statement

28 | does not impact any sales as it would only apply to an existing Neo4j USA customer who changed

1  from the paid for commercial version to Neo4j Sweden's free version based on iGov's statements.

2  That did not occur.

3     In Lanham Act cases, the causation standard for an award of damages is higher than the

4  general standard for in-junctive relief:

5     [C]ases involving injunctive relief and those seeking monetary damages under the Lanham

6     Act have different standards of proof. A plaintiff suing to enjoin conduct that violates the

7     Lanham Act need not prove specific damage. In contrast, courts require a heightened level

8     of proof of injury in order to recover money damages.

9  *Porous Media Corp. v. Pall Corp.*,110 F.3d 1329, 1335 (8th Cir. 1997); *see also Parkway Baking*

10  *v. Freihofer Baking*, 255 F.2d 641, 648-49 (3d Cir. 1958).

11     Thus, a plaintiff seeking monetary rather than injunctive relief must show "actual damages

12  rather than a mere tendency to be damaged." *Synygy v. Scott-Levin*, 51 F.Supp.2d 570 (E.D. Pa.

13  1999); *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 480-81 (D.N.J.

14  2009). "[T]he court must ensure that the record adequately supports all items of damages claimed

15  and establishes a causal link between the damages and the defendant's conduct, lest the award

16  become speculative or violate section 35(a)'s prohibition against punishment." *ALPO Petfoods,*

17  *Inc. v. Ralston Purina Co.*, 913 F.2d 958, 969 (D.C. Cir. 1990).

18     The plaintiff bears the burden of showing that the sales for which it seeks disgorgement

19  occurred because of the alleged false advertising. *Bracco Diagnostics, Inc. v. Amersham Health,*

20  *Inc.* (D.N.J. 2009) 627 F.Supp.2d 384, 484.  Defendants caused no direct damages to Neo4j USA

21  under the Lanham Act or unfair competition claims. Neo4J Sweden does not sell any software and

22  has not lost sales from the DMCA violation.

23     Mr. Suhy committed one copy of the Sweden AGPL software with the Sweden AGPL

24  license replaced with a verbatim copy of the Free Software Foundation's AGPL license. This was

25  consistent with his understanding of the license terms of the AGPL. GFI independently confirmed

26  the right to do that and licensed and distributed ONgDB.

27     Plaintiffs seek an award of fees against defendants and counsel.  Plaintiffs seek to chill the

28  defense by raising a position that defense attorneys should be liable for fees. A similar motion was

denied even where the case was fought aggressively, and the defense filed every motion possible. *Schrader Cellars, LLC v. Roach*, No. 21-CV-01431-SK, 2023 WL 3902696, at *4 (N.D. Cal. June 8, 2023). Defendants have not aggressively litigated this case. They filed only one motion case (and an other than to seal plaintiffs' documents). Defendants have defended against a persistent onslaught of motions from plaintiffs.

On Lanham Act attorney's fees, as *Schrader* pointed out, "The Supreme Court held, in interpreting a similar provision for the award of attorneys' fees in patent cases: an "exceptional" case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated. District courts may determine whether a case is "exceptional" in the case-by-case exercise of their discretion, considering the totality of the circumstances. *Octane Fitness*, 572 U.S. at 554. This case deals with an open source license agreement in a legal landscape with limited jurisprudence on the GPL/AGPL. The Lanham Act claims are defended under applicable case and statutory law.   Parties should not be punished by attorney's fees awards for exercising their right to challenge weak trademarks. *Earthquake Sound Corp. v. Bumper Industries* (9th Cir. 2003) 352 F.3d 1210, 1221–1222 (Judge Ferguson's concurring opinion.)

Plaintiffs' rely on *Int'l Intell. Mgmt. Corp. v. Lee Yunn Enterprises*, Inc. (U.S.A.), No. CV 08-7587 R JWJX, 2009 WL 9137315, at *3–4 (C.D. Cal. Dec. 14, 2009) ("IIMC"). This case has been distinguished. IIMC involved an award of defendants' fees payable by plaintiffs' counsel under 28 U.S.C. § 1927. Here, the parties are reversed. Plaintiff is seeking fees from defense counsel. In analyzing the IIMC case, the central district denied fees sought against defense counsel as they were not the ones who chose to file the lawsuit, and defendants were obligated to defend themselves. *EcoServices, LLC v. Certified Aviation Servs., LLC*, 340 F. Supp. 3d 1004, 1031 (C.D. Cal. 2018), *aff'd in part, vacated in part, remanded*, 830 F. App'x 634 (Fed. Cir. 2020).  This is akin to the rule, an attorney is not required to forfeit client's right to avoid sanctions: "In *USS-POSCO Industries v. Contra Costa County Building & Construction Trades Council*, we held that

the rule "only applies to amended complaints that follow upon dismissal with leave to amend, and not to those that follow summary judgment." 31 F.3d 800, 812 (9th Cir.1994). As we explained, "[c]ounsel were not required to risk forfeiting their client's right to appeal in order to avoid sanctions." *Id. Lacey v. Maricopa Cnty.*, 693 F.3d 896, 925 (9th Cir. 2012).

Plaintiffs broadly seek sanctions, but they are only permitted for specific frivolous or harassing conduct:

> The imposition of attorneys' fees under § 1927 serves "as a sanction against counsel personally for reckless or bad faith conduct in the course of litigation." *Yue v. Storage Tech. Corp.,* No. C-07-05850-MJJ, 2008 WL 361142, at *2 (N.D. Cal. Feb. 11, 2008) (citations and internal quotations omitted). "Bad faith is present when an attorney knowingly or recklessly raises a frivolous argument or argues a meritorious claim for the purpose of harassing an opponent." *Z-Rock Comme'n Corp. v. William A. Exline, Inc.,* No. C-0302436-WHA, 2004 WL 2496158, at *7 (N.D. Cal. Nov. 5, 2004) (citations and internal quotations omitted). Moreover, "[f]or sanctions to apply, if a filing is submitted recklessly, it must be frivolous, while if it is not frivolous, it must be intended to harass." Id. (citations and internal quotations omitted) (emphasis added). Carelessly, negligently, or unreasonably multiplying the proceedings, however, is insufficient for the imposition of sanctions. In re Girardi, 611 F.3d 1027, 1061 (9th Cir. 2010).

*Fitbit, Inc. v. AliphCom* (N.D. Cal., Oct. 25, 2016, No. 5:15-CV-04073-EJD) 2016 WL 7888035, at *1

Plaintiffs seek all fees they claim incurred in the case without any effort to identify which fees apply to which conduct. The unspecific fee request is unreasonable does not support any sanctions request. Plaintiffs claim two events. Defendants' assertion of an unclean hands defense and raising defenses to the DMCA claim. The unclean hands defense raises issues already ruled upon in the 1st summary judgment motion. The unclean hands defense was specifically reserved as a phase 2 issue and invokes the equitable jurisdiction of the court on a defensive claim. The owner of a trademark may be barred from enforcing it under unclean hands. *Japan Telecom, Inc. v. Japan Telecom America Inc.* 287 F.3d 866, 870–871 (9th Cir. 2002). *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.* (1945) 324 U.S. 806, 814 (Patent owner barred from enforcing patent by unclean hands for failing to disclose information to Patent Office). Counsel's assertion of an unclean hands defense is not a violation of §1927.

Plaintiffs claim counsel violated §1927 by asserting the propriety of the removal of the common clause as a defense to the DMCA claim after the Court ruled on the issue. The issue is a proper defense to the DMCA claim. The issue in the DMCA was whether Mr. Suhy's acted intentionally to cause infringement. "Section 1202(b)(3) contains a so-called "double-scienter" requirement: the defendant who distributed improperly attributed copyrighted material must have actual knowledge that CMI "has been removed or altered without authority of the copyright owner or the law," as well as actual or constructive knowledge that such distribution "will induce, enable, facilitate, or conceal an infringement." *Id*. *Mango v. BuzzFeed, Inc.* (2d Cir. 2020) 970 F.3d 167, 171. Plaintiff had the burden to prove the double-scienter elements. Mr. Suhy was allowed to rebut the element. At the time he changed the license to a AGPL license he thought he could do so.

