1  John V. Picone III, Bar No. 187226
   jpicone@hopkinscarley.com
2  Jeffrey M. Ratinoff, Bar No. 197241
   jratinoff@hopkinscarley.com
3  Arthur E. Rothrock, Bar No. 312704
   arothrock@hopkinscarley.com
4  HOPKINS & CARLEY
   A Law Corporation
5  The Letitia Building
   70 South First Street
6  San Jose, CA  95113-2406

7  *mailing address:*
   P.O. Box 1469
8  San Jose, CA 95109-1469
   Telephone:    (408) 286-9800
9  Facsimile:    (408) 998-4790

10 Attorneys for Plaintiffs and Counter-Defendants
   NEO4J, INC. and NEO4J SWEDEN AB
11

12              UNITED STATES DISTRICT COURT

13            NORTHERN DISTRICT OF CALIFORNIA

14 NEO4J, INC., a Delaware corporation,        CASE NO.  5:18-cv-07182-EJD
   NEO4J SWEDEN, AB,
15                                             **PLAINTIFFS' AMENDMENT TO**
                    Plaintiffs,                **DEPOSITION DESIGNATIONS FOR USE**
16                                             **AT TRIAL**
          v.
17
   PURETHINK LLC, a Delaware limited
18 liability company, IGOV INC., a Virginia
   corporation, and JOHN MARK SUHY, an
19 individual,

20                  Defendants.

21
   AND RELATED COUNTERCLAIMS.
22

23

24

25

26

27

28

1    Pursuant to Court granting Plaintiffs Neo4j, Inc. and Neo4j Sweden AB (collectively

2  "Plaintiffs") leave to amend Exhibit 2 to their Deposition Designations for Trial (Dkt. No. 210),

3  Plaintiffs submit the attached amended designation for the Remote Videotaped Deposition of John

4  Mark Suhy, Individually and as a Representative of iGov, Inc. and PureThink LLC Pursuant to

5  Federal Rule of Civil Procedure 30(b)(6) and by Stipulation (Dkt. No. 155), Vol. 2.

6  Dated:  November 16, 2023                                      HOPKINS & CARLEY
                                                                   A Law Corporation
7

8

9                                                                  By: /s/ Jeffrey M. Ratinoff
                                                                       John V. Picone III
10                                                                     Jeffrey M. Ratinoff
                                                                       Arthur E. Rothrock
11                                                                     Attorneys for Plaintiffs and
                                                                       Counter-Defendants
12                                                                     NEO4J, INC. and NEO4J SWEDEN AB

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT 2**

UNITED STATES DISTRICT COURT
NORTHER DISTRICT OF CALIFORNIA


NEO4J, INC., a Delaware
corporation; and NEO4J
SWEDEN AB, a Swedish
corporation,                    CASE NO.
                                5:18-cv-07182-EJD
          Plaintiffs,
vs.
PureThink, LLC, a Delaware
limited liability company;
IGOV, INC., a Virginia
corporation; and JOHN MARK
SUHY, an individual,
          Defendants.
_____/


REMOTE VIDEOTAPED DEPOSITION OF JOHN MARK SUHY, JR.
INDIVIDUALLY AND AS PERSON MOST KNOWLEDGEABLE
PURSUANT TO FED. R. CIV. P. 30(b)(1)
FOR IGOV INC. AND PURETHINK LLC


DATE:          November 29, 2022

TIME:          8:06 a.m. PST

LOCATION:      Via Zoom Videoconference

REPORTED       KAREN L. BUCHANAN
BY:            CSR No. 10772
               CLR No. 031106-04


1

1  AB.   Although he's not on the line right now, my

2  other counsel at Hopkins & Carley, John Picone, will

3  also be attending at some point today.

4         MR. BEENE:  Adron Beene, Jr., for

5  Defendants John Mark Suhy, PureThink LLC and iGov

6  Inc.  Mr. Suhy is in attendance today as the

7  deponent.

8         JOHN MARK SUHY, JR.,

9  being duly sworn by the Certified Shorthand Reporter

10 to tell the truth, the whole truth, and nothing but

11 the truth, testified as follows:

12         EXAMINATION BY MR. RATINOFF:

13     Q.  Good morning, Mr. Suhy.  How are you?

14     A.  Good morning.  I'm good.  How about you?

15     Q.  I'm well, thank you.  You have been deposed

16 in this case before, correct?

17     A.  Yes.

18     Q.  And do you remember at the beginning of the

19 depo we talked about some ground rules about how the

20 deposition is going to proceed?

21     A.  Yes.

22     Q.  Okay.  I just want to go through them real

23 quick, since you have been deposed before.

24         We're going to proceed in a

25 question-and-answer format.  It's important that you

8

1    allow me to finish my question and then pause so if

2    your counsel has any objections he can assert those,

3    and then you can go ahead and answer unless you're

4    instructed not to answer a particular question.  Do

5    you understand this?

6         A.  Yes.

7         Q.  And then your testimony is going to be

8    reported in booklet form.  You'll have a chance to

9    review that testimony once the transcript is issued,

10   and you can make any corrections that you believe

11   need to be made.  Do you understand?

12        A.  Yes.

13        Q.  And if you do make corrections, I'll be

14   able to use those corrections and ask you about them

15   at trial if we use your deposition testimony at

16   trial.  Do you understand this?

17        A.  Yes, I do.

18        Q.  And we're going to go ahead and we're going

19   to be deposing you both in your personal capacity --

20   do you understand what that means?

21        A.  Not exactly.

22        Q.  Okay.  That means what you personally know,

23   your personal knowledge.  Do you understand what I

24   mean by that?

25        A.  Yes.

                                                         9

 1      Q.  And you're also going to be testifying on

 2   behalf of PureThink LLC as a corporate

 3   representative, and you're going to be testifying as

 4   a corporate representative of iGov Inc.  Do you

 5   understand this as well?

 6      A.  Yes.

 7      Q.  And do you understand that your testimony

 8   about those corporations, companies and corporation

 9   will be not just about what you personally know but

10   what the company itself knows, meaning from its

11   documents and other employees?  Do you understand

12   this?

13      A.  Yes.

14      Q.  And is there any reason today you don't

15   believe you can testify to the best of your ability?

16      A.  No.  I should point out that I have

17   attention deficit, so if I start to lose focus or

18   I'm having issues, I'll let you know.

19      Q.  Please do.  If I don't hear from you, I'll

20   assume that you're able to understand my questions

21   and able to answer them to your best ability.  Is

22   that fair?

23      A.  Yes.

24      Q.  And if any time you need to take a break,

25   please let me know.  If there is a question pending,

1    work for you?

2        A.  Yes, whatever the Court Reporters, whatever

3    we have to do for lunch, I'll do it at the same

4    time.

5        Q.  Great.  Thanks.  And you understand you've

6    taken an oath today under the penalty of perjury?

7        A.  Yes.

8        Q.  And do you understand that's as if the same

9    as you were testifying in front of a judge or jury?

10       A.  Yes.

11       Q.  Okay.  Let's go ahead and proceed.

12           Could you please state your full name for

13   the record.

14       A.  John Mark Suhy, Jr.

15       Q.  And are you represented by counsel today?

16       A.  Yes, I am.

17       Q.  And who is your counsel?

18       A.  Adron Beene.

19           MR. RATINOFF:  I'm going to go ahead, and

20   this has been premarked.  We left off I believe at

21   Exhibit 191, so it will be marked as Exhibit 192.

22           (Plaintiffs' Exhibit 192 was marked for

23   identification.)

24           MR. RATINOFF:  And you'll see the exhibits

25   in the chat.  It may take you a minute to open it

12

1        MR. RATINOFF:  Let me go ahead and put this

2   next exhibit in the chat.  This will be marked as

3   Exhibit 195.

4        (Plaintiffs' Exhibit 195 was marked for

5   identification.)

6        MR. BEENE:  Objection.  It hasn't been

7   marked.

8        MR. RATINOFF:  Sorry?

9        MR. BEENE:  There is no marking on it as an

10  exhibit.

11       MR. RATINOFF:  Yeah.  I'm going to mark it.

12       MR. BEENE:  When?

13       MR. RATINOFF:  Now.  I'm marking for

14  identification the document that I just dropped in

15  the chat.  I've been doing this for like six depos

16  that you've been at.  I don't know why you're

17  mentioning that, but okay.

18  BY MR. RATINOFF:

19       Q.  Do you see the document that's been dropped

20  in the chat, Bates number at the top is 00012000?

21       A.  Yes, I have that open.

22       Q.  That's a Bates number that your counsel put

23  on this document and produced in this litigation.

24  Is that fair?

25       A.  If you say so.

48

1      Q.  Do you have any reason to believe this

2   wasn't produced by the litigation?

3      A.  It seems like it would have been responsive

4   for some -- one of the requests.

5      Q.  Do you understand what this document that's

6   been marked as Exhibit 195 is?

7      A.  I'm looking right now.  I believe this is a

8   requisition of Neo4j Enterprise.

9      Q.  This is a subscription, commercial

10  subscription that PureThink sold to the Maryland

11  Procurement Office under the Partner Agreement?

12     A.  Yes, it is.

13     Q.  That's your signature on the first page in

14  the lower left-hand corner?

15     A.  Yes, that's my signature.

16     Q.  And then you'll see on the next page, there

17  is an item No. 1, "Neo4j Enterprise plus software.

18  Instances Purchased:  3 Productions, 3 test, 3

19  Development.  License Term:  1 year."  Do you see

20  that?

21     A.  Yes, I do.

22     Q.  Is that reflective of the sale of a

23  commercial subscription of Neo4j Enterprise under

24  the Partner Agreement?

25     A.  I believe so, yes.

49

1    Q.  And then the price of that one-year
2  subscription was 229,000?
3    A.  Yes.
4    Q.  And under the Partner Agreement, PureThink
5  was entitled to 25-percent commission on that, that
6  sale?
7    A.  Yes.
8    Q.  And you didn't tell the Maryland
9  Procurement Office that Neo4j could be used under
10  the AGPL without a commercial subscription before
11  signing this, correct?
12    A.  Before signing this, no.
13    Q.  And did the Maryland Procurement Office
14  renew this subscription?
15    A.  No, they did not.
16    Q.  Do you know why they didn't?
17    A.  I'm not positive.
18    Q.  What do you mean, you're not positive?
19    A.  I'm not positive right now what the reason
20  was, but I believe part of it was -- I'm trying to
21  remember when we spoke with them.  Part of it was
22  that they could use the Community Edition.
23        Another part of it, I believe, was about
24  scalability, and how it scales could not meet their
25  needs.

50

1          But there was -- there was a discussion.
2   You can ask for a debrief.  I just don't remember
3   the details of what it was exactly right now.
4          Q.  And going back to Sandia, did they renew
5   their subscription to Neo4j after the three-year
6   Discovery bundle expired?
7          A.  No, they did not.
8          Q.  Do you know why they didn't?
9          A.  I don't recall offhand.  I don't recall
10  that.
11         Q.  I believe the FBI was another entity that
12  you mentioned that PureThink sold a commercial
13  subscription of Neo4j under the Partner Agreement.
14         A.  Yes.
15         MR. RATINOFF:  I'm going to go ahead and
16  mark this exhibit that I've dropped in the chat.  I
17  believe this should be 196.
18         (Plaintiffs' Exhibit 196 was marked for
19  identification.)
20         MR. BEENE:  Objection.  This exhibit was
21  not marked.
22         THE WITNESS:  Okay.  It's open.
23  BY MR. RATINOFF:
24         Q.  This document is entitled Order for
25  Supplies or Services.  It's Bates number is 12503 at

                                                      51

1    the top.  Do you see that?

2         A.  Yes, I do.

3         Q.  This is produced by PureThink in this

4    litigation.  Do you have any reason to believe that

5    it wasn't?

6         A.  No.

7         Q.  And do you have an understanding of what

8    this document is?

9         A.  I'm looking over it.  It's an Order For

10   Supplies or Services, so for a Neo4j Commercial --

11   like their contract subscription.

12        Q.  And is this the commercial subscription

13   that you were earlier referring to that was sold to

14   the FBI under the Partner Agreement?

15        A.  Yes.

16             MR. RATINOFF:  I'd just like to remark this

17   exhibit as Exhibit 196, if Counsel doesn't have any

18   objections.

19             MR. BEENE:  I'd like to see a exhibit

20   stamp.

21             MR. RATINOFF:  The exhibit stamp gets put

22   on after the deposition.  Come on.  Really?

23             MR. BEENE:  Generally, it happens during

24   the deposition.

25             MR. RATINOFF:  No.  That's not how it works

                                                        52

1    in video depos.  We've been doing this for months.

2    Come on.

3    BY MR. RATINOFF:

4       Q.   Looking down at it, it says details --

5    actually strike that.

6            Under item No. 1, it says "Neo Graph

7    database software."  Do you see that?

8       A.   Yes.

9       Q.   And was that Neo4j Enterprise commercial

10   subscription that was sold to the FBI, is that

11   reflected there?

12      A.   Yes, the Government Edition, but yes, it

13   was a commercial subscription through the Partner

14   Agreement.

15      Q.   And the Enterprise meaning a one-year

16   subscription was for 222,000?

17           (Reporter interruption.)

18           THE WITNESS:  Yes, I see that.

19   BY MR. RATINOFF:

20      Q.   And that's the amount for a one-year

21   commercial subscription to either the Government

22   Edition or Neo4j Enterprise Edition that was sold to

23   the FBI, correct?

24      A.   Yes.  It seems discounted.  I believe it

25   was higher.  But yes, that's for --

53

1        Q.   And so since this is under the Partner

2   Agreement, PureThink would have been entitled to a

3   25-percent commission, correct?

4        A.   Correct.

5        Q.   I assume that PureThink was paid that

6   commission; is that correct?

7        A.   Yes.

8        Q.   And it was also paid the commission under

9   the MPO order form, as well?

10       A.   The NPO (sic)?   I'm not sure what that is.

11       Q.   Maryland Procurement Office.

12       A.   Yes.

13       Q.   Does the Maryland Procurement Office, is

14   that another name for the National Security Agency?

15       A.   I don't know if that office is another name

16   for it or if it's an office that helps.   I'm not

17   sure how they're related.

18       Q.   Do you have an understanding that the

19   Maryland Procurement Office is affiliated with the

20   National Security Agency?

21       A.   I believe so, yes.

22       Q.   Is it okay if we just refer to the Maryland

23   Procurement Office as MPO?   Is that fair?

24       A.   Yes.

25       Q.   So, so far, we've got the MPO, the FBI, and

                                                          54

1    Q.  Do you recall when that happened?

2    A.  I believe -- I'm not positive of the

3  months.

4    Q.  Did that happen while the Partner Agreement

5  was in effect?

6    A.  We were working on it when it was in

7  effect.  But I don't know when -- what the date was

8  that that the situation with Jason Zagalsky

9  occurred.

10        MR. RATINOFF:  I'd like to go ahead and

11  drop the next document in the chat, which will be

12  marked as Exhibit, I believe, 197.

