1  John V. Picone III, Bar No. 187226
   jpicone@hopkinscarley.com
2  Jeffrey M. Ratinoff, Bar No. 197241
   jratinoff@hopkinscarley.com
3  HOPKINS & CARLEY
   A Law Corporation
4  The Letitia Building
   70 South First Street
5  San Jose, CA  95113-2406

6  *mailing address:*
   P.O. Box 1469
7  San Jose, CA 95109-1469
   Telephone:     (408) 286-9800
8  Facsimile:     (408) 998-4790

9  Attorneys for Plaintiffs and Counter-Defendants
   NEO4J, INC. and NEO4J SWEDEN AB
10

11                 UNITED STATES DISTRICT COURT

12               NORTHERN DISTRICT OF CALIFORNIA

13  NEO4J, INC., a Delaware corporation,          CASE NO.  5:18-cv-07182-EJD
    NEO4J SWEDEN, AB,
14                                                 **PLAINTIFFS' AMENDED [PROPOSED]**
                    Plaintiffs,                    **FINDINGS OF FACT AND**
15                                                 **CONCLUSIONS OF LAW**
            v.
16
    PURETHINK LLC, a Delaware limited
17  liability company, IGOV INC., a Virginia
    corporation, and JOHN MARK SUHY, an
18  individual,

19                  Defendants.

20
    AND RELATED COUNTERCLAIMS.
21

22

23

24

25

26

27

28

## I. **FINDINGS OF FACT**

The Court makes the following findings of fact based on the Court's May 18, 2021 Order (Dkt. No. 118), the parties' Stipulation of Undisputed Facts for Trial (Dkt. No. 227), the parties' Stipulation and Order to Admit Deposition Testimony and Corresponding Trial Exhibits (Dkt. Nos. 210, 230), the parties' Stipulation to the Amount Of Plaintiffs' Lost Profits and Defendants Profits (Dkt. No. 234) and the evidence and testimony admitted at trial in the above-entitled action (Dkt. Nos. 225, 229):

1.     Neo4j, Inc. ("Neo4j USA") is the parent corporation of Neo4j Sweden AB ("Neo4j Sweden"), which in turn is a wholly owned subsidiary of Neo4j USA.  Dkt. No. 227, UDF No. 1.

2.     Neo4j Sweden owns all of the copyrights related to the Neo4j® graph database platform, including the source code, and has licensed those copyrights to Neo4j USA. Dkt. No. 227, UDF No. 58. This also includes the exclusive right to sell commercial subscriptions and licenses to the enterprise versions of the Neo4j graph database platform in the United States.  Trial Transcript ("Trial Tr.") at 38:1-42:3.

3.     In conjunction with its business, Neo4j USA filed for and rightfully obtained several federally registered trademarks, including U.S. Trademark Registration No. 4,784,280 for the word mark "NEO4J" (the "Neo4j Mark"). Dkt. No. 118 at 2:18-26, 13:18-18:1, *aff'd* Dkt. No. 141.

4.     Prior to May 2018, Plaintiffs offered a free and open source version of the Neo4j® graph database platform, Neo4j® Community Edition ("Neo4j® CE"), under the GNU General Public License version 3 ("GPL") license. Dkt. No. 227, UDF No. 5; Trial Tr. at 38:24-39:22, 41:20-46:23.  Neo4j® CE is limited in its feature set and does not come with technical or administrative support. *Id.*

5.     Plaintiffs also offered a more advanced commercial version, which included additional features and support services, known as the Neo4j Enterprise Edition (hereafter referred to as "Neo4j® EE"). Dkt. No. 118 at 3:5-7.  Dkt. No. 227, UDF No. 6; Trial Tr. at 38:24-39:22, 41:20-46:23.  Prior to May 2018, Plaintiffs offered Neo4j® EE under both a paid-for commercial license and for free under the GNU Affero General Public License, version 3 (hereafter referred to as the "AGPL"). Dkt. No. 227, UDF No. 6.

6.      On May 17, 2018, Neo4j Sweden released Neo4j® EE v3.4 and replaced the AGPL with a stricter license, which included the terms from the AGPL and additional commercial restrictions provided by the Commons Clause (hereafter referred to as the "Neo4j Sweden Software License").  Trial Exhibit ("TX") 1002; TX4 and Trial Tr. at 51:16-55:18.  Neo4j® EE v3.4 included advanced scalability, availability, security, and operational features that were not previously available. *Id.;* Dkt. No. 227, UDF No. 10.

7.      The new terms added to the Neo4j Sweden Software License prohibited the non-paying public from engaging in commercial resale and support services. TX4 and Trial Tr. at 54:22-55:19; TX66 ("Most recently, [Neo4j] tried adding a 'commons clause' to the AGPL license, trying to pre[v]ent companies from selling (and competing against them on procurements)"); *see also* Dkt. No. 118 at 3:12-13, 5:26-6:1.

8.      The NOTICE provision in the Neo4j Sweden Software License states that Neo4j® EE is developed and owned by Neo4j Sweden… and is subject to the terms of the [AGPL], with the Commons Clause as follows…." TX1002.  The NOTICE provision also provides additional information, such as the title of the work, terms and conditions for use of the work, and other identifying information about Neo4j Sweden and how to obtain a commercial license for the use of Neo4j® EE. *Id.*

9.      In November 2018, Plaintiffs officially released Neo4j® EE v3.5 solely under a commercial license. Dkt. No. 227, UDF No. 11; TX6 and Trial Tr. at 55:20-59:10.

10.     Prior to the official release of Neo4j® EE v3.5, Plaintiffs published several beta versions via their GitHub repository subject to the Neo4j Sweden Software License.  Dkt. No. 227, UDF No. 12; TX6 and 55:20-59:10.  Thereafter, Neo4j Sweden only made the source code for Neo4j® CE publicly available under the GPL via GitHub.  *Id.*

11.     Following the release of Neo4j® EE v3.4, Suhy worked with Brad and Ben Nussbaum to form Graph Foundation, Inc. ("GFI") in June 2018.  TX58, TX59, TX60, TX66 and Trial Tr. 354:5-361:8; *see also* Dkt. No. 118 at 6:4-7.

12.     Suhy created ONgDB v3.4 by replacing the Neo4j Sweden Software License with verbatim copies of the AGPL, thereby removing the Commons Clause, as well as intentionally

removing certain legal notices identifying Neo4j Sweden as the copyright holder and licensor that could not be characterized as "further restrictions."[1]  Dkt. No. 210, Ex. 1 at 171:23-172:23, 178:17-179:8, 181:24-182:8, 196:22-201:16; Dkt. No. 210, Ex. 2 at 363:21-364:9; TX133, TX1010 and Trial Tr. at 294:4-295:10, 299:23-300:12, 336:3-340:16; TX125 and Trial Tr. at 342:17-346:20; TX66 and Trial Tr. at 359:5-362:9; *see also* Dkt. No. 118 at 6:2-11, 6:24-25.

13.     Suhy created ONgDB v3.5 and donated it to GFI, which then made publicly available for download via GFI's website and GitHub source code repository for ONgDB.  TX108; TX1010 and Trial Tr. at 294:4-295:10, 299:23-300:12, 336:3-340:16, 343:8-346:20.

14.     To create ONgDB v3.5, Suhy replaced the more restrictive Neo4j Sweden Software License with a verbatim copy of the AGPL in 28 LICENSE.txt files on GFI's GitHub repository.  TX1010 and Trial Tr. at 294:4-295:10, 299:23-300:12, 306:4-9, 336:3-340:16, 343:8-346:20; *see also* Dkt. No. 118 at 6:21-26.  Doing so stripped out valid legal notices identifying Neo4j Sweden as the copyright holder and licensor; and removed the commercial restrictions imposed by the Commons Clause in 28 LICENSE.txt files. *Id.*

15.     Neo4j Sweden did not give Suhy permission to remove Commons Clause or the legal notices identifying Neo4j Sweden as the copyright holder and licensor in ONgDB v3.4 and ONgDB v3.5 by replacing the Neo4j Sweden Software License with a verbatim copy of the AGPL. Dkt. No. 227, UDF No. 59.

16.     Suhy understood that the Common Clause imposed commercial restrictions on the use of Neo4j® EE and prohibited the non-paying public from engaging in commercial resale and support services.   Dkt. No. 210, Ex. 1 at 154:22-156:1; Trial Tr. at 359:5-362:9 and TX66 ("Most

---

[1] Suhy testified during trial that he did not remove the Commons Clause from the license governing ONgDB v3.4.  Trial Tr. at 346:21-347:16.  This was contradicted by Suhy's deposition testimony where he confirmed that he replaced the Neo4j Sweden Software License with a "verbatim" copy of the AGPL.  Suhy also admitted that he lied to Neo4j USA regarding his role in founding Graph Foundation, Inc., and provided inconsistent and contradictory testimony on that issue.   TX59, TX60, TX66, and Trial Tr. at 355:14-361:3.  Consequently, Court finds that Suhy was not a credible witness, and as a result gives no weight to his trial testimony.

recently, [Neo4j] tried adding a 'commons clause' to the AGPL license, trying to pre[v]ent companies from selling (and competing against them on procurements)."); Dkt. No. 210, Ex. 5 at 96:6-98:21 and TX127 (Depo Ex. 165) ("Neo4j Inc[.] attempted to add a restrictive term to their open source AGPL license … to prevent any company from selling Neo4j Enterprise open source distributions for money. I.E. Charging a fee for access to Neo4j Enterprise open source distributions."); *see also* Dkt. No. 118 at 3:9-13, 6:21-26.

17.    Suhy removed the Commons Clause to induce and mislead end-users, such as the IRS, to use ONgDB over Neo4j® EE in commercial applications for free, and then use the cost savings to pay Defendants to provide support services to those users. Dkt. No. 210, Ex. 5 at 98:22-100:10, 101:9-104:2 and TX129 (Depo Ex. 166) ("[Neo4j is] trying to protect themselves from another company protesting Neo4j Enterprise commercial packages in the government. Their theory seems to be that another competitor like us, can't offer a competing package with support because of this clause, to address Brand Name justification"); TX133 (Depo Ex. 170) and Dkt. No. 210, Ex. 5 at 126:5-138:2, 138:22-141:24, 142:15-143:20; TX83 and Trial Tr. at 370:13-373:23; TX211, TX212, TX213 and Trial Tr. at 378:6-383:10; TX89, TX91 and Trial Tr. at 44:3-45:2, 54:22-55:12, 72:9-79:24; *see also* TX69 (Depo Ex. 19) and Dkt. No. 210, Ex. 1 at 142:13-145:12.

18.    Prior to replacing the Neo4j Sweden Software License with the AGPL, Suhy sought guidance from the Free Software Foundation ("FSF"), which told him "[t]he copyright holder on a work is the one with the power to enforce the terms of the license" and "[i]f a work was previously available under a free license, and later that license is changed, users can always use that earlier version under the terms of the free license." The FSF also warned that "we cannot provide you with legal advice" and that he should "talk with legal counsel." Dkt. No. 227, UDF No. 33; *see also* TX61 (Depo Ex. 22), TX62 (Depo Ex. 23), TX65 (Depo Ex. 24) and Dkt. No. 210, Ex. 1 at 169:3-170:3, 182:11-184:10, 187:12-188:15, 189:1-191:3, 192:18-193:24, 195:17-196:1, 196:22-201:16.

19.    Prior to replacing the Neo4j Sweden Software License with the AGPL, Suhy ignored the FSF's admonitions and did not seek independent legal advice from an attorney despite understanding that the license was a legal document. Dkt. No. 227, UDF No. 34; *see also* Trial Tr. at 341:8- 344:11; Dkt. No. 210, Ex. 1 at 192:1-193:24, 194:6-196:1, 196:22-201:16.

20.     Prior to replacing the Neo4j Sweden Software License with the AGPL in ONgDB, Suhy knew that Neo4j Sweden owned the copyright for Neo4j® EE and that Neo4j USA controlled the commercial licensing thereof.  Dkt. No. 227, UDF Nos. 58-60; Dkt. No. 210, Ex. 1 at 182:11-184:10, 187:12-188:15, 189:1-191:3 and TX62 ("Neo4j Inc is the copyright holder of the Neo4j Database code we are going to fork" and "Neo4j Inc has a separate commercial license for Neo4j Database (Neo4j) which as a copyright holder we understand is allowed").

21.     Prior to replacing the Neo4j Sweden Software License with the AGPL in ONgDB, Suhy knew that he could not replace it with the AGPL without first obtaining Neo4j Sweden's authorization as the copyright holder. TX62 (Depo Ex. 23), TX65 (Depo Ex. 24)  and Dkt. No. 210, Ex. 1 at 182:11-184:10, 187:12-188:15, 189:1-191:3; 192:1-193:24, 195:6-196:1, 196:22-197:17, 199:22-201:16; Trial Tr. at 342:17-344:11.

22.     Suhy knowingly distributed Neo4j® EE source code without the Neo4j Sweden Software License as ONgDB with the understanding that it would result in the infringement of Neo4j Sweden's copyrights.  Dkt. No. 227, UDF No. 60.

23.     Defendants encourage actual and potential users of commercially licensed Neo4j® EE to adopt ONgDB and obtain support services from iGov instead of Plaintiffs by making the following (and similar) statements via the iGov website: (a) "We only focus on only supporting 100% free and open source ONgDB Enterprise" (b) "ONgDB Enterprise is free and open source. You have all the feature parity of Neo4j Enterprise commercial licenses, but without limits on usage, cluster instances, cores, etc."; (c) "simply download ONgDB Enterprise as a drop in replacement for an existing commercial licensed distribution of the same version number"; and (d) "ONgDB is a drop in replacement for the Neo4j Community and Enterprise branded distributions." TX89, TX91, TX1097 *see also* Dkt. No. 118 at 7:18-24, 24:1-6, 27:6-28:16.

24.     Suhy provided hyperlinks to potential users of Neo4j® EE to view and download ONgDB from GFI's website and GitHub repository from his jmsuhy@purethink.com and jmsuhy@igovsol.com accounts. Dkt. No. 227, UDF Nos. 42-43;

25.     iGov's website provided links to potential users of Neo4j® EE to download ONgDB directly from iGov and from GFI's website. Dkt. No. 227, UDF. No. 44.

26.     iGov and Suhy operated www.graphstack.io, which provided information about ONgDB and hyperlinks for consumers to directly download ONgDB v3.5.x and ONgDB v3.6.x. Dkt. No. 227, UDF. No. 45.

