# EXHIBIT 8

```
                UNITED STATES DISTRICT COURT
                NORTHER DISTRICT OF CALIFORNIA



NEO4J, INC., a Delaware
corporation; and NEO4J
SWEDEN AB, a Swedish
corporation,                         CASE NO.
                                     5:18-cv-07182-EJD
              Plaintiffs,
vs.
PureThink, LLC, a Delaware
limited liability company;
IGOV, INC., a Virginia
corporation; and JOHN MARK
SUHY, an individual,
              Defendants.
_____/


 REMOTE VIDEOTAPED DEPOSITION OF JOHN MARK SUHY, JR.
   INDIVIDUALLY AND AS PERSON MOST KNOWLEDGEABLE
        PURSUANT TO FED. R. CIV. P. 30(b)(1)
           FOR IGOV INC. AND PURETHINK LLC


DATE:           November 29, 2022

TIME:           8:06 a.m. PST

LOCATION:       Via Zoom Videoconference

REPORTED        KAREN L. BUCHANAN
BY:             CSR No. 10772
                CLR No. 031106-04
```

1

                           --oOo--

            THE VIDEOGRAPHER:  Good morning.  We are now on the remote video record, ladies and gentlemen, on Tuesday, November 29th, 2022.  The time on the video screen is 8:06 a.m. Pacific time.

            My name is Carey Mook.  I'm in association with Bell & Myers Court Reporters in San Jose, California.  The phone number is (408)287-7500.

            This is in the matter pending before the United States District Court, Northern District of California, in the case captioned Neo4j, Inc., et al, versus PureThink LLC, et al., Case No. 5:18-cv-07182-EJD.

            This is the beginning of media No. 1, Volume I of the personal and 30(b)(6) deposition by John Mark Suhy.  This deposition is being taken on behalf of the plaintiffs and is being held over Zoom videoconference.

            Starting with the questioning attorney, I will ask counsel to identify yourselves and whom you represent and if co-counsel or your client are in attendance, and then the Court Reporter will administer the oath.

            MR. RATINOFF:  Yes.  This is Jeffrey Ratinoff for Plaintiffs Neo4j Inc. and Neo4j Sweden

                                                              7

1  AB.  Although he's not on the line right now, my
2  other counsel at Hopkins & Carley, John Picone, will
3  also be attending at some point today.
4         MR. BEENE:  Adron Beene, Jr., for
5  Defendants John Mark Suhy, PureThink LLC and iGov
6  Inc.  Mr. Suhy is in attendance today as the
7  deponent.
8                    JOHN MARK SUHY, JR.,
9  being duly sworn by the Certified Shorthand Reporter
10 to tell the truth, the whole truth, and nothing but
11 the truth, testified as follows:
12                 EXAMINATION BY MR. RATINOFF:
13     Q.  Good morning, Mr. Suhy.  How are you?
14     A.  Good morning.  I'm good.  How about you?
15     Q.  I'm well, thank you.  You have been deposed
16 in this case before, correct?
17     A.  Yes.
18     Q.  And do you remember at the beginning of the
19 depo we talked about some ground rules about how the
20 deposition is going to proceed?
21     A.  Yes.
22     Q.  Okay.  I just want to go through them real
23 quick, since you have been deposed before.
24         We're going to proceed in a
25 question-and-answer format.  It's important that you

8

1    allow me to finish my question and then pause so if
2    your counsel has any objections he can assert those,
3    and then you can go ahead and answer unless you're
4    instructed not to answer a particular question.  Do
5    you understand this?
6         A.  Yes.
7         Q.  And then your testimony is going to be
8    reported in booklet form.  You'll have a chance to
9    review that testimony once the transcript is issued,
10   and you can make any corrections that you believe
11   need to be made.  Do you understand?
12        A.  Yes.
13        Q.  And if you do make corrections, I'll be
14   able to use those corrections and ask you about them
15   at trial if we use your deposition testimony at
16   trial.  Do you understand this?
17        A.  Yes, I do.
18        Q.  And we're going to go ahead and we're going
19   to be deposing you both in your personal capacity --
20   do you understand what that means?
21        A.  Not exactly.
22        Q.  Okay.  That means what you personally know,
23   your personal knowledge.  Do you understand what I
24   mean by that?
25        A.  Yes.