Mr. Suhy is allowed to show he was not aware the §7 removal clause only applied to downstream licensee and his conduct was reasonable. This evidence was to show plaintiff cannot prove the double-scienter requirement of the DMCA claim and to show innocence under 17 U.S.C. §1203 (c) (5). While the Court ruled he was not correct to remove the additional clause, he is permitted to defend the claim showing his conduct was reasonable and not to cause infringement. Presenting statutory defenses is not frivolous or harassing supporting the claim.

DMCA damages may be reduced or remitted under 17 U.S.C. §1203 (c)(5)[4]:

> (5) INNOCENT VIOLATIONS.-
> (A) IN GENERAL.-The court in its discretion may reduce or remit the total award of damages in any case in which the violator sustains the burden of proving, and the court finds, that the violator was not aware and had no reason to believe that its acts constituted a violation.

Mr. Suhy's conduct was supportable under the terms of the AGPL, comments he received from FSF and Graph Foundation. His removal of the commons clause was before the Court ruled, he could not.

---

[4] This is not an unpled affirmative defense. *Howarth v. Greenhaw* (W.D. Tex., June 9, 2022, No. A-21-CV-00643-RP) 2022 WL 2072221, at *5, *report and recommendation adopted* (W.D. Tex., July 18, 2022, No. 1:21-CV-643-RP) 2022 WL 20470458. (in analogous copyright innocence defense case, innocence is not an affirmative defense. It is not a bar to recovery; it is a limit on damages.)

### III.   UNDISPUTED FACTS

The following list constitutes the relevant facts[5] to which the parties will stipulate for incorporation into the trial record without the necessity of supporting testimony or exhibits, as well as which facts can be presented at trial upon an agreed statement:[6]

1.   Neo4j USA is the parent corporation of Neo4j Sweden, which in turn is a wholly owned subsidiary of Neo4j USA.  Dkt. No. 118 at 2:15-16.

2.   In conjunction with its business, Neo4j USA filed for and obtained several federally registered trademarks, including U.S. Trademark Registration No. 4,784,280 for the word mark "NEO4J" (the "Neo4j Mark"). Dkt. No. 118 at 2:18-21.

3.   In its registration application, Neo4j USA claimed first use of the Neo4j Mark was in June 2006 and first use in commerce in May 2007 based on the use of that mark by Neo4j Sweden, Neo4j USA's predecessor-in-interest and related company.  Dkt. No. 118 at 2:18-21.

4.   The Court determined that Neo4j USA owns the rights to the Neo4j Mark in the United States and is the proper registrant. Dkt. No. 118 at 2:23-26.

---

[5] Defendants do not agree all these facts are relevant to the trial. The Court has already issued to 2 summary judgment rulings which do not need to be restated for trial. For Undisputed Facts referenced to the summary judgment rulings, defendants do not object for purposes of trial but do not agree they are undisputed facts for all purposes and specifically do not waive the right to dispute the facts on appeal. For purposes of trial, they will not be disputed.

[6] Plaintiffs object to Defendants' attempt to recant their prior agreement in the Final Joint Pretrial Conference Statement that Fact Nos. 1-57 were undisputed for purposes of trial.  Dkt. No. 206 at 21:15-26:28.  To the extent those facts were based on the Court's May 18, 2021 summary judgment order, Defendants already appealed that ruling and lost.  Thus, the factual and legal findings are binding as law of the case and not subject to a second appeal.  *See Richardson v. United States*, 841 F.2d 993, 996 (9th Cir. 1988) (under the law of the case, "a court is ordinarily precluded from reexamining an issue previously decided by the same court, or a higher court, in the same case."); *Leslie Salt Co. v. United States*, 55 F.3d 1388, 1393 (9th Cir.), *cert. denied*, 516 U.S. 955 (1995). Fact No. 58 is based, in part, on Defendants' judicial admissions and thus cannot be contested on appeal.  Fact Nos. 59-118 are not based on either order and therefore should be considered undisputed without the need to offer evidence at trial to support those facts.

5.  Prior to May 2018, Neo4j Sweden offered a free and open source version of the Neo4j® graph database platform, Neo4j® Community Edition ("Neo4j® CE"), under the GNU General Public License version 3 ("GPL") license. Dkt. No. 118 at 3:1-4.  Neo4j® CE is limited in its feature set and does not come with technical or administrative support. *Id.* at 3:4-5.

6.  Plaintiffs also offered a more advanced commercial version, which included additional features and support services, known as the Neo4j Enterprise Edition ("Neo4j® EE"). Dkt. No. 118 at 3:5-7. Prior to May 2018, Plaintiffs offered Neo4j® EE under both a paid-for commercial license and for free under the GNU Affero General Public License, version 3 ("APGL"). *Id.* at 3:7-9.

7.  The Court found that on May 17, 2018, Neo4j Sweden "released Neo4j EE v3.4 but replaced the AGPL with the Neo4j Sweden Software License, a stricter license which included additional restrictions provided by the Commons Clause ("Neo4j Sweden Software License")." Dkt. No. 118 at 3:9-12.

8.  The Court previously recognized that the new terms added by Neo4j Sweden, "prohibited the non-paying public from engaging in commercial resale and certain commercial support services." Dkt. No. 118 at 3:12-13.

9.  The NOTICE provision in the Neo4j Sweden Software License states that Neo4j® EE is developed and owned by Neo4j Sweden… and is subject to the terms of the [AGPL], with the Commons Clause as follows…." Dkt. No. 98-2, ¶ 11 and Ex. 3; Dkt. No. 118 at 6:21-26.  It also provides additional information, such as the title of the work, terms and conditions for use of the work, and other identifying information about Neo4j Sweden and how to obtain a commercial license for the use of Neo4j® EE. *Id.*

10. Neo4j® EE v3.4 included advanced scalability, availability, security, and operational features that were not previously available.  Dkt. No. 118 at 3:1-15

11. In November 2018, Plaintiffs officially released of Neo4j® EE v3.5 solely under a commercial license. Dkt. No. 118 at 3:18-19.

12. Prior to the official release of Neo4j® EE v3.5, Plaintiffs published several beta versions via their GitHub repository subject to the Neo4j Sweden AGPL Software License. Dkt. No. 118 at 6:18-21. Neo4j® EE v3.5.0-RC1 was the last pre-release version available to Defendants via GitHub. *Id.* Thereafter, only the source code for Neo4j® CE was made publicly available under the GPL via Github.  *Id.*

13. Neo4j® EE v3.4 and v3.5 contained at least 182 source code files that were never released under either the GPL or AGPL, and were instead release for the first time under the Neo4j Sweden Software License.  Dkt. No. 98-1, Ex. 38 at 6:23-16:24, 8:4-16:24 (iGov's interrogatory response identifying 182 source code files in Neo4j® EE that had not previously been released under the AGPL); Dkt. No. 188, UDF No. 13 ("UNDISPUTED that there were at least 182 source code files released under AGPL + Commons clause"); *see also* Dkt. No. 118 at 6:18-21.

14. The GPL, AGPL and Neo4j Sweden Software Licenses are copyright licenses and not trademark licenses. Dkt. No. 188, UDF No. 60.

15. John Mark Suhy founded PureThink in 2002, which is a software and information technology consulting company specializing in supporting agencies within the U.S. Government that use Neo4j® graph database software.  Dkt. No. 118. at

3:17-19.

16. PureThink is a single person company filing as an s-corporation for tax purposes. Dkt. No. 188, UDF No. 87. Since at least September 1, 2014, Suhy has been the sole employee, member and manager of PureThink.