13        (Plaintiffs' Exhibit 197 was marked for

14  identification.)

15        THE WITNESS:  But there is no exhibit, so

16  is this tab 501?

17        MR. RATINOFF:  Sure.  That's right.

18        THE WITNESS:  It's open.

19  BY MR. RATINOFF:

20    Q.  Okay.  And what's been identified as

21  Exhibit 197 or will be identified as Exhibit 197 is

22  a Profit and Loss Statement, January through

23  December 2014, for PureThink LLC.  And you'll see

24  there is an iGov Bates number at the bottom.  Do you

25  see that?

56

1          A.  Yes, I do.

2          Q.  Do you recognize what will be marked as

3     Exhibit 197?

4          A.  It looks like a Profit and Loss report for

5     PureThink.

6          Q.  Any reason --

7          A.  2014.

8          Q.  Any reason to believe this isn't a correct

9     copy of Purethink's Profit and Loss Statement for

10    2014?

11         A.  I don't believe so.  It looks -- it looks

12    like something I would have created.

13         Q.  Okay.  So you created this document?

14         A.  I believe so.

15         Q.  It wasn't created by an accountant for

16    PureThink?

17         A.  I don't know if it was.  It would have been

18    created by the software that was used for

19    accounting, and I did a lot of the accounting.

20         Q.  For PureThink?

21         A.  I'm not sure -- I'm not sure who created

22    this.  I looks like something I would have.  It

23    looks like a standard report generated by accounting

24    software.

25         Q.  And says under "Ordinary Income/Expense,

57

1    Sale - Software, 229,000."  Do you see that?

2         A.  Yes.

3         Q.  Do you understand for 2014 what that number

4    is referring to as far as income?

5         A.  It would have been -- since PureThink was

6    only focused -- once we partnered with Neo4j, it

7    would have been Neo4j Commercial license revenue

8    or -- I'm assuming that's what it was.

9         Q.  And then aside from that, there is a

10   consulting income.  What's a consulting income for?

11        A.  I don't remember offhand.

12        Q.  But that would be separate from the

13   software license sale?

14        A.  It looks to be, yes.

15        Q.  And then you look at under Expenses, there

16   is a software reseller license cost for 171,750.  Do

17   you see that?

18        A.  Yes, I do.

19        Q.  And what is that expense in reference to?

20        A.  I'm assuming that that's the money that

21   goes to Neo4j as -- under the Partner Agreement.

22   25 percent of the total stays with us.

23        Q.  Okay.  So the licensee would be -- would

24   pay PureThink the full amount for the commercial

25   license, and then PureThink would remit 75 percent

58

1      of that to Neo4j under the Partner Agreement?  Is

2      that fair?

3           A.  Yes.  In this scenario, yes.

4              MR. RATINOFF:  Now, we were looking at the

5      MPO order form.  24 -- I'm sorry.  Strike that.

6      Okay.  And then let me move on to Exhibit -- what

7      will be marked as Exhibit 198.

8              (Plaintiffs' Exhibit 198 was marked for

9      identification.)

10             MR. RATINOFF:  I'll put this in the chat

11     for you.

12             MR. BEENE:  Okay.  It's open.

13     BY MR. RATINOFF:

14         Q.  Yes.  This is another document.  It's Bates

15     numbered iGov, got an iGov Bates number.  It's

16     entitled "PureThink LLC Profit and Loss, January

17     through December 2015."  Do you recognize this

18     document?

19         A.  Yes.

20         Q.  What is it?

21         A.  It's a Profit and Loss report for 2015 for

22     PureThink.

23         Q.  Okay.  And then looking at the -- under

24     Income, it says "Sales - Software, $320,987.50."  Do

25     you see that?

                                                      59

1          A.  Yes.

2          Q.  And that income would be for commercial

3   software licenses for Neo4j Enterprise or Government

4   Edition that PureThink sold under the Partner

5   Agreement?

6          A.  I believe so.  That was the only thing we

7   were focusing on.

8          Q.  And looking under the expense, it says

9   "Software reseller license cost."  Do you see that

10  it's for $242,715.52?

11         A.  Yes, I see that.

12         Q.  And that would be for the 75 percent that

13  would be owed to Neo4j under the Partner Agreement?

14         A.  I assume that's what that's for.

15         Q.  No reason to believe it isn't?

16         A.  Not off the top of my head, no.

17         Q.  And I believe the FBI and Sandia contracts

18  were for -- from the year 2015, so the sales would

19  be for those licenses?

20         A.  That sounds right.

21         Q.  Any reason to believe it isn't?

22         A.  I would have to go in and look at my

23  documents to verify it, but it sounds -- sounds like

24  that's the reason for these numbers.

25         Q.  PureThink wasn't doing anything else at the

60

1    time, though?

2        A.   Nothing major, no.

3        Q.   It wasn't selling any -- it wasn't selling

4    any other software other than the Neo4j Government

5    Edition?

6        A.   I don't believe so.  I think we were just

7    focused on the Government Edition at this time

8    period, yeah.

9            MR. RATINOFF:  Okay.  We can go ahead and

10   mark the next exhibit.  It's -- it will be marked as

11   Exhibit 199.

12           (Plaintiffs' Exhibit 199 was marked for

13   identification.)

14   BY MR. RATINOFF:

15       Q.   It should be tab 503 in the chat.

16       A.   Okay.  It's open.

17       Q.   Okay.  What we've marked as Exhibit 199 is

18   a document entitled "PureThink LLC Profit and Loss,

19   January through December 2016."

20       A.   Yes, I see that.

21       Q.   And it's got a Bates number at the bottom,

22   IGOV 1569057.001 on the first page?

23       A.   Yes, I see that.

24       Q.   And do you recognize this document?

25       A.   Yes.  It looks like the same as the other

61

1    documents but for 2016.

2        Q.   So Purethink's Profit and Loss Statement

3    for that year, 2016?

4        A.   Yes.  I'm just looking at it to see.  It

5    looks like it's marked for -- "Sales - Software" is

6    probably the wrong category for it.

7        Q.   Category for what?

8        A.   Category for whatever that is.  This would

9    have been -- I'm looking at the expense.  Since

10   there was no expenses, this might have been for IRS,

11   which was the consulting project.  I'm not positive,

12   but it looks -- if it was, it definitely is

13   miscategorized.

14       Q.   So PureThink didn't sell software in 2016?

15       A.   I have to go look and see, because I know

16   that when we started IRS, that was a consulting

17   project.  So I don't -- I think that was in 2016.

18   I'm not sure, but that's what it looks like this

19   might be representing.

20       Q.   This document was prepared by PureThink,

21   correct?

22       A.   Yeah.  I believe I would have done this,

23   yeah.

24       Q.   And as you note, there is no software

25   license fee that was under Expenses that we saw in

62

1  the prior Profit and Loss Statements, correct?

2      A.  Yes.  That's why I think this is for IRS,

3  which wasn't a software license sale.  That's why I

4  believe that that's what this represents.

5      Q.  But there is only a mark for -- I'm sorry,

6  the only income here is showing sales for software

7  and not consulting, correct?

8          MR. BEENE:  Objection to form.

9  BY MR. RATINOFF:

10     Q.  You can answer the question.

11     A.  Well, now, this is -- this definitely is

12 for consulting.

13     Q.  But it's listed as sales and software in

14 this document, correct?

15     A.  It says "Sales - Software"; that's correct.

16     Q.  Now, I'd like to show you the 2017

17 Profit and Loss Statement, but one wasn't produced.

18 Did PureThink prepare a Profit and Loss Statement

19 for 2017?

20     A.  We should have, because that's what I used

21 for taxes, so . . . .

22     Q.  So PureThink was still in business in 2017?

23     A.  Yes.  PureThink is still in business now.

24     Q.  So it should -- it filed its tax return in

25 2017?

63

1    previously talked about that PureThink entered into

2    contracts with under the Partner Agreement, correct?

3         A.  No, that's not correct.

4         Q.  No?  Why is that not correct?

5         A.  IRS was entered into a new agreement for

6    consulting.

7         Q.  But you entered into a contract with the

8    IRS?

9         A.  Yes.

10        Q.  Let me get that and make sure we're on the

11   same page here.  Just give me a second.

12        Okay.  Let me go ahead and put in this next

13   exhibit that was previously marked as Exhibit 159.

14   That should make your counsel happy.

15        A.  Yes.  It's open.

16        Q.  Okay.  Do you recognize what was -- what is

17   marked as Exhibit 159?

18        A.  Yes, I do.

19        Q.  What is it?

20        A.  It's an Order For Supplies or Services.

21        Q.  Is this the contract that you were

22   referring to that PureThink entered into with the

23   IRS?

24        A.  Yes.

25        Q.  You're saying it was for consulting

                                                        74

1    services and not for software?

2        A.  It is for consulting services, yep.

3        Q.  And it says "Implementation" under item

4    No. 1, "Implementation of the Government Edition

5    Neo4j project"?

6        A.  Yes.

7        Q.  And so under this contract, PureThink

8    provided Neo4j -- I'm sorry, provided the IRS with

9    Neo4j Government Edition under the AGPL?

10       A.  Yes.  Since they wouldn't have had a

11   commercial, this would have fallen under the AGPL.

12       Q.  And this is -- this document, Order For

13   Supplies or Services, is dated September 23rd, 2016,

14   correct?

15       A.  Yes, that's correct.

16       Q.  And at that time, the Partner Agreement was

17   in effect between Neo4j and PureThink, correct?

18       A.  Yes, it was.

19       Q.  And did you get approval from Neo4j before

20   entering into this Order For Supplies and Services?

21       A.  Yes.

22       Q.  Who gave that approval?

23       A.  I believe Lars Nordwall, John Broad.

24       Q.  Sorry, did you say John or Sean?

25       A.  John Broad.  And I believe they went and

                                                          75

1    Q.  And you were at the IRS deposition of Mike

2  Dunn, correct?

3    A.  Yes, I was.

4    Q.  And you heard him testify that the reason

5  why they canceled this award was because it was

6  improperly designated as sole source; isn't that

7  correct?

8    A.  I don't remember hearing that.  And it

9  definitely could have been sole sourced because of

10  all the facts around it, so -- I'm also aware Mike

11  Dunn is not a procurement person.

12    MR. RATINOFF:  Okay.  Let's go ahead and

13  mark this next document.  It will be tab 491, and it

14  will get marked as Exhibit 209.

15    (Plaintiffs' Exhibit 209 was marked for

16  identification.)

17    THE WITNESS:  It's downloading slowly.

18  BY MR. RATINOFF:

19    Q.  Yeah.  It's a large document.

20    A.  Yes, it's open.

21    Q.  Okay.  Do you recognize what will be marked

22  as Exhibit 209?

23    A.  Yes.

24    Q.  And what is it?

25    A.  Looks like a pre-award protest.

143

1      Q.   And is this the protest that you were just
2  referring to?
3      A.   Yes, I was.
4      Q.   Do you see it says, "By this protest
5  (defined below)," first page, 3 out or 13, first
6  page of the protest, it says, "By this protest
7  (defined below) Neo also objects to the Agency's
8  sole source justification and the Agency's intended
9  award."  Do you see that?
10      A.   On page 3?
11      Q.   It's page 1 of the actual protest.  It
12  would be page 3 of the document that's been marked
13  as Exhibit 209.
14      A.   Yes.
15      Q.   And in your experience in government
16  contracting, are interested parties permitted to
17  protest awards?
18      A.   Yes.
19      Q.   And that's provided by regulation or
20  statute, to your knowledge?
21      A.   I believe it's in the FAR, Federal
22  Acquisition Regulations.
23           (Reporter interruption.)
24           THE WITNESS:  I believe that's defined in
25  the FAR, the Federal Acquisition Regulations.  I

                                                    144

1    believe that's a FAR.

2    BY MR. RATINOFF:

3        Q.  And by FAR, you're talking about a

4    government regulation; is that correct?  Federal --

5        A.  Procurement rules, laws.

6        Q.  And you also see here, it says, ". . . this

7    pre-award protest challenging the intended award by

8    the Department of Treasury . . . ."  Do you see

9    that?

10       A.  Yes, I do.

11       Q.  So that means that IRS was intending to

12   award but had not officially awarded it yet to iGov;

13   is that correct?

14       A.  They were going to make the award, and

15   there was a time set aside for protest.  So it

16   was -- it was going to be made.

17       Q.  Okay.  So this was -- this protest, to your

18   knowledge, was filed within that protest period?

19       A.  I'm not sure.

20       Q.  In your experience, it wouldn't be

21   considered if it wasn't filed within that period,

22   right?

23       A.  This is an agency-level protest.  There's

24   different types of protests.

25       Q.  But I'm talking about in your experience,

                                                    145

1    agency-level protests.

2        A.  I don't have much experience with

3    agency-level protests.

4        Q.  Have you ever done an agency-level protest

5    before?

6        A.  I'm not sure if the protests I've done

7    before were agency but -- I believe they were

8    agency.  But I'm not sure what the rules are.  I

9    believe each agency has different rules.  And you

10   were asking if this was done in the time period.  I

11   don't know, is the answer.

12       Q.  And you attained this -- a copy of this

13   protest by FOIA request?

14       A.  I believe so.

15           (Reporter interruption.)

16           MR. RATINOFF:  A FOIA, Capital F-O-I-A.

17   It's an acronym.

18           THE WITNESS:  I believe so.  Freedom of

19   Information -- Freedom of Information something.

20   BY MR. RATINOFF:

21       Q.  Act.

22       A.  Act.

23       Q.  Is that correct?

24       A.  Sounds right.

25       Q.  And then have you ever protested -- filed a

1   an agency-level protest with the IRS?

2        A.   IRS?  I don't remember.  I'm not sure.

3             MR. RATINOFF:  Let me go ahead and mark the

4   next exhibit.  This will be tab 492 in the chat.

5   Exhibit 210, it will be marked as.

6             (Plaintiffs' Exhibit 210 was marked for

7   identification.)

8             THE WITNESS:  And it looks like we have.

9   BY MR. RATINOFF:

10       Q.   Do you recognize this document that's

11   been -- or will be marked as Exhibit 210?

12       A.   I'm just looking at what this is for.  Yes,

13   I recognize this.

14       Q.   What is it?

15       A.   It's a protest for AlphaSix Corporation.

16   It's selling Neo4j software, and this is a protest

17   stating that there is other alternatives, I believe.

18   But it's a protest to that award.

19       Q.   And looking at the very bottom of this

20   document, the Bates number IGOV00002851648.012, is

21   that your signature?

22       A.   Yes, it is.

23       Q.   And that -- it says FAR 33.103(d)(4).  Do

24   you see that?

25       A.   Yes.

147

1      Q.  Is that the same provision that Neo4j filed

2   its protest?

3      A.  I have no idea.  I'm not a lawyer.

4      Q.  But you prepared this document and cited it

5   to that statute, correct?

6      A.  Yes.  But I don't remember what that

7   statute was.  I don't remember that.  I would have

8   done due diligence and made sure it was correct, but

9   as for what that means, I have no idea what that

10  statute is.