27.     After this Court first ruled that Sections 7 and 10 of the Neo4j Sweden Software License precluded a down-stream licensee to remove the Commons Clause as further restriction on November 13, 2020, Defendants continued to promote ONgDB via the iGov and Graphstack websites as "free and open" drop-in replacement/equivalent under the AGPL and distributed ONgDB under the AGPL without Commons Clause and Neo4j Sweden's other CMI.  TX147 and Trial Tr. at 375:17-378:5.

28.     John Mark Suhy founded PureThink in 2002, which is a software and information technology consulting company specializing in supporting agencies within the U.S. Government that use Neo4j® graph database software.  Dkt. No. 227, UDF No. 15.

29.     PureThink is a single person limited liability company filing as an s-corporation for tax purposes.  Dkt. No. 227, UDF No. 16.  Since at least September 1, 2014, Suhy has been the sole employee, member and manager of PureThink.  *Id.*

30.     On September 30, 2014, PureThink and Neo4j USA entered into the Neo Technologies Solution Partner Agreement ("Partner Agreement" or "SPA") where PureThink agreed to sell commercial licenses for Neo4j® EE and provide support to end-users that purchased those licenses. Dkt. No. 227, UDF No. 17; Trial Tr. at 59:12-25.

31.     Suhy formed iGov on June 23, 2017 to offer paid support services for open source Neo4j® software to the IRS and other government agencies, which PureThink was prohibited from doing under the SPA.  Trial Tr. at 60:1-62:5, 64:1-19 and TX87 ("The principle behind PureThink and the Government Package has created a new corporate entity called iGov Inc, which is not a Neo4j Solution Partner. Because we are not a solution partner, we are not under the extremely restrictive terms dealing with services around Neo4j open source licenses which applies to partners."); TX51 (Since iGov Inc [sic] has no limitations on supporting or providing services for Neo4j Enterprise open source licenses, we can just have iGov Inc. assume over all [PureThink's] obligations of the current contract now instead of waiting for the next procurement. Nothing would

change, we would have the same team, locations and would keep working as we always have.")

32.     Suhy has been the sole employee, officer and director of iGov since he formed the corporation. Dkt. No. 227, UDF No. 24.

33.     After forming iGov, Suhy specifically targeted the IRS to transition from PureThink to iGov.  TX51 ("[S]ince iGov Inc has no limitations on supporting or providing services for Neo4j Enterprise open source licenses, we can just have iGov Inc. assume over all the obligations of the current contract now instead of waiting for the next procurement. Nothing would change, we would have the same team, locations and would keep working as we always have.").

34.     In late July 2017, the IRS invited iGov to submit a quote for a sole-source contract for the development and support of its CDW Knowledge Graph Environment ("CKGE"), which used an open source version of Neo4j® EE software as a main component.  TX52 (Depo Ex. 163) and Dkt. No. 210, Ex. 5 at 69:8-73:4.

35.     The IRS did so because it was immaterial to the IRS whether iGov or PureThink would be the contracting entity so long as Suhy was the individual providing them.  Dkt. No. 210, Ex. 5 at 61:11-64:23.

36.     In September 2017, the IRS announced its intent to award a sole-source contract to iGov. TX52 (Depo Ex. 163) and Dkt. No. 210, Ex. 5 at 69:8-70:9, 71:1-74:1.

37.     Neo4j USA filed an official agency-level protest pursuant to the applicable Federal Acquisition Regulations with the IRS on the grounds that it was improper to award the contract to iGov on a sole source basis, which the IRS agreed with Neo4j USA and canceled it for that reason. Trial Tr. at 66:12-70:14 and TX57; Dkt. No. 210, Ex. 5 at 69:20-70:9, 71:1-74:1.

38.     The IRS re-issued the contract for the development of the CKGE framework, which required the use and support of Neo4j® EE software. TX124 (Depo Ex. 214) and Dkt. No. 210, Ex. 2 at 188:10-193:25; TX181 (Depo Ex. 102) and Dkt. No. 210, Ex. 3 at 47:14-50:13.  Suhy submitted a bid for the new contract via another entity that he had an ownership interest in at the time, eGovernment Solutions, Inc. ("eGov Solutions").  Dkt. No. 227, UDF No. 61.

39.     Under the proposal for the new contract signed by Suhy, the scope of work required iGov to perform "all operations and maintenances duties for all components of the CKGE

framework….."  iGov would also be "responsible for ensuring any open source products within the CKGE conform to their license-terms" and iGov would "need to work with the following components: React, Angularjs, Neo4j…."  Dkt. No. 227, UDF No. 62; TX181.

40.    On May 22, 2018, Neo4j USA informed the IRS, including those in RAAS, that Neo4j Sweden added the Commons Clause to Neo4j® EE 3.4, and the resulting need to obtain a commercial subscription if they intended to use that software in the CKGE platform.  Dkt. No. 227, UDF No. 63; *see also* TX126 and Trial Tr. at 78:8-82:8.

41.    On May 22, 2018, Suhy sent an email to the IRS claiming Neo4j Sweden could not add the Commons Clause to the license governing Neo4j® EE v3.4. Dkt. No. 227, UDF No. 64; *see also* TX127 (Depo Ex. 165) and Dkt. No. 210, Ex. 5 at 96:6-98:21.

42.    On May 24, 2018, the RAAS division of the IRS awarded eGov Solutions the new contract, Order No. 2032H8-18-P-00151, as amended Order No. 2032H8-18-P-00168, to further develop and support the CKGE in May 2018 ("CKGE Contract"). Dkt. No. 227, UDF No. 65; *see also* TX182 (Depo Ex. 103), TX183 (Depo Ex. 104) and Dkt. No. 210, Ex. 3 at 50:14-56:14.

43.    In July 2018, Jason Zagalsky, a sales representative from Neo4j USA, met with employees of the RAAS division of the IRS, and then provided a quote of $156,000 for a one-year subscription and a $397,800 for a 3-year subscription for a Neo4j® EE v3.4 based on then-current requirements of CKGE.  Dkt. No. 227, UDF No. 65; *see also* TX128, TX131 and Trial Tr. at 82:13-90:12.

44.    As of August 2018, the IRS understood that Neo4j® CE had a performance limitation to only 4 cores, while Neo4j® EE had enterprise-only features, came with professional services and subscriptions, and was priced based on number of cores. Dkt. No. 227, UDF No. 67; *see also* Dkt. No. 210, Ex. 5 at 103:2-104:12, 121:18-124:4, 126:5-132:23.

45.    Under the CKGE Contract, Suhy provided input on the architecture design and hardware requirements needed to run ONgDB installations on multiple servers within the CKGE. Dkt. No. 227, UDF No. 68; *see also* TX132 (Depo Ex. 169), TX133 (Depo Ex. 170); TX137 (Depo Ex. 173) and Dkt. No. 210, Ex. 5 at 126:5-138:2, 138:22-141:24, 142:15-143:20, 152:19-155:9.

46.    In August 2018, Suhy recommended that the IRS integrate ONgDB v3.4 rather than

Neo4j® EE v3.4 in the CKGE framework, and claimed that "ONgDB open source licenses come directly from the Graph Foundation as well, not from Neo4j Inc." Dkt. No. 227, UDF No. 69; *see also* TX132, TX133.

47.     The IRS understood from Suhy that GFI added the source code for the enterprise features to Neo4j® CE (core) to create ONgDB and the open source license for those features came from GFI. Dkt. No. 210, Ex. 5 at 126:5-129:25, 132:2-23, 133:15-138:2, 138:22-140:20, 141:8-24, 142:15-143:20.

48.     Based on Suhy's recommendation, Mike Dunn at the IRS instructed him to "[g]o ahead and integrate the ONgDB into the CKGE framework we'll deploy" on August 14, 2018. Dkt. No. 227, UDF No. 70; *see also* TX133.

49.     Suhy uploaded ONgDB v3.4, which was licensed under the AGPL and was not subject to the commercial restrictions imposed by the Commons Clause, to the IRS's internal Gitlab repository.[2] Dkt. No. 227, UDF Nos. 71, 73; TX132 ("ONgDB open source licenses come directly from the Graph Foundation as well, not from Neo4j Inc."); TX69 (You may want to reference the Neo4j Enterprise open source distribution which has the name "ONgDB Enterprise". [] This distribution is the free and open source fork of Neo4j Enterprise. US Treasury and other agencies use this."); TX66 ("All the Neo4j enterprise distributions we package from now on will come from [GFI] and have the standard vanilla AGPLv3 open source license. Treasury and a bunch of analytic companies in the area now use these."); TX106 ("Not to mention the US Treasury has now adopted ONgDB Enterprise - which is the same code base, with just a different name and removal of the commons clause.").

50.     The IRS decided to not allocate $156,000 for a license to use Neo4j® EE in the

---

[2] Suhy testified during trial that the IRS allegedly used a version of ONgDB that was subject to the Commons Clause. Trial Tr. at 309:18-332:8-337:10, 339:22-341:7. Based on the admitted deposition testimony of Mr. Dunn of the IRS (*see, e.g*, Dkt. No. 210, Ex. 5 at 127:19-138:11), Suhy's contemporaneous emails (*see, e.g*., TX106, TX66, TX69, TX132), and stipulated facts (Dkt. No. 227, UDF Nos. 69-71, 74-76; Dkt. No. 234, UDF Nos. 33-40), the Court again finds that Suhy's trial testimony is not credible.

1  CKGE platform because ONgDB was a free and open, unrestricted alternative.  Dkt. No. 227, UDF

2  No. 72.

3        51.    Under the CKGE contract, Suhy and iGov were responsible for supporting,

4  maintaining and updating ONgDB in an internal Gitlab repository for the RAAS at the IRS.  Dkt.

5  No. 227, UDF Nos. 71, 73; *see also* TX133 (Depo Ex. 170), TX145 (Depo Ex. 181) and Dkt. No.

6  210, Ex. 2 at 364:10-20, 365:11-366:9, 380:12-22; Dkt. No. 210, Ex. 5 at 162:11-164:13, 179:13-

7  23, 204:4-206:9.

8        52.    Under the CKGE contract, Suhy and iGov helped the IRS upgrade the CKGE

9  platform from ONgDB v3.4 to ONgDB v3.5 in April 2019 and integrated subsequent subversions

10  through at least April 2022.  Dkt. No. 227, UDF No. 74; *see also* Dkt. No. 210, Ex. 5 at 207:7-

11  209:15, 210:5-211:20, 213:1-216:8.

12        53.    After April 2022, the IRS started calling ONgDB v3.5 just "GDB" due to the

13  injunction entered against GFI and its rollback of ONgDB source code. Dkt. No. 227, UDF No. 75.

14        54.    GDB was merely a name change because it was still based on Neo4j® EE v3.5

15  source code that was improperly licensed under the AGPL without the Commons Clause, which

16  Suhy continued to be responsible for maintaining on the IRS's internal Gitlab repository under the

17  CKGE Contract.  Dkt. No. 227, UDF No. 76; Dkt. No. 234, UDF No. 40.

18        55.    After the IRS awarded the CKGE Contract to eGov Solutions, it made an initial

19  $300,000 payment to eGov Solutions in July 2018.  Dkt. No. 234, UDF No. 64.  At that time, the

20  money eGov Solutions received from the IRS on the CKGE Contract was to be paid in its entirety

21  to Mr. Suhy, at his sole discretion.  *Id.*

22        56.    eGov Solutions maintained a Wells Fargo bank account for all the payments

23  received from the IRS ("the Wells Fargo Account"), which Suhy had access to and was authorized

24  to disburse the payments made by the IRS as he saw fit.  Dkt. No. 234, UDF No. 65.

25        57.    At some point, Suhy asked eGov Solutions to make the payments received from the

26  IRS to iGov rather than personally.  Dkt. No. 234, UDF No. 66.

27        58.    eGov Solutions considered all the payments made by the IRS under the CKGE

28  Contract into the Wells Fargo Account to belong Suhy and later iGov.  Dkt. No. 234, UDF No. 67.

59.     The IRS paid a total of $1,316,000 to eGov Solutions over the course of five years under the CKGE Contract, which was deposited into the Wells Fargo Account. Dkt. No. 234, UDF No. 68. iGov and Suhy, in turn, realized **$1,316,000** in profits under the CKGE Contract.  Dkt. No. 234, UDF No. 68; *see also* Trial Tr. at 222:22-223:11.  Using the one-year treasury rate, which ranged between .07% and 5.36% and compounding interest on an annual basis, the total prejudgment interest accrued on this amount through December 1, 2023 is **$91,044**. Dkt. No. 234, UDF No. 68.

60.     ASR Analytics LLC ("ASR") also engaged Suhy via iGov as a subcontractor to provide support, consulting and development services for the CKGE and other implementations of ONgDB at the IRS between 2019 and 2022.  Dkt. No. 234, UDF No. 69.

61.     The subcontracts and task orders provided by ASR to iGov included: (1) Knowledge Graph API ("KG-API") for CKGE; (2) Support for Corporate Graph Database; (3) Emerging Compliance Issues; and (4) IDT Innovation, all of which required iGov and Suhy to provide support, consulting and development services for the CKGE and other implementations of ONgDB at the IRS between 2019 and 2022.  Dkt. No. 234, UDF No. 70.

62.     The consulting work that iGov and Suhy performed under the KG-API subcontract with another subcontractor working with ASR, Tylor Data, which related to ONgDB interfacing with another graph software tool.  Dkt No. 210, Ex. 6 at 54:9-55:7, 55:22-57:4, 67:17-70:11; TX158 (Depo Ex. 133) and Dkt. No. 210, Ex. 6 at 91:7-92:6, 92:20-93:7, 93:23-96:19; TX154 (Depo Ex. 134) and Dkt. No. 210, Ex. 6 at 102:8-103:24, 105:1-17, 105:23-106:7; TX161 (Depo Ex. 150) and Dkt No. 210, Ex. 6 at 189:6-190:3, 190:10-20; Dkt. No. 210, Ex. 6 at 178:7-179:12.

63.     KG-API contract expired in September 2021.  Dkt No. 210, Ex. 6 at 102:8-105:17, 175:17-177:2. Immediately thereafter, ASR entered into a similar contract with Tylor Data and ASR, which Suhy continued to work on as a subcontractor.  *Id.*

64.     The work that iGov and Suhy performed under Corporate Graph Database (Subcontractor Task Order Number 0002) involved supporting GraphGrid, a micro services-based application programming interface (API) that includes ONgDB, at the IRS.  TX165 (Depo Ex. 139) and Dkt. No. 210, Ex. 6 at 144:15-146:14, 147:13-149:23; TX167 (Depo Ex. 141) and Dkt. No.