9

1          A.   Yes.  And they also are stored in Spark,
2    and you can store graph models in post-grids.  Graph
3    models --
4          Q.   I understand that, but I'm asking
5    specifically about ONgDB.  Amongst other things, you
6    can store graph models in ONgDB?
7          A.   I don't know if I would use that
8    terminology, but yes.
9          Q.   I'm just repeating what you testified to.
10         A.   I said that you can store data that's in a
11   graph model in ONgDB, so -- but storing graph
12   models, the way that you're saying it doesn't make
13   sense, is what I'm saying.  But I think I understand
14   what you're saying.  I just don't want to answer you
15   if I'm assuming you're saying one thing.  I've
16   learned that.
17              But you can store graph models on plain
18   text.  You can store it in CSVs.  You can store them
19   in any different data formats or data -- databases,
20   date sources.
21         Q.   ONgDB being one of them?
22         A.   Yes.  ONgDB, Neo4j, Spark.
23         Q.   Thank you.  I just asked about ONgDB.
24              So looking at Period of Performance on the
25   first page, it looks like the base here was

284

1    exercised as well as this option year 1, being this
2    document.
3            To your knowledge, has option year 2 been
4    exercised for this task?
5        A.   Not with us, it hasn't been, from what I
6    remember.
7        Q.   What do you mean by not from us?
8        A.   This contract, there is no -- I don't think
9    they were exercising this anymore, this contract.
10       Q.   Okay.  Did you complete the option year 1
11   through 9/29/2022?
12       A.   I believe -- I believe so.
13       Q.   Graystones didn't take over this contract
14   during option year 1?
15           (Reporter interruption.)
16   BY MR. RATINOFF:
17       Q.   Graystones.
18       A.   Graystones didn't take over anything.  They
19   have a new contract, from what I understand.  So
20   that's what I'm saying.  I believe this contract is
21   still active.
22       Q.   You're still doing work under this on
23   behalf of iGov?
24       A.   No.  I'm not doing anything as iGov
25   anymore.

285

1    Q.  So this contract, to your knowledge, has
2  been -- has it been assigned to Graystones, this
3  task order?
4    A.  It has not been assigned.  I believe they
5  have a new contract that they negotiated.
6    Q.  Are you performing work for ASR on behalf
7  of Graystones?
8    A.  Yes.  I'm an employee of Graystones, yep.
9  And I -- I'm still -- I'm still someone that has the
10 expertise, so they come to me under Graystones.
11   Q.  Are you performing work on behalf of
12 Graystones for emerging compliance issues as
13 described in this task order?
14   A.  Well, they have a separate task order, so I
15 would have to see what theirs are.  They have a
16 contract that's new, I believe.  And I don't know
17 what theirs -- what they -- what theirs says.
18   Q.  So you don't know what task you're working
19 under for Graystones with respect to ASR?
20   A.  Well, I know that -- I know that whenever
21 we're given work, we usually will dedicate a certain
22 amount of time for each of the -- like ECI is one of
23 them.  And that corporate -- the corporate tool, the
24 one that you referenced with -- Tylor Data Source is
25 another one.  So it's really just time that we help

286

1   out and offer consulting or advice.  And whenever we
2   do that, we put in the time for that, and it is time
3   tracked.
4       Q.   Time tracked by ASR?
5       A.   I believe by ASR and by Graystones in
6   separate systems.
7       Q.   And you submit your time to those entities?
8       A.   I submit my time to Graystones, yes.  And I
9   believe that they're synched with ASR, yes.  Yes to
10  both.
11      Q.   And prior to doing work for Graystones on
12  task orders for ASR, did you submit your time
13  directly to ASR?
14      A.   Yes.  And we did not have a time system.
15  We used theirs.  iGov used theirs to track time.  So
16  everything was entered into theirs.  It wasn't
17  entered into one and then sent with another.
18      Q.   And let me go ahead and show you what's
19  previously marked as Exhibit 141.
20      A.   I've got that open.
21      Q.   Okay.  Do you recognize what was previously
22  marked as Exhibit 141?
23      A.   Yes.
24      Q.   What is this document?
25      A.   It's a Subcontractor Task Order No. 0002