17. On September 30, 2014, PureThink and Neo4j USA entered into the Neo Technologies Solution Partner Agreement ("Partner Agreement" or "SPA").

18. Neo4j Government Edition ("Gov't Edition") consisted of Neo4j® EE and certain FISMA security plug-ins provided by PureThink, and a framework provided by GraphAware.  Dkt. No. 183-1, Exs. 16-17, 21.

19. PureThink marketed Gov't Edition to the IRS, however, the IRS indicated that it would require a prototype before purchasing a full subscription.

20. The Court found that "[t]o secure the IRS's business, Mr. Suhy told the IRS that it could use the open source version of Neo4j EE and pay PureThink for consulting services instead of buying a commercial subscription from Neo4j USA." Dkt. No. 118 at 4:7-12.

21. On September 23, 2016, the IRS's Office of Research, Applied Analytics and Statistics ("RAAS") awarded PureThink a one-year contract for the "Implementation of the Government Neo4j project" for $229,000.

22. On May 30, 2017, Neo4j USA sent PureThink notice that Mr. Suhy's use, distribution, and marketing of Neo4j Sweden's open source products and his marketing of consulting services focused on those products constitute a material breach of the SPA. Dkt. 118 at 4:13-15.

23. This notice triggered a 30-day cure period, during which Mr. Suhy formed iGov to support open source Neo4j® software without being bound by restrictions in the SPA on June 23, 2017.  Dkt. No. 118 at 4:15-18.

24. Mr. Suhy has been the sole employee, officer and director of iGov since he formed the corporation. Dkt. No. 188, UDF No. 18.

25. On July 11, 2017, Neo4j USA terminated the Partner Agreement thereby requiring PureThink to "cease using [Neo4j's] trademarks, service marks, and other designations…and remove from PureThink's website(s) marketing materials, [Neo4j's] trademarks and tradenames, including, without limitation, Neo4j" as required by Agreement.  Dkt. No. 118 at 4:19-42.

26. After the termination of the SPA, the Court found that "Mr. Suhy and iGov continued marketing the Gov't Edition to government agencies." Dkt. No. 118 at 4:24-5:7.

27. The Court found, Defendants continued to use the Neo4j® Mark without Neo4j USA's authorization to send customers to iGov to obtain "Government Package for Neo4j" and "Government Development Package with Neo4j Enterprise." Dkt. No. 118 at 5:7-12.

28. The Court found, Defendants stated on iGov and PureThink's websites that "[t]he principle [sic] behind PureThink and the Government Package has created a new corporate entity called iGov Inc." and "iGov Inc's new Government Package for Neo4j can be added to any Neo4j instance making it a 'Government Edition'." Dkt. No. 118 at 4:25-5:7. .

29. As recognized by the Court, "iGov advertised itself as 'the only US Federal contractor providing Neo4j Enterprise binaries packaged with it's free Open Source license!'" and "iGov Inc's Government Development Package with Neo4j Enterprise . . . Comes with same physical Neo4j Enterprise software." Dkt. No. 118 at 9-12.

30. The Court found Defendants infringed the Neo4j Mark by operating a website (www.igovsol.com) that contained numerous uses of the Neo4j Mark, including references to "Government Package for Neo4j" and "Government Development Package with Neo4j Enterprise." Dkt. No. 118 at 4:24-5:12, 20:3-21:3.

31. The Court found the iGov website infringed the Neo4j Mark by (1) using "https://igovsol.com/neo4j.html" as a URL to promote "Government Development Packages for Neo4j"; (2) displaying "Request Procurement Document Package" link with "mailto:neo4j@igovsol.com" embedded that creates an email addressed thereto upon activation; (3) encouraging consumers to obtain more information by sending an email to "neo4j@igovsol.com;" and (4) using "Government Packages for Neo4j" and "Neo4j Enterprise" to describe iGov's modified version of Neo4j® EE software. Dkt. No. 118 at 5:13-20, 20:3-21:3.

32. The Court found, without Plaintiffs' authorization, "Defendants and GFI used Neo4j EE version 3.4, which was openly available subject to the Neo4j Sweden Software License, as a base for ONgDB, but they replaced the Neo4j Sweden Software License with the AGPL." Dkt. No. 118 at 6:8-10. "Doing so removed certain legal notices identifying Neo4j Sweden as the copyright holder and licensor, and removed the Commons Clause." *Id.* at 6:24-25.

33. Prior to replacing the Neo4j Sweden Software License with the AGPL, Suhy sought guidance from the FSF, which told him "[t]he copyright holder on a work is the one with the power to enforce the terms of the license" and "[i]f a work was previously available under a free license, and later that license is changed, users can always use that earlier version under the terms of the free license." The FSF also warned that "we cannot provide you with legal advice" and that he should "talk with legal counsel." Dkt. No. 188, UDF No. 41; Dkt. No. 98-1, Ex. 34.

34. Prior to replacing the Neo4j Sweden Software License with the AGPL, Suhy did not seek independent legal advice from any attorney. Dkt. No. 188, UDF No. 42.

35. The Court found that after the release of ONgDB in July 2018, Defendants continued to infringe the Neo4j Mark by using "https://igovsol.com/neo4j.html" as a URL to promote ONgDB until it deactivated that page after July 27, 2020. While iGov replaced this URL with "https://igovsol.com/graph.html," the contents of the page remained the same. Defendants further used a "Download Neo4j Enterprise" hyperlink on iGov's "downloads" page, which redirected consumers to download links for ONgDB until July 27, 2020. Dkt. No. 118 at 6:11-17.

36.   In January 2019, GFI released ONgDB v3.5.1, which contained at least 182 source code files that had only been previously released under the Neo4j Sweden Software License in a publicly available beta version of Neo4j® EE 3.5. Dkt. No. 118 at 6:18-21; Dkt. No. 98-1, Ex. 38 at 6:23-16:24, 8:4-16:24.

37.   As recognized by the Court, "Defendants continued to promote ONgDB as 'free and open source' by replacing the Neo4j Sweden Software License with the AGPL in [28] LICENSE.txt files alongside the source code. [] Doing so removed certain legal notices identifying Neo4j Sweden as the copyright holder and licensor, and removed the Commons Clause, effectively allowing Defendants to commercially use and support ONgDB." Dkt. No. 118 at 6:21-26.

38.   The Court found, "Defendants do not claim that ONgDB is identical to its Neo4j counterpart versions. Rather, it combines the last public Neo4j EE code (beta version of Neo4j 3.5), the Neo4j CE code, and 'glue code' authored by Mr. Suhy and other contributors." Dkt. No. 118 at 7:7-10.

39.   The Court found Defendants falsely advertised via their websites and through direct communications with potential users that ONgDB was licensed under AGPLv3 as a free and open drop-in replacement for Neo4j Enterprise commercial licensed distributions with the same version number. Dkt. No. 118 at 6:18-7:5, 7:18-24, 24:1-28:16.

40.   The Court found Defendants used the Neo4j Mark to create the misleading perception that the products were Plaintiffs' product. For example, Defendants used the Neo4j Mark in the URL https://igovsol.com/neo4j.html to promote ONgDB and in the email address neo4j@igovsol.com as means for consumers to inquire about ONgDB. Dkt. No. 118 at 20:3-21:3.

41.   The Court found Defendants infringed the Neo4j Mark by (1) extensively using of "Neo4j' and "Neo4j Enterprise" on iGov and PureThink's websites without proper trademark notices; (2) using embedded "Neo4j" links to Neo4j USA's website and GitHub repository on their websites; (3) hyperlinking to Plaintiffs' build instructions, support documentation and change logs containing the Neo4j Mark rather than creating and hosting their own with the ONgDB name; and (4) using of "Neo4j Enterprise" and ONgDB" interchangeably to promote ONgDB on their websites. Dkt. No. 118 at 21:25-22:21.