11     Q.  Okay.  Why don't you go ahead and look back

12  at the last exhibit we were just looking at.

13     A.  Which tab would that be?

14     Q.  Tab 491.

15     A.  Okay.  I'm there.

16     Q.  And if you look on page 2 of the protest.

17     A.  Page 2, the actual page 2?

18     Q.  Yeah.

19     A.  Okay.

20     Q.  And it says, "Neo requests an independent

21  review of this potest at a level above the

22  Contracting Officer, pursuant to FAR 33.103(d)(4)."

23  Do you see that?

24     A.  Yes.

25     Q.  Same statute or rule that you've cited in

                                                        148

 1   your protest, right?

 2        A.   Seems to be, yeah.

 3        Q.   So you filed a protest under the same

 4   provision as Neo4j?

 5        A.   I don't know what that means.

 6        Q.   Well, it's the same statute, right?

 7        A.   Yeah, but I'm not a lawyer.  The way you

 8   stated it, I don't know if that's what we did or

 9   not.

10        Q.   You signed the document, right, what's been

11   marked as Exhibit 210, tab 492?

12        A.   Yes.

13        Q.   So everything in this e-mail that you said

14   you would have done -- I'm sorry, in this protest,

15   you would have done due diligence before signing,

16   correct?

17        A.   Yes, I would have.

18        Q.   And what was the result of this protest?

19        A.   The result was they did not award -- oh, is

20   this our 491?  So is that the protest from Neo4j or

21   for iGov?

22        Q.   No.  I'm talking about your protest, the

23   one that you filed that's dated July 8th, 2020.

24        A.   Oh, I'm not sure.  I don't remember.

25        Q.   You don't know if the contract was canceled

                                                149

```
1          THE VIDEOGRAPHER:  Off the record?

2          MR. RATINOFF:  Sure.  Let's go off the

3   record.

4          THE VIDEOGRAPHER:  We are now off the

5   record at 12:29.

6          (Break taken from 12:29 to 12:31 p.m.)

7          THE VIDEOGRAPHER:  We are now on the record

8   at 12:31.

9   BY MR. RATINOFF:

10      Q.  Okay.  I'm going to turn back to

11  Exhibit 202, which was marked as -- originally as

12  tab 485.  It's the amended interrogatory responses.

13  And if you could turn your attention to page 11.

14      A.  One moment.  I'm at page 11.

15      Q.  Okay.  And you'll see interrogatory No. 2,

16  it says:

17          "Identify all facts and documents

18          supporting your contention in

19          Paragraph 15 of your Counterclaim that

20          PureThink" -- sorry, "PureThink spent

21          an equivalent of 650,000 to design,

22          develop, and build a new Neo4j

23          Government Package software based on

24          Mr. Nordwall's representations that

25          PureThink would have continuing
```

170

1          exclusivity with the government sales

2          and support contracts."

3          Do you see that?

4     A.  Yes, I do.

5     Q.  And you understand that's referring to the

6  exclusivity agreement we just talked about in the

7  counterclaims?

8     A.  Yes.

9     Q.  And you'll see -- I'm sorry, in response

10  2.2, it says, "PureThink spent an equivalent of

11  $650,000 to" -- sorry, "spent an equivalent of

12  $650,000."  What do you mean by "equivalent"?

13     A.  So we didn't spend money.  We dedicated

14  full time to building out this framework that would

15  surround Neo4j Enterprise and make it into what was

16  called the Neo4j for Government Edition.  So it was

17  a suite of software, addressed FISMA, modules,

18  documentation, business plan.  It was our full

19  focus.

20          And I needed to make sure that before we

21  focused 100 percent, dropped everything else and

22  focused on this that we were on the same line, that

23  we understood each other, that hey, we're building

24  this Government Edition, it's going to take off,

25  because it allows us to do sole sourcing.  And that

                                                    171

1    is my main focus, and that's -- all my time is being

2    invested into that.

3        Q.   And also, according to this interrogatory

4    response:

5            "Development of the Neo4j Government

6            Edition software business development

7            and marketing activities continued up

8            until about June 2017."

9        A.   Okay.

10       Q.   So you're saying that the $650,000 included

11   work from May of 2015 to June of 2017.   Is that the

12   time period for that amount?

13       A.   That sounds right.

14       Q.   And the work that you're saying that that

15   $650,000 is based on is for the development of the

16   Neo4j Government Edition software, business

17   development and marketing activities, correct?

18       A.   Yes.   It's -- we could have been doing

19   consulting and made that money, but instead it was

20   focused on this.   So it was an investment on my side

21   and the company's side, PureThink.

22       Q.   Weren't you required to market and develop

23   business under the Partner Agreement?

24       A.   Not -- not like this.   This is -- this is a

25   new agreement, and it was for us to run -- it's for

172

1    issue that it wasn't going to work with the

2    government because of the FAR rules and that we had

3    to come up with a different approach to get Neo4j

4    into the government.  And that's where this

5    agreement came.

6             And that's why it took so much dedication

7    to it.  No other teams or companies would go and

8    dedicate this much effort into something that was

9    not guaranteed to bring revenue.  I mean this is an

10   investment, and I don't think the Partner Agreement

11   says you have to drop all your business and only

12   focus on this, and we did for this, and we did it

13   because of the exclusivity agreement.

14   BY MR. RATINOFF:

15        Q.  Looking at the financial statements that we

16   did for PureThink in 2014, you testified, I believe,

17   that revenue generated in 2014 was based on only

18   sales of Neo4j Enterprise Edition, correct?

19        A.  Yes, in which we only got the

20   revenue 25,000 -- we made 25,000 or 25 percent of

21   whatever that total sale was, which was not a lot.

22        Q.  But between 2014 and 2015, April, PureThink

23   was solely focused on developing business under the

24   Partner Agreement, correct?

25        A.  I believe so.  Yes.  That was our -- that

174

1    was our focus.

2         Q.   And in looking at the next page in the

3    interrogatory responses, 2.3, it says:

4              "The hourly rate Neo4j charged for

5              resources that were at or below the

6              expertise level of John Mark Suhy was

7              $300 an hour for a subject matter

8              expert."

9         A.   Yes.

10        Q.   "These rates are used to justify many of

11   the costs."

12        A.   Yes.

13        Q.   Did you take $300 and multiply that by a

14   certain number of hours to come up with $650,000?

15   In other words, if I divide $650,000 by 300 and got

16   approximately 2166 hours, that's what you're saying

17   is the time you spent on Neo4j Government Edition?

18        A.   I believe that's part of it.  Remember that

19   when we're doing business development and marketing

20   and whatnot, that time is not something that's

21   covered under those hourly rates.  The $300 an hour

22   rate is something that Neo4j charges and what we

23   could have done consulting for instead of doing

24   this.

25        Q.   Do you understand that Neo4j charged $300

175

1    an hour to its customers, but that's not what its

2    actual employees who do the consulting make?

3         A.  Well, I don't know any of that.

4         Q.  Isn't it normal in business that if a

5    company charges consulting rates, it's not paying

6    its employee the same amount that it's charging the

7    client?

8              MR. BEENE:  Objection to form.

9              THE WITNESS:  I'm one person, and this is

10   PureThink.  So everything would come back to me

11   anyway in some way or another.

12   BY MR. RATINOFF:

13        Q.  But you don't charge your clients $300 an

14   hour for consulting, do you?

15        A.  It depends on what we're doing, and it

16   depends on if they can afford us.  Sometimes we will

17   give them much less rates just because we feel that

18   it's worthwhile being involved with them so we can,

19   you know, identify their opportunities.  So there is

20   always a balance.

21        Q.  But you don't know whether Neo4j charges

22   its clients $300 an hour and then in turn pays its

23   employees $300 for work per hour, correct?

24        A.  I have no idea about how Neo4j operates.

25        Q.  So then are you saying that you have a way

                                                  176

1    of tracking the 2166 hours plus that you spent

2    between May of 2015 and 2017?

3         A.   Yeah.   I basically was working full time

4    and more than eight hours a day just to get

5    everything done.   And that's how we came up with the

6    dates, the times, the amounts, everything.

7         Q.   Do you have time sheets to evidence that

8    time spent?

9         A.   Hmm -- not time sheets, but I'm sure that

10   you get repos and commits, and all the documents and

11   whatnot would kind of show that.   Writing a 15-page

12   marketing document on how we're going to approach

13   government and whatnot takes days to do.

14        Q.   But you didn't actually keep any official

15   records to track that time, did you?

16        A.   I don't believe we would have needed to,

17   because it was full time, fully dedicated.

18        Q.   Do you have --

19        A.   We're not charging -- you know, usually you

20   track -- you track hours when you're charging

21   someone and billing the rates.   This was an

22   investment on our end, so there would have been no

23   need to do that.   So our goal was to be 100-percent

24   focused on this.

25        Q.   So the $650,000 is essentially just an

                                                      177

1    A.  Yes.  I see it.

2    Q.  And so you're using Neo4j's $300 an hour to

3    calculate the $650,000; is that correct?

4    A.  I believe some of it, yes.

5    Q.  Okay.  So the 650,000 isn't necessarily all

6    at $300 an hour.  It could vary based on whether it

7    be technical work versus marketing and business

8    development.  Is that fair?

9    A.  It could be different amounts, but we had

10   to drop everything.  And, you know, we could have

11   only focused on being subject matter experts, but

12   instead we had to go and focus on building the

13   marketing plans, doing everything.  And so it's --

14   $300 an hour is what we -- what we missed out on

15   because we focused on this.

16   Q.  Did you ever tell Neo4j that your hourly

17   rate for this type of work would be $300 an hour?

18   A.  I have no idea.  I don't remember those

19   discussions.  Because we would have been going

20   directly to clients, not having them pay us.

21        MR. RATINOFF:  We'll have marked the next

22   exhibit.  Have it marked as Exhibit 212.

23        (Plaintiffs' Exhibit 212 was marked for

24   identification.)

25   BY MR. RATINOFF:

181

related to their GSA for staffing.

         You know, the goal is to get business out
of this, and that's why sometimes you do stuff for
free.  And I do a lot of stuff for zero dollars.
You know, if it leads to us making money, then
that's the whole purpose of the investment is we
aren't doing it for the current -- the now.  We're
doing it for the future.

     Q.  All right.  I want to go ahead and move on
to -- we talked about the protest and then the
cancellation of the -- or the pre-award protest.
And you believe that the -- sorry.  Let me start
over.

         So it's PureThink's contention that it lost
out on continuing with the Government Edition?

     A.  Well, it did, because they, Neo4j, canceled
the Government Edition and told our clients that
they couldn't work with us.

     Q.  Did you give back all the work that you did
to Neo4j, all the working documents and the business
development and all the work that you did?  Did you
just say here you go, it's yours?

     A.  I don't believe so.  I don't think that
would be theirs.

     Q.  So you kept all that work?

the different modules that we had created.  I have
no idea if they took our work and integrated it.

Because I do remember that -- what is his
name, the lead, the head of the software
development, I'm forgetting right now, for Neo4j
said that there is a lot of the features they wanted
to integrate into Neo4j Enterprise that we had done
with this.  I don't know if they took our work or if
they just created it from the beginning.

MR. RATINOFF:  And then on this next
exhibit, it's going to be marked for identification
as Exhibit 214, tab 504, will be in your chat.

(Plaintiffs' Exhibit 214 was marked for
identification.)

THE WITNESS:  I'm looking at this.

BY MR. RATINOFF:

Q.  And this is an e-mail.  The last e-mail in
exchange is dated October 4th, 2017.  It's from
Michael Dunn to John Mark Suhy at egovsol.com.  And
the Bates on the first page is -- ends with
3249.001.  Do you see that?

A.  Yes, I do.

Q.  Is this an e-mail exchange you had with
Mr. Dunn?

A.  Yes, it looks to be.

188

1      Q.  And why did you send this e-mail to
2  Mr. Dunn?  At the beginning here, it says, "Hello
3  Michael.  Here is some information for market
4  research regarding eGovernment Solutions, Inc."
5      A.  It sounds like I was giving him information
6  for market research.
7      Q.  Why were you giving him market research
8  information about eGovernment Solutions?
9      A.  Usually the government will reach out
10 saying they're doing market research and ask you for
11 information.  And that's what it looks like they
12 did, and that was the response.
13     Q.  And at this time, were you part owner of
14 eGovernment Solutions?
15     A.  October 2017?  I might have been.  I don't
16 remember when I sold my shares.  But I might have
17 been.
18     Q.  But you were working under the eGovernment
19 Solutions name at this point, correct?
20         MR. BEENE:  Objection to form.
21         THE WITNESS:  I was answering from
22 eGovernment Solutions, so it seems to be that's what
23 this e-mail is from.
24 BY MR. RATINOFF:
25     Q.  And then it says, if you go down towards

189

1   the bottom of the first page:

2           "The current CKGE environment will

3       require any potential vendor to

4       provide 2 critical components:  1) the

5       Government Package/Suite for Neo4j and

6       2) professional services for continued

7       development."

8   And it continues:

9           "Other vendors may be able to offer

10      the professional services, but only

11      iGov Inc. can fulfill the Government

12      Package/Suite for Neo4j requirement."

13      What are you referring to as the Government

14  Package/Suite for Neo4j requirement?

15      A.  I believe we're talking about the bisma and

16  all the auditing that needs to be put in place, and

17  that knowledge we gained by working with IRS at the

18  beginning.  We knew how to apply that, so we could

19  reapply everything.

20          I don't think any other vender -- and I

21  think it would be obvious that other vendors that

22  would come in would not have that knowledge that

23  would be able to help them wrap up and get moving.

24  So it was basically because of me and my knowledge.

25      Q.  And that's the knowledge that you gained

1  working as PureThink under the PureThink/IRS

2  contract we talked about earlier, correct?

3           MR. BEENE:  Objection to form.

4           THE WITNESS:  It's knowledge, but not

5  necessarily software.

6  BY MR. RATINOFF:

7       Q.  And it says, "The same team members," and

8  this is on the second page, halfway down:

9            "The same team members from the past

10           contract would be able to stay on

11           under eGovernment Solutions Inc.  All

12           of the development environment, tools,

13           et cetera would also be maintained

14           meaning there would be no ramp-up

15           time."

16      A.  I see that.

17      Q.  When you say the same team members, are you

18  talking about PureThink on the past contract that we

19  previously discussed between the IRS and PureThink?

20      A.  No.  I believe I'm talking about myself

21  only.

22      Q.  Okay.  But you're talking about the work

23  that you performed for the IRS under PureThink and

24  the contract we discussed earlier, correct?

25      A.  Yes.  I believe I would be showing them

191

1    that, hey, I have all this experience that I bring

2    to the table with this company.

3         Q.  And it says "All of the development

4    environment tools, et cetera will also be maintained

5    meaning there would be no ramp-up time."  Are you

6    referring to the work that you previously did with

7    the IRS under PureThink?

8         A.  Yes.  The software that they actually

9    owned, they have a lot of work product.