210, Ex. 6 at 156:2-159:4, 159:14-160:8. 160:24-161:8, 162:15-163:23; Dkt No. 210, Ex. 6 at 211:3-212:6.

65.     The work that iGov and Suhy performed relating to Emerging Compliance Issues involved the analysis of graph data, including graphs generated using ONgDB.  TX163 (Depo Ex. 136) and Dkt No. 210, Ex. 6 at 119:1-121:14, 121:19-123:24; TX162 (Depo Ex. 137) and Dkt No. 210, Ex. 6 at 124:3-126:13, 127:5-128:5, 128:12-16, 131:1-138:25, 139:13-25; TX164 (Depo Ex. 138) and Dkt No. 210, Ex. 6 at 140:14-143:20, 144:1-14; TX166 (Depo Ex. 140) and Dkt No. 210, Ex. 6 at 151:8-155:17; Dkt No. 210, Ex. 6 at 211:3-212:6.

66.     IDT Innovation was a task order issued by ASR to iGov relating to identity theft, which involved the use of a graph database that was ONgDB.   Dkt No. 210, Ex. 6 at 45:14-47:22, 49:15-52:21, 167:16-169:17; TX158 (Depo Ex. 133) and Dkt No. 210, Ex. 6 at 91:7-92:6, 92:20-93:7; TX168 (Depo Ex. 143) and Dkt No. 210, Ex. 6 at 167:16-169:17.

67.     ASR Analytics paid iGov a total of **$246,082.55** for work performed under all the subcontracts and task orders at the IRS, which all involved the use and support of ONgDB.  Dkt. No. 234, UDF No. 71.  Using the one-year treasury rate, which ranged between .07% and 5.36% and compounding interest on an annual basis, the total prejudgment interest accrued on this amount through December 1, 2023 is **$12,393**. *Id.*

68.     The initial hardware available to run Neo4j® EE in the IRS's pre-CKGE platform was one server with at least 16 cores and 1 terabyte of RAM under the September 23, 2016 contract award to PureThink.  Dkt. No. 227, UDF No. 79; Dkt. No. 234, UDF No. 43.

69.     As of December 2018, the CKGE (a/k/a "main graph") was running, or was expected to be running, on at least two production servers and one development server utilizing ONgDB. Each machine was comprised of a DL380 with 32 cores and 256GB of RAM at minimum. Dkt. No. 227, UDF No. 80; Dkt. No. 234, UDF No. 44.

70.     Between 2019 and 2022, the IRS was running ONgDB on three production servers, and one development server in the CKGE. Dkt. No. 227, UDF Nos. 81-83; Dkt. No. 234, UDF No. 45.

/ / /

Hopkins & Carley
Attorneys At Law
San Jose ◆ Palo Alto

4878-9639-7699.8
- 12 -
PLAINTIFFS' AMENDED [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW          CASE NO. 5:18-CV-07182-EJD

71.     Each machine in the CKGE running ONgDB between December 2018 and November 2022 was comprised of a DL380 with 32 cores and 256GB of RAM.  Dkt. No. 227, UDF No. 85; Dkt. No. 234, UDF No. 46.

72.     As of November 2022, the IRS switched to running ONgDB on two production servers in the CKGE.  Dkt. No. 227, UDF No. 84; Dkt. No. 234, UDF No. 47.  Thereafter, the IRS would only want the bare-minimum Neo4j® EE package for two nodes, each with 16 cores and 256GB RAM for the CKGE.  Dkt. No. 227, UDF No. 86; Dkt. No. 234, UDF No. 47.

73.     Between December 2018 and 2021, one instance of ONgDB was running on its own server in YK1 at the IRS.  Dkt. No. 227, UDF Nos. 88, 90-92; Dkt. No. 234, UDF No. 49.  In 2022, two instance of ONgDB in production and two instances of ONgDB in development/test in YK1 at the IRS.  Dkt. No. 227, UDF No. 93; Dkt. No. 234, UDF No. 49.

74.     Starting in 2019 and continuing through 2022, the IRS ran separate instances of ONgDB in additional projects, including Corporate Graph, Excise Graph, COVID Graph, Policy Net, Individual Graph, CPEO Graph and Ghost Preparer.  Dkt. No. 227, UDF No. 94, 96, 98-99, 101, 103, 105, 107; Dkt. No. 234, UDF No. 50.

75.     The minimum server specifications for YK1, Corporate Graph, Excise Graph, COVID Graph, Policy Net, Individual Graph, CPEO Graph and Ghost Preparer running ONgDB were DL380 with 12 cores and 256GB of RAM.  Dkt. No. 227, UDF Nos. 89, 95, 97, 100, 102, 104, 106, 108; Dkt. No. 234, UDF No. 51.

76.     Defendants' removal of the Commons Clause from the license governing ONgDB enabled the IRS to use ONgDB for free rather than pay for a commercial license to Neo4j® EE beyond the CKGE.  Dkt. No. 227, UDF Nos. 69, 72; Dkt. No. 234, UDF No. 48; *see also* TX89, TX91 and Trial Tr. at 72:9-78:3; TX126, TX128, TX131 and Trial Tr. at 78:13-90:12; TX127 (Depo Ex. 165) and Dkt. No. 210, Ex. 5 at 96:6-98:21; TX129 (Depo Ex. 166) and Dkt. No. 210, Ex. 5 at 98:3-99:10, 100:9-103:12; TX132 (Depo Ex. 169) and Dkt. No. 210, Ex. 5 at 126:5-131:11, 132:2-133:13, 134:7-138:2, 134:7-138:11, 138:22-141:24, TX133 (Depo Ex. 170) and Dkt. No. 210, Ex. 5 at 142:15-143:20.

77.     The IRS understood that Neo4j® EE could run Cypher queries significantly faster

than Neo4j® CE, which is advantageous in terms of productivity in the CKGE.  Dkt. No. 227, UDF No. 78; Dkt. No. 234, UDF No. 42; *see also* TX4 and Trial Tr. at 41:20-44:2, 51:22-55:18.

78.    The IRS uses at least one Neo4j® EE-only feature, node ID, via ONgDB in CKGE and understands that a commercial subscription for Neo4j® EE also comes with professional services.  Dkt. No. 227, UDF No. 77; Dkt. No. 234, UDF No. 41; Dkt. No. 210, Ex. 5 at 94:17-95:22, 103:2-104:12; *see also* Trial Tr. at 41:20-45:2.  The IRS "would have to do a work-around" of that enterprise-only feature if it had to revert to Neo4j Community Edition.  Dkt. No. 210, Ex. 5 at 253:13-254:14.

79.    Based on the enhanced performance and feature set of Neo4j® EE and ONgDB, and the fact that Neo4j USA has sold commercial subscriptions of Neo4j® EE to other divisions at the IRS, the RAAS division at the IRS would have purchased a paid commercial subscription for Neo4j® EE if using ONgDB for free under the AGPL had not been an option.  Dkt. No. 234, UDF Nos. 31, 36, 41-42, 48, 54-56; *see also* Trial Tr. at 73:19-78:3, 78:13-90:12,

80.    The IRS's willingness to pay for a commercial license for Neo4j® EE for the CKGE and other projects in the RAAS had ONgDB not been available for free under the AGPL is further supported by its history of purchasing 1-year commercial licenses to Neo4j® EE and renewing those licenses in other instances. Dkt. No. 234, UDF No. 52; *see also* TX15, Lines 263-277 and Trial Tr. at 104:4-108:10, 171:7-176:15, 232:2-235:3-14, 237:4-8; Dkt. No. 227, UDF No. 109.

81.    Had ONgDB not been available for free under the AGPL, August 1, 2018 is the first hypothetical negotiation date for when the IRS would have purchased a commercial license for Neo4j® EE to be used in the CKGE, and the second hypothetical negotiation date is August 1, 2019 due to a change in hardware specifications and requirements for the CKGE.  Dkt. No. 234, UDF No. 53; Dkt. No. 227, UDF Nos. 66-70, 79-80; TX131 and Trial Tr. at 86:5-90:12, 235:15-21, 240:18-241:7.

82.    Had ONgDB not been available for free under the AGPL, the IRS would have purchased a commercial subscription based off a modified Enterprise Bundle for $156,000 from the October 1, 2017 price list (TX16) at the first hypothetical negotiation for the CKGE.  *See* Dkt.

No. 234, UDF No. 54; Dkt. No. 227, UDF No. 66; TX126, TX127, TX131 and Trial Tr. at 78:8-90:12, 93:4-95:8, 237:9-20.

83. During the second hypothetical negotiation for the CKGE, the IRS would have purchased a commercial subscription for an Enterprise Bundle with additional cores to match the new hardware specifications of the CKGE, plus at least one test machine from Neo4j USA. Dkt. No. 234, UDF No. 55; *see also* Dkt. No. 227, UDF Nos. 80-81; Trial Tr. at 237:4-20.

84. Neo4j USA would have offered Discovery Bundle pricing to the IRS from period-correct price list for each project beyond the CKGE that used ONgDB on less than 3 machines. Dkt. No. 234, UDF No. 56; *see also* TX16, TX17, TX18, TX19 and Trial Tr. at 91:16-20, 93:4-98:19, 100:11-104:3, 237:21-239:2.

85. The IRS would have sought to negotiate certain discounts off the list prices for the applicable Neo4j® EE Enterprise and Discovery Bundles. Trial Tr. at 232:20-235:2, 237:4-240:6. Based on the IRS's history of purchasing commercial subscriptions for Neo4j® EE with year-to-year renewals, with no multi-year subscriptions, the IRS would have likely been unsuccessful in negotiating an additional 15% discount on the subscription price during the aforementioned hypothetical negotiations. *Id.*; *see also* Dkt. No. 234, UDF Nos. 56-57; TX15 and Trial Tr. 104:4-108:10, 127:14-128:22, 172:1-175:24.

86. Neo4j USA's sale of commercial licenses for Neo4j® EE would have been through its reseller at the time of the hypothetical negotiations, Intellipeak, and would receive a 7% reseller fee after any negotiated discount on the applicable subscription fees. Dkt. No. 234, UDF No. 58; *see also* Trial Tr. at 90:13-91:15. The first-year revenue generated from Neo4j USA's sale of commercial licenses for Neo4j® EE to the IRS also would have been subject to the payment of employee commissions at the 2018 average rate of 15.26% or the 2019 average rate of 13.27%. Dkt. No. 234, UDF No. 59; *see also* Trial Tr. at 168:1-170:4.

87. Applying the 15.26% employee commission the first year of subscription for each IRS project that used ONgDB after the application of a 7% reseller fee with no additional subscription fee discount, Neo4j USA suffered a total of **$3,069,646** in lost profits as a result of the

1   IRS's use of improperly licensed ONgDB.  Dkt. No. 234, UDF No. 61; *see also* Trial Tr. at 233:23-

2   235:21, 236:24-242:17.

3         88.    Using the one-year treasury rate, which ranged between .07% and 5.36% and

4   compounding interest on an annual basis, the total prejudgment interest accrued on the **$3,069,646**

5   in lost profits through December 1, 2023 is **$147,136**.  Dkt. No. 234, UDF No. 61.

6         89.    In June 2018, Next Century sought information from Neo4j USA regarding certain

7   Neo4j® EE features, including causal clustering. TX103 and Trial Tr. at 110:13-113:20. In

8   response, Neo4j USA confirmed those features required a commercial subscription for Neo4j® EE,

9   and the pricing for it was based on number of servers in the cluster, cores per server, and RAM per

10   server. *Id.*

11         90.    The Maryland Procurement Office (a/k/a the National Security Agency, the NSA

12   and the MPO) tasked Next Century to analyze available graph database technologies, including

13   Neo4j® EE.  Dkt. No. 234, UDF No. 1; Dkt. No. 227, UDF No. 110; *see also* Dkt. No. 210, Ex. 4

14   at 28:10-30:21.

15         91.    Next Century and the MPO required the enterprise-only features, such as causal

16   clustering and multi-data centers, offered by both Neo4j® EE and ONgDB.  Dkt. No. 227, UDF

17   No. 111; Dkt. No. 234, UDF No. 2.

18         92.    In October 2018, Next Century obtained additional information about the pricing of

19   Neo4j® EE software bundles offered by Neo4j USA from iGov's website, and that iGov offered

20   the same software for free under the AGPL bundled with iGov's consulting services.  Dkt. No. 234,

21   UDF No. 3; Dkt. No. 227, UDF No. 112; *see also* TX104 (Depo Ex. 43), TX105 (Depo Ex. 44)

22   and Dkt. No. 210, Ex. 4 at 42:16-48:10, 49:18--51:14.

23         93.    In October 2018, Next Century also exchanged emails with Suhy regarding

24   representations made on iGov's website that ONgDB v3.4 was an open source version of Neo4j®

25   EE that provided the same enterprise-only features for free under the AGPL.  Dkt. No. 234, UDF

26   No. 4; Dkt. No. 227, UDF No. 113; *see also* TX106 (Depo Ex. 45) and Dkt. No. 210, Ex. 4 at

27   51:23-25, 54:7-56:21, 57:9-59:17; TX89 and Trial Tr. 74:4-24, 350:10-353:1.

28         94.    Suhy told Next Century that the MPO could use ONgDB v3.4 under the AGPL

without restrictions or paying Neo4j USA for a commercial license, as advertised on the iGov website.  Dkt. No. 234, UDF Nos. 4-5; Dkt. No. 227, UDF No. 114; *see also* TX106 (Depo Ex. 45), TX107 (Depo Ex. 46) and Dkt. No. 210, Ex. 4 at 54:7-56:21, 57:9-60:15, 60:19-20; 60:25-62:12.

95.    As a result of its communications with Suhy, Next Century downloaded ONgDB v3.4 and began evaluating against Neo4j® EE v3.4 for the MPO.  Dkt. No. 234, UDF No. 6; Dkt. No. 227, UDF No. 115.