287

1  graph.  I don't know if they're using ONgDB.  If
2  they are, I would think that they would have -- you
3  know, they would be following the rules for it.  But
4  it might be Neo4j Community.  I'm not positive.  But
5  I would have thought that it would have been a
6  version of ONgDB, if that's what they were using at
7  that time.  I don't know.  That's -- AtomRain would
8  know.
9       Q.  To your knowledge, is AtomRain still
10 working on this project?
11      A.  Yes.
12      Q.  Under a separate contract with ASR?
13      A.  I believe they have a contract with ASR.
14      Q.  And did you receive -- did you have to do
15 work under this task order in the base year, 2020 to
16 2021?
17      A.  Yes.
18      Q.  And did you do work in option year 1 under
19 this task order?
20      A.  Yes, I believe so.
21      Q.  You billed that time to ASR, correct?
22      A.  Yes.
23      Q.  And did you complete option year 1 through
24 September 2022?
25      A.  I don't know if I completed it.  If I -- I

292

would have to look at my time sheets to see when --
the last time I actually worked on it under this
contract.

Q. The reason being that Graystones took over the work on corporate graph database for iGov?

A. I don't know if they took over. They have a new contract, from what I understand. This contract I believe is still active. I'm just not working on it. I'm not focusing on iGov.

Q. But you're working on the corporate graph database now on behalf of Graystones, correct?

A. Yes. A very small amount of time. 30 minutes sometimes in a day. Nothing major.

AtomRain is the core developer on that.

Q. And then for your work for ASR, you would receive a 1099 reflecting your compensation, correct?

A. I believe so. Everyone should be given 1099s.

Q. Okay. I'm going to mark what's been marked as 517. It's been a while. I think we're up to 219 (sic).

A. Yes, I have that open. I'm looking at it.

(Reporter interruption.)

(Plaintiffs' Exhibit 220 was marked for

293

1  Air Force Advanced Battle Management Systems IDIQ
2  contract?
3       A.  I'm seeing this now.  I don't remember ever
4  seeing this.
5       Q.  So you're not doing any work for Graystones
6  on any Air Force contracts currently?
7       A.  Yeah.  I'm trying to think if they have a
8  contract with the Air Force at all.  No, not that
9  I -- not that I -- I don't think so.
10      Q.  Did you do any work for Graystones in 2021?
11      A.  I don't believe so.
12      Q.  Are you doing any work for Graystones in
13  2022?
14      A.  Well, I'm an employee now.
15      Q.  When did you become an employee in 2022?
16      A.  I don't remember the exact date.
17          MR. RATINOFF:  Okay.  Let me go ahead and
18  put the next exhibit in the tab.  I'm sorry.  The
19  next tab is 522.  This will be marked as
20  Exhibit 233.
21          (Plaintiffs' Exhibit 233 was marked for
22  identification.)
23          THE WITNESS:  Yes, I have that open.
24  BY MR. RATINOFF:
25      Q.  Do you recognize what's been marked as --

343

1    believe that these pay stubs reflect what was
2    deposited in your account -- don't -- I'm sorry.
3    Strike that.
4            So you have no reason to believe that these
5    pay stubs are not accurate, other than you just said
6    you needed to check your bank account?
7        A.  Yeah.  I'd need to check my bank account.
8    Then I can tell you if they're accurate.
9        Q.  But you wouldn't think that Graystones
10   would issue you inaccurate pay stubs, correct?
11       A.  I wouldn't think they would, but I don't
12   know about Paychex.  There could be any sort of bug
13   in their system.
14       Q.  Of course.
15       A.  I don't understand what "Year to Date," why
16   that's so high.  That's what I'm saying.
17       Q.  When did you start working for Graystones?
18       A.  I don't remember.  It was in 2022, you
19   know, in the past few months.
20       Q.  Okay.  Looking at --
21       A.  I don't know exactly.
22       Q.  Let's look at the bottom.  Do you see the
23   first pay stub here, it says pay period of May 16th,
24   2022, to May 31st, 2022?  Do you see that?
25       A.  That sounds right.  And just to confirm, I

did work for them in 2019.  I'm talking about just my employment in 2022.  It sounds like May then would be when I started.