42.   Mr. Suhy provided hyperlinks to potential users of Neo4j® EE to view and download ONgDB from GFI's website and GitHub repository from his jmsuhy@purethink.com email account. Dkt. No. 188, UDF No. 20.

43.   Mr. Suhy provided hyperlinks to potential users of Neo4j® EE to download ONgDB from GFI's website and GitHub repository from his jmsuhy@igovsol.com email account. Dkt. No. 188, UDF No. 21.

44.   iGov's website provided links to potential users of Neo4j® EE to download ONgDB directly from iGov and from GFI's website. Dkt. No. 188, UDF No. 22.

45.   iGov and Mr. Suhy operated www.graphstack.io, which provided information about ONgDB and hyperlinks for consumers to directly download ONgDB v.3.5.x and ONgDB v.3.6.x. Dkt. No. 188, UDF No. 38.

46.   As recognized by the Court, "[b]y December 2020, just under two years after the release of ONgDB v3.5.1, the ONgDB software had been downloaded over

14,000 times, signaling its widespread success." Dkt. No. 118 at 8:13-15.

47. The Court found Defendants' use of the Neo4j Mark created the misleading perception that Defendants and Plaintiffs are affiliated and falsely suggested endorsement by Neo4j USA. Dkt. No. 118 at 21:25-22:21.

48. The Court found Defendants' actions with respect to ONgDB and use of the Neo4j Mark is likely to cause and have caused significant consumer confusion. For example, "consumers have encountered compatibility issues, technical problems or glitches with ONgDB and sought assistance from Plaintiffs." Dkt. No. 118 at 8:15-23.

49. The Court found Consumers expressed uncertainty about the propriety of the removal of the Commons Clause from the Neo4j Sweden Software License. This caused actual confusion about whether and when a commercial license from Neo4j USA is necessary to use, modify or redistribute the software in a commercial setting. Dkt. No. 118 at 8:24-9:1.

50. The Court has ruled that Sections 7 and 10 of the Neo4j Sweden Software License prohibit a licensee from imposing further restrictions, but do not prohibit Neo4j Sweden as the original licensor of the underlying software from doing so. Dkt. No. 118 at 24:16-25:12.

51. The Court found that Defendants' statements that ONgDB and their version of "Neo4j Enterprise" are "free and open source" versions of or alternatives to commercially licensed Neo4j® EE amount to false advertising because they improperly removed Commons Clause in violation of the Neo4j Sweden Software License. Dkt. No. 118 at 25:13-19.

52. The Court found that Defendants' statements that ONgDB is a "drop-in replacement for an existing commercial licensed distribution of the same version number" of Neo4j® EE were false or misleading. Dkt. No. 118 at 25:20-28:16.

53. The Court found that Defendants made such false and misleading statements to convince customers to adopt ONgDB over Neo4j® EE. Because Defendants misrepresented ONgDB as a free version of Neo4j® EE licensed under the APGL, this price differential (free versus paid) was likely to influence customers purchasing decisions. Dkt. No. 118 at 29:4-11.

54. As recognized by the Court, Defendants' false and misleading statements regarding ONgDB diverted sales from Neo4j USA, including when Next Century adopted ONgDB via the Maryland Procurement Office, amounting to over $2.2 million in lost licensing revenue. Dkt. No. 118 at 29:19-30:13.

55. As recognized by the Court, [t]he Neo4j Mark enjoys strong brand recognition in the graph database software market and is an industry leader. Dkt. No. 118 at 29:19-30:13.

56. As recognized by the Court, Defendants used the Neo4j Mark unfairly compete with Plaintiffs and to convince consumers to use or buy Defendants' products instead of Neo4j® EE commercial licenses, and in doing so caused actual consumer confusion. Dkt. No. 118 at 31:20-32:10

57. As recognized by the Court, Defendants' holding out of ONgDB as free and open source Neo4j® EE is likely to cause consumer confusion, and did cause actual

consumer confusion, and as a result constitutes a false designation of origin.  Dkt. No. 118 at 30:22-32:15.

58.  Neo4j Sweden owns of all copyrights related to the Neo4j graph database platform, including the source code, and has licensed those copyrights to Neo4j USA. Dkt. No. 118 at 2:16-18; Dkt. 100, UDF No. 80; Dkt. No. 216 at 18:5-8.

59.  Neo4j Sweden did not give Mr. Suhy permission to replace the Neo4j Sweden Software License with verbatim copies of the AGPL in the 28 LICENSE.txt files in ONgDB v3.4 and ONgDB v3.5.

60.  Suhy knowingly distributed Neo4j® EE source code without the Neo4j Sweden Software License with the understanding that it would result in the infringement of Neo4j Sweden's copyrights.

61.  Suhy submitted a bid for a new contract issued by the IRS via another entity that he had an ownership interest in at the time, eGovernment Solutions, Inc. ("eGov Sol" or "eGov Solutions").

62.  Under the proposal for the new contract signed by Suhy, the scope of work required iGov to perform "all operations and maintenances duties for all components of the CKGE framework…."   iGov would also be "responsible for ensuring any open source products within the CKGE conform to their license-terms" and iGov would "need to work with the following components: React, Angularjs, Neo4j…."

63.  On May 22, 2018, Neo4j USA informed the IRS, including those in RAAS, that Neo4j Sweden added Commons Clause to Neo4j® EE 3.4, and the resulting need to obtain a commercial subscription if they intended to use that software in the CKGE platform.

64.  On May 22, 2018, Suhy sent an email to the IRS claiming Neo4j Sweden could not add the Commons Clause to the license governing Neo4j® EE v3.4.

65.  On May 24, 2018, the RAAS division of the IRS awarded eGov Solutions the new contract, Order No. 2032H8-18-P-00151, as amended Order No. 2032H8-18-P-00168, to further develop and support the CKGE in May 2018 ("CKGE Contract").

66.  In July 2018, Jason Zagalsky, a sales representative from Neo4j USA, met with employees of the IRS, and then provided a quote of $156,000 for one-year subscription and a $397,800 for a 3-year subscription for a Neo4j® EE v3.4 based on then-current requirements of CKGE.

67.  As of August 2018, the IRS understood that Neo4j® CE had a performance limitation to only 4 cores, while Neo4j® EE had enterprise-only features, came with professional services and subscriptions, and was priced based on number of cores.

68.  Under the CKGE Contract, Suhy provided input in the architecture design and hardware requirements needed to run ONgDB installations on multiple servers within the CKGE.

69.  In August 2018, Suhy recommended that the IRS integrate ONgDB v3.4 rather than Neo4j® EE v3.4 in the CKGE framework, and claimed that "ONgDB open

source licenses come directly from the Graph Foundation as well, not from Neo4j Inc."

70. Based on Suhy's recommendation, Mike Dunn at the IRS instructed him to "[g]o ahead and integrate the ONgDB into the CKGE framework we'll deploy" on August 14, 2018.

71. While working at the IRS, Mr. Suhy helped the IRS upload ONgDB source code into the IRS's internal repository.

72. The IRS decided to not allocate $156,000 for a license to use Neo4j® EE in the CKGE platform because ONgDB was a free and open, unrestricted alternative.

73. Under the CKGE contract, Suhy and iGov were responsible for supporting, maintaining and updating ONgDB in an internal GitLab repository for the RAAS at the IRS.

74. Under the CKGE contract, Suhy and iGov helped the IRS upgrade the CKGE platform to ONgDB v3.5 in April 2019 and integrated subsequent subversions through at least April 2022.

75. After April 2022, the IRS started calling ONgDB v3.5 just "GDB" due to the injunction entered against GFI and its rollback of ONgDB source code.

76. GDB was merely a name change because it was still based on Neo4j® EE v3.5 source code that was improperly licensed under the AGPL without the Commons Clause, which Suhy continued to be responsible for maintaining on the IRS's internal Gitlab repository.