10        Q.  And that was what you developed for the

11   IRS, correct?

12        A.  Some of it was.  Some of it was done by

13   other teams, and we helped them integrate it.

14        Q.  Then at the bottom, it says:

15             "I am a minority partner in

16             eGovernment Solutions, and a majority

17             partner (only partner) in iGov Inc.

18             IGov Inc. holds the rights and sells

19             and supports the Neo4j Government

20             Package/Suite."

21             Do you see that?

22        A.  Yes.

23        Q.  And are you at this time now clearly still

24   an owner or part owner of eGovernment Solutions at

25   this time?

192

1      A.   Yes.   If I said that, then I was still an

2  owner.

3      Q.   And it says, "iGov holds the rights and

4  sells and supports the Neo4j Government

5  Package/Suite."

6      A.   Yes, that's a solution that's an offering.

7  It's not a product.   The Neo4j Government Edition

8  was the product.   The Neo4j Government Package/Suite

9  is a suite of services and support focused on FISMA,

10 addressing other needs that U.S. governments need.

11      And it's important because if you're using

12 Neo4j Community, whatever version you're using, you

13 need to follow these security guidelines and

14 whatnot.   And that's what -- that's the expertise

15 that I bring to the table now, because I gained all

16 that knowledge, you know, what requirements are

17 needed for IRS, what their 508 compliance

18 requirements are and whatnot.

19      Q.   And you gained that knowledge through the

20 prior work that you did under PureThink with the

21 PureThink/IRS contract that we talked about,

22 correct?

23      MR. BEENE:   Objection to form.

24      THE WITNESS:   That as well as I've have

25 other contracts with IRS years before, subcontracts.

193

1    besides the number at this time?

2        A.   Not for this.   They would have stated it in

3    the description.

4        Q.   All right.   Let's take a look at

5    Exhibit 105 --

6        A.   Okay.

7        Q.   -- previously marked.

8        A.   Okay.   I'm looking at it.

9        Q.   Okay.   And do you see the effective date of

10   this Amendment of Solicitation/Modification of

11   Contract is May 24, 2019?

12       A.   Yes, I see that.

13       Q.   Do you understand what this document is?

14       A.   I understand it's an Amendment of

15   Solicitation/Modification of Contract.

16       Q.   Do you know what contract this is referring

17   to?

18       A.   It says 2032H8-18-P-00168.

19       Q.   Do you understand what the actual contract

20   is that's being amended?

21       A.   I believe it's the award that eGovernment

22   Solutions won and that this is for -- this is to

23   exercise option year 1.

24       Q.   And that's for an additional $200,000 for

25   the year from May 24, 2019, to May 23rd, 2020?

205

1   A.   Yep.   That's the next -- the first option

2   year, they said we're going.

3   Q.   And to your knowledge; the IRS paid

4   eGovernment Solutions 300,000 for the first year?

5   A.   Well, they should have.   I believe they

6   did.

7   Q.   To your knowledge, did eGovernment

8   Solutions get $200,000 in conjunction with this

9   option year exercise, 200,000?

10   A.   Yes, they should have.   I don't think IRS

11   has ever missed a payment.

12   Q.   Yeah, that would be pretty bad for the

13   agency that collects taxes to miss payments, right?

14   You don't have to answer that.

15   A.   Oh, sorry.

16   Q.   That was a rhetorical question.   Sorry.

17   Just trying to lighten up the mood a little bit.

18   All right.   Let me mark the next exhibit,

19   or actually, it's been premarked.   So take a look at

20   what was previously marked as Exhibit 106.   Do you

21   recognize what's been previously marked as

22   Exhibit 106?

23   A.   Amendment of solicitation of the contract.

24   Yes, I see this.

25   Q.   What do you understand this document to be?

206

1    A.  This is a modification to add funding to

2    option year 1.

3    Q.  Of the eGovernment Solutions contract that

4    we've been talking about?

5    A.  Yes.

6    Q.  And is that your signature at the bottom of

7    the first page?

8    A.  Yes.

9    Q.  And what was the purpose of the increase of

10   funding for option year 1?

11   A.  I believe this is for us to build a user

12   interface in the micro service for something called

13   the LB&I, Large Business -- Large -- International,

14   I guess, component or division for IRS.

15   Q.  Looking at the next page, you'll see, "The

16   modification will require the contractor to perform

17   the following."

18   A.  Mm-hmm.

19   Q.  Are those bullet points there, one, two,

20   three, four, five bullet points your understanding

21   of what the additional work required?

22   A.  Yes.  And the way they wrote that, they're

23   not technical, so it's not 100-percent correct.  But

24   yes, I know what they're talking about.

25   Q.  And it says, "Integrate corporate graph

207

1        A.   The environment, the CKGE environment is a
2    platform and services, and we don't manage the data
3    sources.   The data sources would be by the team,
4    meaning I would have to ask them what they were
5    using.
6        Q.   So the platform would be built on top of
7    the various data sources which would include ONgDB
8    at this time, correct?
9        A.   If there was a data source with ONgDB, we
10   can connect to it and we could display and let you
11   explore it.   Same with any other graph database
12   software.
13       Q.   Okay.   Let me go ahead and mark the next
14   exhibit.   It's actually already marked.   This will
15   be in your chat here marked as Exhibit 107.
16            By the way, before we get there, was it
17   your understanding that the IRS paid eGovernment
18   Solutions the additional 216,000 for the option year
19   increase?
20       A.   Yes.   All those should have been paid.   I
21   don't remember them ever not paying something.
22            I've got the new EX. 107 open.
23       Q.   This was previously marked at Mr. Mayur's
24   deposition.   Do you recognize this document?
25       A.   Yep.   This is another Amendment of

211

1    Solicitation/Modification of Contract.

2         Q.  And it was for the same eGovernment

3    Solutions contract that we've been talking about

4    that was initially awarded in May of 2018?

5         A.  Let me check.  Well, that depends on if

6    it's the same contract from legal speak between

7    00151 and 168.  But this is the same work.

8         Q.  There is no other contract that the IRS

9    awarded eGovernment Solutions, right, just one?

10        A.  Well, there was the contract that ended in

11   00151.

12        Q.  But it was for the same work, correct?

13        A.  Yes, but you said contract.  And this

14   specifically says contract number is 00168.  The

15   first one was not 00168.  So to me, it looks like

16   they're separate contracts.

17        Q.  But we looked at the exhibit that changed

18   the number, right?

19        A.  Yes, we did.

20        Q.  So it's fair to say it's the same contract

21   based on the change that the IRS made, correct?

22        A.  I wouldn't -- I wouldn't categorize it as

23   that, because they seem to have two different

24   contract numbers.  You would keep the IDs the same

25   if they were the same contracts.  But I'm not a

212

1      Q.  What's a Smart ID?

2      A.  I have no idea.

3      Q.  All right.  Going back to Exhibit 107, do

4  you understand this to be the exercise of option

5  year 2 for the eGovernment Solutions contract?

6      A.  Yes.  That's what it says.

7      Q.  And that's your understanding of what this

8  is?

9      A.  Yes.

10      Q.  And that was for $200,000?

11      A.  Yes.

12      Q.  And that money, to your knowledge, was paid

13  to eGovernment Solutions?

14      A.  Yes.

15      Q.  And then let me take a look at -- okay.

16  Let me drop in Exhibit 108.  Do you recognize what's

17  previously marked as Exhibit 108?

18      A.  Yes.

19      Q.  And is this the exercise of option year 3

20  for eGovernment Solutions under the IRS contract?

21      A.  That looks to be the case, yes.

22      Q.  And it's for $200,000?

23      A.  Yes.

24      Q.  And to your knowledge, that $200,000 was

25  paid to eGovernment Solutions?

214

1          A.   Yes.

2          Q.   And then Exhibit 109, previously marked.  I

3    just dropped that into the chat.  It's also titled

4    Amendment of Solicitation/Modification of Contract.

5    It's dated May 24, 2022.

6          A.   Yes.

7          Q.   Do you recognize this document?

8          A.   Yes.

9          Q.   Is this the exercise of option year 4 for

10   the eGovernment Solutions IRS contract we've been

11   talking about?

12         A.   That's what it says, yes.

13              (Zoom audio and/or video frozen.)

14   BY MR. RATINOFF:

15         Q.   I just said it wouldn't be anything else.

16         A.   That's what it says.  It says the purpose

17   of this modification is to exercise option year 4.

18         Q.   To your knowledge, was that $200,000

19   identified here paid to eGovernment Solutions?

20         A.   Yes.

21         Q.   And was this -- is this the last option

22   year on the contract between eGovernment Solutions

23   and iGov -- I'm sorry, the IRS and eGovernment

24   Solutions?

25         A.   Let me look at -- I believe so.  Yes.

215

1   iGov right now, it's a lot of trouble to fix that

2   damage that's been done.  I believe that IRS

3   associates risk with iGov because of this pestering

4   and intimidation from Neo4j and specifically

5   focusing on me and my company.  So I just don't

6   think it's worth focusing on anymore right now.

7       Q.  All right.

8       A.  iGov.

9       Q.  And eGovernment Solutions isn't going to

10  competitively bid?

11      A.  I have no idea what they're going to do.

12      Q.  You're no longer affiliated with

13  eGovernment Solutions?

14      A.  No.  I'm affiliated.  I help them still on

15  their FSO, and I help -- well, I used to help with

16  the bisdev.  I'm still the subcontractor to finish

17  this contract.  But if they go after it next year,

18  it's not going to be with me.  But they can make

19  their choices however they want to go.

20      Q.  I'm going to drop into the chat what was

21  previously marked as Exhibit 100.  Do you recognize

22  Exhibit 100?

23      A.  I'm still opening it or downloading it.

24      Q.  Yeah.  It's a large one.

25      A.  Yes.

217

1          Q.   And what do you understand Exhibit 100 to

2    be?

3          A.   This is me giving back my shares to eGov

4    and them buying me out.

5          Q.   And what were the terms of the buyout?

6          A.   They would be in the contract.  I would

7    have to go read it all for you.  If you let me do

8    that, I can read it all and tell you.

9          Q.   Let's focus on a couple of sections here.

10         A.   Okay.

11         Q.   You'll see at paragraph 5 --

12         A.   Paragraph 5.

13         Q.   -- it says, "Re:  Treasury contract

14   2032H8-18-P-0015 (aka CKGE Knowledge Environment

15   contract) dated 5/24/2018."  Is that referring to

16   the eGovernment Solutions contract with the IRS we

17   have been discussing?

18         A.   Yeah, referring -- yes, 00151, that

19   contract.

20         Q.   And then in addition to that at paragraph

21   3.1 above, there is a $20,000 payment, correct?

22         A.   Can you say that again?  I'm sorry.

23         Q.   So section 3 is Terms of Payment.

24         A.   Oh, I see.

25         Q.   And it says you were paid $20,000 for your

218

1    shares, as well; is that correct?

2         A.  Yes, that's correct.

3         Q.  And then under 5.1, it says:

4              "eGovernment Solutions Inc. hereby

5              hires John Mark Suhy as an independent

6              Contractor for all options that are

7              exercised on the CKGE contract.  His

8              compensation is $200,000 per year paid

9              when eGovernment Solutions gets paid."

10             So at this time, the IRS had already made

11   the $300,000 initial base contract payment to

12   eGovernment Solutions, correct?

13        A.  I believe so.

14        Q.  If you look at the date of this agreement,

15   it was signed, it looks like, or at least effective

16   date is December 31st, 2018.  Do you see that down

17   in section 7.1?

18        A.  Okay.  I see that.

19        Q.  Okay.  So your interest in iGov -- or I'm

20   sorry, your interest in eGovernment Solutions was

21   sold based on this agreement on December 31st, 2018,

22   correct?

23        A.  Yes.  That looks correct.

24        Q.  And by sections 5.1 through 5.3, was it

25   your understanding that you were still entitled to

219

1    each $200,000 payment that was made in conjunction

2    with each option year on the eGovernment Solutions

3    contract?

4         A.  Only if I actually did the work.  Because

5    they have to -- they have to legally meet those

6    requirements.  So if I didn't do anything, if I

7    didn't accept them using us or using me, they would

8    have had to go and find someone to do this.

9         Q.  But you actually did the work for each

10   option years 1 through 4, correct?

11        A.  Yes, I did.

12        Q.  And under this agreement, you were entitled

13   to the $200,000 that was paid by the IRS for each

14   option year of the contract, correct?

15        A.  Well, my salary was $200,000.  It covered

16   this and other services.  But I allowed them to not

17   pay me the salary.  For some reason, this or some

18   other projects had fallen through.  But that

19   was our -- that was the agreed amount.  It says

20   right there.

21        Q.  The payments were ultimately made to iGov

22   and not you personally, correct?

23        A.  They came to iGov, and I worked through

24   iGov.

25        Q.  But there is no reference to iGov in this

220

1    agreement, correct?

2          A.   I'd have to search and see.  Give me

3    moment.

4          Q.   Well, it says in 5.1, it says:

5               "EGovernment Solutions Inc. hereby

6               hires John Mark Suhy as an independent

7               contractor for all option years that

8               are exercised on the CKGE contract.

9               This compensation will be $200,000 per

10              year when eGovernment Solutions gets

11              paid."

12              There is no reference to iGov in that

13   section, correct?

14         A.   Yes.  We must have had another agreement,

15   which most likely doesn't have a signature, just

16   like everything else.  But it's still a contract,

17   it's still an agreement.  Because it --

18         Q.   So there is another agreement you entered

19   into with eGovernment Solutions that assigned the

20   payments under this agreement from you to iGov?

21         A.   Just a verbal agreement that I would like

22   them to hire iGov.

23         Q.   Why did you do that?

24         A.   I don't remember the exact reasons.  But

25   it's -- I always like to do things as an entity that

221

1   you can focus on and build up.  So most likely it

2   was because I wanted to build up iGov and sell it at

3   some point.

4        Q.  And then I want to --

5        A.  I don't remember exactly what the reasons

6   were, but we did discuss it, you know, and we agreed

7   that yes, we'll do that, then.

8        Q.  Okay.  And you mentioned that Mr. Mayur

9   didn't sign this.  But you understood this agreement

10  was executed between all of the parties involved,

11  the shareholders?

12       A.  I'm not sure what you mean.

13       Q.  Well, you said that you understood this

14  agreement to be executed.  That's right?

15       A.  Yes.  Well, we got paid, so . . . .

16       Q.  Okay.  Let me go ahead and mark the next

17  exhibit.  Actually, it's already been marked.  This

18  was previously marked as Exhibit 110.

19       A.  Okay.  I'm looking at that.

20       Q.  Do you recognize the documents that are

21  comprised of Exhibit 110?

22       A.  Yes.  They look to be invoices.

23       Q.  These are invoices for payment -- or I'm

24  sorry, what are these invoices for?

25       A.  The first one says "CDW Graphic

222

1  Environment," which again is a mis- -- it's not

2  called CDW Graphic Environment.  It's just initiated

3  that was what was on the award.  So the IRS has made

4  a few mistakes in describing things.