96.    In another series of emails with Next Century ending on January 4, 2019, Suhy confirmed that ONgDB v3.5 would have feature parity with the enterprise features of Neo4j® EE v3.5, and would also be available without restrictions on the number of clusters, instances and cores and without paying Neo4j USA for a commercial license.  Dkt. No. 234, UDF No. 8; Dkt. No. 227, UDF No. 116; *see also* TX108 (Depo Ex. 47) and Dkt. No. 210, Ex. 4 at 62:13-65:17. Suhy's statements convinced Next Century to upgrade from ONgDB v3.4 to ONgDB v3.5.  *Id.*

97.    By February 2019, the MPO had chosen to use ONgDB v3.5 over Neo4j® EE v3.5 for continued development work that Next Century was performing for the MPO.  Dkt. No. 234, UDF No. 9; Dkt. No. 227, UDF No. 117.

98.    On February 5, 2019, Next Century informed Neo4j USA of the MPO's decision, stating, "[w]e have found that open-sourced (non-commercial) builds from the Neo4j source code provide the clustering and security requirements needed in our environment."   Dkt. No. 234, UDF No. 10; Dkt. No. 227, UDF No. 118; TX110 and Trial Tr. at 114:13-120:1.

99.    In March 2019, Next Century gave Neo4j USA the required specifications for its ongoing KMS Project with the MPO and asked Neo4j USA for a quote for use in a production environment. Dkt. No. 234, UDF No. 11; Dkt. No. 227, UDF No. 119; TX116 and Trial Tr. at 120:2-125:5.

100.    On April 19, 2019, Mr. Zagalsky sent Next Century a proposal for a 3-year Neo4j Enterprise Bundle based on those requirements. Dkt. No. 234, UDF No. 12; Dkt. No. 227, UDF No. 120; TX118 and Trial Tr. at 125:6-126:3, 127:11-129:16. Under the April 19, 2019 proposal, Next Century and the MPO had the option to (a) purchase three one-year subscriptions on an

incremental basis for a total of $2,667,00 ("MPO Undiscounted Fee"); or (b) purchase a 3-year subscription for a total of $2,266,950, which reflects a 15% multi-year, paid up-front discount ("MPO Discounted Fee").  Dkt. No. 234, UDF No. 17.

101.    On April 29, 2019, Next Century confirmed that it shared Neo4j USA's proposal with the MPO, and was instructed by the MPO to continue using ONgDB.   Dkt. No. 234, UDF No. 13; Dkt. No. 227, UDF No. 121; TX119 and Trial Tr. 130:15-131:24.  The reason for the MPO continuing to use ONgDB over Neo4j® EE was price.  *Id*.

102.    On July 21, 2019, Next Century informed Neo4j USA that the MPO was not interested in the Neo4j® EE proposal for the KMS Project.  Dkt. No. 234, UDF No. 14; Dkt. No. 227, UDF No. 122.  Again, the deciding factor between ONgDB and Neo4j® EE was price.  *Id.*

103.    Next Century continued to use ONgDB v3.5, which was placed into a production environment for the NSA in or about October 2020.  Dkt. No. 234, UDF No. 15; Dkt. No. 227, UDF No. 123.

104.    Defendants' removal of the Commons Clause from the license governing ONgDB enabled Next Century and the MPO to use ONgDB for free rather than pay Neo4j USA for a commercial license to Neo4j® EE. Dkt. No. 234, UDF No. 7; Dkt. No. 227, UDF Nos. 111, 113-123; *see also* Dkt. No. 118 at 5:24-6:1, 6:18-26, 24:7-25:19.

105.    Had ONgDB not been available for free under the AGPL, the hypothetical negotiation between Neo4j USA on one hand, and Next Century and the MPO on the other hand for a commercial license to Neo4j® EE for use in the KMS Project would have occurred in April 2019.  Dkt. No. 234, UDF No. 16; *see also* TX118 and Trial Tr. at 224:22-226:17.

106.    Next Century and the MPO would have purchased a paid commercial subscription for Neo4j® EE if using ONgDB for free under the AGPL was not an option as the enterprise-only features were required by the MPO.  Dkt. No. 234, UDF Nos. 2-10, 13-14; Dkt. No. 227, UDF Nos. 111, 113-123.

107.    The MPO's willingness to pay Neo4j USA for a commercial license for Neo4j® EE is further supported by a history of purchasing a discounted multi-year commercial license for Neo4j® EE and purchasing 1-year commercial licenses and renewing those licenses at

undiscounted amounts. Dkt. No. 234, UDF No. 18; *see also* TX15 (Lines 337-343) and Trial Tr. at 132:14-134:9, 171:7-176:15, 230:25-232:19; Dkt. No. 227, UDF No. 124.

108.    Neo4j USA's sale of a commercial license to Next Century and the MPO for the KMS Project would have been through its reseller, Intellipeak.  Dkt. No. 234, UDF No. 19; *see also* Trial Tr. at 90:13-91:15, 131:6-132:13, 217:13-219:5.  As a result, a reseller fee of 7% would be applied to the total discounted amount of a multi-year deal with Next Century and the MPO, as well as to the purchase of a one-year subscription and each subsequent renewal thereof.  *Id.*

109.    As of April 2019, the average employee commission rate at Neo4j USA was 13.27%.  Dkt. No. 234, UDF No. 20; *see also* Trial Tr. at 168:1-170:4. The additional cost of 13.27% in employee commissions would apply to the entire MPO Discounted Fee, while the employee commissions cost would only apply to the first year's revenue of year-to-year renewals on the MPO Undiscounted Fee.  *Id.*

110.    Based on the majority of the MPO's other large purchases of Neo4j® EE being 1-year commercial licenses and successive renewals at undiscounted amounts, the MPO would have mostly likely purchased a one-year commercial license to Neo4j® EE for KMS Project and renewed that license for two additional years at undiscounted amounts.  Dkt. No. 234, UDF No. 18; TX118 and Trial Tr. at 127:14-128:22, 132:14-134:9, TX15 (Lines 337-343) and Trial Tr. at 171:7-176:15, 230:25-232:19; Dkt. No. 227, UDF No. 124.

111.    After accounting for the 7% reseller fee and 13.27% rate for employee commissions that would have applied at the time of the April 2019 hypothetical negotiation, Neo4j USA's net lost profits for the KMS Project based on the MPO Undiscounted Fee and the 2019 employee commission fee of 13.27% is **$2,370,598**. Dkt. No. 234, UDF No. 24; Trial Tr. at 222:19-232:19.

112.    Using the one-year treasury rate, which ranged between .07% and 5.36% and compounding interest on an annual basis, the total prejudgment interest accrued on this amount through December 1, 2023 is **$140,288**.  Dkt. No. 234, UDF No. 24.

/ / /

/ / /

/ / /

Hopkins & Carley
Attorneys At Law
San Jose ♦ Palo Alto

4878-9639-7699.8
- 19 -
PLAINTIFFS' AMENDED [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW    CASE NO. 5:18-CV-07182-EJD

1  **II.    CONCLUSIONS OF LAW**

2  **A.    Neo4j USA's First Cause of Action for Trademark Infringement, 15 U.S.C. §**

3  **1114 and Third Cause of Action for Unfair Competition, 15 U.S.C. § 1125(a),**

4  **Asserted Against All Defendants**

5  As detailed in this Court's May 18, 2021 order granting partial summary judgment in favor

6  of Neo4j USA on its First Cause of Action for Trademark Infringement, 15 U.S.C. § 1114, and

7  Third Cause of Action for Unfair Competition, 15 U.S.C. § 1125(a), this Court found Defendants

8  liable for infringement of U.S. Trademark Registration No. 4,784,280 for the word mark "NEO4J"

9  covering the goods and services in International Classes, 009, 035, 041, 042 and 045 (the "Neo4j

10  Mark").  *Neo4j, Inc. v. PureThink, LLC*, No. 5:18-CV-07182-EJD, 2021 WL 2483778 (N.D. Cal.

11  May 18, 2021), *aff'd*, No. 21-16029, 2022 WL 501120 (9th Cir. Feb. 18, 2022), *amended on denial*

12  *of reh'g*, No. 21-16029, 2022 WL 781037 (9th Cir. Mar. 14, 2022).

13  In particular, and relevant to this Court's determination here that Defendants willfully

14  infringed the Neo4j Mark, Defendants did not engage in nominative fair use because they used the

15  Neo4j Mark to refer to Defendants' own products, rather than Plaintiffs' products. *Neo4j, Inc. v.*

16  *PureThink, LLC*, 2021 WL 2483778, at *11.  Thus, Defendants were not using "Neo4j" to refer to

17  Plaintiffs' products, they were using it to create the misleading perception that Defendants'

18  products *were* Plaintiffs' products.  *Id.*, at *10 (citing *Adobe Sys. Inc. v. A & S Elecs., Inc.*, 153 F.

19  Supp. 3d 1136, 1143 (N.D. Cal. 2015) (not fair use because defendant's use of Adobe's marks was

20  not intended to describe Adobe's product, but rather to make it appear that the software was

21  sanctioned by Adobe for sale and distribution).

22  **B.    Neo4j USA's Second Cause of Action for False Designation of Origin and False**

23  **Advertising, 15 U.S.C. § 1125(a), Asserted Against All Defendants**

24  **1.    False Advertising**

25  As detailed in this Court's May 18, 2021 order granting partial summary judgment in favor

26  of Neo4j USA on its Second Cause of Action for False Designation of Origin and False Advertising,

27  15 U.S.C. § 1125(a), against all Defendants (Dkt. No. 90 at ¶¶ 112-119), and Neo4j USA's Fourth

28  Cause of Action for Unfair Competition, Cal. Bus. Prof. Code §§ 17200 et seq., against Defendants

(Dkt. No. 90 at ¶¶ 127-133), this Court found Defendants liable under Section 1125(a) for making numerous false and misleading misrepresentations in their advertisement and promotion of ONgDB. *Neo4j, Inc. v. PureThink, LLC*, 2021 WL 2483778, at *13. These statements generally fell into two groups: (1) statements that ONgDB was a "free and open source" version of or alternative to commercially licensed Neo4j® EE; and (2) statements that ONgDB is a "drop-in replacement for an existing commercial licensed distribution of the same version number" of Neo4j® EE. *Neo4j, Inc. v. PureThink, LLC*, 2021 WL 2483778, at *13.

Now relevant to the determination that this is an exceptional case, the Court previously found that the first group of statements that ONgDB is "free and open source" were literally false because the provisions in the Neo4j Sweden Software License did not permit Defendants to remove the commercial restrictions imposed by the Commons Clause. *Neo4j, Inc.*, 2021 WL 2483778, at *14, *aff'd*, No. 21-16029, 2022 WL 501120 (9th Cir. Feb. 18, 2022), *amended on denial of reh'g*, No. 21-16029, 2022 WL 781037 (9th Cir. Mar. 14, 2022) (affirming that "[t]he representation that ONgDB is a 'free and open-source' version of Neo4j® EE was literally false). Similarly, the Court found Defendants' advertisements that ONgDB was licensed under AGPL as a "drop-in replacement" for Neo4j Enterprise commercial licensed distributions with the same version number were literally false and likely to mislead consumers. *Id.* at *15. For the same reasons that Defendants' statements that ONgDB as "free and open source" and as a "drop-in replacement" for Neo4j® EE were likely to mislead consumers, they also had a tendency to deceive. *Id.*, at *16.

On summary judgment, Defendants did not dispute that they made the statements at issue to convince customers to adopt ONgDB over Neo4j® EE. *Neo4j, Inc.*, 2021 WL 2483778, at *16. The Court found that because Defendants misrepresented ONgDB as a free version of Neo4j® EE licensed under the AGPL, there was no doubt that this price differential (free versus paid) was likely to influence customers' purchasing decisions. *Id.* The Court's prior findings are reinforced by the uncontested evidence introduced at trial that Defendants' misrepresentations that ONgDB was a "free and open source drop in replacement" for Neo4j® EE caused both the IRS and the MPO to choose ONgDB over purchasing commercial subscriptions to Neo4j® EE. *See* Fact Nos. 41-50, 76-79, 89-97, 104-106, *supra*.

1    Defendants also argued on summary judgment that Neo4j USA failed to establish that

2    customers would have purchased a commercial license to Neo4j® EE but for Defendants' offering

3    ONgDB as a "free and open source drop-in replacement."  *Neo4j, Inc.*, 2021 WL 2483778, at *16.

4    The Court did not find this argument persuasive because commercial injury is generally presumed

5    "in false comparative advertising cases, where it's reasonable to presume that every dollar defendant

6    makes has come directly out of plaintiff's pocket." *Id. (quoting TrafficSchool.com, Inc. v. Edriver*

7    *Inc*., 653 F.3d 820, 831 (9th Cir. 2011)); *see also LexMark Intern., Inc. v. Static Control*

8    *Components, Inc.* 572 U.S. 118 (2014) ("diversion of sales to a direct competitor may be the

9    paradigmatic direct injury from false advertising").   The Court also found it was undisputed that

10   Neo4j USA lost multi-year deals when Next Century via the MPO adopted ONgDB.  *Neo4j, Inc.*

11   *v. PureThink, LLC*, 2021 WL 2483778, at *16.

12   The uncontested evidence presented at trial confirms that this was not just a presumption,

13   but an actual occurrence directly caused by Defendants' false advertising.  Their removal of the

14   Commons Clause from the license governing ONgDB enabled end-users, such as Next Century,

15   the MPO and IRS, to use ONgDB for free rather than pay for a commercial license to Neo4j® EE.

16   Fact Nos. 7, 76, 104, *supra*.  Both the IRS and the MPO have a history of purchasing commercial

17   subscriptions for Neo4j® EE where ONgDB was not a factor.  *See* Fact Nos. 80, 107, *supra*.

18   The uncontested evidence presented at trial further establishes that Suhy caused the IRS to

19   adopt ONgDB rather than pay for a license to Neo4j® EE.  *See* Fact Nos. 7, 16-17, 22-27, 33-54,

20   68-83, *supra*.  Likewise, the uncontested evidence shows the false advertisements made on the iGov

21   website, as well as those made direct by Suhy to Next Century via emails directly caused Next

22   Century and the MPO to adopt ONgDB over purchasing a commercial license to Neo4j® EE.  *See*

23   Fact Nos. 7, 16-17, 22-27, 89-107.

24   At trial, Defendants did not contest that ONgDB caused Neo4j USA to lose sales at the IRS

25   and MPO.  Rather, they argued that since Defendants were not in the business of selling ONgDB,

26   they cannot be held responsible for Neo4j USA' resulting lost profits.   Defendants need not be a

27   competitor, however, for Neo4j USA to recover damages for false advertising under the Lanham

28   Act.  In *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), the Supreme

Court expressly rejected "a categorical test permitting only direct competitors to sue for false advertising," holding instead that an "application of the zone-of-interests test and the proximate-cause requirement supplies the relevant limits on who may sue" under § 1125(a). *Id*. at 134.[3] Rather, the alleged false advertisement must merely constitute (1) commercial speech; (2) for the purpose of influencing consumers to buy defendant's goods or services; and (3) disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry. *Lona's Lil Eats, LLC v. DoorDash, Inc*., No. 20-CV-06703-TSH, 2021 WL 151978, at *6 (N.D. Cal. Jan. 18, 2021) (citing *Lexmark*, 572 U.S. at 137).