Q.  Okay.  So now that you know it's May, so that's approximately six months ago, do you think that the gross earnings of $35,830 is accurate?

A.  I would have to look at this and calculate it.  I don't want to say if it's accurate or not.

Q.  And you don't know what your salary is?

A.  No, I don't remember.  Because we had an agreement that I would have a lower salary, and then it would go up.  And so I don't know what the salary is at this time.  It was a salary that would move, depending on certain goals.  So that's why.  It's not that I don't know my salary, what we agreed upon.  It starts off at one point, and then it slowly grows.  I have no idea what it's at right now.

Q.  What's the work that you were doing for Graystones between May 2022 and November 2022?

A.  A lot of work.  Consulting, building up the new product, doing business development.  Basically anything to help them grow.

Q.  And is that -- does that include work under the ASR task orders we've previously discussed?

348

1      A.   No.  They have new task orders that --
2 they're something different.  I believe you have
3 them.
4      Q.   But you're doing work under those new task
5 orders for Graystones, correct?
6      A.   Yes.
7      Q.   And that work would be included in this --
8 in your salary under your employment agreement?
9      A.   It should.  I don't know how you'd
10 associate that, because I'm on a salary now,
11 salaried.
12     Q.   Did you enter into an agreement with
13 Graystones about assigning your iGov task orders
14 issued by SR as part of your agreement to come on
15 board as an employee with Graystones?
16     A.   No.  I believe I offered that.  It wasn't
17 a -- it wasn't a part of any deal.  And I don't
18 believe that anything was ever actually assigned.  I
19 believe they ended up just going in and getting
20 their own contracts.
21     Q.   Why would you give up your iGov contracts
22 to work for Graystones?
23     A.   I made a promise that I would be only
24 dedicated to them, so there is no reason for me to
25 focus on iGov right now.

349

```
 1            MR. BEENE:  As stated under the
 2   stipulation.
 3            MR. RATINOFF:  Yes.
 4            MR. BEENE:  Okay.
 5            MR. RATINOFF:  And as provided by the
 6   Federal Rules of Procedure.
 7            THE VIDEOGRAPHER:  Okay.  Jeffrey, do you
 8   have a video order?
 9            MR. RATINOFF:  Yeah.  I'd like the video
10   and also the transcript.  I'd like a rush on the
11   transcript itself.  I won't need the video for a
12   while.
13            THE VIDEOGRAPHER:  Okay.  Okay.  This is
14   the end of video 1 of 1 and concludes today's
15   proceedings.  We are now off the record.  The time
16   is 6:36.
17            (Whereupon, the deposition of JOHN MARK
18   SUHY, JR., individually and as 30(b)(6), was
19   adjourned at 6:36 p.m. PST.)
20
21                       --o0o--
22
23
24
25
```

                                                                    408

DECLARATION OF DEPONENT

I, JOHN MARK SUHY, JR., declare under penalty of perjury that I have reviewed the foregoing transcript; that I have made any corrections, additions, or deletions in my testimony that I deemed necessary; and that the foregoing is a true and correct transcription of my testimony in this matter.

Dated this _____ day of _____, 2022, at _____, _____.
    [City]                    [State]

_____
JOHN MARK SUHY, JR.

409

REPORTER'S CERTIFICATE

The undersigned Certified Shorthand Reporter licensed in the State of California does hereby certify:

I am authorized to administer oaths or affirmations pursuant to Code of Civil Procedure, Section 2093(b), and prior to being examined, the witness was duly administered an oath by me.

I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in the outcome of this action.

I am the deposition officer who stenographically recorded the testimony in the foregoing deposition, and the foregoing transcript is a true record of the testimony given by the witness.

Before completion of the deposition, review of the transcript [x] was [^ ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

In witness whereof, I have subscribed my name this 5th day of December, 2022.

_____
Karen L. Buchanan, CSR 10772

410