77. The IRS used at least one Neo4j® enterprise-only feature, node ID, via ONgDB in CKGE.

78. The IRS understood that Neo4j® EE can run Cypher queries significantly faster than Neo4j® CE, which is advantageous in terms of productivity.

79. The initial hardware available to run Neo4j® EE in the IRS's pre-CKGE platform were for one server with at least 16 cores and 1 terabyte of RAM under the September 23, 2016 contract award to PureThink.

80. As of December 2018, the CKGE (a/k/a "main graph") was running, or was expected to be running, on at least two production servers and one development / test server utilizing ONgDB.  Each machine was comprised of a DL380 with 32 cores and 256GB of RAM at minimum.

81. As of March 2019, the IRS was running ONgDB on three production servers, and one development server in the CKGE, totaling four instances of ONgDB.

82. In 2020, the IRS continued to run ONgDB on at least three production servers in the CKGE with four total instances of ONgDB.

83. In 2021, the IRS continued to run ONgDB on at least three production servers in the CKGE with four total instances of ONgDB.

84. In 2022, the IRS continued to run ONgDB on at least two production servers in the CKGE with at least three total instances of ONgDB.

85. Each machine in the CKGE running ONgDB was comprised of a DL380 with 32 cores and 256GB of RAM.

86. As of November 2022, the IRS would only want the bare-minimum Neo4j® EE package for two nodes, each with 16 cores and 256GB RAM for the CKGE.

87. On August 14, 2018, Mike Dunn asked Suhy to inform the YK1 team of the switch to ONgDB v3.4.x into the CKGE framework "we'll deploy."

88. By December 2018, the IRS's YK1 began using one instance of ONgDB.

89. The minimum server specifications for YK1 at the IRS was a DL380 with 12 cores and 256GB of RAM.

90. In 2019, one instance of ONgDB was running on its own server in YK1 at the IRS.

91. In 2020, one instance of ONgDB was in production and running on its own server in YK1 at the IRS.

92. In 2021, one instance of ONgDB was in production and running on its own server in YK1 at the IRS.

93. In 2022, two instance of ONgDB in production and two instances of ONgDB in development/test in YK1 at the IRS.

94. Starting in 2019 and continuing through 2022, the IRS ran a separate instance of ONgDB in development in a project called "Corporate Graph."

95. The minimum server specifications for Corporate Graph are DL380 with 12 cores and 256GB of RAM.

96. Starting in 2020 and continuing through 2022, the IRS ran one instance of ONgDB in production in a project called "Excise Graph."

97. The minimum server specifications for Excise Graph are DL380 with 12 cores and 256GB of RAM.

98. Starting in summer of 2020 and continuing through September/October 2021, the IRS ran one separate instance of ONgDB in development for its COVID Graph project.

99. Starting in September/October 2021 and continuing through October 2022, the IRS ran one separate instance of ONgDB in production for its COVID Graph project.

100. The minimum server specifications for COVID Graph are DL380 with 12 cores and 256GB of RAM.

101. Starting in 2021 and continuing through 2022, the IRS ran one separate instance of ONgDB in development for a project called "Policy Net."

102. The minimum server specifications for Policy Net are DL380 with 12 cores and 256GB of RAM.

103. Starting in 2021 and continuing through 2022, the IRS ran one separate instance of ONgDB in development called "Individual Graph."

104. The minimum server specifications for Individual Graph are DL380 with 12 cores and 256GB of RAM.

105. In 2022, the IRS ran one separate instance of ONgDB in development in a project called "CPEO Graph."

106. The minimum server specifications for CPEO Graph are DL380 with 12 cores and 256GB of RAM.

107. In 2022, the IRS ran one separate instance of ONgDB in development called "Ghost Preparer."

108. The minimum server specifications for Ghost Preparer graph are DL380 with 12 cores and 256GB of RAM.

109. Between September 2019 and September 2022, Neo4j sold commercial subscriptions of Neo4j® EE to divisions at the IRS other than RAAS for a total price of approximately $1,380,000. These licensed products include a new subscription to Neo4j's Enterprise Bundle in 2019 (as well as renewal subscriptions in 2020, 2021, and 2022).

110. The Maryland Procurement Office (a/k/a the National Security Agency, the NSA and the MPO) tasked Next Century to analyze available graph database technologies, including Neo4j® EE.

111. Next Century and the MPO required the enterprise-only features, such as causal clustering and multi-data centers, offered by both Neo4j® EE and ONgDB.

112. Next Century learned about the pricing of Neo4j Enterprise software bundles offered by Neo4j USA and iGov from iGov's website.

113. In October 2018, Next Century exchanged emails with Suhy regarding representations made on iGov's website that ONgDB v3.4 was an open source version of Neo4j® EE that provided the same enterprise-only features for free.

114. Suhy told Next Century that the MPO could use ONgDB v3.4 under the AGPL without restrictions or paying Plaintiffs for a commercial license, as advertised on the iGov's website.

115. As a result of Next Century's communications with Suhy, Next Century downloaded ONgDB v3.4 and began evaluating against Neo4j® EE v3.4.

116. In a series of emails with Next Century ending on January 4, 2019, Suhy confirmed that ONgDB v3.5 would have feature parity with the enterprise features of Neo4j® EE v3.5, and would also be available without restrictions on the number of clusters, instances and cores and without paying Neo4j USA for a commercial license.  This led Next Century to upgrade from ONgDB v3.4 to ONgDB v3.5.

117. By February 2019, the MPO had chosen to use ONgDB v3.5 over Neo4j® EE v3.5 for continued development work for the MPO.

118. On February 5, 2019, Next Century informed Neo4j USA of this decision, stating, "[w]e have found that open-sourced (non-commercial) builds from the Neo4j source code provide the clustering and security requirements needed in our environment."

119. In March 2019, Next Century gave Neo4j USA the required specifications for its ongoing project with the MPO and ask for Neo4j USA for a quote for use in a production environment.

120. On April 19, 2019, Jason Zagalsky of Neo4j USA sent a 3-year Neo4j Enterprise Edition Enterprise Bundle for $2,266,950 based on those requirements.  This included a commercial license and technical support for (a) 12 Production Machines (up to 12 cores and 256GB of RAM per Machine); and (b) 12 Test Machines (up to 12 cores and 256GB of RAM per Machine). Neo4j USA also provided a 15% multi-year discount.

121. On April 29, 2019, Next Century confirmed that it shared Neo4j USA's proposal with the MPO, and was instructed by the MPO to continue using ONgDB.   The reason for the MPO continuing to use ONgDB over Neo4j® EE was price.

122. On July 21, 2019, Next Century informed Neo4j USA that the MPO was not interested in the Neo4j® EE proposal. Again, the deciding factor between ONgDB and Neo4j® EE was price.

123. Next Century continued to use ONgDB v3.5, which was placed into a production environment for the NSA in or about October 2020.

124. Neo4j USA has a past history of entering into licensing arrangements with the MPO, including one transaction in November 2019 wherein the MPO obtained a license for Neo4j® EE v3.5 discovery bundle for another project, which included one production machine with 12 cores and 256GB of RAM (as well as one test machine) at a price of $59,250.

## IV.     FACTUAL ISSUES THAT REMAIN IN DISPUTE

Without the parties waiving any of their respective remaining claims or defenses, or conceding any legal or factual issues, the following factual issues remain in dispute:

1. After accounting for saved expenses, the lost profits suffered by Neo4j USA in conjunction with the MPO using ONgDB for free instead of paying for a commercial subscription for Neo4j® EE is $2,113,218.

2. As a result of the IRS using ONgDB in the CKGE, Neo4j USA lost $1,471,800 (after the application of a 15% discount) in licensing revenue.

3. As a result of the IRS using ONgDB in YK1, Neo4j USA lost $537,200 (after the application of a 15% discount) in licensing revenue.