5       Q.  But you understand this is an invoice, at

6  least the one that ends in 68, the first one,

7  invoice No. 817 is for the initial 300,000 due under

8  the eGovernment Solutions/IRS contract that we've

9  just been discussing?

10      A.  Yeah.  That looks to be the case.

11      Q.  And then did you generate this document?

12      A.  I believe I did.

13      Q.  And submitted it to the IRS?

14      A.  I believe I did, yeah, on behalf of

15  eGovernment Solutions.

16      Q.  Looking at the next page, invoice 827, and

17  is this an invoice for the eGov Solutions/IRS

18  contract option year 1?

19      A.  Yes, it looks to be.

20      Q.  And this is for the $200,000 on that option

21  year?

22      A.  Yes.

23      Q.  You generated this document, invoice 827?

24      A.  I believe I did for eGovernment Solutions.

25      Q.  And it was submitted to the IRS under the

223

1   eGovernment Solutions/IRS contract?

2        A.  Yes.

3        Q.  And the IRS paid the $200,000?

4        A.  Yes.  I believe they paid everything.

5        Q.  And invoice 901, next page, is this the

6   invoice for option year 3 -- I'm sorry, strike that.

7            This is invoice 901 for option year 1

8   modification.  Is that what we were previously

9   discussing as being a modification to add additional

10  work to the eGovernment Solutions/IRS contract?

11       A.  I'm not sure if that references this, this

12  additional work.

13       Q.  Well, it says under line the item, "CDW

14  Graphic Environment Continued Option Year 1

15  Modification.  Item code:  101B."  Do you see that?

16       A.  I see that.

17       Q.  And for 216,000?

18       A.  I see that.

19       Q.  Isn't that the amount of what the option

20  year 1 increase was for?

21       A.  I don't remember if this was what -- were

22  all the option years 200,000?

23       Q.  Okay.  Why don't we go ahead and just take

24  a quick look at -- let's see.  It was Exhibit 105.

25  Why don't you go just take a quick look at

                                                   224

1    Exhibit 105 and see if that helps.

2         A.  Okay.  Let me get this open.  Bear with me.

3    All right.

4         Q.  Looking at Exhibit 105, do you now

5    understand this invoice is reflecting the

6    modification to option year 1 for the eGovernment

7    Solutions/IRS contract?

8         A.  I see that.  But the prices don't line up.

9         Q.  How so?

10        A.  Well, that invoice says 216,000, and

11   Ex. 105 says 200,000.

12        Q.  If you actually go down, let's see -- so

13   why would you invoice for 216,000?

14        A.  I have no idea if it's a mistake or

15   something else.

16        Q.  You know what, I apologize.  I meant to

17   show you Exhibit 106.  That's my fault.  A lot of

18   exhibits.  So please take a look at Exhibit 106, and

19   let me know if that helps you.

20        A.  This looks like it was just the increase,

21   the option year, by 216,000, yes.

22        Q.  So then going back to Exhibit 110, the

23   invoice we were looking at, which was invoice 901,

24   this is the invoice 901 for that option year

25   modification, correct?

                                                    225

1   A.   Yes, it looks to be.   The numbers line up.

2   Q.   And 216,000, same number?

3   A.   Yes.

4   Q.   This money was paid to eGovernment

5   Solutions?

6   A.   Yes.

7   Q.   And going on to Exhibit -- I'm sorry, the

8   same exhibit, 110, invoice 955.   This is an

9   invoice -- are you there?

10   A.   Yes.

11   Q.   This is the invoice that you generated to

12   send to the IRS for option year 2 under the

13   eGovernment Solutions/IRS contract?

14   A.   Yes, I believe so.   Yeah.

15   Q.   To your knowledge, the IRS paid the 200,000

16   to eGovernment Solutions?

17   A.   Yes.

18   Q.   Looking at invoice 960.

19   A.   I'm looking at it.

20   Q.   Do you recognize invoice 960 as being an

21   invoice you generated for option year 3 under the

22   eGovernment Solutions/IRS contract?

23   A.   That looks right.

24   Q.   And this is for $200,000?

25   A.   Yes.

226

1    Q.  And the IRS paid that $200,000 for option

2    year 3 to eGovernment Solutions?

3    A.  Yes.

4    Q.  And finally looking at invoice 912.

5    A.  I'm looking at it.

6    Q.  And is this the invoice you generated to

7    send to the IRS for option year 4 under the

8    eGovernment Solutions/IRS contract?

9    A.  It looks correct.  But we don't actually

10   send anything to IRS.  This is just an option to

11   upload.  I don't believe you even need to have

12   invoices, because IRS has its own system for

13   payments.  So I don't believe this was sent

14   anywhere.  I believe it was just uploaded as a

15   reference, so when we look in their antiquated

16   system for showing procurements, we could remember

17   what it was for.

18   Q.  So this is uploaded to the IRS, these

19   invoices?

20   A.  Yes.  I believe they were on the website.

21   It could have been another government agency that

22   runs it for all -- for different agencies, but I

23   think it's just for IRS, the website.

24   Q.  And going to the last page of this exhibit,

25   it ends with a Bates number 74, did you generate

227

1    you've got your numbers right, but our numbers are

2    right.  Everything that we made comes in.  We

3    generate reports and pay the taxes.  You can do that

4    without 1099s.  You could make a mistake, though, so

5    1099s are good to help you verify.

6            MR. RATINOFF:  Okay.  Let me mark -- it's

7    already been premarked in a previous deposition as

8    Exhibit 111.

9            THE WITNESS:  I've got that open.

10   BY MR. RATINOFF:

11       Q.  Okay.  Do you recognize this document?

12       A.  Yeah.  That looks like a 1099.

13       Q.  Issued by eGovernment Solutions?

14       A.  EGovernment Solutions to iGov Inc.

15       Q.  And that's for 2018?

16       A.  Yes.

17       Q.  And then the 285,700 would be for the money

18   received that year from eGovernment Solutions?

19       A.  That would have been paying me for my

20   services, consulting, SFO duties and whatnot.

21       Q.  During that year, you performed services

22   for the IRS under the eGovernment Solutions/IRS

23   contract, correct?

24       A.  That's correct.

25       Q.  And that work would have been reflected in

231

1    this 1099?

2         A.   Yes, that would have been part of it.

3         Q.   And the other part is what?

4         A.   FSO services and business development.

5         Q.   You don't have any time sheets, though, to

6    reflect the division of that labor though, do you?

7         A.   There is no need.  This is -- we agreed on

8    fixed prices.  Usually that's the easiest way to do

9    things.  And that's how IRS pays, as well.

10        Q.   So the IRS paid $300,000 in 2018 under the

11   eGovernment Solutions contract, correct?

12        A.   Yes.

13        Q.   And you were paid by eGovernment Solutions

14   285,700, correct?

15        A.   Yes.

16        Q.   And the difference between the 285-plus

17   thousand was that -- and the 300,000, was that

18   expenses that you mentioned that were paid out?

19        A.   I believe so.  It could have been that we

20   had other help.  Whenever I need help on something,

21   it costs money.  So it could have been that, as

22   well.  I'm not positive.

23        Q.   And then I'll mark Exhibit 112, or it's

24   been marked already.  Just let me know when you've

25   had a chance to look at it.

                                                    232

1    A.   Yes, I'm looking at that right now.

2    Q.   And do you understand what Exhibit 112 is?

3    A.   Yes.  This is a 1099 Misc.

4    Q.   This is issued to iGov by eGovernment

5    Solutions?

6    A.   Yes.

7    Q.   And this is for work that you performed

8    under the eGovernment Solutions/iGov -- I'm sorry,

9    eGovernment Solutions/IRS contract?

10    A.   This is for work done, consulting done on

11    that, FSO services and business development

12    services.

13    Q.   So the IRS, I think that year prior to the

14    amendment, paid $200,000 to eGovernment Solutions,

15    correct?

16    A.   Let me look and see for 2019 what was paid.

17    Option year 1 was 200,000.  Option year 1

18    modification, though, was 216,000.

19    Q.   So the total for 2019 was 416,000 that was

20    paid by the IRS to eGovernment Solutions?

21    A.   I'm not positive, but it looks like -- let

22    me see.  From looking at these invoices, it looks

23    like there was a 200,000 for invoice 827, and then

24    there was invoice 901, which was 216,000.

25    Q.   Those are both --

233

1        A.   That's 2020, so never mind.

2        Q.   As far as Exhibit 112 goes, you have no

3   reason to believe this wasn't sent to iGov by

4   eGovernment Solutions?

5        A.   I don't think it was mailed.   These are

6   generated by your tax software.   And it's possible

7   that they e-mailed it to us or provided it by e-mail

8   or didn't provide it at all.   I don't remember.

9        Q.   You have no reason to believe this is an

10  incorrect amount?

11       A.   No, no.   It looks right.

12       Q.   Let me mark Exhibit -- I'm sorry, this one

13  has already been previously marked as Exhibit 113.

14       A.   Okay.   I'm looking at that.

15       Q.   Do you have an understanding of what

16  Exhibit 113 is?

17       A.   Yes.   It's a 1099-NEC for 2020.   I have no

18  idea what that means.

19       Q.   Okay.   To your knowledge, were you paid

20  193,000 by eGovernment Solutions in 2020?

21       A.   I have no reason to think why that wasn't

22  true, but I would have to look at our accounting to

23  see the numbers.   For all of these, I would have to

24  just verify it to say for sure yes.   But it looks

25  like.

234

1    Q.  So this is something that might be
2    reflected in iGov's financial statements?
3    A.  Yes.
4    Q.  But you have no reason to believe this is
5    incorrect 1099 for 2020?
6    A.  It's not a 1099 Misc.  It's a 1099-NEC,
7    which I have no idea what that means.
8    Q.  But it's still a 1099-NEC, correct?
9    A.  Yes.
10   Q.  It's not for employment income?
11   A.  I don't know what -- I'm not familiar with
12   what they all mean.  I just have a vague
13   understanding.
14   Q.  To your knowledge, you were paid 193,000 by
15   eGovernment Solutions for work as an independent
16   contractor?
17   A.  They paid that to iGov Inc. for services.
18   I don't know what the term "independent contractor"
19   means.  iGov Inc. is a company.  It's a corporation.
20   Q.  As working as a contractor for eGovernment
21   Solutions on the IRS/eGovernment Solutions contract,
22   correct?
23   A.  That's one of the things that iGov does for
24   them, yes.
25   Q.  Can iGov as an entity act as an FSO?

235

1    just pick whichever one you want, whatever is

2    available in Exhibit 110, just -- we can start at

3    the top.  That's fine.

4        A.  Okay.  I'm looking at it.

5        Q.  And there's -- actually, scratch that.  Let

6    me move on.

7            So then going and looking at -- I see

8    where -- sorry.  I got sidetracked there.

9            Okay.  So then I don't think I showed you

10   Exhibit 114 yet, so let me do that.  This was

11   previously marked as Exhibit 114.

12       A.  It's not opening.  Maybe I've got to close

13   all my other exhibits.  I have to close everything,

14   because it's no longer opening.

15       Q.  That's fine.  I don't think we're going to

16   be going back to anything as of now.

17       A.  I've got that open.

18       Q.  Okay.  So previously marked Exhibit 114, do

19   you recognize what this document is?

20       A.  Yes.  It says it's a 1099-NEC.

21       Q.  And this is issued by eGovernment Solutions

22   to iGov?

23       A.  Yes, that's correct.

24       Q.  And the amount of employee compensation

25   being 197,000?

                                                    237

1      A.   That sounds right.

2      Q.   And that's for work done under the

3  eGovernment Solutions/IRS contract?

4      A.   And FSO services and then business

5  development services.

6      Q.   But again, you don't have any time sheets

7  to reflect the breakdown of that work versus what

8  was done for the IRS?

9      A.   No.  We -- we put everything together.

10  IRS, they can only subcontract a certain amount of

11  it, and so I could calculate how much that would

12  have been.

13      Q.   You testified that the IRS, for instance in

14  2021, made a $200,000 payment to eGovernment

15  Solutions.

16      A.   Yes.

17      Q.   And it makes that payment pursuant to the

18  renewal, correct?

19      A.   When they exercise an option year, yes.

20      Q.   And they do that as a lump-sum payment,

21  correct?

22      A.   Yes.

23      Q.   And then you perform the work after that

24  for that option year after that payment is made,

25  correct?

238

1    A.  Yes.

2    Q.  Do you submit any time sheets to the IRS to

3  reflect how much of that $200,000 worth of work you

4  do?

5    A.  It's fixed price.  They don't require that.

6  That's one of the benefits of a fixed price is they

7  miss -- they don't have to deal with the risk.  Time

8  and materials could easily make it 500, $600,000.

9    Q.  So you could have worked five hours or

10  5,000 hours that year, and you would still be paid

11  the $200,000 for 2021 by the IRS?

12    A.  Exactly.  And that's why -- that's why the

13  agreement between eGovernment and iGov was the same,

14  because if we were doing time and materials, it

15  could have made it so that eGovernment Solutions

16  could have owed a lot of money that they just didn't

17  have.  If it was time and materials, though, it

18  would have been -- it would have passed through, and

19  iGov would have done time and materials, as well.

20    Q.  But that didn't happen?

21    A.  This is not a time and materials contract.

22    Q.  Okay.  Now, I don't have a 1099 for 2022,

23  because I think we can agree those don't come out

24  until after the close of the calendar year, correct?

25    A.  I believe so.

239

1    know if it's based on it.

2            MR. RATINOFF:  All right.  Let me mark the

3    next exhibit, Exhibit 505.  I'm sorry.  This is tab

4    505.  It will be marked as Exhibit 217.

5            (Plaintiffs' Exhibit 217 was marked for

6    identification.)

7            THE WITNESS:  Yes.  I'm looking at that

8    now.

9    BY MR. RATINOFF:

10      Q.  Okay.  I'll represent to you this is

11   produced by eGovernment Solutions.  It starts at

12   Bates number 151.  Do you understand what what's

13   been marked as 217 is?

14      A.  Tab 505, it's a Wells Fargo transaction

15   history.

16      Q.  And do you recognize the account number for

17   this transaction history?

18      A.  I don't remember account numbers, but there

19   is only one Wells Fargo account that I had access

20   to.

21      Q.  Is this the account that -- is this the

22   account you had access to at eGovernment Solutions?

23      A.  Yes.  I believe I may have had access to

24   this just when I was a partner, and it just stayed

25   there.  But I'm not positive when this was created.

1    Q.  Do you have signing authority on this
2    account?
3    A.  I should have it, but I'm not positive.
4    Q.  You sign checks on this account?
5    A.  Yes, I've signed checks.  I've always
6    signed checks after verifying that I have the
7    permission to do so.  So if there is a check that
8    needs to be submitted, I would always call and get
9    permission.
10   Q.  Permission from who?
11   A.  Ashwani, usually.
12   Q.  Ashwani Mayur?
13   A.  Yes.
14   Q.  And to your knowledge, were all the
15   payments made by the IRS deposited in this account?
16   A.  I believe so.
17   Q.  And you mentioned there was expenses paid
18   on behalf of eGovernment Solutions.  Would those
19   also be paid from this account?
20   A.  I'm not positive.
21   Q.  So for instance, let's go to the next page,
22   152, there is a -- there is an IRS Treas
23   miscellaneous payment for 216,000 dated January 9th,
24   2020.  Do you see that?
25   A.  Yes, I see that.