In other words, Neo4j USA need only prove that it lost sales and incurred damages as a result of Defendants' false advertising. *Lexmark*, 572 U.S. at 137. Such is the case here. As found in the Court's May 18, 2021 summary judgment order, Defendants did not dispute their false and misleading statements about ONgDB made via their websites, email, and social media qualify as commercial advertisements. *Neo4j, Inc.*, 2021 WL 2483778, at *13. Nor did they dispute that such statements made through these channels were placed into interstate commerce. *Id. (citing Healthport Corp. v. Tanita Corp. of Am*., 563 F. Supp. 2d 1169, 1178 (D. Or. 2008), *aff'd*, 324 F. App'x 921 (Fed. Cir. 2009) (holding that statements made on website were advertisements placed into interstate commerce); *SuccessFactors, Inc. v. Softscape, Inc*., 544 F. Supp. 2d 975, 982 (N.D. Cal. 2008) (likelihood of success on interstate commerce element met where defendant had disseminated the misleading statement via email and on its website)). The uncontroverted evidence

---

[3] Defendants rely on non-binding, out of circuit authority predating *Lexmark* to argue that because the parties are not direct competitors, Neo4j USA cannot establish Defendants caused its damages under the Lanham Act. This is yet another example of Defendants and their counsel taking a frivolous legal position that is contrary to controlling authority and ignoring the prior rulings of this Court. In particular, this Court previously determined that Defendants were direct competitors of Neo4j USA. *See Neo4j, Inc.*, 2021 WL 2483778, at *16. The Court also found that Defendants' falsely advertising ONgDB as a "free and open source drop-in replacement" for Neo4j® EE caused Neo4j USA to lose a $2.2 million multi-year deal when Next Century and the Maryland Procurement Office adopted ONgDB rather than pay for a commercial license to Neo4j® EE. *Id*.

1 introduced at trial establishes that Neo4j USA lost sales at the MPO and the IRS, which resulted in

2 significant lost profits.  *See* Fact Nos. 82-88, 105-112, *supra*.

3 **2.     False Designation of Origin**

4 Similar to a false advertising claim, a false designation of origin claim under Section

5 1125(a)(1)(A) requires that Plaintiffs show: (1) the defendants used a false designation of origin;

6 (2) the use occurred in interstate commerce; (3) that such false designation is likely to cause

7 confusion, mistake or deception as to the origin, sponsorship, or approval of defendants' goods or

8 services by another person; and (4) that plaintiffs have been or are likely to be damaged. *Hokto*

9 *Kinoko Co. v. Concord Farms, Inc*., 810 F. Supp. 2d 1013, 1039 (C.D. Cal. 2011), *aff'd*, 738 F.3d

10 1085 (9th Cir. 2013) (citing 15 U.S.C. § 1125(a)).

11 In granting summary judgment in favor of Plaintiffs on this claim, the Court found that

12 Defendants' holding out of ONgDB as free and open source Neo4j® EE constituted a false

13 designation of origin (element 1).  *Neo4j, Inc. v, LLC*, 2021 WL 2483778, at *17.  There was also

14 no dispute that Defendants used the Neo4j Mark to falsely imply origin in interstate commerce

15 (element 2). *Id.*  As to the likelihood of confusion under the *Sleekcraft* test, the Court found that it

16 was undisputed that the Defendants used the Neo4j Mark (factor 1), which Plaintiffs have used in

17 commerce since 2007 and which enjoys strong brand recognition in the graph database software

18 market (factor 2). *Neo4j, Inc.*, 2021 WL 2483778, at *18.  There was also no dispute as to the

19 relatedness of the products, given that Defendants promoted ONgDB as a free and open source

20 drop-in replacement for Neo4j® EE (factor 3). *Id.*

21 The Court further found that Defendants intentionally sought to convince consumers to buy

22 Defendants' products instead of Neo4j® EE commercial licenses; in other words, Defendants used

23 the Neo4j Mark to unfairly compete with Plaintiffs (factor 4). *Neo4j, Inc.*, 2021 WL 2483778, at

24 *18.  The undisputed evidence also showed that both Plaintiffs and Defendants were attempting to

25 gain the business of various government entities, and even bid for the same contracts. *Id.* The

26 evidence introduced at trial reinforces this finding, and in particular with the IRS.  *See* Fact Nos. 7,

27 16-17, 22-27, 33-54, 68-83, *supra*; *see also* TX86, TX87, TX88, TX57 and Trial Tr. at 59:12-70:14;

28 TX89, TX91 and Trial Tr. at 72:9-78:1.  Suhy even admitted at trial that iGov's use of ONgDB in

conjunction with offering paid support services "would take away business" from Neo4j USA. Trial Tr. at 372:3-14.  In this regard, Suhy and iGov filed several protests of awards made to Neo4j USA and its resellers and partners for this very purpose. TX83, TX211, TX212 and Trial Tr. at 370:13-373:22, 378:6-383:13.

At summary judgment, the undisputed evidence showed that Defendants' false designations of origin caused actual customer confusion (factor 5). *Neo4j, Inc.*, 2021 WL 2483778, at *18.  The evidence admitted during trial further confirmed this at least with respect to the IRS.  Fact Nos. 40-50, 76-83, *supra*.  Finally, on summary judgment the undisputed evidence showed that Neo4j USA had been or are likely to be damaged (factor 4).   *Neo4j, Inc.*, 2021 WL 2483778, at *17.  The uncontroverted evidence introduced at trial further establishes that Neo4j USA lost sales at the MPO and the IRS, which resulted in significant lost profits.  *See* Fact Nos. 82-88, 105-112, *supra*.

## C.   Plaintiffs' Eighth Cause of Action for Unauthorized Distribution of Altered Copyright Management Information, 17 U.S.C. § 1202(b), against All Defendants

As detailed in the Court's October 25, 2023 order granting partial summary judgment in favor of Plaintiffs in their Eighth Cause of Action for Unauthorized Distribution of Altered Copyright Management Information, 17 U.S.C. § 1202(b)(1), the Court found Defendants liable for knowingly removing copyright management information ("CMI"). Dkt. No. 216 at 16:23-24:6. Likewise, the Court found Defendants liable under 17 U.S.C. § 1202(b)(3) of the DMCA for distributing works with the knowledge that CMI was removed.  *Id.*  In both instances, Defendants did so knowing or having reasonable grounds to know that the removal of that CMI and the distribution thereof would induce, enable, facilitate, or conceal copyright infringement.

The trial in this matter removed any doubt that Defendants knew that the removal of the Commons Clause would result in the infringement of Neo4j Sweden's copyright, and those acts were in willful violation of the DMCA.   Defendants admitted during trial that (a) "Neo4j Sweden owns of all copyrights related to the Neo4j graph database platform, including the source code, and has licensed those copyrights to Neo4j USA" [Dkt. No. 227, UDF No. 58]; (b) "Neo4j Sweden did not give Mr. Suhy permission to replace the Neo4j Sweden Software License with verbatim copies of the AGPL in the 28 LICENSE.txt files in ONgDB v3.4 and ONgDB v3.5" [*id.*, UDF No. 59];

(c) Suhy provided download links for potential customers to download Neo4j® EE source code without Neo4j Sweden's CMI via Defendants' websites and via GFI's GitHub repository [*id.,* UDF Nos. 42-45]; and (d) "Suhy knowingly distributed Neo4j® EE source code without the Neo4j Sweden Software License with the understanding that it would result in the infringement of Neo4j Sweden's copyrights" [*id.,* UDF No. 60].

The evidence makes clear that Defendants built their entire business around inducing others to use ONgDB and pay Defendants for support services that they clearly understood violated the now-removed Commons Clause. *See* Fact Nos. 4-32, *supra*. This constitutes copyright infringement. *See Jacobsen v. Katzer,* 535 F.3d 1373, 1382 (Fed. Cir. 2008) (the use and distribution of software in violation of an open source license constitutes copyright infringement); *see also Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,* 545 U.S. 913, 930 (2005) ("[o]ne infringes contributorily by intentionally inducing or encouraging direct infringement," which includes providing a service "with the object of promoting its use to infringe copyright") *accord Columbia Pictures Indus., Inc. v. Fung,* 710 F.3d 1020, 1037-38 (9th Cir. 2013) (liability for copyright infringement on an inducement theory is where the product or service was used to infringe the plaintiff's copyrights).

The uncontroverted evidence admitted at trial further establishes that Defendants' removal of Neo4j Sweden's CMI from ONgDB resulted in the concealment of copyright infringement. Suhy misled the IRS into believing that GFI licensed the software rather than Neo4j Sweden. *See* Fact Nos. 46-48, *supra*. This deception caused the IRS to adopt ONgDB over Neo4j® EE in August 2018 and to pay Suhy and iGov over $1.3 million via the CKGE Contract to support that software in violation of the Neo4j Sweden License that they had replaced with the AGPL. *See* Fact Nos. 42, 49-59, *supra*.

The uncontroverted evidence admitted at trial shows the Suhy and iGov intentionally engaged in similar deception with Next Century and the MPO. After the release of ONgDB v3.4, Next Century reconfirmed with Suhy via email that the MPO could use ONgDB under the AGPL without restrictions or paying Plaintiffs for a commercial license as advertised on the iGov's website. *See* Fact Nos. 92-95, *supra*. After the release of ONgDB v3.5, Next Century again asked

Hopkins & Carley
Attorneys At Law
San Jose ◆ Palo Alto

4878-9639-7699.8                                   - 26 -
PLAINTIFFS' AMENDED [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW          CASE NO. 5:18-CV-07182-EJD

1  Suhy whether it had the same closed enterprise features as Neo4j® EE v3.5, and could use it without

2  restrictions or paying Neo4j for a commercial license.  *See* Fact Nos. 96-104, *supra*.  Suhy

3  reconfirmed the same.  *See id.*

4       This same evidence establishes that Defendants were the direct cause of Neo4j USA's lost

5  profits.  Defendants uploaded infringing ONgDB v3.4 into the IRS's repository, as well as

6  continuing to upload, maintain and distribute infringing ONgDB v3.5 and rebranded "GDB" at the

7  IRS.  *See* Fact Nos. 45-49, 51-54, *supra*.  The repository hosting ONgDB that Suhy maintained

8  under the CKGE Contract caused the IRS to adopt ONgDB in multiple projects beyond the CKGE.

9  *See* Fact Nos. 49, 51-59, *supra*.  As a result of the wide-spread adoption of ONgDB within the

10  RAAS division of the IRS, Neo4j USA lost $3,069,646 in net licensing revenue.  *See* Fact Nos. 68-

11  87, *supra*.

12       Similarly, the uncontroverted evidence admitted at trial shows that MPO via Next Century

13  learned about and downloaded ONgDB v3.4 from iGov's website.  *See* Fact Nos. 92-95, *supra*.

14  After Plaintiffs released Neo4j® EE v3.5, Next Century went back to Suhy to seek information

15  about the release of ONgDB v3.5, which led to the MPO to using infringing ONgDB v3.5 for free

16  instead of paying for a commercial license to Neo4j® EE v3.5.  *See* Fact Nos. 96-104, *supra*.  This

17  resulted in Neo4j USA losing $2,370,598 in net licensing revenue when the MPO chose ONgDB

18  over paying for a commercial subscription to Neo4j® EE.  *See* Fact Nos. 98-111, *supra*.

19       Finally, Defendants argued at trial that any damages award should be reduced pursuant to 17

20  U.S.C. §1203(c)(5)(A) because Suhy was an "innocent infringer" based on Suhy's testimony at

21  trial that he believed his removal of the Commons Clause was preventing the infringement of the

22  FSF's copyright.  In addition to this not being believable because Suhy was not a credible witness,

23  the Court already addressed and rejected the same argument in determining labiality on summary

24  judgment.  Dkt. No. 216 at 20:17-21:24.

25       Even still, Defendants could not meet their burden of proof under this section at trial because

26  they ***stipulated and admitted*** that Suhy knowingly distributed Neo4j® EE source code after

27  removing the Commons Clause and Neo4j Sweden's other CMI Software License "with the

28  understanding that it would result in the infringement of Neo4j Sweden's copyrights." Dkt. No.

227, UDF No. 60.  Suhy also admitted that he continued to promote and distribute infringing ONgDB software *after* the Court first determined that Sections 7 and 10 of the Neo4j Sweden Software License prohibited the removal of the Commons Clause as a "further restriction" and *after* the Court entered the Stipulated Judgment and Permanent Injunction against GFI.  *See* TX147 and Trial Tr. 375:17-378:12; *see also Neo4j, Inc. v. Graph Found., Inc.*, 2020 WL 6700480, at *4 (rejecting the argument that it is not possible for a "contractually permitted action" to have been "taken with knowledge that it would aid infringement" under the DMCA).

The Court therefore rejects any notion that Defendants were unaware and had no reason to believe that their acts constituted a violation of the DMCA.  The evidence makes clear that Defendants knew that their removal of Neo4j Sweden's CMI would facilitate the infringement of Neo4j Sweden's copyrights in Neo4j® EE in a commercial setting.  *See Mango v, BuzzFeed, Inc.*, 970 F.3d 167, 172-73 (2nd Cir. 2020) (affirming damages and attorneys' fee award based on district court's finding that defendant violated the DMCA by distributing the photo knowing that the photographer's CMI had been removed and knowing that distributing it with a false credit would conceal that defendant did not have authority to use the photo).