4. As a result of the IRS using ONgDB in Corporate Graph, Neo4j USA lost $217,600 (after the application of a 15% discount) in licensing revenue.

5. As a result of the IRS using ONgDB in Excise Graph, Neo4j USA lost $188,700 (after the application of a 15% discount) in licensing revenue.

6.  As a result of the IRS using ONgDB in COVID Graph, Neo4j USA lost $188,700 (after the application of a 15% discount) in licensing revenue.

7.  As a result of the IRS using ONgDB in Policy Net, Neo4j USA lost $125,800 (after the application of a 15% discount) in licensing revenue.

8.  As a result of the IRS using ONgDB in Individual Graph, Neo4j USA lost $125,800 (after the application of a 15% discount) in licensing revenue.

9.  As a result of the IRS using ONgDB in CPEO Graph, Neo4j USA lost $62,900 (after the application of a 15% discount) in licensing revenue.

10. As a result of the IRS using ONgDB in Ghost Preparer Graph, Neo4j USA lost $62,900 (after the application of a 15% discount) in licensing revenue.

11. On a discounted basis, Neo4j USA's total loss of revenue in conjunction with the IRS using ONgDB for free instead of paying for commercial subscriptions for Neo4j® EE is at least $2,981,000.

12. After accounting for saved expenses, the lost profits suffered by Neo4j USA in conjunction with the IRS using ONgDB for free instead of paying for commercial subscriptions for Neo4j® EE is $2,744,572.

13. After the IRS awarded the CKGE Contract to eGov Solutions, it made an initial $300,000 payment to eGov Solutions in July 2018.  At that time, the money received from the IRS on the CKGE Contract was to be paid in its entirety to Mr. Suhy, at his sole discretion

14. After eGov Solutions obtaining the initial contractual award and performing work for the IRS on the CKGE, Suhy sold his ownership interest in eGov Solutions to its remaining shareholders on December 31, 2018 pursuant to a Stock Purchase Agreement.

15. Consistent with Section 5 of the Stock Purchase Agreement between Mr. Suhy and the other shareholders of eGov Solutions, Suhy had the responsibility and authority with respect to the CKGE Contract to "to drive the direction of the project" and "the authority to enter into agreements on behalf of [eGov Sol] relating to this project as long as the agreements are in line with government contracting laws and hubzone regulations."

16. Under Section 5.1 of the eGov Solutions Stock Purchase Agreement, Suhy was entitled to $200,000 for each option year on the CKGE contract that was exercised by the IRS.

17. eGov Solutions continued to view the CKGE Contract with the IRS as belonging to Suhy to which he had sole control over the performance under the contract and payments received.

18. eGov Solutions maintained a Wells Fargo bank account for all the payments received from the IRS ("the Wells Fargo Account"), which Suhy had access to and was authorized to disburse the payments made by the IRS as he saw fit.

19. eGov Solutions did not take any commission from payments made by the IRS and according to Mr. Mayur the "moment the money comes, John Mark Suhy takes the money out" using an account under his control.

20.  At some point, Mr. Suhy asked eGov Sol to make the payments received from the IRS to iGov rather than personally to him as required by the Stock Purchase Agreement.

21.  eGov Solutions considered all the payments made by the IRS under the CKGE Contract into the eGov Solutions Wells Fargo Account to belong Mr. Suhy and later iGov.

22.  The IRS paid a total of $1,316,000 to eGov Solutions under the CKGE Contract, which was deposited into the eGov Solutions Wells Fargo Account.

23.  This total amount is based on the following contractual increases/renewals: (a) $300,000 for 2018 Base Contract Award; (b) $200,000 for 2019 Option Year 1 exercised; (c) $216,000 for 2019 Modification Option Year 1; (d) $200,000 for 2020 Option Year 2 exercised; (e) $200,000 for 2021 Option Year 3 exercised; and $200,000 for 2022 Option Year 4 exercised.

24.  The financial statements produced by eGov Solutions and iGov indicate that eGov Solutions paid a total of $1,064,550 to iGov for the work it performed under the CKGE Contract.

25.  iGov and Suhy were entitled to the entire $1,316,000 for the work they performed under the CKGE Contract.

26.  The $251,450 difference between the amounts paid by the IRS to eGov Sol and the amounts paid by eGov Sol to iGov and Mr. Suhy are partially explained by Mr. Suhy paying $111,400 to AtomRain via the eGov Solutions Wells Fargo account for work performed by AtomRain at the IRS under the CKGE Contract.

27.  The $251,450 discrepancy between the amounts paid by the IRS to eGov Sol and the amounts paid by eGov Sol to iGov and Suhy are partially explained by Suhy paying $111,400 to AtomRain via the eGov Solutions Wells Fargo account for work performed by AtomRain at the IRS under the CKGE Contract.

28.  The $251,450 discrepancy between the amounts paid by the IRS to eGov Sol and the amounts paid by eGov Sol to iGov and Suhy are also partially explained by a total of $105,835 in payments made from the eGov Solutions Wells Fargo account by Suhy to one of his counsel of record in this action, the Irving Starr law firm

29.  The Profit & Loss statements produced by iGov do not reflect any cost of goods sold (i.e., any expenses that would have been incurred in generating the revenues reported by the company).

30.  ASR Analytics LLC ("ASR") also engaged Mr. Suhy via iGov as a subcontractor to provide support, consulting and development services for the CKGE and other implementations of ONgDB at the IRS between 2019 and 2022.

31.  The subcontracts and task orders provided by ASR to iGov included: (1) Knowledge Graph API (KG-API) for CKGE; (2) Support for Corporate Graph Database; (3) Emerging Compliance Issues; and (4) IDT Innovation.

32.  The consulting work that iGov and Mr. Suhy performed under the KG-API subcontract related to ONgDB interfacing with Spark.

33. KG-API contract expired in September 2021. Immediately thereafter, ASR entered into a similar contract with Tylor Data, which Mr. Suhy continued to work on as a subcontractor.

34. The work that iGov and Mr. Suhy performed under Corporate Graph Database (Subcontractor Task Order Number 0002) involved supporting GraphGrid, a microservices-based application programming interface (API) that includes ONgDB, at the IRS.

35. The work that iGov and Mr. Suhy performed relating to Emerging Compliance Issues involved the analysis of graph data, including graphs generated using ONgDB.

36. IDT Innovation was a task order awarded to ASR relating to identity theft, which involved the use of a graph database that was ONgDB.

37. ASR Analytics paid iGov a total of $246,082.55 for work performed under these subcontracts and task orders at the IRS, which all involved the use and support of ONgDB.

38. The CKGE platform is open source and no license fee was charged to the IRS.

39. On February 18, 2029, Mr. Suhy told Next Century "If you are using ONgDB and have any concerns, or don't see it keeping up with enterprise features, you can always switch to a commercial Neo4j Enterprise package through any partner on the Neo4j.com website."

40. MPO (NSA) had previously used a commercial license for the software from Neo4J USA but did not renew the agreement.

41. Purethink attempted to sell the IRS a commercial license for the software while Purethink was a Neo4J USA partner.

## V.   LEGAL ISSUES THAT REMAIN IN DISPUTE

Without the parties waiving any of their respective remaining claims or defenses, the following legal issues remain in dispute with respect to the parties' claims and defenses:

### A.   **Plaintiffs' Claims and Affirmative Defenses**

#### 1. Neo4j USA's Lanham Act Claims

a.   *Whether Defendants' violations of the Lanham Act under the totality of the circumstances constitutes an exceptional case where Neo4j USA is entitled to its attorney's fees pursuant to 15 U.S.C. § 1117(a).*

As detailed above, Plaintiffs contend that this is an exceptional case because Defendants engaged in willful infringement, intentionally engaged in false advertising and actually deceived consumers. They have also litigated this case in an unreasonable manner by repeatedly re-litigating

1    settled issues and dismissed claims and defenses.  *See SunEarth*, 839 F.3d at 1181; *see also Octane*

2    *Fitness*, 572 U.S. at 554 fn 6; *Jason Scott Collection*, 68 F.4th at 1223 fn 13.  This is further

3    reinforced by the Court recognizing that the law of case barred Defendants from offering expert

4    testimony to justify Suhy's removal of the Commons Clause and rejecting their attempt to re-argue

5    that this was consistent with the terms of the Neo4j Sweden Software License in granting summary

6    judgment on Plaintiffs' DMCA claim.  *See* Dkt. No. 216.