244

1    Q.   That's the 216,000 for that amendment to
2    option year 1?
3    A.   Yep, this seems right.
4    Q.   And below that, you'll see there is GoDaddy
5    payments?
6    A.   Yes, I had that.
7    Q.   Are those GoDaddy payments made on behalf
8    of eGovernment Solutions or iGov?
9    A.   Everything here would be just for
10   eGovernment Solutions.
11   Q.   And I want you to take a look at page 152.
12   A.   That's what I was just looking at.
13   Q.   And you'll see on January 15, 2020, a
14   payment was made to AtomRain for $101,400.  Do you
15   see that?
16   A.   Yes, I see that.
17   Q.   Was that payment made to AtomRain on behalf
18   of iGov?
19   A.   This would have been -- iGov wouldn't have
20   used eGovernment Solutions' bank accounts.  They're
21   completely different entities.  EGovernment
22   Solutions would have paid AtomRain directly.
23   Q.   Did iGov subcontract out work under the
24   eGovernment Solutions/IRS contract to AtomRain?
25   A.   It looks like from this that eGovernment

245

1    Solutions subcontracted out to AtomRain.

2         Q.   Are you aware of any subcontractor

3    agreement between eGovernment Solutions and

4    AtomRain?

5         A.   I'm not sure.  I don't remember.

6         Q.   Did you recommend that eGovernment

7    Solutions hire AtomRain to do additional work on the

8    eGovernment Solutions/IRS contract?

9         A.   Yes.  That would have come from me.

10        Q.   So essentially, you hired them?

11        A.   I didn't hire them.  I would have gone

12   to -- I treat companies as entities, and I try to

13   keep everything separate from anything else.  And I

14   would have gone to them and said these are the

15   experts.  We should subcontract them, because I

16   don't have enough time to do a lot of the work they

17   want.  And then they would have said okay, and then

18   we would have an agreement.  Or they might have got

19   an agreement with AtomRain.  I don't remember.

20        Q.   So you're not aware of there being an

21   actual agreement with AtomRain between eGovernment

22   Solutions and AtomRain?

23        A.   I'm not sure if it was a handshake deal or

24   a written agreement.  I wasn't an owner at this

25   point, so I don't remember if they would have had

246

1    lawyers come in and verify everything.  But they do

2    take -- when I make a recommendation, if I say look,

3    we need to do this, they usually listen.  But they

4    don't have to.

5         Q.  Okay.  I'm going to go ahead and put what

6    was previously marked as an Exhibit 115.

7         A.  After this, I'm going to have to use the

8    bathroom again.  Sorry.

9         Q.  Sure.  No problem.

10        A.  I'm looking at it now.

11            (Reporter interruption.)

12   BY MR. RATINOFF:

13        Q.  It's 115.  And this is also a Wells Fargo

14   business checking printout from eGovernment

15   Solutions production.  It's eGov Production 81 is

16   the first Bates number.

17        A.  Yes, I'm looking at it.

18        Q.  At the bottom of the first page, it says

19   Account Number.

20        A.  I do not see that.  The first page, bottom

21   right?

22        Q.  Yeah.  There is a little line, vertical

23   line, and it says Account Number, and under it, it

24   says eGovernment Solutions.

25        A.  I see that.

                                                          247

1    Q.  And your understanding is that these bank

2    statements are from the same account that we were

3    just discussing?

4    A.  Yes, because I believe there is only one

5    Wells Fargo account.  But I'm not positive.  I know

6    it added other bank accounts, as well.  I believe it

7    is.  The easy way is to check this account number

8    and the previous one you looked at to see if they

9    match.

10   Q.  Why don't you go ahead and do that just so

11   we're clear.  Tab 505 and Exhibit 115.  Tab 505 has

12   now been marked as Exhibit 217.

13   A.  I'm looking right now.  505.  Yep.  They're

14   the same number, account number.

15   Q.  And that's the same account that you had

16   signing authority on?

17   A.  I don't know if I had signing authority,

18   but yes, the same account.

19   Q.  But you had access to it?

20   A.  Yeah, I had access to it.

21   Q.  And then let's go ahead and look at page

22   134, eGov Production 134.  It's going to be -- it's

23   going to be page 54 of 56 of the PDF.

24   A.  Are we talking about EX 155?

25   Q.  Yeah.  EX 155, if you go to 54 out of 56.

248

1    A.   All right.   115 on there?   Okay.   Well,

2  this says account balance calculation sheet.   Is

3  that --

4    Q.   No.   It's going to be -- it's going to be

5  54 out of 56 with the Bates numbers eGov Production

6  134 at the very bottom.

7    A.   I'm confused.   What is the name of the file

8  I should be looking at?

9    Q.   EX 155.

10   A.   Combined statements.   Okay.   So I'm going

11 down to -- you said down to the bottom?

12   Q.   Page 54 out of 56 in the PDF.   The Bates

13 number at the bottom should be eGov Production 134.

14   A.   I'm there.

15   Q.   You'll see there is a payment made by IRS

16 Treas on June 13th, 2022?

17   A.   Yes, I see that.

18   Q.   200,000?

19   A.   I see that.

20   Q.   And that's the payment for option year 4?

21   A.   Based on the date, I believe so.

22   Q.   So going down to the next page, 135.

23   A.   Okay.

24   Q.   $200,000 from IRS Treas dated June 15,

25 2021.   Do you see that?

249

1    A.   I see that.

2    Q.   That's for option year 3 under the

3  IRS/eGovernment Solutions contract?

4    A.   Okay.

5    Q.   Yes?

6    A.   Okay.  Are you asking me a question?

7    Q.   Yeah.

8    A.   It seems like it would be, yes.

9    Q.   Same amount that was due under option year

10  3?

11    A.   I have to go back and keep looking at it,

12  but it sounds right.  Everything was 200,000, so

13  yes.

14    Q.   Everything but the first year of 300,000?

15    A.   Yes.

16    Q.   And obviously 216,000 for the option year 1

17  increase, correct?

18    A.   Yes.

19    Q.   Okay.  We can take a break now.  Thanks for

20  your patience.  We can come back -- if everyone is

21  okay, we can do -- I guess it's 5:30 your time, so

22  5:35?

23          THE VIDEOGRAPHER:  Okay.  We're off the

24  record at 2:28.

25          (Break taken from 2:28 to 2:36 p.m.)

                                                        250

1           THE VIDEOGRAPHER:  We are now on the record
2      at 2:36.
3      BY MR. RATINOFF:
4           Q.  Mr. Suhy, I just want to put the next
5      exhibit into the chat.  It will be tab 507.  This
6      is --
7           A.  It's downloading.
8                MR. RATINOFF:  Let me know when you're
9      ready.
10                While you're doing that, this will be
11      marked as exhibit -- where are we at?  218.
12                (Plaintiffs' Exhibit 218 was marked for
13      identification.)
14                THE WITNESS:  Yes.  I've got it open.
15      BY MR. RATINOFF:
16           Q.  Okay.  And these were checks, printouts of
17      checks that were provided by eGovernment Solutions.
18      You'll see there is a Bates number, EGOVS ending in
19      the Bates number 150.  Do you see that?
20           A.  Yes.
21           Q.  If you look at the top, you'll see there is
22      an account number 5581518783.
23           A.  I don't see that account number.
24           Q.  It's at the very top.  You can also see it
25      on the chat.  You'll see there is an account number

251

1  on the chat as well as the 5581518783.

2          A.   I see it, yes.

3          Q.   That's the same account number that we've

4  been talking about in the bank statements, the

5  Wells Fargo account?

6          A.   Yes.

7          Q.   And is this your signature on this check?

8          A.   Yes.

9          Q.   And this is for at least part payment for

10  the work that you did for eGovernment Solutions on

11  the IRS contract?

12          A.   I believe so.  I would have had to call up

13  and get permission from Ashwani for each of these.

14  So I would have to see how it linked up, but I

15  believe that's what it's for.

16          Q.   Let's go down to the next check.  This one

17  is on Bates number 151.

18          A.   Yes.

19          Q.   And it's dated January 24, 2020.  Do you

20  see that?

21          A.   Yes.

22          Q.   It's for 5,000?

23          A.   Yes, I see that.

24          Q.   And then is that your signature?

25          A.   Yes, it is.

252

1       Q.  And it says, "Pay to the order of Irving
2  Starr, Esquire."  Who is that?
3       A.  That's a legal, for lawyers.  So I have an
4  agreement with eGovernment Solutions that they can
5  help pay for some of the legal fees directly and put
6  it into escrow for me to use.  And we have an
7  agreement that there will be no -- I forgot the name
8  of it, no -- what's it called when you work with
9  someone?  You can have a conflict of interest.  So
10 this is -- this is something that I'd asked them for
11 permission for and they gave me.  And then they gave
12 me permission to sign it.
13      The reason why is I'm the only one that
14 happened to have checks.  So once they get checks,
15 they're able to do everything on their own.  But I
16 was the only one that had checks from the account
17 creation.
18      Q.  You say legal fees.  Whose legal fees are
19 you referring to that this is payment for?
20      A.  Well, this is just -- this is going into a
21 trust.  So this would be for -- I believe this
22 was -- I don't remember if this was for the lawsuit
23 or for something else.
24      Q.  So this is a lawyer or a law firm that iGov
25 retained, Irving Starr?  That's your counsel in this

253

1    case, correct?

2         A.  Yes.

3         Q.  So Irving Starr, they were retained by

4    iGov, not eGovernment Solutions, correct?

5         A.  Retained by, I guess you would say, myself.

6         Q.  Right.  Irving Starr, you're not writing a

7    check for services provided to eGovernment

8    Solutions, correct?

9         A.  No.  This is where I had asked them if they

10   could put a deposit into a legal trust for me to use

11   for other -- you know, by helping out with this, it

12   would let me focus on, you know, helping them with

13   business development and whatnot.

14        Q.  So were they helping pay for your legal

15   fees in this case?

16        A.  Hmm -- I don't know if I consider it

17   helping pay for the legal fees.  I just asked them

18   to put that amount in the trust, and it was

19   something that I didn't bill them for.  So I don't

20   think they actually -- they would have subtracted

21   this out of what we would have billed.

22        Q.  You said you had an agreement with

23   eGovernment Solutions to pay for services provided

24   by Irving Starr?

25        A.  Yes.  Well, yes, to put money into the

                                                        254

1    legal services provided to either you personally,

2    iGov or PureThink, correct?

3        A.  I believe so.  I'm trying to think if there

4    is anything else that it would have gone -- I

5    believe so.  I have to think if there is anything I

6    would have had done for eGov.  I don't believe so.

7            MR. RATINOFF:  All right.  Let me go ahead

8    and mark the next exhibit.  This should be marked as

9    Exhibit 219, and it should be tab 506 in the chat.

10           (Plaintiffs' Exhibit 219 was marked for

11   identification.)

12           THE WITNESS:  I have this open.

13   BY MR. RATINOFF:

14       Q.  And again, this is a document, a series of

15   documents produced by eGovernment Solutions starting

16   with the Bates number EGOVS_000114, I'm sorry, 144.

17   And it's another series of checks.  Do you see that?

18       A.  Yes, I do.

19       Q.  And then looking at the account number on

20   the checks, it's 5581518783.  Do you see that?

21       A.  Yes.

22       Q.  That's the same account that we were

23   talking about in reference to the bank statements

24   such as Exhibit 115, correct?

25       A.  Yes.  It looks to be.

1       Q.   And this check to AtomRain dated July 14,
2  2018, that's your signature on this check?

3       A.   Yes, that looks correct.

4       Q.   Then you see in the little left-hand corner
5  it says, looks like, "2018 IRS RAAS contract
6  support."   Do you see that?

7       A.   Yes.   I can't see what the year is.   Looks
8  like it says 2008.   But yes.

9       Q.   So this is for work that AtomRain performed
10  on the eGovernment Solutions/IRS contract?

11       A.   It should have been, yes.   That's what it
12  looks to be.

13       Q.   And then moving on to the next check on
14  145, it's dated August 3rd, 2018, for 139,000 to
15  iGov.

16       A.   I'm there.

17       Q.   Is that your signature?

18       A.   Yes, it is.

19       Q.   And this is from the same bank account that
20  you had signing authority on that we were talking
21  about with eGovernment Solutions?

22       A.   Yeah.   I don't know if I had signing
23  authority.   That's why I had to call up and get
24  permission for each one of these.

25       Q.   But signing authority means you're allowed

                                                   260

1    to sign a check on this account, right?

2         A.  I don't know.  It's possible that I was

3    signing and I didn't have any authority to do it.  I

4    have no idea.  They allowed it to go through at the

5    bank, so -- but there is actually something called

6    signing authority which I have no idea if I actually

7    have that on the bank account.

8         Q.  And it says, "IRS subcontract services and

9    license/supplies, 2018 to 2019."  This is payment

10   for the work you did under the eGovernment

11   Solutions/IRS contract?

12        A.  Some of it would have been.  Other would

13   have been subcontracting services for FSO duties,

14   business development.

15        Q.  But there is nothing listed there other

16   than IRS subcontract service and license and

17   supplies, correct?

18        A.  Well, there is only so much room to put a

19   quick description.

20        Q.  Moving on to Bates number page 146, it's a

21   check dated August 10th, 2020, for 25,000 to Irving

22   Starr ESQ PC.  Do you see that?

23        A.  Yes.

24        Q.  That's your signature?

25        A.  Yes.

                                                          261

1    Q.  And then again, this is a payment made to a
2    legal escrow account maintained by Irving Starr on
3    behalf of iGov, PureThink and yourself?
4    A.  Not on behalf of.  It's one that was made
5    under an agreement that they would -- that they
6    would help with legal fees.
7    Q.  Who is "they"?
8    A.  EGovernment Solutions.  Otherwise I
9    wouldn't have agreed to this, signing this.  I have
10   to get permission for every single check.
11   Q.  Okay.  But my question is relating to the
12   account that the money is going into, the 25,000.
13   And it's the legal escrow account that Irving Starr
14   maintained on your behalf, correct?
15   A.  I don't know if it's on my behalf, but it's
16   a legal escrow account.
17   Q.  Irving Starr is your lawyer personally,
18   correct?
19   A.  Yes.
20   Q.  And it's PureThink's lawyer?
21   A.  Yes.
22   Q.  And it's also iGov's lawyer?
23   A.  Yes.
24   Q.  And to your knowledge, it does not
25   represent eGovernment Solutions, correct?

262

1       A.  I'm not positive.

2       Q.  I said to your knowledge.  Do you have

3  any --

4       A.  I'm not positive, so I don't want to give

5  you an answer that I'm not 100-percent sure of.