### D.   Plaintiffs Are Entitled to Recover their Actual Damages and the Disgorgement of Defendants' Profits Obtained via their Violations of the Lanham Act and DMCA

Upon establishing a violation of the Lanham Act, "the plaintiff shall be entitled … to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a).  Under the Lanham Act, actual damages sustained by a plaintiff can include commercial injury, such as lost sales.  *See Clorox Co.*, 398 F. Supp. 3d at 644 ("Lost sales for the plaintiff because of the defendant's false advertising is the 'paradigmatic direct injury from false advertising.'") (internal citations omitted). Commercial injury is presumed "when defendant and plaintiff are direct competitors and defendant's misrepresentation has a tendency to mislead consumers." *TrafficSchool.com*, 653 F.3d at 826; *see also Lexmark*, 572 U.S. at 138 ("diversion of sales to a direct competitor may be the paradigmatic direct injury from false advertising").

A plaintiff may recover an infringing defendant's profits under the Lanham Act in two scenarios: (1) as a measure of the plaintiff's own damages; or (2) on a theory of disgorgement of

1   the defendant's unjustly obtained profits.  *See Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407

2   (9th Cir. 1993), *abrogated on other grounds by SunEarth, Inc. v. Sun Earth Solar Power Co.*, 839

3   F.3d 1179 (9th Cir. 2016); *see also Quia Corp. v. Mattel, Inc.*, No. C 10-1902 JF HRL, 2011 WL

4   2749576, at *7 (N.D. Cal. July 14, 2011).   In either scenario, a plaintiff need only prove

5   "defendant's gross profits from the infringing activity with reasonable certainty." *Quia Corp.*, 2011

6   WL 2749576, at *8.  The defendant then "must prove all elements of cost or deduction claimed."

7   15 U.S.C. § 1117(a).

8        Under the DMCA, Plaintiffs may also recover "the actual damages suffered … as a result of

9   the violation, **and** any profits of the violator that are attributable to the violation and are not taken

10  into account in computing the actual damages."  17 U.S.C. § 1203(c)(2) (emphasis added).  Actual

11  damages may consist of lost licensing fees and renewal fees, as well as lost profits.  *See Polar Bear*

12  *Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 707-708 (9th Cir. 2004) (affirming an actual damages

13  award based on the copyright holder's actual price quote to the infringer).  A plaintiff may also

14  recover hypothetical-license damages as actual damages. *Id.*  The Court has the discretion to award

15  prejudgment interest.  *Id.* at 718.

16       With respect to disgorgement, a plaintiff must only prove a defendant's gross revenue in

17  establishing defendant's ill-gotten profits.  *See Netdragon Websoft, Inc. v. Toft*, 2012 WL

18  13008123, at *3 (C.D. Cal. Apr. 24, 2012).  Defendant must then prove their deductible expenses

19  and the elements of profit attributable to factors other than the wrongful conduct. *Id.*  If a defendant

20  fails to present such proof, "the gross [revenue] figure stands as the defendant's profits." *Enter.*

21  *Tech. Holdings, Inc. v. Noveon Sys.*, Inc., No. 05-CV-2236 W (CAB), 2008 WL 11338356, at *15

22  (S.D. Cal. July 29, 2008) (internal quotes and citation omitted).

23       As detailed above and in the Court's May 18, 2021 summary judgment order, Defendants'

24  use of the Neo4j Mark in relation to their promotion of "Neo4j Enterprise," "Neo4j for

25  Government" and similar uses of the Neo4j Mark, as well as their use of the Neo4j Mark in the

26  promotion of ONgDB constituted trademark infringement in violation of Sections 1114(1) and

27  1125(a) of the Lanham Act.  Likewise, statements made by Defendant in promoting ONgDB and

28  their support services of users of that software constituted false advertising and false designation

1   of origin in violation of Section 1125(a) of the Lanham Act.

2         Plaintiffs' DMCA claim is based, in part, on Defendants' unauthorized removal of the

3   Commons Clause, which prohibited the non-paying public from engaging in commercial resale and

4   certain commercial support services, and removal of Neo4j Sweden's other CMI from the software

5   license governing the source code for Neo4j® EE v3.4 and Neo4j® EE v3.5.  Defendants then

6   redistributed that source code containing the DMCA violations as rebranded ONgDB v3.4 and

7   ONgDB v3.5 software to commercial users and offered paid support services to those users, or

8   otherwise caused that source code containing the DMCA violations to be redistributed via their

9   iGov and Graphstack websites, and GFI's website and GitHub repository.

10         Defendants distributed that source code as ONgDB without Neo4j Sweden's CMI with the

11   specific intent of providing an open-source, restriction-free version of the software in violation of

12   the Neo4j Sweden Software License.  Defendants intentionally did so to profit off providing paid

13   support services – in direct contradiction to the commercial restrictions in the missing Commons

14   Clause – based off the savings users would gain by not paying Plaintiffs for a commercial license

15   for Neo4j® EE.

16         In light of Defendants stipulating to the amount of net lost licensing revenue damages

17   amounts and underlying foundational facts (Dkt. No. 234), the Court finds that Neo4j USA

18   established with reasonable certainty that Defendants' aforementioned violations of the Lanham

19   Act and DMCA directly caused Neo4j USA to lose **$2,370,598** in net licensing revenue after Next

20   Century and the MPO adopted ONgDB for free rather than pay for commercial subscription for

21   Neo4j® EE.  *See* Fact Nos. 99-111, *supra*.  Plaintiffs also established with reasonable certainty that

22   Defendants' aforementioned violations of the Lanham Act and DMCA also directly caused Neo4j

23   USA to lose **$3,069,646** in net licensing revenue due to the IRS's widespread adoption and use of

24   ONgDB in a number of servers and projects under the improper license in lieu of purchasing

25   commercial licenses for Neo4j® EE from Neo4j USA.  *See* Fact Nos. 68-87, *supra*.  Consequently,

26   the Court awards Plaintiffs **$5,440,244** in actual damages under 15 U.S.C. § 1117(a) of the Lanham

1    Act and 17 U.S.C. § 1203(c)(2) of the DMCA.[4]

2         In addition, the evidence admitted at trial clearly shows that Defendants generated

3    **$1,316,000** in illicit profits providing support services under a 5-year contract to build and support

4    the IRS' CKGE platform using infringing ONgDB.  *See* Fact Nos. 51-59, *supra*.  This evidence

5    also shows that Defendants generated **$246,082.55** in illicit profits under the iGov's subcontracts

6    with ASR, which involved the use and support of ONgDB at the IRS.  *See* Fact Nos. 60-67, *supra*.

7    As detailed above, the paid support work performed by Defendants under the CKGE Contract and

8    the ASR subcontracts relating to Neo4j® EE software would have otherwise violated the

9    commercial restrictions imposed by the Commons Clause that Defendants removed without Neo4j

10   Sweden's authorization.  At trial, Defendants did not offer evidence of any deductible expenses to

11   offset these amounts earned as a direct result of their violations of the Lanham Act and DMCA.

12   Consequently, the Court awards **$1,562,082.55** to Plaintiffs as a disgorgement remedy pursuant to

13   15 U.S.C. § 1117(a) of the Lanham Act and 17 U.S.C. § 1203(c)(2) of the DMCA.

14        **E.    Plaintiffs Are Entitled to Recover their Attorneys' Fees and Costs under the**

15              **Lanham Act and DMCA**

16        In exceptional Lanham Act cases, the Court may award reasonable attorneys' fees to the

17   prevailing party.  District courts analyzing a request for fees under the Lanham Act should examine

18   the "totality of the circumstances" to determine if the case was exceptional.  *See SunEarth, Inc*.,

19   839 F.3d at 1181.  District courts may exercise equitable discretion and consider nonexclusive

20   factors including, "frivolousness, motivation, objective unreasonableness (both in the factual and

21   legal components of the case) and the need in particular circumstances to advance considerations

22   of compensation and deterrence" based on the preponderance of the evidence. *Id*. (*quoting Octane

23   Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 fn 6, (2014)).

24        A case may be exceptional where the infringement was willful. *See Jason Scott Collection,

25   Inc. v. Trendily Furniture, LLC*, 68 F.4th 1203, 1223 fn 13 (9th Cir. 2023) ("[b]ecause the *SunEarth*

26

27   _____

     [4] The Court notes that there is substantial evidence to support this total amount of lost profits

28   under either the Lanham Act or the DMCA.

1  test is less stringent than the previous 'willful infringement' standard, it stands to reason that this

2  case of willful infringement would satisfy the *SunEarth* test"); *Sophia & Chloe, Inc. v. Brighton*

3  *Collectibles, Inc*., 2019 WL 1429588, at *7 (S.D. Cal. Mar. 29, 2019) (recognizing that inequitable

4  conduct or willful infringement still may make a case exceptional under *SunEarth*).   Willful

5  infringement occurs where a defendant engages in deliberate, false, misleading, or fraudulent

6  conduct.  *Lindy Pen*, 982 F.2d at 1406.  The Ninth Circuit has also stated willful infringement as

7  "attempting to gain the value of an established name of another." *Id*.

8        The DMCA allows for an award of "reasonable attorney's fee to the prevailing party." 17

9  U.S.C. § 1203(b)(5).   In deciding whether the award of attorney's fees is appropriate in cases

10  brought under the Copyright Act, courts consider factors including "frivolousness, motivation,

11  objective unreasonableness (both in the factual and in the legal components of the case) and the

12  need in particular circumstances to advance considerations of compensation and deterrence."

13  *Fogerty v. Fantasy, Inc*., 510 U.S. 517, 534 fn 19 (1994); *see also Unicom Systems, Inc. v. Farmers*

14  *Group, Inc*., 405 F. App'x 152, 155 (9th Cir. 2010) (approving of use of the *Fogerty* factors in

15  determining whether to award fees under Section 1203(b)(5)).   Courts will award a plaintiff its

16  attorneys' fees where defendant's violations of the DMCA were willful.  *See, e.g., Sony Computer*

17  *Entm't Am., Inc. v. Divineo, Inc*., 457 F. Supp. 2d 957, 967 (N.D. Cal. 2006); *Dish Network, L.L.C.*

18  *v. SatFTA*, No. 5:08-CV-01561 JF PSG, 2011 WL 856268, at *7 (N.D. Cal. Mar. 9, 2011).

19        The Court finds this case to be exceptional under the Lanham Act warranting an award of

20  Plaintiffs' attorneys' fees. As noted above, Defendants did not use "Neo4j" to refer to Plaintiffs'

21  products.  Instead, they used it to create the misleading perception that Defendants' products *were*

22  Plaintiffs' products."  *Neo4j, Inc. v. PureThink, LLC*, 2021 WL 2483778, at *11-13.  The evidence

23  makes clear that Defendants intended to convince consumers to buy Defendants' products instead

24  of Neo4j® EE commercial licenses; in other words, Defendants used the Neo4j Mark to unfairly

25  compete with Plaintiffs.  This constitutes willful infringement because Defendants clearly sought

26  to gain the value of the established name of Neo4j.  *Lindy Pen*, 982 F.2d at 1406. Defendants also

27  knowingly engaged in false advertising through the intentional removal of the commercial

28  restrictions by replacing the Neo4j Sweden Software License with the AGPL. Defendants' false

statements actually deceived consumers, such as the IRS, Next Century and the MPO.

Defendants' removal of the Commons Clause in order to commercially use and support ONgDB also establishes their intentional violation of the DMCA. Suhy did so without Neo4j Sweden's authorization under the false premise the Neo4j Sweden Software License permitted licensees to remove "further restrictions," i.e. the Commons Clause, imposed by Neo4j Sweden as the copyright holder and original licensor. Defendants also continued to facilitate the use of ONgDB containing DMCA violations and to support the commercial use of ONgDB at the IRS *after* this Court first determined that Defendants could not remove the Commons Clause from the Neo4j Sweden Software License.

Finally, Defendants have litigated this case in an unreasonable manner. Defendants repeatedly sought to reassert legal arguments, claims and defenses that the Court previously dismissed with prejudice or otherwise determined to be meritless. For example, Defendants argued in opposition to Plaintiffs' summary judgment motion that Neo4j USA's "misrepresentations of time of use, ownership of trademark and failure to correct those misrepresentations is unclean hands under the PTO's standards." Dkt. No. 188 at 7:9-17, 19:16-19. These were the same facts underpinning their twice-stricken cancellation/fraud on the PTO defense. Dkt. Nos. 70, 110. In doing so, the Court warned Defendants and their counsel that "Defendants *are not permitted* to reassert any affirmative defense or counterclaim in this action based on the cancellation or abandonment theories asserted in the stricken defenses." Dkt. No. 110 at 6:1-4 (emphasis added).

Defendants improperly sought to re-litigate the issue of whether Neo4j USA misrepresented that it was the owner of the trademark rights to the Neo4j® Mark to the PTO. This issue was conclusively resolved after the Court granted summary judgment in favor of Neo4j USA during Phase 1 and the Ninth Circuit's affirmation thereof. *Neo4j, Inc. v. PureThink, LLC*, 2021 WL 2483778, at *6-10. Relying on the same intercompany license between Neo4j Sweden and Neo4j USA, Defendants asserted the same facts and arguments in opposition to Plaintiffs' second summary judgment motion and attempted to do so at trial in support of their unclean hands defense.

Defendants sought to reargue that the "further restrictions" provision in Sections 7 and 10 of the Neo4j Sweden License permitted them to remove the Commons Clause, mischaracterized

Hopkins & Carley
Attorneys At Law
San Jose ♦ Palo Alto

4878-9639-7699.8
- 33 -
PLAINTIFFS' AMENDED [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW      CASE NO. 5:18-CV-07182-EJD

this Court's May 18, 2021 Order as an interlocutory order that is subject to reconsideration.  *See,*
*e.g.,* Dkt. No. 188 at 10:6-16:24.  Defendants also sought to use an alleged expert witness to re-
litigate this Court's interpretation of Sections 7 and 10 of the Neo4j Sweden Software License after
the Ninth Circuit affirmed that interpretation.  Thus, requiring Plaintiffs to file a *Daubert* Motion
seeking to preclude that expert from improperly testifying about the meaning of those provisions
and his inadmissible interpretation of the same, which the Court granted. *See* Dkt. No. 181, 186
189, 216.  In doing so, Defendants inexcusably refused to acknowledge that their unsuccessful
appeal of this Court's ruling on that issue barred them from rearguing these trademark ownership
and contractual interpretation issues as the law of the case. *See Herrington*, 12 F.3d at 904; *Aquino*,
2018 WL 3845718, at *1.