7           Defendants dispute this is an exceptional case because their use of the Neo4j was to describe

8    the names of the companies and the products all called Neo4j. The court ruled the use was

9    excessive. This is not a case were defendants palmed some other product as a Neo4j product.

10   ONgDB, the software licensed by GFI, is based on Neo4j software. Suhy thought the AGPL

11   allowed Licensee's to remove additional terms under the terms of the FSF AGPL license when the

12   developer, Neo4j Sweden, used FSF' AGPL License.

13          b.    *Whether Neo4j USA is entitled to prejudgment interest violations of the*

14   *Lanham pursuant to 15 U.S.C. § 1117(a).*

15          As detailed above, Plaintiffs contend Defendants' willful infringement thereby warranting

16   an award of prejudgment interest.  *See Fitness Anywhere*, 2018 WL 6069511, at *7.  As detailed

17   above, Defendants dispute this is an exceptional case.

18          c.    *Whether Neo4j USA is entitled to permanent injunction pursuant to 15*

19   *U.S.C. § 1116(a).*

20          As detailed above, Plaintiffs assert that the Court's previously findings that Defendants'

21   violations of the Lanham Act were likely to cause confusion and did cause actual confusion,

22   justifies making the preliminary injunction entered on May 18, 2021 permanent.  *See Century 21*

23   *Real Estate LLC*, 2014 WL 3378278, at *6; *Sun Microsystems*, 999 F.Supp. at 1311.

24          Defendants assert they have already complied with the preliminary injunction such that no

25   permanent injunction is required.

26          **2. Neo4j USA's UCL Claim**

27          a.    *Whether Neo4j USA is entitled to permanent injunction pursuant to Cal. Bus.*

28   *& Prof. Code § 17203.*

1  Section 17203 provides that "[a]ny person who engages, has engaged, or proposes to engage

2  in unfair competition may be enjoined in any court of competent jurisdiction." Plaintiffs contend

3  that the same reasons the Court entered a preliminary injunction pursuant to both the Lanham Act

4  and the UCL also justify making that injunction permanent.  The fact that there is a permanent

5  injunction entered against the GFI defendants is irrelevant, especially since Defendants insist they

6  are not bound by it.

7  Defendants contend that such an injunction is unnecessary. Neo4j has a judgment of a

8  permanent injunction against the GFI defendants who were the licensors of ONgDB.

9  **3.  Plaintiffs' DMCA Claim**

10  a.  *Whether Defendants are jointly and severally liable for GFI, AtomRain, Inc.*

11  *and/or GraphGrid, Inc.'s admitted violations of 17 U.S.C. § 1202(b).*

12  It is Plaintiffs' position that Defendants should be held jointly and severally liable for GFI,

13  AtomRain, Inc. and/or GraphGrid, Inc.'s admitted wrongful distribution of ONgDB containing

14  DMCA violations.  In this regard, Suhy contributed by removing Neo4j Sweden's CMI via commits

15  on GFI's GitHub repository and provided potential users with links to download the infringing

16  ONgDB software from that repository and GFI's website.  *See Adobe Sys. Inc. v. Blue Source Grp.,*

17  *Inc.*, 125 F. Supp. 3d 945, 973 (N.D. Cal. 2015) (recognizing that "[c]ourts in the Ninth Circuit

18  have held that in patent, trademark, literary property, and copyright infringement cases, any

19  member of the distribution chain of allegedly infringing products can be jointly and severally liable

20  for the alleged misconduct") (internal quotes and citations omitted).

21  Plaintiffs further contend that Defendants cannot escape responsibility for the damages that

22  flowed from their removal of Neo4j Sweden's CMI simply because a judgment was entered against

23  the GFI Defendants.  As recognized by the Supreme Court, "[i]f two or more defendants jointly

24  cause harm, each defendant is held liable for the entire amount of the harm…." *Honeycutt v. United*

25  *States*, 581 U.S. 443, 447-48 (2017); *see also Desire, LLC v. Manna Textiles, Inc*., 986 F.3d 1253,

26  1263 (9th Cir. 2021) ("[w]hen two or more persons have joined in or contributed to a single

27  infringement of a single copyright, each is jointly and severally liable") (internal quotes and citation

28

1   omitted). Defendants also ignore that they continued to promote and distribute software containing

2   the DMCA violations after judgment was entered against the GFI Defendants.

3       It is Defendants' position that Suhy made a contribution to GFI, it was up to GFI to accept

4   it. They independently looked into it and removed CMI from the AGPL. Neo4j has obtained a

5   judgment against the GFI Defendants and all damages and harm for their conduct has been resolved

6   through judgment.

7           b.      *Whether Plaintiffs are entitled to recover their attorneys' fees pursuant to*

8   *17 U.S.C. § 1203(b)(5).*

9       The factors justifying an attorneys' fees award amount to an exceptional case under the

10  Lanham Act are virtually the same for awarding Plaintiffs such fees under the DMCA.  *See Fogerty*,

11  510 U.S. at 534 n.19 (1994); *see also Unicom Systems, Inc*, 405 F. App'x 152, 155.  This includes

12  awarding plaintiff its attorneys' fees where defendant's violations of the DMCA were willful.  *See,*

13  *e.g., Sony Computer Entm't Am., Inc. v. Divineo, Inc*., 457 F. Supp. 2d 957, 967 (N.D. Cal. 2006);

14  *Dish Network, L.L.C. v. SatFTA*, No. 5:08-CV-01561 JF PSG, 2011 WL 856268, at *7 (N.D. Cal.

15  Mar. 9, 2011).  It is therefore Plaintiffs' position that they are entitled to recover their attorneys'

16  fees for the same reasons detailed above with respect to Neo4j USA's Lanham Act claims.

17      It is Defendants' position that Suhy's conduct was not willful as discussed above. Neo4j

18  Sweden violated FSF' copyright. Suhy corrected it to avoid contributing infringement of FSF's

19  copyright. Defendants should recover as prevailing parties.

20          c.      *Whether the Court should permanently enjoin Defendants from further*

21  *violations of the DMCA pursuant to 17 U.S.C. § 1203(b)(1).*

22      Plaintiffs contend that the Court should permanent enjoin Defendants from distributing

23  graph database software containing Neo4j Sweden's source code with a DMCA violation and/or in

24  a manner that infringes Neo4j Sweden's copyrights in Neo4j® EE. *See Apple Inc.,* 673 F. Supp. 2d

25  at 948 (recognizing that monetary damages would not prevent defendant from continuing to

26  infringe plaintiff's copyrights and violate the DMCA in the future, and will not prevent third-parties

27  from infringing plaintiff's copyrights).  A permanent injunction is warranted to prevent Defendants

28  from continuing to distribute improperly licensed ONgDB and its derivatives such as GraphStack

1   GDB and GDB, and attempt to compete with Plaintiffs by offering such software containing

2   DMCA violations for free and promoting paid support services.  *Michael Grecco Prods., Inc. v.*

3   *WrapMarket, LLC*, 2017 WL 10434020, at *4 (C.D. Cal. Nov. 8, 2017) (irreparable injury exists

4   where infringement harms the competitive position and market share of the copyrighted work).