6       Q.  I appreciate that.  Thank you.  So you're

7  not sure whether Irving Starr does legal work for

8  eGovernment Solutions?

9       A.  I'm not positive.  You would have to ask.

10      Q.  Would you be surprised if it's a no?

11      A.  Nothing surprises me much.

12      Q.  Okay.  So -- but in terms of this 25,000,

13  this was paid to the account that you referenced as

14  being maintained for iGov, PureThink and yourself,

15  correct?

16      A.  This would have gone towards helping with

17  legal fees, so I believe that's correct.

18      Q.  And legal fees meaning the legal fees that

19  either you, PureThink or iGov have incurred?

20      A.  Or other -- other fees, as well.  You know,

21  if there was -- on a -- printouts or things related

22  to that.  Anything legal related.

23      Q.  But related to PureThink, yourself and

24  iGov, correct?

25      A.  At least those three, yes.  That's what our

263

 1    agreement was for, to help me with that.

 2        Q.  Okay.  Moving on to the next one, it's

 3    check 1002 on page Bates number 147.  It's made out

 4    to iGov Inc., for $74,850.

 5        A.  I see that.

 6        Q.  Okay.  That's your signature?

 7        A.  Yes.

 8        Q.  Per the memo there in the corner, bottom

 9    left, "IRS CKGE work."  So that's the eGov Solutions

10    eGovernment Solutions/IRS contract?

11        A.  Yes, I believe so.

12        Q.  Moving on to the next check, on 148, it's

13    another $20,000 check to Irving Starr dated

14    April 1st, 2020.  Do you see that?

15        A.  Yes, I do.

16        Q.  And that's your signature?

17        A.  Yes, it is.

18        Q.  Okay.  And this is another payment made

19    under that handshake agreement that you were talking

20    about earlier?

21        A.  I've made a lot of handshake agreements,

22    but it was one of those, yes.

23        Q.  It must be hard to keep track of handshake

24    agreements without your writing, correct?

25            MR. BEENE:  Objection to form.

                                                            264

1          MR. BEENE:  If you want to do that right
2  now, that's fine.
3          MR. RATINOFF:  Yeah, it will kind of close
4  off this line of questioning.
5  BY MR. RATINOFF:
6      Q.  What I put in the chat as Exhibit 145 is a
7  spreadsheet produced by ASR reflecting the payments
8  made between June 28, 2019, July 27, 2022, the total
9  amount being $246,082.55.  Your counsel and I talked
10  about this being a fair and accurate representation
11  of what ASR paid you under the Master Subcontract
12  Agreement.  Is that acceptable?
13      A.  I believe so.  I'd like to verify it if
14  we're going to stipulate to something.  I can -- I
15  can -- unless you have another --
16          MR. RATINOFF:  I'm asking your counsel.
17  I'm just making a record of our stipulation.
18          MR. BEENE:  Let's go off record for one
19  second.
20          MR. RATINOFF:  Okay.
21          THE VIDEOGRAPHER:  Okay.  We are off the
22  record at 3:38.
23          (Break taken from 3:38 to 3:40 p.m.)
24          THE VIDEOGRAPHER:  We are now on the record
25  at 3:40.

296

1          MR. BEENE:  Okay.  So defendants stipulate

2    that Exhibit 145 accurately reflects the payments

3    from ASR to iGov.

4          MR. RATINOFF:  Under the Master Subcontract

5    Agreement and Task Orders?

6          THE WITNESS:  I believe that's what they're

7    for.

8          MR. RATINOFF:  Do you need to go back off

9    the record?

10          MR. BEENE:  No.

11          THE WITNESS:  I don't know which ones --

12    which subcontractor tasks they're for.  But those

13    are all -- those all pertain to iGov.

14          MR. RATINOFF:  I appreciate that.  I just

15    wanted to confirm with your counsel that it's okay

16    to proceed with that addition.

17          Mr. Beene?

18          MR. BEENE:  We'll have to go off the

19    record.

20          MR. RATINOFF:  Okay.  Just to be clear, all

21    I'm asking is that if they weren't payments made by

22    ASR, it would have had to be pursuant through a

23    contract.  So I'm assuming there is no other

24    contract.  The Master Subcontract and the other

25    contract we looked at, the subcontract for Tylor

297

1  Data, and then the Task Orders.  That's all I'm

2  asking.

3          MR. BEENE:  And my client just went on the

4  record saying there is a lack of clarity on that, so

5  I have to talk to him about that clarity.

6          MR. RATINOFF:  Okay.  Gotcha.  Let's just

7  take a full five-minute break to give everyone a

8  chance to stretch their legs.

9          THE VIDEOGRAPHER:  Okay.  We're off the

10  record at 3:42.

11          (Break taken from 3:42 to 3:48 p.m.)

12          THE VIDEOGRAPHER:  We're now on the record

13  at 3:48.

14          MR. RATINOFF:  Just to be clear on the

15  record, we discussed the specific exhibits

16  representing the various subcontracts that iGov is

17  working on with ASR's Exhibits 134, 135, as amended

18  by 136.

19          MR. BEENE:  And Defendants stipulate that

20  the payments reflected in Exhibit 145 from ASR to

21  iGov are those payments applicable to the contracts

22  represented by Exhibits 135, 136 and 134.

23          MR. RATINOFF:  Agreed.  All right.  That

24  was probably easier than doing it via written

25  stipulation.  It would have taken us a week.

298

1    what the Total Retained Earnings means?

2         A.  Not exactly.

3         Q.  What's your understanding?

4         A.  I don't know what it means.

5         Q.  You said not exactly, so it's either you

6    don't know or you have some idea.

7         A.  Just from the words, I have an idea.  But

8    I'm not sure if that's -- I don't want to even

9    speculate, so I would say no, I don't know what that

10   means.

11        Q.  That's fair.  We don't want you to

12   speculate.

13             Okay.  So other than preparing this, you

14   have no understanding of what these numbers mean in

15   the balance sheet?

16        A.  Some of them I have an idea of.  The Total

17   Cash in Bank makes sense.  Total Other Current

18   Assets, I'm assuming that's assets of the company.

19   So I understand some pieces of it.  I'm just not an

20   accountant.

21             MR. RATINOFF:  Okay.  Let's go to the next

22   exhibit.  This is tab 511.  It will be marked as

23   Exhibit 223.

24             (Plaintiffs' Exhibit 223 was marked for

25   identification.)

                                                        309

1          THE WITNESS:  I've got that open.

2     BY MR. RATINOFF:

3          Q.   Okay.  Do you understand what what's being

4     marked as Exhibit 223 is?

5          A.   Yes.

6          Q.   And what is it?

7          A.   It's a Profit and Loss report for 2019.

8          Q.   Is this something you prepared for iGov?

9          A.   I believe I generated this for -- I thought

10    it was generated for you when you had asked for it

11    in previous requests.

12         Q.   This, to your knowledge, accurately

13    reflects what iGov's income was in 2019?

14         A.   Yes.  I would have just clicked a button,

15    and this would have been generated.

16         Q.   So the $203,810.39 was earned by iGov

17    providing consulting services?

18         A.   I believe so.  I would need to see the

19    breakout, but I believe so.  We have never sold

20    software, so . . . .

21         Q.   Then under Cost of Goods Sold, there is

22    zero dollars?

23         A.   I see that.

24         Q.   Is that correct?

25         A.   I don't know.  That's what it generates

310

1    from our accounting system.

2         Q.  So your accounting system reflected a zero

3    cost of goods sold for 2019?

4         A.  Yes.  But I could have not tagged something

5    correctly.  That's why we have the tax accountants

6    at the end of each year.

7         Q.  Did you confer with the tax consultant to

8    make sure this is an accurate Profit and Loss

9    Statement?

10         A.  No.  I send them everything, and they kind

11    of go through it all and figure it out.

12         Q.  And then does that information go back in

13    your accounting software so you can generate

14    documents such as the Profit and Loss Statement?

15         A.  No.

16         Q.  How do you track the profit and loss that

17    you're able to generate this statement?

18         A.  Whenever an income comes in or whenever a

19    check goes out, it's listed as something called

20    transactions.  And you just go in and tag those

21    transactions.  And if you tag it correctly, it

22    breaks it out properly.

23         Q.  So if you were to incur some expenses in

24    providing consulting services, then it would -- it

25    would be reflected in a transactions report?

311

1    A.  Yes, it would be there.  Then you have to

2    tag it specifying that this expense is related to X

3    or Y.

4        Q.  And so looking at operating expenses,

5    $85,657, is that reflecting just normal operating

6    costs for iGov?

7        A.  I have no idea if it's normal operating

8    expenses, but those would have been all the expenses

9    that were shown as money leaving.

10       Q.  Things like rent, utilities?  Is that fair?

11       A.  Anything that could be an expense.

12       Q.  That's what you would tag as an operating

13   expense?  So what I'm saying is in operating

14   expense, you understand that that means something

15   that the company incurs to run its business,

16   correct?

17       A.  Yes.

18       Q.  And so a fair description of at least a

19   couple of operating expenses would be rent,

20   utilities, domain name maintenance.  Would those be

21   operating costs in your mind?

22       A.  Accounting services, legal services,

23   everything needed to run, yes, I believe so, to

24   operate.

25       Q.  And of course I'm not being exhaustive.  I

                                                        312

           A.   Total Other Equity?   I'm not sure what that

means with the negative.   It doesn't make sense to

me, because I don't know accounting.

           MR. RATINOFF:   I'll go ahead and drop the

next exhibit to be marked.   This will be

Exhibit 225.   It should be tab 513.

           (Plaintiffs' Exhibit 225 was marked for

identification.)

BY MR. RATINOFF:

           Q.   Let me know --

           A.   I have that open.

           Q.   So what's going to be marked as Exhibit 225

is a Profit and Loss Statement from iGov from

January 2020 to December 2020.

           A.   Yes, I see it.

           Q.   Do you have an understanding of what this

document is that's going to be marked as

Exhibit 225?

           A.   Yes.

           Q.   What is it?

           A.   It's a Profit and Loss report for iGov Inc.

for 2020.

           Q.   Okay.   And then for 2020, this is the total

income that iGov received for providing consulting

services, $263,492.94?

                                                      314

1     A.  Yes, providing this line is consulting

2  services.

3     Q.  Under the eGovernment Solutions, the IRS

4  contract and ASR, et cetera?

5     A.  Yes.  And the FSO, the bisdev, yes.

6     Q.  As far as cost of goods sold again, it's

7  zero; is that correct?

8     A.  I don't know if it's correct.  It's what it

9  says.

10     Q.  You prepared this document, right?

11     A.  I clicked the button, and it used all the

12  data in the system.  So assuming I tagged

13  everything.  That's, again, why we use tax

14  accountants to verify everything.  I don't do my own

15  taxes.

16     Q.  And then the operating expenses is

17  $29,286.33 -- I'm sorry, 30 cents, and that's again

18  just normal operating costs that we talked about,

19  such as rent, utilities, I believe you said

20  attorneys, accountants.  Is that fair?

21     A.  Yes.  I believe so.

22     Q.  And it's reflecting the entries that you

23  put into the system?

24     A.  Yes.  Well, I didn't put in all the

25  entries.  It picks up entries from credit card

315

1    statements and bank accounts.  So it's not -- it's

2    an automated process where I just have to tag them.

3        Q.  Is it your practice to make sure you go

4    through all your expenses, charges, and income and

5    tag them before the accountants prepare your taxes?

6        A.  Yes.

7        Q.  And you do that every year?

8        A.  Yes.

9        Q.  Do you do it just once a year, or is it

10   something you do on a regular, ongoing basis?

11       A.  I need to do it regularly, but it's usually

12   once a year.

13       Q.  Kind of that mad rush before getting your

14   taxes prepared?

15       A.  Sort of, yes.

16       Q.  Okay.  I think we're all guilty of that.

17       All right.  Let me go ahead and mark the

18   next exhibit.  This will be tab 514.

19       A.  I've got that open.

20       MR. RATINOFF:  Okay.  This will be marked

21   as Exhibit 226.

22       (Plaintiffs' Exhibit 226 was marked for

23   identification.)

24   BY MR. RATINOFF:

25       Q.  Do you have an understanding of -- well,

1    speculate.

2            THE WITNESS:  Okay.  Yes, I do not know.

3            MR. RATINOFF:  That's all I was asking for

4    right now.  I'm not asking him to speculate.

5            THE WITNESS:  Well, I had stated I didn't

6    know before, and you keep asking, so --

7            MR. RATINOFF:  It's a different document,

8    so I just want to make sure we have a clear record.

9            Okay.  The next one will be marked as

10   Exhibit 227.

11           (Plaintiffs' Exhibit 227 was marked for

12   identification.)

13           THE WITNESS:  Okay.  I've got that open.

14   BY MR. RATINOFF:

15      Q.  And you'll see this is a document titled

16   Profit and Loss, iGov, Date Range:  January 1, 2021,

17   to December 31, 2021.  Do you see that?

18      A.  Yes, I see that.

19      Q.  And did you prepare this document?

20      A.  Yes, I would have been the one that clicked

21   the button to generate this.

22      Q.  And you notice here it actually lists out

23   operating expenses?

24      A.  Yes, I see that.

25      Q.  And so would you have been able to kind of

318

 1   list the operating expenses in the prior Profit and

 2   Loss Statements that we just looked at?

 3        A.   I'm assuming so, but it seems like this is

 4   the default maybe now, because I just clicked the

 5   same button that I always clicked.   It -- maybe Wave

 6   made this now the default.

 7        Q.   And you'll see under Operating Expenses it

 8   lists Computer Hardware, Hosting, Internet Software,

 9   Domain Registration/Renewal, Dues and Subscriptions,

10   Education and Training, Legal Fees, Meals,

11   Entertainment, office Supplies, Professional Fees,

12   Telephone Land Line, Telephone Wireless, Vehicle

13   Fuel.   Do you see all those?

14        A.   Yes, I see them.

15        Q.   And that's what you would consider as being

16   normal operating expenses for iGov?

17        A.   Yes.

18        Q.   And there's an Uncategorized Expense for

19   $3,729,92.

20        A.   I see that.

21             Can you give me one second?   My dog is

22   barking.   I need to let my wife know.

23        Q.   Sure.   No problem.

24        A.   Give me a second.

25             MR. RATINOFF:   Go off the record.

                                                      319

 1    very specific question about what you wrote in this

 2    e-mail.  So I'm going to strike your response, and

 3    I'm going to ask you the question one more time.

 4    And I want you to --

 5         A.  That answer is to the previous question.

 6         Q.  I know it's late, but I'm going to ask for

 7    more time because you're wasting my time.

 8              MR. BEENE:  Let's go off the record.

 9              THE WITNESS:  I think you're wasting my

10    time.

11              MR. BEENE:  Let's go off the record.

12              THE WITNESS:  Okay.

13              THE VIDEOGRAPHER:  Jeffrey, do you want to

14    go off the record?