Defendants' attempt to re-litigate the interpretation of the Neo4j Sweden Software License
also violates their prior stipulation (and the resulting order).  On September 2, 2021, the parties
stipulated to narrowing the scope of their claims to streamline Phase 2, and the Court adopted that
stipulation as an order.  *See* Dkt. Nos. 133, 144.  Defendants therein agreed that should the Ninth
Circuit affirm that ruling, they would no longer pursue and would take all necessary steps to dismiss
their Seventh Cause of Action for Declaratory Relief, which sought a determination as to whether
Neo4j Sweden AB's inclusion of Common Clause in the Neo4j Sweden Software License violated
its terms and Suhy's right to remove it as a "further restriction." *Id*. at 3:1-9.

After the Ninth Circuit affirmed this Court's interpretation of the Neo4j Sweden Software
License (Dkt. Nos. 140, 141), Defendants stipulated to dismiss their Seventh Cause of Action for
Declaratory Relief (Dkt. No. 72, ¶¶ 62-69), and Fifth, Sixth and Thirteenth Affirmative Defenses
(Dkt. No. 91 at 19:9-20:9, 22:22-24:5).  Dkt. No. 144 at 1:23-28.  In doing so, Defendants ***expressly***
***admitted their positions were "no longer legally viable."***  Dkt. No. 144 at 1:23-28 (emphasis
added).  Defendants were thus estopped from rearguing the interpretation of the relevant provisions
of the Neo4j Sweden Software License and the AGPL based on their prior stipulations and judicial
admissions made therein. *See United States v. Real Property Located at 22 Santa Barbara Drive*,
264 F.3d 860, 873 (9th Cir. 2001) (stipulation meets the fully litigated requirement where it is clear
that the parties intended the stipulation to adjudicate once and for all the issue or claim); *see also*

Hopkins & Carley
Attorneys At Law
San Jose ♦ Palo Alto

4878-9639-7699.8
- 34 -
PLAINTIFFS' AMENDED [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW      CASE NO. 5:18-CV-07182-EJD

*American Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988) (recognizing "under federal law, stipulations and admissions in the pleadings are generally binding on the parties and the Court").

Finally, Defendants' unreasonableness and bad faith litigation tactics continued at trial. For example, Suhy provided testimony at trial that directly contradicted stipulated facts. *See, e.g.,* Trial Tr. at  Suhy also perjured himself several times at trial. *See* Fn 1 and Fn 2, *supra*. Defendants also sought to yet again re-litigate the interpretation of Sections 7 and 10 of the Neo4j Sweden Software License to argue that any damages award should be reduced pursuant to 17 U.S.C. §1203(c)(5)(A) because Suhy was an "innocent infringer." Trial Tr. at 192:1-202:9. They offered a blog on the FSF's website, which was published on November 14, 2023 – the same day trial began – and a cease and desist letter sent by the FSF to Neo4j USA on November 13, which was inexplicably forwarded to Defendants' counsel on November 22, 2023. *Id.* Defendants offered these exhibits to make the same failed argument used to justify offering Mr. Kuhn as an "expert" on the meaning of "further restrictions." *Id.*

Aside from being clearly inadmissible hearsay, based on the timing these documents were created, it appeared that Defendants colluded with the FSF to manufacture *ex post facto* evidence for trial. Trial Tr. at 192:1-202:9. Indeed, no explanation was provided as to why the FSF suddenly appeared interested in the Neo4j Sweden Software License when the admitted evidence shows that Suhy notified the FSF in May and June of 2018 of Neo4j Sweden's use of the AGPL as the basis for the Neo4j Sweden Software License. *See* TX61 (Depo Ex. 22), TX62 (Depo Ex. 23), TX65 (Depo Ex. 24) and Dkt. No. 210, Ex. 1 at 169:3-170:3, 182:11-184:10, 187:12-188:15, 189:1-191:3, 192:18-193:24, 195:17-196:1, 196:22-201:16. Likewise, the evidence shows that Suhy sent the Court's November 13, 2020 order in the GFI action wherein it determined that Sections 7 and 10 did not permit a down-stream licensee to remove the Commons Clause as further restriction to the FSF, and offered to assist the FSF in intervening. TX147 and Trial Tr. at 375:17-378:5.

Defendants' failure to comply with the Court's prior orders, ignoring their prior stipulations, and "persistent desire to re-litigate issues already decided" makes this an exceptional case thereby entitling Plaintiffs to recover their attorneys' fees. *See San Diego Comic Convention*, 807 F. App'x

at 676.  Accordingly, the Court grants Plaintiffs leave to file a motion for attorneys' fees and costs.

The Court also has the discretion to award prejudgment interest, and willful violations of the Lanham Act are reasons for doing so.  *See Fitness Anywhere LLC v. WOSS Enterprises LLC*, No. 14-CV-01725-BLF, 2018 WL 6069511, at *7 (N.D. Cal. Nov. 20, 2018) (court awarded pre-judgment interest based on the 52-week T-Bill rate, compounded annually due to the willful and deliberate nature of defendant's infringement of plaintiff's mark).   For same reasons making this case exceptional, the Court will award Plaintiffs prejudgment interest.  *See Fitness Anywhere*, 2018 WL 6069511, at *7.  In this regard, the parties stipulated that the amount of prejudgment interest accrued through December 1, 2023 was $390,861.  *See* Fact Nos. 59, 88, 112, *supra*.  The Court grants Plaintiffs leave to provide a declaration from Mr. Boyles on final prejudgment interest calculations between December 2, 2023 and the date of entry of judgment.

**F.    The Court Finds that Counsel for Defendants are Jointly and Severally Responsible for a Portion of Plaintiffs' Attorneys' Fees and Costs**

In cases where attorneys' fees are awarded, the Court may make the non-prevailing party's attorneys jointly and severally liable for the payment thereof pursuant to 28 U.S.C. § 1927.  *See Int'l Intell. Mgmt. Corp. v. Lee Yunn Enterprises*, Inc. (U.S.A.), No. CV 08-7587 R JWJX, 2009 WL 9137315, at *3–4 (C.D. Cal. Dec. 14, 2009).  Under Section 1927, the Court has the inherent authority to order the attorney for the non-prevailing party to compensate a prevailing party if the attorney "so multiplies the proceedings in any case unreasonably and vexatiously...." 28 U.S.C. § 1927. In such a case, the Court may order the non-prevailing attorney to "satisfy personally the excess costs, expenses and attorneys' fees reasonably incurred because of such conduct."  Section 1927 is not limited to patent law, and the regional circuit law controls the analysis of whether to impose Section 1927 sanctions against a party in a patent infringement case. *See, e.g., Phonometrics, Inc. v. Westin Hotel Co.*, 350 F.3d 1242, 1246 (Fed. Cir. 2003).

In the Ninth Circuit, a court may award fees under Section 1927 on a showing of subjective bad faith, which may be met where counsel "'knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent.'" *B.K.B. v. Maui Police Department*, 276 F.3d 1091, 1107 (9th Cir. 2002) (*quoting In re Keegan Mgmt. Co., Sec. Lit.*, 78

F.3d 431, 436 (9th Cir. 1996)). Thus, sanctions are available when counsel either knowingly or recklessly asserts a frivolous claim or defense. *Id.* Section 1927 permits a prevailing party to recover "the excess costs, expenses and attorneys' fees reasonably incurred" caused by opposing counsel's misconduct. *Int'l Intell. Mgmt. Corp.*, 2009 WL 9137315, at *3–4.

In its March 3, 2021 Order Granting Plaintiff's Motion to Strike, the Court declined to sanction Defendants' counsel for having no good faith basis to reassert the same two previously stricken affirmative defenses. Dkt. No. 110. However, the Court warned counsel that it "expect[ed] that Defendants will only advance claims and defenses that are supported by law and evidence and will generally adhere to the proper standard of practice in Federal Court." *Id. at* 7:1-12.

The Court finds that Defendants' counsel has knowingly and recklessly re-litigated settled issues in complete disregard of the Court's orders granting Plaintiffs' dispositive motions, their prior stipulations, and the preclusive effect of their appeal of the Court's summary judgment order, *See* 28 U.S.C. § 1927; *see also*, *B.K.B.,* 276 F.3d at 1107; *Int'l Intell. Mgmt. Corp.*, 2009 WL 9137315, at *3–4. In particular, counsel for Defendants acted in bad faith when they ignored the application of the law of the case doctrine and the case law cited by Plaintiffs making it clear that their interlocutory appeal foreclosed the re-litigation of this issue. *See* Dkt. No. 181 at 7:15-12:8 (citing *Herrington*, 12 F.3d at 904 and *Aquino*, 2018 WL 3845718, at *1). This was not the first time that Defendants ignored the law of the case doctrine. Dkt. No. 110 at 5:16-27, 6:22-7:6. The fact that Counsel for Defendant tried to introduce manufactured evidence at trial to yet again litigate this issue further illustrates their unreasonable and vexatious litigation tactics.

Counsel for Defendants' wanton disregard of this Court's orders and controlling Ninth Circuit authority has unnecessarily increased the costs of this litigation. Accordingly, Defendants and their counsel should be joint and severally responsible for payment of Plaintiffs' attorneys' fees incurred in conjunction with the following:

   a. Plaintiffs' Motion to Strike (Dkt. Nos. 93-96);

   b. Plaintiffs' Motion to Strike the Report and Exclude the Testimony of Defendants' Expert Witness Bradley M. Kuhn (Dkt. Nos. 181, 186, 189);

   c. Plaintiff's Motion for Summary Judgment (Dkt. Nos. 183, 188, 191);

d.   Plaintiffs' pretrial filings and preparation for trial; and

e.   All trial and post-trial proceedings.

Plaintiffs' forthcoming motion for attorneys' fees and costs shall provide the specific amounts of fees and costs incurred with the foregoing.

**G.    Plaintiffs are Entitled to Injunctive Relief under the Lanham Act and DMCA**

The Lanham Act vests the Court with the "power to grant injunctions according to principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right" of the trademark owner. 15 U.S.C. § 1116(a); *see Century 21 Real Estate LLC v. Ed/Var Inc.*, 2014 WL 3378278, at *6 (N.D. Cal. July 10, 2014). Generally, where "a plaintiff demonstrates a likelihood of confusion, it is generally presumed that the plaintiff will suffer irreparable injury if injunctive relief is not granted." *Sun Microsystems, Inc. v. Microsoft Corp.*, 999 F. Supp. 1301, 1311 (N.D. Cal. 1998). Since the Court previously found that Defendants' violations of the Lanham Act were likely to cause confusion and did cause actual confusion, it shall make the preliminary injunction entered on May 18, 2021 permanent as enumerated below. Dkt. No. 118 at 8:13-9:1, 19:2-22:10, 31:20-32:10, 33:3-10 (citing *Sun Microsystems*, 999 F. Supp. at 1311).

The DMCA provides that the Court "may grant temporary and permanent injunctions on such terms as it deems reasonable to prevent or restrain a violation" of Section 1202(b). 17 U.S.C. § 1203(b)(1); *see also Apple Inc. v. Psystar Corp.,* 673 F. Supp. 2d 943, 948 (N.D. Cal. 2009), *aff'd*, 658 F.3d 1150 (9th Cir. 2011). To obtain injunctive relief, a plaintiff must show that: (1) it has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction. *See eBay Inc. v. MercExchange*, L.L.C., 547 U.S. 388, 391 (2006); *accord Apple Inc.,* 673 F. Supp. 2d at 948 (citing same).

In the Court's October 25, 2023 summary judgment order (Dkt. No. 216), the Court found that Defendants' violations of the DMCA have and will continue to cause Plaintiffs to suffer irreparable injury from the ongoing damage resulting from the proliferation of improperly licensed ONgDB and its derivatives such as GraphStack and GDB. *See Apple*, 673 F. Supp. 2d at 948

1    (recognizing that monetary damages would not prevent defendant from continuing to infringe

2    plaintiff's copyrights and violate the DMCA in the future, and will not prevent third-parties from

3    infringing plaintiff's copyrights); *accord Michael Grecco Prods., Inc. v. WrapMarket, LLC*, 2017

4    WL 10434020, at *4 (C.D. Cal. Nov. 8, 2017) (irreparable injury exists where infringement harms

5    the competitive position and market share of the copyrighted work).

6         As detailed above, there is compelling evidence that Plaintiffs have suffered a loss to control

7    over licensing of the commercial licensing of Neo4j® EE as result of Defendants' unauthorized

8    "relicensing" of that software under the AGPL and falsely calling ONgDB a free and unrestricted

9    drop-in replacement for official Neo4j® EE.   It is also clear that Defendants will continue to do

10   so, as evidenced by the IRS's continued use of GDB and Suhy's maintenance thereof, unless

11   enjoined by the Court.

12        Further, the balance of hardships favors Neo4j USA because an injunction would serve the

13   narrow purpose of preventing or restraining further infringement of Neo4j Sweden's copyrights

14   and violations of the DMCA; and Defendants cannot "claim any legitimate hardships as a result of

15   being enjoined from committing unlawful activities." *Apple*, 673 F. Supp. 2d at 950.   A permanent

16   injunction "would serve no purpose other than to vindicate the legitimate rights of [Neo4j Sweden]

17   in its copyrights." *Apple*, 673 F. Supp. 2d at 950.   "Such equitable relief would not harm the

18   interests of the public; rather, consistent with the policies underlying copyright protection, an

19   injunction preventing [Defendants] from continuing to commit infringing and illegal, if not

20   criminal, acts under the Copyright Act and DMCA would ensure that the public will continue to

21   benefit from the creative fruits of [Neo4j Sweden's] labor. *Id.* The public interest is further served

22   by preventing Defendants from inducing unsuspecting customers to use improperly licensed

23   software in violation of Neo4j Sweden's copyright.

24        Accordingly, the Court HEREBY ORDERS that Defendants PureThink LLC, iGov Inc. and

25   John Mark Suhy, and their owners, shareholders, principals, agents, managers, officers, directors,

26   members, agents, contractors, servants, employees, successors, assigns, and all those acting under

27   their direction, control or on their behalf, as well as any entity that is spun-off from or formed by

28   them, or acquires or merges with any Defendant (collectively "Defendants") are PERMANENTLY

ENJOINED pursuant to 17 U.S.C. § 1203(b)(1) and 15 U.S.C. § 1116(a) as follows:

1.      Defendants shall not make further use of, or fork any source code first released under the Neo4j Sweden Software License, including Neo4j® Enterprise Edition 3.4, Neo4j® Enterprise Edition 3.5, or any subsequent subversions or derivatives thereof.