5        It is Defendants position that they do not distribute software. Neo4j obtained a judgment

6   against the GFI defendants who license and distribute ONgDB. Any issues on distribution should

7   be resolved by that judgment.

8            **1.  Other Legal Issues Raised by Defendants**

9            *a.      Whether Lanham Act damages can be applied for false advertising and*

10   *conduct related to licensing software when defendants do not license software.*

11       Plaintiffs contend that Defendants are once again seeking to circumvent legal issues settled

12   by Court's prior summary judgment order in violation of the law of the case. To be sure, the Court

13   rejected Defendants' assertion that "customers like Next Century would have purchased a Neo4j

14   subscription but for Defendants' offering ONgDB as a 'free and open source drop-in replacement,'"

15   finding that commercial injury was presumed because this is a comparative advertising case. Dkt.

16   No. 118 at 29:12-30:13 (citing *TrafficSchool.com, Inc. v. Edriver Inc*., 653 F.3d 820, 831 (9th Cir.

17   2011)); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc*., 572 U.S. 118, 134 S. Ct.

18   1377, 1393 (2014) ("diversion of sales to a direct competitor may be the paradigmatic direct injury

19   from false advertising").  This also appears to be immaterial since the Court separately found that

20   Defendants engaged in false advertising by claiming ONgDB was a "drop-in replacement" for

21   equivalent versions Neo4j® EE.

22       Defendants contend that their customers, the US government, are not impacted by the

23   commons clause as they do not sell any Neo4J software or services based on the use or functionality

24   of the Neo4J software. The drop in replacement advertisement only applied to convert commercial

25   licensees to open source software. Defendants contend the IRS and NSA did not have commercial

26   licenses to which the claim of drop in replacement statement would apply.

27   / / /

28   / / /

## VI.   TRIAL STIPULATIONS

### *Stipulation on Further Dismissal of Claims, Counterclaims and Defenses*

During the parties' meet and confer discussions in conjunction with the preparation of this Statement, the parties discussed ways to further streamline and narrow the claims and defenses to be tried by the Court.  Fed. R. Civ. P. 41 only permits the complete dismissal of a complaint or counterclaim, and does not permit the dismissal of only certain claims "from a multi-claim complaint." *Ethridge v. Harbor House Restaurant*, 861 F.2d 1389, 1392 (9th Cir. 1988).  Instead, where a party seeks to drop certain claims, the proper procedure is to either amend the complaint pursuant to Fed. R. Civ. P. 15(a) or stipulate that certain claims will not be pursued or will be dismissed.  *See Hells Canyon Pres. Council v. U.S. Forest Serv.*, 403 F.3d 683, 688 (9th Cir. 2005). As a result of these discussions, the parties agreed to following:

1.      Defendants will no longer pursue with no determination of liability and to dismiss their: (a) Third Cause of Action for Breach of Contract against Neo4j USA [Dkt. No. 177 at ¶¶ 48-52]; (b) Ninth Cause of Action for Declaratory Relief (Users May Use and Fork Content Neo4j Sweden put on a Public GitHub Repository) against Neo4j Sweden [Dkt. No. 177 at ¶¶ 66-71]; and (c) Third Affirmative Defense of Right to Fork and Use Neo4j Open Source Under GitHub Terms of Service [Dkt. No. 91 at 16:7-19].

2.      Plaintiffs will no longer pursue with no determination of liability and to dismiss their: (a) Fifth Cause of Action for Breach of Contract against PureThink and iGov [Dkt. No. 90 at ¶¶ 134-147]; and (b) Seventh Cause of Action for Defamation against Defendants [Dkt. No. 90 at ¶¶ 157-165].

3.      Plaintiffs agree to provide Defendants with a $26,000 deduction to the total amount of damages awarded to Plaintiffs on their Lanham Act claims and/or DMCA claim.

### *Evidentiary Stipulations*

The parties propose the following stipulations that will expedite the presentation of evidence at trial:

/ / /

/ / /

1.      The parties agree to the authenticity of printouts of archived webpages maintained by the Internet Archive (https://web.archive.org/), also known as the Wayback Machine, where the footer reflects the Internet Archive as the source and the date of that particular printout.

2.      The parties agree that they will not contest the authenticity of any documents that were marked as exhibits during the party and non-party depositions taken in the case unless the party contesting the authenticity made such an objection during that deposition

3.      The parties agree that deposition designations may be submitted for the Court's consideration without having them read in open court where in the interest of judicial economy.

## VII.    FURTHER DISCOVERY OR MOTIONS

The parties agree that there is no further discovery warranted at this time.  There are no remaining motions for the Court to decide before trial.

## VIII.    DISPUTED EVIDENTIARY ISSUES

1.      Plaintiffs object to the vast majority of trial exhibits designated by Defendants as irrelevant to any remaining claims, counterclaims or affirmative defenses.  In particular, most of these exhibits pertain to Defendants' IIPEA and unclean hands defense, which were dismissed by Defendants with prejudice.  Dkt. No. 215.  Many of these exhibits also appear to only be relevant to PureThink's breach of exclusivity contract counterclaim, which the Court completely resolved by granting summary judgment in favor of Neo4j USA.  Dkt. No. 216 at 25:25-31:9.

## IX.    SETTLEMENT AND ADR

The parties engaged in preliminary settlement discussions, and then conducted mediation at JAMS in September 2019. The parties have exchanged settlement proposals since that time, including after the Court entered summary judgment in favor of Plaintiffs.  After the Court entered its second order granting summary judgment in favor of Plaintiffs on their DMCA claims and Defendants' breach of exclusivity contract counter claim, Plaintiffs offered to enter into a stipulated judgment and permanent injunction, which also included reduced amount of damages awarded to Plaintiffs, in order to obviate the need for trial.  Defendants rejected that offer.

## X.    TRIAL ESTIMATE

In light of the Court granting summary judgment in favor of Plaintiffs and the parties'

1  stipulation that deposition testimony may be submitted without a live reading, Plaintiffs believe it

2  is that the case could be tried in 3 full trial days.  Defendants contend under FRCP Rule 1, the

3  trial should be limited to 3 days or 12 hours each side.

4  **XI.    OTHER MATTERS**

5          None.

6  Dated:  October 31, 2023                    HOPKINS & CARLEY
                                               A Law Corporation
7

8                                              By: */s/ Jeffrey M. Ratinoff*

9                                                  John V. Picone III
                                                   Jeffrey M. Ratinoff
10                                                 Arthur E. Rothrock
                                                   Attorneys for Plaintiffs and Counter-
11                                                 Defendants NEO4J, INC. and NEO4J
                                                   SWEDEN AB
12

13 Dated:  October 31, 2023                    By: */s/ Adron W. Beene*

14                                                 Adron W. Beene
                                                   Adron G. Beene
15                                                 Attorneys for Defendants and
                                                   Counterclaimants PURETHINK LLC,
                                                   IGOV INC., and JOHN MARK SUHY
16

17

18

19

20

21

22

23

24

25

26

27

28

4859-1719-5914.3

AMENDED JOINT FINAL PRETRIAL CONFERENCE STATEMENT                    CASE NO. 5:18-CV-07182-EJD

1

**ATTESTATION OF E-FILED SIGNATURE**

2         Pursuant to Local Rule 5-1(i)(3), I hereby certify that I have obtained the concurrence in

3    the filing of this document from all signatories for whom a signature is indicated by a

4    "conformed" signature (/s/) within this electronically filed document and I have on file records to

5    support this concurrence for subsequent production to the Court if so ordered or for inspection

6    upon request.

7    Dated:  October 31, 2023                    HOPKINS & CARLEY
                                                 A Law Corporation
8

9
                                                 By:  /s/ Jeffrey M. Ratinoff
10                                                   Jeffrey M. Ratinoff
                                                     Attorneys for Plaintiffs and Counter-
11                                                   Defendants NEO4J, INC. and NEO4J
                                                     SWEDEN AB
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28