15              MR. RATINOFF:  Yeah, that's fine.

16              THE VIDEOGRAPHER:  We are now off the

17    record at 5:23.

18              (Break taken from 5:23 to 5:31 p.m.)

19              THE VIDEOGRAPHER:  We are now on the record

20    at 5:31.

21    BY MR. RATINOFF:

22         Q.  Mr. Suhy, before we broke you mentioned

23    that at that time ONgDB was based on the identical

24    code to Neo4j Enterprise, correct?

25         A.  It was based on the full code base of

                                                        363

1    Neo4j, which includes Community and Enterprise as

2    submodules, I guess you'd call them.

3         Q.  And at that time, was it your understanding

4    that Neo4j was suiteing (phonetic) the copyrights to

5    the source code for Neo4j Enterprise?

6         A.  Yes.  To the source code, yes.

7         Q.  And that was the same source code that was

8    used in ONgDB 3.4.x?

9         A.  Yes.

10        Q.  Thank you.  All right.  I'm going to give

11   you the next exhibit here.  This was previously

12   marked as Exhibit 170.

13        A.  All right.  I have it open.

14        Q.  You'll see this e-mail was produced by

15   iGov.  There is a Bates number ending in 3216 on the

16   first page, .001.  Do you see that?

17        A.  Yes, I see that.

18        Q.  And you'll see it was produced from your

19   egovsol.com account.  Do you see that?

20        A.  Yes.

21        Q.  And do you understand it's an e-mail to be

22   a continuation of the conversation and e-mail that

23   you were having with Mr. Dunn about switching to

24   ONgDB 3.4.x?

25        A.  I'm not sure if this is a continuation or

364

1    something new.  Let's see the subject line.  Could

2    you give me one moment?

3         Q.  Sure.

4         A.  I'm -- well, the subjects are the same, so

5    I would say this would be a continuation.

6              MR. BEENE:  Don't guess, please.  Make sure

7    you read the whole document.

8              THE WITNESS:  Let me read the whole doc and

9    see.  Okay.  I've read it.

10   BY MR. RATINOFF:

11        Q.  Is it fair to say this is a continuation of

12   your e-mail exchange with Mr. Dunn on recommending

13   going with ONgDB 3.4.x over Neo4j?

14        A.  Well, this is a continuation of the e-mail.

15   I'm not sure if you categorized it correctly.

16        Q.  Okay.  But this is the e-mail where you

17   recommended to Mr. Dunn on August 13th of 2018 at

18   11:58 a.m., "I think we should use ONgDB 3.4.x for

19   the launch," correct?

20        A.  Yes, I said that.

21        Q.  And then eventually Mr. Dunn in the last

22   e-mail in the top here says, "John Mark, go ahead

23   and integrate the ONgDB into the CKGE framework

24   we'll deploy."  Do you see that?

25        A.  I see that.

                                                       365

1      Q.  After that, did you provide a version of
2  ONgDB to the IRS to use in the CKGE framework?
3      A.  I believe he -- he didn't say it correctly.
4  You don't -- you don't deploy it to the framework.
5  You just have your own data sources, and the
6  framework has tools that can connect to it.
7      Q.  So then did you start using ONgDB at the
8  IRS in relationship to the CKGE framework or
9  environment, whatever you like to call it?
10     A.  I didn't.  The teams did, the teams that
11  manage graphs, I'm sure.  Because this says let's go
12  ahead and do it.
13     Q.  Where did ONgDB software come from for the
14  IRS?  Was it downloaded from the iGov website?
15     A.  The Graph Foundation.
16     Q.  And at that time, was the IRS using an
17  internal gitlab repository to maintain its graph
18  database software it was using?
19     A.  I don't remember at that time if they had
20  it.
21     Q.  At some point did the IRS begin using an
22  internal gitlab repository to maintain versions of
23  ONgDB?
24     A.  No, not to maintain versions, but I think
25  it was to be able to run their own code scans.  So

366

1   any time they had software, they had source course

2   available.  They wanted it to be in there so they

3   can run code scan tools.

4       Q.  What are code scan tools?

5       A.  They're tools that can do static secure

6   code.  So it can do static code scanning.  It can

7   identify specific types of vulnerabilities that you

8   can recognize by looking at actual source code.

9       Q.  So they --

10      A.  Tools for that.

11      Q.  So before using that version of ONgDB, it

12  would be loaded into the gitlab, and the IRS would

13  scan it to make sure it didn't have any security

14  vulnerabilities?

15      A.  Sorry, repeat that again.

16      Q.  Yeah.  So for instance, if there was a new

17  version of ONgDB to be used, it would be uploaded to

18  the gitlab in the IRS, and they would run scans on

19  it to make sure it was secure and didn't have any

20  security vulnerabilities?  Is that what you're

21  saying?

22      A.  That's one thing they would do, yes.  But

23  it wasn't mandatory to do it.  It was more that,

24  hey, they have a tool that will scan all the repos,

25  let's make sure everything is there in case there

367

1    was something that wasn't reported to us in gitlab.

2         Q.   Did you ever upload any version of ONgDB to

3    the IRS's gitlab repository?

4         A.   I believe I'm the one that did it, but I

5    don't remember.  I'm the one that's responsible for

6    making sure that any of the software that's being

7    used can all be found in a certain area, in a

8    certain location.  So I think I would have done

9    that.

10        Q.   Is that something you continued to do

11   throughout the eGovernment Solutions contract?

12        A.   No.  I think it was something that I

13   started to help with, and then since it's unpaid,

14   just no time to keep doing it.

15        Q.   To this day, you have access to that gitlab

16   repository that the IRS maintains?

17        A.   I believe so.  I should have it.  I haven't

18   checked it for a while, so . . . .

19        Q.   And do you know whether the IRS switched

20   over to ONgDB for its YK1 platform?

21        A.   I'm not positive.

22        Q.   Take a look at what's been previously

23   marked as Exhibit 174.  Oh, I'm sorry.  I think I

24   put the wrong e-mail in.  Let me back up here.

25   Yeah.  Why don't you hold off on that one.  Let me

```
 1   put it --
 2        A.   Let me close these down so I can open up
 3   new ones.
 4             MR. RATINOFF:   While you're doing that, let
 5   me put in tab 456.   This will be marked as, I
 6   believe, Exhibit 234.
 7             (Plaintiffs' Exhibit 234 was marked for
 8   identification.)
 9             THE WITNESS:   Okay.
10   BY MR. RATINOFF:
11        Q.   Do you have an internal IRS e-mail address?
12        A.   Yes, I do.
13        Q.   And you use that address for work that you
14   do for the IRS under the various contracts that
15   you're working under?
16        A.   Yes.
17        Q.   And do you know who Rahul Tikekar is?
18        A.   Yes.
19        Q.   And who is he?
20        A.   He is an IRS employee.
21        Q.   And is he responsible for the YK1 platform?
22        A.   I'm not sure who's responsible for it, but
23   he's involved in it.
24        Q.   And you'll see in this e-mail dated
25   September 21, 2018, you write:
```

369

```
 1              "I uploaded the ONgDB 3.4.5 instance
 2         with the same configuration settings,
 3         plugins, et cetera, into my directory
 4         on the server you gave me access to,
 5         and everything works just fine."
 6    A.  Yes, I see that.
 7    Q.  Does this refresh your recollection about
 8  the YK1 platform beginning to use ONgDB 3.4.5 in
 9  September of 2018?
10    A.  No.  Because I'm not sure if they ended up
11  using it.  That's what I'm not -- unsure of.  They
12  could have been using Neo4j Community.  You're going
13  to have to ask.
14    Q.  So you defer to the IRS on that?
15    A.  Yes.  I have no idea what they ended up
16  using.
17         But as I said, I help out as much as I can
18  and wanted to make anything we had available.
19  They're obviously talking about something that
20  they're having an issue with on the server, and I'm
21  talking about what I uploaded.
22    Q.  I don't have a question pending, sir, thank
23  you.  You've already answered my question.
24         All right.  Let's go back to Exhibit 174,
25  which I uploaded in the chat.
```

                                                    370

1          A.   Okay.

2          Q.   And do you know who Patrick Martin is?

3          A.   Yes.  Let me review this, please.  Okay.

4    I've read through it.

5          Q.   Do you understand what this e-mail is?

6          A.   Yes, I've got a sense for it.

7          Q.   Any reason to believe this wasn't an e-mail

8    exchange between yourself and Patrick Martin?

9          A.   No.

10         Q.   This was produced by the IRS with Bates

11   number 1738, beginning Bates number.  Do you have an

12   understanding what Patrick Martin was asking you

13   about, "Within this CKGE is ONgDB" -- "Within this

14   CKGE is ONgDB installed on all the database servers

15   or the AS servers or both?"

16         A.   Yes, I see that.

17         Q.   What's he referring to?

18         A.   Well, everyone references anything with

19   Neo4j as ONgDB, first of all, which is not correct

20   all the time.  And he's asking if it's installed on

21   database servers or application AS servers or

22   application servers.

23         Q.   And then you respond to him, "The GDB

24   servers host a single ONgDB node (instance)."  Do

25   you see that?

                                                      371

1      A.   Yes.   So that would be correct, then, if I
2  said that.
3      Q.   So each, when you say each server, you're
4  talking about servers running one instance of ONgDB
5  software?
6      A.   Yes.   The "each server" was a virtual
7  server.   It might have been the same exact hardware,
8  but they're split out into virtual servers.
9      Q.   And those are running ONgDB software?
10      A.   That's what it says.   I don't know if it's
11  Community or Enterprise.   But yes, that's what it
12  says.   So that would have been -- whatever that date
13  is, then I would say that based on this, they were
14  using ONgDB.   The version, and if it was Community
15  or Enterprise, I don't know.
16      Q.   And then you'll see, it says, "I actually
17  have a mapping document in the CKGE docs — I'll send
18  you the direct link to that on gitlab."   Do you see
19  that?
20      A.   Yes, I do.
21      Q.   Did you keep a mapping document with the
22  IRS so they could track which servers were running
23  ONgDB?
24      A.   I didn't keep that, but there was one that
25  somebody had managed, and that's what I was

                                                        372

1    one.

2         Q.   I'm asking in September of 2019, were there

3    two instances of ONgDB running on separate servers

4    within the CKGE environment?

5         A.   I don't remember at that time.

6         Q.   So you'd defer to the IRS on that?

7         A.   Yes.

8         Q.   I'm going to go ahead and put the next

9    exhibit in.  I know we're running short on time.

10        A.   I've got it open.

11        Q.   This was previously marked as Exhibit 181.

12        A.   Got it.  Let me read through this all.

13   Okay.

14        Q.   Okay.  Do you have any reason to believe

15   that wasn't an e-mail that you exchanged, that you

16   participated in?

17        A.   No.

18        Q.   Okay.  And just for the record, this is

19   produced by the IRS, the last Bates number on the

20   first page of 473.

21             And you'll see if you go down to the e-mail

22   from yourself to an Aaron Katch and a Hai Huynh,

23   hopefully I pronounced that correct, and the subject

24   is "Re: Re:  Graph for local install."  Do you see

25   that?

                                                        378

1    A.  Yes, I do.

2    Q.  And you'll see you're referring to the

3    latest ONgDB for Windows, and there is a URL there,

4    a cdwgit.web.irs.gov.  Do you see that?

5    A.  Yes, I do.

6    Q.  And the reference is graphstack-dist, and

7    at the end it says ONgDB.

8    A.  Yes, I see that.

9    Q.  What is that URL referring to?

10   A.  I believe that's a shared folder for

11   different technologies that are available to them.

12   ONgDB would have been one.  They would have had

13   forward slash, like, Elastic, forward slash

14   Keycloak.

15   Q.  But in this case, it's referring to ONgDB?

16   A.  Yes, this one is referring to ONgDB.

17   Q.  And then you'll see below it says Direct

18   link to 3.5.11.

19   A.  Yes.

20   Q.  Okay.  And you'll see a URL there that ends

21   with ongdb-enterprise-3.5.11-windows.zip.

22   A.  Yes.

23   MR. BEENE:  Can we get a time check?

24   THE VIDEOGRAPHER:  Hold on.

25   MR. RATINOFF:  We're off the record.

379

1           THE VIDEOGRAPHER:  All right.  We are now

2    off the record at 5:53.

3           (Break taken from 5:53 to 5:56 p.m.)

4           THE VIDEOGRAPHER:  We are now on the record

5    at 5:56.

6           MR. BEENE:  Defendants are agreeing to

7    extend the deposition by an additional 10 minutes

8    for a total of eight hours and 40 minutes.

9           MR. RATINOFF:  And I appreciate that

10   courtesy, Counsel.

11   BY MR. RATINOFF:

12        Q.  Okay.  So turning back to Exhibit 181, we

13   were looking at that URL that says Direct Link to

14   3.5.11.  That's referring to ONgDB Enterprise

15   version 3.5.11, correct?

16        A.  Yes, Windows version.

17        Q.  And that's something that you put up on the

18   gitlab for the IRS's use?

19        A.  Yes.  It would have been brought in by

20   Graph Foundation, and then I would have put it up

21   there as the shared folder, help everyone figure out

22   where everything is.

23        Q.  Okay.  Thank you.  And moving on to my next

24   exhibit, this is previously marked as Exhibit 151.

25   And I'll represent to you this is an e-mail that was

                                                        380

```
 1              DECLARATION OF DEPONENT

 2

 3      I, JOHN MARK SUHY, JR., declare under penalty of

 4   perjury that I have reviewed the foregoing

 5   transcript; that I have made any corrections,

 6   additions, or deletions in my testimony that I

 7   deemed necessary; and that the foregoing is a true

 8   and correct transcription of my testimony in this

 9   matter.

10

11

12      Dated this _____ day of _____, 2022,

13   at _____, _____.
          [City]                    [State]

14

15                   _____

16                   JOHN MARK SUHY, JR.

17

18

19

20

21

22

23

24

25
```

409

JOHN MARK SUHY                                                November 29, 2022

1              REPORTER'S CERTIFICATE
          The undersigned Certified Shorthand
2    Reporter licensed in the State of California does
     hereby certify:
3              I am authorized to administer oaths or
     affirmations pursuant to Code of Civil Procedure,
4    Section 2093(b), and prior to being examined, the
     witness was duly administered an oath by me.
5              I am not a relative or employee or attorney
     or counsel of any of the parties, nor am I a
6    relative or employee of such attorney or counsel,
     nor am I financially interested in the outcome of
7    this action.
               I am the deposition officer who
8    stenographically recorded the testimony in the
     foregoing deposition, and the foregoing transcript
9    is a true record of the testimony given by the
     witness.
10             Before completion of the deposition, review
     of the transcript [x] was [^ ] was not requested.
11   If requested, any changes made by the deponent (and
     provided to the reporter) during the period allowed
12   are appended hereto.
               In witness whereof, I have subscribed my
13   name this 5th day of December, 2022.

14

15

16

17

18          

19          KAREN L. BUCHANAN
20
21          CSR No. 10772
22
            CLR No. 031106-04
23

24

25

                                                          410

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS  408-287-7500