2.      Defendants shall not make further use of, reverse engineer, decompile, recompile or fork any source code first released under a commercial license by Plaintiffs, including Neo4j® Enterprise Edition 3.5, Neo4j® Enterprise Edition version 4.x, Neo4j® Enterprise Edition version 5.x, or any subsequent versions, subversions or derivatives thereof.

3.      Defendants shall not make further use of or offer for sale ONgDB, GraphStack GDB and GDB (and any derivative or similar software created and/or maintained by Defendants), or any other software containing Neo4j® Enterprise Edition source code with a DMCA Violation[5] or that was first released subject to the Neo4j Sweden Software License.

4.      Defendants shall not offer for sale, advertise, promote, represent or refer to ONgDB GraphStack GDB and GDB (and any derivative or similar software created and/or maintained by Defendants), or any other software containing Neo4j® Enterprise Edition source code with a DMCA Violation or that was first released subject to the Neo4j Sweden Software License as follows:

a.  A free and open source drop-in replacement of Neo4j® Enterprise Edition distributions with the same version number;

b.  A drop-in replacement for commercially licensed Neo4j® Enterprise Edition;

c.  A drop-in replacement for Neo4j® Enterprise Edition under the GNU Affero General Public License, version 3 ("AGPLv3"), without limitations on causal cluster instances, cores, or production usage;

---

[5] As detailed above and in the Court's October 25, 2023 summary judgment order (Dkt. No. 216), Defendants' removal, replacement and/or omission of the Commons Clause, and related copyright management information identifying Neo4j Sweden as the copyright owner and licensor from source code to which Neo4j Sweden AB holds the copyrights constitutes what is referred to herein as the "DMCA Violation."

d.  A fork of the Neo4j® graph database platform that adds enterprise code back into Neo4j® core; and

e.  One hundred percent (100%) free and open source version of Neo4j® Enterprise Edition version 3.4, Neo4j® Enterprise Edition version 3.5, or any version of Neo4j® Enterprise Edition released by Neo4j thereafter.

5.      Defendants shall not state, claim, advertise, or represent that Neo4j Sweden AB's inclusion of the Commons Clause to the license governing Neo4j® Enterprise Edition violates the terms of the AGPLv3 or make similar statements interpreting the terms of the AGPLv3, and/or infringes FSF's copyrights therein.

6.      Defendants shall not state, claim, advertise or represent that the Free Software Foundation ("FSF") or that any person, entity or government agency obtained a legal determination and/or obtained a legal opinion confirming that (a) the inclusion of the Commons Clause to any license governing Neo4j® Enterprise Edition violated the terms of AGPLv3; and/or (b) the Commons Clause can be removed from any software license governing Neo4j® Enterprise Edition and/or ONgDB.

7.      Defendants may only make further use of the following publicly available Neo4j® open source code, subject to the terms of their respective open source licenses: (i) Neo4j® Community Edition Source Code under the GNU General Public License, version 3 ("GPL"); (ii) Neo4j® Enterprise Edition version 3.2.14 source code released under the AGPLv3; (iii) Neo4j® Enterprise Edition version 3.3.10 source code released under the AGPLv3; (iv) Neo4j® Enterprise Edition version 3.4.0.RC02 source code released under the AGPLv3.  Nothing herein, however, shall be construed as a license or otherwise permit Defendants to use any source code, patches or source code commits for Neo4j® Enterprise Edition version 3.3 or Neo4j® Enterprise Edition version 3.4 that were first released under the Neo4j Sweden Software License.  Further, nothing herein shall be construed as a license or otherwise permit Defendants to use or fork, any of Plaintiffs' source code that was first released as Neo4j® Enterprise Edition version 3.5 or otherwise under the Neo4j Sweden Software License, including but not limited to, all beta releases, release

candidates, production releases, stable releases, and official releases, or any subsequent versions, subversions, patches or derivatives thereof.

8.      Within three (3) days of entry of this Permanent Injunction, Defendants shall remove, take down, destroy and prevent further access to all source code, object code, binaries, build files, build scripts, plug-ins and distributions from any and all public and private repositories (e.g., Docker, GitHub and GitLab) that they have access to, control and/or maintain, including but not limited to https://hub.docker.com/repository/docker/graphstack/ongdb, https://hub.docker.com/repository/docker/graphstack/gdb, https://github.com/graphstackio/gdb, that contains any Neo4j® Enterprise Edition source code with a DMCA Violation or that was first released subject to the Neo4j Sweden Software License.  This includes, but is not limited to the removal of (i) ONgDB version 3.4, ONgDB version 3.5, ONgDB version 3.6, ONgDB version 4.x, ONgDB version 2.x, and any versions or subversions thereof; (ii) GraphStack GDB version 3.4, GraphStack GDB version 3.5, GraphStack GDB version 3.6, GraphStack GDB version 4.x, and any versions or subversions thereof; and (iii) GDB version 3.4, GDB version 3.5, GDB version 3.6, GraphStack GDB version 4.x, and any versions or subversions thereof.

9.      Within three (3) days of entry of this Permanent Injunction, Defendants shall permanently remove, take down, destroy and prevent further access to any version of ONgDB, GraphStack GDB and GDB (and any derivative or similar software created and/or maintained by Defendants) that is within their possession, custody or control, contains any Neo4j® Enterprise Edition source code with a DMCA Violation or that was first released subject to the Neo4j Sweden Software License, including but not limited to: (i) ONgDB version 3.4, ONgDB version 3.5, ONgDB version 3.6, ONgDB version 4.x, ONgDB version 2.x, and any versions or subversions thereof; (ii) GraphStack GDB version 3.4, GraphStack GDB version 3.5, GraphStack GDB version 3.6, GraphStack GDB version 4.x, and any versions or subversions thereof; and (iii) GDB version 3.4, GDB version 3.5, GDB version 3.6, GraphStack GDB version 4.x, and any versions or subversions thereof.  This removal and destruction shall be effectuated regardless of where that code resides, e.g., Defendants' websites (i.e., https://igovsol.com/, https://purethink.com/,

1   https://graphstack.io/), and any the Content Delivery Services invoked therein), AWS, AWS Gov

2   Cloud, Docker, GitHub, GitLab and/or any other source code repository or hosting service.

3       10.     Within three (3) days of entry of this Permanent Injunction, Defendants shall take

4   down, delete and otherwise permanently remove all webpages, posts on GitHub, posts on

5   discussion forums, social media posts on Twitter, Facebook, Instagram or similar social media sites,

6   and blog posts (and all links thereto) that they own, control, or have the ability and/or right to

7   remove that directs, redirects, offers, advertises, promotes, represents or refers to ONgDB,

8   GraphStack GDB, GDB (and any derivative or similar software created and/or maintained by

9   Defendants that is within their possession, custody or control) or any other software containing

10  Neo4j® Enterprise Edition source code with a DMCA Violation or that was first released subject

11  to the Neo4j Sweden Software License.

12      11.     Within three (3) days of entry of this Permanent Injunction, Defendants shall (a)

13  take down, delete and otherwise permanently remove all webpages, posts on GitHub, posts on

14  discussion forums, social media posts on Twitter, Facebook, Instagram or similar social media sites,

15  and blog posts (and all links thereto) that they own, control, or have the ability and/or right to

16  remove wherein they reference Plaintiffs, their licensing policies and practices, (b) make the same

17  or similar statements referenced in Paragraph 4 above, or (c) use the Neo4j® Mark.  Defendants

18  also shall not use the Neo4j® Mark as a hashtag on their respective websites or in any posts made

19  on Twitter, Facebook or similar social media sites.

20      12.     Within seven (7) days of entry of this Permanent Injunction, Defendants shall

21  identify in writing any known third-party commercial and/or governmental use of any version of

22  ONgDB containing any Neo4j Enterprise Edition source code with a DMCA Violation, that was

23  first released subject to the Neo4j Sweden Software License, or not otherwise permitted for use by

24  Paragraph 7.

25      13.     Within fourteen (14) days of entry of this Permanent Injunction, Defendants shall

26  provide a certification from the Internal Revenue Service (IRS) that all versions of ONgDB,

27  GraphStack GDB and GDB, and all other source code and software that contains any Neo4j®

28  Enterprise Edition source code with a DMCA Violation or that was first released subject to the

Neo4j Sweden Software License has been removed from the Internal Revenue Service's internal servers and repositories (i.e. GitLab and GitHub) and cloud storage (i.e. Gov Cloud).  This includes, but is not limited to the removal of (i) ONgDB version 3.4, ONgDB version 3.5, ONgDB version 3.6, ONgDB version 4.x, ONgDB version 2.x, and any versions or subversions thereof; (ii) GraphStack GDB version 3.4, GraphStack GDB version 3.5, GraphStack GDB version 3.6, GraphStack GDB version 4.x, and any versions or subversions thereof; and (iii) GDB version 3.4, GDB version 3.5, GDB version 3.6, GDB version 4.x, and any versions or subversions thereof.

14.     Defendants shall not offer for sale or provide for any paid development, support, maintenance or hosting services for ONgDB, GraphStack GDB, GDB (and any derivative or similar software created and/or maintained by Defendants), or any other software containing Neo4j® Enterprise Edition source code with a DMCA Violation or that was first released subject to the Neo4j Sweden Software License.  However, nothing herein prevents Defendants from offering paid consulting services for installations of Neo4j® Enterprise Edition software, but only where the customer receiving such services has a commercial license and has fully paid the commercial license fees to Plaintiffs.  Should Defendants continue to offer consulting services for ONgDB, Graphstack or GDB alongside consulting services with Neo4j® software as permitted herein, then any advertising of Defendants' services related to Neo4j® software is subject to adhering to Plaintiffs' then-current Trademark Policy.

15.     Defendants shall not make any statement and/or representations to any third party, affirmatively or in response to an inquiry, that state or imply that they can provide access to or can obtain any software containing any Neo4j® Enterprise Edition source code with a DMCA Violation or that is subject to the Neo4j Sweden Software License.

16.     Within three (3) days of entry of this Permanent Injunction, Defendants shall take down, delete and otherwise permanently remove all webpages, posts on GitHub, posts on discussion forums, social media posts on Twitter, Facebook, Instagram or similar social media sites, and blog posts (and all links thereto) that claim or assert that (a) Plaintiffs have misrepresented Neo4j USA's ownership of the Neo4j Mark in the United States; (b) Plaintiffs have deceived or sought to deceive its investors concerning the ownership of their intellectual property, including its

copyrights and trademarks related to the Neo4j® graph database platform; (c) Plaintiffs have or sought to deceive its actual and potential customers regarding the licensing of the Neo4j® graph database platform; and (d) Plaintiffs have sought to defraud or have defrauded the United States Government, its departments or its agencies.

17.     Defendants shall not to disparage, or cause others to disparage, Plaintiffs and/or their officers, directors, employees, contractors and agents, in any manner likely to be harmful to their business, business reputation, or personal reputation, including statements that suggest or assert that (a) Plaintiffs have misrepresented Neo4j USA's ownership of the Neo4j Mark in the United States; (b) Plaintiffs have deceived or sought to deceive its investors concerning the ownership of their intellectual property, including its copyrights and trademarks related to the Neo4j® graph database platform; (c) Plaintiffs have or sought to deceive its actual and potential customers regarding the licensing of the Neo4j® graph database platform; and (d) Plaintiffs have sought to defraud or have defrauded the United States Government, its departments or its agencies.

18.     Defendants shall not have any expressed or implied license to use and shall not make any further use of any of Plaintiffs' trademarks, including U.S. Trademark Registration No. 4775253 for "CYPHER," Trademark Registration No. 4784280 for "NEO4J," U.S. Trademark Registration No. 4824877 for "NEO TECHNOLOGY," U.S. Trademark Registration No. 5250026 for the Neo4j Logo, and U.S. Trademark Application No. 90056224 for "NEO4J" (collectively "Plaintiffs' US Marks"), other than what is permitted in Paragraph 19.

19.     If Defendants continue to attempt to fork any of Plaintiffs' source code subject to the terms herein, their description of that source code and/or software, if it includes the Neo4j® Mark, may only be made by the following statement:

> [ONgDB] [Graphstack] [GDB] (or any equivalent) is an independent fork
> of [Neo4j® Enterprise Edition version 3.2.14, Neo4j® Enterprise Edition
> version 3.3.10, and/or Neo4j® Enterprise Edition Source Code version
> 3.4.0.RC02 licensed under the AGPLv3 and/or Community Edition
> licensed under the GPL].   [ONgDB] [Graphstack] [GDB] (or any
> equivalent) and [Defendants to insert name of specific Defendant(s)] is not

1    affiliated in any way with Neo4j, Inc. or Neo4j Sweden AB.  Neo4j, Inc.

2    and Neo4j Sweden AB do not sponsor or endorse "[ONgDB] [Graphstack]

3    [GDB] (or any equivalent) and [Defendants to insert name of the specific

4    Defendant(s)].   Neo4j Sweden AB is the owner of the copyrights for

5    Neo4j® software and commercial use of any source code from Neo4j®

6    Enterprise Edition beyond [Neo4j® Enterprise Edition version 3.2.14,

7    Neo4j® Enterprise Edition version 3.3.10, and/or Neo4j® Enterprise

8    Edition Source Code version 3.4.0.RC02] is prohibited and could subject

9    the user to claims of copyright infringement.

10       20.    Defendants shall not make use of, or direct others to use, any of Plaintiffs'

11   documents or materials, such as software documentation, guides, manuals, change logs, release

12   notes and/or other publicly available technical information to create, maintain, market, use, and/or

13   sell ONgDB (or the equivalent). Any links to Plaintiffs' documentation in Defendants' software

14   shall be removed, or replaced with ONgDB documentation, bearing in mind that Plaintiffs'

15   documentation is licensed under the Creative Commons Attribution-NonCommercial-ShareAlike

16   4.0 International (CC BY-NC-SA 4.0) and its use by third parties, such as Defendants and their

17   customers, would be restricted to noncommercial purposes.

18   Dated:  January 19, 2024                 HOPKINS & CARLEY
                                              A Law Corporation
19

20                                           By: */s/ Jeffrey M. Ratinoff*
                                                John V. Picone III
21                                              Jeffrey M. Ratinoff
                                                Attorneys for Plaintiffs and
22                                              Counter-Defendants
                                                NEO4J, INC. and NEO4J SWEDEN AB
23

24       **IT IS SO ORDERED AND ADJUDICATED**

25

26   Dated:  _____

27                                           _____
                                                Honorable Edward J. Davila
28